# EXHIBIT B-3

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

# Figures

M:\clients\EMSI\westlake\2015\Comp Report\WL-Fig-1-gen-loc.dwg

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM



MISSOURI

AREA SHOWN

SCALE IN MILES

N

Figure 1

General Location Map

West Lake Landfill Superfund Site

EMSI   Engineering Management Support, Inc.

M:\clients\EMSI\westlake\2015\Comp Report\WL-Fig-2-Fac-Layout.dwg

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM



Legend

━━━━━ Operable Unit-1 Areas
╌╌╌╌╌ Operable Unit-2 Areas

0        800
SCALE IN FEET

N

Figure 2

Facility Layout

West Lake Landfill Superfund Site

EMSI    Engineering Management Support, Inc.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

# EXHIBIT 4

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM



U.S. | Tue Nov 22, 2016 | 8:59pm EST

# EPA delays cleanup proposal for radioactive waste in Missouri

   

The U.S. government said on Tuesday it was delaying indefinitely its proposal for how to clean up or seal off radioactive soil buried in a St. Louis-area landfill adjacent to another waste site where an underground fire has been smoldering for several years.

The postponement by the Environmental Protection Agency, citing lags in receiving "technical documents" needed to formulate its plan, drew an outcry from local officials angry at the potential public health hazard posed by the site.

A remediation plan for the West Lake Landfill in Bridgeton, Missouri, about 20 miles (32 km) northeast of St. Louis, had been expected from the EPA by the end of this year.

But the EPA decided to "extend the timeline" to allow for further documentation and review by experts, the agency said. No new deadline was set.

"Given the complexity of this site and potential community impacts, we must ensure that sound science is driving our decision-making," EPA regional chief Mark Hague said.

The West Lake site, originally used for agriculture, became a limestone quarry in 1939. But starting in the 1950s, portions of the area were used to dispose of municipal refuse, industrial wastes and construction debris.

In 1973, some 8,700 tons of leached radioactive barium sulfate from the Manhattan Project, the World War Two-era atomic bomb-development program, were mixed with 38,000 tons of soil used to cover trash dumped at the site, according to the EPA.

In 1990, the landfill and neighboring waste-disposal facilities occupying a total of 200 acres (80 hectares) were designated by the EPA as a single Superfund site.

Adding to concerns, a slow-burning chemical fire has been smoldering since 2010 beneath the surface of the adjacent Bridgeton Landfill, coming within 1,200 feet (365 meters) of the West Lake Landfill.

http://www.reuters.com/article/us-missouri-landfills-idUSKBN13I050

The company that operates both landfills, acting under EPA orders, has since installed a barrier system of heat-extraction wells and other safeguards to keep the fire from reaching the radioactive waste.

The EPA is now deciding whether to proceed with one of three remediation options for West Lake - permanently cap the waste and keep it isolated underground; remove some of the waste and leave a portion of it buried; or excavate all the waste.

St. Louis County Executive Steve Stenger expressed anger at the EPA's postponement on Tuesday.

"It is extremely disappointing and hard to believe that there is yet another delay in EPA's cleanup of the West Lake Landfill," he said. "It is time for a permanent solution."

(Reporting by Steve Gorman in Los Angeles; Editing by Peter Cooney)

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

# EXHIBIT 5

Case: 4:27-cv-00164-CDP   Doc. #: 1-8   Filed: 01/28/22   Page: 9 of 903 PageID #: 1690

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

expenses incident to scholastic activities; or (B) furnishing transportation for citizens of such foreign country who desire to attend American schools and institutions of higher learning in the continental United States, Hawaii, Alaska (including the Aleutian Islands), Puerto Rico, and the Virgin Islands, and whose attendance will not deprive citizens of the United States of an opportunity to attend such schools and institutions: *Provided, however,* That no such agreement or agreements shall provide for the use of an aggregate amount of the currencies, or credits for currencies, of any one country in excess of $20,000,000 or for the expenditure of the currencies, or credits for currencies, of any one foreign country in excess of $1,000,000 annually at the official rate of exchange for such currencies, unless otherwise authorized by Congress, nor shall any such agreement relate to any subject other than the use and expenditure of such currencies or credits for currencies for the purposes herein set forth: *Provided further,* That for the purpose of selecting students and educational institutions qualified to participate in this program, and to supervise the exchange program authorized herein, the President of the United States is hereby authorized to appoint a Board of Foreign Scholarships, consisting of ten members, who shall serve without compensation, composed of representatives of cultural, educational, student and war veterans groups, and including representatives of the United States Office of Education, the United States Veterans' Administration, State educational institutions, and privately endowed educational institutions: *And Provided further,* That in the selection of American citizens for study in foreign countries under this paragraph preference shall be given to applicants who shall have served in the military or naval forces of the United States during World War I or World War II, and due consideration shall be given to applicants from all geographical areas of the United States. The Secretary of State shall transmit to the Congress not later than the 1st day of March of each year a report of operations under this paragraph during the preceding calendar year. Such report shall include the text of any agreements which have been entered into hereunder during the preceding calendar year, and shall specify the names and addresses of American citizens who are attending schools or institutions of higher learning in foreign countries pursuant to such agreements, the names and locations of such schools and institutions, and the amounts of the currencies or credits for currencies expended for any of the purposes under this paragraph in each such foreign country during the preceding calendar year."

Approved August 1, 1946.

*Transportation for citizens of foreign countries.*

*Restriction on use of funds.*

*Board of Foreign Scholarships.*

*Veteran preference.*

*Report to Congress.*

---

[CHAPTER 724]

## AN ACT

For the development and control of atomic energy.

August 1, 1946
[S. 1717]
[Public Law 585]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

## DECLARATION OF POLICY

*Atomic Energy Act of 1946.*

SECTION 1. (a) FINDINGS AND DECLARATION.—Research and experimentation in the field of nuclear chain reaction have attained the stage at which the release of atomic energy on a large scale is practical. The significance of the atomic bomb for military purposes is evident. The effect of the use of atomic energy for civilian purposes upon the social, economic, and political structures of today cannot now be determined. It is a field in which unknown factors are involved. Therefore, any legislation will necessarily be subject to revision from

Case 4:27-cv-00024-CDP Doc #: 1-8 Filed: 01/29/21 Page: 10 of 903 PageID #: 1691

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

time to time. It is reasonable to anticipate, however, that tapping this new source of energy will cause profound changes in our present way of life. Accordingly, it is hereby declared to be the policy of the people of the United States that, subject at all times to the paramount objective of assuring the common defense and security, the development and utilization of atomic energy shall, so far as practicable, be directed toward improving the public welfare, increasing the standard of living, strengthening free competition in private enterprise, and promoting world peace.

*Major programs.* (b) Purpose of Act.—It is the purpose of this Act to effectuate the policies set out in section 1 (a) by providing, among others, for the following major programs relating to atomic energy:

*Private research.* (1) A program of assisting and fostering private research and development to encourage maximum scientific progress;

*Control of information.* (2) A program for the control of scientific and technical information which will permit the dissemination of such information to encourage scientific progress, and for the sharing on a reciprocal basis of information concerning the practical industrial application of atomic energy as soon as effective and enforceable safeguards against its use for destructive purposes can be devised;

*Federal research and development.* (3) A program of federally conducted research and development to assure the Government of adequate scientific and technical accomplishment;

*Government control of material.* (4) A program for Government control of the production, ownership, and use of fissionable material to assure the common defense and security and to insure the broadest possible exploitation of the fields; and

*Administration.* (5) A program of administration which will be consistent with the foregoing policies and with international arrangements made by the United States, and which will enable the Congress to be currently informed so as to take further legislative action as may hereafter be appropriate.

## ORGANIZATION

Sec. 2. (a) Atomic Energy Commission.—

*Members.* (1) There is hereby established an Atomic Energy Commission (herein called the Commission), which shall be composed of five members. Three members shall constitute a quorum of the Commission. The President shall designate one member as Chairman of the Commission.

*Appointment.* (2) Members of the Commission shall be appointed by the President, by and with the advice and consent of the Senate. In submitting any nomination to the Senate, the President shall set forth the experience and the qualifications of the nominee. The term of office of each member of the Commission taking office prior to the expiration of two years after the date of enactment of this Act shall expire upon the expiration of such two years. The term of office of each member of the Commission taking office after the expiration of two years from the date of enactment of this Act shall be five years, except that (A) the terms of office of the members first taking office after the expiration of two years from the date of enactment of this Act shall expire, as designated by the President at the time of appointment, one at the end of three years, one at the end of four years, one at the end of five years, one at the end of six years, and one at the end of seven years, after the date of enactment of this Act; and (B) any member appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed, shall be appointed for the remainder of such term. Any member of the Commission may be removed by the President for inefficiency, neglect of duty, or

*Term of office.*

Case 4:17-cv-00024-CDP Doc #: 1-8 Filed: 01/29/21 Page 1 of 903 PageID #: 1602

malfeasance in office. Each member, except the Chairman, shall receive compensation at the rate of $15,000 per annum; and the Chairman shall receive compensation at the rate of $17,500 per annum. No member of the Commission shall engage in any other business, vocation, or employment than that of serving as a member of the Commission.

(3) The principal office of the Commission shall be in the District of Columbia, but the Commission or any duly authorized representative may exercise any or all of its powers in any place. The Commission shall hold such meetings, conduct such hearings, and receive such reports as may be necessary to enable it to carry out the provisions of this Act.

(4) There are hereby established within the Commission—

(A) a General Manager, who shall discharge such of the administrative and executive functions of the Commission as the Commission may direct. The General Manager shall be appointed by the President by and with the advice and consent of the Senate, and shall receive compensation at the rate of $15,000 per annum. The Commission may make recommendations to the President with respect to the appointment or removal of the General Manager.

(B) a Division of Research, a Division of Production, a Division of Engineering, and a Division of Military Application. Each division shall be under the direction of a Director who shall be appointed by the Commission, and shall receive compensation at the rate of $14,000 per annum. The Director of the Division of Military Application shall be a member of the armed forces. The Commission shall require each such division to exercise such of the Commission's powers under this Act as the Commission may determine, except that the authority granted under section 3 (a) of this Act shall not be exercised by the Division of Research.

(b) GENERAL ADVISORY COMMITTEE.—There shall be a General Advisory Committee to advise the Commission on scientific and technical matters relating to materials, production, and research and development, to be composed of nine members, who shall be appointed from civilian life by the President. Each member shall hold office for a term of six years, except that (1) any member appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed, shall be appointed for the remainder of such term; and (2) the terms of office of the members first taking office after the date of the enactment of this Act shall expire, as designated by the President at the time of appointment, three at the end of two years, three at the end of four years, and three at the end of six years, after the date of the enactment of this Act. The Committee shall designate one of its own members as Chairman. The Committee shall meet at least four times in every calendar year. The members of the Committee shall receive a per diem compensation of $50 for each day spent in meetings or conferences, and all members shall receive their necessary traveling or other expenses while engaged in the work of the Committee.

(c) MILITARY LIAISON COMMITTEE.—There shall be a Military Liaison Committee consisting of representatives of the Departments of War and Navy, detailed or assigned thereto, without additional compensation, by the Secretaries of War and Navy in such number as they may determine. The Commission shall advise and consult with the Committee on all atomic energy matters which the Committees deems to relate to military applications, including the development, manufacture, use, and storage of bombs, the allocation of fissionable material for military research, and the control of information relating to the manufacture or utilization of atomic weapons. The Commission shall

*[Marginal notes:]*
Compensation.

Engaging in other business.

Office in D. C.

General Manager.

Divisions, directors.

Exercise of Commission's powers.

Civilian members.

Terms of office.

Per diem compensation; expenses.

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

keep the Committee fully informed of all such matters before it and the Committee shall keep the Commission fully informed of all atomic energy activities of the War and Navy Departments. The Committee shall have authority to make written recommendations to the Commission on matters relating to military applications from time to time as it may deem appropriate. If the Committee at any time concludes that any action, proposed action, or failure to act of the Commission on such matters is adverse to the responsibilities of the Departments of War or Navy, derived from the Constitution, laws, and treaties, the Committee may refer such action, proposed action, or failure to act to the Secretaries of War and Navy. If either Secretary concurs, he may refer the matter to the President, whose decision shall be final.

(d) APPOINTMENT OF ARMY AND NAVY OFFICERS.—Notwithstanding the provisions of section 1222 of the Revised Statutes (U. S. C., 1940 edition, title 10, sec. 576), section 212 of the Act entitled "An Act making appropriations for the Legislative Branch of the Government for the fiscal year ending June 30, 1933, and for other purposes", approved June 30, 1932, as amended (U. S. C., 1940 edition, title 5, sec. 59a), section 2 of the Act entitled "An Act making appropriations for the legislative, executive, and judicial expenses of the Government for the fiscal year ending June thirtieth, eighteen hundred and ninety-five, and for other purposes", approved July 31, 1894, as amended (U. S. C., 1940 edition, title 5, sec. 62), or any other law, any active or retired officer of the Army or the Navy may serve as Director of the Division of Military Application established by subsection (a) (4) (B) of this section, without prejudice to his commissioned status as such officer. Any such officer serving as Director of the Division of Military Application shall receive, in addition to his pay from the United States as such officer, an amount equal to the difference between such pay and the compensation prescribed in subsection (a) (4) (B) of this section.

*Authority to make recommendations.*

*Director of Division of Military Application.*

*47 Stat. 406.*

*28 Stat. 205.*

## RESEARCH

SEC. 3. (a) RESEARCH ASSISTANCE.—The Commission is directed to exercise its powers in such manner as to insure the continued conduct of research and development activities in the fields specified below by private or public institutions or persons and to assist in the acquisition of an ever-expanding fund of theoretical and practical knowledge in such fields. To this end the Commission is authorized and directed to make arrangements (including contracts, agreements, and loans) for the conduct of research and development activities relating to—

(1) nuclear processes;

(2) the theory and production of atomic energy, including processes, materials, and devices related to such production;

(3) utilization of fissionable and radioactive materials for medical, biological, health, or military purposes;

(4) utilization of fissionable and radioactive materials and processes entailed in the production of such materials for all other purposes, including industrial uses; and

(5) the protection of health during research and production activities.

*Authority of Commission.*

The Commission may make such arrangements without regard to the provisions of section 3709 of the Revised Statutes (U. S. C., title 41, sec. 5) upon certification by the Commission that such action is necessary in the interest of the common defense and security, or upon a showing that advertising is not reasonably practicable, and may make partial and advance payments under such arrangements, and may make available for use in connection therewith such of its equipment and facilities as it may deem desirable. Such arrangements shall contain such provisions to protect health, to minimize danger from explosion

*Post, p. 809.*

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

and other hazards to life or property, and to require the reporting and to permit the inspection of work performed thereunder, as the Commission may determine; but shall not contain any provisions or conditions which prevent the dissemination of scientific or technical information, except to the extent such dissemination is prohibited by law.

(b) RESEARCH BY THE COMMISSION.—The Commission is authorized and directed to conduct, through its own facilities, activities and studies of the types specified in subsection (a) above.

## PRODUCTION OF FISSIONABLE MATERIAL

SEC. 4. (a) DEFINITION.—As used in this Act, the term "produce", when used in relation to fissionable material, means to manufacture, produce, or refine fissionable material, as distinguished from source materials as defined in section 5 (b) (1), or to separate fissionable material from other substances in which such material may be contained or to produce new fissionable material. <span style="float:right">"Produce."</span>

(b) PROHIBITION.—It shall be unlawful for any person to own any facilities for the production of fissionable material or for any person to produce fissionable material, except to the extent authorized by subsection (c).

(c) OWNERSHIP AND OPERATION OF PRODUCTION FACILITIES.—

(1) OWNERSHIP OF PRODUCTION FACILITIES.—The Commission, as agent of and on behalf of the United States, shall be the exclusive owner of all facilities for the production of fissionable material other than facilities which (A) are useful in the conduct of research and development activities in the fields specified in section 3, and (B) do not, in the opinion of the Commission, have a potential production rate adequate to enable the operator of such facilities to produce within a reasonable period of time a sufficient quantity of fissionable material to produce an atomic bomb or any other atomic weapon.

(2) OPERATION OF THE COMMISSION'S PRODUCTION FACILITIES.— The Commission is authorized and directed to produce or to provide for the production of fissionable material in its own facilities. To the extent deemed necessary, the Commission is authorized to make, or to continue in effect, contracts with persons obligating them to produce fissionable material in facilities owned by the Commission. The Commission is also authorized to enter into research and development contracts authorizing the contractor to produce fissionable material in facilities owned by the Commission to the extent that the production of such fissionable material may be incident to the conduct of research and development activities under such contracts. Any contract entered into under this section shall contain provisions (A) prohibiting the contractor with the Commission from subcontracting any part of the work he is obligated to perform under the contract, except as authorized by the Commission, and (B) obligating the contractor to make such reports to the Commission as it may deem appropriate with respect to his activities under the contract, to submit to frequent inspection by employees of the Commission of all such activities, and to comply with all safety and security regulations which may be prescribed by the Commission. Any contract made under the provisions of this paragraph may be made without regard to the provisions of section 3709 of the Revised Statutes (U. S. C., title 41, sec. 5) upon certification by the Commission that such action is necessary in the interest of the common defense and security, or upon a showing that advertising is not reasonably practicable, and partial and advance

<div style="float:right; text-align:right">
Contracts.

Subcontracts.

Reports, etc.

Post, p. 809.
</div>

Case 4:17-cv-00024-CDP Doc #: 148-5 Filed: 01/29/21 Page 14 of 903 PageID #: 3695

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Determination of quantities.

payments may be made under such contracts. The President shall determine at least once each year the quantities of fissionable material to be produced under this paragraph.

(3) Operation of other production facilities.—Fissionable material may be produced in the conduct of research and development activities in facilities which, under paragraph (1) above, are not required to be owned by the Commission.

(d) Irradiation of Materials.—For the purpose of increasing the supply of radioactive materials, the Commission and persons lawfully producing or utilizing fissionable material are authorized to expose materials of any kind to the radiation incident to the processes of producing or utilizing fissionable material.

(e) Manufacture of Production Facilities.—Unless authorized by a license issued by the Commission, no person may manufacture, produce, transfer, or acquire any facilities for the production of fissionable material. Licenses shall be issued in accordance with such procedures as the Commission may by regulation establish and shall be issued in accordance with such standards and upon such conditions as will restrict the production and distribution of such facilities to effectuate the policies and purposes of this Act. Nothing in this section shall be deemed to require a license for such manufacture, production, transfer, or acquisition incident to or for the conduct of research or development activities in the United States of the types specified in section 3, or to prohibit the Commission from manufacturing or producing such facilities for its own use.

Licenses.

## CONTROL OF MATERIALS

Sec. 5. (a) Fissionable Materials.—

(1) Definition.—As used in this Act, the term "fissionable material" means plutonium, uranium enriched in the isotope 235, any other material which the Commission determines to be capable of releasing substantial quantities of energy through nuclear chain reaction of the material, or any material artificially enriched by any of the foregoing; but does not include source materials, as defined in section 5 (b) (1).

(2) Government ownership of all fissionable material.—All right, title, and interest within or under the jurisdiction of the United States, in or to any fissionable material, now or hereafter produced, shall be the property of the Commission, and shall be deemed to be vested in the Commission by virtue of this Act. Any person owning any interest in any fissionable material at the time of the enactment of this Act, or owning any interest in any material at the time when such material is hereafter determined to be a fissionable material, or who lawfully produces any fissionable material incident to privately financed research or development activities, shall be paid just compensation therefor. The Commission may, by action consistent with the provisions of paragraph (4) below, authorize any such person to retain possession of such fissionable material, but no person shall have any title in or to any fissionable material.

(3) Prohibition.—It shall be unlawful for any person, after sixty days from the effective date of this Act to (A) possess or transfer any fissionable material, except as authorized by the Commission, or (B) export from or import into the United States any fissionable material, or (C) directly or indirectly engage in the production of any fissionable material outside of the United States.

(4) Distribution of fissionable material.—Without prejudice to its continued ownership thereof, the Commission is authorized to distribute fissionable material owned by it, with or without charge, to applicants requesting such material (A) for the conduct of research or development activities either independently or under contract or

Research.

other arrangement with the Commission, (B) for use in medical therapy, or (C) for use pursuant to a license issued under the authority of section 7. Such material shall be distributed in such quantities and on such terms that no applicant will be enabled to obtain an amount sufficient to construct a bomb or other military weapon. The Commission is directed to distribute sufficient fissionable material to permit the conduct of widespread independent research and development activity, to the maximum extent practicable. In determining the quantities of fissionable material to be distributed, the Commission shall make such provisions for its own needs and for the conservation of fissionable material as it may determine to be necessary in the national interest for the future development of atomic energy. The Commission shall not distribute any material to any applicant, and shall recall any distributed material from any applicant, who is not equipped to observe or who fails to observe such safety standards to protect health and to minimize danger from explosion or other hazard to life or property as may be established by the Commission, or who uses such material in violation of law or regulation of the Commission or in a manner other than as disclosed in the application therefor.

*Medical therapy.*

*Post,* p. 764.

*Restrictions.*

(5) The Commission is authorized to purchase or otherwise acquire any fissionable material or any interest therein outside the United States, or any interest in facilities for the production of fissionable material, or in real property on which such facilities are located, without regard to the provisions of section 3709 of the Revised Statutes (U. S. C., title 41, sec. 5) upon certification by the Commission that such action is necessary in the interest of the common defense and security, or upon a showing that advertising is not reasonably practicable, and partial and advance payments may be made under contracts for such purposes. The Commission is further authorized to take, requisition, or condemn, or otherwise acquire any interest in such facilities or real property, and just compensation shall be made therefor.

*Acquisition of material outside U. S.*

*Post,* p. 809.

(b) SOURCE MATERIALS.—

(1) DEFINITION.—As used in this Act, the term "source material" means uranium, thorium, or any other material which is determined by the Commission, with the approval of the President, to be peculiarly essential to the production of fissionable materials; but includes ores only if they contain one or more of the foregoing materials in such concentration as the Commission may by regulation determine from time to time.

(2) LICENSE FOR TRANSFERS REQUIRED.—Unless authorized by a license issued by the Commission, no person may transfer or deliver, receive possession of or title to, or export from the United States any source material after removal from its place of deposit in nature, except that licenses shall not be required for quantities of source materials which, in the opinion of the Commission, are unimportant.

(3) ISSUANCE OF LICENSES.—The Commission shall establish such standards for the issuance, refusal, or revocation of licenses as it may deem necessary to assure adequate source materials for production, research, or development activities pursuant to this Act or to prevent the use of such materials in a manner inconsistent with the national welfare. Licenses shall be issued in accordance with such procedures as the Commission may by regulation establish.

(4) REPORTING.—The Commission is authorized to issue such regulations or orders requiring reports of ownership, possession, extraction, refining, shipment, or other handling of source materials as it may deem necessary, except that such reports shall not be required with respect to (A) any source material prior to removal from its place of deposit in nature, or (B) quantities of source materials which in the

Case 4:22-cv-00064-CDP Doc #: 1-5 Filed: 01/29/21 Page 16 of 903 PageID #: 3697
Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

opinion of the Commission are unimportant or the reporting of which will discourage independent prospecting for new deposits.

Source materials.

(5) ACQUISITION.—The Commission is authorized and directed to purchase, take, requisition, condemn, or otherwise acquire, supplies of source materials or any interest in real property containing deposits of source materials to the extent it deems necessary to effectuate the provisions of this Act. Any purchase made under this paragraph may be made without regard to the provisions of section 3709 of the Revised Statutes (U. S. C., title 41, sec. 5) upon certification by the Commission that such action is necessary in the interest of the common defense and security, or upon a showing that advertising is not reasonably practicable, and partial and advance payments may be made thereunder. The Commission may establish guaranteed prices for all source materials delivered to it within a specified time. Just compensation shall be made for any property taken, requisitioned, or condemned under this paragraph.

*Post*, p. 809.

Guaranteed prices.

(6) EXPLORATION.—The Commission is authorized to conduct and enter into contracts for the conduct of exploratory operations, investigations, and inspections to determine the location, extent, mode of occurrence, use, or conditions of deposits or supplies of source materials, making just compensation for any damage or injury occasioned thereby. Such exploratory operations may be conducted only with the consent of the owner, but such investigations and inspections may be conducted with or without such consent.

(7) PUBLIC LANDS.—All uranium, thorium, and all other materials determined pursuant to paragraph (1) of this subsection to be peculiarly essential to the production of fissionable material, contained, in whatever concentration, in deposits in the public lands are hereby reserved for the use of the United States subject to valid claims, rights, or privileges existing on the date of the enactment of this Act: *Provided, however,* That no individual, corporation, partnership, or association, which had any part, directly or indirectly, in the development of the atomic bomb project, may benefit by any location, entry, or settlement upon the public domain made after such individual, corporation, partnership, or association took part in such project, if such individual, corporation, partnership, or association, by reason of having had such part in the development of the atomic bomb project, acquired confidential official information as to the existence of deposits of such uranium, thorium, or other materials in the specific lands upon which such location, entry, or settlement is made, and subsequent to the date of the enactment of this Act made such location, entry, or settlement or caused the same to be made for his, its, or their benefit. The Secretary of the Interior shall cause to be inserted in every patent, conveyance, lease, permit, or other authorization hereafter granted to use the public lands or their mineral resources, under any of which there might result the extraction of any materials so reserved, a reservation to the United States of all such materials, whether or not of commercial value, together with the right of the United States through its authorized agents or representatives at any time to enter upon the land and prospect for, mine, and remove the same, making just compensation for any damage or injury occasioned thereby. Any lands so patented, conveyed, leased, or otherwise disposed of may be used, and any rights under any such permit or authorization may be exercised, as if no reservation of such materials had been made under this subsection; except that, when such use results in the extraction of any such material from the land in quantities which may not be transferred or delivered without a license under this subsection, such material shall be the property of the Commission and the Commission may require delivery of such material to it by any possessor thereof after such material has been separated

Individual benefit, restriction.

Reservation of materials.

Right of U. S. to prospect, etc.

Use of lands.

as such from the ores in which it was contained.  If the Commission requires the delivery of such material to it, it shall pay to the person mining or extracting the same, or to such other person as the Commission determines to be entitled thereto, such sums, including profits, as the Commission deems fair and reasonable for the discovery, mining, development, production, extraction, and other services performed with respect to such material prior to such delivery, but such payment shall not include any amount on account of the value of such material before removal from its place of deposit in nature.  If the Commission does not require delivery of such material to it, the reservation made pursuant to this paragraph shall be of no further force or effect.

*Payments for discovery, mining, etc.*

(c) BYPRODUCT MATERIALS.—

(1) DEFINITION.—As used in this Act, the term "byproduct material" means any radioactive material (except fissionable material) yielded in or made radioactive by exposure to the radiation incident to the processes of producing or utilizing fissionable material.

(2) DISTRIBUTION.—The Commission is authorized to distribute, with or without charge, byproduct materials to applicants seeking such materials for research or development activity, medical therapy, industrial uses, or such other useful applications as may be developed.  In distributing such materials, the Commission shall give preference to applicants proposing to use such materials in the conduct of research and development activity or medical therapy.  The Commission shall not distribute any byproduct materials to any applicant, and shall recall any distributed materials from any applicant, who is not equipped to observe or who fails to observe such safety standards to protect health as may be established by the Commission or who uses such materials in violation of law or regulation of the Commission or in a manner other than as disclosed in the application therefor.

*Preference.*

*Restrictions.*

(d) GENERAL PROVISIONS.—The Commission shall not—

(1) distribute any fissionable material to (A) any person for a use which is not under or within the jurisdiction of the United States, (B) any foreign government, or (C) any person within the United States if, in the opinion of the Commission, the distribution of such fissionable material to such person would be inimical to the common defense and security.

*Restrictions.*
*Distribution.*

(2) license any person to transfer or deliver, receive possession of or title to, or export from the United States any source material if, in the opinion of the Commission, the issuance of a license to such person for such purpose would be inimical to the common defense and security.

*License.*

## MILITARY APPLICATIONS OF ATOMIC ENERGY

SEC. 6 (a) AUTHORITY.—The Commission is authorized to—

(1) conduct experiments and do research and development work in the military application of atomic energy; and

*Experiments, etc.*

(2) engage in the production of atomic bombs, atomic bomb parts, or other military weapons utilizing fissionable materials; except that such activities shall be carried on only to the extent that the express consent and direction of the President of the United States has been obtained, which consent and direction shall be obtained at least once each year.

*Production of military weapons.*

*Consent of President.*

The President from time to time may direct the Commission (1) to deliver such quantities of fissionable materials or weapons to the armed forces for such use as he deems necessary in the interest of national defense or (2) to authorize the armed forces to manufacture, produce, or acquire any equipment or device utilizing fissionable material or atomic energy as a military weapon.

*Delivery to armed forces.*

*Manufacture of equipment, etc.*

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

(b) PROHIBITION.—It shall be unlawful for any person to manufacture, produce, transfer, or acquire any equipment or device utilizing fissionable material or atomic energy as a military weapon, except as may be authorized by the Commission. Nothing in this subsection shall be deemed to modify the provisions of section 4 of this Act, or to prohibit research activities in respect of military weapons, or to permit the export of any such equipment or device.

## UTILIZATION OF ATOMIC ENERGY

SEC. 7. (a) LICENSE REQUIRED.—It shall be unlawful, except as provided in sections 5 (a) (4) (A) or (B) or 6 (a), for any person to manufacture, produce, or export any equipment or device utilizing fissionable material or atomic energy or to utilize fissionable material or atomic energy with or without such equipment or device, except under and in accordance with a license issued by the Commission authorizing such manufacture, production, export, or utilization. No license may permit any such activity if fissionable material is produced incident to such activity, except as provided in sections 3 and 4.

Research relating to manufacture of equipment, etc.

Nothing in this section shall be deemed to require a license for the conduct of research or development activities relating to the manufacture of such equipment or devices or the utilization of fissionable material or atomic energy, or for the manufacture or use of equipment or devices for medical therapy.

(b) REPORT TO CONGRESS.—Whenever in its opinion any industrial, commercial, or other nonmilitary use of fissionable material or atomic energy has been sufficiently developed to be of practical value, the Commission shall prepare a report to the President stating all the facts with respect to such use, the Commission's estimate of the social, political, economic, and international effects of such use and the Commission's recommendations for necessary or desirable supplemental legislation. The President shall then transmit this report to the Congress together with his recommendations.

Restriction on issuance of license.

No license for any manufacture, production, export, or use shall be issued by the Commission under this section until after (1) a report with respect to such manufacture, production, export, or use has been filed with the Congress: and (2) a period of ninety days in which the Congress was in session has elapsed after the report has been so filed. In computing such period of ninety days, there shall be excluded the days on which either House is not in session because of an adjournment of more than three days.

(c) ISSUANCE OF LICENSES.—After such ninety-day period, unless hereafter prohibited by law, the Commission may license such manufacture, production, export, or use in accordance with such procedures and subject to such conditions as it may by regulation establish to effectuate the provisions of this Act. The Commission is authorized and directed to issue licenses on a nonexclusive basis and to supply to the extent available appropriate quantities of fissionable material to licensees (1) whose proposed activities will serve some useful purpose proportionate to the quantities of fissionable material to be consumed; (2) who are equipped to observe such safety standards to protect health and to minimize danger from explosion or other hazard to life or property as the Commission may establish; and (3) who agree to make available to the Commission such technical information and data concerning their activities pursuant to such licenses as the Commission may determine necessary to encourage similar activities by as many licensees as possible.

Supplying of material to licensees.

Renewal, etc.

Each such license shall be issued for a specified period, shall be revocable at any time by the Commission in accordance with such procedures as the Commission may establish, and may be renewed upon the expiration of such period. Where

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

activities under any license might serve to maintain or to foster the growth of monopoly, restraint of trade, unlawful competition, or other trade position inimical to the entry of new, freely competitive enterprises in the field, the Commission is authorized and directed to refuse to issue such license or to establish such conditions to prevent these results as the Commission, in consultation with the Attorney General, may determine. The Commission shall report promptly to the Attorney General any information it may have with respect to any utilization of fissionable material or atomic energy which appears to have these results. No license may be given to any person for activities which are not under or within the jurisdiction of the United States, to any foreign government, or to any person within the United States if, in the opinion of the Commission, the issuance of a license to such person would be inimical to the common defense and security.

*Restriction.*

(d) Byproduct Power.—If energy which may be utilized is produced in the production of fissionable material, such energy may be used by the Commission, transferred to other Government agencies, or sold to public or private utilities under contracts providing for reasonable resale prices.

## INTERNATIONAL ARRANGEMENTS

Sec. 8. (a) Definition.—As used in this Act, the term "international arrangement" shall mean any treaty approved by the Senate or international agreement hereafter approved by the Congress, during the time such treaty or agreement is in full force and effect.

(b) Effect of International Arrangements.—Any provision of this Act or any action of the Commission to the extent that it conflicts with the provisions of any international arrangement made after the date of enactment of this Act shall be deemed to be of no further force or effect.

(c) Policies Contained in International Arrangements.—In the performance of its functions under this Act, the Commission shall give maximum effect to the policies contained in any such international arrangement.

## PROPERTY OF THE COMMISSION

Sec. 9. (a) The President shall direct the transfer to the Commission of all interests owned by the United States or any Government agency in the following property:

*Transfer of U. S. interests.*

(1) All fissionable material; all atomic weapons and parts thereof; all facilities, equipment, and materials for the processing, production, or utilization of fissionable material or atomic energy; all processes and technical information of any kind, and the source thereof (including data, drawings, specifications, patents, patent applications, and other sources (relating to the processing, production, or utilization of fissionable material or atomic energy; and all contracts, agreements, leases, patents, applications for patents, inventions and discoveries (whether patented or unpatented), and other rights of any kind concerning any such items;

(2) All facilities, equipment, and materials, devoted primarily to atomic energy research and development; and

(3) Such other property owned by or in the custody or control of the Manhattan Engineer District or other Government agencies as the President may determine.

(b) In order to render financial assistance to those States and localities in which the activities of the Commission are carried on and in which the Commission has acquired property previously subject to State and local taxation, the Commission is authorized to make payments to State and local governments in lieu of property taxes. Such

*Payments to States, etc.*

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

payments may be in the amounts, at the times, and upon the terms the Commission deems appropriate, but the Commission shall be guided by the policy of not making payments in excess of the taxes which would have been payable for such property in the condition in which it was acquired, except in cases where special burdens have been cast upon the State or local government by activities of the Commission, the Manhattan Engineer District or their agents. In any such case, any benefit accruing to the State or local government by reason of such activities shall be considered in determining the amount of the payment. The Commission, and the property, activities, and income of the Commission, are hereby expressly exempted from taxation in any manner or form by any State, county, municipality, or any subdivision thereof.

*Tax exemptions.*

## CONTROL OF INFORMATION

Sec. 10. (a) Policy.—It shall be the policy of the Commission to control the dissemination of restricted data in such a manner as to assure the common defense and security. Consistent with such policy, the Commission shall be guided by the following principles:

*Exchange with other nations.*

(1) That until Congress declares by joint resolution that effective and enforceable international safeguards against the use of atomic energy for destructive purposes have been established, there shall be no exchange of information with other nations with respect to the use of atomic energy for industrial purposes; and

*Scientific and technical information.*

(2) That the dissemination of scientific and technical information relating to atomic energy should be permitted and encouraged so as to provide that free interchange of ideas and criticisms which is essential to scientific progress.

(b) Restrictions.—

*"Restricted data."*

(1) The term "restricted data" as used in this section means all data concerning the manufacture or utilization of atomic weapons, the production of fissionable material, or the use of fissionable material in the production of power, but shall not include any data which the Commission from time to time determines may be published without adversely affecting the common defense and security.

*Communication with intent to injure U. S., etc.; penalties.*

(2) Whoever, lawfully or unlawfully, having possession of, access to, control over, or being entrusted with, any document, writing, sketch, photograph, plan, model, instrument, appliance, note or information involving or incorporating restricted data—

(A) communicates, transmits, or discloses the same to any individual or person, or attempts or conspires to do any of the foregoing, with intent to injure the United States or with intent to secure an advantage to any foreign nation, upon conviction thereof, shall be punished by death or imprisonment for life (but the penalty of death or imprisonment for life may be imposed only upon recommendation of the jury and only in cases where the offense was committed with intent to injure the United States) ; or by a fine of not more than $20,000 or imprisonment for not more than twenty years, or both;

(B) communicates, transmits, or discloses the same to any individual or person, or attempts or conspires to do any of the foregoing, with reason to believe such data will be utilized to injure the United States or to secure an advantage to any foreign nation, shall, upon conviction, be punished by a fine of not more than $10,000 or imprisonment for not more than ten years, or both.

*Acquisition, etc., of documents.*

(3) Whoever, with intent to injure the United States or with intent to secure an advantage to any foreign nation, acquires or attempts or

Case: 4:22-cv-00016-CDP Doc. #: 148-5 Filed: 01/28/21 Page: 21 of 903 PageID #: 1702

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

conspires to acquire any document, writing, sketch, photograph, plan, model, instrument, appliance, note or information involving or incorporating restricted data shall, upon conviction thereof, be punished by death or imprisonment for life (but the penalty of death or imprisonment for life may be imposed only upon recommendation of the jury and only in cases where the offense was committed with intent to injure the United States) ; or by a fine of not more than $20,000 or imprisonment for not more than twenty years, or both.

*Penalty.*

(4) Whoever, with intent to injure the United States or with intent to secure an advantage to any foreign nation, removes, conceals, tampers with, alters, mutilates, or destroys any document, writing, sketch, photograph, plan, model, instrument, appliance, or note involving or incorporating restricted data and used by any individual or person in connection with the production of fissionable material, or research or development relating to atomic energy, conducted by the United States, or financed in whole or in part by Federal funds, or conducted with the aid of fissionable material, shall be punished by death or imprisonment for life (but the penalty of death or imprisonment for life may be imposed only upon recommendation of the jury and only in cases where the offense was committed with intent to injure the United States) ; or by a fine of not more than $20,000 or imprisonment for not more than twenty years, or both.

*Removal, etc.*

*Penalty.*

(5) (A) No person shall be prosecuted for any violation under this section unless and until the Attorney General of the United States has advised the Commission with respect to such prosecution and no such prosecution shall be commenced except upon the express direction of the Attorney General of the United States.

*Prosecution.*

(B) (i) No arrangement shall be made under section 3, no contract shall be made or continued in effect under section 4, and no license shall be issued under section 4 (e) or 7, unless the person with whom such arrangement is made, the contractor or prospective contractor, or the prospective licensee agrees in writing not to permit any individual to have access to restricted data until the Federal Bureau of Investigation shall have made an investigation and report to the Commission on the character, associations, and loyalty of such individual and the Commission shall have determined that permitting such person to have access to restricted data will not endanger the common defense or security.

*Investigation of designated persons by FBI, etc.*

(ii) Except as authorized by the Commission in case of emergency, no individual shall be employed by the Commission until the Federal Bureau of Investigation shall have made an investigation and report to the Commission on the character, associations, and loyalty of such individual.

(iii) Notwithstanding the provisions of subparagraphs (i) and (ii), during such period of time after the enactment of this Act as may be necessary to make the investigation, report, and determination required by such paragraphs, (a) any individual who was permitted access to restricted data by the Manhattan Engineer District may be permitted access to restricted data and (b) the Commission may employ any individual who was employed by the Manhattan Engineer District.

*Persons previously employed, etc.*

(iv) To protect against the unlawful dissemination of restricted data and to safeguard facilities, equipment, materials, and other property of the Commission, the President shall have authority to utilize the services of any Government agency to the extent he may deem necessary or desirable.

*Use of Government services.*

(C) All violations of this Act shall be investigated by the Federal Bureau of Investigation of the Department of Justice.

*Violations.*

Case: 4:17-cv-00016-CDP Doc. #: 148-5 Filed: 02/28/22 Page: 22 of 903 PageID #: 1703

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

**Applicability of other laws.**

(6) This section shall not exclude the applicable provisions of any other laws, except that no Government agency shall take any action under such other laws inconsistent with the provisions of this section.

(c) INSPECTIONS, RECORDS, AND REPORTS.—The Commission is—

(1) authorized by regulation or order to require such reports and the keeping of such records with respect to, and to provide for such inspections of, activities and studies of types specified in section 3 and of activities under licenses issued pursuant to section 7 as may be necessary to effectuate the purposes of this Act;

(2) authorized and directed by regulation or order to require regular reports and records with respect to, and to provide for frequent inspections of, the production of fissionable material in the conduct of research and development activities.

## PATENTS AND INVENTIONS

SEC. 11. (a) PRODUCTION AND MILITARY UTILIZATION.

(1) No patent shall hereafter be granted for any invention or discovery which is useful solely in the production of fissionable material or in the utilization of fissionable material or atomic energy for a military weapon. Any patent granted for any such invention or discovery is hereby revoked, and just compensation shall be made therefor.

(2) No patent hereafter granted shall confer any rights with respect to any invention or discovery to the extent that such invention or discovery is used in the production of fissionable material or in the utilization of fissionable material or atomic energy for a military weapon. Any rights conferred by any patent heretofore granted for any invention or discovery are hereby revoked to the extent that such invention or discovery is so used, and just compensation shall be made therefor.

**Reports.**

(3) Any person who has made or hereafter makes any invention or discovery useful in the production of fissionable material or in the utilization of fissionable material or atomic energy for a military weapon shall file with the Commission a report containing a complete description thereof, unless such invention or discovery is described in an application for a patent filed in the Patent Office by such person within the time required for the filing of such report. The report covering any such invention or discovery shall be filed on or before whichever of the following is the latest: (A) The sixtieth day after the date of enactment of this Act; (B) the sixtieth day after the completion of such invention or discovery; or (C) the sixtieth day after such person first discovers or first has reason to believe that such invention or discovery is useful in such production or utilization.

(b) USE OF INVENTIONS FOR RESEARCH.—No patent hereafter granted shall confer any rights with respect to any invention or discovery to the extent that such invention or discovery is used in the conduct of research or development activities in the fields specified in section 3.

*Ante,* p. 758.

Any rights conferred by any patent heretofore granted for any invention or discovery are hereby revoked to the extent that such invention or discovery is so used, and just compensation shall be made therefor.

(c) NONMILITARY UTILIZATION.—

(1) It shall be the duty of the Commission to declare any patent to be affected with the public interest if (A) the invention or discovery covered by the patent utilizes or is essential in the utilization of fissionable material or atomic energy; and (B) the licensing of such invention or discovery under this subsection is necessary to effectuate the policies and purposes of this Act.

Case: 4:27-cv-00024-CDP Doc. #: 14-5 Filed: 02/08/21 Page: 23 of 903 PageID #: 1704

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

(2) Whenever any patent has been declared, pursuant to paragraph (1), to be affected with the public interest—

(A) The Commission is hereby licensed to use the invention or discovery covered by such patent in performing any of its powers under this Act; and

(B) Any person to whom a license has been issued under section 7 is hereby licensed to use the invention or discovery covered by such patent to the extent such invention or discovery is used by him in carrying on the activities authorized by his license under section 7. *Ante*, p. 764.

The owner of the patent shall be entitled to a reasonable royalty fee for any use of an invention or discovery licensed by this subsection. Such royalty fee may be agreed upon by such owner and the licensee, or in the absence of such agreement shall be determined by the Commission. Royalty fee.

(3) No court shall have jurisdiction or power to stay, restrain, or otherwise enjoin the use of any invention or discovery by a licensee, to the extent that such use is licensed by paragraph (2) above, on the ground of infringement of any patent. If in any action for infringement against such licensee the court shall determine that the defendant is exercising such license, the measure of damages shall be the royalty fee determined pursuant to this section, together with such costs, interest, and reasonable attorney's fees as may be fixed by the court. If no royalty fee has been determined, the court shall stay the proceeding until the royalty fee is determined pursuant to this section. If any such licensee shall fail to pay such royalty fee, the patentee may bring an action in any court of competent jurisdiction for such royalty fee, together with such costs, interest, and reasonable attorney's fees as may be fixed by the court. Infringement of patent.

(d) ACQUISITION OF PATENTS.—The Commission is authorized to purchase, or to take, requisition, or condemn, and make just compensation for, (1) any invention or discovery which is useful in the production of fissionable material or in the utilization of fissionable material or atomic energy for a military weapon, or which utilizes or is essential in the utilization of fissionable material or atomic energy, or (2) any patent or patent application covering any such invention or discovery. The Commissioner of Patents shall notify the Commission of all applications for patents heretofore or hereafter filed which in his opinion disclose such inventions or discoveries and shall provide the Commission access to all such applications. Notification by Commissioner of Patents.

(e) COMPENSATION AWARDS, AND ROYALTIES.—

(1) PATENT COMPENSATION BOARD.—The Commission shall designate a Patent Compensation Board, consisting of two or more employees of the Commission, to consider applications under this subsection.

(2) ELIGIBILITY.—

(A) Any owner of a patent licensed under subsection (c) (2) or any licensee thereunder may make application to the Commission for the determination of a reasonable royalty fee in accordance with such procedures as it by regulation may establish. Applications.

(B) Any person seeking to obtain the just compensation provided in subsections (a), (b), or (d) shall make application therefor to the Commission in accordance with such procedures as it may by regulation establish.

(C) Any person making any invention or discovery useful in the production of fissionable material or in the utilization of fissionable material or atomic energy for a military weapon who is not entitled to compensation therefor under subsection (a) and

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

who has complied with subsection (a) (3) above may make application to the Commission for, and the Commission may grant, an award.

Counsel.

(D) Any person making application under this subsection shall have the right to be represented by counsel.

(3) Standards.—

Determination of royalty fee.

(A) In determining such reasonable royalty fee, the Commission shall take into consideration any defense, general or special, that might be pleaded by a defendant in an action for infringement, the extent to which, if any, such patent was developed through federally financed research, the degree of utility, novelty, and importance of the invention or discovery, and may consider the cost to the owner of the patent of developing such invention or discovery or acquiring such patent.

Determination of compensation.

(B) In determining what constitutes just compensation under subsection (a), (b), or (d) above, the Commission shall take into account the considerations set forth in paragraph (A) above, and the actual use of such invention or discovery, and may determine that such compensation be paid in periodic payments or in a lump sum.

(C) In determining the amount of any award under paragraph (2) (C) of this subsection, the Commission shall take into account the considerations set forth in paragraph (A) above, and the actual use of such invention or discovery. Awards so made may be paid by the Commission in periodic payments or in a lump sum.

Payment of awards.

(4) Judicial review.—Any person aggrieved by any determination of the Commission of an award or of a reasonable royalty fee may obtain a review of such determination in the Court of Appeals for the District of Columbia by filing in such court, within thirty days after notice of such determination, a written petition praying that such determination be set aside. A copy of such petition shall be forthwith served upon the Commission and thereupon the Commission shall file with the court a certified transcript of the entire record in the proceeding, including the findings and conclusions upon which the determination was based. Upon the filing of such transcript the court shall have exclusive jurisdiction upon the record certified to it to affirm the determination in its entirety or set it aside and remand it to the Commission for further proceedings. The findings of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. The court's judgment shall be final, subject, however, to review by the Supreme Court of the United States upon writ of certiorari on petition therefor under section 240 of the Judicial Code (U. S. C., title 28, sec. 347), by the Commission or any party to the court proceeding.

36 Stat. 1157.

## GENERAL AUTHORITY

Sec. 12. (a) In the performance of its functions the Commission is authorized to—

Advisory boards.

(1) establish advisory boards to advise with and make recommendations to the Commission on legislation, policies, administration, research, and other matters;

Standards to govern use of materials, etc.

(2) establish by regulation or order such standards and instructions to govern the possession and use of fissionable and byproduct materials as the Commission may deem necessary or desirable to protect health or to minimize danger from explosions and other hazards to life or property;

Studies, hearings, etc.

(3) make such studies and investigations, obtain such information, and hold such hearings as the Commission may deem

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

necessary or proper to assist it in exercising any authority provided in this Act, or in the administration or enforcement of this Act, or any regulations or orders issued thereunder. For such purposes the Commission is authorized to administer oaths and affirmations, and by subpena to require any person to appear and testify, or to appear and produce documents, or both, at any designated place. No person shall be excused from complying with any requirements under this paragraph because of his privilege against self-incrimination, but the immunity provisions of the Compulsory Testimony Act of February 11, 1893 (U. S. C., title 49, sec. 46), shall apply with respect to any individual who specifically claims such privilege. Witnesses subpenaed under this subsection shall be paid the same fees and mileage as are paid witnesses in the district courts of the United States;

*Administration of oaths, etc.*

*27 Stat. 443.*

(4) appoint and fix the compensation of such officers and employees as may be necessary to carry out the functions of the Commission. Such officers and employees shall be appointed in accordance with the civil-service laws and their compensation fixed in accordance with the Classification Act of 1923, as amended, except that to the extent the Commission deems such action necessary to the discharge of its responsibilities, personnel may be employed and their compensation fixed without regard to such laws. The Commission shall make adequate provision for administrative review of any determination to dismiss any employee;

*Officers and employees.*

*42 Stat. 1488.*
*5 U. S. C. §§ 661–674;*
*Supp. V, § 661 et seq.*
*Ante, pp. 216, 219.*

(5) acquire such materials, property, equipment, and facilities, establish or construct such buildings and facilities, and modify such buildings and facilities from time to time as it may deem necessary, and construct, acquire, provide, or arrange for such facilities and services (at project sites where such facilities and services are not available) for the housing, health, safety, welfare, and recreation of personnel employed by the Commission as it may deem necessary;

*Acquisition of property, etc.*

(6) with the consent of the agency concerned, utilize or employ the services or personnel of any Government agency or any State or local government, or voluntary or uncompensated personnel, to perform such functions on its behalf as may appear desirable;

*Use of Government services, etc.*

(7) acquire, purchase, lease, and hold real and personal property as agent of and on behalf of the United States and to sell, lease, grant, and dispose of such real and personal property as provided in this Act; and

*Purchase, sale, etc., of property.*

(8) without regard to the provisions of the Surplus Property Act of 1944 or any other law, make such disposition as it may deem desirable of (A) radioactive materials, and (B) any other property the special disposition of which is, in the opinion of the Commission, in the interest of the national security.

*Disposition of radioactive materials, etc.*
*58 Stat. 765.*
*50 U. S. C., Supp.*
*V, app. §§ 1611–1646.*
*Ante, pp. 188, 169,*
*599; post, p. 886.*

(b) SECURITY.—The President may, in advance, exempt any specific action of the Commission in a particular matter from the provisions of law relating to contracts whenever he determines that such action is essential in the interest of the common defense and security.

(c) ADVISORY COMMITTEES.—The members of the General Advisory Committee established pursuant to section 2 (b) and the members of advisory boards established pursuant to subsection (a) (1) of this section may serve as such without regard to the provisions of sections 109 and 113 of the Criminal Code (18 U. S. C., secs. 198 and 203) or section 19 (e) of the Contract Settlement Act of 1944, except insofar as such sections may prohibit any such member from receiving compensation in respect of any particular matter which directly involves the Commission or in which the Commission is directly interested.

*Ante, p. 757.*

*35 Stat. 1107, 1109.*
*18 U. S. C., Supp.*
*V, § 198 note.*
*58 Stat. 668.*
*41 U. S. C., Supp.*
*V, § 119.*

## COMPENSATION FOR PRIVATE PROPERTY ACQUIRED

*Ante*, pp. 760, 768.

Sec. 13. (a). The United States shall make just compensation for any property or interests therein taken or requisitioned pursuant to sections 5 and 11. The Commission shall determine such compensation. If the compensation so determined is unsatisfactory to the person entitled thereto, such person shall be paid 50 per centum of the amount so determined, and shall be entitled to sue the United States in the Court of Claims or in any district court of the United States in the manner provided by sections 24 (20) and 145 of the Judicial Code to recover such further sum as added to said 50 per centum will make up such amount as will be just compensation.

36 Stat. 1093, 1136.
28 U. S. C. §§ 41 (20), 250.

(b) In the exercise of the rights of eminent domain and condemnation, proceedings may be instituted under the Act of August 1, 1888 (U. S. C., title 40, sec. 257), or any other applicable Federal statute. Upon or after the filing of the condemnation petition, immediate possession may be taken and the property may be occupied, used, and improved for the purposes of this Act, notwithstanding any other law. Real property acquired by purchase, donation, or other means of transfer may also be occupied, used, and improved for the purposes of this Act, prior to approval of title by the Attorney General.

25 Stat. 357.

## JUDICIAL REVIEW AND ADMINISTRATIVE PROCEDURE

*Ante*, pp. 244, 243.

Sec. 14. (a) Notwithstanding the provisions of section 12 of the Administrative Procedure Act (Public Law 404, Seventy-ninth Congress, approved June 11, 1946) which provide when such Act shall take effect, section 10 of such Act (relating to judicial review) shall be applicable, upon the enactment of this Act, to any agency action under the authority of this Act or by any agency created by or under the provisions of this Act.

*Ante*, p. 237.

(b) Except as provided in subsection (a), no provision of this Act shall be held to supersede or modify the provisions of the Administrative Procedure Act.

"Agency action," "agency."

(c) As used in this section the terms "agency action" and "agency" shall have the same meaning as is assigned to such terms in the Administrative Procedure Act.

*Ante*, p. 237.

## JOINT COMMITTEE ON ATOMIC ENERGY

Sec. 15. (a) There is hereby established a Joint Committee on Atomic Energy to be composed of nine Members of the Senate to be appointed by the President of the Senate, and nine Members of the House of Representatives to be appointed by the Speaker of the House of Representatives. In each instance not more than five members shall be members of the same political party.

Functions.

(b) The joint committee shall make continuing studies of the activities of the Atomic Energy Commission and of problems relating to the development, use, and control of atomic energy. The Commission shall keep the joint committee fully and currently informed with respect to the Commission's activities. All bills, resolutions, and other matters in the Senate or the House of Representatives relating primarily to the Commission or to the development, use, or control of atomic energy shall be referred to the joint committee. The members of the joint committee who are Members of the Senate shall from time to time report to the Senate, and the members of the joint committee who are Members of the House of Representatives shall from time to time report to the House, by bill or otherwise, their recommendations with respect to matters within the jurisdiction of their respective Houses which are (1) referred to the joint committee or (2) otherwise within the jurisdiction of the joint committee.

Reports.

Case: 4:27-cv-00024-CDP Doc. #: 14-5 Filed: 01/28/17 Page: 27 of 903 PageID #: 1708

(c) Vacancies in the membership of the joint committee shall not affect the power of the remaining members to execute the functions of the joint committee, and shall be filled in the same manner as in the case of the original selection. The joint committee shall select a chairman and a vice chairman from among its members.

Vacancies.

(d) The joint committee, or any duly authorized subcommittee thereof, is authorized to hold such hearings, to sit and act at such places and times, to require, by subpena or otherwise, the attendance of such witnesses and the production of such books, papers, and documents, to administer such oaths, to take such testimony, to procure such printing and binding, and to make such expenditures as it deems advisable. The cost of stenographic services to report such hearings shall not be in excess of 25 cents per hundred words. The provisions of sections 102 to 104, inclusive, of the Revised Statutes shall apply in case of any failure of any witness to comply with a subpena or to testify when summoned under authority of this section.

Hearings, etc.

2 U. S. C. §§ 192-194.

(e) The joint committee is empowered to appoint and fix the compensation of such experts, consultants, technicians, and clerical and stenographic assistants as it deems necessary and advisable, but the compensation so fixed shall not exceed the compensation prescribed under the Classification Act of 1923, as amended, for comparable duties. The committee is authorized to utilize the services, information, facilities, and personnel of the departments and establishments of the Government.

Compensation of experts, etc.

42 Stat. 1488.
5 U. S. C. §§ 661-674; Supp. V, § 661 et seq.
Ante, pp. 216, 219.

## ENFORCEMENT

SEC. 16. (a) Whoever willfully violates, attempts to violate, or conspires to violate, any provision of sections 4 (b), 4 (e), 5 (a) (3), or 6 (b) shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both, except that whoever commits such an offense with intent to injure the United States or with intent to secure an advantage to any foreign nation shall, upon conviction thereof, be punished by death or imprisonment for life (but the penalty of death or imprisonment for life may be imposed only upon recommendation of the jury and only in cases where the offense was committed with intent to injure the United States); or by a fine of not more than $20,000 or by imprisonment for not more than twenty years, or both.

Ante, pp. 759, 760, 764.
Penalty.

(b) Whoever willfully violates, attempts to violate, or conspires to violate, any provision of this Act other than those specified in subsection (a) and other than section 10 (b), or of any regulation or order prescribed or issued under sections 5 (b) (4), 10 (c), or 12 (a) (2), shall, upon conviction thereof, be punished by a fine of not more than $5,000 or by imprisonment for not more than two years, or both, except that whoever commits such an offense with intent to injure the United States or with intent to secure an advantage to any foreign nation shall, upon conviction thereof, be punished by a fine of not more than $20,000 or by imprisonment for not more than twenty years, or both.

Ante, p. 766.

Ante, pp. 761, 768, 770.

(c) Whenever in the judgment of the Commission any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of this Act, or any regulation or order issued thereunder, it may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Commission that such person has engaged or is about to engage in any such acts or practices a permanent or temporary injunction, restraining order, or other order may be granted.

Application by Commission.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Refusal to obey subpena, etc.
*Ante*, p. 770.

(d) In case of failure of refusal to obey a subpena served upon any person pursuant to section 12 (a) (3), the district court for any district in which such person is found or resides or transacts business, upon application by the Commission, shall have jurisdiction to issue an order requiring such person to appear and give testimony or to appear and produce documents, or both, in accordance with the subpena; and any failure to obey such order of the court may be punished by such court as a contempt thereof.

## REPORTS

Additional legislation.

SEC. 17. The Commission shall submit to the Congress, in January and July of each year, a report concerning the activities of the Commission. The Commission shall include in such report, and shall at such other times as it deems desirable submit to the Congress, such recommendations for additional legislation as the Commission deems necessary or desirable.

## DEFINITIONS

SEC. 18. As used in this Act—

"Atomic energy."

(a) The term "atomic energy" shall be construed to mean all forms of energy released in the course of or as a result of nuclear fission or nuclear transformation.

"Government agency."

(b) The term "Government agency" means any executive department, commission, independent establishment, corporation wholly or partly owned by the United States which is an instrumentality of the United States, board, bureau, division, service, office, officer, authority, administration, or other establishment, in the executive branch of the Government.

"Person."

(c) The term "person" means any individual, corporation, partnership, firm, association, trust, estate, public or private institution, group, the United States or any agency thereof, any government other than the United States, any political subdivision of any such government, and any legal successor, representative, agent, or agency of the foregoing, or other entity, but shall not include the Commission or officers or employees of the Commission in the exercise of duly authorized functions.

"United States."

(d) The term "United States", when used in a geographical sense, includes all Territories and possessions of the United States and the Canal Zone.

"Research and development."

(e) The term "research and development" means theoretical analysis, exploration, and experimentation, and the extension of investigative findings and theories of a scientific or technical nature into practical application for experimental and demonstration purposes, including the experimental production and testing of models, devices, equipment, materials, and processes.

"Equipment or device utilizing fissionable material or atomic energy."

(f) The term "equipment or device utilizing fissionable material or atomic energy" shall be construed to mean any equipment or device capable of making use of fissionable material or peculiarly adapted for making use of atomic energy and any important component part especially designed for such equipment or devices, as determined by the Commission.

"Facilities for the production of fissionable material."

(g) The term "facilities for the production of fissionable material" shall be construed to mean any equipment or device capable of such production and any important component part especially designed for such equipment or devices, as determined by the Commission.

Case: 4:22-cv-00016-CDP  Doc. #: 148-5  Filed: 01/28/21  Page: 29 of 903  PageID #: 1710

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

## APPROPRIATIONS

Sec. 19. There are hereby authorized to be appropriated such sums as may be necessary and appropriate to carry out the provisions and purposes of this Act. The Acts appropriating such sums may appropriate specified portions thereof to be accounted for upon the certification of the Commission only. Funds appropriated to the Commission shall, if obligated by contract during the fiscal year for which appropriated, remain available for expenditure for four years following the expiration of the fiscal year for which appropriated. After such four-year period, the unexpended balances of appropriations shall be carried to the surplus fund and covered into the Treasury.

> *Appropriation authorized.*
> *Post, p. 913.*

## SEPARABILITY OF PROVISIONS

Sec. 20. If any provision of this Act, or the application of such provision to any person or circumstances, is held invalid, the remainder of this Act or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

## SHORT TITLE

Sec. 21. This Act may be cited as the "Atomic Energy Act of 1946". Approved August 1, 1946.

---

[CHAPTER 725]

## AN ACT

To amend the Act of June 8, 1936, relating to vocational education, so as to provide for the further development of vocational education in the several States and Territories.

> *August 1, 1946*
> *[S. 619]*
> *[Public Law 586]*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Act approved June 8, 1936, entitled "An Act to provide for the further development of vocational education in the several States and Territories" (49 Stat. 1488, ch. 541), is amended to read as follows:

> *20 U. S. C. §§ 15h–15p.*

### "SHORT TITLE

"Section 1. This Act may be cited as the 'Vocational Education Act of 1946.'

> *Vocational Education Act of 1946.*

### "DEFINITIONS

"Sec. 2. As used in this Act—

"(1) the term 'States and Territories' means the several States, the Territories of Alaska and Hawaii, the island of Puerto Rico, and the District of Columbia;

"(2) the terms 'State plan' and 'State board' shall have the meaning which said terms have in the Smith-Hughes Vocational Education Act; and

> *Infra.*

"(3) the term 'Smith-Hughes Vocational Education Act' means the Act approved February 23, 1917 (39 Stat. 929, ch. 114).

> *20 U. S. C. §§ 11–15, 16–28.*

### "AUTHORIZATION FOR APPROPRIATIONS FOR VOCATIONAL EDUCATION

"Sec. 3. (a) For the purpose of assisting the several States and Territories in the further development of vocational education, there is authorized to be appropriated for the fiscal year beginning July 1, 1946, and annually thereafter—

> *Assistance to States and Territories.*

"(1) $10,000,000 for vocational education in agriculture, including supervision by the vocational agriculture teachers of

> *Agriculture.*

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

# EXHIBIT 6

PL 93–438, OCTOBER 11, 1974, 88 Stat 1233

UNITED STATES PUBLIC LAWS
93rd Congress - Second Session
Convening January 21, 1974

DATA SUPPLIED BY THE U.S. DEPARTMENT OF JUSTICE. (SEE SCOPE)
Additions and Deletions are not identified in this document.

PL 93–438 (HR 11510)
OCTOBER 11, 1974

An Act tO REORGANIZE AND CONSOLIDATE CERTAIN FUNCTIONS OF THE FEDERAL GOVERNMENT IN A NEW ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION AND IN A NEW NUCLEAR REGULATORY COMMISSION IN ORDER TO PROMOTE MORE EFFICIENT MANAGEMENT OF SUCH FUNCTIONS.

BE IT ENACTED BY THE SENATE AND HOUSE OF REPRESENTATIVES
OF THE UNITED STATES OF AMERICA IN CONGRESS ASSEMBLED,

SHORT TITLE //42 USC 5801 NOTE.//

SECTION 1. THIS ACT MAY BE CITED AS THE "ENERGY REORGANIZATION ACT OF 1974".

DECLARATION OF PURPOSE //42 USC 5801.//

SEC. 2. (A) THE CONGRESS HEREBY DECLARES THAT THE GENERAL WELFARE AND THE COMMON DEFENSE AND SECURITY REQUIRE EFFECTIVE ACTION TO DEVELOP, AND INCREASE THE EFFICIENCY AND RELIABLILITY OF USE OF, ALL ENERGY SOURCES TO MEET THE NEEDS OF PRESENT AND FUTURE GENERATIONS, TO INCREASE THE PRODUCTIVITY OF THE NATIONAL ECONOMY AND STRENGTHEN ITS POSITION IN REGARD TO INTERNATIONAL TRADE, TO MAKE THE NATION SELF–SUFFICIENT IN ENERGY, TO ADVANCE THE GOALS OF RESTORING, PROTECTING, AND ENHANCING ENVIRONMENTAL QUALITY, AND TO ASSURE PUBLIC HEALTH AND SAFETY.

(B) THE CONGRESS FINDS THAT, TO BEST ACHIEVE THESE OBJECTIVES, IMPROVE GOVERNMENT OPERATIONS, AND ASSURE THE COORDINATED AND EFFECTIVE DEVELOPMENT OF ALL ENERGY SOURCES, IT IS NECESSARY TO ESTABLISH AN ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION TO BRING TOGETHER AND DIRECT FEDERAL ACTIVITIES RELATING TO RESEARCH AND DEVELOPMENT ON THE VARIOUS SOURCES OF ENERGY, TO INCREASE THE EFFICIENCY AND RELIABILITY IN THE USE OF ENERGY, AND TO CARRY OUT THE PERFORMANCE OF OTHER FUNCTIONS, INCLUDING BUT NOT LIMITED TO THE ATOMIC ENERGY COMMISSION'S MILITARY AND PRODUCTION ACTIVITIES AND ITS GENERAL BASIC RESEARCH ACTIVITIES. IN ESTABLISHING AN ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION TO ACHIEVE THESE OBJECTIVES, THE CONGRESS INTENDS THAT ALL POSSIBLE SOURCES OF ENERGY BE DEVELOPED CONSISTENT WITH WARRANTED PRIORITIES.

(C) THE CONGRESS FINDS THAT IT IS IN THE PUBLIC INTEREST THAT THE LICENSING AND RELATED REGULATORY FUNCTIONS OF THE ATOMIC ENERGY COMMISSION BE SEPARATED FROM THE PERFORMANCE OF THE OTHER FUNCTIONS OF THE COMMISSION, AND THAT THIS SEPARATION BE EFFECTED IN AN ORDERLY MANNER, PURSUANT TO THIS ACT, ASSURING

Case: 4:27-cv-00016-CDP Doc. #: 146 Filed: 01/29/21 Page: 32 of 903 PageID #: 1713

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

ADEQUACY OF TECHNICAL AND OTHER RESOURCES NECESSARY FOR THE PERFORMANCE OF EACH.

(D) THE CONGRESS DECLARES THAT IT IS IN THE PUBLIC INTEREST AND THE POLICY OF CONGRESS THAT SMALL BUSINESS CONCERNS BE GIVEN A REASONABLE OPPORTUNITY TO PARTICIPATE, INSOFAR AS IS POSSIBLE, FAIRLY AND EQUITABLY IN GRANTS, CONTRACTS, PURCHASES, AND OTHER FEDERAL ACTIVITIES RELATING TO RESEARCH, DEVELOPMENT, AND DEMONSTRATION OF SOURCES OF ENERGY EFFICIENCY, AND UTILIZATION AND CONSERVATION OF ENERGY. IN CARRYING OUT THIS POLICY, TO THE EXTENT PRACTICABLE, THE ADMINISTRATOR SHALL CONSULT WITH THE ADMINISTRATOR OF THE SMALL BUSINESS ADMINISTRATION.

(E) DETERMINATION OF PRIORITIES WHICH ARE WARRANTED SHOULD BE BASED ON SUCH CONSIDERATIONS AS POWER–RELATED VALUES OF AN ENERGY SOURCE, PRESERVATION OF MATERIAL RESOURCES, REDUCTION OF POLLUTANTS, EXPORT MARKET POTENTIAL (INCLUDING REDUCTION OF IMPORTS), AMONG OTHERS. ON SUCH A BASIS, ENERGY SOURCES WARRANTING PRIORITY MIGHT INCLUDE, BUT NOT BE LIMITED TO, THE VARIOUS METHODS OF UTILIZING SOLAR ENERGY.

TITLE I—ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION

ESTABLISHMENT //42 USC 5811.//

SEC. 101. THERE IS HEREBY ESTABLISHED AN INDEPENDENT EXECUTIVE AGENCY TO BE KNOWN AS THE ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION (HEREINAFTER IN THIS ACT REFERRED TO AS THE "ADMINISTRATION").

OFFICERS //42 USC 5812.//

SEC. 102. (A) THERE SHALL BE AT THE HEAD OF THE ADMINISTRATION AN ADMINISTRATOR OF ENERGY RESEARCH AND DEVELOPMENT (HEREINAFTER IN THIS ACT REFERRED TO AS THE "ADMINISTRATOR"), WHO SHALL BE APPOINTED FROM CIVILIAN LIFE BY THE PRESIDENT BY AND WITH THE ADVICE AND CONSENT OF THE SENATE. A PERSON MAY NOT BE APPOINTED AS ADMINISTRATOR WITHIN TWO YEARS AFTER RELEASE FROM ACTIVE DUTY AS A COMMISSIONED OFFICER OF A REGULAR COMPONENT OF AN ARMED FORCE. THE ADMINISTRATION SHALL BE ADMINISTERED UNDER THE SUPERVISION AND DIRECTION OF THE ADMINISTRATOR, WHO SHALL BE RESPONSIBLE FOR THE EFFICIENT AND COORDINATED MANAGEMENT OF THE ADMINISTRATION.

(B) THERE SHALL BE IN THE ADMINISTRATION A DEPUTY ADMINISTRATOR, WHO SHALL BE APPOINTED BY THE PRESIDENT, BY AND WITH THE ADVICE AND CONSENT OF THE SENATE.

(C) THE PRESIDENT SHALL APPOINT THE ADMINISTRATOR AND DEPUTY ADMINISTRATOR FROM AMONG INDIVIDUALS WHO, BY REASON OF THEIR GENERAL BACKGROUND AND EXPERIENCE ARE SPECIALLY QUALIFIED TO MANAGE A FULL RANGE OF ENERGY RESEARCH AND DEVELOPMENT PROGRAMS.

(D) THERE SHALL BE IN THE ADMINISTRATION SIX ASSISTANT ADMINISTRATORS, ONE OF WHOM SHALL BE RESPONSIBLE FOR FOSSIL ENERGY, ANOTHER FOR NUCLEAR ENERGY, ANOTHER FOR ENVIRONMENT AND SAFETY, ANOTHER FOR CONSERVATION, ANOTHER FOR SOLAR, GEOTHERMAL, AND ADVANCED ENERGY SYSTEMS, AND ANOTHER FOR NATIONAL SECURITY. THE ASSISTANT ADMINISTRATORS SHALL BE APPOINTED BY THE PRESIDENT, BY AND WITH THE ADVICE AND CONSENT OF THE SENATE. THE PRESIDENT SHALL APPOINT EACH ASSISTANT ADMINISTRATOR FROM AMONG INDIVIDUALS WHO, BY REASON OF GENERAL BACKGROUND AND EXPERIENCE, ARE SPECIALLY QUALIFIED TO MANAGE THE ENERGY TECHNOLOGY AREA ASSIGNED TO SUCH ASSISTANT ADMINISTRATOR.

Case: 4:23-cv-00016-CDP Doc. #: 1-6 Filed: 01/29/21 Page: 33 of 903 PageID #: 1714

(E) THERE SHALL BE IN THE ADMINISTRATION A GENERAL COUNSEL WHO SHALL BE APPOINTED BY THE ADMINISTRATOR AND WHO SHALL SERVE AT THE PLEASURE OF AND BE REMOVABLE BY THE ADMINISTRATOR.

(F) THERE SHALL BE IN THE ADMINISTRATION NOT MORE THAN EIGHT ADDITIONAL OFFICERS APPOINTED BY THE ADMINISTRATOR. THE POSITIONS OF SUCH OFFICERS SHALL BE CONSIDERED CAREER POSITIONS AND BE SUBJECT TO SUBSECTION 161 D. OF THE ATOMIC ENERGY ACT.

(G) THE DIVISION OF MILITARY APPLICATION TRANSFERRED TO AND ESTABLISHED IN THE ADMINISTRATION BY SECTION 104(D) OF THIS ACT SHALL BE UNDER THE DIRECTION OF A DIRECTOR OF MILITARY APPLICATION, WHO SHALL BE APPOINTED BY THE ADMINISTRATOR AND WHO SHALL SERVE AT THE PLEASURE OF AND BE REMOVABLE BY THE ADMINISTRATOR AND SHALL BE AN ACTIVE COMMISSIONED OFFICER OF THE ARMED FORCES SERVING IN GENERAL OF FLAG OFFICER RANK OR GRADE. THE FUNCTIONS, QUALIFICATIONS, AND COMPENSATION OF THE DIRECTOR OF MILITARY APPLICATION SHALL BE THE SAME AS THOSE PROVIDED UNDER THE ATOMIC ENERGY ACT OF 1954, AS AMENDED, //42 USC 2011 NOTE.// FOR THE ASSISTANT GENERAL MANAGER FOR MILITARY APPLICATION.

(H) OFFICERS APPOINTED PURSUANT TO THIS SECTION SHALL PERFORM SUCH FUNCTIONS AS THE ADMINISTRATOR SHALL SPECIFY FROM TIME TO TIME. THE ADMINISTRATOR SHALL DELEGATE TO ONE SUCH OFFICER THE SPECIAL RESPONSIBILITY FOR INTERNATIONAL COOPERATION IN ALL ENERGY AND RELATED ENVIRONMENTAL RESEARCH AND DEVELOPMENT.

(I) THE DEPUTY ADMINISTRATOR (OR IN THE ABSENCE OR DISABILITY OF THE DEPUTY ADMINISTRATOR, OR IN THE EVENT OF A VACANCY IN THE OFFICE OF THE DEPUTY ADMINISTRATOR, AN ASSISTANT ADMINISTRATOR, THE GENERAL COUNSEL OR SUCH OTHER OFFICIAL, DETERMINED ACCORDING TO SUCH ORDER AS THE ADMINISTRATOR SHALL PRESCRIBE) SHALL ACT FOR AND PERFORM THE FUNCTIONS OF THE ADMINISTRATOR DURING ANY ABSENCE OR DISABILITY OF THE ADMINISTRATOR OR IN THE EVENT OF A VACANCY IN THE OFFICE OF THE ADMINISTRATOR.

RESPONSIBILITIES OF THE ADMINISTRATOR //42 USC 5813.//

SEC. 103. THE RESPONSIBILITES OF THE ADMINISTRATOR SHALL INCLUDE, BUT NOT BE LIMITED TO—,

(1) EXERCISING CENTRAL RESPONSIBLITY FOR POLICY PLANNING, COORDINATION, SUPPORT, AND MANAGEMENT OF RESEARCH AND DEVELOPMENT PROGRAMS RESPECTING ALL ENERGY SOURCES, INCLUDING ASSESSING THE REQUIREMENTS FOR RESEARCH AND DEVELOPMENT IN REGARD OT VARIOUS ENERGY SOURCES IN RELATION TO NEAR–TERM AND LONG–RANGE NEEDS, POLICY PLANNING IN REGARD TO MEETING THOSE REQUIREMENTS, UNDER–TAKING PROGRAMS FOR THE OPTIMAL DEVELOPMENT OF THE VARIOUS FORMS OF ENERGY SOURCES, MANAGING SUCH PROGRAMS, AND DISSEMINATING INFORMATION RESULTING THEREFROM;

(2) ENCOURAGING AND CONDUCTING RESEARCH AND DEVELOPMENT, INCLUDING DEMONSTRATION OF COMMERCIAL FEASIBILITY AND PRACTICAL APPLICATIONS OF THE EXTRACTION, CONVERSION, STORAGE, TRANSMISSION, AND UTILIZATION PHASES RELATED TO THE DEVELOPMENT AND USE OF ENERGY FROM FOSSIL,NUCLEAR, SOLAR, GEOTHERMAL, AND OTHER ENERGY SOURCES;

(3) ENGAGING IN AND SUPPORTING ENVIRONMENTAL, BIOMEDICAL, PHYSICAL, AND SAFETY RESEARCH RELATED TO THE DEVELOPMENT OF ENERGY SOURCES AND UTILIZATION TECHNOLOGIES;

(4) TAKING INTO ACCOUNT THE EXISTENCE, PROGRESS, AND RESULTS OF OTHER PUBLIC AND PRIVATE RESEARCH AND DEVELOPMENT ACTIVITIES, INCLUDING THOSE ACTIVITIES OF THE FEDERAL ENERGY ADMINISTRATION RELATING TRO THE DEVELOPMENT OF

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

ENERGY RESOURCES USING CURRENTLY AVAILABLE TECHNOLOGY IN PROMOTING INCREASED UTILIZATION OF ENERGY RESOURCES, RELEVANT TO THE ADMINISTRATION'S MISSION IN FORMULATING ITS OWN RESEARCH AND DEVELOPMENT PROGRAMS;

 (5) PARTICIPATING IN AND SUPPORTING COOPERATIVE RESEARCH AND DEVELOPMENT PROJECTS WHICH MAY INVOLVE CONTRIBUTIONS BY PUBLIC OR PRIVATE PERSONS OR AGENCIES, OF FINANCIAL OR OTHER RESOURCES TO THE PERFORMANCE OF THE WORK;

 (6) DEVELOPING, COLLECTING, DISTRIBUTING, AND MAKING AVAILABLE FOR DISTRIBUTION, SCIENTIFIC AND TECHNICAL INFORMATION CONCERNING THE MANUFACTURE OR DEVELOPMENT OF ENERGY AND ITS EFFICIENT EXTRACTION, CONVERSION, TRANSMISSION, AND UTILIZATION;

 (7) CREATING AND ENCOURAGING THE DEVELOPMENT OF GENERAL INFORMATION TO THE PUBLIC ON ALL ENERGY CONSERVATION TECHNOLOGIES AND ENERGY SOURCES AS THEY BECOME AVAILABLE FOR GENERAL USE, AND THE ADMINISTRATOR, IN CONJUNCTION WITH THE ADMINISTRATOR OF THE FEDERAL ENERGY ADMINISTRATION SHALL, TO THE EXTENT PRACTICABLE, DISSEMINATE SUCH INFORMATION THROUGH THE USE OF MASS COMMUNICATIONS;

 (8) ENCOURAGING AND CONDUCTING RESEARCH AND DEVELOPMENT IN ENERGY CONSERVATION, WHICH SHALL BE DIRECTED TOWARD THE GOALS OF REDUCING TOTAL ENERGY CONSUMPTION TO THE MAXIMUM EXTENT PRACTICABLE, AND TOWARD MAXIMUM POSSIBLE IMPROVEMENT IN THE EFFICIENCY OF ENERGY USE. DEVELOPMENT OF NEW AND IMPROVED CONSERVATION MEASURES SHALL BE CONDUCTED WITH THE GOAL OF THE MOST EXPEDITIOUS POSSIBLE APPLICATION OF THESE MEASURES;

 (9) ENCOURAGING AND PARTICIPATING IN INTERNATIONAL COOPERATION IN ENERGY AND RELATED ENVIRONMENTAL RESEARCH AND DEVELOPMENT;

 (10) HELPING TO ASSURE AN ADEQUATE SUPPLY OF MANPOWER FOR THE ACCOMPLISHMENT OF ENERGY RESEARCH AND DEVELOPMENT PROGRAMS, BY SPONSORING AND ASSISTING IN EDUCATION AND TRAINING ACTIVITIES IN INSTITUTIONS OF HIGHER EDUCATION, VOCATIONAL SCHOOLS, AND OTHER INSTITUTIONS, AND BY ASSURING THE COLLECTIMON, ANALYSIS, AND DISSEMINATION OF NECESSARY MANPOWER SUPPLY AND DEMAND DATA;

 (11) ENCOURAGING AND CONDUCTING RESEARCH AND DEVELOPMENT IN CLEAN AND RENEWABLE ENERGY SOURCES.

 ABOLITION AND TRANSFERS //42 USC 5814.//

SEC. 104. (A) THE ATOMIC ENERGY COMMISSION IS HEREBY ABOLISHED. SECTIONS 21 AND 22 OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED (42 U. S.C. 2031 AND 2032) ARE REPEALED.

 (B) ALL OTHER FUNCTIONS OF THE COMMISSION, THE CHAIRMAN AND MEMBERS OF THE COMMISSION, AND THE OFFICERS AND COMPONENTS OF THE COMMISSION ARE HEREBY TRANSFERRED OR ALLOWED TO LAPSE PURSUANT TO THE PROVISIONS OF THIS ACT.

 (C) THERE ARE HEREBY TRANSFERRED TO AND VESTED IN THE ADMINISTRATOR ALL FUNCTIONS OF THE ATOMIC ENERGY COMMISSION,, THE CHAIRMAN AND MEMBERS OF THE COMMISSION, AND THE OFFICERS AND COMPONENTS OF THE COMMISSION, EXCEPT AS OTHERWISE PROVIDED IN THIS ACT.

 (D) THE GENERAL ADVISORY COMMITTEE ESTABLISHED PURSUANT TO SECTION 26 OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED (42 U.S.C. 2036), THE PATENT COMPENSATION BOARD ESTABLISHED PURSUANT TO SECTION 157 OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED (42 U.S.C. 2187), AND THE DIVISIONS OF MILITARY APPLICATION AND NAVAL REACTORS ESTABLISHED PURSUANT TO SECTION 25 OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED (42 U.S.C. 2035), ARE TRANSFERRED TO THE ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION AND THE FUNCTIONS OF THE COMMISSION WITH RESPECT THERETO, AND

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

WITH RESPECT TO RELATIONS WITH THE MILITARY LIAISON COMMITTEE ESTABLISHED BY SECTION 27 OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED (42 U.S.C. 2037), ARE TRANSFERRED TO THE ADMINISTRATOR.

 (E) THERE ARE HEREBY TRANSFERRED TO AND VESTED IN THE ADMINISTRATOR SUCH FUNCTIONS OF THE SECRETARY OF THE INTERIOR, THE DEPARTMENT OF THE INTERIOR, AND OFFICERS AND COMPONENTS OF SUCH DEPARTMENT—,

 (1) AS RELATE TO OR ARE UTILIZED BY THE OFFICE OF COAL RESEARCH ESTABLISHED PURSUANT TO THE ACT OF JULY 1, 196/ (74 STAT. 336; 30 U.S.C. 661—668);

 (2) AS RELATE TO OR ARE UTILIZED IN CONNECTION WITH FOSSIL FUEL ENERGY RESEARCH AND DEVELOPMENT PROGRAMS AND RELATED ACTIVITIES CONDUCTED BY THE BUREAU OF MINES "ENERGY CENTERS" AND SYNTHANE PLANT TO PROVIDE GREATER EFFICIENCY IN THE EXTRACTION, PROCESSING, AND UTILIZATION OF ENERGY RESOURCES FOR THE PURPOSE OF CONSERVING THOSE RESOURCES, DEVELOPING ALTERNATIVE ENERGY RESOURCES, SUCH AS OIL AND GAS SECONDARY AND TERTIARY RECOVERY, OIL SHALE AND SYNTHETIC FUELS, IMPROVING METHODS OF MANAGING ENERGY–RELATED WASTES AND POLLUTANTS, AND PROVIDING TECHNICAL GUIDANCE NEEDED TO ESTABLISH AND ADMINISTER NATIONAL ENERGY POLICIES; AND

 (3) AS RELATE TO OR ARE UTILIZED FOR UNDERGROUND ELECTRIC POWER TRANSMISSION RESEARCH.

THE ADMINISTRATOR SHALL CONDUCT A STUDY OF THE POTENTIAL ENERGY APPLICATIONS OF HELIUM AND, WITHIN SIX MONTHS FROM THE DATE OF THE ENACTMENT OF THIS ACT, REPORT TO THE PRESIDENT AND CONGRESS HIS RECOMMENDATIONS CONCERNING THE MANAGEMENT OF THE FEDERAL HELIUM PROGRAMS, AS THEY RELATE TO ENERGY.

 (F) THERE ARE HEREBY TRANSFERRED TO AND VESTED IN THE ADMINISTRATOR SUCH FUNCTIONS OF THE NATIONAL SCIENCE FOUNDATION AS RELATE TO OR ARE UTILIZED IN CONNECTION WITH—,

 (1) SOLAR HEARING AND COOLING DEVELOPMENT; AND

 (2) GEOTHERMAL POWER DEVELOPMENT.

 (G) THERE ARE HEREBY TRANSFERRED TO AND VESTED IN THE ADMINISTRATOR SUCH FUNCTIONS OF THE ENVIRONMENTAL PROTECTION AGENCY AND THE OFFICERS AND COMPONENTS THEREOF AS RELATE TO OR ARE UTILIZED IN CONNECTION WITH RESEARCH, DEVELOPMENT, AND DEMONSTRATION, BUT NOT ASSESSMENT OR MONITORING FOR REGULATORY PURPOSES, OF ALTERNATIVE AUTOMOTIVE POWER SYSTEMS.

 (H) TO THE EXTENT NECESSARY OR APPROPRIATE TO PERFORM FUNCTIONS AND CARRY OUT PROGRAMS TRANSFERRED BY THIS ACT, THE ADMINISTRATOR AND COMMISSION MAY EXERCISE, IN RELATION TO THE FUNCTIONS SO TRANSFERRED, ANY AUTHORITY OR PART THEREOF AVAILABLE BY LAW, INCLUDING APPROPRIATION ACTS, TO THE OFFICIAL OR AGENCY FROM WHICH SUCH FUNCTIONS WERE TRANSFERRED.

 (I) IN THE EXERCISE OF HIS RESPONSIBLIITIES UNDER SECTION 103, THE ADMINISTRATOR SHALL UTILIZE, WITH THEIR CONSENT, TO THE FULLEST EXTENT HE DETERMINES ADVISABLE THE TECHNICAL AND MANAGEMENT CAPABILITES OF OTHER EXECUTIVE AGENCIES HAVING FACILITIES, PERSONNEL, OR OTHER RESOURCES WHICH CAN ASSIST OR ADVANTAGEOUSLY BE EXPANDED TO ASSIST IN CARRYING OUT SUCH RESPONSIBILITIES. THE ADMINISTRATOR SHALL CONSULT WITH THE HEAD OF EACH AGENCY WITH RESPECT TO SUCH FACILITIES, PERSONNEL, OR OTHER RESOURCES, AND MAY ASSIGN, WITH THEIR CONSENT, SPECIFIC PROGRAMS OR PROJECTS IN ENERGY RESEARCH AND DEVELOPMENT AS APPROPRIATE. IN MAKING SUCH ASSIGNMENTS UNDER THIS SUBSECTION, THE HEAD OF EACH SUCH AGENCY SHALL INSURE THAT—,

Case: 4:23-cv-00016-CDP Doc. #: 146 Filed: 01/22/21 Page: 36 of 903 PageID #: 1717
Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

(1) SUCH ASSIGNMENTS SHALL BE IN ADDITION TO AND NOT DETRACT FROM THE BASIC MISSION RESPONSIBILITIES OF THE AGENCY, AND

(2) SUCH ASSIGNMENTS SHALL BE CARRIED OUT UNDER SUCH GUIDANCE AS THE ADMINISTRATOR DEEMS APPROPRIATE.

ADMINISTRATIVE PROVISIONS //42 USC 5815.//

SEC. 105. (A) THE ADMINISTRATOR IS AUTHORIZED TO PRESCRIBE SUCH POLICIES, STANDARDS, CRITERIA, PROCEDURES, RULES, AND REGULATIONS AS HE MAY DEEM TO BE NECESSARY OR APPROPRIATE TO PERFORM FUNCTIONS NOW OR HEREAFTER VESTED IN HIM.

(B) THE ADMINISTRATOR SHALL ENGAGE IN SUCH POLICY PLANNING, AND PERFORM SUCH PROGRAM EVALUATION ANALYSES AND OTHER STUDIES, AS MAY BE NECESSARY TO PROMOTE THE EFFICIENT AND COORDINATED ADMINISTRATION OF THE ADMINISTRATION AND PROPERLY ASSESS PROGRESS TOWARD THE ACHIEVEMENT OF ITS MISSIONS.

(C) EXCEPT AS OTHERWISE EXPRESSLY PROVIDED BY LAW, THE ADMINISTRATOR MAY DELEGATE ANY OF HIS FUNCTIONS TO SUCH OFFICERS AND EMPLOYEES OF THE ADMINISTRATION AS HE MAY DESIGNATE, AND MAY AUTHORIZE SUCH SUCCESSIVE REDELEGATIONS OF SUCH FUNCTIONS AS HE MAY DEEM TO BE NECESSARY OR APPROPRIATE.

(D) EXCEPT AS PROVIDED IN SECTION 10I AND IN SECTION 104(D), THE ADMINISTRATOR MAY ORGANIZE THE ADMINISTRATION AS HE MAY DEEM TO BE NECESSARY OR APPROPRIATE.

(E) THE ADMINISTRATOR IS AUTHORIZED TO ESTABLISH, MAINTAIN, ALTER, OR DISCONTINUE SUCH STATE, REGIONAL, DISTRICT, LOCAL, OR OTHER FIELD OFFICES AS HE MAY DEEM TO BE NECESSARY OR APPROPRIATE TO PERFORM FUNCTIONS NOW OR HEREAFTER VESTED IN HIM.

(F) THE ADMINISTRATOR SHALL CAUSE A SEAL OF OFFICE TO BE MADE FOR THE ADMINISTRATION OF SUCH DEVICE AS HE SHALL APPROVE, AND JUDICIAL NOTICE SHALL BE TAKEN OF SUCH SEAL.

(G) THE ADMINISTRATOR IS AUTHORIZED TO ESTABLISH A WORKING CAPITAL FUND, TO BE AVAILABLE WITHOUT FISCAL YEAR LIMITATION, FOR EXPENSES NECESSARY FOR THE MAINTENANCE AND OPERATION OF SUCH COMMON ADMINISTRATIVE SERVICES AS HE SHALL FIND TO BE DESIRABLE IN THE INTERESTS OF ECONOMY AND EFFICIENCY. THERE SHALL BE TRANSFERRED TO THE FUND THE STOCKS OF SUPPLIES, EQUIPMENT, ASSETS OTHER THAN REAL PROPERTY, LIABILITIES, AND UNPAID OBLIGATIONS RELATING TO THE SERVICES WHICH HE DETERMINES WILL BE PERFORMED THROUGH THE FUND. APPROPRIATIONS TO THE FUND, IN SUCH AMOUNTS AS MAY BE NECESSARY TO PROVIDE ADDITIONAL WORKING CAPITAL, ARE AUTHORIZED. THE WORKI,NG CAPITAL FUND SHALL RECOVER, FROM THE APPROPRIATIONS AND FUNDS FOR WHICH SERVICES ARE PERFORMED, EITHER IN ADVANCE OR BY WAY OF REIMBURSEMENT, AMOUNTS WHICH WILL APPROXIMATE THE COSTS INCURRED, INCLUDING THE ACRUAL OF ANNUAL LEAVE AND THE DEPRECIATION OF EQUIPMENT. THE FUND SHALL ALSO BE CREDITED WITH RECEIPTS FROM THE SALE OR EXCHANGE OF ITS PROPERTY, AND RECEIPTS IN PAYMENT FOR LOSS OR DAMAGE TO PROPERTY OWNED BY THE FUND.

(H) EACH DEPARTMENT, AGENCY, AND INSTRUMENTALITY OF THE EXECUTIVE BRANCH OF THE GOVERNMENT IS AUTHORIZED TO FURNISH TO THE ADMINISTRATOR, UPON HIS REQUEST, ANY INFORMATION OR OTHER DATA WHICH THE ADMINISTRATOR DEEMS NECESSARY TO CARRY OUT HIS DUTIES UNDER THIS TITLE.

PERSONNEL AND SERVICES //42 USC 5816.//

SEC. 106. (A) THE ADMINISTRATOR IS AUTHORIZED TO SELECT, APPOINT, EMPLOY, AND FIX THE COMPENSATION OF SUCH OFFICERS AND EMPLOYEES, INCLUDING ATTORNEYS, PURSUANT TO SECTION 161 D. OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED (42 U.S.C. 2201(D)) AS

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

ARE NECESSARY TO PERFORM THE FUNCTIONS NOW OR HEREAFTER VESTED IN HIM AND TO PRESCRIBE THEIR FUNCTIONS.

(B) THE ADMINISTRATOR IS AUTHORIZED TO OBTAIN SERVICES AS PROVIDED BY SECTION 3109 OF TITLE 5 OF THE UNITED STATES CODE.

(C) THE ADMINISTRATOR IS AUTHORIZED TO PROVIDE FOR PARTICIPATION OF MILITARY PERSONNEL IN THE PERFORMANCE OF HIS FUNCTIONS. MEMBERS OF THE ARMY, THE NAVY, THE AIR FORCE, OR THE MARINE CORPS MAY BE DETAILED FOR SERVICE IN THE ADMINISTRATION BY THE APPROPRIATE MILITARY SECRETARY, PURSUANT TO COOPERATIVE AGREEMENTS WITH THE SECRETARY, FOR SERVICE IN THE ADMINISTRATION IN POSITIONS OTHER THAN A POSITION THE OCCUPANT OF WHICH MUST BE APPROVED BY AND WITH THE ADVICE AND CONSENT OF THE SENATE.

(D) APPOINTMENT, DETAIL, OR ASSIGNMENT TO, ACCEPTANCE OF, AND SERVICE IN, ANY APPROINTIVE OR OTHER POSITION IN THE ADMINISTRATION UNDER THIS SECTION SHALL IN NO WAY AFFECT THE STATUS, OFFICE, RANK, OR GRADE WHICH SUCH OFFICERS OR ENLISTED MEN MAY OCCUPY OR HOLD, OR ANY EMOLUMENT, PERQUISITE, RIGHT,PRIVILEGE, OR BENEFIT INCIDENT TO OR ARISING OUT OF ANY SUCH STATUS, OFFICE, RANK, OR GRADE. A MEMBER SO APPOINTED, DETAILED, OR ASSIGNED SHALL NOT BE SUBJECT TO DIRECTION OR CONTROL BY HIS ARMED FORCE, OR ANY OFFICER THEREOF, DIRECTLY OR INDIRECTLY, WITH RESPECT TO THE RESPONSIBILITIES EXERCISED IN THE POSITION TO WHICH APPOINTED, DETAILED, OR ASSIGNED.

(E) THE ADMINISTRATOR IS AUTHORIZED TO PAY TRANSPORTATION EXPENSES, AND PER DIEM IN LIEU OF SUBSISTENCE EXPENSES, IN ACCORDANCE WITH CHAPTER 57 OF TITLE 5 OF THE UNITED STATES CODE FOR TRAVEL BETWEEN PLACES OF RECRUITMENT AND DUTY, AND WHILE AT PLACES OF DUTY, OF PERSONS APPOINTED FOR EMERGENCY, TEMPORARY, OR SEASONAL SERVICES IN THE FIELD SERVICE OF THE ADMINISTRATION.

(F) THE ADMINISTRATOR IS AUTHORIZED TO UTILIZE, ON A REIMBURSABLE BASIS, THE SERVICES OF ANY PERSONNEL MADE AVAILABLE BY ANY DEPARTMENT, AGENCY, OR INSTRUMENTALITY, INCLUDING ANY INDEPENDENT AGENCY OF THE GOVERNMENT.

(G) THE ADMINISTRATOR IS AUTHORIZED TO ESTABLISH ADVISORY BOARDS, IN ACCORDANCE WITH THE PROVISIONS OF THE FEDERAL ADVISORY COMMITTEE ACT (PUBLIC LAW 92—463), //5 USC APP. I.// TO ADVISE WITH AND MAKE RECOMMENDATIONS TO THE ADMINISTRATOR ON LEGISLATION, POLICIES, ADMINISTRATION, RESEARCH, AND OTHER MATTERS.

(H) THE ADMINISTRATOR IS AUTHORIZED TO EMPLOY PERSONS WHO ARE NOT CITIZENS OF THE UNITED STATES IN EXPERT, SCIENTIFIC, TECHNICAL, OR PROFESSIONAL CAPACITIES WHENEVER HE DEEMS IT IN THE PUBLIC INTEREST.

POWERS //42 USC 5817.//

SEC. 107. (A) THE ADMINISTRATOR IS AUTHORIZED TO EXERCISE HIS POWERS IN SUCH MANNER AS TO INSURE THE CONTINUED CONDUCT OF RESEARCH AND DEVELOPMENT AND RELATED ACTIVITIES IN AREAS OR FIELDS DEEMED BY THE ADMINISTRATOR TO BE PERTINENT TO THE ACQUISITION OF AN EXPANDED FUND OF SCIENTIFIC, TECHNICAL, AND PRACTICAL KNOWLEDGE IN ENERGY MATTERS. TO THIS END, THE ADMINISTRATOR IS AUTHORIZED TO MAKE ARRANGEMENTS (INCLUDING CONTRACTS, AGREEMENTS, AND LOANS) FOR THE CONDUCT OF RESEARCH AND DEVELOPMENT ACTIVITIES WITH PRIVATE OR PUBLIC INSTITUTIONS OR PERSONS, INCLUDING PARTICIPATION IN JOINT OR COOPERATIVE PROJECTS OF A RESEARCH, DEVELOPMENTAL, OR EXPERIMENTAL NATURE; TO MAKE PAYMENTS (IN LUMP SUM OR INSTALLMENTS, AND IN ADVANCE OR BY WAY OF REIMBURSEMENT, WITH NECESSARY ADJUSTMENTS ON ACCOUNT OF OVERPAYMENTS OR UNDER PAYMENTS); AND GENERALLY TO TAKE SUCH STEPS AS HE MAY DEEM NECESSARY OR APPROPRAITE TO PERFORM FUNCTIONS NOW OR HEREAFTER VESTED IN HIM. SUCH FUNCTIONS OF THE

ADMINISTRATOR UNDER THIS ACT AS ARE APPLICABLE TO THE NUCLEAR ACTIVITIES TRANSFERRED PURSUANT TO THIS TITLE SHALL BE SUBJECT TO THE PROVISIONS OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED, //42 USC 2011 NOTE.// AND TO OTHER AUTHORITY APPLICABLE TO SUCH NUCLEAR ACTIVITIES. THE NONNUCLEAR RESPONSIBILITIES AND FUNCTIONS OF THE ADMINISTRATOR REFERRED TO IN SECTIONS 103 AND 104 OF THIS ACT SHALL BE CARRIED OUT PURSUANT TO THE PROVISIONS OF THIS ACT, APPLICABLE AUTHORITY EXISTING IMMEDIATELY BEFORE THE EFFECTIVE DATE OF THIS ACT, OR IN ACCORDANCE WITH THE PROVISIONS OF CHAPTER 4 OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED (42 U.S.C. 2051—2053).

(B) EXCEPT FOR PUBLIC BUILDINGS AS DEFINED IN THE PUBLIC BUILDINGS ACT OF 1959, AS AMENDED, //40 USC 601 NOTE.// AND WITH RESPECT TO LEASED SPACE SUBJECT TO THE PROVISIONS OF REORGANIZATION PLAN NUMBERED 18 OF 1950, //5 USC APP. II.// THE ADMINISTRATOR IS AUTHORIZED TO ACQUIRE (BY PURCHASE, LEASE, CONDEMNATION, OR OTHERWISE), CONSTRUCT, IMPROVE, REPAIR, OPERATE, AND MAINTAIN FACILITIES AND REAL PROPERTY AS THE ADMINISTRATOR DEEMS TO BE NECESSARY IN AND OUTSIDE OF THE DISTRICT OF COLUMBIA. SUCH AUTHORITY SHALL APPLY ONLY TO FACILITIES REQUIRED FOR THE MAINTENANCE AND OPERATION OF LABORATORIES, RESEARCH AND TESTING SITES AND FACILITIES, QUARTERS, AND RELATED ACCOMMODATIONS FOR EMPLOYEES AND DEPENDENTS OF EMPLOYEES OF THE ADMINISTRATION, AND SUCH OTHER SPECIAL–PURPOSE REAL PROPERTY AS THE ADMINISTRATOR DEEMS TO BE NECESSARY IN AND OUTSIDE THE DISTRICT OF COLUMBIA. TITLE TO ANY PROPERTY OR INTEREST THEREIN, REAL, PERSONAL, OR MIXED, ACQUIRED PURSUANT TO THIS SECTION, SHALL BE IN THE UNITED STATES.

(C)(1) THE ADMINISTRATOR IS AUTHORIZED TO PROVIDE, CONSTRUCT, OR MAINTAIN, AS NECESSARY AND WHEN NOT OTHERWISE AVAILABLE, THE FOLLOWING FOR EMPLOYEES AND THEIR DEPENDENTS STATIONED AT REMOTE LOCATIONS:

(A) EMERGENCY MEDICAL SERVICES AND SUPPLIES.

(B) FOOD AND OTHER SUBSISTENCE SUPPLIES.

(C) MESSING FACILITIES.

(D) AUDIOVISUAL EQUIPMENT, ACCESSORIES, AND SUPPLIES FOR RECREATION AND TRAINING.

(E) REIMBURSEMENT FOR FOOD, CLOTHING, MEDICINE, AND OTHER SUPPLIES FURNISHED BY SUCH EMPLOYEES IN EMERGENCIES FOR THE TEMPORARY RELIEF OF DISTRESSED PERSONS.

(F) LIVING AND WORKING QUARTERS AND FACILITIES.

(G) TRANSPORTATION FOR SCHOOL–AGE DEPENDENTS OF EMPLOYEES TO THE NEAREST APPROPRIATE EDUCATIONAL FACILITIES.

(2) THE FURNISHING OF MEDICAL TREATMENT UNDER SUBPARAGRAPH (A) OF PARAGRAPH (1) AND THE FURNISHING OF SERVICES AND SUPPLIES UNDER PARAGRAPHS (B) AND (C) OF PARAGRAPH (1) SHALL BE AT PRICES REFLECTING REASONABLE VALUE AS DETERMINED BY THE ADMINISTRATOR.

(3) PROCEEDS FROM REIMBURSEMENTS UNDER THIS SECTION SHALL BE DEPOSITED IN THE TREASURY AND MAY BE WITHDRAWN BY THE ADMINISTRATOR TO PAY DIRECTLY THE COST OF SUCH WORK OR SERVICES, TO REPAY OR MAKE ADVANCES TO APPROPRIATIONS OR FUNDS WHICH DO OR WILL BEAR ALL OR A PART OF SUCH COST, OR TO REFUND EXCESS SUMS WHEN NECESSSARY; EXCEPT THAT SUCH PAYMENTS MAY BE CREDITED TO A SERVICE OR WORKING CAPITAL FUND OTHER WISE ESTABLISHED BY LAW, AND USED UNDER THE LAW GOVERNING SUCH FUNDS, IF THE FUND IS AVAILABLE FOR USE BY THE ADMINISTRATOR FOR PERFORMING THE WORD OR SERVICES FOR WHICH PAYMENT IS RECEIVED.

(D) THE ADMINISTRATOR IS AUTHORIZED TO ACQUIRE ANY OF THE FOLLOWING DESCRIBED RIGHTS IF THE PROPERTY ACQUIRED THEREBY IS FOR USE IN, OR IS USEFUL TO, THE PERFORMANCE OF FUNCTIONS VESTED IN HIM:

 (1) COPYRIGHTS, PATENTS, AND APPLICATIONS FOR PATENTS, DESIGNS, PROCESSES, SPECIFICATIONS, AND DATA.

 (2) LICENSES UNDER COPYRIGHTS, PATENTS, AND APPLICATIONS FOR PATENTS.

 (3) RELEASES, BEFORE SUIT IS BROUGHT, FOR PAST INFRINGEMENT OF PATENTS OR COPYRIGHTS.

 (E) SUBJECT TO THE PROVISIONS OF CHAPTER 12 OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED (42 U.S.C. 2161—2166), AND OTHER APPLICABLE LAW, THE ADMINISTRATOR SHALL DISSEMINATE SCIENTIFIC, TECHNICAL, AND PRACTICAL INFORMATION ACQUIRED PURSUANT TO THIS TITLE THROUGH INFORMATION PROGRAMS AND OTHER APPROPRIATE MEANS, AND SHALL ENCOURAGE THE DISSEMINATION OF SCIENTIFIC, TECHNICAL, AND PRACTICAL INFORMATION RELATING TO ENERGY SO AS TO ENLARGE THE FUND OF SUCH INFORMATION AND TO PROVIDE THAT FREE INTERCHANGE OF IDIAS AND CRITICISM WHICH IS ESSENTIAL TO SCIENTIFIC AND INDUSTRIAL PROGRESS AND PUBLIC UNDERSTANDING.

 (F) THE ADMINISTRATOR IS AUTHORIZED TO ACCEPT, HOLD, ADMINISTER, AND UTILIZE GIFTS, AND BEQUESTS OF PROPERTY, BOTH REAL AND PERSONAL, FOR THE PURPOSE OF AIDING OR FACILITATING THE WORK OF THE ADMINISTRATION. GIFTS AND BEQUESTS OF MONEY AND PROCEEDS FROM SALES OF OTHER PROPERTY RECEIVED AS GIFTS OR BEQUESTS SHALL BE DEPOSITED IN THE TREASURY AND SHALL BE DISBURSED UPON THE ORDER OF THE ADMINISTRATOR. FOR THE PURPOSES OF FEDERAL INCOME, ESTATE, AND GIFT TAXES, PROPERTY ACCEPTED UNDER THIS SECTION SHALL BE CONSIDERED AS A GIFT OR BEQUEST TO THE UNITED STATES.

 INTERIM COORDINATION //42 USC 5818.//

SEC. 108. (A) THERE IS ESTABLISHED IN THE EXECUTIVE OFFICE OF THE PRESIDENT AN ENERGY RESOURCES COUNCIL. THE COUNCIL SHALL BE COMPOSED OF THE SECRETARY OF THE INTERIOR, THE ADMINISTRATOR OF THE FEDERAL ENERGY ADMINISTRATION, THE ADMINISTRATOR OF THE ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION, THE SECRETARY OF STATE, THE DIRECTOR, OFFICE OF MANAGEMENT AND BUDGET, AND SUCH OTHER OFFICIALS OF THE FEDERAL GOVERNMENT AS THE PRESIDENT MAY DESIGNATE. THE PRESIDENT SHALL DESIGNATE ONE OF THE MEMBERS OF THE COUNCIL TO SERVE AS CHAIRMAN.

 (B) IT SHALL BE THE DUTY AND FUNCTION OF THE COUNCIL TO—,

 (1) INSURE COMMUNICATION AND COORDINATION AMONG THE AGENCIES OF THE FEDERAL GOVERNMENT WHICH HAVE RESPONSIBILITIES FOR THE DEVELOPMENTT AND IMPLEMENTATION OF ENERGY POLICY OR FOR THE MANAGEMENT OF ENERGY RESOURCES;

 (2) MAKE RECOMMENDATIONS TO THE PRESIDENT AND TO THE CONGRESS FOR MEASURES TO IMPROVE THE IMPLEMENTATION OF FEDERAL ENERGY POLICIES OR THE MANAGEMENT OF ENERGY RESOURCES WITH PARTICULAR EMPHASIS UPON POLICIES AND ACTIVITIES INVOLVING TWO OR MORE DEPARTMENTS OR INDEPENDENT AGENCIES; AND

 (3) ADVISE THE PRESIDENT IN THE PREPARATION OF THE REORGANIZATION RECOMMENDATIONS REQUIRED BY SECTION 110 OF THIS ACT.

 (C) THE CHAIRMAN OF THE COUNCIL MAY NOT REFUSE TO TESTIFY BEFORE THE CONGRESS OR ANY DULY AUTHORIZED COMMITTEE THEREOF REGARDING THE DUTIES OF THE COUNCIL OR OTHE MATTERS CONCERNING INTERAGENCY COORDINATION OF ENERGY POLICY AND ACTIVITIES.

 (D) THIS SECTION SHALL BE EFFECTIVE NO LATER THAN SIXTY DAYS AFTER THE ENACTMENT OF THIS ACT OR SUCH EARLIER DATE AS THE PRESIDENT SHALL PRESCRIBE AND PUBLISH IN THE FEDERAL REGISTER, AND SHALL TERMINATE UPON ENACTMENT OF A PERMANENT

Case: 4:22-cv-00016-CDP Doc. #: 14-6 Filed: 01/28/22 Page: 40 of 903 PageID #: 1731

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

DEPARTMENT RESPONSIBLE FOR ENERGY AND NATURAL RESOURCES OR TWO YEARS AFTER SUCH EFFECTIVE DATE, WHICHEVER SHALL OCCUR FIRST.
 FUTURE REORGANIZATION //42 USC 5819.//

SEC. 109. (A) THE PRESIDENT SHALL TRANSMIT TO THE CONGRESS AS PROMPTLY AS POSSIBLE, BUT NOT LATER THAN JUNE 30, 1975, SUCH ADDITIONAL RECOMMENDATIONS AS HE DEEMS ADVISABLE FOR ORGANIZATION OF ENERGY AND RELATED FUNCTIONS IN THE FEDERAL GOVERNMENT, INCLUDING, BUT NOT LIMITED TO, WHETHER OR NOT THERE SHALL BE ESTABLISHED (1) A DEPARTMENT OF ENERGY AND NATURAL RESOURCES, (2) AN ENERGY POLICY COUNCIL, AND (3) A CONSOLIDATION IN WHOLE OR IN PART OF REGULATORY FUNCTIONS CONCERNING ENERGY.

 (B) THIS REPORT SHALL REPLACE AND SERVE THE PURPPOSES OF THE REPORT REQUIRED BY SECTION 15(A) (4) OF THE FEDERAL ENERGY ADMINISTRATION ACT. //ANTE, P. 109.//
 COORDINATION WITH ENVIRONMENTAL EFFORTS //42 USC 5820.//

SEC. 110. THE ADMINISTRATOR IS AUTHORIZED TO ESTABLISH PROGRAMS TO UTILIZE RESEARCH AND DEVELOPMENT PERFORMED BY OTHER FEDERAL AGENCIES TO MINIMIZE THE ADVERSE ENVIRONMENTAL PROTECTION AGENCY, PROJECTS. THE ADMINISTRATOR OF THE ENVIRONMENTAL EFFECTS OF ENERGY AS WELL AS OTHER AFFECTED AGENCIES AND DEPARTMENTS, SHALL COOPERATE FULLY WITH THE ADMINISTRATOR IN ESTABLISHING AND MAINTAINING SUCH PROGRAMS, AND IN ESTABLISHING APPROPRIATE INTERAGENCY AGREEMENTS TO DEVELOP COOPERATIVE PROGRAMS AND TO AVOID UNNECESSARY DUPLICATION.

## TITLE II—NUCLEAR REGULATORY COMMISSION
ESTABLISHMENT AND TRANSFERS //42 USC 5841.//

SEC. 201. (A) THERE IS ESTABLISHED AN INDEPENDENT REGULATORY COMMISSION TO BE KNOWN AS THE NUCLEAR REGULATORY COMMISSION WHICH SHALL BE COMPOSED OF FIVE MEMBERS, EACH OF WHOM SHALL BE A CITIZEN OF THE UNITED STATES. THE PRESIDENT SHALL DESIGNATE ONE MEMBER OF THE COMMISSION AS CHAIRMAN THEREOF TO SERVE AS SUCH DURING THE PLEASURE OF THE PRESIDENT. THE CHAIRMAN MAY FROM TIME TO TIME DESIGNATE ANY OTHER MEMBER OF THE COMMISSION AS ACTING CHAIRMAN TO ACT IN THE PLACE AND STEAD OF THE CHAIRMAN DURING HIS ABSENCE. THE CHAIRMAN (OR THE ACTING CHAIRMAN IN THE ABSENCE OF THE CHAIRMAN) SHALL PRESIDE AT ALL MEETINGS OF THE COMMISSION AND A QUORUM FOR THE TRANSACTION OF BUSINESS SHALL CONSIST OF AT LEAST THREE MEMBERS PRESENT. EACH MEMBER OF THE COMMISSION, INCLUDING THE CHAIRMAN, SHALL HAVE EQUAL RESPONSIBILITY AND AUTHORITY IN ALL DECISIONS AND ACTIONS OF THE COMMISSION, SHALL HAVE FULL ACCESS TO ALL INFORMATION RELATING TO THE PERFORMANCE OF HIS DUTIES OR RESPONSIBILITIES, AND SHALL HAVE ONE VOTE. ACTION OF THE COMMISSION SHALL BE DETERMINED BY A MAJORITY VOTE OF THE MEMBERS PRESENT. THE CHAIRMAN (OR ACTING CHAIRMAN IN THE ABSENCE OF THE CHAIRMAN) SHALL BE THE OFFICIAL SPOKESMAN OF THE COMMISSION IN ITS RELATIONS WITH THE CONGRESS, GOVERNMENT AGENCIES, PERSONS, OR THE PUBLIC, AND, ON BEHALF OF THE COMMISSION, SHALL SEE TO THE FAITHFUL EXECUTION OF THE POLICIES AND DECISIONS OF THE COMMISSION, AND SHALL REPORT THEREON TO THE COMMISSION FROM TIME TO TIME OR AS THE COMMISSION MAY DIRECT. THE COMMISSION SHALL HAVE AN OFFICIAL SEAL WHICH SHALL BE JUDICIALLY NOTICED.

(B) (1) MEMBERS OF THE COMMISSION SHALL BE APPOINTED BY THE PRESIDENT, BY AND WITH THE ADVICE AND CONSENT OF THE SENATE.

(2) APPOINTMENTS OF MEMBERS PURSUANT TO THIS SUBSECTION SHALL BE MADE IN SUCH A MANNER THAT NOT MORE THAN THREE MEMBERS OF THE COMMISSION SHALL BE MEMBERS OF THE SAME POLITICAL PARTY.

(C) EACH MEMBER SHALL SERVE FOR A TERM OF FIVE YEARS, EACH SUCH TERM TO COMMENCE ON JULY 1, EXCEPT THAT OF THE FIVE MEMBERS FIRST APPOINTED TO THE COMMISSION, ONE SHALL SERVE FOR ONE YEAR, ONE FOR TWO YEARS, ONE FOR THREE YEARS, ONE FOR FOUR YEARS, AND ONE FOR FIVE YEARS, TO BE DESIGNATED BY THE PRESIDENT AT THE TIME OF APPOINTMENT.

(D) SUCH INITIAL APPOINTMENTS SHALL BE SUBMITTED TO THE SENATE WITHIN SIXTY DAYS OF THE SIGNING OF THIS ACT. ANY INDIVIDUAL WHO IS SERVING AS A MEMBER OF THE ATOMIC ENERGY COMMISSION AT THE TIME OF THE ENACTMENT OF THIS ACT, AND WHO MAY BE APPOINTED BY THE PRESIDENT TO THE COMMISSION, SHALL BE APPOINTED FOR A TERM DESIGNATED BY THE PRESIDENT, BUT WHICH TERM SHALL TERMINATE NOT LATER THAN THE END OF HIS PRESENT TERM AS A MEMBER OF THE ATOMIC ENERGY COMMISSION, WITHOUT REGARD TO THE REQUIREMENTS OF SUBSECTION (B) (2) OF THIS SECTION. ANY SUBSEQUENT APPOINTMENT OF SUCH INDIVIDUALS SHALL BE SUBJECT TO THE PROVISIONS OF THIS SECTION.

(E) ANY MEMBER OF THE COMMISSION MAY BE REMOVED BY THE PRESIDENT FOR INEFFICIENCY, NEGLECT OF DUTY, OR MALFEASANCE IN OFFICE. NO MEMBER OF THE COMMISSION SHALL ENGAGE IN ANY BUSINESS, VOCATION, OR EMPLOYMENT OTHER THAN THAT OF SERVING AS A MEMBER OF THE COMMISSION.

(F) THERE ARE HEREBY TRANSFERRED TO THE COMMISSION ALL THE LICENSING AND RELATED REGULATORY FUNCTIONS OF THE ATOMIC ENERGY COMMISSION, THE CHAIRMAN AND MEMBERS OF THE COMMISSION, THE GENERAL COUNSEL, AND OTHER OFFICERS AND COMPONENTS OF THE COMMISSION—WHICH FUNCTIONS OFFICERS, COMPONENTS, AND PERSONNEL ARE EXCEPTED FROM THE TRANSFER TO THE ADMINISTRATOR BY SECTION 104(C) OF THIS ACT.

(G) IN ADDITION TO OTHER FUNCTIONS AND PERSONNEL TRANSFERRED TO THE COMMISSION, THERE ARE ALSO TRANSFERRED TO THE COMMISSION—,

(1) THE FUNCTIONS OF THE ATOMIC SAFETY AND LICENSING BOARD PANEL AND THE ATOMIC SAFETY AND LICENSING APPEAL BOARD;

(2) SUCH PERSONNEL AS THE DIRECTOR OF THE OFFICE OF MANAGEMENT AND BUDGET DETERMINES ARE NECESSARY FOR EXERCISING RESPONSIBILITIES UNDER SECTION 205, RELATING TO, RESEARCH, FOR THE PURPOSE OF CONFIRMATORY ASSESSMENT RELATING TO LICENSING AND OTHER REGULATION UNDER THE PROVISIONS OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED, //42 USC 2011 NOTE.// AND OF THIS ACT.

LICENSING AND RELATED REGULATORY FUNCTIONS RESPECTING SELECTED ADMINISTRATION FACILITIES //42 USC 5842.//

SEC. 202. NOTWITHSTANDING THE EXCLUSIONS PROVIDED FOR IN SECTION 110 A. OR ANY OTHER PROVISIONS OF THE TOMIC ENERGY ACT OF 1954, AS AMENDED (42 U.S.C. 2140(A)), THE NUCLEAR REGULATORY COMMISSION SHALL, EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED BY SECTION 110 B. OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED (42 U.S.C. 2140(B)), OR OTHER LAW, HAVE LICENSING AND RELATED REGULATORY AUTHORITY PURSUANT TO CHAPTERS 6, 7, 8, AND 1/ OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED, //42. USC 2071—2112, 2131—2140.// AS TO THE FOLLOWING FACILITIES OF THE ADMINISTRATION:

(1) DEMONSTRATION LIQUID METAL FAST BREEDER REACTORS WHEN OPERATED AS PART OF THE POWER GENERATION FACILITIES OF AN ELECTRIC UTILITY SYSTEM, OR WHEN OPERATED

IN ANY OTHER MANNER FOR THE PURPOSE OF DEMONSTRATING THE SUITABILITY FOR COMMERCIAL APPLICATION OF SUCH A REACTOR.

 (2) OTHER DEMONSTRATION NUCLEAR REACTORS—EXCEPT THOSE IN EXISTENCE ON THE EFFECTIVE DATE OF THIS ACT—WHEN OPERATED AS PART OF THE POWER GENERATION FACILITIES OF AN ELECTRIC UTILITY SYSTEM, OR WHEN OPERATED IN ANY OTHER MANNER FOR THE PURPOSE OF DEMONSTRATING THE SUITABLILITY FOR COMMERCIAL APPLICATION OF SUCH A REACTOR.

 (3) FACILITIES USED PRIMARILY FOR THE RECEIPT AND STORAGE OF HIGH–LEVEL RADIOACTIVE WASTES RESULTING FROM ACTIVITIES LICENSED UNDER SUCH ACT.

 (4) RETRIEVABLE SURFACE STORAGE FACILITES AND OTHER FACILITIES AUTHORIZED FOR THE EXPRESS PURPOSE OF SUBSEQUENT LONG–TERM STORAGE OF HIGH–LEVEL RADIOACTIVE WASTE GENERATED BY THE ADMINISTRATION, WHICH ARE NOT USED FOR, OR ARE PART OF, RESEARCH AND DEVELOPMENT ACTIVITIES.

 OFFICE OF NUCLEAR REACTOR REGULATION //42 USC 5843.//

SEC. 203. (A) THERE IS HEREBY ESTABLISHED IN THE COMMISSION AN OFFICE OF NUCLEAR REACTOR REGULATION UNDER THE DIRECTION OF A DIRECTOR OF NICLEAR REACTOR REGULATION, WHO SHALL BE APPOINTED BY THE COMMISSION, WHO MAY REPORT DIRECTLY TO THE COMMISSION, AS PROVIDED IN SECTION 209, AND WHO SHALL SERVE AT THE PLEASURE OF THE BE REMOVABLE BY THE COMMISSION.

 (B) SUBJECT TO THE PROVISIONS OF THIS ACT, THE DIRECTOR OR NUCLEAR REACTOR REGULATION SHAL PERFORM SUCH FUNCTIONS AS THE COMMISSION SHALL DELEGATE INCLUDING:

 (1) PRINCIPAL LICENSING AND REGULATION INVOLVING ALL FACILITIES, AND MATERIALS LICENSED UNDER THE ATOMIC ENERGY ACT OF 1954, AS AMENDED, //42 USC 2011 NOTE.// ASSOCIATED WITH THE CONSTRUCTION AND OPERATION OF NUCLEAR REACTORS LICENSED UNDER THE ATOMIC ENERGY ACT OF 1954, AS AMENDED;

 (2) REVIEW THE SAFETY AND SAFEGUARDS OF ALL SUCH FACILITIES, MATERIALS, AND ACTIVITIES, AND SUCH REVIEW FUNCTIONS SHALL INCLUDE, BUT NOT BE LIMITED TO—,

 (A) MONITORING, TESTING AND RECOMMENDING UPGRADING OF SYSTEMS DESIGNED TO PREVENT SUBSTANTIAL HEALTH OR SAFETY HAZARDS; AND

 (B) EVALUATING METHODS OF TRANSPORTING SPECIAL NUCLEAR AND OTHER NUCLEAR MATERIALS AND OF TRANSPORTING AND STORING HIGH–LEVEL RADIOACTIVE WASTES TO PREVENT RADIATION HAZARDS TO EMPLOYEES AND THE GENERAL PUBLIC.

 (3) RECOMMEND RESEARCH NECESSARY FOR THE DISCHARGE OF THE FUNCTIONS OF THE COMMISSION.

 (C) NOTHING IN THIS SECTION SHALL BE CONSTRUED TO LIMIT IN ANY WAY THE FUNCTIONS OF THE ADMINISTRATION RELATING TO THE SAFE OPERATION OF ALL FACILITIES RESULTING FROM ALL ACTIVITIES WITHIN THE JURISDICTION OF THE ADMINISTRATION PURSUANT TO THIS ACT.

 OFFICE OF NUCLEAR MATERIAL SAFETY AND SAFEGUARDS //42 USC 5844.//

SEC. 204. (A) THERE IS HEREBY ESTABLISHED IN THE COMMISSION AN OFFICE OF NUCLEAR MATERIAL SAFETY AND SAFEGUARDS UNDER THE DIRECTION OF A DIRECTOR OF NUCLEAR MATERIAL SAFETY AND SAFEGUARDS, WHO SHALL BE APPOINTED BY THE COMMISSION, WHO MAY REPORT DIRECTLY TO THE COMMISSION AS PROVIDED IN SECTION 209, AND WHO SHALL SERVE AT THE PLEASURE OF AND BE REMOVABLE BY THE COMMISSION.

**WESTLAW**   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case: 4:22-cv-00016-CDP Doc. #: 1-4 Filed: 01/28/22 Page: 43 of 903 PageID #: 1724
Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

(B) SUBJECT TO THE PROVISIONS OF THIS ACT, THE DIRECTOR OF NICLEAR MATERIAL SAFETY AND SAFEGUARDS SHALL PERFORM SUCH FUNCTIONS AS THE COMMISSION SHALL DELEGATE INCLUDING:

(1) PRINCIPAL LICENSING AND REGULATION INVOLVING ALL FACILITES AND MATERIALS, LICENSED UNDER THE ATOMIC ENERGY ACT OF 1954, AS AMENDED, //42 USC 2011 NOTE.// ASSOCIATED WITH THE PROCESSING, TRANSPORT, AND HANDLING OF NUCLEAR MATERIALS, INCLUDING THE PROVISION AND MAINTENANCE OF SAFEGUARDS AGAINST THREATS, THEFTS, AND SABOTAGE OF SUCH LICENSED FACILITIES, AND MATERIALS.

(2) REVIEW SAFETY AND SAFEGUARDS OF ALL SUCH FACILITIES AND MATERIALS LICENSED UNDER THA ATOMIC ENERGY ACT OF 1954, AS AMENDED, AND SUCH REVIEW SHALL INCLUDE, BUT NOT BE LIMITED TO—,

(A) MONITORING, TESTING, AND RECOMMENDING UPGRADING OF INTERNAL ACCOUNTING SYSTEMS FOR SPECIAL NUCLEAR AND OTHER NUCLEAR MATERIALS LICENSED UNDER THE ATOMIC ENERGY ACT OF 1954, AS AMENDED;

(B) DEVELOPING, IN CONSULTATION AND COORDINATION WITH THE ADMINISTRATION, CONTINGENCY PLANS FOR DEALING WITH THREATS, THEFTS, AND SABOTAGE RELATING TO SPECIAL NUCLEAR MATERIALS, HIGH–LEVEL RADIOACTIVE WASTES AND NUCLEAR FACILITIES RESULTING FROM ALL ACTIVITIES LICENSED UNDER THE ATOMIC ENERGY ACT OF 1954, AS AMENDED;

(C) ASSESSING THE NEED FOR, AND THE FEASIBILITY OF, ESTABLISHING A SECURITY AGENCY WITHING THE OFFICE FOR THE PERFORMANCE OF THE SAFEGUARDS FUNCTIONS, AND A REPORT WITH RECOMMENDATIONS ON THIS MATTER SHALL BE PREPARED WITHING ONE YEAR OF THE EFFECTIVE DATE OF THIS ACT AND PROMPTLY TRANSMITTED TO THE CONGRESS BY THE COMMISSION.

(3) RECOMMENDING RESEARCH TO ENABLE THE COMMISSION TO MORE EFFECTIVELY PERFORM ITS FUNCTIONS.

(C) NOTHING IN THIS SECTION SHALL BE CONSTRUED TO LIMIT IN ANY WAY THE FUNCTIONS OF THE ADMINISTRATION RELATING TO THE SAFEGUARDING OF SPECIAL NUCLEAR MATERIALS, HIGH–LEVEL RADIOACTIVE WASTES AND NUCLEAR FACILITIES RESULTING FROM ALL ACTIVITIES WITHIN THE JURISDICTION OF THE ADMINISTRATION PURSUANT TO THIS ACT.

OFFICE OF NUCLEAR REGULATORY RESEARCH

SEC. 205. (A) THERE IS HEREBY ESTABLISHED IN THE COMMISSION AN OFFICE OF NUCLEAR REGULATORY RESEARCH UNDER THE DIRECTION OF A DIRECTOR OF NUCLEAR REGULATORY RESEARCH, WHO SHALLL BE APPOINTED BY THE COMMISSION, WHO MAY REPORT DIRECTLY TO THE COMMISSION AS PROVIDED IN SECTION 209, AND WHO SHALL SERVE AT THE PLEASURE OF AND BE REMOVABLE BY THE COMMISSION.

(B) SUBJECT TO THE PROVISIONS OF THIS ACT, THE DIRECTOR OF NUCLEAR REGULATORY RESEARCH SHALL PERFORM SUCH FUNCTIONS AS THE COMMISSION SHALL DELEGATE INCLUDING:

(1) DEVELOPING RECOMMENDATIONS FOR RESEARCH DEEMED NECESSARY FOR PERFORMANCE BY THE COMMISSION OF ITS LICENSING AND RELATED REGULATORY FUNCTIONS.

(2) ENGAGING IN OR CONTRACTING FOR RESEARCH WHICH THE COMMISSION DEEMS NECESSARY FOR THE PERFORMANCE OF ITS LICENSING AND RELATED REGULATORY FUNCTIONS.

(C) THE ADMINISTRATOR OF THE ADMINISTRATION AND THE HEAD OF EVERY OTHER FEDERAL AGENCY SHALL—,

(1) COOPERATE WITH RESPECT TO THE ESTABLISHMENT OF PRIORITIES FOR THE FURNISHING OF SUCH RESEARCH SERVICES AS REQUESTED BY THE COMMISSION FOR THE CONDUCT OF ITS FUNCTIONS;

(2) FURNISH TO THE COMMISSION, ON A REIMBURSABLE BASIS, THROUGH THEIR OWN FACILITIES OR BY CONTRACT OR OTHER ARRANGEMENT, SUCH RESEARCH SERVICES AS THE COMMISSION DEEMS NECESSARY AND REQUESTS FOR THE PERFORMANCE OF ITS FUNCTIONS; AND

(3) CONSULT AND COOPERATE WITH THE COMMISSION ON RESEARCH AND DEVELOPMENT MATTERS OF MUTUAL INTEREST AND PROVIDE SUCH INFORMATION AND PHYSICAL ACCESS TO ITS FACILITIES AS WILL ASSIST THE COMMISSION IN ACQUIRING THE EXPERTISE NECESSARY TO PERFORM ITS LICENSING AND RELATED REGULATORY FUNCTIONS.

(D) NOTHING IN SUBSECTIONS (A) AND (B) OF THIS SECTION OR SECTION 201 OF THIS ACT SHALL BE CONSTRUED TO LIMIT IN ANY WAY THE FUNCTIONS OF THE ADMINISTRATION RELATING TO THE SAFETY OF ACTIVITIES WITHIN THE JURISDICTION OF THE ADMINISTRATION.

(E) EACH FEDERAL AGENCY, SUBJECT TO THE PROVISIONS OF EXISTING LAW, SHALL COOPERATE WITH THE COMMISSION AND PROVIDE SUCH INFORMATION AND RESEARCH SERVICES, ON A REIMBURSABLE BASIS, AS IT MAY HAVE OR BE REASONABLY ABLE TO ACQUIRE.

NONCOMPLIANCE //42 USC 5846.//

SEC. 206. (A) ANY INDIVIDUAL DIRECTOR, OR RESPONSIBLE OFFICER OF A FIRM CONSTRUCTING, OWNING, OPERATING, OR SUPPLYING THE COMPONENTS OF ANY FACILITY OR ACTIVITY WHICH IS LICENSED OR OTHERWISE REGULATED PURSUANT TO THE ATOMIC ENERGY ACT OF 1954 AS AMENDED, //42 USC 2011 NOTE.// OR PURSUANT TO THIS ACT, WHO OBTAINS INFORMATION REASONABLY INDICATING THAT SUCH FACILITY OR ACTIVITY OR BASIC COMPONENTS SUPPLIED TO SUCH FACILITY OR ACTIVITY—,

(1) FAILS TO COMPLY WITH THE ATOMIC ENERGY ACT OF 1954, AS AMENDED, OR ANY APPLICABLE RULE, REGULATION, ORDER, OR LICENSE OF THE COMMISSION RELATING TO SUBSTANTIAL SAFETY HAZARDS, OR

(2) CONTAINS A DEFECT WHICH COULD CREATE A SUBSTANTIAL SAFETY HAZARD, AS DEFINED BY REGULATIONS WHICH THE COMMISSION SHALL PROMULGATE, SHALL IMMEDIATELY NOTIFY THE COMMISSION OF SUCH FAILURE TO COMPLY, OR OF SUCH DEFECT, UNLESS SUCH PERSON HAS ACTUAL KNOWLEDGE THAT THE COMMISSION HAS BEEN ADEQUATELY INFORMED OF SUCH DEFECT OR FAILURE TO COMPLY.

(B) ANY PERSON WHO KNOWINGLY AND CONSCIOUSLY FAILS TO PROVIDE THE NOTICE REQUIRED BY SUBSECTION (A) OF THIS SECTION SHALL BE SUBJECT TO A CIVIL PENALTY IN AN AMOUNT EQUAL TO THE AMOUNT PROVIDED BY SECTION 234 OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED. //42 USC 2282.//

(C) THE REQUIREMENTS OF THIS SECTION SHALL BE PROMINENTLY POSTED ON THE PREMISES OF ANY FACILITY LICENSED OR OTHERWISE REGULATED PURSUANT TO THE ATOMIC ENERGY ACT OF 1954, AS AMENDED. //42 USC 2011 NOTE.//

(D) THE COMMISSION IS AUTHORIZED TO CONDUCT SUCH REASONABLE INSPECTIONS AND OTHER ENFORCEMENT ACTICITIES AS NEEDED TO INSURE COMPLIANCE WITH THE PROVISIONS OF THIS SECTION.

NUCLEAR ENERGY CENTER SITE SURVEY //42 USC 5847.//

SEC. 207. (A) (1) THE COMMISSION IS AUTHORIZED AND DIRECTED TO MAKE OR CAUSE TO BE MADE UNDER ITS DIRECTION, A NATIONAL SURVEY, WHICH SHALL INCLUDE CONSIDERATION OF EACH OF THE EXISTING OR FUTURE ELECTRIC RELIABILITY REGIONS, OR OTHER APPROPRIATE REGIONAL AREAS, TO LOCATE AND IDENTIFY POSSIBLE NUCLEAR ENERGY CENTER SITES. THIS

SURVEY SHALL BE CONDUCTED IN COOPERATION WITH OTHER INTERESTED FEDERAL, STATE, AND LOCAL AGENCIES, AND THE VIEWS OF INTERESTED PERSONS, INCLUDING ELECTRIC UTILITIES, CITIZENS' GROUPS, AND OTHERS, SHALL BE SOLICITED AND CONSIDERED.

(2) FOR PURPOSES OF THIS SECTION, THE TERM "NUCLEAR ENERGY CENTER SITE" MEANS ANY SITE, INCLUDING A SITE NOT RESTRICTED TO LAND, LARGE ENOUGH TO SUPPORT UTILITY OPERATIONS OR OTHER ELEMENTS OF THE TOTAL NUCLEAR FUEL CYCLE, OR BOTH INCLUDING, IF APPROPRIATE, NUCLEAR FUEL REPROCESSING FACILITIES, NUCLEAR FUEL FABRICATION PLANTS, RETRIEVABLE NUCLEAR WASTE STORAGE FACILITIES, AND UNRANIUM ENRICHMENT FACILITIES.

(3) THE SURVEY SHALL INCLUDE—,

(A) A REGIONAL EVALUATON OF NATURAL RESOURCES, INCLUDING LAND, AIR, AND WATER RESOURCES, AVAILABLE FOR USE IN CONNECTION WITH NUCLEAR ENERGY CENTER SITES; ESTIMATES OF FUTURE ELECTRIC POWER REQUIREMENTS THAT CAN BE SERVED BY EACH NUCLEAR ENERGY CENTER SITE; AN ASSESSMENT OF THE ECONOMIC IMPACT OF EACH NUCLEAR ENERGY SITE; AND CONSIDERATION OF ANY OTHER RELEVANT FACTORS, INCLUDING BUT NOT LIMITED TO POPULATION DISTRIBUTION, PROXIMITY TO ELECTRIC LOAD CENTERS AND TO OTHER ELEMENTS OF THE FUEL CYCLE, TRANSMISSION LINE RIGHTS–OF–WAY, AND THE AVAILABILITY OF OTHER FUEL RESOURCES;

(B) AN EVALUATION OF THE ENVIRONMENTAL IMPACT LIKELY TO RESULT FROM CONSTRUCTION AND OPERATION OF SUCH NUCLEAR ENERGY CENTERS WILL RESULT IN GREATER OR LESSER ENVIRONMENTAL IMPACT THAN SEPARATE SITING OF THE REACTORS AND/OR FUEL CYCLE FACILITIES; AND

(C) CONSIDERATION OF THE USE OF FEDERALLY OWNED PROPERTY AND OTHER PROPERTY DESIGNATED FOR PUBLIC USE, BUT EXCLUDING NATIONAL PARKS, NATIONAL FORESTS, NATIONAL WILDERNESS AREAS, AND NATIONAL HISTORIC MONUMENTS.

(4) A REPORT OF THE RESULTS OF THE SURVEY SHALL BE PUBLISHED AND TRANSMITTED TO THE CONGRESS AND THE COUNCIL ON ENVIRONMENTAL QUALITY NOT LATER THAN ONE YEAR FROM THE DATE OF THE ENACTMENT OF THIS ACT AND SHALL BE MADE AVAILABLE TO THE PUBLIC, AND SHALL BE UPDATED FROM TIME TO TIME THEREAFTER AS THE COMMISSION, IN ITS DISCRETION, DEEMS ADVISABLE. THE REPORT SHALL INCLUDE THE COMMISSION'S EVALUATION OF THE RESULTS OF THE SURVEY AND ANY CONCLUSIONS AND RECOMMENDATIONS, INCLUDING RECOMMENDATIONS FOR LEGISLATION, WHICH THE COMMISSION MAY HAVE CONCERNING THE FEASIBILITY AND PRACTICALITY OF LOCATING NUCLEAR POWER REACTORS AND/OR OTHER ELEMENTS OF THE NUCLEAR FUEL CYCLE ON NUCLEAR ENERGY CENTER SITES. THE COMMISSION IS AUTHORIZED TO ADOPT POLICIES WHICH WILL ENCOURAGE THE LOCATION OF NUCLEAR POWER REACTORS AND RELATED FUEL CYCLE FACILITIES ON NUCLEAR ENERGY CENTER SITES INSOFAR AS PRACTICABLE.

ABNORMAL OCCURRENCE REPORTS //42 USC 5848.//

SEC. 208. THE COMMISSION SHALL SUBMIT TO THE CONGRESS EACH QUARTER A REPORT LISTING FOR THAT PERIOD ANY ABNORMAL OCCURRENCES AT OR ASSOCIATED WITH ANY FACILITY WHICH IS LICENSED OR OTHERWISE REGULATED PURSUANT TO THE ATOMIC ENERGY ACT OF 1954 AS AMENDED, //42 USC 2011 NOTE.// OR PURSUANT TO THIS ACT. FOR THE PURPOSES OF THIS SECTION AN ABNORMAL OCCURRENCE IS AN UNSCHEDULED INCIDENT OR EVENT WHICH THE COMMISSION DETERMINES IS SIGNIFICANT FROM THE STANDPOINT OF PUBLIC HEALTH OR SAFETY. NOTHING IN THE PRECEDING SENTENCE SHALL LIMIT THE AUTHORITY OF A COURT TO REVIEW THE DETERMINATION OF THE COMMISSION. EACH SUCH REPORT SHALL CONTAIN—,

(1) THE DATE AND PLACE OF EACH OCCURRENCE;

**WESTLAW** © 2017 Thomson Reuters. No claim to original U.S. Government Works. 15

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

(2) THE NATURE AND PROBABLE CONSEQUENCE OF EACH OCCURRENCE;
(3) THE CAUSE OR CAUSES OF EACH; AND
(4) ANY ACTION TAKEN TO PREVENT REOCCURRENCE;

THE COMMISSION SHALL ALSO PROVIDE AS WIDE DISSEMINATION TO THE PUBLIC OF THE INFORMATION SPECIFIED IN CLAUSES (1) AND (2) OF THIS SECTION AS REASONABLY POSSIBLE WITHIN FIFTEEN DAYS OF ITS RECEIVING INFORMATION OF EACH ABNORMAL OCCURRENCE AND SHALL PROVIDE AS WIDE DISSEMINATION TO THE PUBLIC AS REASONABLY POSSIBLE OF THE INFORMATION SPECIFIED IN CLAUSES (3) AND (4) AS SOON AS SUCH INFORMATION BECOMES AVAILABLE TO IT.
 OTHER OFFICERS //42 USC 5849.//

SEC. 209. (A) THE COMMISSION SHALL APPOINT AN EXECUTIVE DIRECTOR FOR OPERATIONS, WHO SHALL SERVE AT THE PLEASURE OF AND BE REMOVABLE BY THE COMMISSION.

 (B) THE EXECUTIVE DIRECTOR SHALL PERFORM SUCH FUNCTIONS AS THE COMMISSION MAY DIRECT, EXCEPT THAT THE EXECUTIVE DIRECTOR SHALL NOT LIMIT THE AUTHORITY OF THE DIRECTOR OF ANY COMPONENT ORGANIZATION PROVIDED IN THIS ACT TO COMMUNICATE WITH OR REPORT DIRECTLY TO THE COMMISSION WHEN SUCH DIRECTOR OF A COMPONENT ORGANIZATION DEEMS IT NECESSARY TO CARRY OUT HIS RESPONSIBILITIES.
 (C) THERE SHALL BE IN THE COMMISSION NOT MORE THAN FIVE ADDITIONAL OFFICERS APPOINTED BY THE COMMISSION. THE POSITIONS OF SUCH OFFICERS SHALL BE CONSIDERED CAREER POSITIONS AND BE SUBJECT TO SUBSECTION 161 D, OF THE ATOMIC ENERGY ACT. //42 USC 2201.//
             TITLE II—MISCELLANEOUS AND TRANSITIONAL PROVISIONS
 TRANSITIONAL PROVISIONS //42 USC 5871.//

SEC. 301. (A) EXCEPT AS OTHERWISE PROVIDED IN THIS ACT, WHENEVER ALL OF THE FUNCTIONS OF PROGRAMS OF AN AGENCY, OR OTHER BODY, OR ANY COMPONENT THEREOF, AFFECTED BY THIS ACT, HAVE BEEN TRANSFERRED FROM THAT AGENCY, OR OTHER BODY, OR ANY COMPONENT THEREOF BY THIS ACT, THE AGENCY, OR OTHER BODY, OR COMPONENT THEREOF SHALL LAPSE. IF AN AGENCY, OR OTHER BODY, OR ANY COMPONENT THEREOF, LAPSES PURSUANT TO THE PRECEDING SENTENCE, EACH POSITION AND OFFICE THEREIN WHICH WAS EXPRESSLY AUTHORIZED BY LAW, OR THE INCUMBENT OF WHICH WAS AUTHORIZED TO RECEIVE COMPENSATION AT THE RATE PRESCRIBED FOR AN OFFICE OR POSITION AT LEVEL II, III, IV, OR V OF THE EXECUTIVE SCHEDULE (5 U.S.C. 5313—5316), SHALL LAPSE.

 (B) ALL ORDERS, DETERMINATIONS, RULES, REGULATIONS, PERMITS, CONTRACTS, CERTIFICATES, LICENSES, AND PRIVILEGES—,
 (1) WHICH HAVE BEEN ISSUED, MADE, GRANTED, OR ALLOWED TO BECOME EFFECTIVE BY THE PRESIDENT, ANY FEDERAL DEPARTMENT OR AGENCY OR OFFICIAL THEREOF, OR BY A COURT OF COMPETENT JURISDICTION, IN THE PERFORMANCE OF FUNCTIONS WHICH ARE TRANSFERRED UNDER THIS ACT, AND
 (2) WHICH ARE IN EFFECT AT THE TIME THIS ACT TAKES EFFECT, SHALL CONTINUE IN EFFECT ACCORDING TO THEIR TERMS UNTIL MODIFIED, TERMINATED, SUPERSEDED, SET ASIDE, OR REVOKED BY THE PRESIDENT, THE ADMINISTRATOR, THE COMMISSION, OR OTHER AUTHORIZED OFFICIALS, A COURT OF COMPETENT JURISDICTION, OR BY OPERATION OF LAW.
 (C) THE PROVISIONS OF THIS ACT SHALL NOT AFFECT ANY PROCEEDING PENDING, AT THE TIME THIS SECTION TAKES EFFECT, BEFORE THE ATOMIC ENERGY COMMISSION OR ANY DEPARTMENT OR AGENCY (OR COMPONENT THEREOF) FUNCTIONS OF WHICH ARE TRANSFERRED BY THIS ACT; BUT SUCH PROCEEDINGS, TO THE EXTENT THAT THEY RELATE TO FUNCTIONS SO TRANSFERRED,

**WESTLAW**  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

SHALL BE CONTINUED. ORDERS SHALL BE ISSUED IN SUCH PROCEEDINGS, APPEALS SHALL BE TAKEN THEREFROM, AND PAYMENTS SHALL BE MADE PURSUANT TO SUCH ORDERS, AS IF THIS ACT HAD NOT BEEN ENACTED; AND ORDERS ISSUED IN ANY SUCH PROCEEDINGS SHALL CONTINUE IN EFFECT UNTIL MODIFIED, TERMINATED, SUPERSEDED, OR REVOKED BY A DULY AUTHORIZED OFFICIAL, BY A COURT OF COMPETENT JURISDICTION, OR BY OPERATION OF LAW. NOTHING IN THIS SUBSECTION SHALL BE DEEMED TO PROHIBIT THE DISCONTINUANCE OR MODIFICATION OF ANY SUCH PROCEEDING UNDER THE SAME TERMS AND CONDITIONS AND TO THE SAME EXTENT THAT SUCH PROCEEDING COULD HAVE BEEN DISCONTINUED IF THIS ACT HAD NOT BEEN ENACTED.

 (D) EXCEPT AS PROVIDED IN SUBSECTION (F)—,

 (1) THE PROVISIONS OF THIS ACT SHALL NOT AFFECT SUITS COMMENCED PRIOR TO THE DATE THIS ACT TAKES EFFECT, AND

 (2) IN ALL SUCH SUITS PROCEEDINGS SHALL BE HAD, APPEALS TAKEN, AND JUDGMENTS RENDERED, IN THE SAME MANNER AND EFFECT AS IF THIS ACT HAD NOT BEEN ENACTED.

 (E) NO SUIT , ACTION, OR OTHER PROCEEDING COMMENCED BY OR AGAINST ANY OFFICER IN HIS OFFICIAL CAPACITY AS AN OFFICER OF ANY DEPARTMENT OR AGENCY, FUNCTIONS OF WHICH ARE TRANFERRED BY THIS ACT, SHALL ABATE BY REASON OF THE ENACTMENT OF THIS ACT. NO CAUSE OF ACTION BY OR AGENCY, FUNCTIONS OF WHICH ARE TRANSFERRED BY THIS ACT, SHALL ABATE BY REASON OF THE ENACTMENT OF THIS ACT. NO CAUSE OF ACTION BY OR AGAINST ANY DEPARTMENT OR AGENCY, FUNCTIONS OF WHICH ARE TRANSFERRED BY THIS ACT, OR BY OR AGAINST ANY OFFICER THEREOF IN HIS OFFICIAL CAPACITY SHALL ABATE BY REASON OF THE ENACTMENT OF THIS ACT. CAUSES OF ACTIONS, SUITS, ACTIONS, OR OTHER PROCEEDINGS MAY BE ASSERTED BY OR AGAINST THE UNITED STATES OR SUCH OFFICIAL AS MAY BE APPROPRIATE AND, IN ANY LITIGATION PENDING WHEN THIS SECTION TAKES EFFECT, THE COURT MAY AT ANY TIME, ON ITS OWN MOTION OR THAT OF ANY PARTY, ENTER ANY ORDER WHICH WILL GIVE EFFECT TO THE PROVISIONS OF THIS SECTION.

 (F) IF, BEFORE THE DATE ON WHICH THIS ACT TAKES EFFECT, ANY DEPARTMENT OR AGENCY, OR OFFICER THEREOF IN HIS OFFICIAL CAPACITY, IS A PARTY TO A SUIT, AND UNDER THIS ACT ANY FUNCTION OF SUCH DEPARTMENT, AGENCY, OR OFFICER IS TRANSFERRED TO THE ADMINISTRATOR OR COMMISSION, OR ANY OTHER OFFICIAL, THEN SUCH SUIT SHALL BE CONTINUED AS IF THIS ACT HAD NOT BEEN ENACTED, WITH THE ADMINISTRATOR OR COMMISSION, OR OTHER OFFICIAL, AS THE CASE MAY BE, SUBSTITUTED.

 (G) FINAL ORDERS AND ACTIONS OF ANY OFFICIAL OR COMPONENT IN THE PERFORMANCE OF FUNCTIONS TRANSFERRED BY THIS ACT SHALL BE SUBJECT TO JUDICIAL REVIEW TO THE SAME EXTENT AND IN THE SAME MANNER AS IF SUCH ORDERS OR ACTIONS HAD BEEN MADE OR TAKEN BY THE OFFICER, DEPARTMENT, AGENCY, OR INSTRUMENTALITY IN THE PERFORMANCE OF SUCH FUNCTIONS IMMEDIATELY PRECEDING THE EFFECTIVE DATE OF THIS ACT. ANY STATUTORY REQUIREMENTS RELATING TO NOTICES, HEARINGS, ACTION UPON THE RECORD, OR ADMINISTRATIVE REVIEW THAT APPLY TO ANY FUNCTION TRANSFERRED BY THIS ACT SHALL APPLY TO THE PERFORMANCE OF THOSE FUNCTIONS BY THE ADMINISTRATOR ORE COMMISSION, OR ANY OFFICER OR COMPONENT.

 (H) WITH RESPENCT TO ANY FUNCTION TRANSFERRED BY THIS ACT AND PERFORMED AFTER THE EFFECTIVE DATE OF THIS ACT, REFERENCE IN ANY OTHER LAW TO ANY DEPARTMENT OR AGENCY, OR ANY OFFICER OR OFFICE, THE FUNCTIONS OF WHICH ARE SO TRANSFEREED, SHALL BE DEEMED TO REFER TO THE ADMINISTRATION, THE ADMINISTRATOR OR COMMISSION, OR OTHER OFFICE OR OFFICIAL IN WHICH THIS ACT VESTS SUCH FUNCTIONS.

 (I) NOTHING CONTAINED IN THIS ACT SHALL BE CONSTRUED TO LIMIT, CURTAIL, ABOLISH, OR TERMINATE ANY FUNCTION OF THE PRESIDENT WHICH HE HAD IMMEDIATELY BEFORE THE EFFECTIVE DATE OF THIS ACT; OR TO LIMIT, CURTAIL, ABOLISH, OR TERMINATE HIS AUTHORITY

TO PERFORM SUCH FUNCTION; OR TO LIMIT, CURTAIL, ABOLISH, OR TERMINATE HIS AUTHORITY TO DELEGATE, REDELEGATE, OR TERMINATE ANY DELEGATION OF FUNCTIONS.

 (J) ANY REFERENCE IN THIS ACT TO ANY PROVISION OF LAW SHALL BE DEEMED TO INCLUDE, AS APPROPRIATE, REFERENCES THERETO AS NOW OR HERE–AFTER AMENDED OR SUPPLEMENTED.

 (K) EXCEPT AS MAY BE OTHERWISE EXPRESSLY PROVIDED IN THIS ACT, ALL FUNCTIONS EXPRESSLY CONFERRED BY THIS ACT SHALL BE IN ADDITION TO AND NOT IN SUBSTUTUTION FOR FUNCTIONS EXISTING IMMEDIATELY BEFORE THE EFFECTIVE DATE OF THIS ACT AND TRANSFERRED BY THIS ACT.

 TRANSFER OF PERSONNEL AND OTHER MATTERS //42 USC 5872.//

SEC. 302. (A) EXCEPT AS PROVIDED IN THE NEXT SENTENCE, THE PERSONNEL EMPLOYED IN CONNECTION WITH, AND THE PERSONNEL POSITIONS, ASSETS, LIABILITIES, CONTRACTS, PROPERTY, RECORDS, AND UNEXPENDED BALANCES OF APPROPRIATIONS, AUTHORIZATIONS, ALLOCATIONS, AND OTHER FUNDS EMPLOYED, HELD, USED, ARISING FROM, AVAILABLE TO OR TO BE MADE AVAILABLE IN CONNECTION WITH THE FUNCTION AND PROGRAMS TRANSFERRED BY THIS ACT, ARE, SUBJECT TO SECTION 202 OF THE BUDGET AND ACCOUNTING PROCEDURES ACT OF 1950 (31 U.S.C. 581C), CORRESPONDINGLY TRANSFERRED FOR APPROPRIATE ALLOCATION. PERSONNEL POSITIONS EXPRESSLY CREATED BY LAW, PERSONNEL OCCUPYING THOSE POSITIONS ON THE EFFECTIVE DATE OF THIS ACT, AND PERSONNEL AUTHORIZED TO RECEIVE COMPENSATION AT THE RATE PRESCRIBED FOR OFFICES AND POSITIONS AT LEVELS II, III, IV, OR V OF THE EXECUTIVE SCHEDULE (5 U.S.C. 5313—5316) ON THE EFFECTIVE DATE OF THIS ACT SHALL BE SUBJECT TO THE PROVISIONS OF SUBSECTION (C) OF THIS SECTION AND SECTION 301 OF THIS ACT.

 (B) EXCEPT AS PROVIDED IN SUBSECTION (C), TRANSFER OF NONTEMPORARY PERSONNEL PURSUANT TO THIS ACT SHALL NOT CAUSE ANY SUCH EMPLOYEE TO BE SEPARATED OR REDUCED IN GRADE OR COMPENSATION FOR ONE YEAR AFTER SUCH TRANSFER.

 (C) ANY PERSON WHO. ON THE EFFECTIVE DATE OF THIS ACT, HELD A POSITION COMPENSATED IN ACCORDANCE WITH THE EXECUTIVE SCHEDULE PRESCRIBED IN CHAPTER 53 OF TITLE 5 OF THE UNITED STATES CODE, AND WHO, WITHOUT A BREAK IN SERVICE, IS APPOINTED IN THE ADMINISTRATION TO A POSITION HAVING DUTIES COMPARABLE TO THOSE PERFORMED IMMEDIATELY PRECEDING HIS APPOINTMENT SHALL CONTINUE TO BE COMPENSATED IN HIS NEW POSITION AS NOT LESS THAN THE RATE PROVIDED FOR THIS PREVIOUS POSITION.

 INCIDENTAL DISPOSITIONS /42 USC 5873.//

AUTHORIZED TO MAKE SUCH ADDITIONAL INCIDENTAL DISPOSITIONS OF PERSONNEL, PERSONNEL POSITIONS, ASSETS, LIABILITIES, CONTRACTS, PROPERTY, RECORDS, AND UNEXPENDED BALANCES OF APPROPRIATIONS, AUTHORIZATIONS, ALLOCATIONS, AND OTHER FUNDS HELD, USED, ARISING FROM, AVAILABLE TO OR TO BE MADE AVAILABE IN CONNECTION WITH FUNCTIONS TRANSFERRED BY THIS ACT, AS HE MAY DEEM NECESSARY OR APPROPRIATE TO ACCOMPLISH THE INTENT AND PURPOSE OF THIS ACT.

 DEFINITIONS //42 USC 5874.//

SEC. 304. AS USED IN THIS ACT—,

 (1) ANY REFERENCE TO "FUNCTION" OR "FUNCTIONS" SHALL BE DEEMED TO INCLUDE REFERENCES TO DUTY, OBLIGATION, POWER, AUTHORITY, RESPONSIBILITY, RIGHT, PRIVILEGE, AND ACTIVITY, OR THE PLURAL THEREOF, AS THE CASE MAY BE; AND

 (2) ANY REFERENCE TO "PERFORM" OR "PERFORMANCE", WHEN USED IN RELATION TO FUNCTIONS, SHALL BE DEEMED TO INCLUDE THE EXERCISE OF POWER, AUTHORITY, RIGHTS, AND PRIVILEGES.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

AUTHORIZATION OF APPROPRIATIONS //42 USC 5875.//

SEC. 305. (A) EXCEPT AS OTHERWISE PROVIDED BY LAW, APPROPRIATIONS MADE UNDER THIS ACT SHALL BE SUBJECT TO ANNUAL AUTHORIZATION.

 (B) AUTHORIZATION OF APPROPRIATIONS TO THE COMMISSION SHALL REFLECT THE NEED FOR EFFECTIVE LICENSING AND OTHER REGULATION OF THE NUCLEAR POWER INDUSTRY IN RELATION TO THE GROWTH OF SUCH INDUSTRY.
 COMPTROLLER GENERAL AUDIT //42 SUC 5876.//

SEC. 306. (A) SECTION 166. "COMPTROLLER GENERAL AUDIT" OF THE ATOMIC ENERGY ACT OF 1954, AS AMENDED, //42 USC 2206.// SHALL BE DEEMED TO BE APPLICABLE, RESPECTIVELY, TO THE NUCLEAR AND NONNUCLEAR ACTIVITIES UNDER TITLE I AND TO THE ACTIVITIES UNDER TITLE II. //ANTE, PP. 1234, 1242.//

 (B) THE COMPTROLLER GENERAL OF THE UNITED STATES SHALL AUDIT, REVIEW, AND EVALUATE THE IMPLEMENTATION OF THE PROVISIONS OF TITLE II OF THIS ACT BY THE NUCLEAR SAFETY AND LICENSING COMMISSION NOT LATER THAN SIXTY MONTHS AFTER THE EFFECTIVE DATE OF THIS ACT, THE COMPTROLLER GENERAL SHALL PREPARE AND SUBMIT TO THE CONGRESS A REPORT ON HIS AUDIT, WHICH SHALL CONTAIN, BUT NOT BE LIMITED TO—,
 (1) AN EVALUATION OF THE EFFECTIVENESS OF THE LICENSING AND RELATED REGULATORY ACTIVITIES OF THE COMMISSION AND THE OPERATIONS OF THE OFFICE OF NUCLEAR SAFETY RESEARCH AND THE BUREAU OF NUCLEAR MATERIALS SECURITY;
 (2) AN EVALUATION OF THE EFFECT OF SUCH COMMISSION ACTIVITIES ON THE EFFICIENCY, EFFECTIVENESS, AND SAFETY WITH WHICH THE ACTIVITIES LICENSED UNDER THE ATOMIC ENERGY ACT OF 1954, AS AMENDED, ARE CARRIED OUT;
 (3) RECOMMENDATIONS CONCERNING ANY LEGISLATION HE DEEMS NECESSARY, AND THE REASONS TEREFOR, FOR IMPROVING THE IMPLEMENTATION OF TITLE II.
 REPORTS //42 USC 5877.//

SEC. 307. (A) THE ADMINISTRATOR SHALL, AS SOON AS PRACTICABLE AFTER THE END OF EACH FISCAL YEAR, MAKE A REPORT TO THE PRESIDENT FOR SUBMISSION TO THE CONGRESS ON THE ACTIVITIES OF THE ADMINISTRATION DURING THE PRECEDING FISCAL YEAR. SUCH REPORT SHALL INCLUDE A STATEMENT OF THE SHORT–RANGE AND LONG–RANGE GOALS, PRIORITIES, AND PLANS OF THE ADMINISTRATION TOGETHER WITH AN ASSESSMENT OF THE PROGRESS MADE TOWARD THE ATTAINMENT OF THOSE OBJECTIVES AND TOWARD THE MORE EFFECTIVE AND EFFICIENT MANAGEMENT OF THE ADMINISTRATION AND THE COORDINATION OF ITS FUNCTIONS.

 (B) DURING THE FIRST YEAR OF OPERATION OF THE ADMINISTRATION, THE ADMINISTRATOR, IN COLLABORATION WITH THE SECRETARY OF DEFENSE, SHALL CONDUCT A THOROUGH REVIEW OF THE DESIRABILITY AND FEASIBILITY OF TRANSFERRING TO THE DEPARTMENT OF DEFENSE OR OTHER FEDERAL AGENCIES THE FUNCTIONS OF THE ADMINISTRATOR RESPECTING MILITARY APPLICATION AND RESTRICTED DATA, AND WITHIN ONE YEAR AFTER THE ADMINISTRATOR FIRST TAKES OFFICE THE ADMINISTRATOR SHALL MAKE A REPORT TO THE PRESIDENT, FOR SUBMISSION TO THE CONGRESS, SETTING FORTH HIS COMPREHENSIVE ANALYSIS, THE PRINCIPAL ALTERMATIVES, AND THE SPECIFIC RECOMMENDATIONS OF THE ADMINISTRATOR AND THE SECREATARY OF DEFENSE.
 (C) THE COMMISSION SHALL, AS SOON AS PRACTICABLE AFTER THE END OF EACH FISCAL YEAR, MAKE A REPORT TO THE PRESIDENT FOR SUBMISSION TO THE CONGRESS ON THE ACTIVITIES OF THE COMMISSION DURING THE PRECEDING FISCAL YEAR. SUCH REPORT SHALL

Case: 4:22-cv-00016-CDP Doc. #: 14-6 Filed: 01/28/22 Page: 50 of 903 PageID #: 1731

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

INCLUDE A CLEAR STATEMENT OF THE SHORT–RANGE AND LONG–RANGE GOALS, PRIORTITIES, AND PLANS OF THE COMMISSION AS THEY RELATE TO THE BENIFITS, COSTS, AND RISKS OF COMMERICIAL NUCLEAR POWER. SUCH REPORT SHALL ALSO INCLUDE A CLEAR DESCRIPTION OF THE COMMISSION'S ACTIVITIES AND FINDINGS IN FOLLOWING AREAS—,

 (1) INSURING THE SAFE DESIGN OF NUCLEAR POWERPLANTS AND OTHER LICENSED FACILITIES;

 (2) INVEISTIGATING ABNORMAL OCCURRENCES AND DEFECTS IN NUCLEAR POWERPLANTS AND OTHER LICENSED FACILITIES;

 (3) SAFEGUARDING SPECIAL NUCLEAR MATERIALS AT ALL STAGES OF THE NUCLEAR FUEL CYCLE;

 (4) INVESTIGATING SUSPECTED, ATTEMPTED, OR ACTUAL THEFTS OF SPECIAL NUCLEAR MATERIALS IN THE LICENSED SECTOR AND DEVELOPING CONTINGENCY PLANS FOR DEALING WITH SUCH INCIDENTS;

 (5) INSURING THE SAFE, PERMANENT DISPOSAL OF HIGH–LEVEL RADIOAVTIVE WASTES THROUGH THE LICENSING OF NUCLEAR ACTIVITIES AND FACILITIES;

 (6) PROTECTING THE PUBLIC AGAINST THE HAZARDS OF LOW–LEVEL RADIOACTIVE EMISSIONS FROM LICENSED NUCLEAR ACTIVITIES AND FACILITIES.

INFORMATION TO COMMITTEES //42 USC 5878.//

SEC. 308. THE ADMINISTRATOR SHALL KEEP THE APPROPRIATE CONGRESSIONAL COMMITTEES FULLY AND CURRENTLY INFORMED WITH RESPECT TO ALL OF THE ADMINISTRATION'S ACTIVITIES.

 TRANSFER OF FUNDS //42 USC 5879.//

SEC. 309. THE ADMINISTRATOR, WHEN AUTHORIZED IN AN APPROPRIATION ACT, MAY, IN ANY FISCAL YEAR, TRANSFER FUNDS FROM ONE APPROPRIATION TO ANOTHER WITHIN THE ADMINISTRATION; EXCEPT, THAT NO APPROPRIATION SHALL BE EITHER INCREASED OR DECREASED PURSUANT TO THIS SECTION BY MORE THAN 5 PER CENTUM OF THE APPROPRIATION FOR SUCH FISCAL YEAR.

CONFORMING AMENDMENTS TO CERTAIN OTHER LAWS

SEC. 310. SUBCHAPTER II (RELATING TO EXECUTIVE SCHEDULE PAY RATES) OF CHAPTER 53 OF TILTE 5, UNITED STATES CODE, IS AMENDED AS FOLLOWS:

 (1) SECTION 5313 IS AMENDED BY STRIKING OUT "(8) CHAIRMAN, ATOMIC ENERGY COMMISSION." AND INSERTING IN LIEU THEREOF "(8) CHAIRMAN, NUCLEAR REGULATORY COMMISSION.", AND BY ADDING AT THE END THEREOF THE FOLLOWING:
 "(22) ADMINISTRATOR OF ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION.".
 (2) SECTION 5314 IS AMENDED BY STRIKING OUT "(42) MEMBERS, ATOMIC ENERGY COMMISSION." AND INSERTING IN LIEU THEREOF "(42) MEMBERS, NUCLEAR REGULATORY COMMISSION.", AND BY ADDING AT THE END THEREOF THE FOLLOWING:
 "(60) DEPUTY ADMINISTRATOR, ENERGY RESEARCH AND DEVELOPMENT AMINISTRATION.".
 (3) SECTION 5315 IS AMENDED BY STRIKING OUT PARAGRAPH (50), AND BY ADDING AT THE END THEREOF THE FOLLOWING:
 "(100) ASSISTANT ADMINISTRATORS, ENERGY
RESEARCH AND DEVELOPMENT ADMINISTRATION (6).
 "(101) DIRECTOR OF NUCLEAR REACTOR REGULATION, NUCLEAR REGULATORY COMMISSION.
 "(102) DIRECTOR OF NUCLEAR MATERIAL SAFETY AND
SAFEGUARDS, NUCLEAR REGULATORY COMMISSION.

"(103) DIRECTOR OF NUCLEAR REGULATORY
RESEARCHT, NUCLEAR REGULATORY COMMISSION.
"(104) EXECUTIVE DIRECTOR FOR OPERATIONS, NUCLEAR REGULATORY COMMISSION."

(4) SECTION 5316 IS AMENDED BY STRIKING OUT PARAGRAPHS (29), (62), (69), AND (102), BY STRIKING OUT "(81) GENERAL COUNSEL OF THE ATOMIC ENERGY COMMISSION," AND INSERTING IN LIEU THEREOF "(81 GENERAL COUNSEL OF THE NUCLEAR REGULATORY COMMISSION.", AND BY ADDING AT THE END THEREOF THE FOLLOWING:

"(134) GENERAL COUNSEL, ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION.
"(135) ADDITIONAL OFFICERS, ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION (8).
"(136) ADDITIONAL OFFICERS, NUCLEAR REGULATORY COMMISSION (5).".

SEPARABILITY //42 USC 5801 NOTE.//

SEC. 311. IF ANY PROVISION OF THIS ACT, OR THE APPLICATION THEREOF TO ANY PERSON OR CIRCUMSTANCE, IS HELD INVALID, THE REMAINDER OF THIS ACT, AND THE APPLICATION OF SUCH PROVISION TO OTHER PERSONS OR CIRCUMSTANCES, SHALL NOT BE AFFECTED THEREBY.

EFFECTIVE DATE AND INTERIM APPOINTMENTS //42 USC 5801 NOTE//

SEC. 312. (A) THIS ACT SHALL TAKE EFFECT ONE HUNBDRED AND TWENTY DAYS AFTER THE DATE OF ITS ENACTMENT, OR ON SUCH EARLIER DATE AS THE PRESIDENT MAY PRESCRIBE AND PUBLISH IN THE FEDERAL REGISTER; EXCEPT THAT ANY OF THE OFFICERS PROVIDED FOR IN TITLE I OF THIS ACT MAY BE NOMINATED AND APPOINTED, AS PROVIDED BY THIS ACT, AT ANY TIME AFTER THE DATE OF ENACTMENT OF THIS ACT. FUNDS AVAILABLE TO ANY DEPARTMENT OR AGENCY (OR ANY OFFICIAL OR COMPONENT THEREOF), ANY FUNCTIONS OF WHICH ARE TRANSFERRED TO THE ADMINISTRATOR AND THE COMMISSION BY THIS ACT, MAY, WITH THE APPROVAL OF THE PRESIDENT, BE USED TO PAY THE COMPENSATION AND EXPENSES OF ANY OFFICER APPOINTED PURSUANT TO THIS SUBSECTION UNTIL SUCH TIME AS FUNDS FOR THAT PURPOSE ARE OTHERWISE AVAILABLE.

(B) IN THE EVENT THAT ANY OFFICER REQUIRED BY THIS ACT TO BE APPOINTED BY AND WITH THE ADVICE AND CONSENT OF THE SENATE SHALL NOT HAVE ENTERED UPON OFFICE ON THE EFFECTIVE DATE OF THIS ACT, THE PRESIDENT MAY DESIGNATE ANY OFFICER, WHOSE APPOINTMENT WAS REQUIRED TO BE MADE BY AND WITH THE ADVICE AND CONSENT OF THE SENATE AND WHO WAS SUCH AN OFFICER IMMEDIATELY PRIOR TO THE EFFECTIVE DATE OF THIS ACT, TO ACT IN SUCH OFFICE UNTIL THE OFFICE IS FILLED AS PROVIDED IN THIS ACT. WHILE SO ACTING, SUCH PERSONS SHALL RECEIVE COMPENSATION AT THE RATES PROVIDED BY THIS ACT FOR THE RESPECTIVE OFFICES IN WHICH THEY ACT.

TITLE IV—SEX DESCRIMINATION

SEX DISCRIMINATION PROHIBITED //42 USC 5891.//

SEC. 401. NO PERSON SHALL ON THE GROUND OF SEX BE EXCLUDED FROM PARTICIPATION IN, BE DENIED A LICENSE UNDER, BE DENIED THE BENEFITS OF, OR BE SUBJECTED TO DISCRIMINATION UNDER ANY PROGRAM OR ACTIVETY CARRIED ON OR RECEIVING FEDERAL ASSISTANCE UNDER ANY TITLE OF THIS ACT. THIS PROVISION WILL BE ENFORCED THROUGH AGENCY PROVISIONS AND RULES SIMILAR TO THOSE ALREADY ESTABLISHED, WITH RESPECT TO RACIAL AND OTHER DISCRIMINATION, UNDER TITLE VI OF THE CIVIL RIGHTS ACT OF 1964. //42 USC 2000D.// HOWEVER, THIS REMEDY IS NOT EXCLUSIVE AND WILL NOT PREFJUDICE OR CUT OFF ANY OTHER LEGAL REMEDIES AVAILABLE TO A DISCRIMINATEE.

LEGISLATIVE HISTORY:

Case: 4:22-cv-00016-CDP   Doc. #: 1-4   Filed: 01/28/22   Page: 52 of 903 PageID #: 1783

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

HOUSE REPORTS: NO. 93—707 (COMM. ON GOVERNMENT
OPERATIONS) AND NO. 93—1445 (COMM. OF CONFERENCE).
SENATE REPORT NO. 93—980 ACCOMPANYING S. 2744 (COMM. ON GOVERNMENT OPERATIONS).
CONGRESSIONAL RECORD:
VOL. 119 (1973): DEC. 19, CONSIDERED AND PASSED HOUSE.
VOL. 120 (1974): AUG. 15, CONSIDERED AND PASSED SENATE, AMENDED, IN LIEU OF S. 2744.
OCT. 9, HOUSE AGREED TO CONFERENCE REPORT.
OCT. 10, SENATE AGREED TO CONFERENCE REPORT.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS:
VOL. 10, NO. 41 (1974): OCT. 11, PRESIDENTIAL STATEMENT.

Approved October 11, 1974.

PL 93–438, 1974 HR 11510

---

**End of Document**                                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

# EXHIBIT 7

Case 4:22-cv-00062-CDP Doc. #: 148-7 Filed: 01/29/21 Page: 54 of 903 PageID #: 1435

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Public Law 703    CHAPTER 1073

## AN ACT

To amend the Atomic Energy Act of 1946, as amended, and for other purposes.

August 30, 1954
[H. R. 9757]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Atomic Energy Act of 1946, as amended, is amended to read as follows:

Atomic Energy Act of 1954.
60 Stat. 755.
42 USC 1801 note.

## "ATOMIC ENERGY ACT OF 1954

"CHAPTER 1. DECLARATION, FINDINGS, AND PURPOSE    *Post,* p. 921.

"Sec. 1. Declaration.
"Sec. 2. Findings.
"Sec. 3. Purpose.

"CHAPTER 2. DEFINITIONS    *Post,* p. 922.

"Sec. 11. Definitions.

"CHAPTER 3. ORGANIZATION    *Post,* p. 924.

"Sec. 21. Atomic Energy Commission.
"Sec. 22. Members.
"Sec. 23. Office.
"Sec. 24. General Manager.
"Sec. 25. Divisions and Offices.
"Sec. 26. General Advisory Committee.
"Sec. 27. Military Liaison Committee.
"Sec. 28. Appointment of Army, Navy, or Air Force Officers.

"CHAPTER 4. RESEARCH    *Post,* p. 927.

"Sec. 31. Research Assistance.
"Sec. 32. Research by the Commission.
"Sec. 33. Research for Others.

"CHAPTER 5. PRODUCTION OF SPECIAL NUCLEAR MATERIAL    *Post,* p. 928.

"Sec. 41. Ownership and Operation of Production Facilities.
"Sec. 42. Irradiation of Materials.
"Sec. 43. Acquisition of Production Facilities.
"Sec. 44. Disposition of Energy.

"CHAPTER 6. SPECIAL NUCLEAR MATERIAL    *Post,* p. 929.

"Sec. 51. Special Nuclear Material.
"Sec. 52. Government Ownership of All Special Nuclear Material.
"Sec. 53. Domestic Distribution of Special Nuclear Material.
"Sec. 54. Foreign Distribution of Special Nuclear Material.
"Sec. 55. Acquisition.
"Sec. 56. Fair Price.
"Sec. 57. Prohibition.

"CHAPTER 7. SOURCE MATERIAL    *Post,* p. 932.

"Sec. 61. Source Material.
"Sec. 62. License for Transfers Required.
"Sec. 63. Domestic Distribution of Source Material.
"Sec. 64. Foreign Distribution of Source Material.
"Sec. 65. Reporting.
"Sec. 66. Acquisition.
"Sec. 67. Operations on Lands Belonging to the United States.
"Sec. 68. Public Lands.
"Sec. 69. Prohibition.

"CHAPTER 8. BYPRODUCT MATERIAL    *Post,* p. 935.

"Sec. 81. Domestic Distribution.
"Sec. 82. Foreign Distribution of Byproduct Material.

"CHAPTER 9. MILITARY APPLICATION OF ATOMIC ENERGY    *Post,* p. 936.

"Sec. 91. Authority.
"Sec. 92. Prohibition.

Case 4:22-cv-00012-CDP Doc. #: 14-7 Filed: 01/29/21 Page: 55 of 93 PageID #: 1726

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

*Post,* p. 936.                    "CHAPTER 10. ATOMIC ENERGY LICENSES

"Sec. 101. License Required.
"Sec. 102. Finding of Practical Value.
"Sec. 103. Commercial Licenses.
"Sec. 104. Medical Therapy and Research and Development.
"Sec. 105. Antitrust Provisions.
"Sec. 106. Classes of Facilities.
"Sec. 107. Operators' Licenses.
"Sec. 108. War or National Emergency.
"Sec. 109. Component Parts of Facilities.
"Sec. 110. Exclusions.

*Post,* p. 939.                    "CHAPTER 11. INTERNATIONAL ACTIVITIES

"Sec. 121. Effect of International Arrangements.
"Sec. 122. Policies Contained in International Arrangements.
"Sec. 123. Cooperation with other Nations.
"Sec. 124. International Atomic Pool.

*Post,* p. 940.                    "CHAPTER 12. CONTROL OF INFORMATION

"Sec. 141. Policy.
"Sec. 142. Classification and Declassification of Restricted Data.
"Sec. 143. Department of Defense Participation.
"Sec. 144. International Cooperation.
"Sec. 145. Restrictions.
"Sec. 146. General Provisions.

*Post,* p. 943.                    "CHAPTER 13. PATENTS AND INVENTIONS

"Sec. 151 Military Utilization.
"Sec. 152. Inventions Conceived During Commission Contracts.
"Sec. 153. Nonmilitary Utilization.
"Sec. 154. Injunctions.
"Sec. 155. Prior Art.
"Sec. 156. Commission Patent Licenses.
"Sec. 157. Compensation, Awards, and Royalties.
"Sec. 158. Monopolistic Use of Patents.
"Sec. 159. Federally Financed Research.
"Sec. 160. Saving Clause.

*Post,* p. 948.                    "CHAPTER 14. GENERAL AUTHORITY

"Sec. 161. General Provisions.
"Sec. 162. Contracts.
"Sec. 163. Advisory Committees.
"Sec. 164. Electric Utility Contracts.
"Sec. 165. Contract Practices.
"Sec. 166. Comptroller General Audit.
"Sec. 167. Claim Settlements.
"Sec. 168. Payments in lieu of Taxes.
"Sec. 169. No Subsidy.

*Post,* p. 952.                    "CHAPTER 15. COMPENSATION FOR PRIVATE PROPERTY ACQUIRED

"Sec. 171. Just Compensation.
"Sec. 172. Condemnation of Real Property.
"Sec. 173. Patent Application Disclosures.
"Sec. 174. Attorney General Approval of Title.

*Post,* p. 953.                    "CHAPTER 16. JUDICIAL REVIEW AND ADMINISTRATIVE PROCEDURE

"Sec. 181. General.
"Sec. 182. License Applications.
"Sec. 183. Terms of Licenses.
"Sec. 184. Inalienability of Licenses.
"Sec. 185. Construction Permits.
"Sec. 186. Revocation.
"Sec. 187. Modification of License.
"Sec. 188. Continued Operation of Facilities.
"Sec. 189. Hearings and Judicial Review.

Case 4:21-cv-00024-CDP Doc #: 1-8 Filed: 01/29/21 Page: 56 of 903 PageID #: 1787

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

"Chapter 17. Joint Committee on Atomic Energy          *Post, p. 956.*

"Sec. 201. Membership.
"Sec. 202. Authority and Duty.
"Sec. 203. Chairman.
"Sec. 204. Powers.
"Sec. 205. Staff and Assistance.
"Sec. 206. Classification of Information.
"Sec. 207. Records.

"Chapter 18. Enforcement          *Post, p. 958.*

"Sec. 221. General Provisions.
"Sec. 222. Violation of Specific Sections.
"Sec. 223. Violation of Sections Generally.
"Sec. 224. Communication of Restricted Data.
"Sec. 225. Receipt of Restricted Data.
"Sec. 226. Tampering with Restricted Data.
"Sec. 227. Disclosure of Restricted Data.
"Sec. 228. Statute of Limitations.
"Sec. 229. Other Laws.
"Sec. 230. Injunction Proceedings.
"Sec. 231. Contempt Proceedings.

"Chapter 19. Miscellaneous          *Post, p. 960.*

"Sec. 241. Transfer of Property.
"Sec. 251. Report to Congress.
"Sec. 261. Appropriations.
"Sec. 271. Agency Jurisdiction.
"Sec. 272. Applicability of Federal Power Act.
"Sec. 273. Licensing of Government Agencies.
"Sec. 281. Separability.
"Sec. 291. Short Title.

## "CHAPTER 1. DECLARATION, FINDINGS, AND PURPOSE

"Section 1. Declaration.—Atomic energy is capable of application for peaceful as well as military purposes. It is therefore declared to be the policy of the United States that—          *Policy of U. S.*

"a. the development, use, and control of atomic energy shall be directed so as to make the maximum contribution to the general welfare, subject at all times to the paramount objective of making the maximum contribution to the common defense and security; and

"b. the development, use, and control of atomic energy shall be directed so as to promote world peace, improve the general welfare, increase the standard of living, and strengthen free competition in private enterprise.

"Sec. 2. Findings.—The Congress of the United States hereby makes the following findings concerning the development, use, and control of atomic energy:

"a. The development, utilization, and control of atomic energy for military and for all other purposes are vital to the common defense and security.

"b. In permitting the property of the United States to be used by others, such use must be regulated in the national interest and in order to provide for the common defense and security and to protect the health and safety of the public.

"c. The processing and utilization of source, byproduct, and special nuclear material affect interstate and foreign commerce and must be regulated in the national interest.

"d. The processing and utilization of source, byproduct, and special nuclear material must be regulated in the national interest and in order to provide for the common defense and security and to protect the health and safety of the public.

Case 4:22-cv-00062-CDP Doc. #: 148-7 Filed: 01/29/21 Page: 57 of 903 PageID #: 3788

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

"e. Source and special nuclear material, production facilities, and utilization facilities are affected with the public interest, and regulation by the United States of the production and utilization of atomic energy and of the facilities used in connection therewith is necessary in the national interest to assure the common defense and security and to protect the health and safety of the public.

"f. The necessity for protection against possible interstate damage occurring from the operation of facilities for the production or utilization of source or special nuclear material places the operation of those facilities in interstate commerce for the purposes of this Act.

"g. Funds of the United States may be provided for the development and use of atomic energy under conditions which will provide for the common defense and security and promote the general welfare.

"h. It is essential to the common defense and security that title to all special nuclear material be in the United States while such special nuclear material is within the United States.

**Programs.**

"Sec. 3. Purpose.—It is the purpose of this Act to effectuate the policies set forth above by providing for—

"a. a program of conducting, assisting, and fostering research and development in order to encourage maximum scientific and industrial progress;

"b. a program for the dissemination of unclassified scientific and technical information and for the control, dissemination, and declassification of Restricted Data, subject to appropriate safeguards, so as to encourage scientific and industrial progress;

"c. a program for Government control of the possession, use, and production of atomic energy and special nuclear material so directed as to make the maximum contribution to the common defense and security and the national welfare;

"d. a program to encourage widespread participation in the development and utilization of atomic energy for peaceful purposes to the maximum extent consistent with the common defense and security and with the health and safety of the public;

"e. a program of international cooperation to promote the common defense and security and to make available to cooperating nations the benefits of peaceful applications of atomic energy as widely as expanding technology and considerations of the common defense and security will permit; and

"f. a program of administration which will be consistent with the foregoing policies and programs, with international arrangements, and with agreements for cooperation, which will enable the Congress to be currently informed so as to take further legislative action as may be appropriate.

## "CHAPTER 2. DEFINITIONS

"Sec. 11. Definitions.—The intent of Congress in the definitions as given in this section should be construed from the words or phrases used in the definitions. As used in this Act:

**"Agency of the U. S."**

"a. The term 'agency of the United States' means the executive branch of the United States, or any Government agency, or the legislative branch of the United States, or any agency, committee, commission, office, or other establishment in the legislative branch, or the judicial branch of the United States, or any office, agency, committee, commission, or other establishment in the judicial branch.

**"Agreement for cooperation."**

"b. The term 'agreement for cooperation' means any agreement with another nation or regional defense organization, authorized or permitted by sections 54, 57, 64, 82, 103, 104, or 144, and made pursuant to section 123.

Case 4:22-cv-00094-CDP Doc. #: 14-8 Filed: 01/29/21 Page: 58 of 24 PageID #: 1739

"c. The term 'atomic energy' means all forms of energy released in the course of nuclear fission or nuclear transformation. *"Atomic energy."*

"d. The term 'atomic weapon' means any device utilizing atomic energy, exclusive of the means for transporting or propelling the device (where such means is a separable and divisible part of the device), the principal purpose of which is for use as, or for development of, a weapon, a weapon prototype, or a weapon test device. *"Atomic weapon."*

"e. The term 'byproduct material' means any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material. *"Byproduct materials."*

"f. The term 'Commission' means the Atomic Energy Commission. *"Commission."*

"g. The term 'common defense and security' means the common defense and security of the United States.

"h. The term 'defense information' means any information in any category determined by any Government agency authorized to classify information, as being information respecting, relating to, or affecting the national defense. *"Defense information."*

"i. The term 'design' means (1) specifications, plans, drawings, blueprints, and other items of like nature; (2) the information contained therein; or (3) the research and development data pertinent to the information contained therein. *"Design."*

"j. The term 'Government agency' means any executive department, commission, independent establishment, corporation, wholly or partly owned by the United States of America which is an instrumentality of the United States, or any board, bureau, division, service, office, officer, authority, administration, or other establishment in the executive branch of the Government. *"Government agency."*

"k. The term 'international arrangement' means any international agreement hereafter approved by the Congress or any treaty during the time such agreement or treaty is in full force and effect, but does not include any agreement for cooperation. *"International arrangement."*

"l. The term 'Joint Committee' means the Joint Committee on Atomic Energy. *"Joint Committee."*

"m. The term 'operator' means any individual who manipulates the controls of a utilization or production facility. *"Operator."*

"n. The term 'person' means (1) any individual, corporation, partnership, firm, association, trust, estate, public or private institution, group, Government agency other than the Commission, any State or any political subdivision of, or any political entity within a State, any foreign government or nation or any political subdivision of any such government or nation, or other entity; and (2) any legal successor, representative, agent, or agency of the foregoing. *"Person."*

"o. The term 'produce', when used in relation to special nuclear material, means (1) to manufacture, make, produce, or refine special nuclear material; (2) to separate special nuclear material from other substances in which such material may be contained; or (3) to make or to produce new special nuclear material. *"Produce."*

"p. The term 'production facility' means (1) any equipment or device determined by rule of the Commission to be capable of the production of special nuclear material in such quantity as to be of significance to the common defense and security, or in such manner as to affect the health and safety of the public; or (2) any important component part especially designed for such equipment or device as determined by the Commission. *"Production facility."*

"q. The term 'research and development' means (1) theoretical analysis, exploration, or experimentation; or (2) the extension of investigative findings and theories of a scientific or technical nature into practical application for experimental and demonstration pur- *"Research and development."*

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

poses, including the experimental production and testing of models, devices, equipment, materials, and processes.

"'Restricted Data.'"

"r. The term 'Restricted Data' means all data concerning (1) design, manufacture, or utilization of atomic weapons; (2) the production of special nuclear material; or (3) the use of special nuclear material in the production of energy, but shall not include data declassified or removed from the Restricted Data category pursuant to section 142.

"'Source material.'"

"s. The term 'source material' means (1) uranium, thorium, or any other material which is determined by the Commission pursuant to the provisions of section 61 to be source material; or (2) ores containing one or more of the foregoing materials, in such concentration as the Commission may by regulation determine from time to time.

"'Special nuclear material.'"

"t. The term 'special nuclear material' means (1) plutonium, uranium enriched in the isotope 233 or in the isotope 235, and any other material which the Commission, pursuant to the provisions of section 51, determines to be special nuclear material, but does not include source material; or (2) any material artificially enriched by any of the foregoing, but does not include source material.

"'United States.'"

"u. The term 'United States', when used in a geographical sense, includes all Territories and possessions of the United States, and the Canal Zone.

"'Utilization facility.'"

"v. The term 'utilization facility' means (1) any equipment or device, except an atomic weapon, determined by rule of the Commission to be capable of making use of special nuclear material in such quantity as to be of significance to the common defense and security, or in such manner as to affect the health and safety of the public, or peculiarly adapted for making use of atomic energy in such quantity as to be of significance to the common defense and security, or in such manner as to affect the health and safety of the public; or (2) any important component part especially designed for such equipment or device as determined by the Commission.

## "CHAPTER 3. ORGANIZATION

"Sec. 21. Atomic Energy Commission.—There is hereby established an Atomic Energy Commission, which shall be composed of five members, each of whom shall be a citizen of the United States. The President shall designate one member of the Commission as Chairman thereof to serve as such during the pleasure of the President. The Chairman may from time to time designate any other member of the Commission as Acting Chairman to act in the place and stead of the Chairman during his absence. The Chairman (or the Acting Chairman in the absence of the Chairman) shall preside at all meetings of the Commission and a quorum for the transaction of business shall consist of at least three members present. Each member of the Commission, including the Chairman, shall have equal responsibility and authority in all decisions and actions of the Commission and shall have one vote.

Action.

Action of the Commission shall be determined by a majority vote of the members present. The Chairman (or Acting Chairman in the absence of the Chairman) shall be the official spokesman of the Commission in its relations with the Congress, Government agencies, persons, or the public, and, on behalf of the Commission, shall see to the faithful execution of the policies and decisions of the Commission, and shall report thereon to the Commission from time to time or as the Commission may direct.

Seal.

The Commission shall have an official seal which shall be judicially noticed.

"Sec. 22. Members.—

Appointment terms, etc.

"a. Members of the Commission shall be appointed by the Presi-

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Case 4:22-cv-00062-CDP Doc #: 14-8 Filed: 01/28/22 Page: 60 of 903 PageID #: 3741

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

dent, by and with the advice and consent of the Senate. In submitting any nomination to the Senate, the President shall set forth the experience and qualifications of the nominee. The term of office of each member of the Commission taking office after June 30, 1950, shall be five years, except that (1) the terms of office of the members first taking office after June 30, 1950, shall expire, as designated by the President at the time of the appointment, one at the end of one year, one at the end of two years, one at the end of three years, one at the end of four years, and one at the end of five years, after June 30, 1950; and (2) any member appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed, shall be appointed for the remainder of such term. Any member of the Commission may be removed by the President for inefficiency, neglect of duty, or malfeasance in office. Each member, except the Chairman, shall receive compensation at the rate of $18,000 per annum; and the member designated as Chairman shall receive compensation at the rate of $20,000 per annum.

"b. No member of the Commission shall engage in any business, vocation, or employment other than that of serving as a member of the Commission.

"SEC. 23. OFFICE.—The principal office of the Commission shall be in or near the District of Columbia, but the Commission or any duly authorized representative may exercise any or all of its powers in any place; however, the Commission shall maintain an office for the service of process and papers within the District of Columbia.

"SEC. 24. GENERAL MANAGER.—There is hereby established within the Commission a General Manager, who shall discharge such of the administrative and executive functions of the Commission as the Commission may direct. The General Manager shall be appointed by the Commission, shall serve at the pleasure of the Commission, shall be removable by the Commission, and shall receive compensation at a rate determined by the Commission, but not in excess of $20,000 per annum.

"SEC. 25. DIVISIONS AND OFFICES.—There is hereby established within the Commission—

"a. a Division of Military Application and such other program divisions (not to exceed ten in number) as the Commission may determine to be necessary to the discharge of its responsibilities, including a division or divisions the primary responsibilities of which include the development and application of civilian uses of atomic energy. Each such division shall be under the direction of a Director who shall be appointed by the Commission and shall receive compensation at a rate determined by the Commission, but not in excess of $16,000 per annum. The Director of the Division of Military Application shall be an active member of the Armed Forces. The Commission shall require each such division to exercise such of the Commission's administrative and executive powers as the Commission may determine;

"b. an Office of the General Counsel under the direction of the General Counsel who shall be appointed by the Commission and shall receive compensation at a rate determined by the Commission, but not in excess of $16,000 per annum; and

"c. an Inspection Division under the direction of a Director who shall be appointed by the Commission and shall receive compensation at a rate determined by the Commission, but not in excess of $16,000 per annum. The Inspection Division shall be responsible for gathering information to show whether or not the contractors, licensees, and officers and employees of the Commis-

*Program divisions.*

*Directors.*

*General Counsel.*

*Inspection Division.*

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

sion are complying with the provisions of this Act (except those provisions for which the Federal Bureau of Investigation is responsible) and the appropriate rules and regulations of the Commission.

"SEC. 26. GENERAL ADVISORY COMMITTEE.—There shall be a General Advisory Committee to advise the Commission on scientific and technical matters relating to materials, production, and research and development, to be composed of nine members, who shall be appointed from civilian life by the President. Each member shall hold office for a term of six years, except that (a) any member appointed to fill a vacancy occurring prior to the expiration of the term for which his predecessor was appointed, shall be appointed for the remainder of such term; and (b) the terms of office of the members first taking office after August 1, 1946, shall expire, as designated by the President at the time of appointment, three at the end of two years, three at the end of four years, and three at the end of six years, after August 1, 1946. The Committee shall designate one of its own members as Chairman. The Committee shall meet at least four times in every calendar year. The members of the Committee shall receive a per diem compensation for each day spent in meetings or conferences, and all members shall receive their necessary traveling or other expenses while engaged in the work of the Committee.

"SEC. 27. MILITARY LIAISON COMMITTEE.—There is hereby established a Military Liaison Committee consisting of—

"a. a Chairman, who shall be the head thereof and who shall be appointed by the President, by and with the advice and consent of the Senate, who shall serve at the pleasure of the President, and who shall receive compensation at the rate prescribed for an Assistant Secretary of Defense; and

"b. a representative or representatives from each of the Departments of the Army, Navy, and Air Force, in equal numbers, as determined by the Secretary of Defense, to be assigned from each Department by the Secretary thereof, and who will serve without additional compensation.

The Chairman of the Committee may designate one of the members of the Committee as Acting Chairman to act during his absence. The Commission shall advise and consult with the Department of Defense, through the Committee, on all atomic energy matters which the Department of Defense deems to relate to military applications of atomic weapons or atomic energy including the development, manufacture, use, and storage of atomic weapons, the allocation of special nuclear material for military research, and the control of information relating to the manufacture or utilization of atomic weapons; and shall keep the Department of Defense, through the Committee, fully and currently informed of all such matters before the Commission. The Department of Defense, through the Committee, shall keep the Commission fully and currently informed on all matters within the Department of Defense which the Commission deems to relate to the development or application of atomic energy. The Department of Defense, through the Committee, shall have the authority to make written recommendations to the Commission from time to time on matters relating to military applications of atomic energy as the Department of Defense may deem appropriate. If the Department of Defense at any time concludes that any request, action, proposed action, or failure to act on the part of the Commission is adverse to the responsibilities of the Department of Defense, the Secretary of Defense shall refer the matter to the President whose decision shall be final.

Authority of Defense Department.

"SEC. 28. APPOINTMENT OF ARMY, NAVY, OR AIR FORCE OFFICERS.—Notwithstanding the provisions of any other law, any active officer of

Director, Division of Military Application.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

the Army, Navy, or Air Force may serve as Director of the Division of Military Application without prejudice to his commissioned status as such officer. Any such officer serving as Director of the Division of Military Application shall receive in addition to his pay and allowances, including special and incentive pays, an amount equal to the difference between such pay and allowances, including special and incentive pays, and the compensation prescribed in section 25. Notwithstanding the provisions of any other law, any active or retired officer of the Army, Navy, or Air Force may serve as Chairman of the Military Liaison Committee without prejudice to his active or retired status as such officer. Any such officer serving as Chairman of the Military Liaison Committee shall receive, in addition to his pay and allowances, including special and incentive pays, or in addition to his retired pay. an amount equal to the difference between such pay and allowances, including special and incentive pays, or between his retired pay. and the compensation prescribed for the Chairman of the Military Liaison Committee.

<div style="text-align:right">Chairman, Military Liaison Committee.</div>

## "CHAPTER 4. RESEARCH

"SEC. 31. RESEARCH ASSISTANCE.—

"a. The Commission is directed to exercise its powers in such manner as to insure the continued conduct of research and development activities in the fields specified below, by private or public institutions or persons, and to assist in the acquisition of an ever-expanding fund of theoretical and practical knowledge in such fields. To this end the Commission is authorized and directed to make arrangements (including contracts, agreements, and loans) for the conduct of research and development activities relating to—

"(1) nuclear processes;

"(2) the theory and production of atomic energy, including processes, materials, and devices related to such production;

"(3) utilization of special nuclear material and radioactive material for medical, biological, agricultural, health, or military purposes;

"(4) utilization of special nuclear material, atomic energy, and radioactive material and processes entailed in the utilization or production of atomic energy or such material for all other purposes, including industrial uses, the generation of usable energy, and the demonstration of the practical value of utilization or production facilities for industrial or commercial purposes; and

"(5) the protection of health and the promotion of safety during research and production activities.

"b. The Commission may (1) make arrangements pursuant to this section, without regard to the provisions of section 3709 of the Revised Statutes, as amended, upon certification by the Commission that such action is necessary in the interest of the common defense and security, or upon a showing by the Commission that advertising is not reasonably practicable; (2) make partial and advance payments under such arrangements; and (3) make available for use in connection therewith such of its equipment and facilities as it may deem desirable.

<div style="text-align:right">41 USC 5.</div>

"c. The arrangements made pursuant to this section shall contain such provisions (1) to protect health, (2) to minimize danger to life or property, and (3) to require the reporting and to permit the inspection of work performed thereunder, as the Commission may determine. No such arrangement shall contain any provisions or conditions which prevent the dissemination of scientific or technical information, except to the extent such dissemination is prohibited by law.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

"SEC. 32. RESEARCH BY THE COMMISSION.—The Commission is authorized and directed to conduct, through its own facilities, activities and studies of the types specified in section 31.

"SEC. 33. RESEARCH FOR OTHERS.—Where the Commission finds private facilities or laboratories are inadequate to the purpose, it is authorized to conduct for other persons, through its own facilities, such of those activities and studies of the types specified in section 31 as it deems appropriate to the development of atomic energy. The Commission is authorized to determine and make such charges as in its discretion may be desirable for the conduct of such activities and studies.

## "CHAPTER 5. PRODUCTION OF SPECIAL NUCLEAR MATERIAL

"SEC. 41. OWNERSHIP AND OPERATION OF PRODUCTION FACILITIES.—

"a. OWNERSHIP OF PRODUCTION FACILITIES.—The Commission, as agent of and on behalf of the United States, shall be the exclusive owner of all production facilities other than facilities which (1) are useful in the conduct of research and development activities in the fields specified in section 31, and do not, in the opinion of the Commission, have a potential production rate adequate to enable the user of such facilities to produce within a reasonable period of time a sufficient quantity of special nuclear material to produce an atomic weapon; or (2) are licensed by the Commission pursuant to section 103 or 104.

"b. OPERATION OF THE COMMISSION'S PRODUCTION FACILITIES.— The Commission is authorized and directed to produce or to provide for the production of special nuclear material in its own production facilities. To the extent deemed necessary, the Commission is authorized to make, or to continue in effect, contracts with persons obligating them to produce special nuclear material in facilities owned by the Commission. The Commission is also authorized to enter into research and development contracts authorizing the contractor to produce special nuclear material in facilities owned by the Commission to the extent that the production of such special nuclear material may be incident to the conduct of research and development activities under such contracts. Any contract entered into under this section shall contain provisions (1) prohibiting the contractor from subcontracting any part of the work he is obligated to perform under the contract, except as authorized by the Commission; and (2) obligating the contractor (A) to make such reports pertaining to activities under the contract to the Commission as the Commission may require, (B) to submit to inspection by employees of the Commission of all such activities, and (C) to comply with all safety and security regulations which may be prescribed by the Commission. Any contract made under the provisions of this paragraph may be made without regard to the provisions of section 3709 of the Revised Statutes, as amended, upon certification by the Commission that such action is necessary in the interest of the common defense and security, or upon a showing by the Commission that advertising is not reasonably practicable. Partial and advance payments may be made under such contracts. The President shall determine in writing at least once each year the quantities of special nuclear material to be produced under this section and shall specify in such determination the quantities of special nuclear material to be available for distribution by the Commission pursuant to section 53 or 54.

41 USC 5.

"c. Operation of other production facilities.—Special nuclear material may be produced in the facilities which under this section are not required to be owned by the Commission.

"Sec. 42. Irradiation of Materials.—The Commission and persons lawfully producing or utilizing special nuclear material are authorized to expose materials of any kind to the radiation incident to the processes of producing or utilizing special nuclear material.

"Sec. 43. Acquisition of Production Facilities.—The Commission is authorized to purchase any interest in facilities for the production of special nuclear materials, or in real property on which such facilities are located, without regard to the provisions of section 3709 of the Revised Statutes, as amended, upon certification by the Commission that such action is necessary in the interest of the common defense and security, or upon a showing by the Commission that advertising is not reasonably practicable. Partial and advance payments may be made under contracts for such purposes. The Commission is further authorized to requisition, condemn, or otherwise acquire any interest in such production facilities, or to condemn or otherwise acquire such real property, and just compensation shall be made therefor.

41 USC 5.

"Sec. 44. Disposition of Energy.—If energy is produced at production facilities of the Commission or is produced in experimental utilization facilities of the Commission, such energy may be used by the Commission, or transferred to other Government agencies, or sold to publicly, cooperatively, or privately owned utilities or users at reasonable and nondiscriminatory prices. If the energy produced is electric energy, the price shall be subject to regulation by the appropriate agency having jurisdiction. In contracting for the disposal of such energy, the Commission shall give preference and priority to public bodies and cooperatives or to privately owned utilities providing electric utility services to high cost areas not being served by public bodies or cooperatives. Nothing in this Act shall be construed to authorize the Commission to engage in the sale or distribution of energy for commercial use except such energy as may be produced by the Commission incident to the operation of research and development facilities of the Commission, or of production facilities of the Commission.

## "CHAPTER 6. SPECIAL NUCLEAR MATERIAL

"Sec. 51. Special Nuclear Material.—The Commission may determine from time to time that other material is special nuclear material in addition to that specified in the definition as special nuclear material. Before making any such determination, the Commission must find that such material is capable of releasing substantial quantities of atomic energy and must find that the determination that such material is special nuclear material is in the interest of the common defense and security, and the President must have expressly assented in writing to the determination. The Commission's determination, together with the assent of the President, shall be submitted to the Joint Committee and a period of thirty days shall elapse while Congress is in session (in computing such thirty days, there shall be excluded the days on which either House is not in session because of an adjournment for more than three days) before the determination of the Commission may become effective: *Provided, however,* That the Joint Committee, after having received such determination, may by resolution in writing, waive the conditions of or all or any portion of such thirty-day period.

"Sec. 52. Government Ownership of All Special Nuclear Material.—All rights, title, and interest in or to any special nuclear

material within or under the jurisdiction of the United States, now or hereafter produced, shall be the property of the United States and shall be administered and controlled by the Commission as agent of and on behalf of the United States by virtue of this Act. Any person owning any interest in any special nuclear material at the time when such material is hereafter determined to be a special nuclear material shall be paid just compensation therefor. Any person who lawfully produces any special nuclear material, except pursuant to a contract with the Commission under the provisions of section 31 or 41, shall be paid a fair price, determined pursuant to section 56, for producing such material.

"Sec. 53. Domestic Distribution of Special Nuclear Material.—

Licenses.

"a. The Commission is authorized to issue licenses for the possession of, to make available for the period of the license, and to distribute special nuclear material within the United States to qualified applicants requesting such material—

"(1) for the conduct of research and development activities of the types specified in section 31;

"(2) for use in the conduct of research and development activities or in medical therapy under a license issued pursuant to section 104; or

"(3) for use under a license issued pursuant to section 103.

"b. The Commission shall establish, by rule, minimum criteria for the issuance of specific or general licenses for the distribution of special nuclear material depending upon the degree of importance to the common defense and security or to the health and safety of the public of—

"(1) the physical characteristics of the special nuclear material to be distributed;

"(2) the quantities of special nuclear material to be distributed; and

"(3) the intended use of the special nuclear material to be distributed.

Charges.

"c. The Commission may make a reasonable charge, determined pursuant to this section, for the use of special nuclear material licensed and distributed under subsection 53 a. (1) or subsection 53 a. (2) and shall make a reasonable charge determined pursuant to this section for the use of special nuclear material licensed and distributed under subsection 53 a. (3). The Commission shall establish criteria in writing for the determination of whether a charge will be made for the use of special nuclear material licensed and distributed under subsection 53 a. (1) or subsection 53 a. (2), considering, among other things, whether the licensee is a nonprofit or eleemosynary institution and the purposes for which the special nuclear material will be used.

"d. In determining the reasonable charge to be made by the Commission for the use of special nuclear material distributed to licensees of utilization or production facilities licensed pursuant to section 103 or 104, in addition to consideration of the cost thereof, the Commission shall take into consideration—

"(1) the use to be made of the special nuclear material;

"(2) the extent to which the use of the special nuclear material will advance the development of the peaceful uses of atomic energy;

"(3) the energy value of the special nuclear material in the particular use for which the license is issued;

"(4) whether the special nuclear material is to be used in facilities licensed pursuant to section 103 or 104. In this respect, the Commission shall, insofar as practicable, make uniform, nondiscriminatory charges for the use of special nuclear material distributed to facilities licensed pursuant to section 103; and

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

"(5) with respect to special nuclear material consumed in a facility licensed pursuant to section 103, the Commission shall make a further charge based on the cost to the Commission, as estimated by the Commission, or the average fair price paid for the production of such special nuclear material as determined by section 56, whichever is lower.

"e. Each license issued pursuant to this section shall contain and be subject to the following conditions— *License conditions.*

"(1) title to all special nuclear material shall at all times be in the United States;

"(2) no right to the special nuclear material shall be conferred by the license except as defined by the license;

"(3) neither the license nor any right under the license shall be assigned or otherwise transferred in violation of the provisions of this Act;

"(4) all special nuclear material shall be subject to the right of recapture or control reserved by section 108 and to all other provisions of this Act;

"(5) no special nuclear material may be used in any utilization or production facility except in accordance with the provisions of this Act;

"(6) special nuclear material shall be distributed only on terms, as may be established by rule of the Commission, such that no user will be permitted to construct an atomic weapon;

"(7) special nuclear material shall be distributed only pursuant to such safety standards as may be established by rule of the Commission to protect health and to minimize danger to life or property; and

"(8) the licensee will hold the United States and the Commission harmless from any damages resulting from the use or possession of special nuclear material by the licensee.

"f. The Commission is directed to distribute within the United States sufficient special nuclear material to permit the conduct of widespread independent research and development activities to the maximum extent practicable and within the limitations set by the President pursuant to section 41. In the event that applications for special nuclear material exceed the amount available for distribution, preference shall be given to those activities which are most likely, in the opinion of the Commission, to contribute to basic research, to the development of peacetime uses of atomic energy, or to the economic and military strength of the Nation. *Distribution for independent research, etc.*

"SEC. 54. FOREIGN DISTRIBUTION OF SPECIAL NUCLEAR MATERIAL.— The Commission is authorized to cooperate with any nation by distributing special nuclear material and to distribute such special nuclear material, pursuant to the terms of an agreement for cooperation to which such nation is a party and which is made in accordance with section 123.

"SEC. 55. ACQUISITION.—The Commission is authorized to purchase or otherwise acquire any special nuclear material or any interest therein outside the United States without regard to the provisions of section 3709 of the Revised Statutes, as amended, upon certification by the Commission that such action is necessary in the interest of the common defense and security, or upon a showing by the Commission that advertising is not reasonably practicable. Partial and advance payments may be made under contracts for such purposes. *41 USC 5.*

"SEC. 56. FAIR PRICE.—In determining the fair price to be paid by the Commission pursuant to section 52 for the production of any special nuclear material, the Commission shall take into consideration the value of the special nuclear material for its intended use by the United

States and may give such weight to the actual cost of producing that material as the Commission finds to be equitable. The fair price, as may be determined by the Commission, shall apply to all licensed producers of the same material: *Provided, however,* That the Commission may establish guaranteed fair prices for all special nuclear material delivered to the Commission for such period of time as it may deem necessary but not to exceed seven years.

"Sec. 57. Prohibition.—

"a. It shall be unlawful for any person to—

"(1) possess or transfer any special nuclear material which is the property of the United States except as authorized by the Commission pursuant to subsection 53 a.;

"(2) tranfer or receive any special nuclear material in interstate commerce except as authorized by the Commission pursuant to subsection 53 a., or export from or import into the United States any special nuclear material; and

"(3) directly or indirectly engage in the production of any special nuclear material outside of the United States except (A) under an agreement for cooperation made pursuant to section 123, or (B) upon authorization by the Commission after a determination that such activity will not be inimical to the interest of the United States.

"b. The Commission shall not distribute any special nuclear material—

"(1) to any person for a use which is not under the jurisdiction of the United States except pursuant to the provisions of section 54; or

"(2) to any person within the United States, if the Commission finds that the distribution of such special nuclear material to such person would be inimical to the common defense and security.

## "CHAPTER 7. SOURCE MATERIAL

"Sec. 61. Source Material.—The Commission may determine from time to time that other material is source material in addition to those specified in the definition of source material. Before making such determination, the Commission must find that such material is essential to the production of special nuclear material and must find that the determination that such material is source material is in the interest of the common defense and security, and the President must have expressly assented in writing to the determination. The Commission's determination, together with the assent of the President, shall be submitted to the Joint Committee and a period of thirty days shall elapse while Congress is in session (in computing such thirty days, there shall be excluded the days on which either House is not in session because of an adjournment of more than three days) before the determination of the Commission may become effective: *Provided, however,* That the Joint Committee, after having received such determination, may by resolution in writing waive the conditions of or all or any portion of such thirty-day period.

<p style="margin-left:2em; font-style:italic; font-size:small;">Submittal of determination to Joint Committee.</p>

"Sec. 62. License for Transfers Required.—Unless authorized by a general or specific license issued by the Commission, which the Commission is hereby authorized to issue, no person may transfer or receive in interstate commerce, transfer, deliver, receive possession of or title to, or import into or export from the United States any source material after removal from its place of deposit in nature, except that licenses shall not be required for quantities of source material which, in the opinion of the Commission, are unimportant.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

"SEC. 63. DOMESTIC DISTRIBUTION OF SOURCE MATERIAL.—

"a. The Commission is authorized to issue licenses for and to distribute source material within the United States to qualified applicants requesting such material— **Licenses.**

"(1) for the conduct of research and development activities of the types specified in section 31;

"(2) for use in the conduct of research and development activities or in medical therapy under a license issued pursuant to section 104;

"(3) for use under a license issued pursuant to section 103; or

"(4) for any other use approved by the Commission as an aid to science or industry.

"b. The Commission shall establish, by rule, minimum criteria for the issuance of specific or general licenses for the distribution of source material depending upon the degree of importance to the common defense and security or to the health and safety of the public of—

"(1) the physical characteristics of the source material to be distributed;

"(2) the quantities of source material to be distributed; and

"(3) the intended use of the source material to be distributed.

"c. The Commission may make a reasonable charge determined pursuant to subsection 161 m. for the source material licensed and distributed under subsection 63 a. (1), subsection 63 a. (2), or subsection 63 a. (4), and shall make a reasonable charge determined pursuant to subsection 161 m., for the source material licensed and distributed under subsection 63 a. (3). The Commission shall establish criteria in writing for the determination of whether a charge will be made for the source material licensed and distributed under subsection 63 a. (1), subsection 63 a. (2), or subsection 63 a. (4), considering, among other things, whether the licensee is a nonprofit or eleemosynary institution and the purposes for which the material will be used. **Charges.**

"SEC. 64. FOREIGN DISTRIBUTION OF SOURCE MATERIAL.—The Commission is authorized to cooperate with any nation by distributing source material and to distribute source material pursuant to the terms of an agreement for cooperation to which such nation is a party and which is made in accordance with section 123. The Commission is also authorized to distribute source material outside of the United States upon a determination by the Commission that such activity will not be inimical to the interests of the United States.

"SEC. 65. REPORTING.—The Commission is authorized to issue such rules, regulations, or orders requiring reports of ownership, possession, extraction, refining, shipment, or other handling of source material as it may deem necessary, except that such reports shall not be required with respect to (a) any source material prior to removal from its place of deposit in nature, or (b) quantities of source material which in the opinion of the Commission are unimportant or the reporting of which will discourage independent prospecting for new deposits.

"SEC. 66. ACQUISITION.—The Commission is authorized and directed, to the extent it deems necessary to effectuate the provisions of this Act—

"a. to purchase, take, requisition, condemn, or otherwise acquire supplies of source material;

"b. to purchase, condemn, or otherwise acquire any interest in real property containing deposits of source material; and

"c. to purchase, condemn, or otherwise acquire rights to enter upon any real property deemed by the Commission to have possibilities of containing deposits of source material in order to conduct prospecting and exploratory operations for such deposits.

Any purchase made under this section may be made without regard to

Case: 4:27-cv-00026-CDP   Doc. #: 14-7   Filed: 02/28/17   Page: 69 of 903   PageID #: 1750

41 USC 5.

the provisions of section 3709 of the Revised Statutes, as amended, upon certification by the Commission that such action is necessary in the interest of the common defense and security, or upon a showing by the Commission that advertising is not reasonably practicable. Partial and advanced payments may be made under contracts for such purposes. The Commission may establish guaranteed prices for all source material delivered to it within a specified time. Just compensation shall be made for any right, property, or interest in property taken, requisitioned, condemned, or otherwise acquired under this section.

"Sec. 67. Operations on Lands Belonging to the United States.— The Commission is authorized, to the extent it deems necessary to effectuate the provisions of this Act, to issue leases or permits for prospecting for, exploration for, mining of, or removal of deposits of source material in lands belonging to the United States: *Provided, however,* That notwithstanding any other provisions of law, such leases or permits may be issued for lands administered for national park, monument, and wildlife purposes only when the President by Executive Order declares that the requirements of the common defense and security make such action necessary.

"Sec. 68. Public Lands.—

"a. No individual, corporation, partnership, or association, which had any part, directly or indirectly, in the development of the atomic energy program, may benefit by any location, entry, or settlement upon the public domain made after such individual, corporation, partnership, or association took part in such project, if such individual, corporation, partnership, or association, by reason of having had such part in the development of the atomic energy program, acquired confidential official information as to the existence of deposits of such uranium, thorium, or other materials in the specific lands upon which such location, entry, or settlement is made, and subsequent to the date of the enactment of this Act made such location, entry, or settlement or caused the same to be made for his, or its, or their benefit.

"b. In cases where any patent, conveyance, lease, permit, or other authorization has been issued, which reserved to the United States source materials and the right to enter upon the land and prospect for, mine, and remove the same, the head of the Government agency which issued the patent, conveyance, lease, permit, or other authorization shall, on application of the holder thereof, issue a new or supplemental patent, conveyance, lease, permit, or other authorization without such reservation. If any rights have been granted by the United States pursuant to any such reservation then such patent shall be made subject to those rights, but the patentee shall be subrogated to the rights of the United States.

60 Stat. 755.
42 USC 1801 note, 1805(b)(7).
67 Stat. 539.
30 USC 501–505, 503.

"c. Notwithstanding the provisions of the Atomic Energy Act of 1946, as amended, and particularly section 5 (b) (7) thereof, or the provisions of the Act of August 12, 1953 (67 Stat. 539), and particularly section 3 thereof, any mining claim, heretofore located under the mining laws of the United States, for or based upon a discovery of a mineral deposit which is a source material and which, except for the possible contrary construction of said Atomic Energy Act, would have been locatable under such mining laws, shall, insofar as adversely affected by such possible contrary construction, be valid and effective, in all respects to the same extent as if said mineral deposit were a locatable mineral deposit other than a source material.

"Sec. 69. Prohibition.—The Commission shall not license any person to transfer or deliver, receive possession of or title to, or import into or export from the United States any source material if, in the opinion of the Commission, the issuance of a license to such person for such

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

purpose would be inimical to the common defense and security or the health and safety of the public.

## "CHAPTER 8. BYPRODUCT MATERIAL

"Sec. 81. Domestic Distribution.—No person may transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, own, possess, import, or export any byproduct material, except to the extent authorized by this section or by section 82. The Commission is authorized to issue general or specific licenses to applicants seeking to use byproduct material for research or development purposes, for medical therapy, industrial uses, agricultural uses, or such other useful applications as may be developed. The Commission may distribute, sell, loan, or lease such byproduct material as it owns to licensees with or without charge: *Provided, however*, That, for byproduct material to be distributed by the Commission for a charge, the Commission shall establish prices on such equitable basis as, in the opinion of the Commission, (a) will provide reasonable compensation to the Government for such material, (b) will not discourage the use of such material or the development of sources of supply of such material independent of the Commission, and (c) will encourage research and development. In distributing such material, the Commission shall give preference to applicants proposing to use such material either in the conduct of research and development or in medical therapy. Licensees of the Commission may distribute byproduct material only to applicants therefor who are licensed by the Commission to receive such byproduct material. The Commission shall not permit the distribution of any byproduct material to any licensee, and shall recall or order the recall of any distributed material from any licensee, who is not equipped to observe or who fails to observe such safety standards to protect health as may be established by the Commission or who uses such material in violation of law or regulation of the Commission or in a manner other than as disclosed in the application therefor or approved by the Commission. The Commission is authorized to establish classes of byproduct material and to exempt certain classes or quantities of material or kinds of uses or users from the requirements for a license set forth in this section when it makes a finding that the exemption of such classes or quantities of such material or such kinds of uses or users will not constitute an unreasonable risk to the common defense and security and to the health and safety of the public.

"Sec. 82. Foreign Distribution of Byproduct Material.—

"a. The Commission is authorized to cooperate with any nation by distributing byproduct material, and to distribute byproduct material, pursuant to the terms of an agreement for cooperation to which such nation is party and which is made in accordance with section 123.

"b. The Commission is also authorized to distribute byproduct material to any person outside the United States upon application therefor by such person and demand such charge for such material as would be charged for the material if it were distributed within the United States: *Provided, however*, That the Commission shall not distribute any such material to any person under this section if, in its opinion, such distribution would be inimical to the common defense and security: *And provided further*, That the Commission may require such reports regarding the use of material distributed pursuant to the provisions of this section as it deems necessary.

"c. The Commission is authorized to license others to distribute byproduct material to any person outside the United States under the same conditions, except as to charges, as would be applicable if the material were distributed by the Commission.

## "CHAPTER 9. MILITARY APPLICATION OF ATOMIC ENERGY

"Sec. 91. Authority.—

"a. The Commission is authorized to—

"(1) conduct experiments and do research and development work in the military application of atomic energy; and

"(2) engage in the production of atomic weapons, or atomic weapon parts, except that such activities shall be carried on only to the extent that the express consent and direction of the President of the United States has been obtained, which consent and direction shall be obtained at least once each year.

"b. The President from time to time may direct the Commission (1) to deliver such quantities of special nuclear material or atomic weapons to the Department of Defense for such use as he deems necessary in the interest of national defense, or (2) to authorize the Department of Defense to manufacture, produce, or acquire any atomic weapon or utilization facility for military purposes: *Provided, however,* That such authorization shall not extend to the production of special nuclear material other than that incidental to the operation of such utilization facilities.

"Sec. 92. Prohibition.—It shall be unlawful for any person to transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, import, or export any atomic weapon, except as may be authorized by the Commission pursuant to the provisions of section 91. Nothing in this section shall be deemed to modify the provisions of subsection 31 a. or section 101.

## "CHAPTER 10. ATOMIC ENERGY LICENSES

"Sec. 101. License Required.—It shall be unlawful, except as provided in section 91, for any person within the United States to transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, import, or export any utilization or production facility except under and in accordance with a license issued by the Commission pursuant to section 103 or 104.

"Sec. 102. Finding of Practical Value.—Whenever the Commission has made a finding in writing that any type of utilization or production facility has been sufficiently developed to be of practical value for industrial or commercial purposes, the Commission may thereafter issue licenses for such type of facility pursuant to section 103.

"Sec. 103. Commercial Licenses.—

"a. Subsequent to a finding by the Commission as required in section 102, the Commission may issue licenses to transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, possess, import, or export under the terms of an agreement for cooperation arranged pursuant to section 123, such type of utilization or production facility. Such licenses shall be issued in accordance with the provisions of chapter 16 and subject to such conditions as the Commission may by rule or regulation establish to effectuate the purposes and provisions of this Act.

"b. The Commission shall issue such licenses on a nonexclusive basis to persons applying therefor (1) whose proposed activities will serve a useful purpose proportionate to the quantities of special nuclear material or source material to be utilized; (2) who are equipped to observe and who agree to observe such safety standards to protect health and to minimize danger to life or property as the Commission

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

may by rule establish; and (3) who agree to make available to the Commission such technical information and data concerning activities under such licenses as the Commission may determine necessary to promote the common defense and security and to protect the health and safety of the public. All such information may be used by the Commission only for the purposes of the common defense and security and to protect the health and safety of the public.

"c. Each such license shall be issued for a specified period, as determined by the Commission, depending on the type of activity to be licensed, but not exceeding forty years, and may be renewed upon the expiration of such period.

"d. No license under this section may be given to any person for activities which are not under or within the jurisdiction of the United States, except for the export of production or utilization facilities under terms of an agreement for cooperation arranged pursuant to section 123, or except under the provisions of section 109. No license may be issued to any corporation or other entity if the Commission knows or has reason to believe it is owned, controlled, or dominated by an alien, a foreign corporation, or a foreign government. In any event, no license may be issued to any person within the United States if, in the opinion of the Commission, the issuance of a license to such person would be inimical to the common defense and security or to the health and safety of the public.

"SEC. 104. MEDICAL THERAPY AND RESEARCH AND DEVELOPMENT.—

"a. The Commission is authorized to issue licenses to persons applying therefor for utilization facilities for use in medical therapy. In issuing such licenses the Commission is directed to permit the widest amount of effective medical therapy possible with the amount of special nuclear material available for such purposes and to impose the minimum amount of regulation consistent with its obligations under this Act to promote the common defense and security and to protect the health and safety of the public.

"b. The Commission is authorized to issue licenses to persons applying therefor for utilization and production facilities involved in the conduct of research and development activities leading to the demonstration of the practical value of such facilities for industrial or commercial purposes. In issuing licenses under this subsection, the Commission shall impose the minimum amount of such regulations and terms of license as will permit the Commission to fulfill its obligations under this Act to promote the common defense and security and to protect the health and safety of the public and will be compatible with the regulations and terms of license which would apply in the event that a commercial license were later to be issued pursuant to section 103 for that type of facility. In issuing such licenses, priority shall be given to those activities which will, in the opinion of the Commission, lead to major advances in the application of atomic energy for industrial or commercial purposes.

"c. The Commission is authorized to issue licenses to persons applying therefor for utilization and production facilities useful in the conduct of research and development activities of the types specified in section 31 and which are not facilities of the type specified in subsection 104 b. The Commission is directed to impose only such minimum amount of regulation of the licensee as the Commission finds will permit the Commission to fulfill its obligations under this Act to promote the common defense and security and to protect the health and safety of the public and will permit the conduct of widespread and diverse research and development.

"d. No license under this section may be given to any person for activities which are not under or within the jurisdiction of the United States, except for the export of production or utilization facilities

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

under terms of an agreement for cooperation arranged pursuant to section 123 or except under the provisions of section 109. No license may be issued to any corporation or other entity if the Commission knows or has reason to believe it is owned, controlled, or dominated by an alien, a foreign corporation, or a foreign government. In any event, no license may be issued to any person within the United States if, in the opinion of the Commission, the issuance of a license to such person would be inimical to the common defense and security or to the health and safety of the public.

"SEC. 105. ANTITRUST PROVISIONS.—

"a. Nothing contained in this Act, including the provisions which vest title to all special nuclear material in the United States, shall relieve any person from the operation of the following Acts, as amended, 'An Act to protect trade and commerce against unlawful restraints and monopolies' approved July second, eighteen hundred and ninety; sections seventy-three to seventy-seven, inclusive, of an Act entitled 'An Act to reduce taxation, to provide revenue for the Government, and for other purposes' approved August twenty-seven, eighteen hundred and ninety-four; 'An Act to supplement existing laws against unlawful restraints and monopolies, and for other purposes' approved October fifteen, nineteen hundred and fourteen; and 'An Act to create a Federal Trade Commission, to define its powers and duties, and for other purposes' approved September twenty-six, nineteen hundred and fourteen. In the event a licensee is found by a court of competent jurisdiction, either in an original action in that court or in a proceeding to enforce or review the findings or orders of any Government agency having jurisdiction under the laws cited above, to have violated any of the provisions of such laws in the conduct of the licensed activity, the Commission may suspend, revoke, or take such other action as it may deem necessary with respect to any license issued by the Commission under the provisions of this Act.

"b. The Commission shall report promptly to the Attorney General any information it may have with respect to any utilization of special nuclear material or atomic energy which appears to violate or to tend toward the violation of any of the foregoing Acts, or to restrict free competition in private enterprise.

"c. Whenever the Commission proposes to issue any license to any person under section 103, it shall notify the Attorney General of the proposed license and the proposed terms and conditions thereof, except such classes or types of licenses, as the Commission, with the approval of the Attorney General, may determine would not significantly affect the licensee's activities under the antitrust laws as specified in subsection 105 a. Within a reasonable time, in no event to exceed 90 days after receiving such notification, the Attorney General shall advise the Commission whether, insofar as he can determine, the proposed license would tend to create or maintain a situation inconsistent with the antitrust laws, and such advice shall be published in the Federal Register. Upon the request of the Attorney General, the Commission shall furnish or cause to be furnished such information as the Attorney General determines to be appropriate or necessary to enable him to give the advice called for by this section.

"SEC. 106. CLASSES OF FACILITIES.—The Commission may—

"a. group the facilities licensed either under section 103 or under section 104 into classes which may include either production or utilization facilities or both, upon the basis of the similarity of operating and technical characteristics of the facilities;

"b. define the various activities to be carried on at each such class of facility; and

"c. designate the amounts of special nuclear material available for use by each such facility.

26 Stat. 209.
15 USC 1-7.

28 Stat. 570.
15 USC 8-11.
38 Stat. 730.
15 USC 12-27,
44; 18 USC 402;
29 USC 52, 53.
38 Stat. 717.
15 USC 41-48.

Publication in
FR.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

"SEC. 107. OPERATORS' LICENSES.—The Commission shall—

"a. prescribe uniform conditions for licensing individuals as operators of any of the various classes of production and utilization facilities licensed in this Act;

"b. determine the qualifications of such individuals;

"c. issue licenses to such individuals in such form as the Commission may prescribe; and

"d. suspend such licenses for violations of any provision of this Act or any rule or regulation issued thereunder whenever the Commission deems such action desirable.

"SEC. 108. WAR OR NATIONAL EMERGENCY.—Whenever the Congress declares that a state of war or national emergency exists, the Commission is authorized to suspend any licenses granted under this Act if in its judgment such action is necessary to the common defense and security. The Commission is authorized during such period, if the Commission finds it necessary to the common defense and security, to order the recapture of any special nuclear material distributed under the provisions of subsection 53 a., or to order the operation of any facility licensed under section 103 or 104, and is authorized to order the entry into any plant or facility in order to recapture such material, or to operate such facility. Just compensation shall be paid for any damages caused by the recapture of any special nuclear material or by the operation of any such facility.

"SEC. 109. COMPONENT PARTS OF FACILITIES.—With respect to those utilization and production facilities which are so determined by the Commission pursuant to subsection 11 p. (2) or 11 v. (2) the Commission may (a) issue general licenses for activities required to be licensed under section 101, if the Commission determines in writing that such general licensing will not constitute an unreasonable risk to the common defense and security, and (b) issue licenses for the export of such facilities, if the Commission determines in writing that each export will not constitute an unreasonable risk to the common defense and security.

"SEC. 110. EXCLUSIONS.—Nothing in this chapter shall be deemed—

"a. to require a license for (1) the processing, fabricating, or refining of special nuclear material, or the separation of special nuclear material, or the separation of special nuclear material from other substances, under contract with and for the account of the Commission; or (2) the construction or operation of facilities under contract with and for the account of the Commission; or

"b. to require a license for the manufacture, production, or acquisition by the Department of Defense of any utilization facility authorized pursuant to section 91, or for the use of such facility by the Department of Defense or a contractor thereof.

## "CHAPTER 11. INTERNATIONAL ACTIVITIES

"SEC. 121. EFFECT OF INTERNATIONAL ARRANGEMENTS.—Any provision of this Act or any action of the Commission to the extent and during the time that it conflicts with the provisions of any international arrangement made after the date of enactment of this Act shall be deemed to be of no force or effect.

"SEC. 122. POLICIES CONTAINED IN INTERNATIONAL ARRANGEMENTS.—In the performance of its functions under this Act, the Commission shall give maximum effect to the policies contained in any international arrangement made after the date of enactment of this Act.

"Sec. 123. Cooperation With Other Nations.—No cooperation with any nation or regional defense organization pursuant to sections 54, 57, 64, 82, 103, 104, or 144 shall be undertaken until—

"a. the Commission or, in the case of those agreements for cooperation arranged pursuant to subsection 144 b., the Department of Defense has submitted to the President the proposed agreement for cooperation, together with its recommendation thereon, which proposed agreement shall include (1) the terms, conditions, duration, nature, and scope of the cooperation; (2) a guaranty by the cooperating party that security safeguards and standards as set forth in the agreement for cooperation will be maintained; (3) a guaranty by the cooperating party that any material to be transferred pursuant to such agreement will not be used for atomic weapons, or for research on or development of atomic weapons, or for any other military purpose; and (4) a guaranty by the cooperating party that any material or any Restricted Data to be transferred pursuant to the agreement for cooperation will not be transferred to unauthorized persons or beyond the jurisdiction of the cooperating party, except as specified in the agreement for cooperation;

"b. the President has approved and authorized the execution of the proposed agreement for cooperation, and has made a determination in writing that the performance of the proposed agreement will promote and will not constitute an unreasonable risk to the common defense and security; and

"c. the proposed agreement for cooperation, together with the approval and the determination of the President, has been submitted to the Joint Committee and a period of thirty days has elapsed while Congress is in session (in computing such thirty days, there shall be excluded the days on which either House is not in session because of an adjournment of more than three days).

"Sec. 124. International Atomic Pool.—The President is authorized to enter into an international arrangement with a group of nations providing for international cooperation in the nonmilitary applications of atomic energy and he may thereafter cooperate with that group of nations pursuant to sections 54, 57, 64, 82, 103, 104, or 144 a.: *Provided, however*, That the cooperation is undertaken pursuant to an agreement for cooperation entered into in accordance with section 123.

## "CHAPTER 12. CONTROL OF INFORMATION

"Sec. 141. Policy.—It shall be the policy of the Commission to control the dissemination and declassification of Restricted Data in such a manner as to assure the common defense and security. Consistent with such policy, the Commission shall be guided by the following principles:

"a. Until effective and enforceable international safeguards against the use of atomic energy for destructive purposes have been established by an international arrangement, there shall be no exchange of Restricted Data with other nations except as authorized by section 144; and

"b. The dissemination of scientific and technical information relating to atomic energy should be permitted and encouraged so as to provide that free interchange of ideas and criticism which is essential to scientific and industrial progress and public understanding and to enlarge the fund of technical information.

Case: 4:27-cv-00024-CDP Doc. #: 14-7 Filed: 01/28/21 Page: 76 of 903 PageID #: 1757

"Sec. 142. Classification and Declassification of Restricted Data.—

"a. The Commission shall from time to time determine the data, within the definition of Restricted Data, which can be published without undue risk to the common defense and security and shall thereupon cause such data to be declassified and removed from the category of Restricted Data.

"b. The Commission shall maintain a continuous review of Restricted Data and of any Classification Guides issued for the guidance of those in the atomic energy program with respect to the areas of Restricted Data which have been declassified in order to determine which information may be declassified and removed from the category of Restricted Data without undue risk to the common defense and security.

"c. In the case of Restricted Data which the Commission and the Department of Defense jointly determine to relate primarily to the military utilization of atomic weapons, the determination that such data may be published without constituting an unreasonable risk to the common defense and security shall be made by the Commission and the Department of Defense jointly, and if the Commission and the Department of Defense do not agree, the determination shall be made by the President.

"d. The Commission shall remove from the Restricted Data category such data as the Commission and the Department of Defense jointly determine relates primarily to the military utilization of atomic weapons and which the Commission and Department of Defense jointly determine can be adequately safeguarded as defense information: *Provided, however*, That no such data so removed from the Restricted Data category shall be transmitted or otherwise made available to any nation or regional defense organization, while such data remains defense information, except pursuant to an agreement for cooperation entered into in accordance with subsection 144 b.

"e. The Commission shall remove from the Restricted Data category such information concerning the atomic energy programs of other nations as the Commission and the Director of Central Intelligence jointly determine to be necessary to carry out the provisions of section 102 (d) of the National Security Act of 1947, as amended, and can be adequately safeguarded as defense information.

61 Stat. 498.
50 USC 403(d).

"Sec. 143. Department of Defense Participation.—The Commission may authorize any of its employees, or employees of any contractor, prospective contractor, licensee or prospective licensee of the Commission to permit any employee of an agency of the Department of Defense or of its contractors, or any member of the Armed Forces to have access to Restricted Data required in the performance of his duties and so certified by the head of the appropriate agency of the Department of Defense or his designee: *Provided, however*, That the head of the appropriate agency of the Department of Defense or his designee has determined, in accordance with the established personnel security procedures and standards of such agency, that permitting the member or employee to have access to such Restricted Data will not endanger the common defense and security: *And provided further*, That the Secretary of Defense finds that the established personnel and other security procedures and standards of such agency are adequate and in reasonable conformity to the standards established by the Commission under section 145.

942                    PUBLIC LAW 703—AUG. 30, 1954                    [68 STAT.

"SEC. 144. INTERNATIONAL COOPERATION.—

"a. The President may authorize the Commission to cooperate with another nation and to communicate to that nation Restricted Data on—

"(1)  refining, purification, and subsequent treatment of source material;

"(2)  reactor development;

"(3)  production of special nuclear material;

"(4)  health and safety;

"(5)  industrial and other applications of atomic energy for peaceful purposes; and

"(6)  research and development relating to the foregoing:

*Provided, however,* That no such cooperation shall involve the communication of Restricted Data relating to the design or fabrication of atomic weapons: *And provided further,* That the cooperation is undertaken pursuant to an agreement for cooperation entered into in accordance with section 123, or is undertaken pursuant to an agreement existing on the effective date of this Act.

"b. The President may authorize the Department of Defense, with the assistance of the Commission, to cooperate with another nation or with a regional defense organization to which the United States is a party, and to communicate to that nation or organization such Restricted Data as is necessary to—

"(1)  the development of defense plans;

"(2)  the training of personnel in the employment of and defense against atomic weapons; and

"(3)  the evaluation of the capabilities of potential enemies in the employment of atomic weapons,

while such other nation or organization is participating with the United States pursuant to an international arrangement by substantial and material contributions to the mutual defense and security: *Provided, however,* That no such cooperation shall involve communication of Restricted Data relating to the design or fabrication of atomic weapons except with regard to external characteristics, including size, weight, and shape, yields and effects, and systems employed in the delivery or use thereof but not including any data in these categories unless in the joint judgment of the Commission and the Department of Defense such data will not reveal important information concerning the design or fabrication of the nuclear components of an atomic weapon: *And provided further,* That the cooperation is undertaken pursuant to an agreement entered into in accordance with section 123.

"SEC. 145. RESTRICTIONS.—

*Investigations by CSC.*

"a. No arrangement shall be made under section 31, no contract shall be made or continued in effect under section 41, and no license shall be issued under section 103 or 104, unless the person with whom such arrangement is made, the contractor or prospective contractor, or the prospective licensee agrees in writing not to permit any individual to have access to Restricted Data until the Civil Service Commission shall have made an investigation and report to the Commission on the character, associations, and loyalty of such individual, and the Commission shall have determined that permitting such person to have access to Restricted Data will not endanger the common defense and security.

"b. Except as authorized by the Commission or the General Manager upon a determination by the Commission or General Manager that such action is clearly consistent with the national interest, no individual shall be employed by the Commission nor shall the Commission permit any individual to have access to Restricted Data until the Civil Service Commission shall have made an investigation and report

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

to the Commission on the character, associations, and loyalty of such individual, and the Commission shall have determined that permitting such person to have access to Restricted Data will not endanger the common defense and security.

"c. In the event an investigation made pursuant to subsections a. and b. of this section develops any data reflecting that the individual who is the subject of the investigation is of questionable loyalty, the Civil Service Commission shall refer the matter to the Federal Bureau of Investigation for the conduct of a full field investigation, the results of which shall be furnished to the Civil Service Commission for its information and appropriate action. *Investigations by FBI.*

"d. If the President deems it to be in the national interest, he may from time to time cause investigations of any group or class which are required by subsections a. and b. of this section to be made by the Federal Bureau of Investigation instead of by the Civil Service Commission.

"e. Notwithstanding the provisions of subsections a. and b. of this section, a majority of the members of the Commission shall certify those specific positions which are of a high degree of importance or sensitivity and upon such certification the investigation and reports required by such provisions shall be made by the Federal Bureau of Investigation instead of by the Civil Service Commission.

"f. The Commission shall establish standards and specifications in writing as to the scope and extent of investigations to be made by the Civil Service Commission pursuant to subsections a. and b. of this section. Such standards and specifications shall be based on the location and class or kind of work to be done, and shall, among other considerations, take into account the degree of importance to the common defense and security of the Restricted Data to which access will be permitted. *Establishment by Commission of investigations standards, etc.*

"Sec. 146. General Provisions.—

"a. Sections 141 to 145, inclusive, shall not exclude the applicable provisions of any other laws, except that no Government agency shall take any action under such other laws inconsistent with the provisions of those sections.

"b. The Commission shall have no power to control or restrict the dissemination of information other than as granted by this or any other law.

## "CHAPTER 13. PATENTS AND INVENTIONS

"Sec. 151. Military Utilization.—

"a. No patent shall hereafter be granted for any invention or discovery which is useful solely in the utilization of special nuclear material or atomic energy in an atomic weapon. Any patent granted for any such invention or discovery is hereby revoked, and just compensation shall be made therefor.

"b. No patent hereafter granted shall confer any rights with respect to any invention or discovery to the extent that such invention or discovery is used in the utilization of special nuclear material or atomic energy in atomic weapons. Any rights conferred by any patent heretofore granted for any invention or discovery are hereby revoked to the extent that such invention or discovery is so used, and just compensation shall be made therefor.

"c. Any person who has made or hereafter makes any invention or discovery useful (1) in the production or utilization of special nuclear material or atomic energy; (2) in the utilization of special nuclear material in an atomic weapon; or (3) in the utilization of atomic energy in an atomic weapon, shall file with the Commission a report *Report of invention to Commission.*

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

containing a complete description thereof unless such invention or discovery is described in an application for a patent filed with the Commissioner of Patents by such person within the time required for the filing of such report. The report covering any such invention or discovery shall be filed on or before whichever of the following is the later: either the ninetieth day after completion of such invention or discovery; or the ninetieth day after such person first discovers or first has reason to believe that such invention or discovery is useful in such production or utilization.

"d. The Commissioner of Patents shall notify the Commission of all applications for patents heretofore or hereafter filed which, in his opinion, disclose inventions or discoveries required to be reported under subsection 151 c., and shall provide the Commission access to all such applications.

"Sec. 152. Inventions Conceived During Commission Contracts.— Any invention or discovery, useful in the production or utilization of special nuclear material or atomic energy, made or conceived under any contract, subcontract, arrangement, or other relationship with the Commission, regardless of whether the contract or arrangement involved the expenditure of funds by the Commission, shall be deemed to have been made or conceived by the Commission, except that the Commission may waive its claim to any such invention or discovery if made or conceived by any person at or in connection with any laboratory under the jurisdiction of the Commission as provided in section 33, or under such other circumstances as the Commission may deem appropriate. No patent for any invention or discovery, useful in the production or utilization of special nuclear material or atomic energy, shall be issued unless the applicant files with the application, or within 30 days after request therefor by the Commissioner of Patents, a statement under oath setting forth the full facts surrounding the making or conception of the invention or discovery described in the application and whether the invention or discovery was made or conceived in the course of, in connection with, or under the terms of any contract, subcontract, arrangement, or other relationship with the Commission, regardless of whether the contract or arrangement involved the expenditure of funds by the Commission. The Commissioner of Patents shall forthwith forward copies of the application and the statement to the Commission.

"The Commissioner of Patents may proceed with the application and issue the patent to the applicant (if the invention or discovery is otherwise patentable) unless the Commission, within 90 days after receipt of copies of the application and statement, directs the Commissioner of Patents to issue the patent to the Commission (if the invention or discovery is otherwise patentable) to be held by the Commission as the agent of and on behalf of the United States.

"If the Commission files such a direction with the Commissioner of Patents, and if the applicant's statement claims, and the applicant still believes, that the invention or discovery was not made or conceived in the course of, in connection with, or under the terms of any contract, subcontract, arrangement, or other relationship with the Commission entitling the Commission to take title to the application or the patent, the applicant may, within 30 days after notification of the filing of such a direction, request a hearing before a Board of Patent Interferences. The Board shall have the power to hear and determine whether the Commission was entitled to the direction filed with the Commissioner of Patents. The Board shall follow the rules and procedures established for interference cases and an appeal may be taken by either the applicant or the Commission from the final order of the Board to the Court of Customs and Patent Appeals

Case: 4:27-cv-00026-CDP Doc. #: 14-7 Filed: 01/28/21 Page: 80 of 903 PageID #: 1761

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

in accordance with the procedures governing the appeals from the Board of Patent Interferences.

"If the statement filed by the applicant should thereafter be found to contain false material statements any notification by the Commission that it has no objections to the issuance of a patent to the applicant shall not be deemed in any respect to constitute a waiver of the provisions of this section or of any applicable civil or criminal statute, and the Commission may have the title to the patent transferred to the Commission on the records of the Commissioner of Patents in accordance with the provisions of this section.

"Sec. 153. Nonmilitary Utilization.—

"a. The Commission may, after giving the patent owner an opportunity for a hearing, declare any patent to be affected with the public interest if (1) the invention or discovery covered by the patent is of primary importance in the production or utilization of special nuclear material or atomic energy; and (2) the licensing of such invention or discovery under this section is of primary importance to effectuate the policies and purposes of this Act.

"b. Whenever any patent has been declared affected with the public interest, pursuant to subsection 153 a.—

"(1) the Commission is hereby licensed to use the invention or discovery covered by such patent in performing any of its powers under this Act; and

"(2) any person may apply to the Commission for a nonexclusive patent license to use the invention or discovery covered by such patent, and the Commission shall grant such patent license to the extent that it finds that the use of the invention or discovery is of primary importance to the conduct of an activity by such person authorized under this Act.

"c. Any person—

"(1) who has made application to the Commission for a license under sections 53, 62, 63, 81, 103, or 104, or a permit or lease under section 67;

"(2) to whom such license, permit, or lease has been issued by the Commission;

"(3) who is authorized to conduct such activities as such applicant is conducting or proposes to conduct under a general license issued by the Commission under sections 62 or 81; or

"(4) whose activities or proposed activities are authorized under section 31,

may at any time make application to the Commission for a patent license for the use of an invention or discovery useful in the production or utilization of special nuclear material or atomic energy covered by a patent. Each such application shall set forth the nature and purpose of the use which the applicant intends to make of the patent license, the steps taken by the applicant to obtain a patent license from the owner of the patent, and a statement of the effects, as estimated by the applicant, on the authorized activities which will result from failure to obtain such patent license and which will result from the granting of such patent license.

"d. Whenever any person has made an application to the Commission for a patent license pursuant to subsection 153 c.—

"(1) the Commission, within 30 days after the filing of such application, shall make available to the owner of the patent all of the information contained in such application, and shall notify the owner of the patent of the time and place at which a hearing will be held by the Commission;

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

"(2) the Commission shall hold a hearing within 60 days after the filing of such application at a time and place designated by the Commission ; and

"(3) in the event an applicant applies for two or more patent licenses, the Commission may, in its discretion, order the consolidation of such applications, and if the patents are owned by more than one owner, such owners may be made parties to one hearing.

"e. If, after any hearing conducted pursuant to subsection 153 d., the Commission finds that—

"(1) the invention or discovery covered by the patent is of primary importance in the production or utilization of special nuclear material or atomic energy;

"(2) the licensing of such invention or discovery is of primary importance to the conduct of the activities of the applicant;

"(3) the activities to which the patent license are proposed to be applied by such applicant are of primary importance to the furtherance of policies and purposes of this Act; and

"(4) such applicant cannot otherwise obtain a patent license from the owner of the patent on terms which the Commission deems to be reasonable for the intended use of the patent to be made by such applicant,

the Commission shall license the applicant to use the invention or discovery covered by the patent for the purposes stated in such application on terms deemed equitable by the Commission and generally not less fair than those granted by the patentee or by the Commission to similar licensees for comparable use.

"f. The Commission shall not grant any patent license pursuant to subsection 153 e. for any other purpose than that stated in the application. Nor shall the Commission grant any patent license to any other applicant for a patent license on the same patent without an application being made by such applicant pursuant to subsection 153 c., and without separate notification and hearing as provided in subsection 153 d., and without a separate finding as provided in subsection 153 e.

"g. The owner of the patent affected by a declaration or a finding made by the Commission pursuant to subsection 153 b. or 153 e. shall be entitled to a reasonable royalty fee from the licensee for any use of an invention or discovery licensed by this section. Such royalty fee may be agreed upon by such owner and the patent licensee, or in the absence of such agreement shall be determined for each patent license by the Commission pursuant to subsection 157 c.

"h. The provisions of this section shall apply to any patent the application for which shall have been filed before September 1, 1959.

"Sec. 154. Injunctions.—No court shall have jurisdiction or power to stay, restrain, or otherwise enjoin the use of any invention or discovery by a patent licensee, to the extent that such use is licensed by subsection 153 b. or 153 e. If, in any action against such patent licensee, the court shall determine that the defendant is exercising such license, the measure of damages shall be the royalty fee determined pursuant to subsection 157 c., together with such costs, interest, and reasonable attorney's fees as may be fixed by the court. If no royalty fee has been determined, the court shall stay the proceeding until the royalty fee is determined pursuant to subsection 157 c. If any such patent licensee shall fail to pay such royalty fee, the patentee may bring an action in any court of competent jurisdiction for such royalty fee, together with such costs, interest, and reasonable attorney's fees as may be fixed by the court.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

"Sec. 155. Prior Art.—In connection with applications for patents covered by this Chapter, the fact that the invention or discovery was known or used before shall be a bar to the patenting of such invention or discovery even though such prior knowledge or use was under secrecy within the atomic energy program of the United States.

"Sec. 156. Commission Patent Licenses.—The Commission shall establish standard specifications upon which it may grant a patent license to use any patent held by the Commission or declared to be affected with the public interest pursuant to subsection 153 a. Such a patent license shall not waive any of the other provisions of this Act.

"Sec. 157. Compensation, Awards, and Royalties.—

"a. Patent Compensation Board.—The Commission shall designate a Patent Compensation Board to consider applications under this section. The members of the Board shall receive a per diem compensation for each day spent in meetings or conferences, and all members shall receive their necessary traveling or other expenses while engaged in the work of the Board. The members of the Board may serve as such without regard to the provisions of sections 281, 283, or 284 of Title 18 of the United States Code, except in so far as such sections may prohibit any such member from receiving compensation in respect of any particular matter which directly involves the Commission or in which the Commission is directly interested.

62 Stat. 697.

"b. Eligibility.—

"(1) Any owner of a patent licensed under section 158 or subsections 153 b. or 153 e., or any patent licensee thereunder may make application to the Commission for the determination of a reasonable royalty fee in accordance with such procedures as the Commission by regulation may establish.

"(2) Any person seeking to obtain the just compensation provided in section 151 shall make application therefor to the Commission in accordance with such procedures as the Commission may by regulation establish.

"(3) Any person making any invention or discovery useful in the production or utilization of special nuclear material or atomic energy, who is not entitled to compensation or a royalty therefor under this Act and who has complied with the provisions of section 151 c. hereof may make application to the Commission for, and the Commission may grant, an award. The Commission may also, upon the recommendation of the General Advisory Committee, and with the approval of the President, grant an award for any especially meritorious contribution to the development, use, or control of atomic energy.

"c. Standards.—

"(1) In determining a reasonable royalty fee as provided for in subsections 153 b. or 153 e., the Commission shall take into consideration (A) the advice of the Patent Compensation Board; (B) any defense, general or special, that might be pleaded by a defendant in an action for infringement; (C) the extent to which, if any, such patent was developed through federally financed research; and (D) the degree of utility, novelty, and importance of the invention or discovery, and may consider the cost to the owner of the patent of developing such invention or discovery or acquiring such patent.

"(2) In determining what constitutes just compensation as provided for in section 151, or in determining the amount of any award under subsection 157 b. (3), the Commission shall take into account the considerations set forth in subsection 157 c. (1) and the actual use of such invention or discovery. Such compensation may be paid by the Commission in periodic payments or in a lump sum.

"Sec. 158. Monopolistic Use of Patents.—Whenever the owner of any patent hereafter granted for any invention or discovery of pri-

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

mary use in the utilization or production of special nuclear material or atomic energy is found by a court of competent jurisdiction to have intentionally used such patent in a manner so as to violate any of the antitrust laws specified in subsection 105 a., there may be included in the judgment of the court, in its discretion and in addition to any other lawful sanctions, a requirement that such owner license such patent to any other licensee of the Commission who demonstrates a need therefor. Such licensee shall pay a reasonable royalty fee, to be determined in accordance with section 157, to the owner of the patent.

"SEC. 159. FEDERALLY FINANCED RESEARCH.—Nothing in this Act shall affect the right of the Commission to require that patents granted on inventions, made or conceived during the course of federally financed research or operations, be assigned to the United States.

"SEC. 160. SAVING CLAUSE.—Any patent application on which a patent was denied by the United States Patent Office under sections 11 (a) (1), 11 (a) (2), or 11 (b) of the Atomic Energy Act of 1946, and which is not prohibited by section 151 or section 155 of this Act may be reinstated upon application to the Commissioner of Patents within one year after enactment of this Act and shall then be deemed to have been continuously pending since its original filing date: *Provided, however,* That no patent issued upon any patent application so reinstated shall in any way furnish a basis of claim against the Government of the United States.

60 Stat. 768.
42 USC 1811.

## "CHAPTER 14. GENERAL AUTHORITY

"SEC. 161. GENERAL PROVISIONS.—In the performance of its functions the Commission is authorized to—

"a. establish advisory boards to advise with and make recommendations to the Commission on legislation, policies, administration, research, and other matters, provided that the Commission issues regulations setting forth the scope, procedure, and limitations of the authority of each such board;

"b. establish by rule, regulation, or order, such standards and instructions to govern the possession and use of special nuclear material, source material, and byproduct material as the Commission may deem necessary or desirable to promote the common defense and security or to protect health or to minimize danger to life or property;

"c. make such studies and investigations, obtain such information, and hold such meetings or hearings as the Commission may deem necessary or proper to assist it in exercising any authority provided in this Act, or in the administration or enforcement of this Act, or any regulations or orders issued thereunder. For such purposes the Commission is authorized to administer oaths and affirmations, and by subpena to require any person to appear and testify, or to appear and produce documents, or both, at any designated place. No person shall be excused from complying with any requirements under this paragraph because of his privilege against self-incrimination, but the immunity provisions of the Compulsory Testimony Act of February 11, 1893, shall apply with respect to any individual who specifically claims such privilege. Witnesses subpenaed under this subsection shall be paid the same fees and mileage as are paid witnesses in the district courts of the United States;

27 Stat. 443.
49 USC 46.

"d. appoint and fix the compensation of such officers and employees as may be necessary to carry out the functions of the Commission. Such officers and employees shall be appointed in accordance with the civil-service laws and their compensation

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

fixed in accordance with the Classification Act of 1949, as amended, except that, to the extent the Commission deems such action necessary to the discharge of its responsibilities, personnel may be employed and their compensation fixed without regard to such laws: *Provided, however,* That no officer or employee (except such officers and employees whose compensation is fixed by law, and scientific and technical personnel) whose position would be subject to the Classification Act of 1949, as amended, if such Act were applicable to such position, shall be paid a salary at a rate in excess of the rate payable under such Act for positions of equivalent difficulty or responsibility. The Commission shall make adequate provision for administrative review of any determination to dismiss any employee;

*63 Stat. 954.*
*5 USC 1071 note.*

"e. acquire such material, property, equipment, and facilities, establish or construct such buildings and facilities, and modify such buildings and facilities from time to time, as it may deem necessary, and construct, acquire, provide, or arrange for such facilities and services (at project sites where such facilities and services are not available) for the housing, health, safety, welfare, and recreation of personnel employed by the Commission as it may deem necessary, subject to the provisions of section 174;

"f. with the consent of the agency concerned, utilize or employ the services or personnel of any Government agency or any State or local government, or voluntary or uncompensated personnel, to perform such functions on its behalf as may appear desirable;

"g. acquire, purchase, lease, and hold real and personal property, including patents, as agent of and on behalf of the United States, subject to the provisions of section 174, and to sell, lease, grant, and dispose of such real and personal property as provided in this Act;

"h. consider in a single application one or more of the activities for which a license is required by this Act, combine in a single license one or more of such activities, and permit the applicant or licensee to incorporate by reference pertinent information already filed with the Commission;

"i. prescribe such regulations or orders as it may deem necessary (1) to protect Restricted Data received by any person in connection with any activity authorized pursuant to this Act, (2) to guard against the loss or diversion of any special nuclear material acquired by any person pursuant to section 53 or produced by any person in connection with any activity authorized pursuant to this Act, and to prevent any use or disposition thereof which the Commission may determine to be inimical to the common defense and security, and (3) to govern any activity authorized pursuant to this Act, including standards and restrictions governing the design, location, and operation of facilities used in the conduct of such activity, in order to protect health and to minimize danger to life or property;

"j. without regard to the provisions of the Federal Property and Administrative Services Act of 1949, as amended, except section 207 of that Act, or any other law, make such disposition as it may deem desirable of (1) radioactive materials, and (2) any other property, the special disposition of which is, in the opinion of the Commission, in the interest of the national security: *Provided, however,* That the property furnished to licensees in accordance with the provisions of subsection 161 m. shall not be deemed to be property disposed of by the Commission pursuant to this subsection;

*63 Stat. 377.*
*40 USC 471 note,*
*488.*

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

"k. authorize such of its members, officers, and employees as it deems necessary in the interest of the common defense and security to carry firearms while in the discharge of their official duties. The Commission may also authorize such of those employees of its contractors engaged in the protection of property owned by the United States and located at facilities owned by or contracted to the United States as it deems necessary in the interests of the common defense and security to carry firearms while in the discharge of their official duties;

"l. secure the admittance free of duty into the United States of purchases made abroad of source materials, upon certification to the Secretary of the Treasury that such entry is necessary in the interest of the common defense and security;

"m. enter into agreements with persons licensed under section 103 or 104 for such periods of time as the Commission may deem necessary or desirable (1) to provide for the processing, fabricating, separating, or refining in facilities owned by the Commission of source, byproduct, or other material or special nuclear material owned by or made available to such licensees and which is utilized or produced in the conduct of the licensed activity, and (2) to sell, lease, or otherwise make available to such licensees such quantities of source or byproduct material, and other material not defined as special nuclear material pursuant to this Act, as may be necessary for the conduct of the licensed activity: *Provided, however,* That any such agreement may be canceled by the licensee at any time upon payment of such reasonable cancellation charges as may be agreed upon by the licensee and the Commission: *And provided further,* That the Commission shall establish prices to be paid by licensees for material or services to be furnished by the Commission pursuant to this subsection, which prices shall be established on such a nondiscriminatory basis as, in the opinion of the Commission, will provide reasonable compensation to the Government for such material or services and will not discourage the development of sources of supply independent of the Commission;

"n. assign scientific, technical, professional, and administrative employees for instruction, education, or training by public or private agencies, institutions of learning, laboratories, or industrial or commercial organizations and to pay the whole or any part of the salaries of such employees, costs of their transportation and per diem in lieu of subsistence in accordance with applicable laws and regulations, and training charges incident to their assignments (including tuition and other related fees): *Provided, however,* That (1) not more than one per centum of the eligible employees shall be so assigned during any fiscal year, and (2) any such assignment shall be approved in advance by the Commission or shall be in accordance with a training program previously approved by the Commission: *And provided further,* That appropriations or other funds available to the Commission for salaries or expenses shall be available for the purposes of this subsection;

"o. delegate to the General Manager or other officers of the Commission any of those functions assigned to it under this Act except those specified in sections 51, 57 a. (3), 61, 102 (with respect to the finding of practical value), 108, 123, 145 b. (with respect to the determination of those persons to whom the Commission may reveal Restricted Data in the national interest), 145 e., and 161 a.;

"p. require by rule, regulation, or order, such reports, and the keeping of such records with respect to, and to provide for such

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

inspections of, activities and studies of types specified in section 31 and of activities under licenses issued pursuant to sections 53, 63, 81, 103, and 104, as may be necessary to effectuate the purposes of this Act, including section 105; and

"q. make, promulgate, issue, rescind, and amend such rules and regulations as may be necessary to carry out the purposes of this Act.

"SEC. 162. CONTRACTS.—The President may, in advance, exempt any specific action of the Commission in a particular matter from the provisions of law relating to contracts whenever he determines that such action is essential in the interest of the common defense and security.

"SEC. 163. ADVISORY COMMITTEES.—The members of the General Advisory Committee established pursuant to section 26 and the members of advisory boards established pursuant to section 161 a. may serve as such without regard to the provisions of sections 281, 283, or 284 of Title 18 of the United States Code, except insofar as such sections may prohibit any such member from receiving compensation in respect of any particular matter which directly involves the Commission or in which the Commission is directly interested.

<div style="text-align:right">62 Stat. 697.</div>

"SEC. 164. ELECTRIC UTILITY CONTRACTS.—The Commission is authorized in connection with the construction or operation of the Oak Ridge, Paducah, and Portsmouth installations of the Commission, without regard to section 3679 of the Revised Statutes, as amended, to enter into new contracts or modify or confirm existing contracts to provide for electric utility services for periods not exceeding twenty-five years, and such contracts shall be subject to termination by the Commission upon payment of cancellation costs as provided in such contracts, and any appropriation presently or hereafter made available to the Commission shall be available for the payment of such cancellation costs. Any such cancellation payments shall be taken into consideration in determination of the rate to be charged in the event the Commission or any other agency of the Federal Government shall purchase electric utility services from the contractor subsequent to the cancellation and during the life of the original contract. The authority of the Commission under this section to enter into new contracts or modify or confirm existing contracts to provide for electric utility services includes, in case such electric utility services are to be furnished to the Commission by the Tennessee Valley Authority, authority to contract with any person to furnish electric utility services to the Tennessee Valley Authority in replacement thereof. Any contract hereafter entered into by the Commission pursuant to this section shall be submitted to the Joint Committee and a period of thirty days shall elapse while Congress is in session (in computing such thirty days, there shall be excluded the days on which either House is not in session because of adjournment for more than three days) before the contract of the Commission shall become effective: *Provided, however,* That the Joint Committee, after having received the proposed contract, may by resolution in writing, waive the conditions of or all or any portion of such thirty-day period.

<div style="text-align:right">31 USC 665.</div>

"SEC. 165. CONTRACT PRACTICES.—

"a. In carrying out the purposes of this Act the Commission shall not use the cost-plus-percentage-of-cost system of contracting.

"b. No contract entered into under the authority of this Act shall provide, and no contract entered into under the authority of the Atomic Energy Act of 1946, as amended, shall be modified or amended after the date of enactment of this Act to provide, for direct payment or direct reimbursement by the Commission of any Federal income taxes on behalf of any contractor performing such contract for profit.

<div style="text-align:right">60 Stat. 755.<br>42 USC 1801<br>note.</div>

"SEC. 166. COMPTROLLER GENERAL AUDIT.—No moneys appropriated

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

for the purposes of this Act shall be available for payments under any contract with the Commission, negotiated without advertising, except contracts with any foreign government or any agency thereof and contracts with foreign producers, unless such contract includes a clause to the effect that the Comptroller General of the United States or any of his duly authorized representatives shall, until the expiration of three years after final payment, have access to and the right to examine any directly pertinent books, documents, papers, and records of the contractor or any of his subcontractors engaged in the performance of, and involving transactions related to such contracts or subcontracts: *Provided, however,* That no moneys so appropriated shall be available for payment under such contract which includes any provision precluding an audit by the General Accounting Office of any transaction under such contract.

"SEC. 167. CLAIM SETTLEMENTS.—The Commission, acting on behalf of the United States, is authorized to consider, ascertain, adjust, determine, settle, and pay, any claim for money damage of $5,000 or less against the United States for bodily injury, death, or damage to or loss of real or personal property resulting from any detonation, explosion, or radiation produced in the conduct of the Commission's program for testing atomic weapons, where such claim is presented to the Commission in writing within one year after the accident or incident out of which the claim arises: *Provided, however,* That the damage to or loss of property, or bodily injury or death, shall not have been caused in whole or in part by any negligence or wrongful act on the part of the claimant, his agents, or employees. Any such settlement under the authority of this section shall be final and conclusive for all purposes, notwithstanding any other provision of law to the contrary.

"SEC. 168. PAYMENTS IN LIEU OF TAXES.—In order to render financial assistance to those States and localities in which the activities of the Commission are carried on, and in which the Commission has acquired property previously subject to State and local taxation, the Commission is authorized to make payments to State and local governments in lieu of property taxes. Such payments may be in the amounts, at the times, and upon the terms the Commission deems appropriate, but the Commission shall be guided by the policy of not making payments in excess of the taxes which would have been payable for such property in the condition in which it was acquired, except in cases where special burdens have been cast upon the State or local government by activities of the Commission, the Manhattan Engineer District or their agents. In any such case, any benefit accruing to the State or local government by reason of such activities shall be considered in determining the amount of the payment.

"SEC. 169. No SUBSIDY.—No funds of the Commission shall be employed in the construction or operation of facilities licensed under section 103 or 104 except under contract or other arrangement entered into pursuant to section 31.

## "CHAPTER 15. COMPENSATION FOR PRIVATE PROPERTY ACQUIRED

"SEC. 171. JUST COMPENSATION.—The United States shall make just compensation for any property or interests therein taken or requisitioned pursuant to sections 43, 52 (with respect to the material for which the United States is required to pay just compensation), 66, and 108. Except in case of real property or any interest therein, the Commission shall determine and pay such just compensation. If the compensation so determined is unsatisfactory to the person entitled

**68 STAT.]** PUBLIC LAW 703—AUG. 30, 1954 **953**

thereto, such person shall be paid 75 per centum of the amount so determined, and shall be entitled to sue the United States in the Court of Claims or in any district court of the United States for the district in which such claimant is a resident in the manner provided by section 1346 of Title 28 of the United States Code to recover such further sum as added to said 75 per centum will constitute just compensation.

62 Stat. 933.

"SEC. 172. CONDEMNATION OF REAL PROPERTY.—Proceedings for condemnation shall be instituted pursuant to the provisions of the Act approved August 1, 1888, as amended, and section 1403 of Title 28 of the United States Code. The Act approved February 26, 1931, as amended, shall be applicable to any such proceedings.

62 Stat. 986,937; 46 Stat. 1421. 40 USC 257, 258-258a.

"SEC. 173. PATENT APPLICATION DISCLOSURES.—In the event that the Commission communicates to any nation any Restricted Data based on any patent application not belonging to the United States, just compensation shall be paid by the United States to the owner of the patent application. The Commission shall determine such compensation. If the compensation so determined is unsatisfactory to the person entitled thereto, such person shall be paid 75 per centum of the amount so determined, and shall be entitled to sue the United States in the Court of Claims or in any district court of the United States for the district in which such claimant is a resident in a manner provided by section 1346 of Title 28 of the United States Code to recover such further sum as added to such 75 per centum will constitute just compensation.

62 Stat. 933.

"SEC. 174. ATTORNEY GENERAL APPROVAL OF TITLE.—All real property acquired under this Act shall be subject to the provisions of section 355 of the Revised Statutes, as amended: *Provided, however,* That real property acquired by purchase or donation, or other means of transfer may also be occupied, used, and improved for the purposes of this Act prior to approval of title by the Attorney General in those cases where the President determines that such action is required in the interest of the common defense and security.

40 USC 255.

## "CHAPTER 16. JUDICIAL REVIEW AND ADMINISTRATIVE PROCEDURE

"SEC. 181. GENERAL.—The provisions of the Administrative Procedure Act (Public Law 404, Seventy-ninth Congress, approved June 11, 1946) shall apply to all agency action taken under this Act, and the terms 'agency' and 'agency action' shall have the meaning specified in the Administrative Procedure Act: *Provided, however,* That in the case of agency proceedings or actions which involve Restricted Data or defense information, the Commission shall provide by regulation for such parallel procedures as will effectively safeguard and prevent disclosure of Restricted Data or defense information to unauthorized persons with minimum impairment of the procedural rights which would be available if Restricted Data or defense information were not involved.

60 Stat. 237. 5 USC 1001 note.

"SEC. 182. LICENSE APPLICATIONS.—

"a. Each application for a license hereunder shall be in writing and shall specifically state such information as the Commission, by rule or regulation, may determine to be necessary to decide such of the technical and financial qualifications of the applicant, the character of the applicant, the citizenship of the applicant, or any other qualifications of the applicant as the Commission may deem appropriate for the license. In connection with applications for licenses to operate production or utilization facilities, the applicant shall state such technical specifications, including information of the amount, kind, and source of special nuclear material required, the place of the use, the specific

characteristics of the facility, and such other information as the Commission may, by rule or regulation, deem necessary in order to enable it to find that the utilization or production of special nuclear material will be in accord with the common defense and security and will provide adequate protection to the health and safety of the public. Such technical specifications shall be a part of any license issued. The Commission may at any time after the filing of the original application, and before the expiration of the license, require further written statements in order to enable the Commission to determine whether the application should be granted or denied or whether a license should be modified or revoked. All applications and statements shall be signed by the applicant or licensee under oath or affirmation.

*Commercial power.*

"b. The Commission shall not issue any license for a utilization or production facility for the generation of commercial power under section 103, until it has given notice in writing to such regulatory agency as may have jurisdiction over the rates and services of the proposed activity, to municipalities, private utilities, public bodies, and cooperatives within transmission distance authorized to engage in the distribution of electric energy and until it has published notice of such

*Notice in FR.*

application once each week for four consecutive weeks in the Federal Register, and until four weeks after the last notice.

"c. The Commission, in issuing any license for a utilization or production facility for the generation of commercial power under section 103, shall give preferred consideration to applications for such facilities which will be located in high cost power areas in the United States if there are conflicting applications for a limited opportunity for such license. Where such conflicting applications resulting from limited opportunity for such license include those submitted by public or cooperative bodies such applications shall be given preferred consideration.

"SEC. 183. TERMS OF LICENSES.—Each license shall be in such form and contain such terms and conditions as the Commission may, by rule or regulation, prescribe to effectuate the provisions of this Act, including the following provisions:

"a. Title to all special nuclear material utilized or produced by facilities pursuant to the license, shall at all times be in the United States.

"b. No right to the special nuclear material shall be conferred by the license except as defined by the license.

"c. Neither the license nor any right under the license shall be assigned or otherwise transferred in violation of the provisions of this Act.

"d. Every license issued under this Act shall be subject to the right of recapture or control reserved by section 108, and to all of the other provisions of this Act, now or hereafter in effect and to all valid rules and regulations of the Commission.

"SEC. 184. INALIENABILITY OF LICENSES.—No license granted hereunder and no right to utilize or produce special nuclear material granted hereby shall be transferred, assigned or in any manner disposed of, either voluntarily or involuntarily, directly or indirectly, through transfer of control of any license to any person, unless the Commission shall, after securing full information, find that the transfer is in accordance with the provisions of this Act, and shall give its consent in writing. The Commission may give such consent to the creation of a mortgage, pledge, or other lien upon any facility owned or thereafter acquired by a licensee, or upon any leasehold or other interest in such property, and the rights of the creditors so secured may thereafter be enforced by any court subject to rules and regulations established by the Commission to protect public health and safety and promote the common defense and security.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

"Sec. 185. Construction Permits.—All applicants for licenses to construct or modify production or utilization facilities shall, if the application is otherwise acceptable to the Commission, be initially granted a construction permit. The construction permit shall state the earliest and latest dates for the completion of the construction or modification. Unless the construction or modification of the facility is completed by the completion date, the construction permit shall expire, and all rights thereunder be forfeited, unless upon good cause shown, the Commission extends the completion date. Upon the completion of the construction or modification of the facility, upon the filing of any additional information needed to bring the original application up to date, and upon finding that the facility authorized has been constructed and will operate in conformity with the application as amended and in conformity with the provisions of this Act and of the rules and regulations of the Commission, and in the absence of any good cause being shown to the Commission why the granting of a license would not be in accordance with the provisions of this Act, the Commission shall thereupon issue a license to the applicant. For all other purposes of this Act, a construction permit is deemed to be a 'license'.

"Sec. 186. Revocation.—

"a. Any license may be revoked for any material false statement in the application or any statement of fact required under section 182, or because of conditions revealed by such application or statement of fact or any report, record, or inspection or other means which would warrant the Commission to refuse to grant a license on an original application, or for failure to construct or operate a facility in accordance with the terms of the construction permit or license or the technical specifications in the application, or for violation of, or failure to observe any of the terms and provisions of this Act or of any regulation of the Commission.

"b. The Commission shall follow the provisions of section 9 (b) of the Administrative Procedure Act in revoking any license.

60 Stat. 242.
5 USC 1008(b).

"c. Upon revocation of the license, the Commission may immediately retake possession of all special nuclear material held by the licensee. In cases found by the Commission to be of extreme importance to the national defense and security or to the health and safety of the public, the Commission may recapture any special nuclear material held by the licensee or may enter upon and operate the facility prior to any of the procedures provided under the Administrative Procedure Act. Just compensation shall be paid for the use of the facility.

5 USC 1001 note.

"Sec. 187. Modification of License.—The terms and conditions of all licenses shall be subject to amendment, revision, or modification, by reason of amendments of this Act or by reason of rules and regulations issued in accordance with the terms of this Act.

"Sec. 188. Continued Operation of Facilities.—Whenever the Commission finds that the public convenience and necessity or the production program of the Commission requires continued operation of a production facility or utilization facility the license for which has been revoked pursuant to section 186, the Commission may, after consultation with the appropriate regulatory agency, State or Federal, having jurisdiction, order that possession be taken of and such facility be operated for such period of time as the public convenience and necessity or the production program of the Commission may, in the judgment of the Commission, require, or until a license for the operation of the facility shall become effective. Just compensation shall be paid for the use of the facility.

"Sec. 189. Hearings and Judicial Review.—

"a. In any proceeding under this Act, for the granting, suspending,

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

revoking, or amending of any license or construction permit, or application to transfer control, and in any proceeding for the issuance or modification of rules and regulations dealing with the activities of licensees, and in any proceeding for the payment of compensation, an award or royalties under sections 153, 157, 186 c., or 188, the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding.

"b. Any final order entered in any proceeding of the kind specified in subsection a. above shall be subject to judicial review in the manner prescribed in the Act of December 29, 1950, as amended (ch. 1189, 64 Stat. 1129), and to the provisions of section 10 of the Administrative Procedure Act, as amended.

5 USC 1031-
1042, 1009.

## "CHAPTER 17. JOINT COMMITTEE ON ATOMIC ENERGY

"SEC. 201. MEMBERSHIP.—There is hereby established a Joint Committee on Atomic Energy to be composed of nine Members of the Senate to be appointed by the President of the Senate, and nine Members of the House of Representatives to be appointed by the Speaker of the House of Representatives. In each instance not more than five Members shall be members of the same political party.

"SEC. 202. AUTHORITY AND DUTY.—The Joint Committee shall make continuing studies of the activities of the Atomic Energy Commission and of problems relating to the development, use, and control of atomic energy. During the first sixty days of each session of the Congress, the Joint Committee shall conduct hearings in either open or executive session for the purpose of receiving information concerning the development, growth, and state of the atomic energy industry. The Commission shall keep the Joint Committee fully and currently informed with respect to all of the Commission's activities. The Department of Defense shall keep the Joint Committee fully and currently informed with respect to all matters within the Department of Defense relating to the development, utilization, or application of atomic energy. Any Government agency shall furnish any information requested by the Joint Committee with respect to the activities or responsibilities of that agency in the field of atomic energy. All bills, resolutions, and other matters in the Senate or the House of Representatives relating primarily to the Commission or to the development, use, or control of atomic energy shall be referred to the Joint Committee. The members of the Joint Committee who are Members of the Senate shall from time to time report to the Senate, and the members of the Joint Committee who are Members of the House of Representatives shall from time to time report to the House, by bill or otherwise, their recommendations with respect to matters within the jurisdiction of their respective Houses which are referred to the Joint Committee or otherwise within the jurisdiction of the Joint Committee.

"SEC. 203. CHAIRMAN.—Vacancies in the membership of the Joint Committee shall not affect the power of the remaining members to execute the functions of the Joint Committee, and shall be filled in the same manner as in the case of the original selection. The Joint Committee shall select a Chairman and a Vice Chairman from among its members at the beginning of each Congress. The Vice Chairman shall act in the place and stead of the Chairman in the absence of the Chairman. The Chairmanship shall alternate between the Senate and the House of Representatives with each Congress, and the Chairman shall be selected by the Members from that House entitled to the Chair-

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

manship. The Vice Chairman shall be chosen from the House other than that of the Chairman by the Members from that House.

"Sec. 204. Powers.—In carrying out its duties under this Act, the Joint Committee, or any duly authorized subcommittee thereof, is authorized to hold such hearings or investigations, to sit and act at such places and times, to require, by subpena or otherwise, the attendance of such witnesses and the production of such books, papers, and documents, to administer such oaths, to take such testimony, to procure such printing and binding, and to make such expenditures as it deems advisable. The Joint Committee may make such rules respecting its organization and procedures as it deems necessary : *Provided, however,* That no measure or recommendation shall be reported from the Joint Committee unless a majority of the committee assent. Subpenas may be issued over the signature of the Chairman of the Joint Committee or by any member designated by him or by the Joint Committee, and may be served by such person or persons as may be designated by such Chairman or member. The Chairman of the Joint Committee or any member thereof may administer oaths to witnesses. The Joint Committee may use a committee seal. The provisions of sections 102 to 104, inclusive, of the Revised Statutes, as amended, shall apply in case of any failure of any witness to comply with a subpena or to testify when summoned under authority of this section. The expenses of the Joint Committee shall be paid from the contingent fund of the Senate from funds appropriated for the Joint Committee upon vouchers approved by the Chairman. The cost of stenographic service to report public hearings shall not be in excess of the amounts prescribed by law for reporting the hearings of standing committees of the Senate. The cost of stenographic service to report executive hearings shall be fixed at an equitable rate by the Joint Committee. Members of the Joint Committee, and its employees and consultants, while traveling on official business for the Joint Committee, may receive either the per diem allowance authorized to be paid to Members of Congress or its employees, or their actual and necessary expenses provided an itemized statement of such expenses is attached to the voucher.

> Committee seal.
> 2 USC 192-194.

"Sec. 205. Staff and Assistance.—The Joint Committee is empowered to appoint and fix the compensation of such experts, consultants, technicians, and staff employees as it deems necessary and advisable. The Joint Committee is authorized to utilize the services, information, facilities, and personnel of the departments and establishments of the Government. The Joint Committee is authorized to permit such of its members, employees, and consultants as it deems necessary in the interest of common defense and security to carry firearms while in the discharge of their official duties for the committee.

"Sec. 206. Classification of Information.—The Joint Committee may classify information originating within the committee in accordance with standards used generally by the executive branch for classifying Restricted Data or defense information.

"Sec. 207. Records.—The Joint Committee shall keep a complete record of all committee actions, including a record of the votes on any question on which a record vote is demanded. All committee records, data, charts, and files shall be the property of the Joint Committee and shall be kept in the offices of the Joint Committee or other places as the Joint Committee may direct under such security safeguards as the Joint Committee shall determine in the interest of the common defense and security.

## "CHAPTER 18. ENFORCEMENT

"Sec. 221. General Provisions.—

"a. To protect against the unlawful dissemination of Restricted Data and to safeguard facilities, equipment, materials, and other property of the Commission, the President shall have authority to utilize the services of any Government agency to the extent he may deem necessary or desirable.

"b. The Federal Bureau of Investigation of the Department of Justice shall investigate all alleged or suspected criminal violations of this Act.

"c. No action shall be brought against any individual or person for any violation under this Act unless and until the Attorney General of the United States has advised the Commission with respect to such action and no such action shall be commenced except by the Attorney General of the United States: *Provided, however,* That no action shall be brought under sections 222, 223, 224, 225 or 226 except by the express direction of the Attorney General.

"Sec. 222. Violation of Specific Sections.—Whoever willfully violates, attempts to violate, or conspires to violate, any provision of sections 57, 92, or 101, or whoever unlawfully interferes, attempts to interfere, or conspires to interfere with any recapture or entry under section 108, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both, except that whoever commits such an offense with intent to injure the United States or with intent to secure an advantage to any foreign nation shall, upon conviction thereof, be punished by death or imprisonment for life (but the penalty of death or imprisonment for life may be imposed only upon recommendation of the jury), or by a fine of not more than $20,000 or by imprisonment for not more than twenty years, or both.

"Sec. 223. Violation of Sections Generally.—Whoever willfully violates, attempts to violate, or conspires to violate, any provision of this Act for which no penalty is specifically provided or of any regulation or order prescribed or issued under section 65 or subsections 161 b., i., or p. shall, upon conviction thereof, be punished by a fine of not more than $5,000 or by imprisonment for not more than two years, or both, except that whoever commits such an offense with intent to injure the United States or with intent to secure an advantage to any foreign nation, shall, upon conviction thereof, be punished by a fine of not more than $20,000 or by imprisonment for not more than twenty years, or both.

"Sec. 224. Communication of Restricted Data.—Whoever, lawfully or unlawfully, having possession of, access to, control over, or being entrusted with any document, writing, sketch, photograph, plan, model, instrument, appliance, note, or information involving or incorporating Restricted Data—

"a. communicates, transmits, or discloses the same to any individual or person, or attempts or conspires to do any of the foregoing, with intent to injure the United States or with intent to secure an advantage to any foreign nation, upon conviction thereof, shall be punished by death or imprisonment for life (but the penalty of death or imprisonment for life may be imposed only upon recommendation of the jury), or by a fine of not more than $20,000 or imprisonment for not more than twenty years, or both;

"b. communicates, transmits, or discloses the same to any individual or person, or attempts or conspires to do any of the foregoing, with reason to believe such data will be utilized to injure the United States or to secure an advantage to any foreign nation,

shall, upon conviction, be punished by a fine of not more than $10,000 or imprisonment for not more than ten years, or both.

"Sec. 225. Receipt of Restricted Data.—Whoever, with intent to injure the United States or with intent to secure an advantage to any foreign nation, acquires, or attempts or conspires to acquire any document, writing, sketch, photograph, plan, model, instrument, appliance, note, or information involving or incorporating Restricted Data shall, upon conviction thereof, be punished by death or imprisonment for life (but the penalty of death or imprisonment for life may be imposed only upon recommendation of the jury), or by a fine of not more than $20,000 or imprisonment for not more than twenty years, or both.

"Sec. 226. Tampering with Restricted Data.—Whoever, with intent to injure the United States or with intent to secure an advantage to any foreign nation, removes, conceals, tampers with, alters, mutilates, or destroys any document, writing, sketch, photograph, plan, model, instrument, appliance, or note involving or incorporating Restricted Data and used by any individual or person in connection with the production of special nuclear material, or research or development relating to atomic energy, conducted by the United States, or financed in whole or in part by Federal funds, or conducted with the aid of special nuclear material, shall be punished by death or imprisonment for life (but the penalty of death or imprisonment for life may be imposed only upon recommendation of the jury), or by a fine of not more than $20,000 or imprisonment for not more than twenty years, or both.

"Sec. 227. Disclosure of Restricted Data.—Whoever, being or having been an employee or member of the Commission, a member of the Armed Forces, an employee of any agency of the United States, or being or having been a contractor of the Commission or of an agency of the United States, or being or having been an employee of a contractor of the Commission or of an agency of the United States, or being or having been a licensee of the Commission, or being or having been an employee of a licensee of the Commission, knowingly communicates, or whoever conspires to communicate or to receive, any Restricted Data, knowing or having reason to believe that such data is Restricted Data, to any person not authorized to receive Restricted Data pursuant to the provisions of this Act or under rule or regulation of the Commission issued pursuant thereto, knowing or having reason to believe such person is not so authorized to receive Restricted Data shall, upon conviction thereof, be punishable by a fine of not more than $2,500.

"Sec. 228. Statute of Limitations.—Except for a capital offense, no individual or person shall be prosecuted, tried, or punished for any offense prescribed or defined in sections 224 to 226, inclusive, of this Act unless the indictment is found or the information is instituted within ten years next after such offense shall have been committed.

"Sec. 229. Other Laws.—Sections 224 to 228 shall not exclude the applicable provisions of any other laws.

"Sec. 230. Injunction Proceedings.—Whenever in the judgment of the Commission any person has engaged or is about to engage in any acts or practices which constitute or will constitute a violation of any provision of this Act, or any regulation or order issued thereunder, the Attorney General on behalf of the United States may make application to the appropriate court for an order enjoining such acts or practices, or for an order enforcing compliance with such provision, and upon a showing by the Commission that such person has engaged or is about to engage in any such acts or practices, a permanent or temporary injunction, restraining order, or other order may be granted.

"SEC. 231. CONTEMPT PROCEEDINGS.—In case of failure or refusal to obey a subpena served upon any person pursuant to subsection 161 c., the district court for any district in which such person is found or resides or transacts business, upon application by the Attorney General on behalf of the United States, shall have jurisdiction to issue an order requiring such person to appear and give testimony or to appear and produce documents, or both, in accordance with the subpena; and any failure to obey such order of the court may be punished by such court as a contempt thereof.

## "CHAPTER 19. MISCELLANEOUS

"SEC. 241. TRANSFER OF PROPERTY.—Nothing in this Act shall be deemed to repeal, modify, amend, or alter the provisions of section 9 (a) of the Atomic Energy Act of 1946, as heretofore amended.

60 Stat. 765.
42 USC 1809(a).

"SEC. 251. REPORT TO CONGRESS.—The Commission shall submit to the Congress, in January and July of each year, a report concerning the activities of the Commission. The Commission shall include in such report, and shall at such other times as it deems desirable submit to the Congress, such recommendations for additional legislation as the Commission deems necessary or desirable.

"SEC. 261. APPROPRIATIONS.—There are hereby authorized to be appropriated such sums as may be necessary and appropriate to carry out the provisions and purposes of this Act except such as may be necessary for acquisition or condemnation of any real property or any facility or for plant or facility acquisition, construction, or expansion. The Acts appropriating such sums may appropriate specified portions thereof to be accounted for upon the certification of the Commission only. Funds appropriated to the Commission shall, if obligated by contract during the fiscal year for which appropriated, remain available for expenditure for four years following the expiration of the fiscal year for which appropriated.

"SEC. 271. AGENCY JURISDICTION.—Nothing in this Act shall be construed to affect the authority or regulations of any Federal, State, or local agency with respect to the generation, sale, or transmission of electric power.

"SEC. 272. APPLICABILITY OF FEDERAL POWER ACT.—Every licensee under this Act who holds a license from the Commission for a utilization or production facility for the generation of commercial electric energy under section 103 and who transmits such electric energy in interstate commerce or sells it at wholesale in interstate commerce shall be subject to the regulatory provisions of the Federal Power Act.

"SEC. 273. LICENSING OF GOVERNMENT AGENCIES.—Nothing in this Act shall preclude any Government agency now or hereafter authorized by law to engage in the production, marketing, or distribution of electric energy from obtaining a license under section 103, if qualified under the provisions of section 103, for the construction and operation of production or utilization facilities for the primary purpose of producing electric energy for disposition for ultimate public consumption.

"SEC. 281. SEPARABILITY.—If any provision of this Act or the application of such provision to any person or circumstances, is held invalid, the remainder of this Act or the application of such provision to persons or circumstances other than those as to which it is held invalid, shall not be affected thereby.

"SEC. 291. SHORT TITLE.—This Act may be cited as the 'Atomic Energy Act of 1954'."

Case: 4:27-cv-00016-CDP   Doc. #: 14-7   Filed: 01/28/21   Page: 96 of 903   PageID #: 1557

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

SEC. 2.—

a. Section 1 (d) of the Act of December 29, 1950 (64 Stat. 1129), is amended by inserting before the period at the end thereof a semicolon and the following: "when such order was entered by the Atomic Energy Commission, 'agency' means that Commission".

5 USC 1031(d).

b. Section 2 of the Act of December 29, 1950 (64 Stat. 1129), is amended by inserting before the period at the end of the first paragraph thereof a comma and the following: "and (d) of the Atomic Energy Commission made reviewable by section 189 of the Atomic Energy Act of 1954, as amended".

5 USC 1032. Court of Appeals, jurisdiction.

Ante, p. 955.

SEC. 3. There is hereby retroceded to the State of New Mexico the exclusive jurisdiction heretofore acquired from the State of New Mexico by the United States of America over the following land of the United States Atomic Energy Commission in Bernalillo County and within the boundaries of the Sandia base, Albuquerque, New Mexico.

New Mexico. Retrocession.

Beginning at the center quarter corner of section 30, township 10 north, range 4 east, New Mexico principal meridian, Bernalillo County, New Mexico, thence south no degrees twenty-three minutes thirty seconds west one thousand nine hundred forty-seven and twenty one-hundredths feet, thence north eighty-nine degrees thirty-six minutes forty-five seconds east two thousand sixty-eight and forty one-hundredths feet, thence north eighty-nine degrees three minutes fifteen seconds east five hundred forty-six feet, thence north no degrees thirty-nine minutes no seconds east two hundred thirty-two and seventy one-hundredths feet, thence north eighty-nine degrees twenty-one minutes no seconds west eight hundred fifty-two and twenty one-hundredths feet, thence north no degrees thirty-nine minutes no seconds east five hundred and sixty one-hundredths feet, thence along the back of the south curb of West Sandia Drive, Sandia Base, Bernalillo County, New Mexico, eight hundred sixty-five and sixty one-hundredths feet, thence north no degrees thirty-nine minutes no seconds east one thousand three hundred thirty-five and three-tenths feet to a point south eighty-nine degrees twenty-seven minutes forty-five seconds west a distance of thirty feet from the quarter corner common to sections 30 and 29, township 10 north, range 4 east, thence south eighty-nine degrees, twenty-seven minutes forty-five seconds west two thousand six hundred twenty-three and forty one-hundredths feet to the point of beginning.

This retrocession of jurisdiction shall take effect upon acceptance by the State of New Mexico.

Approved August 30, 1954, 9:44 a.m., E.D.T.

---

Public Law 704　　　　　　　　　　　　　　　　**CHAPTER 1074**

**AN ACT**

To authorize and direct the construction of bridges over the Potomac River, and for other purposes.

August 30, 1954 [H. R. 1980]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Potomac River bridges.

## TITLE I—BRIDGE IN VICINITY OF CONSTITUTION AVENUE

That (a) the Commissioners of the District of Columbia are authorized and directed to construct, maintain, and operate a low-level bridge over the Potomac River, from the vicinity of Constitution Avenue

Case: 4:17-cv-00024-CDP Doc. #: 48-8 Filed: 02/06/17 Page: 1 of 3 PageID #: 886

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

# EXHIBIT 8

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

S. REP. 83-1699, S. Rep. No. 1699, 83RD Cong., 2ND Sess.
1954, 1954 U.S.C.C.A.N. 3456, 1954 WL 3225 (Leg.Hist.)
**\*3456** P.L. 83-703, ATOMIC ENERGY ACT OF 1954
Senate Report No. 83-1699,
June 30, 1954 (To accompany S. 3690)
House Report No. 83-2181,
July 12, 1954 (To accompany H.R. 9757)
Conference Report No. 83-2639,
Aug. 6, 1954 (To accompany H.R. 9757)
Conference Report No. 83-2666,
Aug. 16, 1954 (To accompany H.R. 9757)
The House bill was passed in lieu of the Senate bill after substituting for its
language the text of the Senate bill, therefore the Senate Report is set out. Two
Conference Reports were submitted with this legislation, both of which are set out.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED
MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

Senate Report No. 83-1699

June 30, 1954

THE Joint Committee on Atomic Energy, to whom was referred the bill (S. 3690) to amend the Atomic Energy Act
of 1946, as amended, and for other purposes, having considered the same, unanimously report favorably thereon and
recommend that the bill do pass. Some individual members of the Joint Committee hold divergent views on certain
sections of the bill which are attached hereto or will be presented appropriately in their respective Houses.

This report describes the background of S. 3690, which is the committee-approved revision of S. 3323 on which public
and executive hearings have been held, sets forth the basic considerations which impelled the Joint Committee to report
it favorably, and furnishes a section-by-section analysis of the bill.

**\*3457** CHANGING PERSPECTIVES IN ATOMIC ENERGY

The primary purpose of S. 3690 is to bring the Atomic Energy Act of 1946 into accord with atomic progress and
to make our Nation's Legislative controls better conform with the scientific, technical, economic, and political facts of
atomic energy as they exist today-- almost a decade after S. 1717 became the law of the land (Public Law 555, 79th Cong.).

The organic law was written at the very outset of the atomic era. Those who participated in drafting that law were
keenly aware that many unknown factors were involved in measuring the future impact of this new source of energy upon
our national life. Indeed, the law warned in its findings and declaration that 'any legislation will necessarily be subject
to revision from time to time.' We deem it a tribute to the special committee which drafted S. 1717, 79th Congress, and
to the late Senator Brien McMahon, sponsor of the legislation and subsequently chairman of the Joint Committee, that
the organic law has served our Nation so well for nearly a full decade. We would also record our satisfaction with the
fact that, at a time when atomic energy was popularly associated only with the atom bomb, the organic law specifically
called attention to constructive uses of the atom, by declaring that--

Subject at all times to the paramount objective of assuring the common defense and security, the development and
utilization of atomic energy shall, so far as practicable, be directed toward improving the public welfare, increasing the
standard of living, strengthening free competition in private enterprise, and promoting world peace.

Under the Atomic Energy Act of 1946, our Nation has developed, in the form of our atomic-weapon stockpile, a degree of deterring power which may well constitute the free world's greatest material asset in its effort to avert another worldwide war. The elementary requirements of national security have compelled us to give military uses of the atom top priority. Yet we have simultaneously developed, to a considerable degree, beneficent applications of this new force.

The past 8 years have witnessed extraordinary scientific and technical achievements in atomic energy, both on the peacetime and military sides. Technological developments-- some promising longer and richer lives for all privileged to share in the peacetime benefits of the atom, and others posing grave threats to the very existence of civilization-- have proceeded much more rapidly than was expected in 1946. As a result, atomic-energy legislation which was once fully responsive to assuring the common defense and promoting the national welfare must now be revised to take account of existing realities in atomic energy, in our Nation and throughout the world.

When the original act was written, the United States possessed a monopoly of atomic weapons. In a world where just and lasting peace was fervently sought though not yet assured, simple prudence dictated stringent security regulations aimed at prolonging our monopoly. It was widely believed that the Soviet Union might not explode its first atomic bomb for many years to come, and that still more years might pass before it could produce atomic weapons in quantity. In point of fact, however, the Soviet Union broke our atomic monopoly less than 3 years after the Atomic Energy Act of 1946 was put on the statute books. In the fall of 1953, less than a **\*3458** year after our first full-scale fusion-weapon test, the Soviets also achieved a thermonuclear explosion. This clearly does not mean that the security regulations contained in the Atomic Energy Act of 1946 served no useful purpose, or that an indiscriminate relaxation of these safeguards is now in order. It does mean that our provisions for the control of information must now be revised to protect our national interest in a world where the forces of evil have added to their conventional arms a growing ability to launch a devastating atomic blow against the free world.

When the organic law was enacted, atomic bombs were regarded by most as strategic weapons. Tactical applications of the military atom were but dimly perceived. Still less was it recognized that the time would soon come when tactical atomic weapons could profoundly, perhaps even decisively, affect the operations of the ground forces defending Western Europe. With our Nation the sole possessor of atomic weapons, and with these weapons husbanded for a strategic counterblow against an aggressor, there was no need for acquainting friendly nations with information concerning the effects and military employment of tactical atomic weapons. Today, however, we are engaged with our allies in a common endeavor, involving common planning and combined forces, to dam the tide of Red military power and prevent it from engulfing free Europe. America's preponderance in atomic weapons can offset the numerical superiority of the Communist forces, and serve emphatic notice on the Soviet dictators that any attempt to occupy free Europe, or to push further anywhere into the free world, would be foredoomed to failure. Yet, so long as our law prohibits us from giving our partners in these joint efforts for common defense such atomic information as is required for realistic military planning, our own national security suffers.

To contrast still further differences between the perspective of 1946 and that of 1954: It was commonly believed 8 years ago that the generation of useful power from atomic energy was a distant goal, a very distant goal. Atomic energy then was 95 percent for military purposes, with possible 5 percent for peacetime uses. The resources of the Atomic Energy Commission and of its contractors appeared fully adequate to develop atomic-power reactors at a rate consistent with foreseeable technical progress. Moreover, there was little experience concerning the health hazards involved in operating atomic plants, and this fact was in itself a compelling argument for making the manufacture and use of atomic materials a Government monopoly.

Today, however, we can draw on the experience acquired in designing, building, and operating more than a score of atomic reactors. It is now evident that greater private participation in power development need not bring with it attendant hazards to the health and safety of the American people. Moreover, the atomic-reactor art has already reached the point

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

where atomic power at prices competitive with electricity derived from conventional fuels is on the horizon, though not within our immediate reach. For more than 2 1/2 years, the experimental breeder reactor has actually been producing relatively small amounts of electricity at the national reactor testing station in Idaho. The land-based prototype of the atomic engine propelling the U.S.S. Nautilus has already produced more than enough power to send an atomic submarine around the world, fully submerged and at full speed. The Westinghouse Electric Corp. and the Duquesne Power & Light Co. are **\*3459** now constructing the Nation's first large-scale atomic-power reactor, which will generate 60,000 kilowatts of electricity-- an amount sufficient to furnish light and power for a sizable city.

Many technological problems remain to be solved before widespread atomic power, at competitive prices, is a reality. It is clear to us that continued Government research and development, using Government funds, will be indispensable to a speedy and resolute attack on these problems. It is equally clear to us, however, that the goal of atomic power at competitive prices will be reached more quickly if private enterprise, using private funds, is now encouraged to play a far larger role in the development of atomic power than is permitted under existing legislation. In particular, we do not believe that any developmental program carried out solely under governmental auspices, no matter how efficient it may be, can substitute for the cost-cutting and other incentives of free and competitive enterprise.

Today we are not alone in the drive to achieve peacetime atomic power. Eight years ago, besides the United States, only the United Kingdom, Canada, and-- as we have recently come to find-- the Soviet Union, had major atomic energy projects in being. The possibility of cooperating with other nations to gain mutual advantage in the area of peacetime power appeared far in the future. As against this, however, more than 20 countries now have vigorous atomic energy programs, and several of them are pressing toward the construction of atomic power plants to turn out useful amounts of electricity.

In 1946, finally, our Nation earnestly hoped that worldwide agreement on international control of atomic energy might soon be secured. It was reasonable, therefore, that the original act should prohibit an exchange of information on commercial uses of atomic energy with other nations until such time as the Congress declared that effective and enforcible international safeguards against the use of atomic energy for destructive purposes had been established.

But our hopes of 1946 have been thwarted by unremitting Soviet opposition to the United Nations plan for the control of atomic energy. Although we would be morally derelict if we abandoned our hopes for the eventual effective international regulation of all armaments, legislative policy cannot now be founded on the expectation that the prospect of such control is either likely or imminent.

In summary: Statutory provisions which were in harmony with the state of atomic development in 1946 are no longer consistent with the realities of atomic energy in 1954. Legislation not responsive to the needs and problems of today can serve only to deny our Nation, and like-minded nations as well, the true promise of atomic energy-- both in augmenting the total military strength of the free world, and in increasing opportunities for beneficent uses of the atom.

## HISTORY OF PROPOSED LEGISLATION

As the committee of Congress required by statute to 'make continuing studies of the development, use and control of atomic energy,' the joint committee has, since it first met in 1947, concerned itself with the relationship between a changing and growing atomic program and the overall legislative requirements of this new field. As a result, the joint committee has, **\*3460** from time to time, recommended to the Congress certain amendments to the basic law as circumstances have demanded.

In the summer of 1952, the committee decided to begin an intensive study of the problems of atomic power development, and requested the Commission to prepare a statement of its views on this matter. Pending completion of the Commission statement, the committee prepared and issued in December 1952, a 415-page print entitled 'Atomic Power

Case: 4:22-cv-00162-CDP Doc. #: 1-48 Filed: 01/28/22 Page: 101 of 903 PageID #: 3782
Case: 4:22-cv-00162-CDP Doc. #: 1-48 Filed: 02/06/17 Page: 5 of 903 PageID #: 890

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

and Private Enterprise.' This print, the first compilation on the subject, sought to illuminate the problems associated with increased peacetime atomic energy developments.

In the spring of 1953 the Commission submitted its policy statement on atomic power, and the committee held extensive hearings on the subject. During the course of these hearings, the Atomic Energy Commission emphasized that maximum progress in this area required greater contributions in manpower, dollars, and resources from private enterprise, and that legislative revisions would be needed to make this possible. Witnesses from the Department of Defense and the Department of State reported that our nation could invigorate its atomic power development effort without subtracting from our atomic military strength, and that such a broadened attack on peacetime power would advantage our country in its international relations.

The testimony of executive branch representatives and of spokesmen for science, industry, labor, and management heard by the joint committee in the course of the 1953 hearings on atomic power development appears in the 649 page joint committee publication on the subject of Atomic Power Development and Private Enterprise, published in the fall of 1953.

The committee has, in addition, maintained a continuing and active interest in all other phases of the atomic program affected by the proposed legislation. Last spring, its Security Subcommittee inquired into the procedures of the Atomic Energy Commission for safeguarding classified information. Its Research and Development Subcommittee held extended hearings on the Commission's 5-year reactor development program and on other related scientific and engineering activities. The weapons program has demanded a large portion of the committee's intense attention.

Thus, through studies, inspections, meetings, hearings, and continuing day-to-day contact with the atomic energy program the committee has amassed a body of information and experience which forms the base underlying the legislation now recommended.

On February 17 of this year, the President of the United States submitted to the Congress a series of recommendations incorporating the proposals of the executive branch for amending the Atomic Energy Act of 1946. These amendments, aimed at 'strengthening the defense and economy of the United States and of the free world,' sought to accomplish the following:

First, widened cooperation with our allies in certain atomic energy matters;

Second, improved procedures for the control and dissemination of atomic energy information; and

Third, encouragement of broadened participation in the development of peacetime uses of atomic energy in the United States.

Following submission of the President's message to the Congress, the Joint Committee, sitting at a subcommittee of the whole, drafted a series of amendments to the Atomic Energy Act of 1946. On April 15 and 19, the chairman and vice chairman of the Joint Committee introduced into the **\*3461** House and Senate H.R. 8862 and S. 3323, the resulting companion bills. At the time these bills were introduced, attention was drawn to the fact that they would undoubtedly be subject to revision by the Joint Committee during the course of public and executive hearings on the proposed legislation.

The committee met almost daily in its consideration of these bills and held many public hearings, at which witnesses representing Government and industry were heard.

Throughout, our deliberations were marked with the spirit of nonpartisanship which has characterized the work of the Joint Committee from its inception. Virtually all differences of opinion originally existing between committee

members concerning specific provisions of the legislation were resolved in the course of our discussions, and through a more complete understanding of the problems and the provisions of the measure, and our hearings ended with essential unanimity having been reached on the general provisions of the bills.

On June 30, new bills incorporating the revisions made during the executive meetings on H.R. 8862 and S. 3323, were introduced. It is these bills, H.R. 9757 and S. 3690, which we now unanimously report favorably.

We are aware of the heavy responsibility we now assume in commending this legislation to the Congress, and thereby to the American people. Many imponderables are still involved in trying to chart the future course of atomic progress, and we presume that the legislative changes we now recommend will themselves undoubtedly require revision from time to time.

It is our deep conviction, however, that this legislation will speed atomic progress and will promote the security and well-being of the Nation. It accomplishes the purposes set forth in the President's February 17 message to the Congress. It addresses itself to a needed, across-the-board modernization of the Atomic Energy Act of 1946. It proposes changes wherever 8 years of testing the organic law in the hard crucible of actual experience has led the committee to conclude that revisions would make for greater security, efficiency, and economy in the operation of our national atomic energy program.

## THE PRESIDENT'S MESSAGE AND THE PROPOSED AMENDMENTS

### Widened cooperation with our allies in certain atomic energy matters

H.R. 9757 and S. 3690 authorize the negotiation of bilateral agreements for cooperation with foreign nations in the area of peacetime uses of atomic energy under carefully stipulated safeguards. The Commission may transfer and exchange restricted data dealing with industrial, nonmilitary uses of atomic energy. Also, under explicitly stated safeguards, the Commission may transfer to another nation, party to an 'agreement for cooperation,' atomic materials in quantities needed for the development or utilization of atomic energy for nonmilitary and research purposes. Besides allowing bilateral agreements in this field, the legislation also authorizes the President to enter into an international arrangement with a group of nations for the purpose of international cooperation in nonmilitary applications of atomic energy and thereafter to cooperate with that group of nations, pursuant to agreements for cooperation. The legislation provides a mechanism to implement **\*3462** the President's peacetime International Atomic Pool Plan, outlined in his speech before the United Nations on December 8, 1953.

On the military side, the legislation permits the Department of Defense, under comprehensive security safeguards, to transfer to another nation, or to a regional defense organization of which we are a member, restricted data concerning the tactical employment of atomic weapons. Such information includes data necessary to the development of defense plans, the training of personnel in the employment of, and defense against, atomic weapons, and the evaluation of the capabilities of potential enemies in the employment of atomic weapons. The types of information that may be communicated to others to achieve these objectives are carefully delineated, and it is made clear that no information which would reveal important or significant data on the design or fabrication of the nuclear portions of atomic weapons, or on the detailed engineering of other important parts of atomic weapons, can be revealed.

We believe that peacetime international atomic energy cooperation on the basis of the terms set forth in this legislation will redound to the mutual benefit of all concerned in such common undertakings. We believe also that the degree of military atomic cooperation envisaged in these amendments will increase the effectiveness of our joint defense planning with other nations in our mutual defense. We further believe that the attendant gains to our own security will more than offset the risks taken when any classified military information, irrespective of its sensitivity or quantity, passes beyond our exclusive control.

In making our recommendations for international cooperation, we have proceeded under the policy that security restrictions which prove to be onerous or unnecessary can always be relaxed, whereas the act of abandoning exclusive control over any item of information is irrevocable. Accordingly, we have approached these sections of legislation with great circumspection-- preferring to resolve any doubts on the side of caution.

Improvement of procedures for the control and dissemination of atomic energy information

The information control provisions of the organic law and of these bills are built around the concept of restricted data, which the Atomic Energy Act of 1946 defines as 'all data concerning the manufacture or utilization of atomic weapons, the production of fissionable material, or the use of fissionable material in the production of power, but shall not include any data which the Commission from time to time determines may be published without adversely affecting the common defense and security.'

Clearance for access to restricted data has been contingent upon an investigation as to character, associations, and loyalty of the individual. The same investigative requirements have applied to all personnel employed by the Atomic Energy Commission or its contractors, whether such employees would in fact have subsequent access to only small amounts of classified information of little security significance, or whether their positions required broad and continuing access to the most sensitive data in the atomic program. The amended legislation would permit the Atomic Energy Commission, on the basis of established criteria, to relate the scope of background investigation required to the extent and sensitivity of the classified information to which an employee would have access while on the project. We believe **\*3463** that such a practice will make for greater overall security and greater protection of atomic secrets, by permitting the resources of our investigative agencies to be concentrated on those areas where painstaking and scrupulous background checks are most urgently required.

As atomic weapons have more and more assumed the status of conventional armaments in our military services, an incrasing number of Department of Defense personnel have required access to restricted data. The Atomic Energy Commission is now permitted to disclose restricted data to military personnel qualifying for such information on a need-to-know basis and possessing the appropriate service clearance. At the same time, Commission contractors are prohibited from revealing or disclosing restricted data to military personnel on the basis of their military clearance, requiring instead that potential recipients first secure an Atomic Energy Commission clearance-- based on investigation by the Federal Bureau of Investigation or by the Civil Service Commission. The amendments would remedy this administrative anomaly by permitting contractors and licensees of the Commission to give Department of Defense personnel access to restricted data under conditions which would assure safeguarding of the information.

Much restricted data concerns the military utilization of atomic weapons. Responsibility for the control of all restricted data, however, is vested in the Atomic Energy Commission. In certain instances, the Department of Defense has desired to remove military utilization information from the restricted data category, and without putting it in the public domain, to handle it under the safeguards used to protect other classified military information. Under the Atomic Energy Act of 1946, however, information can be removed from the restricted data category only through declassification, following a Commission determination that the publication of this data would not adversely affect the common defense and security. To meet this problem, the bill would permit information relating primarily to the utilization of atomic weapons to be removed from the restricted data category after a joint determination by the Commission and the Department of Defense that the data related primarily to military utilization, and that it should and could be safeguarded under the Espionage Act and other applicable statutes. The Department of Defense would also be given a voice with the Atomic Energy Commission in declassification actions involving restricted data which relates primarily to military utilization of atomic weapons.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

The joint committee has been keenly aware of the critical role of information control in helping assure this Nation's continued atomic supremacy. We have recommended legislative changes in this area only after exhaustive consideration of all the factors involved, and on the basis of our carefully considered judgment that these changes will promote our common defense and security.

### The domestic development of peacetime uses of atomic energy

The organic law makes the production and use of fissionable material a Government monopoly. Private industry is permitted neither to own nor possess such material, nor to own or operate atomic reactors or other facilities capable of producing or utilizing these same materials. The basic law stipulates that 'All right, title, and interest within or under the jurisdiction of the United States, in or to any fissionable material, now or hereafter produced, shall be the property of the Commission, and shall be deemed to **\*3464** be vested in the Commission by virtue of this act.' It defines 'fissionable material' as 'plutonium, uranium enriched in the isotope-235, or any other material which the Commission deems to be capable of releasing substantial quantities of energy through nuclear chain reactions of the material, or any material artifically enriched by any of the foregoing. * * * '

The phrase 'fissionable material' is stricken from the proposed legislation, and the new words 'special nuclear material' are substituted in its stead. This change is intended to clarify the original provision of the act to give to the Commission, in addition to the power to determine and regulate the use of materials utilizable in the fission process, the power to perform the same functions in respect to materials which can be utilized in fusion processes.

This report has already summarized the considerations underlying the stringent prohibitions of the Atomic Energy Act of 1946 against private participation in atomic energy. It has also made clear that changing conditions now not only permit but require a relaxation of these prohibitions if atomic energy is to contribute in the fullest possible measure to our national security and progress.

The recommended legislation therefore permits the Commission to license private industry, to possess and use special nuclear materials. The United States Government, however, would retain title to such materials. The legislation also permits private persons, under license of the Commission, to own reactors intended to produce and utilize such materials.

It is our firmly held conviction that increased private participation in atomic power development, under the terms stipulated in this proposed legislation, will measurably accelerate our progress toward the day when economic atomic power will be a fact. It is likewise our conviction that the safeguards written into this legislation will prevent special interests from winning undue advantages at the expense of the national interest.

We do not believe that the efforts of free enterprise, using its own resources and moneys, are by themselves adequate to achieve the speediest possible attack on the goal of peacetime power. Neither do we believe that maximum progress toward this objective will be afforded by an effort relying exclusively on governmental research and development, using the public's moneys. We believe, rather, that teamwork between Government and industry-- teamwork of the type encouraged by these amendments-- is the key to optimum progress, efficiency, and economy in this area of atomic endeavor. In other words, our legislative proposals aim at encouraging flourishing research and development programs under both Government and private auspices.

We are mindful of the fact that in the immediate future, relatively few firms may be involved in this effort. We acknowledge that dangers of restrictive patent practices are present, though not inherent, in such a situation. Accordingly, we recommend to the Congress that holders of patents on inventions of primary importance to the peacetime uses of atomic energy be required to license such patents to others in return for fair royalties. This requirement of compulsory licensing will apply to all patents in the field which are sought in the next 5 years.

Other matters

During the course of its deliberations on these amendments, the committee has scrutinized the entire organic law, revising it in such instances **\*3465** where 8 years of experience have argued that changes were desirable. As a result, all of the 21 sections of the Atomic Energy Act of 1946 have been changed. Some of the proposed revisions affect matters of substance-- they attempt to afford legislative answers for problems not existing at the time the organic law was drafted. Many of the suggested changes are minor-- they are in the nature of perfecting amendments, or else they resolve possible ambiguities in the construction of the language of the original law. These revisions are set forth in the section-by-section analysis, and in the columnar comparison sections of this report.

Considered in their entirety, the amendments, in our opinion, make our Nation's atomic energy legislation a more responsive and adequate instrument for dealing with the problems posed by the advent and evolution of this epochal new force.

Yet we are aware that legislation, standing by itself, can never substitute for prudent and courageous administration of our atomic enterprise by the responsible officials of the executive branch, for continuing understanding and support of our atomic program in the Congress, and-- most of all-- for that enlightened and informed public opinion which is the bedrock of wise national policy in our democratic society.

We have every confidence that the domestic problems created by atomic energy can be resolved through the application of wisdom, willingness of compromise, and good will. We are no less confident that the critical international problems arising out of the growth of nuclear stockpiles could likewise be amenable to resolution through these same means.

We in America cannot be held accountable for the failure of the Communist rulers to join with the free nations of the world in ushering in an era of true atomic peace. We in America are accountable, however, for what we ourselves do, or do not do, in our strivings toward this goal.

We of this generation have been visited with a new form of energy which can ravage this planet beyond recognition, or make it fair beyond the wildest dreams of our fathers. It is the hope, it is the prayer of those of us who now commend this legislation to the Congress that the atom will not be the destroyer but the servant of humanity.

## CHAPTER 1. DECLARATION, FINDINGS, AND PURPOSES

In this chapter are set forth the basic statements of policy and aims of the legislation and the constitutional findings in support of the legislation.

Section 1: The aim of the bill is to assure that atomic energy makes the maximum contribution to the general welfare of the Nation, subject to the paramount objective of having it make the maximum contribution to the common defense and security. The ends toward which the development of atomic energy are directed are further stated to be 'to promote world peace, improve the general welfare, increase the standard of living, and strengthen free competition in private enterprise.'

Section 2: The legal basis of the proposed legislation is the constitutional powers of the United States including, among others, to provide for the common defense; to raise and support armies; to provide and maintain a navy; to make all needful rules and regulations respecting the territory or other property belonging to the United States; and to regulate commerce with foreign nations and among the several States.

**\*3466** Title to special nuclear material is vested in the United States so that there is adequate means of providing the United States with the materials for weapons or other preempting national uses in times of need. The use of the special

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

nuclear material by others in facilities which, for the first time, are permitted to be owned by persons other than the United States Government, is regulated under the power, among the others cited, of the United States to provide for the regulation of its own property. In view of the broad powers conferred upon the Congress by article 4, section 3, clause 2, of the Constitution, there can be no doubt of the authority of the Congress to exercise ist powers to provide for any manner of regulation needed to protect the national interests, and the interests of the public.

Section 3: The bill specifies that the Commission shall carry out programs of encouraging research; of disseminating technical information and controlling and declassifying restricted data; of controlling atomic energy and special nuclear material; of encouraging widespread participation in the atomic-energy program; and of international cooperation, subject to suitable safeguards; and of administration.

## CHAPTER 2. DEFINITIONS.

All definitions set forth in the bill are collected in this chapter. Those portions of the definitions which require substantive action have, in most cases, been separated from the definitions and have been put into the appropriate section of the bill. Some of the definitions which merit particular attention are:

Section 11c: 'Atomic energy' is defined to mean 'all forms of energy released in the course of nuclear fission or nuclear transformation.' This definition includes both fission and fusion types of nuclear reactions. It has been clarified to mean only that energy released 'in the course of' nuclear fission or nuclear transformation. The definition in the act also includes energy released 'as a result of' such fission or transformation, and is scientifically broader than is necessary or desirable. It s deletion in the bill will not change the intended scope of the act or jurisdiction of the Atomic Energy Commission.

Section 11 d: 'Atomic weapon' is defined for the first time to express the intent of Congress in using the phrase in the act. The definition specifically excludes airplanes, submarines, or rockets which may carry the weapons, unless the propulsive power is in integral part of the weapon itself. It also makes clear that devices that are the developmental forerunners of any atomic weapon are classed as atomic weapons.

Section 11 i: 'Design) is defined for the first time to mean the documents containing specifications of any item, the information contained on the documents, and the data from research and development pertinent to the information contained on the documents.

Section 11 m: 'Operator' is defined as any person who manipulates the controls of a production facility or a utilization facility. This definition is incorporated in order to permit the Commission to license the actual operators of nuclear reactors under section 107 in the same way that the Civil Aeronautics Board licenses airplane pilots and the way the Federal Communications Commission licenses radio engineers. The owners of the facilities would be licensed under other sections of the bill.

**\*3467** Section 11 p: 'Production facility' is defined as any facility which is determined to be capable of the production of special nuclear material in such quantity as to be of significance to the common defense and security or in such manner as to affect the health and safety of the public, or any important component part especially designed for such facility. This determination must be made by rule of the Commission. A facility which is not found by rule of the Commission to fall within the above definition is exempt from licensing as a facility, though the owner must still have a license for any special nuclear material involved.

Section 11 r: 'Restricted data' is defined to include all data concerning (1) the design, manufacture, or utilization of atomic weapons; (2) the production of special nuclear material; or (3) the use of special nuclear material in the production of energy. The definition provides that data declassified or removed from the category is removed from the definition. While this definition differs from that of the act by specifically including the 'design' of atomic weapons, it was always

intended that this be included within the definition of restricted data, since it is perhaps the most important area of secret information in the atomic energy field that this Nation possesses. The Commission has always considered that the design of the weapons was covered under the definition of restricted date included in the act, and the Congress has concurred in that belief. Thus, by Public Law 235, 82d Congress (65 Stat. 692), the Congress permitted the interchange of limited portions of restricted data information with other nations with the very first proviso 'that no such arrangement shall involve the communication of restricted data on design and fabrication of atomic weapons.'

Section 11 t: 'Special nuclear material' is defined to mean plutonium, uranium enriched in the isotope 233 or in the isotope 235 or any other material which the Commission determines to be special nuclear material pursuant to the provisions of section 51. The latter section is so constructed that materials essential to fusion processes could be found to be special nuclear materials in addition to materials essential to fission processes. Because the bill covers such materials used in fusion processes, the restrictive term 'fissionable material' used in the act has been changed to 'special nuclear material.'

Section 11 v: 'Utilization facility' has a definition parallel to that of 'production facility' but based on the utilization of atomic energy or special nuclear material rather than on the production of special nuclear material.

## CHAPTER 3. ORGANIZATION

This chapter establishes the Atomic Energy Commission and certain various subordinate and auxiliary units to assist the Commission in the discharge of its statutory duties.

Section 21 establishes the Commission as a five-man body, and gives the President the power to designate one member as the Chairman of the Commission. The Chairman is authorized to designate an Acting Chairman. In providing that all members shall have equal responsibility and authority and that all members shall have one vote in Commission actions, the five-man rule of the Commission's activities is maintained and strengthened. The right of the members to have access to all information within the Commission flows from this responsibility and authority. The Chairman is given   **\*3468** the task of being the official spokesman for the Commission (which does not ban the holding or expression of separate or dissenting views by any member) and of seeing to the faithful execution of the policies decided on by the Commission. This status should centralize the responsibility for carrying out the wishes of the Commission.

Section 22 provides for 5-year terms of the members of the Commission and for the rotation of these terms. It provides for the removal of the members by the President only for cause. It also provides for the compensation of the members at $18,000 per annum, and for the compensation of the Chairman at $20,000 per annum-- as does the present act.

Section 23 provides that the principal office of the Commission may be in or near the District of Columbia, but requires the Commission, in any event, to maintain an office for the service of process in the District of Columbia in view of the many new licensing activities established by the bill.

Section 24 provides for the appointment of a General Manager to perform those administrative and executive functions of the Commission that the Commission may direct; provides that his service shall be at the pleasure of the Commission; and provides that the annual salary of the General Manager shall not exceed $20,000.

Section 25 establishes certain important program and statutory divisions and offices within the Commission. There are 11 program divisions permitted by the bill, including the Division of Military Application. The latter is required to be headed by an active member of the Armed Forces. All program division directors are to receive an annual salary of not to exceed $16,000. In addition, the Office of the General Counsel is recognized as meriting statutory recognition, especially in view of the many new complex legal problems entering the program with the many new licensing and regulatory provisions in the bill. There is also a statutory Inspection Division established by the bill with the duty of

gathering information to show whether or not contractors, licensees, and officers and employees of the Commission are complying with the provisions of the act, and the rules and regulations of the Commission. This Division will be responsible for those provisions of the act not supervised by the Federal Bureau of Investigation. This is the Division to which complaints can be referred when there is concern about the operations of licensees under the new provisions. It is not intended that the Inspection Division replace other necessary management inspection services such as auditing of contractor books and Commission records except as such activities may be necessary to fulfill the responsibilities of the Inspection Division in particular instances.

Section 26 establishes the General Advisory Committee. This Committee consists of nine members appointed by the President and advises the Commission on technical matters involved in the operation of the Commission.

Section 27 establishes the Military Liaison Committee. This Committee acts as a communication link between the Department of Defense and the Commission, through which each keeps the other fully **\*3469** and currently informed of relevant developments. It was originally established in the Atomic Energy Act of 1946 so that the military departments would be sure of having an adequate means of voicing any concern about the activities of a civilian Commission if those activities adversely affected the common defense and security.

Since the passage of the act, the Department of Defense has been established to integrate the various military responsibilities. Therefore, the bill specifies that the Department of Defense (rather than the Military Liaison Committee) shall have the responsibility of taking exception to action or proposed action of the Commission, and provides that in such cases the matter shall be referred to the President for resolution.

Section 28 permits the appointment of active officers to serve as director of the Division of Military Application, and of active or retired officers to serve as the Chairman of the Military Liaison Committee. In either case the bill clearly provides, as has always been congressional intent, that the total amount of compensation to be paid to any such officer is the amount prescribed by sections 25 and 27, respectively.

## CHAPTER 4. RESEARCH

This chapter provides the Commission with the statutory authority to see that adequate research is performed in the program.

Section 31 provides the Commission with the authority to enter contracts or other arrangement to have research work performed for the Commission within very broad scientific areas.

Section 32 provides the Commission with authority to engage in research within those areas if it so desires.

Section 33 permits the Commission to have research within those same areas performed in its facilities for other persons if adequate facilities are not available elsewhere to those persons. The Commission is permitted to make such charge for the performance of this work as it may deem desirable.

## CHAPTER 5. PRODUCTION OF SPECIAL NUCLEAR MATERIAL

This chapter provides the Commission with the authority to produce special nuclear material, or to have such material produced.

Section 41 provides that the Commission, as the agent of the United States, shall be the owner of all production facilities for the production of special nuclear material other than those which are useful for the types of research specified in

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Case: 4:23-cv-00004-CDP Doc. #: 148-8 Filed: 01/29/21 Page: 109 of 903 PageID #: 1790
Case: 4:23-cv-00004-CDP Doc. #: 1-8 Filed: 02/06/17 Page: 23 of 93 PageID #: 890
S. REP. 83-1699, S. REP. 83-1699 (1954)

section 31 above, and do not have a capacity sufficient to permit an operator to manufacture enough special nuclear material to produce an atomic weapon. It also permits licensees of the Commission to own production facilities. This provision requiring Commission ownership of all other production facilities is part of the basic requirements for having civilian rather than military control of the atomic energy program. In connection with its own production facilities, however, the Commission is permitted to have the actual operation carried on by other persons under contract to it and under its direction and control. The total amount **\*3470** of special nuclear material to be produced each year in Commission-owned facilities aer to be determined by the President who also determins the amount of special nuclear material to be available each year for distribution by the Commission to licensees of the Commission.

Section 42 permits the irradiation of materials in facilities lawfully producing or utilizing special nuclear materials.

Section 43 permits the Commission to acquire production facilities or to acquire real property for the construction of production facilities for its own needs.

Section 44 permits the Commission to dispose of usable energy generated in the production facilities or in the experimental utilization facilities owned by the Commission. If the energy is sold to publicly or privately owned utilities or users, the price is to be subject to regulation by the appropriate agency, State or Federal, having jurisdiction. This section will permit the Commission to dispose of that utilizable energy it produces in the course of its own operations, but does not permit the Commission to enter the power-producing business without further congressional authorization to construct or operate such commercial facilities.

## CHAPTER 6. SPECIAL NUCLEAR MATERIAL

This chapter deals with activities involving materials capable of releasing substantial quantities of atomic energy. For all purposes of the bill, such materials are defined as special nuclear material.

Section 51 provides that any material capable of releasing substantial quantities of atomic energy may be found by the Commission to be special nuclear material, provided that the determination is found to be in the interests of the common defense and security. In that case the President must agree with the determination and it must come before the joint committee before it can be effective. In view of the potentially great impact any future declaration of the addition of further materials to the category of special nuclear material could have on the economy of the Nation, these statutory steps were deemed to be necessary. Furthermore, at any such time the United States would be required to pay just compensation to the then owners of the material, and this might require large appropriations. It is believed that this provision gives the Commission the statutory basis it needs for including new materials within this category, and still provides adequate safeguards to assure that this power is not abused. It should be noted that the scientific basis on which the first Commission determination is to be based-- namely, the release of substantial quantities of atomic energy-- permits the inclusion in this category for the first time materials essential to fusion processes as well as those essential to fission processes.

Section 52 provides that title to all special nuclear material is to be in the United States, with the Commission acting as the agent of the United States in this connection. The provision requires the payment of just compensation to those who own special nuclear material at the time it is later determined to be special nuclear material. It also provides that those who **\*3471** hereafter lawfully produce special nuclear material, except under a contract with the Commission, are to be paid a fair price for the production of such material, as determined by section 56.

Section 53 sets forth the uses for which the Commission may license and distribute special nuclear material. These include research of the type specified in section 31, research and development or medical therapy under a license under section 104, or commercial operation under a license issued under section 103. The Commission is authorized to issue general or special licenses for the possession of special nuclear material, and to make a charge for the use of such material.

**WESTLAW** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

S. REP. 83-1699, S. REP. 83-1699 (1954)

The Commission is required to make a charge for such use if it is in connection with a commercial license issued under section 103. An additional charge for special nuclear material consumed by a licensee under section 103 is based on the cost to the Commission of producing or acquiring the special nuclear material. The charges for the other uses are in the discretion of the Commission, but must be established by rule so as to be fair to all in similar situations. The statutory conditions on permitting the use or possession by others of special nuclear material are set forth, and include:

1. Title shall remain in the United States.

2. Only those rights specified in the license are to be granted to the licensee.

3. No license is transferable except pursuant to the bill.

4. All special nuclear material is subject to the right of recapture or control in the event of war or a national emergency.

5. Special nuclear material may be used or produced in utilization and production facilities only in accordance with the provisions of the bill.

6. The possession shall be subject to such terms that no user will be permitted to construct an atomic weapon.

7. The possession is subject to the health and safety standards established by the Commission.

8. The licensee will hold the United States and the Commission harmless from damages resulting from the use or possession of the material.

In distributing the material, the Commission is directed to encourage independent research.

Section 54 permits the Commission to cooperate with any nation pursuant to an agreement for cooperation and to distribute special nuclear material to that nation. (See sec. 123.)

Section 55 permits the Commission to acquire special nuclear material outside of the United States.

Section 56 provides that the fair price to be paid to those lawfully producing special nuclear material (other than under contract) is to be based primarily on the value of the United States of the intended use of the material, and only secondarily to the actual cost of producing the material in licensed facilities. The fair price is to be uniform to all producers at any one time, and the Commission is authorized to guarantee fair prices for periods of up to 7 years. This authorization permits the Commission to announce guaranteed prices at any time for a period extending beyond that specified in any earlier guaranty, but not beyond 7 years from such subsequent announcement.

**\*3472** Section 57 contains prohibitions against having or using special nuclear material except in accordance with the provisions of the bill. One special provision prohibits any person from directly or indirectly producing special nuclear material outside of the United States, except under an agreement for cooperation (see sec. 123), or upon an express determination that such activity will not be inimical to the interests of the United States. This provision is designed to permit those who might teach abroad, or who might wish to sell unclassified services or parts of facilities (not including those parts found by the Commission to be production or utilization facilities because of their special characteristics), or who might wish to help build facilities abroad have an opportunity to do so with prior Commission approval. This section would not permit the disclosure of restricted data, or the export of production or utilization facilities. These are permitted only under section 144a and sections 103 and 104, respectively. This section also contains prohibitions and limitations on the activities of the Commission with respect to the distribution of special nuclear material.

## CHAPTER 7. SOURCE MATERIAL

This chapter specifies the provisions for the location, mining, production, and distribution of source materials.

Section 61 gives the Commission the authority to designate new materials as source materials if the Commission finds that such materials are essential to the production of special nuclear materials. The Commission must also find that the determination of an additional material as source material is in the interest of the common defense and security, and the President must concur in these determinations. Any such determination comes before the joint committee before it can become effective.

Section 62 prohibits any person from transferring any source material except pursuant to a license issued by the Commission.

Section 63 specifies the criteria under which the Commission is authorized to distribute source material within the United States. In addition to such distribution for use in research of the type specified in section 31, for use in a research and development facility, or for medical therapy, licensed under section 104, or for use in a commercial facility licensed under section 103, as is permitted for special nuclear material, source material may also be distributed for any other use approved by the Commission as an aid to science or industry. The criteria for having the Commission establish general or specific licensing provisions are set forth. Also, the method of establishing prices for the source materials so sold is specified. This is tied to the method of charging for materials generally furnished to licensees under section 161 m., and the price is to be such that the Government will receive reasonable compensation, and yet will not discourage the development of sources of supply independent of the Government. The Commission is given authority to determine whether or not charges shall be made for the use of such material, depending, among other factors, upon whether or not a profit is to be made from such use by the distributee.

Section 64 permits the Commission to distribute source material to another nation which is party to an agreement for cooperation (see sec. 123). It also authorizes the Commission to distribute source materials outside of **\*3473** the United States upon a finding that such distribution will not be inimical to the interests of the United States.

Section 65 permits the Commission to require reports on the handling of source material as it deems desirable, but no such report is to be required for amount before they are removed from their place of deposit in nature, or if they involve amounts deemed by the Commission to be insignificant.

Section 66 gives the Commission authority to condemn or acquire supplies of source material, interest in real property containing source material, or rights of entry into property believed to have possibilities of containing source material.

Section 67 gives the Commission authority to lease lands belonging to the United States for mining or prospecting for source materials. The Commission has exercised this right in the past based on the reservation to the United States of all rights to source materials in the public lands. This reservation is contained in the act. The Commission believes that it needs to have the power to lease granted to it, now that this reservation is no longer carried in the bill. Three situations can be envisioned when it might be desirable to lease expressly granted to it, now that this reservation is no longer carried in the bill. Three situations can be envisioned when it might be desirable to lease land belonging to the United States which might contain deposits of source materials: (1) Those lands which are withdrawn from mining locations; (2) those lands which in the opinion of the Commission are not reasonably susceptible of mining development under the mining laws; or (3) those lands on which source materials have been discovered as a result of exploratory work performed under the direction of any Government agency.

It is the intent of Congress that this leasing power should be invoked only where it is the only means of achieving private development of deposits of source material in lands belonging to the United States. It is not intended to supplant the mining laws in any normal situation.

Section 68 prohibits any person connected with the program who acquires confidential official information concerning deposits of source material in the course of his duties from gaining any private benefit from this information. This section also directs the head of any Government agency that heretofore has issued any conveyances of lands belonging to the United States containing reservations to the United States of all rights to source material to reissue such conveyances upon application of the present holder without any such reservation. Any rights issued to others under those reservations have been preserved. The bill deletes the reservation of source materials in public lands to the United States. With respect to this deletion, the Atomic Energy Commission has observed:

This deletion of the reservation would represent no economic loss to the Government since at no time has the Atomic Energy Commission paid less for source materials originating on lands subject to the reservation than it has for source materials originating on lands to which the reservation has no application. The principal practical effect of the reservation thus far has been detrimental to the Commission's program in that, although neither the Commission nor the Department of the Interior believes there is legal ground for it, doubt has arisen in the mining industry as to whether a mining claim based on the discovery of a source material alone is legally valid. Complete deletion of the reservation would place source materials on the same footing as any other materials within the scope of the mining laws of 1872, as amended, and thereby leave no doubt whatsoever on this score.

**\*3474** Provision is also made to assure that mining claims involving source materials located during the period from 1946 to the present, under the mining laws, are recognized as valid. This provision is proposed because of a 1947 ruling in a Government agency which cast doubt on the validity of these claims. This provision has been approved by the Senate and House Committees on Interior and Insular Affairs, by the Commission, and by the Department of the Interior.

Section 69 prohibits the Commission from licensing any person to have source material if such licensing would be inimical to the common defense and security or to the health and safety of the public.

## CHAPTER 8. BYPRODUCT MATERIAL

Section 81: This section permits the Commission to distribute and permit other persons producing byproduct materials to distribute such material to licensees of the Commission who will abide by Commission regulations on the use of those materials, the regulations having been imposed to protect the common defense and security and the health and safety of the public.

Section 82 permits the Commission to distribute byproduct materials abroad under an agreement for cooperation (see sec. 123), or upon an express finding that each such distribution will not be inimical to the interests of the United States. The Commission is also permitted to license others to make foreign distribution of byproducts upon the same terms as the Commission makes such distribution (except as to the charges to be made for the material).

## CHAPTER 9. MILITARY APPLICATIONS OF ATOMIC ENERGY

This chapter sets forth the authorizations and limitations relating to atomic weapons.

Section 91 authorizes the Commission to engage in the research, development, and production of atomic weapons, except that the President must at least once each year give his express consent to the activities of the Commission in such production. The President, furthermore, is authorized to direct the Commission to transfer special nuclear material

or atomic weapons to the Department of Defense. The President may also authorize the Department of Defense to manufacture or acquire any atomic weapon or utilization facility for military purposes. However, the Department of Defense is prohibited from manufacturing special nuclear material except incident to the operation of any utilization facility for military purposes that is authorized pursuant to this section.

Section 92 prohibits any person from having or dealing with any atomic weapons except as authorized in section 91.

## CHAPTER 10. ATOMIC ENERGY LICENSES

This chapter sets forth the provisions and conditions for licensing the facilities which utilize or produce special nuclear material.

Section 101 contains a prohibition against having or dealing with any utilization or production facility except pursuant to a license issued by the Commission.

Section 102 requires the Commission to find that a type of utilization or production facility is of practical value before it can issue licenses for **\*3475** commercial installations of such facilities under section 103. This finding separates the issuance of research and development licenses for any facility under section 104 b, and the issuance of commercial licenses under section 103. This finding of practical value is required by act, which also requires a report to be filed with Congress with respect to the social, political, economic, and international effects of the utilization of special nuclear material before the issuance of any license. In view of the provisions in the act requiring the Commission to keep the joint committee fully and currently informed, the addition provisions in the bill requiring the joint committee to investigate the development of the atomic-energy industry during the first 60 days of each session of Congress, and the amount of study that has already been put into this proposed legislation, it is felt that the requirement for the report to Congress should be discontinued.

Section 103: This section specifies the conditions for the issuance of licenses for types of utilization or production facilities that have been found to be of practical value. For each such type, the Commission is required to issue licenses to all qualified applicants without other discretion on its part. The licensed operations are subject to regulation by the Commission in the interest of the common defense and security and in order to protect the health and safety of the public. The Commission is authorized to issue licenses for specified periods up to 40 years. Licenses cannot be granted to any person where the issuance of such a license would be inimical to the common defense and security or the health and safety of the public.

Section 104 provides the conditions for the issuance of licenses for medical therapy purposes, and for research and development facilities. With respect to the use of utilization facilities in medical therapy, the Commission is required to permit the widest amount of effective medical therapy possible with the amount of special nuclear material available for the purposes. The Commission is directed to impose only the minimum amount of regulation on medical therapy licenses.

With respect to utilization and production facilities which are in the research and development stage, but which look toward the demonstration of any type of facility as having practical value, the Commission is authorized to issue licenses and is directed to impose only those regulations which would be compatible with any regulations which might be imposed later if that type of facility is shown to be of practical value. The Commission is directed to issue licenses giving priority to those facilities which will lead to major advances in the application of atomic energy for industrial or commercial purposes.

With respect to other research and development facilities, the Commission is authorized to issue licenses for them and to impose the minimum amount of regulation.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

All of the facilities authorized to be licensed under this section are subject to the same general conditions as facilities licensed under section 103, namely, ownership and control in United States citizens, and operation to be consonant with the common defense and security and with the health and safety of the public.

Section 105 contains the antitrust provisions relating to licensing. It declares the antitrust laws to be applicable to the atomic-energy program **\*3476** even though title to special nuclear material is vested in the United States. It requires the Commission to report apparent antitrust violations to the Attorney General. It also provides for hearings and judicial review in case there is any claim by the Attorney General or the Federal Trade Commission that a proposed license of any production or utilization facility would violate the antitrust laws.

Section 106 authorizes the Commission to group production and utilization facilities together for licensing purposes since there is no facility known today which is purely a production facility, or purely a utilization facility. It also permits the Commission to define the activities to be carried on by any licensed facility.

Section 107 requires the Commission to license the operators of utilization or production facilities in a manner similar to the Civil Aeronautics Authority licensing of airmen and the Federal Communications Commission licensing of radio operators.

Section 108 provides the Commission with the authority to recapture any special nuclear material licensed or to operate any facility licensed under section 103 or 104, if Congress declares that a state of war or national emergency exists and if the Commission finds that such recapture or operation is needed in the interest of the common defense and security.

Section 109 permits the Commission to exercise less stringent regulation over those component items which are defined as production or utilization facilities merely because the Commission finds that they are important component parts of such facilities.

Section 110 clearly excludes the contract operations of the Commission from the licensing provisions of the bill, and also excludes the activities of the Department of Defense authorized by section 91 from the licensing provisions.

## CHAPTER 11. INTERNATIONAL ACTIVITIES

This chapter provides for international arrangements in the field of atomic energy, and also includes statutory provision for agreements for cooperation which do not rise to the stature of international arrangements. An international arrangement is defined to be a treaty or an executive agreement approved by both Houses of Congress.

Section 121 declares that the provisions of the statute are to be superseded by the terms of any international arrangement during the time that such terms conflict with the provisions of the statute. The force of this section is, of course, in existing law even without any statutory provision. It is, however, reincorporated from the act.

Section 122 provides that the Commission shall give maximum effect to the policies contained in international arrangements, and is in the act.

Section 123 contains the provisions to be included in, and the procedures to be followed in entering into, agreements for cooperation with another nation or with a regional defense organization. The provisions to be incorporated in any such agreement for cooperation include:

(1) The terms, conditions, duration, nature, and scope of the cooperation;

Case: 4:23-cv-00406-CDP Doc. #: 1-8 Filed: 01/29/21 Page: 115 of 903 PageID #: 9726

(2) A guaranty by the cooperating party that security safeguards and standards as set forth in the agreement for cooperation will be maintained;

**\*3477** (3) A guaranty by the cooperating party that any material to be transferred pursuant to any such agreement will not be used for atomic weapons, or for research or on development of atomic weapons, or for any other military purpose; and

(4) A guaranty by the cooperating party that any material or any restricted data to be transferred pursuant to the agreement for cooperation will not be transferred to unauthorized persons or beyond the jurisdiction of the cooperating party, except as specified in the agreement.

The procedures that any such agreement for cooperation must take is:

(1) It must be approved by the Commission, or, in the case of the transfer of restricted data for the development of military plans pursuant to section 144 b., the Department of Defense.

(2) The President must approve the agreement for cooperation. He must also make a determination in writing that the performance of the agreement for cooperation will promote and will not constitute an unreasonable risk to the common defense and security.

(3) The proposed agreement for cooperation together with the Presidential approval and determination must lie before the joint committee for 30 days while Congress is in session.

Through the provisions that are required to be incorporated in the agreement for cooperation and through the procedures set forth in this section, there are amply and sufficient statutory safeguards on the international cooperation. Almost any cooperation with any foreign country can be said to involve some risk to the common defense and security of the United States. The provisions incorporated in section 123 are designed to permit cooperation where, upon weighing those risks in the light of the safeguards provided, there if found to be no reasonable risk to the common defense and security in permitting the cooperation.

It should be specifically pointed out that no cooperation is permitted which would disclose the basic secrets involved in the design or fabrication of atomic weapons. In section 144 a., the section dealing with cooperation relating to restricted data, the subject matter in which such cooperation is possible, is specified to include only:

(1) Refining, purification, and subsequent treatment of source material;

(2) Reactor development;

(3) Production of special nuclear material;

(4) Health and safety;

(5) Industrial and other applications of atomic energy for peaceful purposes; and

(6) Research and development relating to the foregoing.

This subsection provides further, that 'no such cooperation shall involve the communication of Restricted Data relating to the design or fabrication of atomic weapons.'

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

In section 144 b., the section permitting cooperating with a nation or regional defense organization with respect to restricted data, the subject matter includible in that cooperation is limited to that restricted data necessary to:

(1) The development of defense plans;

**\*3478** (2) The training of personnel in the employment of and defense against atomic weapons; and

(3) The evaluation of the capabilities of potential enemies in the employment of atomic weapons.

This subsection provides further than 'no such cooperation shall involve communication of restricted data relating to the design or fabrication of atomic weapons except with regard to the external characteristics, including size, weight, and shape, yields and effects, and systems employed in the delivery or use thereof but not including any data in these categories unless in the joint judgment of the Atomic Energy Commission and the Department of Defense such data will not reveal important information concerning the design or fabrication of the nuclear components of an atomic weapon.'

The cooperation permissible under this section, then, is the transfer of that information which will permit those who are our allies to participate intelligently in planning the defense of the free world against atomic attack from Russia, and to know the effects of any weapons that will be available for use by the United States in helping those other nations join in defending the free world against any such attack.

Section 124 permits the President, once an international atomic pool has been established by an international arrangement (which must be approved by the Congress), to cooperate thereafter with the group of nations involved in that pool by means of agreements for cooperation. This gives the President a means of implementing an international atomic pool plan.

## CHAPTER 12. CONTROL OF INFORMATION

This chapter sets forth provisions for the protection of secret information relating to atomic energy.

Section 141 sets forth the policies for dealing with restricted data; namely, that the Commission shall control the dissemination and classification of restricted data in such a manner as to assure the common defense and security; that the exchange of restricted data with other nations before enforcible international safeguards against the use of atomic energy for destructive purposes have been established are forbidden except pursuant to agreements for cooperation under section 144; and that dissemination of technical information is to be encouraged so as to have the free interchange of ideas and criticism which is essential to scientific and industrial progress and public understanding and to enlarge the fund of technical information.

Section 142 directs the Commission to declassify that information within the definition of restricted data that can be published without due risk to the common defense and security. It also directs the Commission to make continuous reviews of restricted data and of the classification guides so as to determine which information can be so declassified and published. That restricted data which the Commission and the Department of Defense jointly agree relate primarily to the utilization of atomic weapons, and which they jointly determine can be published without undue risk to the common defense and security, can be removed from the classification of restricted data. The President is authorized to settle any disputes respecting such determinations. In addition, the Commission with the concurrence **\*3479** of the Department of Defense, can remove from the category of restricted data any information which they jointly determine relate primarily to the utilization of atomic weapons and which they determine can be adequately protected as defense information. However, any restricted data so classified as defense information cannot be transferred to any other nation except pursuant to an agreement for cooperation in accordance with subsection 144 b. The Commission is also authorized to remove from the category of restricted data any information relating to the atomic-energy programs of other nations

Case: 4:23-cv-00006-CDP Doc. #: 1-8 Filed: 01/29/23 Page: 117 of 903 PageID #: 1798

that the Commission and the Director of Central Intelligence jointly determine to be necessary to carry out the provisions of section 102 d. of the National Security Act of 1947.

Section 143 authorizes the Commission to permit those in its program to provide access to restricted data to persons associated with the Department of Defense, where such access is required in the performance of the duties of the person to whom such access is to be granted, and the head of the agency or department in the Department of Defense so certifies. Furthermore, the head of that agency in the Department of Defense must certify that is has been established in accordance with the usual procedures of that agency that permitting such person to have the access permitted will not endanger the common defense and security and the Secretary of Defense must find that the security procedures are adequate and in reasonable conformity with the standards established by the Commission.

Section 144 permits the President to authorize the Commission, pursuant to agreements for cooperation, to communicate certain types of restricted data which relate to the nonmilitary aspects of atomic energy to other nations. (The specific fields are described in the discussion of sec. 123 above.) This section also permits the President to authorize the Department of Defense to cooperate with another nation or with a regional defense organization, pursuant to an agreement for cooperation and to disclose certain limited types of restricted data relating to the use of atomic weapons. (The specific areas of disclosure permitted are also set forth in the discussion of sec. 123 above.) This section also requires that the other nation or regional defense organization participate with the United States pursuant to an international arrangement by making substantial and material contributions to the mutual defense and security.

Section 145 requires personnel investigations by the Federal Bureau of Investigation or by the Civil Service Commission of persons who will be employed by the Commission or given access to restricted data. It permits the Commission or the General Manager (and this permission rests solely with those named) to exempt persons from this requirement where such exemption is clearly consistent with the national interest. The Federal Bureau of Investigation is required to handle any cases in which the Civil Service Commission finds any information which indicated questionable loyalty. It is also required to conduct investigations for those groups or classes of persons specified by the President, or for those positions certified by the Commission to have a high degree of importance of sensitivity. The Commission is authorized to establish the scope and extent of the less sensitive investigations permitted to be conducted by the Civil Service Commission, depending upon the degree of importance to the common defense and security of the restricted data to which access will be permitted.

**\*3480** Section 146 continues the application to restricted data and to persons in the atomic energy program of other laws relating to the protection of information. It also forbids the Commission from controlling or restricting any information outside of any powers granted by any law.

## CHAPTER 13. PATENTS AND INVENTIONS

This chapter sets forth the provisions under which patents may be issued, and used in the atomic energy field.

Section 151 forbids the issuance of any patent on an invention or discovery useful solely in the utilization of atomic energy or of special nuclear material in an atomic weapon. Where inventions or discoveries have uses other than in weapons, patent rights are forbidden to the extent that the fields are set forth above are involved. Any person making any invention or discovery generally useful in the field of atomic energy, is required to report that invention or discovery to the Commission, or to file a patent application on it within 90 days. The Commissioner of Patents is required to keep the Commission fully informed of all applications in the field of atomic energy. These latter provisions are to keep the Commission fully and currently aware of all technology in the field of atomic energy.

Section 152 permits the Commission to find that a patent is of primary importance in the production or utilization of special nuclear material or atomic energy, and that the licensing of the invention is of primary importance to effectuate

the policies and purposes of the act. Upon making such a finding, the Commission may declare the patent to be affected with the public interest. Thereafter the Commission itself is licensed to use the invention, and other persons engaged in activities authorized by the bill may apply to the Commission for and may be granted a patent license to use the patent if the Commission finds that such a patent license is of primary importance to the conduct of such activities.

The bill also authorizes any person engaged in an atomic energy activity authorized by the bill to apply to the Commission for a license on a patent which was declared to be affected with the public interest. In such cases, the Commission is required to grant a patent license to such person after hearing all materially interested parties, if the Commission finds (1) that the idea or invention involved is of primary importance in the production or utilization of special nuclear material or atomic energy; (2) that the licensing of such patent is of primary importance to the activities of the applicant; (3) that the activities to which the patent license is to be applied are of primary importance to the furtherance of the policies of the bill; and (4) that the applicant cannot obtain a patent license from the owner of the patent on terms which the Commission deems reasonable. The Commission is required to see that the owner of any patent declared to be affected with the public interest, or licensed by this section, receives a reasonable royalty fee for any such use of the patent.

Section 153 provides that no injunction may be issued against the holder of a patent license issued under the provisions of section 152 and that in any court action brought against such a patent licensee, the action is to be stayed until the royalty is determined pursuant to those provisions of this bill.

 **\*3481**  Section 154 provides that no patent may be issued on an invention or discovery known before in this country even though such invention has been known or used in the atomic program in secret.

Section 155 requires the Commission to establish standard specifications for the issuing of any patent license for any patent held by the Commission.

Section 156 establishes a Patent Compensation Advisory Board to consider applications under this chapter. The members are to be paid a per diem and may serve without regard to the conflict of interest statutes except as atomic energy matters may be involved. The Board may hear applications from the owners of patent licensed under the compulsory licensing provisions or from the owners or persons seeking to obtain just compensation for patent rights eliminated by the statute and may also hear applications for awards by persons who have made any invention or discovery not otherwise entitled to compensation or royalty. The Commission is permitted, upon the recommendation of the General Advisory Committee and with the approval of the President, to grant an award for any especially meritorious contribution to the development, use or control of atomic energy.

In determining the reasonable royalty to be paid, the Commission is required to consider the advice of the Patent Compensation Advisory Board, any defense which might be pleaded in an action for infringement, the extent of any Federal financing involved, and the degree of utility, novelty, or importance of the invention, and may consider the cost of developing or acquiring the patent. In determining just compensation and awards, the Commission is required to consider the extent of actual use of the invention or discovery as well as those considerations involved in royalty determinations.

Section 157 declares that the Commission may continue to require that patents made or conceived during the course of federally financed research or operation be assigned to the United States.

Section 158 permits any person who had applied for a patent which was earlier prohibited by the act, and which would now be permitted by the bill, to reinstate his application for the patent. No patent so reinstated can form the basis of a claim against the United States.

S. REP. 83-1699, S. REP. 83-1699 (1954)

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

## CHAPTER 14. GENERAL AUTHORITY

This chapter sets forth the general powers of the Commission in operating or regulating any of the activities authorized by this bill.

Section 161 permits the Commission to: Establish advisory boards; to issue rules on the possession of dangerous materials; to hold hearings; to appoint officers and employees; to acquire property; to use the personnel or services of any other Government agency; to acquire real or personal property including patents; to combine in one license one or more of the activities of which licenses are required by the bill; to prescribe regulations to protect restricted data, to guard against the loss of diversion of special nuclear material, and to govern activities authorized pursuant to the bill, including health and safety regulations; to dispose of radioactive materials or property where special disposition is needed in the interests of national security; to authorize its personnel to carry firearms and also to authorize employees of the contractors who protect the property of the United States **\*3482** to carry firearms; to import, duty free, source and other material obtained abroad; to enter agreements with licensees under section 103 or 104 to provide services or materials to such licensees where those services and materials are not otherwise commercially available; to permit small numbers of its employees to obtain further instruction and training outside of the Commission each year; to delegate to its employees and officers all functions authorized by the act except those specified functions which have the highest degree of importance to the program; to require persons in the program to keep records and reports and to authorize the inspection of the activities of persons in the program and to make rules and regulations necessary to carry out the purposes of the act.

Section 162 permits the President to exempt any action of the Commission that he deems essential to the interests of common defense and security from the provisions of law relating to contracts.

Section 163 permits members of the General Advisory Committee and members of the advisory boards to serve without regard to the conflict of interest statutes.

Section 164, which is unchanged from present law, permits the Commission to enter into contracts for electric utility services for periods not exceeding 25 years in connection with the construction or operation of Oak Ridge, Paducah, and Portsmouth. The contracts may provide cancellation costs for termination of the contracts.

Section 165 prohibits the Commission from using cost-plus-percentage-of-cost contracts in its operations.

Section 166 requires the Commission to require its contractors and their subcontractors to submit to auditing of their books by the Comptroller General of the United States.

Section 167 permits the Commission to settle damages arising out of its program for testing atomic weapons, where the amounts do not exceed $5,000, where the claim is submitted within 1 year, and where the damage is not caused in whole or in part by negligence of the claimant.

Section 168 requires the Commission to make payments in lieu of taxes to States or localities where activities of the Commission are carried on, and where the Commission has acquired property previously subject to State and local taxes. The Commission is to make the payments it deems appropriate but is to be guided by the policy of not making payments in excess of taxes which would have been payable on the property in the condition in which it was acquired except in cases where special burdens have been cast upon a State or local government by the activities of the Commission.

Section 169 provides that no funds of the Commission are to be employed in the construction or operation of production or utilization facilities licensed under section 103 or 104, except pursuant to contract entered into in accordance with the provisions of section 31.

## CHAPTER 15. COMPENSATION FOR PRIVATE PROPERTY ACQUIRED

This chapter establishes the rules for acquiring property condemned and used for public purposes.

Section 171 requires that, where the United States takes any interest in property for which just compensation is required to be paid under the **\*3483** terms of this bill, the Commission shall determine and pay such just compensation except in the case of real property. If that determination is not satisfactory, the Commission is required to pay 75 percent of the amount and the claimant is entitled to sue in the Court of Claims, or in the district court for the district in which he resides, for such further sum as added to the 75 percent will constitute just compensation.

Section 172 requires that real property shall be condemned pursuant to the normal condemnation statutes and procedures.

Section 173 requires the Commission to pay just compensation for the disclosure of restricted data to any foreign nation where such restricted data is based on a patent application owned by a person other than the United States. If the claimant does not believe the Commission's determination of the amount to be just compensation is a proper amount, the Commission is required to pay 75 percent of the amount, and the claimant can sue for such further sum as added to the 75 percent will constitute just compensation.

Section 174 requires the Commission to receive the approval of the Attorney General on the title of any real property to be occupied, used, or improved by the Commission except where the President determines that prior approval of the title by the Attorney General is not required in the interest of the common defense and security.

## CHAPTER 16. JURISDICTIONAL REVIEW AND ADMINISTRATIVE PROCEDURE

This chapter describes the procedures and conditions for issuing licenses under the bill.

Section 181 makes the provisions of the Administrative Procedures Act applicable to all agency actions of the Commission. Where publication of data involved in agency action is contrary to the national security and common defense, then identical secret procedures are required to be set up within the Commission. The Commission is required to grant a hearing to any party materially interested in any agency action.

Section 182 sets forth the information that the Commission may require in any application for a license so as to assure the Commission of adequate information on which to fulfill its obligations to protect the common defense and to protect the health and safety of the public.

With respect to a production or utilization facility to be licensed under a commercial license under section 103, notice is required to be given to the applicable regulatory agency having jurisdiction over the rates and services of the proposed activity and notice is also required to be published once each week for 4 consecutive weeks in the Federal Register. No license may issue until 4 weeks after the last such notice.

In issuing commercial licenses for utilization or production facilities under section 103 where all other conditions are equal and there are conflicting applications for a limited opportunity for a license, the Commission is required to give preferred consideration to facilities which will be located in high-cost power areas.

Section 183 provides that the licenses shall include a term reserving title to all special nuclear material to the United States; a term granting no right to special nuclear material save as defined by the license; a term **\*3484** prohibiting

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

the assignment of the license in violation of the act; and a term reserving the right to recapture or control, contained in section 108, and submitting the license to any changes of the act or to any changes in the rules and regulations of the Commission.

Section 184 prohibits any license from being transferred, assigned, or disposed of, directly or indirectly, unless the Commission finds that the transfer is in accordance with the provisions of the act. The Commission is permitted to consent to the creation of a mortgage, pledge, or other lien on any facility licensed under the act.

Section 185 permits the Commission to issue construction permits to applicants for a production or utilization facility, describes the terms of the construction permit, and requires the issuance of a license if the construction is carried out in accordance with the terms of the construction permit.

Section 186 sets forth the grounds on which the revocation of a license may be based; brings the revocation procedures under the provisions of the Administrative Procedure Act (without limiting the procedures specified in that act in their application to any other section of the bill); and permits the Commission, upon revocation of a license, to retake special nuclear material held by the licensee. In cases of extreme importance, the Commission is permitted to recapture the special nuclear material or to operate any facility even before the procedures of the Administrative Procedure Act have been initiated.

Section 187 requires that all licenses shall be subject to amendment, revision, or modification by reason of amendments to the act or by reason of rules, regulations of the Commission issued in accordance with the terms of the act.

Section 188 permits the Commission to continue the operation of facilities whose licenses are revoked, if public convenience and necessity, or the production program of the Commission require continued operation of the facility. The Commission is required to consult with the appropriate regulatory agency having jurisdiction in cases concerning the public convenience.

Section 189 provides for judicial review of a final order of the Commission entered in certain agency actions. The review is provided by the act establishing judicial review for the actions of other regulatory agencies.

## CHAPTER 17. JOINT COMMITTEE ON ATOMIC ENERGY

This chapter establishes the joint committee and sets forth the provisions governing its operations.

Section 201 establishes the joint committee consisting of 9 Members of the Senate and 9 Members of the House with a limitation that not more than 5 Members of each House shall be members of the same political party.

Section 202 requires the joint committee to make continuing studies of the activities of the Commission, and of problems relating to the development, use, and control of atomic energy. The committee is directed during the first 60 days of each session to conduct hearings on the state of the atomic-energy industry but this is not intended to limit the activity **\*3485** of the joint committee with respect to the industry throughout the balance of the years. The Commission and the Department of Defense are required to keep the joint committee fully and currently informed with respect to all atomic-energy matters. It is the intent of Congress that the joint committee be informed while matters are pending, rather than after action has been taken. All Government agencies are required to furnish any information relating to atomic energy requested by the joint committee. All matters in the Congress relating primarily to the Commission or to the development, use, or control of atomic energy are required to be referred to the joint committee, and the members from the joint committee from the Senate and from the House are required to report to their respective Houses their recommendations with respect to matters within the jurisdiction of the Houses which are referred to the joint committee.

S. REP. 83-1699, S. REP. 83-1699 (1954)

Section 203 permits the joint committee to operate regardless of any vacancies in the membership. The joint committee is required to select a chairman and a vice chairman from its members with the chairmanship alternating between the two Houses with each Congress. Only those members of that House entitled to the chairmanship vote on the election of the chairman. The vice chairman, who must be a Member of the other House, is selected in the same way.

Section 204 permits the joint committee to hold hearings, meetings, investigations, to require the attendance of witnesses, to make rules for its organization, to issue subpenas, to administer oaths, to use a committee seal, and to pay for necessary expenses from the contingent fund of the Senate from funds appropriated for the joint committee.

Section 205 permits the joint committee to appoint experts, consultants, technicians, and staff employees, and to utilize the services, facilities, and personnel of the departments of Government. The joint committee is permitted to authorize its personnel to carry firearms in the discharge of their official duties.

Section 206 permits the joint committee to classify information originating within the committee in accordance with the standards used generally for the classification of restricted data or defense information.

Section 207 requires the joint committee to keep a record of all committee actions and requires that the committee records are the property of the joint committee to be kept in the offices of the joint committee under such security safeguards as the joint committee shall determine in the interest of the common defense and security.

## CHAPTER 18. ENFORCEMENT

This chapter establishes the provisions for enforcing the bill.

Section 221 permits the President to utilize the services of any Government agency to protect the property of the Commission or to prevent the unlawful dissemination of restricted data. The Federal Bureau of Investigation is required to investigate all alleged or suspected criminal violations of the bill. No action may be brought for any violation of the act until the Attorney General has advised the Commission with respect to such action. All actions are required to be brought by the Attorney General as the legal representative of the Commission before the courts.  **\*3486**  In those cases involving the death penalty, action may be brought only on the express direction of the Attorney General himself.

Section 222 establishes criminal penalties for violation of certain of the prohibition sections within the act. The maximum penalty, if the offense is committed with intent to injure the United States or with intent to secure an advantage to any foreign nation, is, on recommendation of the jury, death or imprisonment for life.

Section 223 establishes the criminal penalties for violation of all of the balance of the provisions of the act or for rules and regulations issued under certain specified limited statutory authority. There are lesser penalties attached to this section, though the maximum penalty, if the offense is committed with intent to injure the United States or with intent to secure an advantage to any foreign nation, is, $20,000 or 20 years or both.

Section 224 establishes the penalties for the disclosure of restricted data with intent to injure the United States or with intent to secure an advantage to a foreign nation. The maximum penalty is, on recommendation of the jury, death or imprisonment for life.

Section 225 establishes criminal penalties for acquiring restricted data with intent to injure the United States or with intent to secure advantage to any foreign nation. The maximum penalty is, on recommendation of the jury, death or imprisonment for life.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Section 226 establishes criminal penalties for altering or changing any restricted data with intent to injure the United States or with intent to secure an advantage to any foreign nation. The maximum penalty is, on recommendation of the jury, death or imprisonment for life.

Section 227 prohibits any person authorized to have restricted data from knowingly communicating, or whoever conspires to communicate or to receive, restricted data to any person known not to be authorized to receive restricted data, knowing that the information communicated is restricted data. The penalty is a fine of $2,500.

Section 228 establishes a 10-year period of limitation for noncapital offenses described in sections 224, 225, and 226.

Section 229 continues the applicability of any other laws (including the espionage law) to the field of atomic energy.

Section 230 permits the Attorney General to petition a court on behalf of the Commission for the injunction of any act which the Commission believes will violate any provision of the bill.

Section 231 permits the Attorney General to petition a court for an order requiring any witness to obey a subpena served upon the witness by the Commission or to obtain an order of the court punishing the witness for contempt in the event the order of the court is disobeyed.

## CHAPTER 19. MISCELLANEOUS

This chapter includes several sections of general applicability.

Section 251 requires the Commission to make an annual report to Congress on its activities including recommendations for legislation.

Section 261 authorizes appropriations necessary and appropriate to carry out the provisions of the act, except such sums as may be necessary for the acquisition or condemnation of real property or for plant **\*3487** construction or expansion, and keeps the sums appropriated available for expenditure for 4 years following the expiration of the fiscal year for which the sums were appropriated. The Commission is required to obtain congressional approval of new construction, or expansion, of its plants.

Section 271 preserves the regulatory power of any appropriate agency with respect to the generation, sale, or transmission of electric power.

Section 281 is the standard separability section.

Section 291 provides the short title of the act as the 'Atomic Energy Act of 1954.'

Section 2 of the bill amends the act establishing judicial review from certain regulatory agencies by adding final orders of the Atomic Energy Commission to the provisions of the act.

Section 3 of the bill retrocedes exclusive jurisdiction of the residential area of the Commission's establishment at Sandia Base, Albuquerque, N. Mex.

Section 4 of the bill continues in effect the provisions of the section of the Atomic Energy Act requiring all governmental properties relating to atomic energy to be transferred to the Commission.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

## SEPARATE VIEWS ON PATENTS

Although I joined my colleagues on the Joint Committee in reporting favorably the bill, H.R. 9757, I deeply regret that I find myself in complete disagreement with them with respect to that portion of the bill dealing with patents. Under ordinary circumstances, a divergence of individual views could await discussion when the bill is under consideration by the House. In this instance, however, the issue is so fundamental and, in my opinion, carries within it implications of possible consequences which would be so destructive of the American enterprise system that I feel compelled to protest.

The message of President Eisenhower to the Congress on February 17, 1954, urged that the Congress remove the statutory prohibition against utilization of atomic energy in the nonmilitary field and recommended that the normal patent processes in this area be allowed, but circumscribed by subjecting such patents to a system of compulsory licensing. This recommendation was made by the President--

to assure that the limited number of companies, which as Government contractors now have access to the program, cannot build a patent monopoly which would exclude others desiring to enter the field.

At the outset it should be emphasized that the usual provisions of the antitrust laws with respect to monopoly, including patents or combinations of patents, still obtain with their full force and effect, and are made specifically applicable to all phases of the atomic energy field.

As originally introduced, H.R. 8862 and S. 3323 contained a provision, section 152, which would, in my opinion, adequately protect the public interest. That section was eliminated by the committee, and compulsory licensing is now contained in chapter 13, section 152, of H.R. 9757 and S. 3690.

 **\*3488**  The proposal I advocated to meet the President's objective was to require all applicants for patents in the atomic-energy field to file a statement under oath in connection with their application for patent in which would be disclosed how and when the discovery was conceived. All applications, together with the sworn statements, would be referred by the Commissioner of Patents to the Atomic Energy Commission which would be authorized to interpose an objection to the issue of a patent if the Commission found that the invention or discovery was conceived during the course of any relationship with the Government by the applicant. Inventions found to have been discovered during the course of such a relationship would be held by the Commission in the name of the United States and become part of the public domain. Inventions not discovered in the course of such relationship, or of such minor nature as in the opinion of the Commission to not justify public ownership, could then be processed into a normal patent with all the customary rights and liabilities. This proposal was not accepted by the Joint Committee.

The proposal adopted by the Joint Committee, upon recommendation of the Atomic Energy Commission as a compromise, would require all patents in this field for which applications may be filed within the next 5 years, to be subject to use by any person whatever, irrespective of the wishes of the patentee, upon payment of such royalty as the Commission may consider fair and reasonable.

My objection to this resort to a system of compulsory licensing is threefold:

1. It is unconstitutional;

2. It is unnecessary in order to adequately protect the public interest and prevent undue enrichment or preferential position of persons and corporations engaged in the atomic program; and

3. It is wholly foreign and hostile to American tradition and practice, and the system of private enterprise.

S. REP. 83-1699, S. REP. 83-1699 (1954)

## COMPULSORY LICENSING IS UNCONSTITUTIONAL

Article I, section 8, of the Constitution declares that the Congress shall have power 'to promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors and exclusive Right to their respective Writings and Discoveries.' An exhaustive discussion of the constitutional question is not possible at this time. Such study as I have been able to make, however, establishes the fact that at common law at the time the Constitution was drafted, the word 'patent' had an indefinite and unsettled meaning with respect to the exclusive nature of the right of the patentee, and a variety of limitations upon the use of patents had been enacted by the colonial legislatures, except South Carolina, many of which invaded or circumscribed to some degree the full and sole right of the discoverer to his invention. The framers of our Constitution were aware of this condition. They did not use the word 'patent,' although that word had been specifically proposed in the Convention, but rather very deliberately chose the expression 'the exclusive right,' subject only to duration 'for limited times.' Under this concept, the word 'patent' was given and has acquired a clear and unmistakable meaning: the sole and exclusive right of **\*3489** an inventor to his discovery subject only to the possibility that the exclusive use might be limited by law to a definite period of time.

Authorities credit Charles Pinckney of South Carolina as being the author of the patent clause in the Constitution. Pinckney also proposed to the Constitutional Convention that Congress be given the 'exclusive right' to coin money and to regulate the militia. In addition, it was he who made the proposal dealing with patents which was eventually accepted, and which contains the phrase 'exclusive right.' In connection with the power of Congress to coin money, the Convention finally determined not to use the expression 'the exclusive right' but it did retain that expression in connection with patents. Certainly no one would argue that the Congress does not have the exclusive right to coin money although the Constitution is silent in this respect. How then, can one argue that by choosing to use the explicit language 'exclusive right' in connection with patents, the framers intended the Congress to have authority to pass a law which would give a patentee something less than the 'exclusive right' over his patent?

Furthermore, it should be noted that the First Congress, in enacting the first statute, interpreted this constitutional provision and used the words 'sole and exclusive' with respect to the granting of a patent. The addition of the word 'sole' could be regarded as meaningless since it is synonymous with 'exclusive.' The only constitutional authority given the Congress was to grant an 'exclusive right.' Therefore it would appear that the word 'sole' was included in the first statute on patents in order to fortify the concept of exclusiveness.

In the second patent statute, in 1793, the word 'full' was substituted for the word 'sole', giving further evidence of the purposes and intent of the founders of this Government with respect to patents.

The only invasion of the exclusive right of a patentee, which has ever been attempted, and quite properly successfully retained, is the right of the Government to the use of a patent for its own purposes, upon payment of just compensation. This theory does not apply to compulsory licensing wherein the Government appropriates property (patent) not for its own use, but for the use of an individual and for the latter's eventual profit or gain, which is the effect of the committee proposal.

There is no question but that a system of compulsory licensing is a clear invasion of the exclusive right in a patent. Although the Constitution is silent, the Government may withhold or deny patents in any area it may determine, or Government may use for its own purposes any patent once issued, upon payment therefor, but Government cannot violate the exclusive right of a patentee other than to impose a time limitation.

## COMPULSORY LICENSING IS UNNECESSARY

S. REP. 83-1699, S. REP. 83-1699 (1954)

It is argued by those in support of compulsory licensing that the large companies and thousands of persons who have been engaged as Government contractors or employees in the atomic energy program should not be allowed to obtain a preferential position because of that association and thereby be enabled to obtain patent privileges which might foreclose the use of those patents by other persons. With this objective, I fully concur. But it is argued that compulsory licensing is the only way to forestall this development. That is not so. The Congress might (although there still **\*3490** would be some doubt of its constitutionality) impose a time limitation upon this type of patent for a period less than the normal 17 years; i.e., 5 years, 10 years, or any other period. Or the Congress might, by law, declare that any discovery found in the course of any relationship with the Government as contractor, subcontractor, employee, or collaborator be declared to be public property and become a part of the public domain.

The latter is the course which I recommend with the firm conviction that it adequately protects the public interest in any atomic energy patent over which the Government may have a legitimate claim.

### COMPULSORY LICENSING IS UN-AMERICAN AND DANGEROUS

Even if there were no doubt of the constitutionality of compulsory licensing, even if there were no other course to follow in order to reach this situation, it still would be an unwise step to take.

This is not the first time compulsory licensing has been proposed to be injected into the American economic system. For the last 2 or 3 decades there have been proposals of this nature presented to Congress. As recently as 13 years ago, a special committee created by the Congress, the Temporary National Economic Committee, recommended the adoption of a system of compulsory licensing of patents. This followed the recommendation made by President Roosevelt in a message to Congress in January 1938 that compulsory licensing be adopted. In 1938, the Committee on Patents of the House held hearings in which violent protest was made against the proposal upon the ground that it would hurt the small company and the small inventor, and not effect the large company. No action has ever been taken on any of these proposals, largely for the reason, I believe, that the Congress recognized the inherent danger to our economic system of such a practice. Compulsory licensing would destroy the incentive of our citizens to find new ways of doing things in a better, more efficient, and less costly manner. It would destroy the force which compels competitors to seek an alternative way of performing the same function as may be covered by an existing patent.

In order to minimize the harmful effect of this proposal, it is argued that this limitation is for but 5 years and in a limited field. If it is logical for 5 years, then why not 10 years, or 20 years, or even indefinitely. If it is logical in the atomic-energy field, then why not in other fields of economic endeavor such as electronics, radio, automobile, aircraft, or any other, if not all, segments of our economy. Once this initial step has been taken, the bars will be down, the pressures will begin to mount year after year to extend this principle into all aspects of our productive machinery and, once adopted, will eventually destroy it. It is true that the McMahon Act provided for compulsory licensing, but at the same time it also prohibited private patents in the atomic field, thereby completely nullifying the effectiveness of the compulsory licensing provision.

### CONCLUSION

The Government has no right, in my opinion, to commandeer for someone else's use the discovery which any person might make in the atomic-energy field, or any other field, if the discovery occurs independently of any **\*3491** association with Government. The small company, the individual inventor, the Thomas Edison, the Alexander Bell, or any other person who might contribute to our physical well-being by his own genius, financial resources, perseverance, and ambition will be dealt a death blow by this or any other system of compulsory licensing.

In the unlikely event that a discovery occurs which is so essential to the peacetime atomic program that its general use by all interested persons is highly desirable in the public interest, let the Government negotiate for its purchase. Rather should we sacrifice dollars, if necessary, than surrender a principle so basic in our industrial order and so necessary to our economic prosperity.

Since the proposal is so patently unconstitutional; since it contains possible results which inevitably will be so damaging to our economic well-being; and since there is another course available through which the fear of unjust enrichment to, or preferential position of, those who are now or have been engaged in the atomic-energy program can be met, I strongly urge that section 152 as now contained in H.R. 9757 be rejected and be replaced by the original recommendation contained in H.R. 8862.

Compulsory licensing is not creeping socialism; it is socialism run rampant. This proposal is the initial lurch in the direction of that rampage. It must not be made.

<div align="center">STERLING COLE.</div>

I subscribe to the foregoing views of Mr. Cole.

<div align="center">JAMES E. VAN ZANDT.</div>

<div align="center">SEPARATE VIEWS ON INTERNATIONAL ACTIVITIES</div>

I have been impressed by the spirit of patriotic unselfishness and the display of bipartisanship demonstrated by the committee and its staff through the long days spent in preparation of this bill.

The atomic energy program is both highly technical and complex. The framers of this law had to examine and understand the past and present complexities of nuclear energy activities and try somehow to predict the future. Issues arose which went to the very roots of individual political and economical philosophies, and yet these were resolved by the members of the committee in a spirit of compromise and good will which is the very essence of our democratic legislative process. The difficult questions of compulsory licensing of patents, of antitrust provisions, and of licensing and regulatory provisions were settled in this fashion.

I am frank to state that several portions of this bill do not have my unqualified endorsement, but I am compelled to join the majority in its favorable report on S. 3690 because, on balance, the compromises reached have been for the greater good, and I can accept-- as should any reasonable man in a position of responsibility-- something less than what I think is perfect in each of its parts if the whole structure is worthwhile. But to compromise on anything of deep principle is personally and morally repugnant to me. Therefore, in all conscience, I must append a statement of my views on the all-important matter of international cooperation.

I urge that section 124 of the bill be struck, and that the words 'group **\*3492** of nations' be inserted in sections 11b, 54, 57, 64, 82, 103, 104, and 144 to make those sections read as in the committee print of May 21, 1954.

I have not taken this position lightly; I take it because I believe the very existence of our civilization depends on our finding some way to end safely the mounting atomic and hydrogen armaments race which bodes to annihilate man and all his works. To my mind, the key to finding such a solution lies in the hearts of men of good will everywhere; it is a solemn duty for us, the most powerful Nation on earth, to seize the initiative in bringing about a renascence of the cooperative spirit of common humanity that is needed to solve the basic causes of war-- want, hunger, poverty, and disease. President Eisenhower gave voice to these thoughts when he addressed the United Nations General Assembly last December. There he boldly outlined a plan to bring the great benefits of atomic energy to mankind everywhere. To my mind, in this address the President did what we must now do-- he rose to meet the basic problem head on. His proposal gave heart to all.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Case: 4:23-cv-00106-CDP Doc. #: 148-8 Filed: 01/29/21 Page: 128 of 903 PageID #: 1809

In testimony before the Joint Committee on June 3, 1954, the Secretary of State, Mr. John Foster Dulles, made some highly important comments on the subject of international arrangements for the sharing of atomic knowledge:

\* \* \* \*

As I see it, a main purpose of the proposed legislation is to do just that-- 'to increase our emphasis on the peaceful uses of atomic power at home and abroad.'

\* \* \* \*

We cannot any longer adhere to the theory that knowledge, because it is capable of use for destruction, must be denied for uses of construction.

\* \* \* \*

By amending the Atomic Energy Act now as proposed, we will be laying some of the groundwork for a future era of peace when atomic energy inevitably will be doing constructive work in the world.

\* \* \* \*

Three circumstances, (1) the developing Soviet program, (2) our dependence on foreign uranium, and (3) legitimate hopes for nuclear power abroad, combine to create the need to amend the international cooperation provisions of the Atomic Energy Act of 1946.

\* \* \* \*

Other countries are making progress in atomic power technology. There is a growing tendency for certain raw materials supplying nations which are not industrially well advanced to turn to such other countries for nuclear power information because they have been disappointed by our inability to give them significant help. It is clear to me that if this trend continues the interests of the United States will be seriously and detrimentally affected. There is no need here to emphasize how important it is for us to stay ahead of the U.S.S.R. in providing knowledge of how to put atomic energy to peaceful uses.

In extending abroad, under proper security safeguards, the evolving technology of atomic energy for peaceful purposes, we shall tighten the bonds that tie our friends abroad to us, we shall assure material resources that we need, and we shall maintain world leadership in atomic energy-- leadership which today is such a large element of our national prestige.

\* \* \* \*

In modernizing our atomic-energy law I feel that we will be taking three steps in the direction of peace: First, we will be increasing the deterrent factor represented by our weapons stockpile by the provisions we have requested permitting us to integrate certain tactical weapons information  **\*3493**  into our foreign military planning. Second, by being able to give our friends abroad atomic energy information and material, we shall be strengthening out capacity to build the raw material base on which our entire atomic energy program rests; and , third, we will be strengthening the ties which unite the free nations by a sense of fellowship.

S. REP. 83-1699, S. REP. 83-1699 (1954)

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

* * * *

Perhaps most significant of all, however, are the hundreds of millions of people in the world who, having heard of the promise of atomic energy, wait eagerly to see if there are benefits in it for them in addition to the military shield which has held off the aggressive forces of Soviet communism for almost a decade. The military atom is a fearsome thing, even to those who owe their liberties to it. The constructive uses of atomic energy could promote both peace and plenty, and so holds a special place in man's dream of the future.

The bills which your Committee is considering need to be enacted if our Nation is to serve its own interests and at the same time to show the world anew that our national interests harmonize with the interest of men everywhere.

* * * *

I believe the Secretary of State clearly and forcibly pointed out that the provisions of the bill which are most important to our very survival are those that treat with international cooperation. I share that view.

I also believe that the development of atomic power in this country is important. Coming from an area of the United States which has high-power costs and no foreseeable way of reducing these costs except by the speedy development of this new, primordial source of energy-- I believe I am as aware as any man of the responsibilities of this Congress to provide fully for the fastest development of atomic energy for peacetime uses in this country.

The United States Government has expended many billions of dollars in the development of its atomic program. While the primary purpose of this was the creation of armaments, there were secondary discoveries and advancements of importance in the peacetime uses of nuclear power. Despite this activity, the field of peacetime development is still embryonic. To hasten advancement in this art, it is being proposed to Congress that the private business community of the United States be allowed to share in the opportunities of developing useful applications of what has been but barely touched on in our Government monopoly of the field. In this we can say that the greater good is in making available to the people of the United States at the earliest moment the fruits of such combined Government and private development. We can hardly say that permitting friendly nations to collectively share in some small part of our knowledge for the purpose of the peace and good of all mankind is not equally advantageous.

Our responsibilities transcend our national borders. We have developed materials, knowledge, and techniques which, if exploited fully for the benefit of all mankind, will redound not only to our international credit, but more importantly to the establishment of peace and prosperity in all portions of the globe. We are not alone in this race for atomic-power development. Twenty nations, as the majority report points out, are embarked upon atomic development programs. Not the least of these programs is that of the Soviet Union which now stands second in the world effort on the searching out of the atom's secrets. Coupled with this is the fact that we and the free world are joined against the Soviet Union in a competition for the **\*3494** minds and souls of men. This competition will not be won by words, but by deeds. Consider the effect on the downtrodden of Asia, for example, if the Soviet Union should seize the initiative in bringing to these power-starved nations the great benefits of atomic energy. I say on that day we shall have lost the battle.

It is argued that our national security is in greater jeopardy if we deal with a 'group of nations' as against dealing with one nation at a time, in transmitting information on peacetime developments of atomic energy. I find it very difficult to reconcile this distinction and I would further point out that this is not so, for the information with which we are here concerned is of a low degree of sensitivity and is far removed from the area of information on atomic weapons and atomic production that we must carefully circumscribe.

Case: 4:23-cv-00006-CDP Doc. #: 1-8 Filed: 01/29/23 Page: 130 of 903 PageID #: 9101

It is argued by the majority that S. 3690 offers, in section 124, a possible mechanism for the President to employ in bringing to reality his great plan for speaking atomic blessings to all. I maintain that the bill as presented does little more than restate the powers he already has under the Constitution and existing law. It is no more than an indication-- and a half-hearted indication at that-- of congressional encouragement. It is, to my mind, inadequate and I urge favorable consideration to the amendment on this subject which I will introduce on the floor of the Senate.

In explanation of why I believe that amendment, which will insert the important phrase 'group of nations' in the international portions of the bill, is of transcendent importance, I would point out the following:

Section 123 of the bill contains carefully drawn conditions under which the Government is authorized to cooperate bilaterally with another nation in the field of peacetime development of atomic energy or with a regional defense organization on tactical uses of atomic weapons. These stringent safeguards are:

(1) The agreement for cooperation must include (a) the terms, conditions, duration, nature, and scope of the cooperation; (b) a guaranty by the cooperating party that security safeguards and standards as set forth in the agreement will be maintained; (c) a guaranty by the cooperative party that any material to be transferred will not be used for atomic weapons or for any other military purpose; and (d) a guaranty by the cooperating party that any material or any restricted data to be transferred will not be further transferred to any unauthorized person or beyond the jurisdiction of a cooperating party.

(2) The agreement for cooperation must be approved by the Commission, or, in the case of a transfer of military data, the Department of Defense.

(3) The President himself must approve the agreement for cooperation and he must also determine in writing that the performance of the agreement for cooperation will promote and will not constitute an unreasonable risk to the common defense and security.

(4) The proposed agreement for cooperation, together with the President's approval and determination, must lie before the Joint Committee on Atomic Energy for 30 days while Congress is in session.

These conditions are indeed adequate to protect the national interest. It should be noted that these agreements for cooperation can be entered **\*3495** into only bilaterally; that is to say, the statute does not authorize the President to enter into agreements for cooperation with a group of nations or with an international agency unless, as specified in section 124, an international agreement has previously been entered into with a group of nations.This means that the President must negotiate a treaty (which must receive the approval of two-thirds of the Senate before it can be effective), or an executive agreement (which, under the terms of the law, must be submitted to both Houses of Congress and receive a favorable majority vote before it can become effective), before he can cooperate under the bill with any group of nations.

I would submit that this is an unwarranted and unwise restriction and destroys the pool idea suggested by the President. If the President can deal with a single nation in the atomic field under the stringent safeguards prescribed in this bill, then he should be able to deal with a group of nations under the same stringent arrangement.

Section 124, which purports to deal with the international atomic pool, is, in my considered opinion, nothing more than a restatement of what the President can do now under existing law, without the necessity of passing this bill.

In short, section 124 is illusory and a naked grant, since unless we add the phrase 'group of nations,' we are, under the language of this bill, giving voice to a pious hope, but in fact giving no additional authority to the President to carry out his atomic-pool plan which he does not already have under existing law.

While I consider it desirable and important for us to cooperate bilaterally in the field of peacetime atomic energy, I feel nevertheless that the real solution to the problem which drives men to war will not be found until we deal broadly and collectively with many nations in a spirit of cooperation and partnership to bring the God-given benefits of this new source of power to our friends all over the world. It is for these reasons that I urge the reinsertion of the phrase 'group of nations' in the international section of the bill.

The very foundation of our foreign policy has been built on a philosophy of collectiveness. As a result we have seen the free world grow stronger step by step. It would be wiser for us to take no action at all, rather than injure the spirt of unity which now prevails in the free world. Psychologically, I am afraid that we do exactly this if we make it more difficult for us to deal with a group of nations as against dealing with one nation in this very important field.

Because of this deep-seated feeling I am constrained to disagree with the committee on this point and submit my own minority view.

JOHN O. PASTORE.
I subscribe to the foregoing views of Senator Pastore.

MELVIN PRICE.
CHET HOLIFIELD.

**\*3496**  SEPARATE VIEWS OF REPRESENTATIVE
HOLIFIELD AND REPRESENTATIVE PRICE ON H.R. 9757

INTRODUCTION

The atomic-energy bill is one of the most important bills before the Congress. It proposes to chart the future course of peacetime atomic-energy development. So deep and farreaching is its potential impact on the American economy and upon our position in world affairs that we consider it necessary to set forth our own views and reservations concerning the bill.

As members of the Joint Committee on Atomic Energy we have endeavored always to act in a spirit of nonpartisanship. The duties and responsibilities committed to the jurisdiction of our committee are too directly concerned with the Nation's security and welfare to allow the play of partisan politics. In the same objective way we have tried to approach this legislation.

During the course of the committee hearings and conferences, we have presented what we believed were constructive proposals for improving the bill. Some were accepted in whole or in part and others rejected. Among the committee members there were, and presumably still are, many differences of opinion and interpretation regarding particular provisions of the bill. We respect those differences, and although we were willing to have the bill reported out for floor debate, the public importance of this measure compels us to recount here what we consider still its major defects.

The discussion proceeds under the following headings:

1. The Legislative Setting

2. Questionable Form and Timing

3. Evasion of 7-B Report

4. Placing AEC Chairman on Pedestal

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Case: 4:23-cv-00106-CDP Doc. #: 148-8 Filed: 01/29/23 Page: 132 of 903 PageID #: 9213

5. Withholding Information From Commissioners

6. Overriding the Commission's Will

7. Limiting AEC Power Production

8. Inadequate Power Licensing Provisions

9. Need for Division of Civilian Power Application

10. 'Passing the Buck' on Monopoly Prevention

11. Limiting Access to Patents

12. Built-In Subsidy Feature

13. Omission of Labor-Management Provision

14. Complicating International Arrangements

15. Increasing Military Posture

## 1. The legislative setting

The atomic energy program of the United States is governed by the Atomic Energy Act of 1946, known as the McMahon Act. The basic legislation, enacted in 1946, has been amended from time to time in certain respects, but the original pattern of Government control has not been substantially altered.

The monumental contributions of the atomic energy program under the McMahon Act to the common defense and security and to the protection of the free world need not be recited here. They testify to the basic worth of the legislation and to the wisdom of those who conceived it. President **\*3497** Eisenhower affirmed this testimony when he said in a special message to the Congress on February 17, 1954, that ' * * * the act in the main is still adequate to the Nation's needs.'

The question that now confronts the Congress is what changes are necessary and desirable in the McMahon Act. Unquestionably, some changes are in order. The swift pace of atomic technology, the development of new atomic weapons, the ending of the American monopoly in atomic bombs, all provide-- as the President observed in his message-- a new setting for the legislative problem.

The broad objectives to be sought by new legislation are not in dispute. Changing requirements of mutual defense demands a freer exchange of atomic information with our allies. Beyond atomic armament for mutual defense, there is the mutual benefit of working together with friendly countries to develop the peacetime uses of atomic energy. At home as well as abroad, this great source of energy holds forth the exciting promise of industrial progress and higher standards of living.

Whether the bill now before us would enhance the achievement of these objectives is an exceedingly complex question. The answers, we believe, are both yes and no. The negative side weighs so heavily that we cannot support the bill without further amendment.

### 2. Questionable form and timing

The method of presentation and the timing of the proposed legislation, in our opinion, are most unfortunate. It represents a complete rewriting of the McMahon Act, carrying over some provisions of the existing law intact, modifying others, and adding entirely new sections. Thus the Congress is confronted, in the closing days of this session, with a 'single package' bill comprehending a bewildering array of technical matters. Some are timely; others could well be postponed. The form and wording of the bill, with its many new definitions, cross-referenced and interrelated sections, make it virtually impossible for the Congress to select the more urgent matters for action at this time. In is an 'all or none' proposition.

Before this bill was drafted, we took the position, and Mr. Holifield stated publicly, that the Congress should put first things first and enact those amendments which might be necessary to implement the President's proposal, made before the United Nations General Assembly, for an atomic pool or resources to encourage peacetime development of atomic energy among nations and to prepare the way for international accord on atomic armaments. We see no compelling reason why the legislative requirements to facilitate an exchange of atomic information with friendly nations, whether for purposes of mutual defense or peacetime endeavor, have to be coupled with the granting of private ownership and patent rights in atomic energy to domestic corporations. Defense of the free nations and world peace demand more urgent attention than the desire of a few industrial and utility companies to own and operate atomic reactors.

Furthermore, international obligations and domestic aims in atomic energy development may conflict if simultaneously pursued now. We advert to this matter below.

When President Eisenhower submitted his special message of February 17 on atomic energy, he asked the Congress to 'approve a number of amendments to the Atomic Energy Act.' His recommendations did not **\*3498** contemplate a complete rewriting of the McMahon Act. Accompanying his message were drafts of two separate bills, prepared by the Atomic Energy Commission, proposing to amend the McMahon Act in roder to (1) widen cooperation with our allies in certain atomic energy matters and improve procedures for the control and dissemination of atomic energy information; and (2) encourage broader industrial participation in the development of peacetime uses of atomic energy here at home.

The President's two-package presentation, whether we agree with his particular recommendations or not, at least would have afforded the Congress an opportunity to act on atomic energy matters of more immediate concern without having to consider, as it does now, the whole range of controversial matters embodied in H.R. 9757. Joint Committee members have every right to prepare their own legislation, and, indeed, are to be commended for their initiative. However, the sponsors of the pending bill would have been well advised to take a two-package approach and act first upon the President's suggestions relating to cooperation with our allies, rather than ask the Congress to swallow the whole mass of complicated legislation in one gulp.

Defense and peace requirements in atomic energy which involve our allies should have been first on the agenda. Then the Congress could have taken a long, hard look at the pending proposals to confer private ownership and patent rights in the atomic field.

### 3. Evasion of 7-B report

The framers of the McMahon Act, preoccupied as they were with the awesome implications of the atomic bomb, nevertheless registered their desire 'to promote the use of atomic energy in all possible fields for peacetime purposes ' (79th Cong., 2d sess., S. Rept. No. 1211, p. 20). In anticipation of such peacetime uses, they decided that the Congress should

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  36

have the benefit of a comprehensive report from the Atomic Energy Commission whenever atomic energy developments appeared to be of practical value. Section 7(b) of the McMahon Act reads, in part, as follows:

Report to Congress.

Whenever in its opinion any industrial, commercial, or other nonmilitary use of fissionable material or atomic energy has been sufficiently developed to be of practical value, the Commission shall prepare a report to the President stating all the facts with respect to such use, the Commission's estimate of the social, political, economic, and international effects of such use, and the Commission's recommendations for necessary or desirable supplemental legislation. The President shall then transmit this report to the Congress, together with his recommendations.

The Atomic Energy Commission has never seen fit to prepare and present the report required by section 7(b) of the McMahon Act. One year ago the Commission submitted to the Joint Committee informally a draft of legislation intended to promote wider industrial participation in the atomic energy program, asserting at the same time that atomic energy developments had not reached the stage of practical value and that therefore a report under section 7(b) would be premature.

The President's message of February 17, transmitting new drafts of legislation from the Commission, states hopefully that peacetime use of atomic energy 'can soon become a reality' but makes no mention whatever of a 7(b) report. A Joint Committee request in writing to the Commission **3499** dated July 31, 1953, for the required report, elicited a promise to file an 'interim ' report before 1954. The final gesture as a substitute for actual compliance was an extended speculative essay on the prospects for future industrial development of atomic energy which comprised the major portion of the testimony presented by AEC Chairman Lewis Strauss in his appearance before the Joint Committee during the June 1954 hearings.

If a 7(b) report is premature, as the Commission held last year and still appears to hold by its failure to produce the report, then legislation such as the pending bill, which would lay down a blueprint for industrial activities in the atomic energy field, also is premature. If, on the other hand, the stage of 'practical value' is at hand, the Atomic Energy Commission has evaded the clear intent of Congress set forth in section 7(b) of the McMahon Act.

The sponsors of H.R. 9757 proposed to escape from this dilemma by the simple expedient of eliminating the requirement for a 7(b) report to Congress. The Congress now is asked to legislate for the peacetime uses of atomic energy without the benefit of the careful and comprehensive report from the Commission contemplated by the framers of the McMahon Act. We do not agree with the contention in the majority report (p. 19) that the Commission's general obligation to keep the committee informed, and the proposed new obligation of the committee to investigate the development of the atomic energy industry during the first 60 days of each session of Congress, justify discontinuance of the requirement for the report.

This omission is not a mere matter of form or one to be taken lightly. The 'social, economic, political, and international effects' of using this new source of energy are certain to be profound and wide ranging, even if we discount the more exaggerated and optimistic claims. Surely the Congress is entitled, before legislating, to have the expert analysis and advice of the independent Commission it created to administer the atomic energy program.

The sponsors of H.R. 9757 have retained a watered-down version of the 7(b) report in connection with licensing activities, minus the essential feature of presentation to the Congress. In section 102 of the pending bill the Atomic Energy Commission would have to make a finding in writing as to the 'practical value' of 'any type of utilization or production facility' before issuing a license in a given case. This is a modification of the McMahon Act provision which tied the 7(b) report to a specific requirement that before any license could be issued by the Commission for the manufacture, production, export, or use of atomic energy equipment or devices a report had to be filed with the Congress concerning the

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

activity sought to be licensed, which report was to lie before the Congress for 90 days before issuance of the license. The framers of the McMahon Act evidently regarded industrial licensing in this field so important as to justify a congressional review of specific licensing actions.

### 4. Placing AEC Chairman on pedestal

In considering legislation which proposes a complete overhaul of the McMahon Act, our Joint Committee might well have undertaken a systematic review of all phases of the Atomic Energy Commission's organization and management. This it did not do. The committee's interest in the **\*3500** management of the atomic energy program was directed mainly to a proposal to make the chairman of the Commission its 'principal officer.' Seemingly innocuous and trivial at first, this proposal has opened up issues of such gravity and importance that it merits extended discussion.

Why the sponsors of the pending bill desired to elevate by statutory prescription the Chairman of the Atomic Energy Commission, it is difficult to say. Under the McMahon Act, basic authority to administer the atomic-energy program was vested in a five-man Commission responsible for important policy decisions. The act also provided for a General Manager to whom the Commission could delegate 'executive and administrative' functions. The General Manager is the Commission's director of operations, responsible for day-to-day administration.

This organizational arrangement, which brings to bear the collective judgment of the 5-man Commission on crucial matters in the atomic-energy program, while centering in 1 officer the responsibility for directing its farflung operational activities, appears to be well conceived and conducive to good administration. Three of the five Commissioners testified as to its efficacy. The General Manager gave a clear and explicit statement of his duties and relationship to the Commission. No important evidence had ever been brought before the Joint Committee to indicate that the organizational arrangement was unsatisfactory and should be altered by law.

Nevertheless, Chairman Strauss appeared before the Joint Committee to ask for additional authority in the Chairman's office. He disavowed any responsibility for originating the 'principal officer' proposal, suggesting that the Chairman's role should be defined more precisely than by the simple designation 'principal officer.' Mr. Strauss rested his argument on the recommendations of the first Hoover Commission that the chairman of certain regulatory commissions be made responsible for carrying on the executive and administrative tasks of these commissions.

Since Mr. Strauss relied so heavily on the Hoover Commission report, it is well to emphasize that the Atomic Energy Commission (hardly more than a year old when the Hoover Commission started to work) specifically was excluded from the Hoover Commission studies on independent regulatory commissions.

The Task Force Report on Regulatory Commissions (appendix N), upon which the Hoover Commission based its report, states at page 3:

Although the Atomic Energy Commission has certain regulatory powers and is an independent commission, it has been excluded partly because so large a part of its work is operational, and partly because so many of its problems appear to be unique.

Again the task force report states at page 29:

To avoid misunderstanding, we emphasize that our examination has been limited to the regulatory commissions; we have not made any study of primarily operating commissions such as the Atomic Energy Commission and the Tennessee Valley Authority, both of which combine a governing board with an executive official to manage the operations of the agency. Consequently we do not intend to imply any judgment on such an organization for these purposes.

The statements we have quoted make it clear and certain that the first Hoover Commission's recommendations concerning regulatory commissions **\*3501** in general were not intended to apply to the Atomic Energy Commission in particular. Mr. Hoover has expressed his personal opinion in a telegram to Chairman Cole that the general recommendations are applicable to the Atomic Energy Commission, but there is no warrant for that opinion in the reports of the Hoover Commission. Whether the decision of that group not to study the organization of the Atomic Energy Commission was based on 'security reasons, ' as Mr. Hoover asserts, or on the unique and largely operational character of the agency, as the task force reported, the fact remains that the Atomic Energy Commission was not studied.

In an effort to bring the Atomic Energy Commission within the organization pattern which the Hoover Commission recommended for regulatory commissions generally, Mr. Strauss maintained in his testimony that the relationship of Chairman and General Manager in the Atomic Energy Commission is analogous to that of chairman and executive officer in the recommended organization of regulatory commissions. This analogy is inaccurate and misleading.

The Hoover Commission task force regarded the executive officer as the designee of the chairman, working under the chairman's active direction, speaking in his name, reporting to him exclusively, taking from him the burden of routine administrative detail but keeping away from policy matters which are the business of the Commission itself (see Task Force Report on Regulatory Commissions, appendix N, pp. 47-48). In other words, the executive officer is the chairman's helper in discharging day-to-day administrative duties which the task force proposed to be vested in the chairman of the regulatory commission.

Under the law governing the Atomic Energy Commission, the General Manager enjoys a much more important position than that of Chairman's helper. He receives a salary of $20,000 per annum, equal to that of the Chairman and exceeding by $2,000 that of each other Commission. He performs 'executive or administrative' duties delegated by the whole Commission, whereas the executive officer, in Mr. Strauss' analogy, would be merely carrying out such duties vested in the Chairman.

The anomalous situation that would be created by increasing the Chairman's statutory authority is highlighted by Mr. Hoover's suggestion that the phrase 'principal officer' be clarified by substituting 'administrative and executive authority.' Precisely this authority now is vested by law in the General Manager by delegation from the Commission as a whole.

Commissioner Smyth, in his testimony before the Joint Committee, pointed out cogently that to give the Chairman greater administrative authority implied that he should assume the functions of the General Manager who has been responsible, since the establishment of the Commission, for day-to-day administration of the Commission's business and staff. 'If the Chairman were to become the senior administrative officer of the Commission, with the General Manager as his deputy,' Commissioner Smyth observed, 'the essential purpose of our commission form of organization would be defeated.' It was his judgment that in such a case 'the other Commissioners would be left uninformed and essentially without function' (hearings, pt. II, p. 785).

To accept Mr. Strauss' analogy for the Atomic Energy Commission could only mean that 1 of 2 alternative developments would ensue: either **\*3502** the General Manager would be reduced in status and authority to a mere executive assistant of the Chairman; or else a straight line of authority or 'chain of command' would be created, running from the Chairman as 'principal officer' to the General Manager in his present position as directing officer of operations, with the four other Commissioners being shunted aside. Under any such arrangement, to use the expression of Commissioner Zuckert, 'you would have a Chairman and four junior grade Commissioners.' The Commission would be maintained in form, but there would be one-man administration in substance.

Although Mr. Strauss said he retained a preference for the commission form of organization in the atomic energy field, his conviction was a half-hearted one; a substantial portion of his testimony on this matter was given over to the argument

that 'you can't operate a large business by committee. ' In this approach he had the backing of one Commissioner, Joseph Campbell, the newest appointee. Mr. Campbell, it appeared, was not quite sure what his duties were as AEC Commissioner or whether a Commission even was necessary; he was 'not sold' on the commission form of organization and wanted a 'more coherent chain of command.' Adding up the testimony of Messrs. Strauss and Campbell leaves the net impression that they have little use for the commission form of organization but that they are not quite ready to say so.

A year ago, when President Eisenhower designated Mr. Strauss to be Chairman of the Atomic Energy Commission, the New York Times in an editorial warmly applauded the choice and made this observation about the agency Mr. Strauss was to head:

The Atomic Energy Commission is probably the most important technical body in the world today. It commands intellectual, financial, and industrial resources of unprecedented magnitude. Its power is immense, its decisions have an influence which is far reaching. For those reasons it has responsibilities that far transcend those of other Government agencies, except those that are concerned with national defense and with foreign affairs.

That editorial statement is enough to suggest why the Congress placed the management and direction of the atomic energy program in a five-man commission. The undertaking is vast, the responsibilities great, and there is still much pioneering work to do, as the Commissioners Smyth and Zuckett emphasized before the Joint Committee. A commission, the latter said, would make surer progress in charting the tasks ahead 'than a line organization of the kind that builds bridges, fights wars, or sells toothpaste.'

Similarly, the Joint Committee reported after its extended investigation of the atomic energy program in 1949:

The framers of the McMahon Act deliberately established a five-man directorate, rather than a single administrator, to control our atomic enterprise for the very purpose of assuring that diverse viewpoints would be brought to bear upon issues so far reaching as those here involved (81st Cong., 1st sess., Rept. No. 1169, p. 81).

Therefore we are deeply disturbed at the indications that the Atomic Energy Commission is disintegrating as a commission under the chairmanship of Mr. Strauss. Three of five Commissioners, Mr. Smyth, an eminent scientist; Mr. Murray, an experienced businessman; and Mr. Zuckert, an **\*3503** able public administrator, registered their concern with the Joint Committee over the increasing centralization of authority in the Chairman. They urged the Congress to resist this tendency, and expressed the fear that the designation of the Chairman as 'principal officer' would only accelerate it. We agree with them, and we will not support any statutory provision which reinforces the dominance of the Chairman to the detriment of the Commission as a whole.

The committee decided to strike 'principal officer' from section 21 of the bill, and the phrase does not appear in the final version, H.R. 9757. The committee also wrote language into that section specifying that each Commissioner 'shall have equal authority and responsibility.' However the Chairman's position was singled out by the following language:

The Chairman (or the Acting Chairman in the absence of the Chairman) shall be the official spokesman of the Commission in its relations with the Congress, Government agencies, persons or the public, and, on behalf of the Commission, shall see to the faithful execution of the policies and decisions of the Commission, and shall report thereon to the Commission from time to time or as the Commission may direct.

This particular phraseology apparently represents an attempt to write into law part of an informal description of the Chairman's role which Commissioner Smyth presented to the committee. So far as we know, this is the first time a Federal statute proposes to give the chairman of a commission formal status as 'official spokesman.' Whatever the legal effect of this phrase, we believe it would be a mistake to pin down by law the Chairman's accepted position as chief spokesman of the agency.

S. REP. 83-1699, S. REP. 83-1699 (1954)

Designating the Chairman as 'official spokesman' and obliging him 'to see to the faithful execution of the policies and decisions of the Commission,' are either redundant or a roundabout way of granting him the additional authority he seeks. If redundant, as Commissioner Smyth pointed out in connection with the 'principal officer' proposal, the wording had best be eliminated. It does not appear in the McMahon Act and its inclusion now would be construed as meaningful since the Congress cannot be assumed to legislate for idle or trivial reasons. If the language is not redundant, this is a grant of new authority which, uncertain though its dimensions, conflicts with the 'equal authority and responsibility' of the other Commissioners and overlaps or replace the authority and responsibility of the General Manager.

### 5. Withholding information from Commissioners

It was generally acknowledged in the testimony of the other Commissioners that Mr. Strauss is a strong and vigorous Chairman, and this, in itself, is a matter for commendation and not criticism. But Mr. Strauss emerges in a dual role; he is not only Chairman of the Atomic Energy Commission, but also special adviser on atomic energy affairs to the President. He admits he 'wears two hats,' as they say in Washington. By putting on the hat of special adviser, he can plead the confidence of the Chief Executive and keep his fellow Commissioners in the dark about atomic affairs of the greatest significance.

Three of the five Commissioners, with a combined record of nearly 12 years of service on the Commission, have testified in substance before the Joint Committee that the present Chairman has not taken them fully into **\*3504** his confidence; that they were not informed about certain important actions affecting the atomic energy field; that their access to the President has been virtually cut off; and that there is an increasing tendency to one-man rule in the Commission.

These Commissioners first read in the newspapers the President's speech before the United Nations General Assembly, calling for an international atomic pool of resources to promote peaceful development of atomic energy. Commissioner Smyth, the only scientist on the Commission and senior in length of service, was not even consulted when the Chairman called for an international conference of scientists. A press conference announcement by the President to the effect that atomic weapons have reached optimum size, came as a surprise to the other Commissioners. Since Mr. Strauss became Chairman, none of the others, with the exception of Mr. Campbell, has had an opportunity to visit the White House or to discuss atomic matters with the President.

There was a noticeable and understandable reluctance among these three Commissioners to place on the public record instances of disaffection and discord in the Commission. And there are those who argue that the Chairman was fully within his rights in withholding information from his fellow Commissioners because of his separate and privileged status as special adviser to the Present on atomic energy matters. Nevertheless, there is enough in the testimony, taken together with evidence from other sources, to warrant the conclusion that the Atomic Energy Commission has fallen to a low point in harmony and effectiveness.

In trying to treat generously of the 'strong man' propensities in their Chairman, several Commissioners pointed out that atomic energy is becoming a subject of increasing interest to military men, diplomats, and industrialists; that the difficulties and disturbances in the Atomic energy Commission reflect the changing role of the agency in relation to other agencies of Government and the public; and that, in keeping with these changes, the Chairman necessarily is called upon to take an active part in affairs not directly related to the internal business of the Commission.

There is an important element of truth in these assertions. But the larger truth is that the Congress intended the Atomic Energy Commission to administer the atomic-energy program. There is every reason to suppose that a Commission well organized, with a normal amount of self-discipline and good sense in each Commissioner, with a Chairman possessed of tact and understanding and a degree of administrative ability, can keep the President fully informed and well advised on all atomic-energy matters without distorting the Commission pattern of organization.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

It goes without saying that the President can select whomever he pleases to advise him on atomic energy. It does not go, in our judgment, that the President and the Chairman of the Commission can utilize the device of 'special adviser' to thwart the objectives of the Atomic Energy Act and disrupt the performance of the Commission by putting a blank wall between the Chairman and the other Commissioners.

One of the Commissioners took pains to prepare and submit to Chairman Strauss a detailed memorandum on the latter's dual status as Chairman and 'special adviser' in an effort to determine where the Commission stood. Mr. Strauss himself acknowledged that a 'psychological conflict **\*3505** ' had been created by his two-hat role. He offered to lay aside the hat of 'special adviser' if the other Commissioners so desired. The suggestion ought to be accepted. Maintenance of the integrity of the Commission, of full and equal access by the Commissioners to the information necessary to the proper performance of their duties, will contribute more lasting benefit to the Nation than setting the Chairman on a pedestal closer to the President's ear.

In this context, we are constrained to note that the committee majority, though willing to acknowledge in the bill the 'equal authority and responsibility' of the five Commissioners, were unwilling to write in a guaranty that these Commissioners would have full and equal access to atomic information. The committee report states (p. 10):

The right of the members to have access to all information within the Commission flows from this responsibility and authority.

Undoubtedly this is the case, but explicit statutory affirmation is in order, considering the committee majority's insistence on writing new language with regard to the Chairman's position.

Whether the committee report is intended to mean that atomic information outside the Commission does not come within the purview of the Commissioners' authority and responsibility is uncertain. In any event, we consider the omission of the information guaranty in the bill a sad commentary on the extent to which distrust and suspicion condition the affairs of Government.

Our committee chairman has stated publicly his view that a majority of the Commission at some future time might want to vote to withhold from 1 or 2 Commissioners information on a particular subject. With great affection and respect for our committee chairman, we must say that this suggestion astounds us. It throws doubt upon the ability of a President of the United States to select Commissioners deserving of trust and respect. It throws doubt on the competence of our investigative agencies in checking background of such appointees; and it throws doubt on the judgment and wisdom of the Senate in confirming them.

When and where do doubt and suspicion come to rest if they are carried into the highest levels of government? They will eat like a cancer at the vital organs of free government in a democracy.

### 6. Overriding the Commission's will

The independence and integrity of the Atomic Energy Commission as a commission are seriously threatened not only from within, by the position of dominance assumed by the Chairman, but from without by overriding orders of the President.

The Nation is treated with the unpleasant spectacle of the Commission being ordered, against its better judgment, to enter into a 25-year contract with a private utility syndicate. This contract is not for the purpose of providing utility services to the atomic energy program. It has all the earmarks of a smart play, figured out in the White House and the

Case: 4:23-cv-00006-CDP Doc. #: 148-8 Filed: 01/29/21 Page: 140 of 903 PageID #: 9281
Case: 4:17-cv-00002-CDP Doc. #: 48-8 Filed: 02/06/17 Page: 44 of 93 PageID #: 923
Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

Budget Bureau, to have the Atomic Energy Commission run interference for the private utilities in their contest with the Tennessee Valley Authority.

The committee's immediate interest in this activity stems from the fact that the contract is being negotiated under color of the authority **\*3506** granted in section 12(d) of the McMahon Act, as amended, which section is carried over intact as section 164 of H.R. 9757.

When the Atomic Energy Commission sought and received this authority from the Congress to make long-term contracts, and to pay cancellation charges to the utility groups involved in the event the contracts were terminated, the authority was specifically limited to utility services for the Oak Ridge, Paducah, and Portsmouth installations of the Commission. As the former General Manager, Marion W. Boyer, testified in answer to a question from Congressman Holifield at the time the authorizing legislation was being considered by the committee:

In other words, it is limited to the power requirements for those three installations. It is not a wide-open authority.

Although many Members of Congress had misgivings about this particular grant of authority, which really served no other purpose than the convenience of the private utilities in financing construction of their new plants, the members understandably were unwilling to overturn arrangements already made for supplying electricity to the atomic energy projects. The proposed new contract, however, has nothing to do with the power needs of the atomic energy program. In the words of Commissioners Smyth and Zuckert:

The present proposal would create a situation whereby the AEC would be contracting for power not one kilowatt of which would be used in connection with the Commission production activities (hearings, pt. II, p. 958).

The scheme is for the Commission to maintain its present firm contract for TVA power to run the Paducah plant while contracting for some 600,000 kilowatts of additional power to be delivered by the private utility group to the TVA for service in the Memphis area, several hundred miles away from any atomic-energy installation. In other words, the AEC would become a 'power broker, ' purchasing power it does not need for an area far removed from its activities. The TVA would be forced into buying the power from the private group through AEC instead of building its own plant to serve the Memphis area.

Over the life of the contract, the taxpayers would foot a bill of at least $90 million over and above the cost of power that TVA could produce itself. The $90 million figure is the AEC'S own estimate; the TVA estimate is that this new proposal would result in $140 million added cost to the taxpayers.

The members of the Commission and their General Manager struck us as rather shamefaced about the whole business when they came before the committee. They said in effect: 'This proposal did not originate with us. We don't like it but higher authority has decreed it, and we will be good soldiers and carry out orders.'

The General Manager testified that the proposal 'originated in the Bureau of the Budget as an administration policy.' He cited instructions received from the Bureau of the Budget to proceed with negotiations looking toward a definitive contract, despite his advice to the Bureau 'that the Commission did not agree on the wisdom of AEC entering into this type of contract' (hearings, pt. II, pp. 946 ff.).

**\*3507** Chairman Strauss and Commissioner Campbell were the only Commission members who did not object; in fact; Mr. Strauss had been apprised of the Bureau's intentions at least a month before the matter was brought up at a Commission meeting. The meeting in question was held January 19, 1954, 2 days before the budget message of the President was presented to the Congress, stating that 'arrangements are being made to reduce, by the fall of 1957, existing commitments of the Tennessee Valley Authority to the Atomic Energy Commission by 500,000 to 600,000 kilowatts.' The

'arrangements,' involving discussions with the interested utility groups, had been going on at least since early December of 1953, and, when finally revealed, did not propose to reduce existing TVA commitments to AEC but to compel the TVA purchase of new and additional power from private sources.

Commissioners Smyth and Zuckert, in a joint letter to the Director of the Bureau of the Budget, undertook to express their personal views that the proposed action was 'awkward and unbusinesslike' and 'involves the AEC in a matter remote from its responsibilities.' Commissioner Murray took substantially the same position in testimony before the committee. It is noteworthy that Mr. Murray, as the Commissioner responsibile for initiating the first long-term contract between the Commission and a private-utility group, frankly acknowledged the unsatisfactory performance of that group in comparison with the TVA, and strongly objected to the proposed new contract (hearings, pt. II, p. 1001).

A great deal more is involved here than a simple controversy between private and public power. Is the Atomic Energy Commission, created by the Congress as an independent agency of Government to administer the vast atomic-energy program, which now represents a public investment of $12 billion, to lay aside its collective judgment in deference-- nay, subservience-- to unrelated budgetary and power policies of the current administration?

Who, one may well ask, is in charge of the Atomic Energy Commission? Are there not five Commissioners duly appointed and confirmed under the law, sworn to administer it faithfully, and answerable to the Congress as well as the president for their performance? Or does 'higher authority' take over whenever the Budget Bureau or the White House has a pet scheme to promote?

As Members of Congress and of this committee, we are interested in the efficient performance of Government agencies. We have supported constructive proposals to improve the organization and management of the executive branch. Certainly, the President as the Chief Executive and the appointed heads of the departments and agencies should have the requisite authority to organize their administrative units in a manner conducive to efficient execution of the laws passed by the Congress.

But there is a line to be drawn between Presidential direction of the executive branch for good administration and Presidential usurpation of the authority of independent commissions. The members of the Atomic Energy Commission do not serve at the pleasure of the President. They are appointed by him, of course, but the Senate confirms the appointments, and the period of tenure is fixed by law. The President can remove a Commissioner only for 'inefficiency, neglect of duty, or malfeasance in office.'

 **\*3508** The administration of the atomic energy program is vested by law in the Commission, not in the President. True enough, the President is charged with certain responsibilities of the highest importance, such as directing the Commission to deliver atomic weapons to the Armed Forces for such use as he deems necessary in the national defense; and the President is given extraordinary authority to exempt the Commission from Federal statutes relating to contracts when he determines such action necessary to the common defense and security. But the President is not authorized to substitute his judgment for that of the Commission members in matters committed to their administration, and certainly he is not authorized to direct the Commission to engage in matters foreign to their duties.

For the benefit of the members of the Atomic Energy Commission we say this: The Commission will forfeit the respect of the public and insult the dignity of its high office if it allows itself to become a puppet agency for the execution of purposes alien to the Atomic Energy Act.

Our own committee too has a responsibility in connection with this matter. It is proposing to reenact authority which, in our view, provides no legal justification whatever for the contract under negotiation. None of the three installations named in section 164 of the bill is involved in the proposed new electrical power arrangements, and only by the most

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

violent stretching of an incidental phrase can the General Counsel for the Atomic Energy Commission wrap the cloak of legality around this action.

This latest move of the AEC at the behest of the Budget Bureau illustrates the danger of legislating quickly without laying down adequate standards. As the Federal Power Commission observed in connection with section 164:

Here again the grant of power is without any definition of governing standards, any policy guide, or any limitation of any kind. Apparently this may ratify or authorize ratification of existing contracts. The Federal Power Commission has not indicated any position as to the terms of the contracts heretofore entered into (hearings, pt. II, p. 1133).

We should take the opportunity now to make clear the intent of Congress in originally enacting this section if the plain wording and legislative history of the amendment leave any doubt on that score. We regret that the committee majority has voted down clarifying language and has refused to adopt a motion disapproving the transaction in question. Our responsibility and obligation in this regard are all the greater, since we are asking the Congress to add prerogatives in this bill to the committee's already important jurisdiction and status.

### 7. Limiting AEC power production

A remarkable series of incongruities show up with regard to the power position of the Atomic Energy Commission.

The determination to cast the Commission in the role of 'power broker' under the proposed new contract would commit that agency to continuing responsibilities for a 25-year period in a filed which is external to the Commission's own concerns and power needs.

This contractual arrangement would bring the AEC into the conventional power business as an additional Government agency and tie it to TVA'S future power activities despite the professed intention of that agency and the present administration to limit the role of Government in business.

The AEC already has entered into two long-term contracts, and is about to become involved in a third, for the supply of electrical energy from conventional **\*3509** private sources for the next quarter century, even while freely predicting that electrical energy from atomic sources will be available in the next decade.

Most incongruous of all, the AEC wants to stay out of the atomic power business, a field in which it might be expected to have a legitimate and continuing function.

The Atomic Energy Commission is the largest single consumer of electricity in the world. When presently authorized facilities are completed, the Commission will be utilizing capacity of the New England States. Its consumption of electrical energy in the near future may reach 8 or 10 percent of the Nation's total.

In view of its enormous power needs, which will come to represent an outlay of $150 million to $200 million a year, one would expect the AEC to show initiative and enterprise in adapting its own facilities to supply a substantial portion of these needs rather than to waste the heat energy created by nuclear fission. The framers of the McMahon Act contemplated use of atomic power by AEC as well as the transfer or sale of such power to others when they provided in section 7(d) of the act:

Byproduct power.-- If energy which may be utilized is produced in the production of fissionable material, such energy may be used by the Commission, transferred to other Government agencies, or sold to public or private utilities under contracts providing for reasonable resale prices.

Case: 4:23-cv-00106-CDP Doc. #: 148-8 Filed: 01/29/21 Page: 143 of 903 PageID #: 9324

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Back in 1946 when this section was written, the atomic energy program was centered primarily upon the development and production of atomic weapons. Atomic power was still a remote possibility and the section pertaining to its production was embryonic. Now that we stand on the threshold of the atomic power era and consider legislation designed to usher it in, singular indeed is the fact that the new legislation does not enlarge upon the embryo, so far as AEC production of atomic power is concerned.

Section 7(d) of the McMahon Act is now section 44 of H.R. 9757, dignified only by having a whole section number to itself, and containing a few minor word changes, but still an incidental item tucked away in a corner of the bill instead of becoming a full-fledged set of provisions to launch a positive program of Federal development in the atomic power field. If anything, the language in the new bill is more restrictive than in the existing act.

The Federal Power Commission, in an extended analysis of the proposed atomic energy legislation, criticizes among things the paucity of legislative standards with respect to section 44. It points out that the sale of byproduct power is not a new problem and calls attention to the series of acts in which the Congress has provided detailed and explicit standards governing the disposition of electric power from projects involving the development of irrigation, water conservation, flood control, and navigation improvement projects. The Federal Power Commission then remarks:

Corresponding enunciation of policy in the sale of byproduct power from Government atomic energy installations may present some new or different problems, but the precedents cited are sufficient to suggest that the Congress has been jealous to enunciate the policy to be effectuated by the agency marketing the power and has not been willing to leave the responsibility for policy to the agency (hearings, pt. II, p. 1132).

**\*3510** One of the long-established Federal policies to which the Federal Power Commission adverted is the according of preference to municipal, cooperative, or other public bodies in the sale of federally generated power. Section 44, covering the marketing by the Atomic Energy Commission of surplus energy from its own nuclear operations, contains no such preference. This is in conflict with the policy established by every law governing the marketing of federally generated power within the last 50 years. The section should be amended to accord with established Federal power policy.

The Atomic Energy Commission, whether for lack of a positive congressional mandate or because of preoccupation with atomic weapons has never been a 'power-minded' agency. It has steadily backed away from any concept of Government responsibility for the production of atomic power. It regards the atomic power authorization in section 7(d) of the McMahon Act as incidental and unlikely to be productive of any important achievements. Chairman Strauss describes the AEC'S planned power reactor program for the next few years as a 'minimum program' by choice. The future power role conceived for this agency by the present administration is a narrow and declining one. President Eisenhower said in his message to the Congress of February 17, 1954:

The creation of opportunities for broadened industrial participation may permit the Government to reduce its own reactor research and development after private industrial activity is well established. For the present, in addition to contributing toward the advancement of power-reactor technology, the Government will continue to speed progress in the related technology of military propulsion reactors.

A draft of proposed legislation accompanying the President's message contains this language:

Nothing in this act shall be construed to authorize the Commission to engage in the sale or distribution of electrical energy for commercial use except such energy as may be produced by the Commission incident to the operation of research and development facilities or facilities for the production of fissionable material.

Case: 4:23-cv-00016-CDP  Doc #: 148-8  Filed: 01/29/24  Page: 144 of 903  PageID #: 9825
Case: 4:17-cv-00006-CDP  Doc #: 1-8  Filed: 02/06/17  Page: 48 of 63  PageID #: 9935
Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

That proposed restriction was incorporated in an earlier version of H.R. 9757, but the sponsors were persuaded finally to strike it out. The majority report on the bill, however, construes the restriction to be still applicable to section 44. It states in this regard (p. 15):

This section will permit the Commission to dispose of that utilizable energy it produces in the course of its own operations, but does not permit the Commission to enter into the power-producing business without further congressional authorization to construct or operate such commercial facilities.

We fail to see why the Commission should be enjoined from producing atomic power for commercial use when it would be given broad authority to license others for such production. If the Nation is to realize the maximum power benefits from its investment in this new resource, a positive program of atomic power production by the Federal Government is essential. The history of electrical power development in this country affords ample evidence that a reasonable balance between public and private power serves as the most important check on monopoly control in the vital field of energy resources. The very magnitude of economically feasible nuclear power-plants persuades us to believe that the balance will be thrown heavily in favor  *3511  of private monopoly unless provision is made for Federal development of atomic power, particularly where supply in desired by public or cooperative systems.

The committee members are convinced, for security and perhaps other reasons, and have affirmed in the pending bill, that the special material which produces nuclear energy should remain the property of the United States. Another finding in section 2 of the bill is that--

In permitting the property of the United States to be used by others, such use must be regulated in the national interest
* * *

It is judicially established beyond question in our constitutional system that what the United States owns and permits others to use, it may use itself and dispose in any manner the Congress sees fit, including the transformation of owned resources into electrical energy and the transmission of such energy to market. Private companies engaged in similar and competing enterprises have no vested right to be free from Federal Government competition (Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466; Tennessee Electric Power Co. v. Tennessee Valley Authority, 306 U.S. 118, 59 S.Ct. 366).

## 8. Inadequate power licensing provisions

H.R. 9757 not only fails to mark out a clear and constructive program for Federal production of atomic power; it is altogether deficient in the matter of safeguards to protect the public interest in the licensing of non-Federal agencies to produce and sell atomic power.

As noted above, the nuclear energy resource itself will remain the property of the Federal Government. Thus, in terms of the public interest, the use of nuclear energy and the use of the energy in the falling water of streams should be subject to the same safeguards established by law.

These safeguard involve far more than the bare assurance that the electricity generated from the resource shall be subject to the ordinary processes of utility regulation. They are based on the principles that public resource must be conserved and developed for the best possible use, that it must be always kept open for public use if the people so decide, and that, whatever States may do or fail to do about it, the use must always be directed at providing electricity at the lowest possible rates through preventing private capitalization of the value inherent in the right to use a public resource.

The very fact that there are still six States which have set up no State agency to regulate the rates charged by privately owned electric utilities reveals the extraordinary importance of these public resource safeguards, and the necessity for

S. REP. 83-1699, S. REP. 83-1699 (1954)

their incorporation in any legislation designed to facilitate the use of atomic energy as a source of commercial power. These safeguards for the right of the people to get the full value out of their resources, without any toll being taken above what is necessary to assure the funds required for development, have already been formulated in detail by Congress in the Federal Power Act which prescribes how hydroelectric resources may be used. They include:

(1) Safeguard for the prior right of Federal development of the resource in any specific case where this will best serve the public interest

(2) Safeguard for the prior right of public bodies and cooperatives, as against a private applicant for a license for any specific development of the resource.

**\*3512** (3) Safeguards for the right to public hearing in connection with any application, with specific provision for admission of interested States, State commissions, municipalities, representatives of interested consumers or competitors as parties.

(4) Safeguards for the right of Federal or other public recapture of any development by a private licensee at the end of the license period on payment of no more than the license's net investment in the project.

(5) Safeguards for reasonable rates to consumers by provision requiring licensees as a condition of any license to agree to Federal regulation where States have provided no regulation of electric rates, with further provision that in any rate proceeding the licensee can claim no more than net investment in the development for rate base purposes.

(6) Safeguards for the preferred position of public and cooperative electric systems to obtain power supply from Federal development of the resource.

The bill, as reported, is wholly lacking in such safeguards. It would enable the Atomic Energy Commission to turn this greatest energy resource over to private power monopoly under licenses unconditioned except for the requirements of national security and public health and safety. Aside from section 271, providing that nothing in this act shall affect the authority or regulations of Federal, State, and local regulatory agencies, it is barren of any recognition of the public interest in securing electric energy from this new resource at the lowest possible rates. Experience has shown clearly that such regulatory authority is entirely inadequate to protect the public interest in electric power developed from public resources, unless supplemented by specific standards governing licenses and the availability of public or cooperative competition in the distribution of electric energy.

The bill includes no provision to encourage public or cooperative distribution of nuclear power. Furthermore, it includes no provisions assuring that privately owned electric utilities producing nuclear electric energy under license from the Commission shall sell the power at the lowest possible rates consonant with sound business practices.

The following comments on specific licensing features of the bill indicate what we consider essential requirements for protection of the public interest in the use of this new public resource for the generation of commercial electric power.

Section 103(b), establishing the minimum qualifications for applicants for commercial licenses to construct, own, and operate facilities for the utilization and production of special nuclear material or atomic energy, contains no provisions requiring agreement by the applicant, where the end result is generation of electric energy for sale, to claim no more than net investment in such facilities for ratemaking purposes. Such a limitation is placed upon all licenses for use of the people's waterpower resources under the Federal Power Act. This section of the bill should be amended to bring it in line with established Federal power policy.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Section 103(c), providing for a limitation on the term of commercial licenses issued by the Commission for the ownership and operation of facilities for the utilization and production of special nuclear material or atomic energy, contains no provision for the right of the United States, after reasonable notice, to take over, maintain, and operate such facilities at the end of the license period on payment to the licensee of its net investment, plus **\*3513** severance damages, if any. All private hydroelectric power developments, licensed under the Federal Power Act, are subject to such a provision. This section should be amended to bring it in line with established Federal power policy.

Section 182(b), providing for due notice to the public before the issuance of any license for utilization or production facilities which generate commercial power, is lacking as to both breadth of notice required and provision of specific procedures in connection with license applications to assure full protection of the rights of interested parties. It also lacks specific recognition of those interests whose rights may be affected by Commission action or whose participation may be in the public interest.

To dure these deficiencies, where generation of nuclear-electric power is the primary purpose involved, we believe the section should be amended to provide that notice of applications shall also be sent to municipalities and to public and cooperative electric systems within transmission distance; that, in case of protests, conflicting applications, or proposals for special conditions, interested parties shall be accorded opportunity for intervention, hearing, petition for rehearing, and appeal, in general accord with the procedures now prevailing under Federal power legislation; and that the Commission may admit as parties interested States, State commissions, municipalities, public and cooperative electric systems, or representatives of interested consumers or security holders, or any competitor of a party to such proceedings, or any other person whose participation may be in the public interest.

Section 182(c), providing for preferred consideration to applications for facilities which will be located in high-cost power areas in the United States, lacks a similar provision which has been the policy of the Government since the Federal Power Act became law in 1920, according preferred consideration to public bodies where their applications conflict with those of privately owned systems. We believe this lack should be overcome to bring the section into line with establishing Federal power policy.

Section 183, providing specific terms which must be included in licenses for the ownership and operation of facilities for the utilization or production of special nuclear material or atomic energy, is completely lacking in provision for Federal accounting control of licensees where such licensees are not also engaged in the transmission of electricity or sale of electricity in interstate commerce for resale. Such accounting control should be vested in the Federal Power Commission which is responsible for such regulation over licensees for hydroelectric power developments, and is provided for, with enforcement authority, in sections 301, 302, 304, and 306 of the Federal Power Act. We believe that the bill should be amended to make these sections applicable to licensees for atomic power development.

Section 185, providing for the issuance of construction permits to applicants whose applications are otherwise satisfactory to the Commission, should be specifically subject to the same procedural safeguards, assuring interested parties full opportunity for notice, hearing, and appeal before issuance, as are provided in connection with the issuance of licenses under section 182. We believe that the section should be amended to make the same procedure specified in section 182 mandatory before construction permits are issued.

The parallels between electrical energy from nuclear and hydropower sources were called to the attention of the committee in earlier hearings during **\*3514** the summer of 1953 by a member of the Federal Power Commission and again during the present hearings by Chairman Kuykendall of the Federal Power Commission, who supplied a detailed analysis of pending atomic-energy legislation. This material will be found in part II of the committee's recent hearings at pages 1124 through 1133.

S. REP. 83-1699, S. REP. 83-1699 (1954)

In view of the Federal proprietary interest and congressional authority in the field of atomic energy, the Federal Power Commission observes--

* * * it becomes pertinent to test any legislative proposals with respect to non-Federal development of atomic energy to see whether the public interest in atomic energy is protected and benefited as adequately as the Congress of an earlier generation sought to do for the Nation's interest in water power (p. 1128).

The Federal Power Commission observes further that--

* * * the grant of the (license) privilege should depend not solely on the negative consideration that national defense will not be harmed, but on the affirmative ground of benefit to the public interest in electric power and other products of the operation of nuclear reactors as well (ibid.).

Unfortunately, the present bill reflects nothing of this advice from the Nation's outstanding independent power agency, but relies mainly on negative considerations in licensing. The analysis of the Federal Power Commission is sufficient to indicate that the bill is still incomplete, so far as it comes within the scope of power policy.

### 9. Need for Division of Civilian Power Application

Our concern goes not alone to the omission of public interest safeguards in power licensing. If the use of nuclear energy as a source of commercial electric power is to be accorded the consideration which its importance warrants, this should be reflected in the statutory organization of the Commission. It cannot be left wholly to the discretion of the Commission which may be at any given time, and is now, weighted in favor of playing down the Government responsibilities in this field.

Specifically, we believe there should be a statutory Division of Civilian Power Application, counterbalancing the statutory Division of Military Application, with positive responsibility for the commercial development of nuclear electric power by Federal or non-Federal public and private agencies.

There should also be an Electric Power Liaison Committee, corresponding with the Military Liasion Committee, with provision for full cooperation between the Atomic Energy Commission and those Federal agencies responsible for carrying out other phases of Federal power policy. This would provide a basis, now lacking in the bill, for Federal construction and operation of nuclear powerplants where required in connection with Federal regional programs.

The Electric Power Liaison Committee might well be composed of one representative each of the Federal Power Commission, the Securities and Exchange Commission, the Rural Electrification Administration, the Tennessee Valley Authority, the Bureau of Reclamation, the Bonneville Power Administration, the Southwest Power Administration, the Southeast Power Administration, and the Corps of Engineers, with an independent Chairman appointed by the President, by and with the consent of the Senate, serving at the pleasure of the President.

  **\*3515** This Committee would advise with the Atomic Energy Commission in connection with all activities directed at the development of power from nuclear energy with a view to assuring its maximum contribution to the general welfare. Such advice would include assistance in the formulation of standards as specific problems arise. But dependence on ad hoc decisions alone for the determination of standards affecting the economics of atomic power development and use would be unsatisfactory in the extreme. It is for this reason that we favor amendments which would authorize and direct the Division of Civilian Power Application and the Federal Power Commission, in their respective spheres, to apply substantially the same public interest safeguards in connection with the licensing of atomic powerplants as are applied in licensing hydroelectric developments under the Federal Power Act.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

The Nation's interest in ample supplies of low-cost electric power to meet the requirements of an expanding economy is great. It reaches into every farm home and commercial or industrial establishment. It makes the difference between vigorous and retarded regional development. It is a vital factor in the economical operation of farms. It contributes to continually rising living standards. All this has been emphasized in many official reports, including that of the President's Materials Policy Commission, which made an exhaustive analysis of the future requirements of our civilization.

The quality of the legislation which opens the atomic energy resource to development as a part of the country's total energy economy will have a profound effect on the attainment of these goals. We are convinced that enactment of the present bill without mature consideration of the changes which we propose would be a disserve to the people of the United States. No delay required to perfect the bill to meet the requirements of the general welfare could result in a minute fraction of the losses that would inevitably follow an ill-considered transfer of atomic power development to private monopoly.

10. 'Passing the buck' on monopoly prevention

The fact that electrical utilities are more or less natural monopolies in the areas they serve makes it unlikely that the antitrust provisions in section 105 of the bill will have any important bearing on the licensing of utilities for atomic power production and distribution. Indeed that section empowers the Atomic Power Commission, with the approval of the Attorney General, to exempt such classes or types of licenses as it may determine would not significantly affect the licensee's activities under the antitrust laws.

With regard to the provisions of section 105 generally, we believe it is a mistake to relieve the Commission of the affirmative responsibility contained in the McMahon Act, and deleted in this bill, to exercise its licensing authority in a manner to prevent the growth of monopoly or restraint of trade. Section 7(c) of the McMahon Act reads in part:

Where activities under any license might serve to maintain or to foster the growth of monopoly, restrict of trade, unlawful competition, or other trade position inimical to the entry of new, freely competitive enterprises in the field, the Commission is authorized and directed to refuse to issue such license or to establish such conditions to prevent these results as the Commission, in consultation with the Attorney General, may determine. The Commission shall report promptly to the Attorney General any information it may have with respect to any utilization of fissionable material or atomic energy with appears to have these results.

**\*3516** Section 105a of H.R. 9757 would permit the Commission to suspend or revoke a license only after a court of competent jurisdiction has found a licensee to be guilty of violating the antitrust laws. It seems to us that here the Commission locks the bar after the horse is stolen. In a new, developing field of industrial endeavor, resort to the cumbersome and protracted procedures, sometimes extending over many years, which eventuate in final adjudication of antitrust violations, can have little effect in assuring the maintenance of free competitive enterprise.

Section 105c of the bill does add a procedure whereby some preventive action can be taken against monopoly or restraint of trade. It is left to the Attorney General or the Federal Trade Commission to determine whether 'the proposed license would tend to create or maintain a situation inconsistent with the antitrust laws.' In the event of such a determination, the applicant is permitted to file a petition with the Federal Trade Commission for a hearing, and if the Commission finds adversely, the applicant would have recourse to the courts.

We are uncertain as to the legal effect of a court finding which would put an applicant in a position 'inconsistent with the antitrust laws' without necessarily being guilty of violating the antitrust laws. In any event, we see little validity in the arguments which led the sponsors of the bill to relieve the Atomic Energy Commission of the affirmative responsibility cited above.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

A review of Federal statues demonstrates rather convincingly that many departments and agencies of the Federal Government are charged by law with such positive responsibility and authority to prevent or discourage monopoly of other restraints of trade, or to actively promote competition and participation by small business, in various fields of endeavor. It is specious reasoning, in our opinion, to say that Atomic Energy Commission, as the agency charged with the administration of the atomic energy program, should pass wholly on to others the responsibility for taking steps to insure equality of opportunity by all businesses, large and small, to participate in that program and to share the privileges and benefits arising from it.

## 11. Limiting access to patents

Intimately tied up with the crucial issues of monopoly or competition in the atomic energy field is the extent to which private patents are authorized and others have access to the patented inventions or discoveries.

The patent question is one of the most controversial in the atomic energy field. It arose in the very beginning, when the drafters of the McMahon Act decided to make an outright ban on patents for inventions or discoveries which concerned the production of fissionable material or the utilization of such material in atomic weapons. In the nonmilitary field, patents could be granted, but were subject to a 'public interest' declaration under stated conditions, in which case the Atomic Energy Commission and its licensees automatically were entitled to their use, with reasonable compensation to the owner. This constituted a form of compulsory patent licensing.

Since the licensing provisions of the McMahon Act were never utilized, and the Commission acquired practically all of its patents through arrangements with its contractors, who were operating with public funds, the 'public interest' provision remained a dead letter. It is this feature which H.R. 9757 adopts with modifications, broadening the permissible area of private **\*3517** patenting and authorizing others to have access to the patented inventions or discoveries under certain conditions.

An earlier version of the pending bill proposed to remove the ban on patents in the production of special (fissionable) material, whether for industrial or weapons uses, leaving only the patent ban on utilization of special material in an atomic weapon. The provision for 'public interest' declarations also was eliminated, in effect opening up the whole nonmilitary atomic energy field (and part of the military) for private patenting without any obligation to license others in the use of the patented inventions or discoveries.

We commend the committee majority for withdrawing those earlier provisions and for recognizing in the report (p. 9) that the dangers of restrictive patent practices are present because few firms may be involved in the atomic energy program for the immediate future. The fact that a few large industrial corporations, as contractors to the Atomic Energy Commission, have acquired an overwhelming head start on would-be competitors by virtue of technical know-how acquired on the inside, is enough to warrant the utmost care on the part of the Congress in legislating patent privileges.

The committee has reverted substantially to the position taken by President Eisenhower when he said in his message of February 17, 1954, to the Congress:

Until industrial participation in the utilization of atomic energy acquires a broader base, considerations of fairness require some mechanism to assure that the limited number of companies, which as Government contractors now have access to the program, cannot build a patent monopoly which would exclude others desiring to enter the field. I hope that participation in the development of atomic power will have broadened sufficiently in the next 5 years to remove the need for such provisions.

While we believe that the President's proposal for compulsory patent licensing is necessary until such time as interested industrial concerns are on a more equal footing in their acquisition of skills and experience in atomic technology, we

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Case: 4:23-cv-00006-CDP Doc. #: 1-8 Filed: 01/29/21 Page: 150 of 903 PageID #: 981

believe both the President and the sponsors of this bill are unduly optimistic in the hope that a period of 5 years will suffice to reach that stage. It will take at least 5 years to construct a sufficient number of reactors for making comparative evaluations of performance, and it will take at least 5 years more to accumulate the economic and engineering data for these evaluations.

The Congress would be better advised, as an able patent attorney and former Deputy General Counsel of the Atomic Energy Commission testified before the committee, to strike the September 1, 1959, termination date and leave open the time for legislative removal of compulsory licensing. The Congress could then enact the necessary legislation at such time as a broadened industrial base for atomic energy became evident. At the very minimum the period of compulsory patent licensing should extend for 10 years.

The question next arises whether the language of the bill is designed to make effective the compulsory licensing of patents or whether it is designed to make this process difficult and unusual. Although it is not easy to judge the effect of the prolix and unduly cumbersome provisions in this regard, we are inclined to the conclusion that the compulsory licensing provision is an extremely limited guaranty of accessibility to patented inventions.

**\*3518** Perhaps the simplest way to establish compulsory licensing would have been to carry over the provision in section 11(c) (2) of the McMahon Act which provides that whenever any patent is declared by the Atomic Energy Commission to be affected with the public interest, not only is the Commission automatically licensed to use the invention or discovery covered by the patent (a provision retained in the present bill), but any person licensed by the Commission automatically is licensed to use the invention or discovery covered by the patent.

Under section 152 of the pending bill, whenever a patent has been declared affected with the public interest, the Commission automatically is licensed to use the invention or discovery covered by such patent, but another person desiring to use the patented invention or discovery must apply to the Commission for a patent license, which shall be granted to the extent that the Commission finds that the invention or discovery is of primary importance to the conduct of an activity by such person authorized under the act.

In other words the initiative and the burden of proof now would lie with the applicant who must demonstrate to the satisfaction of the Commission that the use of the invention or discovery is of primary importance to his business. The limiting aspect of this requirement was brought to the attention of the committee in earlier hearings by Caspar Ooms, a patent attorney, formerly United States Patent Commissioner and Chairman of the AEC Patent Compensation Board. Mr. Ooms, who suggested patent revisions in the McMahon Act very similar to those now embodies in H.R. 9757, testified before the committee last July (pp. 458-9) that by eliminating the automatic licensing feature of the McMahon Act even though a patent is declared affected with a public interest:

\* \* \* each applicant for a license must demonstrate separately that the license is necessary to effectuate the policies and purposes of the act. This restriction is maintained to make the invocation of this licensing power an exception and an infrequently used device. It is intended to guard against the fear that the inventor who is willing to devote his resources to making developments in this field would be compelled to share his contributions with his competitors and to insure that he will be required to give licenses only in the extreme and infrequent situation where that is necessary to accomplish the designs of this legislation.

Before a patent reaches the stage of being declared affected with the public interest, several other conditions are interposed by H.R. 9757. In the first place the patent owner is entitled to a hearing before such declaration. Presumably he could present arguments why the patent should be withheld from the public interest sphere, and, if overruled, could appeal to the courts under the Administrative Procedure Act, as provided in section 181. Court action, conceivably, could consume a goodly portion of the 5-year period in which the compulsory licensing requirement obtains.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

S. REP. 83-1699; S. REP. 83-1699 (1954)

Secondly, declaring a patent 'to be affected with the public interest' would be optional or discretionary with the Atomic Energy Commission, whereas under the McMahon Act the declaration is mandatory provided two conditions are met. The pertinent provision of the McMahon Act follows:

(1) It shall be the duty of the Commission to declare any patent to be affected with the public interest if (A) the invention or discovery covered by the patent utilizes or is essential in the utilization of fissionable material or atomic energy; and (B) the licensing of such invention or discovery  *3519  under this subsection is necessary to effectuate the policies and purposes of this act.

In contrast section 152a of the pending bill provides:

The Commission may, after giving the patent owner an opportunity for a hearing, declare any patent to be affected with the public interest if: (1) the invention or discovery covered by the patent is of primary importance in the production or utilization of special nuclear material or atomic energy; and (2) the licensing of such invention or discovery under this section is of primary importance to effectuate the policies and purposes of this act.

It will be noted that under the present bill the concept of 'primary importance' applies to two conditions, whereas in the McMahon Act the mere fact of utilizing fissionable material or atomic energy satisfies one of the conditions. Under the present bill, conceivably, the Atomic Energy Commission could decide that an invention or discovery is of primary importance in the atomic energy field but is not of primary importance to effectuate the purposes of the act. 'Primary importance' is a strong phrase, and its strength is doubled in section 152a of the bill. We can conceive that many inventions or discoveries would not meet the double-strength criterion and yet be important.

Furthermore, it must be borne in mind that what may be of primary importance to the small business may not be of primary importance to the Atomic Energy Commission or to the atomic energy field generally.

If the 'public interest' feature of the patent survives the objection of the owner and the hearing procedure, and meets the double test of primary importance under section 152a, then a person may apply for a license under 152b, which requires still a third test of primary importance.

In the event the Commission fails to make a 'public interest' declaration, prospective or actual licensees or persons otherwise authorized may apply to the Commission under section 152c for a patent license for the use of a patented invention or discovery. The Commission then undertakes a hold a hearing within 60 days (sec. 152d) and must issue the license (sec. 152e) if it finds that the invention or discovery meets three tests of 'primary importance ' and an additional condition.

The application that can survive this procedure will be an impressive one indeed. The patent attorneys may derive more satisfaction from section 152 than the would-be user of the invention.

In issuing a patent license under section 152e, the 'primary importance' of which is triple tested, still the Commission itself would not be automatically licensed to use the invention or discovery. We believe the same privilege of automatic licensing for Commission use should apply here as in the case of 'public interest' patents under section 152b.

In the event the Commission turns down a patent license application for failing to meet the three 'primary importance' criteria under sections 152a and 152b, it is unlikely that a license application for the same invention or discovery under section 152c would ever come within reach of meeting the three 'primary importance' criteria of section 152e. The unlikelihood is the more apparent in case two or more applicants desire the use of the same patented invention, for the Commission would then be faced with the dubious proposition under section 152e (3) that the use by each is 'of primary importance to the furtherance of policies and purposes of this Act.'

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

**\*3520**  In connection with research, we note a serious omission in the patent sections of H.R. 9757. The provision contained in section 11(b) of the McMahon Act and carried over to an earlier version of the pending bill, which prohibited any patent rights with respect to any invention or discovery to the extent used in research and development activities in the atomic-energy program, has been deleted.

Failure to enact this provision undoubtedly would be a deterrent to research. It would appear that those desiring to utilize patented inventions or discoveries in research would have to go through the cumbersome procedures of applying for a patent license under section 152c, d, e, f, and g. The elimination of this patent ban in research, for reasons which are not clear to us, is contrary to the recommendations of the Atomic Energy Commission. We believe the provision should be reinstated.

Other questionable features in the patent sections we note as follows:

While patents are banned in the case of inventions or discoveries useful solely in the utilization of special nuclear material or atomic energy in an atomic weapon, they are not banned in the production of such material. Since special nuclear material can be utilized both for weapons and non-weapons, apparently a producer of such material could get a patent on basic production processes whether the material is used for weapons or not. We do not believe that the area of patentability should extend to inventions or discoveries that affect the weapons field.

Although drastic penalties are provided for violations of certain provisions in the bill, no penalty is provided for failing to report inventions or discoveries under section 151c, which could involve matters of strategic significance to the atomic-energy program.

The Patent Compensation Advisory Board created under section 156a, being 'advisory' only, apparently could not be delegated authority to make final decisions, as under the McMahon Act, in the event the Commission found itself bogged down with matters of compensation, awards, and royalties to the detriment of major responsibilities.

## 12. Built-in subsidy feature

Section 2h of the bill makes this finding:

It is essential to the common defense and security of the United States that title to all special nuclear material be in the United States while such special nuclear material is within the United States.

Accepting as fundamental to the legislation this finding, which is implemented in section 52 and other sections of the bill, nevertheless we wish to point out some of its implications for the development of atomic-energy enterprise.

What this bill proposes in effect is to relinquish the Federal Government's exclusive ownership rights in the facilities which produce or use nuclear material but to retain its exclusive ownership rights in the material itself. As a consequence, the incidents of private and public ownership are intermingled in such a way that not only may vexations problems of administration and accounting control arise, but the private companies licensed for a maximum period of 40 years to own and operate production facilities (atomic reactors) legally can depend on the Government to compensate them adequately for whatever they produce during the life of the license. This constitutes a built-in subsidy for licensed atomic enterprise until about  **\*3521**  the year 2000 A.D. The subsidy implications have been recognized and objected to by industrial spokesman appearing before our Joint Committee.

Since the Government, under the bill, owns any nuclear material which now or may hereafter be produced in privately owned plants, it cannot refuse to take and pay for what is produced. If the Government pays less than the cost of

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

production in a given plant, the action would, in effect, be confiscatory. Therefore the provision in section 56 of the bill that the Atomic Energy Commission shall pay the same fair price to all licensed producers of the same material means that the highest cost and least efficient producer will set the pace on price schedules.

The fact that the Commission is obligated by the same section to consider the value of the material for official Government use in determining a fair price constitutes no ground for paying less than it costs to produce the material. Conceivably, by some happy turn of international events, the Government's requirements of material for atomic weapons could be drastically reduced; and new discoveries of source materials or greatly improved processes of production in the Government's own plants could yield a surplusage of material, reducing its value to the Government to virtually nothing. Still the Government would have to take the material it owns off the hands of private producers at a price fair to them for the 40 years during which they may be licensed to do business.

Even though the Commission can establish 'guaranteed fair prices' for only 7 years at a time, as provided in section 56, the Commission is not thereby relieved of the obligation to pay fair prices throughout the life of the license.

If the Commission, to forestall the possibility that it may be saddled in the future with huge amounts of nuclear material it doesn't need or want, insists on writing into licenses under section 53e or section 183 a cancellation provision against such contingencies, or issues licenses for a much shorter period than 40 years, it is obvious that few firms would be persuaded to enter the field under such uncertainties.

Again, to forestall such conditions, the Commission might easily persuade itself to grant licenses to only a handful of the largest or most efficient producers, thereby denying wide access to competing industrial firms or other interested sectors of industry.

The intertwined complexities implicit in the obligation to compensate producers for the material automatically owned by the Government and to charge licensed users for such material, create further subsidy possibilities.

Section 53 deals with the Commission as a distributor of special nuclear material to qualified applicants, including licensees under section 103; while sections 52 and 56 deal with the Commission as a purchaser of special nuclear material from licensed producers who produce such material in the burning of the nuclear fuel secured from the Commission. In the first instance, the Commission is authorized to make a 'reasonable charge,' in the second, to pay a 'fair price.' But the vague generalities set up in lieu of standards to guide the Commission in determining both these critical figures leaves a degree of discretion in the administrative body that would enable it to pay considerably more for the production than it charged for the original supply of special nuclear material, thus affording private utilities, let us say, subsidies of undetermined magnitude for their participation in the development **\*3522** of nuclear power. Such subsidies resulting from dual transactions might well escape the public eye.

The Federal Power Commissions analysis submitted by Chairman Kuykendall, in pointing out the lack of legislative standards and the subsidy possibilities for electric utilities in the sections discussed immediately above, added this note:

If subsidies are to be permitted, consideration should be given to the question of the desirability of provisions for passing the benefits of such subsidies on to the public (hearings, pt. II, p. 1131).

The legal ramifications of the intermingled incidents of public and private ownership in nuclear-producing facilities have not been explored by the Committee. We venture to suggest that private firms, including utilities, may very well find themselves subject to a variety of Federal statutes affecting Government business in private plants, including the Walsh-Healey Act and other labor standards laws, inasmuch as the nuclear material used in their operations will be Government property.

S. REP. 83-1699, S. REP. 83-1699 (1954)

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

### 13. Omission of labor-management provisions

Labor strikes at the Oak Ridge and Paducah plants of the Atomic Energy Commission at the very time when comprehensive legislation to revise the Atomic Energy Act is before the Congress, serves to highlight an area of legislative concern which the sponsors of H.R. 9757 have completely ignored.

Chronic discontent and frequent strife are attributes of employment in atomic occupations. The labor unions in these occupations believe they are unduly handicapped by the use of secrecy and security as a weapon of management to bludgeon their members into submission and to distort or nullify the procedures of collective bargaining. Many union representatives believe, too, that the Atomic Energy Commission has been completely oriented to the management side in labor disputes.

Whether or not legislative provisions can be written to alleviate the persistent sore spots in atomic labor-management relations, certainly the legislation can at least provide for more effective labor-management representation in the councils of the Atomic Energy Commission. The American Federation of Labor representative who testified before our Committee on two separate occasions has voiced the federation's belief that steps toward this end would have a salutary effect. He also observed (hearings, pt. I, p. 278):

It is worth noting that the membership of the Atomic Energy Commission and other top jobs in that agency have been filled by individuals drawn from the legal profession, Government, business, and finance. Corporation lawyers, investment bankers, Government bureaucrats would seem to be blessed in some mysterious manner with a genius for administering atomic-energy affairs that has been denied to trade-union leaders and officials. We believe that in the ranks of organized labor there are many able and public-spirited administrators who could bring a fresh view to the Atomic Energy Commission and its work and perform a very useful service.

Although the legislation cannot dictate whom the President should appoint to the Commission, at least it can provide for a labor-management advisory committee, coordinate with other advisory committees provided in the bill. Such a committee might well be composed of equal numbers **\*3523** of management and labor representatives, with a public chairman appointed by the President, by and with the consent of the Senate, and serving at the pleasure of the President.

The fields of interest and attention on the part of the labor-management advisory committee would encompass more than assistance in promoting healthier attitudes toward collective-bargaining problems in an area hedged in by difficult security requirements.

The whole difficult area of personnel security, which would involve, under this bill, investigations by the Civil Service Commission and the FBI of the 'character, associations, and loyalty' of privately employed persons having access to restricted data, might well come under the continued scrutiny of the labor-management advisory committee.

Assistance could be provided in the application of safety standards, adequate workman's compensation provisions, and other protective measures in licenses for new and hazardous atomic occupations.

Studies and preparatory steps could be undertaken to minimize the impact of atomic enterprises in industries or areas whose populations depend on competing activities for a livelihood. The economic distress of the coal-mining industry, for example, might become even worse by the substitution of atomic fuel for coal in generating electrical power.

The framers of the McMahon Act had such eventualities in mind when they wrote a requirement for the 7 (b) report discussed above. The special Senate Committee on Atomic Energy reported in 1946 (79th Cong., 2d sess., S. Rept. 1211, p. 20):

S. REP. 83-1699, S. REP. 83-1699 (1954)

The committee is aware, nonetheless, that the sudden introduction of certain devices utilizing the power released by nuclear fission might precipitate profound economic disorganization. Great industrial installations representing nation-wide investments, employing many thousands of workers, might be rendered obsolete.

### 14. Complicating international arrangements

We stated at the outset our conviction that international matters relating to atomic energy would be better treated in legislation separate from that which seeks to open the atomic field to domestic private enterprise and profitmaking opportunities. Our dependence on foreign sources of uranium, our mutual defense requirements, our moral and economic obligations to assist less privileged nations, our never-ending search for world peace-- all these would seem to pose problems of an order and magnitude that press more urgently for solution than how to make a profit from the atom.

Some years ago our Government outlined a plan for the international control of atomic weapons. The plan embraced procedures, carefully drawn, to provide for the gradual transfer of our atomic facilities to international control without endangering national security. It was conceived that the international atomic authority would maintain an inspection system to make sure that no nation would deviate from the control arrangements for aggressive ends.

The Soviets would have no part of this plan. In those days, especially before they had atomic weapons, they insisted that such weapons be banned outright by treaty rather than put under the control of an international authority. Nor did they take kindly to the idea of inspectors **\*3524** coming behind the Iron Curtain. In the face of persistent and stubborn refusal by Soviet Russia to consider a control agency, our plan became dormant.

But the United States has never abandoned as a stated policy its willingness to participate in a really effective program of atomic armament control. The goal may be too remote for achievement in our time, but certainly we should do nothing to throw obstacles in the way of that achievement. Whether the creation of vested ownership rights in atomic facilities by private persons will narrow our opportunities to negotiate in matters which may determine the life or death of civilized society is a question deserving of our most earnest consideration.

When President Eisenhower proposed in an address to the United Nations General Assembly the creation of an international agency to develop peacetime uses of atomic energy, new hope was kindled among peoples everywhere that somehow this might be a vehicle for promoting world peace. Even the Soviets did not dare to ignore the compelling force of this appeal for cooperative peaceful endeavor.

Reportedly, our Secretary of State entered into preliminary discussions with the Soviets on the President's proposal. So far as we know, nothing productive resulted from these meetings. Although the dismal record of Soviet intransigence leaves little to hope for, we see nothing to be gained by closing the door entirely to possible participation by Soviet Russia in an atomic pool plan for peaceful uses.

Section 124 of the bill would seem to close that door. Whereas the President would be authorized to enter into an international arrangement with a group of nations providing for international cooperation in the nonmilitary applications of atomic energy, and to cooperate with that group in specified atomic endeavor, the proviso is entered that the cooperation must accord with the conditions presented in section 123.

Section 123 requires that agreements for cooperation cannot be undertaken until a series of conditions are fulfilled by the other nation or nations involved, including acceptable security safeguards and standards. It would be utterly unrealistic to suppose that Soviet Russia could ever comply with the security and other requirements laid down in section 123, even though the atomic pool is intended for nonmilitary uses.

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

The international atomic pool provision comprising section 124 seems to be a last-minute insertion to suggest that the bill is intended to implement President Eisenhower's proposal. Actually, the legislative requirements, if any, of the atomic pool proposal never have been communicated to us. President Eisenhower in his February 17 message to the Congress making recommendations for legislation to facilitate cooperation in atomic affairs with other nations, stated as follows:

These recommendations are apart from my proposal to seek a new basis for international cooperation in the field of atomic energy as outlined in my address before the General Assembly of the United Nations last December. Consideration of additional legislation which may be needed to implement that proposal should await the development of areas of agreement as a result of our discussions with other nations (83d Cong. 2d Sess., H. Doc. No. 328, p. 4).

Not only would section 124 preclude the 'new basis for international cooperation' which the President seeks; the wording of the section is **\*3525** confusing and self-contradictory. It would authorize the President to enter an 'international arrangement,' which by definition in section 11 k excludes 'any agreement for cooperation'; and yet section 124 requires that an 'agreement for cooperation' is necessary if the desired cooperation is to be exercised.

The United States might very well find itself in the position under section 124 of consummating agreements with other nations without being able to exercise the cooperation promised by the agreement unless such cooperation conformed rigidly to the formula contained in section 123.

If the contention is that the President could further the atomic pool idea by the conventional treaty route, or by an international agreement (which requires approval by both Houses of Congress under the bill) independent of section 124, then it is difficult to see what purpose the section serves, except a restrictive one.

The President has broad authority now to negotiate treaties under the Constitution. Section 124 attempts to prescribe a rigid and more restrictive formula of negotiation upon the President and his Secretary of State. The authority to negotiate treaties in our opinion should be left unfettered, subject always of course to Senate debate and final ratification.

No additional authority is conferred upon the President by the second method embodied in the term 'international arrangement,' I.E., 'international agreement.' The President already has the right to send to Congress any international agreement for legislative approval.

Section 124 on its face seems to authorize the President to 'enter into an international arrangement with a group of nations,' but the proviso requires compliance with the provisions of section 123, which provides for bilateral agreement only between the United States and an individual nation on all peacetime exchange of nuclear material or nuclear information. The reference therefore to a 'group of nations' is misleading because of the proviso. Again it is restrictive and inflexible rather than helpful. It could prove to be embarrassing.

While President Eisenhower's original proposal evidently contemplated a single international atomic pool for peacetime purposes under one universal agreement, our country may be obliged, or may wish, to proceed by smaller group or regional stages, particularly in view of the Soviet Union's negative response. If the negotiations must be undertaken through a bilateral approach, then the language of section 124 which on its face indicates a multilateral agreement, again becomes ambiguous and restrictive on the President.

Section 124 appears to us a premature attempt to legislate in a delicate field where international diplomatic negotiations are pending, and it conflicts with the President's admonition in his message to the Congress that legislation to implement the atomic pool proposal 'should await the development of areas of agreement as a result of our discussions with other nations.'

S. REP. 83-1699, S. REP. 83-1699 (1954)

Section 123, which sets forth a method of cooperation other than treaties or international agreements, is the principal section of the bill dealing with the authority of the President to make executive agreements on the international plane. The President cannot make any such agreement unless it is approved by the Atomic Energy Commission or, in case of agreements **\*3526** related to defense and military matters, by the Department of Defense. Note that the Atomic Energy Commission is an independent agency whose members serve, not at the pleasure of the President, but for a fixed statutory term.

We seriously question the subordination of the President's authority in the conduct of foreign affairs to the judgment of officials who may not be in a position to weigh the importance of countervailing risks, as is the President. In the present juncture of world affairs it cannot be assumed in case of doubt that no agreement is preferable to the only obtainable agreement, even though the obtainable agreement has not all the provisions which those charged with the technical judgments would like it to have. In place of requiring the consent of the Atomic Energy Commission or the Department of Defense, we would prefer merely that the President, before making an agreement, be required to obtain a statement from the Commission or the Department of Defense as to the desirability and sufficiency of the agreement in respect to the matters referred to in section 123a.

Many of the provisions in section 123 as well as some of the provisions in section 144 to which we will refer seem in part to be based on the obsolete and false assumption that we have a monopoly of atomic materials and weapons, that our allies have only what we give them and will have nothing to give in return. We know that Great Britain, for instance, has manufactured and explored atomic bombs.

Section 144a and section 144b both carry a proviso that international cooperation shall not involve the communication of restricted data relating to the design and fabrication of atomic weapons except as to limited external characteristics. Taken in conjunction with the broad definition of 'design' in section 11i, which includes drawings, blueprints, etc., and the development data behind the design, these restrictions ultimately may work to our own disadvantage. They hark back to the time when we had or thought we had a monopoly in this field.

While it is not suggested that there should be a free interchange of restricted data, we fear that any blanket refusal to exchange restricted data under any and all circumstances in the future might debar us from cooperation in particular projects where we might have much more to gain than to lose. Great Britain, for example, might come up with dome discovery comparable in this field to the jet engine in aviation and might be debarred from working with us on it because of our own shortsighted and nonreciprocal policies.

Having in mind that a 1951 amendment which comprises section 10(a)(3) of the McMahon Act set forth similar restrictions on communicating design and fabrication data, nevertheless we believe that new legislation must consider the changing role of atomic armament in mutual defense. An understanding of this part of the bill is important and we offer this explanation of its meaning so that each Member may judge as to whether it goes too far or not far enough.

The exchange of information on weapons is limited to 'external characteristics, including size, weight, and shape, yields and effects, and systems employed in the delivery or use thereof.' These areas of disclosure in the main would permit our military personnel to show our allies an atomic or thermonuclear weapon and describe these external characteristics, also **\*3527** the explosive power in terms of equivalent tons of TNT, the blast effect in terms of square miles destroyed, and the degree of radioactive poisoning of land, water, and air in the vicinity. It would allow disclosure of methods of bomb delivery, whether by plane, artillery device, guided missile, etc.

Apparently American military personnel would be permitted to train allied personnel in attaching or installing such weapons in delivery vehicles or devices (sec. 144b (2)). But they would not be allowed to instruct our allies as to how the weapons are constructed internally, how they are assembled or disassembled, or how they are triggered for explosion.

It is obvious that we do not intend to deliver any of these weapons to any military ally for their own use, as complete knowledge of the internal working would be necessary for such use or adjustment in case the weapon failed to 'work' just prior to release.

Therefore we must acknowledge that the bill does not implement the use of our atomic or hydrogen weapons by our allies on behalf of the defense of the free world. It does not make it possible to include such armament in the common arsenal of the North Atlantic Treaty Organization forces, except as they are retained in our sole custody.

Therefore we raise the following questions:

For what purpose do we contemplate training allied military personnel under such limitations?

Will such training be considered seriously by those who receive it?

Will the imparted knowledge of 'effect' of atomic-hydrogen weapons be considered as inadequate and be used as propaganda by the enemies of America to deride our lack of faith in our allies?

The language of this bill relating to the highly important subject of foreign relations, with immediate reference to sections 123, 124, 141, and 144 is complicated, ambiguous, restrictive, and potentially embarrassing to the President. It adds nothing to the President's treaty powers or the right of Congress to pass specific legislation.

In the lowest strata of 'agreement for cooperation' with foreign nations, the restrictive procedures imposed would seem to be of limited assistance in the exchange or use of nuclear materials and information with our allies. Those who fear vital disclosure of security information need have but little fear. Those who hope for wider dissemination of nuclear information have but little grounds for their hope.

### 15. Increasing military posture

Although we do not believe H.R. 9757 departs in my fundamental way from the accepted principle of civilian control and management of the atomic energy program, we wish to take this opportunity to alert the Congress and the public to the possibilities that lie ahead.

It is generally acknowledged that atomic weapons are rapidly achieving a conventional status in military planning for national and allied defenses. Accordingly, we may except that the military will steadily seek increasing control over the weapons phases of the atomic energy program. This is not said in criticism but only as a reminder that there are bounds which the military must not transgress if the principle of civilian control is to be maintained.

Military influence in the Atomic Energy Commission is by no means lacking and, we believe, it is more pervasive than heretofore.

**\*3528**  Apart from the exercise of military influence within the Commission, formal organizational arrangements and procedures have been established under the McMahon Act, slightly modified in the pending bill, to administer the military application of atomic energy and to effect the proper liaison between the Commission and the Department of Defense. We believe the Joint Committee should have inquired into the efficacy of these arrangements in connection with the proposed revisions of the McMahon Act.

The pending bill gives new authority and responsibility to the Department of Defense in various atomic affairs.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Case: 4:23-cv-00106-CDP  Doc. #: 148-8  Filed: 01/29/21  Page: 159 of 903 PageID #: 1840
Case: 4:23-cv-00106-CDP  Doc. #: 148-8  Filed: 02/06/17  Page: 83 of 903 PageID #: 940

The Department of Defense would be permitted to produce nuclear material in connection with atomic facilities operated for power and other purposes within the military programs (sec. 91b (2)).

The Department of Defense would be authorized to manufacture, produce, or acquire atomic utilization facilities, and its contractors would be likewise authorized, without the need for a license from the Atomic Energy Commission (sec. 110b).

The Department of Defense would have to approve agreements for cooperation undertaken by the President, or by the Department itself at the President's direction, with other nations with respect to specified atomic matters according to the language in sections 123 and 144 B. In effect, an attempt has been made to give power to the Department of Defense to check Presidential action. The grant of power is questionable on constitutional grounds in our opinion, as the President is Commander in Chief and therefore can direct the Department of Defense in matters pertaining to national defense.

The Department of Defense would have joint authority with the Atomic Energy Commission to decide whether certain atomic data could be communicated to other nations (sec. 144b).

The Department of Defense has joint authority with the Commission to determine when data relating to atomic weapons may be published and what information may be removed from the restricted category in the weapons field (sec. 142c and d).

Employees of the Department of Defense, members of the Armed Forces, and contractors of the Department would be authorized to have access to restricted data in certain circumstances determined by the Department of Defense (sec. 143).

We cite these provisions to indicate the increasing military posture of the atomic energy program.

CHET HOLIFIELD.
MELVIN PRICE.

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: *****. 2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

S. REP. 83-1699, S. Rep. No. 1699, 83RD Cong., 2ND Sess. 1954, 1954 U.S.C.C.A.N. 3456, 1954 WL 3225 (Leg.Hist.)

---

**End of Document**  © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

# EXHIBIT 9

Case: 4:22-cv-00016-CDP Doc. #: 1-48 Filed: 01/28/22 Page: 161 of 903 PageID #: 1842
Case: 4:17-cv-00024-CDP Doc. #: 1-5 Filed: 03/06/17 Page: 2 of 98 PageID #: 930

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

H.R. REP. 95-1480(I), H.R. REP. 95-1480, H.R. Rep. No. 1480(I), 95TH Cong., 2ND Sess. 1978, 1978
U.S.C.C.A.N. 7433, 1978 WL 8518 (Leg.Hist.)
**7433 P.L. 95-604, URANIUM MILL TAILINGS RADIATION CONTROL ACT OF 1978
SEE PAGE 92 STAT. 3021
HOUSE REPORT (INTERIOR AND INSULAR AFFAIRS COMMITTEE)
NO. 95-1480(I), AUG. 11, 1978 (TO ACCOMPANY H.R. 13650)
HOUSE REPORT (INTERSTATE AND FOREIGN COMMERCE COMMITTEE)
NO. 95-1480(II), SEPT. 30, 1978 (TO ACCOMPANY H.R. 13650)
CONG. RECORD VOL. 124 (1978)
DATES OF CONSIDERATION AND PASSAGE
HOUSE OCTOBER 3, 14, 1978
SENATE OCTOBER 13, 15, 1978
NO SENATE REPORT WAS SUBMITTED WITH THIS LEGISLATION.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL. EACH COMMITTEE
REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

HOUSE REPORT NO. 95-1480(I)

AUG. 11, 1978
*1 THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS TO WHOM WAS REFERRED THE BILL (H.R.
13650) TO AUTHORIZE THE SECRETARY OF ENERGY TO ENTER INTO COOPERATIVE AGREEMENTS WITH
CERTAIN STATES RESPECTING RESIDUAL RADIOACTIVE MATERIAL AT EXISTING SITES, TO PROVIDE FOR
THE REGULATION OF URANIUM MILL TAILINGS UNDER THE ATOMIC ENERGY ACT OF 1954, AND FOR
OTHER PURPOSES, HAVING CONSIDERED THE SAME, REPORTS FAVORABLY THEREON WITH AN
AMENDMENT AND RECOMMENDS THAT THE BILL AS AMENDED DO PASS.

* * * *

*11 BACKGROUND AND NEEDS

URANIUM MILL TAILINGS ARE THE SANDY WASTE PRODUCED BY THE URANIUM ORE MILLING PROCESS.
BECAUSE ONLY 1 TO 5 POUNDS OF USEABLE URANIUM IS EXTRACTED FROM EACH 2,000 POUNDS OF ORE,
TREMENDOUS QUANTITIES OF WASTE ARE PRODUCED AS A RESULT OF MILLING OPERATIONS. THESE
TAILINGS CONTAIN MANY NATURALLY-OCCURING HAZARDOUS SUBSTANCES, BOTH RADIOACTIVE AND
NONRADIOACTIVE. THE GREATEST THREAT TO PUBLIC HEALTH AND SAFETY IS PRESENTED BY THE
LONG RADIOACTIVE DECAY PROCESS OF RADIUM INTO RADON-222, AN INERT GAS WHICH MAY CAUSE
CANCER OR GENETIC MUTATIONS. THIS DECAY PROCESS, AND THE DANGERS WHICH ACCOMPANY IT,
WILL CONTINUE FOR A BILLION YEARS. AS A RESULT OF BEING FOR ALL PRACTICAL PURPOSES, A
PERPETUAL HAZARD, URANIUM MILL TAILINGS PRESENT THE MAJOR THREAT OF THE NUCLEAR FUEL
CYCLE.

IN ITS EARLY YEARS, THE URANIUM MILLING INDUSTRY WAS UNDER THE DOMINANT CONTROL OF THE
FEDERAL GOVERNMENT. AT THAT TIME, URANIUM WAS BEING PRODUCED UNDER FEDERAL
CONTRACTS FOR THE GOVERNMENT'S MANHATTAN ENGINEERING DISTRICT AND ATOMIC ENERGY
COMMISSION PROGRAM. UNDER THESE CONTRACTS, URANIUM TAILINGS PILED UP SO THAT **7434 NOW
NEARLY 90 MILION TONS OF SUCH WASTE ARE ATTRIBUTABLE TO FEDERALLY-INDUCED PRODUCTION.
OF THIS AMOUNT, ABOUT 27 MILLION TONS OF TAILINGS HAVE BEEN LEFT AT SITES WHERE NO
COMMERCIAL MILLING HAS TAKEN PLACE AND WHICH ARE NOT THE RESPONSIBILITY OF ANY ACTIVE
MILLING COMPANY.

Case: 4:21-cv-00016-CDP Doc. #: 1-48 Filed: 01/08/22 Page: 162 of 903 PageID #: 9343
Case: 4:17-cv-00024-CDP Doc. #: 1-4 Filed: 02/06/17 Page: 3 of 38 PageID #: 931

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

FROM THE EARLY 1940'S THROUGH THE EARLY 1970'S THERE WAS LITTLE OFFICIAL RECOGNITION OF THE HAZARDS PRESENTED BY THESE TAILINGS. FEDERAL REGULATION OF THE INDUSTRY WAS MINIMAL. AS A CONSEQUENCE, MILL TAILINGS WERE LEFT AT SITES, MOSTLY IN THE SOUTHWEST, IN AN UNSTABILIZED AND UNPROTECTED CONDITION. SOME OF THESE TAILINGS WERE USED FOR CONSTRUCTION PURPOSES IN THE FOUNDATIONS AND WALLS OF PRIVATE AND PUBLIC BUILDINGS. THERE, THROUGH THE CONCENTRATED EMISSION OF RADON GAS, THE HAZARD OF THE TAILINGS AND PUBLIC EXPOSURE INCREASED SUBSTANTIALLY.

IN 1971 THE SUBCOMMITTEE ON RAW MATERIALS OF THE JOINT COMMITTEE ON ATOMIC ENERGY BEGAN TO INVESTIGATE THE DANGERS PRESENTED BY THE USE OF URANIUM MILL TAILINGS FOR CONSTRUCTION PURPOSES. TESTIMONY AT **12 THOSE HEARINGS LEAD TO THE PASSAGE OF LEGISLATION IN 1972 AUTHORIZING THE FEDERAL GOVERNMENT TO ENTER INTO A COOPERATIVE PROGRAM WITH THE STATE OF COLORADO TO PROVIDE A PROGRAM OF REMEDIAL ACTION TO REMOVE THE TAILINGS FROM SITES AND STRUCTURES IN GRAND JUNCTION, COLO., WHERE THEY CONSTITUTED A THREAT TO PUBLIC HEALTH. UNDER THAT PROGRAM, 75 PERCENT OF THE COSTS OF THE REMEDIAL ACTION, WERE PAID BY THE FEDERAL GOVERNMENT AND THE STATE OF COLORADO PAID THE REMAINDER.

CONCURRENTLY, PUBLIC AND FEDERAL ATTENTION BEGAN TO FOCUS ON REGULATION OF THE ACTIVE COMMERCIAL URANIUM MILLING INDUSTRY. WITH THE ADVENT OF THE NATIONAL ENVIRONMENTAL POLICY ACT, MORE SCRUTINY WAS APPLIED TO LICENSING STANDARDS AND REQUIREMENTS FOR THE CONTROL AND DISPOSAL OF URANIUM MILL TAILINGS. THE ATOMIC ENERGY COMMISSION, AND ITS SUCCESSOR, THE NUCLEAR REGULATORY COMMISSION, HAVE RETAINED AUTHORITY FOR LICENSING URANIUM MILLS UNDER THE ATOMIC ENERGY ACT SINCE 1954. STATES MAY LICENSE URANIUM MILLING UNDER THEIR OWN AUTHORITIES THROUGH AGREEMENT WITH THE COMMISSION. FIVE OF THE TWENTY-FIVE 'AGREEMENT STATES' NOW HAVE SUCH LICENSING PROGRAMS.

THE STATES AND THE COMMISSION HAVE CONTINUED, SINCE THE EARLY 1970'S, TO UPGRADE THEIR STANDARDS FOR URANIUM MILL LICENSING, IN RESPONSE TO A GROWING AWARENESS OF THE THREAT TO PUBLIC HEALTH PRESENTED BY THESE MATERIALS. IN MAY 1975, THE NUCLEAR RESOURCES DEFENSE COUNCIL PETITIONED THE COMMISSION TO PREPARE A GENERIC ENVIRONMENTAL IMPACT STATEMENT TO EVALUATE THE REGULATORY PROGRAMS FOR URANIUM MILLING AT BOTH THE FEDERAL AND STATE LEVELS, AND TO ADOPT IMPROVED REGULATIONS FOR MILLING OPERATIONS. SUBSEQUENTLY, THE COMMISSION BEGAN THE EVALUATION. THE DRAFT GENERIC ENVIRONMENTAL IMPACT STATEMENT ON URANIUM MILLING REGULATION, AND PROPOSED NEW MILLING REGULATIONS, ARE EXPECTED TO BE COMPLETED BY NRC THIS YEAR. BUT THE STEPS WHICH HAVE BEEN TAKEN TO CONTROL FUTURE URANIUM MILLING OPERATIONS DO NOT REMEDY EXISTING PUBLIC HEALTH HAZARDS RESULTING FROM THE UNSTABILIZED PILES OF WASTES PRODUCED IN PRIOR DECADES.

IN 1974 CONGRESS REQUESTED THE ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION TO SURVEY AND ASSESS THE PROBLEM PRESENTED BY THE TAILINGS LOCATED AT 22 SITES THROUGHOUT THE SOUTHWEST. ON THE BASIS OF THE RESULTING STUDIES, THE ADMINISTRATION PROPOSED LEGISLATION THIS YEAR TO AUTHORIZE A REMEDIAL PROGRAM SIMILAR TO THAT IMPLEMENTED AT GRAND JUNCTION, COLO., TO CLEAN UP EXISTING INACTIVE SITES. THE COST OF THE PROGRAM TO THE FEDERAL GOVERNMENT IS EXPECTED TO BE $180 **7435 MILLION. TO PREVENT ANY FUTURE OCCURRENCE OF A SITUATION OF THIS KIND THE NUCLEAR REGULATORY COMMISSION WAS ASKED BY THE CHAIRMAN OF THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS, REPRESENTATIVE MORRIS K. UDALL, TO SUBMIT DRAFT LEGISLATION PROVIDING IT WITH NECESSARY AUTHORITY TO COMPREHENSIVELY REGULATE THE URANIUM MILL OPERATIONS AND ACTIVITIES. THIS DRAFT LEGISLATION WAS INTRODUCED AND CONSIDERED BY THE COMMITTEE IN DEVELOPING ITS RECOMMENDATIONS.

WITHOUT THE AUTHORITIES INCLUDED IN H.R. 13650, THE CONDITIONS ADDRESSED BY THE REMEDIAL

PROGRAM WOULD BE LEFT WITHOUT REMEDY, AND THE AUTHORITY OF THE COMMISSION TO ESTABLISH UNIFORM RATIONAL STANDARDS FOR WASTE DISPOSAL FROM URANIUM MILLS WOULD NOT BE CLEAR.

## *13 PURPOSE AND SUMMARY

THE URANIUM MILL TAILINGS CONTROL ACT, AS PROPOSED, IS INTENDED TO PROTECT THE PUBLIC HEALTH AND SAFETY AND THE ENVIRONMENT FROM HAZARDS ASSOCIATED WITH WASTES FROM THE URANIUM ORE MILLING PROCESS. IF ENACTED, THE LEGISLATION WILL REQUIRE EVERY REASONABLE EFFORT TO BE MADE BY THE STATES, THE FEDERAL GOVERNMENT, AND PRIVATE INDUSTRY TO PROVIDE FOR THE DISPOSAL, STABILIZATION AND CONTROL IN A SAFE AND ENVIRONMENTALLY SOUND MANNER OF SUCH TAILINGS TO PREVENT OR MINIMIZE THE DIFFUSION OF RADON OR THE ENTRY OF OTHER HAZARDS INTO THE ENVIRONMENT.

TITLE I OF H.R. 13650, IN COOPERATION WITH INTERESTED STATES, INDIAN TRIBES, AND PERSONS WHO OWN OR CONTROL INACTIVE MILL TAILINGS SITES, PROVIDES A PROGRAM OF ASSESSMENT AND REMEDIAL ACTION AT SUCH SITES. SUCH ACTIONS MAY INCLUDE, WHERE APPROPRIATE, THE REPROCESSING OF TAILINGS TO EXTRACT RESIDUAL URANIUM AND OTHER VALUABLE MINERALS.

TITLE II CLARIFIES AND REINFORCES THE AUTHORITY OF THE NUCLEAR REGULATORY COMMISSION TO REGULATE THE PRODUCTION AND DISPOSAL OF URANIUM MILL TAILINGS AT ACTIVE SITES, AND PROVIDES FOR THE APPLICATION OF MINIMUM FEDERAL STANDARDS TO SUCH ACTIVITIES IN STATES WHICH REGULATE THEM UNDER AUTHORITY PERMITTED BY THE ATOMIC ENERGY ACT.

H.R. 13650 ALSO PROVIDES THAT ALL FINAL DISPOSAL AREAS FOR URANIUM MILL TAILINGS BE TREATED IN ACCORDANCE WITH FEDERAL POLICY REGARDING OTHER NUCLEAR WASTES, IN THAT SUCH DISPOSAL SITES WOULD BE TRANSFERRED TO THE FEDERAL GOVERNMENT FOR PERMANENT CUSTODY AND PROTECTION.

## INCLUSION OF SITES

AS REPORTED BY THE COMMITTEE, H.R. 13650 AUTHORIZES FEDERAL PARTICIPATION IN THE REDUCTION OF HAZARDS FROM THE 22 INACTIVE URANIUM MILL TAILINGS SITES. THESE SITES, WHICH ARE FOUND AT 20 DIFFERENT LOCATIONS, HAVE BEEN STUDIED BY THE DEPARTMENT OF ENERGY IN AN EFFORT TO ASSESS THE NEED FOR REMEDIAL ACTION. ALL OF THEM CONSIST OF TAILINGS RESULTING FROM OPERATIONS UNDER FEDERAL CONTRACTS. NONE ARE NOW UNDER ACTIVE LICENSE BY THE NUCLEAR REGULATORY COMMISSION. WHILE IT IS BELIEVED THAT THESE SITES ARE THE ONLY ONES WHICH POSSESS ALL SUCH CHARACTERISTICS, THE BILL PERMITS THE INCLUSION OF ANY OTHER SITES MEETING THOSE CHARACTERISTICS. TWO OTHER SITES WHICH CONTAIN TAILINGS RESULTING ENTIRELY FROM FEDERAL CONTRACTS, BUT WHICH ARE NOW OWNED BY COMPANIES OPERATING UNDER ACTIVE URANIUM MILLING LICENSES ARE TO BE STUDIED TO DETERMINE WHETHER THE STATE OF NEW MEXICO, WHICH LICENSES THE MILLS, HAS THE AUTHORITY TO REQUIRE THE COMPANIES TO REDUCE OR ELIMINATE ANY HAZARDOUS CONDITIONS WHICH MAY EXIST AS A RESULT OF THE CONDITION OF THE SITES.

**7436 THE COMMITTEE QUESTIONED THE EXPENDITURE OF FEDERAL FUNDS TO CLEAN UP URANIUM MILL TAILINGS IN CASES WHERE THE COMMERCIAL URANIUM MILLING INDUSTRY CAN BE REQUIRED THROUGH REGULATORY AUTHORITIES TO ASSUME THOSE COSTS. IT WOULD SEEM THEREFORE, THAT THE SECRETARY OF ENERGY NEED NOT DESIGNATE ANY SITES TO BE INCLUDED IN THE AUTHORIZED PROGRAM WHICH ARE CURRENTLY UNDER ACTIVE LICENSE, OR WHICH CONTAIN TAILINGS FROM COMMERCIAL PRODUCTION, UNLESS IT CAN BE SHOWN, THAT THE TAILINGS HAZARDS COULD IN NO WAY BE REMEDIED WITHOUT SUCH DESIGNATION.

Case: 4:22-cv-00016-CDP Doc. #: 1-48 Filed: 01/28/22 Page: 164 of 903 PageID #: 9345
Case: 4:17-cv-00024-CDP Doc. #: 1-48 Filed: 02/06/17 Page: 5 of 18 PageID #: 988

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

H.R. REP. 95-1480(I), H.R. REP. 95-1480(I) (1978)

*14 DIVISION OF COSTS

H.R. 13650 REQUIRES STATES AND THE FEDERAL GOVERNMENT TO SHARE THE COSTS OF REMEDIAL ACTION FOR INACTIVE TAILINGS SITES. THE COSTS TO BE SHARED INCLUDE EXPENSES FOR REMOVING OR REDUCING HAZARDS BOTH AT THE PROCESSING SITE AND AT LOCATIONS AND STRUCTURES CONTAMINATED WITH TAILINGS FROM THE SITE. ENVIRONMENTAL IMPACT STATEMENTS TO BE PREPARED FOR DETERMINING REMEDIES FOR EACH SITE WILL BE PAID FOR BY THE DEPARTMENT OF ENERGY. COSTS OF LONG-TERM MAINTENANCE AND MONITORING OF FINAL DISPOSAL SITES WILL ALSO BE BORNE BY THE DEPARTMENT. STATES ARE REQUIRED TO ASSUME ALL COSTS OF PURCHASING THE INACTIVE PROCESSING SITES AND ANY NECESSARY NEW DISPOSAL SITES (IN CASES WHERE TAILINGS WILL BE REMOVED FROM THE ORIGINAL PROCESSING SITES).

A CEILING IS PLACED ON ANY STATE'S SHARE OF REMEDIAL COSTS. THE CEILING EQUALS ONE-FOURTH OF 1 PERCENT OF THE STATE'S GENERAL REVENUES, NOT INCLUDING FEDERAL FUNDS, IN THE STATE'S LAST FISCAL YEAR ENDING BEFORE ENACTMENT OF THE ACT. THE COMMITTEE BASES FIGURES FOR STATES' GENERAL REVENUES ON THOSE USED BY THE DEPARTMENT OF COMMERCE FOR ITS DETERMINATIONS.

THE COMMITTEE BELIEVES THAT NO STATE'S PARTICIPATION IN THE REMEDIAL PROGRAM SHOULD BE PRECLUDED BY THE STATE'S INABILITY TO OBLIGATE FUNDS TO MEET ITS SHARE OF PROGRAM COSTS. THE COMMITTEE CONSIDERED IN ITS DELIBERATIONS THE EFFECT OF EXISTING STATE LAWS PROHIBITING DEFICIT SPENDING OR LIMITING THE EXTENT TO WHICH STATES MAY BE INDEBTED BY THEIR LEGISLATURES.

THE FUNDING FORMULA ARRIVED AT BY THE COMMITTEE BOTH INSURES THAT EACH STATE MAY PARTICIPATE IN THE PROGRAM, AND DISTRIBUTES THE BURDEN OF PAYMENTS ACCORDING TO STATES' ABILITY TO PAY. IT ALSO TAKES INTO ACCOUNT THE TREMENDOUS FINANCIAL BURDEN PLACED ON UTAH AND COLORADO WHERE THE NUMBER AND SIZE OF INACTIVE PROCESSING SITES ARE SUBSTANTIAL.

THE COMMITTEE FORMULA WOULD ALLOW EACH STATE TO PROVIDE ITS SHARE OF PROGRAM COSTS THROUGH A ONE-TIME APPROPRIATION FROM ITS LEGISLATIVE BODY. THIS PROTECTS THE FEDERAL GOVERNMENT FROM HAVING TO SUPPLEMENT THE FEDERAL SHARE DUE TO THE FAILURE OF SOME FUTURE LEGISLATURE TO APPROPRIATE FUNDS COMMITTED BY A PREVIOUS LEGISLATURE.

THE FOLLOWING CHART SHOWS ESTIMATED SHARE OF PROGRAM COSTS BASED ON THE COMMITTEE FORMULA FOR EACH AFFECTED STATE. SHARES ARE SHOWN UNDER THE CEILING ONLY WHEN A STATE'S SHARE OF PROGRAM COSTS WOULD MEET OR EXCEED THE CEILING.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
*15 **7437 ALL COSTS FOR REMEDIAL ACTIVITIES UNDERTAKEN ON INDIAN LANDS ARE THE RESPONSIBILITY OF THE FEDERAL GOVERNMENT.

DETERMINATION AND PRIORITY OF REMEDY

IT IS THE PRIMARY RESPONSIBILITY OF THE DEPARTMENT OF ENERGY TO DETERMINE THE APPROPRIATE REMEDY FOR EACH INACTIVE URANIUM MILL TAILINGS SITE INCLUDED UNDER THE LEGISLATION. THE DEPARTMENT IS REQUIRED TO CONSULT WITH ADMINISTRATOR OF THE ENVIRONMENTAL PROTECTION AGENCY IN MAKING SUCH DETERMINATIONS. THE DEPARTMENT MUST HAVE THE CONCURRENCE OF THE STATE WHERE THE SITE IS LOCATED, AND THE NUCLEAR REGULATORY COMMISSION, IN ITS DETERMINATION OF REMEDIES BEFORE ANY REMEDIAL ACTION IS UNDERTAKEN. IN CASES WHERE SITES ARE LOCATED ON INDIAN LANDS, HOWEVER, THE STATE DOES NOT HAVE A CONCURRENCE ROLE. THERE, THE DEPARTMENT MUST CONSULT WITH THE APPROPRIATE TRIBE AND THE ADMINISTRATOR AND GAIN THE CONCURRENCE OF THE SECRETARY OF THE INTERIOR

AND THE COMMISSION.

THE PUBLIC IS TO HAVE A STRONG ROLE IN THE SELECTION OF ANY REMEDY THROUGH PROCEDURES PROVIDED BY THE NATIONAL ENVIRONMENTAL POLICY ACT. IT IS EXPECTED THAT THE SECRETARY WILL GIVE FULL CONSIDERATION TO THE WISHES OF THE PUBLIC AS EXPRESSED THROUGH THOSE PROCESSES.

THE COMMITTEE ALSO EXPECTS THE SECRETARY TO PROCEED WITH IMPLEMENTATION OF REMEDIES IN ACCORD WITH NECESSITY FOR REDUCING THE MOST THREATENING HAZARDS FIRST. IN SETTING PRIORITIES FOR IMPLEMENTATION OF REMEDIAL PROGRAMS, THE SECRETARY SHOULD GIVE SPECIAL CONSIDERATION TO SITES AT SALT LAKE CITY, UTAH, AND RIVERTON AND CONVERSE, WYO.

CAVEAT EMPTOR

IN SOME CASES WHERE THE DEPARTMENT WILL REMEDY INACTIVE TAILINGS HAZARDS, TAILING WILL BE REMOVED FROM THE ORIGINAL PROCESSING SITES AND DISPOSED OF AT MORE SUITABLE LOCATIONS. IN SUCH CASES, THE STATE WHERE THE SITE IS LOCATED MAY SELL THE ORIGINAL, CLEANED-UP PROCESSING SITE ON THE PUBLIC MARKET. H.R. 13650 REQUIRES THAT WHEN A STATE SELLS ANY PROCESSING SITE, IT MUST EXECUTE AND RECORD A DOCUMENT GIVING ALL FUTURE PROSPECTIVE BUYERS NOTICE THAT THE SITE WAS ONCE USED FOR THE DISPOSAL OF RADIOACTIVE MATERIALS. THE RECORD IS ALSO REQUIRED TO NOTE THAT THE SITE WAS CLEANED UP UNDER THE REMEDIAL PROGRAM SO THAT HAZARDS WERE ELIMINATED OR REDUCED TO ACCEPTABLE LEVELS.

**7438** IT IS THE INTENT OF THE COMMITTEE THAT SUCH NOTICE BE IMPLEMENTED THROUGH THE SIMPLEST MECHANISM POSSIBLE PURSUANT TO STATE LAW, AS LONG AS IT PROVIDES A FAIR OPPORTUNITY FOR NOTICE TO PROSPECTIVE BUYERS. THE COMMITTEE DOES NOT INTEND THAT SUCH NOTICE IMPLY THAT THE LAND AS A RESULT OF HAVING BEEN USED AS A DISPOSAL SITE WOULD CONSTITUTE A HAZARD TO PUBLIC HEALTH.

AUTHORITY OF THE NUCLEAR REGULATORY COMMISSION

THE COMMISSION, IN KEEPING WITH ITS RESPONSIBILITIES AND AUTHORITIES UNDER THE ATOMIC ENERGY ACT AND THE NATIONAL ENVIRONMENTAL POLICY ACT, IS THE LEAD AGENCY IN REGULATION, OVERSIGHT AND MANAGEMENT OF URANIUM MILL TAILINGS-RELATED ACTIVITIES. IT IS ONE OF THE MAJOR PURPOSES OF H.R. 13650 TO CLARIFY AND REINFORCE THESE COMMISSION RESPONSIBILITIES, WITH RESPECT TO URANIUM MILL TAILINGS AT BOTH ACTIVE AND INACTIVE SITES.

***16** IN ESTABLISHING REQUIREMENTS OR PROMULGATING REGULATIONS FOR LICENSING OR FOR OVERSIGHT OF THE DEPARTMENT'S REMEDIAL ACTIVITIES, THE COMMISSION MUST SET ALL STANDARDS AND REQUIREMENTS RELATING TO MANAGEMENT CONCEPTS, SPECIFIC TECHNOLOGY, ENGINEERING METHODS, AND PROCEDURES TO BE EMPLOYED TO ACHIEVE DESIRED LEVELS OF CONTROL FOR LIMITING PUBLIC EXPOSURE, AND FOR PROTECTING THE GENERAL ENVIRONMENT. THE COMMISSION'S STANDARDS AND REQUIREMENTS SHOULD BE OF SUCH NATURE AS TO SPECIFY, FOR EXAMPLE, EXCLUSION AREA RESTRICTIONS ON SITE BOUNDARIES, SURVEILLANCE REQUIREMENTS, DETAILED ENGINEERING REQUIREMENTS, INCLUDING LINING FOR TAILINGS PONDS, DEPTH, AND TYPES OF TAILINGS COVERS, POPULATION LIMITATIONS, OR INSTITUTIONAL ARRANGEMENTS SUCH AS FINANCIAL SURETY REQUIREMENTS OR SITE SECURITY MEASURES. THE COMMISSION SHOULD ISSUE ALL NECESSARY PERMITS OR LICENSES FOR URANIUM MILL TAILINGS SITES.

THE NRC IS ALSO RESPONSIBLE FOR IMPLEMENTING GENERAL STANDARDS AND CRITERIA PROMULGATED BY THE ADMINISTRATOR OF THE ENVIRONMENTAL PROTECTION AGENCY. NRC MUST ASSURE THAT THE TECHNOLOGY, ENGINEERING METHODS, OPERATIONAL CONTROLS, SURVEILLANCE REQUIREMENTS AND INSTITUTIONAL ARRANGEMENTS EMPLOYED AT THE SITES PROVIDE THE

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

H.R. REP. 95-1480(I), H.R. REP. 95-1480(I) (1978)

NECESSARY BARRIERS AND LEVELS OF CONTROL TO LIMIT PUBLIC EXPOSURE, AND PROTECT THE ENVIRONMENT FROM RADIOLOGICAL AND TOXIC NONRADIOLOGICAL SUBSTANCES ASSOCIATED WITH URANIUM MILL TAILINGS MATERIALS, AS SPECIFIED BY THE EPA STANDARDS AND CRITERIA.

WITH RESPECT TO NONRADIOLOGICAL MATTERS, THE NRC, THROUGH ITS ENVIRONMENTAL REVIEW UNDER THE NEPA MANDATE, WOULD IMPOSE CONTROLS CONSISTENT WITH THOSE IMPOSED BY EPA ON SIMILAR MATERIALS CONTAINED IN OTHER SOLID WASTES SUBJECT TO EPA AUTHORITY.

THE COMMITTEE RECEIVED TESTIMONY REGARDING AUTHORITIES OF THE EPA UNDER THE SOLID WASTE DISPOSAL ACT WHICH COULD BE BENEFICIALLY APPLIED TO THE MANAGEMENT OF URANIUM MILL TAILINGS. WHILE IT IS IN NO WAY THE INTENT OF THE COMMITTEE TO IMPLY THAT THE EPA OR THE SOLID WASTE DISPOSAL ACT SHOULD GOVERN THE REGULATORY ACTIVITIES OF THE COMMISSION, IT IS THE COMMITTEE'S DESIRE THAT THE COMMISSION EXAMINE THE MANAGEMENT CONCEPTS BEING DEVELOPED FOR THE EPA SOLID WASTE DISPOSAL PROGRAM, AND ASSESS THEM FOR POSSIBLE INCORPORATION INTO NRC REGULATIONS WHERE SUCH CONCEPTS COULD IMPROVE REGULATION OF TAILINGS.

IT ALSO THE DESIRE OF THE COMMITTEE THAT THE NRC AND THE STATES, IN IMPLEMENTING NEW STANDARDS AND REGULATIONS FOR MILL TAILINGS CONTROL, CONSIDER POSSIBLE DIFFERENCES IN APPLICABILITY OF SUCH REQUIREMENTS TO **7439 EXISTING TAILINGS DISPOSAL SITES VERSUS NEW SITES. SPECIFICATIONS FOR TAILINGS SITE SELECTION AND IMPOUNDMENT DESIGN, IN PARTICULAR, ONCE IMPLEMENTED BY A LICENSEE, MAY BE REVERSIBLE ONLY AT GREAT COST. IN ALL CASES SUCH CONSIDERATIONS MUST, OF COURSE, BE WEIGHED AGAINST THE COMMITTEE'S REQUIREMENT IN SECTION 161(X) OF THE ATOMIC ENERGY ACT, AS AMENDED BY SECTION 203 OF H.R. 13650, THAT THE COMMISSION REGULATE TO THE MAXIMUM EXTENT PRACTICABLE IN SUCH A WAY THAT DISPOSAL SITES FOR TAILINGS WILL BE STABILIZED SUFFICIENTLY BY THE LICENSEE TO PRECLUDE ANY NECESSITY FOR LONG-TERM MAINTENANCE AND MONITORING.

AUTHORITY OF THE ENVIRONMENTAL PROTECTION AGENCY

IT IS THE RESPONSIBILITY OF THE ENVIRONMENTAL PRODUCTION AGENCY TO ESTABLISH GENERALLY APPLICABLE STANDARDS AND CRITERIA FOR THE PROTECTION OF THE GENERAL ENVIRONMENT, CONSIDERING RADIOLOGICAL AND NONRADIOLOGICAL ASPECTS OF TAILINGS. THE EPA STANDARDS AND CRITERIA SHOULD BE DEVELOPED TO LIMIT THE EXPOSURE (OR POTENTIAL EXPOSURE) OF THE PUBLIC *17 AND TO PROTECT THE GENERAL ENVIRONMENT FROM EITHER RADIOLOGICAL OR NONRADIOLOGICAL SUBSTANCES TO ACCEPTABLE LEVELS THROUGH SUCH MEANS AS ALLOWABLE CONCENTRATIONS IN AIR OR WATER, QUANTITIES OF THE SUBSTANCES RELEASED OVER A PERIOD OF TIME, OR BY SPECIFYING MAXIMUM ALLOWABLE DOSES OR LEVELS TO INDIVIDUALS IN THE GENERAL POPULATION. THE EPA STANDARDS AND CRITERIA SHOULD NOT INTERJECT ANY DETAILED OR SITE-SPECIFIC REQUIREMENTS FOR MANAGEMENT, TECHNOLOGY OR ENGINEERING METHODS ON LICENSEES OR ON THE DEPARTMENT OF ENERGY. NOR SHOULD EPA INCORPORATE ANY REQUIREMENTS FOR PERMITS OF LICENSES FOR ACTIVITIES CONCERNING URANIUM MILL TAILINGS WHICH WOULD DUPLICATE NRC REGULATORY AUTHORITY OVER THE TAILINGS SITES.

ENVIRONMENTAL REVIEWS

TITLE II REQUIRES THAT STATES WHICH LICENSE URANIUM MILLING OR MILL TAILINGS DISPOSAL ACTIVITIES PREPARE A WRITTEN, INDEPENDENT ENVIRONMENTAL ANALYSIS OR REVIEW AS PART OF ITS LICENSING PROCESS. THE COMMITTEE CONSIDERS THE INDEPENDENT PREPARATION AND PUBLIC DISTRIBUTION OF SUCH AN ANALYSIS ESSENTIAL TO COMPETENT LICENSING OF URANIUM MILLING ACTIVITIES. THE COMMITTEE ALSO RECOGNIZES THAT THE RESOURCES OF A STATE ARE NOT EQUIVALENT TO THOSE OF A FEDERAL AGENCY. DIRECT APPLICATION OF ALL THE PROCEDURES AND REQUIREMENTS EMBODIED IN THE NATIONAL ENVIRONMENTAL POLICY ACT, AND IMPLEMENTED BY

THE COMMISSION IN ITS LICENSING PROCESS, MAY NOT BE APPROPRIATE TO REQUIRE OF THE STATES. SOME LATITUDE SHOULD BE GIVEN TO ALLOW STATES TO PREPARE ENVIRONMENTAL REVIEWS APPROPRIATE TO THEIR NEEDS AND MEANS. THE COMMISSION MUST NOT, HOWEVER, ALLOW STATES TO LICENSE URANIUM MILLING ACTIVITIES WITH LESS THAN THOROUGH AND COMPREHENSIVE ENVIRONMENTAL ASSESSMENTS DUE TO A LACK OF FINANCIAL MEANS IN THE STATE TO MEET FEDERAL ENVIRONMENTAL IMPACT REVIEW STANDARDS.

### FEDERAL CUSTODY OF TAILINGS STATES

IT IS THE INTENT OF H.R. 13650 THAT ALL FINAL DISPOSAL SITES FOR URANIUM MILL TAILINGS BE PLACED ULTIMATELY UNDER FEDERAL CUSTODY. THE PRESIDENT IS GIVEN THE RESPONSIBILITY FOR DESIGNATING AN APPROPRIATE AGENCY TO ACT AS CUSTODIAN FOR THE SITES. IT IS EXPECTED THAT THE DESIGNATED AGENCY **7440** SHOULD BE THE DEPARTMENT OF ENERGY, OR AN AGENCY WITH SIMILAR RESPONSIBILITIES IN THE AREA OF NUCLEAR WASTE MANAGEMENTS.

THE COMMITTEE BELIEVES THAT URANIUM MILL TAILINGS SHOULD BE TREATED BY THE CUSTODIAN IN ACCORDANCE WITH THE SUBSTANTIAL HAZARD THEY WILL PRESENT UNTIL LONG AFTER OUR EXISTING INSTITUTIONS CAN BE EXPECTED TO LAST IN THEIR PRESENT FORMS. ANY DECISION BY A CUSTODIAN WHETHER TO ALLOW ANY USE BY THE PUBLIC OF TAILINGS DISPOSAL SITES MUST TAKE INTO CONSIDERATION THE FRAGILE NATURE OF DISPOSAL TECHNIQUES WHEN THEY ARE MEASURED AGAINST THE TEST OF A BILLION YEARS OF EROSIVE INFLUENCE.

THE NUCLEAR REGULATORY COMMISSION SHOULD CONSIDER ITS RESPONSIBILITIES FOR OVERSIGHT OF THE CUSTODIAN IN A SIMILAR LIGHT.

### LICENSE TERMINATION AND LONG-TERM MAINTENANCE

URANIUM MILL TAILINGS DISPOSAL SITES SHOULD IN ALL CASES BE CONTROLLED AND REGULATED BY STATES AND THE COMMISSION, TO THE MAXIMUM EXTENT ALLOWED BY THE STATE OF THE ART, TO INSURE THAT THE PUBLIC AND THE **18** ENVIRONMENT WILL BE PROTECTED FROM THE HAZARDS OF THE TAILINGS FOR AS LONG AS THEY MAY REMAIN A HAZARD. IT IS THE INTENT OF THE COMMITTEE THAT THE COSTS OF SUCH PROTECTION SHALL BE INTERNALIZED WHEREVER POSSIBLE BY THE COMMERCIAL URANIUM MILLING INDUSTRY.

H.R. 13650 REQUIRES THAT BEFORE THE TRANSFER OF CUSTODY OF ANY DISPOSAL SITES TO THE FEDERAL GOVERNMENT, THE COMMISSION SHALL HAVE MADE ARRANGEMENTS TO INSURE THAT SUCH PILES ARE STABILIZED TO PROVIDE LONG-TERM PROTECTION. PRIOR TO DETERMINATION OF LICENSES FOR COMMERCIAL TAILINGS, THE COMMISSION SHALL HAVE COLLECTED FROM LICENSEES FUNDS ADEQUATE TO COVER COSTS OF LONG-TERM MAINTENANCE AND MONITORING, IF ANY SUCH MEASURES WILL BE NECESSARY.

### SECTION-BY-SECTION ANALYSIS

### TITLE I-- RESIDUAL RADIOACTIVE MATERIAL AT CERTAIN EXISTING SITES

TITLE I AUTHORIZES THE SECRETARY OF ENERGY TO ENTER INTO AGREEMENTS WITH STATES TO REMEDY RADIOACTIVE HAZARDS ASSOCIATED WITH URANIUM MILL TAILINGS CREATED UNDER CONTRACT TO THE FEDERAL GOVERNMENT.

SECTION 101 SETS OUT DEFINITIONS OF TERMS USED TO DESCRIBE SITES AND MATERIALS COVERED BY THE LEGISLATION, AND THOSE DESIGNATING AGENCIES AND OFFICIALS PARTICIPATING IN THE PROGRAM.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

SECTION 102 SPECIFIES AND DEFINES SITES WHERE ABANDONED URANIUM MILL TAILINGS PILES ARE LOCATED WHICH WOULD BE COVERED UNDER THE ACT. THESE INCLUDE SITES IN THREE CATEGORIES: (1) 22 SITES WHICH HAVE BEEN SURVEYED BY THE DEPARTMENT OF ENERGY AND WHICH HAVE BEEN DETERMINED BY THE SECRETARY TO BE IN NEED OF REMEDIAL ACTION AND QUALIFIED FOR FEDERAL FINANCIAL ASSISTANCE; (2) TWO SITES WHICH MEET THE CRITERIA FOR ASSISTANCE EXCEPT THAT THEY ARE UNDER ACTIVE LICENSE BY THE STATE OF NEW MEXICO (THE COMMISSION IS REQUIRED TO MAKE A STUDY TO DETERMINE WHETHER STATES HAVE THE AUTHORITY TO COMPEL THE OWNERS OF THE PILES TO CLEAN THEM UP; IF THE STUDY CONCLUDES SUCH AUTHORITY DOES NOT EXIST, THE SECRETARY IS REQUIRED TO INCLUDE THE SITES UNDER THE ACT); AND (3) ANY OTHER URANIUM TAILINGS SITES WHICH THE SECRETARY MAY DETERMINE WITHIN 5 YEARS TO HAVE BEEN CREATED UNDER FEDERAL CONTRACT AND NOT TO BE UNDER ACTIVE NRC LICENSE.

**\*\*7441** SECTION 103 AUTHORIZES THE SECRETARY OF ENERGY TO ENTER INTO COOPERATIVE ARRANGEMENTS WITH STATES TO CLEAN UP MILL TAILINGS PILES, AND DESCRIBES CONDITIONS WHICH WOULD APPLY TO THE AGREEMENTS. THE CONDITIONS INCLUDE:

SECTION 103(B). A SPLIT OF PROGRAM COSTS SUCH THAT THE FEDERAL GOVERNMENT PAYS 90 PERCENT, AND EACH STATES PAYS 10 PERCENT, OF THE COSTS OF REMEDIAL ACTION WITHIN EACH STATE. A CEILING IS PLACED ON ANY STATE'S SHARE OF COSTS. THE CEILING EQUALS 0.25 PERCENT OF THE STATE'S GENERAL REVENUE IN THE STATE'S FISCAL YEAR ENDING THE YEAR BEFORE THE ENACTMENT OF THE ACT. THE DIFFERENCE BETWEEN THE STATE'S CEILING AND TOTAL COSTS WOULD BE PAID BY THE FEDERAL GOVERNMENT. PROGRAM COSTS DO NOT INCLUDE ANY COSTS OF ENVIRONMENTAL IMPACT STATEMENTS, LAND ACQUISITION OR LONG-TERM CARE OF DISPOSAL SITES.

SECTION 103(C)(1). SELECTION OF THE APPROPRIATE REMEDIAL ACTION FOR EACH SITE BY THE SECRETARY OF ENERGY, WITH THE CONCURRENCE OF THE STATE AND THE NUCLEAR REGULATORY COMMISSION, AND IN CONSULTATION WITH THE ENVIRONMENTAL PROTECTION AGENCY.

**\*19** SECTION 103(C)(2). STATE ACQUISITION OF ALL DESIGNATED SITES AND ANY REQUIRED NEW FINAL DISPOSAL SITES FOR TAILINGS.

SECTION 103(C)(3). TRANSFER OF TITLE, WITHOUT COST, TO THE U.S. GOVERNMENT OF ANY FINAL DISPOSAL SITES FOR TAILINGS, TO BE MAINTAINED IN PERPETUITY BY A DESIGNATED CUSTODIAN.

SECTION 103(C)(4)-(5). STATES MAY SELL ANY CLEANUP SITES NOT USED AS FINAL DISPOSAL SITES. PROFITS RESULTING FROM INCREASED VALUE OF PROPERTY AFTER REMEDIAL ACTION IS COMPLETED WOULD BE SPLIT BETWEEN STATE AND FEDERAL GOVERNMENTS IN PROPORTION TO TOTAL PROGRAM COSTS.

SECTION 103(C)(6). ACTIONS TAKEN TO REMEDY HAZARDOUS MILL TAILINGS SITES MUST BE PERFORMED BY THE SECRETARY OF ENERGY OR BY A CONTRACTOR AUTHORIZED BY THE SECRETARY, UNLESS OTHERWISE DETERMINED BY THE SECRETARY.

SECTION 103(C)(7)-(8). STATES MAY CONTRACT WITH PRIVATE COMPANIES FOR RECOVERY OF ANY VALUABLE MINERALS IN TAILINGS PILES. THE GOVERNMENT'S SHARE OF ANY PROFITS FROM SUCH RECOVERY ARE TO BE SPLIT BETWEEN STATE AND FEDERAL GOVERNMENT IN PROPORTION TO TOTAL PROGRAM COSTS.

SECTION 104 AUTHORIZES THE SECRETARY TO ENTER INTO ARRANGEMENTS WITH INDIAN TRIBES TO CLEAN UP MILL TAILINGS PILES ON TRIBAL PROPERTY. THE CONDITIONS APPLIED TO AGREEMENTS WITH INDIAN TRIBES ARE THE SAME AS THOSE FOR STATES, EXCEPT THAT:

(1) THE FEDERAL GOVERNMENT PAYS 100 PERCENT OF PROGRAM COSTS.

(2) APPROPRIATE REMEDIAL ACTION IS DETERMINED BY THE SECRETARY IN CONSULTATION WITH THE INDIAN TRIBE AND WITH THE CONCURRENCE OF THE SECRETARY OF THE INTERIOR.

(3) MINERAL RECOVERY OPERATIONS WOULD BE CONDUCTED UNDER CONTRACT WITH THE SECRETARY OF THE INTERIOR, AND 100 PERCENT OF ANY GOVERNMENT PROFITS WOULD BE PAID TO THE FEDERAL GOVERNMENT.

SECTION 105 AUTHORIZES THE SECRETARY TO INCLUDE IN TOTAL PROGRAM COSTS FUNDS FOR THE REIMBURSEMENT OF INDIVIDUALS WHO HAVE UNDERTAKEN REMEDIAL ACTION AT THEIR OWN COST ON SITES OR STRUCTURES WHICH WOULD HAVE BEEN REMEDIED UNDER THE ACT. THE SITES OR STRUCTURES MUST BE AT **7442 LOCATIONS OTHER THAN THE ORIGINAL PROCESSING SITE, AND THE ACTIONS MUST HAVE BEEN UNDERTAKEN PRIOR TO ENACTMENT OF THE ACT.

SECTION 106 REQUIRES THE SECRETARY TO CONDUCT RESEARCH TO DETERMINE WHETHER THE HAZARDS OF MILL TAILINGS PILES COULD BE REMEDIED BY EXTRACTING THE DANGEROUS MATERIALS IN THE PILES.

SECTION 107 AUTHORIZES THE SECRETARY TO PROMULGATE RULES AND REGULATIONS NECESSARY TO CARRY OUT THE ACT.

SECTION 108 REQUIRES THE ADMINISTRATOR OF THE ENVIRONMENTAL PROTECTION AGENCY TO PROMULGATE WITHIN 180 DAYS GENERAL STANDARDS AND CRITERIA FOR PROTECTION OF THE ENVIRONMENT AGAINST HAZARDS OF THE URANIUM MILL TAILINGS. SUCH STANDARDS WOULD BE APPLICABLE TO THE ACTIVITIES OF THE DEPARTMENT OF ENERGY IN REMEDYING THE MILL TAILINGS HAZARDS UNDER THE ACT.

SECTION 109 AUTHORIZES THE COMMISSION TO PROMULGATE, IMPLEMENT AND ENFORCE REGULATIONS GOVERNING PERMANENT FEDERAL CUSTODY OF URANIUM MILL TAILINGS DISPOSAL SITES AND GOVERNING THE ACTIVITIES OF THE DEPARTMENT OF ENERGY UNDER TITLE I OF THE ACT. IN ADDITION, THE SECTION INSURES THAT NO REGULATORY GAP WILL EXIST DURING THE 3-YEAR GRACE PERIOD WHEN LICENSES ARE NOT REQUIRED FOR THE TYPE OF BYPRODUCT MATERIAL NEWLY DEFINED IN TITLE II.

**20** SECTION 110 AUTHORIZES $180 MILLION EFFECTIVE OCTOBER 1, 1979, FOR THE DEPARTMENT OF ENERGY TO CARRY OUT THE PURPOSES OF TITLE I OF THE ACT. THE FUNDS ARE TO REMAIN AVAILABLE UNTIL EXPENDED.

SECTION 111 BRINGS THE AUTHORIZATION INTO COMPLIANCE WITH THE BUDGET ACT.

TITLE II-- URANIUM MILL TAILINGS LICENSING AND REGULATION

TITLE II REINFORCES THE AUTHORITY OF THE NUCLEAR REGULATORY COMMISSION TO REGULATE THE URANIUM MILL PROCESS AND MILL TAILINGS DISPOSAL. THE 'AGREEMENT STATES' PROGRAM, UNDER WHICH CERTAIN STATES LICENSE URANIUM MILLING ACTIVITIES, IS MODIFIED TO REQUIRE THAT STATE LICENSING STANDARDS BE EQUIVALENT TO THE EXTENT PRACTICABLE TO THOSE OF THE COMMISSION, AND TO REQUIRE PUBLIC PARTICIPATION AND ENVIRONMENTAL REVIEW AS PART OF THE STATE LICENSING PROCEDURES. TITLE II ALSO REINFORCES THE NRC'S AUTHORITY TO MAKE FINANCIAL ARRANGEMENTS WITH URANIUM MILLING COMPANIES TO INSURE PROPER STABILIZATION AND CARE OF URANIUM MILL TAILINGS.

SECTION 201 AMENDS THE DEFINITION OF 'BYPRODUCT MATERIAL' IN THE ATOMIC ENERGY ACT TO INCLUDE URANIUM MILL TAILINGS. PREVIOUSLY, TAILINGS HAVE BEEN CONTROLLED THROUGH THE LICENSING PROCESS FOR URANIUM MILLS. THIS AMENDMENT WOULD SUBJECT TAILINGS TO SPECIFIC

LICENSING AUTHORITY. (SECTION 209 REQUIRES THAT THE MILLING AND MILL TAILINGS LICENSING PROCESS BE CONSOLIDATED.)

SECTION 202 REQUIRES THAT ALL FINAL DISPOSAL SITES FOR URANIUM MILL TAILINGS BE TRANSFERRED, UPON TERMINATION OF LICENSES, TO THE FEDERAL GOVERNMENT FOR PERMANENT FEDERAL CUSTODY. THE PRESIDENT IS REQUIRED TO DESIGNATE AN APPROPRIATE AGENCY TO ACT AS CUSTODIAN FOR THE TAILINGS. THE DESIGNATED CUSTODIAN IS AUTHORIZED TO ACCEPT DONATIONS OF SITES WHICH HAVE BEEN USED FOR LICENSED TAILINGS DISPOSAL BUT WHICH MAY NOT BE REQUIRED TO BE TRANSFERRED BY THE COMMISSION. THIS PROVISION INSURES THAT NO OWNER OF DISPOSAL SITES WOULD BE COMPELLED TO REMAIN UNDER PERPETUAL COMMISSION LICENSE AS A RESULT OF POSSESSING **7443 BYPRODUCT MATERIAL. TITLE TO ALL TAILINGS SITES IS REQUIRED TO BE TRANSFERRED TO THE UNITED STATES WITHOUT COST.

SECTION 203 AUTHORIZES THE COMMISSION TO REQUIRE SECURE FINANCIAL ARRANGEMENTS FROM LICENSEES FOR MILL TAILINGS STABILIZATION AND, IF NECESSARY, FOR LONG-TERM CARE COSTS. SUCH FINANCIAL ARRANGEMENTS MAY BE IN THE FORM OF BONDS, SURETIES, FEES OR OTHER COLLATERAL TO INSURE THAT FLEXIBILITY MAY BE EXERCISED IN REQUIREMENTS TO PREVENT UNNECESSARY HARDSHIP FOR FIRMS OF DIFFERING SIZE OR FINANCIAL BACKGROUND.

SUBPARAGRAPH (1) REQUIRES THE COMMISSION TO REGULATE URANIUM MILLING AND MILL TAILINGS DISPOSAL IN SUCH A WAY THAT WHEN LICENSES ARE TERMINATED RECLAMATION AND STABILIZATION HAS BEEN IMPLEMENTED BY THE LICENSEE IN SUCH WAY AS TO INSURE, TO THE MAXIMUM EXTENT ALLOWABLE BY THE STATE OF TECHNICAL ART, THAT THE DISPOSAL SITES WILL NOT REQUIRE ANY LONG-TERM MAINTENANCE AND MONITORING TO PROTECT THE PUBLIC AND THE ENVIRONMENT.

SUBPARAGRAPH (2) REQUIRES THAT, IN ANY CASE WHERE LONG-TERM MAINTENANCE AND MONITORING IS DETERMINED TO BE NECESSARY BY THE COMMISSION, THE APPROPRIATE LICENSEE WILL PAY SUCH COSTS. THE COMMISSION IS REQUIRED TO HAVE OBTAINED ANY SUCH FUNDS FROM THE LICENSEE PRIOR TO TERMINATION OF THE LICENSE.

*21 SECTION 204 AMENDS THE ATOMIC ENERGY ACT TO PROVIDE FOR ADHERENCE BY AGREEMENT STATES TO MINIMUM FEDERAL STANDARDS FOR URANIUM MILL TAILINGS CONTROL. SUBSECTIONS (A) THROUGH (D) ALLOW STATES TO DISCONTINUE LICENSING OF URANIUM MILLING AND MILL TAILINGS CONTROL, WHILE RETAINING AUTHORITY TO LICENSE OTHER MATERIALS LICENSABLE UNDER THE AGREEMENT STATES PROGRAM. UNDER CURRENT LAW, STATES WHICH DID NOT WANT TO REGULATE URANIUM MILLING WOULD HAVE TO TERMINATE THEIR COMPLETE AGREEMENTS WITH THE COMMISSION.

SUBSECTION (E) REQUIRES THAT, FOLLOWING 3 YEARS AFTER ENACTMENT OF THE ACT, STATE LICENSING STANDARDS FOR URANIUM MILL TAILINGS AND URANIUM MILLING MUST TO THE EXTENT PRACTICABLE BE EQUIVALENT TO, OR EXCEED, THOSE OF THE COMMISSION. IN ADDITION, LICENSES ISSUED BY STATES MUST REQUIRE THAT UPON TERMINATION OF SUCH LICENSES MILL TAILING DISPOSAL SITES WILL BE TRANSFERRED WITHOUT COST TO PERMANENT FEDERAL CUSTODY. STATE LICENSING PROCEDURES ARE REQUIRED TO INCLUDE PROVISIONS FOR PUBLIC PARTICIPATION AND ENVIRONMENTAL REVIEW.

THE SUBSECTION ALSO PROVIDES FOR STATES TO TRANSFER FEES THEY MAY COLLECT FOR LONG-TERM CARE OF URANIUM MILL TAILINGS DISPOSAL SITES TO THE FEDERAL GOVERNMENT WHEN THE SITES BECOME INACTIVE. ALL URANIUM MILL TAILINGS DISPOSAL SITES WILL BE TRANSFERRED FOR PERMANENT CUSTODY UNDER THE ACT TO THE FEDERAL GOVERNMENT, WHICH WILL IMPLEMENT ANY NECESSARY LONG-TERM CARE REQUIREMENTS.

STATES MAY IMPOSE AND COLLECT LONG-TERM CARE FEES UNDER THEIR OWN AUTHORITIES, WHEN

STATES LICENSE URANIUM MILLING AND MILL TAILINGS DISPOSAL ACTIVITIES. SEVERAL STATES ALREADY COLLECT LONG-TERM CARE FEES FROM LICENSEES. THIS SUBSECTION PROVIDES THAT COLLECTED MAINTENANCE FEES WILL BE TRANSFERRED TO THE FEDERAL GOVERNMENT ALONG WITH THE SITES WHICH WILL REQUIRE THE MAINTENANCE.

SUBSECTION (F) RESERVES THE RIGHT OF THE COMMISSION TO DETERMINE THAT MILL TAILINGS PILES CREATED UNDER AGREEMENT STATE LICENSING HAVE MET APPLICABLE REQUIREMENTS BEFORE THEY ARE TURNED OVER TO FEDERAL CUSTODY.

**\*\*7444** SUBSECTION (G) REQUIRES THE COMMISSION TO REVIEW THE REGULATORY PROGRAMS OF EACH AGREEMENT STATES, AS SOON AS PRACTICABLE 3 YEARS AFTER THE DATE OF ENACTMENT OF THE ACT, TO DETERMINE WHETHER THE STANDARDS APPLIED BY THE STATE ARE AT LEAST EQUIVALENT TO THOSE OF THE COMMISSION. IF THE COMMISSION DETERMINES THAT THE STATE'S PROGRAM DOES NOT COMPLY, IT MAY SUSPEND OR TERMINATE THAT PART OF ITS AGREEMENT WITH THE STATE UNDER WHICH THE STATE IS PERMITTED TO LICENSE AND REGULATE URANIUM MILLING AND MILL TAILINGS ACTIVITIES. REGULATORY AUTHORITY WOULD THEN REVERT TO THE COMMISSION.

SECTION 205 AUTHORIZES THE COMMISSION TO PROMULGATE, IMPLEMENT AND ENFORCE REGULATIONS GOVERNING PERMANENT FEDERAL CUSTODY OF URANIUM MILL TAILINGS DISPOSAL SITES AND GOVERNING THE ACTIVITIES OF THE DEPARTMENT OF ENERGY UNDER TITLE I OF THE ACT. IN ADDITION, THE SECTION INSURES THAT NO REGULATORY GAP WILL EXIST DURING THE 3-YEAR GRACE PERIOD WHEN LICENSES ARE NOT REQUIRED FOR THE TYPE OF BYPRODUCT MATERIAL NEWLY DEFINED IN TITLE II.

SECTION 206 REQUIRES THE ENVIRONMENTAL PROTECTION AGENCY TO SET GENERAL STANDARDS AND CRITERIA FOR THE PROTECTION OF THE ENVIRONMENT OUTSIDE THE BOUNDARIES OF MILL TAILINGS DISPOSAL SITES. THE STANDARDS AND CRITERIA WOULD WOULD BE APPLICABLE TO BOTH RADIOLOGICAL AND NONRADIOLOGICAL HAZARDS IN THE PILES. AUTHORITIES OF THE EPA UNDER OTHER LAWS WOULD NOT BE ABRIDGED BY THE NEW REQUIREMENTS.

**\*22** SECTION 207 AUTHORIZES $500,000 FOR GRANTS TO AGREEMENT STATES TO ASSIST THEM IN REVISION OF CURRENT REGULATORY PROGRAMS TO IMPLEMENT PROVISIONS OF THE ACT.

SECTION 208 PROVIDES EFFECTIVE DATES FOR THE PROVISIONS OF THE ACT SUCH THAT:

(1) NO. LICENSES WOULD BE REQUIRED UNDER THE NEW DEFINITION OF BYPRODUCT MATERIAL UNTIL 3 YEARS FOLLOWING ENACTMENT.

(2) UPGRADED REQUIREMENTS UNDER AGREEMENT STATES LICENSING PROGRAMS WOULD BE APPLIED RETROACTIVELY ONLY TO THE EXTENT PRACTICABLE FOR A GRADE PERIOD FOLLOWING ENACTMENT OF THE ACT. FOR EACH LICENSEE, SUCH PERIOD WOULD BE FOR 3 YEARS FOLLOWING ENACTMENT, OR UNTIL THE TIME AT WHICH THE LICENSEE'S LICENSE WOULD FIRST BE REQUIRED TO BE RENEWED, WHICHEVER IS THE LONGER PERIOD FOR A SPECIFIC LICENSEE. IN NO CASE MAY SUCH GRACE PERIOD BE LONGER THAN 5 YEARS FOLLOWING ENACTMENT OF THE ACT.

(3) REQUIREMENTS FOR TRANSFER OF TITLE TO FINAL DISPOSAL SITES UNDER EITHER NRC OR STATE LICENSING ARE APPLICABLE ONLY TO THE EXTENT PRACTICABLE TO LICENSES ISSUED BEFORE THE DATE OF ENACTMENT OF THE ACT.

(4) AUTHORITY TO REQUIRE SECURE FINANCIAL ARRANGEMENTS WOULD TAKE EFFECT IMMEDIATELY.

THE AUTHORITY OF AGREEMENT STATES TO CONTINUE LICENSING URANIUM MILLING AND TAILINGS DISPOSAL ACTIVITIES UNDER THEIR OWN AUTHORITIES DURING THE PERIOD PRECEDING REQUIREMENT OF LICENSES FOR BYPRODUCT MATERIAL AS NEWLY DEFINED IS MADE CLEAR.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

SECTION 209 REQUIRES THE COMMISSION TO CONSOLIDATE, TO THE EXTENT PRACTICABLE, LICENSES AND LICENSING PROCEDURES FOR THE URANIUM MILLING PROCESS AND FOR URANIUM MILL TAILINGS CONTROL.

SECTION 210 PROHIBITS THE COMMISSION FROM REQUIRING LICENSES FOR ANY ACTIVITIES UNDERTAKEN UNDER TITLE I OF THE ACT, EXCEPT THAT ANY MINERAL RECOVERY OPERATIONS ON ABANDONED MILL TAILINGS PILES WOULD BE SUBJECT TO LICENSING.

**\*\*7445** LEGISLATIVE HISTORY, HEARINGS AND COMMITTEE ACTION AND RECOMMENDATION

H.R. 13650 IS AN AMALGAM OF FOUR BILLS INTRODUCED DURING THE 2D SESSION OF THE 95TH CONGRESS. TO FACILITATE CONSIDERATION OF THE RECOMMENDATIONS OF THE SUBCOMMITTEE ON ENERGY AND THE ENVIRONMENT, IT WAS INTRODUCED AS A CLEAN BILL.

THE FOUR INITIAL PROPOSALS REPRESENTED TWO BASIC PURPOSES: THREE [1] PROPOSED A REMEDY FOR HAZARDS AT INACTIVE SITES WHICH RESULTED FROM THE PRODUCTION OF RADIOACTIVE MATERIALS FOR THE ATOMIC ENERGY COMMISSION UNDER FEDERAL CONTRACT AND THE FOURTH [2] PROVIDED FOR IMPROVED REGULATION OF URANIUM MILL TAILINGS AT ACTIVE URANIUM MILLING SITES.

HEARINGS WERE HELD BY THE SUBCOMMITTEE ON ENERGY AND THE ENVIRONMENT ON THE PROBLEM AT INACTIVE SITES ON JUNE 26 AND 27, 1978. TESTIMONY WAS PRESENTED ON H.R. 13382 JULY 10 AND 17.

WITNESSES AT THESE HEARINGS AGREED ON THE NECESSITY FOR REDUCING OR ELIMINATING HAZARDS PRESENTED BY URANIUM MILL TAILINGS. SUBSTANTIAL DISAGREEMENT AROSE REGARDING THE APPROPRIATE SHARE STATES AND THE FEDERAL GOVERNMENT SHOULD PAY OF THE COSTS OF ANY REMEDIAL PROGRAM **\*23** FOR TAILINGS AT INACTIVE SITES, WITH A SIGNIFICANT NUMBER OF WITNESSES AND MEMBERS ARGUING THAT THE REMEDIAL PROGRAM COSTS SHOULD BE COMPLETELY ASSUMED BY THE FEDERAL GOVERNMENT.

ON AUGUST 3, 5, AND 9 OF 1978, THE COMMITTEE REVIEWED THE RECOMMENDATIONS OF THE SUBCOMMITTEE ON ENERGY AND THE ENVIRONMENT WITH RESPECT TO H.R. 13650, AND ON AUGUST 9 BY UNANIMOUS VOICE VOTE RECOMMENDED THAT THE BILL BE ENACTED, WITH AN AMENDMENT.

OVERSIGHT STATEMENT

SINCE THE LEGISLATION, IF ENACTED, WOULD AFFECT LAWS GOVERNING THE DISPOSAL OF NUCLEAR WASTE AND THE REGULATION OF THE DOMESTIC NUCLEAR INDUSTRY, THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS, PURSUANT TO RULE X, CLAUSES 2(B)(1) AND 3(E), WOULD HAVE OVERSIGHT RESPONSIBILITY OVER ANY ACTION OF THE SECRETARY OF ENERGY OR THE NUCLEAR REGULATORY COMMISSION TO COMPLY WITH THE MANDATE OF THE LEGISLATION. NO RECOMMENDATIONS WERE SUBMITTED TO THE COMMITTEE PURSUANT TO RULE X, CLAUSE (2)(B)(2).

COST ESTIMATE AND BUDGET ACT COMPLIANCE

IN ACCORDANCE WITH RULE XIII, CLAUSE 7(A) OF THE HOUSE OF REPRESENTATIVES, THE COMMITTEE HAS MADE AN ESTIMATE OF THE BUDGET AUTHORITY WHICH WOULD BE REQUIRED TO CARRY OUT H.R. 9203 FOR THE FISCAL YEAR BEGINNING ON OCTOBER 1, 1979.

EFFECTIVE OCTOBER 1, 1978, THE BILL AUTHORIZES $180 MILLION TO BE APPROPRIATED FOR THE DEPARTMENT OF ENERGY TO CARRY OUT THE REMEDIAL PROGRAM UNDER TITLE I. THIS AMOUNT IS IN ADDITION TO $3 MILLION AUTHORIZED BY H.R. 11392 FOR THE DEPARTMENT TO CARRY OUT ACTIVITIES

Case 4:22-cv-00016-CDP Doc. #: 1-8 Filed: 01/29/22 Page: 173 of 903 PageID #: 1054

UNDER TITLE I DURING FISCAL YEAR 1979, WHICH AUTHORIZATION IS SUBJECT TO ENACTMENT OF THIS ACT.

**\*\*7446** ANOTHER $500,000 IS AUTHORIZED FOR FISCAL YEAR 1980 FOR THE NUCLEAR REGULATORY COMMISSION TO MAKE GRANTS TO STATES TO AID THEM IN IMPLEMENTING THE REQUIREMENTS OF TITLE II.

NO COST ESTIMATE FROM THE CONGRESSIONAL BUDGET OFFICE WAS TIMELY SUBMITTED TO THE COMMITTEE FOR INCLUSION IN THIS REPORT.

INFLATIONARY IMPACT

IN ACCORDANCE WITH RULE XI, CLAUSE 2(1)(4) OF THE RULES OF THE HOUSE OF REPRESENTATIVES, THE COMMITTEE HAS DETERMINED THAT THIS LEGISLATION WILL HAVE NO SIGNIFICANT IMPACT ON PRICES OR COSTS AFFECTING THE NATIONAL ECONOMY.

DEPARTMENTAL REPORTS

THE COMMITTEE RECEIVED REPORTS FROM TWO ADMINISTRATION AGENCIES EXPRESSING CONCERNS WITH CERTAIN ASPECTS OF H.R. 13650. ON JULY 13, A COMMUNICATION FROM THE ENVIRONMENTAL PROTECTION AGENCY SUGGESTED AMENDMENTS TO WHAT BECAME TITLE II OF H.R. 13650. (THE EPA LETTER EXPRESSED SUPPORT FOR LEGISLATION IN TITLE I OF THE BILL.) ON AUGUST 3, 1978, THE DEPARTMENT OF ENERGY SENT A LETTER EXPRESSING OBJECTIONS TO THREE ACTIONS OF THE SUBCOMMITTEE ON ENERGY AND THE ENVIRONMENT WITH RESPECT TO TITLE I OF THE BILL. BOTH COMMUNICATIONS ARE PRINTED BELOW:

**\*24** U.S. ENVIRONMENTAL PROTECTION AGENCY,

WASHINGTON, D.C., JULY 13, 1978.

HON. MORRIS UDALL,

CHAIRMAN, SUBCOMMITTEE ON ENERGY AND THE ENVIRONMENT,

COMMITTEE ON INTERIOR AND INSULAR AFFAIRS,

HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

DEAR MR. CHAIRMAN: IT HAS COME TO MY ATTENTION THAT YOUR SUBCOMMITTEE IS PLANNING TO PROCEED ON JULY 17 WITH MARKING UP TWO BILLS DEALING WITH THE PROBLEM OF URANIUM MILL TAILINGS. ONE OF THE BILLS, H.R. 12535, IS THE ADMINISTRATION BILL FOR REMEDIAL ACTION FOR INACTIVE URANIUM MILL TAILINGS SITES. WE HAVE TESTIFIED ON THIS BILL BEFORE CONGRESSMAN DINGELL'S SUBCOMMITTEE ON ENERGY AND POWER, AND WE SUPPORT IT. THE OTHER BILL IS H.R. 13382, THE URANIUM MILL TAILINGS LICENSING ACT OF 1978, WHICH WAS INTRODUCED BY YOU ON JUNE 29, 1978, AND WE HAVE NOT HAD AN OPPORTUNITY TO COMMENT OR TESTIFY ON THIS BILL BEFORE YOUR SUBCOMMITTEE PRIOR TO MARKUP. BASED ON OUR REVIEW OF THE BILL, WE DO HAVE SOME SUBSTANTIVE PROBLEMS WHICH COULD EASILY BE SOLVED BY AMENDING THE BILL AS DESCRIBED BELOW.

H.R. 13382 HAS SEVERAL PURPOSES:

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

1. TO AUTHORIZE THE COMMISSION TO EXERCISE DIRECT LICENSING AND REGULATION OF THE NATURALLY OCCURRING DAUGHTER PRODUCTS OF URANIUM AND THORIUM FOUND IN URANIUM MILL TAILINGS;

2. TO REINFORCE THE COMMISSION'S AUTHORITY TO REQUIRE SECURE FINANCIAL ARRANGEMENTS TO INSURE THE PROPER DECOMMISSIONING, DECONTAMINATION, RECLAMATION, AND LONG-TERM CARE IF NECESSARY, OF RADIOACTIVELY CONTAMINATED SITES, STRUCTURES, AND EQUIPMENT;

3. TO FACILITATE STATE OWNERSHIP AND AUTHORIZE FEDERAL OWNERSHIP OF MILL TAILINGS DISPOSAL AREAS; AND

**\*7447** 4. TO AUTHORIZE STATE REGULATION OF URANIUM MILL TAILINGS UNDER SECTION 274 OF THE ACT AND TO REQUIRE AGREEMENT STATES TO REGULATE URANIUM MILL TAILINGS WITHIN THEIR JURISDICTION TO AT LEAST THE SAME SUBSTANTIVE STANDARDS REQUIRED BY THE COMMISSION FOR ITS LICENSEES.

OUR CONCERNS DEAL MAINLY WITH THE FIRST POINT, WHICH WOULD BE ACCOMPLISHED BY INCLUDING URANIUM MILL TAILINGS UNDER THE DEFINITION OF 'BYPRODUCT MATERIALS ' UNDER THE ATOMIC ENERGY ACT OF 1954, AS AMENDED, THEREBY REMOVING URANIUM MILL TAILINGS FROM THE SCOPE OF THE RESOURCE CONSERVATION AND RECOVERY ACT OF 1976 (RCRA).

EPA IS CONCERNED ABOUT CONSISTENCY BETWEEN REGULATORY APPROACHES TO THE URANIUM MILL TAILINGS PROBLEM. THE NRC LEGISLATION IS APPLICABLE ONLY TO URANIUM MILL TAILINGS, BUT OTHER WASTES, NOTABLY THOSE FROM THE PHOSPHATE INDUSTRY, POSE SIMILAR HAZARDS DUE TO QUANTITY, CONFIGURATION AND RADIONUCLIDE CONTENT AND WILL BE REGULATED UNDER RCRA. LIKE URANIUM TAILINGS, THESE WASTES ARE GENERATED IN LARGE QUANTITIES; THEY CONTAIN RADIUM, THE PRINCIPAL RADIONUCLIDE OF CONCERN; THEY ARE DISPERSED THROUGHOUT A NONRADIOACTIVE MEDIUM IN RELATIVELY LOW CONCENTRATIONS; AND THEY CREATE A HEALTH HAZARD TO MEMBERS OF THE PUBLIC CHRONICALLY EXPOSED TO SUCH MATERIAL. IT WOULD BE DUPLICATIVE AND INCONSISTENT TO HAVE DIFFERENT REGULATIONS FOR SIMILAR **\*25** WASTES RENDERED HAZARDOUS BY IDENTICAL RADIOACTIVE CONSTITUENTS. COMPLICATIONS MAY ARISE ESPECIALLY IN CONNECTION WITH THE REGULATION OF DISPOSAL BY THE PHOSPHATE INDUSTRY. FOR EXAMPLE, SOME PHOSPHATE MINING WASTES ARE BEING REPROCESSED TO EXTRACT URANIUM.

EPA IS ALSO CONCERNED ABOUT THE NONRADIOACTIVE HAZARDOUS CHARACTERISTICS OF THE WASTE. UNDER SECTION 6001 OF RCRA, ALL DEPARTMENTS, AGENCIES AND INSTRUMENTALITIES OF THE FEDERAL GOVERNMENT ARE SUBJECT TO SUBSTANTIVE AND PROCEDURAL RCRA REQUIREMENTS. IF THE URANIUM MILL TAILINGS ALSO HAVE TOXIC CHARACTERISTICS, THEIR MANAGEMENT SHOULD BE COMPATIBLE WITH RCRA PROVISIONS.

TO ADDRESS THESE CONCERNS, SEVERAL AMENDMENTS SHOULD BE MADE TO THE BILL. FIRST, IT SHOULD SPECIFY THAT FOR THE PURPOSES OF 40 CFR 190, THE URANIUM FUEL CYCLE STANDARDS, AND FOR ALL OTHER PURPOSES, THE BILL IS NOT INTENDED TO AFFECT EPA'S GENERALLY APPLICABLE AUTHORITY UNDER THE ATOMIC ENERGY ACT, AS AMENDED, AND REORGANIZATION PLAN NO. 3 OF 1970, OR ANY EPA AUTHORITY UNDER THE CLEAN AIR ACT.

THE BILL SHOULD ALSO REQUIRE EPA TO SET ENVIRONMENTAL STANDARDS AND CRITERIA FOR MANAGEMENT OF URANIUM MILL TAILINGS AND SPECIFY THAT THE LICENSING BY NRC UNDER THE AMENDED ATOMIC ENERGY ACT IMPLEMENT THESE STANDARDS AND CRITERIA. THE BILL SHOULD FURTHER PROVIDE THAT THE LICENSE CONDITIONS REQUIRED BY NRC CONTAIN SUBSTANTIVE REQUIREMENTS COMPARABLE TO THOSE OF RCPA. THE FOLLOWING LANGUAGE COULD INCORPORATE THESE SUGGESTIONS INTO THE BILL:

'THE ENVIRONMENTAL PROTECTION AGENCY SHALL, AFTER NOTICE OF PROPOSED RULEMAKING AND

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

H.R. REP. 95-1480(I), H.R. REP. 95-1480(I) (1978)

OPPORTUNITY FOR ORAL PRESENTATION OF VIEWS, DATA AND ARGUMENTS, PRESCRIBE STANDARDS AND CRITERIA TO ASSURE THAT PUBLIC HEALTH AND THE ENVIRONMENT ARE ADEQUATELY PROTECTED IN CONNECTION WITH THE MANAGEMENT OF URANIUM MILL TAILINGS. THE STANDARDS AND CRITERIA SHALL BE APPLICABLE TO HAZARDOUS RADIOACTIVE AND NONRADIOACTIVE CHARACTERISTICS OF THE URANIUM MILL TAILINGS.

**\*\*7448** 'IN DEVELOPING CRITERIA AND STANDARDS UNDER THIS ACT, EPA WILL AVOID DUPLICATION OF EFFORTS AND ENSURE CONSISTENCY TO THE MAXIMUM EXTENT PRACTICABLE WITH THE REQUIREMENTS OF RCRA OF 1976, THE CLEAN AIR ACT OF 1970, AS AMENDED, AND ANY OTHER FEDERAL LAW RELATING TO PROTECTION OF THE ENVIRONMENT.

'NRC SHALL IMPLEMENT THESE STANDARDS AND CRITERIA IN ITS LICENSING ACTIVITIES UNDER THE ATOMIC ENERGY ACT OF 1954, AS AMENDED. NRC SHALL ALSO ADOPT AND ENFORCE REQUIREMENTS GOVERNING URANIUM MILL TAILINGS PROVIDING FOR THE USE BY LICENSEES OF ADDITIONAL MEASURES COMPARABLE TO THOSE REQUIRED FOR HAZARDOUS MATERIALS UNDER SUBTITLE C OF RCRA.'

THE APPROACH THIS LANGUAGE TAKES TO SETTING STANDARDS AND CRITERIA HAS THE ADDITIONAL BENEFIT OF BASIC CONSISTENCY WITH THE APPROACH TAKEN IN THE ADMINISTRATION'S BILL, H.R. 12535, DEALING WITH REMEDIAL ACTION AT INACTIVE SITES.

I HOPE THESE COMMENTS WILL BE HELPFUL TO THE SUBCOMMITTEE IN ITS CONTINUED WORK ON THE URANIUM MILL TAILINGS PROBLEM.

SINCERELY YOURS,

DOUGLAS M. COSTLE.

**\*26** DEPARTMENT OF ENERGY,

WASHINGTON, D.C., AUGUST 3, 1978.

HON. MORRIS K. UDALL,

CHAIRMAN, COMMITTEE ON INTERIOR AND INSULAR AFFAIRS,

WASHINGTON, D.C.

DEAR MR. CHAIRMAN: ON JULY 20 AND 27, 1978, THE SUBCOMMITTEE ON ENERGY AND ENVIRONMENT CONDUCTED A MARKUP OF THE RESIDUAL RADIOACTIVE MATERIALS ACT OF 1978 (THE ADMINISTRATION BILL). DURING THE MARKUP THE SUBCOMMITTEE AGREED TO THE FOLLOWING CHANGES IN THE ADMINISTRATION BILL WITH RESPECT TO WHICH THE DEPARTMENT OF ENERGY (DOE) WISHES TO EXPRESS ITS CONCERN:

1. A 90-PERCENT FEDERAL/10-PERCENT STATE SHARE OF THE COSTS OF THE REMEDIAL ACTION WITH AN ABSOLUTE CEILING ON ANY STATE'S CUMULATIVE SHARE EQUAL TO ONE-QUARTER OF 1 PERCENT OF THE STATE'S GENERAL REVENUE IN THE YEAR OF ENACTMENT;

2. A CONCURRENCE ROLE, AS OPPOSED TO A CONSULTATION ROLE, FOR THE STATES IN THE DETERMINATION OF THE REMEDIAL ACTION; AND

3. DELETION OF THE SUBSECTIONS OF THE ADMINISTRATION BILL RELATING TO THE RELEASE OF THE UNITED STATES FROM LIABILITY IN CONNECTION WITH THE PERFORMANCE OF THE REMEDIAL ACTION.

### COST SHARING FORMULA

FOR REASONS MADE CLEAR IN THE SUBCOMMITTEE RECORD, DOE IS OPPOSED TO THE FUNDING FORMULA AGREED TO BY THE SUBCOMMITTEE. OF PARTICULAR CONCERN IS THE CEILING IMPOSED ON A STATE'S CONTRIBUTION TO THE REMEDIAL ACTION PROGRAM. IN PRACTICE, IMPOSITION OF SUCH A CEILING COULD CREATE SERIOUS PROBLEMS ONCE THE REMEDIAL ACTION PROGRAM IS UNDERWAY.

ONE OF DOE'S PRIMARY OBJECTIVES WITH RESPECT TO THIS PROGRAM IS THE ACCOMPLISHMENT OF THE CLEANUP OF THE 22 SPECIFIED SITES WITHIN THE ESTIMATED BUDGET OF BETWEEN $80 MILLION AND $125 MILLION. IN ORDER TO ACHIEVE THIS GOAL IT IS IMPERATIVE THAT THE STATES HAVE MORE THAN A MINIMAL, PRELIMINARY FINANCIAL INVOLVEMENT IN THE REMEDIAL PROGRAM. SHOULD CHANGES IN THE PROGRAM BECOME NECESSARY AFTER ITS COMMENCEMENT, **7449 THE STATES SHOULD HAVE AN ONGOING CONCERN WITH THE RELATIVE COSTS ASSOCIATED WITH THESE CHANGES. ADDITIONALLY, THE SECRETARY HAS BEEN PROVIDED DISCRETIONARY AUTHORITY TO DESIGNATE WITHIN 5 YEARS OF ENACTMENT OF THE LEGISLATION ADDITIONAL SITES FOR THE PURPOSE OF REMEDIAL ACTION. IT IS REASONABLE TO EXPECT THAT A SIGNIFICANT AMOUNT OF PRESSURE WILL BE EXERTED UPON THE SECRETARY BY STATE AND PRIVATE PARTIES TO DESIGNATE ADDITIONAL SITES WITHIN THIS 5-YEAR PERIOD. AT A MINIMUM ADDITIONAL SITES, IF DESIGNATED, SHOULD BE EXEMPTED FROM APPLICATION OF THE CEILING IN ORDER TO MINIMIZE SUCH PRESSURE.

### STATE ROLE

UNDER THE ADMINISTRATION BILL, THE APPROPRIATE REMEDIAL ACTION WOULD BE DETERMINED BY THE SECRETARY AFTER CONSULTATION WITH THE STATE; THE STATE WOULD THEN DESIGNATE THE DISPOSAL SITE OR LONG-TERM STABILIZATION OF THE TAILINGS. IN PROPOSING THIS TYPE OF STATE ROLE, IT WAS DOE'S INTENTION TO AFFORD THE STATES FULL PARTICIPATION AT EVERY LEVEL OF THE DECISION MAKING PROCESS. THEREFORE, THE PHILOSOPHY UNDERLYING THE SUBCOMMITTEE'S DECISION TO PROVIDE CONCURRENCE AUTHORITY TO THE *27 STATES IS NOT DISSIMILAR TO DOE'S OBJECTIVES. WE ARE CONCERNED, HOWEVER, AS TO HOW STATES COULD OBTAIN AUTHORITY TO GRANT THIS CONCURRENCE UNDER STATE LAW. SUCH AUTHORITY, IF REQUIRED TO BE SECURED THROUGH NEW STATE LEGISLATION, COULD CAUSE SIGNIFICANT DELAYS IN THE REMEDIAL ACTION PROGRAM AND CREATE UNNECESSARY PROBLEMS WITHIN THE STATES. THE LANGUAGE IN THE ADMINISTRATION BILL ACHIEVES THE SAME OBJECTIVES WITHOUT CREATING SUCH POTENTIAL LEGISLATIVE HURDLES.

### RELEASE OF LIABILITY

THE QUESTION OF LIMITING THE LIABILITY OF THE UNITED STATES IN CONNECTION WITH THE PERFORMANCE OF THE REMEDIAL ACTION IS A SENSITIVE AND COMPLEX ONE, AND WARRANTS A MORE THOROUGH STUDY THAN IS CONTAINED IN THE ONE PARAGRAPH SUMMARY IN THE ISSUE PAPER PRESENTED TO THE SUBCOMMITTEE ON JULY 20, 1978.

THE LANGUAGE PROPOSED BY THE ADMINISTRATION EFFECTS ONLY A LIMITED RELEASE OF LIABILITY DATING FROM ENACTMENT OF THE LEGISLATION THROUGH THE COMPLETION OF THE REMEDIAL ACTION. SUCH A RELEASE WOULD NOT AFFECT THE U.S. LIABILITY, IF ANY, EITHER PRIOR TO OR AFTER COMPLETION OF THE REMEDIAL ACTION. SINCE THE BASIS UPON WHICH THE REMEDIAL ACTION PROGRAM IS BEING UNDERTAKEN IS ONE OF COMPASSIONATE RATHER THAN LEGAL RESPONSIBILITY, DOE CONSIDERS THE INCLUSION OF A LIMITED RELEASE OF LIABILITY TO BE REASONABLE AND PROPER.

WHILE WE RECOGNIZE AND UNDERSTAND THE MOTIVATIONS WHICH HAE PROMPTED THE SUBCOMMITTEE'S ACTIONS WITH RESPECT TO THE ADMINISTRATION BILL, THE MODIFICATIONS ADOPTED ARE CONTRARY TO DOE'S OBJECTIVES AS EXPRESSED ABOVE. WITH RESPECT TO THE THREE

MAJOR ISSUES OF FUNDINGS, STATE ROLE, AND LIABILITY, DOE IS CONCERNED THAT THE SUBCOMMITTEE'S CHANGES COULD RESULT IN DELAYS IN IMPLEMENTATION OF AND COST OVERRUNS FOR THE REMEDIAL ACTIONS.

**\*\*7450** WE APPRECIATE THE TIME AND EFFORT THAT THE SUBCOMMITTEE HAS SPENT IN MARKING UP THIS LEGISLATION. MY STAFF AND I WILL BE HAPPY TO PROVIDE ANY ASSISTANCE THE FULL COMMITTEE MAY REQUIRE DURING ITS MARKUP.

SINCERELY,

JOHN F. O'LEARY,

DEPUTY SECRETARY.

\* \* \* \*

1 H.R. 12535, INTRODUCED BY MR. UDALL (FOR THE ADMINISTRATION), H.R. 12938, INTRODUCED BY MR. MARRIOTT, AND H.R. 13049, INTRODUCED BY MR. JOHNSON OF COLORADO.

2 H.R. 13382 BY MR. UDALL.

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: \*\*\*\*\*. 2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

H.R. REP. 95-1480(I), H.R. REP. 95-1480, H.R. Rep. No. 1480(I), 95TH Cong., 2ND Sess. 1978, 1978 U.S.C.C.A.N. 7433, 1978 WL 8518 (Leg.Hist.)

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

# EXHIBIT 10

H.R. REP. 95-1480(II), H.R. REP. 95-1480, H.R. Rep. No. 1480(II), 95TH Cong., 2ND Sess. 1978, 1978
U.S.C.C.A.N. 7450, 1978 WL 8519 (Leg.Hist.)
**7450 P.L. 95-604, URANIUM MILL TAILINGS RADIATION CONTROL ACT OF 1978
SEE PAGE 92 STAT. 3021
HOUSE REPORT (INTERIOR AND INSULAR AFFAIRS COMMITTEE)
NO. 95-1480(I), AUG. 11, 1978 (TO ACCOMPANY H.R. 13650)
HOUSE REPORT (INTERSTATE AND FOREIGN COMMERCE COMMITTEE)
NO. 95-1480(II), SEPT. 30, 1978 (TO ACCOMPANY H.R. 13650)
CONG. RECORD VOL. 124 (1978)
DATES OF CONSIDERATION AND PASSAGE
HOUSE OCTOBER 3, 14, 1978
SENATE OCTOBER 13, 15, 1978
NO SENATE REPORT WAS SUBMITTED WITH THIS LEGISLATION.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL. EACH COMMITTEE
REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

HOUSE REPORT NO. 95-1480(II)

SEPTEMBER 30, 1978

* * * *

**\*1** THE COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE, TO WHOM WAS REFERRED THE BILL
(H.R. 13650) TO AUTHORIZE THE SECRETARY OF ENERGY TO ENTER INTO COOPERATIVE AGREEMENTS
WITH CERTAIN STATES RESPECTING RESIDUAL RADIOACTIVE MATERIAL AT EXISTING SITES, TO
PROVIDE FOR THE REGULATION OF URANIUM MILL TAILINGS UNDER THE ATOMIC ENERGY ACT OF 1954,
AND FOR OTHER PURPOSES, HAVING CONSIDERED THE SAME, REPORT FAVORABLY THEREON WITH AN
AMENDMENT AND RECOMMEND THAT THE BILL AS AMENDED DO PASS.

* * * *

**\*23** PURPOSE OF THE BILL

H.R. 13650, AS REPORTED BY THE COMMITTEE, ESTABLISHED A REMEDIAL ACTION PROGRAM AT
CERTAIN INACTIVE URANIUM MILL TAILINGS SITES FOR THE PURPOSE OF PROTECTING THE PUBLIC
FROM POSSIBLE RADIATION HEALTH HAZARDS RESULTING FROM SUCH TAILINGS, AMENDS THE
ATOMIC ENERGY ACT OF 1954 TO REGULATE CONTROL, AND LICENSE CERTAIN BYPRODUCT MATERIAL
AT EXISTING AND FUTURE ACTIVE MILL TAILINGS OPERATINGS, AND PROVIDES A STUDY OF CERTAIN
SITES, AND, IN ADDITION, POSSIBLE LIMITED REMEDIAL ACTION AT SUCH SITES IF REGULATORY
AUTHORITY UNDER THE 1954 ACT, AS AMENDED BY THIS BILL, PROVES INADEQUATE.

**\*24** LEGISLATIVE BACKGROUND

ON APRIL 27, 1978 THE DEPARTMENT OF ENERGY, ON BEHALF OF THE ADMINISTRATION, SUBMITTED TO
THE CONGRESS LEGISLATION TO ESTABLISH A REMEDIAL ACTION PROGRAM AT INACTIVE MILL
TAILINGS SITES THROUGH COOPERATIVE ARRANGEMENTS BETWEEN THE SECRETARY OF ENERGY AND
THE STATES AND INDIAN TRIBES. ON MAY 3, 1978, THE CHAIRMAN OF THE COMMITTEE ON INTERIOR
AND INSULAR AFFAIRS, CONGRESSMAN MORRIS K. UDALL, AND THE CHAIRMAN OF THE COMMITTEE,

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

CONGRESSMAN HARLEY O. STAGGERS, INTRODUCED THE ADMINISTRATION PROPOSAL AS H.R. 12535.

**7451** ON JUNE 29, 1978, CONGRESSMAN UDALL ALSO INTRODUCED H.R. 13382 WHICH PROVIDED FOR THE REGULATION OF ACTIVE URANIUM MILL TAILINGS SITES. THAT BILL WAS BASED ON A PROPOSAL DEVELOPED BY THE NUCLEAR REGULATORY COMMISSION.

THREE BILLS, SIMILAR TO H.R. 12535, WERE INTRODUCED BY CONGRESSMAN MARRIOTT. THEY ARE:

H.R. 11698, INTRODUCED ON MARCH 21, 1978.

H.R. 12229, INTRODUCED ON APRIL 19, 1978 AND CO-SPONSORED BY CONGRESSMEN ARMSTRONG, BAUMAN, EDWARDS OF OKLAHOMA, HANSEN, JOHNSON OF COLORADO, KAZEN, LUJAN, MURPHY OF PENNSYLVANIA, RHODES, RONCALIO, RUDD, RUNNELS, SKUBITZ, SYMMS, AND WEAVER.

H.R. 12938, INTRODUCED ON JUNE 1, 1978, WAS ALSO CO-SPONSORED BY THESE CONGRESSMEN AND CONGRESSMEN MCDADE, RUPPE, AND STUMP.

ALL OF THESE BILLS WERE REFERRED JOINTLY TO THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS AND THIS COMMITTEE. HEARINGS WERE HELD ON THE BILL IN JUNE 1978 BY THE SUBCOMMITTEE ON ENERGY AND THE ENVIRONMENT OF THE INTERIOR AND INSULAR AFFAIRS COMMITTEE. ON JULY 28, 1978, CHAIRMAN UDALL INTRODUCED H.R. 13650 WHICH IS COSPONSORED BY CONGRESSMEN LUJAN, SHARP, MARRIOTT, JOHNSON OF COLORADO, MCKAY, VENTO, KAZEN, RONCALIO, BAUMAN, AND RHODES. H.R. 12535 AND H.R. 13382, AS WELL AS SOME FEATURES OF THE OTHER BILLS.

THE SUBCOMMITTEE ON ENERGY AND POWER, CHAIRED BY CONGRESSMAN JOHN D. DINGELL, HELD HEARINGS ON ALL OF THESE BILL ON JUNE 19 AND 20 AND ON AUGUST 2, 1978. TESTIMONY WAS RECEIVED FROM REPRESENTATIVES OF INDUSTRY, THE NATIONAL GOVERNORS ASSOCIATION, THE ENVIRONMENTAL POLICY CENTER, THE DEPARTMENT OF ENERGY, THE NUCLEAR REGULATORY COMMISSION, AND THE ENVIRONMENTAL PROTECTION AGENCY.

ON AUGUST 11, 1978, THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS REPORTED H.R. 13650 IN AMENDED FORM (H. REPT. 95-1480, PART I). ON SIMILAR VERSION OF THE BILL. THEREAFTER, SUBCOMMITTEE CHAIRMAN DINGELL AND CHAIRMAN UDALL, TOGETHER WITH REPRESENTATIVES OF THE MINORITY ON BOTH COMMITTEES, DEVELOPED AMENDMENTS TO THE ENERGY AND POWER VERSION IN ORDER TO RECONCILE THE TWO VERSIONS AND HAVE THE AMENDED BILL CONSIDERED BY THE FULL HOUSE. THE COMMITTEE REPORTED H.R. 13650 WITH AN AMENDMENT THAT INCLUDES THE PROVISIONS SUGGESTED BY THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS. CHAIRMAN UDALL HAS INDICATED THAT HE SUPPORTS THIS AMENDED VERSION.

**\*25** BACKGROUND AND NEED FOR LEGISLATION

A. NEED FOR A REMEDIAL ACTION PROGRAM

URANIUM MILLS ARE A PART OF THE NUCLEAR FUEL CYCLE. THEY EXTRACT URANIUM FROM ORE FOR EVENTUAL USE IN NUCLEAR WEAPONS AND POWERPLANTS, LEAVING RADIOACTIVE SAND-LIKE WASTE-- COMMONLY CALLED URANIUM MILL TAILINGS-- IN GENERALLY UNATTENDED PILES. AS A RESULT OF MANY YEARS OF URANIUM ORE PROCESSING, ABOUT 140 MILLION TONS HAVE NOW ACCUMULATED AT ACTIVE AND INACTIVE MILLING SITES, ACCORDING TO THE NUCLEAR REGULATORY COMMISSION.

**7452** NRC CHAIRMAN, DR. JOSEPH N. HENRIE, DESCRIBES HOW THESE PILES ARE A HAZARD TO THE PUBLIC HEALTH:

H.R. REP. 95-1480(II), H.R. REP. 95-1480(II) (1978)

THE NRC BELIEVES THAT LONG-TERM RELEASE FROM TAILINGS PILES MAY POSE A RADIATION HEALTH HAZARD IF THE PILES ARE NOT EFFECTIVELY STABILIZED TO MINIMIZE RADON RELEASES AND PREVENT UNAUTHORIZED USE OF THE TAILINGS.

\* \* \* \*

UNLIKE HIGH-LEVEL RADIOACTIVE WASTE FROM THE BACK END OF THE NUCLEAR FUEL CYCLE, WHICH CONTAINS PRODUCTS OF THE FISSION REACTION, MILL TAILINGS CONTAIN ONLY NATURALLY OCCURRING RADIOACTIVE ELEMENTS, IN SMALL QUANTITIES. THE RADIOACTIVE DECAY OF THESE ELEMENTS LEADS TO PRODUCTION OF RADON, A RADIOACTIVE GAS WITH A HALF-LIFE OF ABOUT FOUR DAYS, WHICH CAN DIFFUSE FROM A TAILINGS PILE INTO THE ATMOSPHERE AND SUBSEQUENTLY EXPOSE PERSONS TO RADIATION FAR AWAY FROM THE PILE. THE INCREASED EXPOSURE COMPARED TO EXPOSURE FROM RADON ALREADY IN THE ATMOSPHERE FROM OTHER SOURCES IS EXCEEDINGLY SLIGHT, BUT THIS INCREASE IS IN EFFECT PERMANENT. THIS IS BECAUSE RADON PRODUCTION IN MILL TAILINGS CONTINUES FOR TIMES OF THE ORDER OF A HUNDRED THOUSAND YEARS, SO THE TAILINGS PILE BECOMES A PERPETUAL SOURCE INJECTING A SMALL AMOUNT OF RADON INTO THE ATMOSPHERE, UNLESS SOME ACTION IS TAKEN TO KEEP THE RADON FROM ESCAPING.

THE HEALTH EFFECTS OF THIS RADON PRODUCTION ARE TINEY AS APPLIED TO ANY ONE GENERATION, BUT THE SUM OF THESE EXPOSURES CAN BE MADE LARGE BY COUNTING FAR INTO THE FUTURE, LARGE ENOUGH IN FACT TO BE THE DOMINANT RADIATION EXPOSURE FROM THE NUCLEAR FUEL CYCLE. WHETHER IT IS MEANINGFUL TO ATTACH SIGNIFICANCE TO RADIATION EXPOSURES THOUSANDS OF YEARS IN THE FUTURE, OR CONVERSELY, WHETHER IT IS JUSTIFIABLE TO IGNORE THEM, ARE QUESTIONS WITHOUT EASY ANSWERS. THE MOST SATISFACTORY APPROACH IS TO REQUIRE EVERY REASONABLE EFFORT TO DISPOSE OF TAILINGS IN A WAY THAT MINIMIZES RADON DIFFUSION INTO THE ATMOSPHERE.

THE ASSISTANT ADMINISTRATOR FOR AIR AND WASTE MANAGEMENT OF THE ENVIRONMENTAL PROTECTION AGENCY, MR. DAVID G. HAWKINS, TESTIFIED CONCERNING THE HEALTH PROBLEMS AT THESE SITES AS FOLLOWS:

A SUMMARY TABLE IS GIVEN BELOW WHICH LISTS EACH SITE AND AN ESTIMATE OF THE 25-YEAR CUMULATIVE POTENTIAL LUNG CANCERS FROM INHALATION OF RADON DAUGHTERS IF THE SITE WERE LEFT AS IT IS.

**\*26** THE PEOPLE IN THE AREA ARE NOT NECESSARILY 'THREATENED' BY THESE TAILINGS. THE RISK FOR POTENTIAL LUNG CANCER IS INCREASED DUE TO RADON EMANATING FROM THE TAILINGS PILE. THE CALCULATIONS GIVEN IN THE TABLE REFLECT A STATISTICAL INCREASE IN EFFECTS BASED ON THE NUMBER OF PEOPLE ESTIMATED TO BE EXPOSED. THEREFORE HIGHLY POPULATED AREAS SHOW GREATER TOTAL EFFECTS THAN LOW POPULATION AREAS. IN ALL CASES THE INDIVIDUAL RISK IS LESS THAN 1X10.4 PER YEAR.

**\*\*7453** SUMMARY OF PHASE II REPORTS-- HEALTH EFFECTS

SITE . . . . . 25-YEAR POTENTIAL LUNG CANCERS

VITRO (SALT LAKE CITY, UTAH) . . . . . 24

DURANGO, COLO . . . . . 6

SHIPROCK, N. MEX . . . . . 5

GRAND JUNCTION, COLO . . . . . 3

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

RIVERTON, WYO . . . . . 2

GUNNISON, COLO . . . . . 1

RIFLE, COLO. (OLD AND NEW) . . . . . 1

MEXICAN HAT, UTAH . . . . . .2

LAKEVIEW, OREG . . . . . .2

FALLS CITY, TEX . . . . . .1

TUBA CITY, ARIZ . . . . . .1

NATURITA, COLO . . . . . .1

AMBROSIA LAKE, N. MEX . . . . . .1

GREEN RIVER, UTAH . . . . . .02

SLICK ROCK, COLO. (2 SITES) . . . . . .02

MAYBELL, COLO . . . . . .02

MONUMENT VALLEY, ARIZ . . . . . .02

LOWMAN, IDAHO . . . . . .002

CONVERSE COUNTY, WYO . . . . . .001

THE POTENTIAL HEALTH EFFECTS FROM RADON DAUGHTERS WERE CALCULATED BY DOE'S CONTRACTOR ON A ABSOLUTE RISK BASIS. THIS IS THE NUMERICAL INCREASE IN THE NUMBER OF CANCERS PER UNIT OF EXPOSURE. ANOTHER BASIS FOR THE RISK ESTIMATES IS THE RELATIVE RISK APPROACH, WHICH MAY GIVE RISK VALUES HIGHER BY AN ORDER OF MAGNITUDE. THE RELATIVE RISK ESTIMATE, IS THE ESTIMATED PERCENT INCREASE IN CANCER PER UNIT OF EXPOSURE. UNFORTUNATELY, EXISTING INFORMATION DOES NOT ALLOW ONE TO MAKE AN UNEQUIVOCAL CHOICE, AND THUS IT MUST BE KEPT IN MIND THAT THESE PROJECTIONS OF HEALTH IMPACT ARE SOMEWHAT UNCERTAIN AND BASED ON EXTRAPOLATIONS FROM A SELECT POPULATION, NAMELY UNDERGROUND URANIUM MINERS

THE DOE AND OTHERS CONTEND THAT AT THESE INACTIVE SITES, TAILINGS 'RESULTED FROM THE OPERATIONS OF PRIVATE COMPANIES WHICH PROCESSED URANIUM ORE UNDER PROCUREMENT CONTRACTS' FOR THE ATOMIC ENERGY COMMISSION FROM THE MID-1940'S TO 1970 AND THAT STABILIZATION OF THE PILES 'WAS NOT INCLUDED IN THESE CONTRACTS, LARGELY BECAUSE THESE TAILINGS WERE NOT BELIEVED TO BE A PROBLEM.'

IN MAY 1966, AN OFFICIAL OF THE FORMER AEC TESTIFIED BEFORE A SENATE COMMITTEE, SAYING:

THE COMMISSION RECOGNIZES THAT, LIKE TAILINGS PILES FROM OTHER ORE MILLING OPERATIONS, TAILINGS CLOSE TO COMMUNITIES MAY INVOLVE DUSTING OR EROSION, OR MAY BE CONSIDERED UNSIGHTLY. SOME OF THESE TAILINGS ACCUMULATIONS STARTED BEFORE WORLD WAR I WHEN COLORADO ORES WERE PROCESSED FOR RADIUM RECOVERY. OTHER USE OF THE SAME ORES FOR VANADIUM RECOVERY **27** AT A LATER TIME ADDED MORE TAILINGS. SINCE 1948 URANIUM AND

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

VANADIUM RECOVERY OPERATIONS MADE FURTHER ADDITIONS. BECAUSE MOST OF THE TAILINGS HAVE RESULTED FROM OPERATIONS **7454 UNDER AEC URANIUM PROCUREMENT CONTRACTS, THE COMMISSION IS ESPECIALLY INTERESTED IN APPROPRIATE REMEDIAL ACTIONS. THROUGH ITS DIVISION OF RAW MATERIALS, THE COMMISSION HAS TAKEN ACTION AND WILL CONTINUE TO TAKE ACTION THAT INVOLVES THE COOPERATIVE EFFORTS OF BOTH THE MILLING INDUSTRY AND STATE AGENCIES. THIS INCLUDES THE ENCOURAGEMENT OF VOLUNTARY CONTROL BY THE MILLING COMPANIES AND SUPPORT FOR THE DEVELOPMENT OF ADEQUATE AND EFFECTIVE STATE REGULATIONS COMPATIBLE WITH EXECUTIVE ORDER 11258 ON ABATEMENT OF WATER POLLUTION BY FEDERAL ACTIVITIES. THE COMMISSION PLANS TO CONTINUE ITS COOPERATIVE EFFORT WITH FEDERAL, STATE, AND LOCAL AUTHORITIES AND WITH THE MILLING INDUSTRY TO ACHIEVE ADEQUATE POLLUTION CONTROL THE COMMISSION WILL CONTINUE TO PARTICIPATE IN SPECIAL STUDIES, SPECIAL SURVEILLANCE, OR OTHER TECHNICAL ASSISTANCE THAT MAY BE APPROPRIATE.

LATE IN 1966, THREE FEDERAL AGENCIES, INCLUDING AEC, ISSUED A 'JOINT FEDERAL AGENCY POSITION REGARDING CONTROL OF URANIUM MILL TAILINGS' WHICH STATES:

THE FEDERAL WATER POLLUTION CONTROL ADMINISTRATION, THE PUBLIC HEALTH SERVICE, AND THE ATOMIC ENERGY COMMISSION AGREE THAT INACTIVE TAILINGS PILES RESULTING FROM URANIUM MILLING OPERATIONS SHOULD BE STRUCTURALLY STABILIZED AND CONTAINED TO PREVENT WATER AND WIND EROSION. ACTIVE TAILINGS PILES SHOULD BE MANAGED TO MINIMIZE SUCH EROSION DURING USE.

PLANNING, MANAGEMENT, STABILIZATION AND CONTAINMENT OF TAILINGS PILES ARE VIEWED AS BEING THE RESPONSIBILITY OF THE INDIVIDUAL MILL OWNERS. MILL OWNERS SHOULD DEVELOP, WITHOUT UNDUE DELAY, SPECIFIC PLANS FOR ACCOMPLISHING SUCH MANAGEMENT, STABILIZATION AND CONTAINMENT, AND SUBMIT SUCH PLANS THROUGH THE APPROPRIATE STATE REGULATORY AGENCIES FOR APPROVAL. THE STAFFS OF THE FEDERAL WATER POLLUTION CONTROL ADMINISTRATION, THE PUBLIC HEALTH SERVICE, AND THE ATOMIC ENERGY COMMISSION WILL BE AVAILABLE TO THE STATE REGULATORY AGENCIES, UPON REQUEST, TO PROVIDE ADVICE AND ASSISTANCE REGARDING THE DEVELOPMENT OF PILE STABILIZATION AND CONTAINMENT OBJECTIVES AND MEASURES FOR ACHIEVING THEM.

COMPLIANCE BY MILL OWNERS WITH APPROVED PLANS FOR STABILIZATION AND CONTAINMENT SHOULD BE RECOGNIZED AS CONSTITUTING FULFILLMENT OF MILL OWNER RESPONSIBILITY WITH REGARD TO SUCH TAILINGS PILES. OBTAINING AND ENFORCEMENT OF TAILINGS PILES STABILIZATION AND CONTAINMENT PLANS SHOULD REST INITIALLY WITH THE STATES CONCERNED.

THE DOE SAID THAT RESULTS OF THE EFFORTS MADE UNDER THE 1966 AGREEMENT WERE 'FAR FROM SATISFACTORY'.

PRIOR TO THAT AGREEMENT, THE PUBLIC HEALTH SERVICE RECOMMENDED THAT 'MEASURES SHOULD BE TAKEN TO PREVENT THE EROSION AND SPREAD OF URANIUM MILL TAILINGS', ALTHOUGH STATING THAT THERE 'IS CURRENTLY NO SIGNIFICANT IMMEDIATE HAZARD ASSOCIATED WITH URANIUM MILL TAILINGS ACTIVITIES ANYWHERE IN THE COLORADO RIVER BASIN.' ALSO, IN 1960, A WATER POLLUTION CONFERENCE FOR THE COLORADO RIVER BASIN WAS HELD AND, AS A RESULT, MILL DISCHARGES WERE REPORTEDLY REDUCED.

**7455 *28 THUS, IT IS CLEAR THAT IN THE 1960'S, THE FEDERAL GOVERNMENT AND SOME STATES RECOGNIZED A HEALTH PROBLEM WITH THESE TAILINGS, BUT APPARENTLY THEY DID NOT RECOGNIZE THE MAGNITUDE OF IT UNTIL THE EARLY 1970'S, WHEN AN INVESTIGATION BEGAN INTO THE USE OF THESE TAILINGS FOR CONSTRUCTION PURPOSES.

REGULATORY AUTHORITY OVER TAILINGS PRESENTLY IS EXERTED BY THE NRC AND THE SO-CALLED AGREEMENT STATES INDIRECTLY AS PART OF THE LICENSING OF ACTIVE MILLING OPERATIONS UNDER

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

THE ATOMIC ENERGY ACT OF 1954. ONCE THESE OPERATIONS CEASE, HOWEVER, THE NRC AND THE STATES GENERALLY HAVE NO FURTHER ROLE. AS ALREADY NOTED, THE FORMER ATOMIC ENERGY COMMISSION WHICH REGULATED THESE MILLS DID NOT CONSIDER THE TAILINGS A SIGNIFICANT HEALTH PROBLEM UNTIL THE LATE 1960'S.

IN 1972, CONGRESS ENACTED PUBLIC LAW 92-314 WHICH PROVIDES FINANCIAL ASSISTANCE TO THE STATE OF COLORADO TO LIMIT RADIATION EXPOSURE RESULTING FROM THE USE OF THESE TAILINGS FOR CONSTRUCTION PURPOSES IN GRAND JUNCTION, COLO. THAT LAW WAS AMENDED ON FEBRUARY 21, 1978, BY PUBLIC LAW 95-236 WHICH WAS ALSO CONSIDERED BY THIS COMMITTEE.

IN 1974, CONGRESS DIRECTED THAT THE THEN ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION STUDY ALL INACTIVE URANIUM MILL TAILING SITES. A TWO-PHASED STUDY WAS CONDUCTED OF A TOTAL OF 22 INACTIVE MILL SITES. MOST OF THESE PRODUCED URANIUM UNDER CONTRACTS WITH THE AEC DURING THE PERIOD 1947 THROUGH 1970. THESE STUDIES WERE ALL COMPLETED IN JANUARY 1978. ON THE BASIS OF THESE STUDIES THE DEPARTMENT OF ENERGY DEVELOPED H.R. 12535 TO AUTHORIZE A REMEDIAL ACTION PROGRAM TO CLEAN UP THESE INACTIVE SITES AND TO REDUCE, TO THE EXTENT PRACTICABLE, POSSIBLE PUBLIC EXPOSURE TO RADIATION FROM THESE UNSTABILIZED TAILINGS PILES.

IN A COMMENTARY ON THE ADMINISTRATION'S PROPOSAL, THE GENERAL ACCOUNTING OFFICE, IN A JUNE 20, 1978 REPORT ENTITLED, 'THE URANIUM MILL TAILINGS CLEANUP: FEDERAL LEADERSHIP AT LAST', EXPRESSED SUPPORT FOR THE ENACTMENT OF LEGISLATION TO DEAL WITH THIS HEALTH PROBLEM, BUT POINTED OUT SEVERAL DISADVANTAGES AS FOLLOWS:

THE PROPOSED PROGRAM IS ESTIMATED TO COST UP TO $126 MILLION, WITH THE FEDERAL GOVERNMENT BEARING THE HEAVIEST BURDEN, WHILE RECEIVING THE LEAST DIRECT BENEFITS. MORE IMPORTANT, THE CLEANUP PROGRAM COULD BE CONSIDERED AS A PRECEDENT FOR THE FEDERAL GOVERNMENT TO PAY FOR CLEANING UP OTHER NUCLEAR FACILITIES-- A FAR MORE COSTLY ENDEAVOR THAN THE MILL TAILINGS CLEANUP. THIS IS EXTREMELY IMPORTANT BECAUSE THE QUESTION OF WHO SHOULD PAY FOR CLEANING UP NUCLEAR FACILITIES HAS NOT YET BEEN ANSWERED, PRIMARILY BECAUSE VERY LITTLE DECOMMISSIONING OF THESE FACILITIES HAS BEEN DONE TO DATE.

FINALLY, WHILE NOT AS SERIOUS AS THE ABOVE, THE TECHNOLOGY TO STABILIZE THE MILL TAILINGS HAS NOT BEEN FULLY DEVELOPED, POSSIBLY PREVENTING A TRULY SATISFACTORY RESOLUTION OF THE PROBLEM AT THIS TIME.

## B. NEED FOR A REGULATORY PROGRAM

AS ALREADY NOTED, THE NRC NOW REGULATES THESE TAILINGS AT ACTIVE MILLS INDIRECTLY THROUGH ITS LICENSING OF SOURCE MATERIAL MILLING *29 UNDER THE ATOMIC ENERGY ACT OF 1954, LARGELY AS A RESULT OF THE ENACTMENT OF THE NATIONAL ENVIRONMENTAL POLICY ACT OF 1969. STATES ARE PERMITTED **7456 UNDER THE 1954 ACT TO LICENSE URANIUM MILLING UNDER THEIR OWN AUTHORITIES THROUGH AGREEMENT WITH THE NRC. FIVE OF THE 25 'AGREEMENT STATES' NOW HAVE SUCH LICENSING PROGRAMS. HOWEVER, TAILINGS ARE NOT NOW SOURCE MATERIAL LICENSABLE BY THE NRC. THUS, ONCE THE UNDERLYING SOURCE MATERIAL LICENSE FOR THE MILL TERMINATES, THERE IS NO LONGER A 'CLEAR LEGAL BASIS FOR FURTHER COMMISSION REGULATORY CONTROL OF THE MILL TAILINGS', ACCORDING TO DR HENRIE. HE ADDED:

THE ENVIRONMENTAL PROTECTION AGENCY CAN EXERT REGULATORY AUTHORITY OVER URANIUM MILL TAILINGS UNDER THE RESOURCE CONSERVATION AND RECOVERY ACT OF 1976. HOWEVER, EPA HAS NO AUTHORITY OVER THE GENERATION OF THE TAILINGS (THE SOURCE MATERIAL MILLING LICENSED BY THE COMMISSION OR AN AGREEMENT STATE) AND SO FAR THEY HAVE NOT DEVELOPED ANY REGULATION TO IMPLEMENT THEIR AUTHORITY OVER THE DISPOSAL OF TAILINGS. I SHOULD

PERHAPS POINT OUT THAT THE RCRA DOES NOT GIVE ANY AUTHORITY WHATEVER TO THE NRC, AND CONSEQUENTLY THE COMMISSION HAS NOT BEEN ABLE TO BASE ANY PLANS FOR TAILINGS REGULATIONS ON THE PROVISIONS OF THAT ACT. FINALLY, TO COMPLETE THE COMPLICATED REGULATORY PICTURE, IN AGREEMENT STATES IT IS THE STATE IN MOST CASES, RATHER THAN THE COMMISSION, THAT EXERCISES REGULATORY CONTROL OVER THE URANIUM MILLING AND TAILINGS.

THIS SITUATION WAS DISCUSSED AT THE ENERGY AND POWER SUBCOMMITTEE HEARINGS ON H.R. 12535 AND RELATED BILLS ON JUNE 20, 1978. CHARMAN DINGELL URGED THE NRC TO SUBMIT QUICKLY TO CONGRESS LEGISLATION TO DEAL WITH THIS PROBLEM IN ORDER TO PREVENT A REPEAT OF THE SITUATION THAT LED TO THE NEED FOR, AND THE DEVELOPMENT OF, REMEDIAL LEGISLATION. CHAIRMAN UDALL MADE A SIMILAR REQUEST. H.R. 13382 WAS THE RESULT OF THOSE REQUESTS.


COMMITTEE ACTION

THE COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE MET TO CONSIDER H.R. 13650 ON SEPTEMBER 26, 1978. THE COMMITTEE APPROVED THE BILL WITH AN AMENDMENT IN THE NATURE OF A SUBSTITUTE ON THAT DAY AND ORDERED IT REPORTED TO THE HOUSE BY A UNANIMOUS VOTE, A QUORUM BEING PRESENT.

THE COMMITTEE IS CONVINCED THAT ALL TAILINGS POSE A POTENTIAL AND SIGNIFICANT RADIATION HEALTH HAZARD TO THE PUBLIC. LEGISLATION IS NEEDED NOW TO STABILIZE AND CONTROL ALL SUCH TAILINGS IN A SAFE AND ENVIRONMENTALLY SOUND MANNER AND TO MINIMIZE OR ELIMINATE RADIATION HEALTH HAZARDS TO THE PUBLIC. THIS REMEDIAL ACTION PROGRAM WILL AFFECT 26 MILLION OF THE 140 MILLION TONS OF TAILINGS NOW LOCATED AT VARIOUS MILL SITES.

THE COMMITTEE, HOWEVER, IS ALSO CONVINCED THAT IT WOULD BE A GRIEVOUS AND COSTLY MISTAKE TO AUTHORIZE A REMEDIAL PROGRAM FOR INACTIVE MILL SITES WITHOUT ALSO ENACTING REGULATORY LEGISLATION TO CONTROL THE EVEN MORE SERIOUS PROBLEM AT ACTIVE MILL SITES. THIS PORTION OF THE BILL WILL CONTROL ABOUT 120 MILLION TONS OF THE TAILINGS AT ACTIVE OPERATIONS.

THE COMMITTEE'S AMENDMENT JOINS THE TWO PROGRAMS IN ONE BILL.

IN AUTHORIZING A REMEDIAL ACTION PROGRAM, THE COMMITTEE DOES NOT RECOGNIZE ANY FEDERAL RESPONSIBILITY OR LIABILITY FOR THESE TAILINGS. THE COMMITTEE REALIZES THAT THEY WERE LARGELY DERIVED FROM MILLING OPERATIONS CONDUCTED UNDER FEDERAL CONTRACT. HOWEVER, THAT IS NOT THE COMPELLING REASON FOR RECOMMENDING A REMEDIAL ACTION PROGRAM. THE **7457 *30 SIGNIFICANT FACTOR IS THE LACK OF ADEQUATE AUTHORITY UNDER THE ATOMIC ENERGY ACT OF 1954 TO REGULATE THESE TAILINGS. AS THE NRC TESTIFIED:

HISTORICALLY, THE NRC AND ITS PREDECESSOR AGENCY HAVE NOT HAD REGULATORY JURISDICTION OVER URANIUM MILL TAILINGS AFTER MILL OPERATIONS ARE TERMINATED BECAUSE THE TAILINGS ARE NOT THEMSELVES LICENSABLE MATERIAL. REGULATORY CONTROL OVER TAILINGS IS EXERTED INDIRECTLY AS PART OF THE COMMISSION'S LICENSING OF ONGOING MILLING OPERATIONS PURSUANT TO LICENSING AUTHORITY OVER SOURCE MATERIALS. THEREFORE, AFTER OPERATIONS HAD CEASED AT THE 22 INACTIVE SITES BEING CONSIDERED AND ALL LICENSABLE QUANTITIES OF SOURCE MATERIAL REMOVED, THE REGULATORY STAFF HAD NO FURTHER ROLE.

THE LACK OF ANY CONTROL OVER THESE INACTIVE SITES UNDER THE 1954 ACT AND OTHER LAWS TO REQUIRE CLEAN UP OF THESE SITES IS THE PRINCIPAL BASIS FOR COMMITTEE ACTION TO AUTHORIZE THIS REMEDIAL PROGRAM. THIS SITUATION DOES NOT EXIST AT ACTIVE MILL TAILINGS SITES. THOSE SITES, EVEN THOSE WITH TAILINGS DERIVED FROM FEDERAL CONTRACTS, ARE SUBJECT TO NRC REGULATION AS A RESULT OF THE ENACTMENT OF NEPA IN 1970. THE NRC CAN REQUIRE THESE OPERATORS, AS A CONDITION TO THE GRANTING OF A LICENSE, TO TAKE STEPS TO STABILIZE THESE

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

H.R. REP. 95-1480(II), H.R. REP. 95-1480(II) (1978)

PILES, ALTHOUGH THE CONTROL IS NOT ADEQUATE. INDEED, THE NRC TESTIFIED THAT IT HAS OBTAINED COMMITMENTS FROM SOME LICENSEES TO COPE WITH THE PROBLEM TO SOME DEGREE. THIS BILL WILL PROVIDE ADDITIONAL AUTHORITY TO EFFECTIVELY CONTROL TAILINGS AT THESE ACTIVE AND ALL FUTURE SITES.

THE EXISTENCE OF FEDERAL CONTRACTS IN THE 1950'S AND 1960'S PROVIDES AN ADDITIONAL BASIS FOR ESTABLISHING THIS PROGRAM, AS DOES THE FACT THAT SOME SITES ARE NO LONGER OWNED BY PERSONS WHO OPERATED THE MILLS PRIOR TO CLOSING, BUT WE STRESS THAT THE LACK OF ANY SPECIFIC STATUTORY AUTHORITY REQUIRING THE EFFECTIVE STABILIZATION OF THESE MILLS BY THE NRC OR THE STATES AFTER OPERATIONS CEASED AND LICENSES TERMINATED IS THE PRINCIPAL REASON FOR RECOMMENDING THIS PROGRAM.

IT IS FOR THIS AND OTHER REASONS THAT THE COMMITTEE ALSO STRESSES THAT IT DOES NOT CONSIDER THIS BILL A PRECEDENT TO BE FOLLOWED IN THE CASE OF OTHER WASTE MANAGEMENT PROBLEMS, SUCH AS THE ONE NOTED BY THE GAO EARLIER IN THIS REPORT. THE SITUATION AT THESE INACTIVE SITES IS QUITE UNIQUE IN THAT THERE WAS ONCE FEDERAL LICENSING OF THE OPERATIONS, BUT, DUE TO A LOOPHOLE IN THE LAW, THE SITES ESCAPED CONTROL AFTER OPERATIONS CEASED. MOREOVER, IN EACH CASE, MOST, IF NOT ALL, OF THE PRODUCTION WAS FOR FEDERAL PURPOSES.

SITES INCLUDED

TITLE I OF THE BILL PROVIDES FOR THE DESIGNATION OF THE SITES BY THE SECRETARY OF ENERGY TO BE ELIGIBLE FOR REMEDIAL ACTION. THE BILL, AS REPORTED BY THE COMMITTEE, DOES NOT SPECIFICALLY IDENTIFY THE SITES AS DID THE VERSION REPORTED BY THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS, BECAUSE THE COMMITTEE WAS INFORMED BY THE DOE IN A SEPTEMBER 5, 1978, RESPONSE TO AN INQUIRY BY SUBCOMMITTEE CHAIRMAN DINGELL, THAT THE 22 SITES STUDIED BY THE DOE ARE NOT ALL LOCATED WITHIN THE 20 NAMED LOCATIONS REFERENCED IN THAT COMMITTEE'S VERSION OF H.R. 13650. THE DOE SAID:

IT IS CORRECT THAT NOT ALL OF THE SITES ARE LOCATED WITHIN THE BOUNDARIES OF THE COMMUNITIES LISTED IN THE BILL. FURTHER, SOME **7458 *31 OF THESE COMMUNITIES ARE PROBABLY NOT INCORPORATED, AND THUS DO NOT HAVE WELL DEFINED BOUNDARIES. SEVERAL OF THE DESIGNATIONS DO NOT REFER TO COMMUNITIES * * * THE SITES WHICH ARE CLEARLY OUTSIDE OF THE COMMUNITIES LISTED IN THE (INTERIOR COMMITTEE) BILL ARE:

UTAH-- MEXICAN HAT.

COLORADO-- RIFLE (NEW), GUNNISON, NATURITA, MAYBELL, SLICK ROCK (2 SITES).

NEW MEXICO-- AMBROSIA LAKE (NOT AS COMMUNITY).

WYOMING-- RIVERTON, CONVERSE COUNTY (NOT A COMMUNITY).

TEXAS-- FALLS CITY.

ARIZONA-- TUBA CITY, MONUMENT VALLEY (NOT A COMMUNITY).

IDAHO-- LOWMAN.

THERE IS AN ACTIVE MILL OPERATED BY CONOCO-PIONEER NEAR FALLS CITY, TEXAS, AND TWO ACTIVE MILLS IN THE AMBROSIA LAKE AREA IN MCKINLEY COUNTY, NEW MEXICO, OWNED BY KERR-MCGEE CORP., AND UNITED NUCLEAR-HOMESTAKE PARTNERS.

THE FOLLOWING TABLE SHOWS EACH OF THE INACTIVE SITES STUDIED AT WHICH TAILINGS EXIST, THE

Case: 4:27-cv-00016-CDP  Doc. #: 14-11  Filed: 01/22/03  Page: 187 of 903 PageID #: 1868
Case: 4:27-cv-00016-CDP  Doc. #: 48-15  Filed: 02/06/17  Page: 10 of 28 PageID #: 976

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

H.R. REP. 95-1480(II), H.R. REP. 95-1480(II) (1978)

NAME OF THE CONTRACTOR THAT PROVIDED PROCESSED URANIUM TO THE UNITED STATES, AND OTHER RELEVANT DATA:

TABLE 1

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE
**7459 *32 OF THE SITES NAMED IN TABLE I THE FOLLOWING, ACCORDING TO THE DOE, WOULD BE CONSIDERED AS ELIGIBLE FOR DESIGNATION UNDER TITLE I OF THE BILL AS REPORTED BY THE COMMITTEE:

1. SALT LAKE CITY, UTAH.

2. GREEN RIVER, UTAH.

3. MEXICAN HAT, UTAH.

4. DURANGO, COLO.

5. GRAND JUNCTION, COLO.

6. RIFLE, COLO. (2 LOCATIONS).

7. GUNNISON, COLO.

8. NATURITA, COLO.

9. MAYBELL, COLO.

10. SLICK ROCK, COLO. (2 LOCATIONS).

11. SHIPROCK, N. MEX.

12. AMBROSIA LAKE, N. MEX.

13. RIVERTON, WYO.

14. CONVERSE COUNTY, WYO.

15. LAKEVIEW, OREG.

16. FALLS CITY, ARIZ.

17. TUBA CITY, ARIZ.

18. MONUMENT VALLEY, ARIZ.

19. LOWMAN, IDAHO.

20. CANONSBURG, PA.

THE FOLLOWING TABLE PROVIDES SOME ADDITIONAL DATA ABOUT THESE INACTIVE SITES AND OTHER GOVERNMENT-OWNED AND ACTIVE SITES THAT ARE NOT COVERED BY TITLE I OF THIS BILL:

TABLE II. URANIUM MILL TAILINGS

THE FOLLOWING TABULATION WAS DEVELOPED BY THE DEPARTMENT OF ENERGY TO SHOW THE FOLLOWING:

COLUMN 1. TAILINGS WERE ACCUMULATED AS A RESULT OF TOTAL CONCENTRATED PRODUCTION $(U(3O(8))$ PURCHASED BY THE AEC.

COLUMN 2. TAILINGS ACCUMULATED AS A RESULT OF CONCENTRATE PRODUCTION $(U(3O(8))$ PARTIALLY PURCHASED BY AEC AND PARTIALLY PURCHASED ON THE OPEN MARKET-- TAILINGS COMMINGLED.

COLUMN 3. TAILINGS ACCUMULATED AS A RESULT OF CONCENTRATE PRODUCTION $(U(3O(8))$ SUPPLIED TO THE OPEN MARKET-- NONE PURCHASED BY THE AEC.

TABULAR OR GRAPHIC MATERIAL SET FORTH AT THIS POINT IS NOT DISPLAYABLE

**\*7460 \*33** COST OF REMEDIAL ACTION AT INACTIVE SITES

AS PROPOSED BY THE ADMINISTRATION AND THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS, DOE WOULD PAY 100 PERCENT OF THE COSTS OF REMEDIAL ACTION AT INACTIVE SITES INVOLVING INDIAN LANDS. THE COMMITTEE HAS NOT ALTERED THAT PROPOSAL. THE ESTIMATED COST OF REMEDIAL ACTION AT INDIAN LANDS IS BETWEEN $10 AND $21 MILLION, ACCORDING TO THE DEPARTMENT OF ENERGY.

IN ADDITION, THE ADMINISTRATION PROPOSED THAT THE REMEDIAL ACTION INVOLVING NON-INDIAN LANDS WOULD BE COST-SHARED WITH THE STATES. THE FEDERAL SHARE PROPOSED WOULD BE A MAXIMUM OF 75 PERCENT. THE STATES WOULD PAY THE REMAINDER.

VARIOUS OTHER APPROACHES WERE SUGGESTED TO LIMIT THE STATES SHARE SIGNIFICANTLY. THE COMMITTEE, IN REPORTING BILL, INCREASED THE MAXIMUM FEDERAL SHARE TO 90 PERCENT.

THE COMMITTEE REJECTED SUGGESTIONS THAT THIS PROGRAM BE FUNDED ENTIRELY BY THE FEDERAL GOVERNMENT OF THAT THE SHARE OF THE STATES BE LIMITED TO LESS THAN 10 PERCENT OF THE COSTS, AND AT THE SAME TIME, PROVIDE ALL MANNER OF STATE APPROVALS OR CONCURRENCES IN THE REMEDIAL **\*7461 \*34** ACTION PROGRAM. THE COMMITTEE IS CONCERNED ABOUT THE PRECEDENT OF SUCH PROPOSALS AND ABOUT THEIR EFFECT ON THE FEDERAL BUDGET.

THE COMMITTEE IS PARTICULARLY CONCERNED ABOUT THE COST OF THIS PROGRAM. THE RANGE OF THE ESTIMATED COST OF THE PART OF THE PROGRAM SUBJECT TO COST SHARING UNDER THE ADMINISTRATION PROPOSAL OF A MAXIMUM OF 75 PERCENT IS BETWEEN $80 MILLION AND $120 MILLION DEPENDING ON THE EXTENT OF REMEDIAL ACTION REQUIRED. THIS ESTIMATE INCLUDES NO ESCALATION FIGURE. IT IS BASED ON COST ESTIMATES PREPARED AT THE TIME THE REPORTS WERE PREPARED DURING 1976 AND EARLY 1977. IN AN AUGUST 15, 1978, LETTER TO SUBCOMMITTEE CHAIRMAN DINGELL, THE DOE SAID:

FOR THE PURPOSE OF ADJUSTING FOR ESCALATION, A STARTING DATE OF JULY 1, 1977, IS REASONABLE. RECENTLY, ESCALATION HAS BEEN AROUND 10 PERCENT PER YEAR. IN A REMEDIAL PROGRAM ESTIMATED TO REQUIRE 8 YEARS TO CONDUCT, ESCALATION BECOMES A MAJOR FACTOR. IT IS A COMPELLING REASON FOR STARTING AND COMPLETING THE WORK ON EACH SITE AT THE EARLIEST POSSIBLE DATE. ASSUMING REMEDIAL LEGISLATION WERE TO BE ENACTED BY OCTOBER 1978, AND THE EPA STANDARDS AND CRITERIA WERE PROMULGATED IN 6 MONTHS. DOE COULD BEGIN REMEDIAL WORK BY JULY 1979. AT 10 PERCENT ESCALATION, THE ESTIMATED PROGRAM COST BY THEN WOULD BECOME $97 TO $52 MILLION. THE EFFECT ON ESCALATION THEREAFTER WILL DEPEND ON THE SCHEDULE ON WHICH THE WORK IS PERFORMED.

THE STATES RECEIVED SOME BENEFITS FROM THE FEDERAL CONTRACTS WHEN THE MILLS WERE

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

OPERATING. THE WILL CLEARLY BENEFIT SUBSTANTIALLY FORM THIS PROGRAM THROUGH THE IMPROVEMENT OF THESE SITES SO THAT THEY CAN BE PUT TO BENEFICIAL USE AGAIN. THE DOE ESTIMATES THAT THE MARKET VALUE OF ANY OF THESE SITES WILL BE ENHANCED SIGNIFICANTLY AFTER THE REMEDIAL ACTION. FOR EXAMPLE, THE DOE ESTIMATES THAT THE DURANGO, COLO., SITE WILL HAVE A MARKET VALUE OF $10,000 PER ACRE AND THAT THE GRAND JUNCTION AND GARRISON SITES WILL HAVE A VALUE OF $8,000 PER ACRE. THE SALT LAKE CITY, UTAH, SITE IS ESTIMATED TO HAVE A $13,000 PER ACRE MARKET VALUE AFTER DECONTAMINATION. THE PRESENT VALUE OF THESE SITES IS FAR LESS.

GIVEN THESE CONSIDERATIONS, PLUS THE ADDITIONAL FACTOR THAT THE COMMITTEE, LIKE THE DOE, DOES NOT BELIEVE THAT THE FEDERAL GOVERNMENT IS RESPONSIBLE FOR THESE TAILINGS, THE COMMITTEE BELIEVES THAT THE 90 PERCENT MAXIMUM FEDERAL SHARE IS MORE THAN GENEROUS. AT THE 90 PERCENT LEVEL, THE DEPARTMENT OF ENERGY ESTIMATES THAT THE RANGE FOR THE FEDERAL SHARE IS BETWEEN $98 MILLION AND $180 MILLION. THE COMMITTEE ALSO BELIEVES THAT SINCE THE BULK OF THE COSTS WILL BE PAID BY THE NATION'S TAXPAYERS, THE STATES SHOULD NOT HAVE 'CONCURRENCE' OR 'VETO' AUTHORITY OVER THE REMEDIAL ACTION PROGRAM, ALTHOUGH THE COMMITTEE INTENDS THAT DOE CLEARLY CONSULT WITH THE STATES.


SECTION-BY-SECTION ANALYSIS AND COMMITTEE COMMENTS


SECTION 1-- SHORT TITLE

THIS SECTION PROVIDES THAT THE SHORT TITLE FOR THE ACT IS THE 'URANIUM MILL TAILINGS RADIATION CONTROL ACT OF 1978'.


SECTION 2-- FINDINGS AND PURPOSES

SUBSECTION (A) SETS FORTH SEVERAL CONGRESSIONAL FINDINGS. THERE IS A GENERAL FINDING THAT URANIUM MILL TAILINGS POSE A POTENTIAL AND SIGNIFICANT **7462 *35 RADIATION HEALTH HAZARD TO THE PUBLIC AND THAT THE PROTECTION OF THE PUBLIC HEALTH, SAFETY, AND WELFARE AND THE REGULATION OF INTERSTATE COMMERCE REQUIRE A FEDERAL EFFORT TO PROVIDE FOR THE STABILIZATION, DISPOSAL, AND CONTROL, IN A SAFE AND ENVIRONMENTALLY SOUND MANNER, OF THE TAILINGS IN ORDER TO PREVENT AND MINIMIZE HEALTH AND ENVIRONMENTAL HAZARDS. IN ADDITION, THERE ARE FINDINGS THAT AT CERTAIN INACTIVE SITES SUCH TAILINGS RESULTED FROM FEDERAL CONTRACTS FOR THE PURCHASE OF URANIUM AT A TIME WHEN THE HEALTH HAZARDS WERE NOT APPARENTLY FULLY RECOGNIZED BY FEDERAL AGENCIES, ALTHOUGH SOME ENVIRONMENTAL HAZARDS WERE RECOGNIZED AS EARLY AS 1960 BY GOVERNMENTAL AGENCIES; THAT SUCH SITES ARE NOT NOW SUBJECT TO REGULATION UNDER THE ATOMIC ENERGY ACT OF 1954; THAT MILLING OPERATIONS AT THESE SITES TERMINATED PRIOR TO 1973; THAT IN 1972, CONGRESS AUTHORIZED A SIMILAR REMEDIAL ACTION PROGRAM IN GRAND JUNCTION, COLO., CONCERNING SUCH TAILINGS; AND THAT THE PUBLIC INTEREST REQUIRES FINANCIAL ASSISTANCE TO UNDERTAKE REMEDIAL ACTIONS CONCERNING THESE INACTIVE SITES.

SUBSECTION (B) SETS FORTH THE PURPOSES OF THIS ACT. THE FIRST PURPOSE IS TO PROVIDE A PROGRAM TO ASSESS THE TAILINGS AT INACTIVE SITES AND TO PROVIDE REMEDIAL ACTION AT SUCH SITES, INCLUDING THE REPROCESSING, AS APPROPRIATE, OF TAILINGS TO EXTRACT THE MINERALS THAT HAVE A SIGNIFICANT VALUE FROM SUCH TAILINGS, WHERE PRACTICABLE, IN ORDER TO STABILIZE AND CONTROL SUCH TAILINGS. THE SECOND PURPOSE IS TO PROVIDE FOR THE REGULATION OF SUCH TAILINGS AT DURING ACTIVE OPERATIONS AND AFTER TERMINATION OF THOSE MILL OPERATIONS IN ORDER TO STABILIZE AND CONTROL SUCH TAILINGS IN A SAFE AND ENVIRONMENTALLY SOUND MANNER AND TO MINIMIZE OR ELIMINATE RADIATION HEALTH HAZARDS TO THE PUBLIC.

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

TITLE I-- REMEDIAL ACTION PROGRAM

SECTION 101-- DEFINITIONS

THIS SECTION DEFINES SEVERAL TERMS USED IN THE ACT. OF PARTICULAR IMPORTANCE ARE THE TERMS 'PROCESSING SITE' AND 'RESIDUAL RADIOACTIVE MATERIALS'. THE FORMER IS COMPOSED OF THE SITES, INCLUDING THE MILL, WHERE THERE ARE RESIDUAL RADIOACTIVE MATERIALS AND AT WHICH ALL OR SUBSTANTIALLY ALL THE URANIUM WAS PRODUCED FOR SALE TO A FEDERAL AGENCY PRIOR TO JANUARY 1971 UNDER A CONTRACT WITH THAT AGENCY. IT DOES NOT INCLUDE A SITE OWNED OR CONTROLLED BY A FEDERAL AGENCY PRIOR TO JANUARY 1, 1978, OR ONE THAT IS OWNED OR CONTROLLED BY A FEDERAL AGENCY AFTER THAT DATE. ALSO, IT DOES NOT INCLUDE A SITE THAT IS LICENSED UNDER THE ATOMIC ENERGY ACT OF 1954, WHICH LICENSE IS IN EFFECT ON JANUARY 1, 1978, OR IS LICENSED AFTER SUCH DATE. THE TERM ALSO INCLUDED STRUCTURES AND BUILDINGS LOCATED IN THE VICINITY OF SUCH SITE WHICH ARE CONTAMINATED WITH RESIDUAL RADIOACTIVE MATERIALS DERIVED FROM SUCH SITE. THE SECRETARY OF ENERGY, IN CONSULTATION WITH THE NRC, WILL DETERMINE WHICH STRUCTURES AND BUILDINGS ARE ELIGIBLE TO BE INCLUDED AS PART OF THE DESIGNATED PROCESSING SITE. IT IS EXPECTED THAT THE SECRETARY AND THE NUCLEAR REGULATORY COMMISSION WILL USE SOUND JUDGEMENT IN THIS REGARD AND BE CONCERNED ABOUT COSTS, AS WELL AS HEALTH.

THE TERM 'RESIDUAL RADIOACTIVE MATERIAL' IS THE TAILINGS WASTES THAT THE SECRETARY OF ENERGY DETERMINES TO BE RADIOACTIVE. IT ALSO INCLUDES OTHER WASTES WHICH THE SECRETARY DETERMINES TO BE RADIOACTIVE.

SECTION 102-- DESIGNATIONS OF PROCESSING SITES

THIS SECTION PROVIDES FOR THE DESIGNATION BY THE DOE OF PROCESSING SITES AND THE ESTABLISHMENT OF PRIORITIES FOR REMEDIAL ACTION AT THOSE **7463 *36 SITES. IN DESIGNATING SITES, THE SECRETARY OF ENERGY MUST CONSULT WITH THE ENVIRONMENTAL PROTECTION AGENCY, THE NUCLEAR REGULATORY COMMISSION, AND THE STATES. IN THE CASE OF INDIAN SITES, HE WOULD CONSULT WITH THE TRIBAL OFFICIALS AND THE INTERIOR DEPARTMENT, AS WELL AS THE EPA AND NRC. THE DESIGNATIONS WILL ALSO ESTABLISH THE BOUNDARIES OF THE PROCESSING SITE.

THE COMMITTEE IS CONCERNED THAT THE DOE EXPEND FUNDS ON A PRIORITY BASIS IN ORDER TO CORRECT THE MOST SERIOUS PROBLEMS FIRST. THUS, THE BILL REQUIRES THE DOE TO ASSESS THE HEALTH HAZARD TO THE PUBLIC AT EACH SITE WITH THE HELP OF THE EPA AND ESTABLISH PRIORITIES FOR REMEDIAL ACTION. IT IS INTENDED THAT DOE RELY HEAVILY ON THE EPA ADVICE IN ESTABLISHING THESE PRIORITIES.

BOTH THE DESIGNATIONS AND PRIORITIES MUST BE COMPLETED WITHIN 1 YEAR AFTER ENACTMENT. WITHIN 30 DAYS THEREAFTER, THE DOE MUST NOTIFY THE STATES AND INDIAN TRIBES OF THE DESIGNATIONS AND PRIORITIES. THE BILL DOES NOT AUTHORIZE DESIGNATION OR THE ESTABLISHMENT OF PRIORITIES AFTER THE ONE YEAR DEADLINE. HOWEVER, THE COMMITTEE DOES RECOGNIZE THAT DESIGNATION OF ALL STRUCTURES AND BUILDINGS 'IN THE VICINITY' OF A PROCESSING SITE MAY NOT BE PRACTICABLE WITHIN THIS TIMEFRAME AND ALLOWS SOME FLEXIBILITY. THE COMMITTEE EXPECTS THE DOE TO ACT EXPEDITIOUSLY ON THESE DESIGNATIONS AS WELL. AT THE SAME TIME, THE DOE SHOULD BE ASSURED THAT SERIOUS CONTAMINATION THAT POSES A HEALTH HAZARD OF THE STRUCTURES AND BUILDINGS ACTUALLY EXISTS.

THE BILL PRECLUDES JURISDICTIONAL REVIEW OF THE DESIGNATIONS AND PRIORITIES.

SECTION 103-- STATE COOPERATIVE AGREEMENTS

ONCE THE DESIGNATIONS ARE MADE AND ALL PRIORITIES ARE ESTABLISHED, THE DOE MAY NEGOTIATE AND ENTER INTO COOPERATIVE AGREEMENTS WITH THE AFFECTED STATES PURSUANT TO THIS SECTION FOR THE PURPOSE OF CARRYING OUT REMEDIAL ACTION ON NON-INDIAN LANDS. AGAIN THE BILL STRESSES THAT AGREEMENTS SHOULD BE DEVELOPED IN ACCORDANCE WITH THE PRIORITIES ESTABLISHED SO THAT THE SITES THAT POSE THE GREATEST DANGER TO THE POPULATION CENTERS WILL BE ADDRESSED FIRST. THE BILL, HOWEVER, DOES NOT PRECLUDE THE DOE FROM PROCEEDING TO A LOWER PRIORITY SITES IN THOSE CASES, FOR EXAMPLE, WHERE AGREEMENT DOES NOT APPEAR CERTAIN OR WHERE THE BEST TYPE OF REMEDIAL ACTION IS NOT FULLY KNOWN. THE PROVISION RECOGNIZES THAT THERE ARE A LIMITED AMOUNT OF FUNDS AND TIME AVAILABLE AND THAT THE SERIOUSNESS OF THE HEALTH DANGER TO POPULATION CENTERS SHOULD BE THE PRINCIPAL CRITERION FOR ACTION.

SUBSECTION (B) REQUIRES THAT THE DOE INCLUDE TERMS AND CONDITIONS NECESSARY TO IMPLEMENT REMEDIAL ACTION AND INSURE EFFECTIVE COMPLETION OF SUCH ACTION.

SUBSECTION (C) PLACES A DUTY ON THE STATE, NOT ON THE DOE, TO OBTAIN WRITTEN CONSENT FROM THE OWNER OF THE SITE AUTHORIZING THE REMEDIAL ACTION, UNLESS THE SITE IS ACQUIRED. THIS CONSENT MUST ALSO BE OBTAINED FOR THE BUILDINGS AND STRUCTURES IN THE VICINITY OF THE SITE. THE REMEDIAL ACTION IS IN ESSENCE A VOLUNTARY PROGRAM. THE DOE CANNOT ACQUIRE THE PROCESSING SITE. ONLY THE STATE CAN DO SO. IF THE STATE DOES NOT, CONSENT IS REQUIRED.

THE CONSENT MUST INCLUDE A WAIVER RELEASING THE UNITED STATES OF ANY LIABILITY OR CLAIM CONCERNING THE REMEDIAL ACTION AND HOLDING THE GOVERNMENT HARMLESS AGAINST ANY CLAIM ARISING OUT OF THE PERFORMANCE OF THE REMEDIAL ACTION. THE WAIVER WOULD APPLY TO THE PROPERTY OWNER, **\*7464 \*37 HIS HEIRS, SUCCESSORS, AND ASSIGNS. THIS PROVISION IS SIMILAR TO SECTION 202(D) OF PUBLIC LAW 92-314. IT IS NOT A TOTAL RELEASE OF LIABILITY. IT WOULD NOT AFFECT THOSE NOT COVERED BY THE RELEASE WHO MIGHT FILE A CLAIM AGAINST THE UNITED STATES, ALTHOUGH THE COMMITTEE STRESSES THAT NOTHING IN THIS BILL SHOULD BE CONSTRUED TO RECOGNIZE ANY LIABILITY ON THE PART OF THE UNITED STATES FOR ANY OCCURRENCE PRIOR TO ENACTMENT OR AFTER ENACTMENT. FURTHER, THE ACT DOES NOT AFFECT OTHER RESPONSIBILITIES OR REQUIREMENTS UNDER OTHER PROVISIONS OF LAW, INCLUDING WORKMAN'S COMPENSATION LAWS.

THE COMMITTEE NOTES THAT THE PROPERTY OWNER WILL BENEFIT FROM THE VOLUNTARY REMEDIAL ACTION PROVIDED BY THIS ACT. CLEARLY, THE COMMITTEE DOES NOT WANT TO FIND THAT AT SOME LATER DATE THE UNITED STATES IS FACED WITH A CLAIM FROM SUCH OWNER, HIS HEIRS, SUCCESSORS OR ASSIGNS CONCERNING SUCH REMEDIAL ACTION OR ARISING FROM SUCH ACTION.

THIS SECTION ALSO REQUIRES THAT EACH COOPERATIVE AGREEMENT PROVIDE EFFECTIVE ASSURANCE THAT THE DOE, NRC, AND EPA HAVE A PERMANENT RIGHT OF ENTRY AT ANY TIME TO INSPECT THE PROCESSING SITES COVERED BY THE AGREEMENTS, TO CARRY OUT THE AGREEMENT, AND TO ENFORCE THE ACT AND ANY RULES PRESCRIBED UNDER THIS ACT. IN THE CASE OF STRUCTURES AND BUILDINGS IN THE VICINITY OF THE SITE, THIS RIGHT OF ENTRY CAN BE TERMINATED WHEN THE SECRETARY DETERMINES THAT THE REMEDIAL ACTION IS COMPLETED.

NO COOPERATIVE AGREEMENT MAY BE EFFECTIVE UNTIL IT IS CONCURRED IN BY THE NRC. I IS THE INTENTION OF THE COMMITTEE THAT THE SECRETARY AND THE NRC WILL WORK OUT A PROCEDURE WHERE REPRESENTATIVES OF BOTH WILL PARTICIPATE IN THE DEVELOPMENT OF THE AGREEMENT SO THAT CONCURRENCE WILL NOT BE DELAYED. HOWEVER, IT IS ALSO IMPORTANT TO STRESS THAT THE NRC, AS AN INDEPENDENT AGENCY, IS NOT EXPECTED TO RUBBER STAMP THESE AGREEMENTS, BUT TO APPROVE ONLY THOSE THAT CLEARLY MEET THE REQUIREMENTS AND PURPOSES OF THIS ACT.

SUBSECTION (F) AUTHORIZES THE DOE IN ANY COOPERATIVE AGREEMENT ENTERED INTO WITH A

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

STATE OR AN INDIAN TRIBE TO PROVIDE FOR THE REIMBURSEMENT OF THE ACTUAL COSTS INCURRED FOR REMEDIAL ACTION PERFORMED ON STRUCTURES OR BUILDINGS IN THE VICINITY OF A PROCESSING SITE. THE SECRETARY WILL DETERMINE THE COSTS FOR REIMBURSEMENT. THE REIMBURSEMENT CAN ONLY BE MADE TO THE PROPERTY OWNER OF RECORD AT THE TIME OF THE REMEDIAL ACTION AND ONLY FOR COSTS INCURRED BY SUCH OWNER. THE REMEDIAL ACTION MUST HAVE BEEN COMPLETED PRIOR TO ENACTMENT OF THIS LEGISLATION AND THE APPLICATION MUST HAVE BEEN FILED BY THE OWNER WITH THE SECRETARY AND THE AFFECTED STATE OF INDIAN TRIBE WITHIN ONE YEAR AFTER A COOPERATIVE AGREEMENT IS APPROVED BY THE SECRETARY AND THE NRC. THE REMEDIAL ACTION MUST ACHIEVE THE PURPOSES OF THE ACT AND BE CONSISTENT WITH EPA STANDARDS. QUITE CLEARLY UNLESS THE REMEDIAL ACTION WAS PROPERLY DONE, REIMBURSEMENT WOULD NOT BE APPROPRIATE. THE REIMBURSEMENT IS, OF COURSE SUBJECT TO THE FINDING AND PERCENTAGE LIMITATIONS OF THIS ACT.

SECTION 104-- ACQUISITION AND DISPOSITION OF LANDS AND MATERIALS

THE COOPERATIVE AGREEMENT WILL REQUIRE THAT THE AFFECTED STATE ACQUIRE THE PROCESSING SITE BEFORE REMEDIAL ACTION IS INITIATED IF SUCH ACQUISITION IS DETERMINED APPROPRIATE BY THE SECRETARY AND THE NRC. THE ACQUISITION IS TO INCLUDE SUBSURFACE INTERESTS, AS WELL AS SUBSURFACE INTERESTS IF THE SECRETARY AND THE NRC DETERMINE THAT SUCH INTERESTS BE ACQUIRED. SUCH ACQUISITION IS TO BE ACCOMPLISHED PURSUANT TO STATE LAW. IT IS NOT INTENDED THAT THE DOE ACQUIRE THIS SITE.

**7465 *38** PROVISION IS ALSO MADE FOR REMOVAL OF THE RESIDUAL RADIOACTIVE MATERIALS FROM THE PROCESSING SITE TO ANOTHER SITE, IF THE DOE AND NRC AGREE THAT SUCH REMOVAL IS APPROPRIATE. THE AGREEMENT WILL SPECIFY THAT THE DEPOSITORY SITE TO BE ACQUIRED BY THE STATE. SUCH ACQUISITION WILL INCLUDE SUBSURFACE INTERESTS IF THE SECRETARY AND THE NRC BELIEVE SUCH ACQUISITION APPROPRIATE.

THE COMMITTEE IS CONCERNED ABOUT THE COST OF ACQUISITION UNDER SECTION AND EXPECT THAT IT BE UTILIZED ONLY WHEN NECESSARY AND THAT CARE BE TAKEN TO ACQUIRE THE LANDS AND INTERESTS AT THE LOWEST COST. THE COMMITTEE INTENDS THAT IF THE MATERIALS ARE TO BE REMOVED FROM A PROCESSING SITE, THE DOE AND NRC WILL PROBABLY NOT NEED TO ACQUIRE THAT SITE BUT MERELY PROVIDE THAT STATE ENTER INTO AN AGREEMENT WITH THE PROPERTY OWNER FOR SUCH REMOVAL. THE COMMITTEE BELIEVES THAT THE ACQUISITION MUST INCLUDE SUBSURFACE INTERESTS TO PREVENT THE CREATION OF FUTURE HAZARDS TO THE PUBLIC THROUGH DISRUPTION OF THE TAILINGS IN AN ATTEMPT TO RECOVER UNDERLYING MINERALS.

NO ACQUISITION IS REQUIRED IN THE CASE OF STRUCTURES AND BUILDINGS OUTSIDE THE PROCESSING AND DEPOSITORY SITE.

ONCE THE MATERIALS ARE REMOVED FROM A PROCESSING SITE, THE COMMITTEE IS CONCERNED THAT FUTURE PURCHASERS ARE GIVEN NOTICE THAT THE SITE CONTAINING THESE MATERIALS HAS BEEN CLEANED UP. THE SECRETARY IS REQUIRED TO ISSUE REGULATIONS FOR SUCH NOTICE THAT THE STATES MUST FOLLOW, INCLUDING PROVISION FOR NOTICE IN LOCAL LAND RECORDS. OF PARTICULAR CONCERN, IS THAT THE PERSON PURCHASING THE SITE IMMEDIATELY AFTER THE MATERIALS ARE REMOVED OR OTHERWISE CLEANED UP IS GIVEN ADEQUATE AND EFFECTIVE NOTICE BY THE SELLER. OTHER THAN THE USE OF NOTICE IN THE LAND RECORDS, IT IS NOT INTENDED THAT SUBSEQUENT SELLERS PROVIDE FUTURE PURCHASERS SUCH DATA. PRESUMABLY, THE LAND RECORDS CAN BE FLAGGED SO THAT A TITLE SEARCHER WILL AUTOMATICALLY NOTIFY FUTURE PURCHASERS.

THE STATE MAY DISPOSE OF THE PROCESSING SITE ACQUIRED BY IT AFTER COMPLETION OF THE REMEDIAL ACTION OR THE STATE MAY RETAIN THE SITE OR DONATE IT FOR PUBLIC PURPOSES OR TRANSFER IT, WITHOUT COST, TO THE UNITED STATES. SUCH DISPOSAL MUST BE APPROVED BY THE DOE AND THE NRC. BEFORE OFFERING TO SELL THE LANDS, THE STATE MUST GIVE THE PERSON WHO

SOLD THE PROPERTY TO THE STATE AN OPPORTUNITY TO ACQUIRE IT ABACK AT THE FAIR MARKET VALUE DETERMINED AS OF THE DATE OF THE SALE TO SUCH PERSON.

THE COOPERATIVE AGREEMENTS SHALL PROVIDE THAT TITLE TO THE RESIDUAL RADIOACTIVE MATERIALS OR THE ENTIRE TAILINGS, PLUS THE LANDS AND INTERESTS THEREIN, ACQUIRED BY A STATE FOR THEIR FINAL DISPOSITION SHALL BE TRANSFERRED TO THE SECRETARY OF ENERGY AT NO COST TO THE UNITED STATES, EXCEPT POSSIBLE ADMINISTRATIVE AND LEGAL COSTS INCURRED AS A RESULT OF THE TRANSFER. THIS PROVISION IS NOT TO BE CONSTRUED TO PREVENT THE SECRETARY FROM SHARING THE COSTS OF ACQUISITION BY THE STATE AS PROVIDED IN THIS ACT. ONCE TRANSFERRED, THE MATERIALS AND LAND AND INTERESTS THEREIN CANNOT BE DISPOSED OF EXCEPT AS PROVIDED IN THIS SECTION.

IF THE STATES SELLS A PROCESSING SITE, IT MUST REIMBURSE THE UNITED STATES FROM THE PROCEEDS OF THE SALE. THE STATE MUST ALSO SELL THE SITE AT FAIR MARKET VALUE AS DETERMINED BY THE DOE. PROCEEDS FROM SUCH SALE, PLUS ANY OTHER MONIES RECEIVED BY THE DOE UNDER THIS ACT MUST BE DEPOSITED AS MISCELLANEOUS RECEIPTS. THE ANNUAL REPORT OF THE SECRETARY SHOULD INDICATE THE SUMS SO DEPOSITED.

SUBSECTION (H) AUTHORIZES THE DOE TO DISPOSE OF SUBSURFACE MINERALS UNDERLYING THE SITE ON WHICH SUCH MATERIALS ARE LOCATED AFTER SUCH SITE **7466 *39 HAS BEEN TRANSFERRED TO THE DOE. THE MINERALS MUST BE DISPOSED OF BY SALE OR LEASE AND IN ACCORDANCE WITH APPLICABLE LAWS OF THE UNITED STATES CONCERNING THE SALE OR LEASE OF MINERALS. HOWEVER, THE SECRETARY MAY ONLY DO SO IF THERE IS ADEQUATE ASSURANCE THAT MINERAL DEVELOPMENT DOES NOT DISTURB THE DEPOSITORY SITE. THERE MUST ALSO BE AN NRC LICENSE. IF THE DEPOSITORY SITE IS DISTURBED, THE DOE MUST PROVIDE FOR TERMINATION OR SUSPENSION OF MINERAL DEVELOPMENT AND REQUIRE THE MINERAL DEVELOPER TO RESTORE THE SITE AT NO COST TO THE UNITED STATES.

SECTION 105-- INDIAN TRIBE COOPERATIVE AGREEMENTS

THIS SECTION PROVIDES FOR COOPERATIVE AGREEMENTS BETWEEN THE DOE AND INDIAN TRIBES. THE PROVISIONS ARE NEARLY IDENTICAL TO THE PROVISIONS OF SECTION 103.

THE COMMITTEE DOES NOT INTEND BY THIS ACT TO AFFECT THE RESPONSIBILITIES OF THE SECRETARY OF THE INTERIOR AS TRUSTEE FOR ANY INDIAN TRIBE. HOWEVER, THE COMMITTEE INTENDS THAT ANY RELEASE EXECUTED UNDER SECTION 105 SHALL BE FULLY BINDING ON THE INDIAN TRIBE AND THAT THE SECRETARY OF THE INTERIOR, IN EXERCISING SUCH RESPONSIBILITIES, IS ALSO FULLY BOUND BY SUCH WAIVER AND MAY NOT RECOGNIZE ANY CLAIM COVERED BY IT.

SECTION 106-- ACQUISITION OF LAND BY SECRETARY

THIS SECTION AUTHORIZES THE DOE TO ACQUIRE LANDS FOR THE PURPOSE OF CONSOLIDATING IN A SAFE AND ENVIRONMENTALLY SOUND MANNER RESIDUAL RADIOACTIVE MATERIALS WHICH ARE REMOVED FROM PROCESSING SITES OR WHERE OTHERWISE NECESSARY TO CARRY OUT THE PURPOSES OF THIS ACT. THE COMMITTEE RECOGNIZES THAT IT MAY NOT BE SAFE OR ENVIRONMENTALLY SOUND OR PRACTICABLE TO HAVE A SERIES OF DEPOSITORY SITES SCATTERED AMONG SEVERAL STATES. CONSOLIDATION OF THESE MATERIALS INTO A FEW SITES MAY BE A BETTER SOLUTION. THIS SECTION PROVIDES THAT OPTION.

THE SECTION AUTHORIZES ACQUISITION BY PURCHASE, INCLUDING CONDEMNATION, DONATION, OR EXCHANGE. IT ALSO PROVIDED FOR THE TRANSFER OF PUBLIC LANDS ADMINISTERED BY INTERIOR AND AVAILABLE FOR THIS PURPOSE. SURPLUS LANDS COULD ALSO BE USED.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

H.R. REP. 95-1480(II), H.R. REP. 95-1480(II) (1978)

IN EACH ACQUISITION, THE DOE IS REQUIRED TO CONSULT WITH THE STATE WHERE THE ACQUISITION WILL OCCUR. IN THE CASE OF A PROPOSED ACQUISITION, IN A STATE WHERE THERE IS NO DESIGNATED PROCESSING SITE AND NO ACTIVE URANIUM MILL OPERATING, THE SECRETARY MUST OBTAIN THE CONCURRENCE OF THE GOVERNOR BEFORE ACQUIRING THE LAND. THE COMMITTEE BELIEVES THAT CONCURRENCE IS APPROPRIATE WHERE A STATE DOES NOT HAVE TAILINGS. BUT IT DOES NOT APPEAR REASONABLE TO GIVE A STATE SUCH CONCURRENCE AUTHORITY OVER A FEDERAL PROGRAM IF THAT STATE ALREADY HAS ACTIVE OR INACTIVE MILL TAILINGS.

BEFORE FEDERAL LANDS MAY BE TRANSFERRED TO THE SECRETARY, THE AGENCY ADMINISTERING THOSE LANDS MUST CONCUR. MOREOVER, THE TRANSFER MUST BE CONSISTENT WITH THE LAWS APPLICABLE TO THOSE LANDS. THE COMMITTEE DOES NOT INTEND BY THIS SECTION TO ENCOURAGE THE USE OF FEDERAL LANDS, PARTICULARLY THOSE THAT ARE PART OF THE NATIONAL PARK, FISH AND WILDLIFE, AND FOREST SYSTEMS.


SECTION 107-- FINANCIAL ASSISTANCE

THIS SECTION AUTHORIZES THE DOE TO PAY UP TO 90 PERCENT OF THE ACTUAL COSTS OF REMEDIAL ACTION AT THE DESIGNATED PROCESSING SITE, INCLUDING THE BUILDINGS AND STRUCTURES IN THE VICINITY OF SUCH SITE. LAND ACQUISITION IS ALSO TO BE COST SHARED, INCLUDING ANY PREPARATORY OR OTHER WORK AT A DEPOSITORY SITE. THE STATE MUST PAY THE REMAINING **7467 *40 SHARE OF THE COSTS. HOWEVER, THE STATE CANNOT USE FEDERAL FUNDS TO PAY THIS SHARE. THE FEDERAL SHARE WILL NOT COVER ANY STATE COSTS INCURRED IN THE DEVELOPMENT, PREPARATION, OR EXECUTION OF COOPERATIVE AGREEMENT, OTHER THAN LAND ACQUISITION COSTS.

IN THE CASE OF INDIANS, THE DOE WILL PAY ALL THE COSTS.


SECTION 108-- REMEDIAL ACTION

THIS SECTION PROVIDES THAT THE DOE OR A PERSON DESIGNATED BY THE DOE SHALL SELECT AND PERFORM THE REMEDIAL ACTION IN ACCORDANCE WITH EPA GENERAL STANDARDS. THE NRC MUST CONCUR IN BOTH THE SELECTION AND PERFORMANCE. PROVISION IS ALSO MADE FOR CONSULTATION WITH THE INDIAN TRIBE AND THE SECRETARY OF INTERIOR. IN THE CASE OF SITES IN NON-INDIAN LANDS, THE STATES ARE INTENDED TO HAVE A SIGNIFICANT ROLE IN THE SELECTION BECAUSE THEY ARE SHARING IN THE COSTS. IT IS INTENDED THAT THE DOE HAVE COMPLETE FLEXIBILITY IN SELECTING CONTRACTORS SO LONG AS THE NRC CONCURS.

THE DOE IS ALSO DIRECTED TO USE TECHNOLOGY IN PERFORMING REMEDIAL ACTION THAT WILL INSURE COMPLIANCE WITH THE EPA STANDARDS AND INSURE THE SAFE AND ENVIRONMENTALLY SOUND STABILIZATION OF THE MATERIALS. THE COMMITTEE IS CONCERNED ABOUT THE ADEQUACY OF THE TECHNOLOGY TO DEAL WITH THIS PROBLEM. IT IS INTENDED THAT THE DOE NOT RUSH HEADLONG INTO USING TECHNOLOGY THAT MAY BE EFFECTIVE FOR A SHORT PERIOD OF TIME. THE COMMITTEE DOES NOT WANT TO VISIT THIS PROBLEM AGAIN WITH ADDITIONAL AID. THE REMEDIAL ACTION MUST BE DONE RIGHT THE FIRST TIME.

NO PROVISION FOR R AND D WAS INCLUDED BECAUSE IT IS BELIEVED THAT THE DOE HAS ADEQUATE R AND D AUTHORITY NOW. THE COMMITTEE URGES THAT THE DOE AND EPA MOVE RAPIDLY TO IMPROVE THE TECHNOLOGY FOR REMEDIAL ACTION.

THIS SECTION PRECLUDES UNDERTAKING ANY REMEDIAL ACTION BEFORE EPA FINALLY PROMULGATES GENERAL STANDARDS. CLEARLY, THIS IS ESSENTIAL. THE DOE SHOULD NOT PROCEED UNTIL THESE STANDARDS ARE DEVELOPED. EVEN THE SELECTION OF DEPOSITORY SITES COULD BE AFFECTED BY SUCH STANDARDS.

IT SHOULD BE NOTED THAT NOTHING IN THIS TITLE SHOULD BE CONSTRUED AS AFFECTING ANY EXISTING RESPONSIBILITY OF NRC, DOE, AND EPA TO COMPLY WITH NEPA CONCERNING THIS REMEDIAL ACTION PROGRAM.

SUBSECTION (B) REQUIRES THE DOE TO EVALUATE THE MINERAL CONTENT OF THESE MATERIALS AND TO DETERMINE IF RECOVERY IS PRACTICABLE. THE DOE IS THEN AUTHORIZED, WITH NRC CONCURRENCE, TO ENTER INTO CONTRACTS FOR RECOVERY OF THE MINERALS, CONSISTENT WITH THE EPA STANDARDS AND THE PURPOSES OF THIS ACT. THIS RECOVERY MAY TAKE PLACE AS PART OF THE REMEDIAL ACTION EFFORT. THE COST OF RECOVERY, INCLUDING RELATED WORK, TO INSURE COMPLIANCE WITH SUCH STANDARDS AND PURPOSES WILL BE PAID BY THE PERSON RECOVERING THE MINERALS. THE STATES AND THE SECRETARY WILL PARTICIPATE IN THE NET PROFITS. THE AMOUNT OF THE PROFIT TO BE SHARED WILL BE DETERMINED BY THE DOE AS PART OF THE AGREEMENT. THE COMMITTEE'S INTENTION IS THAT THE PERSON RECOVERING THE MINERALS BE ABLE TO MAKE A REASONABLE PROFIT. CLEARLY, SUCH RECOVERY SHOULD ONLY BE UNDERTAKEN IF IT IS CONSISTENT WITH THE PURPOSES OF THIS ACT AND WILL NOT IMPEDE EFFECTIVE AND PROMPT REMEDIAL ACTION.

SECTION 109-- RULES

THIS SECTION PROVIDES FOR DOE RULES AND REGULATIONS IN ACCORDANCE WITH SECTION 501 OF THE DOR ORGANIZATION ACT.

**7468 *41 SECTION 110-- ENFORCEMENT

THIS SECTION PROVIDES FOR ENFORCEMENT THROUGH THE USE OF CIVIL PENALTIES AND EQUITABLE REMEDIES AS APPROPRIATE. SECTION 502(C) OF THE DOE ORGANIZATION ACT APPLIES TO THIS SECTION.

SECTION 111-- PUBLIC PARTICIPATION

THIS SECTION DIRECTS THE DOE, EPA, AND NRC TO ALLOW THE PUBLIC AN OPPORTUNITY TO PARTICIPATE, PARTICULARLY AT THE LOCAL LEVEL, IN THE DESIGNATION OF PROCESSING SITES AND THE ESTABLISHMENT OF PRIORITIES, AND IN THE SELECTION OF DEPOSITORY SITES, THE EXECUTION OF COOPERATIVE AGREEMENTS, AND OTHER MATTERS. HEARINGS AT THE LOCAL LEVEL ARE REQUIRED, WHERE REQUESTED. THE OBJECTIVE IS TO GIVE THE PEOPLE AND OFFICIALS AFFECTED AN OPPORTUNITY TO LEARN WHAT IS PLANNED FOR THEIR AREA AND ITS IMPACT ON THEM. IT IS NOT INTENDED THAT HEARINGS BE HELD AT ALL SITES, HOWEVER. MOREOVER, IT IS EXPECTED THAT THIS PROVISION WILL NOT DELAY THE PROGRAM, BUT SHOULD BE HELPED IN GAINING PUBLIC SUPPORT.

SECTION 112-- TERMINATION; AUTHORIZATION

THIS SECTION REQUIRES THAT THE REMEDIAL ACTION PROGRAM TERMINATE 7 YEARS AFTER THE EPA STANDARDS ARE FINALLY PROMULGATED, UNLESS CONGRESS EXTENDS THE PROGRAM BY LATE AUTHORIZATION. THIS TERMINATION IS LIMITED TO THE REMEDIAL ACTION PROGRAM ONLY. IT IS NOT INTENDED TO TERMINATE THE ENFORCEMENT OR OTHER AUTHORITIES UNDER THE ACT FOR MAINTAINING AND MONITORING DEPOSITORY SITES ONCE REMEDIAL ACTION IS COMPLETED.

THIS SECTION ALSO PROVIDES THAT APPROPRIATION FOR TITLE I SHALL BE ESTABLISHED IN ANNUAL AUTHORIZATION AND APPROPRIATION ACTS FOR THE DOE. FUNDS FOR FISCAL YEAR 1979 ARE INCLUDED IN THE DOE AUTHORIZATION BILL FOR FISCAL YEAR 1979 (H.R. 11392) WHICH IS PENDING HOUSE FLOOR ACTION.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

SECTION 113-- LIMITATION

THIS SECTION IS INTENDED TO INSURE COMPLIANCE WITH BUDGET ACT REQUIREMENTS.


SECTION 114-- REPORTS TO CONGRESS

SUBSECTION (A) PROVIDES FOR AN ANNUAL REPORT TO CONGRESS CONCERNING ACTIONS UNDER TITLE I AND TITLE II OF THE BILL.

SUBSECTION (B) DIRECTS THE DOE TO REPORT BY JULY 1979 TO CONGRESS CONCERNING VARIOUS LOCATIONS UNDER THE JURISDICTIONS OF THE DOE AND OTHER FEDERAL AGENCIES WHERE RESIDUAL RADIOACTIVE MATERIALS OR OTHER RADIOACTIVE WASTES ARE LOCATED. THESE WASTES DO NOT INCLUDE SPEND FUEL FROM NUCLEAR POWER REACTORS. THE REPORT MUST IDENTIFY THE SITE AND THE AGENCY WITH JURISDICTION. IT WILL ALSO IDENTIFY STRUCTURES, BUILDINGS, OR OTHER IMPROVEMENTS IN THE VICINITY OF THE SITES WHICH ARE CONTAMINATED OR MAY BE CONTAMINATED BY SUCH MATERIALS OR TAILINGS. THE REPORT MUST DESCRIBE THE CONDITION OF THE SITES AND MATERIALS AND TAILINGS AND WHAT HAS BEEN DONE OR IS PLANNED TO STABILIZE THE SITES AND MAKE THEM SAFE, INCLUDING A TIMETABLE FOR ACTION, IF NEEDED. THE COMMITTEE EXPECTS THAT THE EPS AND THE NRC WILL PARTICIPATE IN THE STUDY AND REPORT.

THE COMMITTEE UNDERSTANDS THERE THAT ARE A NUMBER OF FEDERALLY OWNED OR CONTROLLED SITES WITH SUCH MATERIALS OR TAILINGS, SUCH AS THE TVA SITE MENTIONED EARLIER AND A DOE SITE IN LEWISTON, N.Y., AND SOME IN NEW JERSEY. THE COMMITTEE WANTS TO HAVE THESE SITES IDENTIFIED BY THE DOE AND HAVE DATA CONCERNING THE HEALTH OR ENVIRONMENTAL PROBLEMS ASSOCIATED WITH THE SITES AND ON WHAT, IF ANYTHING, IS BEING DONE TO ELIMINATE SUCH PROBLEMS AND WHEN.


**7469 *42 SECTION 115-- ACTIVE OPERATIONS; LIABILITY FOR REMEDIAL ACTION

THIS SECTION PROHIBITS DOE FROM EXPENDING FUNDS FOR REMEDIAL ACTION AT ACTIVE MILL TAILING SITES. THE COMMITTEE IS AWARE THAT AT SOME MILLS, TAILINGS WERE ACCUMULATED YEARS AGO UNDER FEDERAL CONTRACT. BUT, AS NOTED EARLIER IN THIS REPORT, THE TAILINGS ARE COMMINGLED WITH TAILINGS DERIVED FROM COMMERCIAL OPERATIONS. ALSO, THEY ARE SUBJECT TO REGULATION BY THE NRC OR THE STATES. CONSISTENT WITH THE VIEWS OF THE COMMITTEE CHAIRMAN DINGELL HAS RECENTLY WRITTEN TO THE DOE CONCERNING THESE MILLS TO OBTAIN MORE DATA. THE COMMITTEE EXPECTS NRC TO EXERCISE ALL ITS RESPONSIBILITY CONCERNING THESE SITES UNDER THE 1954 LAW.

THIS SECTION ALSO DIRECTS THE JUSTICE DEPARTMENT TO STUDY EACH SITE ELIGIBLE FOR REMEDIAL ACTION UNDER TITLE I IN ORDER TO DETERMINE THE IDENTITY OF THOSE WHO OWNED OR CONTROLLED THE SITE BEFORE ENACTMENT OF THIS ACT, INCLUDING PAST OWNERS. THE STUDY MUST ALSO DETERMINE THE LEGAL RESPONSIBILITY, IF ANY, OF SUCH PERSONS UNDER ANY LAW OR RULE OF LAW IN EFFECT AT THE TIME THE MILL WAS PRODUCING URANIUM FOR FEDERAL PURPOSES FOR THE RECLAMATION OR REMEDIAL ACTION AT THE SITE. JUSTICE MUST PROVIDE A REPORT OF ITS FINDINGS TO CONGRESS. BASED ON THE STUDY, THE ATTORNEY GENERAL IS DIRECTED, TO THE EXTENT HE DEEMS APPROPRIATE AND IN THE PUBLIC INTEREST, TO TAKE ACTION UNDER FEDERAL OR STATE LAW, IN EFFECT AT THE TIME OF THE FEDERAL CONTRACT FOR THE THE PURCHASE OF URANIUM FROM THE MILL, TO REQUIRE REIMBURSEMENT FROM SUCH PERSON OF ALL OR PART OF REMEDIAL ACTION COSTS OF THE UNITED STATES FOR WHICH HE DETERMINES SUCH PERSON IS LIABLE.

DURING HEARINGS CONCERNING THIS LEGISLATION, THE DOE CONTENDED THAT IT WAS DIFFICULT TO 'FIX LEGAL RESPONSIBILITY FOR THE TAILINGS PROBLEM'. THE DOE SAID:

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

THE FEDERAL GOVERNMENT AND STATES DO NOT APPEAR TO BE LEGALLY RESPONSIBLE SINCE THEY EXERTED NEITHER OPERATIONAL CONTROL OR REGULATORY JURISDICTION OVER THE TAILINGS. THE FEDERAL GOVERNMENT WAS A MERE PURCHASER OF PRODUCT FROM A NUMBER OF PRIVATELY-OWNED COMPANIES.

INSOFAR AS THE COMPANIES THAT OPERATED THE MILLS ARE CONCERNED, WE HAVE A RATHER MIXED BAG OF CIRCUMSTANCES. SOME COMPANIES HAVE ACTED RESPONSIBLY AND ENDEAVORED TO ESTABLISH AND MAINTAIN A COVER OF VEGETATION ON THE TAILINGS TO STOP WIND AND WATER EROSION. OTHERS SOLD THE PROPERTIES OR SIMPLY ALLOWED THE LEASE ON THE LAND TO EXPIRE. SOME OF THE CORPORATIONS NO LONGER EXIST. THERE WERE NO REQUIREMENTS IN THE GOVERNMENT CONTRACTS FOR TAILINGS STABILIZATION AND THE COMPANIES WERE NOT AWARE OF THE POTENTIAL HEALTH AND SAFETY RISKS RESULTING FORM EXPOSURE TO THE TAILINGS. IT THEREFORE IS QUESTIONABLE WHETHER ANY COMPANIES ARE LEGALLY RESPONSIBLE.

IN RESPONSE TO QUESTIONS, THE DOE PROVIDED TWO MEMORANDA PREPARED BY THE AEC WHICH PURPORT TO BE 'LEGAL OPINIONS' CONCERNING AEC'S REGULATION OF THE TAILINGS. NEITHER OPINION APPEARS TO DEAL WITH THE QUESTION AT ISSUE. INDEED, ONE OPINION DEALS WITH THE QUESTION OF TRANSFERRING WASTES FROM THE MILLS TO OTHER PERSONS AND NOT WITH THE QUESTION OF STABILIZATION AND CONTROL AT THE MILLS.

**7470 *43 THE COMMITTEE IS NOT PERSUADED THAT LIABILITY EXISTS OR DOES NOT EXIST. THE OBJECTIVE OF THIS PROVISION IS TO REQUIRE A CAREFUL STUDY BY THE JUSTICE DEPARTMENT TO RESOLVE THE ISSUE AND, IF APPROPRIATE, TO REQUIRE ACTION TO RECOVER COSTS FROM THE RESPONSIBLE PERSONS. CLEARLY, IF A SITE IS NOT CURRENTLY OWNED OR CONTROLLED BY THE PERSON WHO CONTRACTED WITH THE UNITED STATES TO SELL THE URANIUM, SUCH ACTION TO RECOVER REMEDIAL ACTION COSTS INAPPROPRIATE. BUT IT IS THE INTENTION OF THE COMMITTEE THAT WE FIND OUT. THE COMMITTEE STRESSES THAT THIS SECTION IS NOT INTENDED TO CREATE NEW OR ADDITIONAL LAW UNDER WHICH JUSTICE COULD RECOVER COSTS. JUSTICE MUST LOOK TO THE LAW AS IT WAS AT OR PRIOR TO TERMINATION OF MILL OPERATIONS.

TITLE II-- URANIUM MILL TAILINGS LICENSING AND REGULATION

THIS TITLE AMENDS THE ATOMIC ENERGY ACT OF 1954. IT REINFORCES THE URANIUM MILL PROCESS AND MILL TAILINGS DISPOSAL. THE 'AGREEMENT STATES' PROGRAM, UNDER WHICH CERTAIN STATES LICENSE URANIUM MILLING ACTIVITIES, IS MODIFIED TO REQUIRE THAT STATE LICENSING STANDARDS BE EQUIVALENT TO THOSE OF THE COMMISSION, AND IT REQUIRES PUBLIC PARTICIPATION AND ENVIRONMENTAL REVIEW AS PART OF THE STATE LICENSING PROCEDURES. TITLE II ALSO REINFORCES THE NRC'S AUTHORITY TO MAKE FINANCIAL ARRANGEMENTS WITH URANIUM MILLING COMPANIES TO INSURE PROPER STABILIZATION AND CARE OF URANIUM MILL TAILINGS.

SECTION 201-- DEFINITION

THIS SECTION AMENDS THE DEFINITION OF 'BYPRODUCT MATERIAL' IN THE ATOMIC ENERGY ACT OF 1954 TO INCLUDE URANIUM MILL TAILINGS AND OTHER WASTES. PREVIOUSLY, TAILINGS HAVE BEEN CONTROLLED THROUGH THE LICENSING PROCESS FOR URANIUM MILLS. THIS AMENDMENT WOULD SUBJECT TAILINGS TO SPECIFIC LICENSING AUTHORITY. (SECTION 209 REQUIRES THAT THE MILLING AND MILL TAILINGS LICENSING PROCESS BE CONSOLIDATED.)

SECTION 202-- CUSTODY OF DISPOSAL SITE

THIS SECTION ADDS A NEW SECTION 83 TO CHAPTER 8 OF THE ATOMIC ENERGY ACT OF 1954.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

H.R. REP. 95-1480(II), H.R. REP. 95-1480(II) (1978)

SUBSECTION (A) OF THE THE NEW SECTION REQUIRES THAT ANY LICENSE ISSUED OR RENEWED UNDER SECTIONS 62 OR 81 OF THE 1954 ACT, AFTER THE EFFECTIVE DATE OF THE SECTION, FOR AN ACTIVITY RESULTING IN THE PRODUCTION OF ANY BYPRODUCT MATERIAL AS DEFINED IN SECTION 11E.(2) OF THE 1954 ACT MUST CONTAIN TERMS AND CONDITIONS PRESCRIBED BY THE NRC. THESE TERMS AND CONDITIONS ARE PRIMARILY DESIGNED TO ASSURE THAT, PRIOR TO TERMINATION OF ANY LICENSE, THE LICENSEE WILL COMPLY WITH DECONTAMINATION, DECOMMISSIONING, AND RECLAMATION STANDARDS PRESCRIBED BY THE NRC PURSUANT TO THE NEW SECTION 161X OF THE 1954 ACT FOR THE MILL SITES, INCLUDING ANY DEPOSITORIES OF THE BYPRODUCT MATERIAL. SUCH TERMS AND CONDITIONS WILL ALSO PROVIDE THAT TITLE AND CONTROL OF SUCH BYPRODUCT MATERIAL SHALL BE TRANSFERRED TO THE UNITED STATES. LICENSES IN EFFECT ON ENACTMENT OF THIS ACT MUST, DEPENDING ON WHICH EVENT JUST OCCURES, EITHER CONTAIN SUCH TERMS AND CONDITIONS WHEN NEXT RENEWED AFTER THE EFFECTIVE DATE OF THE SECTION OR SHALL COMPLY WITH THESE STATUTORY PROVISIONS UPON TERMINATION OF THE LICENSE.

SUBSECTION (B) REQUIRES THAT LICENSES ISSUED AFTER THE EFFECTIVE DATE OF THE NEW SECTION 83 MUST INCLUDE TERMS AND CONDITIONS FOR THE TRANSFER OF LAND USED TO DISPOSE OF TAILINGS FROM ACTIVE OPERATIONS TO THE **7471 *44 UNITED STATES. THIS WILL OCCUR BEFORE TERMINATION OF THE LICENSE, BUT AFTER THE LAND HAS MET THE REQUIREMENTS OF SUBSECTION (A). THIS TRANSFER WILL INCLUDE SURFACE AND SUBSURFACE INTERESTS. SIMILAR PROVISION IS MADE FOR THE TRANSFER OF SUCH INTEREST TO THE UNITED STATES IN THE CASE OF A LICENSE IN EFFECT BEFORE THE EFFECTIVE DATE OF THIS SECTION. HOWEVER, IN SUCH CASE, THE NRC HAS SOME DISCRETION BECAUSE SUCH LICENSES MAY NOT OWN THE SUBSURFACE OR EVEN THE SURFACE INTERESTS AND THUS COULD NOT TRANSFER THE LAND TO THE UNITED STATES.

ONCE TITLE TO THE LAND AND INTERESTS THEREIN ARE TRANSFERRED TO THE UNITED STATES THEY CANNOT BE DISPOSED OF. HOWEVER, THE UNDERLYING MINERALS MAY BE SOLD OR LEASED AS PROVIDED IN SECTION 104(H) OF THIS ACT.

THE ABOVE PROVISIONS CONCERNING TRANSFER OF TITLE DO NOT APPLY TO INDIAN LANDS. IN THE CASE OF THOSE LANDS, PROVISION IS MADE FOR AGREEMENTS BETWEEN THE NRC AND THE INDIANS TO ASSURE PROPER MAINTENANCE AND MONITORING BY THE UNITED STATES.

THE NRC IS REQUIRED TO MAKE A DETERMINATION AT THE TIME OF TERMINATION OF A LICENSE THAT THESE REQUIREMENTS AND STANDARDS HAVE BEEN MET. THE DETERMINATION MUST BE IN WRITING.

SECTION 203-- AUTHORITY TO ESTABLISH CERTAIN REQUIREMENTS

THIS SECTION AMENDS SECTION 161 OF THE 1954 ACT BY ADDING A NEW SECTION TO THAT SECTION PROVIDING FOR THE ISSUANCE BY RULE, REGULATION, OR ORDER OF STANDARDS AND INSTRUCTIONS CONCERNING FINANCIAL ARRANGEMENTS WHICH MUST BE MADE BY LICENSEES FOR THE COST OF STABILIZATION AND, IF NECESSARY, THE LONG-TERM COST OF MAINTENANCE AND MONITORING. SUCH ARRANGEMENTS MUST BE MADE BEFORE A LICENSE IS TERMINATED, AND MAY BE BY BOND, SURETY, OR OTHER MEANS TO INSURE THAT THE NRC HAS THE FLEXIBILITY TO EFFECTIVELY IMPLEMENT THIS PROVISION FULLY.

SUBPARAGRAPH (1) REQUIRES THE COMMISSION TO REGULATE THE DISPOSAL OF URANIUM MILLING AND MILL TAILINGS IN SUCH A WAY THAT, WHEN EACH LICENSE IS TERMINATED, RECLAMATION AND STABILIZATION ALREADY HAS BEEN IMPLEMENTED BY THE LICENSEE AND SO THAT NO LONG-TERM MAINTENANCE AND MONITORING IS REQUIRED TO PROTECT THE PUBLIC AND THE ENVIRONMENT.

THIS SECTION IS EFFECTIVE ON THE DATE OF ENACTMENT.

THE COMMITTEE INTENDS THAT THE NRC COMPLY WITH THE APPLICABLE PROVISIONS OF THE SO-CALLED ADMINISTRATIVE PROCEDURES ACT IN ISSUING THE RULES, REGULATIONS, OR ISSUING

ORDERS AUTHORIZED BY THIS SECTION. THIS IS NOT INTENDED TO MEAN THAT SUCH RULEMAKING, ETC., IS SUBJECT TO THE ADJUDICATION PROVISIONS OF THAT LAW. BUT, AS A MINIMUM, THE RULEMAKING PROVISIONS OF THIS LAW (5 U.S.C. 553) SHALL APPLY.

THE COMMITTEE NOTES THAT MANY OF THE PROVISIONS OF TITLE II OF THE ACT MAY MAKE IT DIFFICULT FOR EXISTING LICENSEES TO COMPLY WITH BECAUSE OF THE FINANCIAL IMPACT OR THE TIME IT WILL TAKE TO DO SO. THE NRC SHOULD TAKE SUCH FACTORS INTO ACCOUNT AND PROVIDE A MEANS TO ALLEVIATE OR MITIGATE THOSE PROBLEMS WHERE APPROPRIATE WHILE ASSURING THAT THE PURPOSES OF THIS ACT ARE FULLY MET. THE COMMITTEE BELIEVES AND EXPECTS THAT THESE PURPOSES SHOULD BE MET WITHOUT CAUSING MILL CLOSINGS AND PUTTING PEOPLE OUT OF WORK. AT THE SAME TIME, THE COMMITTEE RECOGNIZES THAT, DESPITE PAST EFFORTS BY A LICENSEE, THE CONTROL AND STABILIZATION MAY NOT BE ADEQUATE TO MEET THE REQUIREMENTS OF THESE AMENDMENTS TO THE 1954 ACT.

SECTION 204-- COOPERATION WITH STATES

THIS SECTION AMENDS SECTION 274 OF THE ATOMIC ENERGY ACT TO PROVIDE FOR ADHERENCE BY AGREEMENT STATES TO MINIMUM FEDERAL STANDARDS FOR URANIUM MILL TAILINGS CONTROL, STABILIZATION AND DISPOSAL. **7472 *45 IT ALLOWS STATES TO DISCONTINUE LICENSING OR URANIUM MILLING AND MILL TAILINGS, WHILE RETAINING AUTHORITY TO CONTINUE LICENSING OTHER RADIOACTIVE MATERIALS LICENSABLE UNDER THE AGREEMENT STATES' PROGRAM. UNDER CURRENT LAW, STATES WHICH DID NOT WANT TO REGULATE URANIUM MILLING WOULD HAVE TO TERMINATE THEIR ENTIRE AGREEMENT PROGRAM WITH THE COMMISSION. IT ALSO AMENDS CURRENT PROVISIONS OF LAW CONCERNING THE REVIEW OF THESE AGREEMENTS.

SUBSECTION (E) ADDS A NEW SUBSECTION TO SECTION 274. IT REQUIRES THAT STATE STANDARDS FOR LICENSING URANIUM MILL TAILINGS AND URANIUM MILLING MUST TO THE EXTENT PRACTICABLE BE EQUIVALENT TO, OR EXCEED, THOSE OF THE COMMISSION. IN ADDITION, LICENSES ISSUED BY STATES MUST REQUIRE THAT, UPON TERMINATION OF SUCH LICENSES, MILL TAILINGS DISPOSAL SITES WILL BE TRANSFERRED WITHOUT COST TO PERMANENT FEDERAL CUSTODY. STATE LICENSING PROCEDURES ARE REQUIRED TO INCLUDE PROVISIONS FOR PUBLIC PARTICIPATION AND ENVIRONMENTAL REVIEWS. THIS NEW SUBSECTION INCLUDES THE PREPARATION OF A WRITTEN ANALYSIS 'CONSISTENT WITH' THE PROVISIONS OF NEPA. THE COMMITTEE STRESSES THE WORDS 'CONSISTENT WITH'. IT IS NOT THE INTENTION THAT A STATE ENACT NEPA LAWS OR ADOPT GUIDELINES SUCH AS ARE NOW IN EFFECT UNDER NEPA. THE INTENT IS TO INSURE THAT ANY ANALYSIS (BY A STATE) IS CARRIED OUT IN A MANNER THAT IS CONSISTENT WITH NEPA, SO THAT MILLS LOCATED IN A NON-AGREEMENT STATE ARE NOT SUBJECT TO DIFFERENT REQUIREMENTS THAN THEIR COMPETITORS WHICH ARE LOCATED IN AN AGREEMENT STATE. INDEED, THAT IS AN OBJECTIVE OF THE ENTIRE SUBSECTION.

SUBSECTION (F) RESERVES THE RIGHT OF THE COMMISSION TO DETERMINE THAT MILL TAILINGS PILES CREATED UNDER AGREEMENT STATE LICENSING HAVE MET APPLICABLE REQUIREMENTS BEFORE THEY ARE TURNED OVER TO FEDERAL CUSTODY.

SUBSECTION (G) REQUIRES THE COMMISSION TO REVIEW THE REGULATORY PROGRAMS OF EACH AGREEMENT STATES, AS SOON AS PRACTICABLE 3 YEARS AFTER THE DATE OF ENACTMENT OF THE ACT, TO DETERMINE WHETHER THE STANDARDS APPLIED BY THE STATE ARE AT LEAST EQUIVALENT TO THOSE OF THE COMMISSION. IF THE COMMISSION DETERMINES THAT THE STATE'S PROGRAM DOES NOT COMPLY, IT MAY SUSPEND OR TERMINATE THAT PART OF ITS AGREEMENT WITH THE STATE UNDER WHICH THE STATE IS PERMITTED TO LICENSE AND REGULATE URANIUM MILLING AND MILL TAILINGS ACTIVITIES. REGULATORY AUTHORITY WOULD THEN REVERT TO THE COMMISSION.

PROVISION IS ALSO MADE FOR AMENDING SUCH AGREEMENTS TO INSURE THAT FEES COLLECTED BY STATES FOR RECLAMATION OR LONG-TERM MAINTENANCE AND MONITORING ARE TRANSFERRED TO THE UNITED STATES UPON TERMINATION OF A LICENSE. ALSO, IF SUCH FEES ARE COLLECTED, THEY

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

MUST BE ADEQUATE. THE COMMITTED DOES NOT WANT TO HAVE THIS PROVISION CONSTRUED AS REQUIRING OR DISCOURAGING SUCH FEES. THAT IS A STATE DECISION.

SIMILARLY, THE COMMITTEE INTENDS THAT STATE LAWS AND PROCEDURES GOVERN THE LICENSING, BUT THIS ACT ESTABLISHES MINIMUM PROCEDURES FOR THIS PURPOSE.

SUBSECTION (H) CONTINUES FOR 3 YEARS STATE CONTROL OVER THESE TAILINGS. AFTER THAT PERIOD, IF A STATE HAS NOT ENTERED INTO AN AGREEMENT, THE NRC WILL LICENSE THE MILLS.

SECTION 205-- AUTHORITIES OF COMMISSION RESPECTING CERTAIN BYPRODUCTS MATERIAL

SECTION 205 AUTHORIZES THE COMMISSION TO PROMULGATE, IMPLEMENT AND ENFORCE REGULATIONS GOVERNING PERMANENT FEDERAL CUSTODY OF URANIUM MILL TAILINGS DISPOSAL SITES AND GOVERNING THE ACTIVITIES OF THE DEPARTMENT OF ENERGY UNDER TITLE I OF THE ACT.

**7473 *46 SECTION 206-- AUTHORITY OF ENVIRONMENTAL PROTECTION AGENCY RESPECTING CERTAIN BYPRODUCT MATERIAL

SUBSECTION (A)(1) REQUIRES EPA TO SET STANDARDS OF GENERAL APPLICABILITY FOR SITES COVERED BY TITLE I OF THIS BILL. THE STANDARDS MUST BE CONSISTENT WITH THE SOLID WASTE DISPOSAL ACT.

THE COMMITTEE OBSERVES THAT EPA TESTIFIED THAT IT COULD SET SUCH STANDARDS IN 6 MONTHS. THE COMMITTEE WAS SKEPTICAL AND ALLOWED MORE TIME. HOWEVER, EPA IS ENCOURAGED TO ACT WITHIN THE 6 MONTHS GOAL EPA ESTABLISHED FOR ITSELF.

SUBSECTION (A)(2) PROVIDES FOR SUCH GENERAL STANDARDS FOR THE TITLE II PROGRAM.

THESE PROVISIONS DIFFER FROM THOSE IN THE VERSION OF H.R. 13650 AS REPORTED BY THE COMMITTEE ON INTERIOR AND INSULAR AFFAIRS. SINCE REPORTING, BOTH COMMITTEES HELD CONSIDERABLE DISCUSSIONS WITH THE EPA AND NRC AND DEVELOPED THESE PROVISIONS. IN AN AUGUST 9, 1978, LETTER TO SUBCOMMITTEE CHAIRMAN DINGELL, ADMINISTRATOR COSTLE SAID:

TITLE II WOULD PROSPECTIVELY GRANT THE URANIUM MILL TAILINGS LICENSING FUNCTION TO THE NRC. WE AGREED THAT NRC WOULD ESTABLISH MANAGEMENT REQUIREMENTS FOR THE URANIUM MILL TAILINGS; THAT SUCH REQUIREMENTS WOULD BE COMPARABLE, TO THE MAXIMUM EXTENT PRACTICABLE, TO REQUIREMENTS APPLICABLE TO THE POSSESSION, TRANSFER, AND DISPOSAL OF SIMILAR HAZARDOUS MATERIAL UNDER THE SOLID WASTE DISPOSAL ACT, AS AMENDED BY THE RESOURCE CONSERVATION AND RECOVERY ACT OF 1976; AND THAT IN ESTABLISHING GENERAL MANAGEMENT REQUIREMENTS, THE NRC WOULD OBTAIN THE CONCURRENCE OF EPA.

UNDER BOTH TITLES, EPA WOULD RETAIN ITS GENERALLY APPLICABLE STANDARDS-SETTING AUTHORITY UNDER THE ATOMIC ENERGY ACT OF 1954, AS AMENDED.

I BELIEVE THIS FORMULATION FOR AGENCY RESPONSIBILITY WILL BEST CONTRIBUTE TO AN EFFECTIVE PROGRAM FOR THE CONTROL OF URANIUM MILL TAILINGS. BOTH EPA AND NRC BELIEVE IT IS NECESSARY TO IMPLEMENT SUCH A PROGRAM AS SOON AS POSSIBLE.

THE COMMITTEE BILL DOES NOT CONTAIN A DISCLAIMER CONCERNING THE CLEAN AIR ACT AND THE FEDERAL WATER POLLUTION CONTROL ACT. IT IS UNNECESSARY. THE BILL DOES NOT AFFECT THOSE LAWS SPECIFICALLY, NOR IS IT INTENDED TO DO SO BY IMPLICATION OR OTHERWISE. THE COMMITTEE DID NOT THINK IT WISE TO MENTION SOME ENVIRONMENTAL LAWS SINCE FAILURE TO MENTION SOME WOULD PRECLUDE THE APPLICABILITY OF THOSE NOT MENTIONED. THE COMMITTEE MERELY

STRESSES THAT THIS ACT DOES NOT CHANGE THOSE LAWS.

### SECTION 207-- AUTHORIZATION OF APPROPRIATION FOR GRANTS

THIS SECTION AUTHORIZES $500,00 IN FISCAL YEAR 1980 FOR GRANTS TO THOSE STATES WITH AGREEMENTS WITH THE NRC.

### SECTION 208-- EFFECTIVE DATE

THE BILL IS EFFECTIVE ON ENACTMENT UNLESS OTHERWISE STATED.

### **7474 *47 SECTION 209-- CONSOLIDATION OF LICENSES AND PROCEDURES

THIS SECTION DIRECTS THE NRC TO CONSOLIDATE ALL LICENSE AND LICENSING PROCEDURES UNDER AMENDMENTS MADE BY THIS TITLE WITH OTHER SUCH LICENSE AND LICENSING PROCEDURES UNDER THE 1954 ACT, TO THE GREATEST EXTENT PRACTICABLE.

### TITLE III-- STUDY AND DESIGNATION OF TWO MILL TAILING SITES IN NEW MEXICO

THIS TITLE PROVIDES FOR A STUDY BY THE NRC OF TWO ACTUAL MILL SITES IN NEW MEXICO WHICH PURPORTEDLY HAVE SEGREGATED THOSE TAILINGS PILES THAT WERE DERIVED FROM PRODUCTION FOR URANIUM FOR FEDERAL PURPOSES. FROM THOSE DERIVED FROM PRODUCTION OF URANIUM FOR COMMERCIAL PURPOSES THE NRC MUST DETERMINE IF THE 1954 LAW, AS AMENDED BY THIS BILL, PROVIDES EFFECTIVE REGULATION AND CONTROL OF THESE SITES. IF THE STUDY CONCLUDES THAT SUCH LAW IS NOT ADEQUATE, THEN THE DOE MAY, WITHIN 90 DAYS AFTER COMPLETION OF THE STUDY, DESIGNATE THE SITES AS ELIGIBLE FOR ASSISTANCE UNDER TITLE I OF THE BILL. THIS DESIGNATION WILL ENABLE THE DOE TO ENTER INTO AGREEMENTS WITH NEW MEXICO FOR REMEDIAL ACTION AT SUCH SITES. BEFORE THE DESIGNATION BECOMES FINAL, THE DESIGNATION, TOGETHER WITH COST AND OTHER DATA, MUST BE REPORTED TO CONGRESS, AND WAIT FOR THE LAPSE OF 120 CALENDAR DAYS BEFORE INITIALING AGREEMENT WITH THE STATE AND REMEDIAL ACTION.

### ECONOMIC IMPACT

THIS LEGISLATION IS NOT EXPECTED TO HAVE ANY SIGNIFICANT INFLATIONARY IMPACT. OVER THE NEXT 7 YEARS, 22 TAILING SITES WILL BE TREATED AT A TOTAL COST RANGING ANYWHERE FROM $15 MILLION TO $200 MILLION, DEPENDING LARGELY UPON WHETHER TAILINGS WILL BE TREATED AND STORED AT THEIR PRESENT LOCATION OR, INSTEAD, MOVED TO NEWLY PREPARED DISPOSAL SITES. LITTLE OF THIS COST IS EXPECTED TO BE INCURRED DURING THE NEXT 3 YEARS BECAUSE OF THE TIME REQUIRED TO IDENTIFY AND PREPARE DISPOSAL SITES. ADDITIONAL COSTS MAY BE BORNE BY INDIVIDUAL STATES IF NEW DISPOSAL SITES ARE REQUIRED. BUT EVEN TAKING THESE ADDITIONAL COSTS INTO ACCOUNT, THE IMPACT OF THE LEGISLATION ON INFLATION AND OVERLY ECONOMIC PERFORMANCE IS EXPECTED TO BE IMMEASURABLE.

### COST OF LEGISLATION

THE COMMITTEE REQUESTED A REPORT FORM THE CONGRESSIONAL BUDGET OFFICE WHEN HR. 13650 WAS ORDERED REPORTED ON SEPTEMBER 26, 1978. HOWEVER, THE CBO WAS UNABLE TO RESPOND BY THE TIME OF FILING OF THIS REPORT

THE BILL DOES NOT AUTHORIZE ANY APPROPRIATIONS IN FISCAL YEAR 1979.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

H.R. REP. 95-1480(II), H.R. REP. 95-1480(II) (1978)

OVERSIGHT STATEMENT-- COMMITTEE ON GOVERNMENT OPERATIONS

NO FINDINGS OR RECOMMENDATIONS ON OVERSIGHT ACTIVITIES PURSUANT TO CLAUSE 2(B)(2) RULE X AND CLAUSE 2(1)(2)(D) UNDER RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES HAVE BEEN SUBMITTED BY THE COMMITTEE ON GOVERNMENT OPERATIONS FOR INCLUSION IN THIS REPORT.

**\*\*7475** DEPARTMENTAL REPORTS

THE COMMITTEE RECEIVED THE FOLLOWING REPORTS:

**\*48** DEPARTMENT OF ENERGY,

WASHINGTON, D.C., SEPTEMBER 14, 1978.

HON. JOHN D. DINGELL,

CHAIRMAN, SUBCOMMITTEE ON ENERGY AND POWER, COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE, HOUSE OF REPRESENTATIVES, WASHINGTON, D.C.

DEAR MR. CHAIRMAN: THIS IS IN RESPONSE TO YOUR REQUEST FOR THE VIEWS OF THE DEPARTMENT OF ENERGY (DOE) ON THE AUGUST 14, 1978, COMMITTEE PRINT, CITED AS THE 'URANIUM MILL TAILINGS RADIATION CONTROL ACT OF 1978.'

A NUMBER OF CHANGES AGREED TO BY THE SUBCOMMITTEE IN ITS MARKUP OF THE 'RESIDUAL RADIOACTIVE MATERIALS ACT OF 1978' (THE ADMINISTRATION BILL) CAUSE US SOME CONCERN. AS YOU KNOW, THE ADMINISTRATION BILL PROVIDED FOR A COOPERATIVE FEDERAL/STATE PROGRAM IN WHICH THE FEDERAL GOVERNMENT WOULD PAY 75 PERCENT OF THE DIRECT COSTS OF REMEDIAL ACTION, WHILE THE STATE WOULD PAY 25 PERCENT. THE JUSTIFICATIONS FOR THIS FINANCING FORMULA WERE CLEARLY SET FORTH IN OUR TESTIMONY BEFORE THE SUBCOMMITTEE. DOE CONSIDERS THE REASONS FOR THE 75/15 PERCENT SPLIT TO BE COMPELLING AND PERSUASIVE; HOWEVER, WE UNDERSTAND THE MOTIVATIONS WHICH INFLUENCED THE SUBCOMMITTEE TO LIMIT THE STATES' SHARE TO 10 PERCENT OF THE COSTS OF THE PROGRAM. WHILE DOE PREFERS THE FUNDING FORMULA OF THE ADMINISTRATION BILL, WE NEVERTHELESS ARE PLEASED WITH THE SUBCOMMITTEE'S DECISION NOT TO IMPOSE A CEILING UPON THE STATES' CONTRIBUTION TO THE REMEDIAL ACTION PROGRAM.

WITH RESPECT TO THE QUESTION OF LIMITING THE LIABILITY OF THE UNITED STATES IN CONNECTION WITH THE PERFORMANCE OF THE REMEDIAL ACTION, DOE CONTINUES TO SUPPORT THE LANGUAGE PROPOSED IN THE ADMINISTRATION BILL, WHICH PROVIDED FOR A RELEASE OF LIABILITY DATING FROM ENACTMENT OF THE LEGISLATION THROUGH THE COMPLETION OF THE REMEDIAL ACTION. SUCH A RELEASE WOULD NOT HAVE AFFECTED THE UNITED STATES' LIABILITY, IF ANY, FOR ACTIONS TAKEN EITHER PRIOR TO OR AFTER COMPLETION OF THE REMEDIAL ACTION, BUT WOULD MERELY HAVE PROTECTED THE UNITED STATES DURING THE TIME SPECIFIED. IN ANY EVENT, ALTHOUGH WE WOULD PREFER A BROADER WAIVER, DOE IS PLEASED THAT THE CONCEPT OF A LIMITED RELEASE OF LIABILITY HAS BEEN ACCEPTED BY THE SUBCOMMITTEE AS REFLECTED IN SECTION 102(C) OF THE COMMITTEE PRINT.

AS WE UNDERSTAND IT, THE LICENSING AND REGULATION PORTION OF THE COMMITTEE PRINT PROVIDES THAT THE ENVIRONMENTAL PROTECTION AGENCY (EPA) WILL PROMULGATE PERFORMANCE STANDARDS FOR THE REMEDIAL ACTION WHILE THE NUCLEAR REGULATORY COMMISSION IS TO HAVE EXCLUSIVE JURISDICTION OVER THE LICENSING OF URANIUM MILL TAILINGS AND ENFORCEMENT OF THE PERFORMANCE STANDARDS SET BY EPA. WE TRUST THAT THE REPORT LANGUAGE WILL CLEARLY

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

H.R. REP. 95-1480(II), H.R. REP. 95-1480(II) (1978)

DEFINE THE RESPECTIVE ROLES OF THESE TWO AGENCIES IN ORDER TO AVOID ANY POSSIBLE CONFLICT OR INCONSISTENCY.

MY STAFF AND I APPRECIATE THE TIME AND EFFORT YOUR SUBCOMMITTEE HAS SPENT IN MARKING UP THIS LEGISLATION. WE WILL BE HAPPY TO PROVIDE THE FULL COMMITTEE WITH ANY FURTHER INFORMATION OR ASSISTANCE IT MAY REQUIRE DURING ITS MARKUP.

**7476 THE OFFICE OF MANAGEMENT AND BUDGET HAS ADVISED THAT THERE IS NO OBJECTION TO THE SUBMISSION OF THIS REPORT FROM THE STANDPOINT OF THE ADMINISTRATION'S PROGRAM.

SINCERELY,

JOHN F. O'LEARY,

DEPUTY SECRETARY.

*49 U.S. DEPARTMENT OF THE INTERIOR,

OFFICE OF THE SECRETARY,

WASHINGTON, D.C., SEPTEMBER 15, 1978.

HON. HARLEY O. STAGGERS,

CHAIRMAN,

COMMITTEE ON INTERSTATE AND FOREIGN COMMERCE,

U.S. HOUSE OF REPRESENTATIVES

WASHINGTON, D.C.

DEAR MR. CHAIRMAN: THIS RESPONDS TO YOUR REQUEST FOR OUR VIEW ON H.R 13650 AS REPORTED BY THE SUBCOMMITTEE ON ENERGY AND POWER OF THE HOUSE INTERSTATE AND FOREIGN COMMERCE COMMITTEE, THE PROPOSED 'URANIUM MILL TAILINGS RADIATION CONTROL ACT OF 1978.'

WE DO NOT OBJECT TO ENACTMENT OF H.R. 13650 AS REPORTED BY THE SUBCOMMITTEE ON ENERGY AND POWER OF THE HOUSE INTERSTATE AND FOREIGN COMMERCE COMMITTEE IF THE BILL IS AMENDED AS SUGGESTED HEREIN.

TITLE I OF HR. 13650 WOULD AUTHORIZE THE SECRETARY OF ENERGY TO ENTER INTO COOPERATIVE AGREEMENTS WITH STATES TO PERFORM REMEDIAL ACTION AT INACTIVE URANIUM PROCESSING SITES. TITLE II WOULD AMEND THE ATOMIC ENERGY ACT OF 1954 TO INCLUDE URANIUM MILL TAILINGS WITHIN THE DEFINITION OF 'BYPRODUCT MATERIAL' AND WOULD REQUIRE THE NUCLEAR REGULATORY COMMISSION LICENSES AND RENEWALS REQUIRE THAT PRIOR TO TERMINATION OF A LICENSE, THE LICENSEE COMPLY WITH NRC-ESTABLISHED DECONTAMINATION, DECOMMISSIONING AND RECLAMATION STANDARDS AND REQUIREMENTS, AND THAT OWNERSHIP OF THE BYPRODUCT MATERIAL BE TRANSFERRED TO THE UNITED STATES ON TERMINATION.

WE HAVE THE FOLLOWING COMMENTS ON THE PROVISIONS OF H.R. 13650 AS REPORTED BY THE SUBCOMMITTEE ON ENERGY AND POWER OF THE HOUSE INTERSTATE AND FOREIGN COMMERCE COMMITTEE. SECTION 104(B)(2) PROVIDES THAT STATE ACQUISITION OF A SITE FOR DISPOSITION AND STABILIZATION OF RESIDUAL RADIOACTIVE MATERIALS SHALL NOT BE REQUIRED IF THE SECRETARY OF ENERGY, WITH THE CONCURRENCE OF THE NUCLEAR REGULATORY COMMISSION, DESIGNATES A

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

H.R. REP. 95-1480(II), H.R. REP. 95-1480(II) (1978)

SITE OWNED BY A FEDERAL AGENCY FOR SUCH DISPOSITION AND STABILIZATION, WE BELIEVE THAT SECTION 104(B)(2) SHOULD INCORPORATE THE PROVISION IN SECTION 106(A), GOVERNING ACQUISITION OF LAND BY THE SECRETARY OF ENERGY, WHICH PERMITS THE SECRETARY OF THE INTERIOR TO MAKE PUBLIC LANDS AVAILABLE TO THE SECRETARY OF ENERGY FOR DISPOSITION OF RESIDUAL RADIOACTIVE MATERIALS IN ACCORDANCE WITH OTHER APPLICABLE PROVISIONS OF LAW. WE ALSO SUGGEST THAT SECTION 106(A)(2) BE AMENDED TO READ: 'THE SECRETARY OF THE INTERIOR MAY MAKE AVAILABLE PUBLIC LANDS ADMINISTERED BY HIM FOR SUCH PURPOSES . . . '

SECTION 105(A)(1) OF THE BILL PROVIDES THAT COOPERATIVE AGREEMENTS ENTERED INTO BETWEEN THE SECRETARY OF ENERGY AND INDIAN TRIBES SHALL REQUIRE THAT INDIAN TRIBES EXECUTE A WAIVER RELEASING THE UNITED STATES FORM ANY LIABILITY CONCERNING THE REMEDIAL ACTION PERFORMED BY THE SECRETARY OF ENERGY OR HIS DESIGNEE. THIS PROVISION SHOULD BE AMENDED TO INCLUDE THE STATEMENT THAT THE PROVISION DOES NOT AFFECT **7477 THE RESPONSIBILITIES OF THE SECRETARY OF THE INTERIOR AS TRUSTEE FOR ANY INDIAN TRIBE.

IN ORDER TO CONSOLIDATE RESIDUAL RADIOACTIVE MATERIALS FOR STORAGE IN A SAFE MANNER, SECTION 106 OF THE BILL AUTHORIZES THE SECRETARY OF ENERGY TO ACQUIRE LAND, AND PROVIDES, IN ADDITION, THAT THE SECRETARY OF THE INTERIOR MAY 'MAKE AVAILABLE PUBLIC LANDS FOR SUCH PURPOSES *50 IN ACCORDANCE WITH OTHER APPLICABLE PROVISIONS OF LAW.' WE BELIEVE THAT SECTION 106(A)(2) SHOULD APPLY TO ALL MANAGERS OF FEDERALLY OWNED LAND, NOT JUST THE SECRETARY OF THE INTERIOR.

SECTION 108(A)(1) AUTHORIZES THE SECRETARY OF ENERGY TO SELECT AND PERFORM REMEDIAL ACTION. THE SELECTION AND PERFORMANCE OF REMEDIAL ACTION IS TO BE DONE WITH THE CONCURRENCE OF THE NUCLEAR REGULATORY COMMISSION AND IN CONSULTATION, AS APPROPRIATE, WITH THE INDIAN TRIBE AND THE SECRETARY OF THE INTERIOR. THE LAST SENTENCE OF SECTION 108(A)(1) PROVIDES THAT SINCE A STATE 'MUST SHARE IN THE COSTS OF SUCH REMEDIAL ACTION, THE STATE SHALL PARTICIPATE FULLY IN THE SELECTION THEREOF.' THE WORD 'SUCH' APPEARS TO IMPLY THAT STATES PAY PART OF THE COSTS OF REMEDIAL ACTION PURSUANT TO AGREEMENTS BETWEEN THE SECRETARY OF ENERGY AND INDIAN TRIBES. SINCE THIS IS NOT THE CASE, WE RECOMMEND THAT THE LAST SENTENCE OF SECTION 108(A)(1) BE AMENDED TO SAY, 'SINCE A STATE MUST, PURSUANT TO AN AGREEMENT BETWEEN THE SECRETARY OF ENERGY AND THE STATE, SHARE IN THE COSTS OF REMEDIAL ACTION, THE STATE SHALL PARTICIPATE FULLY IN THE SELECTION OF THE TYPE OF REMEDIAL ACTION TO BE PERFORMED.'

THE OFFICE OF MANAGEMENT AND BUDGET HAS ADVISED THAT THERE IS NO OBJECTION TO THE PRESENTATION OF THIS REPORT FROM THE STANDPOINT OF THE ADMINISTRATION'S PROGRAM.

SINCERELY,

GUY R. MARTIN,

ASSISTANT SECRETARY.

* * * *

*58 SUPPLEMENTAL VIEWS ON H.R. 13650-- URANIUM MILL TAILINGS RADIATION CONTROL ACT OF 1978

WE CONCUR WITH THE MAJORITY ON THE NEED TO TAKE REMEDIAL ACTION TO SAFELY DISPOSE OF RESIDUAL URANIUM MILL TAILINGS. THESE TAILINGS ARE UNAVOIDABLE BY-PRODUCT OF THE FIRST STAGE OF THE NUCLEAR FUEL CYCLE. WHEN URANIUM IS EXTRACTED FROM RAW ORE, A RADIOACTIVE, SAND-LIKE WASTE REMAINS. THIS WASTE-- CALLED URANIUM MILL TAILINGS-- CAN CONSTITUTE A HEALTH HAZARD UNLESS PROPER DISPOSAL METHODS ARE UTILIZED. BY SHARING

H.R. REP. 95-1480(II), H.R. REP. 95-1480(II) (1978)

COSTS ON A 90/10 BASIS WITH THE AFFECTED STATES, THE FEDERAL GOVERNMENT CAN EFFECTIVELY DO ITS PART TO SAFELY DISPOSE OF THESE TAILINGS, WHICH WERE ONCE THOUGHT TO BE HARMLESS.

WE REMAIN CONCERNED, HOWEVER, ABOUT THE ATTORNEY GENERAL'S AUTHORITY TO STUDY THE LIABILITY (FOR REMEDIAL ACTION COSTS), IF ANY, OF FORMER OWNERS OR OPERATORS OF THESE PROCESSING SITES. AFTER ALL, WHEN THESE FORMER OWNERS OR OPERATORS NEGOTIATED THEIR COST-PLUS CONTRACTS **7478 WITH THE FEDERAL GOVERNMENT, A VERY SMALL AMOUNT WAS SET ASIDE FOR TAILINGS DISPOSAL BECAUSE THE TAILINGS WERE NOT BELIEVED TO BE HEALTH HAZARDS. THE COST OF REMEDIAL ACTION NOW CONTEMPLATED TO SAFELY DISPOSE OF THESE TAILINGS FAR EXCEEDS THAT PRIOR BARGAINED-FOR AMOUNT, AN WILL NEGATE BARGAINED-FOR PROFITS.

AFTER THE STUDY IS COMPLETED, THE ATTORNEY GENERAL IS AUTHORIZED TO TAKE ACTION UNDER ANY APPROPRIATE LAW TO REQUIRE PAYMENT BY A PERSON FOUND TO BE LIABLE. WE DO NOT BELIEVE THAT THE ATTORNEY GENERAL SHOULD BE EMPOWERED TO ENFORCE STATE LAWS IN TAKING ACTION AGAINST THESE FORMER OWNERS OR OPERATORS. HOWEVER, THE MAJORITY HAS ASSURED US THAT THE ATTORNEY GENERAL MUST EXERCISE DISCRETION IN INSTITUTING ANY CIVIL ACTIONS TO RECOVER REMEDIAL COSTS. SPECIFICALLY, THE MAJORITY HAS AGREED THAT IF THE SITE IS NOT CURRENTLY OWNED OR CONTROLLED BY THE PERSONS WHO CONTRACTED WITH THE UNITED STATES, SUCH CIVIL ACTION MAY BE INAPPROPRIATE. IT IS ALSO OUR UNDERSTANDING WITH THE MAJORITY THAT NO NEW FEDERAL AUTHORITY IS BEING CONFERRED ON THE ATTORNEY GENERAL BY THIS PROVISION OF THIS BILL.

WITH THESE UNDERSTANDINGS, WE SUPPORT H.R. 13650 AND URGE BIPARTISAN SUPPORT FOR THIS MEASURE.

CLARENCE J. BROWN,

JAMES M. COLLINS

NORMAN F. LENT.

CARLOS J. MOORHEAD.

MATTHEW J. RINALDO.


(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: *****. 2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))


H.R. REP. 95-1480(II), H.R. REP. 95-1480, H.R. Rep. No. 1480(II), 95TH Cong., 2ND Sess. 1978, 1978 U.S.C.C.A.N. 7450, 1978 WL 8519 (Leg.Hist.)

---

**End of Document**          © 2017 Thomson Reuters. No claim to original U.S. Government Works.

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

# EXHIBIT 11

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

# Public Law 95–604
## 95th Congress

## An Act

To authorize the Secretary of Energy to enter into cooperative agreements with certain States respecting residual radioactive material at existing sites, to provide for the regulation of uranium mill tailings under the Atomic Energy Act of 1954, and for other purposes.

Nov. 8, 1978
[H.R. 13650]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Uranium Mill Tailings Radiation Control Act of 1978. 42 USC 7901 note.

### SHORT TITLE AND TABLE OF CONTENTS

SECTION 1. This Act may be cited as the "Uranium Mill Tailings Radiation Control Act of 1978".

### TABLE OF CONTENTS

Sec. 1. Short title and table of contents.
Sec. 2. Findings and purposes.

TITLE I—REMEDIAL ACTION PROGRAM

Sec. 101. Definitions.
Sec. 102. Designation of processing sites.
Sec. 103. State cooperative agreements.
Sec. 104. Acquisition and disposition of land and materials.
Sec. 105. Indian tribe cooperative agreements.
Sec. 106. Acquisition of lands by Secretary.
Sec. 107. Financial assistance.
Sec. 108. Remedial action.
Sec. 109. Rules.
Sec. 110. Enforcement.
Sec. 111. Public participation.
Sec. 112. Termination ; authorization.
Sec. 113. Limitation.
Sec. 114. Reports to Congress.
Sec. 115. Active operations ; liability for remedial action.

TITLE II—URANIUM MILL TAILINGS LICENSING AND REGULATIONS

Sec. 201. Definition.
Sec. 202. Custody of disposal site.
Sec. 203. Authority to establish certain requirements.
Sec. 204. Cooperation with States.
Sec. 205. Authorities of Commission respecting certain byproduct material.
Sec. 206. Authority of Environmental Protection Agency respecting certain byproduct material.
Sec. 207. Authorization of appropriations for grants.
Sec. 208. Effective date.
Sec. 209. Consolidation of licenses and procedures.

TITLE III—STUDY AND DESIGNATION OF TWO MILL TAILINGS SITES IN NEW MEXICO

Sec. 301. Study.
Sec. 302. Designation by Secretary.

### FINDINGS AND PURPOSES

SEC. 2. (a) The Congress finds that uranium mill tailings located at active and inactive mill operations may pose a potential and significant radiation health hazard to the public, and that the protection of

42 USC 7901.

the public health, safety, and welfare and the regulation of interstate commerce require that every reasonable effort be made to provide for the stabilization, disposal, and control in a safe and environmentally sound manner of such tailings in order to prevent or minimize radon diffusion into the environment and to prevent or minimize other environmental hazards from such tailings.

(b) The purposes of this Act are to provide—

(1) in cooperation with the interested States, Indian tribes, and the persons who own or control inactive mill tailings sites, a program of assessment and remedial action at such sites, including, where appropriate, the reprocessing of tailings to extract residual uranium and other mineral values where practicable, in order to stabilize and control such tailings in a safe and environmentally sound manner and to minimize or eliminate radiation health hazards to the public, and

(2) a program to regulate mill tailings during uranium or thorium ore processing at active mill operations and after termination of such operations in order to stabilize and control such tailings in a safe and environmentally sound manner and to minimize or eliminate radiation health hazards to the public.

## TITLE I—REMEDIAL ACTION PROGRAM

### DEFINITIONS

42 USC 7911.

SEC. 101. For purposes of this title—

(1) The term "Secretary" means the Secretary of Energy.

(2) The term "Commission" means the Nuclear Regulatory Commission.

(3) The term "Administrator" means the Administrator of the Environmental Protection Agency.

(4) The term "Indian tribe" means any tribe, band, clan, group, pueblo, or community of Indians recognized as eligible for services provided by the Secretary of the Interior to Indians.

(5) The term "person" means any individual, association, partnership, corporation, firm, joint venture, trust, government entity, and any other entity, except that such term does not include any Indian or Indian tribe.

(6) The term "processing site" means—

(A) any site, including the mill, containing residual radioactive materials at which all or substantially all of the uranium was produced for sale to any Federal agency prior to January 1, 1971 under a contract with any Federal agency, except in the case of a site at or near Slick Rock, Colorado, unless—

(i) such site was owned or controlled as of January 1, 1978, or is thereafter owned or controlled, by any Federal agency, or

42 USC 2011 note.
42 USC 2021.

(ii) a license (issued by the Commission or its predecessor agency under the Atomic Energy Act of 1954 or by a State as permitted under section 274 of such Act) for the production at such site of any uranium or thorium product derived from ores is in effect on January 1, 1978, or is issued or renewed after such date; and

(B) any other real property or improvement thereon which—

4:22-cv-00006-CDP Doc #: 1-8 Filed: 01/28/22 Page: 209 of 903 PageID #:
4:17-cv-00024-CDP Doc #: 146 Filed: 04/26/17 Page: 9 of 23 PageID #:

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

(i) is in the vicinity of such site, and

(ii) is determined by the Secretary, in consultation with the Commission, to be contaminated with residual radioactive materials derived from such site.

Any ownership or control of an area by a Federal agency which is acquired pursuant to a cooperative agreement under this title shall not be treated as ownership or control by such agency for purposes of subparagraph (A)(i). A license for the production of any uranium product from residual radioactive materials shall not be treated as a license for production from ores within the meaning of subparagraph (A)(ii) if such production is in accordance with section 108(b).

(7) The term "residual radioactive material" means—

(A) waste (which the Secretary determines to be radioactive) in the form of tailings resulting from the processing of ores for the extraction of uranium and other valuable constituents of the ores; and

(B) other waste (which the Secretary determines to be radioactive) at a processing site which relate to such processing, including any residual stock of unprocessed ores or low-grade materials.

(8) The term "tailings" means the remaining portion of a metal-bearing ore after some or all of such metal, such as uranium, has been extracted.

(9) The term "Federal agency" includes any executive agency as defined in section 105 of title 5 of the United States Code.

(10) The term "United States" means the 48 contiguous States and Alaska, Hawaii, Puerto Rico, the District of Columbia, and the territories and possessions of the United States.

## DESIGNATION OF PROCESSING SITES

Sec. 102. (a) (1) As soon as practicable, but no later than one year after enactment of this Act, the Secretary shall designate processing sites at or near the following locations:        42 USC 7912.

Salt Lake City, Utah
Green River, Utah
Mexican Hat, Utah
Durango, Colorado
Grand Junction, Colorado
Rifle, Colorado (two sites)
Gunnison, Colorado
Naturita, Colorado
Maybell, Colorado
Slick Rock, Colorado (two sites)
Shiprock, New Mexico
Ambrosia Lake, New Mexico
Riverton, Wyoming
Converse County, Wyoming
Lakeview, Oregon
Falls City, Texas
Tuba City, Arizona
Monument Valley, Arizona
Lowman, Idaho
Cannonsburg, Pennsylvania

Remedial action.

Subject to the provisions of this title, the Secretary shall complete remedial action at the above listed sites before his authority terminates under this title. The Secretary shall within one year of the date of enactment of this Act also designate all other processing sites within the United States which he determines requires remedial action to carry out the purposes of this title. In making such designation, the Secretary shall consult with the Administrator, the Commission, and the affected States, and in the case of Indian lands, the appropriate Indian tribe and the Secretary of the Interior.

(2) As part of his designation under this subsection, the Secretary, in consultation with the Commission, shall determine the boundaries of each such site.

86 Stat. 222.

(3) No site or structure with respect to which remedial action is authorized under Public Law 92-314 in Grand Junction, Colorado, may be designated by the Secretary as a processing site under this section.

Health hazard assessment.

(b) Within one year from the date of the enactment of this Act, the Secretary shall assess the potential health hazard to the public from the residual radioactive materials at designated processing sites. Based upon such assessment, the Secretary shall, within such one year period, establish priorities for carrying out remedial action at each such site. In establishing such priorities, the Secretary shall rely primarily on the advice of the Administrator.

Notification.

(c) Within thirty days after making designations of processing sites and establishing the priorities for such sites under this section, the Secretary shall notify the Governor of each affected State, and, where appropriate, the Indian tribes and the Secretary of the Interior.

(d) The designations made, and priorities established, by the Secretary under this section shall be final and not be subject to judicial review.

(e)(1) The designation of processing sites within one year after enactment under this section shall include, to the maximum extent practicable, the areas referred to in section 101(6)(B).

(2) Notwithstanding the one year limitation contained in this section, the Secretary may, after such one year period, include any area described in section 101(6)(B) as part of a processing site designated under this section if he determines such inclusion to be appropriate to carry out the purposes of this title.

### STATE COOPERATIVE AGREEMENTS

42 USC 7913.

SEC. 103. (a) After notifying a State of the designation referred to in section 102 of this title, the Secretary subject to section 113, is authorized to enter into cooperative agreements with such State to perform remedial actions at each designated processing site in such State (other than a site located on Indian lands referred to in section 105). The Secretary shall, to the greatest extent practicable, enter into such agreements and carry out such remedial actions in accordance with the priorities established by him under section 102. The Secretary shall commence preparations for cooperative agreements with respect to each designated processing site as promptly as practicable following the designation of each site.

Terms and Conditions.

(b) Each cooperative agreement under this section shall contain such terms and conditions as the Secretary deems appropriate and consistent with the purposes of this Act, including, but not limited

to, a limitation on the use of Federal assistance to those costs which are directly required to complete the remedial action selected pursuant to section 108.

(c) (1) Except where the State is required to acquire the processing site as provided in subsection (a) of section 104, each cooperative agreement with a State under section 103 shall provide that the State shall obtain, in a form prescribed by the Secretary, written consent from any person holding any record interest in the designated processing site for the Secretary or any person designated by him to perform remedial action at such site.

Written consent.

(2) Such written consent shall include a waiver by each such person on behalf of himself, his heirs, successors, and assigns—

Waiver.

    (A) releasing the United States of any liability or claim thereof by such person, his heirs, successors, and assigns concerning such remedial action, and

    (B) holding the United States harmless against any claim by such person on behalf of himself, his heirs, successors, or assigns arising out of the performance of any such remedial action.

(d) Each cooperative agreement under this section shall require the State to assure that the Secretary, the Commission, and the Administrator and their authorized representatives have a permanent right of entry at any time to inspect the processing site and the site provided pursuant to section 104(b) (1) in furtherance of the provisions of this title and to carry out such agreement and enforce this Act and any rules prescribed under this Act. Such right of entry under this section or section 106 into an area described in section 101(6) (B) shall terminate on completion of the remedial action, as determined by the Secretary.

(e) Each agreement under this section shall take effect only upon the concurrence of the Commission with the terms and conditions thereof.

(f) The Secretary may, in any cooperative agreement entered into under this section or section 105, provide for reimbursement of the actual costs, as determined by the Secretary, of any remedial action performed with respect to so much of a designated processing site as is described in section 101(6) (B). Such reimbursement shall be made only to a property owner of record at the time such remedial action was undertaken and only with respect to costs incurred by such property owner. No such reimbursement may be made unless—

    (1) such remedial action was completed prior to enactment of this Act, and unless the application for such reimbursement was filed by such owner within one year after an agreement under this section or section 105 is approved by the Secretary and the Commission, and

    (2) the Secretary is satisfied that such action adequately achieves the purposes of this Act with respect to the site concerned and is consistent with the standards established by the Administrator pursuant to section 275(a) of the Atomic Energy Act of 1954.

*Post,* p. 3039.

### ACQUISITION AND DISPOSITION OF LANDS AND MATERIALS

SEC. 104. (a) Each cooperative agreement under section 103 shall require the State, where determined appropriate by the Secretary with the concurrence of the Commission, to acquire any designated process-

42 USC 7914.

4:27-cv-00021-CDP   Doc. #: 14-1   Filed: 01/28/22   Page: 212 of 903 PageID #:

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

ing site, including where appropriate any interest therein. In determining whether to require the State to acquire a designated processing site or interest therein, consideration shall be given to the prevention of windfall profits.

**Residual radioactive material, removal.**

(b)(1) If the Secretary with the concurrence of the Commission determines that removal of residual radioactive material from a processing site is appropriate, the cooperative agreement shall provide that the State shall acquire land (including, where appropriate, any interest therein) to be used as a site for the permanent disposition and stabilization of such residual radioactive materials in a safe and environmentally sound manner.

(2) Acquisition by the State shall not be required under this subsection if a site located on land controlled by the Secretary or made available by the Secretary of the Interior pursuant to section 106 (a)(2) is designated by the Secretary, with the concurrence of the Commission, for such disposition and stabilization.

(c) No State shall be required under subsection (a) or (b) to acquire any real property or improvement outside the boundaries of—

(1) that portion of the processing site which is described in section 101(6)(A), and

(2) the site used for disposition of the residual radioactive materials.

(d) In the case of each processing site designated under this title other than a site designated on Indian land, the State shall take such action as may be necessary, and pursuant to regulations of the Secretary under this subsection, to assure that any person who purchases such a processing site after the removal of radioactive materials from such site shall be notified in an appropriate manner prior to such purchase, of the nature and extent of residual radioactive materials removed from the site, including notice of the date when such action

**Notification.**

took place, and the condition of such site after such action. If the State is the owner of such site, the State shall so notify any prospective purchaser before entering into a contract, option, or other arrangement to sell or otherwise dispose of such site. The Secretary shall

**Rules and regulations.**

issue appropriate rules and regulations to require notice in the local land records of the residual radioactive materials which were located at any processing site and notice of the nature and extent of residual radioactive materials removed from the site, including notice of the date when such action took place.

(e)(1) The terms and conditions of any cooperative agreement with a State under section 103 shall provide that in the case of any lands or interests therein acquired by the State pursuant to subsection (a), the State, with the concurrence of the Secretary and the Commission, may—

(A) sell such lands and interests,

(B) permanently retain such land and interests in lands (or donate such lands and interests therein to another governmental entity within such State) for permanent use by such State or entity solely for park, recreational, or other public purposes, or

(C) transfer such lands and interests to the United States as provided in subsection (f).

No lands may be sold under subparagraph (A) without the consent of the Secretary and the Commission. No site may be sold under subparagraph (A) or retained under subparagraph (B) if such site is used for the disposition of residual radioactive materials.

10

(2) Before offering for sale any lands and interests therein which comprise a processing site, the State shall offer to sell such lands and interests at their fair market value to the person from whom the State acquired them.

(f)(1) Each agreement under section 103 shall provide that title to—

(A) the residual radioactive materials subject to the agreement, and

(B) any lands and interests therein which have been acquired by the State, under subsection (a) or (b), for the disposition of such materials,

shall be transferred by the State to the Secretary when the Secretary (with the concurrence of the Commission) determines that remedial action is completed in accordance with the requirements imposed pursuant to this title. No payment shall be made in connection with the transfer of such property from funds appropriated for purposes of this Act other than payments for any administrative and legal costs incurred in carrying out such transfer.

(2) Custody of any property transferred to the United States under this subsection shall be assumed by the Secretary or such Federal agency as the President may designate. Notwithstanding any other provision of law, upon completion of the remedial action program authorized by this title, such property and minerals shall be maintained pursuant to a license issued by the Commission in such manner as will protect the public health, safety, and the environment. The Commission may, pursuant to such license or by rule or order, require the Secretary or other Federal agency having custody of such property and minerals to undertake such monitoring, maintenance, and emergency measures necessary to protect public health and safety and other actions as the Commission deems necessary to comply with the standards of section 275(a) of the Atomic Energy Act of 1954. The Secretary or such other Federal agency is authorized to carry out maintenance, monitoring and emergency measures under this subsection, but shall take no other action pursuant to such license, rule or order with respect to such property and minerals unless expressly authorized by Congress after the date of enactment of this Act. The United States shall not transfer title to property or interest therein acquired under this subsection to any person or State, except as provided in subsection (h). <span>*Post,* p. 3039.</span>

(g) Each agreement under section 103 which permits any sale described in subsection (e)(1)(A) shall provide for the prompt reimbursement to the Secretary from the proceeds of such sale. Such reimbursement shall be in an amount equal to the lesser of—

(1) that portion of the fair market value of the lands or interests therein which bears the same ratio to such fair market value as the Federal share of the costs of acquisition by the State to such lands or interest therein bears to the total cost of such acquisition, or

(2) the total amount paid by the Secretary with respect to such acquisition.

The fair market value of such lands or interest shall be determined by the Secretary as of the date of the sale by the State. Any amounts received by the Secretary under this title shall be deposited in the Treasury of the United States as miscellaneous receipts. <span>Fair market value.</span>

(h) No provision of any agreement under section 103 shall prohibit the Secretary of the Interior, with the concurrence of the Secretary of Energy and the Commission, from disposing of any subsurface mineral rights by sale or lease (in accordance with laws of the United States applicable to the sale, lease, or other disposal of such rights) which are associated with land on which residual radioactive materials are disposed and which are transferred to the United States as required under this section if the Secretary of the Interior takes such action as the Commission deems necessary pursuant to a license issued by the Commission to assure that the residual radioactive materials will not be disturbed by reason of any activity carried on following such disposition. If any such materials are disturbed by any such activity, the Secretary of the Interior shall insure, prior to the disposition of the minerals, that such materials will be restored to a safe and environmentally sound condition as determined by the Commission, and that the costs of such restoration will be borne by the person acquiring such rights from the Secretary of the Interior or from his successor or assign.

### INDIAN TRIBE COOPERATIVE AGREEMENTS

42 USC 7915.

SEC. 105. (a) After notifying the Indian tribe of the designation pursuant to section 102 of this title, the Secretary, in consultation with the Secretary of the Interior, is authorized to enter into a cooperative agreement, subject to section 113, with any Indian tribe to perform remedial action at a designated processing site located on land of such Indian tribe. The Secretary shall, to the greatest extent practicable, enter into such agreements and carry out such remedial actions in accordance with the priorities established by him under section 102. In performing any remedial action under this section and in carrying out any continued monitoring or maintenance respecting residual radioactive materials associated with any site subject to a cooperative agreement under this section, the Secretary shall make full use of any qualified members of Indian tribes resident in the vicinity of any such site. Each such agreement shall contain such terms and conditions as the Secretary deems appropriate and consistent with the purposes of this Act. Such terms and conditions shall require the following:

Terms and conditions.

(1) The Indian tribe and any person holding any interest in such land shall execute a waiver (A) releasing the United States of any liability or claim thereof by such tribe or person concerning such remedial action and (B) holding the United States harmless against any claim arising out of the performance of any such remedial action.

(2) The remedial action shall be selected and performed in accordance with section 108 by the Secretary or such person as he may designate.

(3) The Secretary, the Commission, and the Administrator and their authorized representatives shall have a permanent right of entry at any time to inspect such processing site in furtherance of the provisions of this title, to carry out such agreement, and to enforce any rules prescribed under this Act.

Each agreement under this section shall take effect only upon concurrence of the Commission with the terms and conditions thereof.

(b) When the Secretary with the concurrence of the Commission determines removal of residual radioactive materials from a process-

4:27-cv-00012-CDP  Doc. #: 1841  Filed: 01/28/22  Page: 215 of 903 PageID #:
Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

ing site on lands described in subsection (a) to be appropriate, he shall provide, consistent with other applicable provisions of law, a site or sites for the permanent disposition and stabilization in a safe and environmentally sound manner of such residual radioactive materials. Such materials shall be transferred to the Secretary (without payment therefor by the Secretary) and permanently retained and maintained by the Secretary under the conditions established in a license issued by the Commission, subject to section 104(f)(2) and (h).

**Transfer to Secretary of the Interior.**

### ACQUISITION OF LAND BY SECRETARY

SEC. 106. Where necessary or appropriate in order to consolidate in a safe and environmentally sound manner the location of residual radioactive materials which are removed from processing sites under cooperative agreements under this title, or where otherwise necessary for the permanent disposition and stabilization of such materials in such manner—

**42 USC 7916.**

     (1) the Secretary may acquire land and interests in land for such purposes by purchase, donation, or under any other authority of law or
     (2) the Secretary of the Interior may make available public lands administered by him for such purposes in accordance with other applicable provisions of law.

Prior to acquisition of land under paragraph (1) or (2) of this subsection in any State, the Secretary shall consult with the Governor of such State. No lands may be acquired under such paragraph (1) or (2) in any State in which there is no (1) processing site designated under this title or (2) active uranium mill operation, unless the Secretary has obtained the consent of the Governor of such State. No lands controlled by any Federal agency may be transferred to the Secretary to carry out the purposes of this Act without the concurrence of the chief administrative officer of such agency.

**Consultation.**

### FINANCIAL ASSISTANCE

SEC. 107. (a) In the case of any designated processing site for which an agreement is executed with any State for remedial action at such site, the Secretary shall pay 90 per centum of the actual cost of such remedial action, including the actual costs of acquiring such site (and any interest therein) or any disposition site (and any interest therein) pursuant to section 103 of this title, and the State shall pay the remainder of such costs from non-Federal funds. The Secretary shall not pay the administrative costs incurred by any State to develop, prepare, and carry out any cooperative agreement executed with such State under this title, except the proportionate share of the administrative costs associated with the acquisition of lands and interests therein acquired by the State pursuant to this title.

**42 USC 7917.**

(b) In the case of any designated processing site located on Indian lands, the Secretary shall pay the entire cost of such remedial action.

### REMEDIAL ACTION

SEC. 108. (a)(1) The Secretary or such person as he may designate shall select and perform remedial actions at designated processing sites and disposal sites in accordance with the general standards prescribed

**42 USC 7918.**

4:27-cv-00026-CDP   Doc. #: 18-1  Filed: 01/28/21  Page: 216 of 903 PageID #:

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

*Post,* p. 3039.

by the Administrator pursuant to section 275 a. of the Atomic Energy Act of 1954. The State shall participate fully in the selection and performance of a remedial action for which it pays part of the cost. Such remedial action shall be selected and performed with the concurrence of the Commission and in consultation, as appropriate, with the Indian tribe and the Secretary of the Interior.

(2) The Secretary shall use technology in performing such remedial action as will insure compliance with the general standards promulgated by the Administrator under section 275 a. of the Atomic Energy Act of 1954 and will assure the safe and environmentally sound stabilization of residual radioactive materials, consistent with existing law. No such remedial action may be undertaken under this section before the promulgation by the Administrator of such standards.

Evaluation.

(b) Prior to undertaking any remedial action at a designated site pursuant to this title, the Secretary shall request expressions of interest from private parties regarding the remilling of the residual radioactive materials at the site and, upon receipt of any expression of interest, the Secretary shall evaluate among other things the mineral concentration of the residual radioactive materials at each designated processing site to determine whether, as a part of any remedial action program, recovery of such minerals is practicable. The Secretary, with the concurrence of the Commission, may permit the recovery of such minerals, under such terms and conditions as he may prescribe to carry out the purposes of this title. No such recovery shall be permitted unless such recovery is consistent with remedial action. Any person permitted by the Secretary to recover such mineral shall pay to the Secretary a share of the net profits derived from such recovery, as determined by the Secretary. Such share shall not exceed the total amount paid by the Secretary for carrying out remedial action at such designated site. After payment of such share to the United States under this subsection, such person shall pay to the State in which the residual radioactive materials are located a share of the net profits derived from sucl. recovery, as determined by the Secretary. The person recovering such minerals shall bear all costs of such recovery. Any person carrying out mineral recovery activities under this paragraph shall be required to obtain any necessary license under the Atomic Energy Act of 1954 or under State law as permitted under section 274 of such Act.

42 USC 2021.

### RULES

42 USC 7919.

SEC. 109. The Secretary may prescribe such rules consistent with the purposes of this Act as he deems appropriate pursuant to title V of the Department of Energy Organization Act.

### ENFORCEMENT

42 USC 7920.

SEC. 110. (a) (1) Any person who violates any provision of this title or any cooperative agreement entered into pursuant to this title or any rule prescribed under this Act concerning any designated processing site, disposition site, or remedial action shall be subject to an assessment by the Secretary of a civil penalty of not more than $1,000 per day per violation. Such assessment shall be made by order after notice and an opportunity for a public hearing, pursuant to section 554 of title 5, United States Code.

Notice, hearing opportunity.

(2) Any person against whom a penalty is assessed under this section may, within sixty calendar days after the date of the order of

the Secretary assessing such penalty, institute an action in the United States court of appeals for the appropriate judicial circuit for judicial review of such order in accordance with chapter 7 of title 5, United States Code. The court shall have jurisdiction to enter a judgment affirming, modifying, or setting aside in whole or in part, the order of the Secretary, or the court may remand the proceeding to the Secretary for such further action as the court may direct.

5 USC 500 *et seq.*
Jurisdiction.

(3) If any person fails to pay an assessment of a civil penalty after it has become a final and unappealable order, the Secretary shall institute an action to recover the amount of such penalty in any appropriate district court of the United States. In such action, the validity and appropriateness of such final assessment order or judgment shall not be subject to review. Section 402(d) of the Department of Energy Organization Act shall not apply with respect to the functions of the Secretary under this section.

42 USC 7172.

(4) No civil penalty may be assessed against the United States or any State or political subdivision of a State or any official or employee of the foregoing.

(5) Nothing in this section shall prevent the Secretary from enforcing any provision of this title or any cooperative agreement or any such rule by injunction or other equitable remedy.

(b) Subsection (a) shall not apply to any licensing requirement under the Atomic Energy Act of 1954. Such licensing requirements shall be enforced by the Commission as provided in such Act.

42 USC 2011 note.

### PUBLIC PARTICIPATION

SEC. 111. In carrying out the provisions of this title, including the designation of processing sites, establishing priorities for such sites, the selection of remedial actions, and the execution of cooperative agreements, the Secretary, the Administrator, and the Commission shall encourage public participation and, where appropriate, the Secretary shall hold public hearings relative to such matters in the States where processing sites and disposal sites are located.

42 USC 7921.

### TERMINATION; AUTHORIZATION

SEC. 112. (a) The authority of the Secretary to perform remedial action under this title shall terminate on the date seven years after the date of promulgation by the Administrator of general standards applicable to such remedial action unless such termination date is specifically extended by an Act of Congress enacted after the date of enactment of this Act.

42 USC 7922.

(b) The amounts authorized to be appropriated to carry out the purposes of this title by the Secretary, the Administrator, the Commission, and the Secretary of the Interior shall not exceed such amounts as are established in annual authorization Acts for fiscal year 1979 and each fiscal year thereafter applicable to the Department of Energy. Any sums appropriated for the purposes of this title shall be available until expended.

### LIMITATION

SEC. 113. The authority under this title to enter into contracts or other obligations requiring the United States to make outlays may

42 USC 7923.

be exercised only to the extent provided in advance in annual authorization and appropriation Acts.

## REPORTS TO CONGRESS

42 USC 7924.

SEC. 114. (a) Beginning on January 1, 1980, and each year thereafter until January 1, 1986, the Secretary shall submit a report to the Congress with respect to the status of the actions required to be taken by the Secretary, the Commission, the Secretary of the Interior, the Administrator, and the States and Indian tribes under this Act and any amendments to other laws made by this Act. Each report shall—

(1) include data on the actual and estimated costs of the program authorized by this title;

(2) describe the extent of participation by the States and Indian tribes in this program;

(3) evaluate the effectiveness of remedial actions, and describe any problems associated with the performance of such actions; and

(4) contain such other information as may be appropriate.

Such report shall be prepared in consultation with the Commission, the Secretary of the Interior, and the Administrator and shall contain their separate views, comments, and recommendations, if any. The Commission shall submit to the Secretary and Congress such portion of the report under this subsection as relates to the authorities of the Commission under title II of this Act.

(b) Not later than July 1, 1979, the Secretary shall provide a report to the Congress which identifies all sites located on public or acquired lands of the United States containing residual radioactive materials and other raidoactive waste (other than waste resulting from the production of electric energy) and specifies which Federal agency has jurisdiction over such sites. The report shall include the identity of property and other structures in the vicinity of such site that are contaminated or may be contaminated by such materials and the actions planned or taken to remove such materials. The report shall describe in what manner such sites are adequately stabilized and otherwise controlled to prevent radon diffusion from such sites into the environment and other environmental harm. If any site is not so stabilized or controlled, the report shall describe the remedial actions planned for such site and the time frame for performing such actions. In preparing the reports under this section, the Secretary shall avoid duplication of previous or ongoing studies and shall utilize all information available from other departments and agencies of the United States respecting the subject matter of such report. Such agencies shall cooperate with the Secretary in the preparation of such report and furnish such information as available to them and necessary for such report.

Cooperation.

(c) Not later than January 1, 1980, the Administrator, in consultation with the Commission, shall provide a report to the Congress which identifies the location and potential health, safety, and environmental hazards of uranium mine wastes together with recommendations, if any, for a program to eliminate these hazards.

(d) Copies of the reports required by this section to be submitted to the Congress shall be separately submitted to the Committees on Interior and Insular Affairs and on Interstate and Foreign Commerce

of the House of Representatives and the Committee on Energy and Natural Resources of the Senate.

(e) The Commission, in cooperation with the Secretary, shall ensure that any relevant information, other than trade secrets and other proprietary information otherwise exempted from mandatory disclosure under any other provision of law, obtained from the conduct of each of the remedial actions authorized by this title and the subsequent perpetual care of those residual radioactive materials is documented systematically, and made publicly available conveniently for use.

### ACTIVE OPERATIONS; LIABILITY FOR REMEDIAL ACTION

Sec. 115. (a) No amount may be expended under this title with respect to any site licensed by the Commission under the Atomic Energy Act of 1954 or by a State as permitted under section 274 of such Act at which production of any uranium product from ores (other than from residual radioactive materials) takes place.

42 USC 7925.

42 USC 2011 note.
42 USC 2021.
Study.

(b) In the case of each processing site designated under this title, the Attorney General shall conduct a study to determine the identity and legal responsibility which any person (other than the United States, a State, or Indian tribe) who owned or operated or controlled (as determined by the Attorney General) such site before the date of the enactment of this Act may have under any law or rule of law for reclamation or other remedial action with respect to such site. The Attorney General shall publish the results of such study, and provide copies thereof to the Congress, as promptly as practicable following the date of the enactment of this Act. The Attorney General, based on such study, shall, to the extent he deems it appropriate and in the public interest, take such action under any provision of law in effect when uranium was produced at such site to require payment by such person of all or any part of the costs incurred by the United States for such remedial action for which he determines such person is liable.

## TITLE II—URANIUM MILL TAILINGS LICENSING AND REGULATION DEFINITION

Sec. 201. Section 11e. of the Atomic Energy Act of 1954, is amended to read as follows:

"e. The term 'byproduct material' means (1) any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material, and (2) the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content."

42 USC 2014.

"Byproduct material."

### CUSTODY OF DISPOSAL SITE

Sec. 202. (a) Chapter 8 of the Atomic Energy Act of 1954, is amended by adding the following new section at the end thereof:

"Sec. 83. Ownership and Custody of Certain Byproduct Material and Disposal Sites.—

"a. Any license issued or renewed after the effective date of this section under section 62 or section 81 for any activity which results in the production of any byproduct material, as defined in section 11e.

42 USC 2111 et seq.
42 USC 2113.

42 USC 2002, 2111.
42 USC 2014.

(2), shall contain such terms and conditions as the Commission determines to be necessary to assure that, prior to termination of such license—

"(1) the licensee will comply with decontamination, decommissioning, and reclamation standards prescribed by the Commission for sites (A) at which ores were processed primarily for their source material content and (B) at which such byproduct material is deposited, and

42 USC 2014.

"(2) ownership of any byproduct material, as defined in section 11 e. (2), which resulted from such licensed activity shall be transferred to (A) the United States or (B) in the State in which such activity occurred if such State exercises the option under subsection b. (1) to acquire land used for the disposal of byproduct material.

Any license in effect on the date of the enactment of this section shall either contain such terms and conditions on renewal thereof after the effective date of this section, or comply with paragraphs (1) and (2) upon the termination of such license, whichever first occurs.

Rule, regulation or order.

"(b)(1)(A) The Commission shall require by rule, regulation, or order that prior to the termination of any license which is issued after the effective date of this section, title to the land, including any interests therein (other than land owned by the United States or by a State) which is used for the disposal of any byproduct material, as defined by section 11 e. (2), pursuant to such license shall be transferred to—

"(A) the United States, or

"(B) the State in which such land is located, at the option of such State.

"(2) Unless the Commission determines prior to such termination that transfer of title to such land and such byproduct material is not necessary or desirable to protect the public health, safety, or welfare or to minimize or eliminate danger to life or property. Such determination shall be made in accordance with section 181 of this Act. Notwithstanding any other provision of law or any such determination, such property and materials shall be maintained pursuant to a license issued by the Commission pursuant to section 84(b) in such manner as will protect the public health, safety, and the environment.

"(B) If the Commission determines by order that use of the surface or subsurface estates, or both, of the land transferred to the United States or to a State under subparagraph (A) would not endanger the public health, safety, welfare, or environment, the Commission, pursuant to such regulations as it may prescribe, shall permit the use of the surface or subsurface estates, or both, of such land in a manner consistent with the provisions of this section. If the Commission permits such use of such land, it shall provide the person who transferred such land with the right of first refusal with respect to such use of such land.

"(2) If transfer to the United States of title to such byproduct material and such land is required under this section, the Secretary of Energy or any Federal agency designated by the President shall, following the Commission's determination of compliance under subsection c., assume title and custody of such byproduct material and land transferred as provided in this subsection. Such Secretary or Federal agency shall maintain such material and land in such manner as will protect the public health and safety and the environment. Such

custody may be transferred to another officer or instrumentality of the United States only upon approval of the President.

"(3) If transfer to a State of title to such byproduct material is required in accordance with this subsection, such State shall, following the Commission's determination of compliance under subsection d., assume title and custody of such byproduct material and land transferred as provided in this subsection. Such State shall maintain such material and land in such manner as will protect the public health, safety, and the environment.

"(4) In the case of any such license under section 62, which was in effect on the effective date of this section, the Commission may require, before the termination of such license, such transfer of land and interests therein (as described in paragraph (1) of this subsection) to the United States or a State in which such land is located, at the option of such State, as may be necessary to protect the public health, welfare, and the environment from any effects associated with such byproduct material. In exercising the authority of this paragraph, the Commission shall take into consideration the status of the ownership of such land and interests therein and the ability of the licensee to transfer title and custody thereof to the United States or a State.   *42 USC 2092.*

"(5) The Commission may, pursuant to a license, or by rule or order, require the Secretary or other Federal agency or State having custody of such property and materials to undertake such monitoring, maintenance, and emergency measures as are necessary to protect the public health and safety and such other actions as the Commission deems necessary to comply with the standards promulgated pursuant to section 84 of this Act. The Secretary or such other Federal agency is authorized to carry out maintenance, monitoring, and emergency measures, but shall take no other action pursuant to such license, rule or order, with respect to such property and materials unless expressly authorized by Congress after the date of enactment of this Act.   *Post, p. 3039.*

"(6) The transfer of title to land or byproduct materials, as defined in section 11 e. (2), to a State or the United States pursuant to this subsection shall not relieve any licensee of liability for any fraudulent or negligent acts done prior to such transfer.   *42 USC 2014.*

"(7) Material and land transferred to the United States or a State in accordance with this subsection shall be transferred without cost to the United States or a State (other than administrative and legal costs incurred in carrying out such transfer). Subject to the provisions of paragraph (1) (B) of this subsection, the United States or a State shall not transfer title to material or property acquired under this subsection to any person, unless such transfer is in the same manner as provided under section 104 (h) of the Uranium Mill Tailings Radiation Control Act of 1978.

"(8) The provisions of this subsection respecting transfer of title and custody to land shall not apply in the case of lands held in trust by the United States for any Indian tribe or lands owned by such Indian tribe subject to a restriction against alienation imposed by the United States. In the case of such lands which are used for the disposal of byproduct material, as defined in section 11 e. (2), the licensee shall be required to enter into such arrangements with the Commission as may be appropriate to assure the long-term maintenance and monitoring of such lands by the United States.

"c. Upon termination on any license to which this section applies, the Commission shall determine whether or not the licensee has com-

4:22-cv-00022-CDP   Doc. #: 1841   Filed: 02/06/21   Page: 222 of 903 PageID #

Electronically Filed - St. Louis County - April 20, 2020 - 05:28 PM

plied with all applicable standards and requirements under such license.".

Effective date.
42 USC 2113
note.

(b) This section shall be effective three years after the enactment of this Act.

(c) The table of contents for chapter 8 of the Atomic Energy Act of 1954, is amended by inserting the following new item after the item relating to section 82:

"Sec. 83. Ownership and custody of certain byproduct material and disposal sites.".

### AUTHORITY TO ESTABLISH CERTAIN REQUIREMENTS

42 USC 2201.

SEC. 203. Section 161 of the Atomic Energy Act of 1954, is amended by adding the following new subsection at the end thereof:

42 USC 2231.

"x. Establish by rule, regulation, or order, after public notice, and in accordance with the requirements of section 181 of this Act, such standards and instructions as the Commission may deem necessary or desirable to ensure—

42 USC 2014.

"(1) that an adequate bond, surety, or other financial arrangement (as determined by the Commission) will be provided, before termination of any license for byproduct material as defined in section 11 e. (2), by a licensee to permit the completion of all requirements established by the Commission for the decontamination, decommissioning, and reclamation of sites, structures, and equipment used in conjunction with byproduct material as so defined, and

"(2) that—

"(A) in the case of any such license issued or renewed after the date of the enactment of this subsection, the need for long term maintenance and monitoring of such sites, structures and equipment after termination of such license will be minimized and, to the maximum extent practicable, eliminated; and

"(B) in the case of each license for such material (whether in effect on the date of the enactment of this section or issued or renewed thereafter), if the Commission determines that any such long-term maintenance and monitoring is necessary, the licensee, before termination of any license for byproduct material as defined in section 11 e. (2), will make available such bonding, surety, or other financial arrangements as may be necessary to assure such long-term maintenance and monitoring.

Such standards and instructions promulgated by the Commission pursuant to this subsection shall take into account, as determined by the Commission, so as to avoid unnecessary duplication and expense, performance bonds or other financial arrangements which are required by other Federal agencies or State agencies and/or other local governing bodies for such decommissioning, decontamination, and reclamation and long-term maintenance and monitoring except that nothing in this paragraph shall be construed to require that the Commission accept such bonds or arrangements if the Commission determines that such bonds or arrangements are not adequate to carry out subparagraphs (1) and (2) of this subsection.".

### COOPERATION WITH STATES

42 USC 2021.

SEC. 204. (a) Section 274 b. of the Atomic Energy Act of 1954, is amended by adding "as defined in section 11 e. (1)" after the words

"byproduct materials" in paragraph (1) by renumbering paragraphs (2) and (3) as paragraphs (3) and (4); and by inserting the following new paragraph immediately after paragraph (1):

"(2) byproduct materials as defined in section 11 e. (2);".

(b) Section 274 d. (2) of such Act is amended by inserting the following before the word "compatible": "in accordance with the requirements of subsection o. and in all other respects".

42 USC 2021.

(c) Section 274 n. of such Act is amended by adding the following new sentence at the end thereof: "As used in this section, the term 'agreement' includes any amendment to any agreement.".

"Agreement."

(d) Section 274 j. of such Act is amended—

(1) by inserting "all or part of" after "suspend";

(2) by inserting "(1)" after "finds that"; and

(3) by adding at the end before the period the following: ", or (2) the State has not complied with one or more of the requirements of this section. The Commission shall periodically review such agreements and actions taken by the States under the agreements to ensure compliance with the provisions of this section.".

Review.

(e)(1) Section 274 of such Act is amended by adding the following new subsection at the end thereof:

"o. In the licensing and regulation of byproduct material, as defined in section 11 e. (2) of this Act, or of any activity which results in the production of byproduct material as so defined under an agreement entered into pursuant to subsection b., a State shall require—

"(1) compliance with the requirements of subsection b. of section 83 (respecting ownership of byproduct material and land), and

"(2) compliance with standards which shall be adopted by the State for the protection of the public health, safety, and the environment from hazards associated with such material which are equivalent, to the extent practicable, or more stringent than, standards adopted and enforced by the Commission for the same purpose, including requirements and standards promulgated by the Commission and the Administrator of the Environmental Protection Agency pursuant to sections 83, 84, and 275, and

*Ante,* p. 3033.
*Post,* p. 3039.

"(3) procedures which—

"(A) in the case of licenses, provide procedures under State law which include—

"(i) an opportunity, after public notice, for written comments and a public hearing, with a transcript,

"(ii) an opportunity for cross examination, and

"(iii) a written determination which is based upon findings included in such determination and upon the evidence presented during the public comment period and which is subject to judicial review;

"(B) in the case of rulemaking, provide an opportunity for public participation through written comments or a public hearing and provide for judicial review of the rule;

"(C) require for each license which has a significant impact on the human environment a written analysis (which shall be available to the public before the commencement of any such proceedings) of the impact of such license, including any activities conducted pursuant thereto, on the environment, which analysis shall include—

"(i) an assessment of the radiological and nonradiological impacts to the public health of the activities to be conducted pursuant to such license;

"(ii) an assessment of any impact on any waterway and groundwater resulting from such activities;

"(iii) consideration of alternatives, including alternative sites and engineering methods, to the activities to be conducted pursuant to such license; and

"(iv) consideration of the long-term impacts, including decommissioning, decontamination, and reclamation impacts, associated with activities to be conducted pursuant to such license, including the management of any byproduct material, as defined by section 11 e. (2); and

"(D) prohibit any major construction activity with respect to such material prior to complying with the provisions of subparagraph (C).

If any State under such agreement imposes upon any licensee any requirement for the payment of funds to such State for the reclamation or long-term maintenance and monitoring of such material, and if transfer to the United States of such material is required in accordance with section 83 b. of this Act, such agreement shall be amended by the Commission to provide that such State shall transfer to the United States upon termination of the license issued to such licensee the total amount collected by such State from such licensee for such purpose. If such payments are required, they must be sufficient to ensure compliance with the standards established by the Commission pursuant to section 161 x. of this Act. No State shall be required under paragraph (3) to conduct proceedings concerning any license or regulation which would duplicate proceedings conducted by the Commission.".

*Ante*, p. 3033.

42 USC 2201.

42 USC 2021.

(f) Section 274 c. of such Act is amended by inserting the following new sentence after paragraph (4) thereof: "The Commission shall also retain authority under any such agreement to make a determination that all applicable standards and requirements have been met prior to termination of a license for byproduct material, as defined in section 11 e. (2).".

42 USC 2014.
42 USC 2021
note.

(g) Nothing in any amendment made by this section shall preclude any State from exercising any other authority as permitted under the Atomic Energy Act of 1954 respecting any byproduct material, as defined in section 11 e. (2) of the Atomic Energy Act of 1954.

42 USC 2021
note.

(h) (1) On or before the date three years after the date of the enactment of this Act, notwithstanding any amendment made by this title, any State may exercise any authority under State law respecting byproduct material, as defined in section 11 e. (2) of the Atomic Energy Act of 1954, in the same manner, and to the same extent, as permitted before the enactment of this Act.

(2) An agreement entered into with any State as permitted under section 274 of the Atomic Energy Act of 1954 with respect to byproduct material as defined in section 11 e. (2) of such Act, may be entered into at any time after the date of the enactment of this Act but no such agreement may take effect before the date three years after the date of the enactment of this Act.

4:17-cv-00016-CDP   Doc. #: 18-11   Filed: 02/06/17   Page: 25 of 93   PageID #

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

AUTHORITIES OF COMMISSION RESPECTING CERTAIN BYPRODUCT MATERIAL

SEC. 205. (a) Chapter 8 of the Atomic Energy Act of 1954, is amended by adding the following new section at the end thereof: | 42 USC 2111 *et seq.*

"SEC. 84. AUTHORITIES OF COMMISSION RESPECTING CERTAIN BYPRODUCT MATERIAL.— | 42 USC 2114.

"a. The Commission shall insure that the management of any byproduct material, as defined in section 11 e. (2), is carried out in such manner as— | 42 USC 2014.

"(1) the Commission deems appropriate to protect the public health and safety and the environment from radiological and non-radiological hazards associated with the processing and with the possession and transfer of such material,

"(2) conforms with applicable general standards promulgated by the Administrator of the Environmental Protection Agency under section 275, and | *Infra.*

"(3) conforms to general requirements established by the Commission, with the concurrence of the Administrator, which are, to the maximum extent practicable, at least comparable to requirements applicable to the possession, transfer, and disposal of similar hazardous material regulated by the Administrator under the Solid Waste Disposal Act, as amended. | 42 USC 6901 note.

"b. In carrying out its authority under this section, the Commission is authorized to— | Rule, regulation or order.

"(1) by rule, regulation, or order require persons, officers, or instrumentalities exempted from licensing under section 81 of this Act to conduct monitoring, perform remedial work, and to comply with such other measures as it may deem necessary or desirable to protect health or to minimize danger to life or property, and in connection with the disposal or storage of such byproduct material; and | 42 USC 2111.

"(2) make such studies and inspections and to conduct such monitoring as may be necessary.

Any violation by any person other than the United States or any officer or employee of the United States or a State of any rule, regulation, or order or licensing provision, of the Commission established under this section or section 83 shall be subject to a civil penalty in the same manner and in the same amount as violations subject to a civil penalty under section 234. Nothing in this section affects any authority of the Commission under any other provision of this Act.". | Civil penalty.

*Ante,* p. 3033.

42 USC 2282.

(b) The first sentence of section 81 of the Atomic Energy Act of 1954, is amended to read as follows: "No person may transfer or receive in interstate commerce, manufacture, produce, transfer, acquire, own, possess, import, or export any byproduct material, except to the extent authorized by this section, section 82 or section 84.". | 42 USC 2111.

42 USC 2112.

(c) The table of contents for such chapter 8 is amended by inserting the following new item after the item relating to section 83: | *Supra.*

"Sec. 84. Authorities of Commission respecting certain byproduct material.".

AUTHORITY OF ENVIRONMENTAL PROTECTION AGENCY RESPECTING CERTAIN BYPRODUCT MATERIAL

SEC. 206. (a) Chapter 19 of the Atomic Energy Act of 1954, is amended by inserting after section 274 the following new section: | 42 USC 2021.

"SEC. 275. HEALTH AND ENVIRONMENTAL STANDARDS FOR URANIUM MILL TAILINGS.— | 42 USC 2022.

4:22-cv-00022-CDP    Doc. #: 1841   Filed: 01/28/22   Page: 226 of 903 PageID #
Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Rule.

"a. As soon as practicable, but not later than one year after the date of enactment of this section, the Administrator of the Environmental Protection Agency (hereinafter referred to in this section as the 'Administrator') shall, by rule, promulgate standards of general application (including standards applicable to licenses under section 104(h) of the Uranium Mill Tailings Radiation Control Act of 1978) for the protection of the public health, safety, and the environment from radiological and nonradiological hazards associated with residual radioactive materials (as defined in section 101 of the Uranium Mill Tailings Radiation Control Act of 1978) located at inactive uranium mill tailings sites and depository sites for such materials selected by the Secretary of Energy, pursuant to title I of the Uranium Mill Tailings Radiation Control Act of 1978. Standards promulgated pursuant to this subsection shall, to the maximum extent practicable, be consistent with the requirements of the Solid Waste Disposal Act, as amended. The Administrator may periodically revise any standard promulgated pursuant to this subsection.

42 USC 6901 note.

Rule.

"b. (1) As soon as practicable, but not later than eighteen months after the enactment of this section, the Administrator shall, by rule, promulgate standards of general application for the protection of the public health, safety, and the environment from radiological and nonradiological hazards associated with the processing and with the possession, transfer, and disposal of byproduct material, as defined in section 11 e. (2) of this Act, at sites at which ores are processed primarily for their source material content or which are used for the disposal of such byproduct material.

42 USC 2014.

"(2) Such generally applicable standards promulgated pursuant to this subsection for nonradiological hazards shall provide for the protection of human health and the environment consistent with the standards required under subtitle C of the Solid Waste Disposal Act, as amended, which are applicable to such hazards: *Provided, however,* That no permit issued by the Administrator is required under this Act or the Solid Waste Disposal Act, as amended, for the processing, possession, transfer, or disposal of byproduct material, as defined in section 11 e. (2) of this Act. The Administrator may periodically revise any standard promulgated pursuant to this subsection. Within three years after such revision of any such standard, the Commission and any State permitted to exercise authority under section 274 b. (2) shall apply such revised standard in the case of any license for byproduct material as defined in section 11 e. (2) or any revision thereof.

42 USC 2021.

Publication in Federal Register. Notice, hearing opportunity.

"c. (1) Before the promulgation of any rule pursuant to this section, the Administrator shall publish the proposed rule in the Federal Register, together with a statement of the research, analysis, and other available information in support of such proposed rule, and provide a period of public comment of at least thirty days for written comments thereon and an opportunity, after such comment period and after public notice, for any interested person to present oral data, views, and arguments at a public hearing. There shall be a transcript of any such hearing. The Administrator shall consult with the Commission and the Secretary of Energy before promulgation of any such rule.

Consultation.

Judicial review.

"(2) Judicial review of any rule promulgated under this section may be obtained by any interested person only upon such person filing

4:17-cv-00016-CDP   Doc. #: 18-11   Filed: 02/06/17   Page: 227 of 903 PageID #:

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

a petition for review within sixty days after such promulgation in the United States court of appeals for the Federal judicial circuit in which such person resides or has his principal place of business. A copy of the petition shall be forthwith transmitted by the clerk of court to the Administrator. The Administrator thereupon shall file in the court the written submissions to, and transcript of, the written or oral proceedings on which such rule was based as provided in section 2112 of title 28, United States Code. The court shall have jurisdiction to review the rule in accordance with chapter 7 of title 5, United States Code, and to grant appropriate relief as provided in such chapter. The judgment of the court affirming, modifying, or setting aside, in whole or in part, any such rule shall be final, subject to judicial review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28, United States Code.  `5 USC 701 et seq.`

"(3) Any rule promulgated under this section shall not take effect earlier than sixty calendar days after such promulgation.

"d. Implementation and enforcement of the standards promulgated pursuant to subsection b. of this section shall be the responsibility of the Commission in the conduct of its licensing activities under this Act. States exercising authority pursuant to section 274 b. (2) of this Act shall implement and enforce such standards in accordance with subsecton o. of such section.  `42 USC 2021.`

"e. Nothing in this Act applicable to byproduct material, as defined in section 11 e. (2) of this Act, shall affect the authority of the Administrator under the Clean Air Act of 1970, as amended, or the Federal Water Pollution Control Act, as amended.".  `42 USC 2014.`
`42 USC 7401 note.`
`33 USC 1251 note.`

(b) The table of contents for chapter 19 of the Atomic Energy Act is amended by inserting the following new item after the item relating to section 274:  `42 USC 2018 et seq.`

"Sec. 275. Health and environmental standards for uranium mill tailings.".

### AUTHORIZATION OF APPROPRIATION FOR GRANTS

SEC. 207. There is hereby authorized to be appropriated for fiscal year 1980 to the Nuclear Regulatory Commission not to exceed $500,000 to be used for making grants to States which have entered into agreements with the Commission under section 274 of the Atomic Energy Act of 1954, to aid in the development of State regulatory programs under such section which implement the provisions of this Act.

### EFFECTIVE DATE

SEC. 208. Except as otherwise provided in this title the amendments made by this title shall take effect on the date of the enactment of this Act.  `42 USC 2014 note.`

### CONSOLIDATION OF LICENSES AND PROCEDURES

SEC. 209. The Nuclear Regulatory Commission shall consolidate, to the maximum extent practicable, licenses and licensing procedures under amendments made by this title with licenses and licensing procedures under other authorities contained in the Atomic Energy Act of 1954.  `42 USC 2113 note.`

`42 USC 2011 note.`

4:22-cv-00016-CDP   Doc. #: 1841   Filed: 02/06/17   Page: 228 of 903   PageID #

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

## TITLE III—STUDY AND DESIGNATION OF TWO MILL TAILINGS SITES IN NEW MEXICO

### STUDY

42 USC 7941.

42 USC 2021.

Report to Congress.

SEC. 301. The Commission, in consultation with the Attorney General and the Attorney General of the State of New Mexico, shall conduct a study to determine the extent and adequacy of the authority of the Commission and the State of New Mexico to require, under the Atomic Energy Act of 1954 (as amended by title II of this Act) or under State authority as permitted under section 274 of such Act or under other provision of law, the owners of the following active uranium mill sites to undertake appropriate action to regulate and control all residual radioactive materials at such sites to protect public health, safety, and the environment: the former Homestake-New Mexico Partners site near Milan, New Mexico, and the Anaconda carbonate process tailings site near Bluewater, New Mexico. Such study shall be completed and a report thereof submitted to the Congress and to the Secretary within one year after enactment of this Act, together with such recommendations as may be appropriate. If the Commission determines that such authority is not adequate to regulate and control such materials at such sites in the manner provided in the first sentence of this section, the Commission shall include in the report a statement of the basis for such determination. Nothing in this Act shall be construed to prevent or delay action by a State as permitted under section 274 of the Atomic Energy Act of 1954 or under any other provision of law or by the Commission to regulate such residual radioactive materials at such sites prior to completion of such study.

### DESIGNATION BY SECRETARY

42 USC 7942.

Submittal to congressional committees.

SEC. 302. (a) Within ninety days from the date of his receipt of the report and recommendations submitted by the Commission under section 301, notwithstanding the limitations contained in section 101(6)(A) and in section 115(a), if the Commission determines, based on such study, that such sites cannot be regulated and controlled by the State or the Commission in the manner described in section 301, the Secretary may designate either or both of the sites referred to in section 301 as a processing site for purposes of title I. Following such designation, the Secretary may enter into cooperative agreements with New Mexico to perform remedial action pursuant to such title concerning only the residual radioactive materials at such site resulting from uranium produced for sale to a Federal agency prior to January 1, 1971, under contract with such agency. Any such designation shall be submitted by the Secretary, together with his estimate of the cost of carrying out such remedial action at the designated site, to the Committee on Interior and Insular Affairs and the Committee on Interstate and Foreign Commerce of the House of Representatives and to the Committee on Energy and Natural Resources of the Senate.

(b)(1) No designation under subsection (a) shall take effect before the expiration of one hundred and twenty calendar days (not including any day in which either House of Congress is not in session

4:17-cv-00016-CDP   Doc. #: 48-11 Filed: 02/06/17   Page: 229 of 903 PageID #

because of an adjournment of more than three calendar days to a day certain or an adjournment sine die) after receipt by such Committees of such designation.

(c) Except as otherwise specifically provided in subsection (a), any remedial action under title I with respect to any sites designated under this title shall be subject to the provisions of title I (including the authorization of appropriations referred to in section 112(b)).

Approved November 8, 1978.

LEGISLATIVE HISTORY:

HOUSE REPORT No. 95-1480, Pt. I (Comm. on Interior and Insular Affairs) and Pt. II
            (Comm. on Interstate and Foreign Commerce).
CONGRESSIONAL RECORD, Vol. 124 (1978):
        Oct. 3, considered and passed House.
        Oct. 13, considered and passed Senate, amended.
        Oct. 14, House concurred in Senate amendment with amendments.
        Oct. 15, Senate concurred in House amendment.

O

27

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Electronically Filed - St Louis County - April 20, 2020 - 05:28 PM

Based on the Supreme Court Rules governing eFiling, an eService email has been issued to the following parties:


SERVICE PARTY:     BRIAN OCONNOR WATSON, Attorney for Defendant
SERVICE EMAIL:     bwatson@rshc-law.com


SERVICE PARTY:     RYAN A. KEANE, Attorney for Plaintiff
SERVICE EMAIL:     ryan@keanelawllc.com


SERVICE PARTY:     ERIN LYNN BROOKS, Attorney for Defendant
SERVICE EMAIL:     erin.brooks@bryancave.com


SERVICE PARTY:     DANIEL TIMOTHY DEFEO, Attorney for Plaintiff
SERVICE EMAIL:     ddefeo@defeolaw.com


SERVICE PARTY:     ANTHONY DOUGLAS GRAY, Attorney for Plaintiff
SERVICE EMAIL:     gray.lawyer1@gmail.com, agray@johnsongraylaw.com, ejones@stannmo.org

CLOSED,REMAND,TRCK3

# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:17-cv-00024-CDP

Dailey et al v. Bridgeton Landfill, LLC et al
Assigned to: District Judge Catherine D. Perry
Case in other court: Circuit Court St. Louis County 21st Judicial
                     Circu, 16SL-CC04240
Cause: 28:1441 Petition for Removal

Date Filed: 01/06/2017
Date Terminated: 03/23/2020
Jury Demand: Both
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Michael Dailey**                  represented by   **Barry James Cooper , Jr.**
                                                     COOPER LAW FIRM, LLC
                                                     508 St. Philip St.
                                                     New Orleans, LA 70116
                                                     504-566-1558
                                                     Fax: 504-581-9055
                                                     Email: Bcooper@sch-LLC.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Celeste Brustowicz**
                                                     THE COOPER LAW FIRM, LLC
                                                     1525 Religious St.
                                                     New Orleans, LA 70130
                                                     949-315-9075
                                                     Email: cbrustowicz@clfnola.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Stuart H. Smith**
                                                     COOPER LAW FIRM, LLC
                                                     1525 Religious St.
                                                     New Orleans, LA 70130
                                                     504-566-1558
                                                     Fax: 504-581-9055
                                                     Email: ssmith@sch-llc.com
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Victor T. Cobb**
                                                     COOPER LAW FIRM, LLC
                                                     1525 Religious St.
                                                     New Orleans, LA 70130
                                                     504-399-0009
                                                     Email: vcobb@sch-llc.com
                                                     *LEAD ATTORNEY*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

ATTORNEY TO BE NOTICED

**Daniel T. DeFeo**
THE DEFEO LAW FIRM
1627 Main St.
Suite 900
Kansas City, MO 64108
816-581-4600
Fax: 816-581-4646
Email: ddefeo@defeolaw.com
*TERMINATED: 02/21/2018*

**Michael G. Stag**
SMITH STAG, LLC
365 Canal Street
Suite 2850
New Orleans, LA 70130
504-593-9600
Fax: 504-593-9601
Email: mstag@smithstag.com
*TERMINATED: 02/21/2018*

**Michaela G. Spero**
HAUSFELD LLP
1700 K Street NW
Suite 650
Washington, DC 20006
202-540-7200
Fax: 202-540-7201
Email: mspero@hausfeld.com
*TERMINATED: 12/22/2017*

**Richard S. Lewis**
HAUSFELD LLP
1700 K Street NW
Suite 650
Washington, DC 20006
202-540-7200
Fax: 202-540-7201
Email: rlewis@hausfeld.com
*TERMINATED: 12/22/2017*

**Steven J. Stolze**
HOLLAND LAW FIRM LLC
300 N. Tucker Blvd.
Suite 801
St. Louis, MO 63101
314-640-7550
Fax: 314-241-5554
Email: stevenstolze@sbcglobal.net
*TERMINATED: 02/21/2018*

**Swathi Bojedla**
HAUSFELD LLP

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

1700 K Street NW
Suite 650
Washington, DC 20006
202-540-7200
Fax: 202-540-7201
Email: sbojedla@hausfeld.com
*TERMINATED: 12/22/2017*

**Plaintiff**

**Robbin Dailey**                                    represented by  **Barry James Cooper , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celeste Brustowicz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart H. Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victor T. Cobb**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel T. DeFeo**
(See above for address)
*TERMINATED: 02/21/2018*

**Michael G. Stag**
(See above for address)
*TERMINATED: 02/21/2018*

**Michaela G. Spero**
(See above for address)
*TERMINATED: 12/22/2017*

**Richard S. Lewis**
(See above for address)
*TERMINATED: 12/22/2017*

**Steven J. Stolze**
(See above for address)
*TERMINATED: 02/21/2018*

**Swathi Bojedla**
(See above for address)
*TERMINATED: 12/22/2017*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

V.

**Defendant**

**Bridgeton Landfill, LLC**                                 represented by     **Allyson Elisabeth Cunningham**
LATHROP GPM LLP
2345 Grand Boulevard
Suite 2200
Kansas City, MO 64108
816-460-5116
Email:
allyson.cunningham@lathropgpm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia L. Silva**
LATHROP GPM LLP
7701 Forsyth Boulevard
Suite 500
Clayton, MO 63105
314-613-2500
Fax: 314-613-2550
Email: PSilva@lathropgage.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter F. Daniel**
LATHROP GPM LLP
2345 Grand Boulevard
Suite 2200
Kansas City, MO 64108
816-460-5702
Fax: 816-292-2001
Email: peter.daniel@lathropgpm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G. Rooney**
SHOOK HARDY, LLP
2555 Grand Blvd.
Kansas City, MO 64108
816-559-2846
Fax: 816-421-5547
Email: rrooney@shb.com
*TERMINATED: 03/18/2019*
*LEAD ATTORNEY*

**William Garland Beck**
LATHROP GPM LLP
2345 Grand Boulevard
Suite 2200
Kansas City, MO 64108
816-728-8061
Fax: 816-292-2001
Email: william.beck@lathropgpm.com

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Republic Services, Inc.**                    represented by **Allyson Elisabeth Cunningham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia L. Silva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter F. Daniel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G. Rooney**
(See above for address)
*TERMINATED: 03/18/2019*
*LEAD ATTORNEY*

**William Garland Beck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Allied Services L.L.C.**                    represented by **Allyson Elisabeth Cunningham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia L. Silva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter F. Daniel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G. Rooney**
(See above for address)
*TERMINATED: 03/18/2019*
*LEAD ATTORNEY*

**William Garland Beck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rock Road Industries, Inc.**

represented by **Allyson Elisabeth Cunningham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia L. Silva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G. Rooney**
(See above for address)
*TERMINATED: 03/18/2019*
*LEAD ATTORNEY*

**William Garland Beck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mallinckrodt LLC**
*TERMINATED: 03/20/2018*

represented by **David R. Erickson**
SHOOK HARDY, LLP
2555 Grand Blvd.
Kansas City, MO 64108
816-474-6550
Fax: 816-421-5547
Email: derickson@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven D. Soden**
SHOOK HARDY, LLP
2555 Grand Blvd.
Kansas City, MO 64108
816-474-6550
Fax: 816-421-5547
Email: ssoden@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MI Holdings Inc.**
*TERMINATED: 04/21/2017*

represented by **David R. Erickson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cotter Corporation N.S.L.**

represented by **Brian O'Connor Watson**
RILEY SAFER LLP
70 W. Madison

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Suite 2900
Chicago, IL 60602
(312) 471-8776
Fax: (312) 471-8701
Email: bwatson@rshc-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dale A. Guariglia**
BRYAN CAVE LLP - St Louis
One Metropolitan Square
211 N. Broadway
Suite 3600
St. Louis, MO 63102
314-259-2606
Fax: 314-552-8606
Email: daguariglia@bclplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John McGahren**
MORGAN AND LEWIS, LLP
502 Carnegie Center
Princeton, NJ 08540-6241
609-919-6600
Email: jmcgahren@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie Feingold**
MORGAN AND LEWIS, LLP
502 Carnegie Center
Princeton, NJ 08540-6241
609-919-6643
Fax: 609-919-6701
Email:
stephanie.feingold@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Su Jin Kim**
MORGAN AND LEWIS LLP
1701 Market Street
Phildelphia, PA 19103
215-963-1738
Fax: 215-963-5001
Email: su.kim@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Lynn Brooks**
BRYAN CAVE LLP - St Louis
One Metropolitan Square
211 N. Broadway

Suite 3600
St. Louis, MO 63102
314-259-2393
Fax: 314-259-2020
Email: erin.brooks@bclplaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Commonwealth Edison Company**　　　　　represented by　**Dale A. Guariglia**
*TERMINATED: 04/21/2017*　　　　　　　　　　　(See above for address)
　　　　　　　　　　　　　　　　　　　　　　　　*LEAD ATTORNEY*
　　　　　　　　　　　　　　　　　　　　　　　　*ATTORNEY TO BE NOTICED*

　　　　　　　　　　　　　　　　　　　　　　　　**John McGahren**
　　　　　　　　　　　　　　　　　　　　　　　　(See above for address)
　　　　　　　　　　　　　　　　　　　　　　　　*LEAD ATTORNEY*
　　　　　　　　　　　　　　　　　　　　　　　　*ATTORNEY TO BE NOTICED*

　　　　　　　　　　　　　　　　　　　　　　　　**Stephanie Feingold**
　　　　　　　　　　　　　　　　　　　　　　　　(See above for address)
　　　　　　　　　　　　　　　　　　　　　　　　*LEAD ATTORNEY*
　　　　　　　　　　　　　　　　　　　　　　　　*ATTORNEY TO BE NOTICED*

　　　　　　　　　　　　　　　　　　　　　　　　**Erin Lynn Brooks**
　　　　　　　　　　　　　　　　　　　　　　　　(See above for address)
　　　　　　　　　　　　　　　　　　　　　　　　*ATTORNEY TO BE NOTICED*

**Defendant**

**Exelon Corporation**　　　　　　　　　　　represented by　**Dale A. Guariglia**
*TERMINATED: 04/21/2017*　　　　　　　　　　　(See above for address)
　　　　　　　　　　　　　　　　　　　　　　　　*LEAD ATTORNEY*
　　　　　　　　　　　　　　　　　　　　　　　　*ATTORNEY TO BE NOTICED*

　　　　　　　　　　　　　　　　　　　　　　　　**John McGahren**
　　　　　　　　　　　　　　　　　　　　　　　　(See above for address)
　　　　　　　　　　　　　　　　　　　　　　　　*LEAD ATTORNEY*
　　　　　　　　　　　　　　　　　　　　　　　　*ATTORNEY TO BE NOTICED*

　　　　　　　　　　　　　　　　　　　　　　　　**Stephanie Feingold**
　　　　　　　　　　　　　　　　　　　　　　　　(See above for address)
　　　　　　　　　　　　　　　　　　　　　　　　*LEAD ATTORNEY*
　　　　　　　　　　　　　　　　　　　　　　　　*ATTORNEY TO BE NOTICED*

　　　　　　　　　　　　　　　　　　　　　　　　**Erin Lynn Brooks**
　　　　　　　　　　　　　　　　　　　　　　　　(See above for address)
　　　　　　　　　　　　　　　　　　　　　　　　*ATTORNEY TO BE NOTICED*

**Defendant**

**Mallinckrodt Inc.**　　　　　　　　　　　represented by　**David R. Erickson**
*TERMINATED: 04/21/2017*　　　　　　　　　　　(See above for address)
　　　　　　　　　　　　　　　　　　　　　　　　*LEAD ATTORNEY*
　　　　　　　　　　　　　　　　　　　　　　　　*ATTORNEY TO BE NOTICED*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

| Date Filed | # | Docket Text |
|---|---|---|
| 01/06/2017 | 1 | NOTICE OF REMOVAL from Circuit Court for 21st Judicial Circuit, case number 16SL-cc04240, with receipt number 0865-5752287, in the amount of $400 Jury Demand,, filed by Cotter Corporation N.S.L.. (Attachments: # 1 Civil Cover Sheet, # 2 Original Filing Form, # 3 Exhibit Exhibit A, # 4 Exhibit Exhibit B, # 5 Exhibit Exhibit C, # 6 Exhibit Exhibit D)(Guariglia, Dale) (Attachment 1 replaced on 1/9/2017) (MFG). (Entered: 01/06/2017) |
| 01/06/2017 | 2 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Cotter Corporation N.S.L.. Parent companies: General Atomics Uranium Resources, LLC,. (Guariglia, Dale) (Entered: 01/06/2017) |
| 01/06/2017 | 3 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Cotter Corporation N.S.L. Sent To: Plaintiff (Guariglia, Dale) (Entered: 01/06/2017) |
| 01/06/2017 | 4 | Consent to Removal by Defendant MI Holdings Inc.. (Erickson, David) (Entered: 01/06/2017) |
| 01/06/2017 | 5 | Consent to Removal by Defendant Mallinckrodt Inc.. (Erickson, David) (Entered: 01/06/2017) |
| 01/06/2017 | 6 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendants MI Holdings Inc., Mallinckrodt Inc.. Publicly held company: Mallinckrodt plc,. (Erickson, David) (Entered: 01/06/2017) |
| 01/06/2017 | 7 | Consent to Removal by Defendant Allied Services L.L.C.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 8 | Consent to Removal by Defendant Bridgeton Landfill, LLC. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 9 | Consent to Removal by Defendant Republic Services, Inc.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 10 | Consent to Removal by Defendant Rock Road Industries, Inc.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 11 | DEMAND for Trial by Jury by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 12 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Allied Services L.L.C... (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 13 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Bridgeton Landfill, LLC.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 14 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Republic Services, Inc... (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 15 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Rock Road Industries, Inc... (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 17 | Petition (Removal/Transfer) Received From: St. Louis County Circuit Court, filed by Michael Dailey, Robbin Dailey.(MFG) (Entered: 01/09/2017) |
| 01/09/2017 | 16 | ENTRY of Appearance by Erin Lynn Brooks for Defendant Cotter Corporation N.S.L.. (Brooks, Erin) (Entered: 01/09/2017) |
| 01/09/2017 | | Case Opening Notification: All parties must file the Notice Regarding Magistrate Judge |

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

| | | |
|---|---|---|
| | | Jurisdiction Form consenting to or opting out of the Magistrate Judge jurisdiction. Click here for the instructions. and all non-governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate (moed-0001.pdf). Judge Assigned: Honorable Shirley P. Mensah. (MFG) (Entered: 01/09/2017) |
| 01/09/2017 | 18 | Pursuant to Local Rule 2.08, the assigned/referred magistrate judge is designated and authorized by the court to exercise full authority in this assigned/referred action or matter under 28 U.S.C. Sec. 636 and 18 U.S.C Sec. 3401. (CSAW) (Entered: 01/09/2017) |
| 01/10/2017 | 19 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Cotter Corporation N.S.L. *Notice of Removal Filed with State Court* Sent To: State Court - Executed (Attachments: # 1 Exhibit)(Brooks, Erin) (Entered: 01/10/2017) |
| 01/12/2017 | 20 | NOTICE Consent to Removal: by Defendant Exelon Corporation re 1 Notice of Removal Petition, (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 21 | NOTICE Consent to Removal: by Defendant Commonwealth Edison Company re 1 Notice of Removal Petition, (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 22 | CJRA ORDER (GJL). IT IS HEREBY ORDERED that the above styled case is randomly reassigned from Magistrate Judge Shirley P. Mensah to District Judge Catherine D. Perry. In all future documents filed with the Court, please use the following case number 4:16CV1407 CDP. (ARL) (Entered: 01/12/2017) |
| 01/12/2017 | 23 | ENTRY of Appearance by Erin Lynn Brooks for Defendants Commonwealth Edison Company, Exelon Corporation. (Brooks, Erin) (Entered: 01/12/2017) |
| 01/12/2017 | 24 | ENTRY of Appearance by Dale A. Guariglia for Defendants Commonwealth Edison Company, Exelon Corporation. (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 25 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Commonwealth Edison Company. Parent companies: Exelon Energy Delivery Company, LLC, Subsidiaries: RITELine Illinois, LLC, Publicly held company: None,. (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 26 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Exelon Corporation. Parent companies: None, Subsidiaries: None, Publicly held company: None,. (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 27 | Joint MOTION to Transfer Case to Judge Audrey G. Fleissig by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 01/12/2017) |
| 01/13/2017 | 28 | MOTION to Dismiss Case *and Memorandum in Support* by Defendants MI Holdings Inc., Mallinckrodt Inc.. (Erickson, David) (Entered: 01/13/2017) |
| 01/13/2017 | 29 | ANSWER to Complaint by Allied Services L.L.C..(Beck, William) (Entered: 01/13/2017) |
| 01/13/2017 | 30 | ANSWER to Complaint by Bridgeton Landfill, LLC.(Beck, William) (Entered: 01/13/2017) |
| 01/13/2017 | 31 | ANSWER to Complaint by Republic Services, Inc..(Beck, William) (Entered: 01/13/2017) |
| 01/13/2017 | 32 | ANSWER to Complaint by Rock Road Industries, Inc..(Beck, William) (Entered: 01/13/2017) |
| 01/13/2017 | 33 | JOINT MOTION to Dismiss Case *and Memorandum in Support* by Defendants Allied |

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

| | | |
|---|---|---|
| | | Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Guariglia, Dale) Modified on 1/17/2017 (CBL). (Entered: 01/13/2017) |
| 01/13/2017 | 34 | MOTION to Dismiss Case by Defendants Commonwealth Edison Company, Exelon Corporation. (Attachments: # 1 Exhibit Declaration of Scott N. Peters, # 2 Exhibit Declaration of Bruce G. Wilson)(Guariglia, Dale) (Entered: 01/13/2017) |
| 01/17/2017 | 35 | ENTRY of Appearance by William Garland Beck for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 01/17/2017) |
| 01/17/2017 | 36 | ENTRY of Appearance by Robert G. Rooney for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 01/17/2017) |
| 01/17/2017 | 37 | ENTRY of Appearance by Allyson Elisabeth Cunningham for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Cunningham, Allyson) (Entered: 01/17/2017) |
| 01/17/2017 | 38 | ENTRY of Appearance by Patricia L. Silva for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Silva, Patricia) (Entered: 01/17/2017) |
| 01/17/2017 | 39 | First MOTION for Leave to Appear Pro Hac Vice Stephanie Feingold. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5764575) by Defendant Cotter Corporation N.S.L.. (Attachments: # 1 Certificate of Good Standing Certificate for Stephanie Feingold)(Feingold, Stephanie) (Entered: 01/17/2017) |
| 01/17/2017 | 40 | First MOTION for Leave to Appear Pro Hac Vice John McGahren. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5764681) by Defendants Commonwealth Edison Company, Cotter Corporation N.S.L., Exelon Corporation. (Attachments: # 1 Certificate of Good Standing Certificate for John McGahren)(McGahren, John) (Entered: 01/17/2017) |
| 01/17/2017 | 41 | AMENDED MOTION for Leave to Appear Pro Hac Vice Stephanie Feingold. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5764786) by Defendants Cotter Corporation N.S.L., Commonwealth Edison Company, Exelon Corporation. (Attachments: # 1 Certificate of Good Standing Certificate for Stephanie Feingold)(Feingold, Stephanie) Modified on 1/18/2017 (CBL). (Entered: 01/17/2017) |
| 01/18/2017 | 42 | Consent MOTION for Extension of Time to File Response/Reply as to 34 MOTION to Dismiss Case , 33 MOTION to Dismiss Case *and Memorandum in Support*, 27 Joint MOTION to Transfer Case to Judge Audrey G. Fleissig, 28 MOTION to Dismiss Case *and Memorandum in Support* by Plaintiffs Michael Dailey, Robbin Dailey. (Stolze, Steven) (Entered: 01/18/2017) |
| 01/18/2017 | 43 | MOTION for Leave to Appear Pro Hac Vice Richard S. Lewis. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5767364) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Lewis, Richard) (Entered: 01/18/2017) |
| 01/19/2017 | 44 | Docket Text ORDER: Re: [40, 41, 43] MOTIONS for Leave to Appear Pro Hac Vice John McGahren, Stephanie Feingold, Richard S. Lewis: ORDERED GRANTED; 39 First MOTION for Leave to Appear Pro Hac Vice Stephanie Feingold: ORDERED DENIED AS MOOT; 42 Consent MOTION for Extension of Time to File Response/Reply to |

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

| | | |
|---|---|---|
| | | various motions : ORDERED GRANTED.. Signed by District Judge Catherine D. Perry on 1/19/17. (CDP) (Entered: 01/19/2017) |
| 02/03/2017 | 45 | MOTION for Leave to Appear Pro Hac Vice Michael G. Stag. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5793529) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing #1)(Stag, Michael) (Entered: 02/03/2017) |
| 02/03/2017 | 46 | Docket Text ORDER: Re: 45 MOTION for Leave to Appear Pro Hac Vice Michael G. Stag; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/3/17. (CDP) (Entered: 02/03/2017) |
| 02/03/2017 | 47 | Consent MOTION for Leave to File in Excess of Page Limitation by Plaintiffs Michael Dailey, Robbin Dailey. (DeFeo, Daniel) (Entered: 02/03/2017) |
| 02/06/2017 | 48 | (MOTION WITHDRAWN PER ORDER 67 DATED 4/6/17) MOTION to Remand Case to State Court by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14)(Lewis, Richard) Modified on 4/6/2017 (EAB). (Entered: 02/06/2017) |
| 02/06/2017 | 49 | Docket Text ORDER: Re: 47 Consent MOTION for Leave to File in Excess of Page Limitation; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/6/17. (CDP) (Entered: 02/06/2017) |
| 02/07/2017 | 50 | Consent MOTION for Leave to Modify the Briefing Schedule on Defendants' Motions to Dismiss by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) (Entered: 02/07/2017) |
| 02/07/2017 | 51 | Docket Text ORDER: Re: 50 Consent MOTION to Modify the Briefing Schedule on Defendants' Motions to Dismiss; ORDERED GRANTED; responses to motions to dismiss will be due 21 days after the Court rules on the Motion to Remand. Signed by District Judge Catherine D. Perry on 2/7/17. (CDP) (Entered: 02/07/2017) |
| 02/08/2017 | 52 | RESPONSE in Opposition re 27 Joint MOTION to Transfer Case to Judge Audrey G. Fleissig filed by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) (Entered: 02/08/2017) |
| 02/09/2017 | 53 | First MOTION for Extension of Time to File Response/Reply as to 48 MOTION to Remand Case to State Court by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 02/09/2017) |
| 02/09/2017 | 54 | Amended MOTION for Extension of Time to File by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 02/09/2017) |
| 02/09/2017 | 55 | Docket Text ORDER: Re: 54 Amended MOTION for Extension of Time to File respone to motion to remand ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/9/17. (CDP) (Entered: 02/09/2017) |
| 02/14/2017 | 56 | MOTION for Leave to Appear Pro Hac Vice Michaela G. Spero. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5811844) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Spero, Michaela) (Entered: 02/14/2017) |
| 02/15/2017 | 57 | JOINT REPLY MEMORANDUM in Support of Motion re 27 Joint MOTION to Transfer Case to Judge Audrey G. Fleissig filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Commonwealth Edison Company, Cotter Corporation N.S.L., Exelon |

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

|  |  | Corporation, MI Holdings Inc., Mallinckrodt Inc., Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) Modified on 2/16/2017 (CBL). (Entered: 02/15/2017) |
|---|---|---|
| 02/16/2017 | 58 | Docket Text ORDER: Re: 56 MOTION for Leave to Appear Pro Hac Vice Michaela G. Spero by Plaintiffs Michael Dailey, Robbin Dailey. ORDERED: GRANTED. Signed by District Judge Catherine D. Perry on 2/16/2017. (CBL) (Entered: 02/16/2017) |
| 02/16/2017 | 59 | ORDER. I have fully considered the arguments raised by the parties in the motion to transfer this case to another judge of this district. No party has the right to have a case assigned to any particular judge of this court, and the random assignment of cases serves the interests of justice. Accordingly, IT IS HEREBY ORDERED that defendants' motion to transfer this case to the Honorable Audrey G. Fleissig 27 is denied. Signed by District Judge Catherine D. Perry on 2/16/2017. (CBL) (Entered: 02/16/2017) |
| 02/21/2017 | 60 | MOTION for Leave to Appear Pro Hac Vice Swathi Bojedla. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5820974) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Bojedla, Swathi) (Entered: 02/21/2017) |
| 02/21/2017 | 61 | Docket Text ORDER: Re: 60 MOTION for Leave to Appear Pro Hac Vice Swathi Bojedla; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/21/17. (CDP) (Entered: 02/21/2017) |
| 02/24/2017 | 62 | Consent MOTION for Extension of Time to File Response/Reply *to Defendants' Response to Plaintiffs' Motion to Remand* by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) (Entered: 02/24/2017) |
| 02/24/2017 | 63 | Docket Text ORDER: Re: 62 Consent MOTION for Extension of Time to File Response/Reply ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/24/17. (CDP) (Entered: 02/24/2017) |
| 02/27/2017 | 64 | MEMORANDUM in Opposition re 48 MOTION to Remand Case to State Court filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Commonwealth Edison Company, Cotter Corporation N.S.L., Exelon Corporation, MI Holdings Inc., Mallinckrodt Inc., Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Affidavit Declaration of Stephanie Feingold in Support of Opposition to Motion to Remand, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G)(McGahren, John) (Entered: 02/27/2017) |
| 03/16/2017 | 65 | REPLY to Response to Motion re 48 MOTION to Remand Case to State Court filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1)(Lewis, Richard) (Entered: 03/16/2017) |
| 04/05/2017 | 66 | MOTION to Withdraw 48 MOTION to Remand Case to State Court by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Text of Proposed Order)(Stag, Michael) (Entered: 04/05/2017) |
| 04/06/2017 | 67 | ORDER. IT IS HEREBY ORDERED that plaintiffs' motion to withdraw their motion to remand [Doc No. 66 ] is granted. Plaintiffs have twenty-one (21) days from the date of this order to file a response to the motions to dismiss. Signed by District Judge Catherine D. Perry on 4/6/17. (EAB) (Entered: 04/06/2017) |
| 04/20/2017 | 68 | MOTION for Leave to File Amended Complaint and Modify the Briefing Schedule for Responsive Pleadings and/or Motions to Dismiss (Unopposed) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1 - First Amended Complaint)(Lewis, Richard) (Entered: 04/20/2017) |
| 04/21/2017 | 69 | Docket Text ORDER: Re: 68 MOTION for Leave to File Amended Complaint and Modify the Briefing Schedule for Responsive Pleadings and/or Motions to Dismiss |

| | | |
|---|---|---|
| | | (Unopposed) : ORDERED GRANTED; amended complaint deemed filed today; original motions to dismiss [28, 33, 34] denied as moot without prejudice to defendants' right to file motions to dismiss directed to amended complaint within 21 days. Signed by District Judge Catherine D. Perry on 4/21/17. (CDP) (Entered: 04/21/2017) |
| 04/21/2017 | 70 | AMENDED COMPLAINT against defendant Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Mallinckrodt LLC, Republic Services, Inc., Rock Road Industries, Inc.,Terminating MI Holdings Inc., Commonwealth Edison Company and Exelon Corporation filed by Michael Dailey, Robbin Dailey.(MCB) (Entered: 04/24/2017) |
| 05/12/2017 | 71 | MOTION to Dismiss Case, MEMORANDUM in Support and REQUEST for Oral Argument by Defendant Mallinckrodt LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Erickson, David) Modified on 5/15/2017 (CBL). (Entered: 05/12/2017) |
| 05/12/2017 | 72 | Joint MOTION to Dismiss Case *and Memorandum in Support* by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (McGahren, John) (Entered: 05/12/2017) |
| 05/12/2017 | 73 | ANSWER to 70 Amended Complaint, by Allied Services L.L.C..(Beck, William) (Entered: 05/12/2017) |
| 05/12/2017 | 74 | ANSWER to 70 Amended Complaint, by Bridgeton Landfill, LLC.(Beck, William) (Entered: 05/12/2017) |
| 05/12/2017 | 75 | ANSWER to 70 Amended Complaint, by Republic Services, Inc..(Beck, William) (Entered: 05/12/2017) |
| 05/12/2017 | 76 | ANSWER to 70 Amended Complaint, by Rock Road Industries, Inc..(Beck, William) (Entered: 05/12/2017) |
| 05/26/2017 | 77 | MEMORANDUM in Opposition re 72 Joint MOTION to Dismiss Case *and Memorandum in Support*, 71 MOTION to Dismiss Case *(Omnibus Opposition to Both Motions to Dismiss)* filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Lewis, Richard) (Entered: 05/26/2017) |
| 05/31/2017 | 78 | Consent MOTION for Extension of Time to File Response/Reply as to 77 Memorandum in Opposition to Motion, and MOTION for Leave to Exceed Page Limitation by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Mallinckrodt LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) Modified on 6/1/2017 (CBL). (Entered: 05/31/2017) |
| 06/01/2017 | 79 | Docket Text ORDER: Re: 78 Consent MOTION for Extension of Time and to exceed page limits: ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 6/1/17. (CDP) (Entered: 06/01/2017) |
| 06/06/2017 | 80 | *** Incorrect PDF filed. See Document 81 REPLY to Response to Motion re 71 MOTION to Dismiss Case filed by Defendant Mallinckrodt Inc.. (Erickson, David) Modified on 6/7/2017 (CBL). (Entered: 06/06/2017) |
| 06/06/2017 | 81 | REPLY to Response to Motion re 71 MOTION to Dismiss Case *(corrected filing)* filed by Defendant Mallinckrodt LLC. (Erickson, David) (Entered: 06/06/2017) |
| 06/06/2017 | 82 | REPLY to Response to Motion re 72 Joint MOTION to Dismiss Case *and Memorandum in Support* filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (McGahren, John) (Entered: 06/06/2017) |
| 07/13/2017 | 83 | MOTION to Consolidate Cases by Defendants Allied Services L.L.C., Bridgeton |

| | | |
|---|---|---|
| | | Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 07/13/2017) |
| 07/13/2017 | 84 | MEMORANDUM in Support of Motion re 83 MOTION to Consolidate Cases filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Exhibit A)(Beck, William) (Entered: 07/13/2017) |
| 07/25/2017 | 85 | Consent MOTION for Extension of Time to File Response/Reply as to 83 MOTION to Consolidate Cases by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 07/25/2017) |
| 07/25/2017 | 86 | Docket Text ORDER: Re: 85 Consent MOTION for Extension of Time to File Response/Reply as to 83 MOTION to Consolidate Cases ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 7/25/17. (CDP) (Entered: 07/25/2017) |
| 08/07/2017 | 87 | REPLY to Response to Motion re 83 MOTION to Consolidate Cases filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 08/07/2017) |
| 10/23/2017 | 88 | Docket Text ORDER: Re: 83 MOTION to Consolidate Cases ; ORDERED DENIED as moot as other case has been remanded to state court. Signed by District Judge Catherine D. Perry on 10/23/17. (CDP) (Entered: 10/23/2017) |
| 10/27/2017 | 89 | MEMORANDUM AND ORDER. (See Full Order.) IT IS HEREBY ORDERED that defendant Mallinckrodt LLC's motion to dismiss [# 71 ] and defendants Allied Services LLC, Bridgeton Landfill LLC, Cotter Corporation, Republic Services Inc., and Rock Road Industries, Inc.'s motion to dismiss [# 72 ] are GRANTED in part and DENIED in part. Counts II through IV of the First Amended Complaint are dismissed. Plaintiffs' claims for medical monitoring and emotional distress are also dismissed. IT IS FURTHER ORDERED that defendants' requests for oral argument on the motions to dismiss are DENIED. This case will be set for a Rule 16 Scheduling Conference by separate order. Signed by District Judge Catherine D. Perry on 10/27/2017. (CBL) (Entered: 10/27/2017) |
| 10/27/2017 | 90 | ORDER SETTING RULE 16 CONFERENCE. (See Full Order.) This case is assigned to Track: 3 (Complex). Joint Scheduling Plan due by 12/1/2017. Rule 16 Conference set for 12/8/2017 09:30 AM in Chambers before District Judge Catherine D. Perry. Signed by District Judge Catherine D. Perry on 10/27/2017. (CBL) (Entered: 10/27/2017) |
| 11/10/2017 | 91 | ANSWER to 70 Amended Complaint, by Mallinckrodt LLC.(Erickson, David) (Entered: 11/10/2017) |
| 11/10/2017 | 92 | ANSWER to 70 Amended Complaint, by Cotter Corporation N.S.L..(McGahren, John) (Entered: 11/10/2017) |
| 11/28/2017 | 93 | ORDER. IT IS HEREBY ORDERED that the Scheduling Conference pursuant to Fed.R.Civ.P. 16, is reset from December 8, 2017 to Friday, December 15, 2017 at 10:30 a.m. in my chambers. The Joint Proposed Scheduling Plan is now due no later than December 8, 2017. Signed by District Judge Catherine D. Perry on 11/28/17. (EAB) (Entered: 11/28/2017) |
| 12/08/2017 | 94 | JOINT SCHEDULING PLAN by Defendant Cotter Corporation N.S.L.. *on behalf of all parties*. (McGahren, John) (Entered: 12/08/2017) |
| 12/11/2017 | 95 | SUPPLEMENTAL re 94 Joint Scheduling Plan *Exhibit A to Joint Scheduling Plan* by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 12/11/2017) |

| 12/22/2017 | 96 | MOTION to Withdraw as Attorney ;attorney/firm Richard S. Lewis, Michaela G. Spero, Swathi Bojedla, and Hausfeld LLP by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) (Entered: 12/22/2017) |
|---|---|---|
| 12/22/2017 | 97 | Docket Text ORDER: Re: 96 MOTION to Withdraw as Attorney ;attorney/firm Richard S. Lewis, Michaela G. Spero, Swathi Bojedla, and Hausfeld LLP by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) filed by Michael Dailey, Robbin Dailey ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 12/22/17. (CDP) (Entered: 12/22/2017) |
| 12/22/2017 | 98 | MOTION to Withdraw as Attorney ;attorney/firm DeFeo, Stolze, Calvert by Plaintiffs Michael Dailey, Robbin Dailey. (DeFeo, Daniel) (Entered: 12/22/2017) |
| 12/27/2017 | 99 | MOTION to Withdraw 98 MOTION to Withdraw as Attorney ;attorney/firm DeFeo, Stolze, Calvert by Plaintiffs Michael Dailey, Robbin Dailey. (DeFeo, Daniel) (Entered: 12/27/2017) |
| 12/27/2017 | 100 | Docket Text ORDER: 99 MOTION to Withdraw 98 MOTION to Withdraw as Attorney by Plaintiffs Michael Dailey, Robbin Dailey. ORDERED: GRANTED. 98 MOTION to Withdraw as Attorney Plaintiffs Michael Dailey, Robbin Dailey. ORDERED: DENIED AS MOOT. Signed by District Judge Catherine D. Perry on 12/27/2017. (CBL) (Entered: 12/27/2017) |
| 12/28/2017 | 101 | ENTRY of Appearance by Steven D. Soden for Defendant Mallinckrodt LLC. (Soden, Steven) (Entered: 12/28/2017) |
| 01/02/2018 | 102 | INITIAL CASE MANAGEMENT ORDER. This case is assigned to Track: 3 (Complex). Pursuant to the Civil Justice Reform Act Expense and Delay Reduction Plan and the Differentiated Case Management Program of the United States District Court of the Eastern District of Missouri, and the Rule 16 Conference held on December 15, 2017, the Court will set an initial schedule for this case to proceed as detailed herein. (See Full Order.) Signed by District Judge Catherine D. Perry on 1/2/2018. (CBL) (Entered: 01/02/2018) |
| 01/12/2018 | 103 | MOTION for Leave to Appear Pro Hac Vice Barry Cooper. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6330831) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing Certificate of Good Standing (Barry J. Cooper))(Cooper, Barry) (Entered: 01/12/2018) |
| 01/16/2018 | 104 | Docket Text ORDER: Re: 103 MOTION for Leave to Appear Pro Hac Vice Barry Cooper by Plaintiffs Michael Dailey, Robbin Dailey. ORDERED: GRANTED. Signed by District Judge Catherine D. Perry on 1/16/2018. (CBL) (Entered: 01/16/2018) |
| 02/08/2018 | 105 | MOTION to Withdraw as Attorney ;attorney/firm Michael Stag/Smith Stag by Plaintiffs Michael Dailey, Robbin Dailey. (Stag, Michael) (Entered: 02/08/2018) |
| 02/20/2018 | 106 | MOTION to Withdraw as Attorney ;attorney/firm DeFeo, Stolze, Calvert by Plaintiffs Michael Dailey, Robbin Dailey. (DeFeo, Daniel) (Entered: 02/20/2018) |
| 02/21/2018 | 107 | Docket Text ORDER: Re: [105, 106] MOTIONS to Withdraw as Attorney ;attorney/firm Michael Stag/Smith Stag, attorney/firm DeFeo, Stolze, Calvert ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/21/18. (CDP) (Entered: 02/21/2018) |
| 02/21/2018 | 108 | MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE and MOTION for Status Conference by Plaintiffs Michael Dailey, Robbin Dailey. (Cooper, Barry). (Added MOTION for Status Conference on 2/22/2018.) (CBL). (Entered: 02/21/2018) |
| 02/22/2018 | 109 | AMENDED MOTION re: 108 MOTION for Extension of: TIME ON INITIAL CASE |

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

|  |  | MANAGEMENT ORDER SCHEDULE and MOTION for Status Conference by Plaintiffs Michael Dailey, Robbin Dailey. (Cooper, Barry) Modified on 2/23/2018 (CBL). (Entered: 02/22/2018) |
|---|---|---|
| 02/26/2018 | 110 | MOTION for Leave to Appear Pro Hac Vice Celeste Brustowicz. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6400783) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing) (Brustowicz, Celeste) (Entered: 02/26/2018) |
| 02/27/2018 | 111 | ORDER. As requested by the parties, the Court will hold a telephone status conference to discuss the disputes between the parties and the motion for extension of time as to the Initial Case Management Order. Accordingly, IT IS HEREBY ORDERED that plaintiffs' Motion for Leave to Appear Pro Hac Vice Celeste Brustowicz 110 is GRANTED. IT IS FURTHER ORDERED that a telephone conference with counsel will be held on Monday, March 5, 2018 at 2:00 p.m. Counsel for plaintiffs Michael and Robbin Dailey will place the call and have all necessary counsel on the line before joining the undersigned at (314) 244-7520. Signed by District Judge Catherine D. Perry on 2/27/2018. (CBL) (Entered: 02/27/2018) |
| 02/28/2018 | 112 | RESPONSE to Motion re 108 MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE MOTION for Hearing, 109 MOTION to Amend/Correct 108 MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE MOTION for Hearing filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Exhibit 1)(McGahren, John) (Entered: 02/28/2018) |
| 03/02/2018 | 113 | MOTION for Leave to Appear Pro Hac Vice Victor T. Cobb. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6408510) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Cobb, Victor) (Entered: 03/02/2018) |
| 03/02/2018 | 114 | Docket Text ORDER: Re: 113 MOTION for Leave to Appear Pro Hac Vice Victor T. Cobb; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 3/2/18. (CDP) (Entered: 03/02/2018) |
| 03/02/2018 | 115 | REPLY to Response to Motion re 108 MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE MOTION for Hearing, 109 MOTION to Amend/Correct 108 MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE MOTION for Hearing filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Attachment Declaration by Barry J. Cooper, Jr., Esq.)(Cooper, Barry) (Entered: 03/02/2018) |
| 03/05/2018 | 116 | Minute Entry for proceedings held before District Judge Catherine D. Perry: Telephone Conference held on 3/5/2018. Parties present for telephone conference. Parties discuss case status with the court. Certain discovery deadlines and dispositive motions deadlines extended 60 days. Amended case management order to follow with complete details. (Court Reporter:Gayle Madden, Gayle_Madden@moed.uscourts.gov, 314-244-7987) (FTR Gold Operator initials:N/A) (FTR Gold: No) (EAB) (Entered: 03/05/2018) |
| 03/05/2018 | 117 | Joint MOTION for Protective Order by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 03/05/2018) |
| 03/05/2018 | 118 | MEMORANDUM in Support of Motion re 117 Joint MOTION for Protective Order filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Exhibit A, |

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

| | | |
|---|---|---|
| | | # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Rooney, Robert) (Entered: 03/05/2018) |
| 03/06/2018 | 119 | AMENDED CASE MANAGEMENT ORDER - IT IS HEREBY ORDERED that plaintiffs' amended motion for an extension of time of initial case management order schedule [#109] IS GRANTED in part as follows: 1. The parties shall complete all discovery related to the samples collected at Plaintiffs home and property, and the issue of whether the levels of radioactive contamination are sufficient to show a PAA violation, no later than May 2, 2018. 2. Any motions for summary judgment or motions for judgment on the pleadings pertaining to the issue of whether plaintiffs can show levels of radioactive contamination sufficient to show a violation of the PAA must be filed no later than June 4, 2018. Opposition briefs shall be filed no later than thirty days after the motion or July 5, 2018, whichever is earlier. Any reply brief may be filed no later than ten days following the response brief or July 16, 2018, whichever is earlier. IT IS FURTHER ORDERED that plaintiffs' first motion for an extension of time of initial case management order schedule [#108] is DENIED as moot. All other provisions of the Initial Case Management Order [ECF # 102] remain in full force and effect. Failure to comply with any part of this order may result in the imposition of sanctions. ( Discovery Completion due by 5/2/2018. Dispositive Motions due by 6/4/2018.) Signed by District Judge Catherine D. Perry on March 6, 2018. (MCB) (Entered: 03/06/2018) |
| 03/16/2018 | 120 | STIPULATION FOR DISMISSAL with Prejudice of Mallinckrodt LLC Only by Defendant Mallinckrodt LLC. (Erickson, David) Modified on 3/19/2018 (CBL). (Entered: 03/16/2018) |
| 03/20/2018 | 121 | Docket Text ORDER: Re: 117 Joint MOTION for Protective Order ; ORDERED GRANTED without objection. Signed by District Judge Catherine D. Perry on 3/20/18. (CDP) (Entered: 03/20/2018) |
| 03/20/2018 | 122 | Docket Text ORDER: Re: 120 STIPULATION FOR DISMISSAL with Prejudice of Mallinckrodt LLC Only ; ORDERED GRANTED and plaintiffs' claims against defendant Mallinckrodt, LLC are dismissed with prejudice with each side to pay its own costs. Signed by District Judge Catherine D. Perry on 3/20/18. (CDP) (Entered: 03/20/2018) |
| 03/27/2018 | 123 | MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Memo in Support of Motion to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO)(Brustowicz, Celeste) (Entered: 03/27/2018) |
| 04/02/2018 | 124 | Joint MOTION for Extension of Time to File Response/Reply as to 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 04/02/2018) |
| 04/03/2018 | 125 | Docket Text ORDER: Re: 124 Joint MOTION for Extension of Time to File Response/Reply ; ORDERED GRANTED over plaintiffs' objection. Signed by District Judge Catherine D. Perry on 4/3/18. (CDP) (Entered: 04/03/2018) |
| 04/06/2018 | 126 | Consent MOTION for Leave to File in Excess of Page Limitation by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 04/06/2018) |
| 04/09/2018 | 127 | Docket Text ORDER: Re: 126 Consent MOTION for Leave to File in Excess of Page Limitation by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc. ORDERED: LEAVE GRANTED. Signed by District Judge Catherine D. Perry on 4/9/2018. (CBL) (Entered: 04/09/2018) |

| 04/10/2018 | [128](#) | MEMORANDUM in Opposition re [123](#) MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Defendant Cotter Corporation N.S.L.. (Feingold, Stephanie) (Entered: 04/10/2018) |
|---|---|---|
| 04/10/2018 | [129](#) | RESPONSE in Opposition re [123](#) MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # [1](#) Exhibit 1, # [2](#) Exhibit 2, # [3](#) Exhibit 3)(Rooney, Robert) (Entered: 04/10/2018) |
| 04/12/2018 | [130](#) | MOTION for Leave to Appear Pro Hac Vice Su Jin Kim. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6481333) by Defendant Cotter Corporation N.S.L.. (Attachments: # [1](#) Certificate of Good Standing)(Kim, Su) (Entered: 04/12/2018) |
| 04/12/2018 | 131 | Docket Text ORDER: Re: [130](#) MOTION for Leave to Appear Pro Hac Vice Su Jin Kim by Defendant Cotter Corporation N.S.L. ORDERED: GRANTED. Signed by District Judge Catherine D. Perry on 4/12/2018. (CBL) (Entered: 04/12/2018) |
| 04/16/2018 | [132](#) | MOTION for Extension of: Time to File Reply to Defendants' Responses In Opposition to [123](#) Plaintiffs' Motion for Leave to Amend Complaint to dismiss Price-Anderson Act Claims and Reinstate State Law Claims, Motion to Remand, Motion to Stay Pending Discovery and Alternatively Motion to Amend Case Management Order by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) Modified on 4/17/2018 (CBL). (Entered: 04/16/2018) |
| 04/17/2018 | [133](#) | AMENDED DISCLOSURE OF CORPORATE INTERESTS by Defendant Rock Road Industries, Inc. . (Beck, William) Modified on 4/17/2018 (CBL). (Entered: 04/17/2018) |
| 04/17/2018 | 134 | Docket Text ORDER: Re: [132](#) MOTION for Extension of: Time to File Reply to Defendants' Responses In Opposition to [123](#) Plaintiffs' Motion for Leave to Amend Complaint to dismiss Price-Anderson Act Claims and Reinstate State Law Claims, Motion to Remand, Motion to Stay Pending Discovery and Alternatively Motion to Amend Case Management Order by Plaintiffs Michael Dailey, Robbin Dailey ; ORDERED Motion is GRANTED. Signed by District Judge Catherine D. Perry on April 17, 2018. (MCB) (Entered: 04/17/2018) |
| 04/24/2018 | [135](#) | REPLY to Response to Motion re [123](#) MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # [1](#) Exhibit Landfill Defendants Motion to Dismiss in Adams, # [2](#) Exhibit Deferral of regulatory oversight to US EPA, # [3](#) Exhibit Declaration of Richard Stewart, # [4](#) Exhibit Ware II Petition for writ of certiorari, # [5](#) Exhibit Declaration of Stephanie Feingold, # [6](#) Exhibit Cotter's response to CERCLA request)(Brustowicz, Celeste) (Entered: 04/24/2018) |
| 04/26/2018 | [136](#) | Joint MOTION for Leave to File a Sur-Reply by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc.. (Attachments: # [1](#) Exhibit A, # [2](#) Certificate of Service)(Feingold, Stephanie) (Entered: 04/26/2018) |
| 04/27/2018 | 137 | Docket Text ORDER: Re: [136](#) Joint MOTION for Leave to File a Sur-Reply by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc.; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 4/27/18. (KXS) (Entered: 04/27/2018) |
| 04/27/2018 | [138](#) | RESPONSE to Motion re [136](#) Joint MOTION for Leave to File a Sur-Reply filed by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) (Entered: 04/27/2018) |

| 05/08/2018 | 139 | SURREPLY to Motion re 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 05/08/2018) |
|---|---|---|
| 05/08/2018 | 140 | ENTRY of Appearance by Peter F. Daniel for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Daniel, Peter) (Entered: 05/08/2018) |
| 05/08/2018 | 141 | SURREPLY to Motion re 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Defendant Cotter Corporation N.S.L.. (Feingold, Stephanie) (Entered: 05/08/2018) |
| 05/18/2018 | 142 | MOTION to Exclude *Motion and Memorandum in Support Requesting Plaintiffs be Prevented and Enjoined from using Information and Materials they Withheld Until Late in the Discovery Period* by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Beck, William) (Entered: 05/18/2018) |
| 05/25/2018 | 143 | RESPONSE to Motion re 142 MOTION to Exclude *Motion and Memorandum in Support Requesting Plaintiffs be Prevented and Enjoined from using Information and Materials they Withheld Until Late in the Discovery Period* filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Brustowicz, Celeste) (Entered: 05/25/2018) |
| 05/30/2018 | 144 | REPLY to Response to Motion re 142 MOTION to Exclude *Motion and Memorandum in Support Requesting Plaintiffs be Prevented and Enjoined from using Information and Materials they Withheld Until Late in the Discovery Period* filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 05/30/2018) |
| 06/01/2018 | 145 | MOTION for Extension of Time to File *Dispositive Motion* ;Proposed extension date 6/11/2018, MOTION for Leave to File in Excess of Page Limitation by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 06/01/2018) |
| 06/01/2018 | 146 | Consent MOTION for Leave to File Excess Pages by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Silva, Patricia) (Entered: 06/01/2018) |
| 06/02/2018 | 147 | MOTION for Extension of Time to File *Dispositive Motion* ;Proposed extension date June 11, 2018 by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 06/02/2018) |
| 06/04/2018 | 148 | Docket Text ORDER: Re: 145 MOTION for Extension of Time to File *Dispositive Motion and MOTION for Leave to File in Excess of Page Limitation by Defendant Cotter Corporation N.S.L.; 147 MOTION for Extension of Time to File Dispositive Motion by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.; 146 Consent MOTION for Leave to File Excess Pages by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc. ; ORDERED: Motions are GRANTED. ( Dispositive Motions due by 6/11/2018.) Signed by District Judge Catherine D. Perry on June 4, 2018. (MCB) (Entered: 06/04/2018)* |
| 06/05/2018 | 149 | MEMORANDUM AND ORDER - IT IS HEREBY ORDERED that plaintiffs' motion for leave to amend, to remand, and to stay [#123] is GRANTED ONLY with respect to a STAY of future Amended Case Management Order (ECF No. 119) deadlines, and is HELD IN ABEYANCE with respect to leave to amend, remand, and alternatively, amendment of the case management order. Once the Court has ruled pending motions, a new schedule shall be established for this matter, if necessary. Signed by District Judge Catherine D. Perry on June 5, 2018. (MCB) (Entered: 06/05/2018) |

| | | |
|---|---|---|
| 06/06/2018 | [150](#) | NOTICE of Supplemental Authority re [123](#) MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc. . (Attachments: # [1](#) Exhibit A)(Daniel, Peter) (Entered: 06/06/2018) |
| 06/12/2018 | [151](#) | ORAL MOTION *for Argument* by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 06/12/2018) |
| 06/20/2018 | [152](#) | MOTION for Leave to Appear Pro Hac Vice Stuart H. Smtih. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6600931) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # [1](#) Certificate of Good Standing)(Smith, Stuart) (Entered: 06/20/2018) |
| 06/21/2018 | 153 | Docket Text ORDER: Re: [152](#) MOTION for Leave to Appear Pro Hac Vice Stuart H. Smith ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 6/21/18. (CDP) (Entered: 06/21/2018) |
| 03/14/2019 | [154](#) | MOTION to Withdraw as Attorney *by Robert G. Rooney* ;attorney/firm Robert G. Rooney by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 03/14/2019) |
| 03/18/2019 | 155 | Docket Text ORDER: Re: [154](#) MOTION to Withdraw as Attorney *by Robert G. Rooney* by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.; ORDERED: Motion is GRANTED. Signed by District Judge Rodney W. Sippel on behalf of District Judge Catherine D. Perry on March 18, 2019. (MCB) (Entered: 03/18/2019) |
| 04/08/2019 | [156](#) | MEMORANDUM AND ORDER. (See Full Order.) IT IS HEREBY ORDERED that plaintiffs' motion for leave to amend and to remand, or to amend case management order [123](#) is denied without prejudice. Defendants' motion to prevent plaintiffs from using material and information [142](#) is denied as moot. IT IS FURTHER ORDERED that not later than April 29, 2019, plaintiffs shall file either: 1) a motion to dismiss this case without prejudice under Fed. R. Civ. P. 41(a)(2); or 2) a renewed motion for leave to file a Second Amended Complaint, accompanied by the proposed amended complaint. The Federal Rules of Civil Procedure and the Local Rules of this Court govern the time to file any responses and/or replies to plaintiffs' motion. IT IS FURTHER ORDERED that defendants' Motion for Oral Argument [151](#) is denied. The parties thus far have clearly and articulately presented their respective arguments in their prepared briefs. If I determine that oral argument is necessary to assist in my consideration of plaintiffs' anticipated motion to dismiss or to amend, I will not hesitate to schedule a hearing. IT IS FURTHER ORDERED that the case management deadlines in this case remain stayed. Signed by District Judge Catherine D. Perry on 4/8/2019. (CBL) (Entered: 04/08/2019) |
| 04/29/2019 | [157](#) | MOTION for Leave to File a 2nd Amended Complaint by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # [1](#) Memo in Support of Motion, # [2](#) Exhibit 2nd Amended Complaint)(Smith, Stuart) (Entered: 04/29/2019) |
| 05/06/2019 | [158](#) | MOTION for Extension of Time to File Response/Reply as to [157](#) MOTION for Leave to File a 2nd Amended Complaint by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Daniel, Peter) (Entered: 05/06/2019) |
| 05/06/2019 | 159 | Docket Text ORDER: Re: [158](#) MOTION for Extension of Time to File Response to MOTION for Leave to File a 2nd Amended Complaint ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 5/6/19. (CDP) (Entered: 05/06/2019) |
| 05/20/2019 | [160](#) | RESPONSE to Motion re [157](#) MOTION for Leave to File a 2nd Amended Complaint filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, |

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

| | | |
|---|---|---|
| | | Inc.. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Beck, William) (Entered: 05/20/2019) |
| 05/20/2019 | 161 | MEMORANDUM in Opposition re 157 MOTION for Leave to File a 2nd Amended Complaint *Pursuant to April 8, 2019 Order* filed by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 05/20/2019) |
| 05/20/2019 | | NOTICE: IF YOU HAVE ALREADY UPGRADED YOUR PACER ACCOUNT YOU CAN DISREGARD THIS NOTICE. IF YOU DO NOT UPGRADE YOU WILL NOT BE ABLE TO FILE IN THE SYSTEM AFTER MAY 31, 2019. PLEASE UPGRADE IMMEDIATELY. If you are using a shared account to file cases, you will need to create an individual account; instructions can be found at:https://www.moed.uscourts.gov/sites/moed/files/Register-for-New-PACER-account.pdf. If you already have an individual account, it will need to be upgraded; instructions can be found https://www.moed.uscourts.gov/sites/moed/files/Upgrade-Current-PACER-Account.pdf. If you need further assistance contact the MOED CM/ECF Help Desk at 314-244-7650 or moedml_cmecf_help@moed.uscourts.gov. (CSAW) (Entered: 05/20/2019) |
| 05/22/2019 | 162 | MOTION for Extension of Time to File Response/Reply as to 157 MOTION for Leave to File a 2nd Amended Complaint by Plaintiffs Michael Dailey, Robbin Dailey. (Cobb, Victor) (Entered: 05/22/2019) |
| 05/28/2019 | 163 | Docket Text ORDER: Re: 162 MOTION for Extension of Time to File Response/Reply ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 5/28/19. (CDP) (Entered: 05/28/2019) |
| 06/10/2019 | 164 | REPLY to Response to Motion re 157 MOTION for Leave to File a 2nd Amended Complaint filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1 (Judgment denying appeal), # 2 Exhibit 2 (Silva Deposition Transcript))(Brustowicz, Celeste) (Entered: 06/10/2019) |
| 10/22/2019 | 165 | ORDER : IT IS HEREBY ORDERED that plaintiffs Motion for Leave to File a Second Amended Complaint 157 is GRANTED, and the Clerk of Court is instructed to file and docket plaintiffs Second Amended Complaint (ECF 157-2) as of todays date. IT IS FURTHER ORDERED that plaintiffs shall have twenty-one (21) days from the date of this Order within which to file a motion to remand, and defendants shall have fourteen (14) days thereafter within which to respond. Any reply brief may be filed within seven (7) days of the response. Signed by District Judge Catherine D. Perry on 10/22/2019. (KCB) (Entered: 10/22/2019) |
| 10/22/2019 | 166 | SECOND AMENDED COMPLAINT against defendant Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc., filed by Michael Dailey, Robbin Dailey.(KCB) (Entered: 10/22/2019) |
| 10/23/2019 | 167 | Docket Text ORDER: Defense counsel have contacted chambers indicating uncertainty about whether the Court's orders somehow meant that they were not obligated to respond to the Second Amended Complaint. To clear up any confusion: Defendants must respond to the Second Amended Complaint within the time set by the Federal Rules of Civil Procedure. Signed by District Judge Catherine D. Perry on 10/23/19. (CDP) (Entered: 10/23/2019) |
| 11/04/2019 | 168 | MOTION for Extension of Time to File Answer *to Plaintiffs' Second Amended Complaint* by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 11/04/2019) |
| 11/05/2019 | 169 | Docket Text ORDER Re: 168 MOTION for Extension of Time to File Answer *to Plaintiffs' Second Amended Complaint* by Defendant Cotter Corporation N.S.L.. |

| | | |
|---|---|---|
| | | (McGahren, John); ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 11/5/2019. (BRP) (Entered: 11/05/2019) |
| 11/05/2019 | 170 | ANSWER to 166 Amended Complaint by Allied Services L.L.C..(Beck, William) (Entered: 11/05/2019) |
| 11/05/2019 | 171 | ANSWER to 166 Amended Complaint by Bridgeton Landfill, LLC.(Beck, William) (Entered: 11/05/2019) |
| 11/05/2019 | 172 | ANSWER to 166 Amended Complaint by Republic Services, Inc..(Beck, William) (Entered: 11/05/2019) |
| 11/05/2019 | 173 | NOTICE Exhibit 1 to Defendants' Answers to Plaintiffs' Second Amended Complaint: by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc. re 171 Answer to Amended Complaint, 172 Answer to Amended Complaint, 170 Answer to Amended Complaint (Beck, William) (Entered: 11/05/2019) |
| 11/12/2019 | 174 | MOTION to Remand Case to State Court to State Court by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Memo In Support of Motion to Remand)(Brustowicz, Celeste) (Entered: 11/12/2019) |
| 11/12/2019 | 175 | MOTION to Dismiss Case by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 11/12/2019) |
| 11/25/2019 | 176 | MOTION to Stay by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit Memo in Support of Unopposed Motion to Stay)(Brustowicz, Celeste) (Entered: 11/25/2019) |
| 11/25/2019 | 177 | MOTION for Leave to File in Excess of Page Limitation *for Response to Plaintiffs' Motion to Remand* by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 11/25/2019) |
| 11/26/2019 | 178 | Docket Text ORDER: Re: 177 MOTION for Leave to File in Excess of Page Limitation ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 11/26/19. (CDP) (Entered: 11/26/2019) |
| 11/26/2019 | 179 | Docket Text ORDER: Re: 176 MOTION to Stay : ORDERED GRANTED to the extent that deadlines for briefing the motion to dismiss are stayed pending the Court's ruling on the motion to remand. Signed by District Judge Catherine D. Perry on 11/26/19. (CDP) (Entered: 11/26/2019) |
| 11/26/2019 | 180 | MEMORANDUM in Opposition re 174 MOTION to Remand Case to State Court to State Court filed by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 11/26/2019) |
| 11/26/2019 | 181 | RESPONSE to Motion re 174 MOTION to Remand Case to State Court to State Court filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 11/26/2019) |
| 12/02/2019 | 182 | MOTION for Extension of Time to File Response/Reply as to 174 MOTION to Remand Case to State Court to State Court, 180 Memorandum in Opposition to Motion, 181 Response to Motion by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) (Entered: 12/02/2019) |
| 12/03/2019 | 183 | Amended MOTION to Amend/Correct 182 MOTION for Extension of Time to File Response/Reply as to 174 MOTION to Remand Case to State Court to State Court, 180 Memorandum in Opposition to Motion, 181 Response to Motion , MOTION for Extension of Time to File Response/Reply by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) . (Entered: 12/03/2019) |

Case: 4:22-cv-00116-CDP   Doc. #: 1-4   Filed: 01/28/22   Page: 254 of 903 PageID #: 1935

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

| 12/03/2019 | 184 | Docket Text ORDER Re: 183 Amended MOTION to Amend/Correct 182 MOTION for Extension of Time to File Response/Reply as to 174 MOTION to Remand Case to State Court to State Court, 180 Memorandum in Opposition to Motion, 181 Response to Motion , MOTION for Extension of Time to File Response/Reply by Plaintiffs Michael Dailey, Robbin Dailey; OREDERED GRANTED. 182 MOTION for Extension of Time to File Response/Reply as to 174 MOTION to Remand Case to State Court to State Court, 180 Memorandum in Opposition to Motion, 181 Response to Motion by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) filed by Michael Dailey, Robbin Dailey; ORDERED DENIED AS MOOT. Signed by District Judge Catherine D. Perry on 12/3/2019. (BRP) Modified on 12/4/2019 (BRP). (Entered: 12/03/2019) |
| 12/10/2019 | 185 | REPLY to Response to Motion re 174 MOTION to Remand Case to State Court to State Court filed by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) (Entered: 12/10/2019) |
| 03/23/2020 | 186 | MEMORANDUM AND ORDER: IT IS HEREBY ORDERED that plaintiffs Michael and Robbin Daileys' Motion to Remand 174 is GRANTED. IT IS FURTHER ORDERED that this case is REMANDED to the Circuit Court of St. Louis County, Missouri, from which it was removed. All other motions that remain pending in this action are reserved for ruling by that court. Signed by District Judge Catherine D. Perry on 3/23/2020. (TMT) (Entered: 03/23/2020) |
| 04/04/2020 | 187 | ENTRY of Appearance by Brian O'Connor Watson for Defendant Cotter Corporation N.S.L.. (Watson, Brian) (Entered: 04/04/2020) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/20/2020 16:08:59 | | |
| **PACER Login:** | sl040515 | **Client Code:** | 123500 |
| **Description:** | Docket Report | **Search Criteria:** | 4:17-cv-00024-CDP |
| **Billable Pages:** | 21 | **Cost:** | 2.10 |

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT D

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL DAILEY, et al.,           )
                                  )
          Plaintiffs,             )
                                  )
     v.                           )          Case No. 4:17 CV 24 CDP
                                  )
BRIDGETON LANDFILL, LLC, et al.,  )
                                  )
          Defendants.             )

## NOTICE OF RULE 30(B) (6) VIDEO DEPOSITION

TO:   **Rock Road Industries, Inc.**
      Through their counsel of record
      William Garland Beck
      LATHROP AND GAGE, LLP
      2345 Grand Boulevard
      Suite 2200
      Kansas City, MO 64108
      816-292-2000
      Fax: 816-292-2001
      Email: wbeck@lathropgage.com

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of

Procedure, the undersigned attorneys will take the video deposition of:

**Corporate Representative of Rock Road Industries, Inc.**

**March 22, 2018 at 10:00 a.m.**

and continuing thereafter until completed at the offices of LATHROP AND GAGE, LLP,  2345

Grand Boulevard, Suite 2200, Kansas City, MO 64108, or at another mutually agreeable time,

date and location to be determined prior to the deposition, before a notary public or another

officer authorized to administer oaths. This oral examination is being taken for the purpose of discovery, for use at trial, or for such other purposes as are permitted under the applicable Statutes or Rules of the Court.

Deponent is to produce a designated representative(s), who is/are knowledgeable and who has performed an investigation about the matters set for in Exhibit "A" and Exhibit "B" attached hereto.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, deponent is to produce within thirty days (on or before March 4, 2018) all documents, as defined herein, requested to be produced in Exhibit "B" attached hereto.

Respectfully submitted,

**Barry James Cooper, Jr. (pro hac vice)**
COOPER LAW FIRM, LLC
516 St. Philip St.
New Orleans, LA 70116
504-566-1558
Fax: 504-581-9055
Email: Bcooper@sch-llc.com

ATTORNEY FOR PLAINTIFFS

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon counsel of record by electronic mail or by depositing same in the United States Mail, properly addressed and postage prepaid, this 2nd day of February, 2018.

**Barry James Cooper, Jr.**

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## INSTRUCTIONS

1.  This discovery shall be deemed continuing, and supplemental answers shall be required if defendant, directly or indirectly, obtains further information of the nature sought herein between the time answers are served and the time of trial.

2.  With respect to the production of any documents that are claimed to be privileged, a statement shall be provided by the attorneys for the respondent, setting forth as to each such documents, and, where applicable, each attachment thereto:

    (a)  The name of the sender, if any, of the document;
    (b)  The name of the author of the document;
    (c)  The name of the person, if any, to whom the document and copies were sent;
    (d)  The date of the document;
    (e)  The date on which the document was received by those having possession of the document;
    (f)  A description of the nature and the subject matter of the document;
    (g)  The statute, rule or decision which is claimed to give rise to the privilege;
    (h)  The last known custodian of the document and the present location of the document;
    (i)  Attachments to the document;
    (j)  The number of pages comprising the document;
    (k)  Whether the document is handwritten, typewritten or other wise prepared; and
    (l)  Any other information which is usable and identifiable and is necessary to identify the document.
    (m)  Where appropriate, the singular form of a word shall be interpreted in the plural and vice versa.

3.  All words and phrases shall be construed as masculine, feminine or neuter gender according to the context.

4.  The terms "and" and "or" shall be construed either disjunctively or conjunctively if necessary to bring within the scope of this subpoena and/or request for production of documents any matters which might otherwise be misconstrued to be outside of the scope of the subpoena and/or request for production of documents.

## DEFINITIONS

5.  When used herein, the term "Defendant", "You", "Your", shall refer to the person, corporation or other entity that is subject to service of these discovery requests, and in addition to the said Defendant, shall include counsel for Defendant, and all agents, servants, employees, representatives, predecessors in interest, successors in interest, sister or subsidiary companies or corporations, experts, private investigators, and others who are in possession of or may have obtained information for or on behalf of the

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Defendant or are in possession of documents or information that Defendant has under its control.

6. "You" in its various forms such as "your" and "yourself" shall refer to Defendant, and all present and former agents, employees, representatives, attorneys, custodians of records, and all other person acting or who have acted on behalf of such person or corporation.

7. "Documents" shall mean or refer to all authentic written or graphic matter of every kind or description, however produced or reproduced, whether draft or final, original or reproduction, and all tangible things within the scope of the Louisiana Rules of Civil Procedure, specifically including, but not limited to, writings, graphs, charts, photographs, telephone records, data compilations (from which information can be obtained, translated, if necessary, by the respondent due to detection devices and to reasonably useable form), letters, correspondence, memoranda, minutes, notes, post-its, contracts, agreements, memoranda of conversations, films, transcripts, micro film, desk calendars, appointment books, diaries, time sheets, laboratory books, laws, bulletins, circulars, notices, rules, regulations, prospects, directions, teletype messages, interoffice communications, intra-office communications, reports, company work sheets, credit files, evidence of indebtedness, negotiable instruments, telegrams, mailgrams, books, news releases, newspapers, magazines, advertisements, periodicals, pamphlets, sketches, drawings, statements, reports, articles, articles of incorporation, by-laws, directives, minutes of meetings, balance sheets, income and loss statements, profit and loss statements, inventories, operating budgets, accounting work sheets, financial statements, ledgers, journals, books of account, bills, vouchers, bank checks, proposals, offers, orders, acknowledgments, receipts, invoices, checks, working papers, telephone messages (whether written or recorded), note books, post cards, evaluations, recommendations, annual reports, evaluations, confirmations, leases, analysis, feasibility of market studies, disbursement request, orders, charts, graphs, indices, projections, forms, data sheets, data processing disc, readable computer produced interpretations thereof, booklets, articles, manuals, speeches, stenographic notes, maps, studies, tests, log books, daily or other periodical reports, well logs, ledgers, surveys, cables, tape and disc recordings (both audio and video), blue prints, containers, cartons, package labels, slides, auto reports, tender offers or invitations, personal interviews, and summaries, abstracts, compilations or paraphrases of any of the foregoing, or materials similar to the foregoing, however denominated, which are in the possession, custody or control of the party upon whom the subpoena or notice is served or to which said party can obtain access. This subpoena and/or request for production of documents calls for originals, unless otherwise specified and for copies as noted when originals are not available. If a document is prepared in several copies, or additional copies have been made and the copies are not identified (or by reasons of subsequent modification of the copy by additions or notations, or other modifications are no longer identical), each non-identical copy is a separate document.

## EXHIBIT "A"

Please produce a representative(s) who is most knowledgeable with regard the following:

### Corporate Structure/Status

1. Knowledge regarding:

    (a) Your legal status (e.g. corporation, partnership, etc.) and the identity of any and all entities or persons which have ever had a ownership interest in you;

    (b) Your legal domicile and the state in which you are incorporated;

    (c) The nerve-center and/or site of principal policy decision making for the following facets of your organization: (1) corporate policy; (2) landfill operations; (3) worker and public safety; (4) environmental regulatory compliance; (5) budgeting and/or accounting; (6) research and development;

    (d) The locations of all of your headquarter offices, business offices or centers, regional or unit offices, research facilities, in the United States;

    (e) The identities of any of your parent, subsidiary, successor, and/or sibling companies, corporations or related entities, and the relationship between you and that entity;

    (f) The management hierarchy for the operations, safety, research, and training facets of your organization related in any way to the West Lake Landfill for each year since the operations of you or any of your predecessors, successors, parents, siblings or affiliates began at the West Lake Landfill.

    (g) The identities, last known address and telephone number, titles and/or job descriptions of each of your personnel that has had principal responsibilities regarding the following in relation to your operations at the West Lake Landfill:

        1) management of operations;

        2) management of health physics;

        3) management of radiation protection;

        4) management of radiation chemistry;

        5) running, analysis and/or interpretation of all testing for environmental

Page 6 of 15

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

releases of any kind including calibration of radiation monitoring devices;

6) worker and public safety;

7) environmental regulatory compliance; and

8) budgeting and/or accounting.

## Operations

2. Knowledge, as possessed by a senior manager and/or engineer within your organization, regarding your organization's operations and procedures at the West Lake Landfill for minimization of environmental releases from the time of your beginning operations at the West Lake Landfill until the present, including but not limited to operating licenses and any operation involving the storage, handling, transportation and/or disposal of wastes of any kind.

3. Knowledge of operating licenses in effect for the West Lake Landfill.

4. Knowledge of vendors and subcontractors who have been retained by the West Lake Landfill to measure radioactive material samples or calibrate instruments at any facility, such as an offsite laboratory, that is not owned by Rock Road Industries, Inc..

5. Knowledge of Corrective Action Requests (CARs), Licensing Event Reports (LERs) or named equivalent reports, incident reports and correspondence with any and all federal and state agencies regarding any and all problems with the processing systems for the West Lake Landfill.

6. Knowledge of logs and records relating to systems and personnel policies for discharges from the landfill and monitoring thereof regarding the operation of the West Lake Landfill.

7. Knowledge regarding any and all communications discussing or relating to waste materials, environmental releases, effluents and/or operational problems at the West Lake Landfill that have taken place between you and any of the following:

   (a) Any employee or subdivision of your company or organization;

   (b) Any other defendant in this action;

   (c) Any agency of any state or the federal government;

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

(d)   Any service company or contractor that has performed any operation or procedure on any item of equipment that is the source of any waste material, environmental releases, and/or effluents at the West Lake Landfill; and

(e)   Any industry or trade organization.

8.   Knowledge regarding any and all guidelines, procedures, and/or protocols that have been implemented and/or proposed related to worker training or safety with regard to:

> Handling transportation, disposal and/or minimization of exposures to radioactive materials or other harmful or hazardous wastes and/or effluents and/or environmental releases.

## Environmental Testing

9.   Knowledge regarding your organization's methods and procedures for running and interpreting environmental monitoring equipment, effluent or other waste testing at the West Lake Landfill.

10.   Knowledge of the results of any such testing or analysis performed relating in any way to the West Lake Landfill.

## Environmental Safety & Health

11.   Knowledge of, and the date of promulgation of, any and all guidelines, procedures, and/or protocols that have been proposed and/or implemented by you or any subsidiary, division, department, person, or other entity of your organization related to the identification, handling, transportation, disposal and/or minimization of exposures to wastes, radioactive materials, effluents or discharges from the West Lake Landfill.

12.   Knowledge regarding environmental and/or human health risks and/or risk assessments and/or dose assessments associated with radioactive materials and/or wastes released by the West Lake Landfill.

## Statutory/Regulatory Compliance/Surveys/Environmental Testing

13.   Knowledge regarding any program, protocol or procedure of acquiring, collecting and/or disseminating information regarding the existence, quantities, concentrations, levels or

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

other characteristics of any and all wastes produced and/or emissions from the West Lake Landfill.

14.   Knowledge, as possessed by a member of your organization whose job description pertains to statutory compliance and/or regulatory compliance issues, regarding the regulatory and/or statutory requirements of the following agencies and/or regulations as they pertain to your operations at the West Lake Landfill:

    (a)    The United States Environmental Protection Agency;
    (b)    the Regulations for Control of Radiation in Missouri;
    (c)    the United States Nuclear Regulatory Commission; and
    (d)    all agencies responsible for environmental protection and/or regulations in Missouri.

15.   Knowledge regarding the contents and requirements of any and all permits and licenses possessed by your organization in relation to any operation or facility at the West Lake Landfill, and all radioactive material licenses possessed by your organization anywhere in the United States.

16.   Knowledge of any violations by you of any state or federal regulations or laws and/or the terms of your licenses as a result of your activities associated at the West Lake Landfill.

## Research & Development

17.   Knowledge regarding the radiological properties or character of any and all liquid, solid, or gaseous environmental releases that may have knowingly or unknowingly been released from the confines of the West Lake Landfill into the surrounding communities.

18.   Knowledge regarding the non-radiological chemical properties or composition of environmental releases from the West Lake Landfill.

## Waste Cleanups/Storage Facilities

19.   Knowledge regarding the facts and circumstances surrounding any cleanup of any waste or contaminant, disposal site or waste storage facility owned and/or operated by you since you began operations at the West Lake Landfill.

20.   Knowledge regarding the location, design, licensing and/or permitting, and origin of wastes related to Uranium processing at the West Lake Landfill.

21.   Knowledge regarding your organization's policies and procedures for conducting

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

cleanups, pre- and post-cleanup investigations, worker training, transportation and security with regard to radiological and non-radiological wastes.

## Libraries/Record Keeping

22. Knowledge regarding the locations of all libraries maintained by your organization that contain publications, periodicals and/or treatises related to operations at the West Lake Landfill.

23. Knowledge regarding the locations and/or dispositions of all files related to operations that have been conducted by or for you at the West Lake Landfill which relate in any way to the issues identified in Exhibit "A", and/or the documents requested in Exhibit "B".

24. Knowledge of the current location and status of all documents requested by plaintiffs in their request for production of documents.

25. Master index for all microfiche and microfilm documents for the West Lake Landfill stored anywhere in the West Lake Landfill system, and any contract storage facility.

## Insurance Coverage

26. Please identify all insurance policies which may provide coverage for the incident at issue.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**Exhibit "B"**

**Corporate Structure/Status**

Please produce the following:

1.      Any and all documents evidencing:

      (a)      Your legal status (e.g. corporation, partnership, etc.);

      (b)      The state in which you are incorporated;

      (c)      Organizational charts or other documents evidencing the identities, title, and last known address of each of your personnel that has had principal responsibilities regarding the following in relation to your operations in the state of Missouri since the time your organization began operations at the West Lake Landfill:

            1)      management of operations;
            2)      running, analysis, and/or interpretation of all testing for effluents of any kind;
            3)      worker and public safety;
            4)      environmental regulatory compliance; and
            5)      budgeting and/or accounting.

      (d)      Ownership interest in you;

      (e)      Ownership interest in the West Lake Landfill.

**Operations**

2.      Any and all documents evidencing your organization's procedures for conducting operations from the time of your beginning operations until the present, including but not limited to operating licenses; and any operation involving the storage, handling, transportation, release and/or disposal of wastes and/or radioactive materials.

3.      Legible copies of any and all operating licenses in effect for the West Lake Landfill and all amendments thereto.

4.      Legible copies of any and all NRC approved deviations from any and all NRC regulations, including but not limited to General Design Criteria.

5.      Legible copies of any and all handwritten, printed and electronic working papers,

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

correspondence and meeting notes to and from all vendors and subcontractors who have been retained by the West Lake Landfill to measure radioactive material samples or calibrate instruments at any facility, such as an offsite laboratory, that is not owned by Rock Road Industries, Inc..

6.  Legible copies of any and all Corrective Action Requests (CARs), Licensing Event Reports (LERs) or named equivalent reports, incident reports and correspondence with any and all federal and state agencies regarding any and all problems with the West Lake Landfill, including but not limited to any and all liquid, solid, or gaseous releases from the West Lake Landfill that may have knowingly or unknowingly been released from the confines of the site.

7.  Legible copies of any and all correspondence and documents including handwritten, printed and electronic working papers, correspondence, meeting notes with, between and among the Rock Road Industries, Inc. and all federal and state agencies regarding the West Lake Landfill.

## Environmental Testing

8.  Any and all of your organization's methods and procedures for running and interpreting environmental monitoring equipment, effluent or other waste testing at the West Lake Landfill.

9.  Produce all such results of any testing or analysis performed in relation to the West Lake Landfill at any time.

## Environmental Safety & Health

10. Any and all guidelines, procedures, and/or protocols that have been proposed and/or implemented by you or any subsidiary, division, department, person, or other entity of your organization related to the identification, handling, transportation, disposal and/or minimization of exposures, wastes, effluents, radioactive materials or discharges at and from the West Lake Landfill.

11. Any and all documents describing or discussing environmental and/or human health risks and/or risk assessments and/or dose assessments associated with radioactive materials released by the West Lake Landfill.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**Statutory/Regulatory Compliance/Surveys/Environmental Testing**

12. Any and all documents evidencing or comprising any program, protocol or procedure of acquiring, collecting and/or disseminating information regarding the existence, quantities, concentrations, levels or other characteristics of any and all wastes and/or radioactive materials produced and/or emissions from the West Lake Landfill.

13. Legible copies of any and all documentation relating to choosing receptor organisms and locations for the Offsite Radiological Monitoring Programs, as well as all material used in the creation and development of all Offsite Radiological Monitoring Programs, including all handwritten, printed and electronic working papers, correspondence, meeting notes, and test results, regarding the West Lake Landfill.

14. Any and all documents comprising or evidencing the applicability of the following agencies and/or regulations to your operations at the West Lake Landfill:

    (a)   The United States Environmental Protection Agency;
    (b)   the Regulations for Control of Radiation in Missouri;
    (c)   the United States Nuclear Regulatory Commission; and
    (d)   all agencies responsible for environmental protection in Missouri.

15. Any and all documents related to and/or comprising all permits and licenses, including but not limited to radioactive materials licenses and permits, possessed by your organization in relation to any operation or facility in the State of Missouri.

16. Any and all documents evidencing alleged violations by you of any state or federal regulations or laws as a result of contamination at or from the West Lake Landfill.

---

**Research & Development**

17. Any and all documents discussing the radiological properties or character of environmental releases from the West Lake Landfill including any and all liquid, solid, or gaseous releases from the West Lake Landfill that may have knowingly or unknowingly been released from the confines of the site.

18. Any and all documents evidencing and/or discussing the nonradiological chemical properties or composition of environmental releases from the West Lake Landfill.

---

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**Waste Cleanups/Storage Facilities**

19.   Any and all documents evidencing the cleanup of any waste or contaminant, disposal site or waste storage facility and/or holding facilities owned and/or operated by you since you began operations at the West Lake Landfill.

20.   Any and all documents evidencing the location, design, licensing and/or permitting, and origin of wastes and/or radioactive materials related to the West Lake Landfill.

21.   Any and all documents evidencing and/or comprising any policies and procedures for conducting cleanups, pre- and post-cleanup investigations, worker training, effluent release monitoring, transportation and security with regard to radiological and non-radiological wastes.

22.   Any and all internally generated or consultant test results and/or consultant reports related to the environmental conditions at or around the West Lake Landfill.

**Libraries/Recordkeeping**

23.   Any and all lists or indexes of publications, periodicals and/or treatises related to operations at the West Lake Landfill.

24.   Any and all files related to operations that have been conducted by or for you at the West Lake Landfill which relate in any way to releases and/or discharges of radioactive material.

25.   Any and all files related to the knowledge of the current location and status of all documents requested by plaintiffs in their request for production of documents.

26.   Master index for all microfiche and microfilm documents for the West Lake Landfill stored anywhere in the West Lake Landfill system, and any contract storage facility.

**Insurance Coverage**

27.   Any and all insurance policies which may provide coverage for the claims stated herein.

**Public Relations**

28.   Any and all press releases relating to landfill opeations, including television ads,

Page 14 of 15

newspaper ads, computer ads, or any releases in any media whatsoever.

## Miscellaneous

29.   Curriculum vitae or resume of designated witnesses.

30.   Any and all documents reviewed by the designated witnesses in preparation for the depositions.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT E

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL DAILEY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )    Case No. 4:17 CV 24 CDP |
| | ) |
| BRIDGETON LANDFILL, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

## NOTICE OF RULE 30(B) (6) VIDEO DEPOSITION

TO:   **Cotter Corporation N.S.L.**
Through their counsel of record
John McGahren
MORGAN AND LEWIS, LLP
502 Carnegie Center
Princeton, NJ 08540-6241
609-919-6600
Email: jmcgahren@morganlewis.com

PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6) of the Federal Rules of

Procedure, the undersigned attorneys will take the video deposition of:

**Corporate Representative of Cotter Corporation N.S.L.**

**March 23, 2018 at 10:00 a.m.**

and continuing thereafter until completed at the offices of MORGAN AND LEWIS, LLP502

Carnegie Center , Kansas City, MO 64 Princeton, NJ 08540-6241, or at another mutually

agreeable time, date and location to be determined prior to the deposition, before a notary public

or another officer authorized to administer oaths. This oral examination is being taken for the

purpose of discovery, for use at trial, or for such other purposes as are permitted under the applicable Statutes or Rules of the Court.

Deponent is to produce a designated representative(s), who is/are knowledgeable and who has performed an investigation about the matters set for in Exhibit "A" and Exhibit "B" attached hereto.

Pursuant to Rule 34 of the Federal Rules of Civil Procedure, deponent is to produce within thirty days (on or before March 4, 2018) all documents, as defined herein, requested to be produced in Exhibit "B" attached hereto.

Respectfully submitted,

**Barry James Cooper, Jr. (pro hac vice)**
COOPER LAW FIRM, LLC
516 St. Philip St.
New Orleans, LA 70116
504-566-1558
Fax: 504-581-9055
Email: Bcooper@sch-llc.com

ATTORNEY FOR PLAINTIFFS

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been served upon counsel of record by electronic mail or by depositing same in the United States Mail, properly addressed and postage prepaid, this 2nd day of February, 2018.

**Barry James Cooper, Jr.**

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## INSTRUCTIONS

1. This discovery shall be deemed continuing, and supplemental answers shall be required if defendant, directly or indirectly, obtains further information of the nature sought herein between the time answers are served and the time of trial.

2. With respect to the production of any documents that are claimed to be privileged, a statement shall be provided by the attorneys for the respondent, setting forth as to each such documents, and, where applicable, each attachment thereto:

   (a) The name of the sender, if any, of the document;
   (b) The name of the author of the document;
   (c) The name of the person, if any, to whom the document and copies were sent;
   (d) The date of the document;
   (e) The date on which the document was received by those having possession of the document;
   (f) A description of the nature and the subject matter of the document;
   (g) The statute, rule or decision which is claimed to give rise to the privilege;
   (h) The last known custodian of the document and the present location of the document;
   (i) Attachments to the document;
   (j) The number of pages comprising the document;
   (k) Whether the document is handwritten, typewritten or other wise prepared; and
   (l) Any other information which is usable and identifiable and is necessary to identify the document.
   (m) Where appropriate, the singular form of a word shall be interpreted in the plural and vice versa.

3. All words and phrases shall be construed as masculine, feminine or neuter gender according to the context.

4. The terms "and" and "or" shall be construed either disjunctively or conjunctively if necessary to bring within the scope of this subpoena and/or request for production of documents any matters which might otherwise be misconstrued to be outside of the scope of the subpoena and/or request for production of documents.

## DEFINITIONS

5. When used herein, the term "Defendant", "You", "Your", shall refer to the person, corporation or other entity that is subject to service of these discovery requests, and in addition to the said Defendant, shall include counsel for Defendant, and all agents, servants, employees, representatives, predecessors in interest, successors in interest, sister or subsidiary companies or corporations, experts, private investigators, and others who are in possession of or may have obtained information for or on behalf of the

Page 4 of 16

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Defendant or are in possession of documents or information that Defendant has under its control.

6. "You" in its various forms such as "your" and "yourself" shall refer to Defendant, and all present and former agents, employees, representatives, attorneys, custodians of records, and all other person acting or who have acted on behalf of such person or corporation.

7. "Documents" shall mean or refer to all authentic written or graphic matter of every kind or description, however produced or reproduced, whether draft or final, original or reproduction, and all tangible things within the scope of the Louisiana Rules of Civil Procedure, specifically including, but not limited to, writings, graphs, charts, photographs, telephone records, data compilations (from which information can be obtained, translated, if necessary, by the respondent due to detection devices and to reasonably useable form), letters, correspondence, memoranda, minutes, notes, post-its, contracts, agreements, memoranda of conversations, films, transcripts, micro film, desk calendars, appointment books, diaries, time sheets, laboratory books, laws, bulletins, circulars, notices, rules, regulations, prospects, directions, teletype messages, interoffice communications, intra-office communications, reports, company work sheets, credit files, evidence of indebtedness, negotiable instruments, telegrams, mailgrams, books, news releases, newspapers, magazines, advertisements, periodicals, pamphlets, sketches, drawings, statements, reports, articles, articles of incorporation, by-laws, directives, minutes of meetings, balance sheets, income and loss statements, profit and loss statements, inventories, operating budgets, accounting work sheets, financial statements, ledgers, journals, books of account, bills, vouchers, bank checks, proposals, offers, orders, acknowledgments, receipts, invoices, checks, working papers, telephone messages (whether written or recorded), note books, post cards, evaluations, recommendations, annual reports, evaluations, confirmations, leases, analysis, feasibility of market studies, disbursement request, orders, charts, graphs, indices, projections, forms, data sheets, data processing disc, readable computer produced interpretations thereof, booklets, articles, manuals, speeches, stenographic notes, maps, studies, tests, log books, daily or other periodical reports, well logs, ledgers, surveys, cables, tape and disc recordings (both audio and video), blue prints, containers, cartons, package labels, slides, auto reports, tender offers or invitations, personal interviews, and summaries, abstracts, compilations or paraphrases of any of the foregoing, or materials similar to the foregoing, however denominated, which are in the possession, custody or control of the party upon whom the subpoena or notice is served or to which said party can obtain access. This subpoena and/or request for production of documents calls for originals, unless otherwise specified and for copies as noted when originals are not available. If a document is prepared in several copies, or additional copies have been made and the copies are not identified (or by reasons of subsequent modification of the copy by additions or notations, or other modifications are no longer identical), each non-identical copy is a separate document.

## EXHIBIT "A"

Please produce a representative(s) who is most knowledgeable with regard the following:

### Corporate Structure/Status

1.  Knowledge regarding:

    (a)  Your legal status (e.g. corporation, partnership, etc.) and the identity of any and all entities or persons which have ever had a ownership interest in you;

    (b)  Your legal domicile and the state in which you are incorporated;

    (c)  The nerve-center and/or site of principal policy decision making for the following facets of your organization: (1) corporate policy; (2) operations; (3) worker and public safety; (4) environmental regulatory compliance; (5) budgeting and/or accounting; (6) research and development;

    (d)  The locations of all of your headquarter offices, business offices or centers, regional or unit offices, research facilities, in the United States;

    (e)  The identities of any of your parent, subsidiary, successor, and/or sibling companies, corporations or related entities, and the relationship between you and that entity;

    (f)  The management hierarchy for the operations, safety, research, and training facets of your organization related in any way to operations related to the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site for each year since the operations of you or any of your predecessors, successors, parents, siblings or affiliates began at any of the above named sites.

    (g)  The identities, last known address and telephone number, titles and/or job descriptions of each of your personnel that has had principal responsibilities regarding the following in relation to your operations at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site:

        1)  management of operations;

        2)  management of health physics;

        3)  management of radiation protection;

Page 6 of 16

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

4)  management of radiation chemistry;

5)  running, analysis and/or interpretation of all testing for environmental releases of any kind including calibration of radiation monitoring devices;

6)  worker and public safety;

7)  environmental regulatory compliance; and

8)  budgeting and/or accounting.

### Operations

2.  Knowledge, as possessed by a senior manager and/or engineer within your organization, regarding your organization's operations and procedures at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site for minimization of environmental releases from the time of your beginning operations at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site until the present, including but not limited to operating licenses and any operation involving the storage, handling, transportation and/or disposal of wastes of any kind.

3.  Knowledge of operating licenses in effect for the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

4.  Knowledge of vendors and subcontractors who have been retained by Cotter Corporation N.S.L to measure radioactive material samples or calibrate instruments at any facility, such as an offsite laboratory, that is not owned by Cotter Corporation N.S.L.

5.  Knowledge of Corrective Action Requests (CARs), Licensing Event Reports (LERs) or named equivalent reports, facility incident reports and correspondence with any and all federal and state agencies regarding any and all problems with the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

6.  Knowledge regarding any and all communications discussing or relating to waste materials, environmental releases, effluents and/or operational problems at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site that have taken place between you and any of the following:

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

(a)     Any employee or subdivision of your company or organization;

(b)     Any other defendant in this action;

(c)     Any agency of any state or the federal government;

(d)     Any service company or contractor that has performed any operation or procedure on any item of equipment that is the source of any waste material, environmental releases, and/or effluents at St. Lucie; and

(e)     Any industry or trade organization.

7.     Knowledge regarding any and all guidelines, procedures, and/or protocols that have been implemented and/or proposed related to worker training or safety with regard to:

> Handling transportation, disposal and/or minimization of exposures to radioactive materials or other harmful or hazardous wastes and/or effluents and/or environmental releases.

## Environmental Testing

8.     Knowledge regarding your organization's methods and procedures for running and interpreting environmental testing or other waste testing at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site

9.     Knowledge of the results of any such testing or analysis performed relating in any way to the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

## Environmental Safety & Health

10.     Knowledge of, and the date of promulgation of, any and all guidelines, procedures, and/or protocols that have been proposed and/or implemented by you or any subsidiary, division, department, person, or other entity of your organization related to the identification, handling, transportation, disposal and/or minimization of exposures to wastes, radioactive materials, effluents or discharges from the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

11.    Knowledge regarding environmental and/or human health risks and/or risk assessments and/or dose assessments associated with radioactive materials and/or wastes released by the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

### Statutory/Regulatory Compliance/Surveys/Environmental Testing

12.    Knowledge regarding any program, protocol or procedure of acquiring, collecting and/or disseminating information regarding the existence, quantities, concentrations, levels or other characteristics of any and all wastes produced and/or emissions from the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

13.    Knowledge, as possessed by a member of your organization whose job description pertains to statutory compliance and/or regulatory compliance issues, regarding the regulatory and/or statutory requirements of the following agencies and/or regulations as they pertain to your operations related to the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

    (a)    The United States Environmental Protection Agency;
    (b)    the Regulations for Control of Radiation in Missouri;
    (c)    the United States Nuclear Regulatory Commission; and
    (d)    all agencies responsible for environmental protection and/or regulations in Missouri.

14.    Knowledge regarding the contents and requirements of any and all permits and licenses possessed by your organization in relation to any operation related to the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site and all radioactive material licenses possessed by your organization anywhere in the United States.

15.    Knowledge of any violations by you of any state or federal regulations or laws and/or the terms of your licenses as a result of your activities associated at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

### Research & Development

16.    Knowledge regarding the radiological properties or character of any and all radioactive material that you purchased and/or sold to or from the West Lake Landfill, the Bridgeton

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

17.  Knowledge regarding the non-radiological chemical properties or composition of any and all radioactive material that you purchased and/or sold to or from the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

## Waste Cleanups/Storage Facilities

18.  Knowledge regarding the facts and circumstances surrounding any cleanup of any waste or contaminant, disposal site or waste storage facility at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

19.  Knowledge regarding the location, design, licensing and/or permitting, and origin of wastes related to Uranium processing at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

20.  Knowledge regarding your organization's policies and procedures for conducting cleanups, pre- and post-cleanup investigations, worker training, transportation and security with regard to radiological and non-radiological wastes.

## Libraries/Record Keeping

21.  Knowledge regarding the locations of all libraries maintained by your organization that contain publications, periodicals and/or treatises related to operations at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

22.  Knowledge regarding the locations and/or dispositions of all files related to operations that have been conducted by or for you at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site which relate in any way to the issues identified in Exhibit "A", and/or the documents requested in Exhibit "B".

23.  Knowledge of the current location and status of all documents requested by plaintiffs in their request for production of documents.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## Insurance Coverage

24.   Please identify all insurance policies which may provide coverage for the incident at issue.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

**Exhibit "B"**

---

**Corporate Structure/Status**

Please produce the following:

1.    Any and all documents evidencing:

   (a)    Your legal status (e.g. corporation, partnership, etc.);

   (b)    The state in which you are incorporated;

   (c)    Organizational charts or other documents evidencing the identities, title, and last known address of each of your personnel that has had principal responsibilities regarding the following in relation to your operations in the state of Missouri since the time your organization began operations at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site:

   1)    management of operations;
   2)    running, analysis, and/or interpretation of all testing for effluents of any kind;
   3)    worker and public safety;
   4)    environmental regulatory compliance; and
   5)    budgeting and/or accounting.

   (d)    Ownership interest in you;

   (e)    Ownership interest in the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

---

**Operations**

2.    Any and all documents evidencing your organization's procedures for conducting operations from the time of your beginning operations until the present, including but not limited to operating licenses; and any operation involving the storage, handling, transportation, release and/or disposal of wastes and/or effluents.

3.    Legible copies of any and all operating licenses in effect that relate to the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

the Hazelwood Interim Storage Site and all amendments thereto.

4. Legible copies of any and all NRC approved deviations from any and all NRC regulations, including but not limited to General Design Criteria.

5. Legible copies of any and all handwritten, printed and electronic working papers, correspondence and meeting notes to and from all vendors and subcontractors who have been retained by the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site to measure radioactive material samples or calibrate instruments at any facility, such as an offsite laboratory, that is not owned by Cotter Corporation N.S.L.

6. Legible copies of any and all Corrective Action Requests (CARs), Licensing Event Reports (LERs) or named equivalent reports, incident reports and correspondence with any and all federal and state agencies regarding any and all problems with the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site, including but not limited to any and all liquid, solid, or gaseous releases from the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site that may have knowingly or unknowingly been released from the confines of the site.

7. Legible copies of any and all correspondence and documents including handwritten, printed and electronic working papers, correspondence, meeting notes with, between and among the Cotter Corporation N.S.L and all federal and state agencies regarding the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site

## Environmental Testing

8. Any and all of your organization's methods and procedures for running and interpreting environmental monitoring equipment, effluent or other waste testing in relation to the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

9. Produce all such results of any testing or analysis performed in relation to the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site at any time.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

**Environmental Safety & Health**

10.   Any and all guidelines, procedures, and/or protocols that have been proposed and/or implemented by you or any subsidiary, division, department, person, or other entity of your organization related to the identification, handling, transportation, disposal and/or minimization of exposures, wastes, effluents or discharges at and from the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

11.   Any and all documents describing or discussing environmental and/or human health risks and/or risk assessments and/or dose assessments associated with radioactive materials found at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

---

**Statutory/Regulatory Compliance/Surveys/Environmental Testing**

12.   Any and all documents evidencing or comprising any program, protocol or procedure of acquiring, collecting and/or disseminating information regarding the existence, quantities, concentrations, levels or other characteristics of any and all wastes produced and/or emissions from the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site

13.   Any and all documents comprising or evidencing the applicability of the following agencies and/or regulations to your operations related to the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site:

  (a)   The United States Environmental Protection Agency;
  (b)   the Regulations for Control of Radiation in Missouri;
  (c)   the United States Nuclear Regulatory Commission; and
  (d)   all agencies responsible for environmental protection in Missouri.

14.   Any and all documents related to and/or comprising all permits and licenses, including but not limited to radioactive materials licenses and permits, possessed by your organization in relation to any operation or facility in the State of Missouri.

15.   Any and all documents evidencing alleged violations by you of any state or federal regulations or laws as a result of contamination at or from the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site

---

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

### Research & Development

16.   Any and all documents discussing the radiological properties or character of environmental releases from the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site including any and all liquid, solid, or gaseous releases from the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site that may have knowingly or unknowingly been released from the confines of the sites.

17.   Any and all documents evidencing and/or discussing the nonradiological chemical properties or composition of environmental releases from the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

### Waste Cleanups/Storage Facilities

18.   Any and all documents evidencing the cleanup of any waste or contaminant, disposal site or waste storage facility and/or holding facilities owned and/or operated by you since you began operations.

19.   Any and all documents evidencing the location, design, licensing and/or permitting, and origin of wastes related to Uranium processing at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

20.   Any and all documents evidencing and/or comprising any policies and procedures for conducting cleanups, pre- and post-cleanup investigations, worker training, effluent release monitoring, transportation and security with regard to radiological and non-radiological wastes.

21.   Any and all internally generated or consultant test results and/or consultant reports related to the environmental conditions at or around the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

### Libraries/Recordkeeping

22.   Any and all lists or indexes of publications, periodicals and/or treatises related to operations at the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site,

the Latty Avenue Sites and the Hazelwood Interim Storage Site.

23. Any and all files related to operations that have been conducted by or for you related to the West Lake Landfill, the Bridgeton Landfill, the St. Louis Airport Site, the Latty Avenue Sites and the Hazelwood Interim Storage Site.

24. Any and all files related to the knowledge of the current location and status of all documents requested by plaintiffs in their request for production of documents.

## Insurance Coverage

25. Any and all insurance policies which may provide coverage for the claims stated herein.

## Public Relations

26. Any and all press releases relating to your operations, including television ads, newspaper ads, computer ads, or any releases in any media whatsoever.

## Miscellaneous

27. Curriculum vitae or resume of designated witnesses.

28. Any and all documents reviewed by the designated witnesses in preparation for the depositions.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:17 CV 24 CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## **AMENDED CASE MANAGEMENT ORDER**

As discussed with counsel in the telephone conference held **March 5, 2018**,

**IT IS HEREBY ORDERED** that plaintiffs' amended motion for an

extension of time of initial case management order schedule [#109] is **GRANTED**

**in part** as follows:

1.    The parties shall complete all discovery related to the samples collected at Plaintiffs' home and property, and the issue of whether the levels of radioactive contamination are sufficient to show a PAA violation, no later than **May 2, 2018**.

2.    Any motions for summary judgment or motions for judgment on the pleadings pertaining to the issue of whether plaintiffs can show levels of radioactive contamination sufficient to show a violation of the PAA must be filed no later than **June 4, 2018**.  Opposition briefs shall be filed no later than thirty days after the motion or **July 5, 2018**, whichever is earlier. Any reply brief may be filed no later than ten days following the response brief or **July 16, 2018**, whichever is earlier.

**IT IS FURTHER ORDERED** that plaintiffs' first motion for an extension

of time of initial case management order schedule [#108] is **DENIED as moot**.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

All other provisions of the Initial Case Management Order [ECF # 102] remain in full force and effect.

Failure to comply with any part of this order may result in the imposition of sanctions.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 6th day of March, 2018.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL DAILEY and ROBBIN DAILEY, | Case No. 4:17-cv-00024-CDP |
| Plaintiffs, | |
| v. | |
| BRIDGETON LANDFILL, LLC, REPUBLIC SERVICES, INC. ALLIED SERVICES, LLC, ROCKROAD INDUSTRIES, INC., MALLINCKRODT, LLC, and COTTER CORPORATION, | |
| Defendants. | |

## STIPULATION OF DISMISSAL WITH PREJUDICE

COMES NOW, Plaintiffs Michael and Robbin Dailey and Defendant Mallinckrodt LLC ("Mallinckrodt") by and through their attorneys of record, and file their stipulation of dismissal of the claims of Michael and Robbin Dailey against Mallinckrodt only, with prejudice. Each party to pay their own costs. Plaintiffs specifically reserve their claims against all Defendants that are not Mallinckrodt.

**IT IS SO STIPULATED.**

Dated: March 16, 2018           Respectfully submitted,

/s/ David R. Erickson
SHOOK, HARDY & BACON LLP
David R. Erickson, # 31532MO
Steven D. Soden, # 41917MO
2555 Grand Boulevard
Kansas City, MO 64108-2613
Telephone: 816.474.6550
Facsimile: 816.421.5547
derickson@shb.com
ssoden@shb.com

ATTORNEYS FOR DEFENDANT
MALLINCKRODT LLC

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

/s/ Celeste Brustowicz
COOPER LAW FIRM, LLC
Barry J. Cooper Jr.
508 St. Phillip Street
New Orleans, LA 70116

Celeste Brustowicz
1525 Religious Street
New Orleans, LA 70130

KEANE LAW LLC
Ryan Keane
7777 Bonhomme Ave #1600
Clayton, MO
Telephone: 314-240-5278
ryan@keanelawllc.com

JOHNSON GRAY LLC
Anthony Gray
7710 Carondelet Avenue
Clayton, MO 63105
Telephone: (314) 385-9500

ATTORNEYS FOR PLAINTIFFS
MICHAEL AND ROBBIN DAILEY

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## CERTIFICATE OF SERVICE

I hereby certify that on March 16, 2018, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

/s/ David R. Erickson
Attorney for Defendant
Mallinckrodt LLC

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL DAILEY, et al.,                    )
                                           )
        Plaintiffs,                        )
                                           )
        v.                                 )        Case No. 4:17 CV 24 CDP
                                           )
BRIDGETON LANDFILL, LLC, et al.,           )
                                           )
        Defendants.                        )

## PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT TO DISMISS PRICE-ANDERSON ACT CLAIMS AND REINSTATE STATE LAW CLAIMS, MOTION TO REMAND, MOTION TO STAY PENDING DISCOVERY AND ALTERNATIVELY MOTION TO AMEND CASE MANAGEMENT ORDER

Come now, Robbin and Michael Dailey, through undersigned counsel, and hereby move this court for an order: 1) granting leave to amend Plaintiffs' Complaint to eliminate Price-Anderson Act ("PAA") claims and reinstate state law claims; 2) remanding this matter to state court; 3) staying pending discovery deadlines while Court determines whether jurisdiction is proper; and alternatively; 4) amending Case Management Order to focus on the *release* of radiation constituting PAA violation.

This matter was initially filed in the 21st Judicial Circuit of the State of Missouri alleging numerous state law claims related to radioactive wastes that were dumped in the West Lake Landfill.[1]  Defendants' filed a Notice of Removal based on the argument that this Court has subject matter jurisdiction over this action because it arises under the Price-Anderson Act.[2]

---

[1] ECF No. 17 - Plaintiffs' Original State Court Petition.
[2] ECF No. 1 - Notice of Removal.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Plaintiffs' prior lead counsel filed a Motion to Remand but withdrew said motion before the Court made a ruling. On the record as it existed, both Defendants' counsel and Plaintiffs' prior lead counsel believed that the PAA applied giving this Court federal subject matter jurisdiction. Thereafter, Plaintiffs' prior lead counsel erroneously amended the state court Petition to assert PAA claims based on the same facts and circumstances alleged in the Original Petition.[3]

Undersigned counsel only recently became involved in this matter as evidenced by our recent motions for pro hac vice admission[4] and our first motion to this court to extend the initial CMO deadlines.[5] Undersigned counsel have now had the opportunity to review file materials and confer at length with defense counsel about the applicability of the PAA. Undersigned counsel believes and submits via this motion that the PAA does not apply to these Defendants under the circumstances sued on.

Federal courts are courts of limited jurisdiction and "they possess only that power authorized by Constitution and statute."[6] All doubt must be resolved against federal jurisdiction.[7] "If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."[8]

The issue at this stage is not "whether plaintiffs' soil, dust, and runoff samples can prove radioactive contamination levels sufficient to show a violation of the Price-Anderson Act" as indicated in this Court's Initial CMO,[9] but rather, whether the PAA even applies to this case and whether this court has subject matter jurisdiction. While this Court has considered whether the

---

[3] ECF No. 70 - Plaintiffs Amended Complaint.
[4] ECF Nos. 103, 110, and 113 - Motions for Pro Hac Vice Admission
[5] ECF Nos. 108 and 109 - Motion for Extension of CMO and Amended Motion for Extension of CMO.
[6] *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).
[7] *Kirkland v. Wyeth (In re Prempro Prods. Liab. Litig.),* 591 F. 3d 613, 620 (8th Cir. 2010)
[8] 28 U.S.C. § 1447(c).
[9] ECF No. 102 - Initial Case Management Order.

PAA preempts state law when the PAA is plead, this Court has not considered whether the PAA should apply in the first place. Before determining whether there is contamination sufficient to show a violation of the PAA, the Court must first determine whether Plaintiffs' causes of action are as a matter of law PAA claims under the terms of 42 U.S.C. §§ 2210(n)(2) and 2014(hh).

Plaintiffs' contend that the PAA does not apply and this Court lacks subject matter jurisdiction, requiring that this matter be remanded. Accordingly, Plaintiffs bring this motion for leave to file an amended complaint eliminating their PAA claims and reinstating their state law claims and motion to remand this matter to state court. While this Court considers whether it has jurisdiction, the current CMO deadlines and the depositions currently scheduled should be stayed until these issues are briefed, argued and determined.[10] Alternatively, at the very least, the current CMO should be amended to reflect the appropriate standard for a breach of the PAA.

This motion is based on Judge Jean C. Hamilton's ruling in *Strong v. Republic Servs., Inc.*, 2017 WL 4758958 (E.D. Mo. 2017). The *Strong* case deals with the exact same landfills and radioactive waste at issue in this matter as well as many of the same Defendants. The *Strong* court determined that: 1) there cannot be federal jurisdiction under the PAA without a license or an indemnity agreement; and 2) Cotter's 1969 Source Material License does not apply to Plaintiffs' claim because the license does not cover uranium mill tailings.[11] Based on these holdings, the *Strong* Court remanded the case back to state court based on lack of jurisdiction.

As discussed in *Strong*, it is implicit in the legislative history of the PAA that the terms "nuclear incident" and "occurrence" are inextricably intertwined with licenses and indemnification agreements, suggesting licenses and indemnification agreements are an integral part of the PAA's

---

[10] Depositions of Plaintiffs, Robbin and Michael Dailey, and expert, Marco Kaltofen, currently scheduled for the third week of April.
[11] *Strong v. Republic Servs., Inc.*, 2017 WL 4758958 (E.D. Mo. 2017).

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

statutory scheme and that there cannot be a "nuclear incident" without an applicable license or indemnity agreement.

After determining that a license or indemnity agreement is required for the PAA to apply, the *Strong* Court then considered whether Cotter's 1969 Source Materials License would be sufficient to confer jurisdiction. The court reasoned that in 1969 when Cotter received the license and in 1973 when the radioactive waste at issue were dumped in the West Lake Landfill, the definition of "byproduct material" did not include uranium or thorium mill tailings. It was not until 1978 that Congress amended the definition of "byproduct material" to include uranium and thorium mill tailings.[12] Moreover, the Uranium Mill Tailing Radiation Control Act of 1978 ("UMTRCA"), which first included uranium mill tailings in the definition of byproduct material, states that the amendments "shall take effect on the date of the enactment of the Act."[13] Based on this analysis, the *Strong* court concluded that "Cotter's 1969 Source Material License could not have covered uranium mill tailings."[14]

Even if this Court determines that the PAA applies and that jurisdiction is proper, the CMO should be amended to reflect the appropriate standard for a breach of the PAA as discussed in *McClurg v. Mallinckrodt, Inc.*, No. 4:12-CV-00361-AGF, 2017 WL 2929444 (E.D. Mo. July 7, 2017). In *McClurg,* the Court held that "the regulations provide that a breach occurs whenever excessive radiation is released, whether or not anyone is present in the area exposed."[15] Thus, if it is determined that the PAA applies and jurisdiction is proper, the CMO should focus on the *release*

---

[12] 42 U.S.C. § 2014(e)(2). See *Kerr–McGee Chem. Corp. v. U.S. Nuclear Regulatory Comm'n,* 903 F.2d 1, 2–3 (D.C. Cir. 1990)
[13] PL 95–604 (HR 13650), Nov. 8, 1978, 92 Stat. 3021, Title II—Uranium Mill Tailings Licensing and Regulation Definition, Sec. 208.
[14] *Strong v. Republic Servs., Inc.*, 2017 WL 4758958 (E.D. Mo. 2017)
[15] *McClurg v. Mallinckrodt, Inc.*, No. 4:12-CV-00361-AGF, 2017 WL 2929444, at *6 (E.D. Mo. July 7, 2017

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

of radioactive materials as opposed to whether plaintiffs' soil, dust, and runoff samples can prove radioactive contamination levels sufficient to show a violation of the PAA.

WHEREFORE, Plaintiffs respectfully submit that good grounds exist for this Court to determine that the PAA does not apply in this matter because Defendants do not possess an appropriate license or indemnity agreement to trigger the PAA. Plaintiffs' should be granted leave to amend their Complaint to eliminate the erroneous PAA claims and reinstate their state law claims and this Court should remand this matter back to state court based upon lack of jurisdiction. The current CMO deadlines and depositions scheduled should be stayed while this Court determines whether the PAA applies here and that jurisdiction is proper. At the very least, the CMO should be amended to reflect the appropriate standard for a breach of the PAA which focuses on the "release" of radiation as discussed in *McClurg v. Mallinckrodt, Inc.*, No. 4:12-CV-00361-AGF, 2017 WL 2929444 (E.D. Mo. July 7, 2017).

## ORAL ARGUMENT REQUESTED

Pursuant to Local Rule 78-4.02, Plaintiffs request oral argument on their Motion for Leave to Amend Complaint to Dismiss Price-Anderson Act Claims and Reinstate State Law Claims, Motion to Remand, Motion to Stay Pending Discovery and Alternatively Motion to Amend Case Management Order. Oral argument is warranted to provide the opportunity to discuss the complex issues presented, the parties' position on these issues, and the cited case law. In particular, oral argument will afford the parties an opportunity to discuss and answer any questions the Court may have regarding these issues.

[*Certificate and Signature on Following Page*.]

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Respectfully submitted,

*/s/ Celeste Brustowicz*
Barry J. Cooper, Jr. (LSBA 27202), *Pro Hac Vice*
Celeste Brustowicz (LSBA 16835), *Pro Hac Vice*
Victor T. Cobb (LSBA 36830), *Pro Hac Vice*
**COOPER LAW FIRM, LLC**
1525 Religious Street
New Orleans, Louisiana 70130
E-mail: bcooper@sch-llc.com
            cbrustowicz@sch-llc.com
            vcobb@sch-llc.com

**ATTORNEYS FOR PLAINTIFFS,
MICHAEL AND ROBBIN DAILEY**

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2018, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

*/s/ Celeste Brustowicz*
Celeste Brustowicz (LSBA 16835)

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:17 CV 24 CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTIONS FOR LEAVE TO
AMEND COMPLAINT TO DISMISS PRICE-ANDERSON ACT CLAIMS AND
REINSTATE STATE LAW CLAIMS, TO REMAND, TO STAY PENDING DISCOVERY
AND ALTERNATIVELY TO AMEND CASE MANAGEMENT ORDER**

Federal courts of limited jurisdiction "possess only that power authorized by Constitution and statute."[1] All doubt must be resolved against federal jurisdiction.[2] Perhaps most importantly, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded."[3]

"At the threshold of every action asserting liability growing out of a nuclear incident, then, there is a federal definitional matter to be resolved: Is this a public liability action? If the answer to that question is 'yes,' the provisions of the Price-Anderson Act apply."[4] The real issue, despite Defendants' contentions here, is not "whether plaintiffs' soil, dust, and runoff samples can prove radioactive contamination levels sufficient to show a violation of the Price-Anderson Act" as per the Court's Initial Case Management Order ("CMO"),[5] but rather, whether the Price-Anderson Act

---

[1] *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994).
[2] *In re Prempro Prod. Liab. Litig.,* 591 F.3d 613, 620 (8th Cir. 2010).
[3] 28 U.S.C.A. § 1447(c).
[4] *In re TMI Litig. Cases Consol. II,* 940 F.2d 832, 855 (3d Cir. 1991)
[5] ECF No. 102 - Initial Case Management Order.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

("PAA") applies to the allegations made. The essence of the Daileys' complaint is that radioactive wastes were illegally dumped in an illegal landfill in 1973. While this Court determined the PAA preempts state law when the PAA is plead, this Court has not considered whether the PAA should apply in the first place. Before determining whether there is contamination sufficient to show a violation of the PAA, the Court must first determine whether Plaintiffs' causes of action are as a matter of law PAA claims under 42 U.S.C. §§ 2210(n)(2) and 2014(hh).

Plaintiffs' contend that the PAA does not apply, and this Court lacks subject matter jurisdiction requiring remand. Plaintiffs move for leave to file an amended complaint eliminating the erroneously added PAA claims and reinstating their state law claims and for remand. While this Court considers this complex-environmental toxic tort case, the current CMO deadlines and the depositions currently scheduled should be stayed until these issues are briefed, argued, and determined.[6] At the very least, the current CMO should be amended to reflect the correct standard for a breach of the PAA.[7]

As recognized by Judge Jean C. Hamilton in *Strong v. Republic Servs., Inc.,* 2017 WL 4758958 (E.D. Mo. 2017), a case dealing with the exact same landfill here, the PAA does not apply because the Defendants lack the appropriate federal license or indemnity agreement needed to trigger the PAA and its exclusive federal jurisdiction. Without an appropriate and applicable federal license or an indemnification agreement, there can be no "nuclear incident" and thus no "public liability action" under the PAA.  This issue has been extensively discussed with defense counsel without resolution, thus, Plaintiffs' bring the instant motion.

---

[6] Depositions of Plaintiffs, Robbin and Michael Dailey, and expert, Marco Kaltofen, currently scheduled for the third week of April.
[7] The initial PAA inquiry must focus on where the materials were released and not the Plaintiffs' property. *See McClurg v. Mallinckrodt, Inc.,* No. 4:12-CV-00361-AGF, 2017 WL 2929444 (E.D. Mo. July 7, 2017).

Even if this Court determines that the PAA applies as to Cotter (since the Landfill defendants cannot make such claim) and that jurisdiction is proper, the CMO should be amended to reflect the appropriate standard for a breach of the PAA as set forth in *McClurg v. Mallinckrodt, Inc.,* No. 4:12-CV-00361-AGF, 2017 WL 2929444 (E.D. Mo. July 7, 2017). There, the Court held that "the regulations provide that a breach occurs whenever excessive radiation is released, whether or not anyone is present in the area exposed."[8] If it is determined, contrary to the decision in *Strong*, that the PAA applies and jurisdiction is proper, the CMO should be amended to focus on the *release* of radioactive materials from Defendants' properties and not whether plaintiffs' soil, dust, and runoff samples can prove radioactive contamination levels sufficient to show a violation of the PAA. Since Defendants have, upon information and belief, already produced this information in other cases, there is absolutely no burden to them to reproduce the information here.

**I.  Procedural Background**:

Plaintiffs' initially filed this matter in the 21st Judicial Circuit of the State of Missouri alleging numerous state law claims arising out of 1973 illegal actions.[9] The claims were made against three groups of Defendants: 1) "Landfill Defendants"[10], 2) "Radioactive Waste Generator Defendants"[11] and 3) "Radioactive Waste Disposer Defendants"[12].

On December 15, 2016 Defendants' removed, arguing subject matter jurisdiction existed under the Price Anderson Act.[13] Defendants filed Motions to Dismiss on January 13, 2017.[14]

Thereafter, Plaintiffs' then lead counsel filed a Motion to Remand.[15]  Plaintiffs' then lead

---

[8] *McClurg*, 2017 WL 2929444, at *6.
[9] ECF No. 17 - Plaintiffs' Original State Court Petition.
[10] Bridgeton Landfill, LLC, Rock Road Industries, Inc., Republic Services, Inc. and Allied Services, LLC.
[11] MI Holdings and Mallinckrodt, Inc. Plaintiffs' settled this matter with Mallinckrodt.
[12] Cotter Corporation, Commonwealth Edison Company and Exelon Corporation.
[13] ECF No. 1 – Notice of Removal.
[14] ECF Nos. 28, 33, 34 – Defendants' Motions to Dismiss Original Complaint.
[15] ECF No. 48 – Plaintiffs' Motion to Remand.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

counsel filed a Motion to Withdraw the Motion to Remand on March 5, 2017, before this Court ever issued a ruling.[16]   Following that, Plaintiffs' then lead  counsel filed an Amended Complaint alleging PAA violations and numerous state law claims.[17] Undersigned counsel believes that the Amended Complaint was improper because this is not, in fact, a PAA case.

Defendants filed Motions to Dismiss the Amended Complaint on May 12, 2017.[18] Defendants Motions to Dismiss were fully briefed and the Court determined that "[a]lthough the Eighth Circuit has not addressed the issue of PAA preemption of state-law claims, numerous other courts have found that the PAA is the sole avenue for recovery when a public liability action for a nuclear incident is plead."[19] This Court agreed with the reasoning of those courts and dismissed Plaintiffs' state law claims determining that when the PAA is plead, as Plaintiffs' had done, it preempts all state law claims. The Court's decision did not determine whether the PAA applies in the first place.

The Court issued an Initial CMO determining that this is a complex litigation and allowed discovery only focusing on whether plaintiffs' soil, dust, and runoff samples can prove radioactive contamination levels sufficient to show a violation of the PAA.[20]  Plaintiffs' submit that the CMO incorrectly focuses on contamination samples from their property when it should focus on radioactive contamination released from Defendants' property.[21]

**II.    Legal Framework**:

Given the complicated history and structure of the PAA, a brief overview is necessary especially where courts have described the structure of the PAA as "complicated," "interlocking,"

---

[16] ECF No. 66 – Plaintiffs' Motion to Withdraw Motion to Remand.
[17] ECF No. 70 – Plaintiffs' Amended Complaint.
[18] ECF Nos. 71, 72 – Defendants Motions to Dismiss Amended Complaint.
[19] ECF No. 89 – Memo and Order.
[20] ECF No. 102 - Initial Case Management Order.
[21] *McClurg*, supra

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

and "us[ing] words in unintuitive ways."[22]

In 1954 Congress enacted the Atomic Energy Act ("AEA") to encourage the private sector to become involved in atomic energy. The AEA provided for federal regulation and licensing of private construction, ownership, and operation of commercial nuclear power reactors.[23] In 1957, Congress amended the AEA with the PAA "which provided certain federal licensees with a system of private insurance, government indemnification, and limited liability for claims of 'public liability.'"[24] The PAA "mandated that an assured 'pool' of available funds be established to cover certain liabilities which might arise out of the activities related to licenses."[25] In 1988, it was amended ("Amendments Act"), long after the 1973 illegal dumping and release to which the Daileys complain, to "alter the breadth of the compensation system to cover activity related to disposal of nuclear waste," to "create a federal cause of action," and to "channel[] liability to licensees."[26] The amendments also provided for "removal of, and original federal jurisdiction over, claims arising from a 'nuclear incident'"[27] As of 1973 when the remaining Defendants illegally dumped and released radioactive waste, no federal law or regulation covered their specific activities.

Under 10 C.F.R. § 40.3, "[a] person subject to the regulations in this part may not receive title to, own, receive, possess, use, transfer, provide for long-term care, deliver or dispose of byproduct material or residual radioactive material as defined in this part or any source material after removal from its place of deposit in nature, unless authorized in a specific or general license issued by the Commission under the regulations in this part.

---

[22] *Estate of Ware v. Hosp. of the Univ. of Pennsylvania,* 871 F.3d 273, 280 (3d Cir. 2017).
[23] *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n,* 461 U.S. 190, 103 S. Ct. 1713, 75 L. Ed. 2d 752 (1983).
[24] *El Paso Nat. Gas Co. v. Neztsosie,* 526 U.S. 473, 119 S. Ct. 1430, 143 L. Ed. 2d 635 (1999).
[25] *Gilberg v. Stepan Co.,* 24 F. Supp. 2d 325, 333 (D.N.J.), *supplemented,* 24 F. Supp. 2d 355 (D.N.J. 1998).
[26] *In re TMI Litigation Cases Consol. II,* 940 F.2d at 853–854.
[27] *Id.* at 853.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

The PAA's jurisdictional provision, 42 U.S.C.A. § 2210(n)(2), vests federal district courts with original jurisdiction over "any public liability action arising out of or resulting from a nuclear incident."

"Public liability action" is defined in 42 U.S.C.A. § 2014(hh) (West) as:

The term "public liability action", as used in section 2210 of this title, means any suit asserting public liability. A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section.

"Public liability" is defined in 42 U.S.C.A. § 2014(w) as:

any legal liability arising out of or resulting from a *nuclear incident* ... except ... (iii) whenever used in subsections (a), (c), and (k) of section 2210 of this title, claims for loss of, or damages to, or loss of use of property which is located at the site of and used in connection with the licensed activity where the nuclear incident occurs. 'Public liability' also includes damage to property of persons indemnified: Provided, That such property is covered under the terms of the financial protection required, except property which is located at the site of and used in connection with the activity where the nuclear incident occurs.

"Licensed activity" is defined in 42 U.S.C.A. § 2014(p) as "an activity licensed pursuant to this chapter and covered by the provisions of 42 U.S.C.A. § 2210(a) of this title."

"Nuclear incident" is defined in 42 U.S.C.A. § 2014(q) as:

any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of source, special nuclear, or byproduct material.... And provided further, That as the term is used in section 2210(c) of this title, it shall include any such occurrence outside both the United States and any other nation if such occurrence arises out of or results from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material licensed pursuant to subchapters V, VI, VII, and IX of this division, which is used in connection with the operation of a licensed stationary production or utilization facility or which moves outside the territorial limits of the United States in transit from one person licensed by the Nuclear Regulatory Commission to another person licensed by the Nuclear Regulatory Commission.

"Extraordinary nuclear occurrence" is defined in 42 U.S.C.A. § 2014(j) as:

any event causing a discharge or dispersal of source, special nuclear, or byproduct material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines to be substantial, and which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines has resulted or will probably result in substantial damages to persons offsite or property offsite..... The Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, shall establish criteria in writing setting forth the basis upon which such determination shall be made. As used in this subsection, "offsite" means away from "the location" or "the contract location" as defined in the applicable Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, indemnity agreement, entered into pursuant to section 2210 of this title.

"Person indemnified" is defined in 42 U.S.C.A. § 2014(t) as:

The term "person indemnified" means (1) with respect to a nuclear incident occurring within the United States or outside the United States as the term is used in section 2210(c) of this title, ... the person with whom an indemnity agreement is executed or who is required to maintain financial protection, and any other person who may be liable for public liability ....

## III. The Price-Anderson Act Does Not Apply Without an Appropriate License or Indemnity Agreement:

This is not a PAA case because the PAA does not apply unless a nuclear incident has occurred and been properly proven, and a nuclear incident by definition can only occur when Defendants are licensed participants in the nuclear industry or they are a party to an indemnification agreement under 42 U.S.C.A. § 2210. Without a federal license or an indemnification agreement, there is no "nuclear incident" and thus no "public liability action."

The issue is not "whether plaintiffs' soil, dust, and runoff samples can prove radioactive contamination levels sufficient to show a violation of the Price-Anderson Act" as indicated in this Court's Initial complex litigation CMO,[28] but rather, whether the PAA even applies. The current CMO does not address the threshold issue in this matter: do the Defendants have the appropriate

---

[28] ECF No. 102 - Initial Case Management Order.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

license or indemnity agreement that would trigger the PAA along with its exclusive federal jurisdiction?

This issue has not yet been considered here, but was considered by this Court in *Strong*, 2017 WL 4758958 - a case dealing with the exact same landfill and materials. After going through the PAA's legal framework and conducting an analysis of the facts, Judge Jean C. Hamilton determined that with respect to this landfill: 1) there cannot be federal jurisdiction under the PAA without a license or an indemnity agreement; and 2) Cotter's 1969 Source Material License does not apply to Plaintiffs' claim because the license does not cover uranium mill tailings.[29]

### a. Need for an Indemnity Agreement

In *Gilberg*, 24 F. Supp. 2d 325, the court held that for there to be a public liability action under the PAA, an indemnity agreement is required. In other words, there is no federal subject matter jurisdiction without an indemnity agreement. In reaching this conclusion, the court reasoned:

> "[I]t is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation. but must be drawn from the context in which it is used." (citation omitted). In this regard, it is significant that the definition of nuclear incident employs "occurrence" in concert with the clause "including an extraordinary nuclear occurrence," so as to read, "[t]he term 'nuclear incident' means any occurrence, including an extraordinary nuclear occurrence." § 2014(q).

> In the absence of an indemnification agreement, entered into under 42 U.S.C. § 2210 and covering the activities which gave rise to the liability alleged, there can be no "occurrence," that is, no event at the site of "licensed activity," that would constitute a "nuclear incident." Without a nuclear incident, there is no claim for public liability, and without a claim for public liability, there is no federal jurisdiction under Price–Anderson. [30]

---

[29] *Strong*, 2017 WL 4758958. Further, Cotter never possessed proper licensure and/or permits to dispose of radioactive material as required by 10 C.F.R. § 20.301.

[30] *Gilberg*, 24 F. Supp. 2d 325, 332 (D.N.J.), *supplemented*, 24 F. Supp. 2d 355 (D.N.J. 1998).

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

The *Gilberg* Court concluded that "whether as a matter of statutory construction or the structure and history of the Act, no claim for public liability can lie [under the PAA] in the absence of an applicable indemnity agreement."[31]

**b. Need for a License**

In *Samples v. Conoco, Inc.*, 165 F. Supp. 2d 1303 (N.D. Fla. 2001), the Court considered whether a license is necessary for federal subject matter under the PAA. The defendant in *Samples*, claimed that the "clear language of the PAA covers any claim of injury to property allegedly caused by certain nuclear material" and that "Congress did not limit the scope of the PAA's 'public liability' provisions to Nuclear Regulatory Commission (NRC) licensees and Department of Energy (DOE) contractors."[32] Referring to the defendant's argument as "Hogwash," the Court held that "the word 'occurrence' as used in the definition of 'nuclear incident' means 'that event at the site of the *licensed activity, or activity for which the Commission has entered into a contract*, which may cause damage."[33] Finding that there had not been a nuclear incident under the PAA's definition, the court concluded that because the defendant failed to demonstrate that it was a DOE contractor or a NRC licensee, the case did not state a claim under the PAA.[34]

Admittedly, there appears to be jurisprudence to the contrary but none is binding on this Court.[35] After considering these cases, the *Strong* Court, relying on the legislative

---

[31] *Id.* at 343. See also *Joseph v. Sweet*, 125 F. Supp. 2d 573, 576 (D. Mass. 2000) ("[T]he prerequisite for a claim to fall within the scope of the [PAA] [is] the existence of an indemnification agreement between the government and the defendant with respect to the complained of activity.") (citing *Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 296–97 (D. Mass. 1999)).

[32] *Samples*, 165 F. Supp. 2d at 1320–21

[33] *Id.* at 1321 (quoting S. REP. NO. 296, at 16 (1957) (quoted in 10 C.F.R. § 8.2 at 202 (2001)).

[34] *Id.* at 1321–22.

[35] *Estate of Ware*, 871 F.3d 273, cert. docketed ("we do not decide whether the possession of a license…might affect the Act's applicability to a particular case. We note only that these implicit limitations on the Price Anderson Act's scope would not preclude its application here."); *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir. 2000); *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376 (C.D. Ill. 1992), *aff'd*, 13 F.3d 1090 (7th Cir. 1994); *Carey v. Kerr-McGee Chem. Corp.*, 60 F. Supp. 2d 800 (N.D. Ill. 1999); *Cotromano v. United Techs. Corp.*, 7 F. Supp. 3d 1253 (S.D. Fla. 2014)

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

history[36], determined that "[i]t is implicit in the language of the above quoted legislative history that the terms 'nuclear incident' and 'occurrence' are inextricably intertwined with 'licenses' and 'indemnification agreements,' thus suggesting licenses and indemnification agreements are an integral part of the PAA's statutory scheme and that there cannot be a nuclear incident without an applicable license or indemnity agreement."[37]  The *Strong* Court held:

> Given the conflicting interpretations of the PAA regarding whether there must be a license or an indemnity agreement for the PAA to apply and, hence, for a federal court to have subject matter jurisdiction, and considering that conflicts should be resolved by finding no federal preemption, the Court finds that this matter should be resolved in favor of finding that there cannot be federal jurisdiction under the PAA without a license or an indemnity agreement. See *Cook*, 790 F.3d at 1094; *Hughes*, 99 F.Supp.3d at 283; *Gilberg*, 24 F.Supp.2d at 343. In any case, the Court finds persuasive authority holding that, "whether as a matter of statutory construction or the structure and history of the PAA," a license or an indemnity agreement is a prerequisite for federal subject matter jurisdiction pursuant to the PAA. *Gilberg*, 24 F.Supp.2d at 343.[38]

*Strong* applies to this case which concerns the same radioactive wastes, the same landfill, and many of the same Defendants.  As in *Strong*, Defendants here must prove whether they have the requisite license or indemnity agreement in order for the PAA to apply.  It is doubtful the Landfill Defendants will have such proof, considering they have judicially admitted that the PAA does not apply to them because they were not licensed to accept or receive radioactive materials.[39]

---

[36] THE OCCURRENCE WHICH IS THE SUBJECT OF THIS DEFINITION IS THAT EVENT AT THE SITE OF THE LICENSED ACTIVITY, OR ACTIVITY FOR WHICH THE COMMISSION HAS ENTERED IN TO A CONTRACT, WHICH MAY CAUSE DAMAGE, RATHER THAN THE SITE WHERE THE DAMAGE MAY PERHAPS BE CAUSED. THE SITE MUST BE WITHIN THE UNITED STATES. . . . IT DOES NOT MATTER WHAT LICENSE MAY BE APPLICABLE IF THE OCCURENCE IS WITHIN THE UNITED STATES. . . . THE INDEMNIFICATION AGREEMENTS ARE INTENDED TO COVER DAMAGES CAUSED BY NUCLEAR INCIDENTS FOR WHICH THERE MAY BE LIABILITY NO MATTER WHEN THE DAMAGE IS DISCOVERED, I.E., EVEN AFTER THE END OF THE LICENSE. THAT IS WHY THE DEFINITION OF 'NUCLEAR INCIDENT' HAS THE PHRASE 'ANY OCCURENCE * * * CAUSING BODILY INJURY, SICKNESS, DISEASE, OR DEATH' AND WHY THE DEFINITION OF 'PUBLIC LIABILITY' IS TIED TO ANY LEGAL LIABILITY ARISING OUT OF, OR RESULTING FROM, A NUCLEAR INCIDENT. 1957 WL 5103, at *1817–18 (May 9, 1957).

[37] *Strong*, 2017 WL 4758958

[38] *Id.*

[39] *Paulette M. Adams, et al., v. MI Holdings, Inc., et al*, Case No. 4:12CV641, ECF No.15 at 2, 3, 10.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

More specifically, Defendant Rock Road Industries and Defendant Bridgeton Landfill, LLC previously argued that plaintiffs' claims under the PAA should be dismissed because the PAA "is wholly inapplicable to Rock Road and Bridgeton Landfill, as the West Lake Landfill is not a nuclear facility subject to licensing by the Nuclear Regulatory Commission."[40] Rock Road and Bridgeton Landfill also argued that they "are, nor have they ever been, Nuclear Regulatory Commission licensees"[41], and that they "are not, and have not ever been, subject to the Price-Anderson Act."[42]

### c. Cotter's 1969 "Source Material License" Does Not Apply to the Radioactive Waste at Issue

It is true that Cotter was issued a "Source Material License" for uranium on December 3, 1969. However, the *Strong* Court considered the effect of Cotter's license and determined that it was inapplicable:

> in 1969, when Cotter obtained the Source Material License, and, in 1973, when the Landfills allegedly accepted the material at issue, the definition of "byproduct material" did not include uranium or thorium mill tailings. It was not until 1978 that Congress expanded the definition of "byproduct material" to include uranium and thorium mill tailings. 42 U.S.C. § 2014(e)(2). See *Kerr-McGee Chem. Corp. v. U.S. Nuclear Regulatory Comm'n.*, 903 F.2d 1, 2–3 (D.C. Cir. 1990) ("The AEA made no provision for regulating waste materials generated during the extraction or concentration of source material."; "[b]y the 1960's and early 1970's, federal and state authorities began to realize that wastes, or 'mill tailings,' resulting from the extraction or concentration of source material posed a significant public health problem."; "Title II brought mill tailings within the NRC's licensing authority by adding a new category to the AEA's definition of byproduct material, namely, the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content.") (quoting 42 U.S.C. § 2014(e)(2)).
>
> Notably, the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA), which first included uranium mill tailings in the definition of byproduct material, states that, except as otherwise provided by 42 U.S.C. § 2014, the amendments made by Title II of the UMTRCA "shall take effect on the date of the enactment of

---

[40] *Id.* at 3.
[41] *Id.* at *2*.
[42] *Id.* at *10*.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

this Act." PL 95–604 (HR 13650), Nov. 8, 1978, 92 Stat. 3021, Title II—Uranium Mill Tailings Licensing and Regulation Definition, Sec. 208. Moreover, "[r]etroactivity [is] not favored in the law," and "[C]ongressional enactments ... will not be construed to have retroactive effect unless their language requires this result." Simmons v. Lockhart, 931 F.2d 1226, 1230 (8th Cir. 1991)(quoting Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988)). Thus, Cotter's 1969 Source Material License could not have covered uranium mill tailings.[43]

The radioactive waste here is the same radioactive waste in *Strong*."[44]  Cotter's 1969 Source Material License does not apply to the radioactive wastes at issue; it had no license to dispose of such waste. There is no license nor indemnity agreement that supports – as it must – federal subject matter jurisdiction under the PAA.

IV.    **Even if it is Determined that the Price-Anderson Act Applies and Jurisdiction if Proper the Initial Case Management Order Should be Amended to Reflect Appropriate Standard for Breach of the Price Anderson Act**

As discussed in *McClurg*, 2017 WL 2929444, a case dealing with the same radioactive waste here, the appropriate standard for a breach of the PAA is based on the release of radioactive contamination, as opposed to the radioactive contamination present on Plaintiffs' property.  The *McClurg* Court noted that while § 20.105 of 10 C.F.R. Part 20 defines the levels of radiation permitted in unrestricted areas, § 20.106 of 10 C.F.R. Part 20 defines the levels of radioactivity permitted in liquid or airborne effluents released off premises. It provides that licensees 'shall not possess, use, or transfer licensed material so as to release to an unrestricted area radioactive material in concentrations which exceed the limits specified in Appendix 'B', Table II of this part, except as authorized....' Appendix B then lists more than 100 isotopes of almost 100 radioactive elements and provides the maximum permissible level of releases. [45]

---

[43] *Strong*, 2017 WL 4758958
[44] ECF No. 17 - Plaintiffs' Original State Court Petition.
[45] *In re TMI*, 67 F.3d 1103, 1109 (3d Cir. 1995).

The *McClurg* Court agreed with the Third Circuit that this language "does not suggest that a breach occurs only when persons are exposed to excessive radiation. Instead, the regulations provide that a breach occurs whenever excessive radiation is released, whether or not anyone is present in the area exposed."[46]  The *McClurg* Court reiterated the elements of a public liability action: "(1) the defendants released radiation into the environment in excess of the levels permitted by federal regulations in effect [at the time of the alleged nuclear incident]; (2) the plaintiffs were exposed to this radiation (although not necessarily at levels prohibited by those regulations); (3) the plaintiffs have injuries; and (4) radiation was the cause of those injuries."[47]  Based on this analysis, the current CMO does not reflect the correct standard for a PAA breach.  It should focus on the 1973 release of radioactive materials from Defendants property.

## V.   Conclusion and Relief Requested

The CMO does not consider the threshold issue: does the PAA apply to these Defendants under the circumstances sued on? While this Court has determined that the PAA preempts all state law claim claims when it is plead, this Court has not yet considered whether the PAA should apply in the first place. This is because Plaintiffs' prior lead counsel withdrew their Motion to Remand before the Court ruled and Plaintiffs' prior lead counsel filed an Amended Complaint that affirmatively plead the PAA.

As discussed above, this matter is analogous to *Strong* and this Court should reach the same conclusion as Judge Jean C. Hamilton in that: 1) there cannot be federal jurisdiction under the PAA without a license or an indemnity agreement; and 2) Cotter's 1969 Source Material License does not apply to Plaintiffs' claim because the license does not cover uranium mill tailings.  As in *Strong*, this matter should be remanded to state court because this Court lacks jurisdiction under

---

[46] *McClurg*, 2017 WL 2929444, at *6 (E.D. Mo. July 7, 2017)
[47] *In re TMI Litig.*, 193 F.3d 613, 659 (3d Cir. 1999), *amended*, 199 F.3d 158 (3d Cir. 2000).

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

the PAA.  The current CMO deadlines and pending discovery should be stayed while the court considers these issues.

If it is determined that the PAA does in fact apply here, at the very least, the CMO should be amended to reflect the appropriate standard for a PAA violation, namely the "release" of radioactive materials from Defendants' property.

Plaintiffs respectfully submit that good grounds exist for this Court to determine that the PAA does not apply in this matter because Defendants do not possesses an appropriate license or indemnity agreement to trigger the PAA. Accordingly, Plaintiffs contend that their PAA allegations in their Amended Complaint were not proper and as such Plaintiffs' should be granted leave to amend their Complaint to dismiss the PAA claims and reinstate their state law claims. Following the reinstatement of Plaintiffs' state law claims, this matter should be remanded. In the alternative, the CMO should be amended to focus on the 1973 release of radioactive contamination from Defendants' property as opposed to the radioactive contamination present on Plaintiffs' property.

Respectfully submitted,

*/s/ Celeste Brustowicz*
Barry J. Cooper, Jr. (LSBA 27202), *Pro Hac Vice*
Celeste Brustowicz (LSBA 16835), *Pro Hac Vice*
Victor T. Cobb (LSBA 36830), *Pro Hac Vice*
**COOPER LAW FIRM, LLC**
1525 Religious Street
New Orleans, Louisiana 70130
E-mail:bcooper@sch-llc.com
        cbrustowicz@sch-llc.com
        vcobb@sch-llc.com

**ATTORNEYS FOR PLAINTIFFS,
MICHAEL AND ROBBIN DAILEY**

## CERTIFICATE OF SERVICE

I hereby certify that on March 27, 2018, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

*/s/ Celeste Brustowicz*
Celeste Brustowicz (LSBA 16835)

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL DAILEY and ROBBIN DAILEY,

               Plaintiffs,

v.

BRIDGETON LANDFILL, LLC, et al.,

               Defendants.

Case No. 4:17-cv-00024

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT TO DISMISS PRICE-ANDERSON ACT CLAIMS AND REINSTATE STATE LAW CLAIMS, TO REMAND, TO STAY PENDING DISCOVERY OR, ALTERNATIVELY, TO AMEND CASE MANAGEMENT ORDER

Defendant Cotter Corporation (N.S.L.) ("Cotter") (improperly named as Cotter Corporation) submits this memorandum of law in opposition to Plaintiffs Michael Dailey and Robbin Dailey's ("Plaintiffs") Motion for Leave to Amend their First Amended Complaint, to Remand the Matter to State Court, Stay Discovery and, Alternatively, Amend the Court's Case Management Order.

The crux of Plaintiffs' instant motion appears to be that because they have added a new lead attorney to their case (from a law firm that has been involved in this matter since its inception), they are entitled to turn back the clock to *November 2016* to eliminate their claims pursuant to the Price-Anderson Act ("PAA"), 42 U.S.C. § 2011 *et seq.*, and have the matter (in its pre-removal, pre-amendment, and pre-motion-to-dismiss form) remanded to state court. Plaintiffs' self-styled "motion to amend" is procedurally improper, and should be viewed through the lens of Rule 41(a), rather than under the more liberal standards of Rule 15. Further, regardless of the standard applied, Plaintiffs are not entitled to simply dismiss their PAA claims

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

and resurrect their state-law claims given the prejudice this would pose to Defendants. Moreover, Plaintiffs' attempt to cast doubt on this Court's jurisdiction ignores that the Court implicitly ruled as part of its October 27, 2017 Order and Memorandum that Plaintiffs' claims fall within the ambit of the PAA. *See* ECF No. 89. The overwhelming majority of circuit and district court decisions support this Court's prior conclusion that Plaintiffs have alleged a nuclear incident as defined by the PAA. In short, Plaintiffs should not be permitted to dismiss their PAA claims and reinstate their dismissed state-law causes of action, and their request for remand to state court should similarly be denied. The Court should also deny Plaintiffs' request to amend the Court's Initial Case Management Order (the "CMO"), ECF No. 102, and their request to stay discovery during the pendency of the instant motion, as further discussed below.

## ARGUMENTS

I. **Plaintiffs Have Failed to Demonstrate Any Basis for Dismissing their PAA Claim**

    A. **Plaintiffs' Motion Is an End-Run Around Rule 41(a), and, If Granted, Would Prejudice Defendants**

Plaintiffs' motion should be viewed as a motion for voluntary dismissal pursuant to Rule 41(a), rather than under the less-stringent Rule 15(a) motion to amend standard. "[W]hen a plaintiff seeks to dismiss some, but not all, of his or her claims," courts will generally view that motion as one for leave to amend the pleadings, subject to the liberal standards of Rule 15(a), rather than a motion to dismiss under Rule 41(a). *See Paglin v. Saztec Int'l, Inc.*, 384 F. Supp. 1184, 1189 (W.D. Mo. 1993). Here, however, the effect of Plaintiffs' motion would be to eliminate the sole remaining count in their Amended Complaint—their PAA claims against Defendants—for the purpose of returning to state court to re-litigate their previously dismissed state-law causes of action. Given that Plaintiffs seek to dismiss ***all*** of their claims against Defendants, this motion should be subject to the strictures of Rule 41(a), which is concerned

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

chiefly with protecting defendants from prejudice. *See Millsap by Millsap v. Lamb Mem. Hosp.*, 111 F.R.D. 481, 483 (S.D. Iowa 1986) (primary interest of Rule 41 is protecting defendants); *see also Fisher v. Puerto Rico Marine Mngt., Inc.*, 940 F.2d 1502 (11th Cir. 1991) (stating that "Rule 41(a)(2) exists chiefly for the protection of defendants"). As such, to deny the instant motion, this Court need only find "plain legal prejudice arising from the dismissal." *Armstrong v. Adams*, 869 F.3d 410, 414 (8th Cir. 1989).

Although case law does not precisely define "plain legal prejudice," courts commonly consider the following factors: the extent to which the action has progressed; the movant's diligence in prosecuting the suit or bringing the motion; the "duplicative expense" of re-litigating the matter; and the adequacy of plaintiffs' explanation for the motion. *See* 8 James W. Moore, *Moore's Federal Practice* § 41.40[6]; *see also U.S. v. $32,820.56*, 838 F.3d 930, 937 (8th Cir. 2016) (finding that courts may consider whether party has presented a proper explanation for desire to dismiss claim and whether dismissal would result in waste of judicial time and effort). Courts may also consider whether the motion was made at a critical juncture in the case. *See* 8 James W. Moore, *Moore's Federal Practice* § 41.40[6]. Further, the Eighth Circuit generally disapproves of permitting plaintiffs to voluntarily dismiss claims merely to deprive a defendant of otherwise proper federal jurisdiction. *See, e.g.*, *Donner v. Alcoa*, 709 F.3d 694, 699 (8th Cir. 2013); *Thatcher v. Hanover Ins. Grp., Inc.*, 659 F.3d 1212, 1214-1215 (8th Cir. 2011).

Here, to grant Plaintiffs' motion would substantially prejudice Defendants. This matter has been before this Court since January 2017, after having been filed in state court in November 2016. In that time, Defendants have opposed a motion to remand, moved to dismiss both Plaintiffs' initial pleading and Plaintiffs' Amended Complaint, answered that Amended Complaint, participated in case management conferences, engaged in settlement discussion with

Plaintiffs, initiated and exchanged discovery, engaged in several meet and confers, and are now in the midst of preparing to take depositions of Plaintiffs' witnesses with the specific purpose of briefing potentially dispositive motions in two months' time. The result of this activity has been a considerable expenditure of time, resources and money by Defendants, as well as this Court's active participation in crafting the current CMO and limiting the scope of discovery (and burden on Defendants) given the nature of Plaintiffs' claims. Furthermore, Plaintiffs effectively abandoned the issues raised in the current motions when they withdrew their motion to remand in April 2017 and amended their pleading to assert PAA claims against Defendants. Plaintiffs' sole explanation for the dramatic change in course embodied in the instant motion is, in essence, that their "new" counsel has a different litigation strategy from her predecessors.

The timing of Plaintiffs' motion "at a critical juncture in the case" weighs against granting it.[1] After the dismissal of their state law claims, Plaintiffs now face the possibility that their sole remaining claim under the PAA will be dismissed pursuant to the upcoming dispositive motions contemplated by the CMO. Obviously concerned by the risk of losing on that issue, Plaintiffs are desperate to either escape this Court's jurisdiction or yet again create delay.

Perhaps most egregiously, the stated purpose of the instant motion is to eliminate Plaintiffs' federal cause of action in order to deprive this Court of jurisdiction and permit Plaintiffs to re-litigate their previously dismissed state-law causes of action in state court. Such a motive would run afoul of the Eight Circuit's general disapproval of plaintiffs attempting to dismiss claims simply to deprive defendants of the benefits of otherwise proper federal jurisdiction. *See Donner*, 709 F.3d at 699; *Thatcher*, 659 F.3d at 1214-15. For these reasons,

---

[1] Plaintiffs recently filed an opposed Motion for Extension of Time in the Initial CMO on February 22, 2018, *see* ECF No. 109, which the Court granted on March 6, 2018, *see* ECF No. 119. Exactly three weeks later—after Defendants had (re)noticed depositions for both plaintiffs and a third-party witness for the third week of April (dates *offered by and agreed to by Plaintiff*)— Plaintiffs filed the current motion seeking, among other things, to suspend their discovery obligations.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

this Court should not further Plaintiffs' attempt to avoid Rule 41(a), and should deny this motion on the basis that it would result in plain legal prejudice for Defendants.

> **B.      Even Under Rule 15(a), Plaintiffs Should Not Be Permitted to Amend Their Amended Complaint to Dismiss Their PAA Claims**

Assuming *arguendo* that Plaintiffs' motion is properly viewed as a request for leave to amend their pleadings (for the second time), Plaintiffs' undue delay, dilatory motives, bad faith, and the ultimate prejudice to Defendants warrant denial of their motion.

"After an answer has been filed in response to the plaintiff's complaint, the plaintiff 'may amend the party's pleading only by leave of court . . . and leave shall be freely given when justice so requires.'" *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998) (quoting Rule 15(a)). A motion for leave to amend, however, is properly denied where there is "undue delay, bad faith or dilatory motive on the part of the movant, [and] undue prejudice to the opposing party by virtue of allowance of the amendment." *Id.* (internal quotation omitted).

With respect to undue delay and dilatory motive, Plaintiffs initially challenged this Court's subject matter jurisdiction in a motion to remand premised chiefly on the view that the PAA did not apply to their alleged radiation injuries. After withdrawing that motion, Plaintiffs amended their pleadings to embrace claims under the PAA. Thereafter, Plaintiffs prosecuted this case on the basis of those PAA claims, alongside a number of state-law based causes of action. Now, after having all their state-law based claims dismissed as preempted by the PAA, for the sole purpose of defeating this Court's jurisdiction, Plaintiffs seek to turn back the clock to November 2016, before Defendants removed the case to federal court.

Plaintiffs' explanation for this sudden change in tack—occurring long after Plaintiffs first amended their pleadings and Defendants proceeded with motions to dismiss, submitted answers to pleadings, participated in multiple conferences with this Court, settled with and dismissed

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

claims against one Defendant with prejudice,[2] and conducted discovery—underscores that Plaintiffs filed the instant motion in bad faith. Plaintiffs' justification for seeking to dismiss their PAA claims is their new counsel's belief "that the Amended Complaint was improper because this is not, in fact, a PAA case" (*i.e.*, counsel changed their minds). Change of counsel (if adding a new attorney to a previously appearing firm even counts as such) is not grounds for undoing over a year of litigation, particularly where it renders Defendants' expenditure of time, resources, and money, as well as this Court's limited and valuable time and attention, wholly meaningless. Taken to its logical conclusion, were Plaintiffs' view correct, a party could seek to amend its pleadings (and delay resolution of the case) without limit by simply having "new" counsel, with a new litigation strategy, make an appearance and question prior counsel's actions.

Ultimately, for the reasons set forth in Section I. A., *supra*, to permit Plaintiffs to amend their pleading to eliminate a claim they now seemingly regret (and to reinstate state law claims that were properly dismissed) would prejudice Defendants, who have incurred considerable expense prosecuting their defense of this case. The instant motion should therefore be denied.

### C.   This Court Has Implicitly Found That It Has Jurisdiction

Contrary to Plaintiffs' claim that this Court's jurisdiction is unclear because it is undecided "whether the [PAA] applies to allegations made" by Plaintiffs, this Court has implicitly found that it has subject matter jurisdiction. Specifically, in finding that Plaintiffs' state-law claims were preempted by the PAA, this Court held that "[b]ecause [Plaintiffs] allege that [D]efendants 'caused damage to Plaintiffs' property and/or the loss of use of the Plaintiffs' property which constitutes a 'nuclear incident' or series of 'nuclear incidents' under the [PAA],' their amended complaint asserts a federal cause of action . . . that supplants all state causes of

---

[2] On March 16, 2018, this Court entered a Stipulation of Dismissal with prejudice dismissing Plaintiffs' claims against Mallinckrodt, LLC. *See* ECF No. 120.

action."  ECF No. 89, p. 13 (quoting Amended Complaint at ¶ 104, p. 30).  Thereafter, in addressing Defendants' argument that Plaintiffs failed to allege facts sufficient to assert PAA claims, the Court found that Plaintiffs' "amended complaint contains enough factual allegations of a violation of the PAA to survive a motion to dismiss."  ECF No. 89, p. 19.  Here, for purposes of pleading a claim, the Court has already determined that the PAA applies to Plaintiffs' allegations, and by natural extension, that this Court has jurisdiction.  As such, Plaintiffs' claim that the application of the PAA to their allegations is undecided lacks merit.  *See Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir. 2000) ("the Price Anderson Act does confer *exclusive federal jurisdiction* over the claims in this case.") (emphasis added).

> ### D. Plaintiffs Rely on Defunct or Irrelevant Case Law to Maintain that Indemnity and Licensure Are Prerequisites to Jurisdiction Under the PAA

Plaintiffs also attempt to manufacture doubt concerning this Court's jurisdiction by claiming that the PAA does not apply where the defendants lack an indemnity agreement with the United States or an Atomic Energy Commission ("AEC") or Nuclear Regulatory Commission ("NRC") license.  However, the overwhelming majority of federal circuit and district courts have concluded that the PAA applies to nearly all claims alleging radiation-based injuries or damages, and the cases Plaintiffs rely on to limit the scope of federal jurisdiction are either inapplicable or no longer good law.

Since the passage of the PAA in 1957, the federal government has regulated the generation, processing, use, and handling of radioactive materials through a comprehensive federal scheme designed to preempt the states from regulating the health and safety aspects of essentially all radioactive materials.  *See Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212 (1983); *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1240-45 (10th Cir. 2004); *see also Kerr-McGee Corp. v. Farley*, 115

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

F.3d 1498, 1508 (10th Cir. 1997) ("Hazards arising from atomic radiation were made a particularly federal concern, as to which the state had no authority to regulate.").  Against this backdrop, and following the proliferation of lawsuits arising out of the 1979 Three Mile Island incident, Congress amended the PAA in 1988 to create an exclusive and retroactive federal cause of action—called a "public liability action"—for any "public liability" arising from a "nuclear incident."  *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 477 (1999); *see also McClurg v. Mallinckrodt, Inc.*, 2015 WL 857455, at *6 (E.D. Mo. Feb. 27, 2015) (citing 42 U.S.C. §§ 2014 (hh), 2014(w)*;* Pub. L. No. 100-408 § 20 (b)(1), 102 Stat. 1084 ("The amendments [governing judicial review of claims arising out of a nuclear incident] shall apply to nuclear incidents occurring before, on, or after the date of the enactment of this Act"); *In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 857 (3d Cir. 1991), *cert. denied*, 503 U.S. 906 (1992).  The PAA defines "public liability" as "any legal liability arising out of or resulting from a nuclear incident . . . ." 42 U.S.C. § 2014(w).  Under the plain language of § 2014(hh), the PAA will apply to "any suit asserting public liability," arising from a "nuclear incident."  Indeed, since being amended in 1988, courts throughout the country have recognized that the PAA preempts state-law causes for injuries stemming from radioactive materials.  *See Adkins v. Chevron Corp.* 960 F. Supp. 2d 761, 767 (E.D. Tenn. 2012) (finding virtually every court to address the issue—including the Third, Sixth, Seventh, Ninth, Tenth and Eleventh Circuits—has held that the PAA "completely preempts state law causes of action for public liability arising out of or resulting from nuclear incidents"); *McClurg v. MI Holdings, Inc.*, 933 F. Supp. 2d 1179, 1186 (E.D. Mo. 2013).

Given Congress' goal "to expand the scope of federal jurisdiction" through the 1988 amendments to the PAA, courts have generally rejected efforts by plaintiffs to reduce the scope of federal jurisdiction.  *See, e.g.*, *Acuna*, 200 F.3d at 339 (rejecting attempt to limit PAA

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

jurisdiction to indemnitees of United States); *Carey v. Kerr-McGee Chem. Corp.*, 60 F. Supp. 2d 800,804-06 (N.D. Ill. 1999) (rejecting attempt to limit PAA jurisdiction and recognizing that "nuclear incident" was intentionally defined broadly to avoid situation where defendants were left without a federal forum and were forced to defend against lawsuits "in various jurisdictions under various state laws"). Indeed "[t]he plain language of the statute indicates that the possession of a license for radioactive material is unrelated to the jurisdiction issue. None of the statutory definitions limit the jurisdiction over nuclear claims to licensed activity." *Cotromano v. United Techs. Corp.*, 7 F. Supp. 3d 1253, 1257 (S.D. Fla. 2014); *see also Estate of Ware ex rel. Boyer v. Hosp. of Univ. of P.A.*, 73 F. Supp. 3d 519, 530 (E.D. Pa. 2014) (rejecting view "that the PAA is limited to nuclear incidents occurring at utilization and production facilities and other licensed facilities") (internal quotations marks omitted). As a result, the PAA is "broad enough to create a federal forum for any tort claims even remotely involving atomic energy production. The [PAA] on its face provides the sole remedy for the torts alleged." *Farley*, 115 F.3d at 1504.

Despite the widely recognized principle of broad federal jurisdiction over claims asserting radiation-based injuries, Plaintiffs insist that this Court should adopt a narrow view of its own jurisdiction based on a few defunct or otherwise inapposite cases. For example, Plaintiffs maintain that this Court should adopt the reasoning set forth in *Gilberg v. Stepan Co., 24 F. Supp. 2d 325, 340 (D.N.J. 1998)*, concerning the absence of federal jurisdiction where the defendant has no indemnity agreement with government. Plaintiffs fail to mention, however, that *Gilberg*'s tortuous reasoning and statutory interpretation are no longer good law within its own circuit, as it was flatly rejected by the Third Circuit in *Estate of Ware v. Hosp. of the Univ. of Pa.*, 871 F.3d 273, 282-83 (3rd Cir. 2017). *Accord Acuna*, 200 F.3d at 339 (noting *Gilberg*'s analysis and rejecting attempt to curb federal jurisdiction over claim for radiation injuries);

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

*Carey*, 60 F. Supp. 2d at 806-07 (criticizing and declining to follow *Gilberg*); *Cotromano*, 7 F. Supp. 3d at 1258 (same). In any event, *Gilberg* is distinguishable here because the defendant actually had a license, but the Court in *Gilberg* required *both* a license and an indemnity.

Plaintiffs also rely on *Joseph v. Sweet*, 125 F. Supp. 2d 573 (D. Mass. 2000), an inapplicable district court decision arising from a doctor and hospital's use of experimental nuclear medicine on two patients in the 1950s and 1960s. In that case, however, while the court mentioned in passing the need for indemnification between the defendant and government as a prerequisite to a PAA claim, the court acknowledged that issue was not actually disputed by any of the parties, who accepted that the PAA covered the claims by one of the plaintiffs who was allegedly injured in the 1960s. *Id.* at 576. With respect to the plaintiff who was injured in the 1950s, the district court found that the injury pre-dated the existence of the PAA, rendering it inapplicable to the plaintiff's claim. *Ibid.*

In support of their argument that AEC and/or NRC licensure is essential to this Court's jurisdiction under the PAA, Plaintiffs rely on *Samples v. Conoco, Inc.*, 165 F. Supp. 2d 1303 (N.D. Fla. 2001). The chief issues raised in *Samples,* however, related to whether the federal court had jurisdiction under an entirely different federal statute, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. § 9601 *et seq. Id.* at 1320-21. The extent of the court's discussion concerning the PAA[3] in *Samples* is confined to a few paragraphs discussing an argument that the defendants appeared to have included as an afterthought. *Id.* at 1321 (quoting *Acuna*, 200 F.3d at 339); *cf. Farley*, 115 F.3d at 1504 (noting that jurisdiction under the PAA is "broad enough to create a federal forum for any tort claims even remotely involving atomic energy production").

---

[3] The holding in *Samples* also has been criticized by the Third Circuit in *Estate of Ware*, 871 F.3d at 283, which is the same Third Circuit decision that rendered *Gilberg* defunct.

Notwithstanding this lack of support in the case law for their arguments, Plaintiffs insist

that this Court adopt reasoning set forth in *Strong v. Republic Servs., Inc.*, 283 F. Supp. 3d 759

(E.D. Mo. 2017)[4] and find that there cannot be federal jurisdiction under the PAA without a

license or an indemnity agreement and that Cotter's 1969 License does not create jurisdiction

because it does not apply to uranium mill tailings.  However, *Strong*'s statement concerning the

need for a nuclear indemnity or license to establish federal jurisdiction appears to be based

almost exclusively on the New Jersey district court's reasoning in *Gilberg*, 24 F. Supp. 2d at 343,

which, as noted above, has been criticized and rejected by the Third Circuit in *Estate of Ware*,

871 F.3d at 283, and by various other courts.  Furthermore, *Strong* should not be afforded much

weight in the instant matter given that Cotter was not a party to the litigation in *Strong* (a fact

Plaintiffs neglect to mention in their brief), and had no opportunity to brief the issues considered

by the Court concerning either the jurisdictional issues or Cotter's 1969 License.

Further, contrary to Plaintiffs' suggestion, the Court in *Strong* did not conclude that

Cotter's 1969 license could not support jurisdiction under the PAA.[5]  Rather, the Court merely

found that Cotter's license did not extend to uranium mill tailings, while simultaneously

declining to determine, based on the record before it, whether the radioactive materials allegedly

in the landfill were, in fact, uranium mill tailings.  *Strong*, 283 F. Supp. 3d at 773.

Significantly, Plaintiffs' claim that the radioactive materials were unlicensed mill tailings

that fell outside the scope of AEC or NRC licensure is flatly contradicted by the fact that the

AEC issued licenses for the materials ultimately possessed and handled by Cotter prior to the

passage of Uranium Mill Tailings Radiation Control Act of 1978 ("UMTRCA"), a statute which

---

[4] Despite this decision (which seems to be at the core of Plaintiffs' arguments) being filed on October 20, 2017, Plaintiffs did not raise it to this Court's attention until March 27, 2018—over five months after it was entered.
[5] It should be noted that at all relevant times, Cotter was the holder of an AEC License, which authorized Cotter to process source material in anticipation of shipping it elsewhere.  *See* ECF No. 64-1, Declaration of Stephanie Feingold ("Feingold Decl."), Ex. D (License SUB-1022 issued to Cotter on December 30, 1969).

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

the Court in *Strong* heavily relied upon in determining that Cotter's license did not include uranium mill tailings. On February 14, 1966, the AEC issued License No. SMA-862 for Continental Mining & Milling Co., to possess and take other actions with "source material." *See* Feingold Decl., Ex. A (AEC License No. SMA-862). The source material is described in the license as "uranium and thorium" of up to "125,000 tons of residues . . . ." *See* Feingold Decl., Ex. A. The AEC also issued licenses for these materials in 1963, 1966, and 1969. *See* Feingold Decl., Exs. B (License SMB-654 issued to Contemporary Metals Corporation on December 31, 1963); C (License No. SMC-907 issued to Commercial Discount Corporation on December 29, 1966); D (License SUB-1022 issued to Cotter on December 30, 1969).[6] Cotter's License No. SUB-1022 was terminated on November 13, 1974. *See* Feingold Decl., Ex. E (November 13, 1974 letter from AEC informing Cotter of the termination of License No. SUB-1022).

In their Amended Complaint, Plaintiffs essentially admit that materials referenced in the license included the so-called "mill tailings" that they contend were not licensed by the NRC or AEC. *See* Amend Compl. ¶ 43 ("In the 1960's, leftover mill tailings (ore residues, and uranium, and radium-bearing process wastes) . . . were moved to a storage site on Latty Avenue"); ¶ 52 ("In the late 1960's, Cotter purchased [u]ranium mill tailings stored at both SLAPS and at the Latty Avenue Site"). The AEC's licensure of these materials demonstrates, contrary to Plaintiffs' arguments, that the AEC (and, later, the NRC) understood these residues to be subject to their jurisdiction, and exercised that jurisdiction by issuing the referenced licenses. Further, even if Plaintiffs had not performed an about-face from their prior position that the radioactive material in the Landfill supported a PAA claim, a determination regarding the regulatory and chemical characteristics of that material is premature at this early stage of the proceedings.

---

[6] Continental Mining & Milling Co., Contemporary Metals Corporation and Commercial Discount Corporation were prior licensees of the radioactive materials stored at SLAPS and the Latty Avenue Site, a subset of which Cotter ultimately handled and was granted a license for in 1969. *See* Feingold Decl. ¶ 5, Ex. D.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Here, Plaintiffs are the "masters" of their claims, *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394, (1987), and having alleged PAA claims against Defendants—claims that withstood Defendants' prior motions to dismiss—they cannot simply disclaim those causes of action on the basis that it has become inconvenient for their new counsel's litigation strategy. As such, Plaintiffs' arguments lack merit and their motion should be denied.

## II. Plaintiffs Have Failed to Provide Any Basis to Warrant Amending the CMO

Likely sensing that their attempt to unmake their PAA claims to let them start over in state court is doomed, Plaintiffs request, in the alternative, that the Court radically modify the CMO "to Reflect the Appropriate Standard for Breach of the [PAA]." ECF No. 123-1, p. 12. Specifically, Plaintiffs want the CMO to "focus on the 1973 release of radioactive materials from Defendants [sic] property," citing this Court's decision in *McClurg v. Mallinckrodt, Inc.*, 217 WL 2929444, at *6 (E.D. Mo. July 7, 2017), in support of that view. ECF No. 123-1, p. 13. However, Plaintiffs have failed to present any basis for amending the CMO or modifying the limited scope of discovery permitted at this stage in the case.

In its decision granting in part, and denying in part, Defendants' motions to dismiss, the Court found that determining the specific standard of care applicable to Plaintiffs' PAA claims was "at this stage of the litigation . . . premature," thus leaving that issue for another day. ECF No. 89, p. 19. Thereafter, following conferences with the Court, and after Defendants raised serious concerns regarding "whether plaintiffs' soil, dust, and runoff samples can provide radioactive contamination levels sufficient to show a violation of the [PAA]," this Court entered the initial, limited CMO, "in the interests of economy," to permit the parties to address "both the chain of custody and origination of some of the samples taken, but also the appropriate legal

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

standards and whether the samples establish contamination levels sufficient to be a PAA violation."  ECF No. 102, pp. 1-2.

Plaintiffs insist, however, that discovery should be focused on the "release of radioactive materials from Defendants' property" (without identifying which property they mean) rather than the presence of radioactive materials in their own home.  Plaintiffs ignore that part of the purpose of the CMO was to advance the proportionality principles of the Federal Rules of Civil Procedure and save the parties time, resources and money by limiting initial discovery to whether Plaintiffs can show the presence of radioactive materials in their own home—an essential component of their claim, and a far less onerous undertaking for all involved than investigating purported historical "releases" dating back over forty years.  In short, if Plaintiffs cannot demonstrate the presence of radioactive materials on their property at a level sufficient to sustain a claim under the PAA, then any public liability claims they may have under the PAA are moot.  While Plaintiffs place considerable emphasis on this Court's decision in *McClurg* concerning the applicable standard of care, they fail to note that *McClurg*, unlike the instant matter, revolves around claims for ***personal injury***, as opposed to Plaintiffs' claims for property damage at a single site.  As such, contrary to Plaintiffs' suggestion, *McClurg* is hardly definitive concerning the ultimate standard of care applicable to the instant case.  In light of the above, the Court should deny Plaintiffs' motion and leave the CMO in place without modification.

## III.    The Court Should Not Stay Discovery During the Pendency of This Motion

This Court has previously extended the time for the parties to conduct discovery under the CMO in response to Plaintiffs' February 22 motion, *see* ECF No. 119, and the parties should not be delayed any further in addressing issues that may quickly and definitively resolve this case.  Plaintiffs have also failed to provide any explanation or argument to support their view

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

that the pendency of the instant motion warrants a stay in the CMO deadlines and pending discovery. Indeed, granting Plaintiffs' request for a stay substantially prejudices Defendants by needlessly delaying upcoming dispositive motions that may resolve this matter conclusively for Defendants. Plaintiffs have consistently dragged their feet throughout this litigation, and the instant motion is further evidence of Plaintiffs' goal to bring an action they apparently no longer have the appetite for to a screeching halt. The Court should not reward such dilatory behavior.

Accordingly, the Court should not further delay the potential resolution of this matter and should deny Plaintiffs' request for a stay during the pendency of their motion.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs' motion should be denied. Plaintiffs should not be permitted to dismiss their PAA claims simply to evade this Court's jurisdiction, given the prejudice it would have to Defendants, who have devoted significant resources over the past year to move this case toward a speedy resolution. Furthermore, this Court has federal question jurisdiction over this matter under the PAA because it arises from a nuclear incident and asserts claims for damages related to radiation injuries. Lastly, Plaintiffs' requests for a modification of the CMO or a stay in this matter are meritless and should be denied.

Dated: April 10, 2018                                    Respectfully submitted,


                                                        /s/ Stephanie R. Feingold
                                                        MORGAN LEWIS & BOCKIUS, LLP
                                                        John McGahren, Esq. (ID 046791990N)
                                                        john.mcgahren@morganlewis.com
                                                        Stephanie R. Feingold. Esq. (ID 23182005N)
                                                        stephanie.feingold@morganlewis.com
                                                        502 Carnegie Center
                                                        Princeton, NJ 08540
                                                        (609) 919-6600 (telephone)
                                                        (609) 919-6701 (facsimile)

BRYAN CAVE LLP
Dale A. Guariglia, Mo. Bar 32988
daguariglia@bryancave.com
Erin L. Brooks, Mo. Bar 62764
erin.brooks@bryancave.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

ATTORNEYS FOR DEFENDANT
COTTER CORPORATION (N.S.L.)

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## CERTIFICATE OF SERVICE

I hereby certify that on April 10, 2018, I electronically filed the foregoing document

with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic

filing to counsel of record, and caused the same to be served upon the following by U.S. mail,

first-class postage:


Robert G. Rooney
William Garland Beck
Allyson Elisabeth Cunningham
Lathrop and Gage, LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108

Patricia L. Silva
Lathrop and Gage, LLP
7701 Forsyth Boulevard, Suite 500
Clayton, MO 63105

Celeste Brustowicz
Cooper Law Firm L.L.C.
1525 Religious Street
New Orleans, LA 70130

Barry J. Cooper, Jr.
Cooper Law Firm, L.L.C.
508 St. Philip Street
New Orleans, LA 70116

Victor T. Cobb
Cooper Law Firm L.L.C.
1525 Religious Street
New Orleans, LA 70130


/s/ John McGahren_____

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

MICHAEL DAILEY, et al.,       )
                                   )
        Plaintiffs,       )
                                   )
vs.                                 )
                                 )  Case No.  4:17-cv-00024-CDP
BRIDGETON LANDFILL, LLC, et al.,   )
                                 )
        Defendants.       )

**DEFENDANTS BRIDGETON LANDFILL, LLC, REPUBLIC SERVICES, INC.,
ALLIED SERVICES, LLC, AND ROCK ROAD INDUSTRIES, INC.'S
RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND,
MOTION TO REMAND, MOTION TO STAY PENDING DISCOVERY AND,
<u>ALTERNATIVELY, MOTION TO AMEND CASE MANAGEMENT ORDER</u>**

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## I.    <u>Introduction</u>

Plaintiffs' request to radically alter the nature of their claims ignores the year-and-a-half of litigation they instituted, the last eleven months of which arose following Plaintiffs' voluntary addition of claims under the Price-Anderson Act, 42 U.S.C. § 2011 *et seq*.  Plaintiffs' current lead counsel now appears to have a new strategy at odds with the affirmative statements Plaintiffs made to the Court in their First Amended Complaint (Doc. No. 70) (the "Complaint"). This change in direction, independent of anything other than adding a new lawyer to the team, does not permit Plaintiffs a do-over of their case.  Defendants Bridgeton Landfill, LLC ("Bridgeton"), Republic Services, Inc. ("Republic"), Allied Services, LLC ("Allied Services"), and Rock Road Industries, Inc. ("Rock Road") (collectively, "Defendants"), along with Defendant Cotter Corporation (N.S.L.) ("Cotter"), have actively engaged in litigation structured by Plaintiffs' allegations and causes of action.   Allowing Plaintiffs to change their minds this late in the litigation will severely prejudice Defendants and Cotter.

The legal conclusions made in Plaintiffs' Motion regarding the Price-Anderson Act (the "PAA" or "Act") are incorrect.  The 1988 amendments to the Act confer exclusive federal jurisdiction over actions in which a party asserts legal liability for bodily injury, sickness, or property damage caused by hazardous properties of radioactive materials.  Plaintiffs rely on a handful of cases that erroneously use pre-amendment language of the Act to construe the post-amendment Act.  The PAA's plain language and recent Circuit Court decisions demonstrate that Plaintiffs are incorrect. Additionally, although a license is not necessary to trigger the PAA, a license is at the heart of this case because it is the basis upon which Cotter deposited radioactively impacted material at the West Lake Landfill (also referred to as the "Landfill").

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Plaintiffs' claims are governed by the PAA, which preempts state law claims.  As such, the case should proceed as pled by the Plaintiffs, and the Court should not amend its Case Management Order or otherwise stay discovery.

## II.  Plaintiffs Pleaded a PAA Cause of Action

The Complaint, explicitly, affirmatively, and directly alleging a PAA claim, has been the operative pleading for over eleven months. Doc. No. 70 (filed April 21, 2017).  The "U"-turn now desired by Plaintiffs would completely reshape the case.  Almost a year ago, Plaintiffs withdrew their Motion to Remand and embraced the PAA. *See* Doc. No. 66.  State law claims were later dismissed as preempted by the Act.  Doc. No. 89.  Now, Plaintiffs want to rewrite their allegations, remand the case, and re-litigate their previously dismissed state law claims.

Plaintiffs did not make an "erroneous" amendment. *See* Doc. Nos. 123-1 at 2; 123 at 2.  Such a characterization suggests a mere clerical error.  Rather, Plaintiffs made a purposeful decision to forego remand and amend their Complaint to add PAA claims. Doc. Nos. 66, 68, 70.

Current lead-counsel, the Cooper Law Firm (including Barry Cooper) signed the Complaint filed in April 2017 which alleges the PAA claim and the Motion for Leave to Amend to add the PAA claims. Doc. Nos. 68, 70.  It is disingenuous, at best, to say Plaintiffs' current counsel have only "recently" been involved. *See* Doc. No. 123 at 2.[1]  Moreover, the pleadings belong to Plaintiffs, not the law firm or lawyers.  Whether or not the Cooper Law Firm had filed entries of appearance or pro hac vice motions, its involvement in the Complaint's amendment is clear.

---

[1] Fed. R. Civ. P.  11 provides that an attorney or law firm on a pleading represents to the Court that "the claims, defenses, and other legal contentions are warranted by existing law[.]" Fed. R. Civ. P. 11(b), (c).

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

### III. Plaintiffs' Reading of the PAA is Incorrect

Plaintiffs' argument that licenses and indemnity agreements are prerequisites to application of the PAA is simply wrong. Plaintiffs allege the Act does not apply to their claims because "[w]ithout a federal license or an indemnification agreement, there is no 'nuclear incident and thus no 'public liability action.'" Doc. No. 123-1 at 7. In support, Plaintiffs rely on a tortured reading of the statute and a handful of non-binding cases which misunderstand the 1988 expansion of the Act.

#### A. 1988 Amendments Broadened the Act

Plaintiffs' arguments lie in a misunderstanding of amendments made to the PAA in 1988. Prior to 1988, automatic federal jurisdiction under the Act applied only to claims arising out of an "extraordinary nuclear occurrence."[2] *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000). The Three Mile Island nuclear power plant accident laid bare the difficulty in the Act's narrow applicability. Because the accident did not meet the substantiality requirements of an "extraordinary nuclear occurrence," the resulting claims could not be consolidated in federal court. *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 477 (1999).

As a result, Congress amended the Act to broaden federal jurisdiction. *Id.* The 1988 Amendments Act amended section 2210(n)(2) to read, in relevant part:

> With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place…shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy. Upon motion of the defendant…any such action pending in any State court…shall be removed…to the United States district court having venue under this subsection.

---

[2] Under the PAA, an "extraordinary nuclear occurrence" is a release of radioactive material which results in offsite radiation levels and damage *which are found to be substantial in nature* by the Nuclear Regulatory Commission. *See* 42 U.S.C. § 2014(j). The substantiality requirement was the component which limited the cases that qualified for PAA jurisdiction in the pre-1988 amendment period.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

The amendment also added section 2014(hh), defining "public liability action" as "any suit asserting public liability." "Public liability," means, *inter alia*, "any legal liability arising out of or resulting from a nuclear incident or precautionary evacuation[.]" 42 U.S.C. § 2014(w). "Nuclear incident," is defined, *inter alia*, as:

> any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material[.]

42 U.S.C. § 2014(q).[3]

Federal jurisdiction now exists "over any actions 'asserting public liability' arising from a 'nuclear incident,' which generally includes any 'occurrence' causing physical harm [or property damage] resulting from the radioactive properties of nuclear materials." *Estate of Ware v. Hosp. of the Univ. of Pa.*, 871 F.3d 273, 279 (3d Cir. 2017) (hereinafter "*Estate of Ware II*") (citing *El Paso*, 5287 U.S. at 279). The amendments "deliberately increased the scope of the Act's coverage." *Id.* "[O]ne purpose behind the 1988 amendments was to expand the scope of federal jurisdiction beyond actions arising from 'extraordinary nuclear occurrences' only." *Acuna*, 200 F.3d at 339.

Because the 1988 amendments introduced new phrases to broaden federal jurisdiction, pre-1988 definitions, including that of "extraordinary nuclear occurrence," should not be used to restrict the Act's application.

## B.     The Act Is Not Limited to Licensees or Indemnitees

The PAA's application to a public liability action is not further limited under the Act. Statutory interpretation begins "with the language of the statute" and the inquiry ceases "[i]f the

---

[3] Plaintiffs' Motion does not challenge the application of the PAA in a property damage case or assert a position regarding the operative standard of care. Consequently, these issues are not addressed by Defendants in this Response.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

statutory language is unambiguous and the statutory scheme is coherent and consistent[.]"

*Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1976 (2016).  Because

"occurrence," as used in the definition of "nuclear incident," is not defined, the "fundamental

canon of statutory construction requires the Court "follow express statutory definitions" and

"give terms their ordinary meaning." *Carey v. Kerr-McGee Chem. Corp.*, 60 F. Supp. 2d 800,

805-06 (N.D. Ill. 1999).  "[O]ccurrence" simply means "happening or event" and a "nuclear

occurrence" for which jurisdiction is appropriate means any "[happening or event]…causing

bodily injury, loss or damage to property…arising out of or resulting from" radioactive material.

*Id.* at 805-06.  This interpretation is entirely in keeping with Congress' intent to expand federal

court jurisdiction.  Jurisdiction is proper in this case because Plaintiffs' allegations seek redress

under the PAA for damage allegedly due to radioactive materials.  Both the Act's plain language

and the weight of case law are contrary to Plaintiffs' position.

### i.     A License is Not a Prerequisite to Application of the Act

The definition of a "public liability action" does not require the involvement of a

licensee.   The PAA applies when an occurrence causes harm to person or property due to

radioactive sources. 42 U.S.C. § 2014(q).  "[A] 'public liability action' is a suit in which a party

asserts that another party bears any legal liability arising out of an incident in which the

hazardous properties of radioactive material caused bodily injury, sickness, or property damage."

*McClurg v. MI Holdings, Inc.*, 933 F. Supp. 2d 1179, 1186 (E.D. Mo. 2013) (citing *Cotroneo v.

Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 194 (5th Cir. 2011)).  Nothing in the PAA or its

definition of a "nuclear incident" limits jurisdiction under the Act based on whether a defendant

is also a licensee.

Indeed, federal courts have repeatedly held that the PAA applies to a broad range of radiation injuries. "In passing the Price-Anderson Act, Congress recognized that a nuclear incident might be caused by any number of participants in the nuclear industry beyond the actual licensee." *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1378 (C.D. Ill. 1992), aff'd, 13 F.3d 1090 (7th Cir. 1994). *See also Estate of Ware v. Hosp. of the Univ. of Pa.*, 73 F. Supp. 3d 519, 530 (E.D. Pa. 2014) (hereinafter "*Estate of Ware I*") (expressly rejecting that a public liability claim under the PAA is "limited to nuclear incidents occurring at utilization and production facilities and other licensed facilities") (internal quotations omitted); *Cotromano v. United Techs. Corp.*, 7 F. Supp. 3d 1253, 1257-58 (S.D. Fla. 2014) ("demonstration of a license for radioactive materials is not a prerequisite to federal jurisdiction under the plain language of the [PAA.]"); *Carey*, 60 F. Supp. 2d at 804 (rejecting argument to limit PAA to release from a facility that is licensed by the NRC and covered by an indemnification agreement).

Plaintiffs rely on a 2001 decision out of the Northern District of Florida for their "license" argument. That case, *Samples v. Conoco, Inc.*, 165 F. Supp. 2d 1303 (N.D. Fla. 2001) deals primarily with the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9601, *et seq.* The PAA is discussed only in a few paragraphs at the end of the fourteen-page opinion. 165 F. Supp. 2d at 1320-21. The Third Circuit held *Samples* is "unpersuasive" regarding PAA jurisdiction. *Estate of Ware II*, 871 F.3d at 282 n. 7.

### ii.      An Indemnification Agreement is Not a Prerequisite to PAA Jurisdiction

Nor does the PAA limit itself to parties to indemnification agreements. The Act provides that a "person indemnified" by the licensee and the federal government is "the person with whom an indemnity agreement is executed or who is required to maintain a financial protection,

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**and any other person who may be liable for public liability**." 42 U.S.C. § 2014(t) (emphasis added). If only those with an indemnification agreement could be sued for public liability, then Congress' express directive that indemnification extends to "and any other person who may be liable for public liability" would be superfluous because no other person could be liable. The entire bolded clause, above, would mean nothing.

Federal courts have held the Act's plain meaning indicates the PAA is not limited to parties to indemnification agreements. The Fifth Circuit Court of Appeals wrote, "There is nothing in the definition of 'nuclear incident' which suggests it should be contingent on…whether the facility is covered under the separate indemnification portions of the Act." *Acuna*, 200 F.3d at 339. *See also Estate of Ware I*, 73 F. Supp. 3d at 530-31 (adopting analysis of courts "which have concluded that possession of…an indemnification agreement is unrelated to establishing jurisdiction under PAA"); *Cotromano*, 7 F. Supp. 3d at 1259 ("Whether or not Defendants have indemnification agreements with the federal government is not dispositive of the applicability of Price-Anderson"); *Carey*, 60 F. Supp. 2d at 806 ("there can be an [extraordinary nuclear occurrence] to which no indemnity agreement applies.").

Plaintiffs rely heavily on a 1998 Magistrate Judge's ruling from the District of New Jersey to argue that an indemnification agreement is a prerequisite to public liability. Doc. No., 123-1 at 8-9 (citing *Gilberg v. Stepan Co.*, 24 F. Supp. 325 (D.N.J. 1998)).[4] *Gilberg* found an indemnification agreement was a jurisdictional requirement based on its misunderstanding of the definition of "occurrence." *See* 24 F. Supp. 2d at 331-40. The *Gilberg* court limited "occurrence" to the more narrowly defined "extraordinary nuclear occurrence," and failed to give the term its broad, ordinary meaning. *See id.* at 331-32, 339-40.

---

[4] Plaintiffs also cite *Joseph v. Sweet*, 125 F. Supp. 2d 573 (D. Mass 2000). *Joseph* addresses indemnification agreements only in passing, relying on *Gilberg* without its own unique reasoning.

As a District Court in the Northern District of Illinois held, "There are, in fact, numerous problems with the path *Gilberg* takes." *Carey*, 60 F. Supp. 3d at 806. The critical flaw in the *Gilberg* reasoning is its determination that "occurrence," as used in the definition of "nuclear incident," should be equated with the more narrow term "extraordinary nuclear occurrence." *See id.* at 332. As if to highlight the confused and confusing nature of the opinion, the Magistrate Judge candidly admitted his "path to this result is not entirely self-evident[.]" *Id.* at 340.

*Gilberg*'s analysis (and Plaintiffs' arguments here) was expressly rejected by the Third Circuit last September. In *Estate of Ware II*, 871 F.3d at 283, the Third Circuit held, "What *Gilberg* misses is that 'one purpose behind the 1988 amendments was to expand the scope of federal jurisdiction beyond actions arising from extraordinary nuclear occurrences[.]'" (quoting *Acuna*, 200 F.3d at 339). The court found *Gilberg*'s attempts to reintroduce the limitations of "extraordinary nuclear occurrence" into the 1988 amendments to be contrary to Congressional intent. *Id*.

Other federal courts are in accord. The Fifth Circuit in *Acuna*, 200 F.3d at 339, noted case law refuting the arguments made in *Gilberg*. District Courts in the Eleventh and Seventh Circuits have also disagreed with *Gilberg*. *Cotromano*, 7 F. Supp. 3d at 1258 ("A plain reading of the [PAA] contradicts the *Gilberg* court's flawed reasoning"); *Carey*, 60 F. Supp. 2d at 807 (criticizing *Gilberg* for its "use of a narrowing term to restrict what was obviously intended to be a broader term," selective application of statutory construction, and a reading that is "at odds with Congress' intent when it enacted the Amendments Act").

### iii. *Strong Does Not Bind This Court*

Plaintiffs also focus on *Strong v. Republic Servs.*, No. 4:17CV1645JCH, 2017 U.S. Dist. LEXIS 173951 (E.D. Mo. Oct. 20, 2017), to challenge jurisdiction under the PAA. *Strong*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

reviewed the above PAA case law, but then focused on the flawed rationale in *Gilberg*, which has been the subject of repeated criticism. In particular, *Strong* fell into a lengthy *Gilberg*-esque discussion about how jurisdiction under the PAA is affected by the terms "extraordinary nuclear occurrence," "nuclear incident," and indemnification agreements. 2017 U.S. Dist. LEXIS 173951 at *17-30. Consequently, the path to the result in *Strong*, like *Gilberg*, is not entirely self-evident.[5]

As discussed above, before the 1988 amendments to the Act, "extraordinary nuclear occurrence" was the critical requirement which afforded automatic federal jurisdiction under the PAA. In the 1988 amendments, federal jurisdiction was redrawn to cover any "nuclear incident," which is defined more broadly than the old "extraordinary nuclear occurrence." The *Gilberg* court struggled with this concept and *Strong* seems to have followed. As the Fifth Circuit held in *Acuna* when plaintiffs there attempted to follow a *Gilberg*-like line of thought, "attempts to reintroduce the limitations of 'extraordinary nuclear occurrence' into the 1988 amendments' substitution of 'nuclear incident' rely on faulty statutory interpretation and are contrary to Congressional intent." 200 F.3d at 339. *Strong*, like *Gilberg*, failed to follow the plain language of the statute.

Perhaps *Strong*'s most glaring misstep is in its use of **part** of the legislative history for the 1957 amendments to the Atomic Energy Act to reach the mistaken conclusion that "the terms 'nuclear incident' and 'occurrence' are inextricably intertwined with 'licenses' and 'indemnification agreements,' thus suggesting…there cannot be a nuclear incident without an applicable license or indemnity agreement." 2017 U.S. Dist. LEXIS 173951 at *28. It was ultimately on this basis that the *Strong* court found against PAA jurisdiction.

---

[5] Because Defendants' removal in *Strong* was based on federal question jurisdiction under the PAA, the subsequent remand was not appealable. As a result, Defendants had no avenue for relief at that time.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

There are two reasons why this conclusion is demonstrably incorrect. First, as discussed *supra*, the plain language of the PAA provides that a "person indemnified" is "the person with whom an indemnity agreement is executed or who is required to maintain a financial protection, **and any other person who may be liable for public liability**." 42 U.S.C. § 20147(t) (emphasis added). There is no need to peer 60 years into the past to understand the meaning of this unambiguous language—especially when the intervening decades had witnessed critical amendments to the Act.

Second, if the *Strong* court had simply read one paragraph further in the legislative history, the error in its conclusion would have been revealed:

> *The definition "person indemnified" means more than just the person with whom the indemnity agreement is executed....The phrase "person indemnified" also covers any other persons who may be liable....[I]t is not meant to be limited solely to those who may be found liable due to their contractual relationship with the licensee*. In the hearings, the question of protecting the public was raised where some unusual incident, such as negligence in maintaining an airplane motor, should cause an airplane to crash into a reactor and thereby cause damage to the public. Under this bill the public is protected and the airplane company can also take advantage of the indemnification and other proceedings. The proposed AEC limitation to those in privity with the licensee was reconsidered by the Commission, and *the Commission decided to accept the premise of the original bills which would make the person indemnified any person who might be found liable, regardless of the contractual relation*.

S. REP. NO. 85-296 (May 9, 1957), *reprinted in* 1957 U.S.C.C.A.N. 1803, 1818 (1957) (emphasis added) (a true and accurate copy of which is attached as **Exhibit 1**). In other words, contrary to the *Strong* decision, even the legislative history confirms that no indemnity agreement is necessary.

Simply put, whether the conduct alleged by Plaintiffs is a licensed activity or not, or by a NRC licensee or not, and whether any indemnification agreement applies or not, has no bearing on whether the PAA applies and supplies jurisdiction to this Court because none of these

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

conditions is used to define "occurrence" or, therefore, a "nuclear incident" following the 1988 amendment. Because Plaintiffs seek redress for a nuclear incident, the PAA applies and all state law causes of action are completely preempted. Accordingly, Plaintiffs' Motion should be denied.

### C. Plaintiffs Misrepresent Defendants' Statements in *Adams*

Defendants have not "judicially admitted" the PAA does not apply to them. *See* Doc. No. 123-1 at 10. *Adams v. MI Holdings, Inc.* (Eastern District of Missouri Case No. 4:12-cv-00641) named only Defendants Rock Road and Bridgeton, and not Republic or Allied. The *Adams* Complaint incorrectly alleged "Defendants or their predecessors and/or agents have at all relevant times held such federal [Nuclear Regulatory Commission] licenses." Case No. 4:12-cv-00641, Doc. No. 1 ¶ 65. A PAA claim was alleged *based upon* the possession of these licenses and activities in which Defendants Rock Road and Bridgeton were never involved. *Id*. ¶¶ 63-69.

In Defendants Rock Road and Bridgeton's Memorandum in Support of Motion to Dismiss (Doc. No. 15), Rock Road and Bridgeton refuted the specific allegations appearing in the *Adams* Complaint and the purported effect of those allegations. Rock Road and Bridgeton did not make a general statement of PAA applicability. Rock Road and Bridgeton's Reply Memorandum (Doc. No. 65) specifically addressed the argument Plaintiffs make here, stating:

> It was not the intent of Rock Road and Bridgeton Landfill to argue that non-NRC licensees like defendants Rock Road and Bridgeton Landfill *could not ever* be subject to public liability actions under the Price-Anderson Act. Rather, defendants simply state that the allegations contained in Count One of the Complaint, as a matter of fact and by the Complaint's own terms, do not apply to defendants Rock Road and Bridgeton Landfill.

Case No. 4:12-cv-00641, Doc. No. 65 at 12.

The *Adams* Motion to Dismiss argued against the exact allegations asserted by those plaintiffs. As clarified in the Reply Memorandum, the *Adams* plaintiffs failed to properly allege

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

a PAA claim against Rock Road and Bridgeton because of the <u>specific wording</u> of that Complaint.  By contrast, the instant lawsuit is unquestionably a public liability action alleging a nuclear incident, bringing it within the ambit of the PAA and preempting the state law claims.  In failing to include Defendants' clear statement from the *Adams* Reply Memorandum, Plaintiffs misrepresent the pleadings and Defendants Rock Road and Bridgeton's position in that case.

**IV.**  **The Daileys' Lawsuit Should Not Be Remanded Because These Claims Are PAA**

   **A.**  **Cotter's 1969 Source Material License Applies**

   Fundamentally, this case concerns radioactive materials that were allegedly handled, transported, disposed of and possessed by Cotter as a licensee of the Atomic Energy Commission ("AEC").  The Daileys allege the material at the West Lake Landfill originated from a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site"), and that the movement and disposal of the material at the Landfill resulted in contamination of their property.  Doc. No. 70 ¶¶ 43-46, 94.  The material and activities at the Latty Avenue Site were covered by Source Material License No. SUB-1022, issued to Cotter by the AEC (the "Cotter License"). Doc. No. 64-1 (Feingold Decl.) ¶ 5, Ex. D.[6]  Handling, processing, and movement (including off-site disposition) of the radioactive material located at the Latty Avenue Site was activity the license not only contemplated but required of the licensee, Cotter.  Further, in support of its application for termination of the license, Cotter certified that the material had been disposed of in accordance with federal law.  Letter from Edward J. McGrath to W. Burkhardt (May 10, 1974), enclosing Certification of Status of Source Material Activities ("Application for Termination"), a true and accurate copy of the relevant portion of which is attached as **Exhibit 3**.  The license was

---

[6] The Feingold Declaration (Doc. No. 64-1) describes and attaches Source Material Licenses issued between 1963 and 1969 by the Atomic Energy Commission for radioactive material stored and activities performed at the St. Louis Airport Site ("SLAPS") and the Latty Avenue Site.  Doc. No. 64-1, ¶¶ 1-5, Ex. A-D.  For ease of reference, Defendants have attached a true and accurate copy of the Feingold Declaration (and exhibits referenced therein) as **Exhibit 2** to this Response.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

terminated by the AEC in reliance on Cotter's Certification and Application for Termination (among other things). *See* Feingold Decl. (**Exhibit 2**) ¶ 6, Ex. E. Thus, Cotter's disposal of material at the West Lake Landfill arose from a licensed activity, and the Cotter License is inextricably part of Plaintiffs' claim of property damage.

Contrary to Plaintiffs' description, *Strong* did not hold that the Cotter License did not apply to the waste at the West Lake Landfill. Judge Hamilton did not feel the license would extend to uranium mill tailings, but declined to decide if the material deposited at the Landfill was, in fact, uranium mill tailings. In fact, she pointed out the Defendants "do not specifically acknowledge, nor does the record reflect that, the material deposited at the Landfill[] was…uranium mill tailings."[7] *Strong*, 2017 U.S. Dist. LEXIS 173951 at *32. In other words, the section of Judge Hamilton's opinion quoted by Plaintiffs addresses a mere hypothetical, and there was no finding that mill tailings were placed in the Landfill.

### B. State Law Claims Are Preempted

The absence of a proposed amended complaint makes it difficult to predict precisely how Plaintiffs seek to change their case, other than to simply reinstate their original pleading in this action, notwithstanding the intervening 18 months of amendment and procedural history. Regardless, however, it is clear from their Motion that they intend to base it on the same allegations of exposure to radioactive waste from the West Lake Landfill or from transport of the material to the Landfill that has been at the center of the case since its initial filing in November 2016. Regardless of how Plaintiffs now characterize their claims, they effectively allege a "public liability action" because they assert Defendants are liable for alleged property damage due to the hazardous properties of radioactive material. *See McClurg*, 933 F. Supp. 2d at 1186

---

[7] Significantly, Defendants have denied, and continue to deny, that mill tailings were deposited at the Landfill.

(public liability action "is a suit in which a party asserts that another party bears any legal liability arising out of an incident in which the hazardous properties of radioactive material caused…property damage.").

This Court has already found such allegations are "undoubtedly" public liability actions under the Price-Anderson Act. Doc. No. 89 at 15 ("The Court notes that almost every paragraph of the amended complaint in these two state-law counts mentions the radioactive contamination….Undoubtedly, these allegations fall under the PAA's definition of 'nuclear incident…'"). Even if all of the references to the PAA are removed from the Complaint, this will remain a PAA case under the exclusive jurisdiction of this Court.

## V.     Amendment at This Time Is Untimely and Prejudicial

If Plaintiffs intend to add to, amend, amplify, revise, or in any other way change their claims, then the Motion should be denied because they have not provided the Court a proposed amended complaint. While Rule 15 does not require a party to provide a copy of a proposed amended complaint and the Local Rules are silent, this District has ruled that a party must submit the proposed amendment along with its Motion, or at least give "some indication as to what might be added to the complaint to make it viable." *Grace v. Wallace*, 2016 U.S. Dist. LEXIS 104652 August 9, 2016) (citing *Clayton v. White Hall School Dist.*, 778 F.2d 457, 460 (8th Cir. 1985)); *Wolgin v. Simon*, 722 F.2d 389, 395 (8th Cir. 1983); *see also Geier v. Mo. Ethics Comm'n*, 715 F.3d 674 (8th Cir. 2013) (particularity requirement of Fed. R. Civ. P. 7(b) is met by supplying the Court with the proposed amendment along with the motion.).

The Court should deny the Motion because it has not been informed in any detail what the proposed amended complaint would claim. The only "indication" Plaintiffs have provided is the vague statement: "eliminate the erroneous PAA claims and reinstate the state law claims[.]"

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Doc. No. 123 at 5. Plaintiffs have not made clear whether they have an alternative basis for state court claims, additional facts for state court claims, additional parties to add, or any other detail. Defendants are severely prejudiced by the absence of specificity in the motion. Plaintiffs' bare conclusions are inadequate.

Further, Plaintiffs' request is tantamount to a motion for dismissal under Rule 41. Defendants adopt and incorporate by reference the arguments made by Defendant Cotter regarding Rule 41.

A restructuring of Plaintiffs' claims at this late date would prejudice Defendants by eliminating eighteen months of work. This case was originally filed in Missouri state court in November 2016. Since then, Defendants have removed the case, opposed a motion to remand, filed two motions to dismiss, filed answers to Plaintiffs' complaints, appeared before the Court, exchanged written discovery, participated in meet and confers, and actively engaged in discovery discussions. The depositions of Plaintiffs Robin and Michael Dailey are scheduled for April 17th and 18th. The deposition of Marco Kaltofen, who coordinated testing of samples at the Dailey property, is set for April 20th. Defendants are diligently trying to serve a subpoena upon Lucas Hixson who is believed to have collected samples at the Dailey property.[8] The Court's June 4th dispositive motion deadline is not far in the distance. A complete reversal of the claims in this case, going back to the original pleading filed in state court, would render useless the substantial work and expense already devoted to the defense over nearly 18 months.

---

[8] Defendants have reason to believe Mr. Hixson is actively avoiding service of a subpoena.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

**VI.**    **The Case Management Order Should Not Be Amended and Discovery Should Not Be Stayed**

Plaintiffs are again asking the Court to reconsider its Case Management Order ("CMO") more than thirteen weeks after its entry.[9]  The parties had the opportunity to discuss case management at the Court's December 15, 2017 Rule 16 conference.  The Court was aware of the applicable law and representations by Plaintiffs' counsel when it entered the CMO on January 2, 2018.  The Order's scope is proper and satisfies Rule 26(b)'s requirement that discovery be limited to matters "relevant to any party's claim or defense and proportional to the needs of the case[.]"  If Plaintiffs' property lacks sufficient proof of contamination, there is no case.

Similarly, discovery should not be stayed while the Court considers this Motion.  Discovery has already been delayed on Plaintiffs' request. Doc. Nos. 102, 119.  Plaintiffs' depositions are now set for April 17 and 18.  The Motion does not offer any justification for staying discovery.  Plaintiffs' attempt to further delay the case should not be indulged.

**VII.**    **Conclusion**

Plaintiffs cannot disregard their own claims.  The Price-Anderson Act still applies despite the fact their current counsel (evidently) no longer likes the case Plaintiffs filed.  A (nominal) change of representation does not justify an about-face eighteen months into litigation.

Although the Court's analysis and Defendants' response is hampered by Plaintiffs' failure to attach a proposed amended pleading, Plaintiffs' legal arguments in the Motion are not supported by the PAA's plain language or interpreting case law.  Neither a license nor an indemnification agreement is a jurisdictional prerequisite to application of the PAA.  Further, a license is at the origin of this case because the disposition of material at the West Lake Landfill

---

[9] Notably, Plaintiffs have already made a request to the Court for modification of the CMO during the status conference set at their request on March 5, 2018.  At that time, the Court granted Plaintiffs' request for additional time, but denied their attempt to change the remaining requirements contained in the CMO.

occurred during the pendency of the Cotter License. Plaintiffs' case arises under the PAA. This case should continue under the allegations and causes of action Plaintiffs made in the operative Complaint.


Dated: April 10, 2018                          Respectfully submitted,


                                               /s/ Robert G. Rooney
                                               William G. Beck (26849MO)
                                               Robert Rooney (43381MO)
                                               Allyson E. Cunningham (64802MO)
                                               2345 Grand Boulevard, Suite 2200
                                               Kansas City, Missouri 64108-2618
                                               (816) 292-2000 (telephone)
                                               (816) 292-2001 (facsimile)
                                               wbeck@lathropgage.com
                                               rrooney@lathropgage.com
                                               acunningham@lathropgage.com

                                               Patricia Lehtinen Silva (67213MO)
                                               Pierre Laclede Center
                                               7701 Forsyth Boulevard, Suite 500
                                               Clayton, Missouri 63105
                                               (314) 613-2800 (telephone)
                                               (314) 613-2801 (facsimile)
                                               psilva@lathropgage.com

                                               ATTORNEYS FOR DEFENDANTS
                                               BRIDGETON LANDFILL, LLC,
                                               REPUBLIC SERVICES, INC.,
                                               ALLIED SERVICES, LLC, and
                                               ROCK ROAD INDUSTRIES, INC.


## CERTIFICATE OF SERVICE

        I hereby certify that on April 10, 2018, I electronically filed the foregoing document via the Court's CM/ECF system, which will serve notice on all counsel of record.

                                               /s/ Robert G. Rooney

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Case 4:17-cv-00024-CDP Doc #: 129-1 Filed: 04/20/18 Page: 1 of 3 PageID #: 1070

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# Exhibit 1

## ATOMIC ENERGY

## ATOMIC ENERGY ACT OF 1954—AMENDMENT

*For text of Act see p. 629*

**Senate Report No. 296, May 9, 1957 [To accompany S. 2051]**

**House Report No. 435, May 9, 1957 [To accompany H.R. 7383]**

**The House bill was passed in lieu of the Senate bill, but with
Senate amendments. The Senate Report is set out.**

### Senate Report No. 296

THE Joint Committee on Atomic Energy, having considered the subject matter of the amendment to the Atomic Energy Act of 1954 to protect the public by providing governmental indemnity and granting limitation of liability for persons in the atomic energy program, by establishing the Committee on Reactor Safeguards as a statutory committee, and by requiring publication of its safety reports and public hearings on certain facility license applications, report an original bill S. 2051 and recommend that the bill do pass.

### BACKGROUND

When the Atomic Energy Act of 1954 was passed, it was the hope of Congress that the provisions in the laws liberalizing the statutory restrictions which had hitherto given the Government a monopoly in the atomic energy field would encourage the entrance of private industry into the program, and speed the further development of the peaceful uses of atomic energy.

It was brought to the attention of the Joint Committee in the 1956 hearings, which the Joint Committee is required to hold under section 202 of the Atomic Energy Act of 1954, that the problem of possible liability in connection with the operation of reactors is a major deterrent to further industrial participation in the program. While the 202 hearings held in 1957 indicate that it may not be the most important deterrent—that appears to be the current lack of economic incentive—the problem of liability has become a major roadblock.

The Joint Committee held hearings on this problem in May and June last year. At that time it considered proposals which had been drawn up in the committee and the Atomic Energy Commission. It voted out the committee version, but these bills were not brought up for debate on the floor of either House. This year the committee bills were again introduced and further hearings were held on them. The Atomic Energy Commission suggested a number of amendments to the committee bills. The Commission recommendations are incorporated in the record of the hearings for 1957.

### SAFETY OF REACTOR OPERATIONS

The Atomic Energy Commission reports that—

Nuclear reactors have been operated in the United States since December 2, 1942, with a safety record better than that of other industry. More than 100 reactor-years of regular operating experience have been accumulated, including experience with reactors of high power

NELIA insurance policy. The indemnification agreements are intended to cover damages caused by nuclear incidents for which there may be liability no matter when the damage is discovered, i. e., even after the end of the license. That is why the definition of "nuclear incident" has the phrase "*any* occurrence * * * causing bodily injury, sickness, disease, or death" and why the definition of "public liability" is tied to "*any* legal liability arising out of, or resulting from, a nuclear incident * * *." The suggested limitation to the loss of the use of property when evacuated under order of public authority was not accepted as being too limiting an exception. However, it is not the intention of the committee to have the damage to property which is included in the term "nuclear incident" include the diminution in value or other similar causes of action which may occur, namely, from the location of an atomic energy activity at a particular site.

The definition "person indemnified" means more than just the person with whom the indemnity agreement is executed. In the case of license this agreement will be executed with the licensee. Where the Commission and a contractor decide to take advantage of the provisions of this act, an indemnity agreement will be executed with the prime contractor. The phrase "person indemnified" also covers any other persons who may be liable. For a licensee for a reactor, this would mean in addition to the licensee that the indemnification extends to such persons as the subcontractors of the licensee, including those responsible for the design and construction of the reactor and the supplying of parts. However, it is not meant to be limited solely to those who may be found liable due to their contractual relationship with the licensee. In the hearings, the question of protecting the public was raised where some unusual incident, such as negligence in maintaining an airplane motor, should cause an airplane to crash into a reactor and thereby cause damage to the public. Under this bill the public is protected and the airplane company can also take advantage of the indemnification and other proceedings. The proposed AEC limitation to those in privity with the licensee was reconsidered by the Commission, and the Commission decided to accept the premise of the original bills which would make the person indemnified any person who might be found liable, regardless of the contractual relation.

One point mentioned several times in the hearings related to the possible liability of a carrier transporting spent fuel elements from a reactor to a processing plant. If such a company, whether through negligence or otherwise, should have an accident which would spill the radioactive materials into a stream, this bill would afford protection to the public and to the carrier, even though the carrier is not required to be a licensee under the Atomic Energy Act of 1954. However, those transmitting the material are required to be licensees and to see that appropriate safety measures are taken during the shipment. The Atomic Energy Commission has had extensive experience in shipping radioactive materials back and forth across the country without any of these possible incidents having yet occurred. Having the agreement run to the benefit of any other person who may be liable will parallel the policies which the insurance companies are planning to issue. They, too, will be entered into with the licensee or prime contractor and will run for the benefit of any other person who may be liable. This method of approach was suggested by the insurance companies since they

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# Exhibit 2

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL DAILEY and ROBBIN DAILEY,<br><br>Plaintiffs,<br><br>v.<br><br>BRIDGETON LANDFILL, LLC, REPUBLIC SERVICES, INC., ALLIED SERVICES, LLC, ROCK ROAD INDUSTRIES, INC., MI HOLDINGS, INC., MALLINCKRODT, INC., COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, and EXELON CORPORATION,<br><br>Defendants. | Case No. 4:17-cv-00024<br><br>**DECLARATION OF STEPHANIE R. FEINGOLD, ESQ. IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND TO STATE COURT** |

Stephanie R. Feingold, of full age, hereby declares as follow:

1.     I am a partner with the law firm of Morgan, Lewis & Bockius LLP, attorneys for Defendant Cotter Corporation (N.S.L.) ("Cotter") (improperly named as Cotter Corporation), and have been admitted *pro hac vice* to represent Cotter in connection with this matter.  As counsel for Cotter, I am fully familiar with the facts set forth herein and make this Declaration based on personal knowledge.

2.     Attached hereto as Exhibit A is a true and correct copy of Source Material License No. SMA-862, issued by the Atomic Energy Commission on February 14, 1966, to Continental Mining & Milling Company.

3.      Attached hereto as Exhibit B is a true and correct copy of Source Material License No. SMB-654, issued by the Atomic Energy Commission on December 31, 1963, to Contemporary Metals Corporation.

4.      Attached hereto as Exhibit C is a true and correct copy of Source Material License No. SMC-907, issued by the Atomic Energy Commission on December 29, 1966, to Commercial Discount Corporation.

5.      Continental Mining & Milling Co., Contemporary Metals Corporation, and Commercial Discount Corporation were prior licensees of the radioactive materials stored at St. Louis Airport Site and the Latty Avenue Site, for which Cotter was granted a source material license in 1969.  Attached hereto as Exhibit D is a true and correct copy of Source Material License No. SUB-1022, issued by the Atomic Energy Commission on December 30, 1969, to Cotter.

6.      Cotter's source material license remained in effect until the Atomic Energy Commission terminated it on November 13, 1974.  Attached hereto as Exhibit E is a true and correct copy of the November 13, 1974 letter from the Atomic Energy Commission informing Cotter of the termination of Source Material License No. SUB-1022.

7.      Attached hereto as Exhibit F is a true and correct copy of the March 21, 2014 Letter from the EPA Regional Administrator Karl Brooks to Missouri Attorney General Chris Koster.

8.      Attached hereto as Exhibit G is a true and correct copy of the November 17, 2016 letter from EPA General Counsel Alyse Stoy to Plaintiffs' attorneys Richard S. Lewis and Daniel T. DeFeo.

I declare under penalty of perjury that the foregoing is true and correct.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Dated: February 27, 2017

_____
Stephanie R. Feingold

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT A

EE14984

TECHNICAL SERVICES DIVISION (TSD)   BACKFIT
(Documents dated prior to 1 November 1988)

FUSRAP COMMUNICATIONS DISTRIBUTION
DOE/ORO TECHNICAL SERVICES DIVISION (CE-53)
BECHTEL NATIONAL, INC. — JOB 14501

CCN ___

TSD ☐   COMM TYPE 2 G1 X

COMM REF ___

ADMIN RCD ___

SUBJECT **Source Matl License for Slaps**

FROM **Harmon**    TO **Roriak**    COMM DATE 02 1466

ADDR CODE |NUMBER ST| CLOSES CCN    WBS **153**

SUBJECT CODE 2640    DOE FILE NO. ___

AFFECTED DOCUMENT ___

### RESPONSE TRACKING INFORMATION

PRIMARY:
OWED TO: ___    OWED BY: ___ (ORG)
(ORG) ___ TARGET DATE _/_/_   CLOSING CCN ___ COMPL. DATE _/_/_ CLOSING REF ___

SECONDARY:
OWED TO: ___    OWED BY: ___ (ORG)
(ORG) ___ TARGET DATE _/_/_   CLOSING CCN ___ COMPL. DATE _/_/_ CLOSING REF ___

COMMENTS ___

PLEASE RETURN TO PDCC FOR CORRECTIONS

COTTER00000708

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

*File* EE13984

FEB 1 4 1966

DCL:KEL
40-6811

Continental Mining & Milling Co.
203 South LaSalle Street
Chicago, Illinois 60604

Attention: Mr. Clemons M. Roark
Vice President

Gentlemen:

Enclosed is Source Material License No. SMA-862.

Since you indicate in your letter dated February 8, 1966, that the application contained therein supercedes the previous application of your subsidiary company, Contemporary Metals Corporation, Source Material License No. SMB-654 issued to Contemporary Metals Corporation as renewed December 31, 1964, is hereby terminated and a new license No. SMA-862 is issued in the name of Continental Mining & Milling Co.

Please note that this new license authorizes only removal of stockpile residues from 50 Brown Road, Robertson, Missouri, and storage at your facilities at 9200 Latty Avenue, Hazelwood, Missouri.

The remainder of your application dealing with the processing of residues is under review. We will communicate with you later regarding this phase of your application.

Very truly yours,

DISTRIBUTION:
Document Rm. w/encl.
State Health (Lic. only)
Suppl.
Compliance, Reg. III, w/encl.
N. Doulos, DML, w/encl.
Br. Reading File w/encl.
Div. Reading File w/o encl.

Don F. Harmon
Source & Special Nuclear Materials Branch
Division of Materials Licensing

Enclosure:
SMA-862

RECEIVED

Cc: D L Oakley 2-18-66

ENCL 4

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Form AEC-410
(1-61)

**UNITED STATES
ATOMIC ENERGY COMMISSION**

B≡14984

## SOURCE MATERIAL LICENSE

Pursuant to the Atomic Energy Act of 1954, and Title 10, Code of Federal Regulations, Chapter 1, Part 40, "Licensing of Source Material," and in reliance on statements and representations heretofore made by the licensee, a license is hereby issued authorizing the licensee to receive, possess and import the source material designated below; to use such material for the purpose(s) and at the place(s) designated below; and to deliver or transfer such material to persons authorized to receive it in accordance with the regulations in said Part. This license shall be deemed to contain the conditions specified in Section 183 of the Atomic Energy Act of 1954 and is subject to all applicable rules, regulations, and orders of the Atomic Energy Commission, now or hereafter in effect, including Title 10, Code of Federal Regulations, Chapter 1, Part 20, "Standards for Protection Against Radiation," and to any conditions specified below.

| Licensee | | 3. License No. SMA-862 |
|---|---|---|
| 1. Name Continental Mining & Milling Co. | | |
| 2. Address 208 South LaSalle Street Chicago, Illinois 60604 | | 4. Expiration Date February 28, 1969 |
| | | 5. Docket No. 40-6811 |
| 6. Source Material Uranium and thorium. | | 7. Maximum quantity of source material which licensee may possess at any one time under this license 125,000 tons of residues presently stockpiled at 50 Brown Road, Robertson, Missouri |

### CONDITIONS

8. Authorized use (Unless otherwise specified, the authorized place of use is the licensee's address stated in Item 2 above.)
Removal of stockpile residues from 50 Brown Road, Robertson, Missouri, and storage only at the licensee's facilities located at 9200 Latty Avenue, Hazelwood, Missouri, in accordance with the procedures described in the licensee's application dated February 4, 1966, and supplements dated February 7 and February 8, 1966.

9. Transfer of source material to the licensee's Hazelwood, Missouri, site is not authorized until fencing and lock gates have been installed in accordance with the licensee's submittal dated February 8, 1966.

**For the U. S. ATOMIC ENERGY COMMISSION**

Date of issuance ___FEB 1 4 1966___

✩ U. S. GOVERNMENT PRINTING OFFICE : 1962 O - 632504

Don F. Harmon
Division of Materials Licensing



COPY

COTTER00000710

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT B

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

DLR:PLL
40-6211

JAN 3 1 1963

Mr. Clement M. Doark
Suite 201, 500 Plumas
Reno, Nevada

Dear Mr. Doark:

Enclosed is Source Material License No. SMB-654, as re-
newed. Please note that all conditions of this license
remain the same.

In our letter dated November 9, 1962, we requested two
additional copies of your letter dated August 28, 1962,
and two copies of the revised blue print entitled "Sche-
matic Plan for Contemporary Metals Corporation Residue
Recovery Plant," transmitted with this information and
still need it in order to complete our records.

                              Very truly yours,




                              Donald A. Nussbaumer, Chief
                              Source and Special Nuclear Materials
                                Branch
                              Division of Licensing and Regulation

Enclosure:
SMB-654, as ren

DISTRIBUTION:
Formal-
Doc. Rm.
Br. 7 Div. Reg State                    , 3
Compliance                                  (Lic. only)

| OFFICE ▶ | | | | | | E/H/ |
|---|---|---|---|---|---|---|
| SURNAME ▶ | DLarson:red | nut/nelson | | | | |
| DATE ▶ | 12/31/'63 | 12/31/'63 | | | | |

AEC-318 (Rev. 9-53)                U. S. GOVERNMENT PRINTING OFFICE

COTTER00000655

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Fo m AEC—410
(1—61)

# UNITED STATES
## ATOMIC ENERGY COMMISSION

COPY

## SOURCE MATERIAL LICENSE

Pursuant to the Atomic Energy Act of 1954, and Title 10, Code of Federal Regulations, Chapter 1, Part 40, "Licensing of Source Material," and in reliance on statements and representations heretofore made by the licensee, a license is hereby issued authorizing the licensee to receive, possess and import the source material designated below; to use such material for the purpose(s) and at the place(s) designated below; and to deliver or transfer such material to persons authorized to receive it in accordance with the regulations in said Part. This license shall be deemed to contain the conditions specified in Section 183 of the Atomic Energy Act of 1954 and is subject to all applicable rules, regulations, and orders of the Atomic Energy Commission, now or hereafter in effect, including Title 10, Code of Federal Regulations, Chapter 1, Part 20, "Standards for Protection Against Radiation," and to any conditions specified below.

| Licensee | |
|---|---|
| 1. Name  Contemporary Metals Corporation | 3. License No.  SMB- 654, as renewed |
| 2. Address  1039 South San Gabriel Boulevard  San Gabriel, California | 4. Expiration Date  January 1, 1965 |
|  | 5. Docket No.  40-6811 |

| 6. Source Material | 7. Maximum quantity of source material which licensee may possess at any one time under this license |
|---|---|
| Uranium and thorium. | 125,000 tons of residues presently stockpiled at Brown Road, Robertson, Missouri. |

## CONDITIONS

8. Authorized use (Unless otherwise specified, the authorized place of use is the licensee's address stated in Item 2 above.)

For use in accordance with the procedures described in the licensee's application dated May 17, 1962, and supplements dated May 28, July 19 & 20, August 28 & 31, 1962; and December 9, 1963.

9. Authorized places of use:  Residue stockpile at Brown Road, Robertson, Missouri, and the licensee's processing facility at 7210 Polson Lane, Hazelwood, Missouri.

10. Process operations shall begin only at such time as the licensee has completed the installation of all equipment and facilities as described in the application and supplements thereto. However, removal and preparatory operations at the residue stockpile site may begin at such time as the equipment and facilities described in the application and supplements thereto for this operation have been completed.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

FORM AEC-401/410A          U. S. ATOMIC ENERGY COMMISSION          Page 2 of 2 Pages

SOURCE
MATERIAL LICENSE          License Number SMB-654
Supplementary Sheet

11. Mr. Alan P. Denning shall serve as the Director of the radiological safety program described in the application and supplements thereto specified in Item 8 of this license.

12. The St. Louis Testing Laboratory shall perform the quality control services as described in the application and supplements thereto specified in Item 8 of this license.

13. The licensee shall submit after the first three (3) months of operations, a report containing the results of the required radiological surveys.

14. The licensee is hereby exempt from the requirements of Section 20.203 (e)(2) and 20.203 (f)(2), 10 CFR 20, for areas and containers within the plant, provided all entrances to the plant are conspicuously posted in accordance with Section 20.203(e)(2) and with the words, "Any area or container within this mill may contain radioactive material."

*RRR* 12/31/63

For the U. S. Atomic Energy Commission

Date_____          by_____

Division of Licensing and Regulation
Washington 25, D. C.

COTTER00000657

Case: 4:22-cv-00116-CDP   Doc. #: 129-2   Filed: 01/20/23   Page: 364 of 903 PageID #: 2045

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT C

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

DML:CEM
40-7603

DEC 2 9 1966

DISTRIBUTION:
Document Room w/encl.
State Health (lic. only)
Subject File w/encl.
Compliance, Region III w/encl.
N. Doulos, DML w/3 encl.
Br. Reading File w/encl.
Div. Reading File w/o encl.

Commercial Discount Corporation
105 West Adams Street
Chicago, Illinois 60603

Attention: Mr. A. R. McPherson, Jr.
President

Gentlemen:

Enclosed is Source Material License No. SMC-907.

Please note that this license authorizes possession and storage only
of the residues containing source material and does not authorize
processing of any kind. If you should desire to process the residues
or conduct any other activities involving the residues, you should
request an amendment to this license.

Very truly yours,


Don F. Harmon
Source & Special Nuclear Materials
Branch
Division of Materials Licensing

Enclosure:
SMC-907

cc: Leibman, Williams, Bennett, Baird and Minow
208 South LaSalle Street
Chicago, Illinois 60604

Attention: Mr. William P. Colson

| OFFICE ▶ | DML | DML | OKed by Troy Conner - 12/28/66 | DFH |
|----------|-----|-----|--------------------------------|-----|
| SURNAME ▶ | CEMacDonald:jf | DFHarmon | | |
| DATE ▶ | 12/28/66 | 12/29/66 | | DH |

Form AEC-318 (Rev. 9-53)     U. S. GOVERNMENT PRINTING OFFICE   16-63781-3

COTTER00000732

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM



COPY

Form AEC-410
(1-61)

## UNITED STATES
## ATOMIC ENERGY COMMISSION

### SOURCE MATERIAL LICENSE

Pursuant to the Atomic Energy Act of 1954, and Title 10, Code of Federal Regulations, Chapter 1, Part 40, "Licensing of Source Material," and in reliance on statements and representations heretofore made by the licensee, a license is hereby issued authorizing the licensee to receive, possess and import the source material designated below; to use such material for the purpose(s) and at the place(s) designated below; and to deliver or transfer such material to persons authorized to receive it in accordance with the regulations in said Part. This license shall be deemed to contain the conditions specified in Section 183 of the Atomic Energy Act of 1954 and is subject to all applicable rules, regulations, and orders of the Atomic Energy Commission, now or hereafter in effect, including Title 10, Code of Federal Regulations, Chapter 1, Part 20, "Standards for Protection Against Radiation," and to any conditions specified below.

| | |
|---|---|
| Licensee | 3. License No. |
| 1. Name  Commercial Discount Corporation | |
| 2. Address  105 West Adams Street<br>Chicago, Illinois  60603 | 4. Expiration Date<br>December 31, 1969 |
| | 5. Docket No.<br>40-7603 |

| 6. Source Material | 7. Maximum quantity of source material which licensee may possess at any one time under this license |
|---|---|
| Uranium and Thorium | 125,000 tons of residues containing source material. |

### CONDITIONS

8. Authorized use (Unless otherwise specified, the authorized place of use is the licensee's address stated in Item 2 above.)

For storage only in accordance with the procedures described in the licensee's application dated December 14, 1966.

9. Authorized place of storage:  9200 Latty Avenue
Hazelwood, Missouri

For the U. S. ATOMIC ENERGY COMMISSION

Date of issuance

⭑ U. S. GOVERNMENT PRINTING OFFICE : 1962 O—632585

Don F. Harmon
Division of Materials Licensing

COPY

COTTER00000733

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT D

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

DML:DF.
40-8035

DEC 3 . 1969

Cotter Corporation
P. O. Box 1000
Roswell, New Mexico  88201

Attention:  Mr. David F. Marcott
            Executive Vice President and
            General Manager

Gentlemen:

    Enclosed is AEC Source Material License No. SUB-1022.

                        Sincerely,

                        Original Signed by
                        Don F. Harmon

                        Don F. Harmon
                        Source and Special Nuclear
                          Materials Branch
                        Division of Materials Licensing

Enclosure:
As stated

                        DISTRIBUTION:
                        PDR, w/encl.
                        State Health (license only)
                        Docket file, w/encl.
                        Branch R/F, w/encl.
                        Division R/F, w/o encl.
                        Harmon's R/F, w/encl.
                        CO, Region IV, w/encl.
                        N. Doulos, DML

| | | | | | |
|---|---|---|---|---|---|
| OFFICE ▶ | DML | | | | |
| SURNAME ▶ | DFHarmon/dmb | | | | |
| DATE ▶ | 12/30/69 | | | | |

Form AEC—410
(1–61)

## UNITED STATES
## ATOMIC ENERGY COMMISSION

---

## SOURCE MATERIAL LICENSE

Pursuant to the Atomic Energy Act of 1954, and Title 10, Code of Federal Regulations, Chapter 1, Part 40, "Licensing of Source Material," and in reliance on statements and representations heretofore made by the licensee, a license is hereby issued authorizing the licensee to receive, possess and import the source material designated below; to use such material for the purpose(s) and at the place(s) designated below; and to deliver or transfer such material to persons authorized to receive it in accordance with the regulations in said Part. This license shall be deemed to contain the conditions specified in Section 183 of the Atomic Energy Act of 1954 and is subject to all applicable rules, regulations, and orders of the Atomic Energy Commission, now or hereafter in effect, including Title 10, Code of Federal Regulations, Chapter 1, Part 20, "Standards for Protection Against Radiation," and to any conditions specified below.

| Licensee | |
|---|---|
| 1. Name **Cotter Corporation** | **3. License No.** SUB–1022 |
| 2. Address P. O. Box 1000 Roswell, New Mexico  88201 | **4. Expiration Date** December 31, 1974 |
| | **5. Docket No.** 40–8035 |

| 6. Source Material **Uranium** | 7. Maximum quantity of source material which licensee may possess at any one time under this license **Unlimited** |
|---|---|

---

### CONDITIONS

8. Authorized use (Unless otherwise specified, the authorized place of use is the licensee's address stated in Item 2 above.)

For use in accordance with the procedures described in the licensee's application dated December 16, 1969.

9. Authorized place of use:  The licensee's facility located at 9200 Latty Avenue, Hazelwood, Missouri.

RA
12/30/69

For the U. S. ATOMIC ENERGY COMMISSION

Original signed by
Don F. Harmon

Date of issuance   DEC 3 . 1969

Don F. Harmon
**Division of Materials Licensing**

* U. S. GOVERNMENT PRINTING OFFICE: 1962 O –632985

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

COTTER00000816

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT E

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

is less clear than this
notice, it is due to the
quality of the document
being filmed

DEC 16 1974



UNITED STATES
ATOMIC ENERGY COMMISSION
WASHINGTON, D.C. 20545

NOV 1 3 1974

RECEIVED

NOV 1 6 1974

E. J. McGRATH

L:FFRB:WTC
40-8035
SUB-1022

Cotter Corporation
ATTN:  Mr. David P. Marcott
       Executive Vice President
P. O. Box 356
Golden, Colorado  80401

Gentlemen:

In accordance with your application dated May 10, 1974 and pursuant

to Title 10, Code of Federal Regulations, Part 40, Source Material

License No. SUB-1022, is hereby terminated.

FOR THE ATOMIC ENERGY COMMISSION

L. C. Rouse, Chief
Fuel Fabrication and Reprocessing
  Branch No. 1
Directorate of Licensing

COTTER00000899

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT F

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM



# UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

REGION 7
11201 RENNER BOULEVARD
LENEXA, KS 66219

MAR 2 1 2014

OFFICE OF
THE REGIONAL ADMINISTRATOR

The Honorable Chris Koster
Attorney General of Missouri
P.O. Box 899
Jefferson City, MO 65102

Dear Mr. Koster:

I valued the opportunity to speak with you last week about the need to ensure continued protection of public health at the West Lake Superfund site through effective federal-state partnership. The State of Missouri and the Environmental Protection Agency have been using our respective regulatory and oversight powers to keep holding the responsible parties to their duties: controlling the SSE at Bridgeton Sanitary Landfill, separating the West Lake Landfill from the SSE, and completing selection and implementation of a protective long-term Superfund remedy at West Lake.

As we discussed, Region 7's team of experts continues taking several decisive actions at the West Lake Superfund site. The EPA intends soon to conclude an agreement with the United States Army Corps of Engineers to enlist Corps construction expertise for the isolation barrier to separate West Lake from the SSE. I will keep you and the Missouri Department of Natural Resources closely informed about the status of this project. And I concur with your recommendation that you and I promptly take that opportunity to inform the community about isolation barrier construction activities before they begin.

EPA's jurisdiction under the Comprehensive Environmental Response, Compensation, and Liability Act, also known as Superfund, covers release of hazardous substances wherever they have come to be located. EPA is committed to taking actions that compel the West Lake/Bridgeton PRPs to bear the costs legally required to contain and manage radiologically impacted material (RIM) resulting from the disposal of leached barium sulfate, regardless of where it is located at the site.

EPA's jurisdiction extends to wherever hazardous substances are located within the landfill complex. We will of course, closely cooperate with your office and the MDNR to align CERCLA work with PRP duties compelled by your Order at Bridgeton. I assure you that EPA work at the West Lake/Bridgeton NPL site will respect state authority while ensuring consistent site evaluations and appropriate allocation of federal and state responsibilities.

The Order your Office established in the Circuit Court of St. Louis County exercised State environmental-protection authorities which EPA considers complementary to our CERCLA powers. The State's lead in compelling the PRPs to control the subsurface smoldering event better enables this agency to compel the PRPs to isolate Bridgeton's SSE from West Lake. I believe that continuing to coordinate state and federal work will best accomplish our mutual goal to keep the public protected from environmental contaminants and nuisances, no matter their origin within the NPL site.



Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

We will continue to coordinate and communicate with you and your colleagues in the State of Missouri as we work to accomplish our shared goal of protecting the health of all Missourians.

Sincerely,

Karl Brooks

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT G

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM



**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 7**
11201 Renner Boulevard
Lenexa, Kansas 66219


**NOV 1 7 2016**


**ADVANCE COPY VIA ELECTRONIC MAIL**

Richard S. Lewis
Hausfeld, LLP
1700 K Street, NW
Suite 650
Washington, DC 20006

Daniel T. DeFeo
DeFeo & Kolker, LLC
1627 Main Street, Suite 801
Kansas City, Missouri 64108

     RE:   Request for Data

Dear Counsel:

On November 15, 2016, the U.S. Environmental Protection Agency (EPA) was provided a copy of a Petition filed by you on behalf of your clients, Michael and Robbin Dailey. This Petition contains certain allegations regarding radioactive contamination at the Dailey's property, some of which include the following:

- Paragraph 7: "Dusts inside the Dailey Home were shown to contain radioactive Th-230 at levels at least two hundred times higher than Background levels…"
- Paragraph 12: "Plaintiffs first learned that the Dailey Property was contaminated with radioactive material in 2016."
- Paragraph 90: "The Dailey Property is contaminated by radioactive material."
- Paragraph 91: "Samples taken on and around the Dailey Property confirm a highly elevated presence of radioactive particles in the soil and dust."
- Paragraph 92: "Dust samples from inside the Dailey Home contain decay products of radioactive isotopes U-238…"

We have also received your November 16, 2016 letter to EPA Region 7 Regional Administrator Mark Hague providing the December 2015 published journal article, map and summary data table. As a public health agency, EPA takes very seriously any information that relates to the actual or potential exposure to hazardous substances, pollutants or contaminants. EPA notes that the samples identified in the summary table were collected in July 2016, but this information is only now being provided to EPA several months later.


*Printed on Recycled Paper*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Page 2

Out of an abundance of caution, EPA is developing a plan for sampling of dusts and soils at the Dailey home and other areas in Bridgeton. In order for us to develop a scientifically sound plan, as well as fully assess the potential for unacceptable exposure to radioactive contaminants, EPA needs the relevant data that you have. We ask that you immediately provide the soil and dust data not just from the Dailey residence associated with the allegations referenced by you in the Petition, but also any other similar data you possess from nearby residences, businesses and publicly accessible locations in that area. EPA will utilize this data to inform the development of a sampling plan.

Specifically, EPA requests all laboratory data, laboratory reports, and any Quality Assurance Project Plan or other written procedures that describe how the samples were collected, analyzed and validated. Further, EPA asks that you provide documentation identifying the specific locations where samples were collected. Once EPA has an opportunity to review this data and methods employed to collect and analyze these samples our Agency will determine the appropriate next steps.

EPA continues to emphasize that our Agency will evaluate all scientifically valid data, and we greatly appreciate your expedited attention in providing this information. We understand that the allegations in the Petition have caused great concern for your client and others in the Bridgeton community, and we take these concerns seriously. Please do not hesitate to contact me at (913) 551-7826 if you have any questions.

Sincerely,

Alyse Stoy,
Associate Deputy Regional Counsel

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# Exhibit 3

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

40 - 8 0 3 5

LAW OFFICES

# EDWARD J. McGRATH

201 NORTH FREDERICK AVENUE

GAITHERSBURG, MARYLAND 20760

(301) 948-2480

May 10, 1974

W. Burkhardt, Senior Chemical Engineer
Fuels Fabrication & Reprocessing Branch
Licensing, Regulatory
Room 435, East-West Towers
UNITED STATES ATOMIC ENERGY COMMISSION
Washington, D. C. 20545

Re: Cotter Corporation, Source Materials License No. SUB—1022

Dear Mr. Burkhardt:

We enclose four copies of the Certification of Status with respect to the source materials license of Cotter Corporation and constituting notification that the corporation no longer possesses any radioactive material subject to United States Atomic Energy Commission licensing requirements.

Submitted in connection with the certification is a letter from Phillip K. Feeney, P.E., of the firm of Ryckman, Edgerley, Tomlinson & Associates, Inc., consulting environmental engineers, to which are attached plats of the Latty Avenue storage site where the licensed material formerly held by Cotter Corporation was deposited. The plat which we have marked "Attachment A" indicates the locations of the buildings and of the materials which were stored on the site. The plat which we have marked "Attachment B" contains the results of a radiological survey conducted by Ryckman, Edgerley, Tomlinson & Associates, Inc. subsequent to removal of all materials stored on the sight.

Based upon the work performed by Cotter Corporation, the work of contractors hired by Cotter Corporation in connection with removal and cleanup, and upon the monitoring of Rychman, Edgerley, Tomlinson & Associates, Inc., we are of the opinion that the Latty Avenue storage site and all appurtenances have been decontaminated. Cotter Corporation has removed to its mill in Colorado all materials with radioactivity levels meeting or exceeding that which subjects holders to license requirements.

Since all source materials now owned or held by Cotter Corporation are situated in Colorado, and subject to the license issued to the corporation by the State of Colorado, we request at this time that the United States Atomic Energy Commission source materials license issued to Cotter Corporation be terminated.

Please contact me should you wish further information.

Sincerely yours,

Edward O. McGrath
Attorney for Cotter Corporation

EJMcG/jmc
Copy to: David P. Marcott

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

| FROM: | DATE OF DOCUMENT: | DATE RECEIVED | NO.: |
|---|---|---|---|
| Cotter Corporation<br>North Frederick Avenue<br>Gaithersburg, Maryland 20760 | May 10, 1974 | May 14, 1974 | 1501 |

| | | LTR. X | MEMO: | REPORT: | OTHER: |
|---|---|---|---|---|---|
| TO: | | ORIG.: | CC: | OTHER: | |
| Burkhardt, Fuels & Fab.<br>USAEC | | | | | |

| CLASSIF: U | POST OFFICE | ACTION NECESSARY ☐<br>NO ACTION NECESSARY ☐ | CONCURRENCE ☐<br>COMMENT ☐ | DATE ANSWERED:<br>BY: |
|---|---|---|---|---|
| | REG. NO: | FILE CODE:<br>*Docket 40-8135* | | |

DESCRIPTION: (Must Be Unclassified)
**Certification of Status with respect to SNM constituting notification that corp. no longer possesses radioactive subject to AEC licensing requirements**

ENCLOSURES:

| REFERRED TO | DATE | RECEIVED BY | DATE |
|---|---|---|---|
| RICHIE/1 extra<br>Distribution: | 7-8-74 | | |
| Wk1 Burkhardt | | | |
| Reg. File cy | | | |
| PDR | | | |
| NO | | | |
| | | | |
| | | | |
| | | | |
| REMARKS: | | 1501 | |

☆ U.S GOVERNMENT PRINTING OFFICE 1973 — 503-135

U.S. ATOMIC ENERGY COMMISSION

**MAIL CONTROL FORM** FORM AEC-8369 (8-60)

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

UNITED STATES
**ATOMIC ENERGY COMMISSION**
WASHINGTON, D.C. 20545

### CERTIFICATION OF STATUS OF SOURCE MATERIAL ACTIVITIES
### UNITED STATES ATOMIC ENERGY COMMISSION

**LICENSE NUMBER**
SUB—1022

**LICENSEE:**  Cotter Corporation

**ADDRESS:**  P. O. Box 352, 11011 W. 6th Avenue, Suite 302, Lakewood, Colorado

The licensee and any individual executing this certification on behalf of the licensee certify that (check appropriate item(s) below):

_____ No source materials have been procured and/or possessed by licensee.

__X___ All source materials procured and/or possessed by licensee under Source Material License No.               :

_____ (1) have or will be prior to expiration of the above license trans-
ferred to _____
(Institution, firm, hospital, person, etc.)

_____

which has Source Material License No. _____

__X___ (2) have been or will be disposed of in compliance with 10 CFR 20
prior to expiration of this license.

Certifying Official
EDWARD J. McGRATH, Attorney for Cotter Corporat
**Date:**  May 9, 1974

Please return 4 copies to:
U. S. Atomic Energy Commission
Materials Branch, Directorate of
Licensing
Washington, D. C.  20545

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM



St. Louis, Missouri 63141
(314) 434-6960
Cable: RETA STL

# Ryckman/Edgerley/Tomlinson & Associates, Inc.

May 1, 1974
RETA-780

Mr. David P. Marcott
Executive Vice President
Cotter Corporation
Post Office Box 352
Golden, Colorado 80401

Dear Dave:

Attached are two (2) sketches of the Latty Avenue
Storage Site. The first depicts the original place-
ment of the residues and buildings. Building "D" was
the only building used for the actual drying opera-
tion.

The second sketch shows level of activity (MR/hr.) on
April 29, 1974, after decontamination had been com-
pleted. As you can see, all of the locations fall
below the allowable 0.6 MR/hr. (approximately 2,000
counts per minute) level.

If you have any questions or comments, or require
additional information, please contact me.

Very truly yours,

Phillip K. Feeney, P.E.
Associate

Enclosures

PKF:pac

Offices:
McLean,
Virginia
(Washington, D. C.)
Dayton,
Ohio
Memphis,
Tennessee
Denver,
Colorado
Tampa,
Florida
New Orleans,
Louisiana
Arlington,
Texas
(Dallas-Ft. Worth)
Houston,
Texas
Casper,
Wyoming
Chicago,
Illinois
Northumberland,
England
Rome,
Italy

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM



Latty Avenue

A

B

Congo
Raffinate

C

D

Settling
Ponds

Colorado
Raffinate

RR SPUR

Leached
Barium
Sulfate

Sketch not to scale

**RETA**

COTTER CORPORATION
LATTY AVENUE STORAGE SITE
HAZLEWOOD, MISSOURI



Latty Avenue

Yellow BR.

A

RADIATION MONITORING SURVEY

Values of Gross Activity in MR/hr. at
approximately three feet above grade.

April 29, 1974

Sketch not to scale.

COTTER CORPORATION
LATTY AVENUE STORAGE SITE
HAZLEWOOD, MISSOURI

RETA

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL DAILEY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | )   Case No. 4:17-cv-00024-CDP |
| BRIDGETON LANDFILL, LLC, et al. | ) |
| | ) |
| Defendants. | ) |

**AMENDED DISCLOSURE OF ORGANIZATIONAL INTERESTS**

Pursuant to Rule 3-2.09 of the Local Rules of the United States District Court for the

Eastern District of Missouri and Rule 7.1 of the Federal Rules of Civil Procedure, Counsel of

record for Defendant Rock Road Industries, Inc. hereby discloses the following change

organizational interests:

1.    **The parent companies of the corporation:**

Effective April 9, 2018, Rock Road Industries, Inc. merged into Bridgeton Landfill, LLC,

which is a wholly owned subsidiary of Allied Waste North America, LLC, which is a wholly

owned subsidiary of Allied Waste Industries, LLC, which is a wholly owned subsidiary of

Republic Services, Inc., a publicly held corporation.

2.    **Subsidiaries not wholly owned:**

None.

3.    **Any publicly held corporation or company that owns ten percent (10%) or
more of the corporation's stock:**

None.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Dated: April 16, 2018         LATHROP GAGE LLP

By: /s/ *William G. Beck*
    William G. Beck      26849MO
    Peter F. Daniel      33798MO
    Allyson E. Cunningham  64802MO
    2345 Grand Boulevard, Suite 2200
    Kansas City, Missouri  64108-2618
    Telephone:     (816) 292-2000
    Telecopier:    (816) 292-2001
    wbeck@lathropgage.com
    pdaniel@lathropgage.com
    acunningham@lathropgage.com

    Patricia Lehtinen Silva   67213MO
    Pierre Laclede Center
    7701 Forsyth Boulevard, Suite 500
    Clayton, Missouri  63105
    Telephone:     (314) 613-2800
    Telecopier:    (314) 613-2801
    psilva@lathropgage.com

    ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

    I hereby certify that a copy of the above pleading was served via the U.S. District Court ECM/ECF system on all counsel of record, this 16th day of April, 2018.

         */s/ William G. Beck*
         An Attorney for Defendants

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:17 CV 24 CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITIONS TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT TO DISMISS PRICE-ANDERSON ACT CLAIMS AND REINSTATE STATE LAW CLAIMS, MOTION TO REMAND, MOTION TO STAY PENDING DISCOVERY AND ALTERNATIVELY MOTION TO AMEND CASE MANAGEMENT ORDER**

## I. Introduction

On December 15, 2016, Michael and Robin Dailey filed this action in state court based on state law for property damage arising out of the 1973 illegal dumping and continued presence of radioactive materials at the Bridgeton/West Lake Landfill. Such actions not only subject Defendants to tort liability but could also be considered a felony under 18 U.S.C.A. § 831. Cotter (who illegally dumped radioactive materials) and the Landfill Defendants (owners/operators of Bridgeton/West Lake Landfill) removed the case. A motion to remand was filed but abandoned before adjudication.

Then, on April 21, 2017, an amended complaint was filed alleging federal jurisdiction under the Price Anderson Act ("PAA"). A Rule 16 conference followed and so too did a CMO which limited all discovery to radiation levels found on the Daileys' property. No transcript of that conference is available so undersigned counsel has no way of knowing if the Landfill defendants

disclosed to this court their contrary position in *Paulette M. Adams, et al., v. MI Holdings, Inc., et al*, Case No. 4:12CV641, ECF No.15, where they claimed that "Count One, arising under the Price-Anderson Act, is wholly inapplicable to Rock Road and Bridgeton Landfill, as the West Lake Landfill is not a nuclear facility subject to licensing by the Nuclear Regulatory Commission" and that "the West Lake Landfill and defendants Rock Road and Bridgeton Landfill are not, and have not ever been, subject to the Price-Anderson Act."[1] Despite Defendants argument to the contrary, Plaintiffs do not see how providing quoted text "misrepresents" their position.

Also, undersigned counsel has no way of knowing if the Landfill Defendants informed this court of Judge Jean C. Hamilton's October 20, 2017 decision in *Strong v. Republic Servs., Inc.*, 2017 WL 4758958 (E.D. Mo. 2017), a case involving the same landfill and same wastes that was remanded based on lack of subject matter jurisdiction because the PAA did not apply. It seems that Defendants should have since a Motion to Consolidate the *Dailey* and *Strong* cases was filed by the Landfill Defendants.[2] Shortly after the December 15, 2017 Rule 16 conference, the Daileys' previous attorneys withdrew in a series of motions with their present attorneys enrolling on January 16, 2018, February 27, 2018 and March 2, 2018.

A status conference was held; Plaintiffs sought an extension of the CMO deadlines and a discussion of it generally. Defendants argued that Plaintiffs' counsel, Barry Cooper's presence in the case, meant that no extra time was due. Mr. Cooper's declaration which outlined his extremely limited role was filed. This court granted the extension. The court also stated to proceed with the CMO and file a motion to change it. Thus, the present motion which seeks to reinstate the state law claims, to remand the case and alternatively to amend to CMO. The reasons are that (1)

---

[1] *See* Exhibit 1 – Defendants Rock Road Industries and Bridgeton Landfill, LLC's Memorandum in Support of Motion to Dismiss; *Paulette M. Adams, et al., v. MI Holdings, Inc., et al*, Case No. 4:12CV641, ECF No.15 at 2, 3, 10.
[2] ECF. Nos. 83, 84 and 87.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Plaintiffs' as masters of their complaint wish to pursue their claims under state law; (2) since this is a court of limited jurisdiction an adjudication of whether PAA applies or not is required; Honorable Judge Jean C. Hamilton has already found that there is no PAA jurisdiction and the federal government via the Nuclear Regulatory Commission determined long ago that the NRC has no jurisdiction over the byproducts produced when processing source material[3]; and (3) the CMO as currently drafted incorrectly focuses on the Dailey property and not the Latty Avenue property which was subject to Cotter's license.

In opposition, Defendants claim that they are prejudiced, that the law is in their favor, and that undersigned counsel seek to unduly delay and misinform the court. Each of these assertions are laid bare below. To be sure, plaintiffs possess the evidence necessary to establish a PAA claim and their discovery responses will be supplemented shortly. The Daileys have been forced to spend tens of thousands of dollars to acquire this unnecessary evidence. The PAA is complicated and the best minds in the field agree with Plaintiffs.[4] Finally, prejudice exists in this case but not as defendants' claim.

## II. The Price-Anderson Act in Not Applicable To This Matter, Despite Plaintiffs' Previous Counsel Pleading as Such

### a. Environmental and administrative law expert determined that the Price-Anderson Act is not applicable under these circumstances

Richard Stewart, an environmental and administrative law expert, has determined that the Price-Anderson Act ("PAA") does not apply under these circumstances. Mr. Stewart has over forty years of experience researching and teaching U.S. environmental and administrative law at various

---

[3] See *Strong v. Republic Servs., Inc.,* 2017 WL 4758958 (E.D. Mo. 2017); See also *In the Matter of Envirocare of Utah & Snake River All.,* 56 N.R.C. 53, 2000 WL 34400480 (N.R.C. Dec. 13, 2000); See also Exhibit 2 – Nuclear Regulatory Commission letter to the EPA regarding deferral of regulatory oversight to the U.S. Environmental Protection Agency for the West Lake Landfill, Bridgeton, Missouri dated June 16, 1995.
[4] *See* Exhibit 3 – Declaration of Richard B. Stewart. (April 24, 2018)

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

institutions, including Harvard and NYU, and his specialty is nuclear waste regulation and law. Mr. Stewart has authored a number of books and articles on nuclear waste regulation and law. Further, Mr. Stewart worked as Assistant Attorney General for Environment and Natural Resources of the United States Department of Justice.[5]

Mr. Stewart has reviewed the history of the radioactive legacy wastes in the St. Louis area and has concluded the following as it relates to this lawsuit:

(1) Plaintiffs claims do not fall within the exclusive jurisdiction of the PAA and accordingly may be maintained in Missouri state courts under Missouri state law; [6]

(2) The PAA does not preempt Plaintiffs' state law trespass and nuisance claims; [7] and

(3) Assuming arguendo that Plaintiffs' claims are PAA "public liability" actions, Plaintiffs must only prove that radioactive releases from Latty Avenue exceeded federal radiation standards at the landfill fencepost; they need not prove exceedances on their property.[8]

**b. *Ware II* is not dispositive as to the Price-Anderson Act's applicability in this matter**

The Defendants rely on *Estate of Ware v. Hosp. of the Univ. of Pa.*, 871 F.3d 273 (3rd Cir. 2017) (hereinafter "*Ware II*") to suggest that our argument is based on defunct or inapplicable law. In *Ware II*, the court held that "we do not decide whether the possession of a license, the intent of any nuclear energy release, or the medical use of nuclear material, might affect the Act's applicability to a particular case. We note only that these *implicit limitations* on the Price-Anderson Act's scope would preclude its applications here."[9] (emphasis added)  The court in *Ware II* determined that the PAA applied in that case because the University of Pennsylvania was licensed for the same activities that were sued upon. That is not the case here. The Landfill Defendants have

---

[5] *See* Exhibit 3 – Declaration of Richard B. Stewart. (April 24, 2018)
[6] *Id* at page 3.
[7] *Id* at page 7.
[8] *Id* at page 9.
[9] *Estate of Ware v. Hosp. of the Univ. of Pa.*, 871 F.3d 273 (3rd Cir. 2017)

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

no license whatsoever and Cotter's license does not apply to the wastes at issue. Moreover, even if the license applied to the waste at issue, it did not apply to illegal dumping of the material in an unlicensed facility. It is also important to note that the *Strong* decision, which determined that jurisdiction is not proper under these circumstances, was decided after the decision in *Ware II*.

Moreover, a petition for writ of certiorari was filed in *Ware II* on December 15, 2017 and it was docketed by the Supreme Court on March 12, 2018. The writ of certiorari presents two questions: (1) did the District Court err in applying the Price-Anderson Act to a case where Petitioner was injured while conducting research at the University of Pennsylvania with radioactive materials; and (2) did the District Court err by not remanding the state law claims once the Price-Anderson Act claims were voluntarily withdrawn by Petitioner?[10] On April 18, 2018, this writ of certiorari was distributed for Conference of May 10, 2018.[11]

### c. This Court has not determined whether jurisdiction is proper

Despite Defendants' assertion that this court has "implicitly" found that it has jurisdiction, this Court has never determined whether jurisdiction is proper because Plaintiffs' Motion to Remand was withdrawn before the court ever ruled. While it is true that this Court has determined that the PAA preempts all state claims *when* it is plead, this Court did not determine whether the PAA should apply in the first place.

### d. Like *Strong*, the NRC has already determined that wastes at issue are not subject to regulation

Cotter argues that the AEC's licensure of the materials at issue demonstrates that the AEC and later the NRC understood these residues to be subject to their jurisdiction. This is not correct. The NRC considered the issue of whether materials produced during processing of source material

---

[10] *See* Exhibit 4 – *Ware II* Petition for writ of certiorari
[11] www.supremecourt.gov

was subject to their jurisdiction concluding that if the actions were taken prior to 1978, they were
not.

"In 1978, the Uranium Mill Tailings Radiation Control Act (UMTRCA) [Pub. L. No. 95-
604] was enacted. As then Chairman Hendrie of the NRC explained to Congress, the agency at the
time did not have direct regulatory control over uranium mill tailings. The tailings themselves did
not fall into any category of NRC-licensable material. As of 1978, NRC was regulating tailings at
active mills indirectly through its licensing of source material milling operations under the Atomic
Energy Act of 1954 (AEA), largely as a result of the enactment of the National Environmental
Policy Act (NEPA). Operating uranium mill licenses were conditioned to require proper
disposition and stabilization for environmental issues after operations had ceased. However,
*tailings were not source material licensable by the NRC*. Thus once the underlying source material
license terminates, there would no longer be a clear basis for regulating the tailings."[12] (emphasis
added).

     **e.  Even if it is determined that Cotter's license applies to the wastes at issue, it
       certainly does not apply to the illegal dumping of said waste at the West Lake
       Landfill.**

Based on the language in Cotter's license, the license was issued "authorizing the licensee
to receive, possess, and import the source material designated below; to use such material for the
purpose(s) and at the place(s) designated below; and to deliver or transfer such material to persons
authorized to receive it in accordance with the regulations in said Part."[13] The source material
designated in the license is uranium and the location designated is 9200 Latty Avenue. [14] Nothing
in the license indicates that disposal at the West Lake Landfill was authorized.

---

[12] *In the Matter of Envirocare of Utah & Snake River All.*, 56 N.R.C. 53, 2000 WL 34400480 (N.R.C. Dec. 13,
2000)
[13] See Exhibit 5 - Stephanie Feingold's Declaration and attached AEC licenses. Cotter license SUB-1022.
[14] *Id.*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Thus, even if it is determined that Cotter's "source material" license is determined to apply to the wastes at issue, despite the NRC's conclusion that it did not, Cotter's license still does not apply to this matter because it does not cover the illegal disposal of the wastes at the West Lake Landfill, an unlicensed disposal facility. For Defendants to imply otherwise is disingenuous. Attached hereto are some non-certified documents from an EPA proceeding wherein Cotter states that they have no connection to the West Lake Landfill.[15]

### f. The broad jurisdictional definition proposed by Defendants would lead to absurd results

Defendants argue that following the 1988 amendments to the PAA, federal jurisdiction exists "over any actions 'asserting public liability' arising from a 'nuclear incident,' which generally includes any 'occurrence' causing physical harm [or property damage] resulting from the radioactive properties of nuclear materials." *Estate of Ware v. Hosp. of the Univ. of Pa.*, 871 F.3d 273, 279 (3d Cir. 2017)

Applying the PAA to every case involving nuclear material or radiation leads to absurd results. Based on Defendants assertions, the PAA covers all nuclear tortfeasors, no matter the circumstances. For example, as the Defendants would have it, the PAA applies to the properly licensed owner of a nuclear plant as well as the corporate opportunist who forgoes licensing and regulations in order to accept nuclear waste at a discount.

Such an extreme change to the PAA was not Congress' intent and it is not supported by the language of the 1988 amendment. If Congress intended to extend the benefits of the PAA to all nuclear wrongdoers, it would have used a word other than "occurrence" to define "nuclear incident". At the very least, Congress would have provided an alternative definition of

---

[15] *See* Exhibit 6 - Cotter Corporation's responses to EPA's CERCLA 104(e) Information Requests dated July 12, 1991 at pages 10, 13, 21, 22.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

"occurrence" to include events that do not take place at a "location" as set forth in an applicable indemnity agreement or license. Congress chose to do neither, thus, "occurrence" continues to have the same meaning after the amendment that it did before the amendment: an event taking place at a location identified in a license or indemnity agreement held by a defendant. This Court should resist Defendants' invitation to depart from the purpose and language of the PAA by assigning an interpretation that would have absurd consequences.

## III. Defendants fail to demonstrate prejudice, in fact, Plaintiffs have been prejudiced

Defendants argue that this motion should be denied because it would prejudice the Defendants. But, Defendants fail to demonstrate what prejudice would result from ensuring that jurisdiction is proper. The only prejudice Defendants assert is the delay in brining this motion. Delay in seeking to amend, alone, is an insufficient justification to deny leave. Prejudice to the nonmovant must also be shown.[16] Any prejudice to the nonmoving party must be weighed against the prejudice to the moving party by not allowing the amendment.[17] Where the requested amendments are based on facts similar to the original complaint, leave is normally granted.[18]

If anything, Plaintiffs have been prejudiced in the following ways:

(1) Defendants attach documents to their oppositions which were not produced based on Defendants' interpretation of the current CMO. Defendants refuse to consider producing anything that is related to activities outside of the Plaintiffs' property.

(2) Defendants attach a declaration by Stephanie Feingold "authenticating" a number of licenses issued by the Atomic Energy Commission. These documents cannot be "authenticated" by an attorney for Defendant whose parents likely hadn't met at the time the documents were created.

(3) The documents "authenticated" by Stephanie Feingold do not add up. Specifically, licenses SMB-654, SMA-862 and SMC-907 all list the "source material" as "uranium and thorium" and the maximum quantity of "125,00 tons of residues". The license

---

[16] *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 455 (8th Cir.1998) (citing *Buder v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 644 F.2d 690, 694 (8th Cir.1981))

[17] *Id*

[18] *Id*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

issued to Cotter, SUB-1022, lists the "source material" as uranium only and the maximum quantity of "unlimited". The link between Cotter's license and the alleged prior licensees is not explained or understood by a review of the documents. Cotter did not have a license for Thorium like the previous licenses and Thorium is a contaminant that Plaintiffs complain of. Moreover, each of these licenses refers to an application, yet none have been produced. [19]

(4) The issues concerning the PAA are jurisdictional and Plaintiffs are prejudiced by being forced to participate in litigation that could get thrown out at any point because there is not appropriate jurisdiction.

(5) Plaintiffs are currently unable to stop the CMO discovery even though it incorrectly focuses on the Plaintiffs' property. Since filing this motion, three several hour depositions have taken place, one of them out of state, at a tremendous cost to Plaintiffs.

The Landfill Defendants argue that Plaintiffs' should not be permitted to amend the complaint because we did not provide some indication as to what might be added to the complaint to make it viable. The purpose of Plaintiffs' motion is not to add claims to make it viable, in fact, the purpose of Plaintiffs' motion is quite the opposite. Moreover, Plaintiffs motion is clear that the relief requested is that the PAA claims be dismissed and the state law claims be reinstated.

Cotter argues that the crux of our motion appears to be that we are entitled to turn back the clock to November 16 to eliminate Price Anderson Act ("PAA") claims and have this matter remanded based on the fact that Plaintiffs' have a new lead attorney. To the contrary, Plaintiffs' brought this Motion because the law dictates that result based on lack of jurisdiction. Federal courts of limited jurisdiction "possess only that power authorized by Constitution and statute."[20] All doubt must be resolved against federal jurisdiction.[21] "If at *any time before final judgment* it appears that the district court lacks subject matter jurisdiction, the case *shall be remanded*."[22]

---

[19] See Exhibit 5 – Stephanie Feingold's Declaration and attached AEC licenses.
[20] *Kokkonen v. Guardian Life Ins. Co. of Am.,* 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994).
[21] *In re Prempro Prod. Liab. Litig.,* 591 F.3d 613, 620 (8th Cir. 2010).
[22] 28 U.S.C.A. § 1447(c).

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

(emphasis added). "At the threshold of every action asserting liability growing out of a nuclear incident, then, there is a federal definitional matter to be resolved: Is this a public liability action?[23]

## IV. The parties cannot confer jurisdiction on this Court

Cotter argues that Plaintiffs' "effectively abandoned the issues raised in the current motions when they withdrew their motion to remand in April 2017 and amended their pleading to assert PAA against Defendants." Contrary to this argument, Plaintiffs' cannot "effectively abandon" the issue of whether jurisdiction is proper.

"[N]o action of the parties can confer subject-matter jurisdiction upon a federal court."[24] In other words, "subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived."[25] "Indeed, the independent establishment of subject matter jurisdiction is so important that a party ostensibly invoking federal jurisdiction may later challenge it."[26]

Here, even though Plaintiffs' previous attorneys affirmatively invoked the PAA, this Court has an "independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party."[27] This court has never determined whether the PAA applies in the first place and this is the purpose of Plaintiffs' Motion.

## V. Even if it is determined that the PAA applies despite the decision in *Strong*, the current CMO does not address the appropriate standard for breach of the PAA

---

[23] *In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 855 (3d Cir. 1991)

[24] *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982).

[25] *United States v. Cotton*, 535 U.S. 625, 630, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002).

[26] 13 Wright & Miller § 3522, pp. 122–23

[27] *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 514 (2006)

Cotter argues that discovery should focus on whether Plaintiffs can show the presence of radioactive materials in their own home. Similarly, the Landfill Defendants argue that if Plaintiffs' property lacks sufficient proof of contamination, there is no case.

Plaintiffs cite *McClurg v. Mallinckrodt, Inc*., No. 4:12-CV-00361-AGF, 2017 WL 2929444 (E.D. Mo. July 7, 2017) to demonstrate that the focus in determining whether a breach of the PAA has occurred should be on the "release" of contaminants from the Defendants property. Cotter argues that the McClurg decision revolves around claims for personal injury as opposed to property damage. Plaintiffs fail to see how this distinction changes the focus in determining whether a breach of the PAA has occurred. Moreover, Defendants fail to cite any laws or regulations that would demonstrate the appropriate standard for a breach of the PAA. According to the expert, Dr. Stewart, the release measurements should be taken from the fencepost of the licensed location, here that is the Latty Avenue site.[28]

## VI. Despite Defendants' assertions, undersigned counsel only recently became involved in this matter and there has been no undue delay, dilatory motives or bad faith.

Cotter argues that "sole explanation" for this Motion is that "new" counsel has a different litigation strategy and that the "stated purpose" is to eliminate the federal cause of action in order to deprive jurisdiction and permit "relitigation" of previously dismissed state- law causes of action.[29]  The Landfill Defendants go as far as to say that it is "disingenuous, at best, to say that Plaintiffs' current counsel have only "recently" been involved.[30]

There is nothing "disingenuous" to say that Plaintiffs' current counsel only recently became involved. This issue was raised in Plaintiffs' Motion and Amended Motion for Extension of Time on Initial Case Management Order Schedule and Unopposed Motion for Status

---

[28] *See* Exhibit 3 – Declaration of Richard B. Stewart. (April 24, 2018)
[29] ECF. No. 128.
[30] ECF. No. 129

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Conference to Discuss CMO[31]. The issue was further discussed in Plaintiffs' Reply to Defendants' Opposition to Plaintiffs' Motion for Extension of Time on Initial Case Management Order Schedule and the attached Declaration of Barry J. Cooper, Jr., Esq.[32]

Based on these pleadings, Defendants are fully aware that Plaintiffs' current counsel only recently became involved and that we have been diligently getting caught up to speed. While it is true that Barry J. Cooper, Jr. has been involved since the inception of this case, Mr. Cooper served in a limited role.[33] More importantly, due to personal circumstances, Mr. Cooper had no involvement with this matter since it was removed in January 2017 until he was admitted pro hac vice in January of 2018.[34] Plaintiffs' other current attorneys of record, Celeste Brustowicz and Victor Cobb, had no prior involvement with this matter and were not admitted pro hac vice until February 27, 2018 and March 2, 2018 respectively.

## VII. Conclusion

If the PAA applies it would greatly limit the Daileys' recovery. The reason for the liability limitations is based on a legislative prerogative to protect the public and encourage the nuclear industry. Fundamentally, why should the Landfill defendants obtain the PAA's benefits when they were never part of the licensing/indemnity scheme? And, why should Cotter obtain these liability benefits when it violated its license by dumping unlicensed material in a non-licensed facility?

On its face, the PAA is not a model of clarity and the cases interpreting it are nuanced. There is, however, the *Strong* case, in this courthouse, involving the same defendants and the same issues. This case is about as on point as it gets. It is going to state court- and this case should too. Judge Hamilton is in good company as the premier nuclear regulatory agency of the United States

---

[31] ECF Nos. 108 and 109.
[32] ECF Nos. 115 and 115-1.
[33] ECF No. 115-1.
[34] *Id*.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Government, the Nuclear Regulatory Commission has spoken on this issue – authoritatively – concluding if the waste was produced prior to 1978 it is not subject to NRC regulations and licenses. Had the defendants' legal positions in *Adams* and the *Strong* decision been made known to the court then perhaps the applicability of the PAA would have resolved before. No matter, it did not. It is correct for this court to determine if subject matter jurisdiction exists.

The issue of prejudice is raised as the Daileys are seeking a course change. Admittedly, there was some delay caused by the change in the Daileys attorney. But as it relates to the defendants, there has been no delay; they have proceeded along with the CMO they demanded. They refused to conduct discovery outside of the CMO and prevented the Daileys some of the basic information that they now use to support their opposition. Prejudice does not exist because there was a delay. Prejudice must be articulable. Here, the defendants have nothing to say. They did not produce anything and obtained all the information they sought from the Daileys. The Daileys, on the other hand, have been denied the ordinary discovery procedures available to other litigants by virtue of an ill-conceived and incorrect CMO resulting in unnecessarily spending tens of thousands of dollars.

Respectfully submitted,

*/s/ Celeste Brustowicz*
Barry J. Cooper, Jr. (LSBA 27202), *Pro Hac Vice*
Celeste Brustowicz (LSBA 16835), *Pro Hac Vice*
Victor T. Cobb (LSBA 36830), *Pro Hac Vice*
**COOPER LAW FIRM, LLC**
1525 Religious Street
New Orleans, Louisiana 70130
E-mail: bcooper@sch-llc.com
cbrustowicz@sch-llc.com
vcobb@sch-llc.com

**ATTORNEYS FOR PLAINTIFFS,**
**MICHAEL AND ROBBIN DAILEY**

[*Certificate of Service on Following Page.*]

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## CERTIFICATE OF SERVICE

    I hereby certify that on April 24, 2018 I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

*/s/ Celeste Brustowicz*
Celeste Brustowicz (LSBA 16835)

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF MISSOURI

PAULETTE M. ADAMS, et al.,        )
                                 )
            Plaintiffs,       )    Case No.  4:12 – CV – 00641 – JCH
                                 )
vs.                           )
                                 )
MI HOLDINGS, INC., et al.,        )
                                 )
Defendants.               )

## DEFENDANTS ROCK ROAD INDUSTRIES AND BRIDGETON LANDFILL, LLC'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### Introduction

Plaintiffs are sixteen individuals who allege that they have been injured through exposure to radioactive contamination from properties located within the Coldwater Creek watershed, many immediately adjacent to Coldwater Creek.[1]  Plaintiffs allege exposure to residues from the processing of radioactive materials that were stored at these sites – each of which is a part of the Formerly Utilized Sites Remedial Action Program ("FUSRAP") – either by direct contact with the St. Louis FUSRAP sites or indirectly through off-site migrations from the St. Louis FUSRAP sites located within the Coldwater Creek watershed and upgradient of plaintiffs' own residences or public recreation areas.

Yet, the West Lake Landfill, owned by Defendants Rock Road Industries ("Rock Road") and Bridgeton Landfill, LLC ("Bridgeton Landfill"), is not located along Coldwater Creek or even within the Coldwater Creek watershed.[2]  The West Lake Landfill is not upgradient from the residences and recreational areas where plaintiffs allege they were exposed to radionuclides.  The West Lake Landfill is

---

[1] A companion case to this case, *McClurg et al. v. MI Holdings, Inc. et al.*, 12-cv-00361 - AGF was filed by the same attorneys for the plaintiffs in this case in this Court on February 28, 2012 and assigned to District Judge Audrey G. Fleissig.  Rock Road and Bridgeton Landfill are concurrently filing a similar motion in the *McClurg* case.

[2] A watershed is "the land area from which water drains into a stream, river, or reservoir." U.S. Environmental Protection Agency Drinking Water Glossary, August 28, 2009, http://water.epa.gov/lawsregs/guidance/sdwa/upload/2009_08_28_sdwa_fs_30ann_glossary_web.pdf .

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

not, nor has it ever been, a FUSRAP site.  And Rock Road and Bridgeton Landfill, as owners of the

West Lake Landfill, are not, nor have they ever been, Nuclear Regulatory Commission licensees.  In

light of these distinctions, plaintiffs' addition of Rock Road and Bridgeton Landfill as defendants in this

litigation is perplexing, as plaintiffs' allegations do not attempt to establish any connection between the

West Lake Landfill and plaintiffs' alleged exposure to radioactive materials.

      Plaintiffs' allegations are set forth in their 39-page Complaint, which contains 107 separate

paragraphs, only two of which mention Rock Road or Bridgeton Landfill and only nine of which

mention the West Lake Landfill.  Plaintiffs' allegations regarding the West Lake Landfill relate to the

receipt of soils containing trace amounts of leached barium sulfate residues for use as landfill cover from

July to October 1973.  Based on the receipt of these soils, plaintiffs allege that the West Lake Landfill is

contaminated with "hazardous, toxic, and radioactive wastes."  Complaint at ¶ 35.  Plaintiffs make no

specific allegations that they have been exposed to radioactive materials from the West Lake Landfill

via any exposure pathway.  Further, while plaintiffs allege exposure to radioactive residues through the

St. Louis FUSRAP sites, no plaintiff makes any specific allegation of exposure to any contamination

within four miles of the West Lake Landfill.  On its face, plaintiffs' Complaint fails to even attempt to

connect any alleged releases of materials or residues at the West Lake Landfill to plaintiffs' alleged

injuries.  Thus, the Complaint fails to state a claim upon which relief may be granted against Rock Road

and Bridgeton Landfill.[3]

      First, plaintiffs make very few specific allegations against Rock Road or Bridgeton Landfill or

related to the West Lake Landfill.  Those allegations that plaintiffs do make are either mere conclusions

that do not apply to Rock Road, Bridgeton Landfill, or the West Lake Landfill, or are supported by such

threadbare factual allegations that they are not entitled to the presumption of truth.  Second, plaintiffs'

---

[3] The considerations raised in this Motion may be applicable to other defendants, but Rock Road and Bridgeton Landfill make no statement through this Motion as to the truth of the allegations in the Complaint that relate to other defendants.

allegations, even taken as true, fail to state a plausible claim upon which relief may be granted.[4]  Count One, arising under the Price-Anderson Act, is wholly inapplicable to Rock Road and Bridgeton Landfill, as the West Lake Landfill is not a nuclear facility subject to licensing by the Nuclear Regulatory Commission.  Counts Two through Seven are common law claims, and Count Eight is a claim for medical monitoring damages – all of which fall under Missouri state law.  Although some of the elements plaintiffs must plead in Counts Two through Eight will vary by claim, each of these Counts requires pleading the essential element of causation.  Because plaintiffs fail to even attempt to connect any alleged contamination at the West Lake Landfill with their alleged injuries, plaintiffs fail to state a claim upon which relief can be granted for each count in the Complaint.

<div align="center">

**Statement of Alleged Facts[5]**

</div>

**A.    The Manhattan Project**

Plaintiffs' Complaint is based on activities conducted as a part of the Manhattan Project commissioned by the U.S. Army through the Manhattan Engineering District ("MED") during and after World War II.  Complaint at ¶¶ 16-17.  Through the MED, from 1942 to 1957, the facility in downtown St. Louis that became Mallinckrodt Chemical Works (the facility now known as the St. Louis Downtown Site or "SLDS") processed natural uranium into uranium oxide, trioxide, and metal uranium.  Complaint at ¶ 17.

**B.    The North St. Louis County Sites and the Coldwater Creek Watershed**

The MED then acquired a north St. Louis County property near the St. Louis Airport and immediately adjacent to Coldwater Creek (the St. Louis Airport Site or "SLAPS") for storage of the

---

[4] The Complaint does not distinguish among the Defendants in Counts One through Eight, so, for purposes of this Motion, Rock Road and Bridgeton Landfill assume that plaintiffs plead all eight counts against Rock Road and Bridgeton Landfill.

[5] As required, Rock Road and Bridgeton Landfill will treat Plaintiffs' allegations as true solely for the purpose of their motion to dismiss. *See Data Mfg., Inc. v. United Parcel Service*, 557 F.3d 849, 851 (8th Cir. 2009) (in deciding a Rule 12(b)(6) motion to dismiss, "factual allegations of a complaint are assumed true"). In doing so, Rock Road and Bridgeton Landfill do not admit these allegations.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

residues from materials processed at SLDS. Complaint at ¶ 18. In 1966, a private company purchased the SLAPS residues for their valuable metal content and had them hauled to a site on Latty Avenue. *Id.* at ¶ 19. Part of this site later became the Hazelwood Interim Storage Site ("HISS") and part became the Futura Coatings Site (together, the "Latty Avenue Sites"). *Id.* at ¶¶ 19, 29.

In addition to SLAPS and the Latty Avenue sites, several properties in the vicinity of SLAPS and the HISS were allegedly contaminated through the transportation of materials from the SLAPS to HISS and/or through migration of the residues from the SLAPS to the nearby vicinity properties via wind or surface water runoff to Coldwater Creek. *Id.* at ¶¶ 20, 29, 31, 46. Coldwater Creek is a water body that originates south of the SLAPS, continues in a northeasterly direction along the western border of the SLAPS, and flows through the Cities of Hazelwood and Florissant, through unincorporated areas of St. Louis County, and discharges to the Missouri River. *Id.* at ¶ 28.

At the direction of Congress, the SLAPS, HISS and Futura Coatings, and their vicinity properties were added to the Formerly Utilized Sites Remedial Action Program ("FUSRAP"), a program established for the cleanup of sites not owned by the Department of Energy, but contaminated from past activities involving radioactive materials. Complaint at ¶ 20. The West Lake Landfill is not now nor has it ever been a part of FUSRAP.

## C. The Alleged Involvement of Rock Road, Bridgeton Landfill, and the West Lake Landfill

Rock Road and Bridgeton Landfill own the property located at 13570 St. Charles Rock Road in Bridgeton, Missouri, known as the West Lake Landfill. Complaint at ¶¶ B.13-14, 35. The West Lake Landfill reportedly received soil mixed with leached barium sulfate, uranium and thorium from the uranium ore processing residues that were stored at the Latty Avenue sites. *Id.* at ¶¶ 35, 45. Plaintiffs allege that the West Lake Landfill has been "contaminated with hazardous, toxic, and radioactive wastes." *Id.* at ¶ 35.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Plaintiffs make several generalized allegations related to the location of the West Lake Landfill,
but fail to reveal that, unlike SLAPS and the Latty Avenue Sites, the West Lake Landfill is located well
outside the Coldwater Creek watershed, 4.6 miles away from the closest plaintiff's exposure.

**Map of Plaintiff Locations, North County St. Louis FUSRAP Sites, and West Lake Landfill [6]**



Plaintiffs allege that the West Lake Landfill is "located upstream from the intake for the Missouri
American Water Company, which supplies drinking water to Florissant and North County, and the
Chain of Rocks, which supplies drinking water to the city of St. Louis." Complaint at ¶ 36. Plaintiffs
also allege that the West Lake Landfill "lies partially within the Missouri River geomorphic flood plain
in northwest St. Louis County." *Id.* at ¶ 36. Plaintiffs allege that "groundwater beneath the West Lake

---

[6] This map, a copy of which is attached hereto as Exhibit A, was compiled using facts from the following publicly
available sources: (a) addresses of plaintiffs' alleged exposure, the Latty Avenue Sites, and the West Lake Landfill, as alleged
in the Complaint and mapped via on-line mapping tools; (b) Coldwater Creek Watershed as defined by the Metropolitan St.
Louis Sewer District and depicted in the map by the St. Louis County Planning Department, attached hereto as Exhibit B; (c)
Coldwater Creek and municipal boundaries available through on-line mapping programs; and (d) location of the St. Louis
FUSRAP sites not specified in the Complaint as depicted in Figures 2-2 and 2-4 of the Record of Decision for the North St.
Louis County Sites, prepared by the U.S. Army Corps of Engineers, St. Louis Office, Formerly Utilized Site Remedial
Action Program, attached as Exhibit C.

     The facts used to compile the map are the type of facts that are not subject to reasonable dispute because they can be
accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201 (2011);
*U.S. v. Brink*, 795 F.Supp.2d565, 569, n.1 (S.D. Tex. 2011) (courts can take judicial notice of geographic locations and
boundaries when the court has been furnished with government maps). Pursuant to Federal Rule of Evidence 201, Rock
Road and Bridgeton Landfill respectfully request that the Court take judicial notice of the locations depicted in the map based
on the Complaint and the attached Exhibits B – C.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Landfill is shallow, and monitoring wells showed radionuclide concentrations above Maximum

Contaminant Levels ('MCL')." *Id*. at ¶ 37.

Yet plaintiffs make no attempt to tie these allegations to plaintiffs' own exposure or to plaintiffs'

alleged injuries. Rather, plaintiffs conclusively allege that the West Lake Landfill "poses a potential

threat to on site users," and state generically that "the potential for future exposure exists based on both

direct contact with the waste materials and the possibility that off-site migration will continue to occur."

*Id*. at ¶¶ 37, 38. None of the plaintiffs' allegations associate this exposure with plaintiffs or their alleged

injuries.

## Argument

### Standard for a Rule 12(b)(6) Motion to Dismiss

When ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim, courts take as true

the alleged facts and determine whether they are sufficient to raise more than a speculative right to

relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). The court does not accept as true any

allegation that is a legal conclusion. *Aschcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 1949-50 (2009).

The complaint must have "a short and plain statement of the claim showing that the [plaintiff] is entitled

to relief in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it

rests." *Twombly*, 550 U.S. at 555 (quoting Fed. R. Civ. P. 8(a)(2)).

While detailed factual allegations are not necessary, a complaint that contains "labels and

conclusions," and "a formulaic recitation of the elements of a cause of action" is not sufficient.

*Twombly*, 550 U.S. at 555; *Iqbal*, 129 S.Ct. at 1949. The complaint must set forth enough facts to state a

claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 570; *Iqbal*, 129 S.Ct. at 1949. Based

on *Twombly*, the Eighth Circuit recently held:

> While a plaintiff need not set forth detailed factual allegations or specific facts that
> describe the evidence to be presented, the complaint must include sufficient factual

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

allegations to provide the grounds on which the claim rests. A district court, therefore, is not required to divine the litigant's intent and create claims that are clearly not raised, and it need not conjure up unpled allegations to save a complaint.

*Gregory v. Dillard's, Inc.*, 565 F.3d 464, 473 (8th Cir. 2009) (quotations and citations omitted).

For a claim to have facial plausibility, the plaintiff must plead factual content that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949. If the claims are only conceivable, not plausible, the complaint must be dismissed. *Twombly*, 550 U.S. at 570; *Iqbal*, 129 S.Ct. at 1950.

When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), courts engage in a two-step inquiry. *See, e.g., Clark v. Wal-Mart*, 2010 WL 7701137 at *1 (E.D. Mo. July 30, 2010); *McKay v. GMAC Mortgage, LLC*, 2010 WL 2518590 (E.D. Mo. June 14, 2010); *Ginsburg v. InBev NV/SA*, 649 F.Supp.2d 943, 948 (E.D. Mo. 2009); *In re Estate of Butters v. Ash*, 2009 WL 1536606 at *2 (E.D.Mo. May 28, 2009). First, courts identify the allegations in the complaint that are not entitled to the assumption of truth. *Iqbal*, 129 S.Ct. 1950-51. These include legal conclusions and "[t]hreadbare recitals of the elements of a cause of action [that are] supported by mere conclusory statements." *Id*. at 1949. Second, courts determine whether the complaint states a plausible claim for relief. *Id*. at 1950-51. This is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S.Ct. at 1950. In this step, courts review the factual allegations in the complaint "to determine if they plausibly suggest an entitlement to relief." *Id*. at 1951.

## I. Plaintiffs' Allegations as They Relate to the West Lake Landfill are Devoid of Factual Support and are Mere Legal Conclusions Not Entitled to the Presumption of Truth

The first step in a court's analysis of a 12(b)(6) motion is to identify the allegations in the complaint that are not entitled to the assumption of truth. *See, e.g., McKay v. GMAC Mortgage, LLC*, 2010 WL 2518590 (E.D. Mo. June 14, 2010). In their Complaint, plaintiffs make little attempt to plead specific factual allegations related to Rock Road, Bridgeton Landfill, or the West Lake Landfill. Rather,

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

plaintiffs' mere recitation of the elements of each of their counts completely omits mention of Defendants Rock Road or Bridgeton Landfill or of operations at the West Lake Landfill. All of plaintiffs' allegations relating to site history, investigation and contamination, topography and drainage of contaminants, and each allegation in their eight separate counts, refer solely to "Defendants'" activities related to "the St. Louis FUSRAP Sites," from which plaintiffs, correctly, specifically exclude the Landfill. These are precisely the type of conclusions and recitals of legal elements that fail under *Twombly* and *Iqbal*.

> ### a. *Plaintiffs' Blanket Allegations Against the "Defendants" are Conclusions Not Entitled to the Presumption of Truth*

Plaintiffs make no attempt to plead any conduct on the part of Rock Road or Bridgeton Landfill that affected plaintiffs, let alone how such conduct could have caused plaintiffs' exposure to materials that caused the injuries plaintiffs allege. In the Complaint, the only paragraphs that mention Rock Road or Bridgeton Landfill specifically are paragraphs B.13 and B.14, which allege that Rock Road and Bridgeton Landfill currently own the West Lake Landfill and are identified by EPA as potentially responsible parties for that site. Complaint at ¶¶ B.13 – 14. The remaining paragraphs make no further mention of Rock Road or Bridgeton Landfill, but refer only to the conduct of "Defendants" as a group.

In Paragraph 13, plaintiffs introduce a blanket allegation regarding the conduct of all defendants: "Defendants or their predecessors in interest were engaged in the business of processing, distributing, transporting, storing, handling and/or disposing" of the radioactive materials. Complaint at ¶ 13. This blanket allegation or a slight variation of it appears throughout the remainder of the Complaint, but nowhere in the Complaint do plaintiffs specify the conduct of defendants Rock Road or Bridgeton Landfill that would make these entities liable. *See id.* at ¶ 13, 21, 59, 65, 71, 73, 78, 82, 98. Further, plaintiffs' own allegations limit Rock Road and Bridgeton Landfill's involvement in this

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

controversy to their status as owners of the West Lake Landfill.  *See id.* at ¶¶ B.13 – B.14.  Defendants Rock Road and Bridgeton Landfill are entitled to know the bases for the claims plaintiffs allege against them, and generic allegations against all defendants fall well short of the standard required for this Court to presume the truth of these allegations.

### b.  By Their Own Terms, Plaintiffs' Blanket Allegations Regarding Their Alleged Exposure through the St. Louis FUSRAP Sites Do Not Apply to the West Lake Landfill

Plaintiffs also make little attempt to plead exposure to materials from the West Lake Landfill, nor do they plead how any alleged exposure to materials from the West Lake Landfill could have caused their injuries.  Plaintiffs' only allegations specific to the West Lake Landfill are limited and do not plead that any alleged exposure at the Landfill affected plaintiffs at all.  Complaint at ¶¶ B.6, B.11, B.13 –14, 21, 35 – 38, 45.  The remaining allegations are devoid of any mention of the West Lake Landfill, but rather refer to operations and/or activities conducted at the "St. Louis FUSRAP Sites," Complaint at ¶¶ 57, 58, 59, 60, 61, 66, 73, 74, 78, 82, 84, 85, 88, 91, 94, or the individual FUSRAP Sites.  *Id.*  at ¶¶ 17, 18, 19, 20, 22 – 24, 25 – 32, 33 – 34, 39, 40, 41, 42, 43, 44, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56.

The West Lake Landfill is not, nor was it ever, a part of the Formerly Utilized Sites Remedial Action Program ("FUSRAP").  Indeed, by plaintiffs' own definition, the term "St. Louis FUSRAP Sites" excludes the West Lake Landfill.  Complaint at p. 18, n. 5 ("The St. Louis FUSRAP Sites include: (1) the St. Louis Downtown Site ('SLDS'); (2) the St. Louis Airport Site ('SLAPS'); (3) the Hazelwood Interim Storage Site ('HISS'); (4) the Vicinity Properties ('VPs'); and (5) the Madison Site.").[7] Plaintiffs' repetition of blanket conclusions regarding the St. Louis FUSRAP Sites, which admittedly do not apply to the West Lake Landfill, is insufficient to meet the pleadings standards set forth in *Twombly*

---

[7] While plaintiffs list West Lake Landfill as one of the "four separate geographic areas" where "Defendants processed, stored, handled, and/or disposed of large volumes of hazardous, toxic, and radioactive materials," this allegation does not place West Lake among the St. Louis FUSRAP sites. Complaint at ¶ 21.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

and *Iqbal*.  Because none of these counts makes any allegations applicable to the West Lake Landfill, the Complaint on its face fails to state a claim against Rock Road and Bridgeton Landfill.

II.     **Even Assuming the Truth of Plaintiffs' Allegations, the Complaint Fails to State Plausible Claims upon which Relief Can Be Granted**

*a.     Plaintiffs' Allegations in Count I Do Not Apply to the West Lake Landfill*

Despite plaintiffs' indiscriminate allegations to the contrary, the West Lake Landfill and defendants Rock Road and Bridgeton Landfill are not, and have not ever been, subject to the Price-Anderson Act, 42 U.S.C. § 2011, *et seq*.  Complaint at ¶ 64.  Plaintiffs allege that all "Defendants" are "engaged in the development, use, and control of atomic energy within the terms of the Atomic Energy Act" and "have at all relevant times held such federal licenses." Complaint at ¶ 65.  Contrary to plaintiffs' allegations, Rock Road and Bridgeton Landfill have never been engaged in the development, use, and control of atomic energy within the terms of the Atomic Energy Act, and are not now, nor were they ever, Nuclear Regulatory Commission ("NRC") licensees pursuant to the statutory provisions cited by plaintiffs in the Complaint.  Complaint at ¶ 65.  Plaintiffs' attempt to lump Rock Road and Bridgeton Landfill together with other defendants in the litigation through their generic, stock allegations is insufficient to create a claim against these defendants under the Price-Anderson Act.  Further, allegations related to Count One specify activities conducted at the St. Louis FUSRAP Sites. Complaint at ¶ 66.  By the allegations in the Complaint, the West Lake Landfill is not now and was not ever a St. Louis FUSRAP site.  Complaint at 18, n. 5.  Because the allegations in Paragraphs 63 to 69 of the Complaint do not apply to Rock Road or Bridgeton Landfill, Count One fails to state a claim against these defendants upon which relief can be granted.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

### b. *Plaintiffs' Threadbare Allegations Regarding the West Lake Landfill Fail to State How Plaintiffs Were Exposed to Materials at the West Lake Landfill or How Such Exposure Caused Plaintiffs' Alleged Injuries, as Required for Counts Two through Eight in Plaintiffs' Complaint*

Under Missouri law, each of the common law counts plaintiffs allege against Rock Road and

Bridgeton Landfill requires plaintiffs to plead and prove causation. *See Chism v. W.R. Grace & Co.*,

158 F.3d 988, 990 (8th Cir. 1998) (Missouri law requires plaintiff to establish a causal connection

between the defendant's conduct and the plaintiff's resulting injury for negligence and strict liability

claims); *Gerling America Ins. Co. v. Cont'l Cement Co. / Missouri Fuel Recycler*, 2007 WL 2757641, *7

(E.D. Mo. Sept. 20, 2007) (*citing Sill v. Burlington N. R.R.*, 87 S.W.3d 386, 392 (Mo. Ct. App. S.D.

2002) ("a claimant may proceed on a negligence per se claim if the following four elements are met . . .

the violation of the statute was the proximate cause of the injury.")); *Bailey v. Bayer CropScience*, 563

F.3d 302, 310 (8th Cir. 2009) (*citing Gibson v. Brewer*, 952 S.W.2d 239, 249 (Mo. 1997) (to succeed on

a claim for intentional or reckless infliction of emotional distress, plaintiff must plead defendant

intentionally or recklessly caused severe emotional distress that results in bodily harm)); *T-Mobile USA*

*v. Yoak*, 2011 WL 2792435 at *1 (E.D. Mo. July 8, 2011) (under Missouri law, causation is an element

of a claim for intentional infliction of emotional distress); *Moore v. Higgins*, 2008 WL 2225724 at *12

(W.D. Mo. May 29, 2008) (plaintiff failed to show defendant's conduct caused emotional distress or that

such distress resulted in injury); *Bass v. Nooney Co.*, 646 S.W.2d 765, 772-73 (Mo. 1983) (to succeed on

a claim of negligent infliction of emotional distress, plaintiff must plead and prove the defendant should

have realized his conduct involved an unreasonable risk of causing distress); *Meyer ex rel. Coplin v.*

*Fluor Corp.*, 220 S.W.3d 712, 717 (Mo. 2007) (medical monitoring is not a new tort, but a compensable

item of damage when liability is established under traditional tort theories).  Despite the required

causation element, plaintiffs fail to allege how they have been exposed to any materials at the West Lake

Landfill and how their exposure could have caused their alleged injuries.

The primary allegations related to the West Lake Landfill are found in paragraphs 35 – 38 of the Complaint. In this section, plaintiffs allege that the West Lake Landfill "has been contaminated with hazardous, toxic, and radioactive wastes." Complaint at ¶ 35. Even taking this allegation as true, plaintiffs do not assert how such contamination from the West Lake Landfill caused their alleged injuries. *See* Complaint at ¶¶ 36-38. Rather, plaintiffs simply allege that the location of the West Lake Landfill situates it upstream from the intake sources for the Missouri American Water Company, which supplies drinking water to Florissant and North County and within the Missouri River geomorphic flood plain. Complaint at ¶ 36. The Complaint provides no allegations regarding how plaintiffs came into contact with the alleged wastes, for example by dermal contact, ingestion or airborne exposure. Further, plaintiffs do not allege how exposure by any pathway could have caused their individual injuries.

Plaintiffs also allege that the groundwater beneath the West Lake Landfill shows radionuclide concentrations above MCL's. Complaint at ¶ 37. Even taking this statement as true, plaintiffs do not allege if or how they were exposed to the groundwater beneath the West Lake Landfill. Plaintiffs' only statements regarding how these allegedly elevated concentrations could cause exposure to *anyone* are that the Landfill "poses a potential threat to on-site users" from external gamma radiation and radon gas emissions, and that "a potential health threat exists" from the wastes at the site. Complaint at ¶¶ 37, 38. Yet plaintiffs never state if or how *they themselves* could be exposed as "on-site users" or if or how such "potential health threat" could apply to them. Plaintiffs' claim of a potential for future exposure that is "based on both direct contact with the waste materials and the possibility that off-site migration will continue to occur" is also insufficient. Complaint at ¶ 38. Plaintiffs do not allege how they might come into "direct contact" with the waste. Complaint at ¶ 38. And plaintiffs' allegation that "off-site migration will continue to occur" is both incorrect and insufficient, as no off-site migration has

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

occurred, nor have plaintiffs alleged how such future "off-site migration" could expose them to the waste. Complaint at ¶ 38.

Further, these allegations fail to put these defendants on notice of how any alleged exposure could have caused plaintiffs' injuries. Complaint at ¶¶ 35 – 38. Even if plaintiffs had alleged how they were exposed to materials from the West Lake Landfill, that fact alone would be insufficient to plead that Rock Road and Bridgeton Landfill caused plaintiffs' injuries. Plaintiffs must allege how the alleged exposure could have caused their injuries in order to maintain any of the Missouri state common law claims asserted in Counts Two through Eight of the Complaint. Because plaintiffs fail to plead if or how they were exposed to any materials from the West Lake Landfill and fail to plead if or how any such exposure could have caused their injuries, Counts Two through Eight of the Complaint fail to state claims upon which relief can be granted as to these two defendants.

### c. The Facts Plaintiffs Do Provide Make it Implausible that Plaintiffs Could Have Been Exposed to Contamination from the West Lake Landfill or that Such Exposure Could have Caused Plaintiffs' Alleged Injuries

In their Complaint, plaintiffs make specific allegations regarding "Topography and Drainage of Contaminants." Complaint at ¶¶ 52 – 62. As in the other sections of the Complaint, plaintiffs do not mention Rock Road, Bridgeton Landfill, or the West Lake Landfill. *Id.* Rather than support plaintiffs' claims against Rock Road and Bridgeton Landfill, these general allegations make any claim that plaintiffs were exposed to contamination at the West Lake Landfill – or that such exposure caused plaintiffs' alleged injuries – highly implausible. Taking these allegations in the context of the Complaint as a whole, plaintiffs fail to state a claim upon which relief can be granted as to these defendants.

Plaintiffs allege that "Defendants" in general caused recurrent releases of materials into the environment in and around plaintiffs' residences. Complaint ¶¶ 14, 60. Plaintiffs then allege that these releases occurred through discharges into public water bodies, including Coldwater Creek, through the

exposure of workers to these materials, and/or through the improper disposal of the materials. Complaint at ¶ 60.

First, as depicted on the map in the Statement of Alleged Facts and attached hereto as Exhibit A, unlike the plaintiffs' properties or the north St. Louis County FUSRAP Sites, the West Lake Landfill is not located within the Coldwater Creek watershed. As such, it is implausible that any contamination at the West Lake Landfill could migrate to Coldwater Creek. The Landfill lies within a separate watershed, and the closest point of Coldwater Creek is four miles away. The West Lake Landfill is not upgradient to Coldwater Creek or the Florissant Basin. Thus, contamination of Coldwater Creek or the Florissant Basin by migration through surface water or groundwater from the West Lake Landfill is implausible. Even if migration to surface or groundwater were plausible, plaintiffs fail to allege how they came in contact with the surface water or groundwater or how such contact caused their alleged injuries.

Second, plaintiffs' potential exposure by "the exposure of workers to these materials who then in turn spread contamination outside the worksite" is completely implausible, as there are no "workers" exposed to these materials at the West Lake Landfill, and no plaintiff alleges that they were exposed through contact with a "worker" at the West Lake Landfill, or how such contact could have caused their injuries.

Finally, the closest plaintiff's residence to the West Lake Landfill is 4.6 miles away. Even if radioactive materials were disposed of at the West Lake Landfill, and even if those materials were disposed of improperly, plaintiffs fail to address how such improper disposal could have exposed them to the material such a distance or, even if they were exposed, how such exposure could have caused their alleged injuries.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**Conclusion**

The Complaint's relative silence with regard to defendants Rock Road Industries, Inc., Bridgeton Landfill, LLC, and the West Lake Landfill speaks volumes. If plaintiffs had specific factual allegations to bring against Rock Road and Bridgeton Landfill, they would have included those in the Complaint. However, the face of the Complaint shows that the addition of the West Lake Landfill as a source site – and therefore the addition of Rock Road and Bridgeton Landfill as defendants – was a mere afterthought by plaintiffs' counsel.

The purpose of pleading is to put a defendant on notice of the claims alleged against it. This purpose is not served by thin and conclusory allegations. Rock Road and Bridgeton Landfill are hard pressed to answer a complaint that only mentions them twice and does not state any plausible connection between the plaintiffs' alleged injuries and the property they own. Because the Complaint fails to state a claim upon which this Court can grant relief, defendants Rock Road and Bridgeton Landfill respectfully request that the Court grant dismissal of all counts under Federal Rule of Civil Procedure 12(b)(6).

Respectfully Submitted,

___/s/ John Ryan_____
LATHROP & GAGE LLP
John Ryan, # 51944MO
Jessica Merrigan, # 54982MO
2345 Grand Blvd., Suite 220
Kansas City, Missouri 64108
(816) 292-2000
(816) 292-2001
jryan@lathropgage.com
jmerrigan@lathropgage.com

Attorneys for Defendants Rock Road Industries and
Bridgeton Landfill, LLC

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served electronically by means of the Court's CM/ECF filing system on May 7th, 2012 to:

**Eric J. Carlson**
Byron, Carlson, Petri & Kalb, LLC
411 St. Louis Street
P.O. Box 527
Edwardsville, IL 62025
618-656-0066
Fax: 618-655-4004
Email: ejc@bcpklaw.com

Attorney for Plaintiffs

**Stephen Glen Jeffrey**
Jeffery Law Group
20 S. Central Ave., Suite 306
St. Louis, MO 63105
314-561-8503
Fax: 314-714-6510
Email: sjeffery@jefferylawgroup.com

*Attorney for Defendants Jarboe Realty and Investment Company, Inc. and DJR Holdings Inc.*

__/s/ John Ryan_____

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM



**UNITED STATES**
**NUCLEAR REGULATORY COMMISSION**
WASHINGTON, D.C. 20555-0001



A. noor

**RECEIVED**

June 16, 1995

JUN 22 1995

OFFICE OF THE DIRECTOR
WSTM DIVISION

Michael Sanderson, Director
Superfund Division
U.S. Environmental Protection Agency
Region VII
726 Minnesota Avenue
Kansas City, KS  66101

SUBJECT:  DEFERRAL OF REGULATORY OVERSIGHT TO THE U.S. ENVIRONMENTAL
PROTECTION AGENCY FOR THE WEST LAKE LANDFILL, BRIDGETON, MISSOURI

Dear Mr. Sanderson:

The Nuclear Regulatory Commission is deferring regulatory oversight to
Environmental Protection Agency (EPA) for the remedial actions at the West
Lake Landfill site in Bridgeton, Missouri. I have enclosed a paper written by
the NRC staff entitled "Deferral of Regulatory Oversight to the U.S.
Environmental Protection Agency for Two Sites with Radioactive Contamination
and Landfill Disposal of Licensed Material from Remediation of a Third Site."
In this paper, the NRC staff proposed to defer, to EPA, the regulation of the
remediation of two sites:  E.I. DuPont, Newport, DE; and West Lake Landfill,
Bridgeton, MO.  These sites contain both hazardous and radioactive waste, both
are in various stages of remediation by EPA, and neither hold a current NRC
license.  The NRC staff consulted with EPA, the State, and other interested
parties in developing this paper.

The NRC and EPA conduct regulatory programs for site remediation under the
Atomic Energy Act and the Resource Conservation and Recovery Act (RCRA), and
the Comprehensive Environmental Response, Compensation, and Liability Act,
respectively.  Based on the reviews to date, the NRC has concluded that the
remedial programs being administered by EPA at these two sites are adequate to
protect the public and the environment from the risks associated with the
radioactive contamination at these sites.

Therefore, on April 28, 1995, the Commission approved the staff's request to
defer to EPA for the oversight of remediation activities at these two sites.
The deferral of these sites is considered in effect as of the receipt of this
letter.  In addition, the West Lake Landfill will be removed from NRC's Site
Decommissioning Management Plan (SDMP) list.

The NRC staff does not plan to take any further action on the West Lake
Landfill site unless specifically requested by EPA.



40057850
SUPERFUND RECORDS

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

M. Sanderson                              -2-

If you have any questions concerning these actions, please contact Heather
Astwood of my staff on 415-5819.

                              Sincerely,

                              *(signature)*

                              Michael F. Weber, Chief
                              Low-Level Waste and Decommissioning
                                Projects Branch
                              Division of Waste Management
                              Office of Nuclear Material Safety
                                and Safeguards

Enclosure:  As stated

cc:  Steve Kinser, EPA RVII
     Steve Sturgess, MO-DNR
     Ed Sadler, MO-DNR
     James W. Wagoner, DOE
     Doug Borrow, Laidlaw
     Conrad Bowers, Mayor
       of Bridgeton, MO
     Jerome T. Wolf
     Charlotte Nitzel
     James F. Gunn

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM



**RECEIVED**

JUN 22 1995

OFFICE OF THE DIRECTOR
WSTM DIVISION

## POLICY ISSUE
### (Notation Vote)

March 9, 1995

SECY-95-056

FOR:          The Commissioners

FROM:         James M. Taylor
              Executive Director for Operations

SUBJECT:      DEFERRAL OF REGULATORY OVERSIGHT TO THE U.S.
              ENVIRONMENTAL PROTECTION AGENCY FOR TWO
              SITES WITH RADIOACTIVE CONTAMINATION AND
              LANDFILL DISPOSAL OF LICENSED MATERIAL FROM
              REMEDIATION OF A THIRD SITE


PURPOSE:

To obtain the Commission's approval for the staff to defer to the U.S.
Environmental Protection Agency (EPA) for the oversight of remediation
activities involving radioactive contamination at two sites and for staff's
intent to allow disposal of licensed radioactive material in a hazardous waste
landfill.

SUMMARY:

The Nuclear Regulatory Commission and EPA conduct regulatory programs for site
remediation under the Atomic Energy Act (AEA) and the Resource Conservation
and Recovery Act (RCRA), and the Comprehensive Environmental Response,
Compensation, and Liability Act (CERCLA), respectively.  Under certain
conditions, NRC staff believes it would be appropriate for NRC to defer to
EPA, or an authorized State environmental protection program, for the
oversight of remediation of radioactively contaminated sites under NRC


Contact:   Heather M. Astwood, NMSS
           415-5819


NOTE:   TO BE MADE PUBLICLY AVAILABLE WHEN THE FINAL SRM IS MADE AVAILABLE.


Enclosure

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

The Commissioners                    - 2 -

jurisdiction. The staff is proposing to defer, to EPA and an authorized State
environmental program, regulation of remediation of two unlicensed sites:
E.I. DuPont, Newport, DE; and West Lake Landfill, Bridgeton, MO. In addition,
the staff intends to authorize disposal of licensed material generated from
remediating Dow Chemical sites in Midland and Bay City, MI, in a hazardous
waste landfill regulated by the Michigan Department of Natural Resources under
the EPA-authorized RCRA program. Remediation activities at these sites are at
various stages of completion. Based on reviews to date, the staff believes
that the remedial actions and disposal required by EPA, or the authorized
State program, will be sufficient to protect the public and the environment
from the risks associated with the radioactive contamination at these sites.
Deferral would conserve Federal and licensee resources, streamline the
remediation process by eliminating duplicative agency reviews, and simplify
the review process by consolidating regulatory oversight within a single
agency. If the Commission approves deferral and disposal, the staff would:
continue to provide limited technical assistance to EPA or State agencies, on
request, for all sites (licensed and non-licensed); monitor remediation
activities; and review all relevant documents developed by the licensee and
EPA or State for each site with an NRC license.

BACKGROUND:

As part of NRC's decommissioning program for nuclear facilities under the AEA,
some contaminated facilities pose special problems because of the presence of
both non-radiological and radiological hazards, limited technical and
financial viability of licensees, and concurrent regulatory jurisdiction over
various aspects of decommissioning. Some of the sites are being, or will be,
remediated under EPA's Superfund Program, in accordance with CERCLA and the
National Contingency Plan in 40 CFR Part 300. Other sites involve assessment
and disposal of hazardous waste under EPA's RCRA Program. Similar interfaces
exist between NRC and State regulatory programs, in which EPA's authority
under CERCLA and RCRA has been delegated to States. EPA actively promotes
delegation of the RCRA program to authorized States and tends to defer to
States that are willing to oversee preparation of the Remedial
Investigation/Feasibility Studies (RI/FS) for individual sites.

Although the RCRA and CERCLA Programs both address hazards to the environment,
CERCLA is the more comprehensive statute because it addresses both operating
and inactive facilities and includes hazardous materials, as well as source,
special nuclear, and byproduct material as defined in the AEA. The staff
previously discussed EPA's RCRA and CERCLA Programs in SECYs 93-235 and
93-322. RCRA uses a general regulatory program to manage hazardous waste from
generation to ultimate disposal. CERCLA provides authority to respond
whenever there is a release or potential release of hazardous material. The
facility owner or operator implements RCRA corrective action, whereas CERCLA
responses may be implemented by a number of different parties, including
private or public responsible parties, States, or Federal authorities. CERCLA
"hazardous substances" include RCRA "hazardous wastes," as well as toxic
pollutants under the Clean Water Act (CWA), Clean Air Act (CAA), and Toxic
Substances Control Act (TSCA). Although source, special nuclear, and
byproduct materials are excluded from regulation under CWA, TSCA, and RCRA,
they are included under the CAA, so they are included within the scope of
CERCLA. Consequently, EPA can require remediation of both non-radiological

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

The Commissioners                    - 3 -

and radiological contamination, including source, special nuclear, and byproduct material, in accordance with CERCLA.[1]

As a general policy, EPA has declined listing NRC-licensed sites for remediation on the National Priorities List (NPL), in deference to NRC regulation under the AEA, provided that remediation is progressing under an NRC license. However, EPA has required remediation under RCRA or CERCLA at sites that exhibited non-radiological contamination (e.g., chromium contamination at the Shieldalloy facility in Newfield, NJ) or that were licensed by Agreement States (e.g., Homestake uranium mill in Milan, NM). Based on the most recent version of the NPL (February 1994), the total number of sites listed on the NPL is 1191. The Superfund Program is well-established, and has defined remediation procedures and criteria, including those that address radioactive materials. Although the remediation process and criteria are not identical to NRC's, they are parallel in scope and purpose, and in the staff's judgment, are generally adequate for the protection of the public and the environment. A detailed explanation of the Superfund site remediation and closure process is given in Enclosure 1 of SECY-93-235.

The Commission has previously considered staff recommendations to establish procedures for transferring sites from NRC to EPA, for remediation under the Superfund Program. In a staff requirements memorandum (SRM) concerning SECY-89-224, dated August 22, 1989, the Commission stated that it will decide whether to pursue the transfer of sites, to EPA, for remediation, on a case-by-case basis, or through a memorandum of understanding (MOU). The March 16, 1992, general MOU between EPA and NRC explicitly excludes matters arising under CERCLA and RCRA. Since the general MOU was signed, NRC staff has negotiated site-specific cooperative agreements for remediation of the Homestake uranium mill, under CERCLA, and the Sequoyah Fuels and Engelhard Corporation facilities, under RCRA. The staff is also currently discussing cooperative agreements with State agencies in Ohio and Pennsylvania.

In another SRM dated December 21, 1989, the Commission rejected the staff's recommendation to develop a protocol with EPA to govern the application of Superfund to contaminated sites. Instead of developing a protocol, the Commission directed the staff to provide, for each site the staff proposes to defer to EPA or a State agency, under Superfund, analyses of: (1) the cleanup standard that would apply under Superfund, and the differences between that standard and the AEA standard; (2) the rights and authorities the State would have if Superfund were extended to the site; and (3) the rights and authorities that private citizens would have to sue the Federal Government or the licensee(s), using the citizen-suit provisions of Superfund.

More recently, the staff proposed to the Commission, in SECY 93-235, to communicate with EPA about transferring the Safety Light Corporation (SLC) site at Bloomsburg, PA, to EPA, to supervise site remediation under Superfund. The rationale for the transfer was to accelerate the remediation of the site

---

[1] CERCLA does not cover releases that are subject to NRC required financial protection pursuant to Section 170 of the AE Act (i.e., Price Anderson), nor releases from a processing site under Title I of the Uranium Mill Tailing Radiation Control Act of 1978.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

and limit the Federal resources devoted to the litigation to compel SLC to remediate the site.  The paper explained that during the first half of 1993, the staff and the licensee tried unsuccessfully to settle the litigation and the staff believed, as of the date of the paper, that further negotiations would be futile and litigation would resume shortly.  While the Commission was considering SECY-93-235, the parties resumed negotiations; and in an SRM dated November 2, 1993, the Commission returned SECY-93-235 to the staff, "...pending the outcome of the negotiations," and instructed the staff to "...keep the Commission informed of further developments and, based on the outcome of the negotiations, submit recommendations for further action to the Commission, should that be necessary."  The staff recently completed negotiations with SLC and successfully concluded a settlement agreement that governs characterization and remediation planning for the Bloomsburg site.

In a related matter, SECY-93-136 presented the Commission with an analysis of the State of Utah decision to allow Envirocare of Utah to use only institutional controls as a means of reducing the risk to the public health and safety after closure, without government land ownership.  EPA regulations do not always require government land ownership of sites such as these.  The Commission determined that this approach was adequate for protection of public health and safety in this particular case, and in a Director's Decision under 10 CFR 2.206 issued by the Office of State Programs on January 26, 1995, the Commission did not revoke Utah's Agreement State status.

DISCUSSION:

At sites where radioactive and non-radioactive materials are located in distinct and separate areas, NRC and EPA oversight and regulation of remedial actions can proceed effectively and efficiently.  Although the effectiveness of the government's response and oversight can be strengthened through interagency cooperation, each area can be remediated independently in accordance with each agency's requirements and administrative process.

However, independent regulation of remedial activities is not always possible.  There are some sites that contain commingled radioactive and non-radioactive contamination.  At other sites, the contamination is not commingled, but remediation of one type of contamination would affect the responsible party's ability or approach to characterization and remediation of the other type of contamination.  In other cases, although the predominant hazard may be associated with one type of contamination, the licensee or property owner is not capable, technically or financially, to remediate either type of contamination, thus preventing timely and effective completion of necessary decommissioning or remedial actions.  In yet other cases, the responsible party desires a coordinated government response to reduce overall costs, improve efficiency, and promote a compatible solution for both types of contamination.

Under certain circumstances, the staff believes it would be appropriate for NRC to defer to EPA or authorized State oversight of remediation efforts, under CERCLA, RCRA, or State statutes.  Deferral at these sites would reduce the amount of duplicative effort by both agencies and by the site owners.  For example, the types of analyses performed by EPA as part of the development of the RI/FS, under CERCLA (40 CFR 300.430), are very similar to the analyses

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

conducted by NRC in developing an Environmental Impact Statement (EIS) under the National Environmental Policy Act of 1969 (NEPA) and 10 CFR Part 51.   Both agencies require submission of fairly extensive information on the environmental characteristics of the contaminated sites and the nature and extent of contamination.   In addition, the agencies require preparation and submission of a plan for implementing remedial measures found necessary to remove or contain contamination in accordance with applicable remediation criteria.   EPA's plan is called a Remedial Design; NRC calls this a decommissioning plan.

Without cooperation between the agencies, therefore, it is conceivable that site owners could be required by the government to develop separate reports for each agency on site characterization, assessment of remediation alternatives, projected environmental impacts, plans for remedial measures, and documentation that the remedial measures were appropriately implemented. Such an approach could result in an unnecessarily duplicative and burdensome effort by the site owners and by the agencies.

At worst, the requirements of one agency could explicitly conflict with those of the other agency, thus frustrating the government's overall intent to ensure protection of the public and the environment from residual contamination.   If, for example, EPA decided to allow hazardous waste to remain onsite, to avoid excessive worker exposure and cost, and NRC decided that commingled radioactive waste would have to be exhumed and disposed of offsite, it would be difficult and burdensome, if not impossible, for the site owner to simultaneously comply with the requirements of both agencies.   The conflict would be especially significant if one action preceded the other (e.g., EPA requires a cover to be placed over the waste; NRC later determines that the radioactive waste needs to be removed for off-site disposal).

The staff believes that it is appropriate to rely on EPA's environmental remediation programs to ensure protection of the public and environment at the DuPont and Westlake Landfill sites.   Both cases may rely, at least in part, on institutional controls to ensure long-term protection.   As discussed previously and in the attachments, such reliance on institutional controls is somewhat inconsistent with NRC's established policies for low-level radioactive waste disposal (cf. State or Federal land ownership requirement for low level waste disposal in 10 CFR 61.59(a)).   However, the staff believes that EPA remediation will be sufficient to provide adequate protection under the Atomic Energy Act.

In addition, deferral to EPA provides numerous savings in terms of reducing the administrative and regulatory burden on responsible parties conducting the remediation and in conserving NRC staff resources.   The staff estimates that deferral of each site should save between 0.25 and 0.5 FTE per year in direct staff resources required to oversee remediation at the sites.   These resources would partially duplicate the oversight functions that EPA staff will provide in overseeing the safe and protective execution of the planned remedial actions.   In addition, deferral should save NRC an additional 0.5 FTE per year and $600K in program support that could be necessary at each site to prepare an Environmental Impact Statement (EIS) to support consideration of exemptions from NRC's existing requirements for decommissioning for unrestricted use.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Since November 1993, the staff has initiated several EISs to consider exemption requests as appropriate considering the requirements in 10 CFR Part 51. Deferral should also improve the timeliness of remediation by avoiding the potential delay that could be associated with administration of independent and complementary regulatory approval processes for remediation. Remediation could be further delayed by opportunities for legal challenges to NRC approval of remedial actions.

Allowing disposal of the Dow wastes in the hazardous waste landfill cells in Midland may also allow a small increase in the long-term risk to the public and environment due to some reliance on institutional controls. As previously described for the Westlake and DuPont site remediation projects, however, NRC staff believes that such disposal would provide adequate protection of the public, and any small increase in the associated risk is counterbalanced by the improvements in efficiency, reduction in regulatory and administrative burden, and savings of NRC and responsible party resources.

The staff does not consider, however, that these cases would necessarily establish a precedent for resolution of other waste disposal and decommissioning cases or establishment of general requirements in these areas. The decisions on deferral and on approving waste disposal are specific to these cases. In the cases of DuPont and Westlake Landfill, the radioactive components appear to be intimately mixed with non-radiological contaminants and wastes that are not subject to the Commission's jurisdiction. In fact, at least for some of the wastes, the dominant risks to the public and environment may be attributable to the non-radiological contaminants. In addition, both sites are already listed on the National Priorities List for remediation under CERCLA, and the basis for listing and selection of the remedies included consideration of the radiological contaminants.

In the Dow case, the staff has considered the merits of disposing of the specific wastes present at the Dow sites and under the specified conditions for disposal as proposed by the licensee and the State. Staff has already approved other disposals of radioactive waste in or adjacent to hazardous waste landfill cells in accordance with the provisions of 10 CFR 20.302 and 20.2002. Each of these disposals has been based on a site-specific review by the NRC staff to ensure adequate protection of the public and that potential radiological doses do not exceed NRC's limits in 10 CFR Part 20. In most cases, the staff has assured that the potential doses do not exceed a small fraction of the public dose limit. The Dow case is especially significant, however, because it involves the disposal of a relatively large volume of radioactive waste that will be generated in decommissioning an SDMP site and that intrusion into the waste, if it were to occur, could result in doses that may exceed the public dose limit (e.g., if the intruder were to live on top of exposed waste for an extended period). The staff believes that the likelihood of such intrusion is remote in the Dow case because of the design of the disposal cells and the use of the general area for disposal of hazardous waste. It is likely that an intruder into the waste would recognize that a waste disposal cell had been breached and could suffer risk from the non-radiological contaminants in adjacent cells even if the NRC did not authorize disposal of the radioactive waste.

The staff would be prepared to entertain similar requests to the Dow request from licensees to dispose of licensed material in hazardous waste landfills or

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

other suitable disposal facilities (e.g., monofills, sanitary landfills) in accordance with the requirements of 10 CFR 20.2002. In such cases, as with the Dow case, the burden would rest with the licensee to demonstrate that the requirements of 10 CFR Part 20 will be satisfied, specifically that the potential doses will be consistent with the Part 20 limits and are as low as is reasonably achievable. Credit for institutional controls, such as those that accompany Dow's proposal, would also be considered on a site-specific basis.

For these reasons, the staff believes that NRC should defer to EPA or State oversight regulatory programs for specific aspects of the remediation of two contaminated sites: E.I. DuPont, Newport, DE; Cotter Corporation (West Lake Landfill), Bridgeton, MO; and allow disposal of radioactive waste from remediation in a RCRA permitted landfill for Dow Chemical, Midland and Bay City (Salzburg Landfill), MI. By deferral, the staff means a variety of approaches depending on the specific status of the contaminated sites.

For the DuPont site, the staff proposes to recognize EPA's approved remedial measures under CERCLA as being sufficiently protective of the public and environment. The site is not currently licensed by NRC; NRC licensing and oversight of the remediation of a small quantity of thorium waste in a landfill would not be necessary, nor required, under the AEA. No further action would be taken by the NRC staff, unless specifically requested by EPA.

For the West Lake Landfill site, EPA has already agreed to assume lead responsibility for the site. The West Lake Landfill is listed in NRC's Site Decommissioning Management Plan (SDMP). The NRC staff is proposing to defer to EPA oversight of remedial measures under CERCLA. EPA's remediation of the site already considers both radioactive and non-radioactive materials. The site is not currently licensed by NRC; the staff would take no further action at the site after deferral, unless specifically requested by EPA. NRC would remove the site from the SDMP after EPA completes remedial measures at the site.

Regarding the Dow Chemical sites in Midland and Bay City, Michigan, the staff proposes to allow the licensee to dispose of thorium-contaminated waste in a licensee-owned and permitted hazardous waste landfill designed and operated in accordance with the RCRA requirements administered by EPA and the State of Michigan. The staff would authorize disposal in accordance with NRC requirements in 10 CFR 20.2002 and support the decision with an Environmental Assessment that would presume the effectiveness of RCRA controls in ensuring protection of the public and environment. Regulatory responsibility for the management and long-term control of the thorium in the disposal site would, in theory rest with NRC. However, in terminating the license, NRC would recognize that controls for the hazardous waste, developed under RCRA, while relying on land use restrictions which are not dependant on State or EPA regulatory power, will be adequate for the thorium as well. In allowing disposal in the Salzburg Landfill, NRC would be recognizing that disposal of thorium-contaminated wastes in a hazardous waste landfill may be acceptable under the AEA, instead of requiring offsite disposal at a licensed radioactive waste disposal facility. The Dow storage sites are listed in the SDMP and are being remediated under an NRC license. NRC staff would continue to license and regulate the remedial measures directed at removing the thorium waste from its present locations. At such time as all waste has been satisfactorily

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

The Commissioners                    - 8 -

disposed of in the hazardous waste landfill and residual radioactivity has
been reduced in accordance with existing criteria, the staff would terminate
Dow's license for the Midland and Bay City sites and no further action would
be taken by the NRC staff.

Background information for the DuPont, Westlake Landfill, and Dow sites is
provided in Attachments 1 to 3, respectively.  The potential advantages and
disadvantages of deferral for each site are summarized in Attachment 4.

Requested Analysis:

In accordance with the Commission's previous direction on information to
support deferral decisions, the staff provides the following analyses of:
(1) the cleanup standard that would apply under Superfund and the differences
between that standard and the AEA standard; (2) the rights and authorities the
State would have if Superfund were extended to the site; and (3) the rights
and authorities that private citizens would have to sue the Federal Government
or the licensee(s), using the citizen-suit provisions of Superfund.  The
following analyses are presented in generic terms that would apply to all
three sites.  The discussion about remediation criteria is only pertinent at
this time to the West Lake Landfill site; EPA has already decided to stabilize
the thorium waste in place at the Dupont site, and the thorium waste from Dow
would be disposed of in an RCRA-regulated landfill cell.  To compare specific
EPA and NRC remediation standards for the West Lake Landfill, more information
would be needed on the remediation criteria EPA intends to implement at that
site.  EPA will determine these criteria through the RI/FS and Record of
Decision (ROD) process, as described below.

(1) Remediation Standard

As previously stated, both NRC and EPA have been granted the authority
to regulate radioactive materials, in certain situations.  To determine
what remediation standards would govern the remedial actions at a
specific site, EPA would perform a Feasibility Study (FS).  This study
is the basis for the development of a ROD that establishes remediation
standards and remedial actions for each site.  EPA would prepare the FS
after the site had been scored and entered on the NPL, as explained in
Enclosure 1 of SECY-93-235.

EPA's requirements for FSs in 40 CFR 300.430(e)(2)(i) require that the
lead agency establish remedial action alternatives, including
remediation objectives and goals.  The remediation goals establish
acceptable exposure levels to protect human health and the environment
and are developed considering:  applicable or relevant and appropriate
requirements (ARARs) under Federal or State environmental laws,
drinking-water standards and goals, water-quality criteria, and other
factors.  For known or suspected carcinogens (including ionizing
radiation), acceptable exposure levels are generally concentration
levels that represent an excess upper-bound lifetime cancer probability,
for an individual, of about $10^{-4}$ and a cancer probability of $10^{-6}$ for as
many in the population as practical.  The $10^{-6}$ probability is used as
the point of departure for determining remediation goals when ARARs are
not available or are not sufficiently protective, because of the
presence of multiple contaminants or multiple pathways.

Case: 4:22-cv-00116-CDP   Doc. #: 1-4   Filed: 01/28/22   Page: 427 of 903 PageID #: 2108

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

These risk goals do not necessarily take into account human intrusion in
the future.  If human intrusion were to be considered in the dose
pathway analysis, the calculated dose for thorium contaminated sites
could be in excess of 100 mrem/yr assuming standard exposure scenarios
(e.g., resident farmer scenario).  Therefore, sites with significantly
elevated thorium concentrations would not necessarily meet the
provisions of the proposed NRC rule on radiological criteria for
decommissioning (proposed amendments to 10 CFR Part 20; 59 FR 43200).
The statement of considerations for the proposed rule acknowledges that
some sites could not meet the limits proposed in the rule.  Deferral to
the Federal Superfund/RCRA approach is a possible way to address these
cases.

NRC risk analyses differ from EPA risk analyses in several ways.  EPA
calculates risk based on the chance of developing cancer.  NRC relates
risk to both the chance of developing cancer and the chance of a
fatality as a result of cancer.  NRC staff calculated the risk to a
maximally exposed member of the public who at some time in the future,
could reside on top of the site.  By using a general risk estimate of
$5 \times 10^{-2}$ fatal cancers per sievert ($5 \times 10^{-4}$ per rem) of received dose
developed for exposure of a large population, NRC can estimate a
potential risk, to an individual, produced by a specific exposure.
Nevertheless, were an actual measured exposure to occur, the staff
recognizes that it would be more appropriate to estimate the risk to
that individual using the cancer risk tables developed by the National
Cancer Institute.

In general, NRC has not relied on institutional controls as a means for
protecting the public or the environment for decommissioning purposes.
However, EPA and DOE have relied on institutional controls to prevent or
reduce the likelihood for human intrusion and otherwise protect the
public (e.g., restrictions on groundwater use).  Staff compared
regulatory considerations of institutional controls in SECY-93-322,
dated November 26, 1993.  Reliance on institutional controls directly
affects projected risks to exposed humans.

Based on information provided by the EPA staff, NRC has reviewed 19 RODs
for sites that include some radiological contamination.  Most cases
involved contamination by radium-226 and its decay products and other
naturally-occurring radionuclides.  In most of the RODs, EPA selected
ARARs based on EPA's standard, for remedial action, at uranium mill
tailings sites in 40 CFR Part 192.  In many cases, EPA also identified
NRC guidance in Regulatory Guide 1.86 "Termination of Operating Licenses
for Nuclear Reactors," as an ARAR for surface contamination on buildings
and equipment.  Other sources of ARARs for radiological contamination
include:  NRC's air concentration limits in 10 CFR Part 20, Appendix B;
State guidance on acceptable surface contamination; DOE orders for
acceptable public and worker doses; Federal and State water quality
standards; and Federal and State air-emission limits.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

(2) State Authority under Superfund

For facilities covered by CERCLA, 42 USC 9605, *et seq.*, the States are
encouraged to enter into cooperative agreements to enable them to
undertake certain actions, under the National Contingency Plan (NCP), as
the lead agencies.  State and local response organizations are expected
to initiate measures necessary to protect the public health and safety,
consistent with the containment and cleanup requirements in the NCP.

The RI/FS required under 40 CFR 300.430(d) and (e) are to be performed
by a lead agency, in coordination with any support agencies.  Under
40 CFR 300.5, the State may be designated as the lead agency to plan and
implement a response, if it is operating pursuant to a contract or
cooperative agreement, under Section 104(d)(1) of CERCLA, or designated
as the lead agency in a Superfund Memorandum of Agreement (SMOA) or
other agreement.  In addition, even if the State does not serve as lead
agency, the lead agency is required to consult with the local officials
and community representatives before commencing field work for the
remedial investigation.  Under 40 CFR 300.430(c), support agencies are
afforded an opportunity to identify their own ARARs, under 40 CFR
300.430(d)(3).  Support agencies are to be notified, by the lead agency,
of the alternatives that will be evaluated in detail, to facilitate the
identification of ARARs and any appropriate guidance to be considered,
under 40 CFR 300.430(e)(8).

In addition to the above, 40 CFR 300.430(e)(9)(iii)(H) requires that the
State's concerns be assessed, including its views on the preferred and
other alternatives for remedial action and the ARARs or proposed use of
waivers.

Further, 40 CFR 300.430(f)(1)(i)(C) provides that the lead agency must
consult with the State, and that State and community acceptance are
modifying criteria that are to be considered in the remedy selection.
Section 300.430(f)(4)(i) provides that the State's views are to be
considered by the lead agency in its final remedy selection from among
the various alternatives.

(3) The Rights of Private Citizens under Superfund

As discussed above, EPA is to solicit community participation in the
identification of ARARs and other aspects of the RI/FS process.  In
addition, private citizens are authorized under CERCLA to undertake a
response action to eliminate a release of a hazardous substance,
pollutant, or contaminant, subject to the citizens' compliance with the
provisions of 40 CFR 300.700.  Various mechanisms are provided in CERCLA
for a private citizen to recover the cost of such response action.
These mechanisms are summarized in 40 CFR 300.700, and include:
(a) recovery of the response cost, plus interest, from the
parties found to be liable; and (b) recovery from Superfund of the
private citizen's reasonable costs, plus interest.

In addition, "citizens suits" are authorized under Section 310 of
CERCLA.  Private citizens are authorized to commence a civil action, on

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

The Commissioners                  - 11 -

   their own behalf, against:  (a) any person who is alleged to be in
violation of any standard, regulation, condition, requirement, or order
under CERCLA; and (b) any Federal official who is alleged to have failed
to perform a required duty, under CERCLA.  Judicial relief, in such
actions, may consist of an order to enforce and/or correct the violation
or an order imposing any civil penalty provided for the violation; and
the court may award the prevailing party his costs of litigation,
including reasonable attorney and expert witness fees.

## RECOMMENDATIONS:

That the Commission:

1. Approve deferral to EPA's CERCLA program for the remediation of the
   thorium waste located on the E. I. DuPont Superfund site in Newport, DE.

2. Approve deferral to EPA's Superfund program for remediation of the West
   Lake Landfill/Cotter Corporation site in Bridgeton, MO.

3. Approve staff's plans to pursue a request submitted by Dow
   Chemical Company for an exemption from the unrestricted release
   provisions of 10 CFR 40.42(f)(3) and to authorize disposal of
   thorium waste from remediation in a landfill in accordance with
   10 CFR 20.2002.  The landfill would be regulated under Michigan
   hazardous waste regulations that implement the RCRA program for
   long term control of the waste in the Salzburg Landfill cells,
   including reliance on institutional and State control and long-
   term monitoring of the Salzburg Landfill site in Midland, MI.

4. Note:

   a. That although EPA is authorized to regulate byproduct, source, and
   special nuclear material under CERCLA and CAA, the State agencies, if
   they are not NRC Agreement States, are not authorized except under CAA.
   That even though NRC is allowing disposal under the RCRA program
   administered by EPA and Michigan Department of Natural Resources, NRC
   staff will continue to regulate remediation of the Dow Chemical storage
   sites in Michigan, which are currently licensed by NRC.  With respect to
   the disposal in the Salzburg landfill, the staff will continue to review
   pertinent documents to ensure Michigan is not applying significantly
   less stringent waste disposal requirements than NRC.

   b. That reliance on institutional controls over the long term may not
   provide as high a level of protection for the public health and
   environment as that attained if there were no reliance on institutional
   controls.  This lower level of assurance results from the lack of a
   guarantee that there will always be a responsible party to maintain the
   controls.

The Commissioners                     - 12 -

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

COORDINATION:

The Office of the General Counsel has reviewed this paper and has no legal
objection.  NRC staff consulted with EPA and the States of Delaware, Missouri,
and Michigan in preparing this paper.  Neither EPA nor the States objected to
the staff's proposed approach.


James M. Taylor
Executive Director
for Operations


Attachments:
1.  Bkgd Info for E.I. DuPont
2.  Bkgd Info for Cotter Corporation
       West Lake Landfill
3.  Bkgd Info for Dow Chemical
4.  Adv/Disadv of Prop Options by Site


Commissioners' comments or consent should be provided directly to the Office
of the Secretary by COB Friday, March 24, 1995.

Commission Staff Office comments, if any, should be submitted to the Commissioners
NLT March 17, 1995, with an information copy to the Office of the Secretary.
If the paper is of such a nature that it requires additional review and comment,
the Commissioners and the Secretariat should be apprised of when comments may
be expected.


Distribution:
Commissioners
OGC
OCAA
OIG
OPA
OCA
ACNW
Region I
Region III
EDO
SECY

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# BACKGROUND INFORMATION FOR THE
# E.I. DUPONT NEWPORT, DELAWARE, SITE

The E.I. DuPont site is located in Newport, Delaware, near I-95, I-495, and the Christina River.  The entire site is approximately 485,600 m$^2$ (120 acres) and contains a paint pigment production facility, a chromium dioxide production facility, and two industrial landfills (North and South) which are closed.

DuPont was licensed by the U.S. Atomic Energy Commission (AEC) and began using radioactive materials at this site in 1961, for the processing of thorium into metal alloys.  The alloys consisted mostly of nickel, some chromium and molybdenum, and thorium (approximately 2 to 5 percent by weight thorium-232).  Waste materials from this process were buried in the North Landfill, reportedly, in accordance with 10 CFR 20.304 regulations that were in effect at the time.  According to DuPont, the thorium waste was placed in glass jars that were subsequently placed in 55-gallon barrels together with disposable protective clothing and debris from the waste-handling operations.  The barrels were then buried in a specific, although uncertain, section of the North Landfill and covered with 3 m (10 feet) of soil.  The area where the thorium was buried is estimated to be 40 m by 10 m (130 ft by 35 ft) and contains approximately 20 tons of thorium metal, which were placed in the North Landfill over a 7 year period.

DuPont believes most of the thorium in the North Landfill consists of thorium oxide, a relatively insoluble form of thorium.  However, DuPont's records, as well as information in the Nuclear Regulatory Commission's docket files, indicate that thorium nitrate, a more soluble form of thorium, and other salts could also have been disposed of in the North Landfill.  Long-term releases from these other forms of the thorium waste could be greater than from the thorium oxide.  They could also pose a greater threat to shallow groundwater beneath the North Landfill site, because of leaching and subsequent transport.

The thorium burials comprised a small portion of the North Landfill area.  The remaining portion of the North Landfill was used for the disposal of lithophone wastes (an inorganic paint pigment based on zinc and barium), organic pigment wastes, chromium wastes, and other miscellaneous wastes, including the off-specification thoriated nickel and other thorium wastes.

The Environmental Protection Agency (EPA) initiated the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA) Program for remediation of the site in the 1980s and proposed the site for inclusion on the National Priorities List (NPL) in 1987.  EPA proposed the site for remediation under CERCLA because of extensive non-radiological contamination.

DuPont used historical records and interviews with retired employees to estimate the quantity of thorium that was buried in the landfill.  However, the records are not complete and the exact quantity and form of the thorium are not known.  Although the entire DuPont site is currently undergoing remediation, remediation of the North Landfill is of the most concern to NRC because of the thorium buried in the landfill.  The North Landfill is only a small section of the entire 120-acre site.

Attachment 1

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

-2-

Based on available records of the burials, NRC staff believes that at least some of the thorium wastes in the North Landfill exceeds the concentration criteria in Options 1 and 2 of the 1981 Branch Technical Position (BTP) entitled: "Disposal or Onsite Storage of Thorium or Uranium Wastes from Past Operations" (46 FR 52061). NRC identified these criteria as the pertinent release criteria in the Site Decommissioning Management Plan (SDMP) Action Plan of April 16, 1992 (57 FR 13389) coupled with the principle that residual radiation be reduced to as low as is reasonably achievable (ALARA). Because thorium concentrations are expected to exceed these criteria in some areas by a substantial margin (e.g., 10,000 pCi/g thorium-232), the NRC staff would generally not consider onsite disposal as a viable disposal action.

In addition, as described above, it is possible that there are soluble forms of thorium in the landfill, which could become mobile and enter the groundwater beneath the site or the river adjacent to the site. DuPont has not attempted to characterize the thorium waste in the landfill for the following reasons: (1) the exact location of the thorium in the landfill is not known; (2) intrusive and extrusive sampling may be necessary because the waste is very heterogeneous, which would make accurate sampling through a limited number of boreholes difficult; and (3) exposure to the hazardous material in the landfill would cause risks to workers during the characterization and sampling process.

Monitoring well sampling found slightly elevated levels of radium-226 and radium-228 in the groundwater adjacent to the landfill. DuPont believes the elevated levels are representative of background. Elevated levels of radium were not found in surrounding wells or in wells located between the landfill and the well containing the elevated readings.

EPA will require DuPont to place a low-permeability cover system over the landfill, capable of reducing infiltration by over 99 percent, to minimize groundwater contamination below the site. In addition, DuPont is required to construct a physical barrier wall extending from the top on the landfill, along the river bank and down to the base of the Columbia aquifer. This wall will cause mounding of the groundwater in the landfill. Groundwater extraction wells will be installed to control this mounding. The recovered groundwater shall be treated. This wall will prevent the contaminated groundwater from entering the river. Monitoring will be needed to ensure there will not be erosion of the river bank and the potential for erosion from the river into the landfill itself.

The potential risks produced by the thorium contamination are small compared with the risks posed by the other hazardous waste in the North Landfill, as well as the materials on the remaining portions of the site. EPA's risk assessment supporting the ROD concluded that non-radiological risks predominate over radiological risks associated with the thorium waste buried in the landfill. EPA requires in the ROD that DuPont: monitor groundwater to detect any potential migration of thorium or its decay products; apply institutional controls to restrict public access to the waste and to groundwater beneath and adjacent to the site; and assess the existence of radiological contamination at other locations onsite. The remedial action identified in the ROD was developed through a public process that involved DuPont, State of Delaware, local community officials, members of the public, and other interested parties.

The NRC staff believes that the remedial action required by EPA, under CERCLA,

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

-3-

would be sufficient to protect the public and the environment from the risks associated with the thorium waste.  Although NRC and EPA staffs suspect that a majority of the thorium is in the relatively insoluble oxide form, there is a possibility that some more soluble thorium compounds exist in the landfill. However, with the cap, wall along the river bank, groundwater monitoring, institutional controls, and groundwater use restrictions, the staff believes that any significant contamination of the groundwater by thorium is unlikely to occur.  However, if it does, the staff believes the contamination would be accompanied by other contaminants, promptly detected, and mitigated before causing any significant health or environmental hazards.

Since the site is not currently licensed by NRC, the staff would not undertake any other activities directly related to remediation of the site, including: performing reviews of licensing (Superfund-required) documents; undertaking site visits or inspections; monitoring EPA progress on the remediation; and examining the completion of cleanup activities.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**BACKGROUND INFORMATION FOR THE**
**WEST LAKE LANDFILL/COTTER CORPORATION**
**BRIDGETON, MISSOURI SITE**

The West Lake Landfill is a 809,000 $m^2$ (200-acre) tract located in St. Louis County, Missouri, approximately 16 miles northwest of downtown St. Louis. Beginning in 1962, portions of the property were used as an unregulated dump for solid and liquid industrial wastes, municipal refuse, and construction debris. In 1973, Cotter Corporation, a Nuclear Regulatory Commission licensee, disposed of over 39,000 metric tons of uranium ore processing residues and contaminated soil in two areas covering about 64,750 $m^2$ (16 acres) of the site. This is a relatively small portion of the larger 809,000 $m^2$ (200-acre) site. In 1976, the unregulated landfill was closed, and in following years, the Missouri Department of Natural Resources issued several permits for various portions of the 809,000 $m^2$ site. Efforts to remediate the site included NRC survey and site characterization work in the 1980s. In 1990, the Environmental Protection Agency (EPA) listed West Lake Landfill as a Superfund site by adding it to the National Priorities List. Under Superfund, EPA is now regulating remediation of the site for both radiological and other hazardous wastes.

The radioactive wastes in the two soil areas are mostly covered by other landfill materials. The site poses no immediate radiological threat to the public. Radioactive wastes, in concentrations greater than the current NRC standards for unrestricted release, are found in two soil piles and include uranium-238, thorium-230, and radium-226. Elevated levels of radioactivity (gross alpha particle contamination) have been detected in groundwater monitoring wells onsite, indicating slight contamination above background.

The NRC staff proposes to defer to EPA's Superfund Program for the remediation of uranium contamination. NRC staff has already acknowledged that EPA's Superfund Program is responsible for the remediation of the radioactive waste on this site. A letter dated May 1991 states that ". . . EPA is taking the lead for site remediation activities . . . ." NRC staff has performed limited reviews of EPA-required documents, including the Remedial Investigation/ Feasibility Study for the site, that included considerations of both radiological and non-radiological material onsite. The NRC staff believes the remedial actions that would be required by EPA, under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), would be sufficient to protect the public and the environment from the risks associated with the uranium contamination.

Under this deferral scenario, NRC staff would continue to provide certain technical support to EPA, at the specific request of EPA. In addition, NRC would retain a copy of the Record of Decision in the permanent files for the site. The staff would take no further action at the site after deferral to EPA, since the site is not currently licensed by the NRC.

Attachment 2

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## BACKGROUND INFORMATION FOR THE DOW CHEMICAL COMPANY
## BAY CITY AND MIDLAND, MICHIGAN, SITES

Dow Chemical Company possesses thorium-contaminated waste under a Nuclear Regulatory Commission license at two sites in Michigan:  Bay City and Midland. The Bay City site is located 1 mile south of Saginaw Bay and is 20 miles east of Midland, Michigan.  The thorium-contaminated waste at this site is stored in a fenced-in area owned by Dow Chemical Company.  Approximately 30,500 $m^3$ (40,000 $yd^3$) of thorium-contaminated waste is estimated to be stored at the Bay City site.  This waste has an average concentration of 188 pCi/g thorium-232, with a range of from 2 to 7000 pCi/g thorium-232.  Dow estimates that there are about 9.2 Ci of thorium-232 and an equivalent amount of thorium-228 at the Bay City location.

The estimated volume of the thorium-contaminated waste at the Midland site is over 9000 $m^3$ (12,000 $yd^3$).  The area where the waste is stored at the Midland site measures 50 m by 90 m (160 ft by 300 ft) and is roped off.  The waste is covered by a clay cover that is approximately 1-meter thick.  The thorium-contaminated waste storage area is located within a larger industrial complex that Dow owns and controls access to.  The radioactivity in the waste varies substantially and ranges up to 2000 pCi/g, with an average of 29 pCi/g thorium-232 and an equivalent activity concentration of thorium-228.  Dow estimates that there is approximately 0.46 Ci of thorium-232 in the waste at this site.

In 1956, the U.S. Atomic Energy Commission gave Dow Chemical Company a license to use thorium metal and compounds to produce thorium-magnesium alloys.  The alloying process produced a thorium-contaminated waste.  In 1973, the license was amended to authorize storage only at Dow's Bay City and Midland sites in Michigan, and at the Madison site in Illinois.  The Madison site is now under the regulatory authority of the Illinois Department of Nuclear Safety.

Thorium-contaminated waste and associated contaminated soil are currently being stored at both sites.  Dow proposes to dispose of its thorium-contaminated waste in two dedicated disposal cells at the Dow-owned and operated Salzburg Landfill in Midland.  The Salzburg Landfill is permitted by the Michigan Department of Natural Resources and the Environmental Protection Agency (EPA), for the disposal of hazardous and non-hazardous solid wastes. The Salzburg Landfill, is relatively large [615,100 $m^2$ (152 acres)], and is located 1.5 miles from the Midland site and 20 miles from the Bay City site.

The proposed disposal cell design, for the thorium-contaminated waste, would be comprised of, from the bottom, a 6 meter clay underliner with a hydraulic conductivity of less than $10^{-6}$ cm/s; 1 meter of recompacted clay with hydraulic conductivity of less than $10^{-7}$ cm/s; a synthetic liner with a leak detection and removal system consisting of a 0.33-meter sand drainage layer; 1.5 meters of clay; a geosynthetic liner; and a 0.33-meter sand leachate drainage layer.  This liner would underlie the thorium-contaminated waste which would be covered by 1 meter of clay; a 100-mil HDPE synthetic liner; 0.33 meters of drainage medium; almost a meter (91 cm) of a frost protection layer; and 0.66 meters of top soil.  No liquid wastes are allowed to be disposed of at the Salzburg Landfill.  The approximate design area for one of the proposed thorium-contaminated waste disposal cells is 61 m (200 ft) long by 40 m (125 ft) wide, and the other is 221 m (725 ft) long by 23 m (75 ft)

Attachment 3

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

-2-

wide. Both disposal cells will be covered by a unified cover. There are 16 shallow monitoring wells around the proposed disposal cells. These monitoring wells are required under Resource Conservation and Recovery Act (RCRA) and State of Michigan hazardous waste requirements. Groundwater monitoring wells and domestic wells in the area are sampled as part of the Salzburg Landfill monitoring program.

The NRC staff proposes to allow Dow Chemical Company to dispose of licensed material in EPA-approved RCRA designed cells in accordance with 10 CFR 20.2002 and thereby be exempt from NRC's unrestricted release criteria of 10 CFR 40.42(j)(3) [Although the amended rule does not refer to unrestricted release, but to release in accordance with NRC requirements, the criteria of the SDMP Action Plan apply. These are essentially unrestricted release criteria.] Dow has requested to bury thorium-contaminated waste in the Salzburg landfill, per 10 CFR 20.2002, at concentrations above NRC's SDMP Action Plan criteria for unrestricted release.

There is a parallel between what is being proposed by Dow and the burial of low-level waste under 10 CFR Part 61. The performance objectives for the disposal of low-level radioactive waste, as stated in 10 CFR Part 61 and the Final Environmental Impact Statement for Part 61 (NUREG-0945), are to: 1) protect public health and safety (and the environment) over the long term; 2) protect the inadvertent intruder; 3) protect workers and the public during the short-term operational phase; and 4) provide long-term stability, to eliminate the need for active long-term maintenance after operations cease. The staff believes that disposal of the thorium waste in the landfill would be generally consistent with these objectives, although the staff has not completed the kind of detailed review that would be required for a license application under 10 CFR Part 61.

For thorium contamination of the type presently stored by Dow under its license, the dominant exposure pathway is direct exposure from human intrusion. Thorium-232 has an extremely long half-life (in excess of 14 billion years). Thus, the potential hazard will continue to exist whether the material is excavated and shipped to a licensed disposal site (at an estimated cost of about $28 million if disposed at Envirocare or significantly more if disposed at a licensed low-level waste disposal facility) or excavated and shipped to the Salzburg Landfill (at a cost of about $5 million). The primary safety issue then becomes how to minimize the potential for human intrusion over the long term under either disposal alternative. Dilution of the contamination was not considered due to the significant increases in waste volume that would be required to substantially reduce thorium concentrations down to levels approaching natural background for soils in the Midland area.

As a regulated hazardous waste disposal facility, institutional controls would be required to be maintained over the Salzburg Landfill under hazardous and solid waste regulations. Dow states that, even though the concentration of thorium in the waste exceeds NRC's criteria for unrestricted release, the co-location of the thorium waste disposal cells with the hazardous and solid waste disposal cells would offer sufficient institutional control to deter intrusion over the long term. The institutional controls offered by hazardous and solid waste regulations involve environmental monitoring and reporting, maintenance and release control, and controls on the post-closure use of the land (i.e., no disturbance of the waste or any components of the disposal unit). There are additional requirements for post-closure financial assurance and a schedule for closure. Dow estimates that the pre-closure operational

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

-3-

period for the Salzburg Landfill will extend until approximately the year 2045. The post-closure institutional control period generally lasts 30 years and can be extended by the EPA Regional Administrator or State agency. The Salzburg Landfill is not a remote site, but because of the existence of the hazardous waste already buried there, the land can never be used productively again for farming and other non-industrial applications without extensive remediation. Dow has already imposed restrictive covenants in the Salzburg Landfill deed, in accordance with EPA requirements for hazardous waste landfills. If the thorium wastes are buried in the Salzburg Landfill, Dow proposes a requirement (to be inserted into the deed) to notify NRC (or its successor) before disturbing the landfill.

On balance, the staff believes that disposing of the thorium wastes at the Salzburg Landfill constitutes an as low as reasonably achievable (ALARA) approach to remediation of the Bay City and Midland sites, and that the conditions and restrictions placed on the landfill, combined with the RCRA regulatory and cell design provisions, provide a comparable level of protection of human health and the environment, as is provided at other licensed low-level waste disposal sites. In the Office of the General Counsel's opinion, Dow's proposed restrictive covenants appear adequate to support an exemption. With one exception, the restrictive covenants, and the co-location of the thorium-contaminated waste disposal cells with hazardous and solid waste disposal cells, appear to achieve the same effect as if this thorium-contaminated waste were buried at a location where State or Federal control alone is considered sufficient to guarantee institutional care. Inadvertent intrusion into the thorium waste disposal cells would be controlled by the restrictive covenants on the deed as proposed by Dow in its exemption request. The one exception is that, as with the Envirocare facility in Utah, there is no assurance that, for the very long term, there will be a responsible party with the obligation to take additional remedial action should this become necessary.

Therefore, NRC staff proposes to allow disposal of licensed radioactive material in the landfill operated by Dow and regulated by EPA and the State of Michigan. This decision would be supported by an appropriate Environmental Assessment, which would presume the adequacy of the cell design and institutional controls (including EPA and Michigan regulation) in protecting humans and the environment. NRC staff would notice in the Federal Register its intent to issue a license amendment to allow the disposal of the waste in the Salzburg Landfill, including the exemption. Pursuant to Subpart L of 10 CFR Part 2, the notice will offer an opportunity for an informal hearing. The hearing would include approval of the decommissioning plan and the transfer and disposal under 20.2002 at the Salzburg landfill. Following completion of the necessary safety and environmental reviews, NRC staff anticipates issuing the amendment, provided the safety and environmental reviews are favorable. Because the Dow storage sites are currently licensed by the NRC, the staff would monitor the remedial activities being performed by Dow to ensure that NRC requirements are satisfied. The staff would review all pertinent documents and would terminate the license after disposal of the radioactive material currently in storage at the Bay City and Midland sites and the storage sites are cleaned up to unrestricted use standards.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# ADVANTAGES AND DISADVANTAGES OF
# PROPOSED OPTIONS FOR EACH SITE

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

| E. I. DUPONT CORPORATION |
|---|

**Administrative Alternatives for the
Remediation of the Newport, Delaware, Site**

| Deferral to EPA Superfund | NRC Maintains Responsibility |
|---|---|
| **Advantages**<br><br>• Allows DuPont to continue remediation activities in a timely and effective manner.<br><br>• Reduces delays and expense produced from duplicative regulation.<br><br>• Ensures consistency in remediation decision for both radiological and non-radiological waste.<br><br>• Avoids need for an NRC license.<br><br>• Promotes interagency cooperation and consistency in selection of remedial actions. | **Advantages**<br><br>• Remediation of the thorium contamination down to Option 1 or 2 levels[2] would reduce risk to inadvertent intruders.<br><br>• Provides higher level of assurance that remediation is conducted in a satisfactory manner, from NRC's perspective. |

---

[2] Option 1 or 2 of the 1981 Branch Technical Position "Disposal or Onsite Storage of Thorium or Uranium Wastes from Past Operations."

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

| Disadvantages | Disadvantages |
|---|---|
| • Relies on institutional controls for protection of the public.<br><br>• Could require removal at some point in the future, if the thorium contaminates the groundwater.<br><br>• Reduces assurance of satisfactory remediation from NRC's perspective. | • May ultimately find that current proposed remediation is acceptable and preferable, after additional expense and time.<br><br>• If exhumation would be required, could result in increased risk to workers from exposure to non-radiological and radiological wastes in the landfill and extended storage of waste pending access to disposal facilities.<br><br>• Increases costs for DuPont, EPA, and NRC.<br><br>• May require additional effort to establish location of thorium waste in landfill.<br><br>• Could require NRC license.<br><br>• Could delay or impair remedial actions for the other wastes onsite, pending resolution of the thorium waste disposal issue. |

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# WEST LAKE LANDFILL/COTTER CORPORATION

## Administrative Alternatives for the
## Remediation of the Bridgeton, Missouri, Site

| Deferral to EPA Superfund | NRC Maintains Responsibility |
|---|---|
| **Advantages**<br><br>• Continues established lead responsibilities between NRC and EPA (EPA lead).<br><br>• Reduces costs and delays produced from duplicative regulation.<br><br>• Avoids need for an NRC license.<br><br>• Promotes consistency in NRC and EPA remedial decisions. | **Advantages**<br><br>• Maintains NRC control of the remediation under Atomic Energy Act.<br><br>• May result in lower risk to public and environment if site is remediated to Option 1 or 2 levels.<br><br>• Avoids reliance on institutional controls. |
| **Disadvantages**<br><br>• Reduces assurance that NRC will find the remedial action satisfactory because EPA has not yet selected remedial action for the uranium contamination.<br><br>• Introduces possibility that additional remediation may be necessary in the future.<br><br>• Places remediation outside of NRC control; no assurance when remedial actions will occur. | **Disadvantages**<br><br>• Increases costs and duplicative effort for regulating agencies and Cotter Corporation.<br><br>• May delay the remediation of the non-radioactive materials onsite.<br><br>• May produce conflicts for Cotter if NRC and EPA approve inconsistent remedial actions.<br><br>• May require imposition of a license through order, if Cotter objects to license and one is required. |

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## DOW CHEMICAL COMPANY

### Administrative Alternatives for the
### Remediation of the Midland and Bay City, Michigan, Sites

| Approve Site Disposal Request | Removal & Offsite Disposal |
|---|---|
| **Advantages** | **Advantages** |
| • Reduces costs and delays from duplicative regulation. <br><br> • Allows timely completion of remediation and termination of NRC licenses for the Midland and Bay City sites. <br><br> • Could reduce public and worker risks from near site disposal as compared to transporting waste across country. <br><br> • Promotes consistency between NRC and EPA in terms of remediation decisions. | • Maintains NRC control of the disposal of the radioactive waste. <br><br> • May reduce long-term risks if wastes were disposed of at a licensed disposal facility for radioactive waste that does not rely on institutional controls. <br><br> • Reduces by one the number of radioactive waste disposal sites in the country. |
| **Disadvantages** | **Disadvantages** |
| • Additional remediation under NRC control may be necessary at the Salzburg Landfill at some point in the future, if warranted. <br><br> • Establishes precedent for disposal of radioactive wastes in hazardous waste landfill and for reliance on institutional controls. | • Relies on limited disposal capacity for radioactive waste. <br><br> • Increases costs for regulating agencies and Dow Chemical. <br><br> • May delay remediation of the Midland and Bay City sites, pending resolution of waste disposal location. |

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**UNITED STATES DISTRICT
COURT EASTERN DISTRICT OF
MISSOURI EASTERN DIVISION**

| | | |
|---|---|---|
| **MICHAEL DAILEY, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CASE NO.     4 :17-CV-00024** |
| **v.** | ) | |
| | ) | |
| **BRIDGETON LANDFILL, LLC, et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

## DECLARATION OF RICHARD B. STEWART

I, RICHARD B.STEWART, 40 Washington Square South, 411F, New York, NY 10012, submit this Declaration on behalf of Plaintiffs in the above titled matter.

**Expert Qualifications**

I am presently University Professor and John Edward Sexton Professor of Law, New York University School of Law, and Director, Frank J. Guarini Center on Environmental, Energy and Land Use Law. As I explain more fully below, I have over forty years' experience researching  and teaching U.S. environmental and administrative law at various institutions, including Harvard and NYU. An important specialty of mine is nuclear waste regulation and law. I co-authored an authoritative book on US nuclear waste regulation and law; Richard B Stewart and Jane B Stewart, FUEL CYCLE TO NOWHERE? U.S. LAW AND POLICY ON NUCLEAR WASTE (Vanderbilt University Press, 2011). As shown on my attached curriculum vitae, I've also authored a number of substantial articles on nuclear waste regulation and law. I also have significant experience as a practitioner in these fields, including as Assistant Attorney General for Environment and Natural Resources of the United States Department of Justice ("DOJ"), an office which I held in the period 1989-1991, and as counsel.

I have taught U.S. environmental and administrative law for over 40 years, and have published 18 books and monographs and over 100 articles, essays and book chapters in these fields. I am a graduate of Yale University (summa cum laude), the University of Oxford (University College, Rhodes Scholar, First Class Honors), and Harvard Law School (magna cum laude; Editor, Harvard Law Review). Following a clerkship with Mr. Justice Potter Stewart, Supreme Court of the United States, I practiced law for several years with the Washington, D.C. law firm of Covington and Burling LLP. I joined the Harvard Law School faculty in 1971 and taught there for 17 years, becoming Byrne Professor of

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Administrative Law in 1984. I was also a faculty member of the John F. Kennedy School of Government at Harvard in the period 1984- 1989. I joined the NYU Law School faculty in 1992 as Emily Kempin Professor of Law. I hold honorary degrees from the University of Rome La Sapienza and the Erasmus University, Rotterdam. I have also been a visiting professor of law at numerous universities, including Yale University, the University of California-Berkeley, and the European University Institute Florence, and a visiting scholar at the faculty of laws, University College London and Sciences Po Law School, Paris.

In 1989, on appointment by President George H. W. Bush, I became Assistant Attorney General for Environment and Natural Resources of DOJ, leading a staff of 400 lawyers representing the federal government in a wide variety of environmental and natural resources litigation. Among other matters, I was responsible for prosecuting Exxon for the *Exxon Valdez* spill and dealt with other major cases involving spills of oil and hazardous substances.

Following my government service I joined the NYU Law School faculty. From 1993 to 2002 I was of counsel for the law firm of Sidley Austin LLP, specializing in environmental law, in particular hazardous substances liability. Since that time, as well as during my tenure at Harvard, I have been involved in a number of environmental and administrative law cases, including cases involving pollution and hazardous substances liability I have served as a director of the Health Effects Institute and Chairman and Trustee of the Environmental Defense Fund, two leading U.S. nonprofit environmental organizations.  My full curriculum vita is attached.

**Factual Background**

This report is based on the following factual assumptions and documents, provided to me by counsel:

In 1942, as a part of the Manhattan Project and pursuant to contracts with the federal government, Mallinckrodt processed uranium ore from the Belgian Congo at a facility in downtown St. Louis, Missouri, in order to extract uranium for use in nuclear weapons. The residues from the ore processing, known as mill tailings, contain radioactive decay products as well as heavy metals. Mallinckrodt ceased processing operations in 1957. Subsequently, the government sold the mill tailings from these operations. These tailings from Congolese ore, along with Colorado Raffinate waste and other contaminated materials, were stored at a site near the St. Louis airport ("SLAPS"). In the 1960s, some of the mill tailings at SLAPs were moved to a storage site on Latty Avenue in Hazelwood, Missouri for processing by Cotter.

In 1967, Cotter Corp. purchased from Commercial Discount Corporation mill tailings that had been stored at both sites as "$U_3O_8$ bearing residues." Cotter at that time issued a full indemnification to Commercial Discount Corporation. On December 3, 1969 the Atomic Energy Commission ("AEC") issued a source material license to Cotter for work at the Latty Avenue site at least 2 years after Cotter had already obtained the Congo Ore waste. On or about November 13, 1974, the AEC terminated the license. There is no evidence that Cotter executed a

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

financial responsibility and indemnity agreement with the government to ensure compensation for third parties that might be injured by its activities regarding the mill tailings. In 1973, Cotter sent approximately 46,700 tons of mill tailings and residual material from the Latty Avenue site to the West Lake Landfill for disposal; the landfill was not equipped or licensed to receive radioactive wastes. No license was issued by AEC to Cotter for the transfer or disposal of the tailings. Subsequently, the landfill caught fire and radioactive contamination from the tailings was released from the landfill site to surrounding neighborhoods. EPA has designated the landfill as a Superfund Site and is planning to remediate it under CERCLA, but no remediation has yet commenced. The levels of radioactive releases from the restricted area of the Latty Avenue site have exceeded applicable federal health and environmental regulatory standards.

Plaintiffs in the instant case acquired in 1999 a residence in Bridgeton, Missouri, located less than 700m from the fencepost boundary of the landfill. They seek to maintain in Missouri state courts claims for damages and other relief for contamination of their property under Missouri law of nuisance and trespass.

**Issues Addressed in this Declaration**

In this Declaration, I provide my expert opinion on three basic issues:

First, do the plaintiffs' claims fall under the exclusive federal jurisdiction of the Price Anderson Act and accordingly must be maintained in federal rather than state court?

Second, are plaintiffs' state law claims for nuisance and trespass preempted by the Price Anderson Act?

Third, assuming that plaintiffs' claims are governed by the Price Anderson Act, what is the standard that the plaintiffs must meet in order to establish a claim for property damage liability? More specifically, is it sufficient that they show that applicable federal radiation protection standards were exceeded at the fencepost of the Latty Avenue site and/or the Bridgeton Landfill, or must they show that they were exceeded on their property?

I.     **Plaintiffs' Claims Do Not Fall Within the Exclusive Jurisdiction of the Price Anderson Act and Accordingly May be Maintained in Missouri State Courts under Missouri State Law**

The Price Anderson Act provides for exclusive federal court jurisdiction over "public liability" claims arising out of a "nuclear incident," which includes "extraordinary nuclear occurrences." The issue in this case is whether injuries caused by releases of radioactivity from the mill tailings disposed of at the SLAPS sites, Latty Avenue sites, and/or Bridgeton Landfill represent such an "incident" or "occurrence." This question of statutory construction must be answered on the basis not only of the statutory language, but the role of Price Anderson Act public liability claims within the overall structure and purpose of the Act. Furthermore, we deal here with the question of whether a federal statute displaces and preempts state jurisdiction over liability claims based on state tort law. Based on federalism considerations, the Supreme Court

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

has held that in such cases a federal statute should not be interpreted as preemptive of traditional state common law remedies unless the intent of Congress to preempt them is clear. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992). Applying these considerations and principles to the circumstances here, it is manifest that plaintiffs' claims are not subject to the exclusive federal jurisdiction of the Price Anderson Act, and are not preempted by the Act; accordingly that such claims may be maintained in the Missouri state courts.

The basic purpose of the Price Anderson Act was to redress the disincentives posed by the threat of far-reaching liability to private firms' participation in the development of nuclear power and other nuclear-related activities involving certain types of nuclear materials, specifically special nuclear material, source material, and byproduct material. As set forth in 42 U.S. C. § 2210, the means by which Congress implemented this objective was to provide an a federally administered liability and insurance scheme to pay "public liability" claims (discussed below) in order to ensure compensation for injuries suffered by third parties caused by participating nuclear licensees or contractors, while at the same time providing those licensees or contractors with protection against the risk of massive, uninsurable liabilities. Authority to administer the system was originally given to the Atomic Energy Commission ("AEC"); its regulatory authorities were transferred in 1975 to the Nuclear Regulatory Commission ("NRC") and its operational authorities to the Department of Energy. These government authorities are authorized to require nuclear licensees or contractors to establish a basic level of insurance or other financial responsibility to cover their nuclear-related liabilities; in turn, such licensees or contractors receive indemnity agreements under which the government will cover any excess liabilities. The liability of participating licensees or contractors is capped. Liabilities in excess of the cap are covered by an insurance pool established and overseen by AEC/NRC and financed by premiums assessed against nuclear facility operators. Also, all licensees receiving indemnity agreements are required to pay a fee to the government. This liability cap and insurance umbrella system, including government indemnity agreements, was designed to cushion liability risks for participating licensees and contractors conducting their nuclear related activities in accordance with federal licensing and regulatory requirements.

A. *Plaintiffs' Claims Do Not Fall Within the Jurisdiction of the Price Anderson Act Because the Mill Tailings that Defendants Disposed of at the Bridgeton Landfill Are Not Subject to the Atomic Energy Act and the Price Anderson Act*

The Price Anderson Act's public liability provisions cover "nuclear incident" for harms "arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C.§ 2014(q). The terms "special nuclear material," "source material," and "byproduct material." are defined in the Atomic Energy Act ("AEA"). For the reasons explained below, the mill tailings disposed of by defendants in the Bridgeton landfill in 1973 did not fall within any of these three categories of materials, and therefore plaintiffs' claims for injuries caused by radioactive releases from the mill tailings do not fall within the jurisdiction of the Price Anderson Act.

The disposed mill tailings are not "special nuclear material," which the AEA defines (1) plutonium, uranium enriched in the isotope 233 or in the isotope 235 . . . or (2) any material

artificially enriched by any of the foregoing . . . but does not include source material." 42 U.S.C. § 2014(aa).

The disposed mill tailings are not "source material," which the AEA defines as "(1) uranium, thorium, or any other material which is determined by the Commission . . . to be source material; or (2) ores containing one or more of the foregoing materials, in such concentration as the Commission may by regulation determine from time to time." 42 U.S.C. § 2014(z). Although Cotter apparently purchased the tailings issue here in the hope that they might be used to extract triuranium octoxide (U3O8), experience apparently proved that such extraction was infeasible, and Cotter disposed of the mill tailings as refuse in the Bridgeton Landfill.

Finally, the disposed mill tailings are not "byproduct material." At the time of the disposal in 1973 and prior to the 1978 amendments discussed below, the Atomic Energy Act, Section 11(e), defined "byproduct material" as "any radioactive material (except special nuclear material) yielded in or made radioactive by exposure to the radiation incident to the process of producing or utilizing special nuclear material." 68 Stat. at 922-924 (codified as amended at 42 U.S.C. § 2014). This definition did not include mill tailings from the processing of uranium ores, which does not involve radiation exposures. Accordingly, AEC and subsequently NRC determined that mill tailings were not subject to their AEA regulatory authority. See Kerr-McGee Chem. Corp. v. U.S. Nuclear Regulatory Commission, 903 F.2d 1, 2-3 (D.C. Cir. 1990) ("The AEA made no provision for regulating waste materials generated during the extraction or concentrating of source material.")

Subsequently, Congress in 1978 enacted the Uranium Mill Tailings Radiation Control Act (UMTRCA), establishing a federal program for regulation and remediation of mill tailings. In doing so, it amended the AEA definition of "byproduct material" to include mill tailings, modifying Section 11(e) to add as subsection (2): "the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content." 42 U.S.C.. § 2014(e)(2). NRC subsequently considered whether this expanded AEA definition of byproduct material applied retroactively to include mill tailings previously generated by facilities that had ceased operations prior to UMTRCA's enactment. In an exceedingly thorough 25 page determination, the Director of the NRC Office of Nuclear Materials Safety and Safeguards determined, on behalf of the Commission, that such tailings are not "byproduct material" covered by the 1978 amendment to AEA and accordingly are not subject to regulation under UMTRCA. *In the Matter of Envirocare of Utah and Snake River Alliance,* 56 NRC 53 (2002). Under the controlling Supreme Court precedent established in *Skidmore v. Swift & Co,* 323 U.S. 134 (1944) this thorough, cogently reasoned determination, reflecting the expertise and informed judgment of NRC, must receive substantial judicial deference. Further, the Director's determination accords with the general presumption against interpreting statutes as having retroactive application. *Landgraf v. USI Film Prods,* 511 U.S. 244 (1994). Accordingly, the mill tailings generated by Mallinckrodt's processing operations, that ceased in 1957, and which were disposed of by Cotter in the Bridgeton Landfill in 1973, were not and are not "byproduct material" subject to the AEA and therefore cannot provide the basis for a public liability action under the Price Anderson Act.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

*B.  Plaintiffs' Claims Do Not Fall Within the Jurisdiction of the Price Anderson Act Because Defendants' Disposal of Mill Tailings at the Bridgeton Landfill Was Not Undertaken Pursuant to an Appropriate Federal License or Indemnity Agreement*

As previously explained, the Price Anderson Act's scheme for liability, insurance, and compensation for certain nuclear -related injuries, including capping operator liability, applies only to conduct undertaken pursuant to an appropriate federal license and/or government indemnity agreement. Defendants' disposal of mill tailings at Bridgeton Landfill was not conducted pursuant to any such license and there is no evidence that it was undertaken pursuant to any such indemnity agreement. Accordingly, the radioactive releases from the Bridgeton Landfill do not represent a "nuclear incident" covered by the public liability provisions of the Price Anderson Act, and plaintiffs' claims against defendants are not subject to the Act's federal jurisdiction.

<u>The liability provisions of the Price Anderson Act apply only when the conduct causing injury was carried out in accordance with an appropriate government license and/or indemnity agreement.</u>

The Price Anderson Act provides for a scheme of "public liability" and compensation for injuries arising out of activities involving specified nuclear materials (as discussed above). More specifically, this scheme applies only to a "nuclear incident" "including an extraordinary nuclear occurrence."

"Public liability" is defined in 42 U.S.C. § 2014(w) as:

> any legal liability arising out of or resulting from a nuclear incident ... except ...
> (iii) whenever used in subsections (a), (c), and (k) of section 2210 of this title, claims for loss of, or damages to, or loss of use of property which is located at the site of and used in connection with the *licensed activity* where the nuclear incident occurs. 'Public liability' also includes damage to property of *persons indemnified*: Provided, That such property is covered under the terms of the financial protection required, except property which is located at the site of and used in connection with the activity where the nuclear incident occurs. (Emphasis added)

"Nuclear incident" is defined in 42 U.S.C.§ 2014(q) as:

> any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of *source, special nuclear, or byproduct material*.... And provided further, That as the term is used in section 2210(c) of this title, it shall include any such occurrence outside both the United States and any other nation if such occurrence arises out of or results from the radioactive, toxic, explosive, or other hazardous properties of *source, special nuclear, or byproduct material licensed* pursuant to subchapters V, VI, VII, and IX of this division, which is used in connection with the operation of a *licensed* stationary production or utilization facility or which moves outside the territorial limits of the United States in transit from one person *licensed* by the Nuclear Regulatory Commission to another person *licensed* by the Nuclear Regulatory Commission. (Emphasis added)

"Extraordinary nuclear occurrence" is defined in 42 U.S.C.A. § 2014(j) as:

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

any event causing a discharge or dispersal of *source, special nuclear, or byproduct material* from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines to be substantial, and which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines has resulted or will probably result in substantial damages to persons offsite or property offsite..... The Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, shall establish criteria in writing setting forth the basis upon which such determination shall be made. As used in this subsection, "offsite" means away from "the location" or "the contract location" as *defined in the applicable* Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, *indemnity agreement,* entered into pursuant to section 2210 of this title. (Emphasis added)

"Person indemnified" is defined in 42 U.S.C.A. § 2014(t) as:

The term "person indemnified" means (1) with respect to a nuclear incident occurring within the United States or outside the United States as the term is used in section 2210(c) of this title, ... the *person with whom an indemnity agreement is executed or who is required to maintain financial protection,* and any other person who may be liable for public liability .... (Emphasis added)

While hardly a model of legislative drafting, these provisions make sufficiently clear that the Act's public liability provisions are limited to injuries resulting from activities carried on by a party in accordance with a government regulatory license and/or an agreement for government indemnification. This limitation is the logical corollary of the Price Anderson Act scheme of providing a liability cap and insurance umbrella for activities that are subject to government licensing and regulation and/or have a government indemnity agreement. The Act, as amended in 1988 excludes punitive damages in public liability claims; such exclusion is logical in a government supervised insurance system that provides for assured compensation of those suffering injury, for capping nuclear operators' liability, and for government regulatory controls that would provide safeguards against hazard.

Defendants' operations at the Latty Avenue and SLAPS sites do not appear to be the subject of any indemnity agreement with the United States. In fact, the transaction documents show that Cotter indemnified its predecessor in title. Furthermore, the disposal of mill tailings at Bridgeton Landfill was not undertaken pursuant to an appropriate federal license or government indemnity agreement, and accordingly do not give rise to a "public liability" claim under the exclusive jurisdiction of the Price Anderson Act.

The landfill defendants have never had a government license or indemnity agreement. Cotter's disposal of mill tailings at Bridgeton Landfill was not undertaken pursuant to or authorized by a federal license, and *in fact violated the AEC license that it possessed*, which was limited to the Latty Avenue site. There is no evidence that Cotter ever obtained a government indemnity agreement pursuant to the Price Anderson Act for its operations at any of the sites. Thus, landfill defendants and Cotter have failed to show that plaintiffs' claims fall within the federal jurisdiction of the Price Anderson Act.

## II.     The Price Anderson Act Does Not Preempt Plaintiffs' State Law Trespass and Nuisance Claims

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

As shown above, plaintiffs state law trespass and nuisance claims do not fall within the exclusive jurisdiction of the Price Anderson Act. As shown in this section of my Declaration, these state law claims are not preempted by the Price Anderson Act. They may accordingly be maintained in the Missouri state courts.

In enacting the Price Anderson Act, Congress did not preclude maintenance of any and all state law claims for nuclear -related harms. As shown above, the Act provides jurisdiction only over those claims involving special nuclear, source, or byproduct material arising out of conduct by a defendant operating in accordance with an appropriate government license and/or indemnity agreement. It does not preempt state law claims that fall outside of its jurisdiction. The Act does not reflect congressional intent to occupy the entire field of all nuclear -related claims, nor would maintenance in state court under state law of claims not covered by the Act conflict with the Act's scheme.

The well-reasoned opinion by Judge (now Justice) Gorsuch for the court in *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088, 1099 (10th Cir. 2015), *cert. dismissed sub nom. Dow Chem. Co. v. Cook*, 136 S. Ct. 2055 (2016), provides an exceedingly sound analysis of the issues and justification for these conclusions. As Judge Gorsuch shows, the Price Anderson Act does not extend to all nuclear -related activities and resulting injuries. Nor does it preempt the field, so as to preclude state law recovery for such injuries when they are not subject to compensation under the Act. Further, the congressional scheme in the Act can function perfectly well in tandem with state court decision of state law actions involving claims not covered by the Price Anderson Act system. Indeed, the availability of state law claims, which could include punitive damage awards, would strengthen the Price Anderson Act system by giving operators incentives to subject their activities to federal regulatory and financial responsibility/indemnity requirements.

As *Cook* points out, courts that have stated in unqualified terms that the Price Anderson Act and its exclusive federal jurisdiction encompasses all nuclear-related injury claims have failed to address the limitations in the Act's coverage. As shown above, the Act covers only claims arising out of a "nuclear incident" "including an extraordinary nuclear occurrence," involving specified nuclear-related materials in activities subject to federal regulation and/or indemnity agreements. Precluding state law claims that do not meet these limitations would leave injured parties in limbo, without any remedy.

*Cook*'s refusal to preempt all state law claims was anticipated in *Bennett v. Mallinckrodt, Inc.*, 698 S.W.2d 854 (Mo. Ct. App. 1985), *cert denied,* 106 S. Ct. 2903 (1986), which held that action by plaintiffs who lived or worked near defendant's radiopharmaceutical plant was not preempted by the Price Anderson Act. The court found that the Act embodied an underlying principle of interfering with state law to the minimum extent necessary. *Id*. at 860-861. After the Supreme Court declined to review the decision, the radiopharmaceutical industry unsuccessfully sought congressional amendment of the Price Anderson Act to preempt state law claims.

As *Cook* properly emphasized, the federalism canon of statutory construction embraced by the Supreme Court dictates that the Price Anderson Act should not be interpreted to preempt state law claims that do not fall within its "public liability" scheme. Court must not interpret federal statutes to preempt traditional state tort law remedies unless the congressional intent to do so is

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

clear. *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504 (1992); *Riegel v. Medtronic, Inc.*, 552 U.S. 312, 334 (2008). No such intent can be found in the Price Anderson Act .

Furthermore, interpreting the Price Anderson Act to preempt state law claims that do not qualify as "public liability" claims under the Act would leave injured parties without any redress for the harms that they have suffered. Depriving such parties of any remedy at all would likely violate due process. Under the canon of constitutional avoidance enunciated by the Supreme Court, courts should construe federal statutes so as to avoid presenting such serious constitutional issues. *United States v. Witkovich*, 353 U.S. 194 (1957); *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490 (1979). Accordingly, courts should not interpret the Price Anderson Act to preempt state law claims for injuries for which PAA does not itself provide a remedy.

### III.   Assuming Arguendo that Plaintiffs' Claims are Price Anderson Act "Public Liability" Actions, Plaintiffs Must Only Prove that Radioactive Releases from Latty Avenue Exceeded Federal Radiation Standards at the Fencepost; They Need Not Prove Exceedances on their Property

In this part of my Declaration, I assume *arguendo* that plaintiffs' claims for trespass and nuisance represent a Price Anderson Act public liability action. I conclude that in order to maintain such an action, plaintiffs must prove that releases of radioactivity from the SLAPS and Latty Avenue facilities exceeded federal radiation standards outside the restricted area or boundary of the facilities. They are not required to prove that such standards have been exceeded on their property.

*In re TMI*, 67 F.3d 1103 (3d Cir. 1995), involved Price Anderson Act public liability actions for injuries allegedly suffered as a result of radioactive releases from the 3 Mile Island nuclear power plant. The Third Circuit held that in order to recover, plaintiffs must show that "(1) the defendants released radiation into the environment [in excess of the levels permitted by federal regulations]; (2) the plaintiffs were exposed to this radiation (although not necessarily at levels prohibited by [those regulations]); (3) plaintiffs have injuries; and (4) radiation was the cause of those injuries."67 F.3d at 1110. It further held that the relevant regulations for determining an exceedance are the NRC regulations at 10 CFR§ 20.106, which define the levels of radioactivity permitted in liquid or airborne effluents released off of restricted premises. The Third Circuit rejected the argument that a breach of duty occurs only when persons are exposed to radiation in excess of federal exposure standards. "Instead, the regulations provide that a breach occurs whenever excessive radiation is released, whether or not anyone is present in the area exposed." *Id*. at 1116.The Court of Appeals' reasoning is eminently sound, and consistent with the public interest in ensuring compliance with all regulatory requirements for nuclear operations. The Third Circuit's ruling on this point was correctly followed in *McClurg v.Mallinckrodt, Inc*., 2017 WL 2929444 (U.S. Dist. Ct, E.D. Missouri, Eastern Div. 2017).

I declare under penalty of perjury that the foregoing is true and correct.

*Richard B Stewart*

Richard B. Stewart     Dated April 24 2018

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## RICHARD B. STEWART

## - CURRICULUM VITAE -

Employment/Appointments:

> University Professor
> John E. Sexton Professor of Law
> Director, Center on Environmental, Energy and Land Use Law
> New York University

Courses Taught:

> Environmental Law, Administrative Law, International Environmental Law and Policy, Law and Globalization,

Current Research Interests
and Activities:

> Co-founder of major research projects on Global Administrative Law and MegaReg: Regulatory and Justice Dimensions of Economic Globalization, Institute for International Law, New York University School of Law, in collaboration with various universities around the world.,
>
> Currently researching and preparing for publication books/articles on private and hybrid global regulation, "megaregional" trade/regulatory regimes, climate regulation and finance, climate, self-regulation in global supply chains, nuclear waste law and policy, science, law, and governance in the Arctic, global administrative law, environmental protection and market economics and incentives.

Previous Employment/Appointments:

| | |
|---|---|
| 2012 | Visiting Professor, Yale Law School |
| 2009-10 | Fellow, The Straus Institute for the Advanced Study of Law and Justice |
| 2005-6, 1999 | Visiting Professor of Law, University of Rome "La Sapienza" |
| 2000 | Visiting Professor of Law, University of Bologna |
| 1993-2002 | Of Counsel, Sidley and Austin, specializing in environmental regulation and liabilities |

1993:               Jean Monnet Visiting Professor
                    European University Institute, Florence

1991-92:            Visiting Professor of Law
                    Georgetown University School of Law

1989-91:            Assistant Attorney General for Environment and Natural Resources U.S.
                    Department of Justice

1984-89:            Byrne Professor of Administrative Law
                    Harvard Law School

                    Member of the Faculty
                    J. F. Kennedy School of Government
                    Harvard University

1986-87:            Visiting Professor of Law
                    University of Chicago Law School

1984:               Visiting Fellow, European University Institute
                    Florence, Italy

1980:               Visiting Scholar
                    U.S. Environmental Protection Agency

1979-80:            Visiting Professor of Law
                    University of California, Berkeley

1975-84:            Professor of Law
                    Harvard Law School

1971-75:            Assistant Professor of Law
                    Harvard Law School

1973:               Special Counsel, Senate Select Committee on
                    Presidential Campaign Activities

1967-71:            Attorney, Covington Burling
                    888 Sixteenth Street, N.W.
                    Washington, DC 20006
                    Specializing in antitrust, regulatory, and general appellate litigation matters

1966-67:            Law Clerk to Mr. Justice Potter Stewart

Supreme Court of the United States

Other Current Activities, Memberships, Honors:

Advisory Trustee and Member, Litigation Review Committee, Environmental Defense Fund

Management Committee and Researcher, Consortium for Risk-Based Evaluation with Stakeholder Participation (CRESP), university-based nuclear waste cleanup research and policy institution serving as independent advisor to U.S. Department of Energy

Editorial Boards: Review of European Community and International Environmental Law; Oxford Journal of Environmental Law; International Journal of BioSciences and Technology (hon.)

Member, American Law Institute, Phi Beta Kappa; U.S. College of Environmental Lawyers.

American Bar Association 2009 Annual Award for Environmental Stewardship

Fellow, International Association of Administrative law

Fellow, American College of Environmental Lawyers

Fellow, American Academy of Arts and Sciences;

Edmond J. Randolph Award, U.S. Department of Justice;

2009 American Bar Association Annual Award for Environmental Stewardship

Rhodes Scholar

Dr. (*honors causa*), Erasmus University, Rotterdam (1993); Awarded for contributions to environmental law and protection through scholarship on economic incentives for environmental protection and service as US Assistant Attorney General in prosecuting EXXON for the Exxon Valdez oil spill.

Dr. (*honors causa*), University of Rome "La Sapienza" (2005). Awarded for contributions to environmental and administrative law including through scholarship on economic incentives for environmental protection.

Past Activities:

12

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Director, Health Effects Institute, 1997-2007

Principal Investigator, Project on International Trade and Regulatory Conflicts over Genetically Modified Foods and Crops, with special emphasis on position of developing countries. Funded by $435,000 grant from Rockefeller Foundation

Co-Principal Investigator, Project on Capacity-Building for Environmental Legislation in the People's Republic of China, training staff of Environmental Protection Committee of National People's Congress and relevant ministries and assisting them in revising and strengthening China's environmental laws. Grants totally $1.4 million from Asian Development Bank.

Consultant to United Nations Commission on Trade and Developments (UNCTAD) on legal and institutional issues presented in development of international greenhouse gas emissions trading systems.

Member UNEP Group of Experts on Liability and Compensation for Environmental Damage from Military Activities, 1995-1996

Chief Reporter, American Law Institute
Project on Product and Process Injuries, 1985-1989

Member, Board of Trustees, Environmental Defense Fund, 1976-1989 (Chairman, 1980-83). Advisory t Trustee, 1993-present.

U.S. Congress Office of Technology Assessment,
Advisory Committee on New Clean Air Act Issues

Academic Advisory Board, Foundation for Research on Economics and the Environment

Consultant, Administrative Conference of the United States,
U.S. Environmental Protection Agency;
U.S. Federal Trade Commission;
President's Commission on Three Mile Island;
U.S. Congress Office of Technology Assessment;
National Research Council Committee on Environmental Decisionmaking and Chairman, Panel on Legal Considerations

Education:

1963-66:       Harvard Law School
               LL.B. magna cum laude

13

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Editor, Harvard Law Review

1961-63:    Rhodes Scholar, Oxford University.
MA with First Class Honors in Philosophy,
Politics and Economics

1957-61:    Yale University, B.A. summa cum laude
History, the Arts, Letters.  Junior
Phi Beta Kappa

1953-57:    University School, Shaker Heights, Ohio

Permanent address:

(office)    New York University School of Law
40 Washington Square South
New York, NY 10012
Tel:  Office: (212) 998-6170
Mobile: (646) 306-1397

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

SELECTED PUBLICATIONS

**Books and Monographs:**

Private and Hybrid Global Regulatory Governance (with Benedict Kingsbury) (forthcoming, Oxford University Press)

Megaregulation Contested: Global Economic Ordering After TPP (co-editor and author) (forthcoming, Oxford University Press, 2018)

Carbon Capture and Storage: Emerging Legal and Regulatory Issue (2d ed. 2018) (co-editor)

Symposium on International Regulatory Cooperation and Conflict, 48 L.& Contemp Probs –(2016)(with R. Bull. N. Mahboubi & J. Wiener)

Special Issue on Building Blocks for Addressing Climate Change, Climactic Change ( 2016)(with M. Oppenheimer and B. Rudyk)

Hacia El Derecho Administrativo Global: Fundamentos, Principios y Ámbito de Aplicación (2015)
        (with Benedict Kingsbury)

Fuel Cycle to Nowhere? U.S. Law and Policy on Nuclear Waste (2011) (with J. Stewart)

Breaking the Logjam : Environmental Protection that Will Work (2010)(with D. Schoenbrod and K. Wyman)(paper ed. 2012)

Climate Finance: Regulatory and Funding Strategies for Climate Change and Sustainable Development (with B. Kingsbury and B. Rudyk) (editor and principal author)(2009)

Administrative Law and Regulatory Policy (7th ed.)(2008)(with S. Breyer, C. Sunstein & A. Vermeule)

Symposium on Global Administrative Law (37:4 NYU Journal of International Law and Politics, 2005) (ed. with B. Kingsbury)

Symposium on The Emergence of Global Administrative Law (68:3-4 Law and Contemporary Problems, 2005) (ed. with B. Kingsbury, N. Krisch, and J. Weiner)

Beyond Kyoto: Reconstructing Global Climate Policy (2003) (with J. Wiener)

The Reformation of American Administrative Law (in Chinese) (2002)

The Clean Development Mechanism: Building International Private-Public Partnership (United Nations Conference on Trade and Development) (2000) (lead author)

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Environmental Law, The Economy, and Sustainable Development: Europe, the United States, and the Global Regime (Cambridge University Press, 2000) (Editor, with R. Revesz & P. Sands)

Legal Issues Presented By a Pilot International Greenhouse Gas Trading System, United Nations Conference on Trade and Development (1996) (with P. Sands and J. Wiener)

Natural Resource Damages:  A Legal, Economic and Policy Analysis. Washington, D.C. The National Legal Center for the Public Interest (1995)

Analyzing Superfund:  Economics, Science, and Law (Editor, with R. Revesz) (Resources for the Future 1995)

Markets Versus Environment? (The Robert Schuman Centre, European University Institute) (1995)

Environmental Law and Policy, Little, Brown & Co. (1994) (with P. Menell)

Integration Through Law:  Environmental Protection Policy Law (1985) (with E. Rehbinder) De Guyter (paperback edition, 1987)

Environmental Law & Policy (2d ed. 1978) (with J. Krier)

**Articles, Book Chapters, Essays and Reviews:**

Private And Hybrid Governance in a State-Centered World, in Private and Hybrid Global Regulatory Governance (with Benedict Kingsbury) (forthcoming, Oxford University Press)

Megaregulatory Administrative Law: An Instrument of Political Control**,** in Megaregulation Contested: Global Economic Ordering After TPP (forthcoming, Oxford University Press, 2018) (co-author)

Introduction: Contested Megaregulation, the Trans-Pacific Partnership, and the Future of Global Economic Ordering,

TPP as Megaregulation, in Megaregulation Contested: Global Economic Ordering After TPP (forthcoming, Oxford University Press, 2018) (co-author)

Remote Control: Treaty Requirements for Regulatory Procedures, 104 Cornell L. Rev.104 __ (November 2018)] (co-author)

Lancet Commission on Pollution and Health, Report (2017)(co-author)

State Regulatory Capacity and Administrative Law and Governance under Globalization, in N. Parillo and J. Mashaw, eds., in N. Parrillo & J. Mashaw, eds Administrative Law from the Inside Out (2017)

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Toward Global Administrative Law? Trajectories and Challenges (in Spanish), in Hacia El Derecho Administrativo Global: Fundamentos, Principios y Ámbito de Aplicación (with Benedict Kingsbury)(2017)

Introduction to Special Issue on the Building Blocks Strategy for Addressing Climate Change, Climactic Change (2016)(with M. Oppenheimer and B. Rudyk)(2015-16)

Global Standards for National Societies, in Sabino Cassese, ed., Elgar Handbook of Global Administrative Law (2016) (2014-15)

Introduction, Symposium on International Regulatory Cooperation and Conflict, 48 L.& Contemp Probs 1 (2015)(with  R. Bull. N. Mahboubi & J. Wiener) (2014-15)

Remedying Disregard in Global Regulatory Governance: Accountability, Participation and Responsiveness, 108 Am Jl Intl L 211 (2014)

Global Standards for National Societies, in Sabino Cassese, ed., Elgar Handbook of Global Administrative Law (2016)

Introduction, Symposium on International Regulatory Cooperation and Conflict, 48 L.& Contemp Probs – (forthcoming, 2015)(with  R. Bull. N. Mahboubi & J. Wiener)

Remedying Disregard in Global Regulatory Governance: Accountability, Participation and Responsiveness, 108 Am Jl Intl L 211 (2014)

Solving the Spent Nuclear Fuel Impasse, (with J. Stewart) 21 N.Y.U. Envir. L. J. `1 (2014).

Building Blocks for Global Climate Protection, 32 Stanford Envrtl L Rev 341 (2013) (with M. Oppenheimer and B. Rudyk) (28 May 2013)

A New Strategy for Global Climate Protection, Climactic Change, 28 May 2013 (with M. Oppenheimer and B. Rudyk)

"Administrative Tribunals of International Organizations from the Perspective of the Emerging Global Administrative Law," in The Development and Effectiveness of International Administrative Law  (Olufemi Elias, ed., Martinus Nijhoff, 2012) (with Benedict Kingsbury)

Enforcement of Transnational Public Regulation, in, Fabrizio Caffaggi, ed., Enforcement of Transnational Regulation; Ensuring Compliance in a Global World (2012)(paper edition 2014)

The World Trade Organization: Multiple Dimensions of Global Administrative Law (with M. Sanchez Baden), 9 International Journal of Constitutional Law 556 (2011)

Solving the U.S. Nuclear Waste Dilemma. Environmental Law and Policy Review. (2010-11)

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

The World Trade Organization and Global Administrative Law in Christian Joerges and E-U Petersmann, Constitutionalism, Multilevel Trade Governance, and Social Regulation (2d ed. Forthcoming 2010) (with M. Ratton-Sanchez)

The Emerging Global Climate Regime: Challenges for Developing Countries, in Global Regulatory Governance and the State: India and the Emergence of Global Administrative Law (co-author) (OUP, forthcoming)

GMO Trade Regulation and Developing Countries, 2008 Acta Juridica 320

Legitimacy and Accountability in Global Regulatory Governance: The Emerging Global Administrative Law and the Design and Operation of Administrative Tribunals of International Organizations, Spyrodin Flogaitis, Ed. International Administrative Tribunals in a Changing World (2009)(with Benedict Kingsbury)

U.S. Nuclear Waste Law and Policy: Fixing a Bankrupt System, 16 N.Y.U. Envir. L. J 783 (2008)

States (and Cities) as Actors in Global Climate Regulation: Unitary vs. Plural Architectures, 50 Ariz. L. Rev.681 (2008), selected for The Environmental Law and Policy Annual Review

International Environmental Protection and Regulatory Innovation, in Martin Fuhr, Rainer Wahl and Peter von Wilmowsky, eds, Umwelt und Umweltwissenschaft (2007)

Instrument Choice, in Daniel Bodansky and Junetta Brunee, eds, Oxford Handbook of International Environmental Law (2007)

The Global Regulatory Challenge to U.S. Administrative Law, 37 NYU Journal on International law and Politics 695 (2006)

Foreword: Global Governance as Administration –National and Transnational Approaches to        Global Administrative Law, 68 L & Contemp. Probs. 1 (2005)(co-author)

The Emergence of Global Administrative Law, 68 Law & Contemp. Probs. 15 (2005)(co-author) Published in Chinese, Compilation of Articles on Legal Theory and Legal History 2009:3; in  Spanish, Res Publica Argentina, 2007-3 25.

U.S. Administrative Law: A Model for Global Administrative Law?, 68 Law & Contemp. Probs. 63 (2005)

Il Diritto Admministrativo Globale, in Rivista Trimestrale di Diritto Pubblico, 2005, n. 3, p. 633-640.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Administrative Law in the Twenty-First Century 1 Global Administrative Law Review  204 (in Chinese)(2005);

The GM Cold War: How Developing Countries Can Go From Being Dominoes to Being Players, 13 Rev. Eur. Comm. & Intl L 247 (2004)(with E Meijer).

Practical Climate Change Policy, 20 Issues in Science and Technology 71 (2004) (with J. Wiener)

Reconstructing Climate Policy: The Paths Ahead in  Carlo Carraro, ed., Governing the Global Environment 417(2003). (with J. Wiener)

Administrative Law in the Twenty-First Century, 78 N.Y.U.L. Rev. 437 (2003);

The New Generation of United States Environmental Law, 2002 America Hō 1 (in Japanese).

Environmental Regulation Under Uncertainty, 10 Research in Law and Economics 71 (2002)

The Importance of Law and Economics for European Environmental Law, 2 Yearbook of European Environmental Law 856 (2002)

The Legal And Institutional Framework For A Plurilateral Greenhouse Gas Emissions Trading System IN UNCTAD, Greenhouse Gas Market Perspectives, Trade and Investment Implications of Climate Change 82 (2001)

A New Generation of Environmental Regulation?, 29 Capital University Law Review 21 (2001)

Environmental Law and Liberty, in Norman Dorsen and Professor Gifford, Democracy and the Rule of Law. Washington: CQ Press, 2001.

Designing an International Greenhouse Gas Emissions Trading System, 15 Natural Resources & Environment 160  (with James L. Connaughton and Lesley C. Foxhall) (2001)

Global Governance for Sustainable Development, in Progressive Governance for the XXI Century. (European University Institute New York University School of Law; 2000.)

Institutional and Legal Issues of Emissions Trading, in UNCTAD Climate Change and Development (2000)

Introduction: Environmental Regulation in Multi-Jurisdictional Regimes, in Environmental Law, The Economy, and Sustainable Development:  (Richard Revesz, Philippe Sands and Richard Stewart eds.) Europe, the United States, and the Global Regime (Cambridge University Press, 2000)

Economic Incentives for Environmental Protection: Opportunities and Obstacles, in
  Environmental Law, The Economy, and Sustainable Development:  (Richard Revesz,
  Philippe Sands and Richard Stewart eds.) Europe, the United States, and the Global
  Regime (Cambridge University Press, 2000)

The Role of Mitigation and Conservation Measures in Achieving Compliance with Environmental
  Regulatory Programs:  Lessons from Section 316 of the Clean Water Act, 8 NYU Environmental
  Law Journal 237 (2000) (with T. Schoenbaum).

Regulatory Compliance Preclusion of Tort Liability: Limiting the Dual Track
  System, 88 Geo. L. J. 2167 (2000)

Natural Resource Damages:  The New Wave of Environmental Liability, in 1998 Wiley Environmental
  Law Update 263 (C. Volz & P. Gray, eds., 1988) (with J. Connaughton)

Evaluating the New Deal, 22 Harvard Journal of Law & Public Policy 239          (1998)

Environmental Quality as a National Good in a Federal State, 1997 U. Chicago Legal Forum 199

Environmental Statutory Interpretation in China and the United States, 5 N.Y.U. Envt'l. L.J. 556 (1996)

Valuation of Environmental Damage - US and International Law Approaches, 5 Review of European
  Community & International Environmental Law 290 (1996) (with P. Sands)

United States Environmental Regulation:  A Failing Paradigm,15 Jl. L. & Commerce 585 (1996)

Environmental Law, in Fundamentals of American Law, Alan B. Morrison, gen. ed. New York: Oxford
  University Press (1995)

Liability for Natural Resource Damage:  Beyond Tort, in R. Revesz & R. Stewart, eds., Analyzing
  Superfund:  Economics, Science and Law (1995)

Interstate Commerce, Environmental Protection, and U.S. Federal Law, in I Trade & The Environment:
  The Search for Balance (J. Cameron, P. Demaret & D. Geradin, eds.) (1994)

Technology-Based Approaches versus Market-Based Approaches, in P. Sands, Greening International
  Law (1993) (with D. Dudek & J. Wiener)

Environmental Contracts and Covenants:  A United States Perspective, in Jan M. van Dunné, ed.,
  Environmental Contracts and Covenants:  New Instruments for a Realistic Environmental Policy?
  (1993)

Confidentiality in Government Enforcement Proceedings, 2 N.Y.U. Envt'l. L.J. 232 (1993)

The NAFTA:  Trade, Competition, Environmental Protection, 27 International Lawyer 751 (1993)

Environmental Regulation and International Competitiveness, 102 Yale Law Journal 2039 (1993)

Antidotes for the "American Disease", 20 Ecology Law Quarterly 85 (1993)

La Justicia Administrativa En Estados Unidos, in J. Barnes Vasquez, ed., La Justicia Administrativa En
        El Derecho Comparado (1993)

Environmental Law in the United States and the European Community:  Spillovers, Cooperation, Rivalry,
        Institutions 1992 University of Chicago Legal Forum 41

International Trade and the Environment:  Lessons From the Federal Experience, 49 Washington and Lee
        Law Review 1329 (1992)

Environmental Policy for Eastern Europe:  Technology-Based Versus Market-Based Approaches, 17
        Colum. J. Envir. L. 1 (1992) (with D. Dudek & J. Wiener)

The Comprehensive Approach to Global Climate Policy:  Issues of Design and
        Practicality, 9 Ariz. J. of Intl. & Comp. L. 83 (1992) (with J. Wiener)

Models for Environmental Regulation:  Central Planning Versus Market-Based
        Approaches, 19 B.C. Env. Evn. Affs. L. Rev. 547 (1992)

Ambiente, tutela dell, I Encyclopedia Delle Scienze Sociali 146

Regulatory Jurisprudence.  Canous Redux? (Book Review), 79 Calif. L. Rev.
        807 (1991)

Providing Economic Incentives in Environmental Regulation, 8 Yale J. on Reg.
        463 (1991)

Recent Developments in the Field of Liability for Hazardous Wastes under CERCLA and Natural
        Resource Damages in the United States, 4 Milieu Aansprakelijkheid - Environmental Liability
        Law Review 89 (1991); also in Jan M. van Dunné, ed., Transboundary Pollution and Liability:
        The Case of the River Rhine 107 (1991)

Regulatory Law, in Bernard D. Davis, The Genetic Revolution:  Scientific Prospects and Public
        Perceptions 212 (1991)

Madison's Nightmare, 57 U. Chi L. Rev. 335 (1990)

International Aspects of Biotechnology - Implications for Environmental Law

and Policy, 1 Oxford J. Envir. L. 157 (1989) (with Maria Martinez)

Centralization and Its Discontents (Institute of American Culture, Academia Sinica, Tapei) (1988)

I'inculso di Madison:  federalisimo e Stato assistenziale reglomentatore, in Il
     Federalista, 200 Anni Dopo (Guglielmo Negri, ed., 1988)

International Aspects of Biotechnology and Its Use in the Environment in Biotechnology and the
     Environment:  The Regulation of Genetically Engineered Organisms Used in the Environment
     (American Bar Association 1988)

Controlling Environmental Risks Through Economic Incentives, 13 Columbia J. Envir. L. 153 (1988)

Reforming Environmental Law: The Democratic Case for Market Incentives, 13 Columbia J. Envir. L.
     171 (1988) (with Bruce A. Ackerman)

Regulation and the Crisis of Legalization in the United States, in T. Daintith, ed., Law as an Instrument of
     Economic Policy; Comparative and Critical Approaches (1988)

Beyond Delegation Doctrine, 36 Am. Univ. L. Rev. 323 (1987)

Book Review:  Organizational Jurisprudence (Review of Dan-Cohen:  Rights, Persons, and
     Organizations) 101 Harv. L. Rev. 371 (1987)

Crisis in Tort Law? The Institutional Perspective, 54 U. Chi. L. Rev. 184 (1987)

The Judicial Performance of Robert H. Bork in Administrative and Regulatory Law, 9 Cardozo L. Rev.
     135 (1987)

Reconstitutive Law, 46 Md. L. Rev. 86 (1986)

The Role of the Courts in Risk Management, 16 Environmental Law Reporter 10208 (1986)

Federalism and Rights, 19 Ga. L. Rev. 916 (1985)

Reforming Environmental Law, 37 Stan. L. Rev. 301 (1985) (with B. Ackerman)

The Discontents of Legalism:  Interest Group Relations in Administrative Regulation, 1985 Wis. L. Rev.
     655

Legal Integration in Federal Systems:  European Community Environmental Law, 33 Am. J. Comp. L.
     1501 (1985)

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Economics, Environment, and the Limits of Legal Control, 9 Harv. Envir. L. Rev. 1 (1985), and in B. Sadder, ed., Environmental Protection and Resources Development:  Convergence for Today (1985)

Bureaucratic Justice, 96 Harv. L. Rev. 1952 (1983) (with L. Liebman)

Regulation in a Liberal State, The Role of Non-Commodity Values, 92 Yale L. J.      1537 (1983)

The Limits of Administrative Law, in The Courts:  Separation of Powers (B. Goulet, ed., 1983)

The Legal Structure of Interstate Resource Conflicts, in Regional Conflict and National Policy (K. Price, ed., 1982)

Interstate Resource Conflicts:  The Role of the Federal Courts, 6 Harv. Envir. L.  Rev. 241 (1982)

Public Programs and Private Rights, 95 Harv. L. Rev. 1193 (1981-1982) (with C. Sunstein)

Regulation, Innovation, and Administrative Law:  A Conceptual Framework, 69 Calif. L. Rev. 1259 (1981)

The Legal Regulation of Risk, in Genetics and Law II (A. Milunsky, ed., 1980)

Using Economic Analysis in Teaching Environmental Law:  The Example of Common Law Rules, 1

U.C.L.A. Journal of Environmental Law & Policy 13 (1980) (with J. Krier)

Le "Proceduralisme" Dans le Droit Administratif Americain, 30 Conseil d'Etat Etudes et Documents 303 (1979)

History and Policy Analysis, 31 Stan. L. Rev. 1159 (1979)

Standing for Solidarity, 88 Yale L. J. 1559 (1979)

The Resource Allocation Role of Reviewing Courts:  Common Law Functions in a Regulatory Era, in Collective Decision Making:  Applications from Public Choice Theory (C. Russell, ed., 1979)

Vermont Yankee and the Evolution of Administrative Procedure, 91 Harv. L. R. 1805 (1978)

Paradoxes of Liberty, Integrity, and Fraternity:  The Collective Nature of Environmental Quality and Judicial Review of Administrative Action, 7 Envir. L. 463 (1977)

Pyramids of Sacrifice? Federalism Problems in Mandating State Implementation of Federal Environmental Controls, 86 Yale L.J. 1196 (1977)

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Judging the Imponderables of Environmental Policy, in Approaches to Controlling Air Pollution (A. Friedlander, ed., 1978)

The Development of Administrative and Quasi-Constitutional Law in Judicial Review of Environmental Decisionmaking:  Lessons From the Clean Air Act, Iowa L. Rev. (1977); also in Committee on Environmental Decision Making, National Research Council, IIB Decision Making in the Environmental Protection Agency (1977) (with P. Spector)

Energy and the Environment, in Owen and Schultze, eds., Setting National Priorities: The Next Ten Years (1976) (with Roberts)

The Reformation of American Administrative Law, 88 Harv. L. Rev. 1669 (1975)

Book Review, Baxter:  People or Penguins:  The Case for Optimal Pollution, Ackerman and Rose-Ackerman, Sawyer, Henderson:  The Uncertain Search for Environmental Quality, 88 Harv.L. Rev. 1644 (1975) (with M. Roberts)

Book Review, Read, McDonald, Fordham, Pierce, Materials on Legislation, 11 Harvard Journal on Legislation 550 (1974)

The Lawyer and the Legislative Process, 10 Harvard Journal on Legislation 152   (1973)

3/18

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

No._____

# In the Supreme Court of the United States

---

ESTATE OF JEFFREY H. WARE, BY BARBARA
BOYER, INDIVIDUALLY, ON BEHALF OF
WRONGFUL DEATH BENEFICIARIES AND AS
ADMINISTRATRIX OF THE ESTATE OF JEFFREY
H. WARE

*Petitioner,*

v.

HOSPITAL OF THE UNIVERSITY OF
PENNSYLVANIA, ET AL.

*Respondent.*

---

*On Petition for a Writ of Certiorari to the United
States Court of Appeals for the Third Circuit*

---

**PETITION FOR A WRIT OF CERTIORARI**

---

Aaron J. Freiwald, Esquire
*Counsel of Record*
Glenn A. Ellis, Esquire
Matthew R. Bravette, Esquire
Freiwald Law, P.C.
1500 Walnut St., 18th Floor
Philadelphia, PA 19102
(215) 875 − 8000
ajf@freiwaldlaw.com
*Counsel for Petitioner*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

i

## QUESTIONS PRESENTED FOR REVIEW

1.  Did the District Court err in applying the Price-Anderson Act to a case where Petitioner was injured while conducting research at the University of Pennsylvania with radioactive materials?

2.  Did the District Court err by not remanding the state law claims once the Price-Anderson Act claims were voluntarily withdrawn by Petitioner?

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

ii

## PARTIES TO THE PROCEEDING

Petitioner, Estate of Jeffrey H. Ware, by Barbara Boyer, individually, on behalf of wrongful death beneficiaries and as Administratrix of the Estate of Jeffrey H. Ware was the Appellant in the court below. Respondents, Hospital of the University of Pennsylvania, University of Pennsylvania, University of Pennsylvania Perelman School of Medicine, University of Pennsylvania Trustees, Ann R. Kennedy D.S.C., Gary Kao, M.D., Michelle Alonso-Basanta, M.D., were the Appellees in the court below.

iii

# TABLE OF CONTENTS

QUESTIONS PRESENTED……………………………….i

PARTIES TO THE PROCEEDINGS…………………..ii

TABLE OF AUTHORITIES……………………...…vi

OPINIONS BELOW……………………………….1

JURISDICTION……………………………………1

CONSTITUTION AND STATUTORY PROVISIONS
INVOLVED…………………………………………1

STATEMENT OF THE CASE……………………...2

INTRODUCTION…………………………………..2

STATEMENT OF FACTS………………………….3

    A.  BACKGROUND FACTS…………………….3

    B.  PROCEEDINGS BELOW…………………..7

REASONS FOR GRANTING THE WRIT…………8

    I.    The District Court erred in finding that the
        Price-Anderson Act applies to this case
        where the Plaintiff was injured while
        conducting research at the University of
        Pennsylvania with radioactive
        materials………………………………….8

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

iv

II.    The District Court erred by not remanding
       the state law claims once the Price-
       Anderson Act claims were voluntarily
       withdrawn by the Petitioner..................27

CONCLUSION.................................................33

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

v

## APPENDIX

APPENDIX A: Opinion and Judgment in the United States Court of Appeals for the Third Circuit (October 10, 2017)................................................1a

APPENDIX B: Order Dismissing Civil Action in the United State District Court for the Eastern District of Pennsylvania (September 8, 2016)....................35a

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# TABLE OF AUTHORITIES

## CASES

*Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339
(5th Cir. 2000).................................10, 18, 19, 20, 22

*Burns v. Goldberg*, 210 F.2d 646, 648 (3d Cir.
1954)........................................................3

*Carey v. Kerr-McGee Chemical Corporation*, 60 F.
Supp. 2d 800 (N.D. Ill. 1999)....................10, 17, 22

*Cotromano v. United Technologies Corp.*, 2014 WL
259629 (S.D. Fla. 2014)................................17, 22

*Cotroneo v. Shaw Environment & Infrastructure,
Inc., et al.*, 639 F.3d 186, 190
(5th Cir. 2011)......................................9, 17, 22

*Dumontier v. Schlumberger Tech. Corp.*, 543 F.3d
67 (9th Cir. 2008).........................................18

*Gilberg v. Stepan Co.*, 24 F. Supp. 2d 325 (D.N.J.
1998)..............................................10, 15, 16, 22

*In re Cincinnati Radiation Litigation*, 874 F. Supp.
796 (S.D. Ohio 1995)....................................21, 22

*In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 855
(3d Cir. 1991)......................................14, 15, 16, 22

*Irwin v. CSX Transp. Inc.*, 2011 WL 976376 (E.D.
Tenn. 2011).................................................19

vii

*Miller v. French*, 530 U.S. 327, 336
2000)...............................................................11

*Natl. R. R. Passenger Corp. v. Natl. Ass'n of R. R.
Passengers*, 414 U.S. 453, 458 (1974)...............11, 13

*Samples v. Conoco, Inc.*, 165 F. Supp. 2d 1303, 1320
(N.D. Fla. 2001).........................................19, 20

**CONSTITUTIONAL PROVISIONS, STATUTES,
AND REGULATIONS**

10 C.F.R. § 8.2...............................................20
10 C.F.R. § 140.72............................................24
10 C.F.R. § 20.1201(a)(1)(iii)................................24
42 Pa.C.S.A. § 8301.........................................2, 6
42 Pa.C.S.A. § 8302.........................................2, 6
42 U.S.C. § 2210(n)(2).....................1, 7, 16, 19, 29
42 U.S.C. § 2014(j).........................................16
42 U.S.C. § 2014(q)........................................16
42 U.S.C. § 2014(w)........................................16

**OTHER AUTHORITY**

Center for Nuclear Science and Technology
Information, *The Price-Anderson Act*, 1,
http://www.ans.org/pi/ps/docs/ps54-bi.pdf   (November
2005).............................................................12

Dan M. Berkovitz, *Price–Anderson Act: Model
Compensation Legislation?—The Sixty–Three
Million Dollar Question*, 13 Harv.Envtl.L.Rev. 1, 1–2
(1989)...........................................................21

P. Bailey, K. Blake, M. Brown, P. Duback, S. Krill, J.
Laurenson, J. Saltzman, *The Price-Anderson Act
Crossing the Bridge to the Next Century: A Report to*

*Congress*, Nureg/CR-6617,
(ICF Inc. 1998).....................................13, 23, 24

United States Nuclear Regulatory Commission,
*Facility Locator*,
https://www.nrc.gov/info-finder/region-
state/pennsylvania.html (October 2015)...........23

United States Nuclear Regulatory Commission,
*Nuclear Insurance and Disaster Relief*,
https://www.nrc.gov/reading-rm/doc-collections/fact
sheets/nuclear insurance.pdf (December 2014)..12, 23

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## PETITION FOR A WRIT OF CERTIORARI

Petitioner Estate of Jeffrey H. Ware, by Barbara Boyer, individually, on behalf of wrongful death beneficiaries and as Administratrix of the Estate of Jeffrey H. Ware respectfully petitions this Court for a Writ of Certiorari to review the judgment of the United States Court of Appeals for the Third Circuit in this case.

## OPINIONS BELOW

The Opinion of the Third Circuit is unreported, but is reproduced in the Appendix ("App.") at 1a. The Order of the District Court for the Eastern District of Pennsylvania is unreported, but is reproduced in the Appendix ("App.") at 35a.

## JURISDICTION

The judgment of the Third Circuit was entered on September 18, 2017.  The jurisdiction of this Court is invoked under 28 U.S.C. § 1254(1).

## CONSTITUTIONAL AND STATUTORY PROVISIONS INVOLVED

This matter concerns the Price-Anderson Nuclear Industries Indemnities Act (the "Price Anderson-Act") and 42 U.S.C. § 2210(n)(2). The Price-Anderson Act provides for removal of claims arising from nuclear occurrences. Section 2210(n)(2) grants the District Courts original jurisdiction over any "public liability action arising out of or resulting from a nuclear incident."

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## STATEMENT OF THE CASE

## INTRODUCTION

This matter concerns the tragic death of Jeffrey H. Ware, ("Dr. Ware"), a brilliant neuroscientist and researcher at the University of Pennsylvania. Dr. Ware died at the age of 47 from gliosarcoma, an exceedingly rare form of brain cancer associated with radiation exposure. For several years, Dr. Ware was unwittingly exposed to radiation while researching the biological effects of radiation on animals as a means to understanding the health risks to humans traveling in space and developing countermeasures to such risks.

Petitioner, Barbara Boyer, Dr. Ware's wife, brought this action in an attempt to recover damages as a result of the tremendous suffering that she, Dr. Ware, and their family endured as a result of Respondents' negligent, reckless, and fraudulent conduct.

The nature of this case is a survival action under the Survival Act, 42 Pa.C.S.A. § 8302, on behalf of the Estate of Jeffrey H. Ware and a wrongful death claim under the Wrongful Death Act, 42 Pa.C.S.A. § 8301, on behalf of the statutory beneficiaries under this Act.

> Where a death is caused by negligence, two actions may be brought after death: (1) a "death action" which under statute is for the benefit of the enumerated relatives, such as the husband and children in this case and such action is measured by the pecuniary loss

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

sustained by them; and (2) a "survival action," a right which continues after death in the decedent's personal representative. The damages recovered in such action are measured by the pecuniary loss to decedent and therefore accrue to her estate.

*Burns v. Goldberg*, 210 F.2d 646, 648 (3d Cir. 1954). This matter is on appeal in response to the District Court's Order granting Summary Judgment in favor of all Respondents on all Counts of the Petitioner's Amended Complaint. JA-0006 [Or. 09/08/2016]. Barbara Boyer asserts that the District Court erred in denying Petitioner's Motion to Remand and granting Respondents' Motions for Summary Judgment.

## STATEMENT OF FACTS

A.  Background Facts

In 2008, the University of Pennsylvania ("Penn") was awarded a $10 million grant from the National Space Biomedical Research Institute ("NSBRI") to study the acute effects of space radiation. JA-0452 [Amend. Compl. 01/20/2015 ¶ 33]. The goal of the study was to better understand the acute (i.e., relatively immediate) effects of radiation on astronauts in space, such as during extended exploration on the moon. JA-0454 [*Id.* at ¶ 42]. Respondent, Ann R. Kennedy, D.S.C., ("Dr. Kennedy"), a Penn radiation biologist, was the principle investigator on the NSBRI research study, but other Penn scientists and physicians, including, Respondent Gary Kao, M.D., ("Dr. Kao") served as co-investigators. JA-0454 [*Id.* at ¶ 43].

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Dr. Ware, a neuroscientist and researcher, worked at the University of Pennsylvania for more than 15 years. JA-0452 [*Id.* at ¶ 27]. During this time he enjoyed an excellent reputation as a researcher who exceeded expectations in his annual evaluations. JA-0452 [*Id.* at ¶ 28]. Dr. Ware was hired by Dr. Kennedy to work on the NSBRI research study because of his expertise in the use of protease inhibitors to prevent biologic changes that can lead to cancer. Dr. Ware's particular area of expertise, namely the study of how dietary supplements and protease inhibitors could be used effectively to protect against DNA damage, was a key part of Dr. Kennedy's work with NSBRI. JA-0454 [*Id.* at ¶ 46].

This radiation research attracted millions of research dollars. JA-0452 [*Id.* at ¶ 33]. Despite this, Penn and its various corporate entities, along with Dr. Ware's supervisors and research coordinators, failed to take appropriate precautions to protect Dr. Ware from the various forms of radiation that were the subject of his many years of study.

The list of failures on the part of Penn to observe and take appropriate actions for the well-being of its researchers is extensive. Penn's researchers were expected to handle radioactive material, be in close contact with irradiated animals, and experience prolonged indirect and direct exposure from various irradiating machinery, all without adequate protective equipment and monitoring. JA-0457 [*Id.* at ¶ 63]. Perhaps most importantly, Dr. Kennedy's research scientists were not provided individual dosimeter badges, which would have allowed each individual's radiation exposure to be monitored, a safety measure that was required elsewhere in the

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

industry and at Penn. JA-0456 [*Id.* at ¶¶ 59-60]. The Kennedy lab was often severely understaffed and had a high turnover of employees. Dr. Ware was not the only member of the research team to suffer from and eventually die of cancer. JA-0458 [*Id.* at ¶¶ 69-73].

In stark contrast to the lack of safety precautions for Dr. Kennedy's human researchers, the welfare of the animal subjects was closely monitored. JA-0456 [*Id.* at ¶ 54]. For example, the ferrets were to be studied in exquisite detail as to their vomiting reactions. If any particular ferret vomited excessively in the first several hours after radiation exposure, the animal would be removed from the study and euthanized. JA-0456 [*Id.* at ¶ 57].

Dr. Ware was diagnosed with brain cancer in October, 2010, after a period of time during which he exhibited signs of cognitive dysfunction, such as memory loss and confusion.  JA-0465 [*Id.* at ¶ 117]. Following two craniotomies performed at the Hospital of the University of Pennsylvania, the pathology revealed that Dr. Ware's brain cancer was a gliosarcoma, a highly uncommon form of malignant brain cancer that the medical literature associates with radiation exposure. JA-0465 [*Id.* at ¶ 118].

Dr. Ware was then unwittingly turned into a research subject and was enrolled without proper and legal consent, in an experimental study that offered him no real treatment benefit. JA-0466 [*Id.* at ¶ 120]. Respondent Michelle Alonso-Basanta, M.D. ("Dr. Alonso-Basanta"), and other Penn physicians, recommended that Dr. Ware undergo chemotherapy and radiation as a means of slowing the progression of the disease, while making representations to Dr.

Ware and his family that these treatments would improve Dr. Ware's quality of life. JA-0465 [*Id.* at ¶ 118]. However, given the advanced stage of his brain cancer and the extremely poor prognosis, there was little benefit to Dr. Ware undergoing these treatments. JA-0466 [*Id.* at ¶ 120]. Additionally, on November 24, 2010, during a visit in which Barbara Boyer could not accompany her husband, Dr. Ware was enrolled into a research study by Dr. Alonso-Basanta to study the effects of the chemotherapy and radiation on brain cancer patients. JA-0466 [*Id.* at ¶ 122].

In an effort to cover up its terrible record of radiation safety and to protect millions of research dollars, Respondents concealed and withheld documents and data related to Dr. Ware's exposure. Dr. Ware's medical records refer to the experimental research study as an "imaging study," but Penn has failed to release to Dr. Ware's family any further details of this experimental study. JA-0466 [*Id.* at ¶ 123].

Dr. Ware and his family suffered tremendously as a result of the brain cancer and from complications and side effects of the disease and treatments he received. JA-0472 [*Id.* at ¶ 159].

Respondents' fraudulent conduct, in addition to the reckless and outrageous disregard for Dr. Ware's health and well-being during the many years he dedicated himself to his research, provided the basis for the action against the Respondents for both compensatory and punitive damages under Pennsylvania's Survival Act and under the Wrongful Death Act. See 42 Pa.C.S.A. §8302; 42 Pa.C.S.A. § 8301.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

B.  Proceedings Below

Petitioner originally filed this case in the Court of Common Pleas of Philadelphia County, Pennsylvania, on December 03, 2013. JA-0065 [Compl. 12/03/2013]. All of Petitioner's claims were based on state law. *Id.* On January 2, 2014, Respondents filed a Notice of Removal pursuant to the Price-Anderson Act. JA-0140 [Notice of Removal 01/02/2014]; *see also* 42 U.S.C. § 2210(n)(2).

Section 2210(n)(2) grants the District Courts original jurisdiction over any "public liability action arising out of or resulting from a nuclear incident." On January 27, 2014, Petitioner filed a Motion to Remand which was denied. JA-0293 [Pl.'s Mot. to Remand 01/27/2014]. After Petitioner's Motion to Remand, was denied by Judge Edward G. Smith, Petitioner amended her Complaint, pursuant to Court Order. JA-0004 [Or. 12/19/2014].

The Amended Complaint filed on January 20, 2015, replaced Petitioner's state law negligence claims with two claims labeled as "Negligence Action under Price Anderson Act," accompanied by four other state law claims against various combinations of Respondents. JA-0446 [Amend. Compl. 01/20/2015].

Respondents then conducted limited discovery on the Price-Anderson Act issues. On December 09, 2015, Petitioner submitted a letter to the Court stating that she would not be able to submit supporting expert reports and would be withdrawing her Price-Anderson Act claim. JA-0728 [Pl.'s Ltr. to the Ct. 12/09/2015].

On December 14, 2015, Petitioner moved to voluntarily dismiss her two negligence Action under the Price Anderson Act claims without prejudice and to remand the remaining claims to the Philadelphia Court of Common Pleas. JA-0729 [Pl.'s Mot. to Withdraw Counts I and II and to Remand Counts III, IV, V, and VI to the Phila. Ct. of Com. Pleas. 12/14/2015]. Following this, on December 16, 2015, Petitioner entered into a Joint Stipulation to Dismiss, which voluntarily dismissed her claims against the National Space Biomedical Institute and the Center for Acute Cancer Radiation Research, with prejudice. JA-1174 [Jt. Stip. to Dismiss 01/04/2016].

Respondents then filed multiple Motions for Summary Judgment on all counts of Petitioner's Amended Complaint. Respondents filed two Motions for Summary Judgment on December 29, 2015. JA-0901 [Mot. for S.J. 12/29/2015]; JA-0921 [Mot. for. S.J. 12/29.2015]. On September 8, 2016, Judge Joseph F. Leeson, Jr., issued the Order granting Respondents' Motions for Summary Judgment. JA-0006 [Or. 09/08/2016]. A timely Notice of Appeal was filed on October 4, 2016. JA-0001 [Pl.'s Notice of App. 10/04/2016].

### REASONS FOR GRANTING THE WRIT

I. **The District Court erred in finding that the Price-Anderson Act applies to this case where the Plaintiff was injured while conducting research at the University of Pennsylvania with radioactive materials.**

The case presently before the Court is one of first impression. The District Court incorrectly held that

the Price-Anderson Act, which provides federal jurisdiction over "any public liability action arising out of or resulting from a nuclear incident," applies in this case. JA-0008 [Rpt. and Recommendation 05/05/2014]. The District Court, in reaching its opinion that the Price-Anderson Act applied to the Petitioner's injuries, reasoned as follows:

> Having canvassed relevant decisions from other circuits, I agree with the reasoning of those courts that have interpreted the term "public liability action" broadly to include any suit in which a party asserts that another party bears legal liability arising out of an incident in which the hazardous properties of radioactive material caused bodily injury, sickness or property damage. *See Cotroneo*, 639 F.3d at 194 (5th Cir. 2011) (determining that under this definition claims by workers who were employed to clean up radioactive materials at a former nuclear source fabrication facility arose under the PAA). I do not believe, as Plaintiff suggests, that the PAA is limited to "nuclear incidents occurring at utilization and production facilities and other licensed facilities." *See* "Plaintiff's Reply in Opposition of Defendants' Response to Motion to Remand" [Document 15]12, at 4.

> The statutory analysis of those courts which have concluded that possession of a license for radioactive material and/or an indemnification

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

agreement is unrelated to establishing jurisdiction under PAA is, to me, persuasive and I adopt it. *See Carey v. Kerr-McGee*, 60 F.Supp.2d at 803-807 (N.D. Ill. 1999)(explaining that in the absence of an express definition, the term "occurrence" which is used in the definition of "nuclear incident" should be given its common ordinary meaning and not read restrictively, as the *Gilberg* Court did, to narrow the intentionally broad class of nuclear liability cases for which Congress created federal jurisdiction under the PAA). *See also Acuna v. Brown & Root, Inc.,* 200 F.3d at 339-340 (5th Cir. 2000)(concluding that there is nothing in the definition of nuclear incident which suggests that removal under the PAA is contingent on licensing or an indemnification agreement).

JA-0008 [*Id.* 05/05/2014]. The District Court is wrong and should be reversed. Its holding is inconsistent with the intent of Congress and application of the Price-Anderson Act under established jurisprudence. A review of the cases cited by the District Court demonstrates that the Price-Anderson Act was not intended to and should not cover university-based radiation-related research activities such as are at issue here.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

11

A.     **The clear intent of Congress was to limit the application of the Price-Anderson Act to the nuclear energy and weapons industries.**

The Supreme Court, in interpreting a statute, has determined that "where Congress has made its intent clear, 'we must give effect to that intent.'" *Miller v. French*, 530 U.S. 327, 336 (2000). Additionally, the Supreme Court has determined that "even the most basic general principles of statutory construction must yield to clear contrary evidence of legislative intent." *Natl. R. R. Passenger Corp. v. Natl. Ass'n of R. R. Passengers*, 414 U.S. 453, 458 (1974).

In *Natl. R. R. Passenger Corp.*, the Supreme Court undertook the task of interpreting a section of an act that created a public cause of action and allowed a private cause of action only in very limited situations. In making a determination as to whether the act would provide a private cause of action such as the one contemplated in that case, the Supreme Court looked to the legislative history of the act. *Id.* at 458.

One of the proposed amendments to the act would have authorized the private cause of action in question. *Id.* at 459. Ultimately, after a review of the act's legislative history, the Supreme Court determined that the Committee's deliberate failure to adopt that proposal was "…substantial indicia that the legislators understood…" that the act would preclude the type of private cause of action being asserted by the respondent. *Id.* at 461. Additionally, the Supreme Court found that their construction was

consistent with the act as a whole and with its more generalized legislative history. *Id.*

A brief history of the Price-Anderson Act should prove instructive in the present matter. The Price-Anderson Act was enacted in 1957 to meet two objectives: remove deterrents to private sector participation in atomic energy and to provide funding to pay out liability claims in case of a catastrophic nuclear accident. The Act was designed "to cover liability claims of members of the public for personal injury and property damage caused by a nuclear accident involving a commercial power plant. The legislation helped encourage private investment in commercial nuclear power by placing a cap, or ceiling, on the total amount of liability each nuclear power plant licensee faced in the event of an accident." United States Nuclear Regulatory Commission, *Nuclear Insurance and Disaster Relief,* https://www.nrc.gov/reading-rm/doc-collections/fact-sheets/nuclear-insurance.pdf (December 2014).

"The scope of the Act includes nuclear incidents in the course of the operation of power reactors; test and research reactors; Department of Energy nuclear and radiological facilities; and transportation of nuclear fuel to and from a covered facility." Center for Nuclear Science and Technology Information, *The Price-Anderson            Act,*          1, http://www.ans.org/pi/ps/docs/ps54-bi.pdf (November 2005). In addition, the Act has also covered such incidents as those in the course of transportation of nuclear fuel to a reactor site, the storage of nuclear fuel at a site, the operation of reactors including discharges of radioactive emissions or effluents, the storage of nuclear wastes at reactor sites, and the transportation of radioactive material from reactors.

*See* P. Bailey, K. Blake, M. Brown, P. Duback, S. Krill, J. Laurenson, J. Saltzman, *The Price-Anderson Act – Crossing the Bridge to the Next Century: A Report to Congress* xii, Nureg/CR-6617, (ICF Inc. 1998) [hereinafter Crossing the Bridge].

Congress had an opportunity to expand the scope of the Price-Anderson Act to specifically include the kind of exposure at issue in this case, but declined to do so. When Amendments to the Act were considered in 1988, there was an opportunity to include language to cover "persons operating nuclear pharmacies or hospital medicine department" but that language was not enacted. *See* Sen. Rept. 100-218, U.S. Code Cong. & Admin. News 1988, p.1424, 1493, Section 106. The reasonable conclusion is that Congress did not intend for the Act to apply to cases involving pharmacies or hospital medicine departments, such as the Respondents here. Application of the Price-Anderson Act to this case extends the reach of the Act far beyond its original purposes and is contrary to the legislative intent.

As the Supreme Court did in *Natl. R.R. Passenger*, this Court should give significant weight to the fact that Congress specifically chose not to expand the language of the Act to include hospital medicine departments, knowing that it would foreclose the application of the Act to state law claims involving nuclear pharmacies or hospital medicine departments.

Following the Supreme Court's caution against expanding the application of statutes contrary to the clear intentions of Congress, the Third Circuit has refused to stretch the scope of the Price-Anderson Act to apply to a case with facts such as the ones

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

presently before the Court. The Third Circuit has made clear exactly what type of claim is covered under the Act, stating:

> [a]t the threshold of every action asserting liability growing out of a nuclear incident, then, there is a federal definitional matter to be resolved: Is this a public liability action? If the answer to that question is "yes," the provisions of the Price-Anderson Act apply; there can be no action for injuries caused by the release of radiation from **federally licensed nuclear power plants** separate and apart from the federal public liability action created by the Amendments Act.

*In Re TMI Litig. Cases Consol. II*, ("*TMI II*"), 940 F.2d 832, 855 (3d Cir. 1991) (emphasis added). The District Court, in defining a public liability action, quoted to language from *TMI II*, which states that a "'public liability action' encompasses 'any legal liability' of 'any person who may be liable' on account of a nuclear incident." JA-0013 [Rpt. and Recommendation 05/05/2014 at 7]. It is worth noting that the context and factual situation in which *TMI II* was decided is clearly distinct from Petitioner's case.

The Act was amended in direct response to the 1979 incident at the Three Mile Island nuclear facility in Pennsylvania. *TMI II* at 835. *TMI II* involved a federally licensed nuclear power plant where approximately two thousand plaintiffs asserted claims alleging a wide variety of injuries as a result of exposure to radioactive materials. *Id.*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Application of the Act in *TMI II* was proper because it was precisely the type of situation Congress intended to cover under the scope of the 1988 Amendment.

The 1988 Amendment, in expanding the scope of the Act, allowed the Act to apply in a situation such as *TMI II*, where a covered nuclear power plant had an incident that was considered to be less than an extraordinary nuclear occurrence. Prior to the Amendment, there would have been no federal jurisdiction over the case and the resulting litigation would have been handled in state court. This does not, suggest, however, that the Act was intended to apply to a case where a single researcher contracted cancer and died while conducting research at a non-covered hospital medicine department.

Other Courts in the Third Circuit have considered the Price-Anderson Act's scope consistently with *TMI II*. The District Court of New Jersey evaluated the scope of the Act in *Gilberg v. Stepan Co.*, 24 F. Supp. 2d 325 (D.N.J. 1998). *Gilberg,* concerned injuries alleged by residents of an environmentally contaminated community. *Id.* at 328. The contamination arose as a result of environmental exposure to radioactive materials which were produced as a byproduct of a facility that manufactured iridescent gas mantles. *Id.* A gas mantle is a component in portable camping lanterns, pressure lanterns, and some oil lamps. Byproduct tailings from radioactive thorium contaminated real property and water in the surrounding areas. *Gilberg,* after conducting an extensive statutory analysis, concluded that:

...[P]reemption under Price-Anderson sweeps broadly to include any claim alleging 'public liability;' that is, 'any legal liability arising out of or resulting from a nuclear incident.' §2014(w). For there to be nuclear incident, however, there must be an 'occurrence.' And an occurrence under the Act can only be an 'event .... [at] "the location" or "the contract location" as defined in the applicable ... indemnity agreement, entered into pursuant to section 2210.' §2014 (j) & (q). ... Therefore, no event alleged by plaintiff can constitute an 'occurrence.' Plaintiff's action, therefore, is not 'one based on "any legal liability" of "any person who may be liable on account of a nuclear incident." *TMI II*, 940 F.2d at 854, and cannot be removed pursuant to 42 U.S.C. §2210(n)(2).

*Id.* at 345-346. The *Gilberg* Court's opinion is consistent with Congress' intent not to cover manufacturing facilities and other non-covered industries simply because they use radioactive materials in their production process. The Act was only intended to cover facilities and industries using radioactive materials in connection with the nuclear power and nuclear weapons industries.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**B.** **The established case law pertaining to the scope and application of the Price-Anderson Act makes clear that it was meant to cover the conduct of federally regulated power plants, other nuclear energy producers, and the weapons industry.**

The non-Third Circuit cases cited to by Judge Angell of the District Court are not factually analogous to the case presently before the Court. The reasoning of the District Court is inapposite since all of the cases concern the nuclear energy or nuclear weapons industries in some way. For example, in *Cotroneo v. Shaw Environment & Infrastructure, Inc., et al.,* 639 F.3d 186, 190 (5th Cir. 2011), the conduct at issue concerned injuries alleged by workers who were cleaning up radioactive materials at a former nuclear source fabrication facility, which is where enriched uranium is converted into fuel for nuclear reactors. Similarly, in *Cotromano v. United Technologies Corp.,* 2014 WL 1259629 (S.D. Fla. 2014), the conduct at issue was environmental pollution caused by the dumping of uranium and thorium, by mining operators, which the plaintiff did not dispute was a nuclear incident. *Id.* at 1257. In *Carey v. Kerr-McGee Chemical Corporation*, 60 F. Supp. 2d 800 (N.D. Ill. 1999), another case cited to by the District Court, The Act was found to apply, but once again, the context is important to the analysis. *Carey* was brought by landowners who alleged property damage and potential personal injury as a result of improper disposal of radioactive material byproduct by a licensed nuclear facility. There is no dispute that *Cotroneo, Cotromano,* and *Carey,* all fall within the intended scope of the Act.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

18

While the District Court does not give much weight to *Dumontier v. Schlumberger Tech. Corp.,* 543 F.3d 567 (9th Cir. 2008), Respondents heavily relied on this opinion. In *Dumontier,* workers sued an oil and gas technology company, asserting state law claims of emotional distress, medical monitoring, and actual malice based on the worker's exposure to Cesium-137. The workers in *Dumontier* were exposed the radioactive materials while working on a drilling rig. The issue in *Dumontier* was whether the plaintiffs suffered a bodily injury as defined under the Act. This case is inapposite and the only similarity between it and the facts presently before the Court is the nature of the radioactive material used. Cesium-137 is widely used: in medicine it is used to treat cancer; in industry, it is used in flow meters, thickness gauges, moisture density gauges, and well-logging devices. It has also been used to date wine and detect counterfeits.

Of the hundreds of facilities that use cesium irradiators (and therefore, Cesium-137, the material in question), no case has been cited in support of Respondents' position that all medical facilities, research facilities, and scientific facilities should fall under the Price-Anderson Act's provisions simply for using this technology and material.

Finally, the District Court cited to *Acuna v. Brown & Root Inc.,* 200 F.3d 335, 339 (5th Cir. 2000), but failed to note the Fifth Circuit Court of Appeals' holding that the Price-Anderson Act is limited to the conduct of nuclear industries and institutions. In *Acuna,* the employees of a uranium mining company brought personal injury actions against the defendant company as a result of their exposure to radioactive materials. *Id.* at 338. Plaintiffs, in that

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

action, objected to the application of the Price-Anderson Act to their claims. *Id.* at 340. *Acuna* determined that the Act "...sets up an indemnification and limitation of liability scheme for public liability arising out of the conduct of the **nuclear energy and weapons industries.**" *Id.* at 339 (emphasis added). Ultimately, *Acuna* held the Price-Anderson Act applicable because "uranium extraction and processing are part of the nuclear weapons and power industries, and therefore come within the ambit of § 2210(n)(2)." (granting federal jurisdiction in public liability actions arising out of a nuclear incident). *Id.* at 340; *See also Irwin v. CSX Transp. Inc.*, 2011 WL 976376 (E.D. Tenn. 2011) (holding that the Price-Anderson Act only applies to the nuclear energy and weapons industry and granting the motion for remand where Plaintiff alleged exposure to "ionizing radiation/radioactive substances" while employed at Defendant's railroad).

Similar to the Fifth Circuit Court of Appeals decision in *Acuna,* the District Court for the Northern District of Florida held that the Price-Anderson Act did not apply in a case dealing with environmental contamination from exposure to uranium, a material specifically listed in the Act as a "source material." *See Samples v. Conoco, Inc.*, 165 F. Supp. 2d 1303, 1320 (N.D. Fla. 2001). Defendants in *Samples*, an oil company, chemical company, and wood treating company*,* argued for application of the Price-Anderson Act, claiming that the language of the Act covers "any claim of injury to property allegedly caused by certain nuclear material." *Id.* at 1320.

The *Samples* defendants argued that Congress used 'sweepingly broad language, expressly covering

any occurrence causing' damage to property." *Id.* at 1321. To this, the District Court correctly exclaims, "[h]ogwash! This argument is frivolous. The defendants should know the PAA only applies to the nuclear energy and weapons industries." *Id.* The Court in *Samples* agreed with the holding in *Acuna* and concluded that an occurrence "as used in the definition of 'nuclear incident' means 'that event at the site of the licensed activity, or activity for which the commission has entered into a contract, which may cause damage.'" *Id.* at 1321. (citing) *S.Rep. No. 296*, at 16 (1957) (quoted in) 10 C.F.R. § 8.2, at 202 (2001).

As part of its analysis, the *Samples* Court considered a quote by Dan Berkovitz, an attorney with the Office of General Counsel, U.S. Nuclear Regulatory Commission ("NRC"):

> The Price–Anderson Act ... governs liability and compensation in the event of a 'nuclear incident' arising from activities of Nuclear Regulatory Commission ("NRC") licensees and Department of Energy ("DOE") contractors. The coverage for NRC licensees encompasses activities of commercial nuclear power plants, certain fuel fabrication facilities, and non-DOE reactors used for educational and research purposes. Activities of DOE contractors are covered if they involve 'the risk of public liability for a substantial nuclear incident.' These contractor activities include nuclear weapons research, development and testing, nuclear energy research and

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

> development, and nuclear waste
> activities. The Act specifies the
> procedures for determining the amount
> and sources of compensation available
> to compensate persons injured as a
> result of a nuclear incident arising from
> these activities.

*Id.* (quoting) Dan M. Berkovitz, *Price–Anderson Act:
Model Compensation Legislation?—The Sixty–Three
Million Dollar Question,* 13 Harv.Envtl.L.Rev. 1, 1–2
(1989) (footnotes omitted).

The District Court for the Southern District of
Ohio has also ruled on the application of the Act in a
case that is strikingly similar to the one before the
Court. *See In re Cincinnati Radiation Litigation,* 874
F. Supp. 796, 832 (S.D.Ohio 1995). *In re Cincinnati*
determined that there is no nuclear incident when
patients at the Cincinnati General Hospital became
the unwitting subjects of human radiation
experiments. *Id.* at 832. The Court agreed with the
defendant's argument that "Price-Anderson was
never intended to create a federal claim for the
contained application of nuclear medicine, and that
such use of radiation in a controlled environment is
distinguishable from the Fernald and Three Mile
Island occurrences typical to those that the 1988
Amendments were designed to address." *Id.* The
conduct of the Hospital, though perhaps
reprehensible, was not found to be within the scope
of the Price-Anderson Act because there was no
unintended escape or release of nuclear energy,
which would be necessary to find a nuclear incident
had occurred. *Id.*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Although the reasoning behind *In re Cincinnati* is different than that of *Gilberg*, the result leads us to the same place: Congress did not, in amending the Act, intend to provide federal courts with such sweeping jurisdiction over any and all claims that might arise as a result of exposure to radiation. The incident causing harm must fall within the intended scope of the Act or it will not be covered.

Here, it was error for the District Court to apply the Act for several reasons. This case does not involve a nuclear power facility or other facility or industry regulated by the Act such as in *Cotroneo, Carey, Cotromano,* and *Acuna*. Unlike in *TMI II*, Respondents are not a federally licensed nuclear power plant. Moreover, as in *Gilberg*, Respondents lack the indemnity agreement required to make the Act apply. Even the District Court in its Opinion noted that a "public liability action arising out of or resulting from a nuclear incident…would seem to be a peculiar way to describe a case alleging that a researcher was injured while working on the campus of the University of Pennsylvania…" JA-0035 [Mem. Op. 09/08/2016 at 2].

In light of the clear Congressional intent of *TMI II*, it is not peculiar, but it was error to find this case was covered by the Act.

> C.   **The Nuclear Regulatory Commission licensing scheme and policies also make clear that the Price-Anderson Act was not intended to apply to a case such as the one here.**

As determined by *Gilberg*, the presence or absence of the proper indemnification agreement is

critical in determining whether the Act applies. The Price-Anderson Act, covers a number of NRC licensees, each of which is required to execute an indemnity agreement. Those licensees are primarily in the field of nuclear production and utilization facilities. These terms include nuclear reactors, research reactors, and test reactors. The Price-Anderson Act also allows the NRC discretionary authority to apply the Act to additional licensees, such as those in possession of radioactive materials. The NRC has used this authority to cover, in addition to production and utilization facilities, large commercial reactors under 100 MW(e) including federal licensees and nonprofit educational institutions and plutonium processing and fuel fabrication facilities. *See Crossing the Bridge* at 3-5.

The NRC Fact Sheet further states that 104 reactors are currently licensed to operate. This number includes 31 research and test reactors. *See* United States Nuclear Regulatory Commission, *Nuclear Insurance and Disaster Relief,* https://www.nrc.gov/reading-rm/doc-collections/fact-sheets/nuclear-insurance.pdf    (December    2014). However, none of the equipment Dr. Ware operated in connection with his research at Penn involved a reactor included on the list published by the NRC and thus, the Price-Anderson Act should not be applied. *See* United States Nuclear Regulatory Commission, *Facility Locator,* https://www.nrc.gov/info-finder/region-state/pennsylvania.html (October 2015).

Although Congress did contemplate that in certain circumstances the Price-Anderson Act could be applied to nonprofit education institutions, the NRC applies the provisions of the Act in the context

of those nonprofit education institutions operating nuclear reactors under 100 MW(e). *See Crossing the Bridge* at 3-5; *see also* 10 C.F.R. §140.72 (concerning nonprofit educational institution indemnity agreements). Respondent University of Pennsylvania, however, does not fall into this category, as the license provided by the Commonwealth of Pennsylvania to them is for materials only, not for any type of reactor facility.

The District Court's determination that the Act applies to this case, sets an impossible standard for this Plaintiff and future plaintiffs to meet. To trigger the liability of a covered industry or nuclear power plant under the Act, a plaintiff must be able to demonstrate that he has been exposed to a level of radiation beyond the limits set by the Act. *See* 10 C.F.R. §20.1201(a)(1)(iii) (The licensee must control the occupational dose to individuals to be less than the equivalent of 50 rems (0.5 Sv), annually.) This is an impossibly high dose of radiation for a plaintiff to demonstrate, other than in a nuclear incident. This level of radiation is not typical of the dose to which a researcher in a university hospital research lab would ever be exposed. Accordingly, it is unreasonable to suggest that a plaintiff, such as Dr. Ware, should be required to meet that radiation dose threshold to show liability.

The State law standard, on the other hand, is reasonable and should be used to determine Respondents' liability. There are smaller doses of radiation than what is required under the Act to which a person could be exposed to and still develop serious long-term health effects. Under the State law standard, a plaintiff could demonstrate exposure to radiation at these levels, satisfy the State law

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

causation standard, and be given an opportunity to have his case heard. This produces a more fair result and holds the industries that use radiation accountable for their conduct.

Requiring such a high dose of radiation in order to establish liability under the Act speaks to the Congressional intent regarding the scope of the act. The amount of radiation, though not typical of something a researcher in a university hospital lab would be exposed to, is on the other hand, closer to what a reactor produces or a plaintiff living near a nuclear power plant that has an accident might be exposed to. If Congress had intended the act to apply to any and all cases involving injury as a result of exposure to radiation, with the knowledge that not all of the injuries would arise from covered industries and power plants, they surely would have set the threshold for showing liability at a much lower level.

Radioactive materials are presently used in medicine to diagnose, monitor, and treat a wide assortment of medical conditions in humans. These materials are used in universities, colleges, high schools, and other academic and scientific institutions for course work, laboratory demonstrations, and experimental research, such as the research Dr. Ware was conducting. Radiation can be used to irradiate food and medical equipment to kill germs, without harming the substance that is being disinfected. They can be used to help remove toxic pollutants, such as exhaust gases from coal-fired power stations and industry. Radiation is important in food production and packaging, such as polyethylene shrink-wrap that has been irradiated, allowing it to be heated above its usual melting point. Reflective signs are treated with radioactive

tritium and phosphorescent paint, allowing us to see them at night, and ionizing smoke detectors use radiation to keep us safe while we sleep. Radioactive materials are present all around us and make up the things we use and rely on every single day.

Despite the wide-spread application of radioactive materials in all facets of everyday life, there are no cases Respondents have offered to even suggest that their interpretation of the Act is the correct one. To the contrary, they offer one, factually inapposite case and no authority to support application of the Act to the situation presently before the Court. If the Act had been intended to apply to every case involving injury as a result of exposure to radiation, there would be some cases in which the Act was found to apply to a university hospital or research lab, places where radiation use is a daily occurrence.

Application of the Price-Anderson Act to this case, with its heightened standard of liability, will provide any industry, business, or organization, which uses radioactive materials, with a license to be careless, negligent, or even reckless with the safety and health of their employees, consumers, and the people living near their work sites. Application here will effectively bar future plaintiffs in comparable situations from being able to obtain compensation for injuries and loss as a result of exposure to radiation. This surely was not Congress' intent. The District Court's application of the Price-Anderson Act to this case is inconsistent with Congressional intent, legislative history, and established case law.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**II. The District Court erred by not remanding the state law claims once the Price-Anderson Act claims were voluntarily withdrawn by the Petitioner.**

Once Petitioner voluntarily dismissed her negligence under the Price-Anderson Act claims, the District Court should have been divested of its jurisdiction and the case remanded to the Philadelphia Court of Common Pleas.

Respondents' Notice of Removal was filed on January 02, 2014. JA-0140 [Notice of Removal 01/02/2014]. In response, Petitioner filed her Motion to Remand shortly after, on January 27, 2014, which was not denied by Judge Edward G. Smith until December 19, 2014. *See* JA-0293 [Pl's. Mot. to Remand 01/27/2014]; JA-0004 [Or. 12/19/2014].

Petitioner learned that the Price-Anderson Act was definitively going to apply to her case when the District Court issued its Order adopting the Report and Recommendation of Judge Angell in December 2014. In response, Petitioner filed her Amended Complaint containing the Price-Anderson Act Claims on January 20, 2015. JA-0446 [Am. Compl. 01/20/2015]. Once it was clear that Petitioner could not meet the heightened standard of liability under the Act, she sought to dismiss the Price-Anderson Act Claims through her Motion to Withdraw and Remand. JA-0729 [Mot. to Withdraw and Remand 12/14/2015]

The District Court in its Memorandum Opinion denying Plaintiff's Motion to Withdraw and Remand, determined that the negligence under the Price-Anderson Act claims could not be dismissed because

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

28

to have done so would have caused prejudice which, "...amounts to more than just 'the mere prospect of a second lawsuit.'" JA-0040 [Mem. Op. 09/08/2016 at 7]. The District Court considered that Respondents

> ...retained four experts to speak specifically to whether Defendants failed to protect Ware from exposure to excessive amounts of radiation and whether that exposure may have caused his cancer-issues at the heart of these claims, and issues that may not have needed to be explored had Boyer dismissed them before discovery commenced.

JA-0041 [*Id.* at 8]. The District Court also determined that if Petitioner had sought to withdraw her Price-Anderson Act claims soon after the December 19, 2014, Order, "...she likely would have been permitted to do so." JA-0040 [*Id.* at 7].

The District Court's reasoning presents Petitioner with a near impossible situation. After filing her Amended Complaint, Petitioner conducted limited discovery on liability under the Act. As discussed in the first section of this Brief, the Price-Anderson Act has a heightened standard of liability (radiation dose), which presents an extraordinary hurdle for a plaintiff to overcome in a case such as the one presently before the Court. After less than 12 months of limited discovery in this very technical and complex matter, Petitioner determined that she would not be able to meet the heightened standards as required under the Act. Accordingly, she sought to withdraw her claims under the Price-Anderson Act. Any prejudice to the Respondents was a result of the

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

District Court taking more than 11 months to decide Petitioner's Motion to Withdraw and Remand.

It is a circular proposition to suggest that Respondents were prejudiced by Petitioner's failure to voluntarily withdraw the claims at an earlier date, as Petitioner could not know she would be unable to satisfy the heightened standards required under the Act. Only through the conduct of her limited discovery was she able to make this determination in the first place.

In the District Court's Memorandum Opinion, it determined that even if the Price-Anderson Act negligence claims were dismissed, a remand would not have been possible because the Court still had jurisdiction over Petitioner's fraud and negligent infliction of emotional distress claims, as they would be considered a "public liability action" under the Act. JA-0039 [*Id.* at 6]; *see* 42 U.S.C. § 2210(n)(2) (granting district courts original jurisdiction over any "public liability action arising out of or resulting from a nuclear incident.") The reasoning behind the Court's conclusion is that the fraud and negligent infliction of emotional distress claims "...arise, at least in part, out of the harm that Ware allegedly suffered from exposure to radioactive materials." JA-0039 [*Id.* at 6]. Petitioner respectfully disagrees.

Contrary to the Court's Opinion, neither Petitioner's fraud nor her negligent infliction of emotional distress claims arise out of the harm that Dr. Ware suffered from his exposure to radioactive materials. The harms alleged arise out of his subsequent medical treatment and not his research.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Petitioner's fraud claim arises out of the harm caused by Respondents intentional concealment, withholding, and refusal to produce all data and information about Dr. Ware's exposure to radiation, which, had it been disclosed in a timely manner, could have led to earlier medical diagnosis and treatment of Dr. Ware's cancer. JA-0481 [Amend. Compl. 01/20/2015 ¶¶ 195-199]. Additionally, the harm arises out of Respondents intentional concealment of Dr. Kao's involvement in the experimental study in which Dr. Ware was enrolled without his proper legal consent, as well as the concealment of Penn's significant financial interest in the outcome of that study. JA-0482 [*Id.* at ¶¶ 200-202]. Had Respondents not intentionally misled Dr. Ware and his family, they would have been able to seek treatment sooner, and would have considered other options to improve Dr. Ware's quality of life. For example, Petitioner wanted to arrange for palliative care for her husband instead of chemotherapy but Respondents refused to agree as they knew it was important for Dr. Ware to stay committed to his treatment for the purpose of the experimental study. As it turns out, the complications from the treatment only caused Dr. Ware and his family to suffer tremendously. JA-0474 [*Id.* at ¶¶ 161-164]. This fraud claim arises from the Respondents' intentional withholding of critical information pertinent to Dr. Ware's health and well-being, and not, as the Court's Opinion holds, his exposure to radiation though his research.

Petitioner's negligent infliction of emotional distress claim cannot be considered a public liability action under the Price-Anderson Act for similar reasons. Petitioner's claim arises out of the harm caused to Dr. Ware as a result of the substandard

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

and negligent care that was provided to him by the Hospital of the University of Pennsylvania, Dr. Kennedy, Dr. Kao, and Dr. Alonso-Basanta. Some of Respondents deviations included a failure to recognize that the radiation therapy being provided was contra-indicated given Dr. Ware's particular type of cancer, failure to provide and recommend treatment that was reasonably related to improving Dr. Ware's prospects for a quality of life, and failure to disclose the pertinent risks, benefits, and alternatives to the experimental study, including the risk of profound brain damage from the radiation. JA-0484 [*Id.* at ¶ 211]. This claim arises out of the care that Dr. Ware received after his diagnosis of brain cancer, and not, as the Court's Opinion holds, his exposure to radiation.

The District Court, for whom jurisdiction was no longer proper following Petitioner's voluntary withdraw of her Price-Anderson Act claims, determined in its Opinion, that even if the claims were dismissed, the other Counts of Petitioner's Amended Complaint would not have survived summary judgment. *See* JA-0043 [Mem. Op. 09/08/2016 at 10-14]. Petitioner respectfully disagrees with this conclusion as well.

The District Court determined that Petitioner's negligence, fraud, and corporate negligence claims, would not have survived summary judgment because Petitioner failed to produce expert testimony on the issue of causation. The reason behind Petitioners failure to produce expert reports on causation for the state law claims is straightforward. Petitioner only conducted limited discovery on the Price-Anderson issues.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

After consultation with her expert regarding the Price-Anderson Act claims, Petitioner learned that she would not be able to meet the heightened standards of the Act and filed her Motion to Withdraw and Remand, which was not ruled on until almost one year after it was filed. It is troubling to suggest that Petitioner should have conducted discovery on the state law issues while her Motion to Withdraw and Remand was still pending.

Once the Price-Anderson Act claims were withdrawn, the District Court would have been divested of jurisdiction over this matter and the case should have been remanded to the Philadelphia Court of Common Pleas. Once the case was back in the Philadelphia Court of Common Pleas, a case management order would have been issued and Petitioner could have begun discovery on the state law claims (negligence under Mcare, fraud, corporate negligence, and negligent infliction of emotional distress).

It is another circular proposition to suggest that Petitioner's claims should be dismissed by way of summary judgment because she failed to produce evidence of causation on state law matters, when her discovery was limited to issues under the Price-Anderson Act, which should not have applied to this matter given the facts alleged. Had the case been remanded after her voluntary withdraw of the Price-Anderson Act claims, discovery would have been allowed to commence regarding her state law claims. Petitioner then would have been able to produce expert reports regarding causation and the claims would have survived Respondents' Motions for Summary Judgment.

## CONCLUSION

For the reasons stated above, Petitioner respectfully submits that her Petition for a Writ of Certiorari should be granted.

Respectfully submitted,

Aaron J. Freiwald, Esquire
*Counsel of Record*
Glenn A. Ellis, Esquire
Matthew R. Bravette, Esquire
Freiwald Law, P.C.
1500 Walnut Street, 18th Floor
Philadelphia, PA 19102
(215) 875-8000
ajf@freiwaldlaw.com

*Counsel for Petitioner*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# In the Supreme Court of the United States

---

ESTATE OF JEFFREY H. WARE, BY BARBARA
BOYER, INDIVIDUALLY, ON BEHALF OF
WRONGFUL DEATH BENEFICIARIES AND AS
ADMINISTRATRIX OF THE ESTATE OF JEFFREY
H. WARE

*Petitioner,*

v.

HOSPITAL OF THE UNIVERSITY OF
PENNSYLVANIA, ET AL.

*Respondent.*

---

*On Petition for a Writ of Certiorari to the United
States Court of Appeals for the Third Circuit*

---

### APPENDIX TO PETITION FOR A WRIT OF CERTIORARI

---

Aaron J. Freiwald, Esquire
*Counsel of Record*
Glenn A. Ellis, Esquire
Matthew R. Bravette, Esquire
Freiwald Law, P.C.
1500 Walnut St., 18th Floor
Philadelphia, PA 19102
(215) 875 – 8000
ajf@freiwaldlaw.com

*Counsel for Petitioner*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## TABLE OF CONTENTS OF APPENDIX

APPENDIX A: Opinion and Judgment in the United States Court of Appeals for the Third Circuit (October 10, 2017)...............….........................1a

APPENDIX B: Order Dismissing Civil Action in the United State District Court for the Eastern District of Pennsylvania (September 8, 2016)..................35a

1a
APPENDIX A

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 16-3801

_____

ESTATE OF JEFFREY H. WARE, By Barbara
Boyer, individually, on behalf of
wrongful death beneficiaries and as Administratrix
of the Estate of Jeffrey H. Ware,
Appellant
v.
HOSPITAL OF THE UNIVERSITY OF
PENNSYLVANIA;
UNIVERSITY OF PENNSYLVANIA;
UNIVERSITY OF PENNSYLVANIA PERELMAN
SCHOOL OF MEDICINE;
UNIVERSITY OF PENNSYLVANIA TRUSTEES;
ANN R. KENNEDY, D.S.C.;
GARY KAO, M.D.; MICHELLE ALONSO-
BASANTA, M.D.; NATIONAL SPACE
BIOMEDICAL RESEARCH INSTITUTE;
CENTER FOR ACUTE RADIATION RESEARCH

_____

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-14-cv-00014)
District Judge: Honorable Jospeh F. Leeson, Jr.

_____

Argued June 28, 2017

Before: AMBRO, RESTREPO, and COWEN, Circuit
Judges

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

2a

## JUDGMENT

This cause came on to be heard on the record

before the United States District

Court for the Eastern District of Pennsylvania and

was argued on June 28, 2017.

On consideration whereof, IT IS ORDERED AND

ADJUDGED by this Court that the judgment of the

District Court dated September 8, 2016, is hereby

affirmed. Costs are not taxed. All of the above in

accordance with the opinion of this Court.


ATTEST:

s/ Marcia M. Waldron
Clerk

Dated:  September 18, 2017

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

3a

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 16-3801

———————

ESTATE OF JEFFREY H. WARE, By Barbara
Boyer, individually, on behalf of wrongful death
beneficiaries and as Administratrix of the Estate of
Jeffrey H. Ware,
Appellant
v.
HOSPITAL OF THE UNIVERSITY OF
PENNSYLVANIA; UNIVERSITY OF
PENNSYLVANIA;
UNIVERSITY OF PENNSYLVANIA PERELMAN
SCHOOL OF MEDICINE;
UNIVERSITY OF PENNSYLVANIA TRUSTEES;
ANN R. KENNEDY, D.S.C.; GARY KAO, M.D.;
MICHELLE ALONSO-BASANTA, M.D.; NATIONAL
SPACE BIOMEDICAL RESEARCH INSTITUTE;
CENTER FOR ACUTE RADIATION RESEARCH

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil Action No. 2-14-cv-00014)
District Judge: Honorable Joseph F. Leeson, Jr.

4a

Argued June 28, 2017

Before: AMBRO, RESTREPO, and COWEN, Circuit
Judges

(Opinion filed September 18, 2017)

Glenn A. Ellis, Esquire
Aaron J. Freiwald, Esquire (Argued)
Mathew R. Bravette, Esquire
Layser & Freiwald
1500 Walnut Street, 18th Floor
Philadelphia, PA 19102
Counsel for Appellant

Donald E. Jose, Esquire (Argued)
Jose & Associates
108 Tramore Circle
Malvern, PA 19355

Theresa F. Sachs, Esquire (Argued)
Daniel J. Sherry, Esquire
Donna Modestine, Esquire
Marshall Dennehey Warner Coleman &
Goggin
2000 Market Street, Suite 2300
Philadelphia, PA 19103

Counsel for Appellees

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

5a

## OPINION OF THE COURT

AMBRO, <u>Circuit Judge</u>

Barbara Boyer, the widow of a cancer researcher who developed a fatal tumor allegedly as a result of inadequate safety precautions taken to protect him from radiation in his lab, sued the University of Pennsylvania together with affiliated persons and entities[1]. Before us is the reach of the Price-Anderson Act, *see* 42 U.S.C. § 2011, *et seq.*, and its remedy-limiting provisions. The Act gives federal courts jurisdiction to resolve a broad set of claims involving liability for physical harm arising from nuclear radiation. Boyer asserts, however, that the Act's unexpressed intent would exempt her husband's injuries from its jurisdictional grant.

Her claims fall within the text of the Act, so if we are to limit it to a zone of interests narrower than its text provides, Boyer must offer a compelling limiting principle that would put her allegations beyond the Act's reach. Although she suggests several implicit limitations, each is

---

[1] The defendants in this action are the University of Pennsylvania; the Hospital of the University of Pennsylvania; the Perelman School of Medicine; the Trustees of the University of Pennsylvania; and Drs. Ann Kennedy, Gary Kao, and Michelle Alonso-Basanta. We refer to them jointly as the "UPenn defendants"; "UPenn" refers, depending on context, to the University of Pennsylvania or all the defendants.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

6a

either unconvincing or, even if adopted, would leave this case still within the Act's reach. Thus we must affirm.

## I. BACKGROUND

Jeffrey H. Ware, Ph.D., was a neuroscientist at the University of Pennsylvania who studied the effects of radiation on biological organisms with the goal of better understanding how radiation affects astronauts while in orbit. In the course of his research Ware used cesium-137 irradiators to track the effects of low-level radiation on mice and rats.

Tragically, Ware suffered in 2010 a rare form of brain cancer called gliosarcoma. Boyer claims gliosarcoma is associated with radiation exposure (however, because she produced no expert reports, there is nothing in the record to support this link). She also alleges that Ware's cancer specifically resulted from radiation exposure that UPenn failed to monitor properly or protect against. Moreover, UPenn failed to inform Ware of the level of radiation to which he was exposed.

Following his diagnosis, Ware turned to the University's affiliated hospital for medical care. He underwent chemotherapy and radiation in order to slow the cancer's progression. Boyer alleges that Ware was not given appropriate information about these treatments; that, given the advanced stage of his disease, they provided little benefit; and that, at one appointment where she was not present, a UPenn doctor enrolled Ware in a research study to

7a

investigate the effects of chemotherapy and radiation on brain cancer patients without his knowing consent. According to Boyer, UPenn concealed and withheld documents and data related to the study to "cover up its terrible record of radiation safety and to protect millions of research dollars." Boyer's Br. at 9.

UPenn also discouraged Ware from seeking palliative care, she claims, in order to maintain his participation in the study.

Just a year after his diagnosis, Ware died from his cancer at age 47. Boyer filed a complaint in the Pennsylvania Court of Common Pleas as administratrix of Ware's estate as well as on behalf of herself and Ware's surviving children. Her initial complaint alleged numerous counts, including negligence, fraud, retaliation, and negligent infliction of emotional distress. She added to the UPenn defendants the National Space Biomedical Research Institute ("NSBRI"), a research organization started by NASA that funded Ware's work.

UPenn and the NSBRI removed the case to federal court on the grounds that (1) claims against UPenn are covered by the Price-Anderson Act, which provides federal jurisdiction over claims asserting "public liability" arising from a "nuclear incident," *see* 42 U.S.C. §§ 2014(q), (w), (hh), & 2210(n); and (2) 28 U.S.C. § 1442(a) permits removal of claims against NSBRI because it is a federal agency.

Following Boyer's unsuccessful motion to remand, the District Court adopted a Magistrate

8a

Judge's Report and Recommendation that the Price-Anderson Act applies to Boyer's claims alleging that Ware was harmed by radiation from cesium-137 used in his lab and that the NSBRI is a federal agency. Boyer responded by dismissing all claims against the NSBRI and amending her complaint to include two counts of "negligence under the Price-Anderson Act" (the "Price-Anderson claims") and additional counts styled as state-law claims for fraud, negligent infliction of emotional distress, malpractice, and "corporate negligence." J.A. 476-488.

Discovery began, and UPenn produced five expert reports and thousands of pages of documents. Boyer failed to produce a single expert report to substantiate her claims. UPenn filed four motions that the District Court construed as motions for summary judgment, to which Boyer never responded.

Per regulations issued by the Nuclear Regulatory Commission ("NRC"), entities holding licenses to handle certain nuclear materials must limit the dose of radiation received by employees from occupational exposure to five rem (5,000 millirem) per year. 10 C.F.R. § 20.1201 ("Occupational dose limits for adults"). It is uncontested that Ware's total occupational radiation exposure over 16 years was only 0.075 rem (75 millirem), which would yield an annual average of only 0.0047 rem (4.7 millirem)[2].  Because this

---

[2] Boyer alleges that Ware was not, but should have been, provided with a dosimeter badge at all times to monitor his individual radiation exposure. However,

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

9a

amount is far below the five-rem standard set in §
20.1201, Boyer concluded that she could not prevail
on any claims governed by the Price-Anderson Act, so
she moved to withdraw her Price-Anderson claims
and to remand the remainder of her claims to state
court.

The District Court denied the motion to
withdraw, and, because Boyer had failed to produce
any expert reports or even oppose UPenn's motions
for summary judgment, it granted summary
judgment to UPenn on all of her claims. Boyer
appeals, challenging the District Court's
determination that the Price-Anderson Act applies to
her negligence claims as well as the Court's denial of
her motion to withdraw while retaining jurisdiction
over her remaining state-law claims.

## II. STANDARD OF REVIEW

We review *de novo* the District Court's
interpretation of the Price-Anderson Act and exercise
the same review over whether subject-matter
jurisdiction exists. *See Fair Hous. Rights Ctr. in Se.
Pennsylvania v. Post Goldtex GP, LLC*, 823 F.3d 209,
213 (3d Cir. 2016); *Weitzner v. Sanofi Pasteur, Inc.*,
819 F.3d 61, 63 (3d Cir. 2016). Our review of the
District Court's denial of Boyer's request for

---

she does not dispute the 0.075 rem total exposure
calculation.

10a

voluntary dismissal is for abuse of discretion. *Ferguson v. Eakle*, 492 F.2d 26, 28 (3d Cir. 1974).

## III. ANALYSIS

### A. The Price-Anderson Act Governs Boyer's Negligence Claims.

The District Court held the Price-Anderson Act applies to Boyer's claims asserting that Ware was harmed by radiation emitted from cesium-137 irradiators used in his lab. The Act provides for removal to federal court of any "public liability action arising out of or resulting from a nuclear incident." 42 U.S.C. § 2210(n). As noted, Boyer and UPenn agree that, if the Act applies, Boyer can only state a claim for relief if Ware received more than five rem of radiation per year [3]. It is undisputed that Ware's average annual radiation exposure was much less than five rem, so any claim to which the Act applies is not viable.

---

[3] The NRC regulations the parties cite merely set out rules binding entities with licenses to hold certain nuclear materials. *See* 10 C.F.R. § 20.1201. Neither party offers any legal source that would limit liability under the Price-Anderson Act to cases where exposure exceeds § 20.1201's limits. But because Boyer accepts this limitation as true and failed to oppose summary judgment, we have no occasion to challenge it.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

11a

But that is not the worst of Boyer's situation: if the Price-Anderson Act applies, even her claims that don't stem from Ware's radiation exposure are lost as well. Boyer failed to oppose summary judgment on any of her claims (even those, like medical malpractice, that the parties agree are not governed by the Act). Thus, on appeal Boyer attempts to save her claims by contending that the District Court either lacked jurisdiction over her claims or abused its discretion by exercising it.

For these reasons, Boyer contends the Price-Anderson Act, which grew out of the federal Government's initial efforts to regulate nuclear weapons and power plants in the 1940s and '50s, does not apply to laboratory research. Her interpretation of the Act conflicts with its text, and she identifies no principle that would both rule out its application to Ware's research and be true to the Act's purpose and structure.

1.    *The Price-Anderson Act*

a.    History

"With the object of encouraging the private sector to become involved in the development of atomic energy for peaceful purposes, Congress passed the Atomic Energy Act of 1954[], 68 Stat. 919, a broad scheme of federal regulation and licensing." *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 476 (1999) (internal brackets, quotation marks, and citation omitted). "[I]n 1957 Congress amended the [Atomic Energy Act] with the Price-Anderson Act, 71

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

12a

Stat. 576[, which] provided certain federal licensees with a system of private insurance, Government indemnification, and limited liability for claims of 'public liability,' now defined generally as 'any legal liability arising out of or resulting from a nuclear incident or precautionary evacuation[.]" *Id.* (quoting 42 U.S.C. § 2014(w)).

Congress has continued to build on the Price-Anderson Act's foundation, expanding its scope and functions. The Act initially relied on state courts and state law to rule on and govern liability for nuclear accidents. *In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 852 (3d Cir. 1991). However, amendments in 1966 "provided for the transfer, to a federal district court, of all claims arising out of an extraordinary nuclear occurrence"[4] and brought about greater uniformity of liability determinations while retaining state-law causes of action. *Id.* The amendments

---

[4] (4) An "extraordinary nuclear occurrence" is

any event causing a discharge or dispersal of source, special nuclear, or byproduct material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines to be substantial, and which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines has resulted or will probably result in substantial damages to persons offsite or property offsite . . . .
42 U.S.C. § 2014(j).

13a

require indemnified entities "to waive the defenses of negligence, contributory negligence, charitable or governmental immunity, and assumption of the risk in the event of an action arising as the result of an extraordinary nuclear occurrence." *Id.*

"In the wake of the 1979 accident at the Three Mile Island nuclear power plant, suits proliferated in state and federal courts, but because the accident was not an 'extraordinary nuclear occurrence,' within the meaning of the Act, *see* § 2014(j), there was no mechanism for consolidating the claims in federal court." *El Paso Nat. Gas*, 526 U.S. at 477. So Congress acted again in 1988, providing for federal jurisdiction over any actions "asserting public liability" arising from a "nuclear incident," which generally includes any "occurrence" causing physical harm resulting from the radioactive properties of nuclear material. *See id.* The 1988 amendments also took another step toward federalizing the law applicable to nuclear accidents by providing that "any suit asserting public liability . . . shall be deemed to be an action arising under [the Price-Anderson Act]" rather than state law. 42 U.S.C. § 2014(hh).

These 1988 amendments, which are at the heart of this case, deliberately increased the scope of the Act's coverage. *See Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir. 2000) ("'Nuclear incident' is not limited to a single, catastrophic accident: indeed, one purpose behind the 1988 amendments was to expand the scope of federal jurisdiction beyond actions arising from 'extraordinary nuclear

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

14a

occurrences' only." (citing *Kerr–McGee Corp. v. Farley*, 115 F.3d 1498, 1502 (10th Cir. 1997))). They provide federal jurisdiction in a wider variety of situations than the prior version of the law. *See, e.g.*, *Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1133, 1140–42 (10th Cir. 2010) (claims of property owners at risk of nuclear material blowing onto their properties from nuclear weapons plant turned wildlife refuge); *Dumontier v. Schlumberger Tech. Corp.*, 543 F.3d 567, 569 (9th Cir. 2008) (claims of workers exposed to cesium-137 carelessly left on oil drilling rig); *Acuna*, 200 F.3d at 338 (claims of workers, their family members, and nearby residents for harm from uranium mine).

Although the history of the Act's amendments tracks major events in the development of nuclear power and weapons, the Act's concerns are not so narrow. As noted above, Congress has "encourag[ed] the private sector to become involved in the development of atomic energy for peaceful purposes[.]" *El Paso Nat. Gas*, 526 U.S. at 476. Among the purposes pointed to by Congress at the outset of its plan for regulating atomic energy are "providing for . . . a program of conducting, assisting, and fostering research and development in order to encourage maximum scientific and industrial progress[,] . . . for the dissemination of unclassified scientific and technical information[,] and for the control, dissemination, and declassification of Restricted Data, subject to appropriate safeguards, so as to encourage scientific and industrial progress[.]" 42 U.S.C. § 2013. Highlighting the Act's scientific aims, § 2210(k) specifically sets certain

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

15a

financial requirements that apply to non-profit educational institutions.

### b. Key Provisions

Today the Price-Anderson Act provides for the removal to federal court of any "public liability action arising out of or resulting from a nuclear incident." 42 U.S.C. § 2210(n). As the District Court commented, this "would seem to be a peculiar way to describe a case alleging that a researcher was injured while working on the campus of the University of Pennsylvania," *Ware v. Hosp. of the Univ. of Pennsylvania*, No. 2:14-CV-00014, 2016 WL 4702117, at *2 (E.D. Pa. Sept. 8, 2016), but any peculiarity simply derives from Congress' slow expansion of the Act's statutory definitions to bring a growing set of matters within its scope.

In essence, the Act provides federal jurisdiction over claims asserting legal liability for "any occurrence" causing physical harm or property damage resulting from the radioactive properties of nuclear material. 42 U.S.C. §§ 2014(q), (w), (hh) & 2210(n)(2). However, because its definitions are complicated, interlocking, and use words in unintuitive ways, it is worth pausing to consider the Act's key provisions.

Section 2210(n)(2) contains the jurisdictional grant:

> With respect to any public liability action arising out of or resulting from a nuclear

16a

incident, the United States district court in
the district where the nuclear incident takes
place . . . shall have original jurisdiction
without regard to the citizenship of any party
or the amount in controversy.

That grant, in turn, depends on the definitions
of "public liability action" and "nuclear incident." A
"public liability action" is simply "any suit asserting
public liability." *Id.* § 2014(hh)[5]. And "public
liability" means (apart from certain exceptions not
relevant here) "any legal liability arising out of or
resulting from a nuclear incident or precautionary
evacuation." *Id.* § 2014(w). That brings us to "nuclear
incident":

The term "nuclear incident" means any
occurrence, including an extraordinary        nuclear
occurrence, . . . causing . . . bodily injury, sickness,
disease, or death, or        loss of or damage to
property, or loss of use of property, arising out of or
resulting      from the radioactive, toxic, explosive, or

---

[5] Under the Price-Anderson Act "the substantive rules for
decision in [a public liability] action shall be derived from the
law of the State in which the nuclear incident involved occurs,
unless such law is inconsistent with the provisions of [the Act]."
42 U.S.C. § 2014(hh). That is, although (1) the case proceeds in
federal court, (2) the cause of action is itself federal, and (3)
certain state-law defenses may not be raised, *see* 42 U.S.C. §§
2014(hh) & 2210(n)(1), state law nonetheless will provide the
elements of any public liability action except to the extent that
a provision of the Act requires something different.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

17a

other hazardous properties of source,   special
nuclear, or byproduct material[.]

>    *Id.* § 2014(q).

This definition of "nuclear incident" is facially
quite broad, and, because the definitions above all
rely on it, the Price-Anderson Act's jurisdictional
grant is also broad.

### 2. Boyer's Price-Anderson Claims

Despite these expansive definitions, Boyer
contends the District Court erred when it held that
the Price-Anderson Act applied to all of her claims
alleging that Ware was harmed by radiation from
cesium-137 used in his lab. We disagree.

The Act's text maps neatly onto Boyer's
allegations. There is no dispute that cesium-137 is a
by product material,"[6] and, according to Boyer, its
radioactive properties caused Ware's "bodily injury,
sickness, disease, [and ultimately] death." 42 U.S.C.
§ 2014(q). As long as we give the word "occurrence"
its ordinary meaning—"something that takes place;
esp. something that happens unexpectedly and
without design; or the action or process of happening
or taking place," *Carey v. Kerr–McGee Chem. Corp.*,
60 F. Supp. 2d 800, 805 (N.D. Ill. 1999) (quoting

---

[6] (6) *See* 42 U.S.C. § 2014(e) (defining "byproduct material");
*Dumontier*, 543 F.3d at 569 (applying § 2014(q) to injuries
caused by cesium-137).

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

19a

Webster's Third New International Dictionary (1993))—the facts alleged constitute a "nuclear incident" under § 2014(q).

Boyer claims UPenn bears legal liability arising from this nuclear incident, so what she alleges is "public liability" under § 2014(w). Any suit asserting public liability is a "public liability action . . . arising under section 2210" of the Price-Anderson Act. *Id.* § 2014(hh). Accordingly, per § 2210(n)(2) the District Court had jurisdiction over Boyer's claims, and UPenn had the right to remove them to federal court.

Boyer nonetheless raises arguments why the Act does not apply. There may exist some limiting principle that would effectively cabin the sweeping language Congress used to describe any nuclear incident subject to the Act, but none is persuasive here.

As noted, the Price-Anderson Act's history largely tracks major events in the development of the nuclear power and energy industries. Thus Boyer's first argument is that its jurisdictional grant applies *only* to nuclear accidents involving nuclear power plants or weapons facilities. For support, she looks to cases, agency fact-sheets, and academic publications summarizing the Act's applicability. *E.g.*, *In re TMI II*, 940 F.2d at 855 ("[T]here can be no action for injuries caused by the release of radiation from federally licensed nuclear power plants separate and apart from the federal public liability action created by the [Price-Anderson] Act [amendments of 1988].");

20a

*See Acuna*, 200 F.3d at 339 ("The Price Anderson Act
sets up an indemnification and limitation of liability
scheme for public liability arising out of the conduct
of the nuclear energy and weapons industries.");
United States Nuclear Regulatory Commission,
*Nuclear Insurance and Disaster Relief,*
https://www.nrc.gov/reading-rm/doc-collections/fact-
sheets/nuclear-insurance.pdf (December 2014) ("The
Price-Anderson Act . . . cover[s] liability claims of
members of the public for personal injury and
property damage caused by a nuclear accident
involving a commercial nuclear power plant."); Dan
M. Berkovitz, *Price-Anderson Act: Model
Compensation Legislation?–the Sixty-Three Million
Dollar Question*, 13 Harv. Envtl. L. Rev. 1, 1 (1989)
("The Price-Anderson Act['s] . . . coverage for NRC
licensees encompasses activities of commercial
nuclear power plants, certain fuel fabrication
facilities, and non-[Department of Energy] reactors
used for educational and research purposes.").

Boyer contends these descriptions limit the
Act's application regardless of what is in its text. But
the summaries she cites do not purport to explore its
scope. They merely give the reader a rough sense of
the Act's general purpose. *In re TMI II*, for example,
addresses "federally licensed nuclear power plants"

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

21a

because that's what the case was about. 940 F.2d at 835[7]. No one would take a court's statement that

---

[7] True, one District Court has cited the Fifth Circuit's *Acuna* decision for the proposition that "the [Price-Anderson Act] *only* applies to the nuclear energy and weapons industries." *Samples v. Conoco, Inc.*, 165 F. Supp. 2d 1303, 1321 (N.D. Fla. 2001) (emphasis in original) (calling a plain text reading of the statute "Hogwash!"). But a close reading suggests *Samples'* real concern was the defendants' attempt to use the Act's tail to wag the dog. They sought to apply the Act to the plaintiffs' action because uranium was listed among "the [many] hazardous substances found in the sludge ponds" at a chemical waste site. *Id.* at 1320 n.16. The Court evidently found this connection farfetched and gave the Price-Anderson argument short shrift.

Moreover, *Samples* later suggests that a defendant's possession of a license to handle nuclear materials would trigger the Act's reach. *Id.* at 1321 ("The Defendants have failed to provide the Court with proof demonstrating they are a [Department of Energy] contractor or an NRC licensee. Therefore, Plaintiffs' lawsuit does not state a cause of action under the [Price-Anderson Act.]"). As we discuss below, UPenn had such a license. Thus, depending on how one reads *Samples—i.e.,* (1) the Act applies only to the nuclear power and weapons industries or (2) the Act applies only to the holders of licenses to possess nuclear materials—even that Court could have held UPenn to be covered by the Act.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

22a

"Title VII of the Civil Rights Act provides a cause of
action to employees fired because of their race" to
mean Title VII provides no cause of action to
individuals suffering discrimination on the basis of
sex, religion, or national origin.

What is more, the Price-Anderson Act plainly
applies in at least some contexts to research
universities, as it has provisions that cover
specifically institutions like the University of
Pennsylvania. Section 2210(k) provides that
"nonprofit educational institution[s]" conducting
"educational activities" pursuant "to any license
issued" under the federal atomic energy scheme shall
be indemnified by the NRC for "public liability in
excess of $250,000 arising from nuclear incidents." 42
U.S.C. § 2210(k)(1). "[C]ontracts of indemnification
[entered into by the institution and the Commission]
shall cover public liability arising out of or in
connection with the licensed activity[.]" 42 U.S.C. §
2210(k)(2). This section also exempts these licensed
institutions from certain "financial protection"
requirements under the Act. Id. It would make no
sense for the Act to contain these provisions if it did
not apply outside the weapons and energy industries.
That is, Congress' choice to include a provision
indemnifying licensed nonprofit educational
institutions from public liability suggests strongly

23a

(perhaps overwhelmingly) that the Act applies to them[8].

Boyer next argues, following the reasoning of a District Court in our Circuit, that even if the Price-Anderson Act applies to a broad set of industries, it only covers defendants that have indemnity agreements with the NRC. See Gilberg v. Stepan Co., 24 F. Supp. 2d 325, 339 (D.N.J. 1998), supplemented, 24 F. Supp. 2d 355 (D.N.J. 1998).

---

[8]  In the alternative, Boyer claims that, even if the Price-Anderson Act applies to university research labs, it applies only to labs that operate nuclear reactors. She cites no portion of the Act in favor of this position. The most she does is point to regulations dealing with indemnity agreements required for institutions that do use reactors. *See* 10 C.F.R. § 140.72. But the existence of regulations specifying requirements for institutions with reactors does not imply that those without them are somehow exempt from the Act entirely. She goes on to cite the NRC's list of institutions with nuclear reactors in Pennsylvania and notes the University's absence. *See* United States Nuclear Regulatory Commission, https://www.nrc.gov/info-finder/region-state/pennsylvania.html. Its presence on the reactor list is relevant only if having a reactor is a prerequisite to the Act's coverage, and we see no reason to hold that it is.

24a

Noting § 2014(q)'s broad definition of "nuclear incident," the *Gilberg* Court looked for a limit to its reach in the nearby definition of "extraordinary nuclear occurrence." *Id.* (Recall that extraordinary nuclear occurrences were the only events that triggered federal jurisdiction before the 1988 Price-Anderson Act amendments.) Following a long and complicated analysis of the Act's history and structure, *Gilberg* concluded that a nuclear incident may only occur (and the Act applies) when harm happens at a site covered by an indemnification agreement with the NRC. *Id.* The University of Pennsylvania has no such agreement, Audio Recording of Oral Argument held June 28, 2017 at 31:23                              to                              31:40 (http://www2.ca3.uscourts.gov/oralargument/audio/1 6-3801EstateofJeffreyHWarevHospitaloftheUnivesityof Pennsylvaniaetal.mp3); so, the argument goes, its negligence toward Ware did not cause a nuclear incident.

We are unpersuaded that an indemnification agreement is necessary to trigger the Act's applicability. What *Gilberg* misses is that "one purpose behind the 1988 amendments was to expand the scope of federal jurisdiction beyond actions arising from 'extraordinary nuclear occurrences[.]'" *Acuna*, 200 F.3d at 339 (citing *Kerr–McGee,* 115 F.3d at 1502). Indeed, that is why the definition of "nuclear incident" is so broad. *Id.* Thus we agree with the Fifth Circuit's conclusion that *Gilberg*'s "attempts to reintroduce the limitations of 'extraordinary nuclear occurrence' into the 1988

25a

amendments' substitution of 'nuclear incident' rely
on faulty statutory interpretation and are contrary to
Congressional intent." *Id.* (citing *Carey,* 60 F. Supp.
2d at 803–07).

The remaining arguments suffer from the
same flaw. Even if we were to accept the limiting
principles Boyer proposes, her claims would still be
governed by the Act. For this reason, we have no
need to pass on whether the Act is limited in the
remaining ways Boyer suggests. We note only that,
even so, the outcome here would be no different.

Boyer argues that the Act applies only when a
defendant has a license to possess nuclear materials.
Indeed, § 2210(k)'s reference to "any license issued"
under the federal scheme for atomic energy could be
read to suggest that universities are covered by
Price-Anderson only when they hold a license to use
the materials involved in any nuclear incident. One
District Court has held that, regardless of the type of
institution in question, the Act applies exclusively to
entities holding licenses. *Irwin v. CSX Transp., Inc.,*
No. 3:10-CV-300, 2011 WL 976376, at *2 (E.D. Tenn.
Mar. 16, 2011). And the unpersuasive *Samples*
opinion mentioned above in footnote 7 gives a nod to
that view as well, 165 F. Supp. 2d at 1321 ("the word
occurrence as used in the definition of nuclear
incident means that event at the site of the *licensed
activity, or activity for which the Commission has
entered into a contract,* which may cause damage"
(internal quotation marks and citations omitted)
(emphasis in original)). For this reason too, Boyer
asserts, UPenn is not covered by the Act.

26a

But the University of Pennsylvania has such a license. Its license to engage in research using cesium-137 irradiators was issued by the Pennsylvania Department of Environmental Protection Bureau of Radiation Protection, which exercises delegated authority from the NRC per § 274 of the Atomic Energy Act of 1954, 42 U.S.C. § 2021. Boyer says that's not good enough; the license must be issued by the NRC directly. Her argument, however, is hard to follow.

The Price-Anderson Act is part of the Atomic Energy Act. The latter gives the NRC authority to enter into agreements with states allowing them to issue licenses in the NRC's stead. *See* 42 U.S.C. § 2021. In her Reply, Boyer seems to argue that, because UPenn has a state-issued license, only state nuclear regulations apply to its and its affiliates' conduct, and thus the Price-Anderson Act does not apply to her suit. But Boyer never says why this would be true. Indeed, our sister Circuit has held that "[t]here is nothing in the definition of 'nuclear incident' which suggests [the Act's application] should be contingent on whether the occurrence took place in a state which regulates its own [nuclear material] industry under NRC guidelines" or leaves that regulation to the NRC directly. *Acuna*, 200 F.3d at 339. We thus reject the argument that UPenn's state-issued license is meaningfully different in this context from a license issued directly by the NRC. As a result, even if Boyer is correct that possession of a license is the lynchpin for Price-Anderson's

27a

applicability, UPenn's license would satisfy that
requirement here.[9]

Next up is Boyer's claim that the Act applies
only to unintentional releases of nuclear energy. For
support, she looks to one District Court that declined
to apply the Act to claims of cancer patients
intentionally subjected to radiation because "all of
the cases applying the Price–Anderson Act have
extended potential liability only to the *unintended*
escape or release of nuclear energy." *In re Cincinnati
Radiation Litig.*, 874 F. Supp. 796, 832 (S.D. Ohio
1995) (emphasis added). Boyer contends her claims
similarly do not implicate an unintentional release of
nuclear energy. But that's not true. Her complaint
alleges that Ware was harmed by UPenn's neglect of
its duty to protect him adequately from radiation—
that is, negligence, not deliberate exposure. So even
if this exception to the Act exists, it wouldn't apply to
this case.

Finally, the *Cincinnati Radiation* Court also
noted that, during the legislative process leading to
the 1988 amendments, Congress considered
explicitly expanding the Act's reach to cover "persons
operating nuclear pharmacies or hospital medicine

---

[9] We do not hold that possession of a license
determines the Act's applicability. Rather, we note
only that, if having a license matters in this context,
it makes no difference whether the license was
issued by the NRC directly or by a state acting under
delegated authority.

28a

department[s,]" but declined to enact the expansion. *Id.* at 832 n.33 (citing S. Rep. No. 100–218, at 18 (1988), *reprinted as* 1988 U.S.C.C.A.N. 1476, 1493). So, Boyer argues, we should hold Congress' failure to adopt this language implies a limit on the Act's application to harm from radiation used for medical care.

But even if we were to read so much into Congress' inaction, it wouldn't help Boyer. The cesium-137 irradiators that allegedly harmed Ware were not used for patient care or any medical purpose nor were they kept in a nuclear pharmacy. They were used for research only and kept in a lab. The language Congress declined to enact simply has nothing to do with the facts of this case.

None of this is to say that the Act applies to all harm occurring from nuclear material in any situation whatsoever. Counsel for UPenn conceded at oral argument that any nuclear incident must, at the very least, involve "source, special nuclear, or byproduct material[.]" *See* 42 U.S.C. § 2014(q). According to counsel, that limitation would exempt harm arising from, among other things, x-rays, CAT scans, and naturally occurring uranium and radium. Audio Recording of Oral Argument held June 28, 2017 at 32:30 to 33:18 (http://www2.ca3.uscourts.gov/oralargument/audio/16-3801EstateofJeffreyHWarevHospitaloftheUnivesityofPennsylvaniaetal.mp3). Moreover, as mentioned, we do not decide whether the possession of a license, the intent of any nuclear

29a

energy release, or the medical use of nuclear material, might affect the Act's applicability to a particular case. We note only that these implicit limitations on the Price-Anderson Act's scope would not preclude its application here.

\* \* \* \* \*

In sum, Boyer's claims alleging that Ware's cancer developed because UPenn negligently exposed him to cesium-137 are covered by the Price-Anderson Act. The claims allege a "nuclear incident" in that they describe an "occurrence . . . causing . . . bodily injury, sickness, disease, or death . . . arising out of or resulting from the radioactive . . . properties of . . . byproduct material[.]" 42 U.S.C. § 2014(q). Boyer contends UPenn is liable for the harm arising from this nuclear incident, so her action is a "public liability action" subject to federal court jurisdiction. *Id.* §§ 2014(w), (hh) & 2210(n)(2). We know no compelling limiting principle that would bar this straightforward application of the Act's text to her case, so we affirm the District Court's exercise of jurisdiction.

### B. The District Court Did Not Err When It Declined to Permit Voluntary Dismissal of the Price-Anderson Claims and Retained Jurisdiction over Boyer's Remaining Claims.

When Boyer failed to convince the District Court that the Price-Anderson Act did not apply to her negligence claims (and later discovered that she would be unable to make the showing necessary to

30a

prevail on them), she asked to withdraw them and remand the remaining claims to state court. This tactic failed when the Court ruled that Boyer could not withdraw her claims so late in the game and thus retained jurisdiction over the entire case. It went on to grant summary judgment to the UPenn defendants on all of Boyer's claims because she failed to oppose any of their motions.

Boyer argues the District Court abused its discretion by denying her request to withdraw her Price-Anderson negligence claims and by refusing to remand the remainder of her claims. For the reasons that follow, we disagree.

### 1. Motion to Withdraw

Federal Rule of Civil Procedure 41 provides that a "plaintiff may dismiss an action without a court order by filing . . . a notice of dismissal *before* the opposing party serves either an answer or a motion for summary judgment[.]" Fed. R. Civ. P. 41(a) (emphasis added). Boyer waited to withdraw her Price-Anderson claims until after UPenn had filed its answer. At that point, any dismissal could occur "only by court order[] on terms that the court considers proper." *Id.*; *accord Ferguson v. Eakle*, 492 F.2d 26, 28 (3d Cir. 1974) (once an answer has been filed, whether to permit dismissal is left to the discretion of the District Court).

Of course, the District Court's discretion is not without limit. It must consider "the presence or extent of any prejudice to the defendant by the

31a

draconian measure of dismissing [a] plaintiff's complaint." *Ferguson*, 492 F.2d at 29. We have noted that "Rule 41 motions 'should be allowed unless defendant will suffer some prejudice other than the mere prospect of a second lawsuit.'" *In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 863 (3d Cir. 1990) (citing 5 J. Moore, *Moore's Federal Practice* ¶ 41.05[1], at 41–62 (1988)). The record reflects that UPenn would indeed have suffered prejudice had the Price-Anderson negligence claims been withdrawn

The Magistrate Judge held that the Act applied to at least some of Boyer's claims in May 2014, and the District Court adopted the Magistrate Judge's Recommendation in full in December 2014. By the time Boyer filed her withdrawal motion a year later in December 2015, UPenn had produced five expert reports and thousands of pages of documents and had filed one of its four motions for summary judgment (the other three would follow the next month).

These facts are of a piece with *Ferguson*, 492 F.2d at 29, which held that a District Court abused its discretion by granting withdrawal "[f]ourteen months after [the objecting parties] became defendants in one case and had gone to the expense of retaining counsel, six months after they had gone through pre-trial, and at least two months after they had expected that all discovery had been completed[.]" Were Boyer permitted to withdraw her claims without prejudice, UPenn would have faced the prospect of potentially relitigating, at some later date, claims it had put significant time and resources

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

32a

into defending and already litigated to the summary-judgment stage. Thus we have no doubt the District Court acted within its discretion when it denied Boyer's motion.

### 2. Retention of Jurisdiction over Boyer's Remaining Claims

Boyer contends the District Court abused its discretion by retaining jurisdiction over her remaining claims of fraud, negligent infliction of emotional distress, medical malpractice, and corporate negligence. We again disagree.

Per 28 U.S.C. § 1367, the District Court had authority to exercise supplemental jurisdiction over any state-law claims. Even had it permitted withdrawal of claims governed by the Price-Anderson Act, the Court would not have lost jurisdiction to hear any state-law claims "that are so related to [the federal] claims . . . that they form[ed] part of the same case or controversy." *Id.*; *cf. Arbaugh v. Y & H Corp.*, 546 U.S. 500, 513–14, (2006) ("[W]hen a court grants a motion to dismiss for failure to state a federal claim, the court generally retains discretion to exercise supplemental jurisdiction, pursuant to § 1367, over pendent state-law claims."). And Boyer offers no argument that her state-law claims were not part of the same case or controversy as those governed by the Price-Anderson Act. We have explained that the decision to retain supplemental jurisdiction "should be based on considerations of judicial economy, convenience and fairness to the litigants." *Kach v. Hose*, 589 F.3d 626, 650 (3d Cir.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

33a

2009) (internal quotation marks omitted). As discussed above, the parties had already engaged in significant litigation before the District Court, so values of economy, convenience, and fairness all supported its retention of jurisdiction. We see no reason to second-guess it now.[10]

## IV. CONCLUSION

The facts of Boyer's action are tragic: her husband, a 47-year-old researcher whose life's work was studying the effects of radiation on biological organisms, died from a rare form of brain cancer. But as often happens in the law, this case provides us little opportunity to contemplate Ware's suffering from his illness or his family's suffering from his loss. Instead, our review is confined to bloodless questions of statutory interpretation and appropriate management of litigation. On these issues we find no fault with the District Court's holdings. The Price-Anderson Act governed Boyer's negligence claims, and the Court did not abuse its discretion in denying

---

[10] The District Court held that its retention of jurisdiction was all the more appropriate because Boyer's claims of fraud and negligent infliction of emotional distress were in fact federal claims governed by the Price-Anderson Act. Because we hold that the District Court properly exercised supplemental jurisdiction over Boyer's "state-law" claims per § 1367, we do not reach this alternative jurisdictional ground.

34a

her request to withdraw those claims and to remand her others. We thus affirm its judgment.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Case 2:14-cv-00014-JFL Document 87 Filed 09/08/16
Page 1 of 2

35a
**APPENDIX B**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

---

ESTATE OF JEFFREY H. WARE                    :
by Barbara Boyer, individually, on behalf    :
of wrongful death beneficiaries and as       :
administratrix of the Estate of Jeffrey H. Ware,  :
                                             :
                    Plaintiff,               :
        v.                                   :
                                             :
                                             :
HOSPITAL OF THE UNIVERSITY OF                :
PENNSYLVANIA;                                :
UNIVERSITY OF PENNSYLVANIA;                  :
PERELMAN SCHOOL OF MEDICINE                  :
UNIVERSITY OF PENNSYLVANIA;                  :
TRUSTEES OF THE UNIVERSITY OF                :
PENNSYLVANIA;                                :
ANN R. KENNEDY, D.S.C.;                      :
GARY KAO, M.D.;                              :
MICHELLE ALONSO-BASANTA, M.D.;              :
NATIONAL SPACE BIOMEDICAL                    :
RESEARCH INSTITUTE; and                      :
CENTER FOR ACUTE RADIATION                   :
RESEARCH,                                    :
                    Defendants.              :

---

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

36a

## JUDGMENT

And now, this 8thday of September, 2016, for the reasons set forth in the accompanying Memorandum Opinion issued this day, IT IS ORDERED as follows:

1.     Plaintiff's Motion to Withdraw Counts I and II and to Remand Counts III, IV, V, and VI to the Philadelphia Court of Common Pleas, ECF No. 78, is DENIED.

2.     Defendants' Motion for Summary Judgment on the Price-Anderson PLA and on All Federal Issues in Counts Three and Four, ECF No. 82, is GRANTED.

3.     Defendants' Motion for Summary Judgment as to Plaintiff's Claims of Medical Negligence, Counts 3, 4 and 5, ECF No. 81, is GRANTED.

4.     Defendants' Motion to Determine the Duty Owed to Dr. Ware in the Price-Anderson Public Liability Action, ECF No. 72, is DENIED as moot.

5.     Defendants' Motion to Determine the Causation Test in a Price-Anderson PLA, ECF No. 80, is DENIED as moot.

6.     Defendants' Joint Motion for Order Compelling Plaintiff to Produce Expert Reports or be

37a

Precluded and for Modification of Amended
Scheduling Order, ECF No. 73, is DENIED as moot.

   7.     Defendants' Joint Motion for an Order
Compelling Plaintiff to Produce Answers to
Contention Interrogatories Served on September 28,
2015, David Ware and Jean Boyer for Depositions
and Signed Verifications for Release of IRS and
Social Security Records, ECF No. 74, is DENIED as
moot.

   8.     Defendants' Proposed Findings of Fact
and Conclusions of Law, ECF No. 85, is STRICKEN.

   9.     JUDGMENT IS ENTERED in favor of
all Defendants and against the Plaintiff.

   10.    The Clerk of Court is directed to close
this case.

                  BY THE COURT:


                  /s/ Joseph F. Leeson, Jr.
                  JOSEPH F. LEESON, JR.
                  United States District Judge

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

|  |  |
|---|---|
| MICHAEL DAILEY and ROBBIN DAILEY,<br><br>Plaintiffs,<br><br>v.<br><br>BRIDGETON LANDFILL, LLC, REPUBLIC SERVICES, INC., ALLIED SERVICES, LLC, ROCK ROAD INDUSTRIES, INC., MI HOLDINGS, INC., MALLINCKRODT, INC., COTTER CORPORATION, COMMONWEALTH EDISON COMPANY, and EXELON CORPORATION,<br><br>Defendants. | Case No.  4:17-cv-00024<br><br>**DECLARATION OF STEPHANIE R. FEINGOLD, ESQ. IN OPPOSITION TO PLAINTIFFS' MOTION TO REMAND TO STATE COURT** |

Stephanie R. Feingold, of full age, hereby declares as follow:

     1.    I am a partner with the law firm of Morgan, Lewis & Bockius LLP, attorneys for Defendant Cotter Corporation (N.S.L.) ("Cotter") (improperly named as Cotter Corporation), and have been admitted *pro hac vice* to represent Cotter in connection with this matter.  As counsel for Cotter, I am fully familiar with the facts set forth herein and make this Declaration based on personal knowledge.

     2.    Attached hereto as Exhibit A is a true and correct copy of Source Material License No. SMA-862, issued by the Atomic Energy Commission on February 14, 1966, to Continental Mining & Milling Company.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

3.      Attached hereto as Exhibit B is a true and correct copy of Source Material License No. SMB-654, issued by the Atomic Energy Commission on December 31, 1963, to Contemporary Metals Corporation.

4.      Attached hereto as Exhibit C is a true and correct copy of Source Material License No. SMC-907, issued by the Atomic Energy Commission on December 29, 1966, to Commercial Discount Corporation.

5.      Continental Mining & Milling Co., Contemporary Metals Corporation, and Commercial Discount Corporation were prior licensees of the radioactive materials stored at St. Louis Airport Site and the Latty Avenue Site, for which Cotter was granted a source material license in 1969.  Attached hereto as Exhibit D is a true and correct copy of Source Material License No. SUB-1022, issued by the Atomic Energy Commission on December 30, 1969, to Cotter.

6.      Cotter's source material license remained in effect until the Atomic Energy Commission terminated it on November 13, 1974.  Attached hereto as Exhibit E is a true and correct copy of the November 13, 1974 letter from the Atomic Energy Commission informing Cotter of the termination of Source Material License No. SUB-1022.

7.      Attached hereto as Exhibit F is a true and correct copy of the March 21, 2014 Letter from the EPA Regional Administrator Karl Brooks to Missouri Attorney General Chris Koster.

8.      Attached hereto as Exhibit G is a true and correct copy of the November 17, 2016 letter from EPA General Counsel Alyse Stoy to Plaintiffs' attorneys Richard S. Lewis and Daniel T. DeFeo.

I declare under penalty of perjury that the foregoing is true and correct.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Dated: February 27, 2017

Stephanie R. Feingold

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT A

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

BE14984

**TECHNICAL SERVICES DIVISION (TSD)   BACKFIT**
**(Documents dated prior to 1 November 1988)**

FUSRAP COMMUNICATIONS DISTRIBUTION
DOE/ORO TECHNICAL SERVICES DIVISION (CE-53)
BECHTEL NATIONAL INC. — JOB 14501

CCN _____

TSD ☐   COMM TYPE 2 1 G T X

COMM REF _____

ADMIN RCD _____

SUBJECT **SOURCE MATL LICENSE FOR SLAPS**

FROM **HARMON**   TO **ROBAK**   COMM DATE **02 14 66**

ADDR CODE [ | | ]   CLOSES CCN _____   WBS **153**
           NUMBER   ST

SUBJECT CODE **2640**   DOE FILE NO. _____

AFFECTED DOCUMENT _____

**RESPONSE TRACKING INFORMATION**

PRIMARY:
OWED TO: _____   OWED BY: _____   (ORG)
(ORG) _____ TARGET DATE _/_/_   CLOSING CCN _____ COMPL DATE _/_/_   CLOSING REF

SECONDARY:
OWED TO: _____   OWED BY: _____   (ORG)
(ORG) _____ TARGET DATE _/_/_   CLOSING CCN _____ COMPL DATE _/_/_   CLOSING REF

COMMENTS _____

PLEASE RETURN TO PDCC FOR CORRECTIONS

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

BE 17 984

FEB 1 4 1966

DML:KEL
40-6811

Continental Mining & Milling Co.
209 South LaSalle Street
Chicago, Illinois 60604

Attention:  Mr. Clemons M. Roark
            Vice President

Gentlemen:

Enclosed is Source Material License No. SMA-862.

Since you indicate in your letter dated February 8, 1966, that the application contained therein supercedes the previous application of your subsidiary company, Contemporary Metals Corporation, Source Material License No. SMB-654 issued to Contemporary Metals Corporation as renewed December 31, 1964, is hereby terminated and a new license No. SMA-862 is issued in the name of Continental Mining & Milling Co.

Please note that this new license authorizes only removal of stock-pile residues from 50 Brown Road, Robertson, Missouri, and storage at your facilities at 9200 Latty Avenue, Hazelwood, Missouri.

The remainder of your application dealing with the processing of residues is under review. We will communicate with you later regarding this phase of your application.

                                    Very truly yours,

DISTRIBUTION:
Document Rm. w/encl.
State Health (Lic. only)
Suppl.
Compliance, Reg. III, w/encl.        Don F. Harmon
N. Doulos, IML, w/encl.              Source & Special Nuclear Materials Branch
Br. Reading File w/encl.             Division of Materials Licensing
Div. Reading File w/o encl.

Enclosure:
SMA-862

Cc: D L Oakley, 2-18-66

COTTER00000709

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Form AEC- 410
(1-61)

**UNITED STATES
ATOMIC ENERGY COMMISSION**

Ε≡14984

---

## SOURCE MATERIAL LICENSE

Pursuant to the Atomic Energy Act of 1954, and Title 10, Code of Federal Regulations, Chapter 1, Part 40, "Licensing of Source Material," and in reliance on statements and representations heretofore made by the licensee, a license is hereby issued authorizing the licensee to receive, possess and import the source material designated below; to use such material for the purpose(s) and at the place(s) designated below; and to deliver or transfer such material to persons authorized to receive it in accordance with the regulations in said Part. This license shall be deemed to contain the conditions specified in Section 183 of the Atomic Energy Act of 1954 and is subject to all applicable rules, regulations, and orders of the Atomic Energy Commission, now or hereafter in effect, including Title 10, Code of Federal Regulations, Chapter 1, Part 20, "Standards for Protection Against Radiation," and to any conditions specified below.

| Licensee | 3. License No. |
|---|---|
| 1. Name    Continental Mining & Milling Co. | SMA-862 |
| | 4. Expiration Date |
| 2. Address 208 South LaSalle Street<br>Chicago, Illinois 60604 | February 28, 1969 |
| | 5. Docket No. |
| | 40-6811 |

| 6. Source Material | 7. Maximum quantity of source material which licensee may possess at any one time under this license |
|---|---|
| Uranium and thorium. | 125,000 tons of residues presently stockpiled at 50 Brown Road, Robertson, Missouri |

### CONDITIONS

8. Authorized use (Unless otherwise specified, the authorized place of use is the licensee's address stated in Item 2 above.)
Removal of stockpile residues from 50 Brown Road, Robertson, Missouri, and storage only at the licensee's facilities located at 9200 Latty Avenue, Hazelwood, Missouri, in accordance with the procedures described in the licensee's application dated February 4, 1966, and supplements dated February 7 and February 8, 1966.

9. Transfer of source material to the licensee's Hazelwood, Missouri, site is not authorized until fencing and lock gates have been installed in accordance with the licensee's submittal dated February 8, 1966.

For the U. S. ATOMIC ENERGY COMMISSION

Date of issuance   FEB 1 4 1966

Don F. Harmon
Division of Materials Licensing

★ U. S. GOVERNMENT PRINTING OFFICE : 1962 O - 632468



COPY

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT B

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM



DLR:PLL
40-5211

JAN 3 1963

Mr. Clemens M. Roark
Suite 201, 500 Plumas
Reno, Nevada

Dear Mr. Roark:

Enclosed is Source Material License No. SMB-654, as re-
newed.  Please note that all conditions of this license
remain the same.

In our letter dated November 9, 1962, we requested two
additional copies of your letter dated August 28, 1962,
and two copies of the revised blue print entitled "Sche-
matic Plan for Contemporary Metals Corporation Residue
Recovery Plant," transmitted with this information and
still need it in order to complete our records.

                    Very truly yours,




                    Donald A. Nussbaumer, Chief
                    Source and Special Nuclear Materials
                        Branch
                    Division of Licensing and Regulation

Enclosure:
SMB-654, as ren.



COTTER00000655

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Form AEC-400
(1-61)

COPY

UNITED STATES
ATOMIC ENERGY COMMISSION
——————
SOURCE MATERIAL LICENSE

Pursuant to the Atomic Energy Act of 1954, and Title 10, Code of Federal Regulations, Chapter 1, Part 40, "Licensing of Source Material," and in reliance on statements and representations heretofore made by the licensee, a license is hereby issued authorizing the licensee to receive, possess and import the source material designated below; to use such material for the purpose(s) and at the place(s) designated below; and to deliver or transfer such material to persons authorized to receive it in accordance with the regulations in said Part.   This license shall be deemed to contain the conditions specified in Section 183 of the Atomic Energy Act of 1954 and is subject to all applicable rules, regulations, and orders of the Atomic Energy Commission, now or hereafter in effect, including Title 10, Code of Federal Regulations, Chapter 1, Part 20, "Standards for Protection Against Radiation," and to any conditions specified below.

| Licensee | |
|---|---|
| 1. Name   Contemporary Metals Corporation | 3. License No.  SMB-654, as renewed |
| 2. Address   1039 South San Gabriel Boulevard  San Gabriel, California | 4. Expiration Date  January 1, 1965 |
| | 5. Docket No.  40-6811 |

| 6. Source Material | 7. Maximum quantity of source material which licensee may possess at any one time under this license |
|---|---|
| Uranium and thorium. | 125,000 tons of residues presently stockpiled at Brown Road, Robertson, Missouri. |

CONDITIONS

8. Authorized use (Unless otherwise specified, the authorized place of use is the licensee's address stated in Item 2 above.)
   For use in accordance with the procedures described in the licensee's application dated May 17, 1962, and supplements dated May 28, July 19 & 20, August 28 & 31, 1962; and December 9, 1963.

9. Authorized places of use:   Residue stockpile at Brown Road, Robertson, Missouri, and the licensee's processing facility at 7210 Polson Lane, Hazelwood, Missouri.

10. Process operations shall begin only at such time as the licensee has completed the installation of all equipment and facilities as described in the application and supplements thereto.  However, removal and preparatory operations at the residue stockpile site may begin at such time as the equipment and facilities described in the application and supplements thereto for this operation have been completed.

COTTER00000656

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

FORM AEC 401/410A            U. S. ATOMIC ENERGY COMMISSION            Page  2  of  2  Pages

SOURCE

MATERIAL LICENSE            License Number SMB-654

Supplementary Sheet

11.  Mr. Alan P. Denning shall serve as the Director of the radiological
safety program described in the application and supplements thereto
specified in Item 8 of this license.

12.  The St. Louis Testing Laboratory shall perform the quality control
services as described in the application and supplements thereto
specified in Item 8 of this license.

13.  The licensee shall submit after the first three (3) months of
operations, a report containing the results of the required radio-
logical surveys.

14.  The licensee is hereby exempt from the requirements of Section
20.203 (e)(2) and 20.203 (f)(2), 10 CFR 20, for areas and containers
within the plant, provided all entrances to the plant are conspicuously
posted in accordance with Section 20.203(e)(2) and with the words,
"Any area or container within this mill may contain radioactive material."

RRR  12/31/63

For the U. S. Atomic Energy Commission

Date                                        by

Division of Licensing and Regulation
Washington 25, D. C.

COTTER00000657

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT C

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

DML:CEM
48-7603

DEC 2 9 1956

DISTRIBUTION:
Document Room w/encl.
State Health (lic. only)
Subject File w/encl.
Compliance, Region III w/encl.
N. Doulos, DML w/3 encl.
Br. Reading File w/encl.
Div. Reading File w/o encl.

Commercial Discount Corporation
105 West Adams Street
Chicago, Illinois  60603

Attention:  Mr. A. R. McPherson, Jr.
            President

Gentlemen:

Enclosed is Source Material License No. SMC-907.

Please note that this license authorizes possession and storage only
of the residues containing source material and does not authorize
processing of any kind.  If you should desire to process the residues
or conduct any other activities involving the residues, you should
request an amendment to this license.

Very truly yours,

Don F. Harmon
Source & Special Nuclear Materials
   Branch
Division of Materials Licensing

Enclosure:
SMC-907

cc:  Leibman, Williams, Bennett, Baird and Minow
     208 South LaSalle Street
     Chicago, Illinois  60604

     Attention:  Mr. William P. Colson

| OFFICE ▸ | DML | DML | OKed by Troy Conner 12/28/66 | |
| SURNAME ▸ | CFMacDonald:ge | DFHarmon | | |
| DATE ▸ | 12/28/66 | 12/27/66 | | |

Form AEC-318 (Rev. 9-53)        U. S. GOVERNMENT PRINTING OFFICE   16—67791-4

DH

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM



COPY

Form AEC-410

UNITED STATES
ATOMIC ENERGY COMMISSION

**SOURCE MATERIAL LICENSE**

Pursuant to the Atomic Energy Act of 1954, and in Title 10, Code of Federal Regulations, Chapter 1, Part 40, "Licensing of Source Material," and in reliance on statements and representations heretofore made by the licensee, a license is hereby issued authorizing the licensee to receive, possess and import the source material designated below; to use such material for the purpose(s) and at the place(s) designated below; and to deliver or transfer such material to persons authorized to receive it in accordance with the regulations in said Part.   This license shall be deemed to contain the conditions specified in Section 183 of the Atomic Energy Act of 1954 and is subject to all applicable rules, regulations, and orders of the Atomic Energy Commis-   ", now or hereafter in effect, including Title 10, Code of Federal Regulations, Chapter 1, Part 20, "S    lards for Protection Against Radiation," and to any conditions specified below.

| | |
|---|---|
| Lice | 3. License No. |
| 1. Name   Commercial Dis  nt Corporation | S   1 |
| 2. Address   105 West Adams Street<br>Chi  go, Illinois   60603 | 4. Expiration Date<br>December 31, 1969 |
| | 5. Docket No.<br>40-7603 |
| 6. Source Material<br>Uranium and Thorium | 7. Maximum quantity of source material which licensee may possess at any one time under this license<br><br>125,000 tons of residues containing source material. |

CONDITIONS

8. Authorized use (Unless otherwise specified, the authorized place of use is the licensee's address stated in Item 2 above.)

   For storage only in accordance with the procedures described in the licensee's application dated December 14, 1966.

9. Authorized place of storage: 9200 Latty Avenue
   Hazelwood, Missouri

For the U. S. ATOMIC ENERGY COMMISSION

Date of issuance ____

Don F. Harmon
Division of Materials Licensi

COPY

COTTER00000733

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT D

DML:DF:
40-8C35

DEC 3 . 1969

Cotter Corporation
P. O. Box 1000
Roswell, New Mexico  88201

Attention:  Mr. David F. Marcott
            Executive Vice President and
            General Manager

Gentlemen:

    Enclosed is AEC Source Material License No. SUB-1022.

               Sincerely,

               Original signed by
               Don F. Harmon

               Don F. Harmon
               Source and Special Nuclear
                 Materials Branch
               Division of Materials Licensing

Enclosure:
As stated

DISTRIBUTION:
PDR, w/encl.
State Health [license only]
Docket file, w/encl.
Branch R/F, w/encl.
Division R/F, w/o encl.
Harmon's R/F, w/encl.
CO, Region IV, w/encl.
N. Doulos, DML

| OFFICE ▶ | DML | | | | |
|---|---|---|---|---|---|
| SURNAME ▶ | DFHarmon/dmb | | | | |
| DATE ▶ | 12/30/69 | | | | |

Form AEC-318 (Rev. 9-53) AECM 0240      U S GOVERNMENT PRINTING OFFICE 1968 0—294-413

COTTER00000815

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Form AEC—410
(3-61)

# UNITED STATES
## ATOMIC ENERGY COMMISSION

### SOURCE MATERIAL LICENSE

Pursuant to the Atomic Energy Act of 1954, and Title 10, Code of Federal Regulations, Chapter 1, Part 40, "Licensing of Source Material," and in reliance on statements and representations heretofore made by the licensee, a license is hereby issued authorizing the licensee to receive, possess and import the source material designated below; to use such material for the purpose(s) and at the place(s) designated below; and to deliver or transfer such material to persons authorized to receive it in accordance with the regulations in said Part. This license shall be deemed to contain the conditions specified in Section 183 of the Atomic Energy Act of 1954 and is subject to all applicable rules, regulations, and orders of the Atomic Energy Commission, now or hereafter in effect, including Title 10, Code of Federal Regulations, Chapter 1, Part 20, "Standards for Protection Against Radiation," and to any conditions specified below.

| Licensee | |
|---|---|
| 1. Name    Cotter Corporation | **3. License No.**  SUB-1022 |
| 2. Address    P. O. Box 1000  Roswell, New Mexico  88201 | **4. Expiration Date**  December 31, 1974 |
| | **5. Docket No.**  40-8035 |

| 6. Source Material  Uranium | 7. Maximum quantity of source material which licensee may possess at any one time under this license  Unlimited |
|---|---|

## CONDITIONS

8. Authorized use (Unless otherwise specified, the authorized place of use is the licensee's address stated in Item 2 above.)

For use in accordance with the procedures described in the licensee's application dated December 16, 1969.

9. Authorized place of use: The licensee's facility located at 9200 Latty Avenue, Hazelwood, Missouri.

DH
12/30/69

For the U. S. ATOMIC ENERGY COMMISSION
Original signed by
Don F. Harmon

Date of issuance    DEC 3 . 1969

Don F. Harmon
Division of Materials Licensing

✦ U. S. GOVERNMENT PRINTING OFFICE : 1962 O-632845

COTTER00000816

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM



# Cotter Corporation
## General Office

303-980-1292
12596 WEST BAYAUD AVENUE, SUITE 350
LAKEWOOD, COLORADO 80228

RECEIVED

SEP 09 1991

SAFE SECTION

September 6, 1991

Site: Westlake LDF
ID #: MAD079900932
Break: 11.6    au#1
Other: Cotter Corp.
0714    9-6-91

Ms. Diana L. Newman
U.S. EPA, Region VII
Superfund Branch
726 Minnesota Avenue
Kansas City, Kansas  66101

Re:  CERCLA 104(e) Information Requests
     to Cotter Corporation

Dear Ms. Newman:

Enclosed are Cotter Corporation's responses
to EPA's CERCLA 104(e) Information Requests dated July
12, 1991.

Very truly yours,

COTTER CORPORATION

By _____
   Joseph P. McCluskey

JPMc/dd

Enclosures

016.JPM

40057631
SUPERFUND RECORDS

COT 0002

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**COTTER CORPORATION RESPONSES
TO EPA
REQUESTS FOR INFORMATION
DATED JULY 12, 1991**

## GENERAL OBJECTIONS

Cotter Corporation objects to these requests to the extent they seek information that is protected by the attorney-client privilege or the attorney work product doctrine.

Re: Definition 16.  Cotter has searched its records for all information requested by Definition 16 in conjunction with these requests.  On the grounds of undue burden, however, Cotter objects to the extent that the definition requires Cotter to search records that are equally available to the EPA (e.g., public records).  As a courtesy to EPA, Cotter has provided some non-corporate and/or public records that were found in Cotter's files during the search, however, in providing these documents to EPA, Cotter does not intend to waive this objection in any way, nor does Cotter make any representations as to the accuracy or authenticity of any non-corporate and/or public documents that have been provided, nor does Cotter adopt the statements made in such documents.

## RESPONSES

1.   Identify each person who assisted, or is assisting, in the preparation of the answers to this request for information.

    **Response:**    Joseph P. McCluskey
Cotter Corporation
12596 W. Bayaud Ave., #350
Lakewood, Colorado  80228
(303) 980-1292

    Rich Ziegler
Cotter Corporation
12596 W Bayaud Ave., #350
Lakewood, Colorado  80228
(303) 980-1292

    Harlan M. Dellsy
Commonwealth Edison Co.
P.O. Box 767
Chicago, Illinois  60690
(312) 294-4321

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

John L. Watson as well as other
Attorneys and Staff of:
Holme Roberts & Owen
1700 Lincoln; Suite 4100
Denver, Colorado  80203
(303) 861-7000

2.   Identify, if not you, the official or representative of
     Respondent to contact regarding the requested information.

   **Response:**      Joseph P. McCluskey
                      Cotter Corporation
                      12596 W. Bayaud Ave., #350
                      Lakewood, Colorado  80228
                      (303) 980-1292

                      Rich Ziegler
                      Cotter Corporation
                      12596 W Bayaud Ave., #350
                      Lakewood, Colorado  80228
                      (303) 980-1292

3.   Please provide the following information:

   **Response:**      See responses to 3.1 through 3.7,
                      inclusive.

   3.1   The full and correct name of Respondent;

   **Response:**      Cotter Corporation, (N.S.L.)

   3.2   The date of its incorporation or formation;

   **Response:**      February 27, 1956

   3.3   The state of its incorporation or formation;

   **Response:**      New Mexico

   3.4   The nature of its business;

   **Response:**      Uranium mining and uranium milling.

   3.5   Respondent's principal place of business;

   **Response:**      12596 W. Bayaud Ave.
                      Suite #350
                      Lakewood, Colorado  80228

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

3.6   Names and addresses of Respondent's officers and
       directors; and

**Response:**     <u>DIRECTORS</u>

Harlan M. Dellsy
Commonwealth Edison Co.
P.O. Box 767
Chicago, Illinois  60690

Joseph P. McCluskey
Cotter Corporation
12596 W. Bayaud Ave., #350
Lakewood, Colorado  80228

James J. O'Connor
Commonwealth Edison Co.
P.O. Box 767
Chicago, Illinois  60690

George P. Rifakes
Commonwealth Edison Co.
P.O. Box 767
Chicago, Illinois  60690

Ernest M. Roth
Commonwealth Edison Co.
P.O. Box 767
Chicago, Illinois  60690


<u>OFFICERS</u>

Harlan M. Dellsy
Commonwealth Edison Co.
P.O. Box 767
Chicago, Illinois  60690
Vice President and General Counsel

Joseph P. McCluskey
Cotter Corporation
12596 W Bayaud Ave., #350
Lakewood, Colorado  80228
Executive Vice President and General
Manager

Rich Ziegler
Cotter Corporation
12596 W Bayaud Ave., #350
Lakewood, Colorado  80228
Vice President, Secretary, and Treasurer

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

James J. O'Connor
Commonwealth Edison Co.
P.O. Box 767
Chicago, Illinois  60690
Chairman

George P. Rifakes
Commonwealth Edison Co.
P.O. Box 767
Chicago, Illinois  60690
President

Ernest M. Roth
Commonwealth Edison Co.
P.O. Box 767
Chicago, Illinois  60690
Vice President

Roger F. Kovak
Commonwealth Edison Co.
P.O. Box 767
Chicago, Illinois  60690
Controller

Richard E. Martin
Commonwealth Edison Co.
P.O. Box 767
Chicago, Illinois  60690
Assistant Treasurer

William L. Ramey
Commonwealth Edison Co.
P.O. Box 767
Chicago, Illinois  60690
Assistant Secretary

3.7   Respondent's parent corporation or organization.

**Response:**      Commonwealth Edison Company

4.   If Respondent has any subsidiaries or affiliates, please
     state the following with respect to each subsidiary or
     affiliate:

**Response:**      Cotter Corporation does not have any
                   subsidiaries or affiliates.

4.1   The full and correct name of each;

**Response:**      Cotter Corporation does not have any
                   subsidiaries or affiliates.

-4-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

4.2   The address of its principal place of business;

**Response:**      Cotter Corporation does not have any subsidiaries or affiliates.

4.3   If a corporation, the state of its incorporation;

**Response:**      Cotter Corporation does not have any subsidiaries or affiliates.

4.4   Its relationship to Respondent's business or corporation;

**Response:**      Cotter Corporation does not have any subsidiaries or affiliates.

4.5   The name, address, and title of each officer and director;

**Response:**      Cotter Corporation does not have any subsidiaries or affiliates.

4.6   The name and address of the resident agent; and

**Response:**      Cotter Corporation does not have any subsidiaries or affiliates.

4.7   The principal business in which such entity is involved.

**Response:**      Cotter Corporation does not have any subsidiaries or affiliates.

5.   If Respondent is a subsidiary of, a division of, a franchise of or part of the organization of any other corporation, entity or organization, please state the following with regard to each such corporation, entity or organization:

**Response:**      Cotter Corporation is a subsidiary of Commonwealth Edison Co.

5.1   Its relationship to Respondent's entity, organization, or corporation;

**Response:**      Wholly Owned Subsidiary.

5.2   Its principal office;

**Response:**      One First National Plaza
Chicago, Illinois

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

5.3   The state of its incorporation or organization;

**Response:**      Illinois.

5.4   The date of its incorporation or organization;

**Response:**      Commonwealth Edison Company was
incorporated as such on September 16, 1907.
The Chicago Edison Company, the first
predecessor company was incorporated on
April 8, 1887.

5.5   Its principal business;

**Response:**      Electric Utility.

5.6   The commencement date of its relationship with
Respondent's entity, organization, or corporation;
and

**Response:**      Commonwealth Edison Company acquired Cotter
Corporation on July 31, 1974.

5.7   Names and addresses of its officers and directors.

**Response:**      <u>DIRECTORS</u>

Jean Allard
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

James W. Compton
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

R. Robert Funderburg
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

Donald P. Jacobs
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

George E. Johnson
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Harvey Kapnick
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

Byron Lee, Jr.
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

Thomas L. Martin, Jr.
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

Edward A. Mason
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

Patrick G. Ryan
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

Lando W. Zech, Jr.
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

James J. O'Connor
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

Bide L. Thomas
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

OFFICERS

Bide L. Thomas
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
President

-7-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Cordell Reed
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Senior Vice President

Ernest M. Roth
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Senior Vice President

John C. Bukovski
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Vice President

Harlan M. Dellsy
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Vice President and General Counsel

Dennis P. Galle
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Vice President

J. Stanley Graves
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Vice President

Thomas J. Maiman
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767

Robert J. Manning
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Vice President

Donald A. Petkus
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Vice President

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

George P. Rifakes
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Vice President

J. Patrick Sanders
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Vice President

John J. Viera
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Vice President

Michael J. Wallace
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Vice President

Roger F. Kovack
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Comptroller

Dennis F. O'Brien
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Treasurer

David A. Scholz
Commonwealth Edison Company
P.O. Box 767
Chicago, Illinois  60690-0767
Secretary

6.   Describe any clean-up or removal of hazardous substances
     as defined in CERCLA § 101(14); 42 U.S.C. § 9601(14), at
     the site.

     **Response:**      As of the date of these responses, Cotter
                        Corporation has found no corporate or
                        personal information that would allow it to
                        respond to this request.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

7.   What arrangements were made to transport these hazardous
     substances?

**Response:**       As of the date of these responses, Cotter
                    Corporation has found no corporate or
                    personal information that would allow it to
                    respond to this request.

8.   With respect to all hazardous substances disposed of at
     the West Lake Landfill by Respondent, provide the
     following information:

**Response:**       **GENERAL OBJECTION AND INITIAL RESPONSE:**
                    As of the date of these responses, Cotter
                    Corporation has not found any personal or
                    corporate information of any relationship
                    between Cotter and West Lake Landfill, nor
                    has Cotter found any personal or corporate
                    information that any hazardous substances,
                    wastes or other materials of any kind
                    whatsoever were hauled to or disposed of at
                    the site known as West Lake Landfill.

                    Cotter Corporation is aware, however, that
                    an investigation report published by the
                    U.S. Nuclear Regulatory Commission (IE
                    Investigation Report No. 76-01) alleges
                    that material from the former Commercial
                    Discount Corporation, 9200 Latty Avenue,
                    Hazlewood, Missouri property was deposited
                    by B&K Construction "...in an area adjacent
                    to the office building [at West Lake
                    Landfill]."  Reference to the NRC report
                    above is a courtesy to EPA and does not
                    constitute Cotter's endorsement or adoption
                    of this report or the information therein.
                    Insofar as this request asks for
                    information regarding these allegations,
                    Cotter states as follows:

                    See responses to 8.1 through 8.6,
                    inclusive.

8.1   Time period or periods over which each of these
      substances was disposed;

**Response:**       <u>See</u> GENERAL OBJECTION AND INITIAL RESPONSE
                    recited at the beginning of the response to
                    request 8.

                    In or about October of 1972, Cotter
                    contracted with B&K Construction to restore
                    the property located at 9200 Latty Avenue,

                                -10-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Hazlewood, Missouri; however, as of the date of these responses, Cotter has found no other corporate or personal information regarding this request.

8.2 Quantity (weight and volume) of each of these wastes disposed;

Response: See GENERAL OBJECTION AND INITIAL RESPONSE recited at the beginning of the response to request 8.

A letter dated October 1, 1968, from Warren E. Goff of Cotter to S.R. Sapirie of the United States Atomic Energy Commission gives an estimate of "...2500 tons of spent Barium Sulfate..." being present at the "drying plant" in Hazlewood, Missouri [9200 Latty Avenue]. This letter requests permission from the United States Atomic Energy Commission "to dispose of this material at the AEC 'Quarry' burial site at Weldon Springs."

8.3 Nature and condition of any containers in which these wastes were placed prior to disposal;

Response: See GENERAL OBJECTION AND INITIAL RESPONSE recited at the beginning of the response to request 8.

As of the date of these responses, Cotter Corporation has found no corporate or personal information that would allow it to respond to this request.

8.4 List of transporters for each of these wastes, including company name, address, telephone number, and EPA identification number;

Response: See GENERAL OBJECTION AND INITIAL RESPONSE recited at the beginning of the response to request 8.

In or about October of 1972, Cotter entered into an agreement with B&K Construction Company in which B&K Construction Company would perform certain activities at the former Commercial Discount Corporation property located at 9200 Latty Avenue. Pursuant to this agreement, B&K Construction Company's activities included

-11-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

the hauling and dumping of radioactive mineral residue at the "Weldon Springs disposal area."

B&K Construction Company
    Last known address:
4140 Cypress Road
St. Ann, Missouri  63074
(???) 427-5666
Other information unknown to Cotter.

8.5    Results of any sample analyses performed on these wastes prior to disposal; and

Response:    <u>See</u> GENERAL OBJECTION AND INITIAL RESPONSE recited at the beginning of the response to request 8.

As of the date of these responses, Cotter Corporation has found no corporate or personal information that would allow it to respond to this request.

8.6    Results of any sampling analyses performed on these wastes subsequent to disposal.

Response:    <u>See</u> GENERAL OBJECTION AND INITIAL RESPONSE recited at the beginning of the response to request 8.

As of the date of these responses, Cotter Corporation has found no corporate or personal information that would allow it to respond to this request.

9.    Provide names, titles, addresses, and telephone numbers of employees or agents who were involved in making arrangements concerning the hauling and disposal of hazardous wastes and/or substances into the West Lake Landfill Site.  Such individuals might include contracting officers, foremen, bookkeepers, accountants, facility workers, etc.

Response:    **GENERAL OBJECTION AND INITIAL RESPONSE:** As of the date of these responses, Cotter Corporation has not found any personal or corporate information of any relationship between Cotter and West Lake Landfill, nor has Cotter found any personal or corporate information that any hazardous substances, wastes or other materials of any kind whatsoever were hauled to or disposed of at the site known as West Lake Landfill.

-12-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Cotter Corporation is aware, however, that an investigation report published by the U.S. Nuclear Regulatory Commission (IE Investigation Report No. 76-01) alleges that material from the former Commercial Discount Corporation, 9200 Latty Avenue, Hazlewood, Missouri property was deposited by B&K Construction Company "...in an area adjacent to the office building [at West Lake Landfill]."  Reference to the NRC report above is a courtesy to EPA and does not constitute Cotter's endorsement or adoption of this report or the information therein.

10. Provide details of the relationship(s) between Respondent, West Lake Landfill, Inc., Rock Road Industries, Inc., West Lake Quarry and Material Company, West Lake Ready Mix Company, Red Bird Ready Mix Company, Laidlaw Waste Systems (Bridgeton), Inc., Laidlaw Waste Systems, Inc., the Archdiocese of St. Louis, the Shrine of St. Jude, and the Society for the Propagation of Faith.

    Response:    As of the date of these responses, Cotter Corporation has found no corporate or personal information relating to any relationship with any of the entities listed in this request.

11. Identify all persons contracted to haul or dispose of hazardous substances and methods utilized for hauling or transporting material for Respondent.  List dates that the individuals were utilized to provide such services and provide copies of all relevant records documenting such services.

    Response:    **GENERAL OBJECTION AND INITIAL RESPONSE:** As of the date of these responses, Cotter Corporation has not found any personal or corporate information of any relationship between Cotter and West Lake Landfill, nor has Cotter found any personal or corporate information that any hazardous substances, wastes or other materials of any kind whatsoever were hauled to or disposed of at the site known as West Lake Landfill.

    Cotter further objects to this request because it is vague and unduly burdensome insofar as it asks for information

-13-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

unrelated to the site known as West Lake
Landfill. As this request may relate to
the "site" known as West Lake Landfill,
Cotter refers to its responses to requests
numbered 8 through 8.4.

12. Did the Respondent direct any transporter(s) to dispose of
its radioactive material at a designated site? If so,
identify the designated sites.

Response:     **GENERAL OBJECTION AND INITIAL RESPONSE:**
As of the date of these responses, Cotter
Corporation has not found any personal or
corporate information of any relationship
between Cotter and West Lake Landfill, nor
has Cotter found any personal or corporate
information that any hazardous substances,
wastes or other materials of any kind
whatsoever were hauled to or disposed of at
the site known as West Lake Landfill.

Cotter further objects to this request
because it is vague and unduly burdensome
insofar as it asks for information
unrelated to the site known as West Lake
Landfill. As this request may relate to
the site known as West Lake Landfill,
Cotter states as follows:

In May of 1972, B&K Construction Company
(B&K) submitted two separate letter
proposals for the restoration of the 9200
Latty Avenue, Hazlewood, Missouri property
to Ryckman, Edgerley, Tomlinson &
Associates (RETA). These proposals both
specify the United States Atomic Energy
Commission's Weldon Springs disposal area.

Subsequently, in or about October of 1972,
Cotter and B&K entered into a contract
whereby B&K would restore the 9200 Latty
Avenue, Hazlewood, Missouri property under
the supervision of RETA. This contract
states that the materials removed are
"...to be dumped at the Weldon Springs
disposal area..." which, on information and
belief, was owned and operated by the
United States Atomic Energy Commission.

-14-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

13. **What is the relationship of Respondent and B&K Construction?**

Response:   On or about July 20, 1970, Cotter Corporation contracted B&K Construction (B&K) to dry the materials stored at 9200 Latty Avenue, Hazlewood, Missouri, and to transport them to Cotter's Canon City, Colorado facility. During the performance of this contract, a dispute arose regarding payment to B&K for periods during which mechanical failures prevented drying operations. As a result of this dispute, Cotter filed a replevin action (Circuit Court for the County of St. Louis, Cause No. 321030, Assignment Division) against B&K in the spring of 1971 in order to recover a bulldozer.

In May of 1972, B&K submitted two separate letter proposals for the restoration of the 9200 Latty Avenue, Hazlewood, Missouri property to Ryckman, Edgerley, Tomlinson & Associates (RETA). These proposals were forwarded to Cotter by RETA on or about May 25, 1972, with a recommendation that Cotter enter a contract with B&K.

In or about October of 1972, Cotter and B&K entered into a contract whereby B&K would restore the 9200 Latty Avenue, Hazlewood, Missouri property under the supervision of RETA.

On or about May 24, 1976, Robert S. Davis of B&K submitted a proposal for removing waste residue from the "Weldon Springs Site" and loading this material onto railcars. For the purposes of this proposal, Mr. Davis indicated that he would operate under the name R.S. Davis Contracting Company, 1219 Port Royal Drive, St. Louis, Missouri 63141. Cotter never pursued this project.

On or about August 3, 1978, Cotter received a proposal from B&K for certain activities to be undertaken at the 9200 Latty Avenue property.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

14. Provide names, telephone numbers, and addresses of persons with knowledge of B&K Construction.

Response:  Rich Ziegler
Cotter Corporation.
12596 W Bayaud Ave., #350
Lakewood, Colorado  80228
(303) 980-1292

The various historical documents provided with these requests indicate that the following persons may have at one time had knowledge of B&K Construction; however, Cotter makes no representation as to the recollection of these persons.

David P. Marcott
701 Ridgewood Road
Canon City, Colorado  81212
(719) 269-3854

Warren Goff
206 N. 15th Street
Canon City, Colorado  81212
(719) 275-6913

Phillip K. Feeney
 Last known address
Ryckman, Edgerley, Tomlinson & Associates
12161 Lackland Road
St. Louis, Missouri  63141
(314) 434-6960

Robert S. Davis, Jr.
 Last known address:
B&K Construction Company
4140 Cypress Road
St. Ann, Missouri  63074
(???) 427-5666
 Other information unknown to Cotter.

Kenneth F. Davis, President
 Last known address:
B&K Construction Company
4140 Cypress Road
St. Ann, Missouri  63074
(???) 427-5666
 Other information unknown to Cotter.

-16-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

15. Provide a description of any manufacturing or processing activities that utilized hazardous substances.

Response:      Cotter objects to this request because it is vague and unduly burdensome insofar as it asks for information unrelated to the site known as West Lake Landfill. Cotter Corporation is aware, however, that an investigation report published by the U.S. Nuclear Regulatory Commission (IE Investigation Report No. 76-01) alleges that material from the former Commercial Discount Corporation, 9200 Latty Avenue property was deposited by B&K Construction "...in an area adjacent to the office building [at West Lake Landfill]." Reference to the NRC report above is a courtesy to EPA and does not constitute Cotter's endorsement or adoption of this report or the information therein. Insofar as this request asks for information regarding these allegations, Cotter states as follows:

Between approximately 1968 and July of 1969, Commercial Discount Corporation processed certain materials formerly owned by or in the custody of the United States Atomic Energy Commission through a drying facility, located at 9200 Latty Avenue, under Commercial Discount Corporation's source material license issued by the United States Atomic Energy Commission. The dried materials were then sent to Cotter's Canon City, Colorado facility.

In approximately July of 1969, Commercial Discount Corporation terminated its agreement with Cotter Corporation. In August of 1969, Cotter Corporation entered into a second purchase agreement with Commercial Discount Corporation in which Cotter Corporation assumed responsibility for the drying operations.

On or about July 20, 1970, Cotter Corporation contracted with B&K Construction (B&K) pursuant to which B&K was to dry and transport the materials stored at 9200 Latty Avenue, Hazlewood, Missouri. This contract required B&K to dry the materials using equipment located

-17-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

at 9200 Latty Avenue and load the dried materials onto railcars for transport to Cotter's Canon City facility.   Cotter believes that B&K used substantially the same equipment that was previously used by Commercial Discount Corporation for the same purpose.   As of the date of these responses, Cotter has not found a precise process description regarding the 9200 Latty Avenue facility.

16. Provide copies of boring logs, geologic reports, well logs, well locations, soil samples, and all sampling data including sampling locations of all such samples for the site.

    **Response:**      As of the date of these responses, Cotter Corporation has found no corporate or personal information that would allow it to respond to this request.

17. Provide a description of the method of waste disposal (e.g., whether the waste was compacted or crushed prior to disposal), the thickness of waste deposited, and the amount of clean cover on top of the waste.

    **Response:**      Cotter objects to this request because it is vague and unduly burdensome insofar as it asks for information unrelated to the site known as West Lake Landfill.   As this request may relate to the site known as West Lake Landfill, Cotter states as follows:

                  As of the date of these responses, Cotter Corporation has found no personal or corporate information that would allow it to respond to this request.

                  Cotter Corporation is aware, however, that an investigation report published by the U.S. Nuclear Regulatory Commission (IE Investigation Report No. 76-01) may contain information that may be responsive to this request.   Reference to the NRC report above is a courtesy to EPA and does not constitute Cotter's endorsement or adoption of this report or the information therein.

-18-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

18. Provide narrative and documentary information as to any waste Respondent or West Lake Landfill, has ever had transported off site, including but not limited to:

> **Response:** As of the date of these responses, Cotter Corporation has found no corporate or personal information that would allow it to respond to this request.

18.1 Shipping manifests;

> **Response:** As of the date of these responses, Cotter Corporation has found no documents that would allow it to respond to this request.

18.2 Shipping logs;

> **Response:** As of the date of these responses, Cotter Corporation has found no documents that would allow it to respond to this request.

18.3 Receipts;

> **Response:** As of the date of these responses, Cotter Corporation has found no documents that would allow it to respond to this request.

18.4 Weights tickets; and/or

> **Response:** As of the date of these responses, Cotter Corporation has found no documents that would allow it to respond to this request.

18.5 Permits.

> **Response:** As of the date of these responses, Cotter Corporation has found no documents that would allow it to respond to this request.

19. Provide the names, addresses, and telephone numbers of all persons responsible for the financial recordkeeping for Respondent, past and present.

> **Response:** Jesse Link, Jr.
> P.O. Box 1000
> Roswell, New Mexico
> (505) 632-5600
>
> Duane A. Dughman
> 241 S.E. 22nd Street
> Loveland, Colorado  80537-7351
> (303) 962-9548

-19-

Helen L. Bowman
P.O. Box 261298
Lakewood, Colorado  80226
(303) 237-3834

Rich D. Ziegler
12596 W. Bayaud Avenue
Suite #350
Lakewood, Colorado  80228
(303) 980-1292

William A. Allen
c/o Donna Farrell (TCL)
Pioneer Group Inc.
60 State Street
Boston, Massachusetts  02109-1820
(0362) 598/460 (West Africa)

Jerry L. Holloway
12596 W. Bayaud Avenue
Suite #350
Lakewood, Colorado  80228
(303) 980-1292

20. Provide copies of the meeting minutes of the corporate
    directors' meetings, for all the years during which
    Respondent held an interest or was affiliated with the
    site.

    **Response:**      As of the date of these responses, Cotter
                       Corporation has found no relationship or
                       affiliation between itself and the site
                       known as West Lake Landfill.

21. Do you have any knowledge of releases of hazardous wastes
    or hazardous constituents (see 40 C.F.R. Part 261,
    Appendix VIII) into the environment (air, surface water,
    groundwater, or soil) from the site at any time in the
    past or present?  If yes, provide a complete description
    of each release, including but not limited to:

    **Response:**      Cotter does not have any corporate or
                       personal knowledge of any releases of any
                       hazardous wastes, hazardous constituents,
                       hazardous substances, or other materials of
                       any kind whatsoever into the environment
                       from the site known as West Lake Landfill
                       at any time in the past or present.
                       Therefore, Cotter has not responded to
                       requests numbered 21.1 through 21.8.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

21.1   Location of release;

**Response:**

21.2   Waste or constituents released;

**Response:**

21.3   Quantities of release;

**Response:**

21.4   Date of release;

**Response:**

21.5   Cause of release;

**Response:**

21.6   Environmental impact of release and response;

**Response:**

21.7   Response actions taken; and

**Response:**

21.8   Measures taken to prevent the recurrence of release.

**Response:**

22.   Provide a detailed description of the area where
      Respondent deposited radioactive materials at West Lake
      Landfill, including a legal description.

**Response:**      **GENERAL OBJECTION AND INITIAL RESPONSE:**
              As of the date of these responses, Cotter
              Corporation has not found any personal or
              corporate information of any relationship
              between Cotter and West Lake Landfill, nor
              has Cotter found any personal or corporate
              information that any radioactive materials
              were hauled to or disposed of at the site
              known as West Lake Landfill.

              Cotter Corporation is aware, however, that
              an investigation report published by the
              U.S. Nuclear Regulatory Commission (IE
              Investigation Report No. 76-01) alleges
              that material from the former Commercial

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Discount Corporation, 9200 Latty Avenue property was deposited by B&K Construction Company "...in an area adjacent to the office building [at West Lake Landfill]." Reference to the NRC report above is a courtesy to EPA and does not constitute Cotter's endorsement or adoption of this report or the information therein.

23. Describe in detail, the relationship between West Lake Landfill, Inc., and the Respondent, regarding the disposal of hazardous substances at West Lake Landfill.

Response:      **GENERAL OBJECTION AND INITIAL RESPONSE:** As of the date of these responses, Cotter Corporation has not found any personal or corporate information of any relationship between Cotter and West Lake Landfill, nor has Cotter found any personal or corporate information that any hazardous substances were hauled to or disposed of at the site known as West Lake Landfill.

Cotter Corporation is aware, however, that an investigation report published by the U.S. Nuclear Regulatory Commission (IE Investigation Report No. 76-01) alleges that material from the former Commercial Discount Corporation, 9200 Latty Avenue property was deposited by B&K Construction "...in an area adjacent to the office building [at West Lake Landfill]." Reference to the NRC report above is a courtesy to EPA and does not constitute Cotter's endorsement or adoption of this report or the information therein.

24. Provide information describing the location and amount of radioactive waste disposed at West Lake Landfill.  Provide information about the ownership of the radioactive waste before its disposal at the landfill.

Response:      **GENERAL OBJECTION AND INITIAL RESPONSE:** As of the date of these responses, Cotter Corporation has not found any personal or corporate information of any relationship between Cotter and West Lake Landfill, nor has Cotter found any personal or corporate information that any radioactive waste was hauled to or disposed of at the site known as West Lake Landfill.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Cotter Corporation is aware, however, that an investigation report published by the U.S. Nuclear Regulatory Commission (IE Investigation Report No. 76-01) alleges that material from the former Commercial Discount Corporation, 9200 Latty Avenue property was deposited by B&K Construction Company "...in an area adjacent to the office building [at West Lake Landfill]." Reference to the NRC report above is a courtesy to EPA and does not constitute Cotter's endorsement or adoption of this report or the information therein.  Insofar as this request asks for information regarding these allegations, Cotter provides the following ownership information with regard to the various materials that were associated with the former Commercial Discount Corporation, 9200 Latty Avenue property.

In a letter dated June 10, 1960, the United States Atomic Energy Commission solicited a bid from Cotter Corporation for the "purchase and removal of certain items of uranium contaminated residues."  These residues were identified as;  1) "Pitchblende Raffinate" (residue from processing Belgian Congo pitchblende, hereafter referred to as Congo raffinate); 2) "Colorado Raffinate";  3) "Barium Sulfate Cake (Unleached)";  4) "Barium Cake (Leached)";  and, 5) "Miscellaneous Residues."  Cotter Corporation did not purchase these residues pursuant to this request for bids.

The United States Atomic Energy Commission published one or more subsequent invitations to bid for certain materials between 1960 and about 1965, including Invitation to Bid No. AT-(23-2)-53, dated August 3, 1964; Invitation to Bid No. AT-(23-2)-52, dated January 10, 1964; and, Invitation to Bid No. AT-(23-2)-46, dated March 7, 1962.

On or about February 25, 1966, the United States Atomic Energy Commission apparently sold certain materials to Continental Mining & Milling Co. (Continental), under Contract No. AT-(23-2)-56.  Subsequently,

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

on or about September 26, 1966, Continental
also purchased approximately 3500 tons of
"C-liner slag" (C-slag) from the United
States Atomic Energy Commission under
"Modification No. 1" to the above contract.
Upon information and belief, Continental
transferred all of these materials to its
property located at 9200 Latty Avenue,
Hazlewood, Missouri.  Copies of relevant
documents found in Cotter's files are
provided as a courtesy to EPA; however,
Cotter makes no representations as to the
authenticity or accuracy of these
documents, nor does Cotter endorse or adopt
the information therein.

Certain material and real property was
subsequently transferred to Commercial
Discount Corporation (CDC) on or about
February 3, 1967, through foreclosure
proceedings, as is evidenced by public
documents apparently recorded in St. Louis
County.  Copies of relevant documents found
in Cotter's files are provided as a
courtesy to EPA; however, Cotter makes no
representations as to the authenticity or
accuracy of these documents, nor does
Cotter endorse or adopt the information
therein.

During the spring of 1967, it is apparent
that Cotter was negotiating with CDC for
the purchase of certain material owned by
or in the custody of the United States
Atomic Energy Commission.  Cotter
subsequently purchased certain quantities
of the Congo raffinate, the Colorado
raffinate, the C-slag, and the Unleached
Barium Sulfate from CDC in an agreement
dated June 9, 1967.  Pursuant to paragraph
1(a) of this agreement, title to the
materials purchased passed to Cotter upon
delivery of the material to Cotter's
facility in Canon City, Colorado.

By letter to Cotter Corporation from CDC's
counsel dated July 25, 1969, CDC terminated
the June 9, 1967 agreement.

A second agreement between CDC and Cotter
was executed on or about August 7, 1969, in
which Cotter purchased certain materials

-24-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

located at the 9200 Latty Avenue property.
In this agreement Cotter was responsible
for transporting certain materials to its
Canon City, Colorado facility and for
undertaking certain other activities at
CDC's property.

25. Provide a list of all Federal, State and/or local permits
with their respective number, contracts, licenses, or
agreements which involved the disposal of, transporting
of, or ownership of hazardous substances and/or hazardous
wastes by the Respondent.

**Response:**        Cotter objects to this request because it
is vague and unduly burdensome insofar as
it asks for information unrelated to the
site known as West Lake Landfill.  Cotter
Corporation is aware, however, that an
investigation report published by the U.S.
Nuclear Regulatory Commission (IE
Investigation Report No. 76-01) alleges
that material from the former Commercial
Discount Corporation, 9200 Latty Avenue
property was deposited by B&K Construction
"...in an area adjacent to the office
building [at West Lake Landfill]."
Reference to the NRC report above is a
courtesy to EPA and does not constitute
Cotter's endorsement or adoption of this
report or the information therein.  Insofar
as this request asks for information
regarding these allegations, Cotter states
as follows:

Cotter's activities at the 9200 Latty
Avenue property were performed under United
States Atomic Energy Commission Source
Material License Number SUB-1022.

26. Is Respondent covered by any type of liability insurance
for sudden or non-sudden accidental releases of any
hazardous substances or constituents or for any other
liability resulting from your facility's handling of
solvents, acids, metals or other hazardous substances?  If
so, please state.

**Response:**        Many of the policies that Cotter held or
may have held which are older than 7 years
are incomplete or missing entirely from
Cotter's files.  Cotter believes that the
following information is responsive to
EPA's requests; however, some of these

-25-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

policies may have coverage exclusions that were not identified from the information available.  Cotter refers to its responses to requests 26.1 through 26.5, inclusive.

26.1  The name and address of the insurer;

**Response:**    a.   American National Fire Insurance Co.

b.   American National Fire Insurance Co.

c.   American National Fire Insurance Co.

d.   Northbrook Excess and Surplus Insurance Co.

e.   Northbrook Excess and Surplus Insurance Co.

f.   Lexington Insurance Co.

g.   Lexington Insurance Co.

h.   Underwriter's at Lloyd's London

i.   International Insurance Co.

j.   American Employers Insurance Co.

k.   American Employers Insurance Co.

l.   American Employers Insurance Co.

m.   Insurance Company of North America

n.   American Empire Surplus Lines Insurance Company

o.   American Employer's Insurance Co.

p.   Insurance Company of North America

q.   Insurance Company of North America

r.   Insurance Company of North America

s.   Insurance Company of North America

t.   Insurance Company of North America

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

26.2   The number of the policy;

**Response:**       a.    SLP 9 43 52 91

b.    SLP 9 43 46 49

c.    SLP 3-19-85-17

d.    63 008 020

e.    63 006-777

f.    500 15 16

g.    500 03 38

h.    52700

i.    523 402093 8

j.    CLA30-2575-30

k.    CL AE 209818

l.    CL AE 9062106

m.    XCP 52 07

n.    5 CX 0 21 76

o.    AE-8062-101

p.    GLP 09 79 92

q.    TF 10 48 07

r.    TF 10 97 16

s.    TF 10 97 26

t.    TF 11 52 87

26.3   The effective dates of the policy;

**Response:**       a.    06/01/81 - 06/01/82

b.    06/01/78 - 06/01/81

c.    06/01/75 - 06/01/78

d.    06/01/81 - 06/01/82

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

e.   06/01/80 – 06/01/81

f.   01/01/74 – 01/01/77

g.   01/01/78 – 01/01/79

h.   07/05/74 – 07/05/77

i.   08/09/85 – 08/09/86

j.   06/01/68 – 06/01/69

k.   06/01/71 – 06/01/72

l.   06/01/73 – 06/01/74

m.   04/15/70 – 04/15/71

n.   08/09/85 – 08/09/86

o.   01/09/73 – 01/09/74

p.   04/15/69 – 04/15/70

q.   04/15/69 – 04/15/70

r.   04/15/73 – 04/15/74

s.   04/15/74 – 04/15/75

t.   04/15/75 – 04/15/76

26.4  The limits of liability; and

**Response:**    a.    <u>Bodily Injury</u>
$500,000 each occurrence,
$500,000 aggregate products and
completed operations
<u>Property Damage</u>
$500,000 each occurrence,
$500,000 aggregate operations,
$500,000 aggregate protective,
$500,000 aggregate products and
completed operations,
$500,000 aggregate contractual.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

b.  <u>Bodily Injury</u>
$500,000 each occurrence,
$500,000 aggregate products and
completed operations
<u>Property Damage</u>
$500,000 each occurrence,
$500,000 aggregate operations,
$500,000 aggregate protective,
$500,000 aggregate products and
completed operations,
$500,000 aggregate contractual.

c.  <u>Bodily Injury</u>
$300,000 each occurrence,
$300,000 aggregate products and
completed operations
<u>Property Damage</u>
$100,000 each occurrence,
$100,000 aggregate operations,
$100,000 aggregate protective,
$100,000 aggregate products and
completed operations,
$100,000 aggregate contractual.

d.  $10,000,000 each occurrence,
$10,000,000 aggregate for each annual
period,
$10,000 retained limit each
occurrence.

e.  $10,000,000 each occurrence,
$10,000,000 aggregate for each annual
period,
$25,000 retained limit each
occurrence.

f.  $10,000,000 single limit any one
occurrence,
$10,000 ultimate net loss in respect
of each occurrence not covered in
underlying policy,
$10,000,000 aggregate for each annual
period.

g.  $5,000,000 single limit any one
occurrence,
$10,000 ultimate net loss in respect
of each occurrence not covered in
underlying policy,
$5,000,000 aggregate for each annual
period.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

h.   $100,000 each occurrence

i.   $5,000,000 each covered occurrence,
     $5,000,000 aggregate for each annual
     period,
     $10,000 self-insured retention.

j.   Bodily Injury
     $100,000 each person,
     $300,000 each accident,
     Property Damage
     $100,000 each accident,
     $100,000 aggregate operations,
     $100,000 aggregate protective,
     $100,000 aggregate contractual.

k.   Bodily Injury
     $100,000 each person,
     $300,000 each occurrence,
     $100,000 aggregate products and
     completed operations,
     Property Damage
     $100,000 each occurrence,
     $100,000 aggregate operations,
     $100,000 aggregate protective,
     $100,000 aggregate products and
     completed operations,
     $100,000 aggregate contractual.

l.   Bodily Injury
     $500,000 each person,
     $500,000 each occurrence,
     $500,000 aggregate products and
     completed operations,
     Property Damage
     $100,000 each occurrence,
     $100,000 aggregate operations,
     $100,000 aggregate protective,
     $100,000 aggregate products and
     completed operations,
     $100,000 aggregate contractual.

m.   $500,000 single limit

n.   $900,000 in excess of $100,000 Great
     American Insurance Co. Policy.

o.   Personal Injury
     $250,000 each person
     $500,000 each occurrence
     Property Damage
     $100,000 each occurrence
     $100,000 aggregate

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

            p.    $1,000,000 each accident
                  $1,000,000 aggregate

            q.    $25,000 for any one car
                  $75,000 for any one train

            r.    $25,000 for any one car
                  $75,000 for any one train

            s.    $25,000 for any one car
                  $75,000 for any one train

            t.    $25,000 for any one car
                  $75,000 for any one train

26.5  The name and address of the custodian of the policy.

**Response:**       a.    Rich Ziegler
                          Cotter Corporation
                          12596 W Bayaud Ave., #350
                          Lakewood, Colorado  80228

              b.    Rich Ziegler
                    Cotter Corporation
                    12596 W Bayaud Ave., #350
                    Lakewood, Colorado  80228

              c.    Rich Ziegler
                    Cotter Corporation
                    12596 W Bayaud Ave., #350
                    Lakewood, Colorado  80228

              d.    Rich Ziegler
                    Cotter Corporation
                    12596 W Bayaud Ave., #350
                    Lakewood, Colorado  80228

              e.    Rich Ziegler
                    Cotter Corporation
                    12596 W Bayaud Ave., #350
                    Lakewood, Colorado  80228

              f.    Rich Ziegler
                    Cotter Corporation
                    12596 W Bayaud Ave., #350
                    Lakewood, Colorado  80228

              g.    Rich Ziegler
                    Cotter Corporation
                    12596 W Bayaud Ave., #350
                    Lakewood, Colorado  80228

h.   Rich Ziegler
     Cotter Corporation
     12596 W Bayaud Ave., #350
     Lakewood, Colorado  80228

i.   Rich Ziegler
     Cotter Corporation
     12596 W Bayaud Ave., #350
     Lakewood, Colorado  80228

j.   Rich Ziegler
     Cotter Corporation
     12596 W Bayaud Ave., #350
     Lakewood, Colorado  80228

k.   Rich Ziegler
     Cotter Corporation
     12596 W Bayaud Ave., #350
     Lakewood, Colorado  80228

l.   Rich Ziegler
     Cotter Corporation
     12596 W Bayaud Ave., #350
     Lakewood, Colorado  80228

m.   Rich Ziegler
     Cotter Corporation
     12596 W Bayaud Ave., #350
     Lakewood, Colorado  80228

n.   Rich Ziegler
     Cotter Corporation
     12596 W Bayaud Ave., #350
     Lakewood, Colorado  80228

o.   Rich Ziegler
     Cotter Corporation
     12596 W Bayaud Ave., #350
     Lakewood, Colorado  80228

p.   Rich Ziegler
     Cotter Corporation
     12596 W Bayaud Ave., #350
     Lakewood, Colorado  80228

q.   Rich Ziegler
     Cotter Corporation
     12596 W Bayaud Ave., #350
     Lakewood, Colorado  80228

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

r.    Rich Ziegler
      Cotter Corporation
      12596 W Bayaud Ave., #350
      Lakewood, Colorado  80228

s.    Rich Ziegler
      Cotter Corporation
      12596 W Bayaud Ave., #350
      Lakewood, Colorado  80228

t.    Rich Ziegler
      Cotter Corporation
      12596 W Bayaud Ave., #350
      Lakewood, Colorado  80228

27. If you are unable to obtain or provide any of the above
information, please indicate the names and addresses of
those individuals and/or corporations who would possess
such information.

**Response:**        The following individuals and/or
corporations may possess information
regarding the "site" identified as West
Lake Landfill that is not known to Cotter:

Phillip K. Feeney
      Last known address
Ryckman, Edgerley, Tomlinson & Associates
12161 Lackland Road
St. Louis, Missouri  63141
(314) 434-6960

Robert S. Davis, Jr.
      Last known address:
B&K Construction Company
4140 Cypress Road
St. Ann, Missouri  63074
(???) 427-5666
      Other information unknown to Cotter.

Kenneth F. Davis, President
      Last known address:
B&K Construction Company
4140 Cypress Road
St. Ann, Missouri  63074
(???) 427-5666
      Other information unknown to Cotter.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Commercial Discount Corporation
      Last known address:
55 E. Monroe Street
Chicago, Illinois  60603

The attached documents may contain the
names of additional persons and/or entities
that possess knowledge or information
regarding the site known as West Lake
Landfill.

RFKD/AL0

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**DOCUMENT LIST**
**FOR**
**COTTER CORPORATION'S**
**RESPONSES TO EPA**
**REQUESTS FOR INFORMATION**
**DATED JULY 12, 1991**

<u>ITEM#</u>

1      **DOCNUMBER:**   WLA 0292 – WLA 0307; WLA 0117 – WLA 0121
       **DATE:**        02/28/66 – 02/03/67
       **DOCTYPE:**     Foreclosure documents
       **AUTHOR:**
       **ADDRESSEE:**
       **TITLE:**       [Foreclosure by Commercial Discount
                        Corporation against Continental Mining and
                        Milling Company]
       **RESPONSE TO:** Subject to Cotter's objections as stated in
                        its narrative responses, this item may be
                        responsive to EPA's requests numbered:
                        8, 8.2, 8.5, 9, 15, 24, 27.
       **COMMENT:**     These third party documents found in
                        Cotter's files are provided as a courtesy
                        to EPA; however, Cotter Corporation makes
                        no representations as to the authenticity
                        or accuracy of these documents.

2      **DOCNUMBER:**   WLA 1278 – WLA 1283; WLA 1285 – WLA 1286
       **DATE:**        06/10/60
       **DOCTYPE:**     Letter
       **AUTHOR:**      U.S. Atomic Energy Commission
       **ADDRESSEE:**   Cotter Corporation
       **TITLE:**       Request for proposals for the purchase and
                        removal of uranium contaminated residues
       **RESPONSE TO:** Subject to Cotter's objections as stated in
                        its narrative responses, this item may be
                        responsive to EPA's requests numbered:
                        8, 8.2, 8.5, 12, 24, 27.

3      **DOCNUMBER:**   WLA 0096 – WLA 0097; WLA 1288 – WLA 1289;
                        289 0028 – 289 0029
       **DATE:**        06/05/67
       **DOCTYPE:**     Letter
       **AUTHOR:**      David P. Marcott, Cotter Corporation
       **ADDRESSEE:**   Commercial Discount Corporation
       **TITLE:**
       **RESPONSE TO:** Subject to Cotter's objections as stated in
                        its narrative responses, this item may be
                        responsive to EPA's requests numbered:
                        8, 8.2, 8.4, 9, 12, 15, 24, 27.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

| 4 | DOCNUMBER: | WLA 0248 |
|---|---|---|
| | DATE: | 05/17/67 |
| | DOCTYPE: | Letter |
| | AUTHOR: | George F. Quinn, U.S. Atomic Energy Commission |
| | ADDRESSEE: | David P. Marcott, Cotter Corporation |
| | TITLE: | |
| | RESPONSE TO: | Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 24, 27. |

| 5 | DOCNUMBER: | WLA 0014 - WLA 0024; WLA 0279 - WLA 0290 |
|---|---|---|
| | DATE: | 06/09/67 |
| | DOCTYPE: | Contract |
| | AUTHOR: | Commercial Discount Corporation; Cotter Corporation |
| | ADDRESSEE: | |
| | TITLE: | Residue Purchase Agreement |
| | RESPONSE TO: | Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 8, 8.4, 9, 12, 15, 24, 27. |

| 6 | DOCNUMBER: | WLA 0291 |
|---|---|---|
| | DATE: | 06/08/67 |
| | DOCTYPE: | Contract |
| | AUTHOR: | Robert O. Anderson; Donald B. Anderson; Commercial Discount Corporation; Cotter Corporation |
| | ADDRESSEE: | |
| | TITLE: | [Guarantee of 06/09/67 Contract between Commercial Discount Corporation and Cotter Corporation] |
| | RESPONSE TO: | Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 24, 27. |

| 7 | DOCNUMBER: | WLA 0238 |
|---|---|---|
| | DATE: | 06/23/67 |
| | DOCTYPE: | Letter |
| | AUTHOR: | Robert E. Stoneberg, Commercial Discount Corporation |
| | ADDRESSEE: | Donald B. Anderson, Cotter Corporation |
| | TITLE: | |
| | RESPONSE TO: | Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 24, 27. |

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

8       DOCNUMBER:   WLA 1292; MIL0026479
        DATE:        07/14/67
        DOCTYPE:     Letter
        AUTHOR:      J.R. McKinley, Colorado School of Mines
                     Research Foundation
        ADDRESSEE:   Richard Champlin, Commercial Discount
                     Corporation
        TITLE:
        RESPONSE TO: Subject to Cotter's objections as stated in
                     its narrative responses, this item may be
                     responsive to EPA's requests numbered:
                     8, 8.2, 8.5, 15, 24, 27.
        COMMENT:     These third party documents found in
                     Cotter's files are provided as a courtesy
                     to EPA; however, Cotter Corporation makes
                     no representations as to the authenticity
                     or accuracy of these documents.

9       DOCNUMBER:   WLA 0080 – WLA 0082; WLA 0084 – WLA 0095;
                     WLA 1297 – WLA 1302;
        DATE:        00/00/68 – 03/25/68
        DOCTYPE:     Contract
        AUTHOR:      Commercial Discount Corporation; Cotter
                     Corporation
        ADDRESSEE:
        TITLE:       Amendment to Residue Purchase Agreement
        RESPONSE TO: Subject to Cotter's objections as stated in
                     its narrative responses, this item may be
                     responsive to EPA's requests numbered:
                     15, 24, 27.

10      DOCNUMBER:   WLA 0062 – WLA 0067
        DATE:        01/29/68
        DOCTYPE:     Memo
        AUTHOR:      Clyde Osborn
        ADDRESSEE:   Dave Marcott
        TITLE:       Raffinate Drying Project near St. Louis
                     Missouri
        RESPONSE TO: Subject to Cotter's objections as stated in
                     its narrative responses, this item may be
                     responsive to EPA's requests numbered:
                     8.4, 9, 15, 24, 27.

11   DOCNUMBER:    WLA 0068; WLA 1303
     DATE:         03/29/68
     DOCTYPE:      Memo
     AUTHOR:       Clyde Osborn
     ADDRESSEE:    David P. Marcott
     TITLE:        Operations at Hazlewood, Missouri
     RESPONSE TO:  Subject to Cotter's objections as stated in
                   its narrative responses, this item may be
                   responsive to EPA's requests numbered:
                   8.4, 15, 24, 27.

12   DOCNUMBER:    WLA 0069
     DATE:         03/25/68
     DOCTYPE:      Memo
     AUTHOR:       Clyde Osborn
     ADDRESSEE:    David P. Marcott
     TITLE:        Raffinate Drying Project at Hazlewood,
                   Missouri
     RESPONSE TO:  Subject to Cotter's objections as stated in
                   its narrative responses, this item may be
                   responsive to EPA's requests numbered:
                   8.4, 9, 15, 24, 27.

13   DOCNUMBER:    WLA 0070 - WLA 0071
     DATE:         05/06/69
     DOCTYPE:      Memo
     AUTHOR:       Darren
     ADDRESSEE:
     TITLE:        [Raffinate Drying Project at Hazlewood,
                   Missouri]
     RESPONSE TO:  Subject to Cotter's objections as stated in
                   its narrative responses, this item may be
                   responsive to EPA's requests numbered:
                   8, 8.1, 8.3, 8.4, 9, 12, 15, 24, 27.

14   DOCNUMBER:    WLA 0072 - WLA 0076
     DATE:         03/26/68
     DOCTYPE:      Letter
     AUTHOR:       Clyde Osborn
     ADDRESSEE:    Pat Geary
     TITLE:
     RESPONSE TO:  Subject to Cotter's objections as stated in
                   its narrative responses, this item may be
                   responsive to EPA's requests numbered:
                   15, 24, 27.

-4-

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

15    **DOCNUMBER:**  WLA 0077
        **DATE:**  10/01/68
        **DOCTYPE:**  Letter
        **AUTHOR:**  Warren E. Goff, Cotter Corporation
        **ADDRESSEE:**  S.R. Sapirie, U.S. Atomic Energy Commission
        **TITLE:**
        **RESPONSE TO:** Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 8, 8.2, 12, 15, 24, 27.

16    **DOCNUMBER:**  WLA 0078
        **DATE:**  01/16/69
        **DOCTYPE:**  Letter
        **AUTHOR:**  S.R. Sapirie, U.S. Atomic Energy Commission
        **ADDRESSEE:**  Warren E. Goff, Cotter Corporation
        **TITLE:**  Spent Barium Sulfate Residue Disposal
        **RESPONSE TO:** Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 8, 8.2, 12, 15, 24, 27.

17    **DOCNUMBER:**  WLA 0079
        **DATE:**  05/06/69
        **DOCTYPE:**  Inventory
        **AUTHOR:**
        **ADDRESSEE:**
        **TITLE:**  Airport Raffinates: Dry Tons
        **RESPONSE TO:** Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 8, 8.2.

18    **DOCNUMBER:**  WLA 0232
        **DATE:**  04/17/68
        **DOCTYPE:**  Letter
        **AUTHOR:**  J.A. Mauger, Commercial Discount Corporation
        **ADDRESSEE:**  David Marcott, Cotter Corporation
        **TITLE:**
        **RESPONSE TO:** Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 24, 27.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

19 **DOCNUMBER:** WLA 0182 - WLA 0183
   **DATE:** 07/25/69
   **DOCTYPE:** Letter
   **AUTHOR:** Dawson, Nagel, Sherman & Howard
   **ADDRESSEE:** A. Edgar Benton, Holme, Roberts & Owen
   **TITLE:** Commercial Discount Corporation - Cotter Corporation
   **RESPONSE TO:** Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 24, 27.

20 **DOCNUMBER:** WLA 0326 - WLA 0397; WLA 1314 - WLA 1326; MIL0026388 - MIL0026400; MIL0110247 - MIL0110259
   **DATE:** 08/07/69
   **DOCTYPE:** Contract
   **AUTHOR:** Commercial Discount Corporation; Cotter Corporation
   **ADDRESSEE:**
   **TITLE:** Agreement
   **RESPONSE TO:** Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 8, 8.1, 8.5, 12, 15, 24, 27.

21 **DOCNUMBER:** WLA 0253
   **DATE:** 11/28/69
   **DOCTYPE:** Contract
   **AUTHOR:** Robert O. Anderson; Donald B. Anderson; Commercial Discount Corporation; Cotter Corporation
   **ADDRESSEE:**
   **TITLE:** [Guarantee of 08/07/69 contract between Commercial Discount Corporation and Cotter Corporation]
   **RESPONSE TO:** Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 24, 27.

22.   DOCNUMBER:  WLA 0263 – WLA 0268; WLA 1338 – WLA 1343;
                  MIL0110262 – MIL0110267; MIL0026402 –
                  MIL0026407
      DATE:       12/29/69
      DOCTYPE:    Contract
      AUTHOR:     Commercial Discount Corporation
      ADDRESSEE:  Cotter Corporation
      TITLE:      Bill of Sale
      RESPONSE TO: Subject to Cotter's objections as stated in
                  its narrative responses, this item may be
                  responsive to EPA's requests numbered:
                  15, 24, 27.

23    DOCNUMBER:  MIL0157476
      DATE:       04/17/70
      DOCTYPE:    Letter
      AUTHOR:     Kenneth F. Davis, B&K Construction Company
      ADDRESSEE:  Cotter Corporation
      TITLE:
      RESPONSE TO: Subject to Cotter's objections as stated in
                  its narrative responses, this item may be
                  responsive to EPA's requests numbered:
                  13, 14, 15, 24, 27.

24    DOCNUMBER:  MIL0157477 – MIL0157478
      DATE:       00/00/70
      DOCTYPE:    Contract
      AUTHOR:     B&K Construction Company
      ADDRESSEE:  Cotter Corporation
      TITLE:      Agreement
      RESPONSE TO: Subject to Cotter's objections as stated in
                  its narrative responses, this item may be
                  responsive to EPA's requests numbered:
                  13, 14, 15, 24, 27.

25    DOCNUMBER:  MIL0157468
      DATE:       07/13/70
      DOCTYPE:    Letter
      AUTHOR:     Kenneth F. Davis, B&K Construction Company
      ADDRESSEE:  Cotter Corporation
      TITLE:
      RESPONSE TO: Subject to Cotter's objections as stated in
                  its narrative responses, this item may be
                  responsive to EPA's requests numbered:
                  13, 14, 15, 27.

26  **DOCNUMBER:**   MIL0157469 – MIL0157475; WLA 0642 –
                     WLA 0648; WLA 0666 – WLA 0672
    **DATE:**        07/00/70
    **DOCTYPE:**     Contract
    **AUTHOR:**      B&K Construction Company
    **ADDRESSEE:**   Cotter Corporation
    **TITLE:**       Residue Drying Agreement
    **RESPONSE TO:** Subject to Cotter's objections as stated in
                     its narrative responses, this item may be
                     responsive to EPA's requests numbered:
                     13, 14, 15, 27.

27  **DOCNUMBER:**   WLA 0894 – WLA 0898
    **DATE:**        04/29/71
    **DOCTYPE:**     Letter with attachment
    **AUTHOR:**      E. Edgerley, Jr.; Ryckman, Edgerley,
                     Tomlinson and Associates
    **ADDRESSEE:**   Donald P. Marcott; Cotter Corporation
    **TITLE:**       Proposal for Decontamination: Latty Avenue
                     Storage Site
    **RESPONSE TO:** Subject to Cotter's objections as stated in
                     its narrative responses, this item may be
                     responsive to EPA's requests numbered:
                     8, 8.1, 8.2, 8.3, 8.4, 9, 12, 15, 17, 23,
                     24, 27.

28  **DOCNUMBER:**   WLA 0888
    **DATE:**        05/25/72
    **DOCTYPE:**     Letter
    **AUTHOR:**      Phillip K. Feeney; Ryckman, Edgerley,
                     Tomlinson and Associates
    **ADDRESSEE:**   David P. Marcott; Cotter Corporation
    **TITLE:**
    **RESPONSE TO:** Subject to Cotter's objections as stated in
                     its narrative responses, this item may be
                     responsive to EPA's requests numbered:
                     8, 8.1, 8.2, 8.3, 8.4, 9, 12, 13, 14, 15,
                     17, 23, 24, 27.

29  **DOCNUMBER:**   WLA 0889 – WLA 0890
    **DATE:**        05/16/72 & 05/10/72
    **DOCTYPE:**     Letter
    **AUTHOR:**      Robert S. Davis, Jr.; B&K Construction
                     Company
    **ADDRESSEE:**   Phillip K. Feeney; Ryckman, Edgerley,
                     Tomlinson and Associates
    **TITLE:**       [Proposals for Latty Avenue restoration]
    **RESPONSE TO:** Subject to Cotter's objections as stated in
                     its narrative responses, this item may be
                     responsive to EPA's requests numbered:
                     8, 8.1, 8.2, 8.3, 8.4, 9, 12, 13, 14, 15,
                     17, 23, 24, 27.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

| | | |
|---|---|---|
| 30 | DOCNUMBER: | WLA 1348 – WLA 1355 |
| | DATE: | 10/00/72 |
| | DOCTYPE: | Contract |
| | AUTHOR: | B&K Construction Company; Cotter Corporation |
| | ADDRESSEE: | |
| | TITLE: | Contracting Agreement |
| | RESPONSE TO: | Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 8, 8.1, 8.2, 8.3, 8.4, 9, 12, 13, 14, 15, 17, 23, 24, 27. |

| | | |
|---|---|---|
| 31 | DOCNUMBER: | WLA 0853 |
| | DATE: | 09/21/73 |
| | DOCTYPE: | Letter |
| | AUTHOR: | Edward J. McGrath |
| | ADDRESSEE: | Roger Waite |
| | TITLE: | Cotter Corporation - Latty Avenue Storage Site, St. Louis |
| | RESPONSE TO: | Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 8.1, 8.4, 9, 27. |

| | | |
|---|---|---|
| 32 | DOCNUMBER: | WLA 0858 – WLA 0859 |
| | DATE: | 11/01/74 |
| | DOCTYPE: | Letter |
| | AUTHOR: | John G. Davis; U.S. Atomic Energy Commission |
| | ADDRESSEE: | David P. Marcott; Cotter Corporation |
| | TITLE: | |
| | RESPONSE TO: | Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 8, 8.1, 8.2, 8.4, 8.5, 9, 12, 13, 14, 15, 17, 24, 27. |

| | | |
|---|---|---|
| 33 | DOCNUMBER: | WLA 0841 – WLA 0842 |
| | DATE: | 05/24/76 |
| | DOCTYPE: | Letter |
| | AUTHOR: | Robert S. Davis, Jr. |
| | ADDRESSEE: | David Marcott; Cotter Corporation |
| | TITLE: | |
| | RESPONSE TO: | Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 13, 14, 27. |

34   DOCNUMBER:   WLA 0755
     DATE:        07/21/78
     DOCTYPE:     Letter
     AUTHOR:      Edward J. McGrath
     ADDRESSEE:   Robert Davis; R.S. Davis Contracting
                  Company
     TITLE:
     RESPONSE TO: Subject to Cotter's objections as stated in
                  its narrative responses, this item may be
                  responsive to EPA's requests numbered:
                  13, 14, 27.

35   DOCNUMBER:   WLA 0418
     DATE:        08/03/78
     DOCTYPE:     Proposal
     AUTHOR:      Robert S. Davis, Jr.;B&K Construction
                  Company
     ADDRESSEE:   Cotter Corporation
     TITLE:       [Decontamination Proposal for 9200 Latty
                  Ave.]
     RESPONSE TO: Subject to Cotter's objections as stated in
                  its narrative responses, this item may be
                  responsive to EPA's requests numbered:
                  13, 14, 27.

36   DOCNUMBER:   MIL0157501 — MIL0157502
     DATE:        10/08/70
     DOCTYPE:     Letter
     AUTHOR:      Robert S. Davis, Jr.; B&K Construction
                  Company
     ADDRESSEE:   Cotter Corporation
     TITLE:
     RESPONSE TO: Subject to Cotter's objections as stated in
                  its narrative responses, this item may be
                  responsive to EPA's requests numbered:
                  13, 14, 15, 27.

37   DOCNUMBER:   MIL0050960
     DATE:        01/12/71
     DOCTYPE:     Letter
     AUTHOR:      Warren Goff; Cotter Corporation
     ADDRESSEE:   B&K Construction Company
     TITLE:
     RESPONSE TO: Subject to Cotter's objections as stated in
                  its narrative responses, this item may be
                  responsive to EPA's requests numbered:
                  13, 14, 15, 27.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

| 38 | DOCNUMBER: | MIL0026446 – MIL0026447 |
|----|------------|-------------------------|
|    | DATE: | 12/12/67 |
|    | DOCTYPE: | Letter |
|    | AUTHOR: | J.A. Mauger; Commercial Discount Corporation |
|    | ADDRESSEE: | David Marcott; Cotter Corporation |
|    | TITLE: | |
|    | RESPONSE TO: | Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 15, 24, 27. |

| 39 | DOCNUMBER: | 004 1583 |
|----|------------|----------|
|    | DATE: | 10/29/79 |
|    | DOCTYPE: | Memo |
|    | AUTHOR: | Dale Lesher; Cotter Corporation |
|    | ADDRESSEE: | Myles Fixman; Cotter Corporation |
|    | TITLE: | St. Louis Residues |
|    | RESPONSE TO: | Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 8.2, 15, 24. |

| 40 | DOCNUMBER: | WLA 2099 – WLA 2112 |
|----|------------|---------------------|
|    | DATE: | 02/25/66, 09/26/66, & 09/27/66 |
|    | DOCTYPE: | Contract |
|    | AUTHOR: | U.S. Atomic Energy Commission; Continental Mining and Milling |
|    | ADDRESSEE: | |
|    | TITLE: | Contract No. AT-(23-2)-56 & Modification No. 1 |
|    | RESPONSE TO: | Subject to Cotter's objections as stated in its narrative responses, this item may be responsive to EPA's requests numbered: 8, 8.2, 8.4, 8.5, 9, 24, 27. |
|    | STATUS: | These third party documents found in Cotter's files are provided as a courtesy to EPA; however, Cotter Corporation makes no representations as to the authenticity or accuracy of these documents. |

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| MICHAEL DAILEY and ROBBIN DAILEY, | |
| Plaintiffs, | Case No. 4:17-cv-00024 |
| v. | |
| BRIDGETON LANDFILL, LLC, et al., | |
| Defendants. | |

## DEFENDANTS' JOINT MOTION FOR LEAVE TO FILE A SUR-REPLY

Defendants Cotter Corporation (N.S.L.) ("Cotter") (improperly named as Cotter Corporation); Bridgeton Landfill, LLC ("Bridgeton")[1]; Republic Services, Inc. ("Republic"); and Allied Services, LLC ("Allied Services") (collectively, "Defendants") respectfully request leave of this Court to file a sur-reply to the Reply brief filed by Plaintiff on April 24, 2018, ECF No. 135.

Plaintiffs have improperly attempted to introduce new issues through their reply brief and the attached Declaration of Plaintiffs' undisclosed expert Richard Stewart (hereinafter, "Stewart Report")—in clear defiance of basic procedural requirements and Court rules—for the purpose of prejudicing Defendants and foreclosing their ability to respond. Such prejudicial behavior should not be countenanced by the Court and, as such, Defendants should be permitted to file a sur-reply to address the new contentions in Plaintiffs' reply brief, or, alternatively to strike the Stewart Report and all associated arguments. A proposed order granting Defendants leave to file a sur-reply is attached hereto as **Exhibit A**.

---

[1] Rock Road Industries, Inc., named as a defendant by Plaintiffs, was merged into Bridgeton Landfill, LLC effective April 9, 2018. *See* ECF No. 133.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## LEGAL STANDARD

The local rules of the Eastern District of Missouri provide that a matter is fully briefed upon the filing of the original motion and memorandum, any memoranda in opposition, and any reply memoranda in support of the motion. Additional memoranda—namely a sur-reply—may be filed by the parties "only with leave of Court." *See* E.D. Mo. L.R. 7-4.01(C).

It is improper to raise a new argument in a reply brief. *FTC v. Neiswonger*, 580 F.3d 769, 775 (8th Cir. 2009). As such, district courts routinely grant motions to file additional memoranda "when a party is 'unable to contest matters presented to the court for the first time' in the last scheduled pleading." *See Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003) (quoting *Lewis v. Rumsfeld*, 154 F. Supp. 2d 56, 61 (D.D.C. 2001); *see also Fun Servs. of Kansas City, Inc. v. Love*, No. 11-0244, 2011 WL 1843253, at *3 (W.D. Mo. May 11, 2011) (permitting non-moving party to file sur-reply because plaintiff "raised some new arguments in her reply"). Here, Plaintiffs' attempt to introduce new issues by means of the procedurally tenuous Stewart Report warrants granting Defendants leave to file a sur-reply.

## ARGUMENT

### Plaintiffs' Reply Brief Raises New Issues and Arguments Not Previously Raised in Their Moving Papers

In the instant case, Plaintiffs have unquestionably presented new issues in their reply brief that were not raised, in the first instance, in their moving papers. As such, if Defendants are not permitted an opportunity to file a sur-reply, they will be severely prejudiced.

Here, Plaintiffs have improperly appended, incorporated, and relied upon the Stewart Report, in which Mr. Stewart purports to "provide [his] expert opinion" to address: (1) whether "plaintiffs' claims fall under the exclusive federal jurisdiction of the Price-Anderson Act"; (2) whether "plaintiffs' state law claims for nuisance and trespass [are] preempted by the Price-

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Anderson Act"; and (3) "what is the standard that the plaintiffs must meet in order to establish a claim for property damage liability." As a preliminary matter, these "expert" opinions relate to purely legal issues, such as the nature of this Court's jurisdiction, the preemptive effect of the Price-Anderson Act over certain state-law based causes of action, and the applicable legal standard plaintiffs must meet to plead a claim for property damages under the PAA. It is hornbook law, however, that experts may not opine regarding purely legal issues or give opinions that amount to nothing more than conclusions of law. *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) ("As we have had occasion to remark before . . . expert testimony on legal matters is not admissible. Matters of law are for the trial judge . . . ."); *see also In re Genetically Modified Rice Litigation*, 666 F. Supp. 2d 1004, 1025 (E.D. Mo. 2009) (stating that "it is not appropriate for expert witnesses to draw legal conclusions" and that "[e]xpert witnesses must do more than simply summarize documents with a tilt favoring a litigant) (internal quotation marks omitted)); *Peters v. Woodbury Cnty.*, 979 F. Supp. 2d 901 (N.D. Iowa 2013) (stating that "an expert may not opine that the conduct in question transgressed the applicable legal standard"); *Barragan v. Tyson Foods, Inc.*, 2008 WL 1776439, at *1, *8 (N.D. Iowa Apr. 17, 2008) (striking witnesses designation as expert and concluding, *inter alia*, that her testimony "are comprised of nothing more than inadmissible legal conclusions"). Indeed, the Stewart Report appears to be little more than an additional legal brief filed in further support of Plaintiffs' motion. As such, Defendants require additional time to evaluate the Stewart Report, consider its substance and, if necessary, depose Mr. Stewart.

Furthermore, Plaintiffs' attempt to introduce the Stewart Report at this stage in the litigation runs roughshod over the basic procedural requirements applicable to expert reports and the corresponding protections otherwise accorded to Defendants. Plaintiffs' inclusion of and

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

reliance upon the Stewart Report in their reply brief has denied Defendants the opportunity to address any of the "expert opinions" discussed by Mr. Stewart. At a minimum, Defendants must be afforded a meaningful chance to respond to the Stewart Report and Plaintiffs' argument reliant upon the same.

Setting aside the fact that the Stewart Report improperly opines regarding purely legal issues, Plaintiffs failed to disclose the identity of Mr. Stewart to Defendants, in contravention of intent of Federal Rule of Civil Procedure 26(a)(2)(A). Further, Plaintiffs failed to provide Defendants with a copy of the Stewart Report prior to attaching it in support of their reply brief, clearly ignoring the spirit and intent of Rule 26(a)(2)(B). Disturbingly, it appears that Plaintiffs' decision to withhold the Stewart Report was calculated to deny Defendants the chance to depose Mr. Stewart pursuant to Rule 26(b)(4)(A), and to engage an end-run around the parties' upcoming dispositive motions concerning, among other things, the standard applicable to Plaintiffs' claims (a topic about which the Stewart Report purports to opine).

Ultimately, given the new issues raised in the Stewart Report, the fact that Mr. Stewart's "opinions" pertain to purely legal issues and constitute legal conclusions, and the inherent prejudice to Defendants posed by Plaintiffs' decision to ignore basic discovery rules, Defendants should be allowed file a sur-reply to Plaintiffs' reply brief. Furthermore, Defendants should be given time to move to strike the Stewart Report. As such, Defendants request two weeks – a period equal to the amount of time Plaintiffs had to prepare their reply brief – through and including May 8, 2018, to file a sur-reply.

## CONCLUSION

Defendants' Motion for Leave to File a Sur-reply should be granted. Plaintiffs' attempt to introduce new issues by means of the Stewart Report not only prejudices Defendants, but also

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

ignores basic procedural requirements for relying upon expert evidence. For the foregoing

reasons, Defendants respectfully request permission to file a sur-reply to Plaintiffs' Reply Brief

on or before May 8, 2018.

Dated: April 26, 2018                                    Respectfully submitted,

                                                         /s/ Stephanie R. Feingold
                                                         MORGAN LEWIS & BOCKIUS, LLP
                                                         John McGahren, Esq. (ID 046791990N)
                                                         john.mcgahren@morganlewis.com
                                                         Stephanie R. Feingold. Esq. (ID 23182005N)
                                                         stephanie.feingold@morganlewis.com
                                                         502 Carnegie Center
                                                         Princeton, NJ 08540
                                                         (609) 919-6600 (telephone)
                                                         (609) 919-6701 (facsimile)

                                                         BRYAN CAVE LEIGHTON PAISNER LLP
                                                         Dale A. Guariglia, Mo. Bar 32988
                                                         daguariglia@bclplaw.com
                                                         Erin L. Brooks, Mo. Bar 62764
                                                         erin.brooks@bclplaw.com
                                                         One Metropolitan Square
                                                         211 N. Broadway, Suite 3600
                                                         St. Louis, Missouri 63102
                                                         (314) 259-2000 (telephone)
                                                         (314) 259-2020 (facsimile)

                                                         ATTORNEYS FOR DEFENDANT
                                                         COTTER CORPORATION (N.S.L.)


                                                         /s/ William G. Beck
                                                         William G. Beck (26849MO)
                                                         Robert Rooney (43381MO)
                                                         Allyson E. Cunningham (64802MO)
                                                         2345 Grand Boulevard, Suite 2200
                                                         Kansas City, Missouri 64108-2618
                                                         (816) 292-2000 (telephone)
                                                         (816) 292-2001 (facsimile)
                                                         wbeck@lathropgage.com
                                                         rrooney@lathropgage.com
                                                         acunningham@lathropgage.com

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

and

Patricia Lehtinen Silva (67213MO)
Pierre Laclede Center
7701 Forsyth Boulevard, Suite 500
Clayton, Missouri 63105
(314) 613-2800 (telephone)
(314) 613-2801 (facsimile)
psilva@lathropgage.com

ATTORNEYS FOR DEFENDANTS
BRIDGETON LANDFILL, LLC,
REPUBLIC SERVICES, INC, and
ALLIED SERVICES, LLC.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# EXHIBIT A

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL DAILEY and ROBBIN DAILEY,

                Plaintiffs,

      v.

BRIDGETON LANDFILL, LLC, et al.,

                Defendants.

Case No.  4:17-cv-00024

**[PROPOSED] ORDER**

This matter is before the Court on Defendants', Cotter Corporation (N.S.L.) (improperly named as Cotter Corporation); Bridgeton Landfill, LLC; Republic Services, Inc.; and Allied Services, LLC (collectively, "Defendants"), Motion for Leave to File Sur-reply.  Having fully considered the motion, being duly advised as to the merits and for good cause shown,

    **IT IS HEREBY ORDER THAT** Defendants' motion is granted;

    **IT IS FURTHER ORDERED THAT** Defendants shall have two (2) weeks, through and including May 8, 2018, to file a sur-reply.

    **SO ORDERED** this _____ day of _____, 2018.

_____
Honorable Catherine D. Perry, U.S.D.J.

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2018, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record, and caused the same to be served upon the following by U.S. mail, first-class postage:

Celeste Brustowicz
Victor T. Cobb
Cooper Law Firm L.L.C.
1525 Religious Street
New Orleans, LA 70130

Barry J. Cooper, Jr.
Cooper Law Firm, L.L.C.
508 St. Philip Street
New Orleans, LA 70116

/s/ Stephanie Feingold

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:17 CV 24 CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' OBJECTION TO
DEFENDANT'S JOINT MOTION FOR LEAVE**

NOW COMES, through undersigned counsel, Michael and Robin Dailey, who object to defendants' joint motion for leave to file additional briefing. The delay in ruling on plaintiffs' motion means the Daileys will continue to incur unnecessary expenses. As it stands, they have participated in three-CMO related depositions and defendants have a fourth scheduled in Masachusetts on May 15, 2018.

Respectfully submitted,

*/s/ Celeste Brustowicz* .
Barry J. Cooper, Jr. (LSBA 27202), *Pro Hac Vice*
Celeste Brustowicz (LSBA 16835), *Pro Hac Vice*
Victor T. Cobb (LSBA 36830), *Pro Hac Vice*
**COOPER LAW FIRM, LLC**
1525 Religious Street
New Orleans, Louisiana 70130
E-mail: bcooper@sch-llc.com
cbrustowicz@sch-llc.com
vcobb@sch-llc.com

**ATTORNEYS FOR PLAINTIFFS,
MICHAEL AND ROBBIN DAILEY**

[*Certificate of Service on Following Page*]

1

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**CERTIFICATE OF SERVICE**

I hereby certify that on April 27, 2018, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

*/s/ Celeste Brustowicz* .
Celeste Brustowicz (LSBA 16835)

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:17-cv-00024-CDP |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS BRIDGETON, REPUBLIC, AND ALLIED SERVICES'
SUR-REPLY TO
PLAINTIFFS' MOTION FOR LEAVE TO AMEND, MOTION TO REMAND, MOTION
TO STAY PENDING DISCOVERY AND, ALTERNATIVELY, MOTION TO AMEND
CASE MANAGEMENT ORDER**

## I.      Introduction

Plaintiffs' Reply to Defendants' Oppositions to Plaintiffs' Motion for Leave to Amend, Motion to Remand, Motion to Stay pending Discovery and, Alternatively, Motion to Amend Case Management Order ("Reply," Doc. No. 135) makes new arguments not made in either Plaintiffs' original Motion or any Defendants' Response.  Plaintiffs also attach exhibits not found in any prior filings.  Specifically, Plaintiffs for the first time introduce an "expert," Richard Stewart, to allege the Price-Anderson Act ("PAA") is inapplicable. *See* Doc. No. 135 at 3-4. Plaintiffs rely on a nine-page single-spaced declaration by Stewart never previously filed or produced.  *Id*. Ex. 3 ("the Stewart Report").  Accordingly, Defendants Bridgeton Landfill, LLC ("Bridgeton"), Republic Services, Inc. ("Republic"), and Allied Services, LLC ("Allied Services") (collectively, "Defendants"), file this sur-reply specifically opposing Plaintiffs' new material inappropriately added to the Reply.

## II.      Legal Standards

It is improper to raise a new argument in a reply brief. *See Fed. Trade Comm'n v. Neiswonger*, 580 F.3d 769, 775 (8th Cir. 2009).  A reply "must be limited to addressing the arguments raised by the [response]," *Petty v. Portofino Council of Coowners, Inc.*, 702 F. Supp. 2d 721, 730 n.3 (S.D. Tex. 2010).

Experts may not opine on purely legal issues or give opinions that amount to nothing more than conclusions of law.  *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) ("As we have had occasion to remark before . . . expert testimony on legal matters is not admissible.  Matters of law are for the trial judge ...."); *see also In re Genetically Modified Rice Litigation*, 666 F. Supp. 2d 1004, 1025 (E.D. Mo. 2009) ("it is not appropriate for expert witnesses to draw legal conclusions," and "[e]xpert witnesses must do more than simply summarize documents with a tilt favoring a litigant") (internal quotation marks omitted)); *Peters v. Woodbury Cnty.*, 979 F. Supp. 2d 901 (N.D. Iowa 2013) (stating that "an expert may not opine that the conduct in question transgressed the applicable legal standard"); *Barragan v. Tyson Foods, Inc.*, 2008 WL 1776439, at *1, *8 (N.D. Iowa Apr. 17, 2008) (striking witness's designation as expert and concluding, *inter alia*, that her testimony "are comprised of nothing more than inadmissible legal conclusions").

## III.     Argument

### A.      Plaintiffs' Disclosure In Their Reply Is Inappropriate

Defendants learned of Stewart as Plaintiffs' expert for the first time in the Reply.  Neither the Stewart Report nor Stewart's identify had ever been disclosed previously.  This eliminates Defendants' ability to respond to Plaintiffs' arguments.  Such practice frustrates the Federal Rules of Civil Procedure's system of Motion, Response, Reply which allow the parties to ferret

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

out their positions to the Court. *See Neiswonger*, 580 F.3d at 775 (improper to raise new argument in reply). Introducing a brand new expert at this late stage is inappropriate.

Highlighting the languid approach Plaintiffs have taken to timely disclosures, Stewart was disclosed in a reply in support of Plaintiffs' own motion for which they have the burden of persuasion. That is, even if Plaintiffs thought a motion paper sufficed as proper disclosure (which, it would not), Plaintiffs could have named Stewart in the original Motion. Having failed to do so, Plaintiffs caused Defendants to have to ask for leave to file a sur-reply, the Court to rule on Defendants' motion for leave, and Defendants to file the instant sur-reply. This duplication of the proceedings only impedes efficient resolution of this matter.

### B.    Stewart Presents Improper Legal Opinions

Reliance on Stewart is also inappropriate because he opines only on purely legal issues. His Report is essentially a new brief in the guise of an exhibit. In fact, the guise is rather thin. The Stewart Report's stated goals are to provide "expert opinion" on (1) whether "plaintiffs' claims fall under the exclusive federal jurisdiction of the Price-Anderson Act"; (2) whether "plaintiffs' state law claims for nuisance and trespass [are] preempted by the Price-Anderson Act"; and (3) "what is the standard that the plaintiffs must meet in order to establish a claim for property damage liability." Doc. No. 135-3 at 3. These are clearly legal questions on which no expert is required.

Stewart's stated qualifications are, essentially, that he has practiced as an environmental law attorney and has served as a law school professor. *Id.* at 1. Plaintiffs have essentially brought in another lawyer for their legal team to tell the Court how to rule. He is making arguments for Plaintiffs, yet it is unclear whether he has been admitted to practice in this Court, where he is licensed, and whether he meets the Court's requirements for appearance in this case.

Stewart admits that whether Plaintiffs' claims are subject to the exclusive jurisdiction of the PAA is a "question of statutory construction." *See id*. at 3-7. He also waxes about *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015), which the Court has already analyzed (Doc. No. 89 at 11-13). *See id.*at 7-9. Stewart offers opinion as well on the proper standard for a PAA claim. *Id*. at 9. This opinion is truly only a commentary on court cases *In re TMI*, 67 F.3d 1103 (3rd Cir. 1995) and *McClurg v. Mallinckrodt, Inc.*, 2017 WL 2929444 (E.D. Mo. July 7, 2017). *Id*. Such conclusions are purely the province of the Court and inappropriate for an expert witness. *See, e.g., S. Pine Helicopters, Inc.*, 320 F.3d at 841 (legal opinion are "matters of law are for the trial judge") *In re Genetically Modified Rice Litigation*, 666 F. Supp. 2d at 1025 ("[e]xpert witnesses must do more than simply summarize documents with a tilt favoring a litigant.").

## C. Stewart's Improper Legal Opinions are Based on Unsupported Factual Assumptions

The Stewart Report is also faulty in that it is based on factual assumptions not supported in the record. Stewart relies on a conclusion that the materials in the West Lake Landfill are "uranium mill tailings." Doc. No 135-3 at 2-5. Therefore, he surmises, the material cannot be part of a PAA claim. *Id*. Stewart never explains why he thinks the materials are mill tailings. The closest Defendants find to an explanation is the blanket description that the Report is based on "factual assumptions and documents" provided by Plaintiffs' counsel.[1] *Id*. at 2. In fact, the material at the West Lake Landfill has never been determined to be mill tailings. Stewart's failure to state the basis for his opinion is compounded by Plaintiffs' late disclosure prohibiting

---

[1] Defendants Bridgeton, Republic and Allied reserve to another day, after an opportunity to depose Professor Stewart, the question whether an attorney, offering legal opinions to a Court is permitted to rely on factual *assumptions provided by counsel*, rather than facts.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Defendants from taking Stewart's deposition. Because the Stewart Report relies on unsupported assumptions, its conclusions cannot be considered.

### IV.  Conclusion

The new arguments and expert report filed by Plaintiff for the first time in their Reply go beyond the allowable scope of a reply brief and beyond the proper use of an expert. The materials do more than simply respond to the positions taken in Defendants' Response. Rather, Plaintiffs attempt to add to their legal team through the Stewart Report. Plaintiffs' reliance in their Reply brief on an expert whom they had never before disclosed cannot be permitted. The gamesmanship deprived Defendants of the ability to depose Stewart and otherwise defend against his conclusions. Nor does it foster the cooperation and transparency both the Federal Rules and this Court encourage between parties. Plaintiffs' Reply should have stayed within the confines of Defendants' Response. Having failed to do so, Plaintiffs only burden the Court with additional filings and delay resolution of this matter. The Reply as a whole does not provide any founded reason for granting Plaintiffs' Motion. Accordingly, Plaintiffs' Motion should be denied.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Dated: May 8, 2018

Respectfully submitted,

/s/ *William G. Beck*
William G. Beck (26849MO)
Robert Rooney (43381MO)
Allyson E. Cunningham (64802MO)
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
(816) 292-2000 (telephone)
(816) 292-2001 (facsimile)
wbeck@lathropgage.com
rrooney@lathropgage.com
acunningham@lathropgage.com

Patricia Lehtinen Silva (67213MO)
Pierre Laclede Center
7701 Forsyth Boulevard, Suite 500
Clayton, Missouri 63105
(314) 613-2800 (telephone)
(314) 613-2801 (facsimile)
psilva@lathropgage.com
ATTORNEYS FOR DEFENDANTS
BRIDGETON LANDFILL, LLC;
REPUBLIC SERVICES, INC.; AND
ALLIED SERVICES, LLC

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2018, I electronically filed the foregoing document via the Court's CM/ECF system, which will serve notice on all counsel of record.

/s/     *William G. Beck*

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL DAILEY and ROBBIN DAILEY,

               Plaintiffs,

v.

BRIDGETON LANDFILL, LLC, et al.,

               Defendants.

Case No.  4:17-cv-00024

## SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT TO DISMISS PRICE-ANDERSON ACT CLAIMS AND REINSTATE STATE LAW CLAIMS, TO REMAND, TO STAY PENDING DISCOVERY OR, ALTERNATIVELY, TO AMEND CASE MANAGEMENT ORDER

With the permission of the Court (Dkt. 137), Defendant Cotter Corporation (N.S.L.) ("Cotter") (improperly named as Cotter Corporation) submits this Sur-Reply in further opposition to Plaintiffs Michael Dailey and Robbin Dailey's ("Plaintiffs") pending motion (Dkt. 123) ("Motion").

Instead of responding to the substantial body of legal authority cited in Defendants' briefs in opposition (Dkt. 128, 129),[1] Plaintiffs, in their reply brief (Dkt. 135), have improperly resorted to introducing new arguments, documents and issues.  This defect is most notable in the newly introduced declaration from Richard Stewart ("Stewart Report"), which purports to provide expert opinions on purely legal issues in support of their motion, as if Stewart's opinion carries greater weight than the text of the Price-Anderson Act ("PAA"), its legislative history,[2] and the

---

[1] Plaintiffs do not appear to contest that the proper standard to evaluate their motion to amend is Rule 41(a), which governs voluntary dismissals (and thereby focuses on *prejudice to defendants*), rather than Rule 15(a), which governs amendment of complaints.

[2] Plaintiffs also conspicuously fail to address the legislative history cited in the Landfill Defendants' brief in opposition, which directly undermines the rationale used in *Strong v. Republic Servs.,* 2017 WL 4758958 (E.D. Mo. Oct. 20, 2017) (*see* Dkt. 129 at 11).  Plaintiffs also erroneously argue that Court's decision in *Strong* involved "the

pronouncements from multiple federal courts that have decided against Plaintiffs' stated position. The Stewart Report is clearly improper legal opinion that invades the province of the Court, and this Court should accordingly strike it. In addition, Plaintiffs' reliance in their reply on an inapposite and non-binding staff director decision from the Nuclear Regulatory Commission ("NRC") to support their claim that the radioactive materials giving rise to their claims against Defendants were not subject to federal regulation, and thus fall outside the scope of the PAA, 42 U.S.C. § 2011 *et seq.,* exceeds the scope of the issues in the Motion and opposition briefs, and in any event fails in its own right. Furthermore, Plaintiffs contend that this Court should ignore the Third Circuit's well-reasoned and thoughtful opinion in *Estate of Ware v. Hosp. of the Univ. of Pa.*, 871 F.3d 273, 282-83 (3rd Cir. 2017), simply because a petition for writ of certiorari was filed with the Supreme Court in connection with that case and "because the University of Pennsylvania was licensed for the same activities that were sued upon," which they contend "is not the case here." Dkt. 135 at 4. However, the mere filing of a petition for certiorari does not strip *Ware* of its persuasive authority, nor does the existence of a license that Plaintiffs find acceptable in *Ware* make the reasoning of the *Ware II* opinion any less applicable to this case. Similarly, Plaintiffs' introduction of new arguments alleging criminal activity is not only improper for a reply brief, but outside the scope of this action altogether, not to mention inflammatory and wholly unsupported. Lastly, Plaintiffs have provided no basis to modify the January 2, 2018 Case Management Order and March 6, 2018 Amended Case Management Order (collectively, the "CMO"), *see* Dkts. 102 & 119, which properly limit the scope of discovery in this case to the threshold issue of whether Plaintiffs can demonstrate actionable levels of

---

same defendants and the same issues" as this case, and so, the same result should follow. As previously stated by Cotter in its opposition brief, Cotter was never a party to the *Strong* matter, nor did Judge Hamilton hold in *Strong* that the materials disposed of in the West Lake Landfill were, in fact, uranium mill tailings. *See* Dkt. 129, p. 13. Finally, *Strong* was wrongly decided, and this Court should not follow it.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

radioactive contamination on their property. For these reasons, Plaintiffs' reply brief does not cure the fundamental defects of their moving brief and their Motion should be denied, and the Stewart Report should be disregarded and stricken altogether.

## ARGUMENTS

I.   **The Court Should Disregard the Stewart Report Given that It Is Procedurally Improper and Substantively Defective**

The Court should disregard the Declaration of Richard Stewart ("Stewart Report")—a document which is at the very core of Plaintiffs' reply brief—given that it has been submitted in contravention of basic rules of procedure and contains glaring substantive defects.

As a threshold matter, "[i]t is generally improper to raise a new argument in a reply brief." *Fed. Trade Comm'n v. Neiswonger*, 580 F.3d 769, 775 (8th Cir. 2009). Here, Plaintiffs have improperly used their reply brief to address a range of topics that exceed the scope of both their moving papers as well as Defendants' opposition briefs, including, but not limited to: the entirety of the Stewart Report, as well as the topics and issues about which Stewart purports to opine, *see* Dkt. 135, pp. 3-4, 11; Dkt. 135-3; Plaintiffs' newly minted claims that Defendants have acted in an illegal fashion and violated 18 U.S.C. § 831, a federal criminal statute chiefly concerned with the use of nuclear materials by terrorists, *see* Dkt. 135, pp. 1, 3, 7; and Plaintiffs' reliance on "some non-certified documents from an EPA proceeding wherein Cotter states that they have no connection to the West Lake Landfill," *see* Dkt. 135, p. 7; Dkt. 135-6. Ultimately, "the scope of the reply brief must be limited to addressing the arguments raised by the [response]," *Petty v. Portofino Council of Coowners, Inc.*, 702 F. Supp. 2d 721, 730 n.3 (S.D. Tex. 2010), and Plaintiffs' consistent efforts to skirt basic procedural norms should not be countenanced.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## A. Plaintiffs Have Ignored Basic Procedural Norms by Incorporating the Stewart Report as Part of Their Reply Brief

Plaintiffs' reliance upon the Stewart Report is wholly improper at this stage in the litigation given that such reliance violates the terms and spirit of a host of applicable rules of procedure. As such, the Court should strike the Stewart Report.

Plaintiffs failed to disclose the Stewart Report—which purports to provide Stewart's "expert opinion"—to Defendants prior to including it in the reply brief, in violation of various rules concerning the use of expert reports and testimony. Not only did Plaintiffs fail to disclose the identity of Stewart to Defendants at any point in time, thus violating the intent of Rule 26(a)(2)(A), Plaintiffs also failed to provide Defendants with a copy of the Stewart Report prior to attaching it in support of their reply brief, clearly ignoring the spirit and intent of Rule 26(a)(2)(B). It appears that Plaintiffs' decision to withhold the Stewart Report (thus denying Defendants the chance to timely depose Stewart pursuant to Rule 26(b)(4)(A)) was calculated to engage in an end-run around the parties' upcoming dispositive motions concerning, among other things, the standard applicable to Plaintiffs' claims (a topic about which the Stewart Report purports to opine). Ultimately, Plaintiffs' efforts to skirt the basic procedural requirements for the introduction of expert reports, opinions and testimony have prevented Cotter from probing the bases for Stewart's purported expert opinions, resulting in severe prejudice to Cotter.[3]

Given Plaintiffs' disregard for the rules and procedures otherwise applicable to their reliance on expert opinions, as well as their obvious gamesmanship, the Court should disregard the Stewart Report to protect Cotter from further prejudice.

---

[3] Ironically, throughout their reply brief, Plaintiffs complain that they have been prejudiced by Cotter. For instance, they complain that "Defendants attach a declaration by [counsel for Cotter] authenticating a number of licenses issued by the Atomic Energy Commission." Dkt. 135, p. 8. Cotter did not attach this declaration to its opposition brief, however; rather, this declaration was part of the record for the Defendants' February 27, 2017 opposition to Plaintiffs' motion for remand. *See* Dkt. 64-1 (Declaration of Stephanie Feingold); Dkts. 64-2 through 64-5 (relevant licenses). It is unclear how Plaintiffs are prejudiced by Cotter citing materials that have been a part of the record of this case for well over a year.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**B.      Stewart's Opinions Concerning Purely Legal Matters and His Conclusions of Law Exceed the Scope of Proper Expert Testimony**

Setting aside Plaintiffs' indifference toward the procedural requirements surrounding the use of expert reports, opinions, and testimony, the Stewart Report purports to opine on a range of topics that exceed the scope of permissible expert testimony.

It is well established that experts may not opine regarding purely legal issues or give opinions that amount to nothing more than conclusions of law. *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003) ("As we have had occasion to remark before . . . expert testimony on legal matters is not admissible. Matters of law are for the trial judge ...."); *see also In re Genetically Modified Rice Litigation*, 666 F. Supp. 2d 1004, 1025 (E.D. Mo. 2009) ("it is not appropriate for expert witnesses to draw legal conclusions," and "[e]xpert witnesses must do more than simply summarize documents with a tilt favoring a litigant") (internal quotation marks omitted)); *Peters v. Woodbury Cnty.*, 979 F. Supp. 2d 901 (N.D. Iowa 2013) (stating that "an expert may not opine that the conduct in question transgressed the applicable legal standard"); *Barragan v. Tyson Foods, Inc.*, 2008 WL 1776439, at *1, *8 (N.D. Iowa Apr. 17, 2008) (striking witness's designation as expert and concluding, *inter alia*, that her testimony "are comprised of nothing more than inadmissible legal conclusions").

Despite these holdings from courts within the Eighth Circuit, in the Stewart Report, Stewart purports to "provide [his] expert opinion" concerning: (1) whether "plaintiffs' claims fall under the exclusive federal jurisdiction of the Price-Anderson Act"; (2) whether "plaintiffs' state law claims for nuisance and trespass [are] preempted by the Price-Anderson Act"; and (3) "what is the standard that the plaintiffs must meet in order to establish a claim for property damage liability." *See* Dkt. 135-3, p. 3. His "expert" opinions concerning these purely legal issues, however, as well as his accompanying legal conclusions, stray far afield of what is permitted in

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

an expert report or as expert testimony. For instance, in the Stewart Report, Stewart concedes that whether Plaintiffs' claims are subject to the exclusive jurisdiction of the PAA is a "question of statutory construction," after which he proceeds to opine concerning the correct interpretation of the Act's jurisdictional provisions. *See* Dkt. 135-3 pp. 3-7. Yet, as this Court has previously held, the meaning or interpretation of a law or regulation "is a matter for the court to decide; expert testimony is neither helpful nor proper." *In re Genetically Modified Rice Litigation*, 666 F. Supp. 2d at 1021 (citing *S. Pine Helicopters, Inc.*, 320 F.3d at 841). As such, Stewart's opinions concerning the PAA's jurisdictional requirements fall squarely outside the permitted bounds of expert testimony.

Similarly, Stewart opines as to whether the PAA preempts Plaintiffs' previously dismissed claims for trespass and nuisance, while expounding upon the merits of the Tenth Circuit's opinion in *Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015)—the sole decision to recognize a distinction between nuclear occurrences that give rise to PAA claims and so-called "lesser nuclear occurrences," to which the PAA is not applicable. *See* Dkt. 135-3, pp. 7-9. Regardless of the merits of his legal opinion concerning these issues, "matters of law are for the trial judge," and in instances where the question to be decided is "whether federal law was contravened . . . expert opinion as to that [is] simply inadmissible." *S. Pine Helicopters, Inc.*, 320 F.3d at 841.[4] As such, Stewart's purported "expert" opinions concerning whether Plaintiffs' previously dismissed claims for trespass and nuisance are preempted by the PAA have no bearing on the instant motion and should be disregarded.

---

[4] Further, in arguing in favor of the holding in *Cook,* Stewart explicitly relies on his own improper expert opinions concerning the correct interpretation of the PAA's jurisdictional provisions. *See* Dkt. 135-3, p. 8 ("As shown above, the Act covers only claims arising out of a 'nuclear incident' 'including an extraordinary nuclear occurrence,' involving specified nuclear-related materials in activities subject to federal regulations and/or indemnity agreements.").

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Lastly, to the extent that Stewart proffers his expert opinion regarding the standard for proving a PAA claim, *see* Dkt. 135-3, p. 9, his opinions are little more than legal conclusions dressed up with the trappings of expert testimony. Indeed, this entire section of the Stewart Report is largely a recitation of the Third Circuit's holding in *In re TMI*, 67 F.3d 1103 (3d Cir. 1995), followed by Stewart's commentary as to the soundness of that decision and its adoption by the Court in *McClurg v. Mallinckrodt, Inc.*, 2017 WL 2929444 (E.D. Mo. July 7, 2017). However, in relying on Stewart's "expert" opinion in their reply brief, Plaintiffs blatantly ignore that "it is not appropriate for expert witnesses to draw legal conclusions," and that "[e]xpert witnesses must do more than simply summarize documents with a tilt favoring a litigant." *See In re Genetically Modified Rice Litigation*, *supra* at 1025.

In light of the above, it is clear that the "expert" opinions proffered by Stewart pertain to purely legal issues and are tantamount to impermissible conclusions of law. As such, the Court should disregard the Stewart Report and all of Plaintiffs' arguments that rely upon it.

### C. The Stewart Report Is Based on Unsupported Factual Assumptions and Alleged Contamination at Properties Unrelated to Plaintiffs' Complaint

In addition to impermissibly opining about purely legal issues and proffering impermissible conclusions of law, Stewart fails to disclose the basis for the key factual assumptions underlying his opinions, and confusingly refers to alleged contamination at sites and locations other than the West Lake Landfill. As such, Plaintiffs should not be permitted to rely on the Stewart Report in support of their motion.

Throughout his report, Stewart repeatedly declares that the materials allegedly disposed of in the West Lake Landfill were "uranium mill tailings," which he concludes cannot form the basis of a PAA claim. *See* Dkt. 135-3, pp. 2-5. However, nowhere in his report does Stewart explain the basis for his conclusion that these materials were "uranium mill tailings," other than a

perfunctory statement to the effect that the Stewart Report "is based on the following factual assumptions and documents, provided to [Stewart] by counsel." *See* Dkt. 135-3, p. 2. Indeed, the character and nature of those materials has not yet been determined and remains a contested issue in this case. As a result, the Stewart Report either assumes facts not currently in evidence or is based on information that has not yet been, but should be, disclosed to Cotter.

Furthermore, the Stewart Report erroneously states that "[t]he issue in this case is whether injuries caused by releases of radioactivity from the mill tailings disposed of at the SLAPS sites, Latty Avenue sites, and/or Bridgeton Landfill represent" a nuclear incident or extraordinary nuclear occurrence. *See* Dkt. 135-3, p. 3. The Stewart Report also insists that emissions of radioactive materials from the Latty Avenue site (as opposed to the West Lake Landfill), as measured "from the fencepost of the licensed location," should form the basis for any PAA claim against Defendants. However, since the inception of this matter, Plaintiffs' theory of the case – as articulated in their pleadings – has been that their property was contaminated by radioactive materials that were either emitted from the <u>West Lake Landfill or were spread while those materials were transported to the West Lake Landfill</u>. *See e.g.*, Dkt. 1-3 (Plaintiffs' Initial Complaint), ¶ 98, Dkt. 70 (Plaintiffs' Amended Complaint), ¶ 99. Simply put, the Stewart Report's discussion of emissions from SLAPS or the Latty Avenue site is completely irrelevant to Plaintiffs' allegations and goes well beyond the scope of the Case Management Orders (Dkt. 102, 119) that the Court has put in place.

In light of the above, the Court should disregard the improper "expert" opinions stated in the Stewart Report as well as Plaintiffs' arguments that rely upon the same.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

## II. Other New Issues and Arguments Raised by Plaintiffs' in Their Reply Brief

In addition to their inclusion of and reliance upon the procedurally improper and substantively defective Stewart Report, Plaintiffs introduce a host of other new issues and arguments they failed to raise in their opening brief, as discussed below. As with the Stewart Report, these new arguments were improperly included in Plaintiffs' reply brief. *Neiswonger*, 580 F.3d at 775.

### A. Plaintiffs Rely On an Inapposite Staff Director Decision from the NRC to Support their View that the Radioactive Materials Underlying Their Claims Were Beyond Federal Regulatory Jurisdiction[5]

In their reply brief, Plaintiffs introduce new arguments premised on *Envirocare of Utah & Snake River All.*, 56 N.R.C. 53 (Dec. 13, 2000), to contend that the NRC has already determined that it did not have jurisdiction regarding the sorts of radioactive materials allegedly disposed of in the West Lake Landfill and that, as a result, the PAA does not apply to their claims.[6] Indeed, Plaintiffs go so far as to claim that, through *Envirocare*, "the [NRC] has spoken on this issue—authoritatively—concluding that if waste was produced prior to 1978 it is not subject to NRC regulations and license." *See* Dkt. 135, p. 13. However, not only does *Envirocare* not actually support Plaintiffs' claims, as addressed below, but Plaintiffs misleadingly cite that decision as if it were a published adjudicatory decision entitled to significant judicial deference. There is no deference due to *Envirocare*, however, because it was issued by an NRC staff director[7] and thus, is neither a court decision nor even an agency

---

[5] Plaintiffs raised this identical argument in their 2017 motion to remand, Dkt. 48. Thus, there is no reason why it could not have been raised in their moving brief. *See* Defendants' Opposition, Dkt. 64, pp. 14-16, for further discussion and argument on this point.

[6] Plaintiffs also misleadingly suggest in their reply brief that the NRC has already determined in *Envirocare* that Cotter's source material license did not apply to the radioactive materials underlying Plaintiffs' claims. *See* Dkt. 135, p. 7 (stating that "even if it is determined that Cotter's "source material license is determined to apply to the wastes at issues, *despite the NRC's conclusion [in Envirocare] that it did not* . . ."). This is patently false. Cotter was not a party to *Envirocare*, nor did that staff direction decision involve the West Lake Landfill.

[7] The proper cite for *Envirocare* is 56 NRC 53, DD-00-06, which reflects a "director's decision."

adjudicatory decision. A director's decision is issued in response to any member of the public who files a petition with the NRC staff to modify, suspend, or revoke an existing license. *See* 10 C.F.R. § 2.206; *see also Envirocare*, 56 NRC at 53 (the Petitioners "filed separate petitions pursuant to 10 C.F.R. § 2.206"). Indeed, as recognized in *Pacific Gas & Electric Co.* (Diablo Canyon Nuclear Plant, Units 1 and 2), LBP-93-9, 37 NRC 433, 443-44 (1993), which *is* an adjudicatory decision of the NRC, a staff director's decision does not "constitute an adjudicatory decision under section 189b. of the Atomic Energy Act of 1954, as amended." As such, Plaintiffs have mischaracterized the nature of *Envirocare*'s authority.

Were this not enough to demonstrate why this Court should disregard *Envirocare*, the director's decision in *Envirocare* was narrowly tailored to answer questions that are neither relevant to, nor binding on, this lawsuit. The question before the NRC staff director in *Envirocare* was whether the NRC's regulatory jurisdiction "extends to those ore processing residuals or mill tailings currently being remediated by the [Army Corps of Engineers] under the [Formerly Utilized Sites Remedial Action Program (FUSRAP)]." *Envirocare*, 56 NRC at 61. The allegations in *this* action, however, have nothing to do with NRC's *current* jurisdiction over radioactive materials at the West Lake Landfill (which, moreover, are not being remediated by the Army Corps, nor is the Landfill being managed under the FUSRAP program). Rather, without reference to the PAA, the *Envirocare* "decision" explicitly pertains to mill tailings, which Plaintiffs assume and allege are present at West Lake, but which Defendants dispute. Plaintiffs insist that this decision proves their point, when the thrust of the decision is whether NRC had jurisdiction over the disposal of mill tailings from FUSRAP sites – facts not demonstrated here. In sum, *Envirocare* has no bearing on preemption under the PAA or the definition of the materials that could potentially give rise to a nuclear incident under the PAA.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**B.      Although a Petition for Writ of Certiorari Was Filed in Connection with the *Ware* Case, that Does Not Render that Opinion Any Less Persuasive Here**

In their reply brief, Plaintiffs suggest that this Court should disregard the Third Circuit's holding in *Estate of Ware v. Hosp. of the Univ. of Pa.*, 871 F.3d 273, 282-83 (3rd Cir. 2017)—which rejected the holding from *Gilberg v. Stepan Co.,* 24 F. Supp. 2d 325, 340 (D.N.J. 1998) that Plaintiffs chiefly rely upon in support of their motion—because a petition for writ of certiorari was filed with the Supreme Court in that matter.  Setting aside the low likelihood that the Supreme Court will grant certiorari,[8]  *Ware* is not the only case to have rejected or criticized *Gilberg.  See Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir. 2000) (noting *Gilberg*'s analysis and rejecting attempt to curb federal jurisdiction over claim for radiation injuries); *Carey v. Kerr-McGee Chem. Corp.*, 60 F. Supp. 2d 800,806-07 (N.D. Ill. 1999) (criticizing and declining to follow *Gilberg*); *Cotromano v. United Techs. Corp.*, 7 F. Supp. 3d 1253, 1258 (S.D. Fla. 2014) (same).   Regardless, *Ware*'s rejection of *Gilberg* and its capacity as persuasive authority for this Court remain unchanged notwithstanding the filing of the petition for writ of certiorari (which petition, furthermore, was filed in December 2017, and thus was available at the time of Plaintiffs' filing of its moving brief; *see* Dkt. 135, p.5).

**C.      Plaintiffs Erroneously Contend that the CMO Fails to Reflect the Appropriate Standard for a PAA Claim**

Relying on the improper expert opinions contained in the Stewart Report, Plaintiffs maintain that the operative CMO should be amended to focus on "the 'release of contaminants from Defendants [sic] property," and that "the release measurements should be taken from the fencepost of . . . the Latty Avenue site."  *See* Dkt. 135, p. 11.

---

[8] The chances of the Supreme Court granting this writ for certiorari are remarkably low.  For instance, in the 2016 term, despite the Supreme Court docketing over 6,305 cases, it only granted petitions for certiorari 74 times, which constitutes a "success rate" for petitions of roughly 1.2 percent.  The Supreme Court's Journal for the 2016 term, which contains statistics concerning, among other things, grants of petitions for writs of certiorari is available at https://www.supremecourt.gov/orders/Jnl16.pdf.

Plaintiffs' arguments, however, are premised upon two false assumptions. First, Plaintiffs incorrectly assume that Stewart's "expert" opinion regarding the correct standard of care is determinative of this issue and binding on the Court—it is not. As set forth above, the opinions contained in the Stewart Report, including those regarding the correct standard applicable to a PAA claim, pertain to purely legal issues and are tantamount to impermissible conclusions of law. Indeed, Plaintiffs seems to have forgotten that one of the purposes of the upcoming dispositive motions contemplated by the CMO is to address what standard is applicable to Plaintiffs' PAA claims.

Second, as part of their effort to shift the focus of discovery in this early phase of litigation away from the alleged radioactive contamination on their property to the purported releases of radiation from Defendants' property,[9] Plaintiffs incorrectly assume that they need not demonstrate presence of radioactive materials in their own home in order to maintain a claim against Defendants. In so doing, Plaintiffs wholly ignore the CMO in this matter, which was intentionally prepared to advance the proportionality principles of the Federal Rules of Civil Procedure by limiting discovery at this initial phase to the threshold issue of whether they can *demonstrate the presence of radioactive contamination in their own home*—a far less burdensome task for all involved compared to investigating purported historical "releases" from unrelated properties, dating back over forty years. As such, and in light of the above, the Court should not modify the scope of discovery permitted under the CMO.

---

[9] Bizarrely, Plaintiffs now contend via the Stewart Report that releases should be measured at the fencepost of Latty Avenue, even though their entire theory of the case (as set forth in the pleadings) is premised on emissions of radioactive materials from West Lake Landfill or from hauling activities to and from the West Lake Landfill. Plaintiffs cannot simply amend their pleadings through their briefing.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

**D.    Without Citing Any Relevant Legal Authority, Plaintiffs Erroneously State That Cotter Engaged in Illegal Activities and Felonious Conduct**

Finally, Plaintiffs introduce new arguments – without any basis or support – that Cotter illegally and feloniously disposed of radioactive materials in the West Lake Landfill, even going so far as to suggest that Cotter's alleged actions violated 18 U.S.C. § 831, a federal statute adopted by Congress to criminalize the use of certain nuclear materials in connection with terrorist activities and radioactive dispersal devices.    *See Pub. L.* 104-132 § 501(a) (Congressional findings concerning, among other things, "that threat that nuclear materials will be obtained and used by terrorist and other criminal organizations").    Setting aside the obviously inflammatory nature of these wholly unsupported claims, it is unclear how this statute would apply to Plaintiffs' allegations given that none of the materials Cotter is alleged to have handled or disposed of fit within the definitions of "nuclear material" and "nuclear byproduct material" as set forth in the statute.    *See* 18 U.S.C. § 831(g)(1) (defining nuclear material); 18 U.S.C. § 831(g)(2) (defining nuclear byproduct material).

Further suggesting that Cotter has somehow engaged in criminal conduct, Plaintiffs maintain that Cotter's source material license is inapplicable to the instant case because "it does not cover the illegal disposal of the wastes at the West Lake Landfill, an unlicensed disposal facility."    *See* Dkt. 135, p. 7.    In an effort to bolster this specious claim, Plaintiffs attach and cite to "some non-certified documents from an EPA proceeding wherein Cotter states that they have no connection to the West Lake Landfill."    *See* Dkt. 135, p. 7, fn. 15 (referencing Exhibit 6 to the reply brief – Cotter Corporation's responses to the EPA's July 12, 1991 CERCLA 104(e) Information Requests).    However, Plaintiffs have grossly mischaracterized Cotter's responses, as any reading of the actual documents will show.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be denied. Instead of responding to Defendants' substantial and substantive arguments, they introduce in their reply brief new issues, arguments, and evidence, including production of the Stewart Report, which the Court should disregard and strike altogether, as it is procedurally improper and substantively defective. Plaintiffs further rely on unpersuasive "authority" from the NRC that is inapplicable here because that decision dealt with what were clearly uranium mill tailings, whereas it has not been established that the wastes at issue fall into this category, and Defendants have contested Plaintiffs' bald conclusions that the materials at West Lake are uranium mill tailings throughout this litigation. Plaintiffs' arguments fail because they cannot, and do not, rebut the legal authority Defendants have cited. Resorting to improper expert opinions, *ad hominem* attacks, and generally out-of-scope arguments and issues does not save their arguments or the basic premise of their original motion. Moreover, Plaintiffs' repeated efforts to move the goalposts in this case at every possible juncture serve only to drive up Defendants' costs by requiring filing of multiple motions (such as the instant one). Accordingly, this Court should end Plaintiffs' repeated attempts to re-wind the clock, delay these proceedings, and ignore the existing CMOs, so the parties can proceed to dispositive motions and timely resolution of this matter.

Dated: May 8, 2018                    Respectfully submitted,

                                      /s/ Stephanie R. Feingold
                                      MORGAN LEWIS & BOCKIUS, LLP
                                      John McGahren, Esq. (ID 046791990N)
                                      john.mcgahren@morganlewis.com
                                      Stephanie R. Feingold. Esq. (ID 23182005N)
                                      stephanie.feingold@morganlewis.com
                                      502 Carnegie Center
                                      Princeton, NJ 08540
                                      (609) 919-6600 (telephone)
                                      (609) 919-6701 (facsimile)

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

BRYAN CAVE LEIGHTON PAISNER LLP
Dale A. Guariglia, Mo. Bar 32988
daguariglia@bclplaw.com
Erin L. Brooks, Mo. Bar 62764
erin.brooks@bclplaw.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

ATTORNEYS FOR DEFENDANT
COTTER CORPORATION (N.S.L.)

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2018, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record, and caused the same to be served upon the following by U.S. mail, first-class postage:

Robert G. Rooney
William Garland Beck
Peter F. Daniel
Allyson Elisabeth Cunningham
Lathrop and Gage, LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108

Patricia L. Silva
Lathrop and Gage, LLP
7701 Forsyth Boulevard, Suite 500
Clayton, MO 63105

Celeste Brustowicz
Cooper Law Firm L.L.C.
1525 Religious Street
New Orleans, LA 70130

Barry J. Cooper, Jr.
Cooper Law Firm, L.L.C.
508 St. Philip Street
New Orleans, LA 70116

Victor T. Cobb
Cooper Law Firm L.L.C.
1525 Religious Street
New Orleans, LA 70130

/s/ Stephanie Feingold

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:17-cv-00024-CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | ORAL ARGUMENT REQUESTED |

**DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT
REQUESTING PLAINTIFFS BE PREVENTED AND ENJOINED
FROM USING INFORMATION AND MATERIALS THEY WITHHELD
<u>UNTIL LATE IN THE DISCOVERY PERIOD</u>**

Defendants Bridgeton Landfill, LLC, Republic Services, Inc., and Allied Services, LLC

("Defendants"), by and through counsel, respectfully request that the data, information and other

materials, and a purported expert report produced by Plaintiffs in the final days and hours before

the discovery deadline be unavailable for Plaintiffs' use during the period covered by the Court's

Amended Case Management Order. Defendants also seek an opportunity for oral argument on

this Motion. In support of this Motion, Defendants state as follows:

<u>**INTRODUCTION**</u>

In this case, Plaintiffs allege their property has been contaminated by radioactive

material. Following the Rule 16 Conference, this Court issued an Initial Case Management

Order focused on the issue of whether there is contamination present that would rise to the level

of a Price-Anderson Act ("PAA") violation. The parties were to provide information regarding

this issue by February 9 in their Initial Disclosures, and focus additional discovery on this issue.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

This has not happened. Despite Plaintiffs' obligations to timely provide information and materials in disclosures and in response to discovery, it is now clear they withheld massive amounts of information, data, and materials, and orchestrated a data dump in the final days and hours of the discovery period defined in the Court's order. By doing so, they have severely curtailed Defendants' ability to assess or challenge this information and data in the period designated for discovery. For this reason, Plaintiffs should not be allowed to use the electronic files, "supplemental" discovery responses and "supplemental" Initial Disclosures, and report produced at the end of the discovery period in any motion, response, or reply filed in accordance with Paragraph 2 of the Amended Case Management Order (Doc. No. 119). Alternatively, if the Court allows Plaintiffs to use any of these materials, Defendants seek additional time to analyze the late-produced materials, conduct additional discovery into them, and challenge and rebut Plaintiffs' purported expert if he will be allowed to give opinions in this initial phase of the litigation despite the out-of-time production of his report.

## ARGUMENT

### A.    The Court's Discovery Phase Under the Case Management Order

On December 15, 2017, the Court held a Rule 16 Conference with all the parties, and invited the parties to begin written discovery immediately. On January 2, 2018, the Initial Case Management Order ("CMO") was issued. In this CMO, the Court limited discovery to issues "related to the samples collected at Plaintiffs' home and property, and the issue of whether the levels of radioactive contamination are sufficient to show a PAA violation." Discovery was to be completed "no later than March 2, 2018." Doc. No. 102 at 2.

Plaintiffs sought an extension of the deadlines under the CMO and the Court issued its Amended Case Management Order ("Amended CMO") with an identical limitation on the scope

of discovery, but a modification to the deadline ordering that the parties "shall **complete** all

discovery" by May 2, 2018.  Doc. No. 119 at 1 (emphasis added).

**B.     Defendants' Discovery to Plaintiffs and Efforts to Obtain Complete Responses**

Soon after the Rule 16 Conference, Defendants issued their first request for production of

documents to plaintiffs.[1]  This discovery focused on requesting documents related to the

sampling and testing performed on Plaintiffs' property, including lab data, chain of custody

evidence, and quality assurance protocols used in sample collection through analysis, as well as

documentation that the protocols were followed.  Also, field sampling plans, field survey data,

field notes, protocols for conducting sampling and the use of field instruments, and the results of

any field testing were requested.

On January 23, 2018, defendant Bridgeton Landfill, LLC ("Bridgeton") issued its First

Interrogatories and First Request for Production of Documents to Plaintiffs.  In the

interrogatories, Bridgeton sought the identification of any test that allegedly detected

radionuclides on the Plaintiffs' property, the testing performed, date of the sampling used in the

test, the identity of the individual performing the sampling as well as any witness present, the

testing entity, the party performing any analysis or interpretation of the testing, and how the

results of any testing or analysis was memorialized.  Also, Plaintiffs were asked to state the dose

limit they contend is necessary for a PAA violation in this case and the basis for that contention,

as well as the method or analysis they had used to demonstrate a PAA violation, if any.

In the First Request for Production of Documents, Bridgeton sought photographs

supporting the allegations in the Complaint, photos of the interior of the Plaintiffs' home, and

---

[1] This set of discovery was propounded by all Defendants to Plaintiffs.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

documents supporting both the Plaintiffs' position regarding the applicable dose limit in this case and any claim that there is contamination sufficient to constitute a violation of the PAA.

In an attempt to ensure that Plaintiffs were providing everything in their possession or control, Defendants sent five separate, substantial pieces of correspondence seeking to learn if information or material existed that had not been produced. Those letters were sent to Plaintiffs' counsel on February 19, March 22, March 23, April 2, and April 12, 2018. In addition, issue-intensive meet and confer conference calls occurred on February 14 and March 28, 2018. These letters and conference calls resulted in additional productions from Plaintiffs. At the end of those efforts, Plaintiffs' counsel represented that they provided everything in their possession or control. Based on this representation, there was no reason to pursue a motion to compel with this Court.

**C.** **Plaintiffs Serve an "Expert" Report on May 3, 2018 at 12:02 a.m.**

Early on the morning of May 3, 2018 (after the close of discovery), Plaintiffs served the report of Phillip Plato on Defendants. Approximately 25 minutes earlier, at 11:37 p.m. (CDT), Plaintiffs served "Supplemental and Amended Responses" to Bridgeton's First Interrogatories and Request for Production of Documents. In that "supplemental" response, Plaintiffs identified, for the first time in any document or conversation, Phillip Plato, and provided "Draft #3" of his report. Plato's final draft appeared in defense counsel's email inboxes 25 minutes later at 12:02 a.m. on May 3, with a request from Plaintiffs' counsel to disregard the one sent at 11:37 p.m. The Plato report attempts to formulate an opinion to support the allegation that the Dailey property has been contaminated. However, *even now* the Plato report is incomplete. For example, he has failed to provide key information, including the calculations used by him to determine his purported dose and risk assessment at the Dailey property.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Earlier, at 5:33 p.m. (CDT) on May 2, 2018, Plaintiffs also served their "Supplemental Initial Disclosures," which identified at least 23 categories and thousands of pages of documents not previously identified in any prior Initial Disclosure.[2]  At that time, Plaintiffs' counsel wrote that he would "share a Dropbox folder with all materials referenced shortly."  That Dropbox link was provided later in the evening.  This Dropbox contained *3.28 gigabytes* of data.

The last-minute "supplemental" Initial Disclosures, data dump, "supplemental" discovery responses, and out-of-time "expert" report left Defendants with no opportunity before the end of the discovery period to analyze the new productions or assess and test the validity or admissibility of the Plato report.  Much like the report of Richard Stewart, which was sprung on Defendants in an earlier reply brief, it appears that Plaintiffs' decision to withhold the Plato report until the last hours of discovery was intended to deny Defendants the chance to timely depose him pursuant to Rule 26(b)(4)(A), and calculated to engage in an end-run around the parties' upcoming dispositive motions concerning, among other things, the standard applicable to Plaintiffs' claims and the level of contamination allegedly present at Plaintiffs' property.  Ultimately, Plaintiffs' efforts to skirt the basic procedural requirements for the introduction of expert reports, opinions, and testimony have prevented Defendants from probing the bases for Plato's opinions, resulting in severe prejudice to Defendants.[3]

## D.      Plaintiffs Also Mischaracterized the Contents of a Thumb Drive Produced at the Deposition of Marco Kaltofen

On April 20, 2018, Plaintiffs engaged in a similar effort to sandbag Defendants.  Despite the fact Marco Kaltofen was the individual who coordinated and hired others to do all of the

---

[2] Initial Disclosures were due under the Court's CMO on February 9, 2018.  No attempt was made by Plaintiffs to supplement the Initial Disclosures between February 9 and the evening of May 2, 2018.

[3] At this juncture, Defendants are opposing Plaintiffs' use of the Plato report based only on the timing of its late production.  Defendants reserve the right to raise additional issues should the Court allow Plaintiffs to use the report or allow Plato to testify.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

sampling at the Dailey home, Plaintiffs did not voluntarily produce him. Instead, Defendants had to subpoena him to appear in Boston for his deposition. At that deposition, Plaintiffs and Kaltofen produced for the first time a thumb drive, which was marked as Deposition Exhibit 10. During the Kaltofen deposition, plaintiffs' counsel, Celeste Brustowicz, represented to defense counsel that the contents of the thumb drive was "a duplicate of everything that appears here that [sic] has already been produced with the exception of the spreadsheets and, I believe, the photograph we discussed off the record."[4] Deposition of M. Kaltofen, 71:5-19, an accurate copy of the relevant part of which is attached as **Exhibit A**.

Taking Ms. Brustowicz at her word, the thumb drive did not become a significant area of questioning during the deposition. Although there was some discussion of limited additional materials on the thumb drive (e.g., Kaltofen's bills to counsel and contract for services), the extent of the materials contained on the thumb drive was not revealed. Only after the deposition was complete did defense counsel learn that Ms. Brustowicz's characterization of the contents of Exhibit 10 was incorrect, and that it in fact contained over **_four gigabytes_** of data and **_over four thousand files_**.

Had the contents of the drive been disclosed, defense counsel could have questioned Kaltofen about the material or, at least, requested an adjournment of the deposition to allow for a meaningful review of the contents before the deposition was reconvened. Once the Brustowicz mischaracterization was made and accepted, however, there was no opportunity to further explore the drive with Kaltofen or anyone else because the production of the drive on April 20 occurred only 12 days (and only eight business days) before the close of discovery.

---

[4] At this point in time, Plaintiffs had produced some documents from Eberline, Microvision, and AccuStar labs, some field notes (some were reported to be lost), photographs, and data from a survey instrument.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**E.** **Plaintiffs Should Not Be Rewarded for Their Intentional Efforts to Withhold Evidence Until the Last Moment of the Discovery Period**

It is now apparent, in light of the last-second production of materials, that Plaintiffs believe they can withhold information and produce it in a manner that prevents Defendants from having a meaningful opportunity to review it or ask questions of witnesses about it.[5] They have employed a *modus operandi* that is now clear and undeniable: they delay the release of information and production of materials, even after representing that they have nothing remaining, and then engage in last-minute data dumps and discovery "supplementation" which provide the defense no time to review or challenge it, or depose witnesses about it.

The Plato report, the data developed and used for the Plato report, the supplemental disclosures and discovery responses, and the 3.26 gigabytes of data on the Dropbox were not produced until the evening and night of May 2, and early morning hours of May 3, 2018. Likewise, the contents of the thumb drive produced during the April 20, 2018 deposition of Kaltofen should have been identified and produced much earlier. Kaltofen was the individual responsible for coordinating all sampling at the Dailey property, and it is now clear the vast majority of the drive, if not its entirety, had been in his possession for months and possibly years. It is also indisputable that Plaintiffs and their counsel had control over the ability to produce the data and other information in Kaltofen's possession – as was definitively demonstrated when he ultimately produced the material at his April 20, 2018 deposition. Plaintiffs' counsel's decision to, even then, mischaracterize the contents of the previously unproduced drive speaks volumes to their intent and the strategy behind the now-revealed effort to withhold evidence until a time late

---

[5] The attempt to spring experts and expert reports without notice was also attempted by Plaintiffs when they identified and used the report of undisclosed "expert" Richard Stewart in an earlier reply brief. *See* Doc Nos. 135 and 135-3.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

enough in discovery to prevent Defendants from any real opportunity to review it or question witnesses about it.

## **RELIEF SOUGHT**

Because this motion stems from the schedule established under the Amended CMO, relief is sought under Fed. R. Civ. P. 16(f) and this Court's inherent power to enforce its own orders. *See Travel Tags, Inc. v. UV Color, Inc.*, No. 09-1619 (JRT/AJB), 2010 U.S. Dist. LEXIS 144874, at *5 (D. Minn. Apr. 9, 2010) (citation omitted).

Plaintiffs should not be rewarded for under-handed tactics. The decision to withhold the Plato identification and report, the underlying data, the supplemental disclosures, the 3.28 gigabytes of data, and the supplemental discovery responses until the night of May 2 and morning of May 3, 2018 is calculated and improper. Accordingly, all the materials produced by Plaintiffs on May 2 and 3, 2018 should be unavailable to them during this phase of the litigation.

Similarly, the thumb drive produced on April 20, 2018 (Kaltofen Exhibit 10), which was ultimately found to contain over 4 gigabytes of data and four thousand files, should be unavailable to Plaintiffs during this phase of the litigation and plaintiffs should not be allowed to refer or use it in any way. Any other outcome would be severely prejudicial, especially after the contents of the thumb drive were incorrectly represented.

Any other outcome would also be unjust. Defendants were not given an opportunity to review the material with sufficient time to meaningfully use it or challenge it before the end of discovery. Similarly, the late identification of Plato and the production of his report *out of time* have prevented Defendants from questioning him, challenging his theories and methods, or exploring his knowledge about the validity of the underlying data he uses. Defendants have been severely prejudiced by Plaintiffs' sandbagging efforts and last minute production tactics, and respectfully request that the Court prevent and enjoin Plaintiffs from using the contents of the

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

thumb drive (Exhibit 10 of the Kaltofen deposition), and all supplemental discovery responses
and disclosures and reports (as well as data and materials provided with those reports and
supplemental responses) that were produced on May 2 and 3, 2018.  This use prohibition should,
at least, apply to any briefing and responses to briefing contemplated under Paragraph 2 of the
Amended CMO.   A proposed order providing for this relief is attached as **Exhibit B** to this
Motion.  Alternatively, if the Court allows Plaintiffs to use this material, Defendants seek
additional time to analyze the late-produced materials, conduct additional discovery into it, and
challenge and rebut Phillip Plato's report if his testimony will be allowed.

Finally, Defendants seek an opportunity to be heard in oral argument on this Motion.  Not
only is this a time-sensitive matter in light of the briefing deadline of June 4, 2018, but the relief
sought in this Motion would affect the materials that could be used in those briefs and may affect
the deadline under the Amended CMO.

Dated: May 18, 2018                          LATHROP GAGE LLP


By: _/s/ William G. Beck_
       William G. Beck          26849MO
       Peter F. Daniel          33798MO
       Robert G. Rooney         43381MO
       Allyson E. Cunningham  64802MO
       2345 Grand Boulevard, Suite 2200
       Kansas City, Missouri  64108-2618
       Telephone:        (816) 292-2000
       Telecopier:       (816) 292-2001
       wbeck@lathropgage.com
       pdaniel@lathropgage.com
       acunningham@lathropgage.com

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Patricia Lehtinen Silva    67213MO
Pierre Laclede Center
7701 Forsyth Boulevard, Suite 500
Clayton, Missouri  63105
Telephone:        (314) 613-2800
Telecopier:       (314) 613-2801
psilva@lathropgage.com

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2018, I electronically filed the foregoing document via the Court's CM/ECF system, which will serve notice on all counsel of record.

_/s/ William G. Beck_
An Attorney for Defendants

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

Michael Dailey, et al., )
      Plaintiffs, )
              )   Case
   versus        )   No. 4:17-CV-00024-CDP
              )
Bridgeton Landfill, LLC, )
et al.,         )
      Defendants. )

VIDEOTAPED DEPOSITION OF MARCO KALTOFEN, PH.D.

April 20, 2018

9:29 a.m.

Lathrop Gage, LLP

28 State Street, Suite 700

Boston, Massachusetts

---- Reporter: Julie Thomson Riley, RDR, CRR ----

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

```
 1    APPEARANCES:

 2    Counsel for the Defendants Bridgeton Landfill, LLC,

 3    Republic Services, Inc., Allied Services, LLC, and

 4    Rock Road Industries, Inc.:

 5    Lathrop Gage, LLP

 6         by William G. Beck, Esquire

 7         2345 Grand Boulevard, Suite 2200

 8         Kansas City, Missouri 64108-2618

 9         (816) 292-2000

10         wbeck@lathropgage.com

11

12    Counsel for the Plaintiffs:

13    Cooper Law Firm, LLC

14         by Celeste Brustowicz, Esquire

15         508 Rue Saint Philip Street

16         New Orleans, Louisiana 70116

17         (504) 291-1344

18         cbrustowicz@sch-llc.com

19

20

21

22

23

24    (continued)

25
```

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

1    APPEARANCES (continued)

2    Counsel for the Defendant Cotter Corporation:

3    Morgan, Lewis & Bockius, LLP

4        by John McGahren, Esquire

5        502 Carnegie Center

6        Princeton, New Jersey 08540

7        (609) 919-6641

8        john.mcgahren@morganlewis.com

9

10

11   Also Present:

12   Shawn Budd, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 4:17-cv-00064-CDP Doc #: 142 Filed: 01/28/23 Page: 657 of 903 PageID #: 22868

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

```
 1              MR. BECK:  Thank you.

 2              (Document was marked Exhibit No. 10 for

 3       identification.)

 4       BY MR. BECK:

 5          Q.    Dr. Kaltofen, I'm going to hand you what

 6       I've now marked, jumping over some numbering, as

 7       Exhibit 10, which is a thumb drive you brought to

 8       the deposition today.  Is that what that is?

 9          A.    Yes, sir.

10          Q.    All right.  That will be with the record.

11       We'll make copies for everybody for their copies of

12       the deposition --

13              MS. BRUSTOWICZ:  I appreciate it.

14          Q.    -- and we'll know what you produced today.

15              MS. BRUSTOWICZ:  Which is a duplicate of

16       everything that appears here that has already been

17       produced with the exception of the spreadsheets and,

18       I believe, the photograph we discussed off the

19       record.

20              THE WITNESS:  Somebody take this out of my

21       custody.  It's so tiny.

22              MR. BECK:  The court reporter has all the

23       exhibits.

24              THE WITNESS:  Ah, there you go.  It's not

25       my worry then.
```

Case: 4:17-cv-00064-CDP Doc. #: 142 Filed: 04/28/23 Page: 658 of 903 PageID #: 22899

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

```
 1                 CERTIFICATE OF REPORTER

 2       I, Julie Thomson Riley, RDR, CRR, do certify

 3   that the deposition of Marco Kaltofen, Ph.D., in the

 4   matter of Michael Dailey, et al. vs. Bridgeton

 5   Landfill, LLC, et al., on April 20, 2018, was

 6   stenographically recorded by me; that the witness

 7   provided satisfactory evidence of identification, as

 8   prescribed by Executive Order 455 (03-13), issued by

 9   the Governor of the Commonwealth of Massachusetts,

10   before being sworn by me, a Notary Public in and for

11   the Commonwealth of Massachusetts; that the

12   transcript produced by me is a true and accurate

13   record of the proceedings to the best of my ability;

14   that I am neither counsel for, related to, nor

15   employed by any of the parties to the above action;

16   and further that I am not a relative or employee of

17   any attorney or counsel employed by the parties

18   thereto, nor financially or otherwise interested in

19   the outcome of the action.

20

21   April 29, 2018          _____

22                           Julie Thomson Riley, RDR, CRR

23

24

25
```

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# Exhibit B

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:17-cv-00024-CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## [PROPOSED] ORDER

Upon consideration of Defendants' Motion Requesting Plaintiffs Be Prevented and Enjoined From Using Information and Materials They Withheld Until Late in the Discovery Period [#_____], the Court finds good cause for the relief requested.

**IT IS HEREBY ORDERED** that Defendants' Motion is **GRANTED**.  Plaintiffs shall not be able to use any of the following materials as support in any motion, response, or reply filed in accordance with paragraph 2 of the Amended Case Management Order [#119]:

(1)       All materials contained on the thumb drive identified as Exhibit 10 to the Kaltofen deposition; and

(2)       All documents and materials produced for or served on Defendants as supplemental initial disclosures, supplemental discovery responses, or expert reports on May 2 and 3, 2018.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this _____ day of May, 2018.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No.  4:17-cv-00024-CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | ORAL ARGUMENT REQUESTED |

**DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT**
**REQUESTING PLAINTIFFS BE PREVENTED AND ENJOINED**
**FROM USING INFORMATION AND MATERIALS THEY WITHHELD**
**UNTIL LATE IN THE DISCOVERY PERIOD**

Defendants Bridgeton Landfill, LLC, Republic Services, Inc., and Allied Services, LLC

("Defendants"), by and through counsel, respectfully request that the data, information and other

materials, and a purported expert report produced by Plaintiffs in the final days and hours before

the discovery deadline be unavailable for Plaintiffs' use during the period covered by the Court's

Amended Case Management Order.  Defendants also seek an opportunity for oral argument on

this Motion.  In support of this Motion, Defendants state as follows:

**INTRODUCTION**

In this case, Plaintiffs allege their property has been contaminated by radioactive

material.  Following the Rule 16 Conference, this Court issued an Initial Case Management

Order focused on the issue of whether there is contamination present that would rise to the level

of a Price-Anderson Act ("PAA") violation.  The parties were to provide information regarding

this issue by February 9 in their Initial Disclosures, and focus additional discovery on this issue.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

This has not happened. Despite Plaintiffs' obligations to timely provide information and materials in disclosures and in response to discovery, it is now clear they withheld massive amounts of information, data, and materials, and orchestrated a data dump in the final days and hours of the discovery period defined in the Court's order. By doing so, they have severely curtailed Defendants' ability to assess or challenge this information and data in the period designated for discovery. For this reason, Plaintiffs should not be allowed to use the electronic files, "supplemental" discovery responses and "supplemental" Initial Disclosures, and report produced at the end of the discovery period in any motion, response, or reply filed in accordance with Paragraph 2 of the Amended Case Management Order (Doc. No. 119). Alternatively, if the Court allows Plaintiffs to use any of these materials, Defendants seek additional time to analyze the late-produced materials, conduct additional discovery into them, and challenge and rebut Plaintiffs' purported expert if he will be allowed to give opinions in this initial phase of the litigation despite the out-of-time production of his report.

## ARGUMENT

### A.    The Court's Discovery Phase Under the Case Management Order

On December 15, 2017, the Court held a Rule 16 Conference with all the parties, and invited the parties to begin written discovery immediately. On January 2, 2018, the Initial Case Management Order ("CMO") was issued. In this CMO, the Court limited discovery to issues "related to the samples collected at Plaintiffs' home and property, and the issue of whether the levels of radioactive contamination are sufficient to show a PAA violation." Discovery was to be completed "no later than March 2, 2018." Doc. No. 102 at 2.

Plaintiffs sought an extension of the deadlines under the CMO and the Court issued its Amended Case Management Order ("Amended CMO") with an identical limitation on the scope

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

of discovery, but a modification to the deadline ordering that the parties "shall **complete** all discovery" by May 2, 2018.  Doc. No. 119 at 1 (emphasis added).

**B.**    <u>**Defendants' Discovery to Plaintiffs and Efforts to Obtain Complete Responses**</u>

Soon after the Rule 16 Conference, Defendants issued their first request for production of documents to plaintiffs.[1]  This discovery focused on requesting documents related to the sampling and testing performed on Plaintiffs' property, including lab data, chain of custody evidence, and quality assurance protocols used in sample collection through analysis, as well as documentation that the protocols were followed.  Also, field sampling plans, field survey data, field notes, protocols for conducting sampling and the use of field instruments, and the results of any field testing were requested.

On January 23, 2018, defendant Bridgeton Landfill, LLC ("Bridgeton") issued its First Interrogatories and First Request for Production of Documents to Plaintiffs.  In the interrogatories, Bridgeton sought the identification of any test that allegedly detected radionuclides on the Plaintiffs' property, the testing performed, date of the sampling used in the test, the identity of the individual performing the sampling as well as any witness present, the testing entity, the party performing any analysis or interpretation of the testing, and how the results of any testing or analysis was memorialized.  Also, Plaintiffs were asked to state the dose limit they contend is necessary for a PAA violation in this case and the basis for that contention, as well as the method or analysis they had used to demonstrate a PAA violation, if any.

In the First Request for Production of Documents, Bridgeton sought photographs supporting the allegations in the Complaint, photos of the interior of the Plaintiffs' home, and

---

[1] This set of discovery was propounded by all Defendants to Plaintiffs.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

documents supporting both the Plaintiffs' position regarding the applicable dose limit in this case and any claim that there is contamination sufficient to constitute a violation of the PAA.

In an attempt to ensure that Plaintiffs were providing everything in their possession or control, Defendants sent five separate, substantial pieces of correspondence seeking to learn if information or material existed that had not been produced. Those letters were sent to Plaintiffs' counsel on February 19, March 22, March 23, April 2, and April 12, 2018. In addition, issue-intensive meet and confer conference calls occurred on February 14 and March 28, 2018. These letters and conference calls resulted in additional productions from Plaintiffs. At the end of those efforts, Plaintiffs' counsel represented that they provided everything in their possession or control. Based on this representation, there was no reason to pursue a motion to compel with this Court.

**C.** **Plaintiffs Serve an "Expert" Report on May 3, 2018 at 12:02 a.m.**

Early on the morning of May 3, 2018 (after the close of discovery), Plaintiffs served the report of Phillip Plato on Defendants. Approximately 25 minutes earlier, at 11:37 p.m. (CDT), Plaintiffs served "Supplemental and Amended Responses" to Bridgeton's First Interrogatories and Request for Production of Documents. In that "supplemental" response, Plaintiffs identified, for the first time in any document or conversation, Phillip Plato, and provided "Draft #3" of his report. Plato's final draft appeared in defense counsel's email inboxes 25 minutes later at 12:02 a.m. on May 3, with a request from Plaintiffs' counsel to disregard the one sent at 11:37 p.m. The Plato report attempts to formulate an opinion to support the allegation that the Dailey property has been contaminated. However, *even now* the Plato report is incomplete. For example, he has failed to provide key information, including the calculations used by him to determine his purported dose and risk assessment at the Dailey property.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Earlier, at 5:33 p.m. (CDT) on May 2, 2018, Plaintiffs also served their "Supplemental Initial Disclosures," which identified at least 23 categories and thousands of pages of documents not previously identified in any prior Initial Disclosure.[2]  At that time, Plaintiffs' counsel wrote that he would "share a Dropbox folder with all materials referenced shortly."  That Dropbox link was provided later in the evening.  This Dropbox contained *3.28 gigabytes* of data.

The last-minute "supplemental" Initial Disclosures, data dump, "supplemental" discovery responses, and out-of-time "expert" report left Defendants with no opportunity before the end of the discovery period to analyze the new productions or assess and test the validity or admissibility of the Plato report.  Much like the report of Richard Stewart, which was sprung on Defendants in an earlier reply brief, it appears that Plaintiffs' decision to withhold the Plato report until the last hours of discovery was intended to deny Defendants the chance to timely depose him pursuant to Rule 26(b)(4)(A), and calculated to engage in an end-run around the parties' upcoming dispositive motions concerning, among other things, the standard applicable to Plaintiffs' claims and the level of contamination allegedly present at Plaintiffs' property.  Ultimately, Plaintiffs' efforts to skirt the basic procedural requirements for the introduction of expert reports, opinions, and testimony have prevented Defendants from probing the bases for Plato's opinions, resulting in severe prejudice to Defendants.[3]

## D.     Plaintiffs Also Mischaracterized the Contents of a Thumb Drive Produced at the Deposition of Marco Kaltofen

On April 20, 2018, Plaintiffs engaged in a similar effort to sandbag Defendants.  Despite the fact Marco Kaltofen was the individual who coordinated and hired others to do all of the

---

[2] Initial Disclosures were due under the Court's CMO on February 9, 2018.  No attempt was made by Plaintiffs to supplement the Initial Disclosures between February 9 and the evening of May 2, 2018.

[3] At this juncture, Defendants are opposing Plaintiffs' use of the Plato report based only on the timing of its late production.  Defendants reserve the right to raise additional issues should the Court allow Plaintiffs to use the report or allow Plato to testify.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

sampling at the Dailey home, Plaintiffs did not voluntarily produce him.  Instead, Defendants had to subpoena him to appear in Boston for his deposition.  At that deposition, Plaintiffs and Kaltofen produced for the first time a thumb drive, which was marked as Deposition Exhibit 10.  During the Kaltofen deposition, plaintiffs' counsel, Celeste Brustowicz, represented to defense counsel that the contents of the thumb drive was "a duplicate of everything that appears here that [sic] has already been produced with the exception of the spreadsheets and, I believe, the photograph we discussed off the record."[4]  Deposition of M. Kaltofen, 71:5-19, an accurate copy of the relevant part of which is attached as **Exhibit A**.

Taking Ms. Brustowicz at her word, the thumb drive did not become a significant area of questioning during the deposition.  Although there was some discussion of limited additional materials on the thumb drive (e.g., Kaltofen's bills to counsel and contract for services), the extent of the materials contained on the thumb drive was not revealed.  Only after the deposition was complete did defense counsel learn that Ms. Brustowicz's characterization of the contents of Exhibit 10 was incorrect, and that it in fact contained over *four gigabytes* of data and *over four thousand files*.

Had the contents of the drive been disclosed, defense counsel could have questioned Kaltofen about the material or, at least, requested an adjournment of the deposition to allow for a meaningful review of the contents before the deposition was reconvened.  Once the Brustowicz mischaracterization was made and accepted, however, there was no opportunity to further explore the drive with Kaltofen or anyone else because the production of the drive on April 20 occurred only 12 days (and only eight business days) before the close of discovery.

---

[4] At this point in time, Plaintiffs had produced some documents from Eberline, Microvision, and AccuStar labs, some field notes (some were reported to be lost), photographs, and data from a survey instrument.

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

**E.**  **Plaintiffs Should Not Be Rewarded for Their Intentional Efforts to Withhold Evidence Until the Last Moment of the Discovery Period**

It is now apparent, in light of the last-second production of materials, that Plaintiffs believe they can withhold information and produce it in a manner that prevents Defendants from having a meaningful opportunity to review it or ask questions of witnesses about it.[5]  They have employed a *modus operandi* that is now clear and undeniable:  they delay the release of information and production of materials, even after representing that they have nothing remaining, and then engage in last-minute data dumps and discovery "supplementation" which provide the defense no time to review or challenge it, or depose witnesses about it.

The Plato report, the data developed and used for the Plato report, the supplemental disclosures and discovery responses, and the 3.26 gigabytes of data on the Dropbox were not produced until the evening and night of May 2, and early morning hours of May 3, 2018. Likewise, the contents of the thumb drive produced during the April 20, 2018 deposition of Kaltofen should have been identified and produced much earlier.  Kaltofen was the individual responsible for coordinating all sampling at the Dailey property, and it is now clear the vast majority of the drive, if not its entirety, had been in his possession for months and possibly years. It is also indisputable that Plaintiffs and their counsel had control over the ability to produce the data and other information in Kaltofen's possession – as was definitively demonstrated when he ultimately produced the material at his April 20, 2018 deposition.  Plaintiffs' counsel's decision to, even then, mischaracterize the contents of the previously unproduced drive speaks volumes to their intent and the strategy behind the now-revealed effort to withhold evidence until a time late

---

[5] The attempt to spring experts and expert reports without notice was also attempted by Plaintiffs when they identified and used the report of undisclosed "expert" Richard Stewart in an earlier reply brief.  *See* Doc Nos. 135 and 135-3.

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

enough in discovery to prevent Defendants from any real opportunity to review it or question witnesses about it.

## RELIEF SOUGHT

Because this motion stems from the schedule established under the Amended CMO, relief is sought under Fed. R. Civ. P. 16(f) and this Court's inherent power to enforce its own orders. *See Travel Tags, Inc. v. UV Color, Inc.*, No. 09-1619 (JRT/AJB), 2010 U.S. Dist. LEXIS 144874, at *5 (D. Minn. Apr. 9, 2010) (citation omitted).

Plaintiffs should not be rewarded for under-handed tactics. The decision to withhold the Plato identification and report, the underlying data, the supplemental disclosures, the 3.28 gigabytes of data, and the supplemental discovery responses until the night of May 2 and morning of May 3, 2018 is calculated and improper. Accordingly, all the materials produced by Plaintiffs on May 2 and 3, 2018 should be unavailable to them during this phase of the litigation.

Similarly, the thumb drive produced on April 20, 2018 (Kaltofen Exhibit 10), which was ultimately found to contain over 4 gigabytes of data and four thousand files, should be unavailable to Plaintiffs during this phase of the litigation and plaintiffs should not be allowed to refer or use it in any way. Any other outcome would be severely prejudicial, especially after the contents of the thumb drive were incorrectly represented.

Any other outcome would also be unjust. Defendants were not given an opportunity to review the material with sufficient time to meaningfully use it or challenge it before the end of discovery. Similarly, the late identification of Plato and the production of his report *out of time* have prevented Defendants from questioning him, challenging his theories and methods, or exploring his knowledge about the validity of the underlying data he uses. Defendants have been severely prejudiced by Plaintiffs' sandbagging efforts and last minute production tactics, and respectfully request that the Court prevent and enjoin Plaintiffs from using the contents of the

Electronically Filed - St. Louis County - April 20, 2020 - 06:26 PM

thumb drive (Exhibit 10 of the Kaltofen deposition), and all supplemental discovery responses and disclosures and reports (as well as data and materials provided with those reports and supplemental responses) that were produced on May 2 and 3, 2018.  This use prohibition should, at least, apply to any briefing and responses to briefing contemplated under Paragraph 2 of the Amended CMO.   A proposed order providing for this relief is attached as **Exhibit B** to this Motion.  Alternatively, if the Court allows Plaintiffs to use this material, Defendants seek additional time to analyze the late-produced materials, conduct additional discovery into it, and challenge and rebut Phillip Plato's report if his testimony will be allowed.

Finally, Defendants seek an opportunity to be heard in oral argument on this Motion.  Not only is this a time-sensitive matter in light of the briefing deadline of June 4, 2018, but the relief sought in this Motion would affect the materials that could be used in those briefs and may affect the deadline under the Amended CMO.

Dated: May 18, 2018                     LATHROP GAGE LLP


By: */s/ William G. Beck*
　　　William G. Beck          26849MO
　　　Peter F. Daniel          33798MO
　　　Robert G. Rooney         43381MO
　　　Allyson E. Cunningham  64802MO
　　　2345 Grand Boulevard, Suite 2200
　　　Kansas City, Missouri  64108-2618
　　　Telephone:         (816) 292-2000
　　　Telecopier:        (816) 292-2001
　　　wbeck@lathropgage.com
　　　pdaniel@lathropgage.com
　　　acunningham@lathropgage.com

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Patricia Lehtinen Silva    67213MO
Pierre Laclede Center
7701 Forsyth Boulevard, Suite 500
Clayton, Missouri  63105
Telephone:        (314) 613-2800
Telecopier:       (314) 613-2801
psilva@lathropgage.com

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on May 18, 2018, I electronically filed the foregoing document via the Court's CM/ECF system, which will serve notice on all counsel of record.

*/s/ William G. Beck*
An Attorney for Defendants

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

# Exhibit A

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

Michael Dailey, et al.,  )
        Plaintiffs,      )
                         )  Case
    versus               )  No. 4:17-CV-00024-CDP
                         )
Bridgeton Landfill, LLC, )
et al.,                  )
        Defendants.      )

VIDEOTAPED DEPOSITION OF MARCO KALTOFEN, PH.D.

April 20, 2018

9:29 a.m.

Lathrop Gage, LLP

28 State Street, Suite 700

Boston, Massachusetts

---- Reporter:  Julie Thomson Riley, RDR, CRR ----

```
 1    APPEARANCES:

 2    Counsel for the Defendants Bridgeton Landfill, LLC,

 3    Republic Services, Inc., Allied Services, LLC, and

 4    Rock Road Industries, Inc.:

 5    Lathrop Gage, LLP

 6        by William G. Beck, Esquire

 7        2345 Grand Boulevard, Suite 2200

 8        Kansas City, Missouri 64108-2618

 9        (816) 292-2000

10        wbeck@lathropgage.com

11

12    Counsel for the Plaintiffs:

13    Cooper Law Firm, LLC

14        by Celeste Brustowicz, Esquire

15        508 Rue Saint Philip Street

16        New Orleans, Louisiana 70116

17        (504) 291-1344

18        cbrustowicz@sch-llc.com

19

20

21

22

23

24    (continued)

25
```

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

```
 1   APPEARANCES (continued)

 2   Counsel for the Defendant Cotter Corporation:

 3   Morgan, Lewis & Bockius, LLP

 4       by John McGahren, Esquire

 5       502 Carnegie Center

 6       Princeton, New Jersey 08540

 7       (609) 919-6641

 8       john.mcgahren@morganlewis.com

 9

10

11   Also Present:

12   Shawn Budd, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

```
 1              MR. BECK:  Thank you.

 2              (Document was marked Exhibit No. 10 for

 3     identification.)

 4     BY MR. BECK:

 5         Q.    Dr. Kaltofen, I'm going to hand you what

 6     I've now marked, jumping over some numbering, as

 7     Exhibit 10, which is a thumb drive you brought to

 8     the deposition today.  Is that what that is?

 9         A.    Yes, sir.

10         Q.    All right.  That will be with the record.

11     We'll make copies for everybody for their copies of

12     the deposition --

13              MS. BRUSTOWICZ:  I appreciate it.

14         Q.    -- and we'll know what you produced today.

15              MS. BRUSTOWICZ:  Which is a duplicate of

16     everything that appears here that has already been

17     produced with the exception of the spreadsheets and,

18     I believe, the photograph we discussed off the

19     record.

20              THE WITNESS:  Somebody take this out of my

21     custody.  It's so tiny.

22              MR. BECK:  The court reporter has all the

23     exhibits.

24              THE WITNESS:  Ah, there you go.  It's not

25     my worry then.
```

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

```
 1                    CERTIFICATE OF REPORTER
 2        I, Julie Thomson Riley, RDR, CRR, do certify
 3    that the deposition of Marco Kaltofen, Ph.D., in the
 4    matter of Michael Dailey, et al. vs. Bridgeton
 5    Landfill, LLC, et al., on April 20, 2018, was
 6    stenographically recorded by me; that the witness
 7    provided satisfactory evidence of identification, as
 8    prescribed by Executive Order 455 (03-13), issued by
 9    the Governor of the Commonwealth of Massachusetts,
10    before being sworn by me, a Notary Public in and for
11    the Commonwealth of Massachusetts; that the
12    transcript produced by me is a true and accurate
13    record of the proceedings to the best of my ability;
14    that I am neither counsel for, related to, nor
15    employed by any of the parties to the above action;
16    and further that I am not a relative or employee of
17    any attorney or counsel employed by the parties
18    thereto, nor financially or otherwise interested in
19    the outcome of the action.
20
21    April 29, 2018        _____
22                              Julie Thomson Riley, RDR, CRR
23
24
25
```

Electronically Filed - St Louis County - April 20, 2020 - 06:26 PM

Based on the Supreme Court Rules governing eFiling, an eService email has been issued to the following parties:


SERVICE PARTY:   BRIAN OCONNOR WATSON, Attorney for Defendant
SERVICE EMAIL:   bwatson@rshc-law.com


SERVICE PARTY:   RYAN A. KEANE, Attorney for Plaintiff
SERVICE EMAIL:   ryan@keanelawllc.com


SERVICE PARTY:   ERIN LYNN BROOKS, Attorney for Defendant
SERVICE EMAIL:   erin.brooks@bryancave.com


SERVICE PARTY:   DANIEL TIMOTHY DEFEO, Attorney for Plaintiff
SERVICE EMAIL:   ddefeo@defeolaw.com


SERVICE PARTY:   ANTHONY DOUGLAS GRAY, Attorney for Plaintiff
SERVICE EMAIL:   gray.lawyer1@gmail.com, agray@johnsongraylaw.com, ejones@stannmo.org

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Query    Reports    Utilities    Help    Log Out

CLOSED,REMAND,TRCK3

# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:17-cv-00024-CDP

Dailey et al v. Bridgeton Landfill, LLC et al
Assigned to: District Judge Catherine D. Perry
Case in other court: Circuit Court St. Louis County 21st Judicial
　　　　　　　　　　　Circu, 16SL-CC04240
Cause: 28:1441 Petition for Removal

Date Filed: 01/06/2017
Date Terminated: 03/23/2020
Jury Demand: Both
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Michael Dailey**                                     represented by   **Barry James Cooper , Jr.**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　COOPER LAW FIRM, LLC
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　508 St. Philip St.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　New Orleans, LA 70116
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　504-566-1558
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Fax: 504-581-9055
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Email: Bcooper@sch-LLC.com
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*LEAD ATTORNEY*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*ATTORNEY TO BE NOTICED*

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Celeste Brustowicz**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　THE COOPER LAW FIRM, LLC
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　1525 Religious St.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　New Orleans, LA 70130
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　949-315-9075
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Email: cbrustowicz@clfnola.com
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*LEAD ATTORNEY*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*ATTORNEY TO BE NOTICED*

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Stuart H. Smith**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　COOPER LAW FIRM, LLC
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　1525 Religious St.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　New Orleans, LA 70130
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　504-566-1558
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Fax: 504-581-9055
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Email: ssmith@sch-llc.com
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*LEAD ATTORNEY*
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*ATTORNEY TO BE NOTICED*

　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**Victor T. Cobb**
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　COOPER LAW FIRM, LLC
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　1525 Religious St.
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　New Orleans, LA 70130
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　504-399-0009
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　Email: vcobb@sch-llc.com
　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　　*LEAD ATTORNEY*

ATTORNEY TO BE NOTICED

**Daniel T. DeFeo**
THE DEFEO LAW FIRM
1627 Main St.
Suite 900
Kansas City, MO 64108
816-581-4600
Fax: 816-581-4646
Email: ddefeo@defeolaw.com
*TERMINATED: 02/21/2018*

**Michael G. Stag**
SMITH STAG, LLC
365 Canal Street
Suite 2850
New Orleans, LA 70130
504-593-9600
Fax: 504-593-9601
Email: mstag@smithstag.com
*TERMINATED: 02/21/2018*

**Michaela G. Spero**
HAUSFELD LLP
1700 K Street NW
Suite 650
Washington, DC 20006
202-540-7200
Fax: 202-540-7201
Email: mspero@hausfeld.com
*TERMINATED: 12/22/2017*

**Richard S. Lewis**
HAUSFELD LLP
1700 K Street NW
Suite 650
Washington, DC 20006
202-540-7200
Fax: 202-540-7201
Email: rlewis@hausfeld.com
*TERMINATED: 12/22/2017*

**Steven J. Stolze**
HOLLAND LAW FIRM LLC
300 N. Tucker Blvd.
Suite 801
St. Louis, MO 63101
314-640-7550
Fax: 314-241-5554
Email: stevenstolze@sbcglobal.net
*TERMINATED: 02/21/2018*

**Swathi Bojedla**
HAUSFELD LLP

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

1700 K Street NW
Suite 650
Washington, DC 20006
202-540-7200
Fax: 202-540-7201
Email: sbojedla@hausfeld.com
*TERMINATED: 12/22/2017*

**Plaintiff**

**Robbin Dailey**                        represented by   **Barry James Cooper , Jr.**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Celeste Brustowicz**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Stuart H. Smith**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Victor T. Cobb**
                                                          (See above for address)
                                                          *LEAD ATTORNEY*
                                                          *ATTORNEY TO BE NOTICED*

                                                          **Daniel T. DeFeo**
                                                          (See above for address)
                                                          *TERMINATED: 02/21/2018*

                                                          **Michael G. Stag**
                                                          (See above for address)
                                                          *TERMINATED: 02/21/2018*

                                                          **Michaela G. Spero**
                                                          (See above for address)
                                                          *TERMINATED: 12/22/2017*

                                                          **Richard S. Lewis**
                                                          (See above for address)
                                                          *TERMINATED: 12/22/2017*

                                                          **Steven J. Stolze**
                                                          (See above for address)
                                                          *TERMINATED: 02/21/2018*

                                                          **Swathi Bojedla**
                                                          (See above for address)
                                                          *TERMINATED: 12/22/2017*

V.

**Defendant**

**Bridgeton Landfill, LLC**                          represented by   **Allyson Elisabeth Cunningham**
LATHROP GPM LLP
2345 Grand Boulevard
Suite 2200
Kansas City, MO 64108
816-460-5116
Email:
allyson.cunningham@lathropgpm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia L. Silva**
LATHROP GPM LLP
7701 Forsyth Boulevard
Suite 500
Clayton, MO 63105
314-613-2500
Fax: 314-613-2550
Email: PSilva@lathropgage.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter F. Daniel**
LATHROP GPM LLP
2345 Grand Boulevard
Suite 2200
Kansas City, MO 64108
816-460-5702
Fax: 816-292-2001
Email: peter.daniel@lathropgpm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G. Rooney**
SHOOK HARDY, LLP
2555 Grand Blvd.
Kansas City, MO 64108
816-559-2846
Fax: 816-421-5547
Email: rrooney@shb.com
*TERMINATED: 03/18/2019*
*LEAD ATTORNEY*

**William Garland Beck**
LATHROP GPM LLP
2345 Grand Boulevard
Suite 2200
Kansas City, MO 64108
816-728-8061
Fax: 816-292-2001
Email: william.beck@lathropgpm.com

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Republic Services, Inc.**       represented by   **Allyson Elisabeth Cunningham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia L. Silva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter F. Daniel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G. Rooney**
(See above for address)
*TERMINATED: 03/18/2019*
*LEAD ATTORNEY*

**William Garland Beck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Allied Services L.L.C.**       represented by   **Allyson Elisabeth Cunningham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia L. Silva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter F. Daniel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G. Rooney**
(See above for address)
*TERMINATED: 03/18/2019*
*LEAD ATTORNEY*

**William Garland Beck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

**Defendant**

**Rock Road Industries, Inc.**                    represented by **Allyson Elisabeth Cunningham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia L. Silva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G. Rooney**
(See above for address)
*TERMINATED: 03/18/2019*
*LEAD ATTORNEY*

**William Garland Beck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mallinckrodt LLC**                              represented by **David R. Erickson**
*TERMINATED: 03/20/2018*                          SHOOK HARDY, LLP
2555 Grand Blvd.
Kansas City, MO 64108
816-474-6550
Fax: 816-421-5547
Email: derickson@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven D. Soden**
SHOOK HARDY, LLP
2555 Grand Blvd.
Kansas City, MO 64108
816-474-6550
Fax: 816-421-5547
Email: ssoden@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MI Holdings Inc.**                              represented by **David R. Erickson**
*TERMINATED: 04/21/2017*                          (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cotter Corporation N.S.L.**                     represented by **Brian O'Connor Watson**
RILEY SAFER LLP
70 W. Madison

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Suite 2900
Chicago, IL 60602
(312) 471-8776
Fax: (312) 471-8701
Email: bwatson@rshc-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dale A. Guariglia**
BRYAN CAVE LLP - St Louis
One Metropolitan Square
211 N. Broadway
Suite 3600
St. Louis, MO 63102
314-259-2606
Fax: 314-552-8606
Email: daguariglia@bclplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John McGahren**
MORGAN AND LEWIS, LLP
502 Carnegie Center
Princeton, NJ 08540-6241
609-919-6600
Email: jmcgahren@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie Feingold**
MORGAN AND LEWIS, LLP
502 Carnegie Center
Princeton, NJ 08540-6241
609-919-6643
Fax: 609-919-6701
Email:
stephanie.feingold@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Su Jin Kim**
MORGAN AND LEWIS LLP
1701 Market Street
Phildelphia, PA 19103
215-963-1738
Fax: 215-963-5001
Email: su.kim@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Lynn Brooks**
BRYAN CAVE LLP - St Louis
One Metropolitan Square
211 N. Broadway

Suite 3600
St. Louis, MO 63102
314-259-2393
Fax: 314-259-2020
Email: erin.brooks@bclplaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Commonwealth Edison Company**
*TERMINATED: 04/21/2017*

represented by **Dale A. Guariglia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John McGahren**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie Feingold**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Lynn Brooks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Exelon Corporation**
*TERMINATED: 04/21/2017*

represented by **Dale A. Guariglia**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John McGahren**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie Feingold**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Lynn Brooks**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mallinckrodt Inc.**
*TERMINATED: 04/21/2017*

represented by **David R. Erickson**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

| Date Filed | # | Docket Text |
|---|---|---|
| 01/06/2017 | 1 | NOTICE OF REMOVAL from Circuit Court for 21st Judicial Circuit, case number 16SL-cc04240, with receipt number 0865-5752287, in the amount of $400 Jury Demand,, filed by Cotter Corporation N.S.L.. (Attachments: # 1 Civil Cover Sheet, # 2 Original Filing Form, # 3 Exhibit Exhibit A, # 4 Exhibit Exhibit B, # 5 Exhibit Exhibit C, # 6 Exhibit Exhibit D)(Guariglia, Dale) (Attachment 1 replaced on 1/9/2017) (MFG). (Entered: 01/06/2017) |
| 01/06/2017 | 2 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Cotter Corporation N.S.L.. Parent companies: General Atomics Uranium Resources, LLC,. (Guariglia, Dale) (Entered: 01/06/2017) |
| 01/06/2017 | 3 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Cotter Corporation N.S.L. Sent To: Plaintiff (Guariglia, Dale) (Entered: 01/06/2017) |
| 01/06/2017 | 4 | Consent to Removal by Defendant MI Holdings Inc.. (Erickson, David) (Entered: 01/06/2017) |
| 01/06/2017 | 5 | Consent to Removal by Defendant Mallinckrodt Inc.. (Erickson, David) (Entered: 01/06/2017) |
| 01/06/2017 | 6 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendants MI Holdings Inc., Mallinckrodt Inc.. Publicly held company: Mallinckrodt plc,. (Erickson, David) (Entered: 01/06/2017) |
| 01/06/2017 | 7 | Consent to Removal by Defendant Allied Services L.L.C.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 8 | Consent to Removal by Defendant Bridgeton Landfill, LLC. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 9 | Consent to Removal by Defendant Republic Services, Inc.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 10 | Consent to Removal by Defendant Rock Road Industries, Inc.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 11 | DEMAND for Trial by Jury by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 12 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Allied Services L.L.C... (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 13 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Bridgeton Landfill, LLC.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 14 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Republic Services, Inc... (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 15 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Rock Road Industries, Inc... (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 17 | Petition (Removal/Transfer) Received From: St. Louis County Circuit Court, filed by Michael Dailey, Robbin Dailey.(MFG) (Entered: 01/09/2017) |
| 01/09/2017 | 16 | ENTRY of Appearance by Erin Lynn Brooks for Defendant Cotter Corporation N.S.L.. (Brooks, Erin) (Entered: 01/09/2017) |
| 01/09/2017 | | Case Opening Notification: All parties must file the Notice Regarding Magistrate Judge |

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

| | | |
|---|---|---|
| | | Jurisdiction Form consenting to or opting out of the Magistrate Judge jurisdiction. Click here for the instructions. and all non-governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate (moed-0001.pdf). Judge Assigned: Honorable Shirley P. Mensah. (MFG) (Entered: 01/09/2017) |
| 01/09/2017 | 18 | Pursuant to Local Rule 2.08, the assigned/referred magistrate judge is designated and authorized by the court to exercise full authority in this assigned/referred action or matter under 28 U.S.C. Sec. 636 and 18 U.S.C Sec. 3401. (CSAW) (Entered: 01/09/2017) |
| 01/10/2017 | 19 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Cotter Corporation N.S.L. *Notice of Removal Filed with State Court* Sent To: State Court - Executed (Attachments: # 1 Exhibit)(Brooks, Erin) (Entered: 01/10/2017) |
| 01/12/2017 | 20 | NOTICE Consent to Removal: by Defendant Exelon Corporation re 1 Notice of Removal Petition, (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 21 | NOTICE Consent to Removal: by Defendant Commonwealth Edison Company re 1 Notice of Removal Petition, (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 22 | CJRA ORDER (GJL). IT IS HEREBY ORDERED that the above styled case is randomly reassigned from Magistrate Judge Shirley P. Mensah to District Judge Catherine D. Perry. In all future documents filed with the Court, please use the following case number 4:16CV1407 CDP. (ARL) (Entered: 01/12/2017) |
| 01/12/2017 | 23 | ENTRY of Appearance by Erin Lynn Brooks for Defendants Commonwealth Edison Company, Exelon Corporation. (Brooks, Erin) (Entered: 01/12/2017) |
| 01/12/2017 | 24 | ENTRY of Appearance by Dale A. Guariglia for Defendants Commonwealth Edison Company, Exelon Corporation. (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 25 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Commonwealth Edison Company. Parent companies: Exelon Energy Delivery Company, LLC, Subsidiaries: RITELine Illinois, LLC, Publicly held company: None,. (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 26 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Exelon Corporation. Parent companies: None, Subsidiaries: None, Publicly held company: None,. (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 27 | Joint MOTION to Transfer Case to Judge Audrey G. Fleissig by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 01/12/2017) |
| 01/13/2017 | 28 | MOTION to Dismiss Case *and Memorandum in Support* by Defendants MI Holdings Inc., Mallinckrodt Inc.. (Erickson, David) (Entered: 01/13/2017) |
| 01/13/2017 | 29 | ANSWER to Complaint by Allied Services L.L.C..(Beck, William) (Entered: 01/13/2017) |
| 01/13/2017 | 30 | ANSWER to Complaint by Bridgeton Landfill, LLC.(Beck, William) (Entered: 01/13/2017) |
| 01/13/2017 | 31 | ANSWER to Complaint by Republic Services, Inc..(Beck, William) (Entered: 01/13/2017) |
| 01/13/2017 | 32 | ANSWER to Complaint by Rock Road Industries, Inc..(Beck, William) (Entered: 01/13/2017) |
| 01/13/2017 | 33 | JOINT MOTION to Dismiss Case *and Memorandum in Support* by Defendants Allied |

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

| | | |
|---|---|---|
| | | Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Guariglia, Dale) Modified on 1/17/2017 (CBL). (Entered: 01/13/2017) |
| 01/13/2017 | 34 | MOTION to Dismiss Case by Defendants Commonwealth Edison Company, Exelon Corporation. (Attachments: # 1 Exhibit Declaration of Scott N. Peters, # 2 Exhibit Declaration of Bruce G. Wilson)(Guariglia, Dale) (Entered: 01/13/2017) |
| 01/17/2017 | 35 | ENTRY of Appearance by William Garland Beck for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 01/17/2017) |
| 01/17/2017 | 36 | ENTRY of Appearance by Robert G. Rooney for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 01/17/2017) |
| 01/17/2017 | 37 | ENTRY of Appearance by Allyson Elisabeth Cunningham for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Cunningham, Allyson) (Entered: 01/17/2017) |
| 01/17/2017 | 38 | ENTRY of Appearance by Patricia L. Silva for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Silva, Patricia) (Entered: 01/17/2017) |
| 01/17/2017 | 39 | First MOTION for Leave to Appear Pro Hac Vice Stephanie Feingold. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5764575) by Defendant Cotter Corporation N.S.L.. (Attachments: # 1 Certificate of Good Standing Certificate for Stephanie Feingold)(Feingold, Stephanie) (Entered: 01/17/2017) |
| 01/17/2017 | 40 | First MOTION for Leave to Appear Pro Hac Vice John McGahren. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5764681) by Defendants Commonwealth Edison Company, Cotter Corporation N.S.L., Exelon Corporation. (Attachments: # 1 Certificate of Good Standing Certificate for John McGahren)(McGahren, John) (Entered: 01/17/2017) |
| 01/17/2017 | 41 | AMENDED MOTION for Leave to Appear Pro Hac Vice Stephanie Feingold. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5764786) by Defendants Cotter Corporation N.S.L., Commonwealth Edison Company, Exelon Corporation. (Attachments: # 1 Certificate of Good Standing Certificate for Stephanie Feingold)(Feingold, Stephanie) Modified on 1/18/2017 (CBL). (Entered: 01/17/2017) |
| 01/18/2017 | 42 | Consent MOTION for Extension of Time to File Response/Reply as to 34 MOTION to Dismiss Case , 33 MOTION to Dismiss Case *and Memorandum in Support*, 27 Joint MOTION to Transfer Case to Judge Audrey G. Fleissig, 28 MOTION to Dismiss Case *and Memorandum in Support* by Plaintiffs Michael Dailey, Robbin Dailey. (Stolze, Steven) (Entered: 01/18/2017) |
| 01/18/2017 | 43 | MOTION for Leave to Appear Pro Hac Vice Richard S. Lewis. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5767364) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Lewis, Richard) (Entered: 01/18/2017) |
| 01/19/2017 | 44 | Docket Text ORDER: Re: [40, 41, 43] MOTIONS for Leave to Appear Pro Hac Vice John McGahren, Stephanie Feingold, Richard S. Lewis: ORDERED GRANTED; 39 First MOTION for Leave to Appear Pro Hac Vice Stephanie Feingold: ORDERED DENIED AS MOOT; 42 Consent MOTION for Extension of Time to File Response/Reply to |

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

| | | |
|---|---|---|
| | | various motions : ORDERED GRANTED.. Signed by District Judge Catherine D. Perry on 1/19/17. (CDP) (Entered: 01/19/2017) |
| 02/03/2017 | 45 | MOTION for Leave to Appear Pro Hac Vice Michael G. Stag. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5793529) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing #1)(Stag, Michael) (Entered: 02/03/2017) |
| 02/03/2017 | 46 | Docket Text ORDER: Re: 45 MOTION for Leave to Appear Pro Hac Vice Michael G. Stag; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/3/17. (CDP) (Entered: 02/03/2017) |
| 02/03/2017 | 47 | Consent MOTION for Leave to File in Excess of Page Limitation by Plaintiffs Michael Dailey, Robbin Dailey. (DeFeo, Daniel) (Entered: 02/03/2017) |
| 02/06/2017 | 48 | (MOTION WITHDRAWN PER ORDER 67 DATED 4/6/17) MOTION to Remand Case to State Court by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14)(Lewis, Richard) Modified on 4/6/2017 (EAB). (Entered: 02/06/2017) |
| 02/06/2017 | 49 | Docket Text ORDER: Re: 47 Consent MOTION for Leave to File in Excess of Page Limitation; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/6/17. (CDP) (Entered: 02/06/2017) |
| 02/07/2017 | 50 | Consent MOTION for Leave to Modify the Briefing Schedule on Defendants' Motions to Dismiss by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) (Entered: 02/07/2017) |
| 02/07/2017 | 51 | Docket Text ORDER: Re: 50 Consent MOTION to Modify the Briefing Schedule on Defendants' Motions to Dismiss; ORDERED GRANTED; responses to motions to dismiss will be due 21 days after the Court rules on the Motion to Remand. Signed by District Judge Catherine D. Perry on 2/7/17. (CDP) (Entered: 02/07/2017) |
| 02/08/2017 | 52 | RESPONSE in Opposition re 27 Joint MOTION to Transfer Case to Judge Audrey G. Fleissig filed by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) (Entered: 02/08/2017) |
| 02/09/2017 | 53 | First MOTION for Extension of Time to File Response/Reply as to 48 MOTION to Remand Case to State Court by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 02/09/2017) |
| 02/09/2017 | 54 | Amended MOTION for Extension of Time to File by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 02/09/2017) |
| 02/09/2017 | 55 | Docket Text ORDER: Re: 54 Amended MOTION for Extension of Time to File respone to motion to remand ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/9/17. (CDP) (Entered: 02/09/2017) |
| 02/14/2017 | 56 | MOTION for Leave to Appear Pro Hac Vice Michaela G. Spero. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5811844) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Spero, Michaela) (Entered: 02/14/2017) |
| 02/15/2017 | 57 | JOINT REPLY MEMORANDUM in Support of Motion re 27 Joint MOTION to Transfer Case to Judge Audrey G. Fleissig filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Commonwealth Edison Company, Cotter Corporation N.S.L., Exelon |

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

| | | |
|---|---|---|
| | | Corporation, MI Holdings Inc., Mallinckrodt Inc., Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) Modified on 2/16/2017 (CBL). (Entered: 02/15/2017) |
| 02/16/2017 | 58 | Docket Text ORDER: Re: 56 MOTION for Leave to Appear Pro Hac Vice Michaela G. Spero by Plaintiffs Michael Dailey, Robbin Dailey. ORDERED: GRANTED. Signed by District Judge Catherine D. Perry on 2/16/2017. (CBL) (Entered: 02/16/2017) |
| 02/16/2017 | 59 | ORDER. I have fully considered the arguments raised by the parties in the motion to transfer this case to another judge of this district. No party has the right to have a case assigned to any particular judge of this court, and the random assignment of cases serves the interests of justice. Accordingly, IT IS HEREBY ORDERED that defendants' motion to transfer this case to the Honorable Audrey G. Fleissig 27 is denied. Signed by District Judge Catherine D. Perry on 2/16/2017. (CBL) (Entered: 02/16/2017) |
| 02/21/2017 | 60 | MOTION for Leave to Appear Pro Hac Vice Swathi Bojedla. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5820974) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Bojedla, Swathi) (Entered: 02/21/2017) |
| 02/21/2017 | 61 | Docket Text ORDER: Re: 60 MOTION for Leave to Appear Pro Hac Vice Swathi Bojedla; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/21/17. (CDP) (Entered: 02/21/2017) |
| 02/24/2017 | 62 | Consent MOTION for Extension of Time to File Response/Reply *to Defendants' Response to Plaintiffs' Motion to Remand* by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) (Entered: 02/24/2017) |
| 02/24/2017 | 63 | Docket Text ORDER: Re: 62 Consent MOTION for Extension of Time to File Response/Reply ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/24/17. (CDP) (Entered: 02/24/2017) |
| 02/27/2017 | 64 | MEMORANDUM in Opposition re 48 MOTION to Remand Case to State Court filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Commonwealth Edison Company, Cotter Corporation N.S.L., Exelon Corporation, MI Holdings Inc., Mallinckrodt Inc., Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Affidavit Declaration of Stephanie Feingold in Support of Opposition to Motion to Remand, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G)(McGahren, John) (Entered: 02/27/2017) |
| 03/16/2017 | 65 | REPLY to Response to Motion re 48 MOTION to Remand Case to State Court filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1)(Lewis, Richard) (Entered: 03/16/2017) |
| 04/05/2017 | 66 | MOTION to Withdraw 48 MOTION to Remand Case to State Court by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Text of Proposed Order)(Stag, Michael) (Entered: 04/05/2017) |
| 04/06/2017 | 67 | ORDER. IT IS HEREBY ORDERED that plaintiffs' motion to withdraw their motion to remand [Doc No. 66 ] is granted. Plaintiffs have twenty-one (21) days from the date of this order to file a response to the motions to dismiss. Signed by District Judge Catherine D. Perry on 4/6/17. (EAB) (Entered: 04/06/2017) |
| 04/20/2017 | 68 | MOTION for Leave to File Amended Complaint and Modify the Briefing Schedule for Responsive Pleadings and/or Motions to Dismiss (Unopposed) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1 - First Amended Complaint)(Lewis, Richard) (Entered: 04/20/2017) |
| 04/21/2017 | 69 | Docket Text ORDER: Re: 68 MOTION for Leave to File Amended Complaint and Modify the Briefing Schedule for Responsive Pleadings and/or Motions to Dismiss |

| | | |
|---|---|---|
| | | (Unopposed) : ORDERED GRANTED; amended complaint deemed filed today; original motions to dismiss [28, 33, 34] denied as moot without prejudice to defendants' right to file motions to dismiss directed to amended complaint within 21 days. Signed by District Judge Catherine D. Perry on 4/21/17. (CDP) (Entered: 04/21/2017) |
| 04/21/2017 | 70 | AMENDED COMPLAINT against defendant Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Mallinckrodt LLC, Republic Services, Inc., Rock Road Industries, Inc.,Terminating MI Holdings Inc., Commonwealth Edison Company and Exelon Corporation filed by Michael Dailey, Robbin Dailey.(MCB) (Entered: 04/24/2017) |
| 05/12/2017 | 71 | MOTION to Dismiss Case, MEMORANDUM in Support and REQUEST for Oral Argument by Defendant Mallinckrodt LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Erickson, David) Modified on 5/15/2017 (CBL). (Entered: 05/12/2017) |
| 05/12/2017 | 72 | Joint MOTION to Dismiss Case *and Memorandum in Support* by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (McGahren, John) (Entered: 05/12/2017) |
| 05/12/2017 | 73 | ANSWER to 70 Amended Complaint, by Allied Services L.L.C..(Beck, William) (Entered: 05/12/2017) |
| 05/12/2017 | 74 | ANSWER to 70 Amended Complaint, by Bridgeton Landfill, LLC.(Beck, William) (Entered: 05/12/2017) |
| 05/12/2017 | 75 | ANSWER to 70 Amended Complaint, by Republic Services, Inc..(Beck, William) (Entered: 05/12/2017) |
| 05/12/2017 | 76 | ANSWER to 70 Amended Complaint, by Rock Road Industries, Inc..(Beck, William) (Entered: 05/12/2017) |
| 05/26/2017 | 77 | MEMORANDUM in Opposition re 72 Joint MOTION to Dismiss Case *and Memorandum in Support*, 71 MOTION to Dismiss Case *(Omnibus Opposition to Both Motions to Dismiss)* filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Lewis, Richard) (Entered: 05/26/2017) |
| 05/31/2017 | 78 | Consent MOTION for Extension of Time to File Response/Reply as to 77 Memorandum in Opposition to Motion, and MOTION for Leave to Exceed Page Limitation by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Mallinckrodt LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) Modified on 6/1/2017 (CBL). (Entered: 05/31/2017) |
| 06/01/2017 | 79 | Docket Text ORDER: Re: 78 Consent MOTION for Extension of Time and to exceed page limits: ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 6/1/17. (CDP) (Entered: 06/01/2017) |
| 06/06/2017 | 80 | *** Incorrect PDF filed. See Document 81 REPLY to Response to Motion re 71 MOTION to Dismiss Case filed by Defendant Mallinckrodt Inc.. (Erickson, David) Modified on 6/7/2017 (CBL). (Entered: 06/06/2017) |
| 06/06/2017 | 81 | REPLY to Response to Motion re 71 MOTION to Dismiss Case *(corrected filing)* filed by Defendant Mallinckrodt LLC. (Erickson, David) (Entered: 06/06/2017) |
| 06/06/2017 | 82 | REPLY to Response to Motion re 72 Joint MOTION to Dismiss Case *and Memorandum in Support* filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (McGahren, John) (Entered: 06/06/2017) |
| 07/13/2017 | 83 | MOTION to Consolidate Cases by Defendants Allied Services L.L.C., Bridgeton |

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

|  |  |  |
|---|---|---|
|  |  | Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 07/13/2017) |
| 07/13/2017 | 84 | MEMORANDUM in Support of Motion re 83 MOTION to Consolidate Cases filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Exhibit A)(Beck, William) (Entered: 07/13/2017) |
| 07/25/2017 | 85 | Consent MOTION for Extension of Time to File Response/Reply as to 83 MOTION to Consolidate Cases by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 07/25/2017) |
| 07/25/2017 | 86 | Docket Text ORDER: Re: 85 Consent MOTION for Extension of Time to File Response/Reply as to 83 MOTION to Consolidate Cases ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 7/25/17. (CDP) (Entered: 07/25/2017) |
| 08/07/2017 | 87 | REPLY to Response to Motion re 83 MOTION to Consolidate Cases filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 08/07/2017) |
| 10/23/2017 | 88 | Docket Text ORDER: Re: 83 MOTION to Consolidate Cases ; ORDERED DENIED as moot as other case has been remanded to state court. Signed by District Judge Catherine D. Perry on 10/23/17. (CDP) (Entered: 10/23/2017) |
| 10/27/2017 | 89 | MEMORANDUM AND ORDER. (See Full Order.) IT IS HEREBY ORDERED that defendant Mallinckrodt LLC's motion to dismiss [# 71 ] and defendants Allied Services LLC, Bridgeton Landfill LLC, Cotter Corporation, Republic Services Inc., and Rock Road Industries, Inc.'s motion to dismiss [# 72 ] are GRANTED in part and DENIED in part. Counts II through IV of the First Amended Complaint are dismissed. Plaintiffs' claims for medical monitoring and emotional distress are also dismissed. IT IS FURTHER ORDERED that defendants' requests for oral argument on the motions to dismiss are DENIED. This case will be set for a Rule 16 Scheduling Conference by separate order. Signed by District Judge Catherine D. Perry on 10/27/2017. (CBL) (Entered: 10/27/2017) |
| 10/27/2017 | 90 | ORDER SETTING RULE 16 CONFERENCE. (See Full Order.) This case is assigned to Track: 3 (Complex). Joint Scheduling Plan due by 12/1/2017. Rule 16 Conference set for 12/8/2017 09:30 AM in Chambers before District Judge Catherine D. Perry. Signed by District Judge Catherine D. Perry on 10/27/2017. (CBL) (Entered: 10/27/2017) |
| 11/10/2017 | 91 | ANSWER to 70 Amended Complaint, by Mallinckrodt LLC.(Erickson, David) (Entered: 11/10/2017) |
| 11/10/2017 | 92 | ANSWER to 70 Amended Complaint, by Cotter Corporation N.S.L..(McGahren, John) (Entered: 11/10/2017) |
| 11/28/2017 | 93 | ORDER. IT IS HEREBY ORDERED that the Scheduling Conference pursuant to Fed.R.Civ.P. 16, is reset from December 8, 2017 to Friday, December 15, 2017 at 10:30 a.m. in my chambers. The Joint Proposed Scheduling Plan is now due no later than December 8, 2017. Signed by District Judge Catherine D. Perry on 11/28/17. (EAB) (Entered: 11/28/2017) |
| 12/08/2017 | 94 | JOINT SCHEDULING PLAN by Defendant Cotter Corporation N.S.L.. *on behalf of all parties*. (McGahren, John) (Entered: 12/08/2017) |
| 12/11/2017 | 95 | SUPPLEMENTAL re 94 Joint Scheduling Plan *Exhibit A to Joint Scheduling Plan* by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 12/11/2017) |

| | | |
|---|---|---|
| 12/22/2017 | 96 | MOTION to Withdraw as Attorney ;attorney/firm Richard S. Lewis, Michaela G. Spero, Swathi Bojedla, and Hausfeld LLP by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) (Entered: 12/22/2017) |
| 12/22/2017 | 97 | Docket Text ORDER: Re: 96 MOTION to Withdraw as Attorney ;attorney/firm Richard S. Lewis, Michaela G. Spero, Swathi Bojedla, and Hausfeld LLP by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) filed by Michael Dailey, Robbin Dailey ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 12/22/17. (CDP) (Entered: 12/22/2017) |
| 12/22/2017 | 98 | MOTION to Withdraw as Attorney ;attorney/firm DeFeo, Stolze, Calvert by Plaintiffs Michael Dailey, Robbin Dailey. (DeFeo, Daniel) (Entered: 12/22/2017) |
| 12/27/2017 | 99 | MOTION to Withdraw 98 MOTION to Withdraw as Attorney ;attorney/firm DeFeo, Stolze, Calvert by Plaintiffs Michael Dailey, Robbin Dailey. (DeFeo, Daniel) (Entered: 12/27/2017) |
| 12/27/2017 | 100 | Docket Text ORDER: 99 MOTION to Withdraw 98 MOTION to Withdraw as Attorney by Plaintiffs Michael Dailey, Robbin Dailey. ORDERED: GRANTED. 98 MOTION to Withdraw as Attorney Plaintiffs Michael Dailey, Robbin Dailey. ORDERED: DENIED AS MOOT. Signed by District Judge Catherine D. Perry on 12/27/2017. (CBL) (Entered: 12/27/2017) |
| 12/28/2017 | 101 | ENTRY of Appearance by Steven D. Soden for Defendant Mallinckrodt LLC. (Soden, Steven) (Entered: 12/28/2017) |
| 01/02/2018 | 102 | INITIAL CASE MANAGEMENT ORDER. This case is assigned to Track: 3 (Complex). Pursuant to the Civil Justice Reform Act Expense and Delay Reduction Plan and the Differentiated Case Management Program of the United States District Court of the Eastern District of Missouri, and the Rule 16 Conference held on December 15, 2017, the Court will set an initial schedule for this case to proceed as detailed herein. (See Full Order.) Signed by District Judge Catherine D. Perry on 1/2/2018. (CBL) (Entered: 01/02/2018) |
| 01/12/2018 | 103 | MOTION for Leave to Appear Pro Hac Vice Barry Cooper. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6330831) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing Certificate of Good Standing (Barry J. Cooper))(Cooper, Barry) (Entered: 01/12/2018) |
| 01/16/2018 | 104 | Docket Text ORDER: Re: 103 MOTION for Leave to Appear Pro Hac Vice Barry Cooper by Plaintiffs Michael Dailey, Robbin Dailey. ORDERED: GRANTED. Signed by District Judge Catherine D. Perry on 1/16/2018. (CBL) (Entered: 01/16/2018) |
| 02/08/2018 | 105 | MOTION to Withdraw as Attorney ;attorney/firm Michael Stag/Smith Stag by Plaintiffs Michael Dailey, Robbin Dailey. (Stag, Michael) (Entered: 02/08/2018) |
| 02/20/2018 | 106 | MOTION to Withdraw as Attorney ;attorney/firm DeFeo, Stolze, Calvert by Plaintiffs Michael Dailey, Robbin Dailey. (DeFeo, Daniel) (Entered: 02/20/2018) |
| 02/21/2018 | 107 | Docket Text ORDER: Re: [105, 106] MOTIONS to Withdraw as Attorney ;attorney/firm Michael Stag/Smith Stag, attorney/firm DeFeo, Stolze, Calvert ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/21/18. (CDP) (Entered: 02/21/2018) |
| 02/21/2018 | 108 | MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE and MOTION for Status Conference by Plaintiffs Michael Dailey, Robbin Dailey. (Cooper, Barry). (Added MOTION for Status Conference on 2/22/2018.) (CBL). (Entered: 02/21/2018) |
| 02/22/2018 | 109 | AMENDED MOTION re: 108 MOTION for Extension of: TIME ON INITIAL CASE |

MOED-1.0/ECF LIVE   Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

4/20/2020                    MOED-CM/ECF LIVE

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

| | | |
|---|---|---|
| | | MANAGEMENT ORDER SCHEDULE and MOTION for Status Conference by Plaintiffs Michael Dailey, Robbin Dailey. (Cooper, Barry) Modified on 2/23/2018 (CBL). (Entered: 02/22/2018) |
| 02/26/2018 | 110 | MOTION for Leave to Appear Pro Hac Vice Celeste Brustowicz. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6400783) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing) (Brustowicz, Celeste) (Entered: 02/26/2018) |
| 02/27/2018 | 111 | ORDER. As requested by the parties, the Court will hold a telephone status conference to discuss the disputes between the parties and the motion for extension of time as to the Initial Case Management Order. Accordingly, IT IS HEREBY ORDERED that plaintiffs' Motion for Leave to Appear Pro Hac Vice Celeste Brustowicz 110 is GRANTED. IT IS FURTHER ORDERED that a telephone conference with counsel will be held on Monday, March 5, 2018 at 2:00 p.m. Counsel for plaintiffs Michael and Robbin Dailey will place the call and have all necessary counsel on the line before joining the undersigned at (314) 244-7520. Signed by District Judge Catherine D. Perry on 2/27/2018. (CBL) (Entered: 02/27/2018) |
| 02/28/2018 | 112 | RESPONSE to Motion re 108 MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE MOTION for Hearing, 109 MOTION to Amend/Correct 108 MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE MOTION for Hearing filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Exhibit 1)(McGahren, John) (Entered: 02/28/2018) |
| 03/02/2018 | 113 | MOTION for Leave to Appear Pro Hac Vice Victor T. Cobb. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6408510) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Cobb, Victor) (Entered: 03/02/2018) |
| 03/02/2018 | 114 | Docket Text ORDER: Re: 113 MOTION for Leave to Appear Pro Hac Vice Victor T. Cobb; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 3/2/18. (CDP) (Entered: 03/02/2018) |
| 03/02/2018 | 115 | REPLY to Response to Motion re 108 MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE MOTION for Hearing, 109 MOTION to Amend/Correct 108 MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE MOTION for Hearing filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Attachment Declaration by Barry J. Cooper, Jr., Esq.)(Cooper, Barry) (Entered: 03/02/2018) |
| 03/05/2018 | 116 | Minute Entry for proceedings held before District Judge Catherine D. Perry: Telephone Conference held on 3/5/2018. Parties present for telephone conference. Parties discuss case status with the court. Certain discovery deadlines and dispositive motions deadlines extended 60 days. Amended case management order to follow with complete details. (Court Reporter:Gayle Madden, Gayle_Madden@moed.uscourts.gov, 314-244-7987) (FTR Gold Operator initials:N/A) (FTR Gold: No) (EAB) (Entered: 03/05/2018) |
| 03/05/2018 | 117 | Joint MOTION for Protective Order by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 03/05/2018) |
| 03/05/2018 | 118 | MEMORANDUM in Support of Motion re 117 Joint MOTION for Protective Order filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Exhibit A, |

| | | |
|---|---|---|
| | | # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Rooney, Robert) (Entered: 03/05/2018) |
| 03/06/2018 | 119 | AMENDED CASE MANAGEMENT ORDER - IT IS HEREBY ORDERED that plaintiffs' amended motion for an extension of time of initial case management order schedule [#109] IS GRANTED in part as follows: 1. The parties shall complete all discovery related to the samples collected at Plaintiffs home and property, and the issue of whether the levels of radioactive contamination are sufficient to show a PAA violation, no later than May 2, 2018. 2. Any motions for summary judgment or motions for judgment on the pleadings pertaining to the issue of whether plaintiffs can show levels of radioactive contamination sufficient to show a violation of the PAA must be filed no later than June 4, 2018. Opposition briefs shall be filed no later than thirty days after the motion or July 5, 2018, whichever is earlier. Any reply brief may be filed no later than ten days following the response brief or July 16, 2018, whichever is earlier. IT IS FURTHER ORDERED that plaintiffs' first motion for an extension of time of initial case management order schedule [#108] is DENIED as moot. All other provisions of the Initial Case Management Order [ECF # 102] remain in full force and effect. Failure to comply with any part of this order may result in the imposition of sanctions. ( Discovery Completion due by 5/2/2018. Dispositive Motions due by 6/4/2018.) Signed by District Judge Catherine D. Perry on March 6, 2018. (MCB) (Entered: 03/06/2018) |
| 03/16/2018 | 120 | STIPULATION FOR DISMISSAL with Prejudice of Mallinckrodt LLC Only by Defendant Mallinckrodt LLC. (Erickson, David) Modified on 3/19/2018 (CBL). (Entered: 03/16/2018) |
| 03/20/2018 | 121 | Docket Text ORDER: Re: 117 Joint MOTION for Protective Order ; ORDERED GRANTED without objection. Signed by District Judge Catherine D. Perry on 3/20/18. (CDP) (Entered: 03/20/2018) |
| 03/20/2018 | 122 | Docket Text ORDER: Re: 120 STIPULATION FOR DISMISSAL with Prejudice of Mallinckrodt LLC Only ; ORDERED GRANTED and plaintiffs' claims against defendant Mallinckrodt, LLC are dismissed with prejudice with each side to pay its own costs. Signed by District Judge Catherine D. Perry on 3/20/18. (CDP) (Entered: 03/20/2018) |
| 03/27/2018 | 123 | MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Memo in Support of Motion to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO)(Brustowicz, Celeste) (Entered: 03/27/2018) |
| 04/02/2018 | 124 | Joint MOTION for Extension of Time to File Response/Reply as to 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 04/02/2018) |
| 04/03/2018 | 125 | Docket Text ORDER: Re: 124 Joint MOTION for Extension of Time to File Response/Reply ; ORDERED GRANTED over plaintiffs' objection. Signed by District Judge Catherine D. Perry on 4/3/18. (CDP) (Entered: 04/03/2018) |
| 04/06/2018 | 126 | Consent MOTION for Leave to File in Excess of Page Limitation by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 04/06/2018) |
| 04/09/2018 | 127 | Docket Text ORDER: Re: 126 Consent MOTION for Leave to File in Excess of Page Limitation by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc. ORDERED: LEAVE GRANTED. Signed by District Judge Catherine D. Perry on 4/9/2018. (CBL) (Entered: 04/09/2018) |

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

| 04/10/2018 | 128 | MEMORANDUM in Opposition re 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Defendant Cotter Corporation N.S.L.. (Feingold, Stephanie) (Entered: 04/10/2018) |
|---|---|---|
| 04/10/2018 | 129 | RESPONSE in Opposition re 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Rooney, Robert) (Entered: 04/10/2018) |
| 04/12/2018 | 130 | MOTION for Leave to Appear Pro Hac Vice Su Jin Kim. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6481333) by Defendant Cotter Corporation N.S.L.. (Attachments: # 1 Certificate of Good Standing)(Kim, Su) (Entered: 04/12/2018) |
| 04/12/2018 | 131 | Docket Text ORDER: Re: 130 MOTION for Leave to Appear Pro Hac Vice Su Jin Kim by Defendant Cotter Corporation N.S.L. ORDERED: GRANTED. Signed by District Judge Catherine D. Perry on 4/12/2018. (CBL) (Entered: 04/12/2018) |
| 04/16/2018 | 132 | MOTION for Extension of: Time to File Reply to Defendants' Responses In Opposition to 123 Plaintiffs' Motion for Leave to Amend Complaint to dismiss Price-Anderson Act Claims and Reinstate State Law Claims, Motion to Remand, Motion to Stay Pending Discovery and Alternatively Motion to Amend Case Management Order by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) Modified on 4/17/2018 (CBL). (Entered: 04/16/2018) |
| 04/17/2018 | 133 | AMENDED DISCLOSURE OF CORPORATE INTERESTS by Defendant Rock Road Industries, Inc. . (Beck, William) Modified on 4/17/2018 (CBL). (Entered: 04/17/2018) |
| 04/17/2018 | 134 | Docket Text ORDER: Re: 132 MOTION for Extension of: Time to File Reply to Defendants' Responses In Opposition to 123 Plaintiffs' Motion for Leave to Amend Complaint to dismiss Price-Anderson Act Claims and Reinstate State Law Claims, Motion to Remand, Motion to Stay Pending Discovery and Alternatively Motion to Amend Case Management Order by Plaintiffs Michael Dailey, Robbin Dailey ; ORDERED Motion is GRANTED. Signed by District Judge Catherine D. Perry on April 17, 2018. (MCB) (Entered: 04/17/2018) |
| 04/24/2018 | 135 | REPLY to Response to Motion re 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit Landfill Defendants Motion to Dismiss in Adams, # 2 Exhibit Deferral of regulatory oversight to US EPA, # 3 Exhibit Declaration of Richard Stewart, # 4 Exhibit Ware II Petition for writ of certiorari, # 5 Exhibit Declaration of Stephanie Feingold, # 6 Exhibit Cotter's response to CERCLA request)(Brustowicz, Celeste) (Entered: 04/24/2018) |
| 04/26/2018 | 136 | Joint MOTION for Leave to File a Sur-Reply by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc.. (Attachments: # 1 Exhibit A, # 2 Certificate of Service)(Feingold, Stephanie) (Entered: 04/26/2018) |
| 04/27/2018 | 137 | Docket Text ORDER: Re: 136 Joint MOTION for Leave to File a Sur-Reply by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc.; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 4/27/18. (KXS) (Entered: 04/27/2018) |
| 04/27/2018 | 138 | RESPONSE to Motion re 136 Joint MOTION for Leave to File a Sur-Reply filed by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) (Entered: 04/27/2018) |

| 05/08/2018 | 139 | SURREPLY to Motion re 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 05/08/2018) |
| --- | --- | --- |
| 05/08/2018 | 140 | ENTRY of Appearance by Peter F. Daniel for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Daniel, Peter) (Entered: 05/08/2018) |
| 05/08/2018 | 141 | SURREPLY to Motion re 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Defendant Cotter Corporation N.S.L.. (Feingold, Stephanie) (Entered: 05/08/2018) |
| 05/18/2018 | 142 | MOTION to Exclude *Motion and Memorandum in Support Requesting Plaintiffs be Prevented and Enjoined from using Information and Materials they Withheld Until Late in the Discovery Period* by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Beck, William) (Entered: 05/18/2018) |
| 05/25/2018 | 143 | RESPONSE to Motion re 142 MOTION to Exclude *Motion and Memorandum in Support Requesting Plaintiffs be Prevented and Enjoined from using Information and Materials they Withheld Until Late in the Discovery Period* filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Brustowicz, Celeste) (Entered: 05/25/2018) |
| 05/30/2018 | 144 | REPLY to Response to Motion re 142 MOTION to Exclude *Motion and Memorandum in Support Requesting Plaintiffs be Prevented and Enjoined from using Information and Materials they Withheld Until Late in the Discovery Period* filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 05/30/2018) |
| 06/01/2018 | 145 | MOTION for Extension of Time to File *Dispositive Motion* ;Proposed extension date 6/11/2018, MOTION for Leave to File in Excess of Page Limitation by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 06/01/2018) |
| 06/01/2018 | 146 | Consent MOTION for Leave to File Excess Pages by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Silva, Patricia) (Entered: 06/01/2018) |
| 06/02/2018 | 147 | MOTION for Extension of Time to File *Dispositive Motion* ;Proposed extension date June 11, 2018 by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 06/02/2018) |
| 06/04/2018 | 148 | Docket Text ORDER: Re: 145 MOTION for Extension of Time to File *Dispositive Motion and MOTION for Leave to File in Excess of Page Limitation by Defendant Cotter Corporation N.S.L.; 147 MOTION for Extension of Time to File Dispositive Motion by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.; 146 Consent MOTION for Leave to File Excess Pages by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc. ; ORDERED: Motions are GRANTED. ( Dispositive Motions due by 6/11/2018.) Signed by District Judge Catherine D. Perry on June 4, 2018. (MCB) (Entered: 06/04/2018)* |
| 06/05/2018 | 149 | MEMORANDUM AND ORDER - IT IS HEREBY ORDERED that plaintiffs' motion for leave to amend, to remand, and to stay [#123] is GRANTED ONLY with respect to a STAY of future Amended Case Management Order (ECF No. 119) deadlines, and is HELD IN ABEYANCE with respect to leave to amend, remand, and alternatively, amendment of the case management order. Once the Court has ruled pending motions, a new schedule shall be established for this matter, if necessary. Signed by District Judge Catherine D. Perry on June 5, 2018. (MCB) (Entered: 06/05/2018) |

| | | |
|---|---|---|
| 06/06/2018 | [150](#) | NOTICE of Supplemental Authority re [123](#) MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc. . (Attachments: # [1](#) Exhibit A)(Daniel, Peter) (Entered: 06/06/2018) |
| 06/12/2018 | [151](#) | ORAL MOTION *for Argument* by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 06/12/2018) |
| 06/20/2018 | [152](#) | MOTION for Leave to Appear Pro Hac Vice Stuart H. Smtih. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6600931) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # [1](#) Certificate of Good Standing)(Smith, Stuart) (Entered: 06/20/2018) |
| 06/21/2018 | 153 | Docket Text ORDER: Re: [152](#) MOTION for Leave to Appear Pro Hac Vice Stuart H. Smith ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 6/21/18. (CDP) (Entered: 06/21/2018) |
| 03/14/2019 | [154](#) | MOTION to Withdraw as Attorney *by Robert G. Rooney* ;attorney/firm Robert G. Rooney by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 03/14/2019) |
| 03/18/2019 | 155 | Docket Text ORDER: Re: [154](#) MOTION to Withdraw as Attorney *by Robert G. Rooney* by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.; ORDERED: Motion is GRANTED. Signed by District Judge Rodney W. Sippel on behalf of District Judge Catherine D. Perry on March 18, 2019. (MCB) (Entered: 03/18/2019) |
| 04/08/2019 | [156](#) | MEMORANDUM AND ORDER. (See Full Order.) IT IS HEREBY ORDERED that plaintiffs' motion for leave to amend and to remand, or to amend case management order [123](#) is denied without prejudice. Defendants' motion to prevent plaintiffs from using material and information [142](#) is denied as moot. IT IS FURTHER ORDERED that not later than April 29, 2019, plaintiffs shall file either: 1) a motion to dismiss this case without prejudice under Fed. R. Civ. P. 41(a)(2); or 2) a renewed motion for leave to file a Second Amended Complaint, accompanied by the proposed amended complaint. The Federal Rules of Civil Procedure and the Local Rules of this Court govern the time to file any responses and/or replies to plaintiffs' motion. IT IS FURTHER ORDERED that defendants' Motion for Oral Argument [151](#) is denied. The parties thus far have clearly and articulately presented their respective arguments in their prepared briefs. If I determine that oral argument is necessary to assist in my consideration of plaintiffs' anticipated motion to dismiss or to amend, I will not hesitate to schedule a hearing. IT IS FURTHER ORDERED that the case management deadlines in this case remain stayed. Signed by District Judge Catherine D. Perry on 4/8/2019. (CBL) (Entered: 04/08/2019) |
| 04/29/2019 | [157](#) | MOTION for Leave to File a 2nd Amended Complaint by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # [1](#) Memo in Support of Motion, # [2](#) Exhibit 2nd Amended Complaint)(Smith, Stuart) (Entered: 04/29/2019) |
| 05/06/2019 | [158](#) | MOTION for Extension of Time to File Response/Reply as to [157](#) MOTION for Leave to File a 2nd Amended Complaint by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Daniel, Peter) (Entered: 05/06/2019) |
| 05/06/2019 | 159 | Docket Text ORDER: Re: [158](#) MOTION for Extension of Time to File Response to MOTION for Leave to File a 2nd Amended Complaint ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 5/6/19. (CDP) (Entered: 05/06/2019) |
| 05/20/2019 | [160](#) | RESPONSE to Motion re [157](#) MOTION for Leave to File a 2nd Amended Complaint filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, |

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

| | | |
|---|---|---|
| | | Inc.. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Beck, William) (Entered: 05/20/2019) |
| 05/20/2019 | 161 | MEMORANDUM in Opposition re 157 MOTION for Leave to File a 2nd Amended Complaint *Pursuant to April 8, 2019 Order* filed by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 05/20/2019) |
| 05/20/2019 | | NOTICE: IF YOU HAVE ALREADY UPGRADED YOUR PACER ACCOUNT YOU CAN DISREGARD THIS NOTICE. IF YOU DO NOT UPGRADE YOU WILL NOT BE ABLE TO FILE IN THE SYSTEM AFTER MAY 31, 2019. PLEASE UPGRADE IMMEDIATELY. If you are using a shared account to file cases, you will need to create an individual account; instructions can be found at:https://www.moed.uscourts.gov/sites/moed/files/Register-for-New-PACER-account.pdf. If you already have an individual account, it will need to be upgraded; instructions can be found https://www.moed.uscourts.gov/sites/moed/files/Upgrade-Current-PACER-Account.pdf. If you need further assistance contact the MOED CM/ECF Help Desk at 314-244-7650 or moedml_cmecf_help@moed.uscourts.gov. (CSAW) (Entered: 05/20/2019) |
| 05/22/2019 | 162 | MOTION for Extension of Time to File Response/Reply as to 157 MOTION for Leave to File a 2nd Amended Complaint by Plaintiffs Michael Dailey, Robbin Dailey. (Cobb, Victor) (Entered: 05/22/2019) |
| 05/28/2019 | 163 | Docket Text ORDER: Re: 162 MOTION for Extension of Time to File Response/Reply ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 5/28/19. (CDP) (Entered: 05/28/2019) |
| 06/10/2019 | 164 | REPLY to Response to Motion re 157 MOTION for Leave to File a 2nd Amended Complaint filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1 (Judgment denying appeal), # 2 Exhibit 2 (Silva Deposition Transcript))(Brustowicz, Celeste) (Entered: 06/10/2019) |
| 10/22/2019 | 165 | ORDER : IT IS HEREBY ORDERED that plaintiffs Motion for Leave to File a Second Amended Complaint 157 is GRANTED, and the Clerk of Court is instructed to file and docket plaintiffs Second Amended Complaint (ECF 157-2) as of todays date. IT IS FURTHER ORDERED that plaintiffs shall have twenty-one (21) days from the date of this Order within which to file a motion to remand, and defendants shall have fourteen (14) days thereafter within which to respond. Any reply brief may be filed within seven (7) days of the response. Signed by District Judge Catherine D. Perry on 10/22/2019. (KCB) (Entered: 10/22/2019) |
| 10/22/2019 | 166 | SECOND AMENDED COMPLAINT against defendant Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc., filed by Michael Dailey, Robbin Dailey.(KCB) (Entered: 10/22/2019) |
| 10/23/2019 | 167 | Docket Text ORDER: Defense counsel have contacted chambers indicating uncertainty about whether the Court's orders somehow meant that they were not obligated to respond to the Second Amended Complaint. To clear up any confusion: Defendants must respond to the Second Amended Complaint within the time set by the Federal Rules of Civil Procedure. Signed by District Judge Catherine D. Perry on 10/23/19. (CDP) (Entered: 10/23/2019) |
| 11/04/2019 | 168 | MOTION for Extension of Time to File Answer *to Plaintiffs' Second Amended Complaint* by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 11/04/2019) |
| 11/05/2019 | 169 | Docket Text ORDER Re: 168 MOTION for Extension of Time to File Answer *to Plaintiffs' Second Amended Complaint* by Defendant Cotter Corporation N.S.L.. |

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

| | | (McGahren, John); ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 11/5/2019. (BRP) (Entered: 11/05/2019) |
|---|---|---|
| 11/05/2019 | [170](#) | ANSWER to 166 Amended Complaint by Allied Services L.L.C..(Beck, William) (Entered: 11/05/2019) |
| 11/05/2019 | [171](#) | ANSWER to 166 Amended Complaint by Bridgeton Landfill, LLC.(Beck, William) (Entered: 11/05/2019) |
| 11/05/2019 | [172](#) | ANSWER to 166 Amended Complaint by Republic Services, Inc..(Beck, William) (Entered: 11/05/2019) |
| 11/05/2019 | [173](#) | NOTICE Exhibit 1 to Defendants' Answers to Plaintiffs' Second Amended Complaint: by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc. re 171 Answer to Amended Complaint, 172 Answer to Amended Complaint, 170 Answer to Amended Complaint (Beck, William) (Entered: 11/05/2019) |
| 11/12/2019 | [174](#) | MOTION to Remand Case to State Court to State Court by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Memo In Support of Motion to Remand)(Brustowicz, Celeste) (Entered: 11/12/2019) |
| 11/12/2019 | [175](#) | MOTION to Dismiss Case by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 11/12/2019) |
| 11/25/2019 | [176](#) | MOTION to Stay by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit Memo in Support of Unopposed Motion to Stay)(Brustowicz, Celeste) (Entered: 11/25/2019) |
| 11/25/2019 | [177](#) | MOTION for Leave to File in Excess of Page Limitation *for Response to Plaintiffs' Motion to Remand* by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 11/25/2019) |
| 11/26/2019 | 178 | Docket Text ORDER: Re: 177 MOTION for Leave to File in Excess of Page Limitation ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 11/26/19. (CDP) (Entered: 11/26/2019) |
| 11/26/2019 | 179 | Docket Text ORDER: Re: 176 MOTION to Stay : ORDERED GRANTED to the extent that deadlines for briefing the motion to dismiss are stayed pending the Court's ruling on the motion to remand. Signed by District Judge Catherine D. Perry on 11/26/19. (CDP) (Entered: 11/26/2019) |
| 11/26/2019 | [180](#) | MEMORANDUM in Opposition re 174 MOTION to Remand Case to State Court to State Court filed by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 11/26/2019) |
| 11/26/2019 | [181](#) | RESPONSE to Motion re 174 MOTION to Remand Case to State Court to State Court filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 11/26/2019) |
| 12/02/2019 | [182](#) | MOTION for Extension of Time to File Response/Reply as to 174 MOTION to Remand Case to State Court to State Court, 180 Memorandum in Opposition to Motion, 181 Response to Motion by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) (Entered: 12/02/2019) |
| 12/03/2019 | [183](#) | Amended MOTION to Amend/Correct 182 MOTION for Extension of Time to File Response/Reply as to 174 MOTION to Remand Case to State Court to State Court, 180 Memorandum in Opposition to Motion, 181 Response to Motion , MOTION for Extension of Time to File Response/Reply by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) . (Entered: 12/03/2019) |

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

| 12/03/2019 | 184 | Docket Text ORDER Re: 183 Amended MOTION to Amend/Correct 182 MOTION for Extension of Time to File Response/Reply as to 174 MOTION to Remand Case to State Court to State Court, 180 Memorandum in Opposition to Motion, 181 Response to Motion , MOTION for Extension of Time to File Response/Reply by Plaintiffs Michael Dailey, Robbin Dailey; OREDERED GRANTED. 182 MOTION for Extension of Time to File Response/Reply as to 174 MOTION to Remand Case to State Court to State Court, 180 Memorandum in Opposition to Motion, 181 Response to Motion by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) filed by Michael Dailey, Robbin Dailey; ORDERED DENIED AS MOOT. Signed by District Judge Catherine D. Perry on 12/3/2019. (BRP) Modified on 12/4/2019 (BRP). (Entered: 12/03/2019) |
| --- | --- | --- |
| 12/10/2019 | 185 | REPLY to Response to Motion re 174 MOTION to Remand Case to State Court to State Court filed by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) (Entered: 12/10/2019) |
| 03/23/2020 | 186 | MEMORANDUM AND ORDER: IT IS HEREBY ORDERED that plaintiffs Michael and Robbin Daileys' Motion to Remand 174 is GRANTED. IT IS FURTHER ORDERED that this case is REMANDED to the Circuit Court of St. Louis County, Missouri, from which it was removed. All other motions that remain pending in this action are reserved for ruling by that court. Signed by District Judge Catherine D. Perry on 3/23/2020. (TMT) (Entered: 03/23/2020) |
| 04/04/2020 | 187 | ENTRY of Appearance by Brian O'Connor Watson for Defendant Cotter Corporation N.S.L.. (Watson, Brian) (Entered: 04/04/2020) |

| PACER Service Center | | |
| --- | --- | --- |
| Transaction Receipt | | |
| 04/20/2020 16:08:59 | | |
| PACER Login: | sl040515 | Client Code: | 123500 |
| Description: | Docket Report | Search Criteria: | 4:17-cv-00024-CDP |
| Billable Pages: | 21 | Cost: | 2.10 |

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:17-cv-00024-CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**[PROPOSED] ORDER**

Upon consideration of Defendants' Motion Requesting Plaintiffs Be Prevented and

Enjoined From Using Information and Materials They Withheld Until Late in the Discovery

Period [#_____], the Court finds good cause for the relief requested.

**IT IS HEREBY ORDERED** that Defendants' Motion is **GRANTED**. Plaintiffs shall

not be able to use any of the following materials as support in any motion, response, or reply

filed in accordance with paragraph 2 of the Amended Case Management Order [#119]:

(1)     All materials contained on the thumb drive identified as Exhibit 10 to the

Kaltofen deposition; and

(2)     All documents and materials produced for or served on Defendants as

supplemental initial disclosures, supplemental discovery responses, or expert reports on May 2

and 3, 2018.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this _____ day of May, 2018.

1

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL DAILEY, et al.,                    )
                                           )
        Plaintiffs,                        )
                                           )
v.                                         )        Case No. 4:17-cv-00024-CDP
                                           )
BRIDGETON LANDFILL, LLC, et al.,           )
                                           )
        Defendants.                        )

**PLAINTIFFS' REPLY TO DEFENDANTS' MOTION AND
MEMORANDUM IN SUPPORT REQUESTING PLAINTIFFS BE
PREVENTED AND ENJOINED FROM USING INOFMRATIONAND
MATERIALS THEY WITHHELD UNTIL LATE IN THE DISCOVERY PERIOD**

The Landfill defendants want this court to punish Michael and Robbin Dailey, plaintiffs,

for timely providing factual, scientific, and expert evidence to prove a Price Anderson Act

("PAA") violation at their home. There was nothing underhanded or nefarious about the way the

evidence was produced; in fact, plaintiffs have gone well beyond the scope of the CMO and have

provided more evidence than required.

The accumulation of the evidence consisting of testing at other properties along with expert

calculations was extremely expensive and time consuming and it was produced even though not

required by the CMO and despite plaintiffs' belief that this court lacks subject matter jurisdiction

under the PAA. The bottom line is this- the Dailey's have timely produced the necessary factual,

scientific, and expert evidence necessary to sustain a PAA claim despite their belief that the PAA

is not applicable to this matter. This was done out of an abundance of caution.

If these defendants require more time to review and consider the evidence, that is the

remedy- time, not punishment. Had there been a 'meet and confer' discussion amongst counsel

1

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

before the filing of the present motion there seems little doubt the present motion would never have been filed.

As this court is aware, undersigned counsel has not been involved in this matter from the beginning and did not participate in the conference which led to the original CMO (ECF No. 102). After becoming involved, undersigned counsel filed a Motion for Extension of Time and Motion for Status Conference to discuss the CMO. The court granted the extension (ECF No.108) and during the status conference stated to proceed with CMO and file a motion to change it. Thereafter, plaintiffs filed a motion to dismiss their PAA claims and reinstate their state law claims based on concerns that jurisdiction is not proper under the PAA. Alternatively, plaintiffs requested that the CMO be amended to focus on the appropriate standard for a breach of the PAA. This motion is still pending and the CMO, which plaintiffs believe to be incorrect, is still in effect.

Defendants contend that plaintiffs have "withheld massive amounts of information, data, and materials, and orchestrated a data dump."[1] This is not the case.  Prior to the deposition of Dr. Kaltofen at issue, plaintiffs produced all documents related to the Dailey property as they were received.[2]  Dr. Kaltofen was required to produce documents at his deposition on April 20, 2018. Undersigned counsel made a return on the subpoena duces tecum in advance of the deposition.[3]

Immediately before Dr. Kaltofen's deposition, undersigned counsel advised counsel for the Landfill defendants that the witness would bring with him a thumb drive (Deposition Exhibit 10) that contained the Dailey records previously produced along with all the data relating to other properties tested in the area thus accounting for the tremendous size of the data produced. This data was not required to be produced since it did not relate to the Dailey property. It was however

---

[1] ECF No. 142 at page 2
[2] See Exhibit 1 – Production of Dailey Samples.
[3] See Exhibit 2 – Subpoena Return.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

produced out of an abundance of caution because it would be relied on by the Dailey's in opposing any summary judgment motion by the defendants that there was no PAA violation. Notwithstanding the original and amended CMOs, plaintiffs believe that to prove a PAA violation, test results from other properties are necessary along with expert analysis of the test data establishing a dose violation. And that is precisely what the Dailey's produced.

Defendants contend that "the extent of the materials contained on the thumb drive was not revealed."[4] However, the Landfill defendants failed to cite the portion of the deposition where Dr. Kaltofen, who made the thumb drive, described exactly what it was:

> Q. Okay. So can you tell me how you went about producing documents in this litigation to date.
>
> **A. Certainly. At some point, I think it was about two months ago, I got a request to organize any documents or data, records related to Robbin Dailey for production, and it was about the time that the first subpoena in this matter was served, and it just said the same thing. So I went through all of my computer records and other records, looking for anything that was in my case file, anything I relied upon so far in this case and copied that, and I also received several phone calls from the Cooper law firm.**
>
> Q. I'm sorry. Which law firm?
>
> **A. The Cooper law firm.**
>
> Q. Mm-hmm.
>
> **A. Mr. Cobb requesting additional information, things like spectrum files related to gamma spectroscopy equipment and details about any other types of records like field testing that might have been done. That's pretty much it. There was some new analyses that were performed more recently that were added to that production file, and eventually I just put together a thumb drive that had everything whether or not it's related to the Robbin Dailey matter.**
>
> Q. And that thumb drive you're referring to has been marked for identification as Exhibit 10?
>
> **A. That's correct.**

---

[4] ECF No. 142 at page 6.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Q. And you produced that here today?

**A. That's correct.** [5]

A meet and confer would have resolved any confusion about the thumb drive's contents. If the Landfill defendants really have questions for Dr. Kaltofen about the sampling and test results on other properties they should seek to resume his deposition- not strip the Dailey's of their evidence, which cost substantial sums.

Based on plaintiffs' belief that the current CMO does not contemplate necessary elements of PAA violation, namely expert analysis of test results and samples taken from outside the Dailey property, plaintiffs produced documents and information that goes beyond the scope of the CMO. It is this information that Defendants take issue with. The information includes sampling data from numerous locations throughout the St. Louis area which were provided during Dr. Kaltofen's deposition on April 20, 2018 and reproduced on May 2, 2018. The information also includes a report by plaintiffs' expert Dr. Phil Plato which used the data and concluded that a PAA violation does in fact exist at the Dailey property. Despite Defendants contention that plaintiffs withheld this report, plaintiffs did not receive the report until moments before it was produced.

The Dailey's wish to make state law claims and at the same time they do not wish their case to be dismissed for lack of evidence on PAA grounds, thus they have gone to the effort and expense of providing the necessary expert opinion and factual basis to prove the PAA violation. The Landfill defendants have not been prejudiced and no grounds exist to punish the Dailey's. If more time is needed, the Court should grant it.  The motion should be denied.

*[Certificate and Signature on Following Page.]*

---

[5] See Exhibit 3 - Kaltofen Deposition pages 124 – 126.

4838-6485-6934, v. 1

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Respectfully submitted,

*/s/ Celeste Brustowicz*
Barry J. Cooper, Jr. (LSBA 27202), *Pro Hac Vice*
Celeste Brustowicz (LSBA 16835), *Pro Hac Vice*
Victor T. Cobb (LSBA 36830), *Pro Hac Vice*
**COOPER LAW FIRM, LLC**
1525 Religious Street
New Orleans, Louisiana 70130
E-mail:bcooper@sch-llc.com
   cbrustowicz@sch-llc.com
   vcobb@sch-llc.com
**ATTORNEYS FOR PLAINTIFFS,**
**MICHAEL AND ROBBIN DAILEY**


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 25th, 2018, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.


*/s/ Celeste Brustowicz*
Celeste Brustowicz (LSBA 16835)

5

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

| Sample ID | Date Sample Taken | Taken by | Field Notes? | Produced? | Date produced | Location | Bates # | Eberline | Microvison | Scan | EDS (graph) | % Table | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| RD VAC Bag STL 4 | 5/4/2016 | | | YES | 2/9/2018 | Eberline Work Order 16-05025 | 1-275 | Yes | No | NA | NA | NA | 2 different Eberline reports |
| WLL0011S/left side house | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | Eberline Work Order 16-07057 | 276-928 | Yes | No | NA | NA | NA | |
| WLL0012S/corner fence | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | Eberline Work Order 16-07057 | 276-928 | Yes | No | NA | NA | NA | |
| WLL0013S/top berm fence left | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | Eberline Work Order 16-07057 | 276-928 | Yes | No | NA | NA | NA | |
| WLL0014S/right side berm fence | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | Eberline Work Order 16-07057 | 276-928 | Yes | No | NA | NA | NA | |
| RD Tape 207 | 2/30/16 to 1/2/1 | Lucas Hixson | | YES | 2/9/2018 | Eberline Work Order 16-07063 | 929-1365 | Yes | No | NA | NA | NA | |
| WLL0015.1D/fridge | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | Eberline Work Order 16-07063 | 929-1365 | Yes | No | NA | NA | NA | 2 different Eberline reports |
| RD VAC Bag STL 4 | 5/4/2016 | | | YES | 2/9/2018 | Eberline Work Order 16-07071 | 1366-1406 | Yes | No | NA | NA | NA | 2 different Eberline reports |
| WLL0015.1D/fridge 4 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | Eberline Work Order 16-07092 | 1407-1621 | Yes | No | NA | NA | NA | 2 different Eberline reports |
| WLL0008D/whole bag | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | Eberline Work Order 16-07099 | 1622-1998 | Yes | No | NA | NA | NA | |
| WLL0045S/shallow surface | 2/1/2017 | Shawn Strongbear Silva | YES | YES | 2/9/2018 | Eberline Work Order 17-02037 | 1999-3292 | Yes | No | NA | NA | NA | |
| WLL0046S/-10cm | 2/1/2017 | Shawn Strongbear Silva | YES | YES | 2/9/2018 | Eberline Work Order 17-02037 | 1999-3292 | Yes | No | NA | NA | NA | |
| WLL0008D/fines 4 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | Eberline Work Order 17-02038 | 3293-3726 | Yes | No | NA | NA | NA | |
| WLL0049S/Dailey | 2/1/2017 | Shawn Strongbear Silva | | YES | 2/9/2018 | Eberline Work Order 17-02073 | 3293-3726 | Yes | No | NA | NA | NA | |
| WLL0043D/Dailey | 2/1/2017 | Shawn Strongbear Silva | YES | YES | 2/9/2018 | Eberline Work Order 17-02073 | 3727-5009 | Yes | No | NA | NA | NA | |
| WLL0044D/Dailey | 2/1/2017 | Shawn Strongbear Silva | | YES | 2/9/2018 | Eberline Work Order 17-02073 | 3727-5009 | Yes | No | NA | NA | NA | |
| WLL0047D/composite | 2/1/2017 | Shawn Strongbear Silva | YES | YES | 2/9/2018 | Eberline Work Order 17-02073 | 3727-5009 | Yes | No | NA | NA | NA | |
| WLL0008D-Whole bag, particle 1 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | No | Yes | Yes | |
| WLL0008D-Whole bag, particle 2 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | No | Yes | Yes | |
| WLL0010D, particle 1 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | NA | |
| WLL0010D, particle 2 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | NA | |
| WLL0010D, particle 3 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | NA | |
| WLL0010D, particle 4 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | NA | |
| WLL0015.1D-fridge, particle 1 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | NA | |
| WLL0017D, particle 1 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | NA | |
| WLL0017D, particle 2 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Tape 207, particle 1 | 2/30/16 to 1/2/1 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Tape 207, particle 2 | 2/30/16 to 1/2/1 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Tape 207, particle 3 | 2/30/16 to 1/2/1 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Tape 207, particle 4 | 2/30/16 to 1/2/1 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Tape 207, particle 5 | 2/30/16 to 1/2/1 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Tape 207, particle 6 | 2/30/16 to 1/2/1 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Tape 207, particle 7 | 2/30/16 to 1/2/1 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Tape 207, particle 8 | 2/30/16 to 1/2/1 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Tape 207, particle 9 | 2/30/16 to 1/2/1 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Vac Bag STL, particle 1 | 5/4/2016 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Vac Bag STL, particle 2 | 5/4/2016 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Vac Bag STL, particle 3 | 5/4/2016 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD Vac Bag STL, particle 4 | 5/4/2016 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD-STL HVAC, particle 1 | 5/4/2016 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD-STL HVAC, particle 2 | 5/4/2016 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD-STL HVAC, particle 3 | 5/4/2016 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD-STL HVAC, particle 4 | 5/4/2016 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD-STL HVAC, particle 5 | 5/4/2016 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD-STL HVAC, particle 6 | 5/4/2016 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD-STL HVAC, particle 7 | 5/4/2016 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD-STL HVAC, particle 8 | 5/4/2016 | Lucas Hixson | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| RD, Runoff, particle 1 | UNKNOWN | | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | No | Marco doesn't have |
| RD, Runoff, particle 2 | UNKNOWN | | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | No | Marco doesn't have |
| RD, Runoff, particle 3 | UNKNOWN | | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | No | Marco doesn't have |
| WLL0009D, particle 1 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| WLL0009D, particle 2 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| WLL0009D, particle 3 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| WLL0009D, particle 4 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| WLL0009D, particle 5 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| WLL0009D, particle 6 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| WLL0009D, particle 7 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| WLL0009D, particle 8 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| WLL0009D, particle 9 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| WLL0009D, particle 10 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |
| WLL0009D, particle 11 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | 5014-5170 | No | Yes | Yes | Yes | Yes | |

Exhibit 1

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WLL0009D, particle 12 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | S014-S170 | No | Yes | Yes | Yes | Yes |
| WLL0009D, particle 13 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | S014-S170 | No | Yes | Yes | Yes | Yes |
| WLL0009D, particle 14 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | S014-S170 | No | Yes | Yes | Yes | Yes |
| WLL0009D, particle 15 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | S014-S170 | No | Yes | Yes | Yes | Yes |
| WLL0009D, particle 16 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | S014-S170 | No | Yes | Yes | Yes | Yes |
| WLL0009D, particle 17 | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | S014-S170 | No | Yes | Yes | Yes | Yes |
| WLL0009D, unknown particle A | 7/7/2016 | Shawn Strongbear Silva | | YES | 2/9/2018 | SEM EDS Data (original) | S014-S170 | No | Yes | Yes | Yes | Yes |
| **RADON DATA (received 4.4.18)** | | | | | | | | | | | | |
| WLL0003167933A Berm | 7/2016 - 11/9/20 | Shawn Strongbear Silva | | YES | 4/9/2018 | Radon Data (received 4.4.18) | 5248 | No | No | NA | NA | NA |
| WLL0003167934A Lower Yard | 7/2016 - 11/9/20 | Shawn Strongbear Silva | | YES | 4/9/2018 | Radon Data (received 4.4.18) | 5248 | No | No | NA | NA | NA |
| WLL0003164715A Basement | 7/2016 - 11/9/20 | Shawn Strongbear Silva | | YES | 4/9/2018 | Radon Data (received 4.4.18) | 5248 | No | No | NA | NA | NA |
| WLL0003164716A Basement | 7/2016 - 11/9/20 | Shawn Strongbear Silva | | YES | 4/9/2018 | Radon Data (received 4.4.18) | 5248 | No | No | NA | NA | NA |
| WLL0003164699A Cabinet | 7/2016 - 11/9/20 | Shawn Strongbear Silva | | YES | 4/9/2018 | Radon Data (received 4.4.18) | 5248 | No | No | NA | NA | NA |
| WLL0003164700A Cabinet | 7/2016 - 11/9/20 | Shawn Strongbear Silva | | YES | 4/9/2018 | Radon Data (received 4.4.18) | 5248 | No | No | NA | NA | NA |
| **SEM EDS DATA (received 4.6.18)** | | | | | | | | | | | | |
| RD Tape 11S, particle 1 | 2/30/16 to 1/2/1 | Shawn Strongbear Silva | | YES | 4/9/2018 | SEM EDS Data (received 4.6.18) | S249-S275 | No | Yes | Yes | Yes | Yes |
| RD Tape 11S, particle 2 | 2/30/16 to 1/2/1 | Shawn Strongbear Silva | | YES | 4/9/2018 | SEM EDS Data (received 4.6.18) | S249-S275 | No | Yes | Yes | Yes | Yes |
| RD Tape 11S, particle 3 | 2/30/16 to 1/2/1 | Shawn Strongbear Silva | | YES | 4/9/2018 | SEM EDS Data (received 4.6.18) | S249-S275 | No | Yes | Yes | Yes | Yes |
| RD Tape 11S, particle 4 | 2/30/16 to 1/2/1 | Shawn Strongbear Silva | | YES | 4/9/2018 | SEM EDS Data (received 4.6.18) | S249-S275 | No | Yes | Yes | Yes | Yes |
| RD Tape 11S, particle 5 | 2/30/16 to 1/2/1 | Shawn Strongbear Silva | | YES | 4/9/2018 | SEM EDS Data (received 4.6.18) | S249-S275 | No | Yes | Yes | Yes | Yes |
| RD Tape 11S, particle 6 | 2/30/16 to 1/2/1 | Shawn Strongbear Silva | | YES | 4/9/2018 | SEM EDS Data (received 4.6.18) | S249-S275 | No | Yes | Yes | Yes | Yes |
| RD Tape 11S, particle 7 | 2/30/16 to 1/2/1 | Shawn Strongbear Silva | | YES | 4/9/2018 | SEM EDS Data (received 4.6.18) | S249-S275 | No | Yes | Yes | Yes | Yes |
| RD Tape 16S, particle 1 | 2/30/16 to 1/2/1 | Shawn Strongbear Silva | | YES | 4/9/2018 | SEM EDS Data (received 4.6.18) | S249-S275 | No | Yes | Yes | Yes | Yes |
| RD Tape 16S, particle 2 | 2/30/16 to 1/2/1 | Shawn Strongbear Silva | | YES | 4/9/2018 | SEM EDS Data (received 4.6.18) | S249-S275 | No | Yes | Yes | Yes | Yes |
| **SAM940 DATA (4.9.2018)** | | | | | | | | | | | | |
| SAM940 Data (four .n42 files) | UNKNOWN | | | YES | 4/9/2018 | | | NA | No | No | NA | NA |
| fourteen SPU files | UNKNOWN | | | YES | 4/9/2018 | | | NA | No | No | NA | NA |
| **SEM EDS (received 4.16.18)** | | | | | | | | | | | | |
| WLL0008D_VF 10mg, particle 1 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 2 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 3 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 4 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 5 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | No |
| WLL0008D_VF 10mg, particle 6 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 7 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 8 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 9 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 10 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 11 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 12 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 13 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 14 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 15 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 16 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 17 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 18 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 19 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 20 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 21 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 22 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 23 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | No |
| WLL0008D_VF 10mg, particle 24 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 25 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 26 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 27 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 28 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 29 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 30 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 31 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 32 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 33 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 34 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 35 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 36 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 37 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | S276-S425 | No | Yes | Yes | Yes | Yes |

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WLL0008D_VF 10mg, particle 38 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 39 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 40 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 41 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | Yes | Yes | Yes |
| WLL0008D_VF 10mg, particle 42 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | No | Yes | Yes |
| WLL0008D_VF 10mg, particle 43 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | Yes | No | Yes |
| WLL0008D_VF 10mg, particle 44 | 7/7/2016 | Shawn Strongbear Silva | | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | Yes | Yes | Yes |
| WLL0043D, particle 1 | 2/1/2017 | Shawn Strongbear Silva | YES | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | Yes | Yes | Yes |
| WLL0043D, particle 2 | 2/1/2017 | Shawn Strongbear Silva | YES | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | Yes | Yes | Yes |
| WLL0043D, particle 3 | 2/1/2017 | Shawn Strongbear Silva | YES | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | Yes | Yes | Yes |
| WLL0043D, particle 4 | 2/1/2017 | Shawn Strongbear Silva | YES | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | Yes | Yes | Yes |
| WLL0044D, particle 1 | 2/1/2017 | Shawn Strongbear Silva | YES | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | Yes | Yes | Yes |
| WLL0044D, particle 2 | 2/1/2017 | Shawn Strongbear Silva | YES | YES | 4/18/2018 | SEM EDS Data (received 4.16.18) | 5276-5425 | No | Yes | Yes | Yes | Yes |
| | | | | | | | | | | | | |
| WLL0036S/Drainage Spout | 11/9/2016 | Shawn Strongbear Silva | YES | | | | | | | | | |
| WLL0040S | 11/10/2016 | Shawn Strongbear Silva | YES | | | | | | | | | |
| WLL0016D | 7/7/2016 | Shawn Strongbear Silva | NO | | | | | | | | | |
| WLL0018D | 7/7/2016 | Shawn Strongbear Silva | NO | | | | | | | | | |

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

# COOPER LAW FIRM, L.L.C.

1525 Religious Street
NEW ORLEANS, LOUISIANA 70130

April 19, 2018

TELEPHONE: (504) 399-0009
FACSIMILE: (504) 581-9055

VIA E-MAIL: wbeck@lathropgage.com

Celeste Brustowicz
Licensed in La., Ca. & Ms
cbrustowicz@sch-llc.com

Re:   Marco Kaltofen's Subpoena

Dear Mr. Beck:

    We have produced to you all of Marco Kaltofen's file materials that were provided to us and requested in your deposition subpoena. They are as follows:

| Document/Data | Bates Number(s) | Date Produced |
|---|---|---|
| Eberline Analytical Report - Work Order 16-05025 | Dailey 000001 - Dailey 000275 | 2/9/2018 |
| Eberline Analytical Report - Work Order 16-07057 | Dailey 000276 - Dailey 000928 | 2/9/2018 |
| Eberline Analytical Report - Work Order 16-07063 | Dailey 000929 - Dailey 001365 | 2/9/2018 |
| Eberline Analytical Report - Work Order 16-07071 | Dailey 001366 - Dailey 001406 | 2/9/2018 |
| Eberline Analytical Report - Work Order 16-07092 | Dailey 001407 - Dailey 001621 | 2/9/2018 |
| Eberline Analytical Report - Work Order 16-07099 | Dailey 001622 - Dailey 001998 | 2/9/2018 |
| Eberline Analytical Report - Work Order 17-02037 | Dailey 001999 - Dailey 003292 | 2/9/2018 |
| Eberline Analytical Report - Work Order 17-02038 | Dailey 003293 - Dailey 003726 | 2/9/2018 |
| Eberline Analytical Report - Work Order 17-02073 | Dailey 003727 - Dailey 005009 | 2/9/2018 |
| Chain of Custody Documents | Dailey 005010 - Dailey 005013 | 2/9/2018 |
| Microvision Labs: SEM EDS Data | Dailey 005014 - Dailey 005170 | 2/9/2018 |
| Field Notes | Dailey 005175 - Dailey 005179 | 2/26/2018 |
| Photos | Dailey 005180 - Dailey 005182 | 2/26/2018 |
| RD2D57543gr226539..spu | Dailey 005183 | 2/26/2018 |
| Aerial Map | Dailey 005184 | 2/26/2018 |
| Photos | Dailey 005185 - Dailey 005246 | 4/9/2018 |
| Field Note | Dailey 005247 | 4/9/2018 |
| AccuStar Radon Data | Dailey 005248 | 4/9/2018 |
| Microvision Labs: SEM EDS Data | Dailey 005249 - Dailey 005275 | 4/9/2018 |
| SAM940 Data | NONE | 4/9/2018 |
| Spectech Data | NONE | 4/9/2018 |
| Microvision Labs: SEM EDS Data | Dailey 005276 - Dailey 005425 | 4/18/2018 |

**Exhibit 2**

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Further, I am going to bring a photograph to the deposition depicting an ice chest containing sample material taken from the Dailey property that is still available for testing. If you want to test this material, we can make arrangements to ship it you or your expert(s).

Sincerely yours,
**COOPER LAW FIRM, LLC**

**/s/ Celeste Brustowicz**

Celeste Brustowicz
Managing-Partner

cc:   Allyson Cunningham (via email: acunningham@lathropgage.com)
Patricia Silva (via email: PSilva@lathropgage.com)
Robert Rooney (via email: rrooney@lathropgage.com)
Dale Guariglia (via email: daguariglia@bryancave.com)
John McGahren (via email: jmcgahren@morganlewis.com)
Stephanie Feingold (via email: stephanie.feingold@morganlewis.com)
Su Kim (via email: (via email: su.kim@morganlewis.com)
Erin Brooks (via email: erin.brooks@bryancave.com)

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Page 124

```
1     We're off the record.
2               (Lunch recess.)
3     ----------------------------------------------------
4                    AFTERNOON SESSION
5                       12:37 p.m.
6     ----------------------------------------------------
7               THE VIDEOGRAPHER:  Okay.  We are back on
8     the record.  The time is 12:38.
9                    CROSS-EXAMINATION
10    BY MR. MCGAHREN:
11         Q.    Good afternoon, Dr. Kaltofen.  My name is
12    John McGahren.  I'm with Morgan Lewis & Bockius, and
13    I represent Cotter Corporation.
14               Do you know who Cotter is?
15         A.    I do.
16         Q.    You do.  Okay.
17               Earlier you were testifying about you
18    produced certain documents including your contract;
19    is that correct?
20         A.    Yes.
21         Q.    Okay.  When you say you produced, what did
22    you mean?
23         A.    Meaning a copy of the contract is on the
24    thumb drive, Exhibit 10.
25         Q.    Okay.  So can you tell me how you went
```

```
 1    about producing documents in this litigation to
 2    date.
 3       A.    Certainly.  At some point, I think it was
 4    about two months ago, I got a request to organize
 5    any documents or data, records related to Robbin
 6    Dailey for production, and it was about the time
 7    that the first subpoena in this matter was served,
 8    and it just said the same thing.  So I went through
 9    all of my computer records and other records,
10    looking for anything that was in my case file,
11    anything I relied upon so far in this case and
12    copied that, and I also received several phone calls
13    from the Cooper law firm.
14       Q.    I'm sorry.  Which law firm?
15       A.    The Cooper law firm.
16       Q.    Mm-hmm.
17       A.    Mr. Cobb requesting additional information,
18    things like spectrum files related to gamma
19    spectroscopy equipment and details about any other
20    types of records like field testing that might have
21    been done.  That's pretty much it.  There was some
22    new analyses that were performed more recently that
23    were added to that production file, and eventually I
24    just put together a thumb drive that had everything
25    whether or not it's related to the Robbin Dailey
```

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Page 126

```
 1    matter.

 2         Q.    And that thumb drive you're referring to

 3    has been marked for identification as Exhibit 10?

 4         A.    That's correct.

 5         Q.    And you produced that here today?

 6         A.    That's correct.

 7         Q.    Okay.  Now, the stacks of paper that

 8    Mr. Beck has marked, all of the data that's been

 9    marked, when did you produce that information?

10         A.    Oh, goodness.  I don't know the date of

11    the production.  I'm assuming most of it was between

12    the time the first subpoena was served and now.  I

13    think it was mostly towards the beginning of that

14    period.

15         Q.    Prior to that, had you produced any

16    documents to any of the law firms involved in this

17    litigation?

18         A.    I bet a lot of these documents are coming

19    to them for the second time, yes.

20         Q.    Okay.  Were all of your documents produced

21    to the Cooper law firm?

22         A.    Many of the documents were originally

23    produced to the Hausfeld law firm, but anything that

24    was responsive to the subpoenas was produced again

25    to the Cooper law firm.
```

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 4:17-cv-00024-CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | ORAL ARGUMENT REQUESTED |

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION
REQUESTING PLAINTIFFS BE PREVENTED AND ENJOINED
FROM USING INFORMATION AND MATERIALS THEY WITHHELD
UNTIL LATE IN THE DISCOVERY PERIOD**

Defendants Bridgeton Landfill, LLC, Republic Services, Inc., and Allied Services, LLC

("Defendants"), offer this Reply Memorandum in Support of Motion Requesting Plaintiffs Be

Prevented and Enjoined from Using Information and Materials They Withheld Until Late in the

Discovery Period. The Court should either preclude Plaintiffs' use of the late provided materials

and witness, or allow moving Defendants additional time for discovery and to further develop

their own expert testimony.

**I.      Factual Issues Admitted or Not Refuted by Plaintiffs**

Defendants' Motion sets out a number of grounds for their request to prevent Plaintiffs

from using materials withheld until late in the discovery period, as well as the report and

opinions of Phillip Plato, Ph.D. ("Plato opinions"), which were not provided until after the

1

discovery period lapsed.  In their Response (Doc. 143),[1] Plaintiffs acknowledge or do not dispute

the following facts:

> 1.  Under the Amended CMO, the Court ordered that all discovery was to be complete by May 2, 2018.  Doc. 119 at 1.

> 2.  Plaintiffs waited until May 3, 2018 to produce the "expert" report of Dr. Phillip Plato, which was outside the period established by the Court for discovery.  *See* Doc. 142 at 4 (unrefuted).

> 3.  On the night of May 2, 2018, at 11:37 p.m., Plaintiffs served "Supplemental and Amended Responses" to Bridgeton's First Interrogatories and First Request for Production of Documents (which had been served on Plaintiffs on January 28, 2018).  *See* Doc. 142 at 3-4 (unrefuted).

> 4.  On the night of May 2, 2018, at 5:33 p.m., Plaintiffs served their "Supplemental Initial Disclosures," which identified at least twenty-three categories and thousands of pages of documents not previously identified in the prior Initial Disclosure (last updated on February 9, 2018).  *See* Doc. 142 at 5 (unrefuted).

> 5.  The thumb drive produced at Dr. Marco Kaltofen's April 20, 2018 deposition (identified as Exhibit 10) was not accurately characterized by Plaintiffs' counsel during the deposition and described only as copies of materials that had already been produced.  *See* Doc. 142 at 6 (unrefuted).

> 6.  There is nothing in the Kaltofen deposition testimony, set out in Plaintiffs' Response (Doc. 143 at 3-4), which contradicted the representation of Plaintiffs' counsel regarding the thumb drive, or would have caused defense counsel to believe that anything new and relevant to the Daileys' claims was being provided on the drive.

> 7.  After the Kaltofen deposition, it was discovered the thumb drive contained over 4 gigabytes of data and over four thousand files.  *See* Doc. 142 at 6 (unrefuted).

> 8.  As of April 19, 2018, the only materials that had been produced were the twenty-two items identified in a letter from Plaintiffs' counsel, Celeste Brustowicz, of that same date (attached as Exhibit 2 to Plaintiffs' Response).  *See* Doc.143-2.

> 9.  The list of twenty-two items identified in the Brustowicz April 19, 2018 letter fell far short of the four thousand files produced on April 20, 2018.  *Compare* Doc. 143-2, *with* Doc. 142 at 6.

---

[1] Plaintiffs have characterized their brief responding to the Motion as a "Reply" brief.  Defendants will refer to that document (Doc. 143) as Plaintiffs' "Response."

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

Case: 4:21-cv-00116-CDP Doc. #: 1-44 Filed: 01/08/22 Page: 719 of 903 PageID #: 3400
Case: 4:17-cv-00024-CDP Doc. #: 144 Filed: 05/30/18 Page: 3 of 8 PageID #: 2365

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

10.  Plaintiffs' production of the Plato opinions on May 3, 2018, and production of "Supplemental and Amended" Responses and disclosures on the night of May 2, 2018, denied Defendants a chance to depose Dr. Phillip Plato or do any additional meaningful discovery into the new information and materials produced at that time.  *See* Doc. 142 at 5, 7 (unrefuted).

11.  By failing to clearly identify what was contained on the thumb drive produced at the Dr. Kaltofen deposition (Exhibit 10), Plaintiffs prevented Defendants from questioning Mr. Kaltofen about its contents or, at least, requesting adjournment until its contents could be reviewed.  Doc. 142 at 6, 7 (unrefuted).

12.  In the testimony quoted in Plaintiffs' Response, Dr. Kaltofen admits he had received a request to produce materials "about two months" before his deposition and "about the time" that he was also served with a subpoena.  *See* Doc. 143 at 3. Because Dr.  Kaltofen was Plaintiffs' consultant responsible for coordinating the sampling, these materials *were in the control of Plaintiffs' counsel*.  Yet, by Dr. Kaltofen's admission, Plaintiffs waited *two months* to produce the thumb drive and provided Defendants no opportunity to review its contents in advance of the Kaltofen deposition.

II.     **The Undisputed Facts Support Defendants' Request that Plaintiffs be Prevented from Using Phillip Plato, Ph.D.,  as an Expert As Well As Any of the Materials Produced on April 20, and May 2 and 3, 2018**

To defend their actions and choices during the discovery phase, Plaintiffs' Response asserts four positions: (1) a "meet and confer" after Plaintiffs' late production of materials could have solved the issues and prevented the filing of Defendants' Motion; (2) Plaintiffs' late production of materials on Exhibit 10 to the Kaltofen deposition was appropriate; (3) the late production was beyond the scope of the Amended CMO; and (4) the appropriate relief is additional time for discovery, and not preventing Plaintiffs' use of the late-produced materials and the Plato opinions.[2]

---

[2] Additionally, Plaintiffs attempt to re-argue their position regarding the application of the PAA and their view that this Court does not have jurisdiction.  Defendants have already provided formal argument on these points and will not repeat them here.

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

As to Plaintiffs' initial point, an additional meet and confer over Plaintiffs' late productions would have done no good. First, Defendants had made an earlier effort to ensure that Plaintiffs had produced all materials responsive to discovery. This effort included five pieces of correspondence from Defendants setting out positions on discovery as well as two prior "meet and confers." Plaintiffs had already indicated they had produced everything in their possession or control. It is obvious now that, in fact, the documents were not all provided, despite Defendants' efforts. A meet and confer to discuss the May data dump could not have solved any issue prior to the receipt of the data dump. Defendants were unaware they were going to receive the data dump until the close of discovery. The Court's appropriately aggressive schedule provided for only one month from the end of discovery to the filing of dispositive motions. There was no time to go back to the table with Plaintiffs.

Second, Plaintiffs suggest that the production of thumb drive materials on April 20 (Kaltofen Exhibit 10) and later was appropriate. However, they ignore a major point. The materials produced by Kaltofen had been requested in discovery from Defendants in December 2017 and January 2018. No explanation is attempted for why Plaintiffs withheld these materials for nearly four months. Plaintiffs offer no real reason why they withheld Dr. Kaltofen's documents – documents they clearly rely upon – despite the earlier request.

Third, Plaintiffs argue that they went "well beyond the scope of the Court's CMO" with their late productions. This is not so. Defendants' discovery was tailored to the Court's CMO and the sampling performed at the Dailey property. Plaintiffs' production of any materials outside the scope is voluntary and not an issue here. Defendants' Motion, however, is concerned with the multitude of files that were not produced until late in discovery and *were squarely within the CMO*. These materials were not produced or identified until the last moments of the

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

discovery period.  Plaintiffs first argue that they have gone beyond the CMO's scope (Doc. 143 at 1), but later say the late-produced materials were provided "out of an abundance of caution" because they feel those materials will be relevant to their opposition to any summary judgment motion filed under the CMO (Doc. 143 at 2-3).  These are inconsistent positions; the materials are either relevant to the scope of the Amended CMO or they are not.  Plaintiffs cannot have it both ways.

Finally, Plaintiffs have suggested that Defendants should be given more time to review the materials and depose Dr. Plato as an alternative to precluding Plaintiffs' use of the late-produced opinions and materials.  Defendants continue to believe that the appropriate remedy is to preclude Plaintiffs from using Dr. Plato in this phase of the litigation and the materials produced on April 20 and May 2 and 3, 2018.  If, however, the Court decides to allow Defendants' additional time for discovery, Defendants seek a tight window that will (1) allow them to depose Dr. Plato, (2) reconvene the Dr. Kaltofen deposition to ask him about the drive's contents, and (3) allow Defendants ample opportunity to identify appropriate experts and produce expert reports addressing the Plato opinions.

## CONCLUSION

For the foregoing reasons, Defendants Bridgeton Landfill, LLC, Republic Services, Inc., and Allied Services, LLC request that the Court prevent Plaintiffs from using in this initial phase of the litigation (1) all materials contained on the thumb drive identified as Exhibit 10 to the Kaltofen deposition, and (2) all documents and materials produced for or served on Defendants as supplemental initial disclosures, supplemental discovery responses, or expert reports on May 2 and 3, 2018, including the report of Dr. Plato.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Dated: May 30, 2018        LATHROP GAGE LLP

By: */s/ William G. Beck*
William G. Beck     26849MO
Peter F. Daniel      33798MO
Robert G. Rooney    43381MO
Allyson E. Cunningham   64802MO
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Telephone:     (816) 292-2000
Telecopier:     (816) 292-2001
wbeck@lathropgage.com
pdaniel@lathropgage.com
rrooney@lathropgage.com
acunningham@lathropgage.com

Patricia Lehtinen Silva    67213MO
Pierre Laclede Center
7701 Forsyth Boulevard, Suite 500
Clayton, Missouri 63105
Telephone:     (314) 613-2800
Telecopier:     (314) 613-2801
psilva@lathropgage.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

     I hereby certify that on May 30, 2018, I electronically filed the foregoing document via the Court's CM/ECF system, which will serve notice on all counsel of record.

*/s/ William G. Beck*
An Attorney for Defendants

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL DAILEY, et al., )
)
     Plaintiffs, )
)
vs. )     Case No. 4:17 CV 24 CDP
)
BRIDGETON LANDFILL, LLC, et al., )
)
     Defendants. )

## **MEMORANDUM AND ORDER**

This matter is before the Court on plaintiffs' motion for leave to amend complaint, to remand, to stay pending discovery or alternatively, motion to amend the case management order. ECF No. 123. Three of the defendants have also filed a joint motion to prevent and enjoin plaintiffs from using information and materials plaintiffs withheld until late in the discovery period. ECF No. 142. The Court also recognizes that the dispositive motion deadline for the initial phase of discovery in this matter is Monday, June 11, 2018.

Plaintiffs brought this suit for damages and injunctive relief from alleged radioactive contamination of their home caused by neighboring West Lake Landfill against defendant Landfill owners and operators, and defendant waste generators and disposers. Their complaint is brought under the Price-Anderson Act (PAA) as amended in 1988, 42 U.S.C. § 2210, *et seq.*, which provides a federal compensation regime for damages resulting from a nuclear incident. Plaintiffs

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

now seek leave to amend their complaint, arguing that the PAA is not applicable here and therefore this Court lacks subject-matter jurisdiction. Defendants oppose amendment of the complaint, remand, and a stay of discovery deadlines outlined in the Court's Initial Case Management Order (ECF No. 102) and amended deadlines established in the Amended Case Management Order (ECF No. 119). However, as of this date, all discovery deadlines have passed. The only future case management order deadlines concern the filing of dispositive motions regarding issues relevant to the initial phase of discovery.

The Court needs to rule plaintiffs' motion to amend and remand in order to determine the operative claims in this matter and whether this Court has subject-matter jurisdiction. The Court recognizes the parties' desire for this matter to proceed; however, these are complex issues that the Court needs to closely scrutinize. Federal court opinions examining issues of jurisdiction under the PAA have resulted in different interpretations. *See Strong v. Republic Servs., Inc.*, 283 F.Supp.3d 759, 767-72 (E.D. Mo. 2017) (discussing cases representing the "conflicting interpretations of the PAA" in determining whether a federal court has subject-matter jurisdiction). In the interest of saving the parties the time and costs of preparing dispositive motion arguments that could potentially be irrelevant after the Court rules pending motions, I will stay future case management order deadlines until further order from the Court.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' motion for leave to amend, to remand, and to stay [#123] is GRANTED ONLY with respect to a STAY of future Amended Case Management Order (ECF No. 119) deadlines, and is HELD IN ABEYANCE with respect to leave to amend, remand, and alternatively, amendment of the case management order. Once the Court has ruled pending motions, a new schedule shall be established for this matter, if necessary.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 5th day of June, 2018.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No.  4:17-cv-00024-CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

<u>**NOTICE OF SUPPLEMENTAL AUTHORITY**</u>

Defendants Bridgeton Landfill, LLC; Allied Services, LLC; and Republic Services, Inc. ("Defendants") respectfully inform the Court of supplemental authority relating to Plaintiffs' Motion for Leave to Amend, Motion to Remand, Motion to Stay pending Discovery and, Alternatively, Motion to Amend Case Management Order [Doc. No. 123] ("Plaintiffs' Motion").

In their Reply in support of Plaintiffs' Motion, Plaintiffs challenged Defendants' reliance on *Estate of Ware v. Hosp. of the Univ. of Pa.*, 871 F.3d 373 (3rd Cir. 2017) ("*Ware II*") by stating, "Moreover, a petition for writ of certiorari was filed in *Ware II* on December 15, 2017 and it was docketed by the Supreme Court on March 12, 2018." [Doc. No. 135 at 5]

Defendants file this notice to inform the Court that on May 14, 2018, the Supreme Court denied the Petition for writ of certiorari in *Ware II*. *See* Exhibit A Report from Supreme Court of the United States (entry May 14 2018).

Dated: June 6, 2018

LATHROP GAGE LLP

By: */s/ Peter F. Daniel*

William G. Beck      26849MO
Peter F. Daniel      33798MO
Robert G. Rooney      43381MO
Allyson E. Cunningham   64802MO
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108-2618
Telephone:      (816) 292-2000
Telecopier:      (816) 292-2001
wbeck@lathropgage.com
pdaniel@lathropgage.com
rrooney@lathropgage.com
acunningham@lathropgage.com

Patricia Lehtinen Silva    67213MO
Pierre Laclede Center
7701 Forsyth Boulevard, Suite 500
Clayton, Missouri 63105
Telephone:      (314) 613-2800
Telecopier:      (314) 613-2801
psilva@lathropgage.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on June 6, 2018, I electronically filed the foregoing document via the Court's CM/ECF system, which will serve notice on all counsel of record.

*/s/ Peter F. Daniel*
An Attorney for Defendants

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| MICHAEL DAILEY, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | )   Case No.  4:17-cv-00024-CDP |
| | ) |
| BRIDGETON LANDFILL, LLC, et al., | ) |
| | ) |
| Defendants. | ) |

**<u>MOTION FOR ORAL ARGUMENT</u>**

COME NOW Defendants Bridgeton Landfill, LLC and its affiliated companies Republic

Services, Inc. and Allied Services, LLC ("Moving Defendants"), by and through their attorneys,

and hereby join in Plaintiffs' request that the Court hear oral argument on Plaintiffs' Motion for

Leave to Amend Complaint, Remand, Stay Pending Discovery and, Alternatively, Amend Case

Management Order (Doc. No. 123) ("Motion to Amend and Remand"). In support of this

Motion, Moving Defendants state as follows:

1.     There are numerous pending filings presently before the Court.  Plaintiffs' Motion

to Amend and Remand was met with two Responses, a Reply, and two Sur-Replies (Doc. Nos.

128, 129, 135, 139, 141).

2.     Each individual brief addresses complex substantive issues at the heart of this

case.  Plaintiffs' Motion to Amend and Remand requests significant relief which, if granted,

could potentially send this matter to state court, transform the causes of action against

Defendants, and cause new procedural rules to govern the case.

3.     Plaintiffs requested oral argument on their Motion, stating, "Oral argument is

warranted to provide the opportunity to discuss the complex issues presented, the parties'

position on these issues, and the cited case law."  Doc. No. 123 at 5.  Plaintiffs also noted, "oral

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

argument will afford the parties an opportunity to discuss and answer any questions the Court may have regarding these issues." *Id.*

4.      Defendants agree and join Plaintiffs in requesting oral argument

5.      Beyond the relief sought in the Motion to Amend and Remand, oral argument would permit discussion of questions raised by the Court in its Order on a prior Motion to Dismiss (Doc. No. 89) regarding the standard of care applicable under the Price-Anderson Act to Plaintiffs' allegations. The Court's questions may impact the pending Motions.

6.      Moving Defendants believe oral argument would assist the Court in analysis of the various issues at stake. Oral argument is warranted because the issues are complex and are presented in at least six different filings. Presentation before the Court would allow the parties to present their positions in a cohesive manner across the numerous documents.

7.      Further, the force of a possible remand makes oral argument critical. An order remanding a case is only reviewable on appeal under very narrow circumstances. 28 U.S.C. § 1447 (d) (with limited exceptions, an order remanding case is not reviewable on appeal or otherwise). Several statutory and court-made exceptions have been created to permit appeals, but these exceptions are exceedingly narrow. *See generally* Wright & Miller Fed. Prac. and Procedure §3740 Appealability of Orders Relating to Removal. Thus, it is of utmost importance that the issue be fully argued and understood.

8.      At oral argument, Moving Defendants can also answer any questions the Court may have on Moving Defendants' pending Motion Requesting Plaintiffs be Prevented and Enjoined From Using Information and Materials They Withheld Until Late in the Discovery Period (Doc. No. 142).

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

WHEREFORE Moving Defendants respectfully request the Court grant this Motion; hear oral argument on Plaintiffs' Motion for Leave to Amend Complaint, Remand, Stay Pending Discovery and, Alternatively, Amend Case Management Order (Doc. No. 123); and grant such other and further relief as the Court deems necessary.

Dated: June 12, 2018

LATHROP GAGE LLP

By: */s/ William G. Beck*
    William G. Beck    26849MO
    Peter F. Daniel    33798MO
    Robert G. Rooney    43381MO
    Allyson E. Cunningham  64802MO
    2345 Grand Boulevard, Suite 2200
    Kansas City, Missouri 64108-2618
    Telephone:    (816) 292-2000
    Telecopier:    (816) 292-2001
    wbeck@lathropgage.com
    pdaniel@lathropgage.com
    rrooney@lathropgage.com
    acunningham@lathropgage.com

    Patricia Lehtinen Silva   67213MO
    Pierre Laclede Center
    7701 Forsyth Boulevard, Suite 500
    Clayton, Missouri 63105
    Telephone:    (314) 613-2800
    Telecopier:    (314) 613-2801
    psilva@lathropgage.com

    ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that on June 12, 2018, I electronically filed the foregoing document via the Court's CM/ECF system, which will serve notice on all counsel of record.

*/s/ William G. Beck*
An Attorney for Defendants

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL DAILEY, et al.,     )
 )
    Plaintiffs,     )
 )
    v.     )     Case No. 4:17 CV 24 CDP
 )
BRIDGETON LANDFILL, LLC, et al.,     )
 )
    Defendants.     )

## PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT PURSUANT TO APRIL 8, 2019 ORDER

Come now, Michael Dailey and Robbin Dailey ("Plaintiffs"), through undersigned counsel and pursuant to this Court's April 8, 2019 Order hereby move this Court for leave to file a Second Amended Complaint because:

1.    This matter was initially filed on November 15, 2016 in the 21st Judicial Circuit of the State of Missouri alleging numerous state law claims related to radioactive mill tailings wastes that were dumped in the West Lake Landfill.

2.    Defendants filed a Notice of Removal based on the claim this Court has subject matter jurisdiction over this action because it arises under the Price Anderson Act ("PAA").

3.    Plaintiffs' prior lead counsel filed a Motion to Remand (ECF No. 48) but erroneously withdrew it before a ruling. Said counsel has subsequently withdrawn and was terminated by Plaintiffs.

4.    Then, both Defendants' counsel and Plaintiffs' prior lead counsel believed that the PAA applied giving this Court federal subject matter jurisdiction.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

5.      On April 21, 2017, Plaintiffs' prior lead counsel erroneously amended the state court Petition to assert claims under the PAA as well as state law causes of action based on the same facts and circumstances alleged in the Original Petition.

6.      Defendants filed Motions to Dismiss the Amended Complaint on May 12, 2017.

7.      On October 27, 2017, this Court granted Defendants' Motions to Dismiss with respect to Plaintiffs' state law claims and denied Defendants' Motions to Dismiss with respect to Plaintiffs erroneously plead PAA claims. The Court reasoned that "[a]lthough the Eighth Circuit has not addressed the issue of PAA preemption of state-law claims, numerous other courts have found that the PAA is the sole avenue for recovery ***when*** *a public liability action for a nuclear incident is plead*".[1] (emphasis added)

8.      Undersigned counsel became involved in this matter in early 2018, and after reviewing the file, undersigned counsel determined, as have two other Judges in this District, that the PAA is not applicable in this matter as it does not apply to these Defendants under the circumstances sued on; to wit, these defendants had no license for the mill-tailings at issue (the source of the radiation), there was no indemnity agreement,  and there has been no nuclear incident as per *Strong v. Republic Services, Inc.*, 283 F. Supp. 3d 759 (E.D. Mo. 2017). The reasoning from the *Strong* decision has since been adopted in *Banks v. Cotter Corp.*, 4:18-CV-00624 JAR, 2019 WL 1426259 (E.D. Mo. Mar. 29, 2019). These decision within this Court are entitled to comity.

9.      On March 27, 2018, Plaintiffs filed a motion for leave to amend to withdraw the PAA claims, reinstate state law claims and remand this matter to state court because the court lacks jurisdiction under the PAA.

---

[1] ECF No. 89 – Memo and Order

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

10.     This Court denied Plaintiffs motion for leave to amend to withdraw the PAA claims, reinstate state law claims and remand to state court on April 8, 2019. This court indicated that the Eighth Circuit has stated quite clearly that "granting leave to amend a complaint where the plaintiff has not submitted a proposed amended complaint is inappropriate." (citations omitted). This Court further indicated that it would be "inappropriate to grant a motion to remand based on an unfiled complaint, which the Daileys also ask me to do. On this basis, therefore, I will deny the motion to amend and to remand."

11.     This Court allowed Plaintiffs until April 29, 2019 to either file a motion to dismiss the case without prejudice or to file a renewed motion for leave to file a Second Amended Complaint, accompanied by the proposed amended complaint.

12.     Plaintiffs considered the options offered by this court including dismissing this action without prejudice and refiling in state court. The dismissal option seems inappropriate considering Plaintiffs will likely be right back in federal court because Rock Road Industries changed its domicile during the time this matter has been pending by merging with Bridgeton Landfill, LLC, thus creating diversity jurisdiction. Plaintiffs' desire is to sue on state law claims in state court as other state court actions are pending involving identical issues.[2] Undersigned counsel have gone above and beyond to avoid any unnecessary work by this Court and have made efforts to limit this Court's involvement in a case where it lacks jurisdiction. State court will save the parties' and the court resources. Thus, dismissing this action without prejudice and refiling in state court is not a viable option.

13.     Accordingly, Plaintiff bring this Motion for Leave to File a Second Amended Complaint so that the erroneously plead PAA claims can be withdrawn and the Plaintiffs' state

---

[2] *Strong v. Republic Services, Inc.*, 283 F. Supp. 3d 759 (E.D. Mo. 2017); *Banks v. Cotter Corp.*, 4:18-CV-00624 JAR, 2019 WL 1426259 (E.D. Mo. Mar. 29, 2019).

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

law claims can be reinstated. The proposed Second Amended Complaint is attached hereto as Exhibit 1. All as more fully set forth in the memorandum supporting this motion.

Respectfully submitted,

*/s/ Stuart H. Smith*
Stuart H. Smith (LSBA 17805), *Pro Hac Vice*
Barry J. Cooper, Jr. (LSBA 27202), *Pro Hac Vice*
Celeste Brustowicz (LSBA 16835), *Pro Hac Vice*
Victor T. Cobb (LSBA 36830), *Pro Hac Vice*
**COOPER LAW FIRM, LLC**
1525 Religious Street
New Orleans, Louisiana 70130
Phone: 504-399-0009
Facsimile: 504-291-1352
E-mail: ssmith@sch-llc.com
        bcooper@sch-llc.com
        cbrustowicz@sch-llc.com
        vcobb@sch-llc.com
*ATTORNEYS FOR PLAINTIFFS,*
*MICHAEL AND ROBBIN DAILEY*

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2019, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

*/s/ Stuart H. Smith*
Stuart H. Smith (LSBA 17805)

4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:17 CV 24 CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT PURSUANT TO APRIL 8, 2019 ORDER

### I.  FACTS

The plaintiffs were ordered to decide how they wish to proceed by this Court's April 8, 2019 Order. (ECF No. 156) The choices were to file the present motion for leave with an attached Second Amended Complaint or to dismiss and refile in state court. Because the plaintiffs desire to proceed on state law claims in state court they have decided to file in this court and to seek remand once leave is granted.

This matter was initially filed on November 15, 2016 in the 21st Judicial Circuit of the State of Missouri alleging numerous state law claims related to radioactive mill tailings wastes that were dumped in the West Lake Landfill. Defendants filed a Notice of Removal based on the argument that this Court has subject matter jurisdiction over this action because it arises under the Price Anderson Act ("PAA"). Plaintiffs' prior lead counsel, who has since withdrawn, filed a Motion to Remand (ECF No. 48) but erroneously withdrew it before the Court made a ruling. Then, both Defendants' counsel and Plaintiffs' prior lead counsel believed that the PAA applied giving this Court federal subject matter jurisdiction.

On April 21, 2017, Plaintiffs' prior lead counsel erroneously amended the state court Petition to assert claims under the PAA as well as state law causes of action based on the same facts and circumstances alleged in the Original Petition. Defendants filed Motions to Dismiss the Amended Complaint on May 12, 2017. On October 27, 2017, this Court granted Defendants' Motions to Dismiss with respect to Plaintiffs' state law claims and denied Defendants' Motions to Dismiss with respect to Plaintiffs erroneously plead PAA claims. The Court reasoned that "[a]lthough the Eighth Circuit has not addressed the issue of PAA preemption of state-law claims, numerous other courts have found that the PAA is the sole avenue for recovery *when a public liability action for a nuclear incident is plead*". (ECF No. 89) (emphasis added)

Undersigned counsel became involved in this matter in early 2018, and after reviewing the file, undersigned counsel determined that the PAA is not applicable in this matter as it does not apply to these Defendants under the circumstances sued on; to wit, these defendants had no license for mill-tailings (the source of the radiation), there was no indemnity agreement, and there has been no nuclear incident as per *Strong v. Republic Services, Inc.*, 283 F. Supp. 3d 759(E.D. Mo. 2017). The reasoning from the *Strong* decision has since been adopted in *Banks v. Cotter Corp.*, 4:18-CV-00624 JAR, 2019 WL 1426259 (E.D. Mo. Mar. 29, 2019).

Accordingly, on March 27, 2018, Plaintiffs filed a motion for leave to amend to withdraw the PAA claims, reinstate state law claims and remand this matter to state court because the court lacks jurisdiction under the PAA. The motion was based on Judge Jean C. Hamilton's ruling in *Strong v. Republic Servs., Inc.*, 283 F. Supp. 3d 759 (E.D. Mo. 2017), a case dealing with the exact same landfill, which determined that the PAA does not apply to the same wastes at issue here because the Defendants lack the appropriate federal license or indemnity agreement to trigger the PAA and because the mill tailings wastes were not subject to the PAA. See also *Banks v. Cotter*

2

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

*Corp.*, 4:18-CV-00624 JAR, 2019 WL 1426259 (E.D. Mo. Mar. 29, 2019), a decision to remand based on the *Strong* case.

On April 8, 2019, this Court denied Plaintiffs motion for leave to amend to withdraw the PAA claims, reinstate state law claims and remand to state court. This court indicated that the Eighth Circuit has stated quite clearly that "granting leave to amend a complaint where the plaintiff has not submitted a proposed amended complaint is inappropriate." (ECF No. 156) (citations omitted). This Court further indicated that it would be "inappropriate to grant a motion to remand based on an unfiled complaint, which the Dailey's also ask me to do. On this basis, therefore, I will deny the motion to amend and to remand." This Court allowed Plaintiffs until April 29, 2019 to either file a motion to dismiss the case without prejudice or to file a renewed motion for leave to file a Second Amended Complaint, accompanied by the proposed amended complaint.

Rock Road Industries changed its domicile during the time this matter has been pending by was merging with Bridgeton Landfill, LLC, thus creating a great potential for diversity jurisdiction. Plaintiffs' desire is to sue on state law claims in state court as other state court actions are pending involving the same defendants, the same wastes and identical issues. State court will save the parties' and the court resources. Accordingly, Plaintiffs bring this Motion for Leave to File a Second Amended Complaint so that the erroneously plead PAA claims can be withdrawn and the Plaintiffs' state law claims can be reinstated. The proposed Second Amended Complaint is attached hereto as Exhibit 1.

## II.  ARGUMENT

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires." Unless there is a good reason for denial, "such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue

prejudice to the non-moving party, or futility of the amendment, leave to amend should be granted." *Thompson-El v. Jones*, 876 F.2d 66, 67 (8th Cir. 1989) (*citing Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 230, 9 L. Ed. 2d 222 (1962)). A motion to amend should be denied on the merits "only if it asserts clearly frivolous claims or defenses." *Gamma-10 Plastics, Inc. v. American President Lines, Ltd.,* 32 F. 3d 1244, 1255 (8th Cir. 1994), *cert. denied*, 513 U.S. 1198, 115 S.Ct. 1270, 131 L.Ed. 2d 148 (1995).

The amendments would not be futile. To the contrary, the proposed Second Amended Complaint cures the defect in the First Amended Complaint which erroneously plead claims under the PAA. Plaintiffs have not unduly delayed proceedings and have not acted out of any dilatory move. To the contrary, Plaintiffs find themselves in this position because of decisions made by their prior counsel, who has since withdrawn and been terminated by Plaintiffs. Plaintiffs have not repeatedly failed to cure deficiencies. To the contrary, plaintiffs have done all that has been asked of them; despite plaintiffs' belief that the PAA does not apply, Plaintiffs spent considerable resources to prove they have evidence to support a PAA claim. Defendants will not be unduly prejudiced by the amendments as this matter has been stayed.

For the foregoing reasons, Plaintiffs pray this Court grant them leave to file their Second Amended Complaint, attached hereto as Exhibit 1, and grant such further relief as is proper.

[*Signature and Certificate on Following Page*.]

4826-2018-5493, v. 1

Respectfully submitted,

*/s/ Stuart H. Smith*
Stuart H. Smith (LSBA 17805), *Pro Hac Vice*
Barry J. Cooper, Jr. (LSBA 27202), *Pro Hac Vice*
Celeste Brustowicz (LSBA 16835), *Pro Hac Vice*
Victor T. Cobb (LSBA 36830), *Pro Hac Vice*
**COOPER LAW FIRM, LLC**
1525 Religious Street
New Orleans, Louisiana 70130
Phone: 504-399-0009
Facsimile: 504-291-1352
E-mail: ssmith@sch-llc.com
        bcooper@sch-llc.com
        cbrustowicz@sch-llc.com
        vcobb@sch-llc.com
*ATTORNEYS FOR PLAINTIFFS,*
*MICHAEL AND ROBBIN DAILEY*

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2019, I electronically filed the foregoing document with

the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to

counsel of record.

*/s/ Stuart H. Smith*
Stuart H. Smith (LSBA 17805)

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:17 CV 24 CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**SECOND AMENDED COMPLAINT**

COME NOW Plaintiffs Michael Dailey and Robbin Dailey, by and through their counsel, and for their Second Amended Petition against Defendants Bridgeton Landfill, LLC, Rock Road Industries, Inc, Republic Services, Inc., Allied Services, L.L.C., and Cotter Corporation, state and allege as follows:

1.      Since World War II, big companies have made significant profits processing, handling, and storing radioactive materials in the St. Louis area. This activity began seven decades ago, when a government contractor began processing uranium ores in downtown St. Louis City. The hazardous, toxic, carcinogenic, radioactive mill tailings wastes resulting from the processing of these ores are ounce for ounce some of the most dangerous materials on the planet. Despite knowing that these materials were some of the most harmful substances on Earth, Defendants treated these hazardous, toxic, carcinogenic, radioactive mill tailings wastes with about the same level of care that a reasonable person might give to common household garbage, dumping it without authority from the State of Missouri and in violation of law, like everyday trash into the West Lake Landfill—a landfill which experts indicate is not even suitable for garbage, as it contains no liner.

1

2.    Since then, that radioactive material, negligently dumped in an area surrounded by peaceful neighborhoods and playgrounds, has tormented the lives of everyday people—moms and dads who thought they were raising their kids in a clean home in a safe, quiet neighborhood; kids who want nothing more than to play in the backyard; and small business owners who had invested everything to build the American dream for their families. These everyday St. Louisans now find their lives disrupted, their homes contaminated, their businesses upended, and their properties devalued. They find their once-quaint neighborhoods filled with technicians testing and prodding their backyards and the dust of their vacuum cleaners to identify the quantity and the toxicity of the radioactive material Defendants have dumped into their lives.

3.    Tests conducted by representatives of the United States of America and others now confirm that the areas around the West Lake and Bridgeton Landfills (referred to herein as the "Landfill" which consists of several inactive landfills including West Lake and Bridgeton) are contaminated with the same radioactive mill tailings wastes generated in the processing of uranium ores in the St. Louis area. The off-site radioactive mill tailings wastes found today in the real property, which contains businesses and homes, surrounding the Landfill has the fingerprint (or profile) of the ore processed in St. Louis which generated the hazardous, toxic, carcinogenic, radioactive mill tailings wastes that were dumped into and around the Landfill.

4.    These radioactive mill tailings wastes are known human carcinogens that can cause chronic damage to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system in addition to numerous cancers. Illnesses such as cancers or birth defects may take a number of years after exposure to the radioactive material to appear.

5.    Defendants have failed to take responsibility for their negligent behavior, failed to clean up the area, failed to move the residents and businesses out, and failed to make amends for the

2

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

widespread damage they have caused. Instead, Defendants have hidden behind misstatements and omissions, misleading the public about the widespread contamination Defendants have caused and minimizing the immense risks to public health and safety that resulted from Defendants' actions.

6.      It is time that Defendants finally be held accountable for their reckless and tortious conduct. This particular lawsuit seeks to correct the harm Defendants inflicted on just a few of the victims.

7.      Plaintiffs Michael Dailey and Robbin Dailey (hereinafter "Plaintiffs") own property in Bridgeton, Missouri that Defendants contaminated. The Dailey Property, including the land and Plaintiffs' home (hereinafter "Dailey Home"), is contaminated with radioactive material from the Landfill. The radioactive material consists of high levels of Uranium (U-238) decay products, including Thorium (Th-230), Lead (Pb-210), and Radon (Ra-226). Dusts inside the Dailey Home were shows to contain radioactive Th-230 at levels at least two hundred times higher than Background levels, as depicted in the graphic immediately below.

4840-7843-1124, v. 4

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM



8.      Plaintiffs Michael Dailey and Robbin Dailey have sustained significant damages as a result of Defendants' conduct. Defendants should remediate the Dailey Home and compensate Plaintiffs for their damages, and provide further relief as set forth below in the Petition.

9.      Authorities have recently ordered a cleanup that will take many years to complete. This cleanup will result is the uncovering and handling of radioactive mill tailings wastes that will result in additional releases from the site. (This statement is provided for informational purposes only, as Plaintiffs are making no claims under the laws of the United States).

4

# I. JURISDICTION, AUTHORITY, AND VENUE

10.     The Twenty-First Judicial Circuit of the State of Missouri is St. Louis County has

jurisdiction and authority over the subject matter and the parties in this case because the causes

of action stated in this Petition arose out of business activities conducted solely in Missouri, and

out of torts committed solely in Missouri by resident and non-resident defendants.

11.     Complete diversity does not exist in this matter as Defendant Rock Road Industries was a

Missouri corporation at the time this action was commenced, and Plaintiffs are Missouri citizens.[1]

12.     Venue is proper in the Twenty-First Judicial Circuit of the State of Missouri in St. Louis

County pursuant to Mo. Rev. Stat. §508.010, because Defendants' conduct giving rise to this action

took place in St. Louis County, Missouri.

13.     Plaintiffs do not allege any causes of actions arising under any laws of the United States.

14.     Plaintiffs' claims do not fall within the scope of the Price Anderson Act.

    A.  The Landfill is not and has never been a licensed nuclear facility.

    B.  Defendants have never received a license to possess, transport, or dispose of any
        radioactive wastes on or in the Landfill.

    C.  Defendants have never entered into an indemnification agreement with the United States
        government under 42 U.S.C. § 2210 with respect to the complained activities.

15.     Defendants Rock Road Industries and Bridgeton Landfill, LLC previously, and correctly,

declared that the Price-Anderson Act does not apply to them because the West Lake Landfill is

not a licensed nuclear facility: "Count One, arising under the Price-Anderson Act, is wholly

---

[1] When this action was initially filed on November 15, 2016, Rock Road Industries was a Missouri Corporation. Thereafter, on April 10, 2018, Rock Road Industries was merged into Bridgeton Landfill, LLC.

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

inapplicable to Rock Road and Bridgeton Landfill, as the West Lake Landfill is not a nuclear facility subject to licensing by the nuclear Regulatory Commission."[2]

16.     Plaintiffs expressly contend that no occurrences that form the basis for this suit rise to the level of a nuclear incident. Plaintiffs' claims are freestanding state law claims concerning traditional state regulation and do not implicate the Price-Anderson Act and its textually manifest concerns related to liability limitation and indemnification. This principle was clearly enunciated by the Hon. Neil Gorsuch in the case of *Cook v. Rockwell Intern. Corp*., 790 F.3d 1088 (10th. Cir. 2015) also known as the Rocky Flats litigation.

17.     Other decisions in the United States District Court, Eastern District of Missouri have determined that the Price Anderson Act does not apply to the same wastes at issue here because the Defendants lack the appropriate federal license or indemnity agreement to trigger the Price Anderson Act.[3]

18.     At the time of the outrageous, reckless, negligent acts that form the basis for this lawsuit occurred, the Price-Anderson Act did not apply because the wastes at issue were not subject to said Act.

19.     Plaintiffs claims do not fall within the Jurisdiction of the Price Anderson Act because the mill tailings that Cotter disposed of and the Landfill Defendants accepted were not at the time subject to the Atomic Energy Act and the Price Anderson Act.[4]

---

[2] Defendants Rock Road Industries and Bridgeton Landfill, LLC's Memorandum in Support of Motion to Dismiss (Doc 15), Adams v. MI Holdings, Inc. Case No. 4:12-cv-00641-JCH
[3] See *Strong v. Republic Servs., Inc.*, 2017 WL 4758958 (E.D. Mo. 2017); see also *Banks* v. *Cotter Corporation*, 2019 WL 1426259.
[4] See Exhibit 1 – Declaration of Richard B. Stewart (April 24, 2018)

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

20.     Plaintiffs claims do not fall within the Jurisdiction of the Price Anderson Act because Cotter's disposal and the Landfill Defendants' acceptance of mill tailings was not undertaken pursuant to an appropriate federal license or indemnity agreement.[5]

21.     The Price-Anderson Act does not apply to the mill tailings wastes at issue in this Second Amended Petition.

## II. THE PARTIES

### Plaintiffs

22.     Plaintiffs Michael Dailey and Robbin Dailey are Missouri citizens who own real property located at 3550 El Ferrol Court, Bridgeton, Missouri (the "Dailey Property"). Plaintiffs purchased their home in 1999. The property is approximately 0.25 acres in St. Louis County adjacent to what is now the Landfill in Bridgeton, Missouri, more fully described as follows: Lot 18 in Subdivision Spanish Village Plat Two. Plaintiffs Michael Dailey and Robbin Dailey first learned that their property was contaminated with radioactive materials in 2016.

23.     As a result of Defendants' acts and omissions, Plaintiffs have sustained significant damages including damages to their property and the loss of use and enjoyment thereof.

### Defendants

24.     In this Petition, the defendants in this lawsuit are categorized into three groups, namely Landfill Owner Defendants, Landfill Operator Defendants (collectively "Landfill Defendants"), and Radioactive Waste Disposer Defendant:[6]

    A.  Landfill Owner Defendants

---

[5] Id.

[6] When this action was initially commenced it also included Radioactive Waste Generator Defendants MI Holdings, Inc. and Mallinckrodt Inc. In Plaintiffs first Amended Complaint, this action was brought against the Radioactive Waste Generator Defendant Mallinckrodt, LLC. Thereafter, Plaintiffs settled with Mallinckrodt, LLC and the claims against them were dismissed on March 20, 2018.

       i.    Bridgeton Landfill, LLC, which owns the Bridgeton and West Lake Landfills; and

      ii.    Rock Road Industries, Inc., which owned or owns the West Lake Landfill.[7]

B. Landfill Operator Defendants[8]

      i.    Republic Services, Inc., which owns, oversees, and directs the environmental decisions and conduct of Bridgeton Landfill, LLC, Allied Services, L.L.C., and Rock Road Industries, Inc., and operates the Bridgeton and West Lake Landfills; and

      ii.    Allied Services, L.L.C, which operates Bridgeton and West Lake Landfills.

C. Radioactive Waste Disposer Defendant

      iii.    Cotter Corporation, which owned and disposed of the hazardous, toxic, carcinogenic, radioactive residue wastes.

25.    Bridgeton Landfill, LLC formerly "Laidlaw Waste Systems" ("Landfill Owner") is a Delaware limited liability company with its principle place of business in the State of Missouri. It continuously and systematically conducts business activities in the State of Missouri.

A. Upon information and belief, Bridgeton Landfill, LLC owns the Bridgeton Landfill and the West Lake Landfill.

B. Bridgeton Landfill has continuously and systematically availed itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried there.

C. This lawsuit arises out of damages that resulted from Bridgeton Landfill's acts and omissions within the State of Missouri. Specifically, since 2008, Bridgeton Landfill has

---

[7] As noted in footnote 1, Rock Road Industries, Inc. was a Missouri corporation at the time this action was commenced.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

owned, operated and maintained daily operational and managerial control over the management and environmental decisions of the Bridgeton Landfill and the West Lake Landfill, which gave rise to the violations of law and damage to property alleged in this Petition.

26.   Rock Road Industries, Inc. ("Road Road") was a Missouri corporation with its principle place of business in St. Louis Missouri at the time this action was commenced. Rock Road was a wholly-owned subsidiary of Republic Services, Inc. that continuously and systematically conducted business in the State of Missouri. After commencement of this action, Rock Road was merged into Bridgeton Landfill, LLC on April 10, 2018.

    A.   This lawsuit arises out of damages that resulted from Rock Road Industries, Inc.'s acts and omissions within the State of Missouri. Upon information and belief Rock Road Industries, Inc. owned the West Lake Landfill along with Bridgeton Landfill, LLC. Rock Road Industries maintained daily operational and managerial control over the management and environmental decisions of the West Lake Landfill, decisions which gave rise to the violations of law and damage to property alleged in this Petition

27.   Republic Services, Inc. ("Republic") is a Delaware corporation with its principal place of business in the State of Arizona that carries on continuous and systematic business activities within the State of Missouri.

    A.   Republic describes itself as a "leader in the domestic non-hazardous solid waste industry, as measured by revenue as well as a Fortune 500 company, publicly traded on the New York Stock Exchange (NYSE: RSF)."[9] Despite Republic's record of violations and the widespread injuries resulting from Republic's conduct, Republic promises the public that it lives by

---

[9] https://www.republicservices.com/about-us

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

"high environmental and sustainability standards."[10] Republic has engaged in extensive professional public relations efforts to downplay the significance of the problem, and their misleading statements can only be characterized as mere "puffery."

B. Republic's presence in Missouri is immense, servicing more than 300 cities and towns throughout the state, including many in St. Louis County.[11] Republic continuously and systematically avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried there. Republic is responsible for promulgating and enforcing environmental and health and safety policies and procedures to its subsidiaries, which in this case they failed to adequately do.

C. This lawsuit arises out of damages that resulted from Republic's acts and omissions within the State of Missouri. Since 2008, Republic and its subsidiaries have maintained daily operational and managerial control over the management and environmental decisions of the Bridgeton and West Lake Landfills, decisions which gave rise to the violations of law and damage to property alleged in this Petition. Republic did so directly and through its subsidiaries Allied Services, LLC, Bridgeton Landfill LLC, and Rock Road Industries, Inc.

28. Allied Services, LLC ("Allied"), a Delaware limited liability company with its principal place of business in the state of Arizona, is a wholly-owned subsidiary of Republic Services, Inc., that continuously and systematically conducts business in the State of Missouri under its own name and under the fictitious name "Republic Services of Bridgeton."

A. Allied conducts daily operations of the Bridgeton Landfill and the West Lake Landfill.

---

[10] http://www.republicservices.com/customer-support/facilities
[11] https://www.republicservices.com/locations/missouri

10

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

B. Allied regularly and routinely avails itself of the protection of Missouri laws in St. Louis County courts, and regularly appears to defend itself in lawsuits tried there.

C. This lawsuit arises out of damages that resulted from Allied's acts and omissions within the State of Missouri. Since 2008, Allied has maintained daily operational and managerial control over the management and environmental decisions of the Bridgeton and West Lake Landfills, decisions which gave rise to the violations of law and damage to property alleged in this Petition.

D. Allied has also promulgated environmental and health and safety policies and procedures to its subsidiaries, which in this case they failed to adequately do.

29.     Cotter Corporation ("Cotter") is a Colorado corporation with its principle place of business in Englewood, Colorado, which operates as a subsidiary of General Atomics, Inc., a California corporation.

A. Cotter continuously and systematically carries on business activities in the State of Missouri in its own name, as well as through its parent company General Atomics, Inc.

B. This lawsuit arises out of damages that resulted from the Cotter's conduct including acts and omissions within the State of Missouri, as well as the acts and omissions of the predecessors of the Cotter, which gave rise to the violations of law and damage to property alleged in the Petition.

### III. FACTS

### Radioactive Wastes

30.     Ounce for ounce, radioactive isotopes are the most toxic materials known to man.[12]

---

[12] *Allen v. United States*, 588 F. Supp. 247, 292 (D. Utah 1984), rev'd, 816 F.2d 1417 (10th Cir. 1987). Citing J.C. Giddings, *Chemistry, Man & Environmental Change* 412 (1973).

11

31.     Radiation is a type of energy transmitted over a distance. Some materials spontaneously emit radiation through a process known as radioactive decay. As these materials decay they release radiation energy and transform into other radioactive materials which will then also decay by releasing radiation energy and transforming into other materials.

32.     Some radiation energies, including the radiation from the decay of radioactive materials used in nuclear and atomic processes, such as uranium, have the ability to penetrate other material. When radiation energy interacts with other material, it causes a process called ionization[13] which can damage chemical structures. When the "other material" that ionizing radiation passes through is human cells, it can cause damage within those cells resulting in mutation in genetic material which can lead to cancer and other harms.

33.     People are exposed to radiation in two ways: external exposure from radioactive material in the environment and internal exposure by radioactive material that has entered the body. Radioactive material can be taken into the body by consuming foodstuffs and liquids with radioactivity in them, by inhaling radioactive gases or aerosol particles, or by absorption through wounds in the skin. The material taken in will internally expose the organs and tissues for as long as it remains inside the body.

34.     One characteristic of the impact of exposure to ionizing radiation on the human body through both internal and external exposure is that even if the energy absorbed is low, the

---

[13] Ionizing radiation is described as follows in the literature: "Ionizing Radiation is a form of radiation that includes alpha particles, beta particles, gamma rays, x-rays, neutrons, high-speed electrons, high-speed protons, and other particles capable of producing ions. Ionizing radiation has enough energy to cause changes in atoms through a process called ionization. Ionization can affect the atoms in living things and depending on the dose and exposure, can pose a serious health risk to humans.  Ionizing radiation has sufficient energy to cause chemical changes in cells, causing damage to tissue and DNA in genes."  https://www.epa.gov/radiation/radiation-health-effects

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

biological effects can still be gravely serious. The second characteristic is that there are latent biological effects of radiation.

35.     The injuries resulting from exposure to ionizing radiation can also be separated into two categories: somatic injuries and genetic injuries. Somatic injuries are damages to the individual exposed. This can be damages to the skin, reproductive system, blood forming system, digestive system, central nervous system, and immune system, as well as cancers. Illnesses such as cancers may take a number of years to appear.

36.     Genetic injury is damage to the reproductive cells of the exposed individual in the form of mutation of their genetic cells. As a result, the probability of detrimental effects to the descendants of the exposed persons may greatly increase. These genetic mutations can be passed down to a person's offspring even generations later. These injuries include birth abnormalities and cancer.

37.     One of the most dangerous aspects of radioactive materials is the length of time that radioactive isotopes will persist and accumulate in the environment.  As detailed above, radioactive materials decay over time and each radioactive material gives off radiation energy as it decays and transforms into a different material. The rate at which a radioactive isotope decays is measured in half-life. The term "half-life" is defined as the time it takes for one-half of the atoms of a radioactive material to disintegrate. For example, after one half life, there will be one half of the original material, after two half-lives, there will be one fourth the original material, after three half-lives one eight the original sample, and so forth.

38.     Radium-226 has a half-life of 1,600 years.  Radium-226 eventually decays to lead- 210 and polonium-210. This means that as the radium-226 decays, it increases the lead-210 and polonium-210 at the Landfill and in the surrounding environment. Furthermore, half of the hazardous, carcinogenic radium-226 currently contaminating the West Lake Landfill will still remain as a

13

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

grave problem even after 1,000 years from now if it is not physically removed. This is described in the scientific literature as follows:

> Importantly, because the concentrations of short-lived radionuclides will progressively increase, the radioactivity at the site will likewise increase for the foreseeable future. For example, according to NRC, if the present day activity of $^{230}$Th is estimated to be 100 times that of $^{226}$Ra, then the alpha activity due to $^{226}$Ra decay will increase fivefold over present levels in 100 years, nine-fold in 200 years, and 35-fold in 1000 years.[14]

## Radioactive Waste in the St. Louis Area

39.     From 1942 to 1957, uranium ore was processed in downtown St. Louis City in association with the Manhattan Project.[15] Milling is the first step in processing natural Uranium ore and the milling process generates a sandy process waste known as "mill tailings" which contain radioactive decay products. In the late 1940's, the Manhattan Project acquired land near Lambert airport to store the Uranium ore mill tailings wastes from the processing operations in downtown St. Louis. The storage site near the airport is now referred to as the St. Louis Airport Site or SLAPS ("SLAPS"). Radioactive mill tailings wastes accumulated at SLAPS.

40.     In the 1960's, leftover mill tailings (ore residues, and uranium, and radium-bearing process wastes) that had been stored at SLAPS were moved to a storage site on Latty Avenue in Hazelwood, Missouri (the "Latty Avenue Site"). Mill tailings at the Latty Avenue Site included Uranium.

---

[14] Robert E. Criss, *Risk and Character of Radioactive Waste at the West Lake Landfill 1, Bridgeton, Missouri, Department of Earth and Planetary Sciences, Washington University, St. Louis, MO,* Mar. 14, 2013 (footnotes omitted [hereinafter "Criss (2013)"].

[15] Robert Alvarez, *The West Lake Landfill: A Radioactive Legacy of the Nuclear Arms Race* 8, Nov. 21, 2013 (footnotes and citations omitted) [hereinafter "Alvarez (2013)"]; *see also* Denise DeGarmo, *The Disposal of Radioactive Wastes in the Metropolitan St. Louis Area, The Environmental Health Legacy of the Mallinckrodt Chemical Works* 57, 62, 143 (Edwin Mellen Press 2006) (footnotes omitted) [hereinafter "DeGarmo (2006)"].

14

41.     In the late 1960's, Cotter purchased the Uranium mill tailings stored at both SLAPS and at the Latty Avenue Site.

42.     Upon information and belief, as part of the contract between Cotter and the federal government for sale of the radioactive residues, Cotter assumed all liability, including ultimate disposition of the materials.

43.     Cotter did not receive indemnity from the government in connection with this transaction.

44.     Between 1969 and 1973, Cotter stored, processed, and transported the mill tailings at the SLAPS and Latty Avenue sites.

45.     On or about 1973, Cotter mixed uranium mill tailings wastes with soil and upon information and belief they marketed the mill tailings as daily cover for landfill operations. Daily cover is the layer of soil that is laid on top of the day's deposition of waste at an operational landfill.

46.     On or about 1973, Cotter caused to be dumped, and the Landfill Defendants accepted, over 46,000 tons of radioactive mill tailings wastes without any permit whatsoever.

47.     Upon information and belief, despite knowing that Cotter was trying to dispose of dangerous radioactive materials for which the Landfill was not permitted to accept, the radioactive mill tailings waste was used by the Landfill Defendants as daily cover for the Landfill. The Landfill Defendants permitted the dumping of radioactive mill tailings wastes into the Landfill and intentionally spread these wastes over a large area.

48.     The scientific literature summarizes the dumping as follows:

> In 1973, 8700 tons of radionuclide-bearing "leached barium sulfate" was allegedly dumped in an unlined Landfill in Bridgeton, MO that was not licensed to receive radwaste. This report finds that 1) the chemical and physical character of the radioactive materials has not been adequately characterized, and barium sulfate is probably not a major constituent; 2) the alpha and beta emissions of this material will increase 10x to 100x over present levels, reaching maximum

15

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

activity in about 9000 years; 3) the Landfill has no protective barriers and a proximal subsurface fire; 4) the site has several hydrologic and geologic risk factors that magnify its unsatisfactory location in a populated area; 5) nuclear material has been in contact with percolating waters and with a fluctuating water table; 6) groundwaters contaminated with radionuclides have migrated far from the original location of disposal; 7) background levels of radiation have been overstated, while other risks have been underestimated ….[16]

## **The Landfill**

49.     The West Lake Landfill is situated on about 200 acres at 13570 St. Charles Rock Road, in the City of Bridgeton. The Missouri River lies about one and one-half miles to the north and west of the Landfill. A shallow aquifer lies beneath the West Lake Landfill and surrounding neighborhoods.

50.     Originally used for agriculture, the land became a limestone quarrying and crushing operation in 1939.

51.     Beginning in the early 1950s, portions of the quarried areas and adjacent areas were used to dispose of municipal refuse, chemical wastes, industrial solid wastes, and construction/demolition debris.

52.     The Landfill was never designed to be an adequate storage or disposal site for radioactive materials, nor was it ever licensed as such. Despite the Landfill not being properly designed to receive radioactive materials, the Landfill Defendants accepted hazardous, toxic, carcinogenic, radioactive mill tailings wastes and spread them around the Landfill.

53.     The inadequacies of the Landfill itself are described in the scientific literature as follows:

> Although the West Lake Landfill contains significant amounts of long-lived radiotoxic wastes such as those contained in federally licensed commercial radioactive waste Landfills, it meets virtually

---

[16] Criss (2013) at 1.

16

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

> none of legal requirements governing shallow radioactive waste disposal to prevent off-site migration.[17]

54.     The data collected on and around the Landfill documents radioactive contamination of soil, water, and air.

> Onsite 226Ra concentrations in soils as high as 21,000 pCi/g were measured, compared to estimated background levels of 2 pCi/g. Elevated radium contents above the EPA's MCL of 5 pCi/l are also widespread in both the alluvial and bedrock aquifer within about 1500 feet of Areas 1 and Area 2. Airborne surveys established that external radiation levels exceeding 100µR/hr, while distal samples were <10 µR/hr. Levels recorded one meter above Area 2 were as high as 3-4 mR/hr, or as much as 400x higher than background. NRC reports that the subsequent addition of soil cover and construction debris to Areas 1 and 2 diminished these levels several fold.[18]

55.     Other toxic and hazardous materials are expected to have been released via the air pathway, in addition to the radioactive materials. This phenomenon contributes to the damages complained of herein.

56.     The Landfill stopped accepting waste on December 31, 2004 and is now used as a transfer station for municipal wastes.

57.     The Landfill waste mass encompasses approximately 52 acres with approximately 240 feet below the ground's surface and a total waste thickness of 320 feet.

## Radioactive Mill Tailing Wastes at the West Lake Landfill

58.     Defendants caused or contributed to the improper handling, storage, and disposal of an estimated 500,000 cubic yards of radioactive mill tailings wastes in the Landfill. As a result, about

---

[17] Marco Kaltofen et al, Tracking legacy radionuclides in St. Louis, Missouri, via unsupported[210]Pb at 104, *Journal of Environmental Radioactivity,* Vol. 153 (2016) [hereinafter "Kaltofen (2016)"].

[18] Criss (2013) at 2 (citations omitted)

15 acres of the West Lake Landfill are filled with radioactive mill tailings waste at depths up to 20 feet.

59.     Cotter failed to obtain a license from any governmental authority to transport radioactive mill tailings wastes to the West Lake Landfill. The West Lake Landfill failed to obtain any governmental authority to receive or possess radioactive mill tailings wastes from Cotter. The West Lake Landfill was not sited, designed, nor operated as a land disposal facility suitable for radioactive waste in accordance with any governmental authority. The Landfill is not and has never been licensed by the NRC as a land disposal site or to receive or possess radioactive material. (These statements are provided for informational purposes only, as Plaintiffs are making no claims under the laws of the United States).

60.     Upon information and belief, Defendants who operated the Landfill used the radioactive mill tailings waste mixed with radioactive soil as daily cover in its Landfill operations thereby spreading the waste throughout the Landfill.

61.     Defendants did not take necessary safety precautions when disposing of and handling the radioactive mill tailings wastes and radioactive soil to prevent off-site contamination.

62.     The staff of the Landfill was neither qualified, nor trained to handle or dispose of radioactive wastes in a safe manner.

63.     The Landfill was not intended, nor designed to contain mill tailing radioactive wastes. In reality, the Landfill is a chaotic pile of debris covered by unmanaged "natural vegetation, surrounded by a fence with radioactive [warning] signs." Given the significant design and operations deficiencies, experts contend that the Landfill is even unsuitable for ordinary domestic waste.[19]

---

[19] Criss (2013) at 4

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

**The Fire**

64.     The Landfill has experienced problems with subsurface fires throughout its operational history. Despite having past experiences with subsurface fires, sufficient precautionary measures were not implemented to prevent future fires or to protect the radiologically contaminated areas from being affected.

65.     Upon information and belief, Defendants discovered high temperatures in several monitoring wells. Upon information and belief, Defendants continued with aggressive gas extraction methods exacerbating the underground fire and enabling it to spread uncontrolled. Defendants finally reported to authorities that the Landfill was experiencing high temperatures on extraction wells evidencing a subsurface smoldering event.

66.     Since then, the smoldering has intensified into a spreading subsurface fire evidenced by surface soil settlement, increased odors, elevated hydrogen levels, and high temperatures. High temperatures and smoke caused by the fire could mobilize radionuclides into the air and ultimately into soil, surface water, ground water.

67.     Due to the fact that the radioactive material was used as daily cover around the landfill, it is more likely than not that some fire has already consumed radioactive material.  If there is sufficient contact with radioactive material, hot gases from the fire will likely cause fissures in the overburden material. These fissures will allow additional quantities of radioactive radon gas to escape the Landfill and become deposited as lead- 210 onto Plaintiffs' property as it decays.

68.     A subsurface fire in the radioactively contaminated areas would be expected to create increased pressure conditions within the Landfill and force out entrained radioactive gases, including radon which is extremely toxic to breathe. A subsurface fire may be present in the radioactively contaminated areas for a long period of time before it is detected, because the only

19

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

apparent means to detect a subsurface smoldering event after closure is through annual visual inspections.

69.     Another effect of a subsurface fire or smoldering event would be increased leachate production which has been observed in the Bridgeton Landfill from condensation of large amounts of steam.[20]

70.     The literature describes the risk of the Landfill underground fire as follows:

> An underground fire is currently ongoing in the municipal Landfill (OU-2) that is immediately south of Area 1 of OU-1. Such fires can burn for years, creating high underground temperatures, and releasing carbon monoxide, dioxins, VOCs and other noxious chemicals, and particulates into air. Numerous people who reside near the Landfill complained about odor and health problems at the January 17, 2013 public meeting in Bridgeton. Risks for adjacent, radionuclide-bearing OU-1 include but are not restricted to the following 1) fire can spread from OU-2 into OU-1, particularly because demolition and construction Landfills are known to have much higher risk than municipal Landfills; 2: subterranean fires can result in Landfills collapse, landslides and slumping, endangering personnel and exposing dangerous materials to the surface; 3) Landfill fires have high explosion risk because of methane, gas cylinders, and drums; 4) high temperatures and smoke could mobilize radionuclides into surface water, ground water and air.[21]

71.     There are at least two human exposure risk pathways that would exist from a subsurface smoldering event or subsurface fire reaching the radioactive materials. The first is the risk of people being subjected to increased air exposures to contaminants such as breathing in radon gas, radon-226. As airborne concentrations of radon gas increase, so would the risk to the neighboring population of breathing in radon gas and developing injuries such as lung cancers. Additionally, as radon gas decays it will become deposited onto people's property and in their homes as

---

[20] Leachate means liquid that has percolated through solid waste or has come in contact with solid waste and has extracted, dissolved or suspended materials from it. Mo. Code Regs. Ann. tit. 10, § 80-2.010.
[21] Criss (2013) at 4-5 (citations omitted).

radioactive lead-210 and polonium-210 which would subject people to increased risk of internal exposure to radioactive materials. The second pathway is increased leachate production that could further move contaminants and radioactive materials into the groundwater.

72.     Despite these risks, the Landfill Defendants have allowed the subsurface fire to spread uncontrolled.

73.     From the start of the subsurface smoldering event and throughout the subsequent fire, Plaintiffs have regularly encountered noxious, putrid, and offensive odors on their property coming from the Landfill, which diminishes quality of life, results in lost property value and is an absolute nuisance.

### The Spread of Defendants Radioactive Wastes to Off-Site Businesses and Homes

74.     As stated herein, Defendants have violated numerous Missouri standards for protection against radiation. Defendants' negligent handling, storage, and disposal of radioactive wastes and radioactive soil as daily cover caused dangerous contaminants to be deposited in several areas throughout the Landfill site and to be highly susceptible to off-site migration of radioactive materials including radon gas, radioactive particles, and radioactively-contaminated groundwater

75.     An example of water impacts of the Landfill will put this in perspective. Every day, the Landfill generates about 150,000 gallons of contaminated hazardous liquid leachate waste. In a doomed attempt to capture that waste, the Landfill Defendants installed a leachate collection system.  But the leachate collection system itself was inadequate and has resulted in spills, releases, and leaks that have contributed to the groundwater and surface water contamination in the area.

76.     Radiological and organic contamination was also detected in trees adjacent to and off-site from the Landfill. The presence of radioactive contamination in the trees resulted from the uptake of off-site contamination from the Landfill.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

77.     Recent studies of the Landfill area document radioactive radon gas emissions from the Landfill are falling out and contaminating soil. Kaltofen reported the following:

> Levels of $^{210}$Pb in key samples were well above background activities, and were significantly out of secular equilibrium with other members of the uranium decay chain. This is strong evidence that the $^{210}$Pb originated by decay of short-lived, fugitive radon gas that escaped the Landfill.[22]

78.     Importantly, wherever lead-210 occurs, it will decay to polonium-210, creating an additional dose, as a matter of the laws of physics.

79.     In addition, recent studies of surface water runoff from the Landfill, particularly after heavy rains, document radioactive contaminated surface water runoff to off-site properties.[23]

80.     Critical to the legacy of radioactive particles contaminating the homes and communities surrounding the Landfill is that the radioactive contamination has gone off-site.

81.     Landfill Defendants have a long and consistent history of consciously disregarding the regulations for the control of radiation in Missouri by:

A.  failing to make such surveys as are reasonably necessary to comply with the regulations;

B.  failing to post adequate warning signs as required by the regulations;

C.  failing to obtain a specific license for the handling of radioactive materials and wastes;

D.  failing to adequately monitor or control its offsite effluent by air and water;

E.  failing to provide dosimetry to workers and more than occasional visits by members of the general public to the site;

---

[22] Kaltofen (2016) at 110.
[23] EPA Finds Radiation in West Lake Landfill Runoff, *CBS St. Louis*, May 26, 2016, http://stlouis.cbslocal.com/2016/05/26/epa-finds-radiation-inwestlake-landfill-runoff.

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

F. failing to have an adequate or proper radiation protection program for its workers, despite knowledge of the significant potential for those workers to be exposed to material emitting gamma, beta, alpha radiation;

G. allowing off-site migration of the radioactive materials, resulting in a release to an unrestricted area;

H. allowing excessive radon emanation from the landfill;

I. allowing unmonitored offsite migration of contaminated surface waters without a specific license;

J. failing to maintain adequate waste exposure records and reports;

K. failing retain and employ qualified radiation protection experts;

L. failing to supply former workers with a summary of their radiation dose;

M. failing to see that all work with radioactive materials is carried under conditions which will minimize the possibility of spread of radioactive materials;

N. failing to monitor the workplace and prevent worker or visitors' clothing from becoming contaminated with radioactive materials;

O. failing to require third parties who were disposing of radioactive material at the site to obtain a specific license;

P. allowing the disposal of radioactive waste materials by dumping or burial at a site not approved by the Department of Health;

Q. failing to have an accurate accounting for all radioactive materials at the site; and

R. failing to have records which show the amount of radioactive material received, transferred, decayed in storage, disposed of, and other information as may be necessary

23

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

to account for the difference between the amount of radioactive material received or produced and the amount on hand.

82. Defendants essentially violated every Missouri regulation related to radiation exposure.

83. Due to risk of gamma radiation exposure, governmental authorities have directed Republic to cover portions of the landfill with six inches of fill to protect workers and innocent members of the general public who will be exposed to gamma radiation if they are in that area.

84. This zone of excessive gamma radiation was identified in 1978 during a surveillance flight by the NRC. Despite being informed of this zone of excessive gamma radiation, the Landfill Defendants did nothing.

85. The only time Defendants takes any action to remediate or protect workers or the public from radioactive wastes is when ordered to do so by a governmental body.

86. A recent study of the wastes that have come from the Landfill and migrated off-site to contaminate local businesses and homes stated the following:

> Analysis of 287 soil, sediment and house dust samples collected in a 200km2 zone in northern St. Louis County, Missouri, establish that off-site migration of radiological contaminants from Manhattan Project-era uranium processing wastes has occurred in this populated area.

## Concealment of Facts Related to Risk

87. Republic and other Defendants through their silence have reassured government officials, the public and Plaintiffs that the Landfill has not contaminated nearby properties. In particular, Republic and its representatives, as well as its professional public relations firm(s), with their puff talk that they really care have made misrepresentations that were meant to assure Plaintiffs that:

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

A. Any suspicion of off-site contamination from the Landfill are merely rumors "being spread by alarmists."[24]

B. Its activities "should reassure the community that they are safe from and not being exposed to any risk from groundwater beneath West Lake Landfill."[25]

C. The Landfill's neighbors, including the Plaintiffs "can rest assured that they are safe."[26]

D. The fire and Landfill are both at a "managed state."[27]

E. The waste at the Landfill presents no danger to public health.[28]

88.    Republic and other Defendants engaged in extensive professional public relations efforts to downplay the significance of the problem and the dangers associated with radioactive wastes sitting in a landfill which experts indicate is not even suitable for household garbage, as it contains no liner. Defendants misrepresentations can only be characterized as mere "puffery".

**Defendants' Radioactive Particles Contaminated the Plaintiffs Property**

89.    The Dailey Property is contaminated by radioactive material.

90.    Samples taken on and around the Dailey Property confirm an elevated presence of radioactive particles.

91.    Dust samples from inside the Dailey Home contain decay products of radioactive isotopes U-238, including Th-230, Ra-226 and Pb-210, which match the *fingerprint* (or profile) of the hazardous, toxic, carcinogenic radioactive wastes generated from the processing of uranium ore in downtown St. Louis which was subsequently stored at SLAPS and Latty Avenue before being

---

[24] Jacob Barker, Radium above federal guidelines in groundwater near West Lake at 2, *St. Louis Today*, Dec. 17, 2014.
[25] *Id*.
[26] Jacob Barker, Frustration with EPA handling of West Lake growing at 5, *St. Louis Today*, Jan. 3, 2015.
[27] *Frustration with EPA handling of West Lake growing*, Jacob Barker, St. Louis Today, January 3, 2015 at p. 5.
[28] *Id*.

disposed of in the Landfill. These dusts show levels of radioactive Th-230 at least two hundred times above background.

92.     The Dailey Property neighbors the Landfill. This proximity puts the Plaintiffs' Property in the direct path of radioactive and other hazardous air emissions, radioactive particles distributed by the wind blowing such contamination off the site in dirt and dust, radon gas, and frequent offensive odors; all of which emanate from the Landfill.

93.     The Kaltofen (2016) published scientific paper identified "strong evidence of short lived fugitive radon gas that escaped from the landfill."[29] These air emissions fall out to soil and dust as $^{210}$Pb, a highly radioactive isotope.

94.     It is also clear that radioactive material will be distributed from the Landfill "by surface water and winds."[21] The surface water runoff threat is heightened during periods of high rainfall and flooding and has been documented.[30]

95.     Frequent offensive odors from the Landfill are experienced by Plaintiffs.

96.     The radioactive wastes, which are hazardous, toxic, carcinogenic, that have polluted the Dailey Property and continue to threaten, especially during the proposed cleanup, to further pollute the Dailey Property match the waste fingerprint (or profile) of the hazardous, toxic, carcinogenic radioactive mill tailings wastes dumped in the Landfill.

97.     This radioactive contamination on the Dailey Property migrated from the  Landfill. The contamination was caused by the Defendants' improper handling, storage, and disposal of radioactive materials.

---

[29] Kaltofen (2016) at 111.
[30] EPA Finds Radiation in West Lake Landfill Runoff, *CBS St. Louis*, May 26, 2016, http://stlouis.cbslocal.com/2016/05/26/epa-finds-radiation-inwestlake-landfill-runoff.

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

98.     Radioactive contamination of the Dailey Property and frequent offensive odors render the Dailey Property unfit for normal use and enjoyment, and destroys its fair market value.

99.     As a direct and proximate result of Defendants' conduct, Plaintiffs are currently being subjected to radioactive waste contamination and will suffer irreparable harm if an injunction is not granted requiring Defendants conduct a total and complete cleanup of the contamination on the Dailey Property.

## COUNT I - TRESPASS

100.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

101.    Plaintiffs Michael Dailey and Robbin Dailey own and control the Dailey Property located at 3550 El Ferrol Court, more particularly described in Paragraph 19 above.

102.    Landfill Defendants own and control property located at the Bridgeton and West Lake Landfills, which adjoins Plaintiffs' property.

103.    Landfill Defendants store and/or transport radioactive materials and other toxic and hazardous wastes on their property.

104.    Cotter purchased massive quantities of highly toxic radioactive wastes and failed to properly dispose of these wastes. Cotter intentionally, maliciously, and wantonly disposed of radioactive wastes at a facility unfit to handle such wastes.

105.    Landfill Defendants have used these radioactive materials in a manner that is unreasonable, unlawful, malicious, and wanton, resulting in an invasion of Plaintiffs' property.

106.    Landfill Defendants have caused these radioactive materials to migrate from their property and contaminate Plaintiffs' property.

27

107.    Landfill Defendants willfully, wantonly, and maliciously caused the emission of radon gas, and radioactive particles onto and around Plaintiffs' property through their Landfill operations.

108.    It was reasonably foreseeable that Defendants' actions would and will continue to contaminate Plaintiffs' property with radioactive particles and other hazardous wastes.

109.    The migration of radon gas and radioactive particles from Landfill Defendants' property onto Plaintiffs' property has resulted and continues to result in direct physical interference with Plaintiffs' property. Such contamination is incompatible with the normal use and enjoyment of Plaintiffs' Property.

110.    Plaintiffs did not give Defendants permission or consent to interfere with their property in this manner. Through Defendants' actions and inactions, they are illegally and improperly using Plaintiffs' property to store hazardous, toxic, carcinogenic, radioactive wastes.

111.    The contamination of Plaintiffs' property with radon gas and radioactive particles, and other hazardous wastes, has resulted in significant damage to the property.

112.    As a direct and proximate cause of this continuing and recurring physical interference, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT II – PERMANENT NUISANCE

113.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

114.    Plaintiffs Michael Dailey and Robbin Dailey own and control the Dailey Property located at 3550 El Ferrol Court, more particularly described in Paragraph 19 above.

115.    Landfill Defendants own and control property located at the Bridgeton and West Lake Landfills, which adjoins Plaintiffs' property.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

116.    Defendants unreasonably and unlawfully stored and used radioactive materials at the Landfill, which adjoins Plaintiffs' property.

117.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

118.    The Landfill and the radioactive waste that the Landfill contains are a permanent construction that is necessarily injurious to Plaintiffs as installed. It is not practical or possible to abate the presence of the Landfill or the radioactive waste stored there.

119.    Operating an unlicensed radioactive hazardous waste dump in a populated area is a nuisance *per se*.

120.    Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property. Such contamination is incompatible with the normal use and enjoyment of the Dailey Property.

121.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

122.    Landfill Defendants have intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allowed the emission of noxious, offensive odors and various hazardous substances into the surrounding air resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.

123.    Landfill Defendants' continuous and unrelenting noxious odors invading Plaintiffs' property causes inconvenience to Plaintiffs and prevents them from using the property.

4840-7843-1124, v. 4

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

124.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered permanent injury, including decreased property value.

## COUNT III – TEMPORARY NUISANCE

125.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

126.    Plaintiffs Michael Dailey and Robbin Dailey own and control the Dailey Property located at 3550 El Ferrol Court, more particularly described in Paragraph 19 above.

127.    Landfill Defendants own and control property located at the Bridgeton and West Lake Landfills, which adjoins Plaintiffs' property.

128.    Defendants unreasonably and unlawfully store and use radioactive materials at the Landfill, which adjoins Plaintiffs' property.

129.    The Defendants caused and contributed to the radioactive contamination of Plaintiffs' property.

130.    The Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of radon gas and radioactive particles onto and around Plaintiffs' property, resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property. Such contamination is incompatible with the normal use and enjoyment of the Dailey Property.

131.    Defendants' interference with Plaintiffs' use and enjoyment of the property is substantial.

132.    Landfill Defendants intentionally, unreasonably, negligently, recklessly, willfully, wantonly and maliciously allow the emission of noxious, offensive odors and various hazardous

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

substances into the surrounding air resulting in unreasonable interference with Plaintiffs' use and enjoyment of their property.

133.    Landfill Defendants' use of the Landfill causes frequent and unrelenting noxious odors to invade Plaintiffs' property and prevents Plaintiffs from using their property.

134.    As a direct and proximate result of Defendants' interference with Plaintiffs' use and enjoyment of the property, Plaintiffs have suffered and continue to suffer injury, including decreased property value.

## COUNT IV – NEGLIGENCE

135.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

136.    Radioactive isotopes are known human carcinogens and are among the most toxic materials known to man. When property becomes contaminated with these wastes, the dangers can persist in the environment for thousands of years. Radioactive wastes should be handled, stored, and disposed of with the utmost safety in mind. Exposures to radioactive wastes should be as low as is reasonably achievable.

137.    Knowing of the grave dangers posed by these wastes, Cotter owed a duty of care to the Plaintiffs and the public to ensure the safe and legal handling, storage, and disposal of the radioactive wastes in order to prevent significant injury to property and persons.

138.    Cotter was negligent in failing to ensure that the radioactive wastes were safely disposed of at an appropriate facility. Cotter negligently disposed of these radioactive wastes at a landfill located in a residential area that was not capable of safely and properly disposing of radioactive materials. The Landfill was not properly licensed, nor configured, nor staffed to handle the disposal of radioactive wastes. Upon information and belief, Cotter negligently encouraged the Landfill

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

operators to use the radioactive mill tailings wastes which were mixed with contaminated soil as daily cover.

139. As a direct and proximate result of Cotter's failure to ensure that the radioactive wastes were properly disposed of at an appropriate facility, Plaintiffs suffered and continue to suffer injury to due to the radioactive contamination of their property, including diminished property value.

140. The Landfill Defendants owed a duty to the Plaintiffs to operate the Landfill in a safe, legal, and reasonable manner so as not to contaminate and interfere with surrounding properties. The Landfill Defendants owed a duty not to accept radioactive wastes for which they were not licensed or qualified to handle. After accepting radioactive wastes, the Landfill Defendants had a duty to safely handle, store and/or dispose of the radioactive wastes in order to prevent significant injury to property and persons.

141. Landfill Defendants were negligent in the construction, design, operating and maintenance of the Landfill.

142. Landfill Defendants negligently accepted hazardous, toxic, carcinogenic radioactive mill tailings when the Landfill was not designed, nor staffed to handle the disposal of radioactive wastes. The negligent design and maintenance of the Landfill by Landfill Defendants failed to prevent the release of radon gas and radioactive particles and hazardous and toxic wastes onto surrounding properties in excess of guidelines.

143. Landfill Defendants were negligent in accepting hazardous, toxic, carcinogenic radioactive mill tailings at a landfill located in a residential area that was not capable of safely and properly disposing of radioactive materials. The Landfill was not properly licensed, nor configured, nor staffed to handle the disposal of radioactive wastes. Upon information and belief Defendants used the radioactive materials which were mixed with contaminated soil as daily cover.

144.    Upon information and belief, Landfill Defendants' negligent training of personnel handling radioactive, toxic, and hazardous materials on site was a direct and proximate cause of damage to Plaintiffs' property.

145.    Landfill Defendants' negligent use of radioactive wastes mixed with radioactive soil as daily cover spread contamination into a broader area and prevented Defendants and regulators from knowing the location of these dangerous wastes. The negligent use of radioactive materials as daily cover in an unlined Landfill resulted in contamination of the groundwater underlying the Landfill and surrounding properties.

146.    Landfill Defendants were negligent in failing to prevent the subsurface fire. Defendants should have implemented adequate practices with respect to gas extraction to avoid subsurface fires after they initially dealt with problems with smoldering events and increased subsurface temperatures in the 1990's. The subsurface fire along with the resulting noxious odors and increased risk of significant radon gas emissions are a direct and proximate result of the Landfill Defendants' negligence in the operation of the Landfill. Such contamination is incompatible with the normal use and enjoyment of the Dailey Property.

147.    Defendants' collective negligence throughout the history of the mishandling and improper dumping of radioactive wastes in the Landfill has resulted in repeated releases of radon gas and radioactive particles and other hazardous materials as well as offensive odors onto Plaintiffs' property, in disregard of applicable regulations and property rights.

148.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances and noxious odors. Defendant's negligence diminished Plaintiffs' property value.

149.    The injuries sustained by Plaintiffs are of the kind that do not occur without negligence.

33

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

150.    Plaintiffs' injuries were the result of wastes disposed of and controlled by Defendants.

151.    Defendants' negligent acts and omissions were a direct and proximate cause of Plaintiffs' injuries. Plaintiffs are entitled to recover damages for damage to property and/or loss of use of property.

152.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT V – NEGLIGENCE PER SE

153.    Plaintiffs re-allege and incorporate by reference every allegation of this Complaint as if each were set forth fully herein.

154.    Cotter violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, and the Missouri Hazardous Waste Management regulations, 10 C.S.R. 25-5.262, both of which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

155.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation and Hazardous Waste Management were meant to protect.

156.    The contamination of Plaintiffs' property is the kind of injury that the regulations for protection against ionizing radiation were designed to prevent.

157.    Cotter's violations of the regulations for Protection against Ionizing Radiation and Hazardous Waste Management were the proximate cause of Plaintiffs' injuries.

158.    The Landfill Defendants violated Missouri regulations for Protection against Ionizing Radiation, 19 C.S.R. 20-10.070, 20-10.090, Missouri Solid Waste Management Law and Regulations, 10 C.S.R. 80-2.020(1)(F), 80-3.010(3)(A)(2), 80-3.010(3)(B)(1), 80-3.010(8)(A), 80-3.010(9)(C)(2), 80-3.010(13)(C), 80-3.010(14)(C), 80-3.010(19)(A), 10 CSR 80-3.010(19)(C)(7); Mo. Rev. Stat. §§ 260.210.1(4), 260.380(1); Missouri Clean Water Act, Mo. Rev. State. §

34

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

644.051.1, and Missouri Air Conservation regulations, 10 C.S.R. 10-6.165, all of which require the safe storage and disposal of radioactive material so as to protect the health and safety of the public.

159.    Plaintiffs are members of the class of persons that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were intended to protect.

160.    The contamination of Plaintiffs' property is the kind of injury that the Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, Missouri Hazardous Waste Management Law, and Missouri Air Conservation regulations were designed to prevent.

161.    The Landfill Defendants' violations of Missouri regulations for Protection against Ionizing Radiation, Missouri Solid Waste Management Law and Regulations, and Missouri Air Conservation regulations were the proximate cause of Plaintiffs' injuries.

162.    Defendants' collective negligence throughout the history of the mishandling and improper dumping hazardous, toxic, carcinogenic, radioactive wastes in the Landfill area has resulted in repeated releases of radon gas and radioactive particles and other hazardous materials as well as offensive odors onto Plaintiffs' property in violation of applicable regulations and disregard for property rights.

163.    Defendants' negligence has damaged Plaintiffs' property by contaminating it with radioactive particles, toxic and other hazardous substances and noxious odors. Defendant's negligence diminished Plaintiffs' property value.

164.    Plaintiffs did not consent to the injuries, nor did they contribute to the injuries in any way.

## COUNT VI – STRICT LIABILITY/ABSOLUTE LIABILITY

165.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

166.    Defendants engaged in the abnormally dangerous activity of handling, storing, and/or disposing of radioactive waste.

167.    By handling, storing, and/or disposing of radioactive waste, Defendants have created and continue to create a high degree of risk of harm to Plaintiffs' property.

168.    Defendants have intentionally failed to eliminate the risk of harm caused by their handling, storing, and/or disposing of radioactive waste.

169.    As a direct result of Defendants' abnormally dangerous activities, Plaintiffs' property was contaminated with radioactive materials and they suffered and continue to suffer injury, including diminished property value. Such contamination is incompatible with the normal use and enjoyment of the Dailey Property.

170.    Plaintiffs' injuries are of the kinds that result from the dangerous nature of handling, storing, and/or disposing of radioactive waste.

171.    The injuries that Defendants' handling, storing, and/or disposing of radioactive waste have caused Plaintiffs to suffer, drastically outweigh the value of the Landfill.

172.    Accordingly, Defendants are jointly and severally liable for any and all damages Plaintiffs have sustained as a result of their strict liability for handling, storing and/or disposing of radioactive materials, including, without limitation, any incidental or consequential damages.

## COUNT VII – INJUNCTIVE RELIEF

173.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

174.  Defendants have tortiously contaminated Plaintiffs' property with hazardous, toxic, carcinogenic, radioactive wastes.

175.  The Defendants' tortious acts threaten the safety and normal use and enjoyment of the Plaintiffs' property.

176.  The radioactive contamination of Plaintiffs' property has caused a significant increased risk to Plaintiffs, and therefore Plaintiffs are in need of a thorough scientific evaluation of the radioactive contaminant levels throughout their Property.

177.  The need for such an evaluation is a direct consequence of the Defendants' tortious conduct, and does not arise from the innocent conduct of the homeowners.

178.  Therefore, Plaintiffs seek injunctive and equitable relief to require the Defendants to conduct the necessary scientific evaluation of the Dailey Property, consistent with contemporary scientific principles. Plaintiffs seek injunctive and equitable relief to require the Defendants to respond to the consequences of this tortious contamination by providing the necessary medical monitoring in the form of environmental testing, clean-up, and medical tests as indicated by the results of the scientific evaluation.

179.  Plaintiffs seek this injunctive and equitable relief either in the form of an injunction requiring the Defendants to conduct the necessary monitoring themselves, or in the form of a court-ordered and court-supervised fund (with a court-appointed trustee if the court deems that appropriate) to provide for the necessary monitoring.

180.  Such injunctive and equitable relief will decrease the radioactive contamination risks of Plaintiffs' Property, decrease the interference with the use and enjoyment of said property, and further mitigate Plaintiffs' damages.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

## COUNT XIII – PUNITIVE DAMAGES

181.    Plaintiffs incorporate by reference all allegations of the preceding paragraphs as though fully set forth herein.

182.    Defendants committed one or more of the willful, wanton, malicious, reckless, and outrageous acts more fully set forth above which individually or cumulatively justify the award of punitive damages in this matter.

183.    Defendants knew or had information from which, in the exercise of ordinary care, should have known that such conduct, as detailed above, created a high degree of probability of injury to Plaintiffs.

184.    The willful, wanton, malicious, reckless, and outrageous acts of Defendants, as detailed above, evidence Defendants' complete indifference to and/or conscious disregard for the safety of Plaintiffs.

## PRAYER FOR RELIEF

**WHEREFORE**, as to each Count, and all Counts, Plaintiffs pray for judgment in favor of Plaintiffs and against Defendants Bridgeton Landfill, LLC, Rock Road Industries, Inc, Republic Services, Inc., Allied Services, L.L.C., and Cotter Corporation, as well as awarding the following to Plaintiffs and against Defendants:

A.  an award of actual, general, special, incidental, statutory, compensatory and consequential damages in an amount to be proven at trial, including compensatory damages for the loss and use of enjoyment of Plaintiffs' property; annoyance and discomfort; damage to Plaintiffs' personal property; the diminution in the market value of Plaintiffs' property; as well as the costs and expenses incurred as a result of Plaintiffs' exposure to radioactive emissions, including costs of remediation and relocation;

B. an award of double damages for malicious trespass as provided for under Mo. Rev. Stat. § 537.330;

C. an award of punitive and exemplary damages as fair and reasonable in an amount sufficient to punish Defendants and to deter similar conduct in the future;

D. costs and attorney fees;

E. interest on the above amounts as allowed by law, including but not limited to pre- and post-judgement interest;

F. for appropriate injunctive and equitable relief, including medical monitoring; and

G. for any further relief this Court deems just and proper.

Respectfully submitted,

*/s/ Stuart H. Smith*
Stuart H. Smith (LSBA 17805), *Pro Hac Vice*
Barry J. Cooper, Jr. (LSBA 27202), *Pro Hac Vice*
Celeste Brustowicz (LSBA 16835), *Pro Hac Vice*
Victor T. Cobb (LSBA 36830), *Pro Hac Vice*
**COOPER LAW FIRM, LLC**
1525 Religious Street
New Orleans, Louisiana 70130
Phone: 504-399-0009
Facsimile: 504-291-1352
E-mail: ssmith@sch-llc.com
        bcooper@sch-llc.com
        cbrustowicz@sch-llc.com
        vcobb@sch-llc.com
*ATTORNEYS FOR PLAINTIFFS,*
*MICHAEL AND ROBBIN DAILEY*

39

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

## CERTIFICATE OF SERVICE

I hereby certify that on April 29, 2019, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

/s/ Stuart H. Smith
Stuart H. Smith (LSBA 17805)

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No. 4:17-cv-00024-CDP |
| BRIDGETON LANDFILL, LLC, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR LEAVE TO**
**FILE A SECOND AMENDED COMPLAINT PURSUANT TO APRIL 8, 2019 ORDER**

Defendants Bridgeton Landfill, LLC (in its own right and as the merger successor to Rock Road Industries, Inc.); Republic Services, Inc.; and Allied Services, LLC (collectively, "Defendants"), for their Response to Plaintiffs' Motion for Leave to File a Second Amended Complaint (Doc. No. 157), state:

**I.    Introduction.**

Over two years ago, on April 21, 2017, Plaintiffs filed an Amended Complaint naming the Price-Anderson Act ("PAA"), 42 U.S.C. § 2011 *et seq.*, and explicitly pleading that their claims sound under the PAA. The Court ought not allow Plaintiffs to abandon their own positions regarding jurisdiction and the basis for their claims, on which both the Defendants and the Court have relied. Plaintiffs may be the "masters" of their own complaint but that does not allow them to plead a case, abandon it, plead a new case, attempt to abandon it, and plead yet another case. Plaintiffs' gamesmanship is impermissible and highly prejudicial to Defendants.

If Plaintiffs have a cause of action, it is under the PAA because their claim is for damage arising from radioactive material and they plead a nuclear incident. Plaintiffs sudden switch of tactics based on the claim that the material placed in the West Lake Landfill is allegedly "mill

tailings" is insufficient to take the case outside PAA. The waste is not, in fact, mill tailings. At a minimum, Defendants should be allowed to conduct discovery of the alleged "fact" that the material is mill tailings. Justice provides no basis for granting Plaintiffs' Motion; instead, it requires the Motion's denial.

If the Court does grant Plaintiff's' Motion it would implicitly hold that Plaintiffs' proposed state law claims do not bring a PAA claim that belong in federal court. The PAA determines not only the forum but also the standard of care. Remand decisions are generally unappealable without a determination for interlocutory appeal. Decisions of this District conflict with those of most Circuits which hold the PAA governs all claims of injury from radioactive material. Should this Court grant leave to amend, the Court should determine that its Order qualifies for interlocutory review to materially advance this litigation to allow appellate review of the PAA's preemptive scope.

## II. **Legal Standards**

Leave to file an amended complaint need only be "freely" granted "when justice so requires." Fed. R. Civ. P. 15 (a)(2). "A district court may deny leave to amend if there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Reuter v. Jax Ltd., Inc.*, 711 F.3d 918, 922 (8th Cir. 2013) (internal quotations omitted). The Eighth Circuit has upheld a district court's denial of motion to leave when numerous motions to dismiss had been briefed and decided and discovery was underway. *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1066 (8th Cir. 2005).

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

**III.** **Leave Must Not be Permitted Because It Is Highly Prejudicial to Allow Amendment At This Stage**

This untimely Motion must be denied because Plaintiffs' delay has created extreme and undue prejudice to the non-moving parties. Plaintiffs began this litigation with media fanfare in November, 2016. Defendants removed Plaintiffs' original complaint and fully briefed a motion to remand, moved to dismiss the original and then the amended complaint, won dismissal of the state-law claims in the amended complaint, filed answers and conducted substantial discovery on the specific claims plaintiffs had brought.

Plaintiffs obtained leave to explicitly plead a Price-Anderson Act claim on April 21, 2017, which Defendants answered and moved to dismiss. This Court granted Defendants' motion in part and dismissed the state-law claims. Doc. No. 89. On January 2, 2018, the Court entered a CMO guiding how discovery was to proceed. Doc. No. 102. The Court ordered discovery to proceed only on the issue of alleged contamination of Plaintiffs' property. The CMO was premised explicitly on Plaintiffs' decision to bring a PAA claim.[1] The parties then proceeded with discovery.

The case was well on its way to a dispositive motion when Plaintiffs, on March 27, 2018, filed a motion to amend, remand, and stay discovery. Doc. No. 123. Defendants have been stuck in limbo ever since. Before Plaintiffs' tactics halted progress in the case, the parties had exchanged written discovery, appeared before the Court, participated in meet and confers regarding discovery disputes, and scheduled and taken depositions. Defendants had already taken both Plaintiffs' depositions as well as two of Plaintiffs' experts and were in the throes of preparing dispositive motions.

---

[1] On March 6, 2018, the Court entered an Amended Case Management Order altering only the deadlines, not the substance of the Order. Doc. No. 119.

Undue prejudice arises because Plaintiffs seek to change the legal framework for their lawsuit. This is not a clarification of claims already in the suit; rather, it is a radical change which Plaintiff seek to parlay into a change the venue and jurisdiction in an order granting amendment that is ordinarily not subject to an appeal. Plaintiffs have already named these state-law causes of action, amended to add the PAA, and had these state-law causes of action dismissed. Allowing a *second* amendment that institutes claims this Court has already dismissed would be prejudicial to Defendants who have proceeded under the PAA claim for months and were in the midst of discovery and defense expert preparation to win the claim.

Further, Plaintiffs' request is tantamount to a motion for dismissal under Rule 41. As the Court itself noted, "I question the propriety of 'amending' the operative complaint to omit the only claim that remains pending and over which the Court has subject-matter jurisdiction – this essentially amounts to a dismissal." Doc. No. 156 at 3.

The Third Circuit recently upheld the denial of a plaintiff's motion to dismiss its PAA claims and remand to state court. *Estate of Ware v. Hosp. of the Univ. of Pennsylvania*, 871 F.3d 273, 285-86 (3d Cir. 2017), *cert. denied sub nom. Boyer v. Hosp. of the Univ. of Pennsylvania*, 138 S. Ct. 2018 (2018). The court concluded that dismissal would prejudice the defendants when the plaintiff waited to seek leave to amend until after an answer was filed and discovery was conducted. *Id*. Defendants adopt and incorporate by reference the additional arguments made by Defendant Cotter Corporation (N.S.L.) regarding Rule 41.

Additionally, as recently ordered, it is inappropriate for the Court to consider a motion to amend when the full proposed pleading has not been filed. Doc. No. 156 (citing *Popoalii v. Correctional Med. Servs.*, 512 F.3d 488, 497 (8th Cir. 2008)). Plaintiffs reference a declaration from Richard B. Stewart as Exhibit 1 to the proposed amendment, but they do not actually attach

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

it. *See* Doc. No. 157-1 at 6, n. 4. This declaration is an important part of the proposed complaint as Plaintiffs draw on it for two critical arguments – that the waste is mill tailings and a license or indemnification agreement is necessary. Without this exhibit, the proposed amendment is fatally incomplete. It is prejudicial to allow amendment when neither the Court nor Defendants have been provided the full pleading.

## IV.    Amendment is Futile Because the PAA Applies

### *A. Plaintiffs Have Already Conceded Their Claims Are Governed By the PAA*

If Plaintiffs are the masters of their complaint, then their own statements in the Amended Complaint must be respected. Plaintiffs were, in fact, correct when they repeatedly and affirmatively stated to the Court that PAA applies. The Amended Complaint explicitly pleads a PAA claim. In their Response to Defendants' Motion to Dismiss the Amended Complaint, Plaintiffs stated, "Plaintiffs Have Pled a Valid Price-Anderson Act Claim." Doc. No. 77 at 6. The entire 34-page filing defends Plaintiffs' pursuing a Price-Anderson Act cause of action. Plaintiffs' contention now that the PAA does not apply is illogical when Plaintiffs themselves brought the Act into this litigation and continue to plead a case for the same relief on the same facts merely under different headings.

Arguments in the Motion for Leave regarding involvement of counsel are nothing but distractions and excuses. The pleading is the party's, not the attorney's. To allow amendment every time a new counsel came in would create chaos and unfair prejudice and is contrary to the intention of the Rules of Civil Procedure to "secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1.

Plaintiffs' amendment was not "erroneous" (157 at ¶¶ 3, 5; 157-1 at 2-3); that implies some clerical mistake. Plaintiffs purposely filed the Amended Complaint affirmatively asserting

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

the PAA.  Thereafter, they defended the PAA claims against Defendants' Motions to Dismiss and filed dozens of pages with the Court regarding the validity of the claim.  Plaintiffs made a purposeful decision to plead the PAA and cannot now, two years later, wash their hands of it and argue they did not mean to file the cause of action.

What is more, counsel's claim that they are merely correcting prior counsel's errors is alarmingly misleading.  Plaintiffs' current lead counsel, the Cooper Law Firm has been named on the pleadings in this case since 2017.  The Firm and Mr. Barry Cooper were on the Motion for Leave to Amend filed April 20, 2017 (Doc. No. 68) and the Amended Complaint filed April 21, 2017 (Doc. No. 70).  Federal Rule of Civil Procedure 11(c) imposes duty on _any_ attorney, law firm, or party appearing on a pleading.  Thus, counsel has been involved well before "early 2018," as they represent to the Court. Doc. No. 157-1 at 2.  The Cooper Law Firm cannot pretend they had nothing to do with the amendment when they were on the pleading.

Plaintiffs' games must end.  As the Court already ruled, "The Daileys cannot have their cake and eat it too." Doc. No. 89 at 13.

### B.  The Plain Language of the PAA Demonstrates the Act Applies to Plaintiffs' Allegations

#### i.  The Act's Plain Meaning is Clear

The Court need not reach any analysis other than the plain meaning of the Act to find that Plaintiffs have artfully pleaded a PAA claim subject to determination in a federal forum.  When a statute's plain meaning is unambiguous, the court's inquiry begins and ends with the text. _Nat'l Ass'n of Mfrs. v. Dep't of Def._, 138 S. Ct. 617, 631 (2018).

As this Court has read in myriad briefing, the PAA completely preempts state law causes of action for injury resulting from radioactive material.  Through a series of definitions, the Act provides the federal courts "shall have original jurisdiction" over any suit for "any occurrence"

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

of bodily injury or property damage arising out of the hazardous properties of radioactive material.[2] *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186, 194 (5th Cir. 2011); 42 U.S.C. §§ 2210(n)(2); 2014(hh), (w), (q).

"Occurrence" is not further defined in the statute. Thus, the word must be given its ordinary meaning. *Lawson v. FMR LLC*, 571 U.S. 429, 440 (2014) (words should be interpreted with their ordinary meaning). "Occurrence" simply means "something that happens or takes place." Black's Law Dictionary (10th ed. 2014). Thus, a Price-Anderson claim is any happening that causes bodily injury or property damage due to radioactive material. *Carey v. Kerr-McGee Chem. Corp.*, 60 F. Supp. 2d 800, 805 (N.D. Ill. 1999).

The statute provides that a PAA claim "shall be removed" to the federal courts. 42 U.S.C. § 2014(n)(2). With that provision, Congress expressed "an unmistakable preference for a federal forum, at the behest of the defending party, both for litigating a Price–Anderson claim on the merits and for determining whether a claim falls under Price–Anderson when removal is contested." *El Paso Nat. Gas Co. v. Neztsosie*, 526 U.S. 473, 484 (1999). In 2018, the Eighth Circuit in *Halbrook v. Mallinckrodt, LLC*, 88 F.3d 971, 977 (8th Cir. 2018) ruled Congress "spoke clearly" when stating that a PAA cause of action arises under federal law and creates a federal cause of action. Defendants adopt and incorporate their prior briefing at Doc. No. 129 delving further into the case law.

---

[2] One of the materials the Act names is "source material," defined as "(1) uranium, thorium, or any other material which is determined by the Commission pursuant to the provisions of section 2091 of this title to be source material; or (2) ores containing one or more of the foregoing materials, in such concentration as the Commission may by regulation determine from time to time." § 2014(z). The waste deposited at the Westlake Landfill by Cotter was subject to an AEC-issued Source Material License.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

### ii.   § 2014(q) Does Not Limit the Act to Licensees or Indemnitees

Defendants are mindful of the Court's ruling in *Kitchin, et al. v. Bridgeton Landfill, LLC, et al.*, Case No. 4:18-cv-00672, in which the Court relied on § 2014(q)'s reference to 42 U.S.C. § 2210(c) and (d).  Sections 2210(c) and (d) govern indemnification of NRC licensees and Department of Energy contractors.  The clauses referring to § 2210(c) and (d) are not meant to narrow the entire definition of "nuclear incident."  Rather, they are guidance for how to read and apply "nuclear incident" in certain specified sections or circumstances.  Each clause begins with "*And provided further*, That as the term is used in [§ 2210 (c) and (d)], it shall include…" 42 U.S.C. § 2014(q) (emphasis in original).  By beginning the phrase with "as the term is used in" and then augmenting the definitions to "nuclear incident," Congress indicated it was not attempting to constrain the overall definition when the phrase is used in other portions of the PAA. *See TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (statute must be construed so no clause, sentence, or word is superfluous, void, or insignificant).  The whole should not limited by the part.  Rather, the Eighth Circuit's determination that "Congress spoke clearly" in making a PAA claim a federal cause of action should be followed.  *See Halbrook*, 88 F.3d at 977.

Multiple courts have held the statute is not limited to licensees or indemnification agreements. *Estate of Ware*, 871 F.3d 284; *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir. 2000); *Cotromano v. United Techs. Corp.*, 7 F. Supp. 3d 1253, 1259 (S.D. Fla. 2014); *Carey*, 60 F. Supp. 2d at 806; *O'Conner v. Commonwealth Edison Co.*, 807 F. Supp. 1376, 1378. (C.D. Ill. 1992), *aff'd,* 13 F.3d 1090 (7th Cir. 1994).

### iii.   Prior Eastern District of Missouri Cases Are Not Persuasive

Much ado has been made of *Banks v. Cotter Corp.*, No. 4:18-CV-00624 JAR, 2019 WL 1426259 (E.D. Mo. Mar. 29, 2019) and *Strong, et al. v. Republic Servs., Inc., et al.*, 283 F. Supp.

3d 759 (E.D. Mo. 2017). Notably, *Strong* did not conclude that a license or indemnification agreement is necessary; rather it believed there was case law on both sides and chose to apply a presumption in favor of remand. 283 F. Supp. 3d at 772.

*Strong*, on which *Banks* relies, centered its ruling largely on a Magistrate Judge's twenty-one-year-old ruling that has been overturned in its own Circuit. *Gilberg v. Stephan Co.*, 24 F. Supp. 325 (D.N.J. 1998) mistakenly limited the PAA definitions by ignoring the sweeping 1988 amendments to the Act after Three Mile Island and held an indemnification agreement was a jurisdictional requirement. The Third Circuit in *Estate of Ware*, 871 F. 3d at 283, held *Gilberg* was wrong because an indemnification agreement is <u>not</u> necessary "to trigger the Act's applicability." *Gilberg*'s holding on this point was also criticized by the *Acuna*, 200 F.3d at 339; *Cotromano*, 7 F. Supp. 3d at 1258; and *Carey*, 60 F. Supp. 3d at 806 decisions.

### iv. This Court Has Already Found Plaintiffs' Allegations Are Preempted by the PAA

Plaintiffs have, in fact, alleged a Price-Anderson Act claim in the proposed amendment. Attempts to disguise the claims as state-law claims are impermissible under the artful pleading doctrine. "A plaintiff may not avoid federal jurisdiction by omitting from the complaint federal law essential to his or her claim or by casting in state terms a claim that can be made only under federal law." *Franchise Tax Bd. v. Construction Laborers*, 463 U.S. 1, 22 (1983).

The state claims suggested now are no different than those in the prior pleading which the Court has found were preempted by the PAA.[3] The proposed second amendment and the Amended Complaint both claim injuries for bodily and property damage based on the hazardous properties of radioactive material that were subject to Cotter's Source Material License and

---

[3] The proposed amendment also misleadingly continues to selectively quote from *Adams*. Defendants adopt and incorporate their prior arguments regarding Plaintiffs' tactic at Doc. No. 129.

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

deposited in the Landfill. The only substantive difference between the two pleadings is Plaintiffs' addition of the inaccurate allegation that the waste at issue is "mill tailings." This claim is untrue and cannot be given credence, as outlined further in the following section.

Examining the facts, the Court dismissed the Amended Complaint's state-law claims as preempted by the PAA. Doc. No. 89. This Court found that "undoubtedly" these allegations based on radioactive contamination are governed and preempted by the PAA. Doc. No. 89 at 15 ("The Court notes that almost every paragraph of the amended complaint in these two state-law counts mentions the radioactive contamination….Undoubtedly, these allegations fall under the PAA's definition of 'nuclear incident…'"). Thus, the Court has already reviewed Plaintiffs' essential allegations and found that the very factual claims Plaintiffs now wish to replead are governed by the PAA.

### C. The Waste at the West Lake Landfill Is Subject To the PAA

#### i. Materials Are Not Mill Tailings

Plaintiffs are simply wrong in alleging the radioactive materials were unlicensed mill tailings outside the scope of the PAA. They add these baseless allegations in a blatant attempt to convince the Court they should be allowed to forum shop back to Missouri state court. Yet, the administrative record of the federal government's oversight of the West Lake Landfill is replete with statements that the Superfund site is not a uranium mill tailings site. In 2018, the Environmental Protection Agency stated, "The West Lake Landfill OU-1 Site is not a designated Title I uranium mill tailings site[.]" **Exhibit 1** at 277 (EPA 2018 Amended Record of Decision Appendix D-1). The EPA also concludes that the Uranium Mill Tailings Radiation Control Act does not govern the site. *Id*. In their 2008 Responsiveness Summary, the EPA went on to

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

pointedly state, "Areas 1 and 2 [of West Lake Landfill] do not resemble tailings piles or impoundments." **Exhibit 2** at 33-34 (EPA 2008 West Lake OU-1 Responsiveness Summary).

### ii. PAA Applies Because Material Was Licensed by AEC as Source Material

The PAA governs source material. Source material is defined as, "(1) Uranium or thorium, or any combination thereof, in any physical or chemical form or (2) ores which contain by weight one-twentieth of one percent (0.05%) or more of: (i) Uranium, (ii) thorium or (iii) any combination thereof. 10 CFR 40.4; *see also* 42 U.S.C. § 2014(z). Uranium processing is part of the nuclear industry that the PAA governs. *See Acuna*, 200 F.3d at 340; *Kerr-McGee Corp. v. Farley*, 115 F.3d 1498. The estimated 8,700 tons of leached barium sulfate residue that Cotter disposed at West Lake contained an estimated 7 tons of Uranium, or 0.08%. The Atomic Energy Commission (AEC) issued a Source Material License to Cotter for possession of an unlimited amount of uranium from December 3, 1969 to December 31, 1974. Defendants received the AEC-licensed waste directly from trucks hired by Cotter, an AEC-licensed entity.

It is important to understand that the Source Material License attached to the material itself, not to the licensee or to the location of the material (in this case, Latty Avenue). The fact that the AEC issued a Source Material License for these materials proves that the AEC understood these materials to be subject to its jurisdiction. Thus, injuries allegedly resulting from activities under the License, including disposal of the waste, are governed by the PAA.

Cotter's license also applies to Plaintiffs' allegations because the material was subject to the License, i.e. the License was still attached to the material, when disposal at the West Lake Landfill occurred. When seeking to terminate the License, Cotter certified that the material was lawfully disposed. Doc. No. 129-3 (Application for Termination of Source Material License SUB-1022). In reliance on that representation, the government terminated the License. Doc. No.

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

129-2 (Feingold Decl. ¶ 6, Ex. E).  Thus, Cotter's License, and the waste governed by that License and deposited in the West Lake Landfill, is subject to the PAA, and is the origin of Plaintiffs' allegations. Attempting to plead it another way, or call it a different name does not circumvent PAA jurisdiction.

### iii.   Stewart Declaration is Impermissible

Further, Plaintiffs' inaccurate claims are founded on the impermissible Stewart declaration that was not filed with the Court.  Plaintiffs claim that the Stewart declaration they intend to include is dated April 24, 2018.  For the sake of efficiency and for purposes of this argument only, Defendants will assume it is the declaration filed on April 24, 2018 at Doc. No. 135-3.  Defendants adopt and incorporate their arguments against the declaration developed at Doc. No. 139.

Defendants further state that Stewart improperly conflates the PAA and Uranium Mill Tailings Radiation Control Act ("UMTRCA").  As outlined *supra*, the West Lake Landfill is not a designated mill tailings site. **Ex. 1** at 277.  The UMTRCA definition of mill tailings does not apply at the West Lake Landfill.  Under the plain language of the PAA, the material in the West Lake Landfill is source material.  Stewart's attempt to redefine the material as mill tailings pursuant to UMTRCA is irrelevant and misleading.

### iv.   At a Minimum, Discovery Should be Permitted Prior to a Ruling

At the least, prior to granting this Motion, the Court should allow discovery into this issue whether the waste is mill tailings because it is potentially critical to the future of this case. The parties should not be subjected to remand orders which are only rarely appealable based on unsupported and false allegations.  Defendants should, at a minimum, be provided to the opportunity to prove to the Court that Plaintiffs' allegations are merely a game to avoid federal

jurisdiction.  Further, Defendants deserve to be able to depose and inquire of Mr. Stewart before the Court unquestioningly accepts his conclusions.

## V.    The Court Should Certify Its Ruling for Interlocutory Review

This case is a strong case for interlocutory appeal under 28 U.S.C. § 1292(b).  As detailed here and in the multiple briefings filed before the Court, there is ample case law supporting the PAA's preemptive scope.  If for any reason the Court is inclined to grant leave, the decision will necessarily rest on a determination that Plaintiffs may pursue state law claims and forgo the PAA and, hence, that the PAA does not preempt state law.  Thus, the decision will involve a controlling question of law as to which there is substantial ground for difference of opinion.

Application of the PAA is a critical question as it determines not only the venue and jurisdiction but also the standard of care. *See, e.g.*, *Roberts v. Fla. Power & Light Co.*, 146 F.3d 1305, 1308 (11th Cir. 1998); *O'Conner v. Commonwealth Edison*, 13 F.3d at 1090, 1105 (7th Cir. 1994); *In re TMI Litig. Cases Consol. II*, 940 F.2d 832, 859-60 (3d Cir. 1991); *McClurg v. MI Holdings, Inc.*, 933 F. Supp. 2d 1179, 1187 (E.D. Mo. 2013); *Corcoran v. New York Power Authority,* 935 F. Supp. 376, 387 (S.D.N.Y. 1996); *Carey*, 60 F. Supp. 2d at 807-08.

The scope of the PAA's application to numerous cases in this District has repeatedly evaded review. *See Banks v. Cotter Corp.*, No. 4:18-CV-00624 JAR, 2019 WL 1426259 (E.D. Mo. Mar. 29, 2019) (remand order); *Marc Czapla, et al. v. Republic Servs., Inc., et al.* E.D.Mo. Case No. 4:18-cv-00357-JAR Doc. No. 41 (remand order); *Strong, et al. v. Republic Servs., Inc., et al.*, 283 F. Supp. 3d 759 (E.D. Mo. 2017) (remand order).[4]  Plaintiffs have stated they will

---

[4] This Court in *John C. Kitchin et al. v. Bridgeton Landfill, LLC, et al.*, Case No. 4:18-cv-00672-CDP, also ruled on the scope of the PAA and remanded the case.  The complete remand order in that case is appealable under 28 U.S.C. §§ 1453(c) and 1291 because of the Class Action Fairness Act issues raised in that case.  Defendants are filing a Petition for Permission to Appeal and a Notice of Appeal in *Kitchin* today.

Electronically Filed - St. Louis County - April 20, 2020 - 07:09 PM

move to remand if the Court allows amendment. Doc. No. 157-1 at 1. Hence, granting leave to amend may set the stage for an unappealable remand order. An immediate appeal of the order would materially advance the litigation by providing appellate determination of the PAA's scope. Allowing the Court's order to be appealed would also help resolve the conflict between the Eastern District of Missouri cases and the decisions detailed above ruling regarding the PAA's broad preemptive scope.

## VI.   <u>Conclusion</u>

This case has proceeded for far too long to allow Plaintiffs to make an about-face and dismiss their PAA claim. Defendants will suffer undue prejudice if Plaintiffs are permitted to disavow Plaintiffs' own admissions that the PAA applies to their factual allegations. Although carefully pleaded to avoid it, Plaintiffs do, in fact, make a PAA claim in the proposed amendment. Both this version of Plaintiffs' litigation strategy and the prior version are the same: injuries allegedly caused by AEC-licensed radioactive waste deposited at the West Lake Landfill by an AEC-licensed entity. These facts were reviewed by the Court when it held the PAA preempts state law and dismissed the very claims the Plaintiffs now seek to revive. The PAA's plain language also makes clear that the Act applies to Plaintiffs' allegations because they seek recovery for bodily and property damage for harm from radioactive material. Plaintiffs' attempts to plead that the waste at issue is "mill tailings" is an attempt to forum shop and not founded in truth. These ploys cannot continue unchecked by the Court. Should the Court find Plaintiffs may amend their pleading, it should allow the matter to be an interlocutory appeal to materially advance the litigation for all parties.

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Dated: May 20, 2019

Respectfully submitted,

/s/ *William G. Beck*
_____
William G. Beck (26849MO)
Peter F. Daniel (33798MO)
Allyson E. Cunningham (64802MO)
2345 Grand Boulevard, Suite 2200
Kansas City, Missouri 64108
(816) 292-2000 (telephone)
(816) 292-2001 (facsimile)
wbeck@lathropgage.com
pdaniel@lathropgage.com
acunningham@lathropgage.com

Patricia Lehtinen Silva (67213MO)
Pierre Laclede Center
7701 Forsyth Boulevard, Suite 500
Clayton, Missouri 63105
(314) 613-2800 (telephone)
(314) 613-2801 (facsimile)
psilva@lathropgage.com

ATTORNEYS FOR DEFENDANTS

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2019, I electronically filed the foregoing document via the Court's CM/ECF system, which will serve notice on all counsel of record.

/s/ *William G. Beck*
_____

Electronically Filed - St Louis County - April 20, 2020 - 07:09 PM

Based on the Supreme Court Rules governing eFiling, an eService email has been issued to the following parties:


SERVICE PARTY:    BRIAN OCONNOR WATSON, Attorney for Defendant
SERVICE EMAIL:    bwatson@rshc-law.com


SERVICE PARTY:    RYAN A. KEANE, Attorney for Plaintiff
SERVICE EMAIL:    ryan@keanelawllc.com


SERVICE PARTY:    ERIN LYNN BROOKS, Attorney for Defendant
SERVICE EMAIL:    erin.brooks@bryancave.com


SERVICE PARTY:    DANIEL TIMOTHY DEFEO, Attorney for Plaintiff
SERVICE EMAIL:    ddefeo@defeolaw.com


SERVICE PARTY:    ANTHONY DOUGLAS GRAY, Attorney for Plaintiff
SERVICE EMAIL:    gray.lawyer1@gmail.com, agray@johnsongraylaw.com, ejones@stannmo.org

**Query**    **Reports**    **Utilities**    **Help**    **Log Out**

CLOSED,REMAND,TRCK3

# U.S. District Court
## Eastern District of Missouri (St. Louis)
## CIVIL DOCKET FOR CASE #: 4:17-cv-00024-CDP

Dailey et al v. Bridgeton Landfill, LLC et al                    Date Filed: 01/06/2017
Assigned to: District Judge Catherine D. Perry              Date Terminated: 03/23/2020
Case in other court: Circuit Court St. Louis County 21st Judicial    Jury Demand: Both
                                    Circu, 16SL-CC04240              Nature of Suit: 890 Other Statutory Actions
Cause: 28:1441 Petition for Removal                          Jurisdiction: Federal Question

**Plaintiff**

**Michael Dailey**                              represented by    **Barry James Cooper , Jr.**
                                                                COOPER LAW FIRM, LLC
                                                                508 St. Philip St.
                                                                New Orleans, LA 70116
                                                                504-566-1558
                                                                Fax: 504-581-9055
                                                                Email: Bcooper@sch-LLC.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Celeste Brustowicz**
                                                                THE COOPER LAW FIRM, LLC
                                                                1525 Religious St.
                                                                New Orleans, LA 70130
                                                                949-315-9075
                                                                Email: cbrustowicz@clfnola.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Stuart H. Smith**
                                                                COOPER LAW FIRM, LLC
                                                                1525 Religious St.
                                                                New Orleans, LA 70130
                                                                504-566-1558
                                                                Fax: 504-581-9055
                                                                Email: ssmith@sch-llc.com
                                                                *LEAD ATTORNEY*
                                                                *ATTORNEY TO BE NOTICED*

                                                                **Victor T. Cobb**
                                                                COOPER LAW FIRM, LLC
                                                                1525 Religious St.
                                                                New Orleans, LA 70130
                                                                504-399-0009
                                                                Email: vcobb@sch-llc.com
                                                                *LEAD ATTORNEY*

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

*ATTORNEY TO BE NOTICED*

**Daniel T. DeFeo**
THE DEFEO LAW FIRM
1627 Main St.
Suite 900
Kansas City, MO 64108
816-581-4600
Fax: 816-581-4646
Email: ddefeo@defeolaw.com
*TERMINATED: 02/21/2018*

**Michael G. Stag**
SMITH STAG, LLC
365 Canal Street
Suite 2850
New Orleans, LA 70130
504-593-9600
Fax: 504-593-9601
Email: mstag@smithstag.com
*TERMINATED: 02/21/2018*

**Michaela G. Spero**
HAUSFELD LLP
1700 K Street NW
Suite 650
Washington, DC 20006
202-540-7200
Fax: 202-540-7201
Email: mspero@hausfeld.com
*TERMINATED: 12/22/2017*

**Richard S. Lewis**
HAUSFELD LLP
1700 K Street NW
Suite 650
Washington, DC 20006
202-540-7200
Fax: 202-540-7201
Email: rlewis@hausfeld.com
*TERMINATED: 12/22/2017*

**Steven J. Stolze**
HOLLAND LAW FIRM LLC
300 N. Tucker Blvd.
Suite 801
St. Louis, MO 63101
314-640-7550
Fax: 314-241-5554
Email: stevenstolze@sbcglobal.net
*TERMINATED: 02/21/2018*

**Swathi Bojedla**
HAUSFELD LLP

1700 K Street NW
Suite 650
Washington, DC 20006
202-540-7200
Fax: 202-540-7201
Email: sbojedla@hausfeld.com
*TERMINATED: 12/22/2017*

**Plaintiff**

**Robbin Dailey**                                    represented by    **Barry James Cooper , Jr.**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Celeste Brustowicz**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stuart H. Smith**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Victor T. Cobb**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Daniel T. DeFeo**
(See above for address)
*TERMINATED: 02/21/2018*

**Michael G. Stag**
(See above for address)
*TERMINATED: 02/21/2018*

**Michaela G. Spero**
(See above for address)
*TERMINATED: 12/22/2017*

**Richard S. Lewis**
(See above for address)
*TERMINATED: 12/22/2017*

**Steven J. Stolze**
(See above for address)
*TERMINATED: 02/21/2018*

**Swathi Bojedla**
(See above for address)
*TERMINATED: 12/22/2017*

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

V.

**Defendant**

**Bridgeton Landfill, LLC**                    represented by   **Allyson Elisabeth Cunningham**
LATHROP GPM LLP
2345 Grand Boulevard
Suite 2200
Kansas City, MO 64108
816-460-5116
Email:
allyson.cunningham@lathropgpm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia L. Silva**
LATHROP GPM LLP
7701 Forsyth Boulevard
Suite 500
Clayton, MO 63105
314-613-2500
Fax: 314-613-2550
Email: PSilva@lathropgage.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter F. Daniel**
LATHROP GPM LLP
2345 Grand Boulevard
Suite 2200
Kansas City, MO 64108
816-460-5702
Fax: 816-292-2001
Email: peter.daniel@lathropgpm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G. Rooney**
SHOOK HARDY, LLP
2555 Grand Blvd.
Kansas City, MO 64108
816-559-2846
Fax: 816-421-5547
Email: rrooney@shb.com
*TERMINATED: 03/18/2019*
*LEAD ATTORNEY*

**William Garland Beck**
LATHROP GPM LLP
2345 Grand Boulevard
Suite 2200
Kansas City, MO 64108
816-728-8061
Fax: 816-292-2001
Email: william.beck@lathropgpm.com

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Republic Services, Inc.**      represented by **Allyson Elisabeth Cunningham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia L. Silva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter F. Daniel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G. Rooney**
(See above for address)
*TERMINATED: 03/18/2019*
*LEAD ATTORNEY*

**William Garland Beck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Allied Services L.L.C.**      represented by **Allyson Elisabeth Cunningham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia L. Silva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter F. Daniel**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G. Rooney**
(See above for address)
*TERMINATED: 03/18/2019*
*LEAD ATTORNEY*

**William Garland Beck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Rock Road Industries, Inc.**                   represented by  **Allyson Elisabeth Cunningham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patricia L. Silva**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Robert G. Rooney**
(See above for address)
*TERMINATED: 03/18/2019*
*LEAD ATTORNEY*

**William Garland Beck**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mallinckrodt LLC**                             represented by  **David R. Erickson**
*TERMINATED: 03/20/2018*                                         SHOOK HARDY, LLP
2555 Grand Blvd.
Kansas City, MO 64108
816-474-6550
Fax: 816-421-5547
Email: derickson@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Steven D. Soden**
SHOOK HARDY, LLP
2555 Grand Blvd.
Kansas City, MO 64108
816-474-6550
Fax: 816-421-5547
Email: ssoden@shb.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**MI Holdings Inc.**                             represented by  **David R. Erickson**
*TERMINATED: 04/21/2017*                                         (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Cotter Corporation N.S.L.**                    represented by  **Brian O'Connor Watson**
RILEY SAFER LLP
70 W. Madison

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Suite 2900
Chicago, IL 60602
(312) 471-8776
Fax: (312) 471-8701
Email: bwatson@rshc-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dale A. Guariglia**
BRYAN CAVE LLP - St Louis
One Metropolitan Square
211 N. Broadway
Suite 3600
St. Louis, MO 63102
314-259-2606
Fax: 314-552-8606
Email: daguariglia@bclplaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John McGahren**
MORGAN AND LEWIS, LLP
502 Carnegie Center
Princeton, NJ 08540-6241
609-919-6600
Email: jmcgahren@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Stephanie Feingold**
MORGAN AND LEWIS, LLP
502 Carnegie Center
Princeton, NJ 08540-6241
609-919-6643
Fax: 609-919-6701
Email:
stephanie.feingold@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Su Jin Kim**
MORGAN AND LEWIS LLP
1701 Market Street
Phildelphia, PA 19103
215-963-1738
Fax: 215-963-5001
Email: su.kim@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Erin Lynn Brooks**
BRYAN CAVE LLP - St Louis
One Metropolitan Square
211 N. Broadway

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Suite 3600
St. Louis, MO 63102
314-259-2393
Fax: 314-259-2020
Email: erin.brooks@bclplaw.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Commonwealth Edison Company**         represented by   **Dale A. Guariglia**
*TERMINATED: 04/21/2017*                                 (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **John McGahren**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Stephanie Feingold**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Erin Lynn Brooks**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Exelon Corporation**                  represented by   **Dale A. Guariglia**
*TERMINATED: 04/21/2017*                                 (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **John McGahren**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Stephanie Feingold**
                                                         (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

                                                         **Erin Lynn Brooks**
                                                         (See above for address)
                                                         *ATTORNEY TO BE NOTICED*

**Defendant**

**Mallinckrodt Inc.**                   represented by   **David R. Erickson**
*TERMINATED: 04/21/2017*                                 (See above for address)
                                                         *LEAD ATTORNEY*
                                                         *ATTORNEY TO BE NOTICED*

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

| Date Filed | # | Docket Text |
|---|---|---|
| 01/06/2017 | 1 | NOTICE OF REMOVAL from Circuit Court for 21st Judicial Circuit, case number 16SL-cc04240, with receipt number 0865-5752287, in the amount of $400 Jury Demand,, filed by Cotter Corporation N.S.L.. (Attachments: # 1 Civil Cover Sheet, # 2 Original Filing Form, # 3 Exhibit Exhibit A, # 4 Exhibit Exhibit B, # 5 Exhibit Exhibit C, # 6 Exhibit Exhibit D)(Guariglia, Dale) (Attachment 1 replaced on 1/9/2017) (MFG). (Entered: 01/06/2017) |
| 01/06/2017 | 2 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Cotter Corporation N.S.L.. Parent companies: General Atomics Uranium Resources, LLC,. (Guariglia, Dale) (Entered: 01/06/2017) |
| 01/06/2017 | 3 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Cotter Corporation N.S.L. Sent To: Plaintiff (Guariglia, Dale) (Entered: 01/06/2017) |
| 01/06/2017 | 4 | Consent to Removal by Defendant MI Holdings Inc.. (Erickson, David) (Entered: 01/06/2017) |
| 01/06/2017 | 5 | Consent to Removal by Defendant Mallinckrodt Inc.. (Erickson, David) (Entered: 01/06/2017) |
| 01/06/2017 | 6 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendants MI Holdings Inc., Mallinckrodt Inc.. Publicly held company: Mallinckrodt plc,. (Erickson, David) (Entered: 01/06/2017) |
| 01/06/2017 | 7 | Consent to Removal by Defendant Allied Services L.L.C.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 8 | Consent to Removal by Defendant Bridgeton Landfill, LLC. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 9 | Consent to Removal by Defendant Republic Services, Inc.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 10 | Consent to Removal by Defendant Rock Road Industries, Inc.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 11 | DEMAND for Trial by Jury by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 12 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Allied Services L.L.C... (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 13 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Bridgeton Landfill, LLC.. (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 14 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Republic Services, Inc... (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 15 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Rock Road Industries, Inc... (Beck, William) (Entered: 01/06/2017) |
| 01/06/2017 | 17 | Petition (Removal/Transfer) Received From: St. Louis County Circuit Court, filed by Michael Dailey, Robbin Dailey.(MFG) (Entered: 01/09/2017) |
| 01/09/2017 | 16 | ENTRY of Appearance by Erin Lynn Brooks for Defendant Cotter Corporation N.S.L.. (Brooks, Erin) (Entered: 01/09/2017) |
| 01/09/2017 | | Case Opening Notification: All parties must file the Notice Regarding Magistrate Judge |

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

| | | |
|---|---|---|
| | | Jurisdiction Form consenting to or opting out of the Magistrate Judge jurisdiction. Click here for the instructions. and all non-governmental organizational parties (corporations, limited liability companies, limited liability partnerships) must file Disclosure of Organizational Interests Certificate (moed-0001.pdf). Judge Assigned: Honorable Shirley P. Mensah. (MFG) (Entered: 01/09/2017) |
| 01/09/2017 | 18 | Pursuant to Local Rule 2.08, the assigned/referred magistrate judge is designated and authorized by the court to exercise full authority in this assigned/referred action or matter under 28 U.S.C. Sec. 636 and 18 U.S.C Sec. 3401. (CSAW) (Entered: 01/09/2017) |
| 01/10/2017 | 19 | NOTICE OF FILING NOTICE OF REMOVAL filed by Defendant Cotter Corporation N.S.L. *Notice of Removal Filed with State Court* Sent To: State Court - Executed (Attachments: # 1 Exhibit)(Brooks, Erin) (Entered: 01/10/2017) |
| 01/12/2017 | 20 | NOTICE Consent to Removal: by Defendant Exelon Corporation re 1 Notice of Removal Petition, (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 21 | NOTICE Consent to Removal: by Defendant Commonwealth Edison Company re 1 Notice of Removal Petition, (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 22 | CJRA ORDER (GJL). IT IS HEREBY ORDERED that the above styled case is randomly reassigned from Magistrate Judge Shirley P. Mensah to District Judge Catherine D. Perry. In all future documents filed with the Court, please use the following case number 4:16CV1407 CDP. (ARL) (Entered: 01/12/2017) |
| 01/12/2017 | 23 | ENTRY of Appearance by Erin Lynn Brooks for Defendants Commonwealth Edison Company, Exelon Corporation. (Brooks, Erin) (Entered: 01/12/2017) |
| 01/12/2017 | 24 | ENTRY of Appearance by Dale A. Guariglia for Defendants Commonwealth Edison Company, Exelon Corporation. (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 25 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Commonwealth Edison Company. Parent companies: Exelon Energy Delivery Company, LLC, Subsidiaries: RITELine Illinois, LLC, Publicly held company: None,. (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 26 | DISCLOSURE OF ORGANIZATIONAL INTERESTS CERTIFICATE by Defendant Exelon Corporation. Parent companies: None, Subsidiaries: None, Publicly held company: None,. (Guariglia, Dale) (Entered: 01/12/2017) |
| 01/12/2017 | 27 | Joint MOTION to Transfer Case to Judge Audrey G. Fleissig by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 01/12/2017) |
| 01/13/2017 | 28 | MOTION to Dismiss Case *and Memorandum in Support* by Defendants MI Holdings Inc., Mallinckrodt Inc.. (Erickson, David) (Entered: 01/13/2017) |
| 01/13/2017 | 29 | ANSWER to Complaint by Allied Services L.L.C..(Beck, William) (Entered: 01/13/2017) |
| 01/13/2017 | 30 | ANSWER to Complaint by Bridgeton Landfill, LLC.(Beck, William) (Entered: 01/13/2017) |
| 01/13/2017 | 31 | ANSWER to Complaint by Republic Services, Inc..(Beck, William) (Entered: 01/13/2017) |
| 01/13/2017 | 32 | ANSWER to Complaint by Rock Road Industries, Inc..(Beck, William) (Entered: 01/13/2017) |
| 01/13/2017 | 33 | JOINT MOTION to Dismiss Case *and Memorandum in Support* by Defendants Allied |

| | | |
|---|---|---|
| | | Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Guariglia, Dale) Modified on 1/17/2017 (CBL). (Entered: 01/13/2017) |
| 01/13/2017 | 34 | MOTION to Dismiss Case by Defendants Commonwealth Edison Company, Exelon Corporation. (Attachments: # 1 Exhibit Declaration of Scott N. Peters, # 2 Exhibit Declaration of Bruce G. Wilson)(Guariglia, Dale) (Entered: 01/13/2017) |
| 01/17/2017 | 35 | ENTRY of Appearance by William Garland Beck for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 01/17/2017) |
| 01/17/2017 | 36 | ENTRY of Appearance by Robert G. Rooney for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 01/17/2017) |
| 01/17/2017 | 37 | ENTRY of Appearance by Allyson Elisabeth Cunningham for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Cunningham, Allyson) (Entered: 01/17/2017) |
| 01/17/2017 | 38 | ENTRY of Appearance by Patricia L. Silva for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Silva, Patricia) (Entered: 01/17/2017) |
| 01/17/2017 | 39 | First MOTION for Leave to Appear Pro Hac Vice Stephanie Feingold. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5764575) by Defendant Cotter Corporation N.S.L.. (Attachments: # 1 Certificate of Good Standing Certificate for Stephanie Feingold)(Feingold, Stephanie) (Entered: 01/17/2017) |
| 01/17/2017 | 40 | First MOTION for Leave to Appear Pro Hac Vice John McGahren. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5764681) by Defendants Commonwealth Edison Company, Cotter Corporation N.S.L., Exelon Corporation. (Attachments: # 1 Certificate of Good Standing Certificate for John McGahren)(McGahren, John) (Entered: 01/17/2017) |
| 01/17/2017 | 41 | AMENDED MOTION for Leave to Appear Pro Hac Vice Stephanie Feingold. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5764786) by Defendants Cotter Corporation N.S.L., Commonwealth Edison Company, Exelon Corporation. (Attachments: # 1 Certificate of Good Standing Certificate for Stephanie Feingold)(Feingold, Stephanie) Modified on 1/18/2017 (CBL). (Entered: 01/17/2017) |
| 01/18/2017 | 42 | Consent MOTION for Extension of Time to File Response/Reply as to 34 MOTION to Dismiss Case , 33 MOTION to Dismiss Case *and Memorandum in Support*, 27 Joint MOTION to Transfer Case to Judge Audrey G. Fleissig, 28 MOTION to Dismiss Case *and Memorandum in Support* by Plaintiffs Michael Dailey, Robbin Dailey. (Stolze, Steven) (Entered: 01/18/2017) |
| 01/18/2017 | 43 | MOTION for Leave to Appear Pro Hac Vice Richard S. Lewis. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5767364) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Lewis, Richard) (Entered: 01/18/2017) |
| 01/19/2017 | 44 | Docket Text ORDER: Re: [40, 41, 43] MOTIONS for Leave to Appear Pro Hac Vice John McGahren, Stephanie Feingold, Richard S. Lewis: ORDERED GRANTED; 39 First MOTION for Leave to Appear Pro Hac Vice Stephanie Feingold: ORDERED DENIED AS MOOT; 42 Consent MOTION for Extension of Time to File Response/Reply to |

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

| | | |
|---|---|---|
| | | various motions : ORDERED GRANTED.. Signed by District Judge Catherine D. Perry on 1/19/17. (CDP) (Entered: 01/19/2017) |
| 02/03/2017 | 45 | MOTION for Leave to Appear Pro Hac Vice Michael G. Stag. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5793529) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing #1)(Stag, Michael) (Entered: 02/03/2017) |
| 02/03/2017 | 46 | Docket Text ORDER: Re: 45 MOTION for Leave to Appear Pro Hac Vice Michael G. Stag; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/3/17. (CDP) (Entered: 02/03/2017) |
| 02/03/2017 | 47 | Consent MOTION for Leave to File in Excess of Page Limitation by Plaintiffs Michael Dailey, Robbin Dailey. (DeFeo, Daniel) (Entered: 02/03/2017) |
| 02/06/2017 | 48 | (MOTION WITHDRAWN PER ORDER 67 DATED 4/6/17) MOTION to Remand Case to State Court by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14)(Lewis, Richard) Modified on 4/6/2017 (EAB). (Entered: 02/06/2017) |
| 02/06/2017 | 49 | Docket Text ORDER: Re: 47 Consent MOTION for Leave to File in Excess of Page Limitation; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/6/17. (CDP) (Entered: 02/06/2017) |
| 02/07/2017 | 50 | Consent MOTION for Leave to Modify the Briefing Schedule on Defendants' Motions to Dismiss by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) (Entered: 02/07/2017) |
| 02/07/2017 | 51 | Docket Text ORDER: Re: 50 Consent MOTION to Modify the Briefing Schedule on Defendants' Motions to Dismiss; ORDERED GRANTED; responses to motions to dismiss will be due 21 days after the Court rules on the Motion to Remand. Signed by District Judge Catherine D. Perry on 2/7/17. (CDP) (Entered: 02/07/2017) |
| 02/08/2017 | 52 | RESPONSE in Opposition re 27 Joint MOTION to Transfer Case to Judge Audrey G. Fleissig filed by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) (Entered: 02/08/2017) |
| 02/09/2017 | 53 | First MOTION for Extension of Time to File Response/Reply as to 48 MOTION to Remand Case to State Court by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 02/09/2017) |
| 02/09/2017 | 54 | Amended MOTION for Extension of Time to File by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 02/09/2017) |
| 02/09/2017 | 55 | Docket Text ORDER: Re: 54 Amended MOTION for Extension of Time to File respone to motion to remand ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/9/17. (CDP) (Entered: 02/09/2017) |
| 02/14/2017 | 56 | MOTION for Leave to Appear Pro Hac Vice Michaela G. Spero. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5811844) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Spero, Michaela) (Entered: 02/14/2017) |
| 02/15/2017 | 57 | JOINT REPLY MEMORANDUM in Support of Motion re 27 Joint MOTION to Transfer Case to Judge Audrey G. Fleissig filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Commonwealth Edison Company, Cotter Corporation N.S.L., Exelon |

| | | |
|---|---|---|
| | | Corporation, MI Holdings Inc., Mallinckrodt Inc., Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) Modified on 2/16/2017 (CBL). (Entered: 02/15/2017) |
| 02/16/2017 | 58 | Docket Text ORDER: Re: 56 MOTION for Leave to Appear Pro Hac Vice Michaela G. Spero by Plaintiffs Michael Dailey, Robbin Dailey. ORDERED: GRANTED. Signed by District Judge Catherine D. Perry on 2/16/2017. (CBL) (Entered: 02/16/2017) |
| 02/16/2017 | 59 | ORDER. I have fully considered the arguments raised by the parties in the motion to transfer this case to another judge of this district. No party has the right to have a case assigned to any particular judge of this court, and the random assignment of cases serves the interests of justice. Accordingly, IT IS HEREBY ORDERED that defendants' motion to transfer this case to the Honorable Audrey G. Fleissig 27 is denied. Signed by District Judge Catherine D. Perry on 2/16/2017. (CBL) (Entered: 02/16/2017) |
| 02/21/2017 | 60 | MOTION for Leave to Appear Pro Hac Vice Swathi Bojedla. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-5820974) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Bojedla, Swathi) (Entered: 02/21/2017) |
| 02/21/2017 | 61 | Docket Text ORDER: Re: 60 MOTION for Leave to Appear Pro Hac Vice Swathi Bojedla; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/21/17. (CDP) (Entered: 02/21/2017) |
| 02/24/2017 | 62 | Consent MOTION for Extension of Time to File Response/Reply *to Defendants' Response to Plaintiffs' Motion to Remand* by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) (Entered: 02/24/2017) |
| 02/24/2017 | 63 | Docket Text ORDER: Re: 62 Consent MOTION for Extension of Time to File Response/Reply ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/24/17. (CDP) (Entered: 02/24/2017) |
| 02/27/2017 | 64 | MEMORANDUM in Opposition re 48 MOTION to Remand Case to State Court filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Commonwealth Edison Company, Cotter Corporation N.S.L., Exelon Corporation, MI Holdings Inc., Mallinckrodt Inc., Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Affidavit Declaration of Stephanie Feingold in Support of Opposition to Motion to Remand, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G)(McGahren, John) (Entered: 02/27/2017) |
| 03/16/2017 | 65 | REPLY to Response to Motion re 48 MOTION to Remand Case to State Court filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1)(Lewis, Richard) (Entered: 03/16/2017) |
| 04/05/2017 | 66 | MOTION to Withdraw 48 MOTION to Remand Case to State Court by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Text of Proposed Order)(Stag, Michael) (Entered: 04/05/2017) |
| 04/06/2017 | 67 | ORDER. IT IS HEREBY ORDERED that plaintiffs' motion to withdraw their motion to remand [Doc No. 66 ] is granted. Plaintiffs have twenty-one (21) days from the date of this order to file a response to the motions to dismiss. Signed by District Judge Catherine D. Perry on 4/6/17. (EAB) (Entered: 04/06/2017) |
| 04/20/2017 | 68 | MOTION for Leave to File Amended Complaint and Modify the Briefing Schedule for Responsive Pleadings and/or Motions to Dismiss (Unopposed) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1 - First Amended Complaint)(Lewis, Richard) (Entered: 04/20/2017) |
| 04/21/2017 | 69 | Docket Text ORDER: Re: 68 MOTION for Leave to File Amended Complaint and Modify the Briefing Schedule for Responsive Pleadings and/or Motions to Dismiss |

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

| | | |
|---|---|---|
| | | (Unopposed) : ORDERED GRANTED; amended complaint deemed filed today; original motions to dismiss [28, 33, 34] denied as moot without prejudice to defendants' right to file motions to dismiss directed to amended complaint within 21 days. Signed by District Judge Catherine D. Perry on 4/21/17. (CDP) (Entered: 04/21/2017) |
| 04/21/2017 | 70 | AMENDED COMPLAINT against defendant Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Mallinckrodt LLC, Republic Services, Inc., Rock Road Industries, Inc.,Terminating MI Holdings Inc., Commonwealth Edison Company and Exelon Corporation filed by Michael Dailey, Robbin Dailey.(MCB) (Entered: 04/24/2017) |
| 05/12/2017 | 71 | MOTION to Dismiss Case, MEMORANDUM in Support and REQUEST for Oral Argument by Defendant Mallinckrodt LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Erickson, David) Modified on 5/15/2017 (CBL). (Entered: 05/12/2017) |
| 05/12/2017 | 72 | Joint MOTION to Dismiss Case *and Memorandum in Support* by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (McGahren, John) (Entered: 05/12/2017) |
| 05/12/2017 | 73 | ANSWER to 70 Amended Complaint, by Allied Services L.L.C..(Beck, William) (Entered: 05/12/2017) |
| 05/12/2017 | 74 | ANSWER to 70 Amended Complaint, by Bridgeton Landfill, LLC.(Beck, William) (Entered: 05/12/2017) |
| 05/12/2017 | 75 | ANSWER to 70 Amended Complaint, by Republic Services, Inc..(Beck, William) (Entered: 05/12/2017) |
| 05/12/2017 | 76 | ANSWER to 70 Amended Complaint, by Rock Road Industries, Inc..(Beck, William) (Entered: 05/12/2017) |
| 05/26/2017 | 77 | MEMORANDUM in Opposition re 72 Joint MOTION to Dismiss Case *and Memorandum in Support*, 71 MOTION to Dismiss Case *(Omnibus Opposition to Both Motions to Dismiss)* filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Lewis, Richard) (Entered: 05/26/2017) |
| 05/31/2017 | 78 | Consent MOTION for Extension of Time to File Response/Reply as to 77 Memorandum in Opposition to Motion, and MOTION for Leave to Exceed Page Limitation by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Mallinckrodt LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) Modified on 6/1/2017 (CBL). (Entered: 05/31/2017) |
| 06/01/2017 | 79 | Docket Text ORDER: Re: 78 Consent MOTION for Extension of Time and to exceed page limits: ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 6/1/17. (CDP) (Entered: 06/01/2017) |
| 06/06/2017 | 80 | *** Incorrect PDF filed. See Document 81 REPLY to Response to Motion re 71 MOTION to Dismiss Case filed by Defendant Mallinckrodt Inc.. (Erickson, David) Modified on 6/7/2017 (CBL). (Entered: 06/06/2017) |
| 06/06/2017 | 81 | REPLY to Response to Motion re 71 MOTION to Dismiss Case *(corrected filing)* filed by Defendant Mallinckrodt LLC. (Erickson, David) (Entered: 06/06/2017) |
| 06/06/2017 | 82 | REPLY to Response to Motion re 72 Joint MOTION to Dismiss Case *and Memorandum in Support* filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (McGahren, John) (Entered: 06/06/2017) |
| 07/13/2017 | 83 | MOTION to Consolidate Cases by Defendants Allied Services L.L.C., Bridgeton |

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

| | | |
|---|---|---|
| | | Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 07/13/2017) |
| 07/13/2017 | 84 | MEMORANDUM in Support of Motion re 83 MOTION to Consolidate Cases filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Exhibit A)(Beck, William) (Entered: 07/13/2017) |
| 07/25/2017 | 85 | Consent MOTION for Extension of Time to File Response/Reply as to 83 MOTION to Consolidate Cases by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 07/25/2017) |
| 07/25/2017 | 86 | Docket Text ORDER: Re: 85 Consent MOTION for Extension of Time to File Response/Reply as to 83 MOTION to Consolidate Cases ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 7/25/17. (CDP) (Entered: 07/25/2017) |
| 08/07/2017 | 87 | REPLY to Response to Motion re 83 MOTION to Consolidate Cases filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Beck, William) (Entered: 08/07/2017) |
| 10/23/2017 | 88 | Docket Text ORDER: Re: 83 MOTION to Consolidate Cases ; ORDERED DENIED as moot as other case has been remanded to state court. Signed by District Judge Catherine D. Perry on 10/23/17. (CDP) (Entered: 10/23/2017) |
| 10/27/2017 | 89 | MEMORANDUM AND ORDER. (See Full Order.) IT IS HEREBY ORDERED that defendant Mallinckrodt LLC's motion to dismiss [# 71 ] and defendants Allied Services LLC, Bridgeton Landfill LLC, Cotter Corporation, Republic Services Inc., and Rock Road Industries, Inc.'s motion to dismiss [# 72 ] are GRANTED in part and DENIED in part. Counts II through IV of the First Amended Complaint are dismissed. Plaintiffs' claims for medical monitoring and emotional distress are also dismissed. IT IS FURTHER ORDERED that defendants' requests for oral argument on the motions to dismiss are DENIED. This case will be set for a Rule 16 Scheduling Conference by separate order. Signed by District Judge Catherine D. Perry on 10/27/2017. (CBL) (Entered: 10/27/2017) |
| 10/27/2017 | 90 | ORDER SETTING RULE 16 CONFERENCE. (See Full Order.) This case is assigned to Track: 3 (Complex). Joint Scheduling Plan due by 12/1/2017. Rule 16 Conference set for 12/8/2017 09:30 AM in Chambers before District Judge Catherine D. Perry. Signed by District Judge Catherine D. Perry on 10/27/2017. (CBL) (Entered: 10/27/2017) |
| 11/10/2017 | 91 | ANSWER to 70 Amended Complaint, by Mallinckrodt LLC.(Erickson, David) (Entered: 11/10/2017) |
| 11/10/2017 | 92 | ANSWER to 70 Amended Complaint, by Cotter Corporation N.S.L..(McGahren, John) (Entered: 11/10/2017) |
| 11/28/2017 | 93 | ORDER. IT IS HEREBY ORDERED that the Scheduling Conference pursuant to Fed.R.Civ.P. 16, is reset from December 8, 2017 to Friday, December 15, 2017 at 10:30 a.m. in my chambers. The Joint Proposed Scheduling Plan is now due no later than December 8, 2017. Signed by District Judge Catherine D. Perry on 11/28/17. (EAB) (Entered: 11/28/2017) |
| 12/08/2017 | 94 | JOINT SCHEDULING PLAN by Defendant Cotter Corporation N.S.L.. *on behalf of all parties*. (McGahren, John) (Entered: 12/08/2017) |
| 12/11/2017 | 95 | SUPPLEMENTAL re 94 Joint Scheduling Plan *Exhibit A to Joint Scheduling Plan* by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 12/11/2017) |

| | | |
|---|---|---|
| 12/22/2017 | 96 | MOTION to Withdraw as Attorney ;attorney/firm Richard S. Lewis, Michaela G. Spero, Swathi Bojedla, and Hausfeld LLP by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) (Entered: 12/22/2017) |
| 12/22/2017 | 97 | Docket Text ORDER: Re: 96 MOTION to Withdraw as Attorney ;attorney/firm Richard S. Lewis, Michaela G. Spero, Swathi Bojedla, and Hausfeld LLP by Plaintiffs Michael Dailey, Robbin Dailey. (Lewis, Richard) filed by Michael Dailey, Robbin Dailey ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 12/22/17. (CDP) (Entered: 12/22/2017) |
| 12/22/2017 | 98 | MOTION to Withdraw as Attorney ;attorney/firm DeFeo, Stolze, Calvert by Plaintiffs Michael Dailey, Robbin Dailey. (DeFeo, Daniel) (Entered: 12/22/2017) |
| 12/27/2017 | 99 | MOTION to Withdraw 98 MOTION to Withdraw as Attorney ;attorney/firm DeFeo, Stolze, Calvert by Plaintiffs Michael Dailey, Robbin Dailey. (DeFeo, Daniel) (Entered: 12/27/2017) |
| 12/27/2017 | 100 | Docket Text ORDER: 99 MOTION to Withdraw 98 MOTION to Withdraw as Attorney by Plaintiffs Michael Dailey, Robbin Dailey. ORDERED: GRANTED. 98 MOTION to Withdraw as Attorney Plaintiffs Michael Dailey, Robbin Dailey. ORDERED: DENIED AS MOOT. Signed by District Judge Catherine D. Perry on 12/27/2017. (CBL) (Entered: 12/27/2017) |
| 12/28/2017 | 101 | ENTRY of Appearance by Steven D. Soden for Defendant Mallinckrodt LLC. (Soden, Steven) (Entered: 12/28/2017) |
| 01/02/2018 | 102 | INITIAL CASE MANAGEMENT ORDER. This case is assigned to Track: 3 (Complex). Pursuant to the Civil Justice Reform Act Expense and Delay Reduction Plan and the Differentiated Case Management Program of the United States District Court of the Eastern District of Missouri, and the Rule 16 Conference held on December 15, 2017, the Court will set an initial schedule for this case to proceed as detailed herein. (See Full Order.) Signed by District Judge Catherine D. Perry on 1/2/2018. (CBL) (Entered: 01/02/2018) |
| 01/12/2018 | 103 | MOTION for Leave to Appear Pro Hac Vice Barry Cooper. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6330831) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing Certificate of Good Standing (Barry J. Cooper))(Cooper, Barry) (Entered: 01/12/2018) |
| 01/16/2018 | 104 | Docket Text ORDER: Re: 103 MOTION for Leave to Appear Pro Hac Vice Barry Cooper by Plaintiffs Michael Dailey, Robbin Dailey. ORDERED: GRANTED. Signed by District Judge Catherine D. Perry on 1/16/2018. (CBL) (Entered: 01/16/2018) |
| 02/08/2018 | 105 | MOTION to Withdraw as Attorney ;attorney/firm Michael Stag/Smith Stag by Plaintiffs Michael Dailey, Robbin Dailey. (Stag, Michael) (Entered: 02/08/2018) |
| 02/20/2018 | 106 | MOTION to Withdraw as Attorney ;attorney/firm DeFeo, Stolze, Calvert by Plaintiffs Michael Dailey, Robbin Dailey. (DeFeo, Daniel) (Entered: 02/20/2018) |
| 02/21/2018 | 107 | Docket Text ORDER: Re: [105, 106] MOTIONS to Withdraw as Attorney ;attorney/firm Michael Stag/Smith Stag, attorney/firm DeFeo, Stolze, Calvert ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 2/21/18. (CDP) (Entered: 02/21/2018) |
| 02/21/2018 | 108 | MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE and MOTION for Status Conference by Plaintiffs Michael Dailey, Robbin Dailey. (Cooper, Barry). (Added MOTION for Status Conference on 2/22/2018.) (CBL). (Entered: 02/21/2018) |
| 02/22/2018 | 109 | AMENDED MOTION re: 108 MOTION for Extension of: TIME ON INITIAL CASE |

| | | |
|---|---|---|
| | | MANAGEMENT ORDER SCHEDULE and MOTION for Status Conference by Plaintiffs Michael Dailey, Robbin Dailey. (Cooper, Barry) Modified on 2/23/2018 (CBL). (Entered: 02/22/2018) |
| 02/26/2018 | 110 | MOTION for Leave to Appear Pro Hac Vice Celeste Brustowicz. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6400783) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing) (Brustowicz, Celeste) (Entered: 02/26/2018) |
| 02/27/2018 | 111 | ORDER. As requested by the parties, the Court will hold a telephone status conference to discuss the disputes between the parties and the motion for extension of time as to the Initial Case Management Order. Accordingly, IT IS HEREBY ORDERED that plaintiffs' Motion for Leave to Appear Pro Hac Vice Celeste Brustowicz 110 is GRANTED. IT IS FURTHER ORDERED that a telephone conference with counsel will be held on Monday, March 5, 2018 at 2:00 p.m. Counsel for plaintiffs Michael and Robbin Dailey will place the call and have all necessary counsel on the line before joining the undersigned at (314) 244-7520. Signed by District Judge Catherine D. Perry on 2/27/2018. (CBL) (Entered: 02/27/2018) |
| 02/28/2018 | 112 | RESPONSE to Motion re 108 MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE MOTION for Hearing, 109 MOTION to Amend/Correct 108 MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE MOTION for Hearing filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Exhibit 1)(McGahren, John) (Entered: 02/28/2018) |
| 03/02/2018 | 113 | MOTION for Leave to Appear Pro Hac Vice Victor T. Cobb. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6408510) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Cobb, Victor) (Entered: 03/02/2018) |
| 03/02/2018 | 114 | Docket Text ORDER: Re: 113 MOTION for Leave to Appear Pro Hac Vice Victor T. Cobb; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 3/2/18. (CDP) (Entered: 03/02/2018) |
| 03/02/2018 | 115 | REPLY to Response to Motion re 108 MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE MOTION for Hearing, 109 MOTION to Amend/Correct 108 MOTION for Extension of: TIME ON INITIAL CASE MANAGEMENT ORDER SCHEDULE MOTION for Hearing filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Attachment Declaration by Barry J. Cooper, Jr., Esq.)(Cooper, Barry) (Entered: 03/02/2018) |
| 03/05/2018 | 116 | Minute Entry for proceedings held before District Judge Catherine D. Perry: Telephone Conference held on 3/5/2018. Parties present for telephone conference. Parties discuss case status with the court. Certain discovery deadlines and dispositive motions deadlines extended 60 days. Amended case management order to follow with complete details. (Court Reporter:Gayle Madden, Gayle_Madden@moed.uscourts.gov, 314-244-7987) (FTR Gold Operator initials:N/A) (FTR Gold: No) (EAB) (Entered: 03/05/2018) |
| 03/05/2018 | 117 | Joint MOTION for Protective Order by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 03/05/2018) |
| 03/05/2018 | 118 | MEMORANDUM in Support of Motion re 117 Joint MOTION for Protective Order filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Exhibit A, |

| | | |
|---|---|---|
| | | # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Rooney, Robert) (Entered: 03/05/2018) |
| 03/06/2018 | 119 | AMENDED CASE MANAGEMENT ORDER - IT IS HEREBY ORDERED that plaintiffs' amended motion for an extension of time of initial case management order schedule [#109] is GRANTED in part as follows: 1. The parties shall complete all discovery related to the samples collected at Plaintiffs home and property, and the issue of whether the levels of radioactive contamination are sufficient to show a PAA violation, no later than May 2, 2018. 2. Any motions for summary judgment or motions for judgment on the pleadings pertaining to the issue of whether plaintiffs can show levels of radioactive contamination sufficient to show a violation of the PAA must be filed no later than June 4, 2018. Opposition briefs shall be filed no later than thirty days after the motion or July 5, 2018, whichever is earlier. Any reply brief may be filed no later than ten days following the response brief or July 16, 2018, whichever is earlier. IT IS FURTHER ORDERED that plaintiffs' first motion for an extension of time of initial case management order schedule [#108] is DENIED as moot. All other provisions of the Initial Case Management Order [ECF # 102] remain in full force and effect. Failure to comply with any part of this order may result in the imposition of sanctions. ( Discovery Completion due by 5/2/2018. Dispositive Motions due by 6/4/2018.) Signed by District Judge Catherine D. Perry on March 6, 2018. (MCB) (Entered: 03/06/2018) |
| 03/16/2018 | 120 | STIPULATION FOR DISMISSAL with Prejudice of Mallinckrodt LLC Only by Defendant Mallinckrodt LLC. (Erickson, David) Modified on 3/19/2018 (CBL). (Entered: 03/16/2018) |
| 03/20/2018 | 121 | Docket Text ORDER: Re: 117 Joint MOTION for Protective Order ; ORDERED GRANTED without objection. Signed by District Judge Catherine D. Perry on 3/20/18. (CDP) (Entered: 03/20/2018) |
| 03/20/2018 | 122 | Docket Text ORDER: Re: 120 STIPULATION FOR DISMISSAL with Prejudice of Mallinckrodt LLC Only ; ORDERED GRANTED and plaintiffs' claims against defendant Mallinckrodt, LLC are dismissed with prejudice with each side to pay its own costs. Signed by District Judge Catherine D. Perry on 3/20/18. (CDP) (Entered: 03/20/2018) |
| 03/27/2018 | 123 | MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Memo in Support of Motion to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO)(Brustowicz, Celeste) (Entered: 03/27/2018) |
| 04/02/2018 | 124 | Joint MOTION for Extension of Time to File Response/Reply as to 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 04/02/2018) |
| 04/03/2018 | 125 | Docket Text ORDER: Re: 124 Joint MOTION for Extension of Time to File Response/Reply ; ORDERED GRANTED over plaintiffs' objection. Signed by District Judge Catherine D. Perry on 4/3/18. (CDP) (Entered: 04/03/2018) |
| 04/06/2018 | 126 | Consent MOTION for Leave to File in Excess of Page Limitation by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 04/06/2018) |
| 04/09/2018 | 127 | Docket Text ORDER: Re: 126 Consent MOTION for Leave to File in Excess of Page Limitation by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc. ORDERED: LEAVE GRANTED. Signed by District Judge Catherine D. Perry on 4/9/2018. (CBL) (Entered: 04/09/2018) |

| 04/10/2018 | 128 | MEMORANDUM in Opposition re 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Defendant Cotter Corporation N.S.L.. (Feingold, Stephanie) (Entered: 04/10/2018) |
|---|---|---|
| 04/10/2018 | 129 | RESPONSE in Opposition re 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Rooney, Robert) (Entered: 04/10/2018) |
| 04/12/2018 | 130 | MOTION for Leave to Appear Pro Hac Vice Su Jin Kim. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6481333) by Defendant Cotter Corporation N.S.L.. (Attachments: # 1 Certificate of Good Standing)(Kim, Su) (Entered: 04/12/2018) |
| 04/12/2018 | 131 | Docket Text ORDER: Re: 130 MOTION for Leave to Appear Pro Hac Vice Su Jin Kim by Defendant Cotter Corporation N.S.L. ORDERED: GRANTED. Signed by District Judge Catherine D. Perry on 4/12/2018. (CBL) (Entered: 04/12/2018) |
| 04/16/2018 | 132 | MOTION for Extension of: Time to File Reply to Defendants' Responses In Opposition to 123 Plaintiffs' Motion for Leave to Amend Complaint to dismiss Price-Anderson Act Claims and Reinstate State Law Claims, Motion to Remand, Motion to Stay Pending Discovery and Alternatively Motion to Amend Case Management Order by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) Modified on 4/17/2018 (CBL). (Entered: 04/16/2018) |
| 04/17/2018 | 133 | AMENDED DISCLOSURE OF CORPORATE INTERESTS by Defendant Rock Road Industries, Inc. . (Beck, William) Modified on 4/17/2018 (CBL). (Entered: 04/17/2018) |
| 04/17/2018 | 134 | Docket Text ORDER: Re: 132 MOTION for Extension of: Time to File Reply to Defendants' Responses In Opposition to 123 Plaintiffs' Motion for Leave to Amend Complaint to dismiss Price-Anderson Act Claims and Reinstate State Law Claims, Motion to Remand, Motion to Stay Pending Discovery and Alternatively Motion to Amend Case Management Order by Plaintiffs Michael Dailey, Robbin Dailey ; ORDERED Motion is GRANTED. Signed by District Judge Catherine D. Perry on April 17, 2018. (MCB) (Entered: 04/17/2018) |
| 04/24/2018 | 135 | REPLY to Response to Motion re 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit Landfill Defendants Motion to Dismiss in Adams, # 2 Exhibit Deferral of regulatory oversight to US EPA, # 3 Exhibit Declaration of Richard Stewart, # 4 Exhibit Ware II Petition for writ of certiorari, # 5 Exhibit Declaration of Stephanie Feingold, # 6 Exhibit Cotter's response to CERCLA request)(Brustowicz, Celeste) (Entered: 04/24/2018) |
| 04/26/2018 | 136 | Joint MOTION for Leave to File a Sur-Reply by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc.. (Attachments: # 1 Exhibit A, # 2 Certificate of Service)(Feingold, Stephanie) (Entered: 04/26/2018) |
| 04/27/2018 | 137 | Docket Text ORDER: Re: 136 Joint MOTION for Leave to File a Sur-Reply by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc.; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 4/27/18. (KXS) (Entered: 04/27/2018) |
| 04/27/2018 | 138 | RESPONSE to Motion re 136 Joint MOTION for Leave to File a Sur-Reply filed by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) (Entered: 04/27/2018) |

| | | |
|---|---|---|
| 05/08/2018 | [139](#) | SURREPLY to Motion re [123](#) MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 05/08/2018) |
| 05/08/2018 | [140](#) | ENTRY of Appearance by Peter F. Daniel for Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Daniel, Peter) (Entered: 05/08/2018) |
| 05/08/2018 | [141](#) | SURREPLY to Motion re [123](#) MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO filed by Defendant Cotter Corporation N.S.L.. (Feingold, Stephanie) (Entered: 05/08/2018) |
| 05/18/2018 | [142](#) | MOTION to Exclude *Motion and Memorandum in Support Requesting Plaintiffs be Prevented and Enjoined from using Information and Materials they Withheld Until Late in the Discovery Period* by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Attachments: # [1](#) Exhibit A, # [2](#) Exhibit B)(Beck, William) (Entered: 05/18/2018) |
| 05/25/2018 | [143](#) | RESPONSE to Motion re [142](#) MOTION to Exclude *Motion and Memorandum in Support Requesting Plaintiffs be Prevented and Enjoined from using Information and Materials they Withheld Until Late in the Discovery Period* filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # [1](#) Exhibit 1, # [2](#) Exhibit 2, # [3](#) Exhibit 3)(Brustowicz, Celeste) (Entered: 05/25/2018) |
| 05/30/2018 | [144](#) | REPLY to Response to Motion re [142](#) MOTION to Exclude *Motion and Memorandum in Support Requesting Plaintiffs be Prevented and Enjoined from using Information and Materials they Withheld Until Late in the Discovery Period* filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 05/30/2018) |
| 06/01/2018 | [145](#) | MOTION for Extension of Time to File *Dispositive Motion* ;Proposed extension date 6/11/2018, MOTION for Leave to File in Excess of Page Limitation by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 06/01/2018) |
| 06/01/2018 | [146](#) | Consent MOTION for Leave to File Excess Pages by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Silva, Patricia) (Entered: 06/01/2018) |
| 06/02/2018 | [147](#) | MOTION for Extension of Time to File *Dispositive Motion* ;Proposed extension date June 11, 2018 by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 06/02/2018) |
| 06/04/2018 | 148 | Docket Text ORDER: Re: [145](#) MOTION for Extension of Time to File *Dispositive Motion and MOTION for Leave to File in Excess of Page Limitation by Defendant Cotter Corporation N.S.L.; [147](#) MOTION for Extension of Time to File Dispositive Motion by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.; [146](#) Consent MOTION for Leave to File Excess Pages by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc. ; ORDERED: Motions are GRANTED. ( Dispositive Motions due by 6/11/2018.) Signed by District Judge Catherine D. Perry on June 4, 2018. (MCB) (Entered: 06/04/2018)* |
| 06/05/2018 | [149](#) | MEMORANDUM AND ORDER - IT IS HEREBY ORDERED that plaintiffs' motion for leave to amend, to remand, and to stay [#123] is GRANTED ONLY with respect to a STAY of future Amended Case Management Order (ECF No. 119) deadlines, and is HELD IN ABEYANCE with respect to leave to amend, remand, and alternatively, amendment of the case management order. Once the Court has ruled pending motions, a new schedule shall be established for this matter, if necessary. Signed by District Judge Catherine D. Perry on June 5, 2018. (MCB) (Entered: 06/05/2018) |
| | | |

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

| | | |
|---|---|---|
| 06/06/2018 | 150 | NOTICE of Supplemental Authority re 123 MOTION for Leave to Amend Complaint, Remand, Stay Pending Discovery and Alternatively Amend CMO by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc. . (Attachments: # 1 Exhibit A)(Daniel, Peter) (Entered: 06/06/2018) |
| 06/12/2018 | 151 | ORAL MOTION *for Argument* by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 06/12/2018) |
| 06/20/2018 | 152 | MOTION for Leave to Appear Pro Hac Vice Stuart H. Smtih. The Certificate of Good Standing was attached.(Filing fee $100 receipt number 0865-6600931) by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Certificate of Good Standing)(Smith, Stuart) (Entered: 06/20/2018) |
| 06/21/2018 | 153 | Docket Text ORDER: Re: 152 MOTION for Leave to Appear Pro Hac Vice Stuart H. Smith ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 6/21/18. (CDP) (Entered: 06/21/2018) |
| 03/14/2019 | 154 | MOTION to Withdraw as Attorney *by Robert G. Rooney* ;attorney/firm Robert G. Rooney by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.. (Rooney, Robert) (Entered: 03/14/2019) |
| 03/18/2019 | 155 | Docket Text ORDER: Re: 154 MOTION to Withdraw as Attorney *by Robert G. Rooney* by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc., Rock Road Industries, Inc.; ORDERED: Motion is GRANTED. Signed by District Judge Rodney W. Sippel on behalf of District Judge Catherine D. Perry on March 18, 2019. (MCB) (Entered: 03/18/2019) |
| 04/08/2019 | 156 | MEMORANDUM AND ORDER. (See Full Order.) IT IS HEREBY ORDERED that plaintiffs' motion for leave to amend and to remand, or to amend case management order 123 is denied without prejudice. Defendants' motion to prevent plaintiffs from using material and information 142 is denied as moot. IT IS FURTHER ORDERED that not later than April 29, 2019, plaintiffs shall file either: 1) a motion to dismiss this case without prejudice under Fed. R. Civ. P. 41(a)(2); or 2) a renewed motion for leave to file a Second Amended Complaint, accompanied by the proposed amended complaint. The Federal Rules of Civil Procedure and the Local Rules of this Court govern the time to file any responses and/or replies to plaintiffs' motion. IT IS FURTHER ORDERED that defendants' Motion for Oral Argument 151 is denied. The parties thus far have clearly and articulately presented their respective arguments in their prepared briefs. If I determine that oral argument is necessary to assist in my consideration of plaintiffs' anticipated motion to dismiss or to amend, I will not hesitate to schedule a hearing. IT IS FURTHER ORDERED that the case management deadlines in this case remain stayed. Signed by District Judge Catherine D. Perry on 4/8/2019. (CBL) (Entered: 04/08/2019) |
| 04/29/2019 | 157 | MOTION for Leave to File a 2nd Amended Complaint by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Memo in Support of Motion, # 2 Exhibit 2nd Amended Complaint)(Smith, Stuart) (Entered: 04/29/2019) |
| 05/06/2019 | 158 | MOTION for Extension of Time to File Response/Reply as to 157 MOTION for Leave to File a 2nd Amended Complaint by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Daniel, Peter) (Entered: 05/06/2019) |
| 05/06/2019 | 159 | Docket Text ORDER: Re: 158 MOTION for Extension of Time to File Response to MOTION for Leave to File a 2nd Amended Complaint ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 5/6/19. (CDP) (Entered: 05/06/2019) |
| 05/20/2019 | 160 | RESPONSE to Motion re 157 MOTION for Leave to File a 2nd Amended Complaint filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, |

| | | |
|---|---|---|
| | | Inc.. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(Beck, William) (Entered: 05/20/2019) |
| 05/20/2019 | 161 | MEMORANDUM in Opposition re 157 MOTION for Leave to File a 2nd Amended Complaint *Pursuant to April 8, 2019 Order* filed by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 05/20/2019) |
| 05/20/2019 | | NOTICE: IF YOU HAVE ALREADY UPGRADED YOUR PACER ACCOUNT YOU CAN DISREGARD THIS NOTICE. IF YOU DO NOT UPGRADE YOU WILL NOT BE ABLE TO FILE IN THE SYSTEM AFTER MAY 31, 2019. PLEASE UPGRADE IMMEDIATELY. If you are using a shared account to file cases, you will need to create an individual account; instructions can be found at:https://www.moed.uscourts.gov/sites/moed/files/Register-for-New-PACER-account.pdf. If you already have an individual account, it will need to be upgraded; instructions can be found https://www.moed.uscourts.gov/sites/moed/files/Upgrade-Current-PACER-Account.pdf. If you need further assistance contact the MOED CM/ECF Help Desk at 314-244-7650 or moedml_cmecf_help@moed.uscourts.gov. (CSAW) (Entered: 05/20/2019) |
| 05/22/2019 | 162 | MOTION for Extension of Time to File Response/Reply as to 157 MOTION for Leave to File a 2nd Amended Complaint by Plaintiffs Michael Dailey, Robbin Dailey. (Cobb, Victor) (Entered: 05/22/2019) |
| 05/28/2019 | 163 | Docket Text ORDER: Re: 162 MOTION for Extension of Time to File Response/Reply ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 5/28/19. (CDP) (Entered: 05/28/2019) |
| 06/10/2019 | 164 | REPLY to Response to Motion re 157 MOTION for Leave to File a 2nd Amended Complaint filed by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit 1 (Judgment denying appeal), # 2 Exhibit 2 (Silva Deposition Transcript))(Brustowicz, Celeste) (Entered: 06/10/2019) |
| 10/22/2019 | 165 | ORDER : IT IS HEREBY ORDERED that plaintiffs Motion for Leave to File a Second Amended Complaint 157 is GRANTED, and the Clerk of Court is instructed to file and docket plaintiffs Second Amended Complaint (ECF 157-2) as of todays date. IT IS FURTHER ORDERED that plaintiffs shall have twenty-one (21) days from the date of this Order within which to file a motion to remand, and defendants shall have fourteen (14) days thereafter within which to respond. Any reply brief may be filed within seven (7) days of the response. Signed by District Judge Catherine D. Perry on 10/22/2019. (KCB) (Entered: 10/22/2019) |
| 10/22/2019 | 166 | SECOND AMENDED COMPLAINT against defendant Allied Services L.L.C., Bridgeton Landfill, LLC, Cotter Corporation N.S.L., Republic Services, Inc., Rock Road Industries, Inc., filed by Michael Dailey, Robbin Dailey.(KCB) (Entered: 10/22/2019) |
| 10/23/2019 | 167 | Docket Text ORDER: Defense counsel have contacted chambers indicating uncertainty about whether the Court's orders somehow meant that they were not obligated to respond to the Second Amended Complaint. To clear up any confusion: Defendants must respond to the Second Amended Complaint within the time set by the Federal Rules of Civil Procedure. Signed by District Judge Catherine D. Perry on 10/23/19. (CDP) (Entered: 10/23/2019) |
| 11/04/2019 | 168 | MOTION for Extension of Time to File Answer *to Plaintiffs' Second Amended Complaint* by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 11/04/2019) |
| 11/05/2019 | 169 | Docket Text ORDER Re: 168 MOTION for Extension of Time to File Answer *to Plaintiffs' Second Amended Complaint* by Defendant Cotter Corporation N.S.L.. |

| | | |
|---|---|---|
| | | (McGahren, John); ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 11/5/2019. (BRP) (Entered: 11/05/2019) |
| 11/05/2019 | 170 | ANSWER to 166 Amended Complaint by Allied Services L.L.C..(Beck, William) (Entered: 11/05/2019) |
| 11/05/2019 | 171 | ANSWER to 166 Amended Complaint by Bridgeton Landfill, LLC.(Beck, William) (Entered: 11/05/2019) |
| 11/05/2019 | 172 | ANSWER to 166 Amended Complaint by Republic Services, Inc..(Beck, William) (Entered: 11/05/2019) |
| 11/05/2019 | 173 | NOTICE Exhibit 1 to Defendants' Answers to Plaintiffs' Second Amended Complaint: by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc. re 171 Answer to Amended Complaint, 172 Answer to Amended Complaint, 170 Answer to Amended Complaint (Beck, William) (Entered: 11/05/2019) |
| 11/12/2019 | 174 | MOTION to Remand Case to State Court to State Court by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Memo In Support of Motion to Remand)(Brustowicz, Celeste) (Entered: 11/12/2019) |
| 11/12/2019 | 175 | MOTION to Dismiss Case by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 11/12/2019) |
| 11/25/2019 | 176 | MOTION to Stay by Plaintiffs Michael Dailey, Robbin Dailey. (Attachments: # 1 Exhibit Memo in Support of Unopposed Motion to Stay)(Brustowicz, Celeste) (Entered: 11/25/2019) |
| 11/25/2019 | 177 | MOTION for Leave to File in Excess of Page Limitation *for Response to Plaintiffs' Motion to Remand* by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 11/25/2019) |
| 11/26/2019 | 178 | Docket Text ORDER: Re: 177 MOTION for Leave to File in Excess of Page Limitation ; ORDERED GRANTED. Signed by District Judge Catherine D. Perry on 11/26/19. (CDP) (Entered: 11/26/2019) |
| 11/26/2019 | 179 | Docket Text ORDER: Re: 176 MOTION to Stay : ORDERED GRANTED to the extent that deadlines for briefing the motion to dismiss are stayed pending the Court's ruling on the motion to remand. Signed by District Judge Catherine D. Perry on 11/26/19. (CDP) (Entered: 11/26/2019) |
| 11/26/2019 | 180 | MEMORANDUM in Opposition re 174 MOTION to Remand Case to State Court to State Court filed by Defendant Cotter Corporation N.S.L.. (McGahren, John) (Entered: 11/26/2019) |
| 11/26/2019 | 181 | RESPONSE to Motion re 174 MOTION to Remand Case to State Court to State Court filed by Defendants Allied Services L.L.C., Bridgeton Landfill, LLC, Republic Services, Inc.. (Beck, William) (Entered: 11/26/2019) |
| 12/02/2019 | 182 | MOTION for Extension of Time to File Response/Reply as to 174 MOTION to Remand Case to State Court to State Court, 180 Memorandum in Opposition to Motion, 181 Response to Motion by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) (Entered: 12/02/2019) |
| 12/03/2019 | 183 | Amended MOTION to Amend/Correct 182 MOTION for Extension of Time to File Response/Reply as to 174 MOTION to Remand Case to State Court to State Court, 180 Memorandum in Opposition to Motion, 181 Response to Motion , MOTION for Extension of Time to File Response/Reply by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) . (Entered: 12/03/2019) |

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

| 12/03/2019 | 184 | Docket Text ORDER Re: 183 Amended MOTION to Amend/Correct 182 MOTION for Extension of Time to File Response/Reply as to 174 MOTION to Remand Case to State Court to State Court, 180 Memorandum in Opposition to Motion, 181 Response to Motion , MOTION for Extension of Time to File Response/Reply by Plaintiffs Michael Dailey, Robbin Dailey; OREDERED GRANTED. 182 MOTION for Extension of Time to File Response/Reply as to 174 MOTION to Remand Case to State Court to State Court, 180 Memorandum in Opposition to Motion, 181 Response to Motion by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) filed by Michael Dailey, Robbin Dailey; ORDERED DENIED AS MOOT. Signed by District Judge Catherine D. Perry on 12/3/2019. (BRP) Modified on 12/4/2019 (BRP). (Entered: 12/03/2019) |
| 12/10/2019 | 185 | REPLY to Response to Motion re 174 MOTION to Remand Case to State Court to State Court filed by Plaintiffs Michael Dailey, Robbin Dailey. (Brustowicz, Celeste) (Entered: 12/10/2019) |
| 03/23/2020 | 186 | MEMORANDUM AND ORDER: IT IS HEREBY ORDERED that plaintiffs Michael and Robbin Daileys' Motion to Remand 174 is GRANTED. IT IS FURTHER ORDERED that this case is REMANDED to the Circuit Court of St. Louis County, Missouri, from which it was removed. All other motions that remain pending in this action are reserved for ruling by that court. Signed by District Judge Catherine D. Perry on 3/23/2020. (TMT) (Entered: 03/23/2020) |
| 04/04/2020 | 187 | ENTRY of Appearance by Brian O'Connor Watson for Defendant Cotter Corporation N.S.L.. (Watson, Brian) (Entered: 04/04/2020) |

| **PACER Service Center** | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/20/2020 16:08:59 | | |
| **PACER Login:** | sl040515 | **Client Code:** | 123500 |
| **Description:** | Docket Report | **Search Criteria:** | 4:17-cv-00024-CDP |
| **Billable Pages:** | 21 | **Cost:** | 2.10 |

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Case: 4:27-cv-00124-CDP   Doc. #: 160-2   Filed: 01/28/22   Page: 820 of 903 PageID #: 2501

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

# EXHIBIT 2

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

# RESPONSIVENESS SUMMARY

This section provides the Environmental Protection Agency's (EPA) responses to all public comments received on the Proposed Plan for the West Lake Landfill site (Site). The Proposed Plan outlined the proposed remedies for both Operable Unit 1 (OU 1) and OU 2. The first public comment period opened on June 14, 2006, and after several extensions was ended on December 29, 2006. During this period, two public meetings were held – the first on June 22, 2006, at the Bridgeton Community Center and the second on September 14, 2006, at the Bridgeton City Hall.

In response to public comment on the levee system and flood plain issues, EPA decided to reopen the public comment period and hold a third public meeting. The comment period was reopened and the public meeting was held on March 27, 2008, at the Bridgeton Community Center to present more information on flood protection issues. In addition, more information was placed in the Administrative Record regarding these issues. The second comment period was closed April 9, 2008.

Transcripts of the proceedings for all three public meetings are part of the Administrative Record, and copies are available at the Bridgton Trails Branch of the St. Louis County Library in Bridgton and at the EPA Region 7 Records Center in Kansas City, Kansas. All written comments received are also part of the Administrative Record.

Pursuant to section 113(k)(2)(B)(iv) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §9613(k)(2)(B)(iv), this section of the Record of Decision (ROD) responds to "each of the significant comments, criticisms, and new data submitted in written or oral presentation" to EPA regarding the Proposed Plan.

EPA wishes to thank all members of the community who took the time to provide comments or otherwise participate in this public process. All comments received have been thoroughly reviewed and considered by EPA in its decision-making process. To minimize redundancy, many recurrent comments are addressed once with a general response. Many of the more rigorous or unique comment letters containing comments not fully addressed by the general responses have been addressed individually. In these cases, copies of the comment letters are attached to assist readers in following the responses. All significant comments or criticisms received appear to be related to the presence of radiologically contaminated materials at the landfill and are therefore considered to be comments on OU 1 which addresses the radiologically contaminated areas. No significant comments were received on the proposal for OU 2.

**General Responses**

**1. Comment:** Many commenters make the general claim that the radiologically contaminated materials disposed in Areas 1 and 2 pose a current public health risk and that it is unsafe to manage these materials in place.

**Response:** Evaluation of the factual information does not support this claim. For toxic materials to pose a health risk to individuals or populations there must be human exposure. Exposure to toxic pollutants may occur through three primary exposure pathways: ingestion, inhalation, and absorption through the skin. In the case of radionuclides, the external (gamma) radiation pathway must also be considered. Under current conditions and current land uses, there are no complete pathways for significant exposure to the general public. The contamination that could pose an exposure concern is in soils and solid waste buried in the landfill. The Site is fenced and access controlled. There is no opportunity for members of the general public to contact materials that are disposed in the landfill, and there are no contaminated drinking water sources. Radon concentrations are elevated only in the immediate vicinity of the buried materials. There is little opportunity for unplanned earth moving activities in Areas 1 and 2 that might release fugitive dust and cause an inhalation concern. There is no opportunity to take up occupancy of Areas 1 and 2 where long-term exposure to radon and external gamma radiation might occur. As long as the Site is used in ways consistent with it being a landfill, there is no public health concern.

Significant exposure to the radionuclides at the Site could occur under potential future circumstances if no remedial action is taken. The baseline risk assessment (BRA) looked at some of these potential scenarios based on reasonably anticipated land use including groundskeepers and other workers using Areas 1 and 2 for storage or other ancillary purpose. Under the assumption that radionuclides remain at or near the ground surface, some exposure to these workers would occur. The assessment uses standard exposure factors and toxicity values to estimate the health risks to these hypothetical workers. Exposure frequencies and routes of exposure vary depending on the nature of the job. Exposure duration, or the time a worker remains in the job, was assumed to be 6.6 years. The calculated risks are expressed in terms of increased lifetime cancer risk to the exposed individual. Under two of the worker scenarios examined, the calculated risks exceed EPA's acceptable risk range defined as $1 \times 10^{-4}$ or 1 in 10,000.

To put some perspective on it, risks of this magnitude expressed in annual radiation dose to a residential receptor are in the range of 15 millirem (mrem). The average person in the United States receives about 360 mrem of radiation exposure per year, 82 percent of which is from natural sources like cosmic radiation and radon exposure. In other words, the potential radiation doses being addressed by this remedy are a small fraction of the doses people receive from normal background radiation.

The risk calculations are used to put boundaries on the problem. The methods are standardized so that comparisons against the acceptable risk range and across sites can be made. The risk assessment contains many estimates and assumptions. Generally, very

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

conservative assumptions are used to ensure that risks are not underestimated. Although not every possible exposure scenario was evaluated, the assessment does allow some relative judgments to be made about other hypothetical exposures. A person living as a resident on Area 2 for example would be at higher risk than a groundskeeper due to the increased exposure frequency and duration. The risk to a casual trespasser on-site would not be significant due to the very low frequency and duration of exposure.

The general conclusion is that members of the general public, i.e., people who live and work in the vicinity of the Site, are not at risk under current conditions. There are potential risks to future on-site workers or others who might come in direct contact with the contaminated material. The potential risks are not acute and can be managed by preventing direct contact with the waste materials.

**2. Comment:** Many commenters claim that radiological contaminants at the Site are migrating or will migrate to the groundwater and impact off-site water supply wells and/or water quality in the Missouri River.

**Response:** Groundwater samples obtained from a network of on-site monitoring wells over a period of years have been analyzed for a wide range of chemicals including radionuclides, trace metals, petroleum hydrocarbons, volatile organic compounds (VOCs), semivolatile organic compounds (SVOCs), pesticides, and polychlorinated biphenyls. Surface water samples have also been analyzed  In the case of radionuclides and metals, both filtered and unfiltered samples were analyzed and evaluated. The results generally show sporadic and isolated detections of a small number of contaminants at relatively low concentration levels. The results are not indicative of on-site contaminant plumes, radial migration, or other forms of contiguous groundwater contamination that might be attributable to the landfill units being investigated. The analytical results were compared to drinking water standards referred to as Maximum Contaminant Levels (MCLs).

Based on frequency of detection and concentration level relative to its MCL, arsenic is the most noteworthy constituent found in the groundwater. However, even in the case of arsenic no evidence of contiguous radial migration was found, i.e., the elevated detections were not supported by nearby monitoring locations. Total arsenic was detected in many of the samples at concentrations ranging from 0.010 to 0.420 milligrams per liter (mg/l). Most results were nondetect or consistent with background.

The groundwater results show no evidence of significant leaching and migration of radionuclides from Areas 1 and 2. The vast majority of the results are consistent with background concentrations. Only four wells exhibited a total radium concentration above the MCL of 5 picocuries per liter (pCi/l). These exceedances ranged from 5.74 pCi/l to 6.33 pCi/l. These slight exceedances are isolated spatially. Two of the four wells with total radium exceedances are located in areas that are not downgradient of either Radiological Area 1 or Radiological Area 2. Uranium isotopes (U-238 and U-234) were generally detected in wells at 5 pCi/l or less. For comparison, the background level is about 2 pCi/l and the drinking water standard is about 20 pCi/l (converted from the

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

uranium MCL of 30 micrograms per liter [ug/l]).  Moreover, perched water from locations in the waste material contained in Areas 1 and 2 was sampled and analyzed and elevated concentrations of radionuclides were not detected.  This is the case even though the waste materials have been in place without a landfill cover for over 30 years.  In other words, significant leaching and migration of radionuclides to perched water or groundwater have not occurred despite landfilled waste materials having been exposed to worst-case leaching conditions from surface water infiltration over a period of decades.

In conclusion, the results of extensive monitoring over a period of years show that the radiological contaminants have not had significant impacts on shallow groundwater underlying Areas 1 and 2.  Without significant impacts to the groundwater underlying and immediately downgradient of the waste material, there can be no significant impact to the alluvial aquifer or the Missouri River.  Based on the data, it is reasonable to conclude that no current or potential water supplies have been affected.

Other factors were examined to evaluate the potential for future leaching to groundwater.  A dominant factor influencing the transport and environmental fate of contaminants is the sorption-desorption process.  Desorption or leaching is the process whereby molecules attached to the solid phase (in this case soil) are mobilized into the dissolved phase in water.  Sorption is the process by which the molecules become or remain attached to the solid phase (soil).  Partitioning calculations presented in the Remedial Investigation (RI) support the conclusion that even in the absence of an infiltration barrier, e.g., landfill cover, impacts to groundwater over time may be low.  The distribution coefficient values for these radionuclides are relatively high which is consistent with the tendency to remain in the soil or sediment phases rather than leaching to the water phase.  The calculated radionuclide concentrations in the water phase are consistent with the groundwater sampling data collected during the RI.

Also, according to the applied chemistry that is known from the reprocessing of ore residues, the uranium in barium sulfate is insoluble in water.  That is, the uranium cannot be leached from the barium sulfate using water.  The Mallinckrodt process used sodium carbonate solution to recover trace uranium from barium sulfate cake.  Based on this information, one would not expect to find significant levels of uranium in the water at the Site and the groundwater data bear this out.

However, as long as waste materials in the landfill are exposed to infiltrating surface water, the potential for migration to groundwater remains.  To address this, the Selected Remedy calls for construction of a multi-layer engineered cover that meets sloping and permeability requirements designed to shed water and minimize the potential for water to infiltrate the waste material.  This is the same kind of technology used successfully at permitted landfills.  With the low leaching potential of the waste materials and an engineered cover in place, the probability of continued groundwater protection is very high.

Groundwater protection is a principal objective of the Selected Remedy.  The long-term groundwater monitoring program will be designed to verify over time that the remedy is

protective of the groundwater.  The objectives of the monitoring program are described in section 12 of the OU 1 ROD.  The monitoring plan required as part of the remedy will specify sampling locations, sampling frequencies, analytical parameters, procedures, etc.  Periodic sampling reports that include data summaries and interpretation will be published.  After the baseline is established, trend analysis will be used to verify performance.

**3.  Comment:**  Many commenters state that the Site is in a flood plain which could affect the integrity of the remedy and could spread contamination or impact water quality in the Missouri River.

**Response:**  Under current conditions, the Site is not located in a flood plain.  The Site is located behind the Earth City Levee.  The Earth City Levee District is protected from flooding of the Missouri River by a 500-year earthen levee and supporting flood control system.  At the end of 2005, this Levee District contained 450 businesses employing 22,800 people.  At one time prior to development of the Earth City area and prior to construction of the landfill, the surface elevation at the northwestern half of the Site was below the 100-year high water level.  About half of the landfill is built onto a historic or geomorphic flood plain.

It is important to understand that the landfill itself has altered the topography such that the surface elevation of the Site is 20 to 30 feet or more above the level of the historic flood plain.  After construction of the remedy, surface grade at the landfill will be a minimum of 25 feet above the flood plain.  In the event that the levee is breached and 500-year flood waters were to encroach on the business park, it would be expected to result in about two feet of water at the northwestern toe of the landfill.  As part of the Selected Remedy, the landfill toe in this area will be regraded through placement of additional clean fill and capped with an engineered landfill cover resulting in approximately 100 lateral feet of additional materials between the current landfill toe and the toe at completion of the remedial action.  Only cover material and clean fill material are potentially impacted by flood water.  As part of the remedial design process and in response to public comment, flood protection measures will be evaluated during remedial design and appropriate bank protection methods will be used in construction of the toe area.  Any encroaching flood water would be expected to recede with no damage to the landfill cover.  However, in the event any damage did occur, it will be repaired in accordance with the operation and maintenance (O&M) plan.

The information in the following paragraph was taken from the Earth City Levee District website:  http://www.earthcityld.com/index.aspx

The 1,891-acre Levee District is protected on three sides with the main levee running 2.6 miles along the eastern bank of the Missouri River.  The levee system is designed to exceed the 500-year flood level and ranges from 462.03 feet above mean sea level (ft/msl) at the south end to 459.34 ft/msl at the north end.  The 500-year flood elevation at these locations is 459.03 ft/msl and 452.15 ft/msl, respectively.  Assuming a 500-year flood, the Missouri River would be 3 to 7 feet below the top of the Earth City Levee.

Four major floods have occurred since the levee was completed in 1972 including the record level flood of August 1993 when the Missouri River crested at 14.6 feet above flood stage and remained above flood level for about 110 days. The flood control system functioned successfully in each case.

For more information on this subject, see the attached technical memorandum developed in response to congressional inquiry on the levee systems and flood plain issues as they relate to the Site.

**4. Comment:** Some commenters questioned whether EPA considered what impact an earthquake might have on the remedy.

**Response:** The Site is in St. Louis County which is located within the New Madrid seismic zone. According to the Mercalli Intensity Scale, a major earthquake (magnitude 7.0 to 7.9) in the New Madrid seismic zone affecting St. Louis County could in some locations cause severe damage to poorly built structures, cause partial collapse of ordinary substantial buildings, and shift houses on their foundations. Tall structures such as towers and chimneys might twist and fall. Damage to structures built to withstand earthquakes would be slight.

Because the Site is in a seismic zone, the remedy design will include an evaluation of potential seismic effects. The design will look at estimated horizontal acceleration of the earth materials at the Site in the event of a major earthquake and identify appropriate engineering characteristics for the materials and structural components.

Observational data on the performance of solid waste landfills during major earthquakes indicate that these structures are not particularly susceptible to earthquake-induced damage. Moreover, the Site cover is expected to be constructed entirely of earthen materials and will not contain synthetic membranes that might slip or be damaged during a seismic event. Also, there are no subsurface drainage systems or other buried structures that could be damaged. However, in the event the Site remedy is subjected to a major earthquake, the potential for damage exists, e.g., settlement or slumping of cover materials. In the event the cover system is damaged, appropriate repairs would be made in accordance with approved O&M plans required as part of the remedy. It should be understood that any potential earthquake-induced damage to the landfill cover will not result in a significant public health threat because the materials in the landfill will still not be accessible to the general public and the solubility of the contaminants would not be affected.

The alluvial materials on which the landfill is built are not the type that is vulnerable to earthquake liquefaction. Liquefaction occurs in loose, fine-grained materials that are saturated with water. When shaken by an earthquake, these loose sediments can lose their strength and behave like a liquid. The most vulnerable areas, like the San Francisco Bay region, are areas that used to be bay or marshland before being filled with pumped or dredged material. By contrast, the Site is built over compact sand and gravels at the

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

margin of the alluvium. These materials possess much greater frictional strength than the fine-grained materials that are vulnerable to liquefaction.

**5. Comment:** Many commenters questioned whether capping alone with no liner is sufficient to isolate the contamination from the environment.

**Response:** Capping through the use of engineered covers is a mature and routinely applied technology that forms a barrier between the contaminated media and the surface, thereby shielding humans and the environment from the contaminants and from the effects of radiation. Capping is the approach used at uranium mill tailings sites for example. The cap is designed to be sufficiently thick and impermeable to isolate the waste and restrict surface water infiltration into the subsurface. When the waste is above the water table, as in the case of the radiologically contaminated material at the Site, a properly designed cap can prevent the percolation of water from the surface to the underlying contaminated materials. The cap will be extended beyond the perimeter of the contaminated area and include side slopes to prevent any lateral infiltration. It is important to understand that it is the cover, not a liner, which prevents surface water from contacting the waste material.

**6. Comment:** Many commenters expressed concern about the ability to assure protectiveness over the long term, particularly given the long-lived nature of the radionuclides at the Site.

**Response:** In cases where the remedy results in hazardous substances remaining on-site, CERCLA requires ongoing forms of surveillance, monitoring, maintenance, institutional control, etc. The expectation is that this will continue for as long as the hazardous substances remain. In these cases, the monitoring period will extend beyond the foreseeable future. The challenge is no greater at the Site than it is at various Superfund sites or other waste sites where long-lived radionuclides, heavy metals, or other nondegradable waste materials will be permanently disposed or managed in place. If the wastes in the Site were moved to another landfill, the location would change but the ongoing stewardship requirements would remain the same.

The first objective is to make sure the engineering measures are designed for longevity. Most of the engineering measures used at the Site will continue to be effective even in the event that institutional control becomes ineffective. The conceptual design of the landfill cover identified in the Selected Remedy relies on natural materials rather than synthetics. Synthetic materials like flexible membrane liners tend to degrade over time; whereas natural materials such as rock, clay, and soil should remain effective for vastly longer periods. The thickness and properties of the materials used will be more than sufficient to shield any future users of the Site from any increased gamma exposure, and the materials will act as a barrier to radon gas emissions. The cover will also incorporate a layer of rock or concrete rubble. This feature will enhance longevity by inhibiting the potential for intrusion into the landfill and limiting the potential damage that could be done by erosion. The shallow sloping requirements for this cover will also help to minimize the potential for erosion and enhance longevity. Thus, the landfill cover will

prevent potential exposures and will remain effective for as long as the cover materials are left in place.

The second objective is to make the long-term Site management plans as robust as possible. Long-term O&M plans will establish requirements for long-term groundwater monitoring, institutional control implementation and assurance, periodic inspection, maintenance, and community involvement. These plans will be approved by EPA and made available to the public. The institutional control strategy will use redundant mechanisms and employ enforceable proprietary controls that run with the land.

Finally, CERCLA and the National Oil and Hazardous Substances Pollution Contingency Plan (NCP) require that periodic reviews, referred to as Five-Year Reviews, be conducted. At least every five years, a review will be performed to evaluate the remedy to assure it remains protective and is performing as expected. In the event the remedy is not protective or is not performing as expected, these findings will be presented in the Five-Year Review Report and corrective measures will be required to be undertaken. The Five-Year Review Report will also describe maintenance issues, recommended optimizations, identify new requirements, etc. This process also provides for community involvement.

**7. Comment:** Many commenters refer to the radiological material in the landfill as being particularly dangerous because it comes from the extremely *hot* Belgian Congo ore.

**Response:** It should be clarified that there are actually no feed materials (ore or ore concentrates) in the landfill and there is no raw Belgian Congo pitchblende in the waste materials. The radiologically contaminated material in the landfill is soil blended with residues that were the byproduct of processing the ore for its uranium content. Certainly, the most reliable way to ascertain the composition of the waste material in the landfill is through direct measurement. Therefore, as part of the RI, extensive field study was performed on the landfill and the waste materials including overland gamma surveys, surface and subsurface sampling through an extensive boring program, downhole radiological logging, radon flux measurements, perched water and landfill gas sampling, surface water and sediment investigation, etc. The data provide the primary basis for the technical judgments that have been made in the EPA decision-making process.

However, there is clearly a great interest in the origins of the material, and there appears to be a general lack of clarity on the subject. This response is designed to summarize what is known on the origins of the material based on documents kept by the various federal agencies and programs and other parties involved. Under contracts with the Manhattan Engineering District (MED) and the Atom Energy Commission (AEC), Mallinckrodt Chemical Works processed uranium feed materials for production of uranium metal from 1942 to 1957. The processing occurred at the location of the Mallinckrodt plant in downtown St. Louis. Feed materials included uranium black oxide, uranium ores, and concentrates. In 1944, pitchblende ore from the Shinkolobwe Mine in the Belgian Congo was processed. The Shinkolobwe ore is noted for its extremely high

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

concentrations of uranium (30 to 65 percent by weight).  The plant also processed some domestic ores which were much less concentrated (< 1 percent uranium).

The first two steps of the process performed by Mallinckrodt involved digestion of the feed materials in acid and adjustment of the resulting solution.  The uranium remained in solution as uranyl nitrate while the other constituents of the feed material were precipitated out as solids and removed.  A condition placed on the Belgian Congo ore by the supplier required that radium, radium daughters, lead, and other valuable metals be extracted, stored, and returned to the supplier.  Therefore, the Mallinckrodt process included steps to extract these materials as a separate residue apart from the bulk of the ore residue.  The separated radium- and lead-bearing residue was known as *K-65* residue.

In 1946, AEC acquired a 21.7-acre tract of land in a then undeveloped area of north St. Louis County to store byproducts and scrap from the uranium processing at the downtown plant.  This tract of land is now known as the St. Louis Airport Site (SLAPS), which is part of the St. Louis Formerly Utilized Sites Remedial Action Program (FUSRAP) managed by the U.S. Army Corps of Engineers, St. Louis District.  The radium-bearing K-65 residues were stored in drums at the airport site from 1946 to 1948.  All the K-65 residues were eventually transferred to federal facilities in Lake Ontario, New York, and Fernald, Ohio, in 1948 and 1949.  There are no K-65 residues at the West Lake Site.

Other residues and scrap from the uranium processing were stored on the ground at the airport site.  Ultimately the airport residues were offered for public sale in June of 1960.  According to the Request for Proposal issued by AEC, the intent was to offer the purchaser the opportunity to recover valuable metals including copper, nickel, and cobalt.  The following residues were included in the offer:

- AM-7 pitchblende raffinate cake – This solid residue consisted of various metal hydroxides. The approximate gross weight of this material was estimated to be 74,000 tons containing about 113 tons of uranium.

- AM-10 or Colorado raffinate cake – This solid residue consisted of various metal hydroxides.  The material had an estimated gross weight of 32,500 tons containing an estimated 48 tons of uranium.

- AJ-4 barium sulfate cake (unleached) – The barium sulfate solids contained the remaining traces of radium and lead sulfates that were not removed as K-65 residue.  There was an estimated 1,500 tons of this material containing approximately 22 tons of uranium.

- AJ-4 barium sulfate cake (leached) – This residue resulted from leaching the barium sulfate cake with sodium carbonate solution so that as much of the remaining traces of uranium as was feasible was recovered.  There was an estimated 8,700 tons of this material containing approximately 7 tons of uranium.

Eventually, all of these residues were purchased by a private company and subsequently moved to a nearby location on Latty Avenue. All of the residues were ultimately shipped to Canon City, Colorado, for reprocessing except for the 8,700 tons of leached AJ-4 barium sulfate cake which had such low concentrations of uranium that it was considered commercially impractical to further process this material for its uranium content. The leached barium sulfate cake was reportedly mixed with 39,000 tons of soil and transported to the Site for use as daily and intermediate cover in the solid waste landfill operation.

While the Belgian Congo pitchblende ore concentrates and the radium-bearing K-65 residue might be described as extremely *hot* due to the high radium content, it is not accurate to refer to the leached barium sulfate cake, which is the material in Areas 1 and 2, as extremely hot or extremely dangerous. The unleached barium sulfate cake contained about $4 \times 10^{-9}$ grams of radium per gram of residue (0.0000004 percent) and about 0.1 percent uranium. After leaching, the residue contained even less of these constituents. The material was then blended with soil at approximately 5 to 1 before being put in the landfill. An approximate average uranium weight percentage of the soil mixture calculates at about 0.015 percent or an order of magnitude less than a common low-grade ore body. Analytical results from samples collected during the RI are consistent with these conclusions.

**8. Comment:** Polonium-210 has been in the news because it was believed to have been used to poison the former Russian intelligence officer, Alexander Litvinenko. Some commenters claim the presence of polonium-210 in the landfill material is of particular concern for public safety due to its highly radioactive nature.

**Response:** All of the radionuclides in the waste materials have been considered in the evaluation of this Site. The wastes contain naturally occurring uranium-238, thorium-232, uranium-235, and all the associated daughters in these decay series. For purposes of site characterization, the radionuclides with relatively long half lives are used as indicators for all members of their associated decay chains. Consistent with established practice, the occurrences of the short-lived daughters were inferred from the concentrations of these long-lived indicators.

Polonium-210 is one of the short-lived daughters of uranium-238. Like uranium-238, polonium-210 occurs naturally in the environment and can be found almost everywhere in soil, rock, rivers, and oceans. In fact, we all have low concentrations of polonium-210 in our bodies. Unlike uranium-238, however, polonium-210 is very radioactive compared to the same mass of uranium and has a correspondingly short half life of 138 days (meaning its activity will reduce by half every 138 days). For a given sample of material in secular equilibrium, the activity of each radionuclide in the decay series will equal the activity of every other radionuclide in the series. Therefore, the activity concentration of polonium-210 will equal the activity concentration of its long-lived progenitors, e.g., radium-226, but its relative mass concentration will be extremely small.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

The polonium-210 in the radiologically contaminated soils in the Site is in equilibrium with radium-226 and they have equal activity concentrations. For site characterization purposes, sampling and analysis measures the long-lived radionuclides in the decay series and the occurrence of the short-lived daughters such as polonium-210 is inferred. The risk assessment methodology is designed to account for dose contributions from all radionuclides in the decay chain.

Polonium-210 is an intense alpha emitter but because alpha particles cannot penetrate skin, it poses no external hazard. It must be either ingested or inhaled for it to be a potential hazard. Polonium-210 is a radon daughter and contributes to the inhalation hazard associated with prolonged radon exposure and cigarette smoking.

Lethal doses of polonium-210, such as implicated in the poisoning of Alexander Litvinenko, would require a nuclear reactor to produce and any significant amounts would not persist over long periods of time because of its very short half life.

As was explained in a prior response, toxic materials present a potential health concern only in the event people are exposed to the material. The Selected Remedy is the best option for ensuring that no human exposure occurs.

**9. Comment:** A few commenters make reference to the 1988 report by the Nuclear Regulatory Commission (NRC) which contains a conclusion that on-site disposal would likely require that the material be placed in a disposal cell.

**Response:** The 1988 NRC report (NUREG-1308, Rev. 1) examines the applicability of the 1981 NRC Branch Technical Position (BTP). The NRC's BTP was established prior to the implementation of the revised NRC standards for protection against radiation (10 CFR 20) in 1996 and was intended to provide options for license termination under restricted conditions at uranium and thorium processing facilities. The BTP prescribed five acceptable options for disposal or on-site storage of materials containing low levels of uranium and thorium. Options 1 through 4 range from conditions requiring no use restrictions to conditions of on-site burial with land-use restrictions and institutional control. The appropriate option depended on the concentrations of radionuclides present. If concentrations exceeded those permitted under Option 4, the materials were to be stored on-site pending the availability of an appropriate disposal option.

The NRC concluded in the 1988 report that the future concentrations of Ra-226 would exceed the Option 4 criteria and therefore "…onsite disposal, if possible, will likely require moving the material to a carefully designed and constructed 'disposal cell.'" Construction of an on-site disposal cell is not one of the options provided for in the BTP, and the report does not describe the rationale that led to this conclusion. A reasonable interpretation is that the Site presented circumstances very different from the circumstances anticipated in the NRC's BTP. The BTP was intended to address residual contamination in soils and waste materials at uranium and thorium processing facilities. The BTP lacks any reasonable option for residual contamination that is mixed with large volumes of heterogeneous municipal refuse in an existing landfill.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

The 1988 NRC report was based on very limited field investigations.  No comprehensive groundwater investigation had been performed.  As the NRC explained in the report, its conclusions are preliminary and field investigations must be performed to resolve major questions and allow proper evaluation of remedial alternatives.  The necessary work to support the Selected Remedy has since been conducted through the Superfund RI and Feasibility Study (FS) process.

Note that the NRC's decommissioning rules and associated guidelines have undergone substantial changes since the 1981 BTP.  The NRC decommissioning standards are mainly codified in 10 CFR Part 20, Subpart E, and provide radiological dose limits for termination of licenses.  The standards apply to facilities decommissioned under 10 CFR Part 30 which governs byproduct materials, Part 40 which governs source material, and Part 70 which governs special nuclear material.  The decommissioning standards establish criteria for license termination with unrestricted use, termination under restricted-use conditions, and allow the submission of alternative criteria for license termination.

The NRC criteria for operation of uranium mills (Appendix A to Part 40) are the most relevant to the conditions present at the Site.  These criteria are derived from standards set by EPA under the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA).  UMTRCA directed EPA to set standards to govern the stabilization, disposal, and control of uranium and thorium mill tailings.  These standards were promulgated in 40 CFR Part 192.  The Selected Remedy will meet relevant and appropriate standards from 40 CFR 192.  See section 12 of the OU 1 ROD for a description of these requirements.

**10. Comment:**  A number of commenters are concerned about radon releases and the effectiveness of landfill caps or clay liners in containing radon releases.

**Response:**  First of all, it should be clarified that any release or potential release of radon from the radiologically contaminated disposal areas (Areas 1 and 2) is only an exposure concern for someone who occupies the surface of Areas 1 and 2 and the immediate vicinity.  The average radon flux from the Site under current conditions with no landfill cap in place at Areas 1 and 2 is already less than the standard that is considered safe for tailings piles at uranium mill tailing sites.  The net contribution of radon to the ambient air from the Site is very small and would not be detectable at off-site locations.  Even if left in its current condition, radon from the Site will not pose any sort of threat to the air in the St. Louis region and beyond as some commenters claim.

Multi-layer, natural material cover systems are effectively designed and engineered to mitigate the release of radon gas, minimize water infiltration, and remain effective for long periods of time.  When caps are used to contain radium-contaminated wastes, they are typically designed to confine gaseous radon until it has essentially decayed.  Such systems are used to contain long-lived radionulides at large uranium mill tailing sites where radon generation is a larger problem than at the Site due to the vast amounts of tailings involved.  Since radon decays rather rapidly (Ra-222 has a half life of 3.8 days),

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

vertically migrating gas only needs to be detained for a relatively short period of time for the radon to decay. The typical depth of a natural materials cover necessary to accomplish this is about five feet for radon-222. When the remedy is implemented, it will be designed so that radon measurements at the surface of the cap should be indistinguishable from background.

**11. Comment:** Many commenters refer to the illegal dumping of the radiological material at the landfill.

**Response:** We assume this refers to conclusions reached by AEC inspectors in 1974 who judged that the licensee had acted improperly by mixing the barium sulfate residues with soil to achieve uranium concentrations (less than 0.05 percent) which would otherwise have made the material exempt from licensed disposal. Mixing with clean material to achieve this condition was not considered permissible. Follow-up inspections of the Site by the NRC in 1976 found no potential for significant radiological hazards to the public under the then current circumstances. They did caution that indoor radon could be an issue if structures were to be built on-site. (NRC Office of Inspection and Enforcement Region III, Investigation Report No. 76-01)

Nonetheless, regardless of whether the activity that caused the release was legal or illegal at the time it took place, CERCLA or Superfund gives EPA the authority to respond to releases of hazardous substances from a facility into the environment. Further, EPA has the statutory authority to respond to a release or to enter into settlement agreements with Potentially Responsible Parties (PRPs) requiring them to respond to the release; in many cases, this authority is used to address contamination resulting from old, uncontrolled, or abandoned waste sites. The stated purpose of CERCLA as indicated in the legislative history is to establish a comprehensive response and financing mechanism to abate and control the vast problems associated with abandoned or inactive hazardous waste sites. The NCP which can be found at 40 CFR Part 300, provides a regulatory framework for implementing the goals of CERCLA. The NCP provides specific decision-making criteria for reaching a ROD using those evaluation criteria. The legality of any historic activities that may have lead to the problem has no bearing on the decision-making process and it is not material to selecting the optimal remedial approach.

**12. Comment:** Some commenters question why the Site contamination should be managed in place while similar contamination at the nearby North St. Louis County FUSRAP sites is being excavated and shipped for commercial disposal.

**Response:** The differences in the remedies selected for each site are a function of the differing site-specific circumstances; the differences cannot be attributed to the fact that one site is FUSRAP and the other is not. The AEC established FUSRAP in March 1974 under the authority of the Atomic Energy Act (AEA) of 1954 to identify, investigate, and take appropriate cleanup action at sites where work was performed in support of MED and early AEC programs. FUSRAP provides for federal funding to designated sites. It is CERCLA, however, that provides the response authority and governs the decision-making process at both North St. Louis County FUSRAP sites and the West Lake Site.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

In the case of the North St. Louis County sites, the contaminated media is generally surface soils. The contaminated soil is or was widely distributed across approximately 80 properties including SLAPS, owned by the city of St. Louis, and a variety of properties used for a variety of purposes, e.g., commercial, light industrial, recreational, open fields, and transportation facilities. The mostly private properties are criss-crossed with public roadways, railroads, and utility right-of-ways. The majority of these soils are accessible to the public. The contaminated soil is located in places where workers or members of the public might reasonably be expected to come into contact with it. Moreover, many of these properties are being used or could be used in ways that are incompatible with leaving the soil in place. These considerations were factored into the remedy which calls for the accessible contaminated soils to be excavated and shipped for commercial disposal.

A subset of the St. Louis FUSRAP contaminated soils, referred to as the inaccessible soils, are located under roads, active rail lines, buildings, and other permanent structures. There are over 69,000 cubic yards of contaminated soils in this category. The inaccessible soils do not pose an exposure concern as long as the road or other permanent structure remains in place. The Selected Remedy for the inaccessible soils at the North St. Louis County North FUSRAP sites is to manage these in place using institutional controls.

In contrast to the situation in North St. Louis County, the West Lake Site has been a landfill site since the early 1950s and will remain a dedicated landfill site into the future. The radiological contamination is disposed with other wastes in the landfill. The current use and the reasonably anticipated future use of the Site is as a landfill. In short, waste disposal is consistent with current and future land use at the West Lake Site; such is not the case for the St. Louis sites. Accordingly, land use at the Site is restricted through covenants recorded by the property owners; the restrictions cannot be terminated without the written approval of both the Missouri Department of Natural Resources (MDNR) and EPA. In addition, more comprehensive land-use restrictions are required as part of the Selected Remedy. If there is an analogy to be drawn with the St. Louis FUSRAP, it is with the inaccessible soils that, like the soils in the landfill, do not pose a health concern as long as the barrier to exposure remains in place.

**13. Comment:** Some commenters object to the process that allows the parties responsible for the contamination to develop the RI, BRA, and other documents that support the decision-making process.

**Response:** When CERCLA was enacted in 1980, it contained a broad liability scheme which could reach the variety of people who were responsible for the contamination at the various sites. This liability scheme focused on requiring the polluters to pay for the cleanup of sites. In 1986, Congress amended CERCLA by the Superfund Amendments and Reauthorization Act which, among other provisions, authorized EPA to achieve cleanup by negotiating with potentially responsible parties (PRPs) to enter into agreements to perform response action including RIs. EPA followed this statutory

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

process by entering into an Administrative Order on Consent (AOC) in 1993 with the PRPs to perform the RI/FS. Various provisions of that AOC require the PRPs (who are known as Respondents in the AOC) to submit reports to EPA for approval or disapproval and to respond to EPA's comments or requests for modification of the documents. In addition, all data collected by the Respondents were subjected to a rigorous Quality Assurance/Quality Control (QA/QC) process which provides yet another safeguard. The RI report and all the documents that were submitted by the Respondents in preparation for that document were subjected to this process, thus assuring that EPA had the final approval on the contents of the documents.

When the AOC was signed in 1993, it was anticipated that EPA would perform the risk assessment; however, late in 1993, EPA changed its practice and allowed the option of having the PRPs perform the risk assessment under certain specified conditions. Since issuance of the 1993 directive, PRPs have been allowed to perform the risk assessment at most sites. EPA's experience with these risk assessments has shown that with appropriate oversight, PRPs can perform acceptable risk assessments and allowing the PRPs to perform the BRA can be the most effective and efficient way to complete the RI/FS. Subsequent to the new directive, the AOC was modified to allow the PRPs to perform the risk assessment with oversight from EPA. The AOC procedures for approval, disapproval, and modification were followed for the risk assessment as well.

Moreover, EPA has a longstanding policy to pursue "Enforcement First" throughout the Superfund cleanup process. This policy promotes the polluter pays principle and helps to conserve the resources of the Hazardous Substance Response Trust Fund for the cleanup of those sites where viable responsible parties do not exist. The process undertaken at the Site has been consistent with these requirements of sections 104, 122(a), and 122(d)(3) of CERCLA, as amended, as well as the expectations outlined in EPA guidance. At this Site, the polluters have been paying.

**14. Comment:** Many commenters make the general claim that the Site is a bad location to dispose of radiological waste and that the waste should be disposed in a federally licensed landfill.

**Response:** The objective of the CERCLA decision process for the Site is to identify the best option for existing land disposal units considering the risk-based evaluation criteria provided in the implementing regulations (NCP).

The CERCLA evaluation criteria are explained in section 10 of the ROD and can be found at 40 CFR Section 300.430(e). The information compiled during the RI/FS indicates that the waste can be safely managed in place using mature and well understood landfill techniques, while excavation of waste materials from this or any landfill introduces a variety of risks and complications. For example, there are risks associated with spills during transport and the increased risk of traffic accidents. Excavation involves many worker safety issues, both from potential exposure to toxics and from the physical hazards of having to manually excavate, sort, and sample various types of refuse, debris, and oversized objects. Excavation introduces the potential for spreading

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

contamination due to complicated water management issues, decontamination issues, and dust suppression concerns. Uncovering putrescible waste introduces the potential for odor emissions and bird problems. The potential to attract birds raises specific safety and administrative issues for the Site due to its proximity to the Lambert-St. Louis International Airport.

Moreover, there is no clear path to commercial disposal for the wastes in Areas 1 and 2. Currently available commercial disposal facilities for radiologically contaminated materials are not permitted to accept municipal solid wastes. Therefore, the nature of necessary waste handling or treatment prior to disposal as well as the final unit disposal cost is highly uncertain. In short, excavation options are much more difficult and time consuming to implement, much more expensive, and actually introduce unnecessary health and safety risks.

EPA has a lot of experience with CERCLA municipal landfill sites. Approximately 20 percent of the sites on the Superfund National Priorities List (NPL) are municipal landfill sites. These sites share many similar characteristics including large waste volumes and heterogeneous mixtures of municipal waste frequently co-disposed with industrial and hazardous wastes. In many cases, the hazardous chemical substances are much more toxic and more mobile in the environment than the radionuclides contained at the Site. Nevertheless, containment in place is the primary remedy selected in these cases because excavation and removal of the landfill simply does not compare favorably with containment when evaluated against the nine evaluation criteria from the NCP.

**15. Comment:** Some residents of the Spanish Village subdivision, and others who may have been living in proximity to the Site in the 1973 time frame when the radiologically contaminated soil was placed in the landfill, have expressed concern about the potential for cancer or other health effects resulting from airborne dust or other potential exposures to these materials at that time.

**Response:** While there is no specific information available that could be used to estimate potential exposures during this episode, we can make some generalizations. Based on a review of the available records, about 43,000 tons of radiologically contaminated soil was delivered to the Site from the period July 16 to October 9, 1973. Therefore, the period of time over which there could have been exposure is short – less than a few months. The soil was reportedly used as daily and intermediate cover in the landfill operation. The off-loaded soil would likely have been stockpiled, spread out with heavy equipment, and ultimately compacted under successive layers of waste and soil placement. During this period, there may have been some variable off-site air releases in the form of radon and windblown dust. The potential for off-site migration of contaminated soil particulates or radon would have varied considerably depending on the direction and velocity of the wind and the moisture content of the soil. However, any releases of this nature would have been subject to rapid wind dispersal; people would have had to be on the Site or quite near it during late summer or early fall 1973 to have become exposed to Site contaminants. It is highly unlikely that people located in Spanish Village, for example, would have been exposed to Site contaminants.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

One should keep in mind that the radionuclides at the Site in the concentrations at which they occur do not pose acute health risks. A person would generally have to be in contact with the contaminated material at the Site over a period of years before significant calculated health risks would accrue. Considering the low exposure point concentrations and short duration of any potential exposures, the probability of significant public health effects from the disposal episode in 1973 is very small.

There are options available for people who continue to have health questions. Individuals can initiate a cancer cluster investigation through the Missouri Department of Health and Senior Services (MDHSS). MDHSS staff will work with individuals or communities to investigate the concern. MDHSS staff can be reached at (573) 522-2840. This information was also provided during one the of EPA public meetings.

Also, the Agency for Toxic Substances and Disease Registry (ATSDR) can look into health concerns at Superfund sites. Upon request, ATSDR will look at various site-related factors and draw some conclusions about the potential for human exposure to toxic materials at the Site. For more information, you may contact Denise Jordan-Izaguirre at (913) 551-1310 or Sue Casteel at (913) 551-1312.

If there is sufficient interest, a community meeting designed to address potential health issues associated with the Site can be arranged. EPA would be willing to organize a meeting and make public health officials available to answer questions. To discuss the possibility, please contact our community involvement coordinator, Debbie Kring, at (913) 551-7725.

**16. Comment:** Many commenters, particularly those who live or work near the Site, expressed support for the proposed remedy and objected to any plan to excavate materials from the landfill. The major concerns included the potential for airborne and waterborne releases of contaminants and the potential for accidents associated with increased truck traffic. Some are also concerned about the nuisance issues associated with trash hauling including truck traffic, noise, and odor. The potential for bird problems is also an issue particularly for the nearby Lambert Airport.

 **Response:** The Selected Remedy is consistent with the remedy presented in the Proposed Plan. The concerns expressed by these commenters are consistent with some of the trade-offs identified by EPA in the evaluation of the alternatives. No extensive waste excavation and trash hauling are planned. Some excavation and relocation of contaminated soils may be necessary to address the Buffer Zone/Crossroad Property. If so, dust control measures will be used as necessary to ensure no air releases of fugitive dust. Work place air monitoring will also be employed. To implement the Selected Remedy, some additional local truck traffic will be necessary to bring in materials and equipment used to construct the landfill cover; however, the duration of the construction activities will be relatively short, i.e., one or two construction seasons.

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

**17.  Comment:**  Several commenters were of the opinion that there was inadequate public notice of the Proposed Plan and the first two public meetings held in 2006.

**Response:**  EPA implemented its normal notification procedures which are designed to inform the affected community and other stakeholders.  Concurrent with the release of the Proposed Plan in June 2006, display ads were placed in multiple editions of the *Hazelwood-Bridgeton Journal* of the *Post Dispatch*.  Fact sheets were mailed to area residents, schools, media contacts, local government, environmental and activist groups, state and federal elected officials, and other known interested parties.  The ads and fact sheets all included notice of the first public meeting in June 2006 and instructions on how to obtain Site documents.  The Proposed Plan and FS were made available on the Internet and the Administrative Record was placed at the Bridgeton Trails Branch of the St. Louis County Library near the Site.  EPA provided specific documents on request.  In preparation for the second and third public meetings in September 2006 and March 2008, this entire notification process was repeated.  EPA believes every reasonable effort was made to assure full public participation in the process.

**Specific Responses:**

Individual responses are provided for cases where the commenter submitted very specific comments, some of which are not fully covered by the general responses above.  These comments are in no particular order, but are identified according to the name of the person or organization that submitted the comments.  The bold headings used to organize some responses are taken from the letter submitted by the commenter.  In some cases it will be necessary to read the comment letters themselves in order to fully understand the response.  Therefore, copies of the comment letters addressed by these specific responses are attached.

**1.  <u>Byron Clemens</u>**

1.  The commenter states: The BRA should be given NO WEIGHT, etc., (pg. 1 of comment letter).

The purpose of the BRA is to establish a statutory basis for taking a response action.  In other words, an unacceptable threat to human health and the environment must be established before EPA can compel a response action.  Both the statute and NCP control the manner in which the BRA is prepared, no matter who prepares the document.

The BRA was prepared in accordance with EPA's Risk Assessment Guidance for Superfund, Volume I, Human Health Evaluation Manual (Part A), EPA/540/1-89/002 (RAGs).  This guidance establishes a standardized conservative methodology for conducting human health evaluations at Superfund sites.  Standard exposure factors and toxicity data are used.  The BRA was developed using prescribed methods and verifiable data.  The document was submitted to EPA and the Missouri Department of Health and was reviewed extensively before being approved.  There is no basis for the commenter's claim that the BRA misrepresents the case.

The BRA draws no conclusions with respect to risk management.  All risk management decisions are made by EPA with participation from the state.  These risk management decisions are described in the Proposed Plan and ROD, and only alternatives that are protective of human health and the environment may be considered for selection.

The commenter has misinterpreted the reference in the BRA to the no action alternative.  The NCP requires that a no action alternative be developed in the FS [40 C.F.R.300.430(e)(6)]; this alternative then serves as a benchmark for evaluating other action alternatives.  As such, the BRA must also evaluate a range of risks under the condition that no mitigating action is taken.  That is why it is referred to as a baseline risk assessment.

2.  The commenter states: Page A.2-4 of the BRA indicates that the levels of U-235 are "higher *than one would expect*," indicates a significant lack of institutional memory, etc. (see pg. 1 - 2 of comment letter).

The commenter has misinterpreted the information.  Several points should be made here.  First of all as previously stated, there is no raw Belgian Congo pitchblende in the waste materials at the landfill.  The leached barium sulfate residues in the waste material are byproduct material left over after a substantial amount of processing had been done to remove uranium, radium, and their daughters.  Secondly, the observation in the BRA that U-235 concentrations were higher than one would expect from natural uranium is not a comment on the absolute concentrations.   It is a comment on the relative concentrations with respect to the other natural isotopes of uranium.  The Belgian Congo pitchblende ore had high concentrations of uranium (30 to 65 percent by weight); however, the isotopes of uranium were in their natural ratios.  Concentrations in the contaminated soils average less than 0.02 percent or substantially less than would be found in a low-grade domestic ore body.  Therefore, the absolute concentrations of total uranium in the Site waste material are not particularly high.

3.  The commenter states: Page 15 of NUREG – 1308 lists the presence of Th-230 and Ra-226 and states, "…*indicating a significant increase in radiological hazards*", etc. (see pg. 4 of comment letter).

As explained in the NUREG – 1308 report and the RI/FS documents, one of the effects of the ore processing is that the naturally occurring U-238 to Th-230 to Ra-226 equilibrium has been altered.  The ratio of Th-230 to Ra-226 is much greater than would be the case if these radionuclides were in equilibrium.  Therefore, radioactive decay of the Th-230 will increase the concentration of its decay product Ra-226 with time until these radionuclides are again in equilibrium.  Ra-226 and its daughters are principal risk drivers in this decay series and therefore the radiological hazard from potential exposure to these materials will increase with time until equilibrium is reached.  The buildup of a daughter radionuclide takes about 7 x the daughter's half life; in terms of Th-230 to Ra-226, this would take about 7 x 1,600 years or about 11,200 years.  Also, increased Ra-226 concentrations will lead to increased radon generation.  These factors were taken into

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

account when evaluating the remedial alternatives.  The selected engineered cover system will be designed to account for future ingrowth of Ra-226 and future radon gas generation.  The properties and thicknesses of the materials used to attenuate emissions will be developed according to the future composition of the waste material.

The NUREG – 1308 report states that "some low-level contamination of the groundwater is occurring."  The 1988 NRC report indicates that multiple sampling events over several years identified a few sporadic detections in groundwater or borehole water at or slightly exceeding the drinking water standard of 15pCi/l gross alpha activity.  This draws from the results of NRC-sponsored field investigations conducted in the early 1980s, most notably the radiological survey report developed by Radiation Management Corporation (RMC).  Without any follow-up radiochemical analysis, it is difficult to draw many precise conclusions from this information; however, the tabularized results on alpha particle activity provided in the report do not indicate significant or wide-spread impacts to groundwater, and most of the sample results fall in a range consistent with background.

More extensive groundwater investigations were conducted in conjunction with the RI and included isotopic analysis for the uranium-238, uranium-235, and thorium-232 decay series over a period of years.  The results produced only two detections of total radium (combined radium-226 and radium-228) exceeding the MCL (drinking water standard) of 5 pCi/l, with the maximum detected concentration of 8 pCi/l.  It is clear from the RI data that there are no concentrated or wide-spread radiological impacts to groundwater from Areas 1 and 2.

The NUREG – 1308 report contains a conclusion to the effect that the long-term Ra-226 concentration will exceed the Option 4 criteria and therefore on-site disposal would likely require the material to be placed in a designed and constructed disposal cell.  This conclusion needs to be looked at in context.  The Option 4 reference comes from the NRC BTP on options for on-site disposal or storage of thorium or uranium wastes from past operations (46 FR 52061, October 23, 1981).  The guidance sets out five progressively more restrictive options for dealing with residual contamination at former processing sites.  Options 1 through 4 range from no-use restrictions necessary to burial on-site with land-use restrictions.  Option 5 consists of on-site storage pending availability of a licensed disposal facility.  The option of a designed and constructed on-site disposal cell is not among the options described in this guidance, so this conclusion appears to be based on site conditions not meeting any of the prescribed options.  However, the NUREG -1308 report does go on to explain that this conclusion is not based on groundwater study or engineering evaluation and that investigations must be performed to develop the necessary information to resolve major questions and to provide a sound basis for evaluation of the feasibility of disposal alternatives.  EPA has since performed the investigations and engineering evaluations necessary to support the Selected Remedy.

For informational purposes, the NRC's decommissioning rules and associated guidelines have undergone substantial changes since the 1981 guidance.  The NRC decommissioning standards are mainly codified in 10 CFR Part 20, Subpart E, and

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

provide radiological-dose limits for termination of licenses.  The standards apply to facilities decommissioned under 10 CFR Part 30 which governs byproduct materials, Part 40 which governs source material, and Part 70 which governs special nuclear material.  The decommissioning standards establish criteria for license termination with unrestricted use, termination under restricted-use conditions, and allow the submission of alternative criteria for license termination.

Most relevant to the West Lake Site are the NRC criteria for operation of uranium mills which are derived from standards set by EPA under the UMTRCA of 1978.  UMTRCA directed EPA to set standards to govern the stabilization, disposal, and control of uranium and thorium mill tailings.  These standards were promulgated in 40 CFR Part 192.  The Selected Remedy will meet relevant and appropriate standards from 40 CFR Part 192.  See section 12 of the OU 1 ROD for a description of these requirements.

4.  The commenter states:  U.S. NRC NUREG/CR 2722, May 1982, characterizes the Westlake wastes….(beginning pg. 4 of the comment letter).

In August 1980, the NRC contracted with RMC to perform a radiological evaluation of the Site.  The NUREG/CR 2722 report provides the results of that study.  RMC used a variety of methods to evaluate the Site including gamma surveys, surface and subsurface sampling, radon flux measurements, and measurement of airborne radioactivity.  The RMC concluded that radiation exposure risk to Site workers was minimal.  Elevated concentrations of uranium and daughters exist in landfill soils but elevated levels were not found in off-site soils.  RMC did not find any indications that groundwater movement of materials from the Site had occurred.

EPA takes no issue with factual representations from this report, and the findings of this study are generally consistent with the results of the CERCLA RI phase.

The commenter provides a series of excerpts and representations from the RMC report.  Many statements in the comment misrepresent the information presented in the report.  Some of the statements are addressed below.

- The comment says the RMC report, "states 1977 and 1978 monitoring wells showed movement of contaminants."  It needs to be clarified that the results of this U.S. Geological Survey monitoring indicated movement of leachate based on chemical (not radiological) analysis.  This finding is consistent with the findings of the RI groundwater sampling which detected some limited occurrences of VOCs and SVOCs.

- The comment misquotes page 15 of the study as finding "water monitoring wells with levels of U-238 daughters at more than 19,000 pCi/g."  This section of the report is describing the results of subsurface soil analysis and perhaps this quote derives from the finding that concentrations of Bi-214 in subsurface soils ranged from less than 1 to 19,000 picocuries per gram (pCi/g).  In fact, the results of water analysis summarized beginning on page 16 of the report found no significant alpha activities.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

- Referring to the RMC report, the comment describes, "Westlake samples from 1980 and 1981 on Page 16 found several water samples exceeding U.S. EPA gross beta drinking water standards." It needs to be clarified as explained in the RMC report that the gross beta activity was from the leachate treatment lagoons and isotopic analysis attributed the beta activity to potassium-40, probably from potassium phosphates. The gross beta activity is unrelated to the Mallinckrodt wastes.

- Referring to radon flux measurements as high as 858 pCi/sq.m-s, the comment states that, "The maximum permissible standard is 20." Consistent with the findings of the RI, radon flux measurements at several discrete locations were relatively high. The radon flux standard for uranium and thorium mill tailings found in 40 CFR Part 192 is 20 pCi/m$^2$s. The standard is applied to an annual and a spatial average across the entire tailings pile or waste site not to a single measurement. As explained in section 12 of the OU 1 ROD, this standard, although not applicable, is considered relevant and appropriate to Areas 1 and 2 of the Site and will be met. The average radon flux for all 54 measurements was 22 pCi/m$^2$s. After the Selected Remedy has been implemented (after the cover has been constructed), the radon flux will be much lower than the standard and probably will be indistinguishable from background.


## 2. **Kay Drey**

**I.** The headings used to organize this response are not EPA's and were taken from the December 19, 2006, comment letter attached.

### A. **Some of the radioactive wastes at West Lake are extremely rare and particularly dangerous.**

Many of the claims made here are not true or are misleading. The radionuclides in the waste material at Areas 1 and 2 are derived from natural uranium ore. Natural uranium ore has both U-235 and U-238. Each of these has a chain of decay products, for a total of 32 separate isotopes including the isotopes identified in this comment. The nuclides in these series are not rare or unusual. Also, the dangers posed by these radionuclides are a function of the concentration, the manner in which someone becomes exposed, and the period of time over which someone is exposed. Judgments regarding health risk cannot be made without considering these factors.

Uranium is one of the most abundant elements found in the earth's crust. The following comparison is intended to provide a general point of reference for the concentration levels found at the West Lake Site. Natural uranium occurs in soil and rock at a few parts per million (ppm). Natural uranium occurs in the contaminated soils in Areas 1 and 2 at about 150 ppm. Natural uranium occurs in a low-grade ore body (0.1 % U) at about 1,000 ppm. Natural uranium occurs in a high-grade ore body, like the Belgian Congo pitchblende, at a few hundred thousand ppm. The measured uranium concentration in the landfill is much lower than the concentration found in uranium ore. In all of these cases, the uranium exists as several isotopes in their naturally occurring proportions: primarily

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

U-238 (99.275 percent), U-235 (0.72 percent), and U-234 (0.0058 percent).  In terms of activity concentration, natural uranium has approximately equal activity concentrations of U-234 and U-238.  The activity concentration of U-235 is approximately 5 percent of the activity concentration of U-238 or U-234.

For purposes of site characterization and risk assessment, the radionuclides with relatively long half lives are used as indicators for all members of their associated decay chains.  The occurrences of the short-lived daughters can be inferred from the concentrations of these long-lived indicators.  It is true that the short-lived radionuclides, such as Po-210, are more highly radioactive than the long-lived members of the decay chain, but because of their short-half lives, they are present in relatively small mass concentrations.

See also the General Responses on the Belgian Congo pitchblende ore, contaminant migration to groundwater, and the safety of managing the material in place.

**B.  Flood plains are for flood waters – NOT for radioactive wastes.**

If we assume some sort of catastrophic failure of the levee as the commenter suggests, high velocity water might be expected to scour the ground and spread unconsolidated material for miles.  Such an event could do considerable damage to many of the buildings and structures in the business park.  Fortunately, the closest portion of the Site is one and one-third mile from the river.  Based on flood water elevations, the potential depth of flood waters at the Site is small and the energy of the water would be substantially dissipated.  However, to address this concern, flood protection measures will be evaluated in the remedial design.

EPA has not made the claim that levees do not fail; in fact at the third public meeting, EPA arranged for presentations regarding the performance and construction of levees, and the impact of levee failures that occurred as a result of Hurricane Katrina.  It is noteworthy that the vast majority of levee "failures" are actually the result of overtopping, i.e., the flood event exceeds the design criteria for the levee.  In the event of overtopping, flood waters would be expected to fill the protected area behind the levee; however, such an event would generally not result in high velocity water.  Under this scenario, any flood waters reaching the toe of the landfill would be shallow and low energy and would not be expected to have significant impact on the landfill cover.

See also General Response on the flood plain issue above.

See General Response on earthquake impacts.

See General Response on groundwater impacts.

**C.  Longevity:  West Lake's radioactive wastes will continue releasing dangerous particles and rays into the Metropolitan St. Louis environment VIRTUALLY FOREVER  -- unless they are removed.**

It is certainly true that the principal isotopes of uranium and thorium at the Site are extremely long lived.  The half life of U-238 is 4.5 billion years, almost as long as the earth is old.  However, it is simply not true that these wastes are releasing dangerous particles and rays into the metropolitan St. Louis environment.  It is a straightforward task to measure the radiological impacts of these materials, and such measurements have been made numerous times including during the RI.  The data do not support this claim.  See also, General Responses above.

Regarding the interrelationship of the radiological wastes with other chemical toxins at the Site, one of the primary purposes of the field studies for both the OU 1 and OU 2 was to investigate for the presence of industrial hazardous wastes.  Based on extensive sampling of groundwater, leachate, soil, and waste material, no evidence of significant industrial hazardous waste disposal was found in any of the landfill units.  Most of the data are consistent with typical sanitary and municipal solid waste disposal.

Shallow groundwater at the southwest corner of the Site has been significantly impacted by petroleum hydrocarbons and VOCs.  The source of these impacts could be the OU 2 Inactive Sanitary Landfill, or more likely, the leaking underground storage tank site located to the east near the asphalt plant.  The storage tanks which contained diesel fuel have been removed, but impacts to the groundwater in this vicinity remain.  This will not have any impact on the efficacy of the Selected Remedy.  The groundwater underlying Areas 1 and 2 is not significantly impacted, and the detection monitoring program can be designed to account for baseline conditions.

**D.  *Hot spots* are found at and below the surface at West Lake.**

In the context of CERCLA municipal landfill sites, the term "hot spot" is a term-of-art.  It is used to refer to discrete volumes of highly toxic or highly mobile wastes located within the much greater volume of heterogeneous material that makes up the landfill waste.  Typical examples include buried drums containing hazardous chemicals or lagoons full of liquid industrial waste.  Under the guidelines, such hot spots should be evaluated for removal.  Even though the radiologically contaminated areas at the Site do not qualify as hot spots under the guidance, the presence of these long-lived radionuclides led EPA to determine that an alternative involving removal of material should be developed and evaluated.  The discussion in the Proposed Plan and ROD on this subject is intended to clarify the basis for developing Alternative 6 – *Excavation of higher levels of radioactivity from Area 2 and regrading and installation of a Subtitle D cover system.*  By assuming a subset of waste material with relatively higher concentrations, the objective was to define an excavation alternative that had a chance to compare favorably with containment only under the evaluation process.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Alternative 6 involves many uncertain assumptions.  For example, it is not clear that identifying hot spots or subsets of more radiologically contaminated material would have practicable implementation value.  Since the contaminated soil was originally distributed in layer-like fashion, it would be expected that multiple, elevated concentration levels could be found at similar depths.  However, these correlations do not translate into a capacity to recover the in situ radiologically contaminated soil as some sort of discrete unit.  In fact, the data indicate that the soils are variably distributed through the upper 10 or 15 feet of municipal refuse.  The contaminated soils would have to be removed along with large quantities of heterogeneous bulk waste materials.  The feasibility and effectiveness of separating the soils from the bulk waste are uncertain.  Also, there may not be a correlation between higher radioactivity measurements and the presence of greater quantities of soil.  So targeting soils that have relatively higher radionuclide concentrations might not yield large quantities of contaminated soil.  In short, successful recovery of a subset of contaminated soil could be achieved; however, successful recovery of a subset of soil that truly contains a disproportionate amount of the radiological content could be difficult to achieve or verify.

The commenter questions what she characterizes as the lack of data or data gaps associated with the soil sampling conducted during the RI.  While it is true that more information on the subsurface profile of the radionuclide contamination would likely be needed to effectively design and implement a response action consistent with Alternative 6, the RI data are sufficient to support comparative analysis as required in a FS.

The question goes to the purpose of the RI soil boring program which was intended to identify some of the higher radionuclide concentrations and define the general extent of the radiologically contaminated soils.  In accordance with the RI Work Plan, soil samples were collected at five-foot depth intervals from the various borings and correlated with downhole gamma surveys.  The plan called for laboratory analysis of two samples from each of the 50 borings.  One sample was to be analyzed from the location of the radiological high as determined by the gamma logs.  The second sample was collected from immediately below the base of the radiologically elevated interval or from the base of the landfill debris if elevated readings were not detected.  Samples were analyzed for the range of radiological and nonradiological parameters.  The general absence of radionuclides in the deeper samples from these borings shows that the radiologically contaminated soils are generally located in the upper 10 to 15 feet of the landfill material.

Some of the information contained in this comment about U-235 and its daughters is simply not the case.  U-235 is not rare and occurs naturally in U.S. uranium mill tailings piles and in rock and soils everywhere.  At 5 percent the activity of U-238, U-235 is present in the background soils at about 0.14 pCi/g.  U-235 was not detected in the background soil samples at the Site because levels in the 0.14 pCi/g range are below the detection limit for the method that was used.  The combination of U-235/236 was measured in background samples from 0.21 to 0.91 pCi/g.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

**1.  Some relevant federal regulations and standards:**

**a.**  The reference levels used in the RI come from the soil cleanup standards found in UMTRCA, 40 CFR Part 192, Subpart B, which apply to the cleanup of inactive uranium processing sites and specify that Ra-226 concentrations should not exceed 5 pCi/g above background in the top 15 centimeter (cm) of soil and 15 pCi/g in lower 15 cm layers averaged over 100 square meters.  These numbers are used in the RI as a simple reference for the purpose of putting a boundary around the significantly impacted areas.  These standards are also considered relevant and appropriate to the cleanup of soils on the Crossroads Property adjacent to Area 2.  Design-level investigation will need to be done to determine the extent of any necessary cleanup of that property.

The criterion for gamma exposure rates identified in the NRC's reports is used in the survey methodology to identify the limits of elevated, external gamma radiation.  Gamma readings are generally taken on a grid at about 1 meter above ground surface.  The background gamma exposure rate in the area of the Site and in Missouri in general is approximately 10,000 counts per minute (cpm) using a 2"x2" sodium iodide detector or about 10 Micro Roentgen per hour (uR/hr).  At one meter above the ground surface, approximately half of this exposure is due to terrestrial radiation and half is due to cosmic radiation.  The criterion of 20 uR/hr used in the NRC's investigation of the Site comes from the NRC's BTP (October 1981) which identified elevated, external gamma as 10uR/hr above background.

External gamma radiation levels are elevated in Areas 1 and 2.  Overland gamma survey results identified some locations at several times background.  Several downhole gamma readings were over 100 times background, e.g., the reading of "nearly 2,300,000 counts per minute" referenced in the comment.  (Note: background readings using a 2"x2" sodium iodide detector of the sort used in this study is approximately 10,000 cpm, not 10 cpm as claimed in the comment.)  This does not present a health concern because there is no reasonable way for anyone to be subjected to prolonged contact with the materials buried in the landfill.  Also, direct comparison of overland gamma readings and borehole measurements cannot be made even if a similar detector is used because the geometry of the borehole is much different than a reading taken at three feet above the surface.  In a borehole, the detector is physically closer to the contaminated material and is completely surrounded by the contaminated material.

**b.**  EPA agrees that the radionulides at the Site derive from uranium processing and that certain UMTRCA requirements including the groundwater protection standards are relevant and appropriate to the selected remedial action.  See section 12 of the ROD for a description of these applicable or relevant and appropriate requirements (ARARs).

**E.  Many unanswered questions remain about the monitoring of the West Lake radioactive wastes.**

**1.**  The commenter makes the claim that the RI, having been developed on behalf of the PRPs, attempts to discount elevated readings or otherwise explain-away results that might be considered unfavorable to the responsible parties.

EPA rigorously reviewed the reports submitted by the PRPs; as a result of its review of the RI reports, EPA did not identify any efforts to improperly explain-away elevated readings.  Further examination of the examples provided by the commenter does not indicate anything improper.  A prime example provided by the commenter points to an interpretation in the RI that certain radiologically impacted surface material is the result of sediment deposition verses original placement.  The commenter gives no reason why she believes this interpretation represents a more favorable condition.  We fail to understand how this could be construed as evidence to support the charge of a spurious claim.

The commenter takes particular issue with the sampling and analysis reports prepared by McLaren/Hart.  As is required, these reports discuss data quality issues and draw conclusions about the representativeness of the data.  All of the data obtained as part of the RI have been presented, evaluated, and considered as part of the interpretive process.  No data meeting QA/QC criteria were eliminated or otherwise not considered.  Any complex environmental investigation involving extensive data collection from various media, multiple sampling events, rigorous data validation procedures, etc., will result in some number of suspect data.  The data validation procedures apply standard criteria for data quality that address precision, accuracy, representativeness, comparability, and completeness of analytical data sets.  In the event certain analytical results do not conform to expectation, e.g., results are higher or lower than other results obtained from the same location over time, and no error is directly attributable to factors associated with the precision and accuracy of the laboratory analyses, it is incumbent on the data user to consider the representativeness and the comparability of the results relative to the body of evidence.  Moreover, one of the requirements of appropriate QA/QC is that the analytical labs are independent and have no interest in the outcome of these investigations.  This provides yet another control on outcomes.  The RI and supporting documents contain some assessments of certain data that are considered unrepresentative; however, all of the data are presented and considered as part of the RI process.

**Data Quality Issues:**

Groundwater Results:

As explained in section 4.5.5 of the RI, the analytical lab identified a data quality issue relative to the Th-230 analytical results for the groundwater samples collected during the November 1995 sampling round.  Poor analytical recoveries of the laboratory spiked tracer indicated a problem with the volume reduction step of the sample preparation.  Repeat samplings using a different sample preparation procedure yielded consistent

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

results meeting the analytical quality assurance criteria.  A comparative review of all the data indicates that the results from November 1995 are probably biased high.  These results are referred to as false positive or results that are considered higher than were actually present.

There was also a problem with the analysis of radium-226 and daughters in the November 1995 and February 1996 sampling rounds.  The RI Work Plan specified EPA method 903.0, an isotopic method with a minimum detectable activity (MDA) level below the MCL values for radium-226 and radium-228.  However, the contractor failed to specify this method on the chain of custody forms submitted to the laboratory and the samples were analyzed using gamma spectroscopy.  Gamma spectroscopy does not require chemical separation of the target nuclides and identification is made by comparing gamma energies with the instrument's software library.  The method is less reliable at identifying specific nuclides and is subject to interferences.  Also, the MDA levels are greater than the MCL for radium.  The gamma spectroscopy results identified significant concentrations of radium-226 and/or its daughters in several wells.  Subsequent rounds of sampling and analysis using the isotopic method did not produce any similar results.  The gamma spectroscopy results from November 1995 and February 1996 are presented and considered, but for the reasons just described we do not have a high degree of confidence that these elevated reading were accurate.  Overall, the body of groundwater analytical results is consistent with background for these nuclides.

Because of these data quality issues, EPA requested an additional sampling round be conducted in May 1996; this was completed without problems.  Well D-14 was not resampled in the May 1996 and subsequent events because the well casing was found to be obstructed.

As part of the RI site reconnaissance activities conducted in 1994, grab samples were taken from some of the pre-existing monitoring wells.  These wells were not purged, and the unfiltered grab samples were analyzed for gross alpha to determine whether any special handling of purge water would be necessary when the RI wells were installed and developed.  Most of the results, 28 of 31 wells sampled, indicated gross alpha concentrations were acceptable for discharge to the Metropolitan Sewer District (<15 pCi/l).  The three wells exhibiting high gross alpha concentrations were resampled and analyzed as filtered groundwater samples and also analyzed for radiological isotopes.  The results of re-sampling indicated the water in these three wells would be acceptable for discharge to MSD.  Monitoring wells S-88 and 1206 were not sampled during subsequent RI sampling events because they were not part of the identified OU 1 monitoring network as described in the work plan.  Located on property adjacent to the Site, S-80 was intended to serve as a background well because it is hydrologically upgradient and quite far removed from any potential influences from the Site.  S-80 was not sampled in May 1996 or subsequent RI sampling events because the well was abandoned due to redevelopment of the property.  The network of wells sampled during the RI was extensive and appropriate to characterize the groundwater in proximity to Areas 1 and 2.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

It should be noted that the RI does not present a statistical evaluation of groundwater quality, and such an evaluation will be necessary as part of the long-term monitoring program to assess groundwater quality and evaluate trends. (See section 12 of the ROD.)

Soil Results:

In 1996, EPA requested split sample analysis for both soil and groundwater samples. The split samples came from archived soil samples and newly collected groundwater samples. The soil samples were therefore the equivalent of field splits rather than laboratory duplicate splits. In the summary report, McLaren/Hart concluded that comparison of the soil analytical data from the two analyzing laboratories showed overall good agreement except for the Th-230 results where the analysis of the split was consistently higher than the original results by about a factor of two. It was noted in the discussion that the higher results are consistent with results produced by the original lab prior to adding an additional cleanup column to the analytical procedure. The procedure change was initiated by the laboratory to address possible interferences, most notably from uranium-234. As indicated previously, the analytical laboratory is independent and has no knowledge of the Site background information (nor should it) and the reference to possible interference from plutonium and neptunium is a generic concern with the sample preparation methodology.

Methods and MDA Levels:

The field sampling procedures and analytical methods were specified as part of the approved RI/FS Work Plan. Laboratory sample preparation and analytical protocols are identified as part of the EPA-approved methods. The analytical laboratory may make adjustments consistent with the approved methods.

Both filtered and unfiltered groundwater samples were collected and analyzed for radionuclides and metals. Both kinds of samples are important to understanding the nature of any potential contaminant migration in groundwater, i.e., the degree to which contaminants might be partitioned to the solid phase. Filtered samples remove suspended solids in order to determine the concentration of the analyte in the water phase. Both filtered and unfiltered results are compared to the drinking water standards. Although drinking water standards apply to public water supplies, the unfiltered results may be considered a more conservative representation of water that might be consumed by a private well owner.

The MDA levels for radionuclides are determined by the analytical laboratory based on instrument response factors, analysis of laboratory standards, and other ongoing QA/QC evaluations. Variability in the MDA levels occurs as laboratory samples are analyzed in batches that correlate with specific QA/QC data and results. In addition, the MDA values are also a function of the duration of the sample analyses (termed the counting time) with MDA values varying as a function of the length of the counting times employed for each sample.

The reports regarding the Site which were prepared pursuant to the AOC with EPA do not contain monitoring incongruities; the data are accurately reported and any (anomolies) are explained or interpreted which is expected and required as part of the QA/QC process. The analysis is required to be performed by an independent laboratory according to methods and standards dictated by EPA. The scientists who tested the soil and water did not have a financial stake in the outcome of the test results, and their work was reviewed at length by qualified scientists at both EPA and MDNR.

**F.  Other monitoring issues at the Site.**

EPA is the lead agency and will be responsible for tracking the Site for the federal government.  MDNR will provide assistance to EPA and have lead responsibility for tracking the Site on behalf of the state of Missouri.

The specifics of the O&M program, including the long-term groundwater monitoring plan, will be developed as part of the remedial design process.  See section 12 of the ROD for a description of the monitoring objectives.

It is EPA's intent to seek a settlement with the responsible parties for implementation and maintenance of the remedy as described in this ROD.  This process is in accordance with section 122 of CERCLA and is consistent with EPA's "Enforcement First" and "Polluter Pays" policies.  The settlement will be embodied in a Consent Decree (CD) and Remedial Design/Remedial Action Statement of Work filed with the U.S. District Court, which will maintain jurisdiction to enforce the terms of the CD.  The terms of the CD are binding on the settling defendants, settling federal agency, and their successors and assigns.  These parties will be required to finance and perform all remedial design/remedial action activities under the oversight of EPA and/or the state.

The O&M plan will specify the requirements for inspection, maintenance, and repair.  Inspections will be performed on a periodic basis and in response to any unusual conditions.  Inspectors will evaluate all the physical aspects of the remedy as well as the administrative and institutional controls.  Maintenance and repair activities will be performed on a periodic basis and as identified during inspections.  Reports on inspection and maintenance activities will be submitted on a periodic basis.

The long-term groundwater monitoring plan will specify the monitoring well locations, sampling frequencies, analytical parameters, procedures, etc.  Periodic sampling reports that include data summaries and interpretation of the results will be published.  Trend analysis will be used to verify performance.

CERCLA and the NCP require that periodic reviews, referred to as Five-Year Reviews, be conducted at every site where contamination remains above levels that do not allow for unrestricted use.  At least every five years, an evaluation will be performed to ensure that the remedy remains protective and is performing as expected.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

In the event of new information or if the remedy is not performing as expected, e.g., monitoring shows that groundwater quality is degrading over time, EPA may re-evaluate the remedy and select further response actions as necessary to protect human health and the environment in accordance with the requirements of CERCLA and the NCP.

**G and H.**

Containment in place consistent with the Selected Remedy is protective of human health and groundwater. It is true that safe removal of the wastes is possible. However, it is not the option that provides the best balance of trade-offs when considered against the evaluation criteria provided in the NCP. See General Responses.

**II.** Ms. Drey submitted a second comment letter dated April 9, 2008 (copy attached). The numbering for this response corresponds to the numbering in the comment letter.

1. The commenter reiterates that the Missouri River flood plain is a poor location for the waste and cites NRC rule (10 CFR Part 61) which says that a near-surface radioactive waste disposal site "must minimize to the extent practicable the contact of water with waste."

**Response:** 10 CFR Part 61 provides the licensing requirements for land disposal of certain radioactive wastes. Note that the regulations in this part do not apply to uranium mill tailings waste which are governed by Part 40 for sites under NRC license and developed consistent with health and environmental standards set by EPA pursuant to UMTRCA (40 CFR Part 192).

Keep in mind that the purpose of the Site response action is not to site a new disposal facility. The purpose is to determine the best solution for existing landfill areas consistent with the requirements of CERCLA and the NCP. Nevertheless, the landfill cover required by the Selected Remedy is designed to minimize contact of water with waste and employs the same methods used at uranium mill tailing sites.

2. The commenter notes that the Site is located directly upstream of the St. Louis City and North County public drinking water intakes.

**Response:** EPA is aware that the Missouri River is a valuable resource and a source of drinking water to St. Louis and beyond. The Site is not a threat to the Missouri River or public water supplies. The groundwater at the Site is not significantly impacted by the radiologically contaminated material in the landfill, and the Selected Remedy will ensure that this remains the case. See the response to General Comment 2.

3. The commenter notes that the radioactive materials at the Site will be radioactive for many thousands of years. The commenter claims that the radioisotopes are ranked among the most dangerous known and include some not detected in American ore residues.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

**Response:** EPA is aware that the radioactive materials will be radioactive for millennia. Managing the West Lake Site over the long term poses the same sort of challenges faced at countless waste sites where long-lived radionuclides, heavy metals, or other stable toxic materials will remain. See the response to General Comments above. As explained in response to the commenter's first letter above, EPA disagrees that the radioisotopes at the Site are unusually dangerous or rare.

4. The commenter claims that the Selected Remedy would provide neither current nor lasting protection from radioactive gases and dust through cracks that develop in the cap.

**Response:** The Selected Remedy uses the same methods used at uranium mill tailing disposal sites and landfill sites with great success. See General Comment 10 above.

5. The commenter claims that all the other St. Louis sites contaminated with Mallinckrodt Chemical Works wastes have been or are being cleaned up by the U.S. Army Corps of Engineers. Why not West Lake too?

**Response:** Distinctions in cleanup decisions between the St. Louis sites and the West Lake Site have nothing to do with which federal agency is responsible for the cleanup. In both cases, the remedy selection is governed by the Superfund process and the distinctions have to do with the physical setting and the reasonably anticipated land use. In St. Louis, accessible soils are being excavated for commercial disposal because these contaminated soils would present potential exposure concerns. The inaccessible soils in St. Louis, i.e., soils under roads, buildings, and other structures, are being managed in place. Like the soils in the landfill, the inaccessible soils do not present a health concern as long as they remain where they are. At the Site, the contaminated soils are disposed in a landfill that is dedicated to use as a landfill.

6. The commenter states that the federal government is paying for the remediation of all the other Mallinckrodt nuclear weapons waste sites in metropolitan St. Louis, including one billion dollars expended at Weldon Spring. Why not West Lake too?

**Response:** Again, the remedy selection for these sites is governed by the Superfund process and is not dependent on whether the source of funding is public or private. In addition, the federal government will be asked to pay for part of the cleanup at the Site because the Department of Energy (DOE) is a PRP.

### 3. Great Rivers Environmental Law Center

**I.** The headings used to organize this response are not EPA's and were taken from the December 28, 2006, comment letter sent by Henry B. Robertson on behalf of the Great Rivers Environmental Law Center (copy attached).

1. We d*isagree that RCRA Subtitle C or D is ARAR. The waste is source material and byproduct material and is regulated exclusively under AEA. Can't treat West Lake like just another municipal landfill, etc.*

We disagree with the inference that AEA has exclusive jurisdiction over the wastes at the Site. CERCLA provides authority to clean up the Site. Section 104 provides the authority to respond to releases of hazardous substances, which has a very broad definition and includes those subject to the AEA. Section 106 provides the authority to issue orders and to secure injunctive relief for the cleanup of sites and section 122 provides a statutory process for settlements. In addition, CERCLA provides that if the responsible parties do not agree to perform the studies, investigations, and response actions found to be necessary by EPA, EPA may use trust fund money to clean up a site and pursue the PRPs for cost recovery. It is a very comprehensive statute which also acknowledges that specific requirements under other environmental laws may be considered relevant and appropriate if they apply to contaminants and/or activities that are sufficiently similar to that being addressed by the CERCLA action. See section 13.2 of the OU 1 ROD for a description of all ARARs.

In addition, NRC (the successor agency to AEC) by letter dated June 16, 1995, deferred its regulatory authority to EPA for the remedial actions at the Site. The letter, which can be found in the Administrative Record for OU 1, acknowledges that the materials at the Site are within the authority of CERCLA which can require the remediation of both radiological and nonradiological wastes.

The Resource Conservation and Recovery Act (RCRA) Subtitle D provides the requirements for municipal solid waste landfills. Since the disposal in Areas 1 and 2 occurred prior to the effective date of RCRA Subtitle D, these requirements are not applicable. However, like a solid waste municipal landfill unit, the Site Areas 1 and 2 are land disposal units containing large volumes of miscellaneous municipal solid waste. Most of the wastes in the Site Areas 1 and 2 are very similar to the sort of wastes to which RCRA Subtitle D regulations and corresponding state requirements are intended to apply. Therefore, in carrying out any action to close these units, it is appropriate to meet the solid waste requirements for closure and post-closure care. The mere presence of soils contaminated with long-lived radionuclides mixed in with the larger volume of municipal solid waste does not alter this fundamental conclusion. Since Areas 1 and 2 are like a municipal solid waste landfill and the Selected Remedy is containment, the various requirements for closure and post-closure care identified in the Missouri solid waste rules for sanitary landfills are considered relevant and appropriate.

RCRA Subtitle C regulations provide performance standards for the treatment, storage, and disposal of RCRA hazardous wastes. Since the disposal in Areas 1 and 2 occurred prior to the effective date of RCRA Subtitle C, these requirements are not applicable. In addition, there are no records or other evidence that RCRA hazardous wastes were disposed of in these landfill units. However, the remedy for the Site involves permanent land disposal of hazardous substances; therefore, it was considered reasonable to review various closure and post-closure care requirements. During this review, however, no RCRA Subtitle C requirements were identified as relevant and appropriate.

The radiological materials at the Site derive from the processing of uranium ore. UMTRCA (40 CFR Part 192) amended the AEA by directing EPA to set generally

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

applicable health and environmental standards to govern the stabilization, restoration, disposal, and control of effluents and emissions at both active and inactive uranium mill tailing sites. These requirements only apply to active and designated inactive uranium mill processing sites. The requirements are intended to apply to large tailings piles or impoundments. Areas 1 and 2 do not resemble tailings piles or impoundments. Areas 1 and 2 contain low activity radioactively contaminated soils mixed with large volumes of municipal trash and construction debris. The radionuclides at the Site are similar to those found at uranium mill tailing sites; therefore, specific requirements under 40 CFR 192 Subpart A and 40 CFR 192 Subpart B were carefully reviewed to determine which should be considered relevant and appropriate to remedial actions at OU 1. Due to the presence of the long-lived radionulcides similar to those found at uranium mill tailings sites, the state solid waste requirements have been augmented to include appropriate closure and post-closure care requirements from the UMTRCA regulations. Therefore, the Site is not being treated as just another landfill. In addition, see the discussion below relating to other ARARs.

*2. The Plan should consider as an ARAR 10 CFR Part 40, Appendix A, "Criteria relating to the operation of uranium mills…."*

These NRC requirements apply to license applicants for the design and operation of a uranium mill. Some of the requirements for the disposition of tailings piles and impoundments could be considered relevant and appropriate to the remedy for OU 1. These requirements derive from standards set by EPA under UMTRCA. UMTRCA directed EPA to set standards for the stabilization, disposal, and control of uranium and thorium mill tailings. These standards were promulgated in 40 CFR 192. The NRC decommissioning rules are excluded from application to uranium and thorium recovery facilities subject to 40 CFR 192. The Selected Remedy will meet relevant and appropriate requirements from 40 CFR 192 as described in section 13.2 of the OU 1 ROD.

The groundwater protection standards in 10 CFR Part 40 incorporate the basic groundwater protection standards imposed by EPA in 40 CFR Part 192. The groundwater protection standards under 40 CFR 192 are relevant and appropriate and will be complied with. Note that Criterion 5 applies to active surface impoundments and there is no such comparable activity for OU 1.

3. It is true that Subtitle D closures do not typically include a rock armoring layer or a radon barrier; however, the solid waste closure requirements for the Selected Remedy have been supplemented with relevant and appropriate requirements from 40 CFR 192. As such, the conceptual cover system includes a rock armoring layer to address longevity considerations and a radon barrier. EPA's Selected Remedy includes what the commenter suggested.

4. Removal and consolidation of residual radioactive material will be used to address any contaminated material on the Crossroad Property consistent with the UMTRCA soil standards and EPA guidance on the use of these standards at CERCLA sites.

5. The Site involves low activity ore processing waste which was land disposed with municipal waste. Requirements for the management of spent nuclear fuel, high level, and transuranic wastes are not relevant or appropriate to any waste materials at the Site or for activities selected for implementation of the OU 1 remedy.

6. Uranium was evaluated in the BRA as both a radiological and chemical toxin. This has been accounted for by the Selected Remedy.

7. EPA's presumptive approach to CERCLA municipal landfill sites is intended to take advantage of considerable experience with these kinds of sites. Approximately 20 percent of the sites on the NPL are municipal landfill sites. These sites share many similar characteristics including large waste volumes and heterogeneous mixtures of municipal waste, frequently co-disposed with industrial and hazardous wastes. Many of these industrial and hazardous wastes are far more toxic and mobile in the environment than the radiolocically contaminated soils in OU 1. The basic purpose of this guidance, *Application of the CERCLA Municipal Landfill Presumptive Remedy to Military Landfills*, is to establish that the occurrence of waste types that may differ from a typical municipal landfill does not overturn the validity of the presumptive approach.

Moreover, EPA did not rely solely on the presumptive remedy guidance to select a remedy for OU 1. Rather, the RI/FS process involved extensive characterization of the landfill waste materials and evaluation of an excavation and remote disposal alternative. EPA is not treating the Site as just another landfill. However, the results of this site-specific evaluation performed in the RI/FS confirmed the general experience forming the basis of the presumptive approach.

**II.** An additional comment letter dated April 8, 2008, was sent by Bruce A. Morrison on behalf of the Great Rivers Environmental Law Center (copy attached).

The commenter questions whether EPA should defer to the U.S. Army Corps of Engineers' and/or the Earth City Levee District's assessment that there is little risk that flood waters will reach the landfill's contaminated waste.

EPA is not deferring to the U.S. Army Corps of Engineers or the Levee District on the potential for flood waters to reach the landfill or on any other aspect of the Selected Remedy. Moreover, the U.S. Army Corps of Engineers and the Levee District have offered no such assessment. EPA invited the U.S. Army Corps of Engineers and the Levee District to present information on the levee system due to the public interest on this subject.

The protectiveness of the Selected Remedy does not rely on the levee system. Even in the event the levee failed or was overtopped, the resultant flood water would have minimal impact on the landfill.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

### 4. **Missouri Coalition for the Environment**

**I.** The headings used to organize this response are not EPA's and were taken from the December 29, 2006, comment letter from Kathleen Logan-Smith, Executive Director, submitted on behalf of the Missouri Coalition for the Environment (copy attached).

All of the subjects covered by this comment letter have been thoroughly studied, presented, and considered in the decision process for the Site. The Coalition's comments contain many factual errors and misinterpretations of the technical information. This response is intended to provide a more accurate representation of the subject matter raised by each of these comments.

In the Coalition's introductory remarks, a request was made for an extension of the comment period. The comment period opened on June 14, 2006; was extended until August 14, 2006; was extended again to October 14, 2006; and was extended again until December 29, 2006; as requested by St. Louis County on the Coalition's behalf. Since EPA's Proposed Plan and Administrative Record had been available for review and for comment for more than six months, EPA determined that the comment period was sufficient. Initially, EPA held two public meetings (one on June 22, 2006, and another on September 14, 2006) which were attended by many local residents, public and elected officials, and many of the commenters. During the two public meetings, the attendees were provided with information about the CERCLA process, the studies, and investigations performed at the Site and the Proposed Plan. Oral comments were taken from those present including this commenter, the members of the public, and elected officials. EPA did not refuse to meet with public officials as asserted by the commenter, but EPA did not agree to have an off the record meeting with these officials during the public comment period.

In response to public comment on the levee system and flood plain issues, EPA decided to reopen the public comment period and hold a third public meeting. The comment period was reopened and the public meeting was held on March 27, 2008, at the Bridgeton Community Center to present more information on flood protection issues. In addition, more information was placed in the Administrative Record regarding these issues. The second comment period was closed on April 9, 2008.

**These Are Not Uranium Mill Tailings**

See General Response regarding Belgian Congo ore. See section 13.2 of the ROD for ARARs analysis.

**The West Lake Waste is Hot and Getting Hotter**

The 1988 NRC report (NUREG – 1308) and the RI/FS documents explain that one of the effects of the ore processing is the naturally occurring U-238 to Th-230 to Ra-226 equilibrium has been altered. The ratio of Th-230 to Ra-226 is much greater than would be the case if these radionuclides were in equilibrium. Therefore, radioactive decay of Th-230 will increase the concentration of its decay product Ra-226 with time until these

radionuclides are again in equilibrium.  Ra-226 and its daughters are principal risk drivers in this decay series and therefore the radiological hazard from potential exposure to these materials will increase with time until equilibrium is reached.  Also, increased Ra-226 concentrations will lead to increased radon generation.  These factors were taken into account when evaluating the remedial alternatives. The engineered cover system will be designed to account for future ingrowth of Ra-226 and future radon gas generation.

It is worth noting that the NRC staff was working with limited radiochemical data from the 1982 radiological survey report prepared by RMC.  Because they had such limited Th-230 data and in the interest of ensuring conservatism in estimating the long-term ingrowth of Ra-226, the NRC staff used a Th-230:Ra-226 ratio of 100:1 to estimate Th-230 activity from the mean concentration of Ra-226.  The survey data indicated an average Ra-226 concentration of 90 pCi/g, which was used to estimate an average Th-230 concentration of 9,000 pCi/g.

The more extensive soil analytical results collected during the RI have allowed some better estimates.  The arithmetic average values of Th-230 and Ra-226 from all of the Area 2 samples were 2,140 and 189 pCi/g, respectively.  Therefore, the average Ra-226 concentration from the RI data is about double the concentration determined by RMC, but the average Th-230 concentration is about one fourth the NRC estimate.  The Th-230:Ra-226 ratio is actually 11:1, or about an order of magnitude less than that used by the NRC in their calculations.  Accounting for the ingrowth of Ra-226 due to the decay of 2,140 pCi/g of Th-230 results in an estimated average Ra-226 concentration of 749 pCi/g in 1,000 years.  However, in that same 1,000 years, the existing 189 pCi/g of Ra-226 would decay to 123 pCi/g resulting in a total estimated average concentration of Ra-226 of 872 pCi/g after 1,000 years.

It is unclear what the commenter intends to convey by providing this partial quote from the 1988 NRC report: "….even a small concentration of Ra-226 in 1988 implies such a large concentration later that it will be necessary to employ more difficult measurement techniques to confirm that the cleanup has been satisfactory."  This is merely an elaboration on the point by NRC that the controlling radionuclide (Th-230) is a weak gamma emitter and, in isolation from the other radionuclides, cannot be reliably detected at low levels using the field survey detectors.

The commenter points out conclusions in the 1988 NRC report quoting: "Under these conditions, onsite disposal, if possible, will likely require moving the material to a carefully designed and constructed 'disposal cell.' ….Any possibility of disposal on site will depend on adequate isolation of the waste from the environment, especially for protection of the groundwater."

These statements need to be looked at in context.  In its 1988 report, the NRC, working with limited data, looked at the applicability of its 1981 BTP, which outlines options for residual contamination at processing sites.  Since the circumstances at the Site did not fit any of the prescribed options in the BTP, they made a presumption as to the likely need for a disposal cell.  As the report goes on to explain, the conclusions were not based on

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

comprehensive field study or engineering evaluation which should be performed before major questions can be resolved and any final judgment is made regarding the appropriate remedy. EPA has since gone on to perform the necessary study (the RI and all the studies that are comprehended within it) and evaluation (the FS). EPA agrees with the statement that the feasibility of on-site disposal depends on adequate isolation of the waste and protection of the groundwater. Data collected during the RI/FS support conclusions that the Selected Remedy meets these expectations and will provide that protection.

**Consider Other Radionuclides**

All of the radionuclides in the waste materials have been considered in the evaluation of this Site. The wastes contain naturally occurring uranium-238, thorium-232, uranium-235, and all the associated daughters in these decay series. For purposes of site characterization and risk assessment, the radionuclides with relatively long half lives, are used as indicators for all members of their associated decay chains. The occurrences of the short-lived daughters are inferred from the concentrations of these long-lived indicators and thus are considered. Also, risk assessment methodology is designed to account for dose contributions from all radionuclides in the decay chain; these were accounted for in the BRA.

As opposed to the suggestion in the comment, the remedy prevents migration of contaminants to groundwater and does not rely on dilution. See General Response on groundwater protection.

**The Radionuclides Are in the Groundwater**

Significant migration of radionuclides to groundwater or perched water within the landfill waste material has not occurred. As presented in the RI, the results of extensive groundwater monitoring indicate some isolated impacts to the shallow groundwater from the landfill activities. Radionuclides, total petroleum hydrocarbons, VOCs, SVOCs, pesticides, and trace metals have all been detected. Most of these occur sporadically and at trace levels. Most of the results for radionuclides and trace metals are consistent with background, although several detections of radium and arsenic have exceeded drinking water standards (MCL). The one leachate seep came from perched groundwater in the southwest corner of Area 2. The seep is an intermittent flow resulting from periods of extended rainfall. The seep flows over the ground for a short distance before evaporating or infiltrating back into the subsurface. The results from analysis of the seepage were consistent with the results obtained from the perched groundwater, i.e., it contained constituents from the uranium-238 decay series at levels similar to background. It also contained some VOCs, SVOCs, trace metals, pesticides and total petroleum hydrocarbons. While a single sample is considered sufficient to confirm the relationship between the seep and the perched groundwater, the seep is not considered a significant pathway for off-site migration because of its low flow and the fact that the seepage does not migrate off-site. In any event, following implementation of the Selected Remedy, the

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

installed landfill cover will prevent the infiltration that is the source of the perched water and the seep. See General Response on groundwater protection.

**The Groundwater is Moving**

The hydrogeologic setting, including groundwater levels and gradients, has been thoroughly investigated and evaluated. Detailed descriptions are provided in the RI reports for OU 1 and OU 2. All of this information has been factored into EPA's decision process for this Site. Based on studies conducted during the RI, groundwater movement in the alluvial aquifer is predictable and contaminant monitoring is very straightforward. There are no unusual or atypical conditions that would introduce unreasonable difficulties or uncertainties.

The alluvial aquifer has a relatively high hydraulic conductivity but the water levels show generally flat gradients that range below 0.0001 ft/ft. The site straddles the edge of the alluvial valley where the bedrock and the alluvium meet. The shallow groundwater underlying the Site is heavily influenced by the presence of the permitted sanitary landfill which operates leachate collection sumps in the upper bedrock units at the former quarry pits which create a groundwater sink that causes shallow groundwater across much of the Site to draw down toward the sanitary landfill. The alluvial water level in piezometers near the sanitary landfill is actually about 80 to 150 feet above the leachate riser level in the landfill. If pumping were to cease, water levels would return to the natural water level in the alluvial aquifer; however, this would not effect the performance of the remedy for OU 1 because the landfilled material at Areas 1 and 2 are above the natural water table. Currently, there are no alluvial pumping wells at Earth City or in the vicinity of the Site and current state regulations prohibit placement of water wells within 300 feet of a landfill. Nevertheless, assuming an alluvial pumping well was placed in close proximity to the Site, most of the inflow would be from the direction of the river but it could draw a lesser contribution from the direction of the Site. Since the natural water table has a lower elevation than the radiological waste material at Areas 1 and 2, this would have no influence on the potential for Site contaminants to migrate to groundwater and would have no influence on the performance of the landfill cover. Note that the nearest registered well is a bedrock well located one mile northeast of the Site. The closest alluvial well is about 2.5 miles south.

The alluvial aquifer consists of unconsolidated sediments including gravels and sands. It is not unusual to encounter caving sands when drilling or boring in this hydrogeologic setting. The caving sands are not caused by either water or wind and are not moving with the groundwater, but rather they are unconsolidated river deposits that move to fill the void introduced by the drilling process. This condition did present some difficulty for boring and monitoring well installation in certain locations. One of the 52 planned borings had to be re-located because caving sand prevented boring to full depth in the original location. Also, drilling additives needed to be used to counteract caving sands for three of the monitoring well installations. These alluvial sands have nothing to do with the prospect of radionuclides in the landfill migrating to groundwater.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

The groundwater monitoring results collected during the RI phase address the potential for colloid-facilitated contaminant transport. The groundwater sampling and analysis included both filtered and unfiltered samples. The monitoring results include contaminants found in both the aqueous phase and the solid phase. This will be true of the long-term groundwater monitoring program as well.

**The Waste is Not Just in Water**

The RI/FS does not rely on assumptions about solubility to determine what is in the leachate/perched water and groundwater. The results of direct sampling and analysis are presented in the RI. The perched water shows some low levels of VOCs and metals. Radionuclide values from the perched water were in the background range. EPA generally agrees with the conclusion cited by the commenter from the 1988 NRC study, i.e., some low-level contamination of groundwater has occurred and the present disposition of the wastes may not be adequately protective of the groundwater over the long term. Installation of a landfill cover designed to limit surface water infiltration will address this concern.

**The Radioactive Contamination Has Already Moved Off-Site**

Most of the radionuclide occurrences at the locations cited in this comment are due to original deposition not migration. However, erosional transport of contaminated soils is a pathway of concern that will be addressed by the remedy. Some erosional transport of radionuclides has occurred in the past, e.g., the contamination on the Buffer Zone/Crossroad Property adjacent to Area 2 and contamination in the drainage ditch along the access road adjacent to Area 1. Consolidation and containment under an engineered landfill cover will prevent any soil or sediment migration from happening in the future.

**A History of Assumptions That Proved Wrong**

One of the objectives of the Selected Remedy is to put controls into place including a formal O&M plan. This will ensure that the physical remedy and institutional controls are subject to periodic surveillance, maintenance, and reporting. O&M for the Site is not an assumption but rather a requirement that can be enforced.

**State and Federal Agencies Are Not Paying Attention**

This comment refers to the erosional event that deposited contaminated soil on the adjacent Buffer Zone/Crossroads Property. Erosional transport of contaminated soils is a pathway of concern that will addressed by the remedy. The remedy requires that any contamination on the Buffer Zone/Crossroads Property be consolidated onto the disposal area prior to installation of the landfill cover. The remedy does not rely on vegetation to limit wind and water migration of contaminants. The cover will ensure that waste materials in the landfill will not be exposed to erosion in the future.

**Institutional Controls are Meaningless Over Eons**

While EPA would agree that documents from 700 A.D. would be difficult to locate on this continent, EPA has had success locating land records in Missouri dating back to the early 1800s. Modern record keeping has greatly improved, and electronic record keeping has revolutionized the availability of data once difficult to locate and read. Many historic records have been transferred to electronic media.

The Missouri legislature recently passed the Missouri Environmental Covenants Act (MECA) which provides for a better and more durable use restriction than under previously existing common law. The ROD requires land-use restrictions be implemented using the type of environmental covenants described in MECA.

**The Air We Breathe**

Air sampling was performed during the RI phase and confirmed that airborne transport of fugitive dust is not a pathway of concern under the current conditions. However, airborne transport of contaminated soil or dust may have occurred in the past, especially during the period that the material was placed in the landfill back in 1973. Given the episodic nature of the potential release and assuming typical patterns of fugitive dust dispersal, it is extremely unlikely that this process could have resulted in any measurable accumulation of contamination at off-site locations.

An extensive study of background radionuclide concentrations was not performed; however, gamma exposure rates were recorded and soil samples were collected from several locations near the Site. The results were consistent with background values from other investigations in Missouri.

There is no evidence that the 1993 flood had any impact whatsoever on the Site. Given its location inside the Earth City Levee, this event could not have resulted in any redistribution of materials.

The discussion in the Proposed Plan on National Emissions Standards for Hazardous Pollutants (NESHAP) is part of the determination as to what environmental requirements are considered ARAR. Under CERCLA, requirements under other environmental laws may be applicable if they are specifically intended to apply to the circumstance being addressed. Even if not applicable, requirements may be considered relevant and appropriate if they apply to a circumstance that is sufficiently similar to the circumstance being addressed by the CERCLA action. The Site is not a designated uranium mill tailing pile, therefore, the NESHAP standard for radon-222 emission is not applicable. However, the requirement is considered relevant and appropriate and will be met.

**Inadequate Alternative Analysis**

Most of the claims and conclusions provided in this comment are in error and simply not supported by the available information. All practicable alternatives have been considered

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

for the Site.  The RI/FS for the Site did not rely only on EPA's presumptive remedy guidance for CERCLA municipal landfill sites.  For example, the RI/FS included thorough in-situ waste characterization and evaluation of large-scale waste excavation as a remedial alternative.  This extensive site-specific analysis did reconfirm many of the basic experiences and observations around which the presumptive remedy guidance is built.

CERCLA municipal landfill sites share many similar characteristics including large waste volumes and heterogeneous mixtures of municipal waste, frequently co-disposed with industrial and hazardous wastes.  In many cases, the hazardous chemical substances are much more toxic and more mobile in the environment than the radionuclides contained at the Site.  In some cases, these sites contain industrial wastes with radiological contents similar to the Site radiological residues, including oil and gas production wastes and water treatment plant sludges.  The *Feasibility Study Analysis for CERCLA Municipal Landfill Sites* (EPA540/R-94/081), which provides a technical basis for the presumptive remedy guidance, considered full-range FSs at 30 municipal landfill sites.  In all cases, containment in place was the primary remedy selected.  Where containment is feasible, wholesale excavation and removal of a landfill simply does not compare favorably with containment when evaluated against the nine evaluation criteria from the NCP.

Groundwater flows in the alluvial and bedrock formations that underlie the Site.  This fact was not ignored and, in fact, was studied quite extensively.  No current or future sources of groundwater are contaminated.  Groundwater protection is a principal goal of the Selected Remedy and remedy performance will be verified through groundwater monitoring.  Active groundwater remediation options were not considered as part of the evaluation process because the data collected during the RI showed that there are no contaminant plumes or significant groundwater releases associated with the landfill areas.

We did not find any consideration of groundwater intercept approaches in the 1982 NRC report; however, we do generally agree with the basic conclusions provided in the report that the lack of radiological contamination found in groundwater and leachate indicates that the ore residues are not soluble and are not moving off-site via groundwater.  The landfill cover system will be designed to mitigate surface water infiltration.  The cover, together with long-term groundwater monitoring, ensures that the Selected Remedy will address any ongoing groundwater concerns.

The Niagra Falls Storage Site involved above ground storage silos containing the radium-bearing K-65 residues.  The situation at the Site is not comparable.  See general responses above on risk and Belgian Congo wastes.

**The Evaluation of Alternatives is Flawed**

The evaluation of the alternatives in the FS is comprehensive and does not focus on cost, as charged by the commenter.  As indicated previously, EPA reviewed the investigations and the studies prepared by the PRPs; the Proposed Plan itself was prepared by EPA. The alternative proposed in the plan was based on consideration of all of the evaluation

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

criteria provided in Superfund's implementing regulations (the NCP). Many considerations beyond cost work against the excavation alternative including the greater potential for human exposures and increased physical hazards during implementation. See general response above on PRP-lead RI/FS.

**The Plan Does Not Fully Consider Human Health Risks**

The plan does fully consider human health risks. The human health risk assessment was conducted in accordance with EPA's Risk Assessment Guidance for Superfund, Volume 1, Human Health Evaluation Manual. It is true that the biological effects associated with chronic exposure to ionizing radiation in the environment may include carcinogenicity, i.e., induction of cancer; mutagenicity, i.e., induction of mutations in somatic or reproductive cells, including genetic effects; and teratogenicity, i.e., effects on growth and development of an embryo or fetus. However, the cumulative risk of cancer due to chronic exposure is considered to be many times greater than the risk of genetic or teratogenic effects. Therefore, under EPA guidance, evaluation of teratogenic and genetic effects is not required because these risks are small in comparison. Similarly, consideration of acute effects is not required since these effects occur at much higher doses than any potential doses being addressed at the Site.

Again, it should be kept in mind that the purpose of the BRA is not to evaluate each and every conceivable risk. The purpose is to determine whether acceptable risk thresholds are exceeded, in which case there is a basis for taking a response action under CERCLA and EPA reaches this conclusion in the Proposed Plan and the ROD.

The remedy selected in the ROD is designed to address all potential pathways for human exposure. In preventing human exposure to Site contaminants through these pathways, the Selected Remedy addresses all types of potential health effects. Residential use of the landfill was not evaluated because the process is designed to examine risks under current and reasonably anticipated land use. The potential health risk posed by direct consumption of the contaminated groundwater was not calculated. There are no significant offsite areas of groundwater contamination attributable to the contaminants in Areas 1 and 2. As a matter of policy, EPA generally does not calculate the risk from drinking groundwater on landfill sites because such activity is incompatible with the land use. Moreover, the remedy for CERCLA landfill sites presumes the need to protect groundwater from any ongoing or potential contaminant migration.

See sections 5 and 8 of the ROD for a discussion of migration pathways and remedial action objectives.

See general responses above on risk and groundwater.

It is not clear where the commenter's information on water wells comes from but it does not appear to be current. Based on information from the state of Missouri, there are no registered wells between the Site and the Missouri River in the direction of regional groundwater flow. The nearest registered well is about one mile northeast of the landfill

and is drilled to 245 feet indicating bedrock completion. The closest registered well that appears to be completed in the alluvium is 2.5 miles south of the landfill. A review of unregistered wells, i.e., private wells installed before the adoption of formal registration requirements, was also conducted. Field reconnaissance of unregistered wells in the area found only one existing well. The owner indicated that the well is no longer used because the property is serviced by municipal water.

**The Proposed Plan Fails to Apply Appropriate Legal and Scientific Standards**

EPA disagrees that the remedy fails to protect public health and the environment. The various environmental requirements were determined by EPA in consultation with MDNR. See ROD section 13.2 for a list of ARARs. Although operated prior to RCRA regulation, the Site Areas 1 and 2 are land disposal units containing large volumes of miscellaneous municipal solid waste. Most of the wastes in the Site Areas 1 and 2 are very similar to the sort of wastes to which RCRA Subtitle D regulations and corresponding state requirements are intended to apply. Therefore, in carrying out any action to close these units, it is appropriate to meet the solid waste requirements for closure and post-closure care. The presence of soils contaminated with long-lived radionuclides mixed in with the larger volume of municipal solid waste does not alter the fundamental conclusion that Areas 1 and 2 are similar to municipal solid waste units. Due to the presence of the long-lived radionulcides similar to those found at uranium mill tailings sites, the state solid waste landfill closure and post-closure care requirements have been augmented to include appropriate closure and post-closure care requirements from the UMTRCA regulations.

RCRA requirements that have been identified as relevant and appropriate are the Missouri solid waste regulations for closure and post-closure care. There are no requirements for risk assessment or otherwise that would limit the time frame over which the remedy must remain protective. Also, it should be pointed out again, that the Selected Remedy is a response action under CERCLA not RCRA. Under CERCLA, the remedy must be maintained for as long as hazardous substances, pollutants, or contaminants remain on-site above levels that allow for unlimited use and unrestricted exposure. A statutory review of the remedy must be conducted to confirm that the remedy remains protective no less often than every five years.

**Removal Can Be Achieved**

Removal of waste materials from the Site is feasible. That is not in question. The question is what available option for remediating the Site provides the best balance of trade-offs against the nine evaluation criteria provided in the NCP. See general responses above on FUSRAP and comparative analysis.

**There is No Better Time to Remove the Waste**

The results of various field investigations over the years, including the RI, do not support any of the statements contained in this comment. The groundwater data fully

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

demonstrate that contaminants are not migrating in the fashion described. There are no impacts to any current or future drinking water sources. The Selected Remedy addresses all potential migration pathways and ensures long-term protection of human health and the environment.

**II.** Additional comments were submitted on behalf of the Missouri Coalition for the Environment in an April 9, 2008, letter from Kathleen Logan-Smith, Executive Director (copy attached). These comments are addressed below.

**Comment 1:** The commenter cites the Site OU 1 FS Report which states that the RI was not designed to support definitive conclusions about the potential for contaminants to leach to groundwater over time. It also concludes that leaching of contaminants to groundwater is a potential migration pathway that must be addressed by the remedial action. The commenter proposes that these statements are evidence that the RI did not fully investigate and explore groundwater contamination and questions how EPA could therefore conclude that the groundwater is protected.

**Response 1:** The commenter has misinterpreted the meaning of these statements. The groundwater investigations conducted during the RI were designed to characterize the current nature and extent of contaminant migration to the groundwater. The results of these investigations can be used to confidently draw conclusions about the current extent of groundwater contamination and can be used to support qualitative judgments about the leaching potential of the contaminants in the source areas. However, these investigations are not considered sufficient to rule out leaching to groundwater as a pathway of concern at some point in the future if no response action is taken. It was not part of the intent of the RI to undertake the sort of studies that might be necessary to make the case that a barrier to surface infiltration is unnecessary. Consistent with this approach, the Selected Remedy requires a landfill cover designed to shed water and minimize infiltration.

**Comment 2:** The commenter questions the completeness of the groundwater data and the validity of EPA's conclusions regarding groundwater contamination given that many of the perimeter monitoring wells are identified in the FS as damaged or no longer existing.

**Response 2:** The wells that are identified as no longer existing were lost due to construction along St. Charles Rock Road and development on the Crossroad Property after the RI investigations had been completed. The fact that these wells are no longer in service does not invalidate the data collected during multiple rounds of groundwater sampling during the RI. Going forward, EPA will be relying on a long-term groundwater monitoring program that will be designed, implemented and maintained as part of the remedial design/remedial action process. Specific monitoring locations, sampling frequencies, and analytical parameters will be developed according to the objectives identified in section 12 of the ROD. New monitoring wells will be installed as necessary to accomplish these objectives.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

**Comment 3:** Groundwater is present in the bedrock. What evidence does EPA rely on to conclude that bedrock aquifers are: (1) not impacted by radiotoxic materials, and (2) not likely to be impacted by radiotoxic materials?

**Response 3:** Both alluvial and bedrock aquifers are present at the Site. Alluvial deposits of varying thickness are present over most of the northern half of the Site ranging from less than 5 feet in the vicinity of Area 1 and increasing in thickness in the direction of the river to approximately 100 feet beneath Area 2. The monitoring well network was designed to give coverage across the Site at shallow, intermediate, and deep intervals. Many of the monitored intervals are in bedrock. Likewise, in the long-term monitoring program, many of the monitored intervals will be in bedrock.

The groundwater monitoring data collected to date did show the presence of radionuclides in the shallow groundwater beneath the Site, but the radiological contaminants occur at low concentrations that are generally consistent with background levels. The data do not indicate the presence of groundwater plumes or contiguous areas of groundwater contamination associated with the landfill area. Groundwater transport of contaminants to off-site areas does not appear to be significant under current Site conditions. The long-term monitoring program will be designed to detect contaminant migration to the groundwater, including the bedrock aquifer, should such a condition develop sometime in the future.

**Comment 4:** The risk assessment did not address irrigation scenarios from groundwater or the risks from flood waters carrying radionuclides onto crop fields. The risk assessment took a very short view of very long-lived wastes. Thus, it was inadequate and should not guide decisions about the Site.

**Response 4:** The Selected Remedy requires institutional controls to prevent the use of all groundwater underlying the Site. In addition, the Missouri Well Construction Code prohibits the placement of wells within 300 feet of a landfill. Because there are no sources of groundwater contaminated with radionuclides, irrigation would not result in a complete pathway for exposure to radionuclides under current conditions.

The specific purpose of the BRA is to establish a statutory basis for taking a response action. The BRA was prepared according to Superfund guidelines to estimate risks under a range of scenarios assuming reasonably anticipated land use. There is no expectation that the BRA evaluate every possible scenario. See General Response 3 on the potential for flood water impacts.

After the Selected Remedy is in place, there is no foreseeable mechanism that would result in radionuclides being carried away by flood waters.

As to the BRA taking a short view, the future exposure conditions were evaluated based on the future source term which accounts for radionuclide ingrowth and decay over a 1,000-year study period.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

**Comment 5:**  Referring to erosional transport of contaminated soils from the western portion of Area 2 onto the adjacent Buffer Zone/Crossroad Property, the commenter suggests that erosion of contaminated material off-site will continue to be a problem and asks what volume we can expect to erode off the site over thousands of years.

**Response 5:**  As has been demonstrated through sampling and documented and explained in the FS, significant areas of radionuclide-contaminated soils in Areas 1 and 2 are currently located at or near surface.  Although mostly vegetated now, these areas have been and could be subject to rainwater runoff and sediment transport as well as potential erosional events.  In one erosional event, mudflow on the western portion of Area 2 transported contaminated soils to the adjacent Buffer Zone/Crossroad Property resulting in surficial contamination of the eastern edge of the property.  In addition, rainwater runoff has resulted in minor amounts of sediment transport to the drainage ditches along the landfill access roads.  The Selected Remedy is designed to eliminate these conditions.  After the multi-layer landfill cover has been installed, the contaminants will be isolated from rainwater runoff.  The plan is to inspect and maintain the cover for as long as the landfill remains; however, even without such maintenance, the cover will function in this regard long past the foreseeable future.

**Comment 6:**  The commenter suggests that the contamination on the Buffer Zone/Crossroad Property will pose a threat in the future if the Earth City Levee were to fail and the flood waters were to encroach on the toe of the landfill.

**Response 6:**  The data demonstrate that the contaminant concentrations on the Buffer Zone/Crossroad Property are very low, marginally above background, and may very well meet unrestricted use standards under current conditions.  Neither flooding nor any other transport mechanism could redistribute these contaminants in a way that would pose any sort of health threat.  More importantly, the Selected Remedy requires that any soils on this property exceeding standards for unrestricted use will be excavated and consolidated in the disposal area.

**Comment 7:**  The commenter questions the FS description of the Site as being two miles from the river when the Site is actually one-half mile closer to the river and wonders whether any of EPA's assessments need to be adjusted to fit this reality, particularly relating to groundwater and the number and type of wells in range of the Site.

**Response 7:**  EPA agrees that describing the Site as one and one-half miles from the river is a more precise description.  The FS description was intended for general orientation purposes and is not a material factor in any of the technical assessments.  A regional well survey was performed using data from MDNR.  There is no current groundwater use in the vicinity of the Site.  The nearest well is a deep bedrock well located about one mile northeast of the Site.  Figure 2-3 of the Site OU 2 FS shows the locations of registered wells in the vicinity of the Site.  For easy reference, a copy of this figure is attached.

**III.**     Additional comments were submitted on behalf of the Missouri Coalition for the Environment in an April 9, 2008, letter from David Lobbig, President, Board of Directors (copy attached).

**Comment:**  In summary, the commenter attempts to make the case that EPA's decision making in this case must be politically motivated.  The argument is made by pointing out that long-lived radionuclides will remain toxic long after EPA, the United States Government, and civilization itself have ceased to exist.  Since EPA knows that even a sincere promise to monitor the remedy must eventually come to an end, so the logic goes, EPA is engaging in delusion or falsehood by proposing to manage the waste in place.

**Response:**  EPA's motivation is protection of human health and the environment in accordance with the mandates set out in the Superfund law and its implementing regulations.  It is true that EPA's assurances are subject to the limits of human capacity to plan for the future.  This is true at the West Lake Site as well as the countless other Superfund sites and disposal sites where waste will be permanently managed.  This is a limitation that cannot be overcome by moving the waste from one location to another.  The reality is that all potential remedies are ultimately reliant on the durability and adaptability of human systems, and Superfund provides the current human construct under which we must work.  Many commenters have expressed concern about the ability to assure protectiveness over the long term.  See the response to General Comment 6 above.

### 5. Daniel W. McKeel, Jr., MD

**I.**     The following responds to the December 29, 2006, comment letter provided by Dr. McKeel (copy attached).

**1.**  The commenter was part of a group of concerned stakeholders that met with representatives of St. Louis County to seek assistance in having the public comment period extended and arranging open dialogue meetings to discuss various issues on the Proposed Plan.  The commenter is disappointed that these meetings were not arranged.

**Response:**  EPA generally welcomes and encourages open dialogue on site issues; however, EPA cannot hold off the record meetings of this sort during the public comment period.  The NCP § 300.430 sets out specific requirements for public participation in the remedy selection process intended to ensure that the public has a reasonable opportunity to review the plan and submit written and oral comments.  The public process used by EPA, i.e., public notice, structured public meeting format, recorded transcripts, etc., was established to meet these requirements.  During the public comment period, EPA may not meet off the record and may not give special access to individuals or stakeholder groups outside the public process.  All timely requests to extend the public comment period were granted, and the first public comment period was held open for over six months.  In addition, there will be further opportunities for public involvement during the design and implementation phases of the remedy.  If the group continues to have an interest in holding meetings, EPA would be more than happy to participate.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

**2.** The commenter suggests that the absence of an off-site radiological contaminant plume is not confirmed because there are no off-site monitoring wells that could detect the migrating plume.

**Response:** This comment reflects a misunderstanding of hydrogeology and the mechanisms of contaminant fate and transport. The first place to look for evidence of a groundwater contaminant plume is in the groundwater underlying and immediately downgradient of the contaminant source area. If groundwater monitoring data show no evidence of a contaminant plume underlying and immediately downgradient of the source material, then it is reasonable to conclude that there is no contaminant plume further downgradient that could be attributable to the source area of interest. The groundwater monitoring results for the Site indicate there is no radiological contaminant plume on-site; therefore, there is no radiological contaminant plume off-site. Further supporting this conclusion are the results from sampling and analysis of perched water within the landfill waste material itself, indicating no significant radiological contamination in the aqueous phase. See also the general response on groundwater study above.

**3.** The commenter states that Spanish Village immediately abuts the landfill and that these residents will be at risk by leaving the waste in place.

**Response:** The Spanish Village subdivision is located almost a mile from the southern extreme of the Site with intervening commercial development. It does not abut the landfill. Further, the residents of Spanish Village are not at risk from wastes at the Site because there is currently no reasonable pathway for exposure. See responses to General Comments above.

**II.** The following responds to written comments by Dr. McKeel dated April 9, 2008. The numbering applied here corresponds to the numbering of the comments (copy attached). Each significant comment is summarized here and followed by a response.

The commenter states that the Site is not designed to safely contain radioactive wastes by any criteria of any regulatory agency (NRC, EPA, DOE, MDNR).

**Response:** EPA is not proposing to take no action. Implementation of the Selected Remedy will safely contain the waste materials including the radiologically contaminated soils. Consistent with the Superfund law and implementing regulations, the Selected Remedy requires that ARARs be met. The Selected Remedy will meet appropriate closure and post-closure care requirements for both uranium mill tailing disposal sites and sanitary landfills. See section 13.2 of the ROD for a full description of these requirements.

**(1)** The commenter states that violent rainstorms could relocate the radioactive soil within the confines of the landfill itself and cause runoff from the steep slopes. The commenter states that severe flooding is a danger, and EPA and MDNR understate the concern by disputing that the landfill is in a flood plain. The commenter states the Site is

protected by levees of the type that failed during Hurricane Katrina in New Orleans and that levee failure is certain at some point in the future.

**Response:**  As explained and documented in the RI/FS reports, some radiologically contaminated soils are currently located at or near the surface.  EPA agrees that rainstorms have in the past and could in the future cause soils and sediments to be re-suspended or eroded.  The Selected Remedy is specifically designed to prevent this from occurring.  After the cover has been installed, the waste materials will be isolated from rainfall runoff.

EPA does not dispute that parts of the landfill are built on the historic or geomorphic flood plain.  This fact is well documented in the RI/FS reports and was presented at the third public meeting on March 27, 2008.  It is also fact that the landfill is located behind the Earth City Levee system designed to exceed the 500-year flood protection level.  Whether the Site is in a flood plain or not is a function of the definition being applied.  There has been no intent on EPA's part to confuse anybody on this issue.

Note that Earth City is protected by an engineered levee system that is much more sophisticated and robust than the various agricultural levees and flood walls that failed or were overtopped during Hurricane Katrina.  Nevertheless, the protectiveness of the Selected Remedy does not depend on the Earth City Levee system.  In the unlikely event that the Earth City Levee fails or is overtopped, the resultant flooding would have little impact on the Selected Remedy.  See the response to General Comment 3 for more explanation.

**(2)**  The commenter states that the Site is unlined and is not a hazardous waste landfill designed to contain radioactive waste.  Although some municipal landfills similar to the West Lake Site do accept radiological waste, the practice is being reduced.  No U.S. hazardous waste landfills are licensed to accept radiological waste of the Site's type.

**Response:**  The purpose of the Site response action is to determine what should be done with existing landfill units.  The Site will not be receiving any new waste streams.  If the remedy for the Site involved excavation and commercial disposal of waste, as in FS Alternative 6 for example, then the licensing and waste acceptance criteria of potential receiving facilities would become relevant.

The following is offered to help clear up some apparent confusion about what the Selected Remedy requires and how it fits in the regulatory frame work established under other environmental laws:

The Selected Remedy requires that the landfill cover, at a minimum, meets the Missouri requirements for sanitary landfills.  The cover will be designed to shed water and include a low permeability barrier to surface water infiltration.  It is the cover system that functions to prevent water from contacting the waste material.  Consistent with the requirements for uranium mill tailing sites, the cover design will be augmented as necessary to address the radiological concerns, i.e., the cap will be of sufficient thickness

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

to shield the gamma radiation and the compacted clay component will also serve as a radon barrier.

The Missouri sanitary landfill requirements derive from the RCRA Subtitle D rules. Hazardous waste landfill requirements derive from the RCRA Subtitle C rules. Briefly, the conventional Subtitle D design relies on natural materials and the low permeability component in the liner and cover is a compacted clay layer. The conventional Subtitle C design uses flexible membrane liners (FML). The Subtitle C design includes a double-lined leachate collection system.

There is no RCRA hazardous waste in the Site, i.e., no listed chemicals or chemicals that are flammable, corrosive, mobile, or highly toxic. The Site is most like a municipal solid waste landfill which is why the Subtitle D design is considered more appropriate. In addition, the Subtitle D design is arguably more compatible with long-lived radioactive waste disposal which typically relies on natural material designs due to longevity considerations. The FMLs have a more limited design life than the natural materials.

The commenter is correct that RCRA landfills are not licensed to accept waste streams that are regulated for their radiological content. However, there are no technological reasons that low-level radiological waste cannot be safely managed in a RCRA-permitted landfill provided that the cover design and long-term monitoring and maintenance plans are modified accordingly.

**(3)** The commenter suggests NRC should have jurisdiction over the Site and questions the lack of NRC involvement. The commenter is interested in seeing a copy of the letter in which NRC defers oversight to EPA.

**Response:** The Site was never licensed by NRC. However, the Site was listed on NRC's Site Decommissioning Management Plan due to the radiological waste material having originated with one of its licensees. NRC followed up with some preliminary studies in the 1980s.

In 1990, EPA placed the Site on the NPL. CERCLA provides the authority to clean up the Site. Section 104 of CERCLA provides the authority to respond to releases of hazardous substances which has a broad definition and includes substances subject to the AEA. There was coordination and cooperation between the two agencies as EPA initiated its RI process. In 1995, NRC staff recommended to the Commissioners that NRC defer regulatory oversight to EPA. The basis for the recommendation is documented in a paper dated March 9, 1995. NRC concluded that the Superfund program administered by EPA will protect public health and the environment. The recommendation was approved and formally sent to EPA under a letter dated June 16, 1995. This document has been available in the Administrative Record for the Site. A copy is attached for ease of reference.

**(4)** The commenter states that capping the waste is a temporary solution. Someday the wastes will need to be removed. The cost to excavate and move off-site will rise as the

years go by. The commenter suggests that the Selected Remedy is a function of the regulatory climate being business friendly which may change after the elections.

**Response:** The Selected Remedy is intended to be a permanent solution. The Selected Remedy is not a function of regulatory climate. It is a function of the requirements established by CERCLA and NCP. If the requirements are modified in the future, EPA will adhere to the then current requirements.

EPA is required by statute to conduct periodic reviews (called Five-Year Reviews) for the purpose of certifying that the remedy continues to be protective of human health and the environment. Any changes to requirements or health standards will be factored into the evaluation. Based on significant new information, EPA can require new work and/or make changes to the remedy as necessary to protect human health and the environment.

**(5)** The commenter claims that EPA and MDNR have misrepresented the difficulty of suppressing dust and other airborne emissions were the wastes to be excavated and transported off-site. Portable buildings with negative pressure filters and other similar technologies could be used. The commenter cites FUSRAP and another example of sites where excavation of waste materials was safely done. The commenter references information circulated by Kay Drey on dust-containment technologies.

**Response:** There was no intent by EPA or MDNR to misrepresent the difficulty of suppressing airborne emissions during excavation of the wastes. However, this comment contains many inaccurate representations. As documented in the FS, it is clearly feasible to excavate waste materials from the Site. EPA has tried to convey that excavation of the wastes would come with many challenges and introduce potential risks that can be avoided by managing the material in place. Furthermore, excavation could be done using conventional dust suppression methods, work place monitoring, and personal protective equipment for the workers. It is unlikely there would be any need to resort to exotic solutions such as portable buildings.

EPA has never declared that "cost was not a factor in remedy selection" as the commenter claims. On occasion, EPA has responded to oral comments by explaining that cost was not the only factor considered in remedy selection. Cost Effectiveness is one of five primary balancing criteria enumerated in the NCP against which the feasible alternatives are compared. The objective is to assess the relative advantages and disadvantages of each alternative when evaluated against these criteria. See section 10.0 of the ROD for a summary of the comparative analysis.

It should be noted that conditions at the St. Louis FUSRAP sites are not comparable to those at this west Lake Site. Large-scale excavation of municipal trash and debris from a landfill presents much greater challenges than large-scale excavation of accessible soils from mostly surface locations.

EPA did receive an article circulated by Kay Drey about a portable shelter used at the Hanford site. This innovative shelter was used to facilitate targeted retrieval of drummed

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

wastes including transuranics and potentially pressurized drums, etc., from burial trenches. The primary purpose of this shelter is to protect workers from weather and temperature extremes. This allows workers in protective clothing to be more comfortable resulting in increased work time and productivity. Use of such a shelter would also protect against windblown migration of contaminants. The circumstances being addressed at the West Lake Site are not comparable to the Hanford situation. It is questionable whether this technology is useful or practicable for the circumstances at the Site where heavy excavation and earth moving equipment would be needed to perform the large-scale excavation of municipal trash from the Site.

**(6) & (7)** These comments have to do with being denied open dialogue meetings during the public comment period. See the response to the first comment in Dr. McKeel's first letter.

**(8)** The commenter continues to have questions about whether new groundwater studies are planned and why the ROD was delayed.

**Response:** As a result of EPA's review of the public comments regarding the groundwater data, EPA decided to present more extensive summary of the groundwater data and analysis in the ROD. This work required some additional time and is the primary reason for not meeting the September 2007 projection. There are no additional groundwater characterization studies planned except as they relate to the design and implementation of the long-term groundwater monitoring program.

**(9)** The commenter makes a series of points which are addressed as follows:

(a) These questions about the levee system, flood plain status, and the impact on the Selected Remedy have already been addressed.

(b) EPA developed a technical memorandum responding to Senator Bond's concerns. A copy is attached.

(c) See response to (8) above. The OU 1 ROD is the final planned ROD for the Site. There is no separate groundwater ROD planned for the Site. There is no evidence to support the commenter's claim that contaminated groundwater has migrated off-site. As indicated by the presence of radionuclides in the upgradient and background wells, these radionuclides are naturally occurring. The well that was located on the St. Louis Rams Training Center in Earth City was a background location. It is upgradient of the Site. There is no plausible hydrologic mechanism for this well to be impacted by contaminants migrating from the Site. The relatively high levels of gross alpha from this location could be indicative of shale bedrock in the area.

As has been addressed in a number of responses, the Selected Remedy will meet relevant and appropriate closure and post-closure care requirements. The landfill cover will provide the barrier to prevent water from contacting the waste material. This is the standard landfill method for limiting water percolation and preventing the ongoing

generation of leachate.  As explained in Number (2) above, the Site contains no hazardous waste and hazardous waste rules are not relevant and appropriate.  Long-term monitoring of the shallow groundwater underlying the waste will verify that groundwater is protected.

The OU 1 cap has not been designed yet.  As explained in Number (2) above, the cap will be of sufficient thickness to shield the gamma radiation; and the compacted clay component will also serve as a radon barrier.  In the same fashion as it was done at the Weldon Spring Site and mill tailing disposal sites, the landfill cover will be designed to act as a diffusion barrier for radon.  Rn-222 has a half life of 3.8 days.  Radon is continually produced from the radium source, but need only be detained in the cover materials for a few days before it decays to its solid progeny thereby eliminating significant emissions to the atmosphere.  After the cap is in place, radon measurements at the surface of the cap will be consistent with background.  The radon may also be vented or diverted to a gas control system.  The commenter is mistaken about the thickness of the Weldon Spring Site disposal cell cap.  The cap is actually 8.5 feet (2.6 meters) thick.  The upper 3.5 feet are a limestone rip rap layer.  The principal radon/infiltration barrier is a 3-foot thick layer of compacted low permeability clayey soil.  Likewise, the Site will be sufficient to meet the performance objectives.

## 6.  City of Bridgeton

The mayor and the city council of the city of Bridgeton, Missouri, passed a resolution asking EPA to recommend removal of the radioactive wastes from the Site.  The reasons cited include: the Site being located in a flood plain, the landfill is not a location designed to store radioactive waste, institutional controls do not solve the problem, and contamination will continue to spread.

**Response:**  EPA understands that the council's primary concern is for the safety of the public, and this resolution is intended to request the best solution possible for Bridgeton and the Site.  We want to assure the council that protection of human health and the environment is EPA's primary concern.  Based on extensive field study, we have every reason to believe that the Selected Remedy is and will be protective.  Following construction of the remedy, EPA will carefully monitor the Site over the long term to verify the performance of the remedy and demonstrate to the public that the contamination is not migrating.  We would like to point out that institutional controls are not being used to solve the problem but rather to augment the engineering solution.

## 7.  American Water Company

American Water Company (AWC) generally supports the Selected Remedy but submits comments to emphasize the importance of conducting rigorous long-term monitoring and implementing any necessary action to protect the Missouri River, a major source of St. Louis public drinking water.  AWC specifically requests the plan: (1) include measures to periodically test the Missouri River for radioactive materials, beginning with an initial test to establish baseline levels; (2) better delineate groundwater monitoring

activities and include specific plans to address any migrating contamination; and (3) include procedures for keeping the public, and specifically AWC and other drinking water purveyors in the area, informed of monitoring activities and results.

**Response:** EPA is in full agreement on the importance of rigorous long-term monitoring and taking any action necessary to protect the Missouri River. The primary objective of the Selected Remedy is to protect groundwater and surface water from ongoing or future impacts from the waste materials in the landfill. A long-term groundwater monitoring program will be designed and implemented to demonstrate that the remedy is protective of groundwater over time. The program will include a system of monitoring wells designed to intercept any potential migration to groundwater from the source materials. This will provide the best possible indicator of any potential contaminant migration. If monitoring shows any statistically significant deterioration in groundwater quality with time as a result of contaminant migration from Areas 1 and 2, appropriate response action will be taken including remedy change as necessary to protect the groundwater.

Monitoring plans and groundwater protection standards will be consistent with the requirements found in the Health and Environmental Protection Standards for Uranium and Thorium Mill Tailings (40 CFR 192 Subparts A and B) and the Missouri Solid Waste Rules for Sanitary Landfills [10 CSR 80-3.010 (11)].

Detailed monitoring plans requiring specific monitoring locations, sampling frequencies, parameters, sampling and analysis procedures, and evaluation approach will be developed as part of the remedial design/remedial action process. The community relations plan will include procedures for keeping the community informed of monitoring activities and results. These plans will be made available to AWC and other stakeholders. EPA will consider any comments AWC may have on how these plans can be improved.

## 8. **Missouri Department of Natural Resources**

MDNR provides assistance to EPA in its oversight role and provides review and comment on the Site's documents as they are developed. EPA consults with MDNR during the remedy selection process. MDNR provided a statement to be included in the ROD describing state acceptance of the remedy (see section 10.8 of the ROD). MDNR supports the Selected Remedy provided that the long-term care and monitoring is robust and durable. In addition, MDNR provided specific comments during the public comment period. The comments and EPA's responses are provided below.

**1.** For risk management purposes, EPA should provide estimates of the number of years needed to reduce toxicity, i.e., radioactivity, and the volume of radiological contamination below levels of health concern (using both dose assessment and risk assessment approaches).

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

**Response:** EPA does not believe the requested calculations would add anything useful to the analysis. It is sufficient to understand that the principal isotopes of uranium and thorium at the Site are extremely long lived. The half life of U-238 is 4.5 billion years or almost as long as the earth is old. For all intents and purposes, the radiological contamination will remain above levels of concern and would not allow for unrestricted use for as long as the landfill remains on the Site.

**2.** Due to the extremely long half lives of the radionuclides within the landfill, plans for carrying the remedy beyond the 30-year scope for Alternative L4 should be demonstrated to cover the estimated time needed to reduce the radioactivity below levels of concern.

**Response:** The Selected Remedy does not have a "30-year scope" nor do any of the alternatives that were evaluated. The expectation from the NCP is that the remedy will remain enforce for as long as contaminants remain on-site above levels that allow for unlimited use and unrestricted exposure. The 30-year evaluation period is used in the FS only to allow for present worth cost calculations and has nothing to do with the expected duration of the remedy. This is fully explained in the description of the Selected Remedy in the ROD.

**3.** The performance of the concrete rubble used in the final landfill cover design should be evaluated and reported to ensure integrity of the cap in perpetuity.

**Response:** Specifications for the concrete rubble layer will be developed in remedial design. MDNR will have full opportunity to review and comment. The specifications will be developed with longevity in mind. Performance standards for mill tailing sites (40 CFR 192) indicate that the design life should be 200 to 1,000 years.

**4.** Trigger criteria based on long-term monitoring data such as newly detected groundwater contamination should be set forth in the ROD which potentially requires additional investigation and/or remedy modification discussions. The five-year review events would be an effective tool in the collection and evaluation process for any such future decision-making events.

**Response:** Agree. The Selected Remedy identifies the groundwater protection standards in 40 CFR 192 and the Missouri solid waste rules as relevant and appropriate requirements. The "trigger" criteria are found in these requirements. In addition, the Selected Remedy provides that groundwater quality not degrade over time due to contaminants migrating from sources at Areas 1 and 2. Specific monitoring plans will be developed in the remedial design/remedial action implementation. MDNR will have full opportunity to review and comment. The five-year review event is an appropriate tool for identifying issues that could lead to remedy re-evaluation or remedy change.

**5.** To supplement the five-year reviews, an agreement with the U.S. Army Corps of Engineers and the Earth City Levee District should be developed to perform regular inspections and maintenance of the levee system surrounding the Site.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

**Response:**  Surveillance and maintenance plans will be developed as part of the remedial design/remedial action process.  MDNR will have full opportunity to review and comment.  It seems reasonable to incorporate coordination with the U.S. Army Corps of Engineers and the Earth City Levee District on levee inspection and maintenance in these plans.

THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

|  |  |
|---|---|
| MICHAEL DAILEY and ROBBIN DAILEY, | |
| Plaintiffs, | Case No. 4:17-cv-00024 |
| v. | |
| BRIDGETON LANDFILL, LLC, et al., | |
| Defendants. | |

## MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT PURSUANT TO APRIL 8, 2019 ORDER

Defendant Cotter Corporation (N.S.L.) ("Cotter") (improperly named as Cotter Corporation) submits this memorandum of law in opposition to Plaintiffs Michael Dailey and Robbin Dailey's ("Plaintiffs") Motion for Leave to File a Second Amend Complaint Pursuant to April 8, 2019 Order ("Motion"), ECF No. 157.

In their Motion, Plaintiffs request permission to file an "amended" complaint that would "essentially amount[] to a dismissal." ECF No. 156 at p. 3. Despite this Court's April 8, 2019 Memorandum and Order "question[ing] the propriety of 'amending' the operative complaint to omit the only claim that remains pending and over which the Court has subject-matter jurisdiction," *id.*, the Motion asks this Court to countenance that exact gambit. Plaintiffs admit as much. *E.g.*, Motion at p. 3, ¶ 12. Allowing Plaintiffs to dismiss their claim under the Price-Anderson Act ("PAA"), 42 U.S.C. § 2011 *et seq.*, and resurrect their state-law claims would prejudice Cotter and unduly delay this matter. The Motion thus fails under both Federal Rules of Civil Procedure 41(a) and 15(a).

-1-

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Further, the Motion—and the success of the larger scheme outlined therein—relies on Plaintiffs' position that the PAA would not preempt their proposed amended complaint's "state-law claims."  But as the overwhelming weight of federal authority has concluded, the PAA applies to nearly all claims alleging radiation-based injuries or damages, including the claims Plaintiffs will assert if the Motion is granted.  This is not Plaintiffs' first attempt to improperly manufacture state court jurisdiction based on these same arguments.  Indeed, Plaintiffs' Motion simply echoes the arguments advanced in their original Motion for Leave to Amend Complaint to Dismiss Price-Anderson Act Claims and Reinstate State Law Claims, to Remand, to Stay Pending Discovery or, Alternatively, to Amend Case Management Order (ECF No. 123).  Accordingly, Cotter incorporates by reference its April 10, 2018 Memorandum of Law in Opposition to Plaintiffs' Motion for Leave to Amend Complaint to Dismiss Price-Anderson Act Claims and Reinstate State Law Claims, to Remand, to Stay Pending Discovery or, Alternatively, to Amend Case Management Order ("April 10, 2018 Memorandum"), ECF No. 128, and the arguments set forth therein.  For these reasons, and those set forth below, this Court should deny the Motion.  Should this Court grant leave to amend, Cotter joins Bridgeton Landfill, LLC's request for interlocutory review pursuant to 29 U.S.C. § 1292(b), as set forth in Part V of their opposition brief, ECF No. 160, to allow appellate review of the PAA's preemptive scope.

## ARGUMENT

### I.    The Motion Fails to Address the April 8, 2019 Memorandum and Order, and Instead Seeks to Manufacture a Remand

This Court's April 8, 2019 Memorandum and Order cautioned Plaintiffs against pursuing the very relief they now seek.  ECF No. 156 at p. 3.  In their Motion, Plaintiffs ask for leave to eliminate their claim under the PAA, in a transparent attempt to deprive this Court of subject

matter jurisdiction and manipulate the forum in which Plaintiffs' claims are heard.[1] Motion at p. 3, ¶ 12 ("Plaintiffs' desire is to sue on state law claims in state court . . . ."). Less than one month ago, however, this Court "question[ed] the propriety of 'amending' the operative complaint to omit the only claim that remains pending and over which the Court has subject-matter jurisdiction." ECF No. 156 at p. 3. Yet Plaintiffs' Motion does not attempt to address this Court's concerns or explain how a dismissal-through-amendment strategy is appropriate. Rather, the Motion doubles down on Plaintiffs' rejected position that this Court lacks subject matter jurisdiction and makes clear that Plaintiffs' "desire is to sue on state law claims in state court . . . ." Motion at p. 3, ¶ 12. Plaintiffs' desire does not make amendment procedurally proper, and granting the Motion would condone such manipulative practices and prejudice Cotter.

Plaintiffs' apparent explanation for pursuing their dismissal-through-amendment strategy underscores its impropriety. They spend much time and paper blaming their prior counsel for "erroneously amend[ing]" their state court Petition to assert claims under the PAA. *E.g.*, Motion at p. 2; ECF No. 157-1 at p. 2. As an initial matter, however, prior counsel's "erroneous" amendment was no error: This Court has implicitly found that it has subject matter jurisdiction under the PAA. *E.g.*, ECF No. 89 at p. 13 ("Because [Plaintiffs] allege that [D]efendants 'caused damage to Plaintiffs' property and/or the loss of use of the Plaintiffs' property which constitutes a 'nuclear incident' or series of 'nuclear incidents' under the [PAA],' their amended complaint asserts a federal cause of action . . . that supplants all state causes of action."). Regardless, and as Cotter explained in its April 10, 2018 Memorandum, a change of counsel is not an adequate

---

[1] For all intents and purposes, Plaintiffs' proposed Second Amended Complaint (ECF No. 157-2) and their November 2016 state court Petition are identical. Aside from removing allegations against former defendants like Mallinckrodt, LLC, which were voluntarily dismissed from this matter by stipulation (*see* ECF No. 120) or otherwise, Plaintiffs are quite literally asking this Court for permission to rewind this matter back to 2016.

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

excuse for unravelling over two years of litigation in this forum. April 10, 2018 Memorandum at pp. 5-6; *see also* ECF No. 112 at 5. Plaintiffs' recycled change-of-counsel argument is especially unpersuasive where, as here, the Court and defendants have expended significant time and resources in moving this cause forward. *Id.* Indeed, at the time this action was stayed in June 2018, the parties were in the process of briefing summary judgment motions. *See, e.g.,* ECF Nos. 148, 149.

Further, the stated purpose of Plaintiffs' Motion is to deprive this Court of subject matter jurisdiction by eliminating their federal cause of action. *E.g.*, Motion pp. 3-4, ¶¶ 12-13. Permitting Plaintiffs to amend would thus facilitate their attempt to re-litigate their previously dismissed state-law causes of action in state court, but not before filing (and prevailing on) a contested motion to remand in this Court.[2] Granting Plaintiffs this procedural windfall would conflict with the Eight Circuit's general disapproval of such gamesmanship whereby plaintiffs dismiss claims to deprive defendants of otherwise proper federal jurisdiction. *See, e.g.*, *Donner v. Alcoa*, 709 F.3d 694, 699 (8th Cir. 2013). Because Plaintiffs are pursuing an improper amendment that disregards this Court's earlier warnings, the Motion should be denied.

## II. Plaintiffs' Motion Fails Under Rules 41(a) and 15(a)

### A. Plaintiffs' Motion Should Be Analyzed Under Rule 41(a), and Would Prejudice Defendants if Granted

Plaintiffs' memorandum in support of their Motion assumes without analysis that Federal Rule of Civil Procedure 15(a) applies in these circumstances. *See* ECF No. 157-1 at pp. 3-4. Plaintiffs are wrong. This Court has already observed that the "amendment" Plaintiffs seek would "essentially amount[] to a dismissal." ECF No. 156 at p. 3. Plaintiffs' Motion should accordingly be viewed as a motion for voluntary dismissal under Rule 41(a), rather than a motion

---

[2] Any future motion to remand that Plaintiffs might file under their dismissal-through-amendment strategy would fail for the reasons set forth in the April 10, 2018 Memorandum.

to amend under Rule 15(a).  Under Rule 41(a)'s standard, Plaintiff's Motion fails.

To deny a motion under Rule 41(a), this Court need only find "plain legal prejudice arising from the dismissal."  *Armstrong v. Adams*, 869 F.3d 410, 414 (8th Cir. 1989).  Although "plain legal prejudice" is not precisely defined in case law, courts generally consider the following factors: (1) the extent to which the action has progressed; (2) the movant's diligence in prosecuting the suit or bringing the motion; (3) the "duplicative expense" of re-litigating the matter; and (4) the adequacy of plaintiffs' explanation for the motion.  *See* 8 James W. Moore, *Moore's Federal Practice* § 41.40[6]; *see also U.S. v. Thirty-two thousand eight hundred twenty dollars & fifty-six cents ($32,820.56) in U.S. Currency*, 838 F.3d 930, 937 (8th Cir. 2016) ("*U.S. Currency*") (explaining that courts may consider whether party has presented a proper explanation for desire to dismiss claim and whether dismissal would result in waste of judicial time and effort).  In addition, the Eighth Circuit has stated its disapproval of permitting plaintiffs to voluntarily dismiss claims merely to deprive a defendant of otherwise proper federal jurisdiction.  *See, e.g.*, *Donner*, 709 F.3d at 699; *Thatcher v. Hanover Ins. Grp., Inc.*, 659 F.3d 1212, 1214-15 (8th Cir. 2011).

Here, granting Plaintiffs' Motion would substantially prejudice Defendants for at least three reasons.[3]  First, this matter has been pending in this Court since January 2017, after Plaintiffs initiated it in state court in November 2016.  During that time, the defendants have opposed Plaintiffs' attempts to remand, moved to dismiss Plaintiffs' initial pleading and Amended Complaint, answered the Amended Complaint, participated in case management conferences, engaged in settlement discussions, initiated and exchanged discovery, engaged in multiple meet and confers, and prepared (and taken) depositions of Plaintiffs' witnesses, and

---

[3] Those reasons set forth in Section I, *supra*, also show that Cotter would be significantly prejudiced if Plaintiffs' Motion were granted.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

were poised to file summary judgment briefs. These activities have caused Cotter (and this
Court) to expend considerable time and resources – prejudice that remains even if Plaintiffs'
hypothesis that "[s]tate court will save the parties' [sic] and the court resources" were true.
Motion at p. 3.

  Second, Plaintiffs' Motion comes "at a critical juncture in the case." Facing the prospect
of their sole remaining claim under the PAA being dismissed, Plaintiffs are attempting to create
state court jurisdiction where there is none and begin this case anew. Given the choice of filing
either a motion to dismiss this matter without prejudice or a renewed motion for leave to file a
Second Amended Complaint, Plaintiffs essentially chose neither, opting instead for a procedural
ploy aimed at forcing Cotter into state court. As this Court has explained, however, "[t]o the
extent the Daileys express their intent to resurrect their previously-dismissed state law claims
and pursue them in state court, this objective can be met by refiling their state claims in state
court upon the dismissal of this action without prejudice." ECF No. 156 at p. 3. The Daileys
made plain their intention to pursue their state law claims in state court, *e.g.*, Motion at p. 3 ¶ 12,
but chose the very procedural route against which this Court cautioned, ECF No. 156 at p. 3.

  Finally, Plaintiffs' Motion explicitly seeks to deprive this Court of subject matter
jurisdiction by eliminating their express federal cause of action. *E.g.*, Motion pp. 3-4, ¶¶ 12-13.
Far from "present[ing] a proper explanation for its desire to dismiss," *U.S. Currency*, 838 F.3d at
937, Plaintiffs actually acknowledge that they are attempting to dismiss through amendment for
an improper purpose. Granting Plaintiffs leave to proceed with their telegraphed plan would run
afoul of Rule 41(a) and Eighth Circuit law. *E.g.*, *Donner*, 709 F.3d at 699; *Thatcher*, 659 F.3d at
1214-15. Accordingly, this Court should analyze the Motion under Rule 41(a) and deny it.

### B.     Plaintiffs' Motion Also Fails Under Rule 15(a)

Assuming for the sake of argument that the Motion were a proper request for leave to amend (for a third time), Plaintiffs' undue delay, dilatory motives, bad faith, and the resulting prejudice to Cotter would also warrant denial under Rule 15(a).

"After an answer has been filed in response to the plaintiff's complaint, the plaintiff 'may amend the party's pleading only by leave of court . . . and leave shall be freely given when justice so requires.'" *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998) (quoting Rule 15(a)).  A motion for leave to amend should be denied, however, where there is "undue delay, bad faith or dilatory motive on the part of the movant, [and] undue prejudice to the opposing party by virtue of allowance of the amendment." *Id.* (internal quotation omitted).

Cotter's arguments in its April 10, 2018 Memorandum showing undue delay and dilatory motive apply *a fortiori* here, after another year has passed in this forum.  *See* April 10, 2018 Memorandum at pp. 5-6.  The history of Plaintiffs' position could cause whiplash:  Plaintiffs initially argued that the PAA did not apply to their alleged radiation injuries, but later amended their pleadings to assert claims under the PAA alongside state-law claims.  After all of their state-law based claims were dismissed as preempted by the PAA, Plaintiffs then moved to amend to withdraw their PAA claims while resurrecting their state-law claims.  Since the Court rejected this motion to amend, Plaintiffs again seek to withdraw their PAA claims and replead their state law claims, making no change to their substantive position, but simply attaching the proposed pleading that they omitted from their earlier motion.[4]  Plaintiffs should not be permitted to benefit from their pattern of delay and self-contradiction.

---

[4] This pleading, moreover, is defective, insofar as it fails to include the declaration of Richard B. Stewart relied upon by Plaintiffs, referenced as Exhibit 1 to the proposed amendment. *See* ECF. No. 157-1 at 6, n. 4.

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

Nor does Plaintiffs' purported change of counsel justify their abrupt shifts in strategy, as explained above. As a preliminary matter, this assertion is belied by the fact that current counsel, Barry Cooper, has been named counsel for Plaintiffs from the very beginning of this litigation. *See* ECF No. 1, Ex. A. pp. 47-48. In any event, Plaintiffs' reliance on this inadequate explanation shows that Plaintiffs lack a good-faith explanation for their current Motion. The Motion would also prejudice Defendants for the reasons set forth in Sections I and II. A., *supra*, and the April 10, 2018 Memorandum. Allowing Plaintiffs to eliminate a claim they now regret, while reasserting state law claims to try to secure a remand, would prejudice Cotter and waste additional time and resources. Moreover, Plaintiffs' proposed amendment would be futile. *Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 719 (8th Cir. 2014). The Court should deny Plaintiffs' Motion.

## III. Plaintiffs' Claims Are Subject to Exclusive Federal Jurisdiction Under the PAA

While we are dealing here specifically with a question of amendment of a pleading, because Plaintiffs have stated their intent to use this proposed amendment to strip this Court of jurisdiction, smoothing the path for their planned remand, discussion of the applicability of the PAA, and why this applicability renders Plaintiffs' proposed amendment futile, is necessary here. Indeed, the success of the Motion's telegraphed plan is contingent on Plaintiffs' position that the PAA does not apply if defendants lack an Atomic Energy Commission ("AEC") or Nuclear Regulatory Commission ("NRC") license or an indemnity agreement with the United States. The majority of federal courts to have analyzed that position have rejected it, however, concluding that the text of the PAA establishes no such requirement. *E.g.*, *Acuna v. Brown & Root, Inc.*, 200 F.3d 335, 339 (5th Cir. 2000) ("There is nothing [in the PAA's language establishing exclusive federal jurisdiction] which suggests it should be contingent on . . . whether

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

the facility is covered under the separate indemnification portions of the Act. . . .”); *Cotromano v. United Technologies Corp.*, 7 F. Supp. 3d 1253, 1257 (S.D. Fla. 2014) (“The plain language of the statute indicates that the possession of a license for radioactive material is unrelated to the jurisdiction issue.”); *see also* April 10, 2018 Memorandum, ECF No. 128, at 8-13. The Motion should thus be denied, because it is contrary to the PAA’s history, text, and applicable case law, and any amendment would be futile.

Since the PAA was enacted in 1957, the federal government has regulated the generation, processing, use, and handling of radioactive materials through a comprehensive federal scheme designed to preempt the states from regulating the health and safety aspects of essentially all radioactive materials. *See Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm’n*, 461 U.S. 190, 212 (1983); *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1240-45 (10th Cir. 2004); *see also Kerr-McGee Corp. v. Farley*, 115 F.3d 1498, 1508 (10th Cir. 1997) (“Hazards arising from atomic radiation were made a particularly federal concern, as to which the state had no authority to regulate.”). In 1988, Congress amended the PAA to create an exclusive and *retroactive* federal cause of action, called a “public liability action,” for any “public liability” arising from a “nuclear incident.” *El Paso Natural Gas Co. v. Neztsosie*, 526 U.S. 473, 477 (1999); *see also McClurg v. Mallinckrodt, Inc.*, 2015 WL 857455, at *6 (E.D. Mo. Feb. 27, 2015) (citing 42 U.S.C. §§ 2014 (hh), 2014(w); Pub. L. No. 100-408 § 20 (b)(1), 102 Stat. 1084 (“The amendments [governing judicial review of claims arising out of a nuclear incident] shall apply to nuclear incidents *occurring before, on, or after the date of the enactment of this Act*.”) (emphasis added)). The PAA defines “public liability” as “any legal liability arising out of or resulting from a nuclear incident . . . .” 42 U.S.C. § 2014(w).

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

Under the plain language of § 2014(hh), the PAA applies to "any suit asserting public liability," arising from a "nuclear incident." The definition of "nuclear incident" does not include any requirement that a defendant possess either a license or an indemnity agreement in order to trigger federal jurisdiction. 42 U.S.C. § 2014(q); *Acuna*, 200 F.3d at 339; *Cotromano*, 7 F. Supp. 3d at 1257. In contrast, since the PAA's 1988 amendment, courts throughout the country have consistently recognized that the PAA preempts state-law causes of action for nearly all injuries allegedly stemming from radioactive materials (like those the Motion requests leave to assert). *See Adkins v. Chevron Corp.* 960 F. Supp. 2d 761, 767 (E.D. Tenn. 2012) (finding that virtually every court to address the issue—including the Third, Sixth, Seventh, Ninth, Tenth and Eleventh Circuits—has held that the PAA "completely preempts state law causes of action for public liability arising out of or resulting from nuclear incidents"); *McClurg v. MI Holdings, Inc.*, 933 F. Supp. 2d 1179, 1186 (E.D. Mo. 2013). Indeed, consistent with the plain statutory text, courts have rejected efforts by plaintiffs since the 1988 amendment to limit or restrict the scope of federal jurisdiction under the PAA. *See, e.g.*, *Acuna*, 200 F.3d at 339 (rejecting attempt to limit PAA jurisdiction to indemnitees of United States); *Carey v. Kerr-McGee Chem. Corp.*, 60 F. Supp. 2d 800,804-06 (N.D. Ill. 1999) (rejecting attempt to limit PAA jurisdiction and recognizing that the term "nuclear incident" was intentionally defined broadly to avoid situation where defendants were left without a federal forum and were forced to defend against lawsuits "in various jurisdictions under various state laws").

Recently rejected efforts include attempts by plaintiffs to tie federal jurisdiction under the PAA to the possession of a license for radioactive material or an indemnity agreement with the United States. *See Cotromano*, 7 F. Supp. 3d at 1257 ("None of the statutory definitions limit the jurisdiction over nuclear claims to licensed activity."); *see also Estate of Ware ex rel. Boyer*

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

*v. Hosp. of Univ. of P.A.*, 73 F. Supp. 3d 519, 530 (E.D. Pa. 2014) (rejecting view "that the PAA is limited to nuclear incidents occurring at utilization and production facilities and other licensed facilities") (internal quotations marks omitted).  As courts have repeatedly explained in denying such efforts to graft unwritten conditions on federal jurisdiction, the PAA is "broad enough to create a federal forum for any tort claims even remotely involving atomic energy production.  The [PAA] on its face provides the sole remedy for the torts alleged."  *Farley*, 115 F.3d at 1504.

Notwithstanding this authority, Plaintiffs' plan to effectively dismiss this action through amendment would require this Court to further extend what Cotter respectfully submits is a mistaken interpretation of the scope of the PAA, as first set forth in *Strong v. Republic Services, Inc.*, 283 F. Supp. 3d 759 (E.D. Mo. 2017).[5]  In *Strong*, Judge Hamilton concluded that there cannot be federal jurisdiction under the PAA without a license or an indemnity agreement, and that Cotter's 1969 License does not create jurisdiction because it does not apply to uranium mill tailings (although, at the same time, Judge Hamilton declined to determine whether the radioactive materials in the landfill were, in fact, uranium mill tailings).  283 F. Supp. 3d at 772-774.  The statement in *Strong* that a nuclear indemnity or license is needed to establish federal jurisdiction under the PAA, however, is almost exclusively based on a district court opinion from New Jersey that the Third Circuit has since criticized and rejected.  *See id.* at 767-69 (acknowledging that *Gilberg v. Stepan Co.*, 24 F. Supp. 2d 325, 333 (D.N.J. 1998) was "recently criticized by" the Third Circuit in *Estate of Ware v. Hosp. of the Univ. of Penn.*, 871 F.3d 273 (3rd Cir. 2017)).  In other words, the case on which *Strong*'s foundation was built has been rejected in its own Circuit and elsewhere.  *See Estate of Ware*, 871 F.3d 273, 282-83 (3rd Cir.

---

[5] Because Cotter was not a party in *Strong* at the time of this opinion, it had no opportunity to brief the issues considered by Judge Hamilton concerning federal jurisdiction or Cotter's 1969 License.  In this matter, however, the Court has already considered PAA preemption and concluded that state-law claims are preempted by the PAA.  *See* ECF No. 89 at p. 13.

2017), *cert. denied sub nom. Boyer v. Hosp. of the Univ. of Pennsylvania*, 138 S. Ct. 2018 (2018); *Acuna*, 200 F.3d at 339 (noting *Gilberg*'s analysis and rejecting attempt to limit federal jurisdiction over claim for radiation injuries); *Carey*, 60 F. Supp. 2d at 806-07 (criticizing and declining to follow *Gilberg*); *Cotromano*, 7 F. Supp. 3d at 1258 (same).

In addition, both Judge Hamilton's 2017 decision in *Strong* and this Court's more recent interpretation of 42 U.S.C. § 2210 in *Kitchin v. Bridgeton Landfill, LLC,* 18-cv-672 (ECF No. 51) fail to take into account the part of the statute that expressly states that the AEC/NRC *may* require indemnity agreements, *but does not mandate that all source material license holders* hold such agreements. Specifically:

> Each license issued under section 2133 or 2134 of this title and each construction permit issued under section 2235 of this title *shall*, and each license issued under section 2073, *2093*, or 2111 of this title *may*, . . . have as a condition of the license a requirement that the licensee have and maintain financial protection of such type and in such amounts as the Nuclear Regulatory Commission (in this section referred to as the "Commission") in the exercise of its licensing and regulatory authority and responsibility shall require in accordance with subsection (b) of this section to cover public liability claims. Whenever such financial protection is required, *it may be a further condition of the license that the licensee execute and maintain an indemnification agreement* in accordance with subsection (c) of this section.

42 U.S.C. § 2210(a) (emphasis added).[6] Section 2093 (referenced above) pertains to source material licenses. Thus, indemnification agreements *may* be a condition for a licensee but are *not required* in every instance that the AEC issues a source material license.[7]

Cotter is not a party to *Kitchin*, but it has read this Court's recent opinion remanding that action to state court and respectfully submits that the Court's reasoning, like Judge Hamilton's decision in *Strong,* should not be extended here, and doing so would result in a holding at odds

---

[6] Since all activities occurred within the United States, provisions relating to activities or occurrences *outside* the United States (such as those found in 42 U.S.C. § 2014(q)) are not applicable here.

[7] Cotter was at all times relevant the holder of an AEC License, which authorized Cotter to process source material in anticipation of shipping it elsewhere. *See* ECF No. 64-1, Ex. D (License SUB-1022 issued to Cotter on December 31, 1969).

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

with congressional intent, the applicable statutory scheme, and Plaintiffs' own positions at various times throughout this litigation.

In significant part, Plaintiffs here have specifically alleged that "Cotter transferred source material from Latty Avenue to the West Lake Landfill without a license in violation of 42 U.S.C. § 2092." Am. Compl., ECF No. 70, ¶ 62. This referenced statutory provision expressly provides: "Unless authorized by a general or specific license issued by the Commission which the Commission is authorized to issue, no person may transfer or receive in interstate commerce, transfer, deliver, receive possession of or title to, or import into or export from the United States any source material after removal from its place of deposit in nature, *except that licenses shall not be required for quantities of source material which, in the opinion of the Commission, are unimportant*." 42 U.S.C. § 2092 (emphasis added). While Plaintiffs seek to artfully plead around the specific statutory references in their proposed Second Amended Complaint, the substance of the allegation is unchanged. *Compare, e.g.,* Am. Compl., ECF No. 70, ¶ 62 (above) *with* ECF No. 157-2, ¶ 59 ("Cotter failed to obtain a license from any governmental authority to transport radioactive mill tailings wastes to the West Lake Landfill…."). Although the latter allegation omits the specific reference to 42 U.S.C. § 2092 and tries to (incorrectly) change the characterization of the source material to "mill tailings," the result remains the same: If the disposal was of "unimportant quantities" (which it was), no license was required to dispose of the material at West Lake Landfill, even accepting Plaintiffs' allegation that West Lake Landfill is not licensed by the NRC.

According to 10 C.F.R. § 40.13, "Unimportant quantities of source material," disposal of source material is permitted if the mixture or compound consists of "less than one-twentieth of 1 percent (0.05 percent)" of the source material. This regulation has been in place since the 1960s.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

*See* 26 Fed. Reg. 284 (Jan. 14, 1961). The material allegedly transferred by Cotter to the Westlake Landfill contains less than 0.05 percent source material. *See, e.g.,* Remedial Investigation Addendum, West Lake Landfill – OU-1, at Section 6.1 (pp. 159-161), available at https://semspub.epa.gov/work/07/30352110.pdf (describing the LBSR as containing 0.05-0.1 percent source material *prior to* being combined with 39,000 tons of soil, which would have reduced this percentage by a further 22%, or to between 0.01%-0.02%). This material is an "unimportant quantity" that *did not require the issuance of a license* for its disposal at West Lake Landfill. In other words, Cotter held a source material license issued by the AEC (predecessor to the NRC); the material Cotter possessed was licensed source material; and Cotter's alleged transfer of some of that material to West Lake Landfill for disposal, which the NRC would have considered an unimportant quantity of source material under 10 C.F.R. § 40.13, did not require a license. The law specifically provides for this. *See* 42 U.S.C. § 2092.[8] Accordingly, the scope of the PAA adopted in *Strong* and *Kitchen* is narrower than what the statute provides. For the same reasons, Plaintiffs' allegations (whether the allegation at ¶ 59 of the proposed Second Amended Complaint, or ¶¶ 60 and 62 of the First Amended Complaint) that Cotter needed a license to transfer or dispose of these materials is beside the point, since no license was required for these unimportant quantities.[9] The proposed amendment to Plaintiffs' allegations does not alter the fact that these claims are subject to the PAA, and thus Plaintiffs' proposed amendment (particularly in light of their stated purposes of allowing for remand) is futile.

---

[8] Even today, the prevailing NRC regulations provide for several mechanisms whereby licensed material may be disposed of in an unlicensed facility. This activity does not destroy the applicability of the PAA to these materials.
[9] For the same reasons expressed herein, Judge Ross's opinion in *Banks v. Cotter Corporation, et al.*, 4:18-CV-00624, ECF No. 75, which also drew heavily upon Judge Hamilton's decision in *Strong,* is mistaken. Moreover, this Court's conclusion in *Kitchin* that "Cotter's Source Material License did not cover its delivery or transfer of the material to such unauthorized entities," *id.* at 20, does not account for the "unimportant quantity" exception, and instead makes factual findings concerning facts that have not been developed.

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

The Motion seeks permission to allege "state-law claims" against Cotter in name only. These purported "state law claims," if Plaintiffs are granted leave to assert them, will remain claims subject to exclusive federal jurisdiction under the PAA. Plaintiffs acknowledged this inconvenient truth at other points during this litigation, but now disclaim it because they "desire [] to sue on state law claims in state court[.]" Motion at p. 3, ¶ 12. Plaintiffs' position will fail and the Motion should be denied.

## CONCLUSION

This Court should reject Plaintiffs' attempt to turn back the clock to November 2016 to eliminate their express claims under the PAA. Granting the Motion would improperly allow Plaintiffs an attempt to restart this matter (in its pre-removal, pre-amendment, and pre-motion-to-dismiss form), following motion practice over an ill-conceived remand attempt. Cotter has expended significant resources defending this matter for over two years in this forum, and granting the Motion would prejudice it. In addition, the "state-law claims" that Plaintiffs seek to assert through an amendment would remain subject to exclusive federal jurisdiction under the PAA. For the foregoing reasons, Plaintiffs' Motion should be denied. Should this Court grant leave to amend, Cotter joins Bridgeton Landfill, LLC's request for interlocutory review pursuant to 29 U.S.C. § 1292(b).

Dated: May 20, 2019                                  Respectfully submitted,

                                                     /s/ John McGahren
                                                     MORGAN LEWIS & BOCKIUS, LLP
                                                     John McGahren, Esq. (ID 046791990N)
                                                     john.mcgahren@morganlewis.com
                                                     Stephanie R. Feingold. Esq. (ID 23182005N)
                                                     stephanie.feingold@morganlewis.com
                                                     502 Carnegie Center
                                                     Princeton, NJ 08540
                                                     (609) 919-6600 (telephone)

(609) 919-6701 (facsimile)

BRYAN CAVE LLP
Dale A. Guariglia, Mo. Bar 32988
daguariglia@bryancave.com
Erin L. Brooks, Mo. Bar 62764
erin.brooks@bryancave.com
One Metropolitan Square
211 N. Broadway, Suite 3600
St. Louis, Missouri 63102
(314) 259-2000 (telephone)
(314) 259-2020 (facsimile)

ATTORNEYS FOR DEFENDANT
COTTER CORPORATION (N.S.L.)

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

## CERTIFICATE OF SERVICE

I hereby certify that on May 20, 2019, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to counsel of record.

/s/ John McGahren

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

MICHAEL DAILEY, *et al.*,                    )
                                             )
        Plaintiffs,                          )
                                             )
    v.                                       )        Case No. 4:17 CV 24 CDP
                                             )
BRIDGETON LANDFILL, LLC, *et al.*,           )
                                             )
        Defendants.                          )

**REPLY MEMORANDUM SUPPORTING MOTION FOR LEAVE TO AMEND**

The issue is should the Dailey's be granted leave to reinstate their state law claims and remove their federal law claim so the case can then be remanded back to state court for adjudication where all of the other cases involving Cotter's illegal dumping, and the Landfill Defendants' possession of radioactive materials are now pending. Since March 2018 when plaintiffs originally requested leave to do so, this court in *Kitchin v. Bridgeton Landfill, LLC*, 4:18 CV 672 CDP, 2019 WL 2027649 (E.D. Mo. May 8, 2019) and Judge Ross in *Banks v. Cotter Corp.*, 4:18-CV-00624 JAR, 2019 WL 1426259 (E.D. Mo. Mar. 29, 2019) both concluded that federal question jurisdiction does not exist because the Price Anderson Act (the sole basis for removal) does not apply to Cotter and the Landfill Defendants conduct arising out of these radioactive wastes. These decisions conform with Judge Hamilton's decision in the *Strong v. Republic Services, Inc.*, 283 F. Supp. 3d 759 (E.D. Mo. 2017). The Eight Circuit just denied the Landfill Defendants' request for a permissive appeal in *Kitchin*.[1]

_____

[1] See Exhibit 1 attached hereto

4813-7627-9705, v. 1

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

The defendants raise many points in opposition, most of which were the subject of prior briefing.[2] To the extent the defendants wish to relitigate whether the Price Anderson Act ("PAA") applies, the Dailey's submit that the issue preclusion doctrine prevents it. But first, the claim of 'gamesmanship' requires attention.

There is no dispute, the Dailey's initial lead counsel abandoned them and before doing so incorrectly concluded this was a Price Anderson Act case despite Defendants not being participants in the Price Anderson Act insurance system. Undersigned counsel has always disagreed with that conclusion and at every opportunity made that disagreement known to this court and all parties.[3] And we have diligently continued to resolve the issue while at the same time spending tens of thousands of dollars to comply with the CMO which mandated a *Lone Pine* Price Anderson Act path.

The defendants deposed the plaintiffs obtaining information beyond the CMO designation, deposed one of plaintiffs' experts, and even deposed the technician who collected samples grilling him on such matters as how long did it take to obtain a dust sample from under the Daileys' refrigerator. Or, whether he knew the Daileys bought a new refrigerator since he took the sample (he did not).[4] The Daileys also produced all of the test data from the Dailey home and that obtained in and for the *Kitchin* case.[5] The Daileys further produced the declarations of their other experts, Dr. Phil Plato, demonstrating the dose exposures at the Dailey home violate federal standards and

---

[2] The issue of attorney Barry J. Cooper's presence in the case is set forth in Doc. 115 and 115-1
[3] Doc. 123
[4] Deposition of Shawn DeSilva p. 159 Exhibit 2.
[5] Docs 142-143

2

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Professor Richard Stewart, Esq.[6] demonstrating his expert legal analysis of the Price Anderson Act, mill-tailings, and the applicable standard of care were also produced.[7]

The Daileys were, during this same time, prevented from obtaining basic discovery from the defendants as every request was rebuffed based on the CMO. Other than their slim Rule 26 Disclosures, defendants have provided no information relative to their conduct or their alleged entitlement to Price Anderson Act coverage- such as proof of the requisite financial protection or the required indemnity agreement.

The Landfill Defendants have not always been resolute in their contention that the Price Anderson Act applies to their landfill having taken the position in the *Paulette M. Adams, et al., v. MI Holdings, Inc., et al*, Case No. 4:12-cv-00641-JCH case that the Price Anderson Act was "wholly inapplicable to Rock Road and Bridgeton Landfill, as the West Lake Landfill is not a nuclear facility subject to licensing by the Nuclear Regulatory Commission."[8] It even moved this court to consolidate the Dailey's suit with the *Strong* case, a request that was denied because *Strong* was remanded to state court while the consolidation motion was pending.[9] And then in the remanded *Strong* case, the Landfill Defendants added Cotter as a third-party defendant and removed again;[10] Judge Hamilton remanded again.[11]

In April 2018, the Landfill Defendants filed an Amended Disclosure of Organizational Interests to show that Rock Road Industries, Inc. merged into Bridgeton Landfill, LLC, meaning

---

[6] Defendants complain the Stewart declaration was not attached to the complaint; it has long been of record. If it was a true impediment surely, they would have requested a copy; they did not. It is Doc. 135 of record since April 24, 2018
[7] Doc. 135
[8] 4:12-cv-00641-AGF - Doc.15
[9] Docs. 83-84
[10] 4:17-cv-1645 Docs. 1, 2 & 14
[11] 4:17-cv-1645 Docs. 42-43

Rock Road, the owner of the landfill was no longer a Missouri corporation.[12] It is reasonable to conclude that the merger was to purposefully avoid litigating future cases about the landfill in state court. Defendants, like plaintiffs, can move and change their citizenship before suit is filed in order to effect diversity jurisdiction.[13] But parties cannot do so after the fact. The problem here is that because of the Price Anderson Act pleading by a prior attorney, which is obviously incorrect, the defendants would be allowed to create diversity post-removal based on now defunct federal-question jurisdiction. This is precisely why the Daileys seek reinstatement of the state law claims. A dismissal of this suit and a new state court suit would give the defendants the opportunity of removing again but this time based on diversity.

All economies including judicial resources that will be saved by having all matters in one courthouse would be lost. Having spent so much money on the Price Anderson Act proof, plaintiffs are very keen to avoid unnecessary expenditures. But more so, if leave is denied, this case will go forward on a law that does not apply.

The notion that a plaintiff cannot plead themselves out of federal court is not an absolute.[14] FRCP Rule 15 (a) requires that leave be freely given when justice so requires. Courts consider these factors when determining whether to grant leave (1) undue prejudice to the opposing party (2) undue delay (3) bad faith or dilatory motive; and (4) futility of amendment.[15]

<u>UNDUE PREJUDICE TO THE OPPOSING PARTY</u>

The defendants sought removal based on the Price Anderson Act, a law we now know does not apply to Cotter and Bridgeton under these circumstances. The rulings making that clear

---

[12] Doc. 133.
[13] Grupo Dataflux v. Altas Glob. Group, L.P. 541 U.S. 567, 570-71 (2004); Stevens v. Nichols, 130 U.S. 230, 231-32 (1889); 14C Charles Alan Wright and Arthur R. Miller, Federal Practices and Procedure § 2723
[14] Mary R. Fritz Revocable Trust v. Board of Zoning, 2009 WL 1578805 (E.D. Mo 2009)
[15] Id.

4813-7627-9705, v. 1

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

occurred during the pendency of this action, most recently June 6, 2019 when the Eight Circuit denied Bridgeton's permissive appeal in the *Kitchin* case. The record reveals that the defendants have been afforded an opportunity to learn all aspects of plaintiffs' claims and from their various experts, while the plaintiffs have been denied the opportunity to discover anything of the defendants and their defenses. Whatever the defendants' prejudice might be, the Daileys have also suffered prejudice and it is not unreasonable to think theirs was in fact greater.

### UNDUE DELAY

From March 2018 when plaintiffs sought this relief, the case, with the exception of defense-initiated discovery, has been stayed. The time the court took to resolve the plaintiffs' March motion was eleven months which was entirely commensurate with the complex issues presented. None of the work accomplished during this time period is a loss for the defendants (unlike plaintiffs). Defendants obtained discovery which can be used in state court. And none of the delay was specifically caused by plaintiffs or their present counsel.

### BAD FAITH OR DILATORY MOTIVE

It is incorrect to conclude that undersigned counsel was in bad faith or acting dilatory in seeking to ensure that the cause of actions asserted were correct under the facts and the law and that jurisdiction was proper. Defendants' contention that the Price Anderson Act applies to the Daileys' claim is simply incorrect. The Eight Circuit, the last court to weigh in, has concluded no grounds for a permissive appeal or appeal exist in a case involving identical facts and liability issues. The delay was caused by a legitimate legal dispute and nothing more. Seeking application of the correct law should not be interpreted as bad faith or dilatory actions.

4813-7627-9705, v. 1

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

FUTILITY OF AMENDMENT

Ordinarily, the question is whether the law allows a plaintiff a cause of action based on a certain set of facts. If not, there is no amendment. Here, the facts have always been the same; the question has been which law applies, Missouri's or the Price Anderson Act. We now know Missouri law applies. To deny the amendment would require the plaintiffs to put on evidence based on a law that does not apply. That is a futile act.

ISSUE PRECLUSION

Defendants seek to litigate the Price Anderson Act issue in this motion for leave. The record shows it was raised by defendants via a motion to dismiss that led to the first amended complaint alleging Price Anderson Act causes of action.[16] The court then ruled that when the Price Anderson Act is pleaded state law claims are preempted.[17] Plaintiffs' counsel changed and the March 2018 motion to reinstate was filed.[18] The question then is what effect this court's (and the Eight Circuit's) decision in *Kitchin* and Judge Ross's decision in *Banks* have on this case?

*Kitchin* is the same as the Daileys' case except for these inconsequential differences: Cotter is not named as a defendant, and it is a class action.[19] The actions, the damages, and the landfill are all identical.[20] *Banks* involves Cotter and not Bridgeton or the landfill.[21] It is a class action and the issue on the granted remand was whether the Price Anderson Act applied; Judge Ross concluded it did not.[22]

---

[16] Doc. 72
[17] Doc. 89
[18] Doc. 123
[19] 4:18-cv-00672 Docs. 12 & 13
[20] Id.
[21] 4:18-cv-00624 Docs. 5 & 6.
[22] 4:18-cv-00624 Doc. 75

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

Issue preclusion or collateral estoppel, precludes re-litigation of the same issue by the same parties.[23] But the issues must be the same, and "central to the fair administration of preclusion doctrine is the notion that a party will be bound only if it had an adequate opportunity or incentive to obtain a full and fair adjudication in the first proceeding."[24]

The factual allegations of negligence, misconduct, and tortuous behavior and the legal effect, if any, of Cotter's Source Material license is identical in *Kitchins*, *Banks*, and this case. The parties, though not always in the same case, are in fact the same. The operative facts are identical. The briefing was extensive and considered.[25] And now the Eight Circuit has had its say.[26]

The relevant holding in *Banks* was based on the *Strong* case concluding that Cotter's source License provided no basis for Subject Matter Jurisdiction:

> It is clear that the 1988 amendments were enacted to expand the scope of federal jurisdiction to a broader class of nuclear liability cases than those arising just from extraordinary nuclear occurrences as well as to provide for consolidation of those claims in federal court. However, in light of the Price Anderson Act's concerns related to liability limitation and indemnification, the Court is not convinced that the 1988 amendments were meant to extend the reach of the Price Anderson Act to activities not covered by applicable licenses or indemnity agreements. Defendants' construction overlooks the original purposes and framework of the AEA and the Price Anderson Act - to require those involved in the nuclear industry to obtain licenses and maintain financial protections. When faced with "competing preemption narratives," the Court has the "duty to accept the reading that disfavors preemption." Cook v. Rockwell Int'l Corp., 790 F.3d 1088, 1094 (10th Cir. 2015). Defendants further argue that Strong did not conclude that Cotter's 1969 source material license could not support jurisdiction under the Price Anderson Act. Rather, the court merely found that Cotter's license did not cover uranium mill tailings. Here, Plaintiffs assert that Cotter's license authorizing it "to receive, possess and import" uranium did not apply to the uranium mill tailings at issue. Defendants dispute that the material at issue was mill tailings. Like in Strong, the Court cannot conclude, based on the record before it, that the material was in fact mill tailings. If, as Plaintiffs contend, the material is uranium mill tailings, then consistent with the analysis in Strong, Cotter's 1969 Source Material License

---

[23] *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293 (2015); *Simmons v. O'Brien*, 77 F.3d 1093 (8th Cir. 1996).

[24] *Simmons*, 77 F.3d at 1095

[25] 4:18-cv-00624 Docs. 38, 39, 52-54, 4:18-cv-00627 Docs. 28, 39, 44-46,52

[26] See Exhibit 1.

Electronically Filed - St. Louis County - April 20, 2020 - 07:20 PM

could not have covered it because at the time the license was issued, the term "byproduct material" did not include uranium mill tailings. 283 F. Supp. 3d at 772-73. Moreover, Defendants have not established that Cotter's 1969 Source Material License authorizing it "to receive, possess and import" uranium covered their activities. The Court notes that Plaintiffs' amended complaint does not specifically allege the material at issue was uranium mill tailings. (See FAP at ¶ 89) ("[t]he radioactive contamination that has polluted [Plaintiff's property] and continues to threaten to further pollute [Plaintiffs' property] match the waste fingerprint (or profile) of the radioactive wastes generated in the processing of uranium ores in the St. Louis area.") at the sites involved in this case. Thus, Cotter's license does not provide a basis for federal subject matter jurisdiction.[27]

This court's decision in *Kitchen* concluded similarly:

> Defendants have failed to meet their burden of establishing federal subject matter jurisdiction for purposes of the Price Anderson Act and CERCLA. Further, Plaintiffs have met their burden of establishing that the local-controversy exception to CAFA jurisdiction applies in this case. Accordingly, this action must be remanded to state court. In light of this determination, I need not address Plaintiffs' argument that applying the Price Anderson Act to their claims would deprive them of due process.[28]

## DEFENDANTS REQUEST TO APPEAL

The recent decision in *Kitchin* reveals this is not a matter appropriate for appeal.[29]

Defendants request should be denied.

## CONCLUSION AND RELIEF REQUESTED

The Daileys respectfully submit that their motion for leave be granted, that they be permitted to reinstate their state law claims and then dismiss their Price Anderson Act claims.

Respectfully submitted,

*/s/ Celeste Brustowicz*
Stuart H. Smith (LSBA 17805), *Pro Hac Vice*
Barry J. Cooper, Jr. (LSBA 27202), *Pro Hac Vice*
Celeste Brustowicz (LSBA 16835), *Pro Hac Vice*
Victor T. Cobb (LSBA 36830), *Pro Hac Vice*
**COOPER LAW FIRM, LLC**
1525 Religious Street

---

[27] 4:18-cv-00624-JAR Doc. 75
[28] 4:18-cv-00672 Doc. 51.
[29] See Exhibit 1.

4813-7627-9705, v. 1

Electronically Filed - St Louis County - April 20, 2020 - 07:20 PM

New Orleans, Louisiana  70130
Phone:     504-399-0009
Facsimile:  504-291-1352
E-mail: ssmith@sch-llc.com
         bcooper@sch-llc.com
         cbrustowicz@sch-llc.com
         vcobb@sch-llc.com
*ATTORNEYS FOR PLAINTIFFS,*
*MICHAEL AND ROBBIN DAILEY*


## CERTIFICATE OF SERVICE

I hereby certify that on June 10, 2019, I electronically filed the foregoing document with

the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to

counsel of record.


*/s/ Celeste Brustowicz*
Celeste Brustowicz (LSBA 16835)

4813-7627-9705, v. 1