UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL DAILEY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:22 CV 116 CDP |
| | ) | |
| BRIDGETON LANDFILL, LLC, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>MEMORANDUM AND ORDER OF REMAND</u>

Defendant Cotter Corporation (N.S.L.) first removed this action from the

Circuit Court of St. Louis County, Missouri, in January 2017, invoking federal

question jurisdiction under the Price-Anderson Act (PAA), 42 U.S.C. §§ 2011, *et*

*seq.  See Dailey v. Bridgeton Landfill, LLC*, Case No. 4:17CV24 CDP (E.D. Mo.).

Finding that the PAA did not apply to plaintiffs' claims, I remanded the case in

March 2020 for lack of federal subject-matter jurisdiction.  (*Id.*, ECF 186.)  In

January 2022, Cotter Corporation again removed the case from State court, again

invoking federal question jurisdiction under the PAA based on a recent decision by

the Eighth Circuit Court of Appeals, *In re Cotter Corp. (N.S.L.)*, 22 F.4th 788 (8th

Cir. 2022).[1]  Plaintiffs move to remand, arguing *inter alia* that not all required

---

[1] In Case No. 4:17CV24, I concluded that federal jurisdiction under the PAA required that the
alleged unlawful conduct must have arisen from activities licensed by the Nuclear Regulatory

bases for PAA jurisdiction are present or met in this case.  For the following reasons, I agree and will remand the case back to State court for lack of federal subject-matter jurisdiction.  Because this Court lacked subject-matter jurisdiction as of the date of removal, I do not have the requisite jurisdiction to rule the third-party defendants' motion to sever the third-party complaint from plaintiffs' action. That motion is therefore reserved to be ruled in State court upon remand.

The background of this case is thoroughly set out in this Court's Memoranda and Orders entered in Case No. 4:17CV24 (*see* ECF 89, 186).  I incorporate the background set out in those Memoranda and Orders as if fully set forth herein. Additional background is provided as needed to address the parties' arguments.

The following background and summary of the PAA is largely taken from Senate Report No. 100-70 addressing the Price-Anderson Amendments Act of 1988.  S. Rep. No. 100-70, 1988 U.S.C.C.A.N. 1424, 1988 WL 169872.

The Price-Anderson system is a comprehensive, compensation-oriented system of liability insurance for Department of Energy (DOE) contractors and Nuclear Regulatory Commission (NRC) licensees operating nuclear facilities. Under the Price-Anderson system, there is a ready source of funds available to

---

Commission (NRC) or under a contract with the Department of Energy (DOE) with agreements of indemnification.  Given that neither NRC-licensed activity nor a DOE indemnity agreement was alleged to be involved in this case, I remanded the case back to State court for lack of jurisdiction under the PAA.  In *In re Cotter Corp.*, however, the Eighth Circuit held that an indemnity agreement is not a prerequisite for jurisdiction under the PAA.  22 F.4th at 796.

- 2 -

compensate the public after an accident, and the channeling of liability to a single entity and waiver of defenses insures that protracted litigation will be avoided.  In short, the PAA provides a type of "no fault" insurance, by which all liability after an accident is assumed to rest with the facility operator, even though other parties (such as subcontractors or suppliers) might be liable under conventional tort principles.

The PAA was enacted in 1957 as an amendment to the Atomic Energy Act (AEA) of 1954.  The purpose of the AEA was to open up nuclear development to civilian industry.  But because of the risk of extensive liability potentially facing entities in the event of a nuclear accident, civilian response to the AEA was limited.  Accordingly, to remove this deterrent to private participation in the development of nuclear energy, Congress passed the PAA to 1) assure adequate public compensation in case of a nuclear accident, and 2) set a limit on the liability of private industry.  As enacted, the PAA established liability limits for commercial power plants licensed by the Atomic Energy Commission (AEC) (now licensed by the NRC) through a combination of private insurance and indemnification by the federal government.  For contractor-operated activities of the AEC (now contractor activities of the DOE), liability limits were established by federal indemnification alone.[2]

_____

[2] With the Energy Reorganization Act of 1974 (ERA), Congress abolished the AEC and created

- 3 -

When enacted in 1957, the PAA provided federal-question jurisdiction over "extraordinary nuclear occurrences" only.  An "extraordinary nuclear occurrence" was defined in the AEA as "an occurrence '[t]hat has resulted or probably will result in substantial damages to persons offsite or property offsite.'"  S. Rep. No. 100-70, 15, 1988 U.S.C.C.A.N. 1424, 1427.  Therefore, unless diversity jurisdiction existed, most nuclear-exposure claims were litigated in State court.  *See* Nathan White, *Arguments Not Raised: How the Plaintiffs' Missed Opportunity Led to the Tenth Circuit's Decision in June v. Union Carbide Corp.*, 2011 B.Y.U. L. Rev. 245, 248 (2011).  With the renewal of the PAA in 1966, Congress required licensees and contractors to waive traditional defenses of State tort law against claims of an extraordinary nuclear occurrence in order to facilitate recovery by plaintiffs.  S. Rep. No. 100-70, 15, 1988 U.S.C.C.A.N. 1424, 1427.

In 1975, Congress added a provision to the PAA to phase out federal indemnity for NRC licensees and replace it with a self-insurance pool-type arrangement.  Under this arrangement, in the event that damages from a commercial nuclear power plant accident were likely to exceed the coverage available from private insurance, each NRC reactor licensee would be assessed up

the NRC, to which some of the AEC's duties were transferred, including all of the AEC's licensing functions.  All licenses previously issued by the AEC and in effect upon ERA's passage remained in effect.  Pub. L. No. 93-438, 88 Stat. 1233 (1974).  The ERA also created the Energy Research and Development Administration (ERDA), which assumed the AEC's research and development responsibilities.  *Id*.  In 1977, the ERDA was terminated and its responsibilities were transferred to the newly-created DOE.  *See* Department of Energy Organization Act, Pub. L. No. 95-91, 91 Stat. 565 (1977).

to a capped amount to pay a pro-rated share of the damages in excess of private insurance available.[3]  For such accidents, therefore, the limited liability plan consisted of a combination of the maximum amount of private insurance and contributions made by each of the reactor licensees.  The federal-indemnification plan remained in place for DOE contractors for DOE-contractor-related accidents. S. Rep. No. 100-70, 15, 1988 U.S.C.C.A.N. 1424, 1428.  However, whether to enter into indemnification agreements with such contractors was at the Energy Secretary's discretion, based on the Secretary's determination as to whether the contractor's activities involved the risk of public liability for a "substantial" nuclear incident.[4]

In 1988, Congress passed the Price-Anderson Amendments Act ("1988 PAA"), which, among other things, removed the Energy Secretary's discretion to indemnify DOE contractors.  Under the 1988 PAA, federal indemnification to DOE contractors was now required for all nuclear activities, regardless of whether the risk of a nuclear incident was "substantial" or not.  The purpose of this amendment was to guarantee to the public that the Price-Anderson system would be available to provide compensation in the event of a nuclear incident. Accordingly, the DOE was now mandated to "enter into agreements of

---

[3] Licensees were required to provide proof to the NRC that they had the maximum amount of private nuclear liability insurance.  S. Rep. No. 100-70, 43, 1988 U.S.C.C.A.N. 1424, 1452.

[4] *See Dep't of Energy Rep. to Congress on the Price-Anderson Act* (March 1999), *available at* https://www.energy.gov/sites/prod/files/gcprod/documents/paa-rep.pdf.

indemnification . . . with any person who may conduct activities under a contract with the Department of Energy that involve the risk of public liability[.]"  42 U.S.C. § 2210(d)(1)(A).  *See also* 48 C.F.R. §§ 950.7006, 952.250-70.  With these mandated agreements, the DOE was charged with providing indemnification to such persons on claims for public liability that "arise[] out of or in connection with the activities under [the DOE] contract" and "arise[] out of or result[] from a nuclear incident[.]").  48 C.F.R. § 952.250-70(d)(2).

The 1988 PAA amendments also broadened federal jurisdiction beyond just "extraordinary nuclear occurrences" – that is, those occurrences involving "substantial" damages – and created a federal cause of action for "any public liability action arising out of or resulting from a nuclear incident."  42 U.S.C. § 2210(n)(2).  The amendments also provided that such public liability actions filed in State court were to be removed to federal court.  *Id*.

"With respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place, . . . shall have original jurisdiction without regard to the citizenship of any party or the amount in controversy."  42 U.S.C. § 2210(n)(2).  A "public liability action" is "any suit asserting public liability."  42 U.S.C. § 2014(hh).  And "public liability" means "any legal liability arising out of or resulting from a nuclear incident[.]"  42 U.S.C. § 2014(w).  Accordingly, only suits

that involve "nuclear incidents" as defined by the PAA are subject to PAA federal-question jurisdiction.  *See Cook v. Rockwell Int'l Corp.*, 790 F.3d 1088 (10th Cir. 2015); *Cotroneo v. Shaw Env't & Infrastructure, Inc.*, 639 F.3d 186 (5th Cir. 2011).  As defined in the 1988 PAA, a "nuclear incident" is

> *any occurrence*, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, *arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material*. . . .

42 U.S.C. § 2014(q) (emphasis added).

The operative complaint in this action that provided the basis for Cotter Corporation's most recent removal to this Court (ECF 7) specifically alleges that plaintiffs' injuries were caused by Cotter Corporation's transport and disposal of radioactive "mill tailings wastes" at the West Lake Landfill in 1973.[5]  Although Cotter Corporation argues that mill tailings are "byproduct material" under the PAA, mill tailings were not considered to be or regulated as "byproduct material" until 1978 when Congress expanded the definition under Title II of the Uranium Mill Tailings Radiation Control Act of 1978 (UMTRCA) to include uranium and thorium mill tailings.  PL 95-604 (HR 13650), Nov. 8, 1978, 92 Stat. 3021.  *See* 42

---

[5] "[P]rocessing uranium ore involves three steps:  mining, milling, and storing 'tailings.'  *Mining* is the extracting of uranium ore from the ground; *milling* is the process of turning the substance into a usable form; and *tailings* are the leftover radioactive waste that must be safely stored." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1916 (2019) (Roberts, C.J., dissenting).

U.S.C. § 2014(e)(2).

Before Congress enacted UMTRCA in 1978, mill tailings "lay outside the AEC's statutory licensing authority and therefore beyond its regulatory reach." *Kerr-McGee Chem. Corp. v. U.S. Nuclear Regulatory Comm'n*, 903 F.2d 1, 3 (D.C. Cir. 1990). Accordingly, "[t]he AEA made no provision for regulating waste materials generated during the extraction or concentration of source material." *Id.* at 2. It was not until 1978 when Congress "brought mill tailings within the NRC's licensing authority by adding a new category to the AEA's definition of byproduct material, namely, 'the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content.'" *Id.* at 3 (quoting 42 U.S.C. § 2014(e)(2)). This expanded definition came about upon federal and state authorities' realization that wastes, or "mill tailings," resulting from the extraction or concentration of source material posed a significant public health problem. *Id.*

Cotter Corporation's alleged conduct here involving mill tailings wastes occurred in 1973, five years before UMTRCA was enacted. The UMTRCA states, however, that except as otherwise provided by 42 U.S.C. § 2014, the amendments made by Title II of the Act "shall take effect on the date of the enactment of this Act." PL 95-604 (HR 13650), Nov. 8, 1978, 92 Stat. 3021, Title II, Sec. 208. "[C]ongressional enactments . . . will not be construed to have retroactive effect

unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). *See also Univ. of Iowa Hosps. & Clinics v. Shalala*, 180 F.3d 943, 951 (8th Cir. 1999). Because UMTRCA's language does not require retroactive effect of mill tailings being considered as federally-regulated byproduct material – and indeed explicitly counsels against it – the material at issue in this case, mill tailings wastes, was neither byproduct material nor regulated as such by the NRC until 1978, several years after the alleged wrongful conduct in this action.

Given that there is no retroactive effect to Title II of UMTRCA, the mill tailings wastes plaintiffs claim Cotter Corporation transported and disposed of in 1973 were not "source, special nuclear, or byproduct material" at the time of the alleged occurrence in this action. The occurrence therefore did not and could not arise out of or result from hazardous properties of such material. Accordingly, there was no "nuclear incident" as defined to bring this action under the PAA. This Court therefore does not have federal subject-matter jurisdiction under the PAA, and the case must be remanded to State court.

Given that this Court did not have federal subject-matter jurisdiction when this case was removed from State court, I do not have jurisdictional authority to consider the third-party defendants' motion to sever. *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 291 (1938) (court reviews State-court petition pending at time of removal to determine existence of subject-matter jurisdiction);

*Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) ("Without jurisdiction the court cannot proceed at all in any cause.").  That motion is therefore reserved for ruling by the State court upon remand.

Accordingly,

**IT IS HEREBY ORDERED** that plaintiffs' Motion to Remand [32] is **GRANTED**.

**IT IS FURTHER ORDERED** that defendant Cotter Corporation (N.S.L.)'s Motion for Oral Argument [60] is **DENIED as moot**.

**IT IS FURTHER ORDERED** that this action is **REMANDED** to the Circuit Court of St. Louis County, Missouri, from which it was removed.  Third-party defendants' Motion to Sever [65] is reserved for ruling by that court.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 6th day of July, 2022.